UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | CRIMINAL NO. 21-cr-399 (RDM) |
| v. | : | |
| | : | |
| ROMAN STERLINGOV, | : | |
| | : | |
| Defendant. | : | |

**GOVERNMENT'S REPLY IN SUPPORT OF**
**<u>MOTION FOR PROTECTIVE ORDER</u>**

The United States of America, by and through its attorney, the Acting United States Attorney for the District of Columbia, respectfully submits the following Reply in Support of Motion for Protective Order:

**<u>Background</u>**

1. This case involves a multi-year investigation into the one of the most sophisticated and longest-running bitcoin money laundering services on the darknet, Bitcoin Fog. Bitcoin Fog operated as a bitcoin "tumbler" or "mixer" service.[1] It was accessible through a Tor hidden service, on what is commonly referred to as the darknet.[2] As a bitcoin tumbler, Bitcoin Fog

---

[1] The virtual currency bitcoin (abbreviated "BTC") is a form of value that is able to be transacted over the Internet using Bitcoin software. This software provides all necessary services including allowing users to create "bitcoin addresses," roughly analogous to anonymous accounts; the injection of new bitcoin into circulation; and securely transferring bitcoin from one bitcoin address to another. For security and privacy reasons, it is common for a single bitcoin user to control numerous bitcoin addresses, which are stored and controlled in a "wallet." Each address is controlled through the use of a unique "private key," akin to a password. "Conventionally, the Bitcoin network and its protocols are referred to with a capital B, while the units transmitted on the network are referred to with a lowercase b." *United States v. Harmon*, 474 F. Supp. 3d 76, 81 (D.D.C. 2020).

[2] *See Harmon*, 474 F. Supp. 3d at 82 ("The Darknet is a collection of hidden websites accessible only through anonymization software that obscures users' internet protocol addresses by filtering their traffic through a network of relay computers called the Tor network.") (internal quotations and alterations omitted); *In the Matter of the Search of One Address in Washington, D.C., Under Rule 41*, 512 F. Supp. 3d 23, 25-26 (D.D.C. 2021) ("Darknet marketplaces frequently act as 'the Amazon for contraband.' To access darknet marketplaces, users must download anonymizing software called 'The Onion Router' (also referred to as 'Tor'). Tor-based websites anonymize internet activity by routing a user's communications through a global network of relay computers (or proxies), thus effectively masking the internet-protocol ('IP') address of the user.") (internal quotations and alterations omitted).

allowed users to send bitcoins to designated recipients in a manner designed to conceal and obfuscate the source of the bitcoins.  Since Bitcoin Fog's launch in or about October 2021, investigators have traced more than 1.2 million BTC transactions through Bitcoin Fog—the equivalent of more than $335 million at the times of the transactions.  The largest senders through Bitcoin Fog were darknet markets that primarily trafficked in illegal narcotics and other illegal goods.  *See* ECF No. 1-1 (Statement of Facts in Support of Crim. Compl.), at 1-2.

      2.      The defendant went to extraordinary lengths to conceal his identity as the administrator of Bitcoin Fog.  He created a fictitious persona, Akemashite Omedetou, to announce the launch of Bitcoin Fog and to register the original Clearnet domain for the site, www.bitcoinfog.com.  This persona was operated by means of a "burner" email address, shormint@hotmail.com, that was registered with a fake name and accessed via a Virtual Private Network (VPN) service.  The defendant paid for the Clearnet domain through a six-layered transaction involving four forms of fiat and virtual currency (euros, U.S. dollars, BTC, and Liberty Reserve Dollars), three virtual currency payment services (Mt. Gox, Aurum, and Liberty Reserve), and accounts registered with three different burner email accounts (including shormint@hotmail.com, nfs9000@hotmail.com, and kolbasa99@rambler.ru).  *See* ECF No. 1-1, at 7-9.

      3.      Bitcoin Fog charged a variable fee of 2% to 2.5% on each transaction.  Those fees, representing the proceeds of the illegal money laundering and money transmitting business, were retained within the cluster of bitcoin addresses associated with Bitcoin Fog and then periodically withdrawn.  Investigators obtained records of the defendant's true-name accounts at several cryptocurrency exchanges.  Analysis of the defendant's accounts revealed the vast majority of

cryptocurrency deposited into his accounts was originally sourced and traced back to the Bitcoin Fog cluster. *See* ECF No. 1-1, at 11.

4. Since the defendant was presented for his Initial Appearance and Arraignment in the District of Columbia on June 23, 2021, and defense counsel appointed, the government has worked diligently to produce the substantial volume of discovery in this case. The government attempted to negotiate in good faith with defense counsel on an appropriate protective order. After initial negotiations reached a standstill, the parties agreed (by email dated July 15, 2021) that the government could proceed with discovery and that any materials so produced would be considered covered nunc pro tunc by any protective order subsequently entered in the case.

