**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **CRIMINAL NO. 21-cr-399 (RDM)** |
| **v.** | : | |
| | : | |
| **ROMAN STERLINGOV,** | : | |
| | : | |
| **Defendant.** | : | |

**GOVERNMENT'S OPPOSITION TO DEFENDANT'S**
**MOTION TO REVOKE DETENTION ORDER**

The United States, by and through its attorney, the Acting United States Attorney for the

District of Columbia, respectfully files its opposition to the Defendant's Motion, Pursuant to 18

U.S.C. § 3145(b), For Revocation of His Pretrial Detention, ECF No. 17.   In support whereof,

the government states as follows:

**FACTUAL BACKGROUND**

As summarized by the sworn agent affidavit in support of the criminal complaint in this

case (the "Affidavit"), ECF No. 1-1, which is incorporated by reference herein, the defendant is a

sophisticated cyber criminal who operated one of the darknet's largest and longest-running money

laundering services, Bitcoin Fog, for nearly a decade with impunity.   Bitcoin Fog functioned as

a bitcoin "tumbler" or "mixer" service.[1]   It was accessible through a Tor hidden service, on what

is commonly referred to as the darknet.[2]   As a bitcoin tumbler, Bitcoin Fog allowed users to send

---

[1]  The virtual currency bitcoin (abbreviated "BTC") is a form of value that is able to be transacted over the Internet using Bitcoin software. This software provides all necessary services including allowing users to create "bitcoin addresses," roughly analogous to anonymous accounts; the injection of new bitcoin into circulation; and securely transferring bitcoin from one bitcoin address to another. For security and privacy reasons, it is common for a single bitcoin user to control numerous bitcoin addresses, which are stored and controlled in a "wallet."   Each address is controlled through the use of a unique "private key," akin to a password.   "Conventionally, the Bitcoin network and its protocols are referred to with a capital B, while the units transmitted on the network are referred to with a lowercase b."   *United States v. Harmon*, 474 F. Supp. 3d 76, 81 (D.D.C. 2020).

[2]  *See Harmon*, 474 F. Supp. 3d at 82 ("The Darknet is a collection of hidden websites accessible only through anonymization software that obscures users' internet protocol addresses by filtering their traffic through a network of

bitcoins to designated recipients in a manner designed to conceal and obfuscate the source of the bitcoins.   Bitcoin Fog was launched in or about October 2011 and remained operational through the date of the defendant's arrest on April 27, 2021.   Investigators have traced more than 1.2 million BTC transactions through Bitcoin Fog—valued at more than $335 million as of the date of the individual transactions.   Bitcoin Fog specifically catered to illegal darknet markets, trafficking in illegal narcotics and other goods, which accounted for the largest volume of transactions sent through Bitcoin Fog.   *See* ECF No. 1-1, at 1-2.



**Figure 1:   Bitcoin Fog Tor site**

---

relay computers called the Tor network.") (internal quotations and alterations omitted); *In the Matter of the Search of One Address in Washington, D.C., Under Rule 41*, 512 F. Supp. 3d 23, 25-26 (D.D.C. 2021) ("Darknet marketplaces frequently act as 'the Amazon for contraband.'   To access darknet marketplaces, users must download anonymizing software called 'The Onion Router' (also referred to as 'Tor').   Tor-based websites anonymize internet activity by routing a user's communications through a global network of relay computers (or proxies), thus effectively masking the internet-protocol ('IP') address of the user.") (internal quotations and alterations omitted).

### 1.   Launch of Bitcoin Fog

Bitcoin Fog's launch was announced in an October 27, 2011 posting titled "[ANNOUNCE] Bitcoin Fog: Secure Bitcoin Anonymization" on the BitcoinTalk.org online forum.   The announcement was posted by a user with the pseudonym Akemashite Omedetou (Japanese for "Happy New Year") and included links to a clearnet website for Bitcoin Fog (www.bitcoinfog.com),[3]  the Tor onion site (http://foggeddriztrcar2.onion), and a Twitter feed for updates on the site (www.twitter.com/#!/@Bitcoinfog).   The announcement post described Bitcoin Fog as a tool to make it difficult for "interested parties, be it authorities or just interested researchers" to trace users' bitcoin transactions across the Bitcoin network.   The post explained how Bitcoin Fog's mixing service worked to obscure transactions: "using our service you mix up your bitcoins in our own pool with other users' bitcoins, and get paid back to other accounts from our mixed pool, which, if properly done by you can eliminate any chance of finding your payments and making it impossible to prove any connection between a deposit and a withdraw inside our service."   *See* ECF No. 1-1, at 2.

---

[3]  The clearnet site provided a referral link to the Tor onion site and some explanatory material.   Bitcoin Fog's mixer service was only accessible via Tor.



**Figure 2:   Bitcoin Fog announcement on BitcoinTalk.org (excerpt)**

The announcement post further stated that Bitcoin Fog operated exclusively on the Tor network in order to evade the "authorities," and promised that Bitcoin Fog would "not cooperate" with any authorities: "For security purposes, the service operates through the Tor network only. . . . [T]his also makes us feel more secure, knowing that we will never be found and dealt with by proper authorities. . . . [W]e can say with high certainty that not only will we not cooperate with any authorities, the authorities will not actually be able to show up at our doorstep, because finding a tor doorstep has proven difficult."

For security purposes, the service operates through the Tor network only. You can be sure your data is processed securely and only by our server if you use our .onion address. On the other hand, this also makes us feel more secure, knowing that we will never be found and dealt with by proper authorities. (Even if Tor network would be compromised, we have taken all the necessary precautions to still stay hidden.) This is better for you as well; while a freenet service may swear on not cooperating with authorities in case they show up at their homes, we can say with high certainty that only will we not cooperate with any authorities, the authorities will not actually be able to show up at our doorstep, because finding a tor doorstep has proven difficult.

**Figure 3:   Bitcoin Fog Announcement on BitcoinTalk.org (excerpt)**

After announcing the launch of Bitcoin Fog, the pseudonym Akemashite Omedetou continued to post on BitcoinTalk.org, extolling the anonymizing features of Bitcoin Fog and providing updates on the service.   For example, on or about November 11, 2011, in response to an online comment that questioned a design feature of Bitcoin Fog, Akemashite stated: "should we make it easier…to do statistical analysis on our payouts…to help[ing] them start finding our

bitcoin client? (that could only be done by an authority of course…) We won't make their life easier."   ECF No. 1-1, at 2.

In another post, dated on or about February 9, 2012, Akemashite responded to a comment from a poster about using mainstream Bitcoin exchanges to mix virtual currency. Akemashite stated: "most of them [exchanges] are also run as legitimate, visible businesses, which will be forced to reveal information about your funds, should such a request be made by the authorities…us on the other hand, the authorities have to find first, which, as Silk Road[4]  have [sic] demonstrated, can prove problematic."   ECF No. 1-1, at 2.

In another post, dated on or about March 9, 2014, Akemashite responded to a comment from a poster asking about the "Shared Coin" feature offered by a mainstream wallet hosting provider, Blockchain.info.   Akemashite contrasted "Shared Coin" with his service, Bitcoin Fog, by suggesting that Bitcoin Fog was designed for "washing" bitcoins and noting, negatively, that Blockchain.info would cooperate with authorities: "Blockchain is a public company and is required by law to comply with anti- money laundering laws, as well as revealing user information and logs, should the law require that."

---

[4]  At the time of the post, Silk Road was still operating as the largest darknet marketplace, openly peddling large volumes of illegal narcotics and other criminal goods and services.   The site was seized by law enforcement and its administrator was arrested in 2013.   He was convicted at trial and is currently serving a life sentence.

Title: Re: [ANNOUNCE] Bitcoin Fog: Secure Bitcoin Anonymization
Post by: Bitcoi2n2n on March 07, 2014, 07:49:27 PM

Are there any objective advantages to blockchains Shared Coin feature?

Title: Re: [ANNOUNCE] Bitcoin Fog: Secure Bitcoin Anonymization
Post by: Akemashite Omedetou on March 09, 2014, 02:44:36 PM

And once again big number of deposits have caused delays in our service.
We have no excuse really, instead still working on improving it and making sure our
security layer does not cause these delays in the future, that it can handle larger and
larger number of users.
Currently everything is running on schedule.

As for
Quote
> Are there any objective advantages to blockchains Shared Coin feature?

We would personally never use them as the only step in the washing. Blockchain is a
public company and is required by law to comply with anti- money laundering laws, as
well as revealing user information and logs, should the law require that.

**Figure 4: BitcoinTalk.org messages**

The Twitter account @BitcoinFog was established on or about October 27, 2011, the date

on which Bitcoin Fog was launched.   The @BitcoinFog account regularly posted updates

regarding the status of the Bitcoin Fog hidden service, including tweeting a link on November 14,

2014, to http://foggeddriztrcar2.onion, the current hidden services address for Bitcoin Fog.   ECF

No. 1-1, at 2.

The @BitcoinFog account also tweeted links to stories discussing why users should tumble

bitcoins – to thwart law enforcement.   For example, on or about September 13, 2017, the

@BitcoinFog account tweeted a link to a story about the IRS using blockchain analysis software

to track bitcoin.   ECF No. 1-1, at 2.



**Figure 5: BitcoinFog Twitter posting**

On or about June 11, 2019, @BitcoinFog tweeted a link to a Europol press release announcing the law enforcement takedown of Bestmixer.io, another Bitcoin mixer/tumbler, commenting: "This is why you need to use ONLY a Tor-based mixing service (Such a surprise)." ECF No. 1-1, at 2.



**Figure 6: BitcoinFog Twitter post**

### 2.   Coordination with the Darknet Market Agora

Bitcoin Fog had a particularly close relationship with the darknet market Agora, which was one of the darknet's largest illegal marketplaces selling illegal narcotics and other goods.   When Agora was first launched in or about December 2013, Bitcoin Fog sent out an advertisement to its own users in order to drive traffic to the new illegal market.   One Reddit user posted about the Bitcoin Fog/Agora cross-promotion on or about December 5, 2013, stating that he found a referral to Agora when he logged into his Bitcoin Fog account.



