# Exhibit 1

AO 106A  (08/18)  Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

District of Columbia

| | |
|---|---|
| In the Matter of the Search of )<br>*(Briefly describe the property to be searched* )<br>*or identify the person by name and address)* )<br>SEIZED LUGGAGE AND ELECTRONIC DEVICES )<br>CURRENTLY LOCATED AT THE IRS WASHINGTON )<br>FIELD OFFICE AT 1200 FIRST ST NE UNDER RULE 41 ) | Case No. 21-SW-134 |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

Located in the _____ District of Columbia _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1956 - Money Laundering; 18 U.S.C. § 1960 - Unlicensed Money Transmission; D.C. Code 26-1023(c) - Money Transmitting Without a License in the District of Columbia. | |

The application is based on these facts:

See Affidavit in Support of Application for Search Warrant.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

James A. Rohls Jr., Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
Telephone _____ *(specify reliable electronic means).*

Date:   4/30/2021

G. Michael Harvey
2021.04.30 19:40:47
-04'00'
*Judge's signature*

City and state:   Washington, D.C.

G. Michael Harvey
United States Magistrate Judge

AO 93C  (08/18)  Warrant by Telephone or Other Reliable Electronic Means

☑ Original          ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

### for the

### District of Columbia

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched* | ) |
| *or identify the person by name and address)* | ) Case No.  21-SW-134 |
| SEIZED LUGGAGE AND ELECTRONIC DEVICES | ) |
| CURRENTLY LOCATED AT THE IRS WASHINGTON | ) |
| FIELD OFFICE AT 1200 FIRST ST NE UNDER RULE 41 | ) |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____ District of Columbia _____ .
*(identify the person or describe the property to be searched and give its location)*:

See Attachment  A (incorporated by reference).

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment  B (incorporated by reference).

**YOU ARE COMMANDED** to execute this warrant on or before _____ May 14, 2021 _____ *(not to exceed 14 days)*

☐ in the daytime 6:00 a.m. to 10:00 p.m.   ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____ G. Michael Harvey _____ .
*(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*

☐ for _____ days *(not to exceed 30)*   ☐ until, the facts justifying, the later specific date of _____ .

Date and time issued: _____ 4/30/2021 _____

G. Michael Harvey
2021.04.30 19:41:15 -04'00'
*Judge's signature*

City and state: _____ Washington, D.C. _____

G. Michael Harvey
United States Magistrate Judge

AO 93C  (08/18) Warrant by Telephone or Other Reliable Electronic Means (Page 2)

| **Return** | | |
|---|---|---|
| Case No.:<br><br>21-SW-134 | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of : | | |
| Inventory of the property taken and name(s) of any person(s) seized: | | |

**Certification**

      I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

## **ATTACHMENT A**

*Property to be searched*

The property to be searched is:

- One (1) black Kayoba-brand carry-on suitcase;

- One (1) black pleated duffel bag;

- One (1) metallic gray Regent-brand rolling suitcase; and

- One (1) black and brown Hartmann-brand rolling suitcase;

hereinafter the "Property."  The Property in currently located at the IRS Washington Field Office at 1200 First Street NE, Washington, D.C.

# ATTACHMENT B

*Property to be seized*

1.      The items, information, and data to be seized are fruits, evidence, information relating to, contraband, or instrumentalities, in whatever form and however stored, relating to violations of 18 U.S.C. § 1956 (money laundering), 18 U.S.C. § 1960 (unlicensed money transmission), and D.C. Code 26-1023(c) (money transmitting without a license in the District of Columbia), as described in the search warrant affidavit, including, but not limited to:

    a.  Records and information relating to the operation of BITCOIN FOG, including BITCOIN FOG's database in its entirety and any associated transaction history, logs, customer communication records, and user details;

    b.  Records and information related to financial accounts, including accounts at virtual currency exchanges;

    c.  Records and information related to cryptocurrency, money laundering, and blockchain analysis.

    d.  Records and information related to online usernames, social media accounts, monikers, aliases, email addresses, IP addresses, and other identifiers used by STERLINGOV;

    e.  Records related to other electronic devices, including servers, used by STERLINGOV;

    f.  Records related to the use of and STERLINGOV's familiarity with Tor and the darknet;

g.  Records and information related to darknet markets, including STERLINGOV's knowledge of darknet markets;

h.  Records and information related to the crimes constituting the specified unlawful activities for BITCOIN FOG's money laundering activity, including the narcotics distribution (21 U.S.C. § 841); identity theft and the sale of stolen personally identifiable information (PII) (18 U.S.C. § 1028A); and computer fraud and abuse, including the sale of computer hacking tools and exploits (18 U.S.C. § 1030).

i.  Records and information regarding STERLINGOV's efforts to evade law enforcement;

j.  Records and information relating to the identity or location of perpetrators, aiders and abettors, coconspirators, and accessories after the fact, including BITCOIN FOG users;

k.  Records and information that constitute evidence of the state of mind of STERLINGOV, *e.g.*, intent, absence of mistake, or evidence indicating preparation or planning, or knowledge and experience, related to the criminal activity under investigation;

l.  Records and information that constitute evidence concerning persons who either (i) collaborated, conspired, or assisted (knowingly or unknowingly) the commission of the criminal activity under investigation; or (ii) communicated with STERLINGOV about matters relating to the criminal activity under investigation, including records that help reveal their whereabouts.

2

2.      For any digital device which is capable of containing and reasonably could contain fruits, evidence, information, contraband, or instrumentalities as described in the search warrant affidavit and above, including but not limited to computers, smartphones, mobile devices, tablets, hard drives, SD cards and micro SD cards, Raspberry Pi mini computers, SIM cards, card readers, routers, modems, and network equipment used to connect computers to the Internet or other computers, hereinafter the "Devices":

    a. evidence of who used, owned, or controlled the Devices at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, chat, instant messaging logs, photographs, and correspondence;

    b. evidence of software, or the lack thereof, that would allow others to control the Devices, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

    c. evidence of the attachment to the Devices of other storage devices or similar containers for electronic evidence;

    d. evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the Devices;

    e. evidence of the times the Devices was used;

    f. passwords, encryption keys, and other access devices that may be necessary to access the Devices;

3

g.  documentation and manuals that may be necessary to access the Devices or to conduct a forensic examination of the Devices;

h.  records of or information about Internet Protocol addresses used by the Devices; and

i.  records of or information about the Devices's Internet activity or other network activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, records of user-typed web addresses, and records of connections to other networks or servers.

3.  Any and all cryptocurrency and related evidence, to include the following:

a.  any and all representations of cryptocurrency public keys or addresses, whether in digital or physical format;

b.  any and all representations of cryptocurrency private keys, whether in digital or physical format;

c.  any and all representations of cryptocurrency wallets or their constitutive parts, to include "recovery seeds," "seed phrases," or "root keys" which may be used to regenerate a wallet, whether in digital or physical format.

The United States is authorized to seize any and all cryptocurrency by transferring the full account balance in each wallet to a cryptocurrency address controlled by the United States.

The United States is further authorized to copy any wallet files and restore them onto computers controlled by the United States. By restoring the wallets on its own computers, the United States will continue to collect cryptocurrency transferred into

4

the defendant's wallets as a result of transactions that were not yet completed at the time that the defendant's devices were seized.

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **IN THE MATTER OF THE SEARCH OF SEIZED LUGGAGE AND ELECTRONIC DEVICES CURRENTLY LOCATED AT THE IRS WASHINGTON FIELD OFFICE AT 1200 FIRST ST NE UNDER RULE 41** | **SW No. 21SW134** |

## AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE

I, James A. Rohls, Jr., being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the search of property—namely, four suitcases containing, *inter alia*, electronic devices, documents, and personal effects—which is currently in law enforcement possession (the "Property"), as described in Attachment A, for information, including electronically stored information, as described in Attachment B.

2.      I am a Special Agent with the Federal Bureau of Investigation (FBI).  I have been employed by the FBI been since September 2002.  I am currently assigned to investigations of computer crimes, including those involving virtual currency, money laundering, and the darknet. Prior to my current assignment, I was assigned to a counterterrorism squad specializing in the identification of terrorist activity directed against the United States, as well as identification of the physical and financial support networks for terrorists who sought to target the interests of the United States and its allies.  In the course of conducting or participating in criminal investigations, I have been involved in interviewing and debriefing witnesses and informants; conducting physical surveillance; tracing and analyzing Internet Protocol (IP) addresses; tracing

and analyzing financial transactions, including through blockchain analysis; analyzing telephone pen registers; collecting and analyzing evidence; and preparing and executing search warrants. I have received organizational sponsored computer training as well as computer training at the SANS institute. I have received training in the area of computer security and network administration. I have also participated in the execution of many federal search warrants. As a federal agent, I am authorized to investigate violations of laws of the United States, and as a law enforcement officer I am authorized to execute warrants issued under the authority of the United States.

