## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **Criminal No. 21-cr-399 (RDM)** |
| | : | |
| **ROMAN STERLINGOV,** | : | |
| | : | |
| **Defendant.** | : | |

### GOVERNMENT'S NOTICE AND MOTION IN LIMINE
### TO ADMIT CERTAIN GOVERNMENT EXHIBITS

The United States of America, by and through its counsel, the United States Attorney for the District of Columbia, hereby provides notice of its intent to introduce evidence described herein. The government intends to introduce records that are self-authenticating under Federal Rule of Evidence 902, including records from financial institutions, online service providers, and other businesses; official government records; records from Archive.org; and the blockchain. The government also intends to admit evidence from seized electronic devices and seeks to authenticate those records through certifications complying with Fed. R. Evid. 902(11), (13), and (14); the authentication of these records is further bolstered through their distinctive characteristics pursuant to Fed R. Evid. 901(b)(4). The government intends to move for admission of charts and summaries of voluminous records under Fed. R. Evid. 1006, and will move for admission after a witness sets the proper foundation. The government also intends to use demonstratives in the form of visual aids in order to assist the jury in understanding the evidence.

### ARGUMENT

**I.    The Government Intends To Admit Self-Authenticating Records Pursuant to Fed. R. Evid. 902**

Under Fed. R. Evid. 902, certain categories of records are self-authenticating and "require no extrinsic evidence of authenticity in order to be admitted." The government intends to admit

self-authenticating records pursuant to Fed. R. Evid. 902(11), 902(13), and 902(14), as well as 18 U.S.C. § 3505, described further below.

Fed. R. Evid. 902(11) provides for the authentication of "Certified Domestic Records of a Regularly Conducted Activity."  The records must satisfy the business records requirements set forth in Fed. R. Evid. 803(6)(A)-(C).  Rule 803(6) provides that business records are admissible if they are accompanied by a certification of their custodian or other qualified person that satisfies three requirements: (A) that the records were "made at or near the time by—or from information transmitted by—someone with knowledge"; (B) that they were "kept in the course of a regularly conducted activity of a business"; and (C) that "making the record was a regular practice of that activity."  *Id.*  18 U.S.C. § 3505 provides a parallel mechanism for authenticating foreign records of regularly conducted activity where an appropriate certification has been obtained.

The Federal Rules of Evidence were amended in 2017 to add Rule 902(13) and 902(14), which allow the use of a certification to authenticate certain electronic evidence, previously provided by a live witness.  Fed. R. Evid. 902(13) addresses the authentication of "a record generated by an electronic process or system that produces an accurate result, as shown by a certification of a qualified person that complies with the certification requirements of Rule 902(11) or (12)."  Just as business records are certified by Fed. R. Evid. 902(11), an electronic record is also deemed to be self-authenticating and requires no extrinsic evidence of authenticity for it to be admitted into evidence, as long as there is a "certification of a qualified person" that is consistent with the requirements of Rule 902.  *See* Fed. R. Evid. 902(13) (2017 amendment).

Similarly, Fed. R. Evid. 902(14) provides for self-authentication of copied data if it is certified by a qualified person as "[d]ata copied from an electronic device, storage medium, or file, if authenticated by a process of digital identification."  The purpose of the rule, as described by

the Advisory Committee, is to set out "a procedure by which the parties can authenticate data copied from an electronic device, storage medium, or an electronic file," without having to call a witness to authenticate the process.   Fed. R. Evid. 902(14) advisory committee note to 2017 Amendment. The Committee reasoned that the expense and inconvenience of producing an authenticating witness for this type of evidence is often unnecessary. *Id.* The rule "is flexible enough to allow certifications through processes other than comparison of hash value . . . ."  *Id.* To satisfy the requirements of the rule, the proponent must "present a certification containing information that would be sufficient to establish authenticity were that information provided by a witness at trial." *Id.*  These new rules did not change the standard of authentication, but rather made it easier for parties to authenticate certain types of electronic evidence without "the expense and inconvenience of producing a witness" unnecessarily.   Fed. R. Evid. 902(13) advisory committee's note to 2017 amendment.

Rule 902(11) directs the party intending to offer a record into evidence pursuant to the rule to provide notice and to make the records and certifications available to the opposing party.  Rules 902(13) and 902(14) incorporate the notice provisions of Rule 902(11).   The government respectfully submits that this filing satisfies the requirement of  "reasonable written notice" of the government's intent to admit the below-described records.   The bulk of the referenced certifications were produced to defense counsel alongside the underlying records in discovery; the remaining certifications—particularly certifications pertaining to specific trial exhibits that have not yet been finalized—will be provided to defense counsel as they are available and in advance of the pretrial conference.  Defense counsel will be afforded ample time and opportunity to object to the certifications.

In advance of the pretrial conference, if the defendant has not objected to the use of the certifications or otherwise stipulated to certain records and facts, the government will move for a ruling from this court that the United States has made a *prima facie* showing that the records are authentic pursuant to Federal Rule of Evidence 902, such that the United States need not call witnesses merely to establish the authenticity of the records. The defendant will retain the right to object to the admission at trial on other grounds, such as relevance.

The government respectfully reserves the right to supplement and amend this notice as trial approaches and will provide reasonable notice before trial.

## A.  Records from Financial Institutions, Online Service Providers, and Other Businesses

As alleged in the Indictment, the defendant operated a darknet cryptocurrency money laundering service that moved hundreds of millions of dollars worth of cryptocurrency. To profit from his crimes and conceal his activities, the defendant created and used accounts at numerous online platforms and financial service providers. A significant body of the government's evidence at trial will consist of records produced by financial institutions, online service providers, and other businesses, located in the United States and abroad. The government intends to admit these records through certifications that satisfy Rule 902(11), 18 U.S.C. § 3505, and/or Rule 902(13), where applicable. This evidence includes records from:

- Adventure Flight
- AIMCO
- Allocate Smartly
- Assembla
- Atlantic Broadband
- Atlassian
- Bitcoin Talk
- BitPay
- BitStamp
- Binance

- Bitfinex
- Circle/Poloniex
- Comcast
- Coinbase
- Craigslist
- DropBox
- EBay
- Enterprise Rental Car
- Expedia
- FiServ
- Google
- Gyft
- High Hosting
- HitBTC
- HostGator
- Instawallet
- Kraken
- Local Bitcoins*
- M247*
- Microsoft
- Microtronix
- Namecheap
- Newfold
- Oath
- One.com*
- Optal*
- Paymium
- PayPal
- Prepaid Financial Services*
- Ramnode
- Sixt Rental Car
- SpiderOak
- Tower Condominium
- Twitter
- Tesla
- Zelle
- Zillow

Records denoted with an asterisk were obtained pursuant to an official request to a foreign country and are discussed further in subsequent sections.

