# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | CRIMINAL NO. 21-cr-399 (RDM) |
| | : | |
| ROMAN STERLINGOV, | : | |
| | : | |
| Defendant. | : | |

## GOVERNMENT'S REPLY IN SUPPORT OF
## MOTION TO QUASH EARLY-RETURN RULE 17(c) SUBPOENAS

The United States of America, by and through the United States Attorney for the District of Columbia, respectfully files the following Reply in support of its Motion To Quash the defendant's early-return Rule 17(c) subpoenas, ECF No. 93.

### A. The Defendant's Early-Return Rule 17(c) Subpoenas Are Procedurally Invalid, and the Defendant Has Not Established the Necessity of Production "Before Trial"

As explained in the government's Motion To Quash, under the plain text of Rule 17(c)(1) and decisions such as *United State v. Binh Tang Vo*, 78 F. Supp. 3d 171 (D.D.C. 2015), only "[t]he court" may authorize an early-return Rule 17(c) subpoena "before trial." This requirement is "no mere technicality" but is "a vital protection against misuse or improvident use of such subpoenas." *Binh Tang Vo*, 78 F. Supp. 3d at 178 (internal quotations omitted). Because the defendant failed to obtain Court approval, his early-return subpoenas are procedurally defective and should be quashed.

The defendant simply ignores the text of Rule 17(c) and inconvenient authority like *Binh Tang Vo*, declines to offer any competing legal authority, and asserts vaguely (at 7) that Court permission is not required "before issuing a Rule 17(c) subpoena"—eliding the distinction between a true trial subpoena, returnable at trial, and an early-return subpoena. But as Judge Sullivan articulated in *Binh Tang Vo*, the text of Rule 17(c) draws a distinction between the two and requires

prior Court authorization for any Rule 17(c) subpoena returnable "before trial."  78 F. Supp. 3d at 178.  As the defendant's grossly overbroad and irrelevant subpoenas well illustrate, early-return subpoenas—untethered to particular witnesses or evidentiary presentations planned at trial—are much more susceptible to misuse by litigants seeking to cast a wide net of civil-style discovery demands.

Nor has the defendant established a need for the early-return date in this case.  The defendant argues (at 10-11) that pretrial production is necessary for the defense to have time to "forensically analyze proprietary code," and suggests that the volume of the anticipated production of "computer code, input data, and communications" make it impracticable to review the records prior to trial.  But if the anticipated production is so large, that only proves that the defendant is misusing Rule 17(c) as a discovery tool to conduct a fishing expedition—in violation of well-established case law.  *See* ECF No. 93, at 4-7 (collecting cases).  If, on the other hand, the defendant had issued a narrow set of requests satisfying the *Nixon* standards of relevancy, admissibility, and specificity, there would be no practical difficulty in receiving the evidence at trial in the nature of a traditional subpoena *duces tecum*.  The defendant can hardly rely on the overbreadth of his Rule 17(c) subpoenas to justify an exceptional return before trial.

### B.  The Defendant Has Not Carried His Burden of Establishing that the Subpoenas Seek Relevant, Admissible, and Specific Evidence Under *Nixon*

In addition to being procedurally invalid, the subpoenas are grossly overbroad and irrelevant in violation of Rule 17(c)'s substantive standards.  It is the defendant's burden to show that the subpoenas satisfy the three-part test of "(1) relevancy; (2) admissibility; [and] (3) specificity," *United States v. Nixon*, 418 U.S. 683, 700 (1974); *see United States v. Fitzsimons*, 342 F.R.D. 18, 20 (D.D.C. 2022) (burden of satisfying *Nixon* test falls on party requesting information).  It is a matter of black-letter law that a Rule 17(c) subpoena is not a discovery device

2

and cannot be used to conduct a broad fishing expedition.  *See, e.g.*, *United States v. Cuthbertson*, 630 F.2d 139, 144, 146 (3d Cir. 1980); *United States v. Fitzsimons*, 342 F.R.D. 18, 20 (D.D.C. 2022); *United States v. Libby*, 432 F. Supp. 2d 26, 30-32 (D.D.C. 2006).

