# Exhibit 'A'

**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

---

*United States of America*,

Plaintiff,

*v.*

*Roman Sterlingov*,

Defendant.

---

**21 - CR - 399 (RDM)**

## Declaration of Roman Sterlingov

I, Roman Sterlingov, hereby declare under the penalty of perjury under the laws of the United States the following:

1. I have been interested in computers since I was a kid.
2. At age 14, I moved permanently to Sweden with my mother, fleeing Russia, where I was born. I am a dual Swedish-Russian citizen.
3. At first, I lived with my mother in Jonkoping, Sweden.
4. After graduating the Swedish equivalent of high school, I began working in odd jobs, both ones that required computers and ones that required physical labor.
5. I worked as a catalogue publisher, in internet marketing, and in administrative jobs involving computers.

6. While living in Jonkoping, I began working for a marketing company called Capo Marknadskommunikation. I had this job for several years. I kept this job when I moved to Gothenburg, Sweden where I got a small studio apartment and lived as a bachelor.
7. Around 2009, when I was about 21, I got my own apartment in Gothenburg Sweden, 2 hours away from Jonkoping.
8. Because I am currently jailed, it is difficult for me to get records and check precise dates and amounts. The dates I am giving in my Statement of Net Worth, attached as Exhibit B to my Supplemental Motion to Release Funds are approximations upon information and belief where I could not access accurate records.
9. Around 2010, I first heard about Bitcoin and became interested in it. I thought it could transform the world. I set up my first Bitcoin wallets on my computer around this time as an experiment with this new technology. Using these wallets, I sold Bitcoin to other Bitcoin enthusiasts I met online or at Bitcoin meetups.
10. It was an exciting time, and I was interacting with lots of people who had grand visions for this technology.
11. I would go to local Bitcoin meetups in Sweden and sometimes travel around Europe to Bitcoin related meetups. A community was growing around Bitcoin.
12. The people I met at these meetups were exciting and interesting. They all seemed to have cool jobs, ideas, and interests.
13. Around 2011-2012, I began buying, selling, and investing in Bitcoin. I realized that it could be a good additional income source to sell Bitcoin to people I met at these meetups. I enjoyed socializing with the people and helping them get into Bitcoin. At this time there

were no commercial cryptocurrency exchanges and people asked me to help them acquire this exciting new digital currency known as Bitcoin.

14. I did this as a hobby and never made a lot of money from it. At the time Bitcoin wasn't worth much relative to now. Almost all of my money comes from Bitcoin's appreciation.

15. Early on, somebody recommended I use Bitcoin Fog to secure and protect my transactions. A lot of people did. I became a user of Bitcoin Fog for this purpose, but I have never run, operated, or had any administrative access to Bitcoin Fog. I used it for completely legal purposes, in completely legal transactions, in Sweden.

16. At my small studio apartment during this time, I would often have friends and guests stay over because it was centrally located in Gothenburg, Sweden. Some people came from these Bitcoin meetups. I would regularly share my WiFi with visitors.

17. After moving to Gothenburg, I worked at Capo Marknadskommunikation for a few years. During this period, I continued to sell, trade, and accumulate Bitcoin.

18. I viewed Bitcoin as form of financial savings.

19. Around 2013/2014, I realized that I had enough savings to take six-months off from my work at Capo Marknadskommunikation. I did so with their consent.

20. I had these savings because my Bitcoin holdings had appreciated significantly from the spike in market price.

21. I viewed this six-month break from working at Capo Marknadskommunikation as an opportunity to find myself. I looked into various job prospects at this time including teaching and mental health careers.

22. After my six-month break from working at Capo Marknadskommunikation expired, I resigned from my position there. My understanding was that I could go back to work for

them at any time because they were short on qualified staff. People with computer skills were in demand.

