UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| v. | Criminal Action No. 21-399 (RDM) |
| ROMAN STERLINGOV, | |
| *Defendant.* | |

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on Defendant Roman Sterlingov's motion for release of funds, Dkt. 48, and supplemental motion for the same, Dkt. 101. Sterlingov is charged with money laundering conspiracy, money laundering, operating an unlicensed money transmitting business, and money transmission without a license, all in relation to his alleged operation of a Bitcoin mixer known as Bitcoin Fog. Dkt. 43 (Superseding Indictment). Pursuant to a warrant issued by a U.S. Magistrate Judge, the government has seized certain of his assets that it alleges were involved in the charged offenses. *See* Dkt 40; Dkt. 53-2. Sterlingov seeks release of these funds to pay for his legal defense. Dkt. 48; Dkt. 101. For the reasons that follow, the Court will **DENY** Sterlingov's motions. Dkt. 48; Dkt. 101.

### I. BACKGROUND

The following background is taken from the government's charging instruments; the affidavit of Special Agent Devon Beckett; the parties' proffers and testimony at the hearings held on January 13, 2023 and January 31, 2023; and the exhibits tendered to the Court, including the seizure warrant affidavit and the declaration of Staff Operations Specialist Luke Scholl. It bears emphasis, however, that the Court's description of the facts is necessarily preliminary and does

not represent a determination on the merits, which is both premature and, in any event, the sole province of the jury.

The government contends that Sterlingov operated "an illicit Bitcoin money transmitting and money laundering service" known as Bitcoin Fog. Dkt. 1-1 at 1; *see also* Dkt. 43. Bitcoin, also known as BTC, "is a decentralized form of electronic or digital currency that exists only on the internet." *United States v. Harmon*, 474 F. Supp. 3d 76, 80 (D.D.C. 2020) (quotation marks and alterations omitted). The term "bitcoin" refers both to "a system" that facilitates financial transactions and to "a unit" of currency. *Id.* Bitcoin the system "is a peer-to-peer network enabling proof and transfer of ownership—of units, or tokens, also called bitcoin—without involving a third-party such as a bank." *id.*; bitcoin the unit is a virtual currency "transacted over the Internet using Bitcoin software," Dkt. 1-1 at 1 n.2. This software permits users to create "'Bitcoin addresses,' roughly analogous to anonymous accounts," and to "securely transfer[] bitcoin from one Bitcoin address to another." *Id.* "[T]he identity of a Bitcoin address owner is generally anonymous." *Id.* at 3. But the government maintains that "law enforcement can often identify the owner of a particular Bitcoin address by analyzing the blockchain," which "is essentially a distributed public ledger that keeps track of all Bitcoin transactions, incoming and outgoing, and . . . records every address that has ever received a bitcoin and maintains records of every transaction." *Id.* at 3 & n.3. Sterlingov and his experts do not accept this premise and, instead, argue that blockchain analysis is unscientific and unreliable. *See, e.g.*, Dkt. 48 at 7–11; Dkt. 48-1 (Vickery Decl.).

Bitcoin Fog is a bitcoin mixer (or tumbler) that offers enhanced anonymity to those engaged in bitcoin transactions. Dkt. 1-1 at 1. The service enables users to "send bitcoins to designated recipients in a manner designed to conceal and obfuscate the source of the bitcoins."

Dkt. 1-1 at 1–2. Bitcoin Fog does this by "disassociating incoming bitcoin from particular Bitcoin addresses or transactions and then comingling that bitcoin with other incoming bitcoin prior to conducting any further transactions." *Id.* at 2. Simplified somewhat, the process works as follows: Users who register with Bitcoin Fog receive a randomly generated account into which they can deposit bitcoins. Dkt. 106-1 at 2 (Gov't's Suppl. Ex. 1). Bitcoin Fog then gradually draws these bitcoins down into a centralized pool comprised of many bitcoins from many users. *Id.* Users can then schedule withdrawals, at which point funds from the pool are sent to them at a separate account, at random times and in random amounts, until the full withdrawal has been accomplished. *Id.* This process makes it next to impossible to determine the origin of the bitcoin deposited in that separate account. Dkt. 1-1 at 2. For that reason, Bitcoin Fog is allegedly used by those engaged in criminal activity to launder illicitly obtained funds. *Id.*