5. Since that date, the government has electronically produced more than 8 gigabytes of records, including investigative records produced by FBI and IRS-Criminal Investigation, records of undercover transactions, grand jury subpoena returns, electronic search warrant returns, and more. The FBI records alone include 52 FBI reports (FD-302s, *etc.*) with 59 attachments in a variety of native electronic formats, including Microsoft Excel spreadsheets, html files (readable on a web browser), image files, zip files containing collections of images, and various Microsoft Word and text files. Other discovery includes more than 10,000 unique files in a variety of file formats.

6. Of the discovery produced to date, *not one* record has been designated by the government as "sensitive."

### Request for Protective Order

7. Federal Rule of Criminal Procedure 16(d) authorizes this Court to issue any appropriate protective order for good cause. As the proponent of the proposed order, the government bears the burden of showing that good cause exists. *United States v. Dixon*, 355 F.

Supp. 3d 1, 4 (D.D.C. 2019). Courts have recognized a variety of interests that can support entry of a protective order, including "where the disclosure of discovery could jeopardize the national security of the United States, compromise an ongoing investigation, or infringe on the privacy of uncharged third parties and others associated with a case." *United States v. Concord Management & Consulting LLC*, 404 F. Supp. 3d 67, 75 (D.D.C. 2019). "Protective orders are used 'not only to resolve individual discovery disputes, but also to expedite the flow of discovery in cases involving a large amount of sensitive information.'" *United States v. McCaughey*, 2021 WL 1564463, at *2 (D.D.C. Apr. 21, 2021) (quoting *United States v. Johnson*, 314 F. Supp. 3d 248, 252 (D.D.C. 2018)).

8. Much of the discovery in this case comprises complex electronic records and financial records, including records pertaining to the defendant's online aliases and "burner" accounts. The government has *not* marked these records as sensitive, as the government does not view them as third-party information. However, to the extent the defendant intends to disclaim ownership over these accounts, future discovery pertaining to the accounts could present a significant volume of arguable third-party personal and financial information. It is also unknown to what extent the defendant may have used real identity information belonging to other persons in the operation of his scheme; such discovery would also be appropriately marked as sensitive.

9. Further, while the majority of defendant-specific discovery has already been produced,[3] the government anticipates that additional discoverable materials may be identified and produced in the course of trial preparation. Such materials might include records relating to

---

[3] Forensic examination of the defendant's seized electronic devices is ongoing, and the government anticipates making further discovery of those electronic records.

potential trial witnesses, or records relating to the darknet markets or individual darknet vendors that used the defendant's bitcoin money laundering service, Bitcoin Fog. Some of these records may include sensitive financial information, personally identifiable information, or other sensitive information pertaining to third parties or potential witnesses. They may also include records relating to ongoing investigations of other darknet vendors, market administrators, or other criminal subjects. The government therefore seeks the ability to designate such materials as "sensitive" under the proposed Protective Order.

10. The proposed Protective Order provides for the production and use of "sensitive" materials in a manner that is consistent with the protective orders entered across the wide run of criminal cases in this District, including all of the prosecutions related to the attack on the U.S. Capitol on January 6, 2021. Under the proposed Protective Order, the defendant is free to personally review all of the discovery produced in the case, *including* "sensitive" materials. *See* ECF No. 13-1, ¶ 8. The defendant is only restricted from retaining "sensitive" materials in his personal possession. *Id.* ¶ 9. Instead, "sensitive" materials must be maintained in the custody and control of defense counsel and members of the defense team, including retained experts. *Id.*

11. As an additional concession, based on concerns articulated by the defense, the government proposed an additional term in the proposed Protective Order that obligates the government to provide redacted copies of any discovery for the defendant's use, upon request by the defense, to the extent practicable. *See* ECF No. 13-1, ¶ 10.

12. The government respectfully submits that its proposed Protective Order, including its general protections for all discovery material (which are undisputed) and the additional protections for the subset of materials considered "sensitive," represents an appropriate balance of the defendant's need for expeditious discovery and the government's concerns about maintaining

the integrity of ongoing investigations and the privacy interests of uncharged third parties or potential witnesses in the case. *See Concord Management*, 404 F. Supp. 3d at 75. Accordingly, good cause exists to enter the proposed Protective Order.

13. The defense has refused to compromise with the government, and now takes the maximalist position that there should be no protective order at all, or that it should be stripped of any protections for "sensitive" materials. ECF No. 15, at 3. Instead, the defense proposes that the government be required to pre-redact all of its discovery and that no other protections for "sensitive" discovery should exist. *Id.* at 3-4.