**Figure 7: Reddit post about Bitcoin Fog referral to Agora**

Another user on the Agora forum (using the moniker "weed4you") posted the full text of an advertisement for Agora found on the Bitcoin Fog site.   The advertisement from Bitcoin Fog (which appears to have been decrypted using PGP encryption) stated that it was being sent on behalf of "former team members" of Bitcoin Fog who had created the new darknet market, Agora. It continued by vouching for the security features of the new marketplace, showing awareness that Agora was intended to traffic in illegal goods and services: "The marketplace is operated by associates of ours in whom we have complete trust both in terms of not being a honeypot (if they were, we would be in jail) and in terms of their security expertise . . . ."   The advertisement went on to compare Agora to Silk Road, the first major darknet marketplace to specialize in online drug trafficking,[5] noting that "we are big fans of the original Silk Road freedom-based libertarian

---

[5]  *See United States v. Ulbricht*, 31 F. Supp. 3d 540, 549 (S.D.N.Y. 2014) ("The Indictment here alleges that Ulbricht designed, created, operated, and owned Silk Road, 'the most sophisticated and extensive criminal marketplace on the Internet.'   Silk Road operated using Tor, software and a network that enables users to access the Internet anonymously—it keeps users' unique identifying Internet Protocol ('IP') addresses obscured, preventing surveillance or tracking. All purchases occurred on Silk Road using Bitcoin, an anonymous online currency. Silk Road allegedly functioned as designed—tens of thousands of buyers and sellers are alleged to have entered into transactions using the

policy and looking around the other markets that have reincarnated from the ashes of the giant, it seems that few have that particular purpose in mind."

postSubject: [info] Who is behind AgoraMarket ?

*t*postText: Who is behind Agora? There is some info i found on bitcoin fog (bitcoin tumbler service) which I didnt find there. After all bad thinks that happened last months its atleast somethink good that we might be on good market for next months, but only time will show. Quote from Bitcoin Fog: "-----BEGIN PGP SIGNED MESSAGE----- Hash: SHA256 Bitcoin Fog: we are sending this message on behalf of our former team members. We would like to invite you to a beta test of a new marketplace: Agora. The marketplace is operated by associates of ours in whom we have complete trust both in terms of not being a honeypot (if they were, we would be in jail) and in terms of their security expertise (they have helped us to overlook even our own security and found issues which helped us to prevent hacks and stay operational for as long as we have). It is sad to see that there are so many scammers around that that create marketplaces with the purpose of stealing the money. We think that besides the obvious damage they undermine the trust the community has for the technology stack itself (Tor+Bitcoin+Secure marketplace), creating this idea that it is somehow impossible to operate a stable marketplace for a long time. Here at Bitcoin Fog we have at least shown that operating a service like that is both possible and viable economically to do for a long time, as opposed to running away with the first deposits. Additionally we are big fans of the original Silk Road freedom-based libertarian policy and looking around the other markets that have reincarnated from the ashes of the giant, it seems that few have that particular purpose in mind. We shall try to change that. The marketplace is about 90% feature-complete and needs real life usage to configure the servers to the load as well as finish the functionality that is most needed. As such, the number of users that can register at this point is limited, since the load is very hard to predict. However we encourage you to try it out and help us to get it fully functional. (All the current functions work, but many more features are needed.) The marketplace is going to employ a referral program: if you refer to another vendor and he registers with your link, you are going to receive 20% of fees we collect from that vendor for every order he makes, with no time restrictions. For the normal users that you refer to the service, you are going to receive 10% of the fee we collect from their EVERY order placed with ANY other vendor. This is partly the reason it might pay up to register early: you can have most referrals and make a lot of money in the end. Being referred does not imply any losses for the referred users or vendors. Your share is coming from our own fees which would be collected in any case. Basically we want the community to make money as well as us, thus creating a plethora of users who are actually interested in making the service the best it can be, by providing feedback. The standard fee taken on each order (and from which the referral percentages are calculated) is 4%. To become a vendor we require a 0.2 BTC deposit which is held by the service and is used in case you will try to scam users. The deposit shall be increased in the future. Address of the service: http://agorabasakxmewww.onion Forums to discuss the service issues: http://i4rx33ibdndtqayh.onion To make sure your referrals are more inclined to use your link, we have currently disabled non-referral registrations. To register you can use this link: http://agorabasakxmewww.onion/register/hjFvNUz1WM -----BEGIN PGP SIGNATURE----- iF4EAREIAAYFAlKfhrAACgkQdmYE0rvhrkqYZgD/S3iyY5/ZVOs6yD0TB2hMQyNU kmctdzUIupsFQctkzWYBAKmVBjyo3+NivF4UDTzpLjesPeYXk8hzsS2RcffnQ02c =Tqe1 -----END PGP SIGNATURE----- "

*t*posterName: weed4you

**Figure 8: Bitcoin Fog advertisement for Agora posted by user on Agora forum**

---

site, violating numerous criminal laws. Over time, thousands of kilograms of heroin and cocaine were allegedly bought and sold, as if the purchases were occurring on eBay or any other similar website.") (internal citation omitted).

On or about December 27, 2013, Akemashite posted to BitcoinTalk.org implying that the programmers behind Agora were assisting Bitcoin Fog in resolving a technical issue that had arisen with the Bitcoin Fog site.

Title: **Re: [ANNOUNCE] Bitcoin Fog: Secure Bitcoin Anonymization**
Post by: **Akemashite Omedetou on December 27, 2013, 01:20:53 PM**

> We acknowledge the problem and shall resolve this matter with any users involved (please contact us on the Fog). If there were any unauthorized withdrawals we shall reverse them. It seems we have now localized the problem. We would like to thank the good hackers at Agora for their help once again.

**Figure 9: BitcoinTalk.org message**

As described in further detail below, Agora market accounted for the largest identifiable share of transaction volume on Bitcoin Fog, totaling more than $14,398,745.73 in bitcoin transactions from Agora to Bitcoin Fog, and another $8,680,430.34 in bitcoin transactions from Bitcoin Fog to Agora.   *See* ECF No. 1-1, at 4.

### 3. Blockchain Analysis Shows Bitcoin Fog Catered to Darknet Markets Trafficking in Illegal Narcotics and Ransomware Operators

As the Affidavit explains, using blockchain analysis, law enforcement confirmed that over 1.2 million BTC (valued at approximately $335,809,383 at the time of the transactions) have been sent through Bitcoin Fog since the site was launched in 2011.   This figure includes BTC from various sources: all direct and indirect transactions from sources such as darknet markets; funds stolen from bitcoin addresses through hacks; direct deposits and withdrawals from Bitcoin wallets; sends and receives from wallets not apparently affiliated with a known hosted service; and other unknown sources.   IRS-CI cyber analysts reviewed all inputs and outputs from Bitcoin Fog to identify bitcoins sent directly to Bitcoin Fog from known darknet markets and bitcoins sent from Bitcoin Fog to known darknet markets.   IRS-CI's analysis determined Bitcoin Fog received

11

approximately 486,861.69 BTC (approximately $54,897,316.44 at the time of the transactions) *directly* from darknet markets.   Bitcoin Fog sent approximately 164,931.13 BTC (approximately $23,690,956.28 at the time of the transactions) *directly* to darknet markets.   In sum, Bitcoin Fog sent or received more than $78 million in transactions involving known darknet markets, counting only direct transactions.   *See* ECF No. 1-1, at 3-4.

Among these, IRS-CI cyber analysts identified direct deposits into Bitcoin Fog from at least 35 darknet markets. Below are the top five markets by U.S. dollar value of deposits:[6]

| Source Market | Total Received (BTC) | Total Received (USD) |
|---|---|---|
| Agora Market | 41,966.87 | $14,398,754.73 |
| Silk Road 2.0 Market | 22,863.74 | $12,518,636.97 |
| Silk Road Marketplace | 377,102.74 | $9,556,159.49 |
| Evolution Market | 11,100.79 | $3,199,542.15 |
| AlphaBay Market | 5,442.86 | $2,907,508.67 |

IRS-CI cyber analysts identified funds sent directly from Bitcoin Fog to at least 51 different darknet markets. Below are the top five markets by dollar value of sends:

| Destination Market | Total Sent (BTC) | Total Sent (USD) |
|---|---|---|
| Agora Market | 26,398.12 | $8,680,430.34 |
| Silk Road 2.0 Market | 11,274.21 | $5,871,831.33 |
| Silk Road Marketplace | 106,522.77 | $2,289,509.42 |
| Evolution Market | 6,473.24 | $1,860,053.75 |
| AlphaBay Market | 3,375.90 | $1,557,931.95 |

Darknet markets exist primarily to traffic in illegal narcotics and other illegal goods and services—a fact well-known among darknet market users and administrators, and intended by the

---

[6]  The U.S. dollar value is calculated as of the date of each BTC transaction.   Because the price of BTC has fluctuated significantly since Bitcoin Fog first became operational in or about October 2011, the tables presented above do not show a consistent exchange rate between BTC and U.S. dollars.

administrators.    That the darknet markets listed above primarily traffic in illegal narcotics and other illegal goods and services would be apparent to anyone using the markets because the categories listed on each market, and the majority of specific listings, openly discuss illegal goods and services.    ECF No. 1-1, at 4-5.

In addition to darknet markets, Bitcoin Fog was a top mixer for laundering the proceeds of ransomware payments.    According to FBI analysis of ransomware payments between October 1, 2013, through November 7, 2019, Bitcoin Fog was one of the top mixers to receive direct transfers from ransomware actors, totaling $517,787 during the timeframe of the study.    In 2016, researchers from Arizona State University found that Bitcoin Fog played a significant role in laundering ransomware proceeds associated with the ransomware tool CryptoLocker in and around late 2013 and early 2014: "In [Community 1], we see a clear indication that the CryptoLocker threat actors decide to use Bitcoin mixers, particularly Bitcoin Fog, to launder their proceeds." Kevin Liao, *et al.*, *Behind Closed Doors: Measurement and Analysis of CryptoLocker Ransoms in Bitcoin*, Proceedings of the 2016 APWG Symposium on Electronic Crime Research (eCrime) (June 2016), at 10, available at https://ieeexplore.ieee.org/document/7487938.