3.       The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents, witnesses, and agencies. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant. It does not set forth all of my knowledge, or the knowledge of others, about this matter.

4.       Based on my training and experience and the facts as set forth in this affidavit, I respectfully submit that there is probable cause to believe that violations of 18 U.S.C. § 1956 (money laundering), 18 U.S.C. § 1960 (unlicensed money transmission), and D.C. Code 26-1023(c) (money transmitting without a license in the District of Columbia) have been committed by Roman STERLINGOV. There is also probable cause to search the Property, further described below and in Attachment A, for the things described in Attachment B.

## IDENTIFICATION OF THE PROPERTY TO BE SEARCHED

5.       The property to be searched is:

- One (1) black Kayoba-brand carry-on suitcase;

- One (1) black pleated duffel bag;

2

- One (1) metallic gray Regent-brand rolling suitcase; and

- One (1) black and brown Hartmann-brand rolling suitcase;

that is, the "Property."

6.    The Property contains voluminous electronic devices and items of significance to the investigation, including (but not limited to):

    i.    Three (3) Samsung Galaxy mobile phones;

    ii.    Three (3) Samsung Evo 1TB Internal SDD hard drives;

    iii.    Multiple SD cards and micro SD cards;

    iv.    Multiple SIM cards;

    v.    Twelve (12) micro SD card readers;

    vi.    MSI Laptop, serial number █████████████

    vii.    Three (3) Raspberry Pi mini computers;

    viii.    Boox Model N96 Tablet, serial number ████████████████

    ix.    Bitcoin debit cards; and

    x.    Financial documents;

7.    The Property is currently located at the IRS Washington Field Office at 1200 First Street NE, Washington, D.C.

**<u>PROBABLE CAUSE</u>**

8.    The Federal Bureau of Investigation (FBI) and the Internal Revenue Service, Criminal Investigation (IRS-CI) have been investigating an illicit Bitcoin money transmitting and money laundering service called BITCOIN FOG.   As described further below, the investigation identified Roman STERLINGOV as the operator of BITCOIN FOG.   On April 26,

2021, STERLINGOV was charged by complaint in the District of Columbia with money laundering, in violation of 18 U.S.C. § 1956(a)(3); unlicensed money transmission, in violation of 18 U.S.C. § 1960; and money transmission without a license, in violation of D.C. Code 26-1023(c).  The Government anticipates indicting STERLINGOV in the coming weeks and is investigating additional money laundering conduct in addition to the activity specifically described in the complaint.  STERLINGOV was arrested shortly after midnight on April 27, 2021, after he traveled from Moscow to Los Angeles International Airport.  STERLINGOV had the Property in his possession at the time of his arrest.

**BITCOIN FOG Background**

9.      BITCOIN FOG is an Internet-based service accessible from the District of Columbia and U.S. states.  As of April 26, 2021, it could be accessed through the Tor hidden website located at http://foggeddriztrcar2.onion.[1]  BITCOIN FOG functioned as a Bitcoin

---

[1] Tor is a computer network designed to facilitate anonymous communication over the Internet.  The Tor network does this by routing a user's communications through a globally distributed network of relay computers, or proxies, rendering conventional Internet Protocol ("IP") address-based methods of identifying users ineffective.  To access the Tor network, a user must install Tor software either by downloading an add-on to the user's web browser or by downloading the free "Tor browser bundle," which is available at www.torproject.org.  When a Tor user accesses a website, only the IP address of the last relay computer (the "exit node"), as opposed to the user's actual IP address, is logged by the website.  The Tor network also makes it possible for users to operate websites, called "hidden services," in a manner that conceals the true IP address of the computer hosting the website.  Unlike standard Internet websites, a Tor-based web address is comprised of a series of 16 algorithm-generated characters, for example "asdlk8fs9dflku7f," followed by the suffix ".onion."  As with all Tor communications, communications between users' computers and a Tor hidden-service webserver are routed through a series of intermediary computers.  Accordingly, neither law enforcement nor hidden-service users can use public lookups or ordinary investigative means to determine the true IP address—and therefore the location—of a computer server that hosts a hidden service.  For these reasons, hidden services are often referenced as residing on the "darknet" or "Dark Web," and ordinary Internet websites are often referenced as residing on the "clearnet."

"tumbler" or "mixer" service.[2]  It allowed users to send bitcoins to designated recipients in a manner designed to conceal and obfuscate the source of the bitcoins.  It worked by disassociating incoming bitcoin from particular Bitcoin addresses or transactions and then comingling that bitcoin with other incoming bitcoin prior to conducting any further transactions.  This process allowed BITCOIN FOG customers engaged in unlawful activities to launder their proceeds by concealing the nature, source, and location of their "dirty" bitcoin.  BITCOIN FOG publicly advertised this service as a way to help users obfuscate the source of their bitcoin.  BITCOIN FOG charged customers a fee for this service.

10.     BITCOIN FOG was launched on or about October 27, 2011, and was operational as of April 26, 2021.  The website was one of the original Bitcoin tumbling sites on the darknet (i.e., areas of the Internet that can usually only be accessed with specific software, configurations, or authorization).  As described below, more than 1.2 million BTC (valued at approximately $335,809,383 at the time of the transactions) were sent through the site from in or about October 2011 through April 26, 2021.  The largest senders of BTC through BITCOIN FOG were darknet markets, such as Agora, Silk Road 2.0, Silk Road, Evolution, and AlphaBay, that primarily trafficked in illegal narcotics and other illegal goods.

11.     BITCOIN FOG was publicly advertised on Internet forums and well-known web pages promoting darknet markets as a tool for anonymizing bitcoin transactions.  The

---

[2] The virtual currency bitcoin (abbreviated "BTC") is a form of value that is able to be transacted over the Internet using Bitcoin software.  This software provides all necessary services including allowing users to create "Bitcoin addresses," roughly analogous to anonymous accounts; the injection of new bitcoin into circulation; and securely transferring bitcoin from one Bitcoin address to another.  For security and privacy reasons, it is common for a single Bitcoin user to control numerous Bitcoin addresses, which are stored and controlled in a "wallet."  Each address is controlled through the use of a unique "private key," akin to a password.

administrator of BITCOIN FOG publicly promoted the service through a clearnet site (www.bitcoinfog.com and www.bitcoinfog.info) and a Twitter page.  These outlets allowed users to easily locate and access the hidden services site through simple clearnet Internet searches.

**BITCOIN FOG Advertised Its Mixing Service Would Conceal BTC Transactions from Authorities**

12.    BITCOIN FOG's launch was announced in an October 27, 2011, posting titled "[ANNOUNCE] Bitcoin Fog: Secure Bitcoin Anonymization" on the BitcoinTalk.org online forum.  The announcement was posted by a user with the pseudonym Akemashite Omedetou (Japanese for "Happy New Year") and included links to a clearnet website for BITCOIN FOG (www.bitcoinfog.com), the Tor onion site (http://foggeddriztrcar2.onion), and a Twitter feed for updates on the site (www.twitter.com/#!/@Bitcoinfog).

13.    The announcement post described BITCOIN FOG as a tool to make it difficult for "interested parties, be it authorities or just interested researchers" to trace users' Bitcoin transactions across the Bitcoin network.  The post stated that BITCOIN FOG: "mix(es) up your bitcoins in our own pool with other users…get paid back to other accounts from our mixed pool…can eliminate any chance of finding your payments and making it impossible to prove any connection between a deposit and a withdraw inside our service."

14.    After announcing the launch of BITCOIN FOG, the pseudonym Akemashite Omedetou continued to post on BitcoinTalk.org, extolling the anonymizing features of BITCOIN FOG and providing updates on the service.  For example, on or about November 11, 2011, in response to an online comment that questioned a design feature of BITCOIN FOG, Akemashite stated: "should we make it easier…to do statistical analysis on our payouts…to help[ing] them

start finding our bitcoin client? (that could only be done by an authority of course…) We won't make their life easier."