### B.   Official Government Records – Lack of Registration or Licensure

The defendant is charged with, *inter alia*, Operating an Unlicensed Money Transmitting Business, in violation of 18 U.S.C. § 1960(a); and Money Transmission Without a License, in violation of D.C. CODE § 26-1023(c).  The government intends to introduce official records from the Financial Crimes Enforcement Network (FinCEN) and the D.C. Department of Insurance, Securities and Banking (DISB) establishing that Bitcoin Fog was not registered or licensed as a money services business with either entity.  These records are self-authenticating and admissible under multiple provisions of Rule 902, including Rule 902(1) for public documents that are sealed and signed; Rule 902(2) for public documents that are signed and certified; and Rule 902(11) as certified records of regularly conducted activity.  The government hereby provides notice pursuant to Rule 902, as well as Rule 803(6), (7), (8), and (10), that it intends to offer certifications from FinCEN and DISB establishing the absence of public record as described above.  The certification from FinCEN is being provided to defense counsel in discovery.  The government is in the process of securing the needed certification from DISB and will provide it to defense counsel as soon as it is available.

### C.   Archive.org Screenshots

The government intends to introduce at trial records from the Internet Archive's Wayback Machine, which documents and stores copies of websites archived at various points in time and allows users to retrieve and view those records, offering a snapshot of the website's contents at a given point in time.  To support the admission of the records, the government will obtain a certification complying with Federal Rules of Evidence 902(11) and 902(13).  The information from the Wayback Machine is freely and publicly available, but the Internet Archive requests a

subpoena in order to produce the requisite certification; the government will be separately seeking a trial subpoena to obtain the needed certification.

The records are properly authenticated through a certification satisfying Federal Rules of Evidence 901(11) and 902(13); indeed, in a handbook setting out the best practices for authenticating electronic evidence, the authors—including The Honorable Paul W. Grimm, a widely respected authority in the field of electronic evidence—recognized a printout from the Wayback Machine as a means of authenticating website postings and advised, "[T]he reliability of the Wayback machine process could be established by a certificate of the Internet Archive official, rather than in-court testimony. See Proposed Rule 902(13)." Hon. Paul Grimm, Gregory Joseph & Daniel Capra, Best Practices for Authenticating Digital Evidence, pp. 16-17, n. 50, West Academic Publishing (2016).  Other courts have found that screenshots from the Wayback Machine are appropriately authenticated through certifications satisfying Fed. R. Evid. 901(11) and (13).  *See, e.g., U.S. v. Bondars*, No. 1:16-cr-228, 2018 WL 9755074, at *2 (E.D. Va., Aug. 20, 2018) (Order on Motion in Limine).  ("[T]he Wayback Machine screenshots introduced by the Government comport with the requirements and purpose of Rule 902(13).").[1]

---

[1] Prior to the enactment of Fed. R. Evid. 902(13) in 2017, courts routinely admitted screenshots from the Wayback Machine based on testimony from a representative of the website or other indicia of reliability.  *See, e.g., United States v. Gasperini*, 894 F.3d 482, 290 (2d Cir. 2018); *United States v. Bansal*, 663 F.3d 634, 667-68 (3d Cir. 2011); *Foster v. Lee*, 93 F. Supp. 3d 223, 232 (S.D.N.Y. 2015); *Klayman v. Judicial Watch, Inc.*, 299 F. Supp. 3d 141, 147-48 (D.D.C. 2018); *Telewizja Polska USA, Inc. v. Echostar Satellite Corp.*, No. 02 C 3293, 2004 WL 2367740, *6 (N.D. Ill. Oct. 15, 2004); *Masters v. UHS of Delaware, Inc.*, No. 4:06CV1850-DJS, 2008 WL 5600714, at *2 (E.D. Mo., October 21, 2008).

### D. Blockchain Records

The government hereby provides notice of its intent to admit blockchain records through a hybrid certification that satisfies Fed. R. Evid. 902(11) and 902(13) completed by an official who regularly maintains a copy of the blockchain to perform his/her official duties.  Blockchain records readily meet the business records requirements set forth in Rule 803(6)(A)-(C).  The blockchain is a living record, with new blocks of transactions being appended with each confirmation at roughly 10-minute intervals.  The record is made by the miner validating the transaction block, based on the information relayed to it by the computers announcing the proposed transactions.  The blockchain is necessarily kept in the course of miners' and node operators' regularly conducted activity, and making the record is a regular practice of their activity—indeed, the maintenance of the blockchain is the core function of these virtual currency participants.  Blockchain records were thus "made at or near the time by—or from information transmitted by—someone with knowledge" and "kept in the course of a regularly conducted activity of a business," where "making the record was a regular practice of that activity."  Fed. R. Evid. 803(6)(A)-(C).

Rule 902(11) allows the certification to be completed by "the custodian or *another qualified person*."  Fed. R. Evid. 902(11) (emphasis added).  As the advisory committee notes to Rule 803(6) comment, records may be admitted through someone acting merely as an observer.  Fed. R. Evid. 803(6), advisory committee notes ("Occasional decisions have reached for enhanced accuracy by requiring involvement as a participant in matters reported. . . .  The rule includes no requirement of this nature. Wholly acceptable records may involve matters merely observed . . .").  This approach is reflected in the case law in this District and others.  *See, e.g., United States v. Adefehinti,* 510 F.3d 319, 326 (D.C. 2007) (noting "there was no requirement that the business records be created by the business having custody of them") (cleaned up) (collecting cases).  This

is significant in the blockchain context: It confirms that one need not be a miner or the operator of a full node involved in relaying and verifying transactions to appropriately certify the blockchain. Rather, any individual—including a law enforcement official—who directly obtains a copy of the blockchain and meets the remaining requirements under Rule 803(6) may provide a certification under Rule 902(11).

The government submits that a certification satisfying only the requirements of 902(11) would appropriately authenticate blockchain records.  Here, however, the government's certification will also set forth the requisite basis for a certification under Fed. R. Evid. 902(13)— namely, a high-level description of the transaction verification and validation process that ensures that the blockchain is resistant to any attempted manipulation, exemplifying a "system or process that produces an accurate result."  Bitcoin is designed to ensure that the blockchain is resistant to any attempted manipulation.  Bitcoin transactions are signed by the sender's private key, validated by nodes, confirmed by miners, and then added to the blockchain, whereupon subsequent node operators and miners affirm the integrity of the transaction by accepting the block in which the transaction is contained and adding new blocks on top of it.  In short, the blockchain has extensive built-in protections to ensure the system or process produces an accurate result, meeting the requisite reliability showing envisioned by Rule 902(13).

If defense counsel desires, the government will make a copy of the blockchain available to defense counsel through discovery.  As the blockchain is a publicly available dataset, defense counsel is also able to access and view the underlying blockchain data on its own, which the government understands the defense has already done.

### E. Records from Seized Electronic Devices

Another large body of evidence in this case consists of incriminating files located on electronic devices that were seized and imaged by law enforcement.  This includes the numerous hard drives and devices owned and controlled by the defendant himself, as well as devices used by darknet market administrators, illicit payment platforms, and other criminal services used by the defendant in furtherance of his money laundering activity.  Each of these electronic devices were forensically imaged or extracted by U.S. or foreign law enforcement, and then further reviewed to retrieve the particular files and records that the government intends to introduce in its case in chief.

In order to streamline the proceedings, the government seeks to authenticate records from these services through appropriate certifications, or a series of certifications where needed, complying with the requirements of Federal Rules of Evidence 902(11), 902(13), 902(14), and/or 18 U.S.C. § 3505.  These certifications include facts specific to each piece of electronic evidence, explaining the process through which the information on the electronic device or file was reliably retrieved and/or copied and the relevant records extracted therefrom.  This will significantly decrease the number of purely authentication witnesses needed for trial—including many who would need to travel from across the United States and overseas—and provide greater flexibility in the ordering of witness testimony.  The government will move to admit these records prior to or during the testimony of a witness familiar with each of the sites or services in question.