1.   **The Subpoenas Should Be Evaluated in Light of the Defendant's Inappropriate Threat of Future Litigation and Derogatory Out-of-Court Statements About the Respondents**

As a preliminary matter, the Court should note what is missing—namely, any explanation or excuse for the inappropriate threat delivered in the subpoena cover letter to the third-party respondents that "because of your company's involvement in Mr. Sterlingov's prosecution, you face potential liability should he be acquitted," or defense counsel's repeated out-of-court statements via Twitter and the media calling Chainalysis the "the Theranos of blockchain analysis."  Any evaluation of the Rule 17(c) subpoenas here must take into account the context of defense counsel's personal hostility toward Chainalysis and his stated intent to pursue follow-on litigation against the company.  Indeed, the defendant's fixation above all else on gaining access to Chainalysis's proprietary computer code—its intellectual property—suggests that the defendant is more interested in imposing costs and pressure on Chainalysis than in obtaining anything of true relevance to the preparation of the defense.  This Court has an obligation to ensure that its compulsory process is not misused for harassment or other improper purposes—such as gathering evidence for an anticipated civil suit.  *See* Fed. R. Crim. P. 17(c)(2) (subpoena may be quashed if "unreasonable" or "oppressive").  The defendant's inability to acknowledge these threats and insults—let alone explain them—casts considerable doubt over the sincerity of his proffered explanations for the grossly overbroad and irrelevant Rule 17(c) subpoenas.

Even if the subpoenas had not been delivered with a threat and surrounded by a cloud of derogatory out-of-court statements denigrating the respondents, the defendant's response would still be woefully inadequate to justify the Rule 17(c) subpoenas here.  The defendant simply ignores

the weight of legal authority forbidding the misuse of Rule 17(c) subpoenas to engage in fishing expeditions—other than to assert, *ipse dixit*, that "[t]his is not a fishing expedition." The defendant does not (and cannot) offer any competing legal authority to support his grossly overbroad and irrelevant subpoena requests. The defendant provides only airy rhetorical arguments (*e.g.*, at 12, 17-18) about "complex computer case law" and "the computer age" in an attempt to distinguish the Supreme Court's binding decision in *Nixon*. That is insufficient for this Court to disregard the overwhelming weight of authority forbidding precisely this kind of overbroad fishing expedition.

The defendant does not attempt to defend any of his *eighty-one* numbered discovery requests in any specific detail, even though that is his burden. To take just one example, the defendant cannot explain Request No. 13. What is the basis for believing that *specific* "documents, records and communications, including individual notes to one's self" exist "between Chainalysis or Michael Gronager and MITRE related to this investigation"? *See Libby*, 432 F. Supp. 2d at 31 ("If the moving party cannot reasonably specify the information contained or believed to be contained in the documents sought but merely hopes that something useful will turn up, this is a sure sign that the subpoena is being misused.") (internal quotations and alteration omitted). How would the existence of any such communications between Chainalysis and MITRE make any probative fact at issue before the jury in this case more or less probable? Are the communications being sought admissible at trial? And how is it even possible to have "notes to one's self" *between* two separate persons or entities? These are not rhetorical questions; they are part of the defendant's burden, which he must satisfy to justify enforcement of the subpoenas against a third party. If individual subpoena requests read like boilerplate civil document requests, that simply demonstrates that this is an impermissible fishing expedition exceeding the scope of Rule 17(c).

2. **The Mismatch Between the Defendant's Asserted Rationalizations and the Text of the Subpoena Requests Shows that They Fail the *Nixon* Test for Relevancy, Admissibility, and Specificity**

Instead of addressing his eighty-one requests in detail, the defendant relies on a broad and generalized assertions of relevance for the entire set. Before addressing the substance of these arguments, it is worth pausing to note the mismatch between what the defendant *claims* as justification for the subpoenas, and what the subpoenas *actually say*.