23. Throughout this period of my life, I struggled with depression.
24. I continued to attend self-development and self-help seminars.
25. I lived off the savings I had accumulated through Bitcoin. I was rather frugal with my spending.
26. Around 2014/2015, I opened up a small music studio in Gothenburg, Sweden with a few friends. We were also interested in mental health and made some videos on the subject.
27. We ran the studio and made these videos for 2-3 years. In 2017, we started putting videos up on YouTube under the name "Technology of Winning" @technologyofwinning8592: https://www.youtube.com/@technologyofwinning8592/videos
28. Around 2014, I set up a Kraken account where I kept most of my cryptocurrency. The Government has seized these accounts. I had some other small accounts with substantially smaller amounts of cryptocurrency in them.
29. None of my assets are the knowing proceeds of any crime. I never operated Bitcoin Fog. I do not have any administrator logins for Bitcoin Fog, and I never have. I do not know who operates Bitcoin Fog. I have never laundered any money in my life.
30. Around this time, I eventually stopped buying Bitcoin because I had no new income for which to buy it. I was living off of my capital gains.
31. From around 2014 until when I was arrested, I visited the United States to see family, to see friends, and also for vacation with my girlfriend. This included trips to Massachusetts to see a cousin, and a trip to Florida with my steady girlfriend at the time and her mother during which time I attended a life coaching seminar.

32. Prior to my arrest, I had never been to Washington D.C. I have no friends or contacts in D.C., and I have never done business in D.C.
33. Around 2015-2016, I attempted to set up a commercial VPN service called To The Moon, Ltd. as an income source and to decrease my reliance on my Bitcoin holdings. The business never took off. I underestimated the amount of work this would take.
34. Around this time, concerned with protecting my crypto savings, I explored tax structures available for my types of holdings.
35. By 2020, the music studio had long been shut down. To the Moon Ltd. was not taking off. I realized that my life coaching videos were not a reliable source of income. I was eating into my Bitcoin savings. I did not have any new Bitcoin coming in. I spent a lot of time trying to learn how to be a better investor and trader in Bitcoin. Essentially, my net worth was entirely based on capital gains and not a reliable income stream. Even though Bitcoin was appreciating astronomically, I was worried I couldn't rely on my Bitcoin savings to continue appreciating at that rate forever, so I decided to look for a career that provided a reliable income. After researching, I discovered that a career as a commercial pilot suited my skill set and could provide me with a stable career.
36. In 2021, I signed up for a flight school intensive in Sacramento, CA.
37. After signing up for the flight school, I discovered that at the time the United States required citizens of the Schengen Zone, of which Sweden is part, to quarantine for 14-days in one of a limited number of countries outside the Schengen Zone. Russia was one of these countries. Because I had a Russian passport, Moscow was a logical choice of location to quarantine for COVID-19. While in Moscow I studied for the flight intensive.

38. Because I am a Russian citizen by birth, I have two Russian passports. The first one is for international travel. The second one is required for internal travel within Russia and functions as a Government ID. As a Swedish citizen, I have two identical Swedish passports, as is common in Sweden. People do this so that they don't get caught up in diplomatic disputes based on the stamps in their passports. All my passports are legitimately issued by the Russian and Swedish governments. This fact is readily verifiable by checking with the respective governments. I have no other passports. I had my passports with me when I travelled to the United States after my two-week quarantine in Moscow.
39. When I travel, I regularly carry most of my computer equipment with me.
40. I was bewildered and surprised to be arrested at Los Angeles International Airport on April 27, 2021, after a long flight from Moscow. The arresting agents informed me that they were going to go through all my seized luggage, computers, phones, etc. They gave me the impression that they knew about and had seized all of my assets.
41. After my arrest I was taken to a holding facility somewhere in California. I had a brief conversation with a Federal Defender.
42. Several days after my arrest I was able to speak at a little more length with my Federal Defender via video and phone about my upcoming interview with pre-trial services. These conversations totaled no more that 15 minutes.
43. Because I was quarantined along with the other people being held, I only had access to a phone for one hour a day and did not know when that hour would be. This made it impossible to communicate effectively with my Federal Defender, or my family, or my friends. I had no access to my assets, or any information about them. I did not understand

what was going on. I was scared, confused, and stressed out. My Federal Defender advised me that because I was being charged with financial crimes that I should be careful discussing my finances with pre-trial services.