Bitcoin Fog makes money by charging a fee of between 2% and 2.5% of each transaction that it processes. *Id.* at 11. Based on the service's alleged transaction volume, the government calculates that it has generated approximately $8 million in fees, assuming that its proceeds (taken in bitcoin) were converted into cash at or near the time of the relevant transactions. *Id.* But bitcoin has appreciated dramatically since Bitcoin Fog's inception—from $2 during the fall of 2011 when Bitcoin Fog launched to around $50,000 at the time Sterlingov was charged—so the government estimates that Bitcoin Fog may have generated nearly $70 million in profits at more recent valuations. *Id.*

The government has proffered some evidence that parties seeking to launder the proceeds of criminal activities comprise a substantial portion of Bitcoin Fog's customer base. *Id.* at 3–5. In particular, the government presents evidence that Bitcoin Fog has processed more than $78

3

million in transactions from "darknet markets"—hidden online businesses that "primarily traffic in illegal narcotics and other illegal goods and services." *Id.* at 4.  There is also evidence that Bitcoin Fog's operators were aware of the nature of its customers. *Id.* at 2–3.  Indeed, one of Bitcoin Fog's selling points was that its operators could not be found by nor would they cooperate with the authorities. *Id.* at 2–3.  In addition, the government has provided evidence that Sterlingov was involved in Bitcoin Fog's founding and operations. *Id.* at 7–11.

On April 26, 2021, the government charged Sterlingov by criminal complaint with money laundering, in violation of 18 U.S.C. § 1956(a)(3); operating an unlicensed money transmitting business, in violation of 18 U.S.C. § 1960(a); and money transmission without a license, in violation of D.C. Code § 26-1023(c).  Dkt. 1.  Sterlingov was arrested the following day in Los Angeles and was subsequently transported to the District of Columbia.  Dkt. 53 at 3.  He was later charged in a three-count indictment with the same offenses charged in the complaint: money laundering (Count One), operating an unlicensed money transmitting business (Count Two), and money transmission without a license (Count Three).  Dkt. 8 at 1–3.  The indictment also contained a criminal forfeiture allegation, seeking forfeiture, upon Sterlingov's conviction on Counts One and Two, of "any property, real or personal, involved in the offense, and any property traceable thereto," pursuant to 18 U.S.C. § 982(a)(1).  *Id.* at 3.

Three days after Sterlingov was indicted, a U.S. Magistrate Judge of this Court issued a seizure warrant for the contents of two accounts associated with Sterlingov at the digital currency exchange known as Kraken.  Dkt. 53-2 at 5.  The warrant was issued based on an affidavit alleging probable cause to believe that the contents of these accounts "constitute the proceeds of, and property involved in" the operation of Bitcoin Fog, in violation of 18 U.S.C. § 1956(a) and 18 U.S.C. § 1960(a).  *Id.* at 31.  One of these accounts was held in Sterlingov's name and the

other in the name of TO THE MOON LTD. *Id.* at 5; Rough Hearing Tr. at 109 (Jan. 31, 2023). The government executed the warrant and seized the following:

- $349,625.72 in cash
- 0.10877 in BTC
- 205.9625 Ethereum (ETH) (a cryptocurrency)
- 9,371.52683 Stellar (XLM) (a cryptocurrency)
- 35.9998 Monero (XMR) (a cryptocurrency)

Dkt. 40 at 1–2. The government has also provided notice that, if Sterlingov is convicted, it intends to seek forfeiture of 1,354 BTC currently held in a cryptocurrency wallet that the government attributes to Bitcoin Fog. *Id.* at 2

A grand jury returned a superseding indictment on July 18, 2022. Dkt. 43. The superseding indictment contains a new Count One for Money Laundering Conspiracy, in violation of 18 U.S.C. § 1956(h). *Id.* at 1–2. The other counts mirror those in the original indictment: Money Laundering, in violation of 18 U.S.C. § 1956(a)(3)(A), (B) (Count Two); Operating an Unlicensed Money Transmitting Business and Aiding and Abetting in violation of 18 U.S.C. § 1960(a) & 2 (Count Three); and Money Transmission Without a License in violation of D.C. Code § 26-1023(c) (Count Four). *Id.* at 3–5. As before, the indictment also contains a criminal forfeiture allegation under 18 U.S.C. § 982(a)(1). *Id.* at 5–6. This allegation provides additional detail on the seized contents of the Kraken accounts and reflects the government's intent to seek forfeiture of the contents of the alleged Bitcoin Fog wallet if Sterlingov is convicted. *Id.*

Sterlingov now seeks release of his seized funds. Dkt. 48; Dkt. 101. He contends that he needs the money to pay for the counsel of his choice and other litigation expenses, most notably

expert witness fees. Dkt. 48 at 25–26; Dkt. 101 at 12–16. The Court held hearings on this matter on January 13, 2023 and January 31, 2023, at which the parties presented evidence and argument regarding Sterlingov's need for his funds and the evidentiary basis of the seizure. Min. Entry (Jan. 13, 2023); Min. Entry (Jan. 31, 2023).