14. The defendant's counterproposal does not represent a practical solution. First, there may be situations where defense counsel and the defendant wish to review unredacted discovery, and perhaps even contest the government's redaction decisions. *See Concord Management*, 404 F. Supp. 3d at 74 ("[S]uch orders permit defendants to review the documents without prior censorship or redaction by the Government and avoid subsequent discovery disputes involving issues like claims of privilege and wrongful redactions.") (internal quotations and alterations omitted). Indeed, the government previously understood that the basis for the defendant's objection was his desire to personally review *unredacted* discovery.

15. Second, many electronic records are not easily redactable, and redactions could result in the exclusion of key metadata that may be important evidence. For example, to redact data from an Excel spreadsheet, the government would have to print the file to a pdf image and manually redact fields containing "sensitive" information. The resulting image file would lose important functionality and—depending on the number of fields—could be practically unreadable. Furthermore, producing the redacted PDF rather than the original Excel spreadsheet could deprive the defendant of the opportunity to review the original file's metadata and other properties. In

some instances, this metadata may contain key evidence in the government's case. In other cases, the excluded data could be considered *Brady*—for example, if an incriminating file was recovered from the defendant's server but the metadata suggests that the defendant did not create or never modified the file. Failing to produce the raw, unredacted file in its original form to defense counsel could place the government in conflict with its *Brady* obligations. To take another example, Google search warrant returns (such as the warrant return for the defendant's heavydist@gmail.com burner account, or the return for a possible testifying cooperator's account) are typically produced in the form of a compressed zip file, accompanied by a business records declaration that authenticates the production and references file hash values. The zip file contains multiple files of varying formats, often saved in nested .zip files within the original .zip file. This creates an internal directory that is necessary to navigate and locate files within the overall production, and also makes it impossible to extract and redact individual records without altering the hash value of the production file. Furthermore, redacting the underlying records would likely require converting each individual email to another file format – losing metadata that may be highly relevant – and necessitate individually redacting the sensitive information contained within potentially tens of thousands of pages of largely non-sensitive emails and attachments. Redacting evidence retrieved from forensic images of electronic devices presents similar challenges.

   16. While the above-noted issues may be addressed when it comes time to prepare and introduce individual trial exhibits—which would involve a smaller universe of records and, ideally, would come after stipulations between the parties or litigation before the Court to resolve authenticity issues—it would be impracticable and potentially prejudicial to the defense to pre-redact every single record in discovery.

17.     The defense exaggerates the imagined burdens of the proposed Protective Order. First, nowhere does the defense acknowledge the substantial volume of discovery that has already been produced, or the fact that *none* of it, to date, has been designated as "sensitive." The government anticipates that "sensitive" discovery will amount to a relatively small share of the total discovery in this case. Second, defense counsel will retain unfettered access to "sensitive" discovery and be able to show it to the defendant and discuss it freely with him. *See United States v. Cordova*, 806 F.3d 1085, 1091 (D.C. Cir. 2015) (upholding protective order that restricted defendant from reviewing *Jencks* material outside the presence of defense counsel or staff, where "defense counsel had full and unfettered access to the Jencks materials at all relevant times, and the protective order did not otherwise limit their ability to discuss the materials with Appellants or to obtain their input"). Third, the government's proposed accommodation, offering to provide redacted copies of discovery upon defense request and to the extent practicable, should resolve most of the defendant's legitimate concerns.[4] The government's good faith in this matter should be evident from its decision to go forward with discovery prior to reaching agreement on the protective order, the numerous modifications to the government's standard protective order that have been offered in response to defense feedback, and the government's judicious use of the "sensitive" designation to date. Finally, to the extent the defendant's concerns arise from the fact of his pretrial detention at Northern Neck Regional Jail (and not from any of the terms of the proposed Protective Order), the government supports and joins in any request to move the defendant to D.C. Jail or to the Alexandria Detention Center.

---

[4] The defendant argues (at 2-3) that requesting redacted documents would "reveal[] attorney work product to the government," but it is highly speculative that merely asking for a redacted copy of a document—an inherently ambiguous act—would actually reveal anything meaningful about the defendant's trial strategy or otherwise prejudice his defense.

WHEREFORE, the government respectfully moves for entry of its proposed Protective Order, docketed at ECF No. 13-1.

                              Respectfully submitted,

                              CHANNING D. PHILLIPS
                              ACTING UNITED STATES ATTORNEY
                              D.C. Bar No. 415793

BY:    */s/ Christopher B. Brown*
         Christopher B. Brown, D.C. Bar No. 1008763
         Assistant United States Attorney
         U.S. Attorney's Office for the District of Columbia
         555 4th Street, N.W.
         Washington, D.C. 20530
         (202) 252-7153
         Christopher.Brown6@usdoj.gov

         */s/ C. Alden Pelker*
         C. Alden Pelker, Maryland Bar
         Trial Attorney, U.S. Department of Justice
         1301 New York Ave., N.W., Suite 600
         Washington, D.C. 20005
         (202) 616-5007
         Catherine.Pelker@usdoj.gov