### 4.   Undercover Transactions

During the investigation, law enforcement agents from the Internal Revenue Service, Criminal Investigation (IRS-CI) conducted undercover transactions through Bitcoin Fog while physically located in the District of Columbia.    Beginning on or about September 11, 2019, an IRS-CI agent created a Bitcoin Fog account and sent approximately 0.02488936 BTC (valued at approximately $249.99) from an IRS-CI controlled covert wallet into a wallet address provided by Bitcoin Fog.    The agent was never asked for any identifying information, such as email account,

13

date of birth, social security number, passport number, or any other proof of identification, when creating an account.   The deposit was credited to the agent's Bitcoin Fog account, and the agent successfully directed another transaction from Bitcoin Fog to another IRS-CI controlled covert receiving wallet.   Blockchain analysis confirmed that the bitcoin deposited by the agent went to the known Bitcoin Fog clusters, and that the bitcoin received into the covert receiving wallet was sourced from known Bitcoin Fog clusters.   *See* ECF No. 1-1, at 5.

On or about November 19, 2019, an IRS-CI agent initiated another transaction by sending approximately 0.01173987 BTC to Bitcoin Fog from an IRS-CI controlled undercover account on the Apollon darknet market.   Apollon was a darknet market known to sell illegal narcotics, stolen PII, and other illegal items.   The deposit was credited to the agent's Bitcoin Fog account.   *See* ECF No. 1-1, at 5.

Further on or about November 19, 2019, after confirming the deposit of funds from Apollon Market had been credited to the agent's Bitcoin Fog account, the agent sent the message below to the Bitcoin Fog administrator using the messaging function on the Bitcoin Fog site, stating the funds were the proceeds of illegal narcotics sales.   The agent stated, "i created my account to clean my coins from selling ecstasy," and added that "I sold molly on apollon and ive been selling on WSM and dream," referring to the darknet markets Wall Street Market and Dream Market.   The agent further stated: "I need help cleaning my bitcoin and I dont trust the big mixers after best mixer."   *See* ECF No. 1-1, at 6.

**Message history:**

(Answers from our crew appear here.)

(You can also wipe the message history (not undoable)).

**fatkitty11:**

hello, i need help.

i created my account to clean my coins from selling ecstasy. I sold molly on apollon and ive been selling on WSM and dream but all the exit scams and cops got me spooked. Im new to this and im worried im gonna get caught.

I need help cleaning my bitcoin and I dont trust the big mixers after best mixer. Bitcoin fog has been around forever you you guys must be doing something right. I have more coins i need cleaned but how do i know I can trust you??? People on bitcoin talk say your a scam.

**Figure 10: Message sent to Bitcoin Fog administrator by undercover agent**

On or about November 21, 2021, the agent again accessed the agent's Bitcoin Fog account. There was no response to the agent's message. The agent successfully directed another transaction from Bitcoin Fog to an IRS-CI controlled covert receiving wallet. Blockchain analysis of the transaction validated that the send and receive transactions involved known Bitcoin Fog clusters. At no point did the Bitcoin Fog administrator prevent the deposit of funds from Apollon or prevent the withdrawal of funds after the funds were represented to be the proceeds of illegal drug sales. *See* ECF No. 1-1, at 6.

There is significant evidence that Sterlingov reviewed and responded to support messages submitted by Bitcoin Fog users, such as the message submitted by the IRS-CI agent. In posts to BitcoinTalk.org, Akemashite made multiple references to reading such messages, including the following:

- On or about January 16, 2016, Akemashite responded to a complaint from a BitcoinFog user claiming that he was missing funds and had not received a response from BitcoinFog support.   Akemashite stated: "We haven't received any complaints for that exact amount lately, and we have been answering to messages regarding the outages which happened during these latest delays."

- On or about March 16, 2014, in response to a complaint on BitcoinTalk, Akemashite stated: "You have already spammed our support page with your messages claiming we steal somebody's money," indicating that he was aware of the messages being sent to support.

- On or about March 13, 2014, Akemashite stated: "We are STILL responding to many support messages from the last week, as we haven't been able to process them all yet."

- On or about December 27, 2013, Akemashite responded to a comment about withdrawal issues and asked that users "please contact us on The Fog."

- On or about August 5, 2013, Akemashite explained the value of communicating through BitcoinFog's support system: "We have the support form on the website which we have been using for all customer contacts. We trust that form much more than any other external service, forum or mail server, since that way we don't have another link in the compromization [*sic*] chain that could become the weakest."

- On or about December 3, 2012, Akemashite explained, "We have been handling all the support through the secure contact form on the hidden service, so we haven't been checking this thread."

16

**5.  Attribution of Bitcoin Fog to Sterlingov**

Through analysis of bitcoin transactions, financial records, Internet service provider records, e-mail content, and additional investigative information, U.S. authorities identified the principal operator of Bitcoin Fog as Sterlingov.

Early in the investigation, identifiers connected Bitcoin Fog to the pseudonym Akemashite Omedotou and the email account shormint@hotmail.com.   As noted above, Bitcoin Fog's launch was announced in a posting on the BitcoinTalk.org forum on or about October 27, 2011 by a user called Akemashite Omedetou.   Records from BitcoinTalk.org for the account associated with Akemashite Omedetou revealed that the account was created on or about October 25, 2011, using email address shormint@hotmail.com.   The account registration information included the website title "Bitcoin Fog" and website URL http://www.bitcoinfog.com.   *See* ECF No. 1-1, at 7.

| | |
|---|---|
| User ID: 44692 | Personal text: None |
| Date registered: 2011-10-25 11:54:39 | ICQ: None |
| Username: Akemashite Omedetou | AIM: None |
| Email address: shormint@hotmail.com (not verified) | YIM: None |
| Website title: Bitcoin Fog | MSN: None |
| Website URL: http://www.bitcoinfog.com | |

**Figure 11: Registration Information for BitcoinTalk.org**

According to account details obtained from Twitter, the account @BitcoinFog was created on October 27, 2011 (the date Bitcoin Fog was announced) and was registered with email address shormint@hotmail.com.

Records from Microsoft pertaining to shormint@hotmail.com revealed that the account was created on October 7, 2011, using an apparent fake name and accessed through a Virtual Private Network (VPN) service, used to anonymize user's Internet traffic.

Additional investigation, as described below, connects Sterlingov to the original Bitcoin Fog clearnet domain.

According to publicly available WhoIs information, www.bitcoinfog.com was registered through the web hosting service Highhosting.net on October 25, 2011.   The WhoIs records showed that the domain was registered to "Akemashite Omedetou" using email address shormint@hotmail.com.   Records from Highhosting.net revealed that Akemashite Omedetou used a Liberty Reserve[7] account (Liberty Reserve Account 1) to pay for the domain.   Liberty Reserve records showed that Liberty Reserve Account 1 was registered to shormint@hotmail.com.

Investigators reviewed the account activity associated with Liberty Reserve Account 1 and determined that Sterlingov had funded the account using a series of layered transactions through multiple payment platforms, performed in close temporal proximity and apparently designed to make it difficult to trace the payment to his true identity.   Specifically:

---

[7]  Liberty Reserve was a Costa Rica-based digital currency exchange service that allowed users to register and transfer money to other users with only a name, e-mail address, and birth date.   Deposits could be made through third parties using a credit card or bank wire, among other deposit options.   Liberty Reserve did not directly process deposits or withdrawals.   Deposited funds were then "converted" into Liberty Reserve Dollars (LRUSD) or Liberty Reserve Euros (LREUR), which were tied to the value of the U.S. dollar and the euro, respectively.   The service was shut down by U.S. law enforcement in May 2013 after the founder was charged in the United States with money laundering and operation of an unlicensed money service business.

- On September 29, 2011, according to records from the virtual currency exchange Mt. Gox,[8] Roman Sterlingov opened an account in his true name at Mt. Gox (Mt. Gox Account 1), using the email address plasma@plasmadivision.com.

- On October 3, 2011, Sterlingov funded Mt. Gox Account 1 with 100 euros.

- On October 19, 2011, Mt. Gox Account 1 sent 36 BTC (1 BTC at the time being worth about $2.27) through an off-platform Bitcoin address to a second Mt. Gox Account (Mt. Gox Account 2) (registered to "nfs9000@hotmail.com").

- On October 20, 2011, Mt. Gox Account 2 sent 35 BTC to a third Mt. Gox Account (Mt. Gox Account 3) (registered to "kolbasa99@rambler.ru").

- On October 20, 2011, Mt. Gox Account 3 sent $80 USD to an account at Aurum Xchange (Aurum Xchange Account 1), another digital payment platform.

- On October 20, 2011, Aurum Xchange Account 1 sent $76 USD to Liberty Reserve Account 1.

- On October 25, 2011, Liberty Reserve Account 1 paid the domain fees for www.bitcoinfog.com to Highhosting.net.

This series of transactions is depicted in the below chart:

---

[8]  Mt. Gox was a Bitcoin exchange based in Japan that suspended operation in April 2014 after suffering a hack that stole 850,000 bitcoins.



An analysis of the IP addresses used to access the above Liberty Reserve and Mt. Gox accounts confirmed that the accounts shared a common owner: Sterlingov.    For example, IP logs from Mt. Gox and Liberty Reserve showed that on November 24, 2011, a user using the IP address 212.117.160.123 logged into Mt. Gox Account 2, Mt. Gox Account 3, and Liberty Reserve Account 1, as well as another Liberty Reserve account registered to Roman Sterlingov (Liberty Reserve Account 2).    Sterlingov was also the named account owner of a third Liberty Reserve account (Liberty Reserve Account 3) registered using the email address heavydist@gmail.com (Google Account 1).

Liberty Reserve records revealed that Liberty Reserve Account 2 was registered in Sterlingov's true name using the email address plasma@plasmadivision.com, the same e-mail tied to Mt. Gox Account 1.    The account registration information included a residential address in Gothenburg, Sweden corresponding to Sterlingov's home address.    Both Liberty Reserve Account 2 and Liberty Reserve Account 3 were registered using a Swedish telephone number, TELEPHONE NUMBER 1, which Swedish telecommunications provider records revealed is registered to Sterlingov.

On August 25, 2012, Mt. Gox Account 1 received a 180 BTC deposit sent from an account at BTC-e[9] (BTC-e Account 1).   According to records from BTC-e, BTC-e Account 1 was registered to Roman Sterlingov, using Google Account 1.