15.     In another post, dated on or about February 9, 2012, Akemashite responded to a comment from a poster about using mainstream Bitcoin exchanges to mix virtual currency. Akemashite stated: "most of them [exchanges] are also run as legitimate, visible businesses, which will be forced to reveal information about your funds, should such a request be made by the authorities…us on the other hand, the authorities have to find first, which, as Silk Road have [sic] demonstrated, can prove problematic."

16.     The Twitter account @BitcoinFog was established on or about October 27, 2011, the date on which BITCOIN FOG was launched. The @BitcoinFog account regularly posted updates regarding the status of the BITCOIN FOG hidden site, including tweeting a link on November 14, 2014, to http://foggeddriztrcar2.onion, the current hidden services address for BITCOIN FOG.

17.     The @BitcoinFog account also tweeted links to stories discussing why users should tumble bitcoins – in order to thwart law enforcement.  For example, on or about September 13, 2017, the @BitcoinFog account tweeted a link to a story about the IRS using blockchain analysis software to track bitcoin.  On or about June 11, 2019, @BitcoinFog tweeted a link to a Europol press release announcing the law enforcement takedown of Bestmixer.io, another Bitcoin mixer/tumbler, commenting: "this is why you need to use ONLY a Tor-based mixing service (Such a surprise)."

**BITCOIN FOG Operated as an Illegal Money Transmitting and Money Laundering Service on the Darknet**

18.     While the identity of a Bitcoin address owner is generally anonymous (unless the owner opts to make the information publicly available), law enforcement can often identify the owner of a particular Bitcoin address by analyzing the blockchain.[3]  The analysis can also reveal additional addresses controlled by the same individual or entity.  For example, a user or business may create many Bitcoin addresses to receive payments from different customers.  When the user wants to transact the bitcoin that it has received (for example, to exchange bitcoin for other currency or to purchase goods or services), it may group those addresses together to send a single transaction.  Law enforcement uses commercial services offered by several different blockchain-analysis companies to investigate virtual currency transactions.  These companies analyze the blockchain and attempt to identify the individuals or groups involved in the virtual currency transactions.  Specifically, these companies create large databases that group transactions into "clusters" through analysis of data underlying the virtual currency transactions.

19.     Using blockchain analysis, law enforcement confirmed that over 1.2 million BTC (valued at approximately $335,809,383 at the time of the transactions) have been sent through BITCOIN FOG since the site was launched in 2011.  This figure includes BTC from various sources: all direct and indirect transactions from sources such as darknet markets; funds stolen from bitcoin addresses through hacks; direct deposits and withdrawals from Bitcoin wallets; sends and receives from wallets not apparently affiliated with a known hosted service; and other unknown sources.  IRS-CI cyber analysts reviewed all inputs and outputs from BITCOIN FOG

---

[3] All Bitcoin transactions are recorded on what is known as the blockchain.  The blockchain is essentially a distributed public ledger that keeps track of all Bitcoin transactions, incoming and outgoing, and updates approximately six times per hour.  The blockchain records every address that has ever received a bitcoin and maintains records of every transaction.

to identify bitcoins sent directly to BITCOIN FOG from known darknet markets and bitcoins sent from BITCOIN FOG to known darknet markets.  IRS-CI's analysis determined BITCOIN FOG received approximately 486,861.69 BTC (approximately $54,897,316.44 at the time of the transactions) *directly* from darknet markets.  BITCOIN FOG sent approximately 164,931.13 BTC (approximately $23,690,956.28 at the time of the transactions) *directly* to darknet markets. In sum, BITCOIN FOG sent or received more than $78 million in transactions involving known darknet markets, counting only direct transactions.

| Source Market | Total Received (BTC) | Total Received (USD) |
|---|---|---|

| | | |
|---|---|---|
| Agora Market | 41,966.87 | $14,398,754.73 |
| Silk Road 2.0 Market | 22,863.74 | $12,518,636.97 |
| Silk Road Marketplace | 377,102.74 | $9,556,159.49 |
| Evolution Market | 11,100.79 | $3,199,542.15 |
| AlphaBay Market | 5,442.86 | $2,907,508.67 |

20.     Among these, IRS-CI cyber analysts identified direct deposits into BITCOIN FOG from at least 35 darknet markets. Below are the top five markets by U.S. dollar value of deposits:[4]

21.     IRS-CI cyber analysts identified funds sent directly from BITCOIN FOG to at least 51 different darknet markets. Below are the top five markets by dollar value of sends:

| Destination Market | Total Sent (BTC) | Total Sent (USD) |
|---|---|---|
| Agora Market | 26,398.12 | $8,680,430.34 |
| Silk Road 2.0 Market | 11,274.21 | $5,871,831.33 |
| Silk Road Marketplace | 106,522.77 | $2,289,509.42 |

---

[4] The U.S. dollar value is calculated as of the date of each BTC transaction.  Because the price of BTC has fluctuated significantly since BITCOIN FOG first became operational in or about October 2011, the tables presented above do not show a consistent exchange rate between BTC and U.S. dollars.

|                  |          |                |
|------------------|----------|----------------|
| Evolution Market | 6,473.24 | $1,860,053.75  |
| AlphaBay Market  | 3,375.90 | $1,557,931.95  |

22.     Based on my training and experience, including experience in other darknet investigations, darknet markets exist primarily to traffic in illegal narcotics and other illegal goods and services – a fact well-known among darknet market user and administrators, and intended by the administrators.  That the darknet markets listed above primarily traffic in illegal narcotics and other illegal goods and services would be apparent to anyone using the markets because the categories listed on each market, and the majority of specific listings, openly discuss illegal goods and services.  I am familiar with each of the darknet markets listed in the tables above and am aware that illegal narcotics and other illegal goods and services constituted the majority of items for sale on each market.  Accordingly, there is probable cause to believe that the bitcoin transactions sent to and from BITCOIN FOG involved the proceeds of "specified unlawful activity," as defined in 18 U.S.C. § 1956(c)(7), such as narcotics distribution (21 U.S.C. § 841); identity theft and the sale of stolen personally identifiable information (PII) (18 U.S.C. § 1028A); and computer fraud and abuse, including the sale of computer hacking tools and exploits (18 U.S.C. § 1030).

**Undercover Transactions on BITCOIN FOG**

### *September 2019 Undercover Transaction*

23.     On or about September 11, 2019, an IRS-CI Special Agent (UC) physically located in the District of Columbia and operating in an online undercover capacity accessed BITCOIN FOG at foggeddriztrcar2.onion through the Tor browser.  The UC created an account

through the registration page by creating a username, password, and entering a security text phrase pictured below the registration text boxes.  The registration page of BITCOIN FOG stated: "As an anonymous service, we do not collect any additional information about you besides a user name and password."

24.     The UC was never asked for any identifying information such as an email account, date of birth, social security number, or passport number, or for any other proof of identification, when creating the account.

25.     On or about September 11, 2019, while physically located in the District of Columbia, the UC sent approximately 0.02488936 BTC ($249.99) from an IRS-CI controlled covert wallet ("UC Sending Wallet") into a wallet address provided by BITCOIN FOG.

26.     On or about September 12, 2019, while physically located in the District of Columbia, the UC accessed foggeddriztrcar2.onion.  The UC's undercover BITCOIN FOG account showed a balance of approximately 0.02425700.  The difference of approximately 0.00063236 BTC between the amount the UC deposited and the balance shown is approximately 2.5% of the total deposit.  This is the service fee charged by BITCOIN FOG.  On or about September 12, 2019, while physically located in the District of Columbia, the UC sent 0.02 BTC from BITCOIN FOG to an IRS-CI controlled covert wallet ("UC Receiving Wallet").

27.     Through blockchain analysis, investigators traced bitcoin from the BITCOIN FOG deposit address to known BITCOIN FOG Bitcoin clusters identified through blockchain analysis.  IRS-CI investigators also traced bitcoin sent to the UC Receiving Wallet and confirmed that the bitcoin was sourced from BITCOIN FOG clusters.

12

28.     Investigators were unable to directly trace any direct link between the "UC Sending Wallet" and the "UC Receiving Wallet," confirming that BITCOIN FOG successfully tumbled the transaction by breaking the link in the blockchain between the source and ultimate destination of the funds.