In addition to the certifications providing a basis for authentication, the seized devices contain "distinctive characteristics" independently sufficient to authenticate the computers under Fed. R. Evid. 901(b)(4), which provides for authentication based on "appearance, contents, substance, internal patterns, or other distinctive characteristics of the item, taken together with all

the circumstances." Fed. R. Evid. 901(b)(4).  Rule 901(b)(4) is "one of the most frequently used

to authenticate . . . electronic records." *Lorraine v. Markel Am. Ins. Co.*, 241 F.R.D. 534, 554–55

(D. Md. 2007).  Indeed, courts have repeatedly upheld the admission of computers and other

electronic evidence, even in the absence of chain-of-custody evidence, based solely on identifying

evidence found on item itself.  *See, e.g.*, *United States v. Reed*, 780 F.3d 260, 265-67 (4th Cir.

2015) (holding that "the government proffered evidence that the jury could use to attribute" a

particular phone to defendant Dyer, despite offering "no testimony about how this phone was

seized," because there was evidence of "photos of Dyer on the phone and text messages attributing

the number to Dyer, including several that used . . . his first name"); *United States v. Siddiqui,* 235

F.3d 1318, 1322–23 (11th Cir. 2000) (email authenticated by the use of the defendant's email

address and nickname, as well as its contents which included information the defendant would

know); *United  States v. Fluker,* 698 F.3d at 999-1000 (7th Cir. 2012) (same); *United States v.

Lewisbey*, 843 F.3d 653, 658 (7th Cir. 2016) (cell phones authenticated in part by information on

the phones themselves such as "properties," "contacts," and communications associated with the

defendant).

Evidence obtained from outside of the United States is frequently authenticated under Rule

901(b)(4) without showing an unbroken chain of custody.  *See United States v. Collins,* 715 F.3d

1032, 1035-36 (7th Cir. 2013) (holding that chain of custody "would be an impossible standard"

for foreign evidence and approving admission of audio tapes created in Mexico based on voice

identification and distinctive characteristics of the recordings); *United States v. Dumeisi,* 424 F.3d

566, 574-75 (7th Cir. 2005) (finding a file from Saddam Hussein's former Iraqi Intelligence

Service was properly authenticated based on "distinctive characteristics" of the documents

themselves, "including the style and form of the documents" as well as the circumstances relating

to the file recovery); *Xiao Wei Yang Catering Linkage in Inner Mongolia Co. Ltd. v. Inner Mongolia Xiao Wei Yang USA, Inc.*, No. 15-cv-10114-DJC, 2017 WL 507211, at *4 (D. Mass. 2017) (Chinese government screenshots authenticated based on substance and internal patterns).

Any short gaps in the chain of custody for any of the records described below should not serve as a hindrance to admitting the evidence. "Gaps in the chain of custody normally go to the weight of the evidence rather than its admissibility." *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 311 n.1 (2009) (internal quotations and alterations omitted); *accord United States v. Williams*, 103 F.3d 122 (4th Cir. 1996). This is especially true where any "gap" in the chain of custody occurred while the evidence was located abroad and in the possession of a foreign government. When chain of custody evidence is used to authenticate foreign evidence, courts can consider the chain of custody beginning when U.S. authorities first receive the evidence. *See United States v. Collins,* 715 F.3d 1032, 1035-36 (7th Cir. 2013) (rejecting argument that evidence should be excluded based on "lingering questions" surrounding the custody of the evidence "while it was in Mexico," after observing that, while no U.S. agents were present when the evidence was obtained, the evidence "never left the government's possession after the moment of receipt"). *See United States v. Vidacak,* 553 F.3d 344, 348-49 (4th Cir. 2009) (evidence authenticated despite "three year gap between the creation of the documents [by a foreign army] and their seizure in 1998").

Furthermore, evidence may be authenticated under Fed. R. Evid. 901(b)(3) through comparison with independently authenticated evidence. As discussed below, for many of the categories of evidence, a substantial overlap exists between information recovered from the seized electronic devices and email messages and financial records obtained through separate legal process. (See Best Practices for Authenticating Digital Evidence, p. 8).

### i.      Devices Seized from the Defendant at the Time of Arrest

The defendant was arrested at Los Angeles International Airport after arriving in the United States on an international flight.  His luggage was subject to an inventory search, transported to the District of Columbia, and then searched pursuant to a search warrant issued by Magistrate Judge Harvey of the U.S. District Court of the District of Columbia.  The defendant had brought to the United States numerous electronic devices, included multiple computers, mobile phones, hard drives, Raspberry Pi microcomputers, and memory cards.  In order to maintain the integrity of the original evidence, and consistent with established best practices, the devices were imaged by qualified, experienced forensic personnel.  Members of the case team could then review the images, ensuring that the original devices were not subject to risk of alteration.  A team of experts from IRS and FBI was responsible for forensically imaging the large volume of devices and extracting the data from the phones.

The government seeks to authenticate the forensic images of the original devices through certifications completed by the forensic examiners that satisfy Fed. R. Evid. 902(14).  Each certification sets out the forensic examiner's qualifications, including training and experience in the field of device imaging and forensics.   The certification then describes the original devices that the examiner imaged, uniquely identifying them by device and serial number as applicable. The certification then explains the process of forensic imaging, which entails copying all of the data on the original storage media device, saving the copy to new digital media, and verifying that the data is an exact duplicate and true copy of the original through a process of digital identification.  The certification further notes the file name of the image file.  The certification identifies the data's hash value, a unique digital identifier produced by an algorithm based on the digital contents of a drive, medium, or file.  The certification also attests that the hash value of the

copy matched the hash value of the original, confirming that the copy is an exact duplicate of the original. *See* Fed. R. Evid. 902(14) advisory committee's note to 2017 amendment ("Thus, identical hash values for the original and copy reliably attest to the fact that they are exact duplicates."). Each certification has been or is being executed by the forensic examiner who made the referenced images. These certifications track the requirements of Fed. R. Evid. 902(14) to authenticate data copied from an electronic device.

The government also seeks to authenticate the forensic extractions of the data from the defendant's cell phones through certifications completed by the forensic examiners that satisfy Fed. R. Evid. 902(13) and 902(14). The defendant brought three cellphones to the United States. Pursuant to the above-described search warrant, forensic examiners extracted and imaged the cell phone devices. The cell phone extraction and imaging process entails using forensic software to access the information contained on the phone and copy that information. The case team then reviews the information from the extraction, rather than continuing to access the phone itself, ensuring the integrity of the original evidence. Each forensic examiner who copied the defendant's phones is executing a certification satisfying Fed. R. Evid. 902(13) and 902(14). The certifications set forth the examiner's qualifications and explain that they copied the information on the phone using Cellebrite, one of the most common and widely accepted cell phone forensic tools, which is a system or process that produces an accurate result—the verified extraction of records from a cell phone. The certification further confirms that this forensic copying process resulted in accurate copies of the information contained on the device.