For example, the defendant repeats many of his arguments about "source code." But *none* of the defendant's eighty-one requests clearly asks for software source code from Chainalysis. To be sure, the defendant's threatening cover letter refers to "source code, object code, algorithms, and all software code," but the cover letter is not enforceable under Rule 17(c). By contrast, nowhere in the eighty-one numbered requests does the defendant directly ask for "source code" or software code of any kind from Chainalysis. The only request that arguably comes close is Request No. 8, which asks for source code *that was sent* by Chainalysis to a group of researchers working on a whitepaper published in 2022. Undoubtedly, defense counsel *meant* to include a straightforward request for source code in the subpoenas—but it is not there. This is not just a question of imprecision in the drafting; it goes to the foundational question of whether the subpoenas reflect a targeted attempt to secure specific items of evidence needed for trial, or whether they are an indiscriminate fishing expedition.

Similarly, the defendant now advances arguments (at 13-14) about account data for the cryptocurrency exchange Mt. Gox. Again, nowhere in the eighty-one subpoena requests is Mt. Gox referenced in any way. Undoubtedly, the defense would ask the Court to liberally construe one or another of the eighty-one subpoena requests to encompass records related to Mt. Gox or the Mt. Gox bankruptcy—but that would stretch the requests beyond all linguistic recognition, not to mention the requirement that Rule 17(c) requests satisfy the *Nixon* "specificity" standard. The fact

that the defense has so little understanding of the contents of its *own* subpoenas only exemplifies its failure to comply with the strict standards of *Nixon*.

>   **3.   The Defendant's Attempted Justifications Are Vague, Unsupported by Reference to Individual Requests, and Fail To Establish Relevancy, Admissibility, and Specificity**

On the merits, the defendant reprises his conspiracy theory (at 12-13) about alleged profiteering, asserting—falsely, without evidence—that the subpoenaed parties "stand to profit from Mr. Sterlingov's conviction" and will "have a lot of money to lose should Mr. Sterlingov be acquitted."  The government has responded to this absurd conspiracy theory elsewhere, including in its opening motion, and incorporates its arguments by reference here.  *See* ECF No. 93, at 8-9; ECF No. 50 (Gov't Opp. to Def. Mtn. To Reconsider Pre-Trial Detention), at 24-25; ECF No. 80 (Gov't Reply in Support of Mtn. *In Limine* To Preclude Def. from Calling Prosecutor as Witness for Def.), at  2-4; ECF No. 81 (Gov't Reply in Support of Mtn. *In Limine* To Preclude Certain Impermissible Def. Arguments & Evidence), at 2-3.  The defense will have ample opportunity to cross-examine Ms. Bisbee, one of the government's experts and the sole Chainalysis employee who will testify as a witness in the government's case, about her fees, whether those fees depend on the verdict in this case, and any other possible sources of bias.  The defense will also be able to cross-examine Ms. Bisbee about her methodology and her use of Chainalysis software, and confront her with the competing analysis of any qualified defense blockchain expert.[1]  But the financial interests of non-witnesses are completely irrelevant.  The defendant has never explained in logical terms how his conspiracy theory could conceivably change the way the jury weighs or

---

[1] Ms. Bisbee's expert report was delivered with a complete appendix (totaling hundreds of megabytes) of relevant bitcoin addresses.  Any qualified blockchain expert can take the same data set and validate or falsify the analysis.  The government's second blockchain expert report, of FBI Staff Operations Specialist Luke Scholl, was also delivered with a complete appendix of blockchain information.

interprets the evidence to be presented in the government's case—including items as diverse as financial account records, Internet Protocol logs, email and cloud storage search warrant returns, forum postings and private messages from BitcoinTalk, records of the defendant's personal account activity on the Silk Road darknet market, handwritten notes recovered from the defendant upon his arrest, forensic examination of the numerous unusual electronic devices with which the defendant was traveling at the time of his arrest, and so forth.