44. When I finally had my pre-trial services interview, without my Federal Defender present, I advised my interviewer that I was uncomfortable discussing my finances given the charges. I told her that I owned a Tesla and an old Jeep in Sweden. I was also in no position to discuss my assets given that my contact and access to the outside world had been almost completely cut off. I was stressed and confused about an arrest for something I had never done. I also assumed that the Government knew what my assets were because they told me when they arrested me that they were seizing and searching my computers, luggage and knew about all my assets.

45. Upon my case being transferred to the District of Columbia. I have been jailed at the Northern Neck Regional Jail in Warsaw, VA. I have since learned that the Government seized substantially all of my assets.

46. Tor Ekeland Law, PLLC is my counsel of choice.

47. During my stay at the Northern Neck Regional Jail, through a relative that I gave Power of Attorney to, I sold my Tesla and paid the proceeds to Tor Ekeland Law, PLLC, to cover a small portion of my legal fees. I am in the process of selling my old Jeep. I was also, through my law firm, able to identify some assets in Monero, Ethereum and Bitcoin that the Government had not seized. These assets were liquidated and paid to my attorneys to cover a small part of my legal fees and expenses. They are listed in Exhibit B, filed under seal.

48. My attorneys are currently trying to access a Mycelium account that the Government has not seized. However, my attorneys are having difficulty accessing the account given that the Government has seized the phone I used to access it.

49. Also on my seized phone is an Eclair account that has less than 1 Bitcoin in it.

50. I have other cryptocurrency accounts with various providers accumulated over the years. I was interested in trying new applications that came out. I don't believe that any of these accounts have substantial assets. I am having trouble accessing them through my lawyers and power of attorney.

51. Outside of what is listed in Exhibit B, I have no other assets that I am aware of that the Government has not seized. The possibility exists that I have old cryptocurrency wallets that I have accumulated over the years, with nominal amounts, but I have no way of checking this given that I am jailed, and the Government has seized my computers.

52. I also have a claim against Mt. Gox, but I do not know the value of this, or how to value it, given that Bitcoin's value has changed so dramatically since Mt. Gox has collapsed. Regardless, it is not available at this time and may be completely worthless.

53. All these assets are listed to the best of my ability under my present circumstances on the spreadsheet attached as Exhibit B.

54. It was a common security practice of mine to mix any assets through Bitcoin Fog before depositing them into my Kraken account.

55. I have no property or assets in Russia, and never have.

56. In almost all of my transactions I deal exclusively in Euros or Swedish Kroner. I rarely, if ever, use US Dollars, and have never had any significant holdings in US Dollars, or any involvement with the United States other than visiting on holiday or to see family and

friends. Prior to my arrest, I never had a US bank account. After my arrest, my lawyers set up a US bank account for me so that I could transfer what is left of my unseized assets to pay my lawyers as discussed above.

57. Given the variety and volatility of my cryptocurrency holdings, it is difficult for me to estimate their value, but it is my understanding that the assets the Government seized have depreciated considerably since their seizure.

58. My legal fees and expenses on this case far exceed the amounts paid to my attorneys of choice. Tor Ekeland Law, PLLC is my counsel of choice, and without access to the seized assets, I have no way of paying for their representation for what is likely to be a multi-week trial. Nor do I have the money to pay for the expensive experts necessary in this complex blockchain prosecution. Outside of what I mention above and in the attached Exhibit B, I have no source of money or assets to pay counsel. If the Court releases the funds, they will be solely used to pay my legal fees and expenses, and for nothing else.

DATED: December 19, 2022
Warsaw, VA

Roman Sterlingov
Roman Sterlingov