## II. ANALYSIS

### A. Legal Framework

Individuals convicted of certain federal crimes, including all three federal crimes charged here, must forfeit to the United States any property "involved in" their offenses or property "traceable to" property involved in their offenses. 18 U.S.C. § 982(a)(1). Even before trial, the government can seize the property of a defendant indicted for these crimes if it can convince a court that there is probable cause to believe that: (1) "the defendant has committed an offense permitting forfeiture," and (2) "the property at issue has the requisite connection to that crime." *Kaley v. United States*, 571 U.S. 320, 323–24 (2014); *see also* 18 U.S.C. § 982(b)(1); 21 U.S.C. § 853(e), (f). In other words, if there is probable cause to believe that an indicted defendant's property will be subject to forfeiture upon the defendant's conviction, the government can seize it in advance. *United States v. Monsanto*, 491 U.S. 600, 615 (1989) (upholding the constitutionality of this practice). And, once the government has seized property on this basis, the property lies beyond the defendant's reach pending further order of the court, even if the defendant "seeks to use the disputed property to pay for a lawyer." *Kaley*, 571 U.S. at 322.

A defendant may move for the release of his seized assets, but he faces a high hurdle. He must first make a showing of need. *See United States v. E-Gold, LTD.*, 521 F.3d 411, 417, 421 (D.C. Cir. 2008), *abrogated in part on other grounds by Kaley v. United States*, 571 U.S. 320. This requirement is satisfied "at least where access to the assets is necessary for [the defendant's]

effective exercise of the Sixth Amendment right to counsel"—*i.e.* if the defendant needs the funds to pay for his counsel of choice. *Id.* at 421. A defendant who makes that showing may then challenge the seizure of his assets on the merits and has the right to an adversarial hearing in which to do so. *Id.* at 419. But he may not attack the grand jury's determination of probable cause that he has "committed an offense permitting forfeiture;" the indictment is "conclusive" on that score. *Kaley*, 571 U.S. at 323, 331. Instead, the defendant may only challenge *whether the specific property that has been seized is forfeitable*—that is, whether the property at issue is sufficiently connected to the charged crime. *See E-Gold,* 521 F.3d at 419; *United States v. Bikundi*, 125 F. Supp. 3d 178, 185 (D.D.C. 2015) (recognizing that *Kaley* specifically declined to decide whether a defendant can challenge "the forfeitability of the specified property" and that *E–Gold*'s recognition of a right to make such a challenge, accordingly, remains intact); *see also Kaley*, 571 U.S. at 324 ("Since *Monsanto*, the lower courts have generally provided a hearing to any indicted defendant seeking to lift an asset restraint to pay for a lawyer. In that hearing, they have uniformly allowed the defendant to litigate . . . whether probable cause exists to believe that the assets in dispute are traceable or otherwise sufficiently related to the crime charged in the indictment."). Where forfeiture is based on allegations of money laundering or operating an unlicensed money transmitting business, this means that a defendant may challenge whether the seized property was "involved in" these offenses or is traceable to property that was. *E-Gold,* 521 F.3d at 419; 18 U.S.C. § 982(a)(1).

The weight of authority holds that once a defendant has satisfied the need prong of the inquiry, the government bears the burden of showing—defending, really, since it has already made the showing once—that there is probable cause to conclude that the seized property is traceable to the charged offenses. *See United States v. Bonventre*, 720 F.3d 126, 131 (2d Cir.

7

2013); *United States v. Jamieson*, 427 F.3d 394, 406 (6th Cir. 2005); *United States v. Omidi*, No. 17-661, 2021 WL 7629897, at *5 (C.D. Cal. June 15, 2021); *United States v. Swenson*, No. 13-00091, 2013 WL 4782134, at *2 (D. Idaho Sep. 5, 2013). *But see United States v. Farmer*, 274 F.3d 800, 805 (4th Cir. 2001). Although the D.C. Circuit has yet to address this question, the government is willing to assume *arguendo* that it bears the burden here, and the Court will assume the same. That said, probable cause is "not a high bar." *Kaley*, 571 U.S. at 338. "It requires only the 'kind of fair probability on which reasonable and prudent people, not legal technicians, act.'" *Id.* (cleaned up) (quoting *Florida v. Harris*, 568 U.S. 237, 244 (2013)).