Records from Google pertaining to Google Account 1 revealed that the account was registered to "Roman Heavydist" and was linked to TELEPHONE NUMBER 1, identified above as Sterlingov's phone number.    Investigators obtained the contents of Google Account 1 pursuant to a lawfully authorized search warrant.   Google Account 1's Google Drive folder contained Russian language document titled Ввод денег ("Putting Money"), dated September 29, 2011 (less than a month prior to the launch of Bitcoin Fog).    A translation of the document showed that the document appeared to be notes taken by Sterlingov describing how to layer funds.   The steps outlined in the document match the steps that Sterlingov took to pay for the domain www.bitcoinfog.com.   The below chart displays the relevant text of the document overlayed on the transaction path used by Sterlingov to pay for the BitcoinFog.com domain.

---

[9]  BTC-e was cryptocurrency exchange that was shut down in July 2017 after the exchange founder was indicted in the United States for money laundering and the servers were seized by U.S. law enforcement.



Following Sterlingov's arrest, his luggage was subject to an inventory search, transported to the District of Columbia, and then searched pursuant to a search warrant.    Among other things, agents found a printout with Google recovery codes for the heavydist@gmail.com account (Google Account 1):



**Figure 12: Google recovery codes found in Sterlingov's luggage**

22

### 6. **Sterlingov's Connections to Early Bitcoin Fog Test Transactions**

Blockchain analysis of the earliest transactions associated with Bitcoin Fog's activity on the blockchain revealed a series of small value transactions, beginning in early October 2011, approximately two weeks before Bitcoin Fog was officially launched on October 27, 2011.   The transactions appeared to be test transactions conducted to beta test the Bitcoin Fog mixer before it went live.   These transactions originated from Mt. Gox Account 1, registered in Sterlingov's true name.

As shown by Mt. Gox records and blockchain analysis, on October 13, 2011, Mt. Gox Account 1 sent approximately two BTC to Bitcoin cluster 12NSB5.   This deposit was then broken into smaller amounts through a series of four Bitcoin transactions.   Subsequently, the bitcoin was deposited into two new bitcoin wallets, 1KWMex (0.41 BTC) and 1NeWNP (1.57 BTC).   The transaction pattern within cluster 12NSB5 is consistent with mixing/tumbling transactions, including those seen from Bitcoin Fog.

Wallet 1KWMex held its 0.41 bitcoin idle, while wallet 1NeWNP transferred its bitcoin to a new address.   Through blockchain analysis, investigators traced the outflow of the balance of 1.57 BTC from wallet 1NeWNP to Bitcoin Fog.

The activity described above is consistent with beta testing the Bitcoin Fog platform.   I am aware that such beta testing would typically only be conducted an individual involved in administrating a website or service.

### 7. **Sterlingov's Receipt of Proceeds from Bitcoin Fog**

Bitcoin Fog charged a variable fee of 2% to 2.5% on each deposit.   Blockchain analysis revealed that these fees were retained within the Bitcoin Fog cluster, and that the administrator

made periodic withdrawals from the Bitcoin Fog cluster to pay himself.    These withdrawals occur sporadically and in the same manner as a regular user.    The withdrawals appear to be concealed to blend in with regular mixing transactions in order to protect the site administrator from scrutiny. Based on Bitcoin Fog's transaction activity over time, Sterlingov would have made approximately $8 million in commissions from Bitcoin Fog transactions if he had cashed out the administrative fees near the time that the transactions occurred.    Due to the significant increase in value of bitcoin over the course of Bitcoin Fog's operation—from a low of approximately $2 shortly after Bitcoin Fog launched in fall 2011 to a current value of more than $40,000—Sterlingov has been able to reap significant appreciation from his profits that were kept in bitcoin.    The current value of the Bitcoin Fog cluster—including customer funds in Sterlingov's control and Sterlingov's own money—is nearly $70 million.

Investigators obtained records of Sterlingov's true-name accounts at several cryptocurrency exchanges.    Analysis of Sterlingov's accounts revealed the vast majority of cryptocurrency deposited into his accounts was originally sourced and traced back to Bitcoin Fog clusters.    This activity continued through at least 2019.

### 8.  **Arrest and Search of Sterlingov**

Sterlingov was charged by criminal complaint on April 26, 2021, on charges of Money Laundering, in violation of 18 U.S.C. § 1956(a)(3)(A); Operating an Unlicensed Money Transmitting Business, in violation of 18 U.S.C. § 1960(a); and Money Transmission Without a License, in violation of D.C. Code § 26-1023(c).    He was arrested in the early morning hours of Tuesday, April 27, 2021, arriving at Los Angeles International Airport ("LAX") on a direct flight from Moscow, Russia.    When Sterlingov arrived at LAX, he initially did not provide an

explanation for his trip to the United States to Customs and Border Patrol ("CBP") officers.    He

mentioned possibly traveling to Florida, visiting a cousin in Boston, and traveling internationally

to Playa Del Carmen, Mexico.[10]    Sterlingov later admitted that he planned to attend a flight school

near Sacramento, California, after CPB officers located a flight manual in his luggage.    In fact,

subpoena returns confirmed that Sterlingov had signed up for a flight instruction course in Lincoln,

California, from April 29, 2021 through May 21, 2021.    Sterlingov's subsequent intentions,

following the conclusion of the flight training, remain unknown.

As noted above, Sterlingov's luggage was subject to an inventory search, transported to

the District of Columbia, and then searched pursuant to a search warrant.    In addition to the

Google account recovery codes noted above, agents found bitcoin debit cards, multiple laptops,

Raspberry Pi microcomputers, approximately 15 SD memory cards, mobile phones, and an

unusual cellular modem device that appears to be designed to combine up to four separate cellular

Internet connections in order to anonymize a computer's Internet traffic or connections to other

servers.    Sterlingov's electronic devices contained programs for location spoofing, including

GPS spoofing.

---

[10]  Based on initial review of Sterlingov's electronic devices, he exchanged messages suggesting he intended to attend the "Nomad Capitalist" conference in Mexico.   According to its website, the Nomad Capitalist conference was scheduled for May 12-15, 2021 in Playa Del Carmen, Mexico, and was billed as "the premier gathering of global citizens" to cover topics including "international tax strategies, offshore banking, second citizenship, international investing, and the Nomad Capitalist Lifestyle."   The website offers further information about topics including "second passport," "citizenship by investment," and "cryptocurrency."   *See* https://nomadcapitalist.com/live/ (last accessed Sept. 22, 2021).



**Figure 13: Cellular modem device found in Sterlingov's luggage**

### 9.  Subsequent Procedural History

Sterlingov was presented on April 27, 2021 for his Initial Appearance before Magistrate Judge Paul L. Abrams in the Central District of California.   A detention hearing was held on May 6, 2021.   After reviewing the parties' written submissions and the Pretrial Services interview report and hearing oral argument, Magistrate Judge Abrams ordered the defendant detained without bond and transported to the District of Columbia for further proceedings.

While the defendant was in transit to the District of Columbia, on June 14, 2021, a federal grand jury in the District of Columbia returned an Indictment against the defendant on charges of Money Laundering, in violation of 18 U.S.C. § 1956(a)(3)(A); Operating an Unlicensed Money Transmitting Business, in violation of 18 U.S.C. § 1960(a); and Money Transmission Without a License, in violation of D.C. Code § 26-1023(c).   The defendant was presented for his Initial Appearance in the District of Columbia and was arraigned on the Indictment on June 23, 2021.

## APPLICABLE LAW

Under the Bail Reform Act, the Court "shall order" that the defendant be detained pending trial if it determines after a hearing that no condition or combination of conditions "will reasonably assure the appearance of the person as required and the safety of any other person and the community."  18 U.S.C. § 3142(e).  A finding of either risk of flight or danger is sufficient for detention.  *See, e.g.*, *United States v. Ferranti*, 66 F.3d 540, 543-44 (2d Cir. 1995).  The government must prove the defendant presents a risk of flight only by a preponderance of the evidence, not by clear or convincing evidence or other, more demanding standards.  *United States v. Vortis*, 785 F.2d 327, 328-29 (D.C. Cir. 1986); *United States v. Xulam*, 84 F.3d 441, 442 (D.C. Cir. 1996).  At a detention hearing, the government may present evidence by way of proffer, *United States v. Smith*, 79 F.3d 1208, 1209-10 (D.C. Cir. 1996), and "[t]he rules concerning admissibility of evidence in criminal trials do not apply" at a detention hearing, 18 U.S.C. § 3142(f).

In reviewing the Magistrate Judge's detention order, this Court conducts a *de novo* review of the record to determine whether the defendant should be detained pending trial.  *United States v. Smith*, 160 F. Supp. 3d 280, 282 (D.D.C. 2016).   "The Court is free to use in its analysis any evidence or reasons relied on by the magistrate judge, but it may also hear additional evidence and rely on its own reasons."  *Id.* (quoting *United States v. Hubbard*, 962 F. Supp. 2d 212, 215 (D.D.C. 2013)).

In assessing the risk of flight presented by the defendant, the Court must assess the statutory factors specified in 18 U.S.C. § 3142(g), including (1) the nature and circumstances of the offense

charged; (2) the weight of the evidence against the defendant; and (3) the history and characteristics of the defendant.    18 U.S.C. § 3142(g)(1)-(3).[11]

## ARGUMENT

### 1. The Nature and Circumstances of the Offense

#### a. The Vast Scale and Sophistication of Bitcoin Fog Enabled Substantial Darknet Money Laundering

Sterlingov is a sophisticated cyber criminal who operated his cryptocurrency money laundering service, Bitcoin Fog, in the shadows for almost 10 years.    Bitcoin Fog operated at a massive scale—laundering the equivalent of more than $335 million since its launch in October 2011.    This figure includes facilitating more than $78 million in bitcoin transactions sent directly to or from darknet markets including Silk Road, Silk Road 2.0, Agora, Evolution, and AlphaBay—markets that primarily trafficked in illegal narcotics and other illegal goods and services. Sterlingov's money laundering service fueled an immense volume of very serious criminal activity by providing an anonymized bitcoin money transmission service for darknet vendors and buyers.