### *November 2019 Undercover Transaction*

29.     On or about November 18, 2019, while physically located in the District of Columbia, an IRS-CI Special Agent (UC) operating in an online undercover capacity sent approximately 0.01173987 BTC to BITCOIN FOG from an IRS-CI controlled undercover account on the Apollon darknet market.  Apollon was a darknet market known to sell illegal narcotics, stolen PII, and other illegal items.  On November 19, 2019, while physically located in the District of Columbia, the SA accessed BITCOIN FOG at foggeddriztrcar2.onion.  The UC's undercover account on BITCOIN FOG showed that the account had been credited by the amount of the send transaction, less an approximately 2.32% fee.

30.     On or about November 19, 2019, while physically located in the District of Columbia and after confirming the deposit of funds from Apollon Market had been credited to the UC's BITCOIN FOG account, the UC sent the message below to the BITCOIN FOG administrator using the messaging function on the BITCOIN FOG site, stating the funds were the proceeds of illegal narcotics sales:

**Message history:**

(Answers from our crew appear here.)

(You can also wipe the message history (not undoable)).

hello, i need help.

i created my account to clean my coins from selling ecstasy. I sold molly on apollon and ive been selling on WSM and dream but all the exit scams and cops got me spooked. Im new to this and im worried im gonna get caught.

I need help cleaning my bitcoin and I dont trust the big mixers after best mixer. Bitcoin fog has been around forever you you guys must be doing something right. I have more coins i need cleaned but how do i know I can trust you??? People on bitcoin talk say your a scam.

31.     On or about November 21, 2019, while physically located in the District of Columbia, the UC again accessed BITCOIN FOG operating in an online undercover capacity. There was no response to the above message posted by the SA on or about November 19, 2019. The UC then directed BITCOIN FOG to send 0.01146764 BTC from the undercover account on BITCOIN FOG to an IRS-CI controlled undercover wallet.  BITCOIN FOG did so.

32.     The UC clearly stated that the BTC was from the sale of ecstasy/molly, an illegal narcotic.  At no point did the administrator of BITCOIN FOG prevent the deposit of funds from Apollon or prevent the withdrawal of funds after the funds were represented to be the proceeds of illegal drug sales.

33.     Through blockchain analysis, investigators traced bitcoin from the IRS-CI controlled account on Apollon Market, to the BITCOIN FOG deposit address, to known BITCOIN FOG bitcoin clusters identified through blockchain analysis.  IRS-CI investigators

14

also traced bitcoin sent to the IRS-CI controlled undercover wallet and confirmed that the bitcoin was sourced from BITCOIN FOG clusters.

### *March–April 2021 Undercover Transaction*

34.     On or about March 10, 2021, while physically located in the District of Columbia, an IRS-CI Special Agent (UC) operating in an online undercover capacity accessed BITCOIN FOG.  The UC sent three separate deposits to BITCOIN FOG in the amounts of 0.0043444 BTC, 0.00836095 BTC, and 0.0089869 BTC.

35.     On or about April 19, 2021, while physically located in the District of Columbia, the UC contacted the administrator of BITCOIN FOG and advised that the deposited funds were the proceeds of a COVID fraud scheme, stating: "I am in need of partner.  I have many targets in US for my attack.  I develop program to lock government corona checks until persons pay me bitcoin ransom.  These are first three deposits to the fog."

36.     The UC clearly stated that the BTC was from a COVID fraud.  At no point did the administrator of BITCOIN FOG prevent the use of BITCOIN FOG to launder funds that were represented to be illicit proceeds.

## Attribution of BITCOIN FOG to ROMAN STERLINGOV

37.     Analysis of bitcoin transactions, financial records, Internet service provider records, e-mail records, and additional investigative information, identifies ROMAN STERLINGOV as the principal operator of BITCOIN FOG.

### *"Akemashite Omedotou" and the Shormint@hotmail.com Account*

38.     Early in the investigation, identifiers connected BITCOIN FOG to the pseudonym Akemashite Omedotou and the email account shormint@hotmail.com.  As noted above,

BITCOIN FOG's launch was announced in a posting on the BitcoinTalk.org forum on or about October 27, 2011, by a user called Akemashite Omedetou.  Records from BitcoinTalk.org for the account associated with Akemashite Omedetou revealed that the account was created on or about October 25, 2011, using email address shormint@hotmail.com.   The account registration information included the website title "Bitcoin Fog" and website URL http://www.bitcoinfog.com.

39.    According to account details obtained from Twitter, the account @BitcoinFog was created on October 27, 2011 (the date BITCOIN FOG was announced) and was registered with email address shormint@hotmail.com.

40.    Records from Microsoft pertaining to shormint@hotmail.com revealed that the account was created on October 7, 2011, using an apparent false name and accessed through a Virtual Private Network (VPN) service, used to anonymize user's Internet traffic.  Based on my training and experience, I know that criminals often set up "burner" accounts in order to register domains and pay for services tied to their illicit activity.

### Connecting the BITCOIN FOG Domain to STERLINGOV

41.    Additional investigation, as described below, connects STERLINGOV to the original BITCOIN FOG clearnet domain.

42.    According to publicly available WhoIs information, www.bitcoinfog.com was registered through the web hosting service Highhosting.net on October 25, 2011.  The WhoIs records showed that the domain was registered to "Akemashite Omedetou" using email address shormint@hotmail.com.   Records from Highhosting.net revealed that Akemashite Omedetou

16

used a Liberty Reserve[5] account (Liberty Reserve Account 1) to pay for the domain.  Liberty Reserve records showed that Liberty Reserve Account 1 was registered to shormint@hotmail.com.

43.    Investigators reviewed the account activity associated with Liberty Reserve Account 1 and determined that STERLINGOV had funded the account using a series of layered transactions through multiple payment platforms, performed in close temporal proximity and apparently designed to make it difficult to trace the payment to his true identity.  Specifically:

- On September 29, 2011, according to records from the virtual currency exchange Mt. Gox,[6] Roman STERLINGOV opened an account in his true name at Mt. Gox (Mt. Gox Account 1), using the email address plasma@plasmadivision.com.

- On October 3, 2011, STERLINGOV funded Mt. Gox Account 1 with 100 euros.

- On October 19, 2011, Mt. Gox Account 1 sent 36 BTC through an off-platform Bitcoin address to a second Mt. Gox Account (Mt. Gox Account 2) (registered to "nfs9000@hotmail.com").

---

[5] Liberty Reserve was a Costa Rica-based digital currency exchange service that allowed users to register and transfer money to other users with only a name, e-mail address, and birth date.  Deposits could be made through third parties using a credit card or bank wire, among other deposit options.  Liberty Reserve did not directly process deposits or withdrawals.  Deposited funds were then "converted" into Liberty Reserve Dollars (LRUSD) or Liberty Reserve Euros (LREUR), which were tied to the value of the U.S. dollar and the euro, respectively.  The service was shut down by U.S. law enforcement in May 2013 after the founder was charged in the United States with money laundering and operation of an unlicensed money service business.

[6] Mt. Gox was a Bitcoin exchange based in Japan that suspended operation in April 2014 after suffering a hack that stole 850,000 bitcoins.

- On October 20, 2011, Mt. Gox Account 2 sent 35 BTC to a third Mt. Gox Account (Mt. Gox Account 3) (registered to "kolbasa99@rambler.ru").

- On October 20, 2011, Mt. Gox Account 3 sent $80 USD to an account at Aurum Xchange (Aurum Xchange Account 1), another digital payment platform.

- On October 20, 2011, Aurum Xchange Account 1 sent $76 USD to Liberty Reserve Account 1.

- On October 25, 2011, Liberty Reserve Account 1 paid the domain fees for www.bitcoinfog.com to Highhosting.net.

This series of transactions is depicted in the below chart:



44.     An analysis of the IP addresses used to access the above Liberty Reserve and Mt. Gox accounts confirmed that the accounts shared a common owner: STERLINGOV.   For example, IP logs from Mt. Gox and Liberty Reserve showed that on November 24, 2011, a user using the IP address 212.117.160.123 logged into Mt. Gox Account 2, Mt. Gox Account 3, and Liberty Reserve Account 1, as well as another Liberty Reserve account registered to Roman STERLINGOV (Liberty Reserve Account 2).   STERLINGOV was also the named account

owner of a third Liberty Reserve account (Liberty Reserve Account 3) registered using the email address heavydist@gmail.com (Google Account 1).

45.     Liberty Reserve records revealed that Liberty Reserve Account 2 was registered in STERLINGOV's true name using the email address plasma@plasmadivision.com, the same e-mail tied to Mt. Gox Account 1.  The account registration information included a residential address in Gothenburg, Sweden corresponding to STERLINGOV's home address.  Both Liberty Reserve Account 2 and Liberty Reserve Account 3 were registered using a Swedish telephone number, TELEPHONE NUMBER 1, which Swedish telecommunications provider records revealed is registered to STERLINGOV.