The government is preparing to provide executed certifications to defense counsel. The government submits that these certifications will appropriately authenticate the images of the devices. At trial, the government will present testimony from members of the case team who were

involved in the seizure of the original items, and from members of the case team who reviewed the device images and identified specific relevant records. The government will then seek to admit those relevant records at trial. The government will not seek to admit the certifications themselves into evidence.

### ii.    Defendant's Servers in Romania

The government also intends to introduce records from and related to servers controlled by the defendant and hosted at the Romanian data center M247 Networks. These records include 1) subscriber information provided by M247 Networks identifying Roman Sterlingov; 2) network traffic data showing the connections to and from server (*i.e.*, the equivalent of wiretap and/or pen register/trap and trace data); and 3) forensic images of the servers.

The above information was obtained by Romanian authorities pursuant to an official request from the United States to Romania, which was in turn fulfilled through official channels by the Romanian Public Ministry Directorate for Investigating Crime and Terrorism, Bureau for International Cooperation, Representation and Judicial Assistance (the "Romanian Authorities"), which is the Romanian equivalent of the U.S. Department of Justice's Office of International Affairs. The Romanian Authorities submitted detailed packages to and obtained orders from Romanian courts authorizing the collection and sharing of the referenced information. Supporting documentation regarding the Romanian records and their English translations have been provided to the defense in discovery.

In support of the request for subscriber records, the Romanian Authorities provided an official Romanian "response letter," the Romanian equivalent of a U.S. subpoena return and records certification, from M247. The response letter contained the subscriber information for the defendant's servers, reflecting that the IP addresses 185.120.145.154, 185.120.145.155,

185.120.145.156, 185.120.145.157, and 185.120.145.158 were registered to the customer "To the Moon ltd.," with Roman Sterlingov listed as the point of contact.  The email address on file was info@dangerzone.today, and the phone number was +356.4673069405.  The response letter was executed by M247 Europe's attorney as the company's official representative, with a corporate seal affixed to the records.  Providing a false statement would have subjected M247 and/or its representatives to criminal penalty, including jail time, under Romanian law.  While the specific language used in the certification tracks Romanian legal requirements rather than that of the United States, the essential elements of the document mirror the requirements of a business record certification under Fed. R. Evid. 902(11) and 803(6).  The records were transmitted to the United States with a cover letter further signed and stamped by the Romanian Authorities.

The Romanian Authorities also obtained orders from a Romanian court to collect network traffic information regarding the servers controlled by the defendant.  Those orders, termed "warrants for technical surveillance" under the Romanian judicial system, were lawfully issued for periods of 30 days.  Specifically, on December 11, 2020, following a review of the case summary submitted to the Judge of Rights and Liberties, the Bucharest County Court issued an order approving the measure of technical surveillance for a period of 30 days starting on December 13, 2020 and ending on January 12, 2021.  On February 11, 2021, the same court approved another 30 days of technical surveillance, starting on February 11, 2021 and concluding on March 12, 2021.  Pursuant to these court orders, during the timeframes noted, Romanian Authorities collected the network traffic information related to the defendant's servers.  The network traffic information was batched and provided as historical collections to U.S. authorities.

The Romanian Authorities also obtained images of the three servers assigned to the defendant's account at M247.  Those images were accompanied by a certification signed by

Romanian Police Subinspector David Teodor. The certification, which has been provided to defense counsel in both the original Romanian and the official English translation, certifies that the declarant copied three drives—identified by brand and model—that had been provided by a named representative of M247 Europe. The certification affirms that the media was imaged in a way that preserved the integrity of the information on the devices, tracking the principal requirements under Fed. R. Evid. 902(14). *See* Fed. R. Evid. 902(14) advisory committee's note to 2017 amendment ("The reference [in Rule 902(14)] to Rule 902(12) is intended to cover certifications that are made in a foreign country."). Those images and the certification were provided to the requesting U.S. authorities through official channels.

The authenticity and reliability of the Romanian records are bolstered by substantial additional indicia of authenticity. The phone number listed in the M247 account records, +356.4673069405, matches the phone number (without the country code) associated with one of the defendant's phones seized at the time of his arrest and associated with the defendant's accounts at Liberty Reserve. Records from the Swedish telecommunications provider Hi3G/Tre further confirm that the phone number is registered to the defendant. The email address listed in the M247 account records, info@dangerzone.today, is connected to other accounts controlled and used by the defendant, including an account at the virtual currency exchange Bitfinex.

The defendant's email accounts include messages indicating that the defendant incorporated a company called To The Moon VPN in Malta with the assistance of a Maltese accounting company specializing in the creation of offshore companies. The defendant controlled several accounts at virtual currency exchanges that were opened in the name of "To The Moon VPN" and similar variations. The defendant also held a bank account in Malta under the name To The Moon LTD.

The defendant's e-mail account contained invoice and payment receipt information from M247 Networks and a message from the defendant regarding additional payments to M247 Networks.  The defendant's notes seized at the time of his arrest contain references to "M247."  A financial review of the defendant's Swedish bank accounts revealed regular payments made to M247 Networks via PayPal.  The defendant's email messages further contained a package shipping confirmation dated November 23, 2015, from the United Parcel Service.   The shipping confirmation was written in Romanian and indicated that the defendant shipped a package weighing 12.5 kilograms from his home in Sweden to M247 Networks's business address in Romania.  The weight of the package and destination was consistent with the defendant shipping a server or other computer equipment to M247.

The network traffic information and forensic images of the defendant's Romanian servers were analyzed by U.S. experts, including FBI Computer Science Valerie Mazars de Mazarin, who will testify at trial regarding her review of the traffic and devices.  Within a subfolder named "satoshis"—an apparent reference to Satoshi Nakamoto, the pseudonym of the anonymous Bitcoin creator(s)—CS Mazars located a description of tables in a database located on the server.  The file included a note, "Copyright 2015 Max Sterlingov and [C.J.M.]."  The defendant uses the name "Max" on other platforms, including the WhatsApp account on his phone.  The Romanian servers also included a reference to allowing connections from 83.248.64.79, an IP address that resolves to Gothenburg, Sweden, the defendant's hometown.  The network traffic information included bitcoin-related traffic as well as traffic with IP addresses located in Gothenburg.

The contents of these records constitute "distinctive characteristics," independently sufficient to authenticate the records under Fed R. Evid. 901(b)(4), which provides for authentication based on "appearance, contents, substance, internal patterns, or other distinctive

characteristics of the item, taken together with all the circumstances."  Fed. R. Evid. 901(b)(4). The circumstances of their collection—pursuant to official requests to the government of Romania and following judicial review and court orders by Romanian legal authorities, and subsequent transmittal back to the United States through official channels—further bolsters the records' reliability and authenticity.  The accompanying certifications from M247's representative, the Romanian police subinspector, and the Romanian prosecutor's office further authenticate the records and images.