The defendant claims (at 13-14) that there are unspecified "errors" in account records for Mt. Gox which the government provided in discovery.  First, it is impossible for the government to respond to the defendant's vague claims without knowing the specific records or transactions to which the defendant is referring.  Second, as noted above, the defendant's subpoenas do not even ask for records related to Mt. Gox.  And third, the Mt. Gox account records that the government intends to admit at trial did not come from Chainalysis; the records were obtained through a formal legal request to Japanese authorities and are authenticated by the Japanese bankruptcy trustee and Tokyo prosecutor's office.  *See* ECF No. 62, at 20-22 (Gov't Notice and Mtn. *In Limine* To Admit Certain Government Exhibits) (describing Mt. Gox records and basis for authentication).

The defendant makes a blanket assertion (at 15-16) that the subpoenaed records "are admissible," but never quite explains why or how any specific record or communication would be admissible.  Simply repeating an assertion does not make it true.  Instead, the defendant asks the Court to fill in the blanks, stating vaguely (at 16) that "[a]s the Court is aware, there are numerous exceptions to the hearsay rule."  But the defendant is not a *pro se* litigant whose pleadings need to be liberally construed.  The defendant—as the party seeking to persuade the Court to enforce the subpoenas—should be able to articulate for himself any applicable hearsay exceptions in order to carry his burden under *Nixon*.

Finally, the defendant argues (at 16-17) that the subpoenas are "specific" because they are long ("totaling 51-pages together") and complicated ("[a] detailed set of definitions are provided prior to the numbered requests for the subpoenaed party"). That is not what "specificity" means under *United States v. Nixon*. The defendant's laundry list demands for "[a]ny" or "[a]ll" documents illustrate exactly the kind of catch-all demand forbidden by the Supreme Court's decision in *Bowman Dairy*. *See Bowman Dairy Co. v. United States*, 341 U.S. 214, 221 (1951) (invalidating similar "catch-all provision" in Rule 17(c) subpoena). The defendant's inability to specifically identify any particular document he expects to obtain demonstrates that the subpoena fails the specificity prong of *Nixon*, in addition to relevancy and admissibility. *See Libby*, 432 F. Supp. 2d at 31.

In sum, the defendant has not carried his burden under *Nixon* to justify enforcement of his procedurally improper and grossly overbroad and irrelevant Rule 17(c) subpoenas.

### C.  The Government's Motion Is Not "Moot"

The government's motion is not "moot," by which the defendant apparently means (at 9) the government "lacks standing" to move to quash the Rule 17(c) subpoena to the respondents. The defendant relies on *United States v. Cartagena-Albaladejo*, 299 F. Supp. 3d 378 (D.P.R. 2018), but that decision actually confirms the government's third-party standing to challenge a Rule 17(c) subpoena to prevent "harassment of potential witnesses, as well as undue lengthening of the trial and discovery process with evidence that may neither be relevant nor admissible." *Id.* at 384. Just so here. The government has an interest in seeing the Court police the boundaries of relevance in this case, particularly given defense counsel's stated intention to use this case as a springboard for future litigation and to indulge his personal feelings of hostility towards the respondents. The government also has an interest in ensuring that the procedural requirements of

Rule 17(c) are honored both here and in future subpoenas issued in this case.  Meanwhile, Chainalysis has its own interests in moving to quash, such as undue burden.  The government agrees, however, that the Court can and should resolve both motions at the same time.

## **CONCLUSION**

For the foregoing reasons and those outlined in the government's Motion To Quash, ECF No. 93, the Court should quash the defendant's Rule 17(c) subpoenas to Chainalysis, Inc. and its employees, and it should order the defendant to seek specific leave of Court before issuing any early-return Rule 17(c) subpoenas.

Respectfully submitted,
MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar No. 481052

BY:    */s/ Christopher B. Brown*
Christopher B. Brown, D.C. Bar No. 1008763
Assistant United States Attorney
U.S. Attorney's Office for the District of Columbia
601 D Street, N.W.
Washington, D.C. 20530
(202) 252-7153
Christopher.Brown6@usdoj.gov

*/s/ C. Alden Pelker*
C. Alden Pelker, Maryland Bar
Trial Attorney, U.S. Department of Justice
Computer Crime & Intellectual Property Section
1301 New York Ave., N.W., Suite 600
Washington, D.C. 20005
(202) 616-5007
Catherine.Pelker@usdoj.gov