**B.    Need**

Sterlingov has met his burden of showing that he needs the seized funds. He has attested that, without these funds, he lacks the means to pay his current counsel, who is counsel of choice. Dkt. 101-1 at 10 (Sterlingov Decl. ¶ 58). In support of this assertion, he has submitted a declaration affirming that his legal expenses "far exceed" what he has been able to pay his attorneys using the assets at his disposal and that he lacks money "to pay for the expensive experts necessary in this complex blockchain prosecution." *Id.* He has also provided the Court a summary of his assets, both seized and unseized. *Id.* at 8–9 (Sterlingov Decl. ¶¶ 47–58); Dkt. 102 (Pl.'s Sealed Exhibit). Based on that summary and representations from Sterlingov's counsel, the Court finds that Sterlingov's unseized assets are insufficient to retain his current counsel, at least for the duration of this case and without limiting the scope of the work that his counsel recommends. Rough Hearing Tr. at 24–27 (Jan. 13, 2023). His counsel repeatedly affirmed that absent access to the seized funds or some other accommodation he could not afford to continue representing Sterlingov in this matter, at least not with the same degree of time and investment as he has to date. *Id.* Nor was he prepared to commit to handle the case through trial

and without significant limitation at the reduced rates available under the Criminal Justice Act. Rough Hearing Tr. at 129 (Jan. 31, 2023). Finally, the Court notes that this is complex case and that the fees and expenses that Sterlingov's counsel anticipates incurring appear realistic. Rough Hearing Tr. at 8–9, 15, 17–18 (Jan. 13, 2023); *see* Dkt. 110 at 3 (Def.'s Ex. K).

Sterlingov's showing of need is in line with the showing that was deemed sufficient in *E–Gold*, the D.C. Circuit's leading precedent on this issue. There, as here, the defendants provided statements under the penalty of perjury detailing their assets and attesting that, without the encumbered funds, they would not be able to pay for the counsel of their choice. *See, e.g.*, *E–Gold*, No. 07-109, Dkt. 35-5 at 6 (D. Jackson Aff. ¶ 15); Dkt. 35-6 at 3 (R. Jackson Aff. ¶¶ 4–7); Dkt. 35-7 at 4–5 (Downey Aff. ¶¶ 10, 16); Dkt. 35-3 at 4 (E–Gold Aff. ¶ 17). It is true that some defendants in this district who have made similar representations have nevertheless failed to meet the need hurdle, because they could not substantiate that their counsel of choice would be unable to represent them without access to their funds. *See, e.g.*, *United States v. Emor*, 794 F. Supp. 2d 143, 149 (D.D.C. 2011); *United States v. Edwards*, 856 F. Supp. 2d 42, 46 (D.D.C. 2012). But as explained, Sterlingov and his counsel have made that showing. So the Court is satisfied that absent the release of his seized funds Sterlingov will, in all likelihood, be deprived of his counsel of choice—if not immediately and totally, at least at some point or to some material extent before the case reaches verdict.

The government must therefore satisfy its burden on the issue of traceability in order to preclude Sterlingov from accessing the seized assets.

**C.    Traceability**

The key facts bearing on the traceability inquiry are less contested than one might expect. Sterlingov admits that most if not all of the seized funds arrived in his Kraken accounts by way

of Bitcoin Fog, either directly or after passing through intermediary accounts. Dkt. 101-1 at 9 (Sterlingov Decl. ¶ 54) ("It was a common security practice of mine to mix any assets through Bitcoin Fog before depositing them into my Kraken account.").[1] Rather than take aim at that premise, he devotes the bulk of his factual response to advancing the contention that he earned the funds deposited in those accounts through legitimate means. *Id.* at 5 (Sterlingov Decl. ¶ 29); Rough Hearing Tr. at 21–22 (Jan. 31, 2023). As Sterlingov tells it, his Kraken accounts contain money he earned from licit employment and gains from his cryptocurrency investments, not proceeds earned from operating Bitcoin Fog or any other illegal activity. Dkt. 101-1 at 4–6 (Sterlingov Decl. ¶¶ 14, 17, 20, 28, 35); Rough Hearing Tr. at 21–22 (Jan. 31, 2023). The government, for its part, agrees that the seized funds reached Sterlingov's Kraken accounts by way of Bitcoin Fog, a conclusion that it reached independently through its analysis of the blockchain. Dkt. 53-2 (Warrant Aff.); Dkt. 53-5 (Scholl Decl.). And, although the government relies on the grand jury's finding of probable cause that Sterlingov operated Bitcoin Fog as a money laundering enterprise, it devotes little effort to showing that the specific funds deposited

---

[1] Sterlingov confirmed this admission at the hearing:

| | |
|---|---|
| Q: | And you stated in paragraph 54 of that declaration: It was a common security practice of mine to mix any assets through Bitcoin Fog before depositing them into my Kraken account, right? |
| A: | Yes. |
| Q: | And that's true, right? |
| A: | It's true. |
| Q: | And is it true that you mixed most, if not all, of the deposits into that Kraken account through Bitcoin Fog before depositing them? |
| A: | Yes. |

Rough Hearing Tr. at 53–54 (Jan. 31, 2023).