Sterlingov explicitly announced that the purpose of Bitcoin Fog was to allow users to evade lawful authorities while conducting transactions on the darknet.    The defendant's intent was

---

[11] The defendant implies (*e.g.*, at 9, 12) that the Court should also consider whether pretrial release would be helpful in the preparation of his defense, but that is not one of the statutory factors listed under § 3142(g).    The question before the Court is solely whether the defendant poses a serious risk of flight such that no condition or combination of conditions will reasonably assure his appearance at trial.    To the extent the defendant wishes to argue that pretrial release is necessary for the preparation of his defense, he must move pursuant to 18 U.S.C. § 3142(i), and the *defendant*, not the government, bears the burden of showing that pretrial release is "necessary" for such purposes. *See United States v. Otunyo*, No. 18-cr-251, 2020 WL 2065041 (BAH), at *3 (D.D.C. Apr. 28, 2020) ("Section 3142(i) provides a distinct mechanism for temporarily releasing a detained defendant, in a manner that has nothing to do with a revisiting of the initial detention determination, but a defendant has the burden of showing that temporary release is 'necessary.'") (internal citations and alterations omitted); *see generally United States v. Bikundi*, 47 F. Supp. 3d 131, 136 (D.D.C. 2014) ("[D]efense counsel pointed out at a May 29, 2014 status hearing that the defendant's ability to assist in review of the [discovery] material is adversely affected by her incarceration pending trial. . . .    The remedy for that concern, however, is not pretrial release when the statutory conditions are not met, but unrelenting efforts by the government to process discovery and get ready for trial as promptly as possible.").

apparent from the very start, when he announced that Bitcoin Fog would operate in the shadows of Tor to prevent the "proper authorities" from catching either the Bitcoin Fog administrators (operating an illegal service) or its customers (engaging in illegal transactions):

- "[W]e will never be found and dealt with by proper authorities."

- "This is better for you as well; while a freenet service may swear on not cooperating with authorities in case they show up at their homes, we can say with high certainty that not only will we not cooperate with any authorities, the authorities will not actually be able to show up at our doorstep, because finding a tor doorstep has proven difficult."

Figure 3, *supra*.   Sterlingov reaffirmed his intent in public statements (in alias) over the years:

- "[M]ost of them [exchanges] are also run as legitimate, visible businesses, which will be forced to reveal information about your funds, should such a request be made by the authorities . . . us on the other hand, the authorities have to find first, which, as Silk Road have [sic] demonstrated, can prove problematic."   ECF No. 1-1, at 2 (quoting BitcoinTalk.org post).

- "This is why you need to use ONLY a Tor-based mixing service (Such a surprise)."   ECF No. 1-1, at 2 (quoting @BitcoinFog Twitter post).

- "We would personally never use them [*i.e.* Blockchain.info] as the only step in the washing.   Blockchain is a public company and is required by law to comply with anti-money laundering laws, as well as revealing user information and logs, should the law require that."   Figure 4, *supra* (quoting BitcoinTalk.org post).

Bitcoin Fog's illicit purpose was apparent from the design of the service itself.   First, bitcoin wallet addresses are already pseudonymous by default—publicly identifiable only as a

"long string of letters and numbers," *United States v. Gratkowski*, 964 F.3d 307, 309 (5th Cir. 2020).   "When a Bitcoin user transfers Bitcoin to another address, the sender transmits a transaction announcement on Bitcoin's public network, known as a blockchain.   The Bitcoin blockchain contains only the sender's address, the receiver's address, and the amount of Bitcoin transferred."   *Id.*   It is virtually impossible to de-anonymize a bitcoin wallet address without some external source of information.   For example, law enforcement can issue a subpoena for accountholder information to a custodial service, such as a virtual currency exchange that hosts users' bitcoin wallets on their behalf, but this option is unavailable to members of the general public.   To the extent that a law-abiding user is concerned about a third party analyzing his pseudonymous bitcoin address transactions on the blockchain, numerous legitimate services— notably, virtual currency exchanges—are available that preserve user's privacy without endeavoring to place the user beyond the law.   While it is theoretically possible to operate a "legitimate" mixer—one which complies with applicable money transmitter laws, registers with the appropriate authorities, collects customer identifying information, and implements an effective anti-money laundering program, among other requirements—this is the antithesis of the criminal mixer business model.   Second, Bitcoin was created with the explicit goal of reducing transaction fees and eliminating financial intermediaries from online transactions.   *See* Satoshi Nakamoto, *Bitcoin: A Peer-to-Peer Electronic Cash System*, at 1 (Oct. 31, 2008), available at https://bitcoin.org/bitcoin.pdf.   A mixer such as Bitcoin Fog introduces significant transaction fees (from 2% to 2.5%, *see* ECF No. 1-1, at 11), delays the clearing of a transaction, and inserts a custodial middleman between sender and recipient.   Bitcoin Fog served no economic function

other than to obscure transaction histories, which are already anonymized with respect to public view, from investigation by legal authorities.

It is significant that Sterlingov evaded law enforcement for so long. The sworn agent Affidavit shows that Sterlingov went to extraordinary lengths to conceal his identity as the administrator of Bitcoin Fog. He created a fictitious persona, Akemashite Omedetou, to announce the launch of Bitcoin Fog and to register the original clearnet domain for the site, www.bitcoinfog.com. This persona was operated by means of a "burner" email address, shormint@hotmail.com, that was registered with a fake name and accessed via a Virtual Private Network (VPN) service. Sterlingov paid for the clearnet domain through a six-layered transaction involving four forms of fiat and virtual currency (euros, U.S. dollars, BTC, and Liberty Reserve Dollars), three virtual currency payment services (Mt. Gox, Aurum, and Liberty Reserve), and accounts registered with three different burner email accounts (including shormint@hotmail.com, nfs9000@hotmail.com, and kolbasa99@rambler.ru). See ECF No. 1-1, at 7-9. Sterlingov's meticulous operational security was a key element of his criminal enterprise. It also belies any potential defense that Sterlingov was unaware that Bitcoin Fog was being used to launder drug proceeds and fuel other illicit cyber crime; no one would go to such lengths to conceal his true identity if he believed his conduct was truly benign.

In addition to Sterlingov's money laundering, his operating an unlicensed money transmitting business of this scale—catering to darknet customers involved in drug trafficking, ransomware, and other illegal commerce—poses substantial harm. The federal prohibition on operating an unlicensed money transmitting business, 18 U.S.C. § 1960, was created in 1992 as part of the Annunzio-Wylie Anti-Money Laundering Act. "Title 18 U.S.C. § 1960 was enacted

in order to combat the growing use of money transmitting businesses to transfer large amounts of

the monetary proceeds of unlawful enterprises."   *United States v. Velastegui*, 199 F.3d 590, 593

(2d Cir. 1999).   Specifically, Congress found that anti-money laundering regulation in the formal

banking sector had the effect of driving drug traffickers and other criminals toward smaller, often

poorly regulated nonbank financial institutions:

> In the past, drug money laundering deterrence legislation has focused on depository
> institutions. However, as deterrence and compliance programs by depository
> institutions have improved, money launderers with illicit profits have found new
> avenues of entry into the financial system. . . . Increasingly, money launderers are
> using money transmitters, check cashers, money exchanges and other nonbank
> financial companies for initial placement and the number of such businesses is
> growing rapidly in some States.

S. Rep. No. 101-460 (1990).   Section 1960 was enacted to fill this gap in the regulatory

framework.   It strengthened federal regulation of money transmitters, and at the same time

created a vehicle for federal law enforcement to enforce and complement state regulatory schemes.

*See id.* ("The legislation . . . provides for an expanded federal role in a way that enhances and

supplements State regulation.").

The federal prong of § 1960, § 1960(b)(1)(B), criminalizes the failure to comply with

money transmitting business requirements set forth under the Bank Secrecy Act ("BSA").   Under

the BSA and its implementing regulations, a money transmitting businesses is required to register

as a "money services business" ("MSB") with the Financial Crimes Enforcement Network

("FinCEN"), a division of the U.S. Department of Treasury.   *See* 31 C.F.R. § 1022.380(a)(1).

Registration carries with it a responsibility to comply with federal regulations designed to combat

illicit money laundering.   MSBs are required to establish and maintain programs designed to

detect and report suspicious activity, and to maintain certain records "where they have a high

32

degree of usefulness in criminal, tax, or regulatory investigations or proceedings." 31 U.S.C. § 5311; *see, e.g.*, 31 U.S.C. § 5318(h)(1); 31 C.F.R. § 1022.210(a) (anti-money laundering programs); 31 U.S.C. § 5318(g)(1); 31 C.F.R. § 1022.320(a)(1) (suspicious activity reporting); 31 U.S.C. § 5313; 31 C.F.R. § 1010.311 (currency transaction reporting for transactions involving more than $10,000 in currency). When MSBs do not register, it makes it more difficult for FinCEN to identify them and ensure they are in compliance with these obligations. Unregistered MSBs thus operate in, and fuel, a black market financial system, and pose the very threats that animated the enactment of § 1960.

Compliance with these requirements is crucial for law enforcement efforts to combat dangerous criminal activity, especially criminal activity enabled by Bitcoin or other virtual currencies. In *United States v. Galarza*, for example, law enforcement used information collected by a virtual currency exchanger pursuant to the BSA to identify a dangerous child pornography defendant, who uploaded more than 500 videos depicting child pornography to an illicit Tor-based website. *See United States v. Galarza*, No. 18-mj-146 (RMM/BAH), 2019 WL 2028710, at *1-2 (D.D.C. May 8, 2019). After identifying a bitcoin payment sent to the child pornography website, "[l]aw enforcement subpoenaed a virtual-currency exchange in the United States, *which is required by U.S. law to collect identifying information on its customers*," and discovered the defendant's name, phone number, email address, and other information. *Id.* at 2 (emphasis added). This know-your-customer information provided "compelling evidence that the website user who uploaded and downloaded child pornography to and from the [Child Pornography] Website is the defendant." *Id.*; *see also, e.g.*, *Gratkowski*, 964 F.3d at 309 (explaining how law enforcement "served a grand jury subpoena on [virtual currency exchange] Coinbase . . . for all

information on the Coinbase customers whose accounts had sent Bitcoin to any of the addresses"
associated with a child pornography website, and "Coinbase identified [the defendant] as one of
these customers," allowing agents to obtain a search warrant and recover "hard drive containing
child pornography" from the defendant's house).   As Judge Collyer noted in *United States v. E-
Gold, Ltd., et al.*, No. 07-cr-109 (RMC), in sentencing one of the defendants involved in an
unlicensed virtual currency operation: "[T]he failure to register is what leads to the ability of
criminals to make use of the E-Gold system for nefarious purposes . . . Because once you register
you have to report things and therefore it's not as anonymous or private . . . . So on one hand it's
just a regulatory compliance issue.   On the other hand it's a very serious problem."   *In re
Downey*, 162 A.3d 162, 170 (D.C. 2017) (opinion on attorney discipline for *E-Gold* defendant
Robert Downey).   The huge volume of illegal transactions processed by Sterlingov's service—
including more than $78 million in bitcoin transactions sent directly to or from darknet markets
and at least $517,787 in payments tied to ransomware actors—underscores the dangerousness of
such a large, unlicensed and non-compliant bitcoin money transmitting service.