46.     On August 25, 2012, Mt. Gox Account 1 received a 180 BTC deposit sent from an account at BTC-e[7] (BTC-e Account 1).  According to records from BTC-e, BTC-e Account 1 was registered to Roman STERLINGOV, using Google Account 1.

47.     Records from Google pertaining to Google Account 1 revealed that the account was registered to "Roman Heavydist" and was linked to TELEPHONE NUMBER 1, identified above as STERLINGOV's phone number.  Investigators obtained the contents of Google Account 1 pursuant to a lawfully authorized search warrant.  Google Account 1's Google Drive folder contained Russian language document titled Ввод денег  ("Putting Money"), dated September 29, 2011 (less than a month prior to the launch of BITCOIN FOG).  A translation of the document showed that the document appeared to be notes taken by STERLINGOV describing how to layer funds.  The steps outlined in the document match the steps that

_____

[7] BTC-e was cryptocurrency exchange that was shut down in July 2017 when the exchange founder was indicted in the United States for money laundering and the servers were seized by U.S. law enforcement.

STERLINGOV took to pay for the domain www.bitcoinfog.com. The below chart displays the relevant text of the document overlayed on the transaction path used by STERLINGOV to pay for the BitcoinFog.com domain.



***STERLINGOV's Connections to Early BITCOIN FOG Test Transactions***

48.     Blockchain analysis of the earliest transactions associated with BITCOIN FOG's activity on the blockchain revealed a series of small value transactions, beginning in early October 2011, approximately two weeks before BITCOIN FOG was officially launched on October 27, 2011.  The transactions appeared to be test transactions conducted to beta test the BITCOIN FOG mixer before it went live.  These transactions originated from Mt. Gox Account 1, registered in STERLINGOV's true name.

49.     As shown by Mt. Gox records and blockchain analysis, on October 13, 2011, Mt. Gox Account 1 sent approximately two BTC to Bitcoin cluster 12NSB5.  This deposit was then broken into smaller amounts through a series of four Bitcoin transactions.  Subsequently, the

bitcoin was deposited into two new bitcoin wallets,  1KWMex (0.41 BTC) and 1NeWNP (1.57 BTC).  The transaction pattern within cluster 12NSB5 is consistent with mixing/tumbling transactions, including those seen from BITCOIN FOG.

50.    Wallet 1KWMex held its 0.41 bitcoin idle, while wallet 1NeWNP transferred its bitcoin to a new address.  Through blockchain analysis, investigators traced the outflow of the balance of 1.57 BTC from wallet 1NeWNP to BITCOIN FOG.

51.    Based on my training and experience, I know that software and web developers typically beta-test new software and websites prior to launching them.  Beta testing is conducted to confirm that a site's features work and, in the case of a mixer such as BITCOIN FOG, to ensure the tumbler's algorithm is properly working.   Law enforcement has observed on numerous occasions darknet market site administrators conduct beta testing prior to launching darknet platforms to the public. Based on my training and experience, including previous investigations of Bitcoin mixers, I believe that the activity described above is consistent with beta testing the BITCOIN FOG platform.  I am aware that such beta testing would typically only be conducted an individual involved in administrating a website or service.

### STERLINGOV's Receipt of Proceeds from BITCOIN FOG

52.    BITCOIN FOG charges a variable fee of 2% to 2.5% on each deposit. Blockchain analysis revealed that these fees are retained within the BITCOIN FOG cluster, and that the administrator made periodic withdrawals from the BITCOIN FOG cluster to pay himself. These withdrawals occur sporadically and in the same manner as a regular user.   The withdrawals appear to be concealed to blend in with regular mixing transactions in order to protect the site administrator from scrutiny.  Based on BITCOIN FOG's transaction activity over

time, STERLINGOV would have made approximately $8 million in commissions from BITCOIN FOG transactions if he had cashed out the administrative fees near the time that the transactions occurred.  Due to the significant increase in value of bitcoin over the course of BITCOIN FOG's operation – from a low of approximately $2 shortly after BITCOIN FOG launched in fall 2011 to a current value of $50,000 – STERLINGOV has been able to reap significant appreciation from his profits that were kept in bitcoin.  The current value of the BITCOIN FOG cluster – including customer funds in STERLINGOV's control and STERLINGOV's own money – is nearly $70 million.

53.     Investigators obtained records of STERLINGOV's true-name accounts at several cryptocurrency exchanges.  Analysis of STERLINGOV's accounts revealed the vast majority of cryptocurrency deposited into his accounts was originally sourced and traced back to BITCOIN FOG clusters.  This activity continued through at least 2019.

**BITCOIN FOG Is Not Registered with FinCEN or Licensed in the District of Columbia**

54.     Records from the Financial Crimes Enforcement Network ("FinCEN"), a division of the U.S. Department of Treasury, revealed that neither ROMAN STERLINGOV nor BITCOIN FOG was registered as a Money Services Business under federal law, despite conducting transactions with U.S. based customers.  Similarly, records from the District of Columbia Department of Insurance and Banking (DISB) revealed that neither ROMAN STERLINGOV nor BITCOIN FOG was licensed as a Money Transmitter under District of Columbia law, despite conducting transactions with persons based in the District of Columbia.

55.     Based on my training and experience, I am aware that the Bank Secrecy Act requires anyone who owns or controls a money transmitting business to register with the

Secretary of the Treasury. *See* 31 U.S.C. § 5330(a)(1). I am further aware that federal regulations issued pursuant to the Bank Secrecy Act define "money services business" ("MSBs"), which include "money transmitter[s]." 31 C.F.R. § 1010.100(ff)(5). Money transmitters are defined broadly, and include anyone who "accept[s] . . . currency, funds, or other value that substitutes for currency from one person and . . . transmi[ts] . . . currency, funds, or other value that substitutes for currency to another location or person by any means," as well as "[a]ny other person engaged in the transfer of funds." 31 C.F.R. § 1010.100(ff)(5)(i)(A)-(B). MSBs are required to register with the FinCEN, unless specific exemptions apply. 31 C.F.R. § 1022.380(a)(1). MSBs are required to establish and maintain anti-money laundering programs, to detect and report suspicious transactions, and to collect certain records of customers and customer transactions.

56.     I am further aware that, in the District of Columbia, anyone engaging in the "business of money transmission" is generally required to obtain a license from the Superintendent of the Office of Banking and Financial Institutions of the District of Columbia. D.C. Code § 26-1002(a). "Money transmission" is defined as "the sale or issuance of payment instruments or engaging in the business of receiving money for transmission or transmitting money within the United States, or to locations abroad, by any and all means, including but not limited to payment instrument, wire, facsimile, or electronic transfer." D.C. Code § 26-1001(10). Under District of Columbia code, engaging in the business of money transmission without a license is punishable as a felony. D.C. Code § 26-1023(c).

57.     I am further aware that Bitcoin "mixers" or "tumblers" such as BITCOIN FOG are considered to be MSBs under federal law, and they are also considered to be money

transmitting businesses under District of Columbia law. *See* U.S. Dep't of the Treasury FinCEN Guidance, *Application of FinCEN's Regulations to Certain Business Models Involving Convertible Virtual Currencies*, FIN-2019-G001 (May 9, 2019), at 19-20; *United States v. Harmon*, 474 F. Supp. 3d 76 (D.D.C. 2020).

**The Property**

58.     STERLINGOV had the Property in his possession at the time of his arrest at Los Angeles International Airport.  The Property was seized incident to STERLINGOV's arrest, inventoried, and transported to the District of Columbia.  The Property is currently in the lawful possession of IRS-CI and stored at the IRS Washington Field Office at 1200 First Street NE, Washington, D.C.

59.     The inventory of the Property showed that the Property contained voluminous electronics equipment, as well as bitcoin debit cards and documents.

60.     For example, the black pleated duffel bag contained items including, but not limited to, three Samsung Galaxy phones, a wallet, U.S. and foreign currency, 5 bitcoin debit cards, an orange folder with documents, receipts, three Samsung Evo 1TB Internal SDD hard drives; a purse containing 5 SD storage cards, 3 USB storage devices, 4 phone Sim cards, 12 micro SD card readers, 1 partially broken micro SD card, and several loose SIM card holders. The purse within the duffel bag also contained an additional 7 micro SD cards concealed in Ikea tape measurers.