### iii.    Seized Electronic Evidence from Other Investigations

The government intends to introduce business records from several shuttered financial platforms and seized darknet sites, including Mt. Gox, a former virtual currency exchange that went bankrupt in 2014; BTC-e, an illicit virtual currency exchange that was seized by law enforcement in 2017; Liberty Reserve, an illicit electronic payment platform that was seized by law enforcement in 2014; Silk Road, a darknet marketplace that was seized by law enforcement in 2013; Silk Road 2.0, a darknet marketplace that was seized by law enforcement in 2014; AlphaBay, a darknet marketplace dismantled by law enforcement in 2017; and Welcome to Video, a darknet site distributing child sexual exploitation material seized by law enforcement in 2018.  These records will include records of the defendant's accounts on the platforms (specifically, Mt. Gox, BTC-e, Liberty Reserve, Silk Road, and Silk Road 2.0), records related to the bitcoin addresses controlled by the sites, and records pertaining to a subset of site users who used Bitcoin Fog to launder their cryptocurrency.  The records will be authenticated through a combination of records certifications satisfying Fed. R. Evid. 902(11), (13), and/or (14).  Their authentication and reliability are further bolstered by the circumstances of the records' acquisition by law

enforcement, and by the servers' appearance, contents, substance, internal patterns, and other distinctive characteristics, consistent with Fed. R. Evid. 901(b)(4).

a. *Mt. Gox*

The government will introduce records from Mt. Gox, a former virtual currency exchange. Mt. Gox operated from 2010 through 2014 until it filed for bankruptcy following the loss of hundreds of millions of dollars worth of bitcoin. As part of the bankruptcy proceedings, Mt. Gox's assets and records were transferred to the control of a trustee, led by Japanese attorney Kobayashi Nobuaki, the head of the Insolvency/Restructuring Practice Group at the Japanese law firm Nagashima Ohno & Tsunematsu.

In 2019, pursuant to a request from the United States, the Tokyo District Prosecutors Office obtained from Mr. Nobuaki a 4TB hard drive containing Mt. Gox records, including a copy of the Mt. Gox customer database. The assistant officer for the Tokyo District Prosecutor's Office who took possession of the drive from Mr. Kobayashi completed a certification of the chain of custody, including the date and location of the transfer. Another assistant officer with the Public Prosecutors Office then took possession of the drive to make a forensic image of the contents. That officer completed another certification noting the transfer in the chain of custody and describing the imaging process. The certification, tracking the language of Fed. R. Evid. 902(14), indicates that the officer copied the drive using standard forensic software and confirmed that the hash value of the image matched the hash value of the original. The specific hash value is further noted in the certification. These certifications, in both the original Japanese and the English translation, are being provided to defense counsel in discovery. The hard drive containing the forensic image was then transferred from Japan to the United States, where it has been maintained as evidence in FBI custody.

The Mt. Gox records on the hard drive included a SQL database of Mt. Gox customer records. SQL, or "Structured Query Language," is a computer language used for database management. A SQL database is a structured database that is commonly used by businesses, including financial institutions, to store records pertaining to customer accounts and business activity. SQL databases are made up of one or more tables, each of which include rows and columns of data. SQL databases allow businesses to efficiently store and organize data. Information stored in a SQL database can be viewed by manually viewing the entries in the database, or can be retrieved through SQL queries. SQL queries are searches of the SQL database for specific search terms. For example, a SQL database query for "user x" can produce all of the records for "user x" in the queried SQL Database.

Law enforcement personnel familiar with the Mt. Gox SQL database conducted SQL queries to retrieve records related to the user accounts roso987341870, volfprius, peternfs, and kolbasa. Law enforcement has tested these SQL database queries for the Mt. Gox SQL database, including by comparing the returns to the raw records in the database, and has confirmed that the retrieved information is an accurate reflection of the records in the database. This SQL database query is an electronic process that produces an accurate result, within the meaning of Fed. R. Evid. 902(13). The government is in the process of obtaining a records certification pursuant to Fed. R. Evid. 902(13) to authenticate the resulting records from the SQL database query.

The authentication of the Mt. Gox records is further bolstered by the defendant's own communications. The Mt. Gox account roso987341870 was initially registered to the defendant's plasma@plasmadivision.com email address. That account was serviced through One.com, and the government obtained the contents of the email account through an official legal request to Denmark, where the company is based. The email account contents—which are authenticated

through a business records certification executed by One.com, enumerated in section I.A, *supra*—
included an email from Mt. Gox dated September 29, 2011, with the subject line "Account creation
confirmation" and a body noting the login "roso987341870."  The email account also includes
numerous emails from info@mtgox.com with confirmation of funds received and account
withdrawals.  The transaction information in the emails matches the information returned from the
SQL query of the Mt. Gox SQL database.[2]

Additionally, corroborating information regarding the defendant's use of virtual currency
is contained in the records provided by the virtual currency exchange Bitstamp regarding the
defendant's account.  Bitstamp contacted the defendant to ask about the source of his funds and
whether he had used any "tumblers," a reference to cryptocurrency mixing and tumbling services
like Bitcoin Fog.  The defendant told Bitstamp that he purchased his bitcoin on Mt. Gox and
provided supporting documentation of one of the plasma@plasmadivision.com emails from Mt.
Gox regarding a deposit into the roso987341870 account.  The defendant also provided a
screenshot showing a claims form for the Mt. Gox bankruptcy claims filing system.

b. *BTC-e Records*

The government will introduce records from BTC-e, a criminal virtual currency exchange
seized by law enforcement in 2017.  This evidence will include records of the defendant's financial
transactions through BTC-e.

BTC-e operated as a financial institution and maintained detailed records of its customers'
accounts and activities.  Between its launch in 2011 and its shutdown in 2017, BTC-e served
approximately one million customers across the globe and facilitated billions of dollars of payment

---

[2] Due to apparent time zone differences, certain emails were dated one day prior to the date
reflected in the Mt. Gox database.

in cryptocurrency.  Information was recorded automatically in the BTC-e database at the time that the information was entered or transmitted by the user or the action was taken by BTC-e.  These records were maintained as part of BTC-e's regularly conducted activity and its regular business practice.  BTC-e ceased operations in 2017 when its servers, records, and domain were seized by U.S. law enforcement and one of its principal operators, Alexander Vinnik, was arrested.  FBI Supervisory Special Agent Stephen Oakes was the FBI case agent assigned to the BTC-e investigation and took custody of the BTC-e server records.  SSA Oakes is deeply familiar with BTC-e's business operation from his investigation into BTC-e, as well as his in-depth review and analysis of the contents of the BTC-e servers.  He is familiar with how the BTC-e records were created, managed, stored, and retrieved.  He is a "custodian or other qualified person" within the meaning of Fed. R. Evid. 902(11).

The BTC-e servers seized by U.S. law enforcement pursuant to the 2017 search warrant contained voluminous records corroborating the servers' use in the operation of BTC-e.  In particular, the servers included a SQL database that held records pertaining to BTC-e's users, including the users' account information, IP log-in information, bitcoin addresses, transactions, withdrawals, and chat messages.  These records can be retrieved through a SQL database query. As described above, a SQL database query is an electronic process that produces an accurate result within the meaning of Fed. R. Evid. 902(13).  SSA Oakes tested the SQL database queries for the BTC-e SQL database, including by comparing the returns to the raw records in the database, and confirmed that the retrieved information is an accurate reflection of the records in the database.