10

in the Kraken accounts constitute the profits that Sterlingov earned by doing so. Rough Hearing Tr. at 110–12 (Jan. 31, 2023). As a result, the Court will consider whether—regardless of how Sterlingov initially obtained the funds at issue—the fact that the funds were transmitted through Bitcoin Fog is sufficient to establish probable cause that they were "involved in" one or more of the charged offenses. 18 U.S.C. § 982(a)(1).

The applicable law, the offenses charged, and the nature of Bitcoin Fog's service all weigh against Sterlingov's request for relief. Begin with the law. The relevant forfeiture statute, 18 U.S.C. § 982(a)(1), "sweeps broadly" to cover all funds "involved in" money laundering, money laundering conspiracy, or operating an unlicensed money transmitting business. *United States v. Bikundi*, 926 F.3d 761, 793 (D.C. Cir. 2019). Because money laundering typically "depends upon the use of legitimate monies to advance or facilitate the scheme," even funds that are not themselves the proceeds of illegal activity can become "involved in" a money laundering operation. *Id.* (internal quotation marks omitted). To be sure, the D.C. Circuit has yet definitively to interpret this provision. But it has observed—without qualification or disapproval—that "other circuits have held that funds 'involved in' money laundering include those that 'facilitate' the money laundering scheme, which encompasses unlaundered funds when they are transferred 'in order to conceal the nature and source' of [criminal] proceeds." *Id.* The Tenth Circuit, for instance, has explained that although "the mere pooling or commingling of tainted and untainted funds in an account does not, without more, render the entire contents of the account subject to forfeiture, . . . forfeiture of legitimate and illegitimate funds commingled in an account is proper as long as the government demonstrates that the defendant pooled the funds to facilitate, i.e., disguise the nature and source of [] his scheme." *United States v. Bornfield*, 145 F.3d 1123, 1135 (10th Cir. 1998). Other circuits have held that property

11

"facilities" criminal activity—and is thus "involved in" it—where it makes such activity "less difficult or more or less free from obstruction or hindrance." *United States v. Tencer*, 107 F.3d 1120, 1134 (5th Cir. 1997) (quoting *United States v. Schifferli*, 895 F.2d 987, 990 (4th Cir. 1990)).

This interpretation of § 982(a) comports with the plain language of the statute and with common sense. Not only has the interpretation been widely embraced in other circuits, *see*, *e.g.*, *United States v. McGauley*, 279 F.3d 62, 76–77 (1st Cir. 2002); *Tencer*, 107 F.3d at 1134; *United States v. Baker*, 227 F.3d 955, 969–70 (7th Cir. 2000); *Bornfield*, 145 F.3d at 1135; *United States v. Puche*, 350 F.3d 1137, 1153 (11th Cir. 2003), it also gives the phrase "any property . . . involved in such offense" its natural meaning, 18 U.S.C. § 982(a). Had Congress intended to limit forfeiture under § 982(a) to the *proceeds* of the illegal activity, it could easily have done so. But instead Congress wrote the statute to reach money "involved" in such activity. *See Involved*, Merriam-Webster, https://www.merriam-webster.com/dictionary/involved (last visited Mar. 2, 2023) ("having a part in something: included in something"); *Involved*, Oxford English Dictionary (2d ed. 1989), https://www.oed.com/oed2/00120757 (last visited Mar. 3, 2023) (def. 5 "[t]o implicate in a charge or crime; to cause or prove (a person) to be concerned in it;" def. 6 "[t]o include; to contain, imply"). The D.C. Circuit approved this reading of the statute under a plain error standard in *United States v. Bikundi*, 926 F.3d at 793–94, and Sterlingov has failed to identify any authority to the contrary, *cf. United States v. Braxtonbrown-Smith*, 278 F.3d 1348, 1352–53 (D.C. Cir. 2002) (noting that 18 U.S.C. § 1956, the substantive money laundering statute, reaches all funds "involved" in covered criminal activity, including, for example, "a particular [] sum used as the bankroll facilitating the fraud" (internal quotation marks omitted)).