### b.   Substantial Criminal and Financial Penalties Provide Incentive To Flee

If convicted, Sterlingov faces significant criminal and financial penalties.   In Count One,
he is charged with laundering bitcoin represented to be the proceeds of illegal narcotics trafficking
in violation of the "sting" money laundering provision, a felony punishable by up to 20 years of
imprisonment and a $250,000 fine.   *See* 18 U.S.C. §§ 1956(a)(3), 3571(b)(3).   He is also
charged with operating an unlicensed money transmitting business under federal law, *see* 18
U.S.C. § 1960(a); and engaging in the business of money transmission without a license under
District of Columbia law, *see* D.C. Code § 26-1023(c).   Although these offenses each carry a

maximum term of 5 years of imprisonment, the scale of the defendant's illegal operation—totaling more than $335 million in illicit bitcoin transactions—would likely push Sterlingov's recommended sentence under the U.S. Sentencing Commission Guidelines Manual (the "Guidelines" or U.S.S.G.) well past the 5-year statutory maximum.   In fact, the defendant's Guidelines calculation for these offenses may be so high that, under the total punishment provision of U.S.S.G. § 5G1.2(d), the defendant's sentences for Counts One, Two, and Three may be stacked to run consecutively under the Guidelines for as long as 30 years.[12]

---

[12]  For example, the government estimates that the applicable Guidelines range for the federal registration and/or state licensing prong of Count Two, 18 U.S.C. § 1960(b)(1)(A)-(B), would be calculated as follows:

| | | |
|---|---|---|
| U.S.S.G. § 2S1.3(a)(2) | Base offense level | 6 |
| U.S.S.G. § 2B1.1(b)(1)(O) | More than $250,000,000 | +28 |
| U.S.S.G. § 2S1.3(b)(1)(A) | Knew funds were proceeds of | |
| | or intended to promote illegal activity | +2 |
| | **Total offense level:** | **36** |

For the third prong of Count Two, which charges operating a money transmitting business which "otherwise involves the transportation or transmission of funds that are known to the defendant to have been derived from a criminal offense or are intended to be used to promote or support unlawful activity," 18 U.S.C. § 1960(b)(1)(C), the applicable Guidelines range is calculated as follows:

| | | |
|---|---|---|
| U.S.S.G. § 2S1.1(a)(2) | Base offense level | 8 |
| U.S.S.G. § 2B1.1(b)(1)(O) | More than $250,000,000 | +28 |
| U.S.S.G. § 2S1.1(b)(1)(i) | Knew funds were proceeds of | |
| | or intended to promote drug offenses | +6 |
| U.S.S.G. § 2S1.1(b)(2)(C) | Defendant in business of laundering | +4 |
| | **Total offense level:** | **46** |

Even with a -3 adjustment for acceptance of responsibility under U.S.S.G. § 3E1.1—assuming the defendant pleads guilty instead of going to trial—the resulting overall offense level could be as high as 43, with an advisory sentencing range of "life" in prison.

Under U.S.S.G. § 5G1.2(d), if the combined Guidelines range exceeds the statutory maximum of the Count carrying the highest authorized term of imprisonment, "then the sentence imposed on one or more other counts shall run consecutively, but only to the extent necessary to produce a combined sentence equal to the total punishment."   Here, that would mean consecutive sentences for Count One (20 years), Count Two (5 years), and Count Three (5 years). While this Court may well depart from the advisory Guidelines range provided by § 5G1.2(d), or find that one or more specific offense characteristics do not apply, the possibility of an advisory recommendation of "life" in prison—even one limited by statute to 30 years—provides an irresistible incentive for a Russian-Swedish national with immense cryptocurrency wealth and scarce ties to the United States to flee rather than face prosecution.

The defense relies on the undisputed truism that the Guidelines are not binding on this Court, but, in evaluating risk of flight, it is the possibility, not the certainty, of a high Guidelines sentence that provides an incentive to flee.   *See, e.g.*, *United States v. Otunyo*, No. 18-cr-251, 2020 WL 2065041 (BAH), at *4 (D.D.C. Apr. 28, 2020) (finding that, *inter alia*, "guidelines sentencing range of up to 11 years in prison if convicted of the current charges," weighs "strongly in favor of detention"); *United States v. Scali*, 738 F. App'x 32, 33 (2d Cir. Sept. 26, 2018) (unpublished) ("The court reasonably determined that Scali's Guidelines range of 87-108 months' imprisonment was significant enough to provide an incentive to flee").

In addition, a conviction under § 1960(a) carries other significant financial penalties, including forfeiture of not just the proceeds of the offense but "any property . . . *involved in* such offense," 18 U.S.C. § 982(a)(1) (emphasis added)—resulting in a forfeiture money judgment of up to $335 million and forfeiture of any cryptocurrency or other assets that Sterlingov accumulated through his operation of Bitcoin Fog, or purchased with his illegal proceeds.   These significant personal and financial penalties provide Sterlingov with an overwhelming incentive to flee prosecution.

In sum, the nature and sophistication of Sterlingov's scheme, the brazenness with which he advertised Bitcoin Fog as a tool for evading law enforcement, the tens of millions of dollars in illegal transactions he facilitated, and the significant criminal and financial penalties he faces all weigh heavily in favor of detention.

---

The defendant claims (at 14) the government has "improperly inflate[d]" its Guidelines calculation, but the factual predicate for each of the specific offense characteristics—from the defendant's knowledge that Bitcoin Fog was designed and operated to facilitate drug money laundering on the darknet, to the volume of transactions, to the millions of dollars in bitcoin transaction fees that the defendant earned from operating Bitcoin Fog—is amply supported by the agent Affidavit and other proffered evidence, and the defendant offers no argument or evidence to the contrary.

## 2.   The Weight of the Evidence Against the Defendant

The government's case against Sterlingov is strong.    In addition to the detailed Affidavit, this is an indicted case in which the grand jury found probable cause to believe Sterlingov is guilty of the charged offenses.    *See United States v. Johnson*, 212 F. Supp. 3d 126, 129 (D.D.C. 2016) (noting indictment is "not dispositive" but still relevant).    To be sure, Sterlingov went to elaborate lengths to conceal his identity as the administrator of Bitcoin Fog—but once these strands are untangled, Sterlingov's identity is clear.    The funds used to pay for Bitcoin Fog's clearnet domain originated from a financial account Sterlingov opened in his true name at Mt. Gox (Mt. Gox Account 1).    ECF No. 1-1, at 8.    Sterlingov registered a Liberty Reserve account (Liberty Reserve Account 2) in his true name, and registered this account using the same burner email address (plasma@plasmadivision.com) that was tied to Mt. Gox Account 1.    *Id.*    9.    The same Mt. Gox account (Mt. Gox Account 1) that was used to pay domain fees for Bitcoin Fog also received a transfer from a BTC-e account opened in Sterlingov's name.    *Id.*    Sterlingov used the same Google email address (heavydist@gmail.com) to register both the BTC-e account and Liberty Reserve account 3 in his true name.    An email search warrant of this Google account recovered a Russian-language document detailing the exact steps Sterlingov used to launder the Bitcoin Fog domain fees.    *Id.* at 9-10.    Evidence also ties Sterlingov's true-name Mt. Gox account to early beta test transactions sent through Bitcoin Fog in early October 2011, before the site officially launched.    *Id.* at 10-11.    Blockchain analysis, combined with financial records for Sterlingov, shows that Sterlingov's true-name accounts have received deposits derived from the Bitcoin Fog BTC clusters through at least 2019.    *Id.* at 11.    In addition, Sterlingov's collection of unusual electronic devices, bitcoin debit cards, and other records recovered from the search of

37

Sterlingov's luggage provides substantial corroborating evidence of Sterlingov's ownership and control over the accounts involved in Bitcoin Fog and his receipt of the illicit cryptocurrency proceeds from the illegal mixer.

Sterlingov argues (at 13) in conclusory terms that the evidence is "circumstantial" and that the government "has provided little to support its allegations," but does not actually grapple with any of the government's evidence or offer any specific argument as to its theory of the case.   This despite having the government's case summarized in a detailed 13-page agent affidavit, and having access to more than 10,000 unique files produced in discovery.   Indeed, it is not even clear whether the defendant disputes whether he was, in fact, the administrator of Bitcoin Fog.