61.     The black Kayoba suitcase contained items including, but not limited to, an MSI laptop, serial number ███████████ an Eco Plus 412P UPS (equipment for providing an uninterrupted power supply to a router); a Boox Model N96 Tablet with serial number

▮▮▮▮▮▮▮▮ documents and receipts; a webcam; a D-link Switch (computer network equipment); two Raspberry Pi miniature computers, one containing a micro SD card; handwritten documents; 3 sealed prepaid SIM cards; computer accessories and adapters; Russian-branded 4G modems; and back-up codes for heavydist@gmail.com.

62.     The silver Regent-brand suitcase contained items including, but not limited to, another Raspberry Pi mini computer, a shoebox containing documents and hard drives, and a notebook.  The silver Regent suitcase also contained a LiveLTE modem, which, according to the LiveLTE website, is a Russian-branded modem which anonymizes user's Internet traffic through the use of multiple SIM cards from multiple networks, splitting packets across those networks and anonymizing the connection to a destination server.

63.     The black and brown Hartmann-brand suitcase contained items including, but not limited to, various personal items, business cards, a security token, and empty electronics boxes.

64.     The Property was repacked after being inventoried, including consolidating electronics and valuables to protect from potential damage during transport.  Apart from this repacking, the Property is in substantially the same state as it was when it was seized incident to Sterlingov's arrest.

65.     In my training and experience, the items included in the inventory are indicative of a highly sophisticated cyber criminal who is going to great lengths to conceal his activities. The volume and array of electronic equipment are not consistent with an individual planning to engage in purely leisure activities during a U.S. vacation.  Rather, STERLINGOV's luggage and their contents are more consistent with an individual who needs to be actively connecting to servers or other electronic devices with high levels of anonymity and who needs significant

computing power and storage. Based on this information, I believe that STERLINGOV was planning to actively work on BITCOIN FOG during his time in the United States, and that the equipment that he packed was intended to support his work on BITCOIN FOG.

## TECHNICAL TERMS

66.     Based on my training and experience, and information acquired from other law enforcement officials with technical expertise, I know the terms described below have the following meanings or characteristics:

a.     "Digital device," as used herein, includes the following three terms and their respective definitions:

1)     A "computer" means an electronic, magnetic, optical, or other high speed data processing device performing logical or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device. *See* 18 U.S.C. § 1030(e)(1). Computers are physical units of equipment that perform information processing using a binary system to represent information. Computers include, but are not limited to, desktop and laptop computers, smartphones, tablets, smartwatches, and binary data processing units used in the operation of other products like automobiles.

2)     "Digital storage media," as used herein, means any information storage device in which information is preserved in binary form and includes electrical, optical, and magnetic digital storage devices. Examples of digital storage media include, but are not limited to, compact disks, digital versatile disks ("DVDs"), USB flash drives, flash memory cards, and internal and external hard drives.

26

3)  "Computer hardware" means all equipment that can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data.  Computer hardware includes any data-processing devices (including, but not limited to, central processing units, internal and peripheral storage devices such as fixed disks, external hard drives, floppy disk drives and diskettes, and other memory storage devices); peripheral input/output devices (including, but not limited to, keyboards, printers, video display monitors, modems, routers, scanners, and related communications devices such as cables and connections), as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including, but not limited to, physical keys and locks).

b.  "Wireless telephone" (or mobile telephone, or cellular telephone), a type of digital device, is a handheld wireless device used for voice and data communication at least in part through radio signals and also often through "wi-fi" networks.  When communicating via radio signals, these telephones send signals through networks of transmitters/receivers, enabling communication with other wireless telephones, traditional "land line" telephones, computers, and other digital devices.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones offer a broad range of applications and capabilities.  These include, variously: storing names and phone numbers in electronic "address books"; sending, receiving, and storing text messages, e-mail, and other forms of messaging; taking, sending, receiving, and storing still photographs and video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; utilizing global

positioning system ("GPS") locating and tracking technology, and accessing and downloading information from the Internet..

      e.     "Computer passwords and data security devices" means information or items designed to restrict access to or hide computer software, documentation, or data.  Data security devices may consist of hardware, software, or other programming code.  A password (a string of alpha-numeric characters) usually operates as a digital key to "unlock" particular data security devices.  Data security hardware may include encryption devices, chips, and circuit boards.  Data security software of digital code may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched.  Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the progress to restore it.

      f.     "Computer software" means digital information which can be interpreted by a computer and any of its related components to direct the way they work.  Computer software is stored in electronic, magnetic, or other digital form.  It commonly includes programs to run operating systems, applications, and utilities.

      g.     Internet Protocol ("IP") Address is a unique numeric address used by digital devices on the Internet.  An IP address, for present purposes, looks like a series of four numbers, each in the range 0-255, separated by periods (*e.g.*, 149.101.1.32).  Every computer attached to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination.  Most Internet service providers control a range of IP addresses.  Some computers have static—that is,

long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

        h.     The "Internet" is a global network of computers and other electronic devices that communicate with each other using numerous specified protocols.  Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

        i.     "Internet Service Providers," or "ISPs," are entities that provide individuals and businesses access to the Internet.  ISPs provide a range of functions for their customers, including access to the Internet, web hosting, e-mail, remote storage, and co-location of computers and other communications equipment.  ISPs can offer a range of options in providing access to the Internet, including via telephone-based dial-up and broadband access via digital subscriber line ("DSL"), cable, dedicated circuits, fiber-optic, or satellite.  ISPs typically charge a fee based upon the type of connection and volume of data, called bandwidth, which the connection supports.  Many ISPs assign each subscriber an account name, a user name or screen name, an e-mail address, an e-mail mailbox, and a personal password selected by the subscriber.  By using a modem, the subscriber can establish communication with an ISP and access the Internet by using his or her account name and password.

        j.     A "modem" translates signals for physical transmission to and from the ISP, which then sends and receives the information to and from other computers connected to the Internet.

k.      A "router" often serves as a wireless Internet access point for a single or multiple devices, and directs traffic between computers connected to a network (whether by wire or wirelessly).  A router connected to the Internet collects traffic bound for the Internet from its client machines and sends out requests on their behalf.  The router also distributes to the relevant client inbound traffic arriving from the Internet.  A router usually retains logs for any devices using that router for Internet connectivity.  Routers, in turn, are typically connected to a modem.

l.      "Cache" means the text, image, and graphic files sent to and temporarily stored by a user's computer from a website accessed by the user in order to allow the user speedier access to and interaction with that website in the future.

m.      "SD card" and "Micro SD card" are small, removable memory cards that are used to store data.

n.      "SIM card, or Subscriber Identity Module card, is a very small circuit board that is inserted into a mobile device to allow the user to connect to a mobile phone network.

o.      "VPN" means a virtual private network.  A VPN extends a private network across public networks like the Internet.  It enables a host computer to send and receive data across shared or public networks as if they were an integral part of a private network with all the functionality, security, and management policies of the private network.  This is done by establishing a virtual point-to-point connection through the use of dedicated connections, encryption, or a combination of the two.  The VPN connection across the Internet is technically a wide area network (WAN) link between the sites.  From a user perspective, the extended network resources are accessed in the same way as resources available from a private network-

30

hence the name "virtual private network."  The communication between two VPN endpoints is encrypted and usually cannot be intercepted by law enforcement.

p.      "Encryption" is the process of encoding messages or information in such a way that eavesdroppers or hackers cannot read it but authorized parties can.  In an encryption scheme, the message or information, referred to as plaintext, is encrypted using an encryption algorithm, turning it into an unreadable ciphertext.  This is usually done with the use of an encryption key, which specifies how the message is to be encoded.  Any unintended party that can see the ciphertext should not be able to determine anything about the original message.  An authorized party, however, is able to decode the ciphertext using a decryption algorithm that usually requires a secret decryption key, to which adversaries do not have access.

q.      "Malware," short for malicious (or malevolent) software, is software used or programmed by attackers to disrupt computer operations, gather sensitive information, or gain access to private computer systems.  It can appear in the form of code, scripts, active content, and other software.  Malware is a general term used to refer to a variety of forms of hostile or intrusive software.

67.     In my training and experience, examining data stored on devices of the types contained in the Property can uncover, among other things, evidence that reveals or suggests who possessed or used the device, and sometimes by implication who did not, as well as evidence relating to the commission of the offense(s) under investigation.