In response to a case team request, SSA Oakes retrieved the records for BTC-e user ID 11144, which corresponds to the user account "henderson."  SA Oakes will execute a certification setting forth his qualifications and the information stated above, satisfying the requirements of

Fed. R. Evid. 902(11), 902(13), and 902(14).  The henderson BTC-e account was associated with two email addresses—info@dangerzone.today and heavydist@gmail.com—both of which are controlled by the defendant.

c.  *Liberty Reserve Records*

The government will introduce records from Liberty Reserve, a criminal electronic payment provider seized by law enforcement in 2013.  This evidence will include records of the defendant's financial transactions through Liberty Reserve.  The Liberty Reserve servers were located in Costa Rica and were seized by Costa Rican law enforcement pursuant to an official request from the United States in 2013, at which time Liberty Reserve's principals were arrested. The servers were transferred to the custody of the United States Secret Service (USSS).  The servers contained the database of Liberty Reserve user accounts and activity, which was maintained by the Liberty Reserve operators in the course of Liberty Reserve's business operations.  Information was recorded automatically in the Liberty Reserve database at the time that the information was entered or transmitted by the user or the action was taken by Liberty Reserve.  USSS Special Agent John Szydlik was a USSS case manager assigned to the Liberty Reserve investigation.  From his investigation into Liberty Reserve and subsequent review of the Liberty Reserve servers, SA Szydlik is knowledgeable as to how the Liberty records were created, managed, and stored.  He is a "custodian or other qualified person" within the meaning of 902(11).

To certify Liberty Reserve records for use as evidence in U.S. court proceedings, law enforcement personnel retrieve the information from the Liberty Reserve database using a SQL query written to accurately retrieve and copy the responsive records.  In response to a case team request, SA Szydlik accessed the Liberty Reserve SQL database and retrieved the records for Liberty Reserve user accounts U0074465, U0845692, U1990745, and U7489869.  SA Szydlik

executed a certification complying with Fed. R. Evid. 902(11), 902(13), and 902(14) documenting the retrieval of the Liberty Reserve records pertaining to the defendant's accounts.

The accuracy of the Liberty Reserve records are further bolstered by the defendant's own communications. The plasma@plasmadivision.com email account contained an email from "no_reply@libertyreserve.com" on September 29, 2011, with the subject line "Successful Liberty Reserve Registration" and a reference in text to "Your Liberty Reserve account number: U7489869." The email account included other emails from Liberty Reserve, including emails referencing the defendant's Liberty Reserve account number. The inbox also contained emails with AurumXChange, another electronic payment platform, containing invoices reflecting payment to Liberty Reserve account U7489869, account name Roso7234852.

d. *Silk Road*

The government intends to introduce records from Silk Road. Silk Road was the first major darknet market, operating from 2011 through 2013 when its administrator, Ross Ulbricht, was arrested on narcotics distribution and money laundering charges in the Southern District of New York. In 2015, Ulbricht was convicted in the Southern District of New York following a multi-week trial; the conviction and sentence was affirmed following an appeal to the Second Circuit.

At trial, the government admitted image copies of the Silk Road servers, including the marketplace's main back-end server, located in Iceland; the market's bitcoin server, also located in Iceland; and the back-up server, located in Pennsylvania. Former FBI Special Agent Ilwan Yum testified that on September 9, 2013, he executed a search warrant at the Pennsylvania server hosting facility where the back-up server was located. SA Yum testified under oath that he made a forensic copy of the server and compared the hash values, and that the original hard drive hash matched the hash of the copy that he had made. *United States v. Ulbricht*, 14-cr-68 (S.D.N.Y. Jan.

29, 2015), ECF No. 212 (1/29/15 Tr. at 77-84).  The forensic image was admitted as Government

Exhibit 604, and the documentation of the hash value was admitted as Government Exhibit 604A.

*Id.*

SA Yum further testified that in October 2013, he traveled to Iceland and accompanied

Iceland police officers to the data center where the Silk Road servers were hosted.  SA Yum seized

a hard drive containing a copy of the Silk Road marketplace, and a hard drive holding the

marketplace's bitcoin.  SA Yum brought the hard drives back to New York, made working copies,

and checked the original hard drives into evidence.  *United States v. Ulbricht*, 14-cr-68 (S.D.N.Y.

Jan. 29, 2015), ECF No. 212 (1/29/15 Tr. at 92).  The original marketplace server was admitted

into evidence as Government Exhibit 603.  *Id.* at 93.  Documentation showing the MD5 and SHA1

hash values of the working copy was admitted as Exhibit 603A.  *Id.* at 94.  The hard drive

containing the bitcoin server was admitted into evidence as Government Exhibit 605.  *Id.* at 96-

97.  Documentation showing the hash values for that hard drive was admitted as Exhibit 605A.  *Id.*

at 97.

SA Yum further testified that he recovered 22 bitcoin wallet files from the Philadelphia

back-up server and the Iceland servers, containing 2,105,527 unique bitcoin addresses.  *United

States v. Ulbricht*, 14-cr-68 (S.D.N.Y Jan. 29, 2015), ECF No. 212 (1/29/15 Tr. at 122-124).  A

CD containing a text file of all of the Silk Road Market bitcoin addresses was admitted as

Government Exhibit 650.  *Id.* at 125-126.  Silk Road Trial Government Exhibits 603A, 605A, and

650 are being provided to defense in discovery.  The Silk Road records have been securely stored

and maintained by FBI New York.

The Silk Road marketplace server contained a database that included transaction records

for purchases conducted on Silk Road.  These records can be retrieved using a SQL query written

to accurately retrieve and copy the responsive records.  Records from the Silk Road server have been used in support of numerous investigations and prosecutions of Silk Road users who bought and sold narcotics and other illicit items on the site.  FBI personnel responsible for running these queries, including FBI Task Force Officer Detective Mark Rubins, are familiar with the Silk Road database and knowledgeable as to how the records are managed, stored, and retrieved.  FBI personnel have tested the SQL database queries for the Silk Road database, including by comparing the returns to the raw records in the database, and confirmed that the retrieved information is an accurate reflection of the records in the database.

In response to a case team request, FBI Task Force Officer Detective Mark Rubins retrieved records pertaining to a Silk Road account connected to the defendant.  In addition to the defendant's own Silk Road account, the government intends to admit records pertaining to other Silk Road users who interacted with the defendant and who laundered funds through Bitcoin Fog. These records will be accompanied by a records certification that satisfies Fed. R. Evid. 902(11) and (13).  The government is finalizing its list of requested user accounts for trial and will provide the corresponding records and certifications to defense counsel as soon as they are available, providing reasonable time to object to the certifications and authentication of the records.

*e.  Silk Road 2.0*

The government intends to introduce records from Silk Road 2.0.  Silk Road 2.0 was a darknet market that succeeded Silk Road, opening shortly after the shutdown of Silk Road in 2013 and operating through 2014.  Silk Road 2.0's marketplace server and bitcoin server were located overseas. Pursuant to official requests from U.S. authorities, foreign law enforcement authorities forensically imaged the Silk Road 2.0 servers and provided the images to the FBI.  The servers

contained extensive records pertaining to Silk Road 2.0, corroborating the servers' use and connection to the market.