There is less precedent on forfeiture related to the operation of an unlicensed money transmitting business, but such law as there is suggests that all money transmitted through such a business is subject to forfeiture. In *United States v. Elfgeeh*, 515 F.3d 100, 122, 138 (2d Cir. 2008), for instance, the defendants had been convicted of running an unlicensed money transmitting business out of an ice cream shop. The Second Circuit upheld, albeit in part under a plain-error standard, the forfeiture of "all assets that passed through the [ice cream shop's] account"—a number that appears to have included all money unlawfully transferred as well as any proceeds the ice cream shop collected. *See id.* As the court saw it, funds "transferred in the unlicensed operation" of the business were "involved in" it, which is all 18 U.S.C. § 982(a)(1) requires. *Id.* at 138–39; *id.* at 139 (treating the "total amount" deposited in and withdrawn from the ice cream shop's account as "integral to the offenses"); *see also United States v. $715,031.27,* 587 F. Supp. 2d 1275, 1277–78 (N.D. Ga. 2008) (same under identically worded civil forfeiture statute); *cf. United States v. Hodge*, 558 F.3d 630, 635 (7th Cir. 2009) (explaining that "[w]hen a business has both lawful and unlawful aspects, only income attributable to the unlawful activities is forfeitable," but when "the business as a whole was overwhelmingly [unlawful], . . . everything is forfeitable"). Here, however, the Court need not go as far as the Second Circuit did in *Elfgeeh*. Unlike what may have been true of funds in the ice cream shop's account, *all* funds deposited with Bitcoin Fog were intermingled (or tumbled) with other funds, and thus *all* of the funds were "involved in" the alleged operation of an unlicensed money transmitting business.

The potency of the forfeiture statute is enhanced in this context by the rule of *Kaley*: the Court must assume that there is probable cause to believe that Sterlingov committed the charged offenses. 571 U.S. at 323. Although the Court is aware of no decision analyzing the extent to

13

which the grand jury's finding of probable cause that the alleged crimes were committed should bleed into the traceability analysis, the Supreme Court's reasoning in *Kaley* applies with equal force in this context: "[a] defendant has no right to judicial review of a grand jury's determination of probable cause to think a defendant committed a crime." 571 U.S. at 333. That is so regardless of whether the defendant seeks to revisit that finding to challenge an indictment as factually inaccurate, to obtain pretrial release, to challenge the probable cause foundation of a seizure order, or to challenge traceability. *Id*. at 327–33 & n.6. The grand jury's finding of probable cause that Sterlingov operated Bitcoin Fog as a money laundering enterprise and as an unlicensed money transmitting business, therefore, bears on the Court's analysis of whether the Kraken funds are traceable to the crimes charged in the indictment. Dkt. 43 at 1, 3. And if that much is a given, Sterlingov must be presumed both to have understood how Bitcoin Fog worked and to have knowingly participated in its alleged unlawful activities. *Id.* at 1–2.

This legal framework—broad forfeiture authority and a presumption that Sterlingov has committed the charged offenses in the manner specified in the indictment—must then be applied to two essential facts. The first, as noted above, is that Sterlingov admits that he mixed most, if not all, of the seized funds using Bitcoin Fog before those funds reached his personal accounts. Dkt. 101-1 at 9 (Sterlingov Decl. ¶ 54); Rough Hearing Tr. at 53–54 (Jan. 31, 2023). The second is that the very essence of Bitcoin Fog's service was commingling—that is, mixing—funds. Dkt. 106-1 at 2 ("[U]sing our service you mix up your bitcoins in our own pool, with other users' bitcoins, and get paid back to other accounts from our mixed pool, which, if properly done by you can eliminate any chance of finding your payments and mak[e] it impossible to prove any connection between a deposit and a withdraw[al] inside our service."). It anonymized bitcoins by combining them with other bitcoins, and, importantly, without a sufficiently large pool of

14

bitcoins to mix, it would not have worked. *Id.* Each deposit of funds into Bitcoin Fog therefore contributed to its efficacy and facilitated its activities—both lawful and unlawful. To be sure, the seized funds represent only a small fraction of the total funds that Bitcoin Fog allegedly mixed. But that fact does not mean that the seized funds were "uninvolved" in Bitcoin Fog's money laundering or unlicensed money transmitting operations. Just as someone playing a game of Jenga can remove a block without the tower falling, one can remove specific funds from a money laundering operation without crippling the scheme. But there is little doubt that those funds, like the Jenga blocks, support the endeavor.