It is significant that Sterlingov has few legal defenses available, aside from mistaken attribution, for the unlicensed money transmitting business charge under § 1960(a).   For example, the defendant cannot rely on an ignorance-of-the-law defense by arguing that he did not know he was required to register with FinCEN or obtain a license in the District of Columbia.   As the Seventh Circuit explained in *United States v. Dimitrov*, 546 F.3d 409 (7th Cir. 2008), the 2001 Patriot Act specifically amended 18 U.S.C. § 1960 to remove any "scienter requirement" regarding registration or licensing: "Under the amended § 1960, the government no longer need prove that a defendant was aware of state licensing requirements or that he knew about the federal registration requirements found at 31 U.S.C. § 5330."    546 F.3d at 413; *see also, e.g., United States v. Keleta*, 441 F. Supp. 2d 1, 3 (D.D.C. 2006) ("[T]he Court finds that 18 U.S.C. § 1960(b)(1)(B) does not require that the Defendant either knew or willfully violated (or both) federal money transmitting registration requirements in order to have violated the statute."); *cf. United States v. O'Brien*, 131 F.3d 1428, 1430 (10th Cir. 1997) ("Section 1955 is not a specific intent statute. To be convicted

under this provision, therefore, a defendant need not know that the gambling business involved five or more people, remained in operation for thirty days, or was violative of state law. The statute requires only a general criminal intent, which is satisfied whenever the defendant knowingly does an act made unlawful by the statute."); *United States v. Hawes*, 529 F.2d 472 (5th Cir. 1976) ("We have previously held that [section] 1955 and related statutes do not condition guilt upon knowledge that a federal law has been violated.   It is sufficient that appellants intended to do all of the acts prohibited by the statute and proceeded to do them.") (internal quotations omitted). [13]   The defendant claims (at 15) that he has "reasonable defenses" to these charges, but he never specifies what those defenses are, other than the uninformative statement (at 13) that he will "hold the government to its burden" of proving its case-in-chief. [14]

Questions about the scope of § 1960(a) and the D.C. Money Transmitters Act, and whether these statutes apply to bitcoin mixers such as Bitcoin Fog, have already been extensively litigated before Chief Judge Howell in a similar prosecution against Larry Dean Harmon, the administrator of the bitcoin mixer Helix.   *See United States v. Harmon*, 474 F. Supp. 3d 76 (D.D.C. 2020)

---

[13] Similarly, the District of Columbia Money Transmitters Act ("MTA") defines the offense of engaging in the business of money transmission as a general intent crime, without any willfulness or heightened mens rea requirement. *See* D.C. Code §§ 26-1023(c) & 26-1001(10).   The defendant can hardly dispute that Bitcoin Fog was a business, that it engaged in "receiving money for transmission or transmitting money within the United States, or to locations abroad, by any and all means," D.C. Code § 26-1001(1), or that he failed to obtain a money transmitting license from the D.C. Department of Insurance, Securities, and Banking.   He may intend to argue that bitcoin does not qualify as "money" within the meaning of the statute, but if so, he does not say so in his motion, and he offers no basis to distinguish Chief Judge Howell's thorough statutory analysis in *United States v. Harmon*, 474 F. Supp. 3d 76, 87-99 (D.D.C. 2020) (holding that "bitcoin qualifies as money under the MTA" and denying motion to dismiss).

[14] The defendant also knocks down strawmen in claiming (at 13) that bitcoin mixing "is not *per se* illegal" and that there is nothing wrong with "personal and financial privacy on the Internet."   The defendant was indicted by the grand jury and is being prosecuted for operating a bitcoin money laundering and unlicensed money transmitting business that facilitated millions of dollars in transactions with darknet markets trafficking in illegal drugs and with ransomware operators—deliberately criminal conduct which the defendant went to extraordinary lengths to conceal from the "proper authorities."

(holding that bitcoin qualifies as "money" under D.C. Money Transmitters Act, and that indictment sufficiently alleged bitcoin mixer was an unlicensed money transmitting business under § 1960), *reconsideration denied*, 514 F. Supp. 3d 47 (D.D.C. 2020); *United States v. Harmon*, 2021 WL 1518344 (D.D.C. Apr. 16, 2021) (rejecting vagueness challenge to § 1960 and D.C. Money Transmitters Act as applied to bitcoin mixer).   The defendant cites (at 12) a government filing from the *beginning* of the Harmon case predicting that "issues of first impression" might arise, but fails to acknowledge the substantial body of case law resolving those issues—nor does he suggest any basis to distinguish those persuasive authorities.

The strength of the government's evidence, the absence of any serious counterargument by the defendant, and the paucity of viable legal defenses all weigh in favor of pretrial detention.

### 3.   The Defendant's History and Characteristics

Sterlingov is a dual Russian and Swedish citizen with few if any real ties to the United States.   He was arrested at LAX on an inbound flight from Moscow, Russia.   Sterlingov was vague in his statements to Customs and Border Protection agents upon his arrival about his travel plans within the United States, and suggested that he might also be traveling to Mexico.   In his interview with Pretrial Services in the Central District of California, he gave a vague account of his employment history—including freelance web development and film work, employment in "life coaching," and living off his "investments."

Sterlingov has substantial cryptocurrency resources, accessible from anywhere in the world with an Internet connection, which he could use to finance flight from prosecution.   As the Affidavit explains, Sterlingov is estimated to have obtained—at a minimum—at least $8 million in cryptocurrency proceeds from the transaction fees charged by Bitcoin Fog.   ECF No. 1-1, at

11.   This is a conservative figure; it assumes that he "cashed out" (*i.e.*, converted his BTC to fiat currency such as euros or U.S. dollars) at the time the transactions occurred.   *Id.*   It is probable that Sterlingov retained at least a portion of his illegal proceeds in BTC; if so, his cryptocurrency proceeds would have ballooned in value as the price of BTC rose from hundreds of dollars per bitcoin to more than $40,000 per bitcoin today.[15]   Indeed, on June 18, 2021, the government served a seizure warrant on the virtual currency exchange Kraken for accounts under Sterlingov's name, and recovered $349,625.72 in U.S. dollars and cryptocurrency valued at $498,586.04 as of date of seizure (including Bitcoin, Ethereum, Monero, and Solaris).   In addition, Sterlingov likely has access to the Bitcoin Fog "cluster"—including customer funds under Sterlingov's control and Sterlingov's own money—valued at close to $70 million as of the date of the Criminal Complaint. ECF No. 1-1, at 11.   Cryptocurrency assets such as these can be accessed with an Internet connection from anywhere in the world, and they can be reconstituted without physical access to the electronic storage media on which the private keys are stored if the user has configured a seed recovery key.[16]   With millions of dollars in virtually untraceable cryptocurrency assets at his disposal, Sterlingov could easily finance his flight from prosecution indefinitely.

At the time of his arrest, Sterlingov was carrying multiple prepaid bitcoin debit cards, which allow him to make payments with high degrees of anonymity.   Sterlingov also engaged in selling bitcoin on LocalBitcoins, a peer-to-peer bitcoin sales platform which allows users to exchange bitcoin for cash, often without providing any identification documents through illegal

---

[15]   *See* Coindesk, Bitcoin price (showing BTC valued at $43,481.78 as of September 22, 2021), available at https://www.coindesk.com/price/bitcoin (last accessed Sept. 22, 2021).

[16]   A seed key or seed phrase is a list of words used to encode a bitcoin wallet.   Wallet software will typically generate a seed phrase and instruct the user to write it down on paper.   The same software can be used to decode the seed phrase and reconstitute the wallet.

brokers.    The use of bitcoin debit cards and LocalBitcoins trading activity reveals Sterlingov's ability to live "off the financial grid" by using bitcoin to avoid being traced or tracked through financial transactions, even in the real world.

In addition, Sterlingov has a long history of creating numerous limited-use identities to obfuscate, conceal, and compartmentalize his activities online.    *See* ECF No. 1-1, at 7-10.    At a minimum, this would make it virtually impossible for Pretrial Services to adequately track and monitor Sterlingov's activities, should he be released pending trial.    In addition, Bitcoin Fog operated on the darknet and offers services to darknet market administrators, vendors, and users. False identification documents, including passports, are readily available on those markets. Given Sterlingov's intimate familiarity with these illicit markets—including Bitcoin Fog's particularly close relationship with Agora darknet market—and his vast cryptocurrency resources, Sterlingov could easily obtain false identification documents and melt back into the shadows to evade prosecution.[17]    As this Court noted in *United States v. Eccleston*, 140 F. Supp. 3d 102 (D.D.C. 2015), pretrial supervision is ill-equipped to prevent a determined defendant from accessing an Internet-connected device in violation of his conditions of release.    *See id.* at 107

---

[17] The defense argues (at 15) that Sterlingov traveled to the United States "openly and under his own name," but of course that was before he was arrested, and while he was unaware he had been identified as the administrator of Bitcoin Fog and was facing potential criminal exposure of up to 30 years in prison and millions of dollars in forfeiture and other financial penalties.

The defendant also relies (at 15) on *United States v. Friedman*, 837 F.2d 48 (2d Cir. 1988), to suggest that the government must proffer evidence such as "skill in avoiding surveillance, prior flight from law enforcement, and use of aliases."    *Friedman* did not purport to set forth an exhaustive list of factors necessary to establish risk of flight, but only an illustrative list of factors that may be sufficient for such a showing.    *See* 837 F.2d at 50.    And, in any event, Sterlingov *has* been shown to use aliases and to go to elaborate lengths to conceal his true identity.    Further, Sterlingov has access to "hidden assets"—another item on *Friedman*'s list, *see id.*, which the defendant fails to acknowledge in his motion—including likely access to hidden cryptocurrency assets worth tens of millions of dollars.

("[I]t is a case in which supervision can do little to alleviate the risk that the defendant might access a computer or other electronic device and continue to engage in the alleged criminal behavior.").

The defense offers several letters of reference on behalf of Sterlingov.   *See* ECF No. 17-1.   It is telling that all but two of these letters come from friends or family *overseas*—which only serves to underscore Sterlingov's lack of ties to the United States. [18]   The letters are also studiously silent about Sterlingov's employment or his sources of wealth.   The offer by Sterlingov's uncle to pledge a "property that I own" as bond (which appears to be an investment property in St. Joseph, Missouri, not his personal home in Boston, Massachusetts) is generous, *see* ECF No. 17-1, at 9, 32, but the (unspecified) value of such an investment property is trivial in comparison to the tens of millions of dollars in cryptocurrency assets to which Sterlingov likely has access.

In any event, even Sterlingov's ties to Sweden appear to be weak.   Based on initial review of Sterlingov's electronic devices, agents have recovered evidence that Sterlingov has lived in Germany and Spain since in or about 2019—a fact not disclosed in the defense motion.   On or about April 28, 2019, Sterlingov (using the name "Max" or "Max Power") used WhatsApp, a messaging app that uses end-to-end encryption by default, to tell an associate that he was "based on the internet" and "roaming around trying to find a place to move parttime instead of foggy old

---

[18] Sterlingov also argues (at 2) that he "frequently visits the U.S."   The government has verified occasional visits prior to 2017, but his last confirmed entry into the United States was in or about April 2017, approximately four years before the date of his arrest on April 27, 2021.   In any event, choosing to vacation in the United States is not evidence of strong community ties, and it hardly provides an incentive sufficient to overcome the substantial risk of conviction and incarceration Sterlingov now faces in the United States.

sweden."   On or about December 28, 2020, he told another associate that he was a "Digital

nomad," and "I don't live in a specific place, i travel."