## ADDITIONAL PROBABLE CAUSE CONNECTED TO THE PROPERTY

68.     As described above and in Attachment B, this application seeks permission to search for evidence, fruits, contraband, instrumentalities, and information that might be found

within the Property, in whatever form they are found.  Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I respectfully submit that there is probable cause to believe that the records and information described in Attachment B will be stored within the Property for at least the following reasons:

- Through investigation and training, I am aware that individuals involved in criminal schemes on the darknet frequently launder both cryptocurrency and fiat currency sourced from their illicit activities.  Individuals convert the cryptocurrency to fiat currency using cryptocurrency exchanges, online sales of cryptocurrency for fiat currency through peer-to-peer trading platforms, or through direct person-to-person exchanges of cryptocurrency for fiat currency.  The fiat currency is often laundered through corporate and personal accounts, both in the United States and abroad.  Your Affiant is aware that records relating to these transactions are often found in electronic devices used by individuals and their associated businesses.  This information is sometimes co-located in files or applications that also contain information regarding the legal banking information of their businesses, which usually play a role in the money laundering enterprise.  These financial dealings are often done digitally through an electronic device.  Furthermore, banks often provide information relating to financial transactions through automated texts or emails that are stored on electronic devices.  Printed financial records may similarly provide insight into a criminal's illicit financial activity.  Similarly, cryptocurrency debit cards and receipts may assist investigators in identifying and tracing illicit financial activity.

- I am aware that individuals engaged in criminal schemes on the darknet, such as operating a money laundering service, often maintain virtual currency wallets on their electronic devices. They also often back up copies of their cryptocurrency wallets in paper form, including by writing down the recovery seeds in notebooks.

- I am further aware that individuals engaged in criminal schemes on the darknet launder profits by purchasing assets. In sophisticated schemes, real or sham businesses or real estate transactions are used to "clean" the proceeds of the illegal conduct. Individuals often keep records of these transactions on their electronic devices and in paper form as a means of identifying the location of their illicit gain.

- I am aware that individuals involved in criminal schemes on the darknet often maintain records linking them to their activity and their criminal associates. These records may be stored physically or digitally on computers or other electronic devices or media, or in physical form. These records may include notes, records or ledgers of money laundering transactions, records of virtual currency and fiat currency transactions and other records, including telephone records, text messages, emails, and contact lists, which identify other co-conspirators. I know that records may be in code and/or may appear as rather innocuous and not particularly incriminating on their face. Such records are often maintained for extended periods of time.

- Based on my training and experience, I am also aware that individuals involved in criminal schemes on the darknet store on electronic devices photos, videos, and other media associated with the operation of the online criminal scheme. This media includes photographs and videos of the website, graphics used on the site, promotional advertisements

(both photo and video) and other items associated with their illegal activities to demonstrate their prowess and as an advertisement of their wares. These photos, videos, and other media often establish the identities of the individuals involved in the perpetration of other individuals involved in criminal schemes on the darknet.

- Based upon my training and experience, I know that communication through electronic devices—such as through telephone calls, texts, chat, email, instant messaging, and other applications—enables individuals involved in criminal schemes on the darknet to maintain constant contact with associates, co-conspirators, customers and service providers. I know that it is common for individuals involved in criminal schemes on the darknet to use these applications to communicate with associates relating to the logistics of running their online scheme and store information (purposely or inadvertently) relating to their unlawful activities.

- Additionally, individuals involved in criminal schemes on the darknet often use or otherwise store data about payments for services, such as web hosting, database administration, and hardware purchases on electronic devices. These communications and other records also tend to establish the perpetrators' identities. Based on my training and experience, I am aware that individuals involved in criminal schemes on the darknet often use electronic devices to facilitate transactions. These electronic devices often contain financial data relating to the transactions, such as bank account numbers, bank records, credit card numbers, credit card account and account information used for the purchase of services and equipment, and all identifying information for the same. The communications and other data often also demonstrate the subject's state of mind.

- Based upon my training and experience, I am aware that individuals involved in criminal schemes on the darknet also use electronic devices for communication or other forms of data storage or sending/receiving information relating to bank records, account information, and other electronic financial records ties to the operation of the criminal scheme.

- Based on my training and experience, I am aware that sophisticated cyber criminals take many steps to conceal their activity online, including through the use of customized computer and network configurations such as those that are possible using the hardware contained in the Property.  I know that this hardware can contain essential evidence of a criminal's activity online.  For example, networking equipment may be configured to connect to or through particular servers, revealing the location of additional infrastructure used in the criminal scheme.

- Through training and experience conducting numerous investigations of individuals involved in the creation, administration and operation of illicit websites on the Darknet, I am aware that the perpetrators of these schemes often retain backup copies of developmental databases, website administrative databases and other pertinent information on removable electronic media devices such as thumb drives, portable hard drives, and other storage devices.  These individuals typically retain this information in the event that their website crashes or in some cases to re-sell to other individuals involved in similar illicit activities.

- Individuals who engage in the foregoing criminal activity, in the event that they change digital devices, will often "back up" or transfer files from their old digital devices to that of their new digital devices, so as not to lose data, including that described in the foregoing paragraph, which would be valuable in facilitating their criminal activity.

35

- Digital device files, or remnants of such files, can be recovered months or even many years after they have been downloaded onto the medium or device, deleted, or viewed via the Internet. Electronic files downloaded to a digital device can be stored for years at little or no cost. Even when such files have been deleted, they can be recovered months or years later using readily-available forensics tools. When a person "deletes" a file on a digital device such as a home computer, a smart phone, or a memory card, the data contained in the file does not actually disappear; rather, that data remains on the storage medium and within the device unless and until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space – that is, in space on the digital device that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space – for long periods of time before they are overwritten. In addition, a digital device's operating system may also keep a record of deleted data in a "swap" or "recovery" file. Similarly, files that have been viewed via the Internet are automatically downloaded into a temporary Internet directory or "cache." The browser typically maintains a fixed amount of electronic storage medium space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages. Thus, the ability to retrieve "residue" of an electronic file from a digital device depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer, smart phone, or other digital device habits.

69. As further described in Attachment B, this application seeks permission to locate not only electronic evidence or information that might serve as direct evidence of the crimes described in this affidavit, but also for forensic electronic evidence or information that

establishes how the digital device(s) were used, the purpose of their use, who used them (or did not), and when.   Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I respectfully submit there is probable cause to believe that this forensic electronic evidence and information will be in any of the Device(s) at issue here because:

• Although some of the records called for by this warrant might be found in the form of user-generated documents or records (such as word processing, picture, movie, or texting files), digital devices can contain other forms of electronic evidence as well.   In particular, records of how a digital device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials contained on the digital devices are, as described further in the attachments, called for by this warrant.   Those records will not always be found in digital data that is neatly segregable from the hard drive, flash drive, memory card, or other electronic storage media image as a whole.   Digital data stored in the digital devices not currently associated with any file, can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).   Virtual memory paging systems can leave digital data on a hard drive that show what tasks and processes on a digital device were recently used.   Web browsers, e-mail programs, and chat programs often store configuration data on a hard drive, flash drive, memory card, or memory chip that can reveal information such as online nicknames and passwords.   Operating systems can record additional data, such as the attachment of peripherals, the attachment of USB flash storage devices, and the times a computer, smart phone,

or other digital device was in use.  Computer, smart phone, and other digital device file systems can record data about the dates files were created and the sequence in which they were created. This data can be evidence of a crime, indicate the identity of the user of the digital device, or point toward the existence of evidence in other locations.  Recovery of this data requires specialized tools and a controlled laboratory environment, and also can require substantial time.

- Forensic evidence on a digital device can also indicate who has used or controlled the device.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  For example, registry information, configuration files, user profiles, e-mail, e-mail address books, chats, instant messaging logs, photographs, the presence or absence of malware, and correspondence (and the data associated with the foregoing, such as file creation and last-accessed dates) may be evidence of who used or controlled the digital device at a relevant time, and potentially who did not.

- A person with appropriate familiarity with how a digital device works can, after examining this forensic evidence in its proper context, draw conclusions about how such digital devices were used, the purpose of their use, who used them, and when.

- The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a digital device that are necessary to draw an accurate conclusion is a dynamic process.  While it is possible to specify in advance the records to be sought, digital device evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on digital devices is evidence may depend on other information stored on the devices and the application of knowledge about how

the devices behave.  Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

- Further, in finding evidence of how a digital device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on the device.  For example, the presence or absence of counter-forensic programs, anti-virus programs (and associated data), and malware may be relevant to establishing the user's intent and the identity of the user.