The Silk Road 2.0 server contained a database that held detailed records for purchases conducted on Silk Road 2.0.  These records can be retrieved using scripts written to accurately retrieve and copy the responsive records.  The scripts run through a graphical user interface, which does not modify the script itself or the records.  FBI-affiliated personnel responsible for running these queries, including FBI Task Force Officer Detective Mark Rubins, are familiar with the Silk Road 2.0 server records and knowledgeable as to how the records are managed, stored, and retrieved.  FBI personnel have tested the database queries for the Silk Road 2.0 database, including by comparing the returns to the raw records in the database, and confirmed that the retrieved information is an accurate reflection of the records in the database.  This script is an electronic process that produces an accurate result.

In response to a case team request, FBI Task Force Officer Detective Mark Rubins retrieved records pertaining to a Silk Road 2.0 account connected to the defendant.  In addition to the defendant's own Silk Road 2.0 account, the government intends to admit records pertaining to other Silk Road 2.0 users who interacted with the defendant and who laundered funds through Bitcoin Fog.  The government will also seek to admit a list of all bitcoin addresses held in the Silk Road 2.0 bitcoin wallet extracted from the Silk Road 2.0 bitcoin server.  These records will be accompanied by a records certification that satisfies Fed. R. Evid. 902(11) and (13).  The government is finalizing its list of requested user accounts for trial and will provide the corresponding records and certifications to defense counsel as soon as they are available, providing reasonable time to object to the certifications and authentication of the records.

*f.   AlphaBay*

The government will also introduce evidence from AlphaBay.  Until the website was seized by law enforcement in July 2017, AlphaBay was the largest online black market through which users in the United States and abroad bought and sold malicious software, hacker-for-hire services, stolen financial information and payment cards/numbers, access device-making equipment, firearms and explosives, counterfeit goods and currency, toxic chemicals, illegal narcotics and other controlled substances online, and other illegal contraband using virtual currencies.   Until July 2017, AlphaBay Market operated much like a conventional e-commerce website.  AlphaBay users could register for a free account and select a screen name and password of their choosing.  Once an account was created, users were able to browse goods for sale from the AlphaBay home page, which were organized by category.  Some of these categories included "fraud," "drugs and chemicals," "counterfeit items," "weapons," "carded items," i.e., stolen credit card numbers and other access devices, services, "software and malware," and more.  AlphaBay also provided a search tool that allowed users to easily find listings for the types of illegal goods or services they want to purchase, and permitted searching by price range, popularity of item, vendor, origin or shipping country, and payment type.  The goods sold on AlphaBay were pervasively criminal in nature.

Beginning on July 3, 2017, pursuant to lawful authorities, the United States and other countries conducted a large-scale international operation to arrest the AlphaBay administrator and dismantle AlphaBay's technical infrastructure.  During that operation, with support of U.S. law enforcement, foreign law enforcement seized the computer servers used to operate AlphaBay, pursuant to an official request from United States.  The servers were then transferred to the custody of U.S. law enforcement.

The FBI created an image of the primary server used to operate the AlphaBay Market. This server contained, among other things, transaction histories, communications, and other information associated with AlphaBay users who transacted and/or communicated on AlphaBay, verifying that the server was used in the operation of AlphaBay Market. These AlphaBay records can be retrieved using a SQL query written to accurately retrieve and copy the responsive records. Law enforcement personnel familiar with the AlphaBay records have verified the SQL queries and have confirmed that the retrieved information is an accurate reflection of the records in the database. This SQL database query is an electronic process that produces an accurate result, within the meaning of Fed. R. Evid. 902(13).

The government intends to admit records pertaining to AlphaBay users who laundered funds through Bitcoin Fog. These records will be accompanied by an appropriate records certification authenticating the resulting records. The government is finalizing its list of requested user accounts for trial and will provide the corresponding records and certifications to defense counsel as soon as they are available, providing reasonable time to object to the certifications and authentication of the records.

g. *Welcome to Video*

The government will also introduce evidence from Welcome to Video, a darknet site distributing child sexual exploitation material that was seized by law enforcement in 2018. Welcome to Video allowed users to purchase access to material through bitcoin. The Welcome to Video servers were located in the home of the service's administrator, Jungwoo Son, in South Korea. On March 5, 2018, Korean National Police executed a search warrant at Son's residence and seized a custom-built computer containing four internal hard drives housing the Welcome to Video site. The hard drives held over 8 terabytes of child sexual exploitation videos, as well as

records of the Welcome to Video users and their activity on the site.   Homeland Security Investigations Computer Forensic Agent Edward Schwaigert observed the search from outside of Son's residence and photographed the four seized drives.   He then observed Korean National Police forensically image the devices, using standard forensic imaging software, and verify the resulting hash values from the imaging.   The images were copied to hard drives that the U.S. authorities provided for this purpose.   The Korean authorities provided the automated printouts verifying the imaging process.   The investigator from the Korean National Police Agency who forensically imaged the four seized drives also executed a certification identifying the four original drives and explaining that he copied all of the data to drives provided by U.S. law enforcement. The certification explains that the investigator calculated the MD5 hash value of the original and image copy and confirmed that they matched, attesting that the drives provided to the U.S. authorities were true copies of the Welcome to Video servers.

Mr. Schwaigert subsequently made copies of the provided drives and calculated the hash values himself, verifying that they matched the original hash values.   The original drives were stored as evidence.   Mr. Schwaigert executed a certification attesting to his actions noted above, authenticating the server images pursuant to Fed. R. Evid. 902(14).

The Welcome to Video servers included the then-current copy of the Welcome to Video database as well as several back-up copies, as well as Welcome to Video's bitcoin wallets.   The Welcome to Video database included basic profile information, such as username and assigned bitcoin address, and download history.   To retrieve Welcome to Video records pertaining to specific users, law enforcement personnel and/or qualified contractors retrieved the information from the Welcome to Video database using a SQL query written to accurately copy the responsive records.

The government intends to admit records pertaining to Welcome to Video users who laundered funds through Bitcoin Fog as well as the bitcoin addresses controlled by Welcome to Video. These records will be limited to the file names noted in the database and will **not** include any images or videos, which were stored separately on the Welcome to Video servers. These records will be accompanied by records certifications that satisfy Fed. R. Evid. (13) and (14). The government is finalizing its list of requested user accounts for trial and will provide the corresponding records and certifications to defense counsel as soon as they are available, providing reasonable time to object to the certifications and authentication of the records.

## II.     The Government Intends to Admit Records from Official Foreign Requests

The government intends to introduce records from foreign businesses that were obtained pursuant to official U.S. government requests. These include records from Denmark, the United Kingdom, Sweden, and Finland, in addition to the seized servers and related records noted in Section I.E, *supra*.

The defendant created a customized domain, @plasmadivision.com, for his personal email. That account was serviced through One.com, a company based in Denmark. In response to an official request from U.S. authorities to Denmark authorities, One.com provided records of the defendant's account, including the contents of his communication. A senior administrative supervisor from One.com executed a certification complying with 902(11) and 902(13), declaring that the records "1. were made at or near the time of occurrence of the matters set forth therein, by (or from information transmitted by) a person with knowledge of those matters; 2. were kept in the course of regularly conducted business activity; 3. were made by the said business activity as a regular practice; and, 4. if not original records, are duplicates of original records."