Taken together, these propositions lead inescapably to the conclusion that there is probable cause to believe that Sterlingov's seized funds were "involved in" the charged offenses. By running funds through Bitcoin Fog, Sterlingov facilitated its operations, irrespective of how the funds were initially procured. And those operations, the Court must assume, were generally unlawful because Bitcoin Fog was an unlicensed money transmitting business and because they, at least in part, involved a money laundering conspiracy. *See* Dkt. 43. As the presumed operator of Bitcoin Fog, Sterlingov would have understood all of this. So even if the funds at issue were first obtained through legal means, Sterlingov would have known that by combining them with the rest of the funds in Bitcoin Fog's pool, he was facilitating Bitcoin Fog's criminal activities. The seized funds are therefore subject to forfeiture. *See* 18 U.S.C. 982(a)(1); *Bornfield*, 145 F.3d at 1135.

This result mirrors that which Chief Judge Howell reached in *United States v. Harmon*, 474 F. Supp. 3d 76 (D.D.C. 2020), another Bitcoin mixer case. Like Sterlingov, the *Harmon* defendant was charged with money laundering conspiracy and operating an unlicensed money transmitting business. *Id.* at 80. The government seized certain of his funds pretrial, and he too

moved for their release so that he could pay his counsel. *Id.* at 85 n.5. Chief Judge Howell denied the motion, rejecting the defendant's contention that only funds "shown to be from narcotics transactions" could be forfeited. *Id.* She explained that "property need not be directly derived from the predicate unlawful activity to be forfeitable, as the [forfeiture] statute covers any property 'involved in' the ongoing conspiracy." *Id.* As such, she reasoned, when a "[money laundering] conspiracy takes the form of a business, all funds flowing through the business that 'bankroll' or otherwise facilitate the alleged conspiracy are 'involved in it'" and may be restrained. *Id.* (quoting *Baker*, 227 F.3d at 969–70). So it is here as well.

**D.    Counterarguments**

Sterlingov offers several counterarguments, none of which is persuasive. Most of all he attacks the strength of the government's evidence that he operated Bitcoin Fog. *See* Dkt. 48 at 7–8; Dkt. 101 at 3, 6–7, 10, 14–15; Rough Hearing Tr. at 31, 34, 118–23 (Jan. 31, 2023). Under *Kaley*, however, this argument misses the point. 571 U.S. at 331. The grand jury's finding of probable cause that Sterlingov committed the charged offenses through his operation of Bitcoin Fog is "conclusive" for present purposes. *Id.* Sterlingov also contends that the blockchain tracing analysis that the government used to tie the funds in his Kraken accounts to Bitcoin Fog is unreliable. Dkt. 48 at 6–11; Dkt. 48-1 (Vickery Decl.). But because he has admitted that the funds in his Kraken account arrived there after being mixed in Bitcoin Fog, Dkt. 101-1 at 9 (Sterlingov Decl. ¶ 54); Rough Hearing Tr. at 53–54 (Jan. 31, 2023), he has conceded the very thing that the government was trying to prove through its blockchain analysis. That analysis is thus corroborated, or, in any event, unnecessary in light of Sterlingov's own testimony.

Sterlingov spent much of the hearing attempting to show that the seized funds were initially derived from lawful activity and were not profits earned through the operation of Bitcoin

16

Fog. Rough Hearing Tr. at 121–23 (Jan. 31, 2023). He testified that he had legitimate sources of income and that he was an early investor in Bitcoin, which has appreciated dramatically over the last decade. *Id.* at 10–12, 16, 17, 22. The government has its counterpoints: It elicited some evidence that Sterlingov had spent most of the bitcoin he concededly had acquired through lawful means years ago, long before the funds at issue were transferred from Bitcoin Fog to his Kraken accounts. *Id.* at 83–85. It also points out that if Sterlingov in fact obtained his funds lawfully before mixing them, then there should be some electronic record of his transfers *into* Bitcoin Fog. Dkt. 106 at 7, 9–10; Rough Hearing Tr. at 95–96 (Jan. 31, 2023). Yet neither the government nor Sterlingov has identified any such records, raising the inference, says the government, that Sterlingov generated the funds through the operation of Bitcoin Fog. Dkt. 106 at 7, 9–10.

None of this dueling evidence makes a difference, however, because, as the Court has explained, the seizure of Sterlingov's funds can be sustained even if the Court accepts Sterlingov's position that the funds were lawfully acquired in the first instance. By tumbling his funds through Bitcoin Fog—with knowledge, the Court must assume, of its operations, lack of a license, and involvement in money laundering—Sterlingov facilitated Bitcoin Fog's unlawful activities. Thus, even though Sterlingov is correct that it is not per se unlawful to mix cryptocurrency, Rough Hearing Tr. at 126 (Jan. 31, 2023), that is no answer under the circumstances present here. It *is* unlawful to mix cryptocurrency if one is the operator of a bitcoin mixer that is both an unlicensed money transmitting business and involved in a money laundering conspiracy, because adding funds to the mixer's underlying pool of funds facilitates its criminal activity. The combination of broad statutory forfeiture authority, the nature of the

17

charged offenses, Bitcoin Fog's business model, and Sterlingov's concession regarding his use of Bitcoin Fog resolve the issue.

Sterlingov's remaining contentions can be dealt with in short order. He maintains that the seizure warrant lacks particularity and was unsupported by probable cause. Dkt. 48 at 18–21. For all of the reasons just provided, the Court disagrees as to probable cause. Nor does the seizure warrant lack particularity, as it specifically identifies the two Kraken accounts, the contents of which were seized. Dkt. 53-2 at 5. He also argues that the forfeiture was conducted in violation of the Department of Justice's Asset Forfeiture Policy Manual. Dkt. 48 at 23. But, as the government points out, this policy manual states that it "does not create or confer any legal rights, privileges, or benefits that may be enforced in any way by private parties." Dep't of Just., *Asset Forfeiture Policy Manual* 1 (2021), https://www.justice.gov/criminal-afmls/file/839521/download. Finally, Sterlingov renews his attack on criminal venue in the District of Columbia, made at greater length in his motion to dismiss the indictment. *See* Dkt. 46 at 9–12. But the legality of venue is not at issue here. The only thing Sterlingov can contest in moving to release his funds is whether those funds have a sufficient connection to the charged offenses. *Kaley*, 571 U.S. at 324 n.3, 333. The Court will take up Sterlingov's venue arguments at another time.[2]

## CONCLUSION

The Court recognizes that Sterlingov finds himself in a difficult position. He is incarcerated thousands of miles from his home, facing serious criminal charges. And, although he is presumed innocent, the grand jury's finding of probable cause precludes him from

---

[2] Sterlingov's arguments that failure to provide him a hearing regarding the seizure of his funds violated the Fifth and Sixth amendments were addressed by holding a hearing. Dkt. 48 at 22–23.

contesting the factual predicate for the government's seizure of the assets that he wants to use to retain the counsel of his choice. Faced with this conundrum at the hearing, Sterlingov's counsel invoked Chief Justice Roberts' dissenting opinion in *Kaley v. United States*. Rough Hearing Tr. at 120, 126 (Jan. 31, 2023). As the Chief Justice observed, a criminal defendant "faces a foe of powerful might and vast resources, intent on seeing him behind bars." 571 U.S. at 357 (Roberts, C.J., dissenting). Yet our law allows that same foe "effectively [to] remove a defendant's primary weapon of defense—the attorney he selects and trusts—by freezing assets he needs to pay his lawyer," and it constrains his ability to do anything about it. *Id.* at 341. Like Sterlingov's counsel, the Chief Justice posited that the Constitution does not permit the government to place a defendant in this predicament.

Notably, Justice Kagan, who authored the *Kaley* decision, has expressed similar concerns about the state of the law and has described *United States v. Monsanto*, 491 U.S. 600 (1989), as "a troubling decision." *Luis v. United States*, 578 U.S. 5, 51 (2016) (Kagan, J., dissenting). As she has observed, "[i]t is one thing to hold . . . that a convicted felon has no Sixth Amendment right to pay his lawyer with funds adjudged forfeitable" but "quite another thing to say that the Government may, prior to trial, freeze assets that a defendant needs to hire an attorney, based on nothing more than probable cause to believe that the property will ultimately be proved forfeitable." *Id.* (internal quotation marks omitted).

But *Kaley* and *Monsanto* are controlling precedent, and this Court is constrained to apply the view of the law reflected in the majority opinions in those cases. Because that precedent leaves no room for the arguments that Sterlingov's counsel presses here, the Court must deny his motions for release of funds, Dkt. 48; Dkt. 101.

\* \* \*

For these reasons, it is **ORDERED** that Sterlingov's motions for release of funds Dkt. 48; Dkt. 101, are **DENIED**.

**SO ORDERED**.

<u>/s/ Randolph D. Moss</u>
RANDOLPH D. MOSS
United States District Judge

Date: March 6, 2023