**Figure 14: WhatsApp messages sent by defendant**

In other messages from 2019 through 2021, he told associates that was living in Spain or Berlin

(*e.g.*, "And totally happy to be in Spain finally!" "I'm still in Berlin so far . . . .").   Agents

recovered multiple electronic records confirming that, as of early 2021, Sterlingov was receiving mail addressed to him at an address in Berlin.



**Figure 15: Mail addressed to defendant at address in Berlin, Germany**

Sterlingov's "Digital nomad" lifestyle, drifting from country to country while pursuing his criminal livelihood online, undermines his claim of deep community ties and raises an obvious risk of flight.

At best, Sterlingov's circumstances are analogous to those of the defendant Florence Bikundi in *United States v. Bikundi*, 47 F. Supp. 3d 131 (D.D.C. 2014).    Like Sterlingov, Florence Bikundi was facing a "considerable" advisory Guidelines sentence in a complex, document-heavy white collar prosecution.    *See id.* at 134.    Florence Bikundi was also a foreign citizen without legal immigration status in the United States.    *Id.* at 136.    Unlike Sterlingov, Florence Bikundi could point to significant and sustained ties to the United States, where she had lived for more than 16 years, had three children, and had numerous relatives including her parents living in this country.    *Id.*    Nevertheless, Chief Judge Howell found that Florence Bikundi's lack of

immigration status and evidence that she maintained a bank account in her home country of Cameroon, which potentially contained significant assets derived from her fraud scheme, weighed in favor of detention: "The Court finds that the defendant has continuing significant foreign ties to her country of origin, including potential access to funds located in Cameroon, and that this raises a significant concern about her serious risk of flight."   *Id.* at 137.

Similarly, in *United States v. Eccleston*, 140 F. Supp. 3d 102 (D.D.C. 2015), this Court found that pretrial detention was warranted based on, *inter alia*, risk of flight for a defendant charged with serious computer offenses that exposed him to up to 10 years in prison.   *Id.* at 107. Among other things, the Court noted that the defendant had lived for four years prior to his arrest in the Philippines, where his children still resided, and he "appear[ed] to lack close family ties in the United States."   *Id.*   Nor did the defendant have "any long-term employment prospects or other significant financial ties to the United States."   *Id.*   The same analysis applies with even more force here, where Sterlingov has never lived in the United States, lacks any deep personal or financial ties to the United States, and has significant roots and access to substantial cryptocurrency assets overseas.

Finally, in *United States v. Amar*, 300 F. Supp. 3d 287 (D.D.C. 2018), Judge Kollar-Kotelly found that pretrial detention was warranted based on risk of flight for a defendant charged with a "sophisticated" cyber fraud conspiracy that exposed him to up to 20 years in prison.   *Id.* at 288-89.   The defendant was a dual citizen of Morocco and Israel, with few ties to the United States, and Judge Kollar-Kotelly's reasoning is readily applicable here:

> Not only is Defendant not a *citizen* of the United States—which does not automatically disqualify an individual for pretrial release—Defendant's connection to this country is quite weak.   He has no legal status at all here and, unlike in many cases cited in Defendant's briefs, he has not been living or working in this country.

46

> The Court is aware of no business, property or other similar types of connections Defendant has with the United States.   The only real connection Defendant appears to have to this country is that some of his relatives are apparently living here.   But even these familial connections do not appear to be particularly strong.

*Id.* at 290.   The court also rejected the defendant's argument that the government could prevent him from fleeing the country by issuing an order pursuant to 8 C.F.R. § 215.2, agreeing with the government that such an order "would not be sufficient to prevent Defendant from leaving the country given the lack of biometric checkpoints at the border and the fact that there are no or limited outbound controls for various modes of departure." *Id.*[19]

In sum, Sterlingov has not just a strong incentive to flee, but the means to do so, and a foreign home—whether in Russia, Sweden, or another country—in which to live out his fugitive status.   Sterlingov's lack of community ties, access to millions of dollars in cryptocurrency,

---

[19] The defendant relies (at 19-20 & n.19) on a number of decisions involving pretrial release, but none of them involved the same combination of factual elements as here, including exposure to substantial criminal and financial penalties; foreign citizenship, including citizenship of a country with which the United States does not have an extradition treaty (Russia); lack of significant ties to the United States; likely access to tens of millions of dollars in cryptocurrency assets accessible from anywhere in the world; use of aliases and history of elaborate operational security measures to conceal the defendant's true identity; and experience and familiarity with darknet markets, where false identification documents are readily available for purchase.   For instance, *United States v. Karni*, 298 F. Supp. 2d 129 (D.D.C. 2004), involved a foreign citizen charged with export control violations who had few ties to the United States, but the brief written opinion reveals no information about the defendant's potential access to hidden assets or ability to procure false identifications documents, and the defendant was able to be released into the custody of a local rabbi who was required to be with the defendant "on a twenty four hour basis, seven days a week." *Id.* at 133. Similarly, in *United States v. Hanson*, 613 F. Supp. 2d 85 (D.D.C. 2009)—another export control case—the defendant was a naturalized U.S. citizen of 20 years, married to a U.S. citizen and U.S. Army officer (her co-defendant), owned a home in California, and lived with her husband and adult adopted son in a rental home in Silver Spring, Maryland, near her husband's post at Walter Reed Army Medical Center. *Id.* at 89.   The Sixth Circuit's decision in *United States v. Hansen*, 108 F. App'x 331 (6th Cir. 2004), was a summary, unpublished disposition that merely affirmed it was not "clearly erroneous" for a district court to release a non-citizen defendant charged with bulk cash smuggling, a 5-year offense with a Guidelines offense level starting at 6 and a recommended sentencing range of 0-6 months of probation. *Id.* at 331-32; 31 U.S.C. § 5332(b)(1) (setting forth authorized punishment for bulk cash smuggling); U.S.S.G. § 2S1.3.   The other cases are similarly inapposite.

ability to procure false identity documents on the darknet, and history of elaborate operational security measures weigh heavily in favor of detention.

### 4. The Defendant's Proposed Conditions of Release Would Not Reasonably Assure His Appearance

The defendant proposes (at 20-22) that he be released into high-intensity supervision under the same conditions of release imposed in *Unites States v. Larry Harmon*, No. 19-cr-395 (BAH), or *United States v. Lokesh Naik*, No. 19-cr-373 (TSC).   But Larry Harmon was a U.S. citizen and lifelong resident of Ohio, and he demonstrated significant family support and ties to the community.   The defendant also fails to disclose that the release conditions *initially* imposed in the Harmon case proved difficult to administer and were ultimately modified by the Court.   After Larry Harmon was released on bond, the government observed millions of dollars in bitcoin transactions moving out of wallet addresses traced to him and his illegal bitcoin mixer, Helix.[20] Chief Judge Howell considered revoking Larry Harmon's pretrial release, and ultimately granted the government's motion for a restraining order requiring him to provide the government with access to any and all cryptocurrency within his possession, including by disclosing seed recovery keys, access to hidden wallets, and other keys needed to transfer cryptocurrency.   *See* 19-cr-395, ECF Nos. 22, 22-1 (Gov't motion and agent affidavit), 28 (Court's restraining order).

Meanwhile, the defendant's reliance on the *Naik* case is puzzling; the only similarity appears to be that both defendants were foreign citizens who posed some risk of flight.[21]   The

---

[20]  Larry Harmon's brother, Gary James Harmon, has been indicted on counts of money laundering, in violation of 18 U.S.C. § 1956(a)(1)(B)(i); obstruction of an official proceeding, in violation of 1512(c)(2); and removal of property to prevent seizure, in violation of 18 U.S.C. § 2232(a); in connection with these illicit bitcoin movements.   Gary Harmon is currently pending trial in this District.   *See* 21-cr-433 (BAH).

[21]  The defendant also mischaracterizes *Naik* (at 18) as a case involving "child pornography offenses" which "carried a mandatory minimum sentence."   Neither of those assertions is accurate.

defendant in *Naik*, an Indian national who was employed by the U.S. military in Afghanistan, was charged with serious sexual assault offenses.    But the evidence of a nonconsensual encounter was hotly contested and the defense raised questions about the victim's "inconsistent statements" which, the defense argued, damaged her "credibility or reliability."    *See* 19-cr-373, ECF No. 10, at 7-8.    The defendant in *Naik* was a foreign national, but he was also "indigent" and "d[id] not have the means to leave the United States."    *Id.* at 8.    *Naik* is hardly comparable to this case, with the defendant's exposure to substantial criminal and financial penalties, strong evidence and lack of viable legal defenses, lack of community ties, ability to procure false identity documents on the darknet and history of elaborate operational security measures, and likely access to tens of millions of dollars in cryptocurrency.

## <u>CONCLUSION</u>

For the foregoing reasons, the Magistrate Judge correctly found that there is no condition or combination of conditions that can reasonably assure the defendant's appearance for proceedings in this case.    The defendant's motion should be denied, and the defendant should continue to be detained without bail pending trial in this case.

Respectfully submitted,

CHANNING D. PHILLIPS
ACTING UNITED STATES ATTORNEY
D.C. Bar No. 415793

BY:      */s/ Christopher B. Brown*
         Christopher B. Brown, D.C. Bar No. 1008763
         Assistant United States Attorney
         U.S. Attorney's Office for the District of Columbia
         555 4th Street, N.W.
         Washington, D.C. 20530
         (202) 252-7153
         Christopher.Brown6@usdoj.gov

         */s/ C. Alden Pelker*
         C. Alden Pelker, Maryland Bar
         Trial Attorney, U.S. Department of Justice
         Computer Crime & Intellectual Property Section
         1301 New York Ave., N.W., Suite 600
         Washington, D.C. 20005
         (202) 616-5007
         Catherine.Pelker@usdoj.gov