- I know that when an individual uses a digital device to run a darknet money laundering service, the individual's device will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime.  The digital device is an instrumentality of the crime because it is used as a means of committing the criminal offense.  The digital device is also likely to be a storage medium for evidence of crime.  From my training and experience, I believe that a digital device used to commit a crime of this type may contain data that is evidence of how the digital device was used; data that was sent or received; notes as to how the criminal conduct was achieved; records of Internet discussions about the crime; and other records that indicate the nature of the offense and the identities of those perpetrating it.

## <u>METHODS TO BE USED TO SEARCH DIGITAL DEVICES</u>

70.     Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I know that:

• Searching digital devices can be an extremely technical process, often requiring specific expertise, specialized equipment, and substantial amounts of time, in part because there are so many types of digital devices and software programs in use today. Digital devices – whether, for example, desktop computers, mobile devices, or portable storage devices – may be customized with a vast array of software applications, each generating a particular form of information or records and each often requiring unique forensic tools, techniques, and expertise. As a result, it may be necessary to consult with specially trained personnel who have specific expertise in the types of digital devices, operating systems, or software applications that are being searched, and to obtain specialized hardware and software solutions to meet the needs of a particular forensic analysis.

• Digital data is particularly vulnerable to inadvertent or intentional modification or destruction. Searching digital devices can require the use of precise, scientific procedures that are designed to maintain the integrity of digital data and to recover "hidden," erased, compressed, encrypted, or password-protected data. Recovery of "residue" of electronic files from digital devices also requires specialized tools and often substantial time. As a result, a controlled environment, such as a law enforcement laboratory or similar facility, is often essential to conducting a complete and accurate analysis of data stored on digital devices.

• Further, as discussed above, evidence of how a digital device has been used, the purposes for which it has been used, and who has used it, may be reflected in the absence of particular data on a digital device. For example, to rebut a claim that the owner of a digital device was not responsible for a particular use because the device was being controlled remotely by malicious software, it may be necessary to show that malicious software that allows

someone else to control the digital device remotely is not present on the digital device. Evidence of the absence of particular data or software on a digital device is not segregable from the digital device itself. Analysis of the digital device as a whole to demonstrate the absence of particular data or software requires specialized tools and a controlled laboratory environment, and can require substantial time.

•       Digital device users can attempt to conceal data within digital devices through a number of methods, including the use of innocuous or misleading filenames and extensions. For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear as though the file contains text. Digital device users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form. Digital device users may encode communications or files, including substituting innocuous terms for incriminating terms or deliberately misspelling words, thereby thwarting "keyword" search techniques and necessitating continuous modification of keyword terms. Moreover, certain file formats, like portable document format ("PDF"), do not lend themselves to keyword searches. Some applications for computers, smart phones, and other digital devices, do not store data as searchable text; rather, the data is saved in a proprietary non-text format. Documents printed by a computer, even if the document was never saved to the hard drive, are recoverable by forensic examiners but not discoverable by keyword searches because the printed document is stored by the computer as a graphic image and not as text. In addition, digital device users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography." For example, by using steganography, a digital device

user can conceal text in an image file that cannot be viewed when the image file is opened. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  A substantial amount of time is necessary to extract and sort through data that is concealed, encrypted, or subject to booby traps, to determine whether it is evidence, contraband, or instrumentalities of a crime.

- Analyzing the contents of mobile devices, including tablets, can be very labor intensive and also requires special technical skills, equipment, and software.  The large, and ever increasing, number and variety of available mobile device applications generate unique forms of data, in different formats, and user information, all of which present formidable and sometimes novel forensic challenges to investigators that cannot be anticipated before examination of the device.  Additionally, most smart phones and other mobile devices require passwords for access.  For example, even older iPhone 4 models, running IOS 7, deployed a type of sophisticated encryption known as "AES-256 encryption" to secure and encrypt the operating system and application data, which could only be bypassed with a numeric passcode.  Newer cell phones employ equally sophisticated encryption along with alpha-numeric passcodes, rendering most smart phones inaccessible without highly sophisticated forensic tools and techniques, or assistance from the phone manufacturer.  Mobile devices used by individuals engaged in criminal activity are often further protected and encrypted by one or more third party applications, of which there are many.  For example, one such mobile application, "Hide It Pro," disguises itself as an audio application, allows users to hide pictures and documents, and offers the same sophisticated AES-256 encryption for all data stored within the database in the mobile device.

- Based on all of the foregoing, I respectfully submit that searching any digital device for the information, records, or evidence pursuant to this warrant may require a wide array of electronic data analysis techniques and may take weeks or months to complete. Any pre-defined search protocol would only inevitably result in over- or under-inclusive searches, and misdirected time and effort, as forensic examiners encounter technological and user-created challenges, content, and software applications that cannot be anticipated in advance of the forensic examination of the devices. In light of these difficulties, your affiant requests permission to use whatever data analysis techniques reasonably appear to be necessary to locate and retrieve digital information, records, or evidence within the scope of this warrant.

71. In searching for information, records, or evidence, further described in Attachment B, law enforcement personnel executing this search warrant will employ the following procedures:

- The digital devices, and/or any digital images thereof created by law enforcement, sometimes with the aid of a technical expert, in an appropriate setting, in aid of the examination and review, will be examined and reviewed in order to extract and seize the information, records, or evidence described in Attachment B.

- The analysis of the contents of the digital devices may entail any or all of various forensic techniques as circumstances warrant. Such techniques may include, but shall not be limited to, surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer believed to contain pertinent files); conducting a file-by-file review by "opening," reviewing, or reading the images or first few "pages" of such files in order to determine their

precise contents; "scanning" storage areas to discover and possibly recover recently deleted data; scanning storage areas for deliberately hidden files; and performing electronic "keyword" searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are related to the subject matter of the investigation.

- In searching the digital devices, the forensic examiners may examine as much of the contents of the digital devices as deemed necessary to make a determination as to whether the contents fall within the items to be seized as set forth in Attachment B.  In addition, the forensic examiners may search for and attempt to recover "deleted," "hidden," or encrypted data to determine whether the contents fall within the items to be seized as described in Attachment B.  Any search techniques or protocols used in searching the contents of the Device(s) will be specifically chosen to identify the specific items to be seized under this warrant.

## CRYPTOCURRENCY SEIZURE

72.     Bitcoin transactions require the use of a private key to complete a transaction.  If an individual loses his private key, the individual can no longer access his bitcoin.  Through training and experience, I am aware individuals typically maintain their private keys in a secure location and may keep them on their person while traveling.  Individuals also typically maintain a second copy of their private key, often in a second location, in the event that they cannot access the primary copy of their private keys.  Many bitcoin platforms also offer users multiple backup options.  Users involved in the illicit use of bitcoin typically maintain backup paper wallets, seed phrases,  and recovery keys in offsite locations to prevent them from falling into the hands of law enforcement in the event that their primary residence is searched.  Users involved in the illicit

use of bitcoin may also entrust private key information with co-conspirators or other associates, with instructions to transfer their virtual currency holdings in the event they are discovered or arrested.

73.     Consequently, I am aware that simply taking physical possession of the storage media on which private key information is stored is not always sufficient to safeguard the virtual currency for an eventual criminal prosecution and/or forfeiture proceeding.  Instead, as part of the seizure process, law enforcement typically transfers the value of any virtual currency to a secure law enforcement wallet.

74.     As set forth in the Attachment B, this warrant authorizes the Government to transfer any cryptocurrency located in the Property to a Government-controlled cryptocurrency address.

### AUTHORIZATION TO SEARCH AT ANY TIME OF THE DAY OR NIGHT

75.     Because law enforcement and forensic examiners will be conducting their search of the Property in a law enforcement setting over a potentially prolonged period of time, I respectfully submit that good cause has been shown, and therefore request authority, to conduct the search at any time of the day or night.

## **CONCLUSION**

14.     I submit that this affidavit supports probable cause for a warrant to search the

Property described in Attachment A and to seize the items described in Attachment B.


Respectfully submitted,



James A. Rohls, Jr.
Special Agent
Federal Bureau of Investigation

Subscribed and sworn pursuant to Fed. R. Crim. P. 4.1 and 41(d)(3) on April 30, 2021

G. Michael Harvey
2021.04.30 19:41:45 -04'00'

G. MICHAEL HARVEY
UNITED STATES MAGISTRATE JUDGE

46