The government also intends to admit records from United Kingdom-based financial institutions Optal Financial Limited and Prepaid Financial Services Limited.  Optal's Head of Risk and Compliance and MLRO executed a records certification attesting to the authenticity of the records provided.  A qualified fraud analyst from Prepaid Financial Services Limited similarly executed a standard business records certification for the records provided by Prepaid Financial Services Limited.  Those records and certifications were then transmitted through official channels from the United Kingdom to the United States.  These records are appropriately admitted as business records pursuant to Fed. R. Evid. 902 and 18 U.S.C. § 3505.

The government intends to admit records from the virtual currency exchange LocalBitcoins.com, which is incorporated in Finland.  The records, pertaining to accounts held by the defendant, were accompanied by a certification executed by the LocalBitcoins CCO in Helsinki, declaring that each record, "1. was made at or near the time of the occurrence of the matter set forth therein by (or from information transmitted by) a person with knowledge of those matters; 2. was kept in the course of a regularly conducted business activity; 3. was made by the business as a regular practice; and 4. if not an original record, is a duplicate of the original."  The LocalBitcoins.com records should be admitted as certified business records pursuant to Fed. R. Evid. 902 and 18 U.S.C. § 3505.

The government will seek to admit records of the defendant's accounts at Swedish financial and telecommunications companies.  These records were provided from the Swedish Prosecution Authority through official channels.  The bank records were accompanied by a memorandum and certification from Senior Financial Investigator Grethe Lindskog.  The memorandum summarized the obtained records, including records from Nordea, a financial institution based in Finland and operating in Sweden.  Nordea provided the records via email

from Nordea to the Swedish National Police.  The Nordea records were accompanied by cover letters – signed and unsigned – from Nordea.  The Swedish authorities provided electronic copies of the email correspondence with the records attached.

The Swedish telecommunications records were accompanied by a memorandum from police inspector Håkan Börjesson.  The memorandum summarized the obtained records, namely records from Hi3G/Tre, a Swedish telecommunications company.  The Swedish authorities provided electronic copies of the records provided by Hi3G/Tre.

The records were provided pursuant to a request under the Mutual Legal Assistance Treaty from the United States to Sweden.  The treaty  establishes alternative methods of authentication, noting, "where such items are business records, the attestation may be (a) by a certificate such as Form A [a standard business records certification form] or A–1 appended to the Treaty; (b) by a written summary of testimony containing the essential information sought in Form A or A–1, or (c) by a document containing the essential information required by the Requesting State.  Records so authenticated in Sweden . . . shall be admissible in evidence in the United States as proof of the truth of the matters set forth therein."  Treaty Between the Government of the United States of America and the Government of the Kingdom of Sweden on Mutual Legal Assistance in Criminal Matters, signed at Stockholm on December 17, 2001 (Treaty Doc. 107-12), submitted to Senate July 15, 2002, at *8, available at https://www.congress.gov/107/cdoc/tdoc12/CDOC-107tdoc12.pdf.  The memorandum and summaries prepared by Swedish authorities authenticate the records through the process set forth in the treaty.

### III.   The Government Intends To Admit Summary Charts and Testimony

Federal Rule of Evidence 1006 provides that, "The proponent may use a summary, chart, or calculation to prove the content of voluminous writings, recordings, or photographs that cannot be conveniently examined in court."  Fed. R. Evid. 1006.  Certain evidence in this case, such as the hundreds of thousands of bitcoin addresses controlled by Bitcoin Fog and records of hundreds of thousands of transactions moved through the mixer, not to mention the other extensive complex financial transactions involved in the defendant's money laundering scheme and other related blockchain-based evidence, fall within the category of records too voluminous to be conveniently examined in court.

The government anticipates introducing summary charts to aid the jury.  The charts will summarize relevant transactions involved in the defendant's money laundering scheme.  Summary charts under Fed R. Evid. 1006 are permissible where:  (1) the documents are so voluminous as to make comprehension difficult and inconvenient (though not necessarily impossible); (2) the documents themselves are admissible; (3) the chart is reasonably available for inspection and copying; (4) the chart is accurate and non-prejudicial; and (5) the witness who prepared the chart is available to lay an appropriate foundation.  *See United States v. Hemphill*, 514 F.3d 1350, 1358-59 (D.C. Cir. 2008) (noting that as long as a party has laid a foundation for the underlying documents, a chart summarizing them can itself be evidence under Rule 1006) (*citing United States v. Bray*, 139 F.3d 1104, 1109-10 (6th Cir.1998)).

Here, the government's charts will allow the jury to "follow the money" through the defendant's efforts to launder cryptocurrency and profit from his criminal activity.   The government's charts will fairly and accurately outline the facts, without using inflammatory and prejudicial wording.  The charts will accurately summarize otherwise admissible documents that

are too voluminous to be easily or conveniently examined by the jury.  The government will ask the Court to instruct the jury that the charts are being admitted solely for the jury's convenience, and are valid only to the extent they accurately reflect the underlying evidence and that if the summary evidence does not correctly reflect the facts proved at trial, the jury should give the summary evidence only such weight as it deserves.

The government also intends to present testimony summarizing lengthy and complex records and other testimony.

If defense counsel desires, the government will make a copy of the blockchain available to defense counsel upon request to comply with Fed R. Evid. 1006 ("The proponent must make the originals or duplicates available for examination or copying, or both, by other parties at a reasonable time and place.  And the court may order the proponent to produce them in court.") and any other applicable discovery obligations.  As the blockchain is a publicly available dataset, defense counsel is also able to access and view the underlying blockchain data on its own.

## IV.  The Government Intends To Use Demonstratives To Aid the Jury

This case involves numerous technical concepts, such as cryptocurrency transactions, the blockchain, mixing techniques, and the darknet.  The government witnesses will explain these concepts to the jury through the testimony and evidence relevant to this case.  In order to aid the jury in understanding the evidence, the government intends to use demonstrative exhibits in the form of visual aids, in addition to the summary exhibits discussed above.  Such demonstratives will be consistent with Fed. R. Evid. 611(a), intended to serve as pedagogical aids without wasting time or confusing the jury.

## **CONCLUSION**

For the foregoing reasons, the government provides notice of its intent to introduce the above-described evidence and requests that it be admitted at trial.

Respectfully submitted,
MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar No. 481052

BY:      */s/ Christopher B. Brown*
Christopher B. Brown, D.C. Bar No. 1008763
Assistant United States Attorney
U.S. Attorney's Office for the District of Columbia
601 D Street, N.W.
Washington, D.C. 20530
(202) 252-7153
Christopher.Brown6@usdoj.gov

*/s/ C. Alden Pelker*
C. Alden Pelker, Maryland Bar
Trial Attorney, U.S. Department of Justice
Computer Crime & Intellectual Property Section
1301 New York Ave., N.W., Suite 600
Washington, D.C. 20005
(202) 616-5007
Catherine.Pelker@usdoj.gov

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | **:** | |
| | **:** | |
| **v.** | **:** | **Criminal No. 21-cr-399 (RDM)** |
| | **:** | |
| **ROMAN STERLINGOV,** | **:** | |
| | **:** | |
| **Defendant** | **:** | |

## <u>ORDER</u>

Upon consideration of the government's Notice of Intent to Admit Certain Government Exhibits, any opposition thereto, and such evidence and argument as has been presented at any hearing on the motion, it is this _____ day of _____, 2022, hereby

ORDERED, that the motion is GRANTED.

_____
THE HONORABLE RANDOLPH D. MOSS
UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA