Exhibit 'B'



# FATF

# SECOND 12-MONTH REVIEW OF THE REVISED FATF STANDARDS ON VIRTUAL ASSETS AND VIRTUAL ASSET SERVICE PROVIDERS



**JULY 2021**



The Financial Action Task Force (FATF) is an independent inter-governmental body that develops and promotes policies to protect the global financial system against money laundering, terrorist financing and the financing of proliferation of weapons of mass destruction.  The FATF Recommendations are recognised as the global anti-money laundering (AML) and counter-terrorist financing (CFT) standard.

For more information about the FATF, please visit **www.fatf-gafi.org**

This document and/or any map included herein are without prejudice to the status of or sovereignty over any territory, to the delimitation of international frontiers and boundaries and to the name of any territory, city or area.

Citing reference:

FATF (2021), *Second 12-month Review Virtual Assets and VASPs,* FATF, Paris, France,
www.fatf-gafi.org/publications/fatfrecommendations/documents/second-12-month-review-virtual-assets-vasps.html

© 2021 FATF/OECD. All rights reserved.
No reproduction or translation of this publication may be made without prior written permission.
Applications for such permission, for all or part of this publication, should be made to
the FATF Secretariat, 2 rue André Pascal 75775 Paris Cedex 16, France  (fax: +33 1 44 30 61 37 or e-mail:
contact@fatf-gafi.org)

Photocredits coverphoto ©Gettyimages

*Table of Contents*

Introduction ..................................................................................................................................................... 5

SECTION ONE:  FATF Work on Virtual Assets since July 2020 ............................................................ 8

SECTION TWO:  State of Implementation by the Public Sector.......................................................... 10

SECTION THREE:  State of Implementation by the Private Sector ..................................................... 17

Implementation of the travel rule ............................................................................................................. 17
Implementation of other AML/CFT obligations ...................................................................................... 19

SECTION FOUR:  ML/TF Risks and the Virtual Asset Market ........................................................... 21

Trends in use of virtual assets for ML/TF purposes ................................................................................. 22
Peer-to-peer market metrics ..................................................................................................................... 23
Conclusions ............................................................................................................................................... 28

SECTION FIVE:  FATF Issues identified with the revised FATF Standard and Guidance ................ 31

Definitions of virtual asset and VASP...................................................................................................... 32
Peer-to-peer transactions and AML/CFT intermediaries.......................................................................... 34
Travel rule implementation ....................................................................................................................... 36
Overall implementation ............................................................................................................................. 36
Proliferation financing obligations ........................................................................................................... 38

SECTION SIX:  FINDINGS AND NEXT STEPS.................................................................................... 39

Annex 1.A. Recommendation 15 and its Interpretive Note and FATF Definitions ........................... 41

Recommendation 15 – New Technologies ................................................................................................ 41
Interpretative Note to Recommendation 15............................................................................................... 41
FATF Glossary .......................................................................................................................................... 43

## Executive Summary

1. The Financial Action Task Force (FATF) is the inter-governmental body which sets international standards to prevent money laundering, terrorist financing and the financing of the proliferation of weapons of mass destruction. In June 2019, the FATF finalised amendments to its global Standards to clearly place anti-money laundering and counter-terrorism financing (AML/CFT) requirements on virtual assets and virtual asset service providers (VASPs) by revising Recommendation 15 (R.15) and adding a new Interpretive Note (INR.15). The FATF also agreed to undertake a 12-month review to measure the implementation of the revised Standards by jurisdictions and the private sector, as well as monitoring for any changes in the typologies, risks and the market structure of the virtual assets sector. The FATF released the findings of that review in July 2020 and committed to undertake a second 12-month review by June 2021.

2. This report sets out the findings of the FATF's second 12-month review. The report finds that many jurisdictions and the VASP sector have continued to make progress in implementing the revised FATF Standards on virtual assets and VASPs but implementation is still far from sufficient, with particular work remaining among FSRB jurisdictions. In April 2021, 128 jurisdictions (38 FATF members and 90 members of FATF-Style Regional Bodies (FSRBs) advised on their progress in implementing the revised FATF Standards. 58 jurisdictions (28 FATF members and 30 FSRB members) reported that they had introduced the necessary legislation to implement the revised FATF Standards. 52 of these jurisdictions advised that they had a regulatory regime permitting VASPs, while 6 of these jurisdictions advised that they had prohibited VASPs. The other 70 jurisdictions (10 FATF members and 60 FSRB members) have not yet implemented the revised Standards into their national law.

3. Since the FATF's first 12-month review, there has been clear progress in the implementation of the revised FATF Standards by the public sector. While it is difficult to make a direct comparison, as a large number of additional jurisdictions participated in the second 12-month review, 33 jurisdictions (25 FATF members and 8 FSRB members) reported that they had an AML/CFT regulatory regime for VASPs in the first 12-month review. This compares to 58 jurisdictions in this review.

4. While this represents progress, there is not yet sufficient implementation of the revised FATF Standards to enable a global AML/CFT regime for virtual assets and VASPs. The lack of regulation or the lack of enforcement of regulation in jurisdictions is allowing for jurisdictional arbitrage and the raising of ML/TF risks. Similarly, while there has been progress, there has not yet been sufficient advancement in the global implementation of the travel rule or the development of associated technological solutions.[1] The lack of implementation of the travel rule by jurisdictions is acting as disincentive to the private sector, particularly VASPs, to invest in the necessary technology solutions and compliance infrastructure to comply with the travel rule.

5. The report also finds strong and rapid growth in the virtual asset sector since the FATF revised its Standards. The FATF does not see any evidence that the revisions

---

[1] The 'travel rule' is a key AML/CFT measure, which mandates that VASPs obtain, hold and exchange information about the originators and beneficiaries of virtual asset transfers.

© FATF/OECD 2021

to its Standards in 2019 have stifled innovation in the sector, indicating that greater regulatory certainty and strong AML/CFT controls at the international level can act as a facilitator to business development and public adoption. The FATF has observed that the ML/TF trends for virtual assets have largely continued from those reported in the first 12-month review report. In particular, there has been a large increase in the use of virtual assets to collect ransomware payments and to commit and launder the proceeds of fraud, and the pace, sophistication, and costs of ransomware attacks is likely to grow in 2021. The report also highlights uneven global implementation of the revised Standards, with a large number of weakly compliant or non-compliant jurisdictions leading to jurisdictional arbitrage, and the associated problems of non-compliant or weakly compliant VASPs and tools and methods to increase anonymity as two ongoing trends.

6. The report also includes the first market metrics on peer-to-peer (P2P) transactions[2] of virtual assets, using data from seven blockchain analytic companies. These metrics indicate that a significant amount of certain virtual assets is transferred on a P2P basis. The share of illicit transactions also appears higher for P2P compared with transactions with VASPs, at least in terms of direct transactions. However, the substantial amount of variation in the data means that there is no consensus on the size of the P2P sector and its associated ML/TF risk.

7. As the FATF found in its first 12-month review, there is no need to amend the revised FATF Standards at this point in time, except for technical amendments to apply the FATF's recent changes on proliferation financing to virtual assets and VASPs. While there are many areas where both jurisdictions and the private sector seek further clarity, these are questions regarding the application of the Standards rather than the Standards themselves. The FATF's forthcoming revised Guidance on virtual assets and VASPs will assist jurisdictions and the private sector in implementing the revised FATF Standards. If the market structure or ML/TF risk profile of virtual assets and VASPs, such as in relation to P2P transactions, was to significantly change, the FATF should consider whether amendments to the revised Standards are warranted.

8. Therefore, challenges remain in the implementation of the revised FATF Standards. Going forward, the FATF should prioritise promoting rapid and effective implementation of the revised FATF Standards by jurisdictions. All jurisdictions need to implement the revised FATF Standards, including travel rule requirements, as quickly as possible. Therefore, this review recommends the FATF undertake the following actions:

   a. The FATF should focus on the effective implementation of the current FATF Standards on virtual assets and VASPs across the Global Network. Members of the FATF and its broader Global Network should implement the revised FATF Standards (R.15/INR.15) as a matter of priority. The FATF should publish its revised Guidance on virtual assets and VASPs for the public and private sectors by November 2021. This will provide revised FATF Guidance on the definition of virtual asset and VASP, so-called stablecoins, P2P transactions, registration and licensing of VASPs, the travel rule and international co-operation amongst VASP supervisors, which will aid

---

[2]   A peer-to-peer transaction is a virtual asset transaction that does not involve a VASP or other AML/CFT-obliged entity.

© FATF/OECD 2021

with implementation. FATF members, particularly those which are leaders in the field of AML/CFT regulation of VASPs, should work collaboratively with the private sector and other jurisdictions to facilitate implementation. The FATF's Virtual Assets Contact Group (VACG) should focus on supporting this implementation agenda and should place particular emphasis on actions to help mitigate the risk of ransomware-related virtual asset use. The VACG should engage with the private sector after the publication of the revised FATF Guidance and report to the FATF's Policy Development Group on progress in implementation by June 2022.

b.  The FATF should accelerate implementation of the travel rule by the private sector as a priority. To facilitate this, the FATF members should implement the travel rule into their domestic legislation as soon as possible, including consideration of a staged approach to implementation as appropriate. FATF members, particularly those which are leaders in the field of AML/CFT regulation of VASPs, should work collaboratively with the private sector and each other to facilitate this. FATF members shall discuss implementation status through outreach by June 2022.

c.  The FATF should monitor the virtual asset and VASP sector for any material changes or developments that necessitate further revision or clarification of the FATF Standards considering the fast changing business and technological environment of virtual assets, including through its revised Guidance project. While not further revising the Standards at this point in time, the FATF should introduce a technical amendment to INR.15 to reflect the changes to Recommendation 1 in the FATF Standards regarding proliferation financing.

© FATF/OECD 2021

# Introduction

9.  The emergence of new technologies, products and related services over the last decade has been one of the major changes to the global financial system. These new technologies, products, and related services have the potential to spur financial innovation and efficiency and improve financial inclusion, but they also create new opportunities for criminals and terrorists to launder their proceeds or finance their illicit activities. Consistent with the risk-based approach which underpins the FATF Standards, understanding and responding to identified money laundering and terrorist financing (ML/TF) risks is at the core of the FATF's work. The FATF is the inter-governmental body which sets the international standards to prevent money laundering, terrorist financing and the financing of the proliferation of weapons of mass destruction.

10. In June 2014, the FATF issued Virtual Currencies: Key Definitions and Potential AML/CFT Risks in response to the emergence of virtual currencies and their associated payment mechanisms. In June 2015, the FATF issued the Guidance for a Risk-Based Approach to Virtual Currencies as part of a staged approach to addressing the ML/TF risks associated with virtual currency payment products and services.

11. As the virtual asset market continued to evolve and develop, the FATF recognized the need for further clarification on the application of the FATF Standards to virtual assets and their service providers. In October 2018, the FATF adopted two new Glossary definitions – "virtual asset" and "virtual asset service provider" (VASP) – and updated Recommendation 15 (R.15). Virtual assets is the term the FATF uses to refer to crypto-assets and other digital assets. In June 2019, the FATF adopted an Interpretive Note to Recommendation 15 (INR.15) to further clarify how the FATF requirements apply in relation to virtual assets and VASPs (see **Annex 1.A**). These changes were accompanied by a new Guidance for a Risk-Based Approach for Virtual Assets and VASPs, a *Confidential FATF Report on Financial Investigations Involving Virtual Assets* and updates to the FATF's Methodology for Assessing Technical Compliance with the FATF Recommendations and the Effectiveness of AML/CFT Systems to reflect the revised Standards.

12. Following revisions to the FATF Standards, the FATF continued its enhanced monitoring of the virtual asset sector and implementation of the revised Standards (R.15/INR.15) by countries. In July 2020, the FATF completed a 12-Month Review of the Revised FATF Standards on VAs and VASPs. Simultaneously with this report, the FATF also released its Report to the G20 on So-called Stablecoins. This report sets out how the revised FATF Standards apply to so-called stablecoins and considers the AML/CFT issues.

13. The FATF's first 12-month review report found that, overall, both the public and private sectors had made progress in implementing the revised FATF Standards. The report considered that there was no clear need to amend the revised FATF Standards, but noted that substantial work remained for the revised FATF Standards to be effectively implemented globally.

14. Recognising this, the first 12-month review report committed the FATF to undertake a second 12-month review of implementation. This report sets out the findings of the second 12-month review. The scope of the second 12-month review is as follows:

    a. *Monitoring jurisdictions' implementation of the revised FATF Standards by FATF and FSRB members*. This would include consideration of whether jurisdictions have transposed the requirements into law and regulation, established supervisors or implemented other regulatory framework changes, and implemented licensing/registering requirements and the 'travel rule' for VASPs, among other obligations under the revised FATF Standards. This will include the collection of data and information on the status of jurisdictions' progress in implementation.

    b. Monitoring VASPs' (as well as other obliged entities') progress in developing and implementing their obligations under the revised FATF Standards, including in the development of technological solutions for the global implementation of the 'travel rule'.

    c. *Monitoring the virtual assets sector for any potential changes in typologies, risks and the market structure of the sector*. The review would seek to give the FATF indications of any changes in ML/TF risks and typologies involving virtual assets. This will also include the collection of better market metrics on virtual assets, especially on the volume and proportion of peer-to-peer virtual asset transactions.

15. Information on these issues has informed the analysis below on whether jurisdictions and the private sector are making sufficient progress in implementing the revised Standards and whether the FATF Standards need to be further clarified. The following information sources have informed the review:

    a. A questionnaire surveying jurisdictions' implementation was conducted in March-April 2021. 128 jurisdictions (38 FATF members and 90 members of the FATF's Global Network of FATF-Style Regional Bodies (FSRBs)) responded to the questionnaire or provided updates on their progress. The questionnaire was a self-assessment by participating jurisdictions and was not an official FATF assessment of the level of implementation by jurisdictions. This questionnaire did not assess individual jurisdiction's compliance with the revised FATF Standards.

    b. Outreach to representatives from the VASP sector through meetings with the VACG and the FATF's Private Sector Consultative Forum (PSCF) in April 2021. These meetings have included a select number of VASPs, industry associations and technology providers, but cannot be taken to represent the views of the entirety of the global virtual asset and VASP sector. Relevant information was also collected through the FATF's consultation on the draft revisions to the FATF Guidance on virtual assets and VASPs in April 2021 (see Section 1).

    c. The results from the completed mutual evaluation reports and follow-up reports using the revised FATF Standards.

    d. The development of market metrics on virtual assets, particularly in relation to P2P transactions.

© FATF/OECD 2021

16.   This report sets out the findings of this review as follows:

a.   **Section 1** summarises the FATF's work on virtual assets since July 2020;

b.   **Section 2** sets out jurisdictions' progress in implementing the revised FATF Standards;

c.   **Section 3** sets out the private sector's progress in implementing the revised FATF Standards, including the travel rule;

d.   **Section 4** sets out how ML/TF risks and the virtual asset market have changed since July 2020;

e.   **Section 5** sets out the main issues identified in implementing the revised FATF Standards; and

f.   **Section 6** sets out the findings of this review and the FATF's next steps.

© FATF/OECD 2021

### SECTION ONE:
### FATF Work on Virtual Assets since July 2020

17.   The first 12-month review report committed the FATF to continue its focus on virtual assets. That report committed the FATF to undertake five main activities to promote implementation of the revised FATF Standards;

   a.   continue its enhanced monitoring of virtual assets and VASPs and undertake a second 12-month review of the implementation of the revised FATF Standards on virtual assets and VASPs by June 2021;

   b.   release updated Guidance on virtual assets and VASPs;

   c.   continue to promote the understanding of ML/TF risks involved in transactions using virtual assets and the potential misuse of virtual assets for ML/TF purposes by publishing red flag indicators and relevant case studies by October 2020;

   d.   continue and enhance its engagement with the private sector, including VASPs, technology providers, technical experts and academics, through its VACG; and

   e.   continue its program of work to enhance international co-operation amongst VASP supervisors.

18.   Since the first 12-month review report was published in July 2020, alongside the FATF's report to G20 on so-called stablecoins, the FATF has continued its work focused on virtual assets. Key outcomes of this work, which fulfil the commitments in the first 12-month review report, are set out below.

19.   The FATF continued to promote the understanding of ML/TF risks relating to virtual assets. In September 2020, the FATF released a report on Virtual Asset Red Flag Indicators of ML/TF. These red flag indicators are for use by the public and private sectors to identify and analyse suspicious activity involving virtual assets. To promote understanding of the report, the FATF also presented the findings at the 2020 OECD Blockchain Policy Forum in October 2020. As part of the FATF wider initiative of digital transformation, the FATF is also exploring how operational agencies could leverage big data, artificial intelligence, and advanced analytics to facilitate early detection and investigation of the misuse of virtual assets.

20.   In October 2020, the FATF commenced its project to revise its 2019 Guidance on virtual assets and VASPs to address the issues identified in the first 12-month

© FATF/OECD 2021

review report. A cross-jurisdictional project team[3] was established to develop the revised Guidance on (1) the definition of virtual asset and VASP (2) so-called stablecoins (3) P2P transactions (4) registration and licensing of VASPs and (5) the travel rule. In March-April 2021, the FATF consulted on draft revisions to its 2019 Guidance, receiving 75 submissions from the public. The FATF expects to finalise and release the revised Guidance by November 2021. This timeline will allow the project team to incorporate the findings of this review as appropriate. In March 2021, the FATF also released guidance on the supervision of VASPs as part of its broader Guidance on Risk-Based Supervision.

21. The FATF has continued its outreach to the private sector. The VACG held three meetings with the experts from the virtual asset sector in September 2020 and April 2021. These meetings discussed progress in the travel rule implementation and looked at the development of P2P transactions and associated risks and metrics. The FATF also held two meetings as part of the FATF's virtual PSCF focused on virtual assets in October 2020 and April 2021. Close to 800 representatives from the public and private sectors registered for these events and discussed the use of virtual assets for ML/TF, AML/CFT regulation and supervision of VASPs and the draft revised FATF Guidance. In addition, the FATF Secretariat and the VACG co-chairs have participated in numerous public and private sector events, webinars and conferences.

22. The FATF has continued its work focused on enhancing international cooperation amongst VASP supervisors. In December 2020, the FATF hosted a third meeting of its VASP Supervisors' Forum for 2020. Over 300 VASP supervisors and other public sector representatives registered for this event, which discussed licensing and registration of VASPs and the risk-based approach to supervision of VASPs. In January 2021, the FATF launched a VASP Supervisors' Directory to enable supervisors to access contact information and basic supervisory information. Finally, the FATF developed draft Principles for Information-Sharing and Co-Operation amongst VASP supervisors. These are included as a new annex in the draft revised Guidance, which the FATF intends to finalise and release by November 2021.

23. As a result of a voluntary contribution by Japan, the FATF is developing specific training for its membership and the broader Global Network on virtual assets and VASPs. This online training course will have a general opening module and four separate learning paths to inform policy makers, competent authorities and assessors about the R.15/INR.15 requirements, FATF Guidance and best practice documents and the results of mutual evaluation reports. This e-learning training course will be available to all members of the FATF Global Network to build capacity worldwide in these critical areas. The FATF expects this training to launch in the second half of 2021.

---

[3]   The project team is co-chaired by the VACG co-chairs (Japan and United States of America) and includes representatives from Canada, Eurasian Group, European Commission, France, Germany, Greece, Ireland, Israel, Italy, Japan, Singapore, Switzerland and the United States of America.

© FATF/OECD 2021

**SECTION TWO:**
**State of Implementation by the Public Sector**

24. This Section sets out the state of implementation of the revised FATF Standards on virtual assets and VASPs by jurisdictions. This overview is based on two main sources (1) a questionnaire of the members of the FATF and its Global Network conducted over March-April 2021 and (2) a review of the completed mutual evaluation reports (MERs) and follow-up reports (FURs) by the FATF and its Global Network.

25. Like the first 12-month review, the FATF issued a questionnaire to its membership and its broader Global Network on implementation. 128 jurisdictions responded, comprising 38 FATF members (37 jurisdictions and one regional organisation) and 90 FSRB member jurisdictions. This is triple the number which responded to the first 12-month review, where 54 jurisdictions responded to the questionnaire. The questionnaire was also a self-assessment by participating jurisdictions and is not an official FATF assessment of the level of implementation of jurisdictions. Compliance with the FATF Standards is assessed through the MER/FUR process. The results of the MER/FUR process on R.15/INR.15 is set out below.

26. An overview of the results suggests that significant progress has been made, but global implementation still has very large gaps that need to be addressed. 58 jurisdictions, (28 FATF members and 30 FSRB members) reported that they had the necessary legislation to implement R.15/INR.15, with 35 of these jurisdictions (18 FATF members and 17 FSRB members) reporting that their regime was operational. A minority of jurisdictions have conducted examinations and still fewer have imposed any enforcement actions. These gaps are particularly relevant, since weak or non-existent AML/CFT controls in VASPs remain a key source of risk. The level of progress amongst non-reporting FSRB members also remains unknown, but the evidence from the completed MERs/FURs indicates that they are likely to have made much less progress in implementation.

27. Under the revised FATF Standards, jurisdictions may either permit and regulate VASPs or prohibit them and enforce the prohibition. In the questionnaire, 58 jurisdictions (28 FATF members and 30 FSRB members) reported that they had introduced the necessary legislation to implement R.15/INR.15. 52 of these jurisdictions advised that they had a regulatory regime permitting VASPs, while 6 of these jurisdictions advised that they had prohibited VASPs. 35 jurisdictions (30 jurisdictions permitting VASPs and five jurisdictions prohibiting VASPs) reported that their regimes were operational.

© FATF/OECD 2021

28. A further 26 jurisdictions (7 FATF members and 19 FSRB members) reported that they were in the process of passing the necessary legislation/regulations in order to regulate or prohibit VASPs.

29. A further 12 jurisdictions (2 FATF members and 10 FSRB members) reported that they had decided what approach they intended to take on VASPs in terms of regulation or prohibition, but had not yet commenced the necessary legislative/regulatory process. 32 jurisdictions (1 FATF member and 31 FSRB members) reported that they had not yet decided what approach to take for VASPs. This means that these jurisdictions do not have an AML/CFT regime for VASPs and have not commenced the necessary legislative/regulatory process. However, they may have undertaken other actions such as conducting national risk assessments or consulting on options for reform.

### Table 1. Progress in implementing AML/CFT regulatory regimes for VASPs[4]

| | FATF | FSRB | Total |
|---|---|---|---|
| **Jurisdiction has necessary legislation for AML/CFT regime for VASPs** | | | |
| *Permit and regulate VASPs* | 27 | 25 | 52 |
| *Prohibit VASPs* | 1 | 5 | 6 |
| **Jurisdiction is in the process of introducing necessary legislation/regulations for AML/CFT regime for VASPs** | | | |
| *Permit and regulate VASPs* | 7 | 19 | 26 |
| *Prohibit VASPs* | 0 | 0 | 0 |
| **Jurisdiction has decided its approach on VASPs, but has not *yet commenced* the necessary legislative/regulatory process.** | | | |
| *Permit and regulate VASPs* | 1 | 5 | 6 |
| *Prohibit VASPs* | 1 | 5 | 6 |
| **Jurisdiction is yet to decide what approach to take for VASPs** | | | |
| *Approach to VASPs under consideration* | 1 | 31 | 32 |
| **Total** | **38** | **90** | **128** |

30. For the 52 jurisdictions which reported that they have established regulatory regimes permitting VASPs, 31 have established registration regimes for VASPs, 17 have established licensing regimes for VASPs and four have regimes with both licensing and registration for different types of VASPs. 51 of these jurisdictions advised that their registration/licensing regime included minimum option of covering VASPs created in their jurisdiction as required by the revised FATF Standards. 32 jurisdictions advised that they have extended their regime to included VASPs incorporated overseas but which offer products/services to customers in their jurisdiction and 35 jurisdictions advised that they have extended their regime to include VASPs conducting operations from their jurisdiction. As noted in the first 12-month review report, this diversity in approach may present challenges in identifying which VASPs are regulated by each jurisdiction. 31 jurisdictions reported that they had publicly available list(s) of VASPs that they have registered and/or licensed.

31. For the 52 jurisdictions that reported that they have established regulatory regimes permitting VASPs, 15 noted that they had not covered all VASPs per the FATF definition in their AML/CFT regime. While all covered limb (i) of the FATF definition

---

[44]   As reported by participating jurisdictions through the self-assessment questionnaire. This information is accurate as at April 2021.

© FATF/OECD 2021

(in relation to fiat/virtual asset exchanges), these 15 jurisdictions noted that they were missing other limbs of the definition (e.g. in relation to initial coin offerings).

32. Jurisdictions use a wide range of terms to refer to VASPs in legislation/regulation, with at least 25 different terms reported (e.g., VASP, digital asset business, cryptoasset exchange provider, DLT provider). Nonetheless, the term 'VASP' is the most popular, with 21 jurisdictions reporting the use of this term in their legislation. Other jurisdictions do not have a specific legislative term, as they consider that VASPs are covered by their laws for financial institutions (FIs) (e.g. as a type of money service business or securities broker).

33. Of the 52 jurisdictions that have established regulatory regimes permitting VASPs, 36 of these jurisdictions advised that they have commenced licensing / registering VASPs. These jurisdictions reported that they had licensed or registered 2 374 VASPs. This number should be regarded as a minimum, as even licensed / registered VASPs can be difficult to identify if the jurisdiction does not have a separate VASP licensing / registration scheme. This doubles the reported number of registered/licensed VASPs recorded in the first 12-month review (1 133 VASPs from 20 jurisdictions). It is unclear whether this reflects new jurisdictions applying registration/license requirements or if it reflects growth in the sector. Most jurisdictions reported less than 20 registered or licensed VASPs, although five reported 100 or more VASPs.

34. For the 52 jurisdictions that reported that they have established regulatory regimes permitting VASPs, all but one reported that they had applied the preventive measures to VASPs. Under the revised FATF Standards, VASPs largely have the same obligations as other AML/CFT-obliged entities and must conduct customer due diligence (CDD), keep records and report suspicious transaction reports (STRs) (see Recommendations 10-21 as set our INR.15). There are two modifications. Firstly, the occasional transaction threshold for CDD is set at USD/EUR 1 000 for virtual asset transfers. Some jurisdictions reported that they had introduced the reduced threshold, others reported that they had not yet. A few jurisdictions reported that they had introduced stricter measures than the FATF Standards by introducing a zero-dollar CDD threshold. The second modification relates to how Recommendation 16 applies requirements for wire transfers to virtual asset transfers (the 'travel rule'). The implementation of the travel rule is set out in **Section 3**.

35. Regarding STR reporting, 36 jurisdictions provided data on STRs from VASPs. These 36 jurisdictions reported 146 704 STRs by VASPs between 2019 and 2020. The data shows a large increase in the number of STRs between 2019 and 2020 from 55 118 reported STRs to 91 586 STRs. Some jurisdictions noted that there was an increasing trend in STRs as more VASPs entered the market, knowledge of AML/CFT grew in the sector and VASPs developed their reporting systems

36. Seventy-three jurisdictions reported that they have identified a supervisor of VASPs. This includes both jurisdictions that have established their supervisory regime and those who are in the process of establishing their supervisory regime. A range of different organisations have been designated as VASP supervisors, including financial services supervisors, central banks, securities regulators, tax authorities and specialist VASP supervisors, and some jurisdictions have multiple supervisors. The most commonly designated supervisor is the jurisdiction's main financial services supervisor, being designated by 28 jurisdictions.

© FATF/OECD 2021

37. 57 jurisdictions reported that they have allocated staff to undertake AML/CFT supervision of VASPs by their relevant supervisor. This compares to 30 jurisdictions as reported in the first 12-month review. 55 jurisdictions reported that they are undertaking a risk-based approach to supervision of VASPs. This compares to 28 jurisdictions as reported in the first 12-month review.

38. Jurisdictions reported that their supervisors are using a wide range of information to inform their risk-based approach, including information collected through the registration or licensing process, compliance information, reporting from VASPs, information from supervisory activities, partner agencies and public and open source information, including information from public blockchains. Several jurisdictions noted that they were using, or considering using, blockchain analytical tools to assist in their ability to supervise the VASP sector.

39. 29 jurisdictions reported that they had conducted on- and/or off-site inspections of VASPs. While still a minority, this is a major expansion over the 15 jurisdictions in the first 12-month review. From these jurisdictions, commonly observed issues in compliance include issues relating to risk assessments, AML/CFT programs and internal control, STR and transaction reporting, staff and training, CDD, governance and record-keeping (see **Section 4** for further information on private sector implementation of AML/CFT obligations).

40. 18 jurisdictions advised that they had placed criminal, civil and/or administrative sanctions on VASPs. This compares to 8 jurisdictions in the first 12-month review report. From the information provided, the sanctions imposed include the cancellation, refusal of suspension of VASPs' registrations/licenses, administrative sanctions to improve VASP compliance, public warnings, civil monetary penalties and criminal sanctions.

**Table 2. Key data for 2nd 12-month review questionnaire of jurisdictions**



52 jurisdictions regulating VASPs

36 jurisdictions licensing / registering VASPs

29 jurisdictions inspecting VASPs

18 jurisdictions sanctioning VASPs

2 374 VASPs registered/licensed

© FATF/OECD 2021

41. 70 jurisdictions reported that they had assessed the ML/TF risks posed by virtual assets and VASPs. This compared to 34 jurisdictions in the first 12-month review. Among the jurisdictions that reported that they had not assessed the ML/TF risks relating to virtual assets and VASPs, 31 reported that they planned to in the next year. Different information sources are used for risk assessments, including financial intelligence unit (FIU) information (including STRs), law enforcement cases involving virtual assets, VASPs supervisory information, international cooperation requests, transactions involving virtual assets and internet information on activity of virtual assets and VASPs. Commonly cited risks relating to virtual assets and VASPs include anonymity, cross-border transactions, the lack of regulation and the level of technical knowledge regarding virtual assets, VASPs and AML/CFT.

42. In terms of international cooperation, jurisdictions noted the presence of pre-existing memoranda of understanding and international cooperation frameworks that could enable cooperation in the supervision of VASPs. In terms of VASP-specific international co-operation, jurisdictions noted operational information-sharing in the licensing/registration process and in supervision of VASPs, information-sharing under mutual legal assistance and FIU-FIU cooperation as well as broader information-sharing relating to strategies, best practice and challenges in supervising VASPs. To facilitate supervisory cooperation, the FATF has developed a VASP Supervisors' Directory to provide contact information and basic information about VASP supervision in jurisdictions.

43. As set out above, a minority of jurisdictions have chosen to prohibit VASPs. For the 12 jurisdictions that reported that they prohibit, or plan to prohibit VASPs, a range of tools and techniques were highlighted as ways to enforce the prohibition. Five jurisdictions stated that they have prohibited VASPs and were enforcing that prohibition, with a further seven in the process of prohibiting VASPs or having decided to prohibit VASPs. The highlighted tools and techniques included the use of risk assessments, public information campaigns, supervisory activity and STRs from FIs to identify illicit virtual asset activity and the development of bespoke technological tools in order to identify illicit virtual asset activity.

44. Since the first 12-month review, there has been clear progress in the implementation of the revised FATF Standards by the public sector. While it is difficult to make a direct comparison, as a large number of additional jurisdictions participated in the second 12-month review, 33 jurisdictions (25 FATF members and 8 FSRB members) reported that they had an AML/CFT regulatory regime for VASPs in the first 12-month review. This compares to 58 jurisdictions in this review.

45. While this does represent progress, it means that after two years many jurisdictions still do not have the basic regulatory framework for VASPs. At the FATF-level, 74% (28/38) of members reported that they have passed the necessary laws/regulations to permit or prohibit VASPs. This is significantly worse at the FSRB level. 33% (30/90) of reporting FSRB members reported that they have passed the necessary laws/regulations to permit or prohibit VASPs. The number of jurisdictions whose AML/CFT regime for VASPs is operational is lower. As noted above, 35 of the 58 jurisdictions (18 FATF members and 17 FSRB members) reported that their AML/CFT regimes permitting or prohibiting VASPs were operational. A minority of jurisdictions have conducted examinations and still fewer have imposed any enforcement actions. These gaps are particularly relevant when weak or non-existent AML/CFT controls in VASPs remain a key source of risk. It should be noted

that the majority of the Global Network which did not provide a response to the questionnaire has likely made less progress in implementation than the reporting jurisdictions.

46.   Commonly cited reasons for lack of implementation included an apparent lack of VASPs based in their jurisdiction, a lack of expertise and understanding regarding virtual assets and VASPs and resource constraints, particularly arising from the COVID-19 pandemic.

47.   As set out above, the data from the questionnaire is self-reported by jurisdictions and does not come from actual compliance assessments performed by the FATF and its Global Network. Technical compliance with R.15/INR.15 is assessed instead through the MER/FUR process. Since the first 12-month review, there are substantially more MERs/FURs now completed. 27 jurisdictions have had their technical compliance assessed with R.15/INR.15 and had their reports published.[5] While most of the criteria in the technical compliance assessment of R.15/INR.15 are specific to virtual assets and VASPs, R.15 also includes criteria that are not specific to VASPs (in relation to new technologies). A jurisdiction's performance on these criteria will also impact their overall rating.

48.   Overall, most jurisdictions assessed through the MER/FUR process with published reports have received a partially compliant (PC) rating (19 jurisdictions). Six jurisdictions have been assessed as having a largely compliant (LC) rating and two have been assessed as having a non-compliant (NC) rating (see **Graph 1**). No jurisdiction has been assessed as having a compliant (C) rating. These results suggest that even where jurisdictions have done some implementation, the quality may require further improvement to effectively mitigate risks.

## Graph 1. R.15 assessment by FATF/FSRB region



---

5      FATF: China, Denmark, Iceland, New Zealand, Sweden, Switzerland, United States of America; APG: Bangladesh, Mongolia, Myanmar, Pakistan, the Philippines, Sri Lanka CFATF: Barbados, Cayman Islands, Jamaica; ESAAMLG: Botswana, Mauritius, Seychelles; GAFILAT: Cuba, Nicaragua; MENAFATF: Mauritania; Moneyval: Czech Republic, Georgia, Isle of Man, Lithuania, Ukraine.

49. In terms of why jurisdictions are not meeting the technical requirements of R.15, the main barrier appears to be a lack of action by jurisdictions. A third of jurisdictions with FURs/MERs assessing R.15 have taken no or minimal action to implement the requirements. The other two thirds have taken action, but have not implemented the requirements fully. In some cases, it is due to a lack of action specific to virtual assets/VASPs (e.g. insufficient risk assessments, the definition of VASP does not cover all five limbs, lack of CDD threshold specific to VA transactions, lack of travel rule implementation, lack of guidance for VASPs). In other cases, shortcomings in other Recommendations impact R.15 (e.g. shortcomings relating to targeted financial sanctions or preventive measures like CDD, STRs or record-keeping).

50. This gives a worse picture of implementation than the results of the questionnaire. However, it is important to recognise the differences between these two processes. The questionnaire measures the progress a jurisdiction has made according to their self-assessment, while the MER/FUR process is a technical compliance assessment of whether that progress meets the FATF Standards. Conversely, jurisdictions may have taken action to progress their implementation of R.15 after the publication of their FUR/MER (noting that the earliest reports are from March 2020).

51. Similar to the first 12-month review, a range of practical challenges have also been identified in implementing the revised FATF Standards where jurisdictions have requested greater Guidance. These areas are elaborated in **Section 5**.

© FATF/OECD 2021

**SECTION THREE:**
**State of Implementation by the Private Sector**

52. This Section sets out the state of implementation of the revised FATF Standards on virtual assets and VASPs by the VASP sector. It is based on (1) information collected through the FATF questionnaire and (2) the FATF's outreach to the private sector in April 2021 through the VACG, PSCF and the public consultation on the draft revised FATF Guidance. The meetings of the VACG and PSCF only encompassed a selection of representatives from the VASP sector and the broader private sector, so the results outlined in this report cannot be taken to represent the entirety of the global VASP sector.

### Implementation of the travel rule

53. Jurisdictions should require VASPs to implement the FATF's AML/CFT preventive measures in Recommendations 10-21 as set out in INR.15. This includes Recommendation 16 (R.16), which sets out wire transfer requirements. It is a key AML/CFT measure to ensure that originators and beneficiaries of financial transactions are identifiable and are not anonymous. Jurisdictions should require VASPs and FIs to comply with these requirements for virtual asset transfers.[6] This is the so-called 'travel rule' and is the issue of most focus in terms of VASPs' compliance with the revised FATF Standards.

54. There are various technologies and tools available that could enable VASPs to comply with the travel rule, although compliance is reported as challenging due to the lack of a unified technology to support it. While the FATF is technology-neutral and does not prescribe a particular technology or software, the FATF Guidance on virtual assets and VASPs published in June 2019 lists a range of technologies which may enable VASPs to comply with aspects of the travel rule requirements.[7] These technologies existed when the FATF Standards were revised in June 2019. There was not, however, a technological solution(s) that enabled VASPs to comply with all aspects of the travel rule in a holistic, instantaneous and secure manner when the FATF revised its Standards.

55. The FATF has therefore been monitoring the progress by the VASP sector in developing solutions and complying with R.16 requirements. The first 12-month

---

[6]    See **Annex 1.A** for the full requirements.
[7]    These include public and private keys, Transport Layer Security/Secure Sockets Layer connections, X.509 certificates, X.509 attribute certificates and API technology.

© FATF/OECD 2021

review in July 2020 concluded that there seemed to have been progress in developing technological solutions for the travel rule.[8] The report noted the development of messaging standards for use by travel rule solutions and that several different travel rule technology solutions were being developed, with some solutions being launched or being tested. The report concluded that 'the FATF is not aware yet that that there are sufficient holistic technological solutions for global travel rule implementation that have been established and widely adopted'.

56.   Since July 2020, there seems to have been more progress in travel rule technology development. Several standards and protocols have been launched, which can help enable interoperability between solutions and identify VASPs to exchange travel rule data. Further standards are also being considered to cover different aspects of travel rule compliance (e.g. data storage). Some companies have reported that travel rule technology solutions have been launched and are said to be now operational. 11 jurisdictions reported in the questionnaire that they were aware of VASPs in their jurisdiction complying with some travel rule requirements. These jurisdictions noted the use of both manual and automated processes by VASPs to submit the necessary information, as well as the development of third party technological solutions for information-sharing. Some VASPs were also using blockchain analytics to assist in their compliance. However, no jurisdiction advised that they were aware of a VASP which complied fully with each element of the travel rule.

57.   In the jurisdictional questionnaire, 10 jurisdictions reported that they had implemented travel rule requirements for VASPs and that these requirements were being enforced. A further 14 jurisdictions reported that they had introduced travel rule requirements but these were not yet being enforced. For those jurisdictions that have introduced travel rule requirements, several noted techniques they had used to assist industry in compliance including:

   a.   cooperating with market participants to identify travel rule solutions;

   b.   communicating regulatory expectations for compliance and travel rule solutions;

   c.   introducing travel rule requirements with a grace period (e.g. 6 months / one year) or granting regulatory exemptions to enable VASPs to develop the sufficient IT infrastructure to comply; and

   d.   analysing the measures the VASP is taking to mitigate the inherent risks to the application of the travel rule.

58.   While these jurisdictions noted that they were cooperating with industry and had oversight of developments in technological solutions, several noted that they would not endorse or prescribe specific platforms so as to remain technology neutral. Several jurisdictions noted that VASPs would need to implement interim solutions while global technological solutions were developed

59.   Overall, there has been further progress in the last year. Nonetheless, two years after the FATF revised its Standards, most jurisdictions and most VASPs are not complying with the travel rule. This is a major obstacle to effective global AML/CFT mitigation and is undermining the effectiveness and impact of the revised FATF Standards.

---

[8]   See paragraphs 38-45 of the first 12-month review report.

60.  In addition, there are still not sufficient holistic and scalable technological solutions available for global travel rule implementation and progress appears to have slowed since the last 12 month review. In the questionnaire, only 17 jurisdictions considered that there are sufficient technological solutions to encourage the efficient and effective implementation of the travel rule in their jurisdiction.

61.  These two problems—the lack of implementation and the lack of globally available, comprehensive travel rule solutions—appear to have created a self-reinforcing conundrum. The lack of national implementation reduces the incentive for technical progress, and the lack of technical progress is used to justify lack of national implementation. As set out above, only 23 jurisdictions reported that they have introduced travel rule requirements, of which only 10 reported that they were enforcing these requirements. This is only a marginal increase in the number of jurisdictions that have introduced travel rule requirements for VASPs since the first 12-month review. That review found that 15 jurisdictions had advised that they had introduced travel rule requirements for VASPs. This indicates that there has been little further implementation of the travel rule by jurisdictions. As only jurisdictions can mandate implementation and given that the past two years of non-implementation pending a technological resolution have not led to a solution, this review suggests that greater jurisdictional implementation is a necessary prerequisite in order to create technical progress. In addition, a rapid expansion of implementation by numerous jurisdictions would help to address the sunrise problem which is a critical need for the private sector. This is explored further in **Section 5** below

## Implementation of other AML/CFT obligations

62.  In terms of VASPs' implementation of their other AML/CFT obligations, the observations made in the first 12-month review remain accurate. Implementation of other AML/CFT obligations globally is at early stages. In many jurisdictions, the VASP sector is new, without a history of regulatory oversight and lack of familiarity with the fundamentals of AML/CFT. This challenge is further complicated by the continued trend of rapid technological progress in the VASP sector, where there is a constant evolution in technology, services, business practices and firms entering and exiting the market.

63.  Most jurisdictions that have implemented regimes to regulate VASPs have applied the preventive measures on VASPs the same as any other AML/CFT-obliged entity. Some jurisdictions have additional requirements, such as reporting requirements in relation to virtual asset transfers. Several jurisdictions noted that they had set the occasional transaction CDD threshold at or near the FATF's USD/EUR 1 000, while others noted that they had yet to introduce the requirement but planned to in the future. Finally, some jurisdictions noted that they have introduced a zero-dollar CDD threshold for VASPs in light of the potential ML/TF risks and their nascent AML/CFT regime.

64.  Some jurisdictions reported improvements in overall compliance by VASPs, with increasing awareness and attention to AML/CFT obligations, particularly among larger, established VASPs. Still, commonly observed issues in VASPs' compliance with AML/CFT obligations include:

    a.  issues in the risk assessment of the VASP or its understanding of ML/TF risk;

© FATF/OECD 2021

b.  the quality of CDD, including enhanced CDD and beneficial ownership requirements and electronic verification;

c.  ineffective AML/CFT programs and internal controls and issues in outsourcing AML/CFT duties;

d.  issues in STRs, other transaction reporting and transaction monitoring;

e.  issues regarding data protection and record-keeping;

f.  issues relating to governance and internal oversight and audit expertise; and

g.  the lack of sufficient staff and expertise for compliance and the quality of staff training (or the lack thereof).

© FATF/OECD 2021

**SECTION FOUR:**
**ML/TF Risks and the Virtual Asset Market**

65. This Section sets out how the ML/TF risks and the virtual asset market has changed since July 2020. This Section is based on (1) information collected through the jurisdiction questionnaire, (2) outreach to the private sector, (3) desk-based research by the Secretariat and (4) analysis conducted by blockchain analytic companies.

66. As set out in Section 2 of this report, implementation by jurisdictions of the revised FATF Standards remains a work in progress. Changes in the usage of virtual assets or VASPs can be driven by a range of factors, including consumer preferences, competition, regulation, speculation, technological development and privacy and security concerns.

67. While it is difficult to make any link between the changes in the sector and specific explanatory factors, the FATF does not see any evidence that the revisions to its Standards in 2019 have stifled innovation in the sector. Indeed, since the revisions, the sector has seen continued and rapid growth. Virtual assets grew in popularity over the last year, and, in January 2021 alone, virtual asset users increased by almost 16 percent.[9] For example, in June 2015, four years before the FATF revised R.15/INR.15, there were approximately 265 000 active daily bitcoin addresses. This number had nearly doubled to approximately 572 400 in June 2019, when the FATF revised R.15/INR.15 and released its Guidance on virtual assets and VASPs. The number has again doubled since the FATF changed its Standards. As of April 2021, there were over a million daily active bitcoin addresses. While the FATF cannot examine the counterfactual, these numbers make it difficult to argue that the revisions to the Standards have hindered the growth of this market.

68. There has also been increasing adoption of virtual assets in the mainstream of the traditional financial sector. A number of traditional financial institutions, including banks, credit card providers, and MVTS have offered virtual asset products and services. This has often been done in partnership with VASPs.

69. This huge growth and development in the virtual asset sector has all occurred after the FATF revised its Standards and jurisdictions began implementing the revised

---

[9]    Crypto.com; "Measuring Global Crypto Users: A Study to Measure Market Size Using On-Chain Metrics, 2/2021;
https://assets.ctfassets.net/hfgyig42jimx/5u8QqK4lqjEgL506mOx4m3/
d44d8e204aecfc75a839e2a9d505f5d1/Crypto.com_Data_Report_-_On-chain_Market_Sizing.pdf; accessed on 29 March /2021.

© FATF/OECD 2021

Standards. This indicates that regulatory certainty and strong AML/CFT controls at the international level can also act as a facilitator to business development, public adoption, and the creation of necessary national regulatory frameworks, rather than an inherent barrier.

## Trends in use of virtual assets for ML/TF purposes

70.   The FATF has observed that the ML/TF trends for virtual assets have largely continued from those reported in the first 12-month review report. The value of virtual assets involved in most ML/TF cases detected to date remains relatively small compared to cases using more traditional financial services and products. Most detected cases involved the use of one type of virtual asset only. In cases where criminals did make use of more than one type of virtual asset, such use was primarily for the layering of illicit proceeds. For instance, assets are sometimes laundered through services which aim to obfuscate ownership by taking in assets, co-mingling them, and then providing outputs of equal value to users, less a transaction fee, in a process known as "mixing". Criminals also sometimes move assets across multiple addresses, VASPs, types of virtual asset, or different blockchains.

71.   The types of offences involving virtual assets include ML, the sale of controlled substances and other illegal items (including firearms), fraud, tax evasion, sanctions evasion, computer crimes (e.g. cyberattacks resulting in thefts or ransomware), child exploitation, human trafficking and TF. Among these, narcotics-related and fraud offences (e.g. investment scams and swindling, blackmail, and extortion) are the most prevalent. There has been a large increase in the value of virtual assets collected as ransomware payments and in the use of virtual assets to commit and launder the proceeds of fraud in the last year, which is consistent with the general pattern of misuse of online financial services as a result of COVID-19-related confinement measures. In particular, the pace and sophistication of ransomware attacks continued to increase in 2021 rapidly, victimizing, notably, governments, schools, hospitals, and other critical infrastructure providers all over the world. The proceeds of such ransomware attacks are often moved via unhosted or privacy wallets[10] and/or other anonymity-enhancing tools and methods to VASPs, where they are exchanged for other virtual assets or fiat currency and can be used by illicit actors to pay for their criminal enterprises. Separately, sophisticated illicit activity by state actors using virtual assets for sanctions evasion has also been observed.

72.   Most identified ML/TF activity relates to activity that is native to virtual assets. That is, it is ML/TF activity where the predicate activity begins in virtual assets (e.g. ransomware payments, darknet markets, frauds and investment scams and hacks). It is much less clear the extent to which virtual assets are being used to launder proceeds of crime that originate in fiat currency. However, jurisdictions have identified professional ML networks which are using virtual assets as one of their means to launder illicit proceeds and quickly transfer value around the world (e.g., converting proceeds of crime from drug sales in cash into virtual assets in order to transfer the profits).

73.   The main trends in the virtual asset ML/TF risk landscape since July 2020 are continuations of those identified in the first 12-month review report, namely jurisdictional arbitrage and the associated problem of non-compliant or weakly

---

10      Privacy wallets, also called mixing-enabled wallets, allow transfers where multiple people's transactions are combined into a single transfer.

compliant VASPs and tools and methods to increase anonymity. Jurisdictional arbitrage is a growing problem. While the number of jurisdictions registering/licensing VASPs is growing, there are still large gaps in global implementation due to a lack of or ineffective implementation by jurisdictions (see **Section 3**). Certain VASPs are taking advantage of this to operate in jurisdictions that lack effective implementation of AML/CFT regulation and supervision or spread their operations over multiple jurisdictions, while offering services with extremely weak or non-existent AML/CFT controls. Illicit actors are taking advantage of poor CDD and screening processes within these VASPs for ML/TF purposes. This finding underscores the importance of continuing to press forward with effective, on-the-ground implementation of the existing FATF Standards worldwide, as VASPs with weak or non-existent AML/CFT programs remain one of the key virtual asset risks.

74. Tools and methods to increase anonymity in virtual asset transfers continued to be used and developed. This includes a wide range of techniques, including registering Internet domain names through proxies and using DNS registrars that supress or redact the true owners of the domain names, the use of tumblers, mixers and AECs or privacy coins (which are considered virtual assets) and privacy wallets, chain-hopping and dusting (which allows the transfer of tiny amounts of virtual assets to random wallets) and the use of decentralised applications, decentralised exchanges and atomic swapping exchanges.

75. The market for anonymity-enhancing tools and methods is in rapid flux. For example, several mixer/tumbler services have been taken offline following enforcement action for operating as unregistered VASPs. Some VASPs have also delisted AECs due to their ML/TF risks, which has reduced access to AECs. Nonetheless, some AECs have seen increased adoption by darknet markets and ransomware actors, while bitcoin or fiat currencies still seems to be the major settlement methods. For example, while cybercriminals often require payment in bitcoin, some ransomware operators have offered discounted rates to victims who pay in AECs, likely to reduce transparency of payments. In addition, the last year has seen significant increase in the use of privacy wallet transfers where multiple people's transactions are combined into a single transfer, such as CoinJoin. Overall, the use of anonymity enhancements remains a key area of ML/TF concern.

### Peer-to-peer market metrics

76. The FATF's first 12-month review report committed the FATF to 'seek to collect better market metrics on virtual assets, especially on the volume and proportion of peer-to-peer virtual asset transactions'. The revised FATF Standards do not explicitly apply to P2P transactions, which are transactions that do not involve a VASP or other AML/CFT-obliged entity, except for obligations on all persons (such as those for targeted financial sanctions). The FATF had identified the risks relating to P2P as one of the particular residual ML/TF risks in its report to the G20 Finance Ministers and Central Bank Governors on so-called stablecoins and accordingly committed to work on market metrics in the first 12-month review report.

77. The purpose of this research was therefore (1) to understand the extent to which virtual asset transfers occur with a VASP or without (i.e. P2P transactions) (2) whether this has changed since the FATF revised its Standards in June 2019 and (3) the ML/TF risk associated with P2P transactions. This would inform the extent to

which P2P metrics can be developed and whether there is a need to further revise the FATF Standards and/or Guidance.

78. This work was designed to develop a picture on the scale of transactions taking place without a regulated entity responsible for AML/CFT obligations. It is important for the FATF and its membership to understand these market metrics, because mass-adoption of so-called stablecoins or virtual assets could potentially decrease the use of AML/CFT-obliged entities to transfer virtual assets or hold custody in the future. Alternatively, data indicating that most transactions did involve an AML/CFT-obliged entity could emphasize the importance of ensuring that such institutions implement appropriate AML/CFT controls and that the jurisdictions in which they are based implement the FATF Standards. It could also serve to illustrate the extent to which users who want to use virtual assets as a medium of exchange or cash out into fiat currencies will likely need to do this through a VASP, providing transparency for AML/CFT purposes if those VASPs fulfil their obligations.

79. As set out below, there are significant challenges in the development and interpretation of these market metrics. The blockchain analytic companies often reached starkly divergent results for the same questions, so caution must be exercised in drawing conclusions. Still, the metrics collected for this project do not clearly demonstrate a significant rise in the use of P2P transactions.

### Background

80. To develop these market metrics, the FATF selected seven blockchain analytic companies (Chainalysis, CipherTrace, Coinfirm, Elliptic, Merkle Science, Scorechain, and TRM Labs) based on the outreach and feedback from experts and delegations. The FATF commissioned the companies to develop a set of market metrics on the extent to which virtual assets are being used on a P2P basis or being transferred with or through a VASP and the extent to which there is illicit use of virtual asset transfers. The FATF thanks these seven companies for providing their time, resources and expertise in this project.

81. It is important to note that each company has its own methodology, analytical tools, techniques, proprietary data and expertise. Additionally, the FATF recognizes that blockchain analytic companies normally focus on detecting and tracking illicit activity as opposed to providing metrics on the size of the P2P market. Thus, the companies embarked on conducting this exceedingly difficult research at the request of the FATF and some may have less experience in conducting this type of macro-level analysis. While each company is using data from the bitcoin and Ethereum blockchains, they have each approached this task from their own background and expertise and have devised separate methodologies. This includes separate definitions for illicit wallets and transfers and VASPs. Therefore, the companies should not be treated as equivalents and their work should not be treated as interchangeable.

82. In scope of this project were three of the most prominent virtual assets (bitcoin, ether and tether[11]). Only data relating to bitcoin has been included in this report, as it had the greatest coverage by the seven companies.

---

[11]   Only tether issued on the Ethereum blockchain (ERC-20) was in scope of this exercise.

*Summary of results*

83.   The following two graphs show the proportion of transactions which occur <u>without</u> <u>a VASP</u> (i.e. the P2P usage of the virtual asset), as defined by the analytic company, for <u>bitcoin</u> in terms of <u>number of transactions</u> and <u>USD value</u> between <u>2016-2020</u>. Transactions which occur without a VASP are those in which neither the sender nor the receiver are VASPs. The inverse of this proportion is then the proportion of transactions that occur <u>with a VASP</u>. The data included is only for <u>direct</u> transactions with and without a VASP.

84.   It is difficult to draw clear conclusions from the graphs, due to the level of variation in the data provided by the different companies. Using the total number of bitcoin transactions, four companies identified that approximately 60% of transactions occurring without a VASP between 2016-2020. Two companies then provided lower estimates of 13% and 25% of transactions occurring without a VASP during the same time period.

85.   Using USD value, the data provided shows greater variation, making conclusions even more tenuous. The total number of bitcoin transactions occurring without a VASP between 2016-2020 ranges very widely between 3% and 85% of the USD value. The data from four companies indicates an average proportion of around 50% of USD value with a VASP and 50% without a VASP. Three other companies, however, have radically different results. One company finds a very low proportion of USD value of bitcoin transacting without a VASP (3%) and another company finds a generally high proportion (85%). The final company finds a low proportion with a total of 16% of USD value of bitcoin occurring without a VASP.

86.   Despite the variation between the companies, the data from all companies is consistent in one sense. The data does not show a clear and consistent shift towards P2P transactions or away from transactions with VASPs. Particularly with the number of transactions, the proportion transacted with and without a VASP has remained largely stable between 2016-2020.

87.   Fewer companies provided data on ether and tether. There is also substantive variation in terms of the data provided. The data shows indicators of a potential trend for an increase in the number of transactions occurring without a VASP. However, the level of variation between the companies prevents any firm conclusions from being drawn.

© FATF/OECD 2021

**Graph 2: Proportion of bitcoin transactions which occur without a VASP between 2016-2020 (left: number of transactions;12 right: USD value13)**



88. The companies also provided data on virtual asset transfers characterized as <u>illicit by the companies</u>[14]. The following two graphs shows the proportion of <u>identified illicit transactions</u> as a percentage of the <u>number of transactions</u> and the <u>USD value</u> of all transactions between <u>2016-2020</u> for <u>bitcoin</u>.

89. Similar to the data on the transactions without a VASP, there is variation between the companies' data in terms of the proportion of identified illicit transactions. The variation is again quite significant, with the total proportion of known illicit transactions over 2016-2020 for bitcoin ranging between 0.6%-9.9% in terms of transactions and 0.1%-5.1% in terms of USD value. However, here too there is significant variation in the methodology as well.

---

12    Six companies provided data.
13    Seven companies provided data.
14    The data from some of the companies may also include 'high risk' activity in addition to illicit activity. This is activity that is associated with criminal activity or marketed as being outside of regulation and enforcement (e.g. mixers/tumblers or illicit gambling).

© FATF/OECD 2021

**Graph 3: Proportion of identified illicit bitcoin transactions between 2016-2020 (left: number of transactions[15]; right: USD value[16])**



90.  Four of the companies also broke down the number of identified illicit bitcoin transactions that occur with and without a VASP, based on lists of addressed known or suspected to be associated with illicit activity. All of the companies found that in total more identified illicit transactions occur without a VASP than with a VASP. Similarly, a higher amount of USD was transferred in identified illicit transactions without a VASP than with a VASP.

---

15    Six companies provided data.
16    Seven companies provided data.

© FATF/OECD 2021

**Graph 4: Proportion of identified illicit bitcoin transactions with a VASP / without a VASP between 2016-2020 (left: number of transations, right: USD value)**



**Conclusions**

91.  It is difficult to draw clear conclusions from the data regarding the extent to which virtual asset transfers occur with VASPs vs P2P transactions. The level of variation between the companies' data is extremely high. Based on this data, it is not possible to give a conclusive number on the extent of P2P usage of bitcoin. Similar observations apply to the data collected on ether and tether.

92.  This variation can be driven by a number of factors, including methodologies and technologies for clustering and heuristic rules, the data the companies have for mapping virtual asset addresses to real-world entities and the definitions used for illicit transactions and VASPs, which may not always directly match the FATF definition of VASP.

93.  Some broad, but low-confidence, conclusions can be drawn from the data. The data shows a significant proportion of bitcoin, ether and tether occur without a VASP (i.e. P2P transactions). For bitcoin transactions, the data does not show any clear trend towards or away from VASPs. For ether and tether, there are indicators of a potential trend towards more P2P transactions. This could be driven by increases in decentralised finance (DeFi) projects (which are categorised as non-VASPs by the companies) in recent years. However, the substantive variation between the companies and the lesser coverage of these two assets means that any trend cannot be confirmed definitively. Accordingly, it cannot be concluded from this data that there has been a strong move towards P2P transactions over the last five years or since the FATF revised its Standards in 2019.

94.  The data also shows that there are significant differences between how bitcoin, ether and tether are used. Each company shows differing levels of usage without a VASP and different trends lines in terms of use. This demonstrates that P2P usage of virtual assets may differ between virtual assets, based on their differing characteristics, use cases and scale of adoption, although it is possibly also a

© FATF/OECD 2021

methodological consequence. Therefore, future virtual assets may have different profiles in terms of their P2P usage.

95.     While the collected data on illicit usage varies dramatically between providers, thus not reflecting a clear trend towards increasing or decreasing illicit virtual asset transfers, all of the companies identified some proportion of illicit bitcoin activity between 2016-2020. The results not only demonstrate that there are ML/TF risks associated with virtual assets, but also that the estimates are quite different. This suggests that there is considerable uncertainty among the analytics companies, with an extremely large difference between the high and low estimates. There is also not a clear indication regarding whether more illicit transactions are moving towards P2P or not.

96.     It is important to recognise that the data provided only relates to *identified* illicit transactions which the companies are able to identify, based on lists of known or suspected illicit addresses. If this universe of suspect addresses is incomplete, the proportion of transactions considered illicit will also tend to be an undercount. For example, terrorists raising funds in virtual assets may not be captured in the data if the actors and wallet addresses are not known to blockchain analytic companies. In addition, some transactions which may not appear illicit because they are relatively small could still pose a serious risk, as in the example of inexpensive terrorist attacks that have an outsized impact on security. The data may also include activity that the companies suspect to be high-risk (like mixer/tumblers) that is not definitively illicit. Nonetheless, the data included here should be treated as the likely *minimum of illicit activity*.

97.     The data provided also mainly relates to illicit activity that is largely native to the blockchain. That is, it is ML/TF activity where the predicate activity begins in virtual assets (e.g. ransomware payments, darknet markets, frauds and investment scams and hacks). The data does not generally include ML/TF activity where virtual assets are being used to launder proceeds of crime that originate in fiat currency (e.g. using virtual assets to launder the proceeds of cash-based illicit drug sales). It also does not cover other virtual assets that have not been included for analysis or flows between different blockchains or virtual assets. This is because the companies do not have oversight over the on-ramps/off-ramps among the fiat and virtual asset ecosystems (i.e. exchanges). It is therefore not known to which extent this kind of illicit activity is happening from this data.

98.     Nonetheless, the companies consistently identified that there are on average more known illicit transactions with bitcoin than ether or tether (both in terms of overall value and in proportion of transfers). This accords with the FATF's previous observations that bitcoin is the most used virtual asset for ML/TF purposes, due to it being the most liquid, well-known and widely-available virtual asset.

99.     Likewise, it appears that more illicit transactions occur without a VASP than with a VASP, especially for bitcoin. This could imply that there are greater ML/TF risks in the P2P sector. However, as set out above, this data only looked at direct transactions. According to some blockchain analytic companies, many illicit transactions will be eventually received by a VASP after being exchanged via P2P transactions, which could be due to the present difficulty of using virtual assets without an off-ramp such as an exchange.

100.    This work has also demonstrated the challenges of such research with blockchain analytics. As noted above, each company has their own methods, resources,

techniques and data which they combine with the data taken from the blockchain. It takes significant time, resources, expertise and investment for companies to map real-world entities onto wallets. This is an ongoing challenge, as more wallets are easily created, new businesses and services are established, new virtual assets are released and services operate over an increasing number of blockchains. Entities, including compliant VASPs, often change their addresses, which can also challenge the attribution process. Therefore, the work of each company is not equivalent and it is not interchangeable, which makes it difficult to know what the 'right' numbers are for market metrics.

101. This field of research is ultimately a very young area. There does not yet appear to be a fully established method or widely accepted literature on how to undertake such research into P2P transactions, due to the evolving nature of blockchain and the virtual asset sector. Blockchain analytics is probabilistic and data produced has an inherent level of uncertainty associated with it. Accordingly, the data included in this report and the conclusions drawn should be treated as a first attempt. Despite these limitations, blockchain analytics can provide interesting insights into the use of virtual assets that are not available with traditional financial products and services. Moreover, blockchain analysis can be useful for investigative purposes to track identified illicit funds or attribute identities of wallet holders. Such tools can be of great potential benefit to law enforcement, FIUs, supervisors, VASPs and the broader private sector in fulfilling their AML/CFT obligations and combating illicit activity.

102. Developing this understanding further may become more important as virtual assets are adopted further and new virtual assets come onto the market. Further information on the implications of this work is set out in **Section 5** below.

© FATF/OECD 2021

# SECTION FIVE:
# FATF Issues identified with the revised FATF Standard and Guidance

103.  The first 12-month review concluded that the revised FATF Standards on virtual assets and VASPs did not need to be amended at that point in time. The review identified five main issues where further FATF Guidance and sustained outreach and collaboration were needed. These were in relation to:

  a.  the definition of virtual asset and VASP;

  b.  peer-to-peer transactions and unhosted wallets;

  c.  so-called stablecoins;

  d.  licensing and registration of VASPs; and

  e.  implementation of the travel rule.

104.  To address these five areas, the FATF is updating its 2019 Guidance on virtual assets and VASPs to address these five areas and to enhance international co-operation amongst VASP supervisors. The FATF consulted on draft revisions in March-April 2021 and expects to finalise and release this revised Guidance by November 2021.

105.  Information on the challenges and barriers to implementation was collected through the jurisdictional questionnaire. 104 jurisdictions provided information on what they saw as the greatest barriers/challenges to implementation, many of which are already being addressed in the forthcoming Guidance revision. The five most commonly cited challenges and barriers to implementation were (1) the lack of capacity, expertise and experience in public sector agencies to implement R.15/INR.15, (2) the implementation of the travel rule and the lack of sufficient technological solutions, (3) challenges in identifying and registering/licensing VASPs, (4) the lack of implementation of domestic regulations for virtual assets/VASPs and (5) challenges in conducting ML/TF risk assessments and understanding the size of the virtual asset/VASP sector.

106.  31 jurisdictions also raised issues where they sought more guidance or clarity on R.15/INR.15 and/or FATF Guidance. The five most commonly cited issues include the need for clarification on (1) the definition of VASP and obligations of VASPs, particularly in relation to how the definition applies to decentralised applications (DApps), DeFi and P2P trading platforms, (2) the definition of virtual asset, particularly in relation to types of tokens, (3) how to implement the travel rule, (4) how to register/license VASPs and (5) P2P transactions. While asking for greater clarity in several places, no jurisdictions clearly considered R.15/INR.15 needed to be amended.

© FATF/OECD 2021

107.  As set out above, the FATF will provide updated FATF Guidance on the issues raised in the first 12-month review. The issues raised by jurisdictions in this review largely are the same five areas outlined in the first 12-month review. Accordingly, this review will not revisit all of the same issues considered in the first 12-month review, as it expects that the forthcoming revised Guidance will address many of these concerns.

108.  A common factor underpinning these issues is the challenges that new and innovative technologies can pose to traditional AML/CFT regulatory approaches. While bringing opportunities to develop new and innovative approaches to ML/TF risk mitigation, virtual assets can bring a range of challenges to supervisors, law enforcement and the private sector in effectively implementing AML/CFT controls. For example, the public nature of blockchains can provide new data sources for blockchain analytics, but can also bring challenges in identifying who controls which wallets. The decentralised nature of virtual assets can allow direct P2P transactions, but can make it difficult to identify VASPs and understand the extent to which P2P transactions can occur. Overcoming these challenges will require ongoing dialogue and effort by the public and private sectors to deepen the understanding of AML/CFT and virtual assets, implement key measures like the travel rule and develop a clearer regulatory perimeter.

109.  The analysis below deals with new and emerging issues and issues that are additional to the issues being addressed by the Guidance update.

## Definitions of virtual asset and VASP

110.  When the FATF revised its Standards in June 2019, it placed all AML/CFT obligations in relation to virtual assets and VASPs in R.15/INR.15, which relates to new technologies. The revisions set out in R.15/INR.15 relate to nearly all of the FATF's 40 Recommendations. By centralising the changes in one Recommendation, it made it much clearer for jurisdictions the actions they needed to take to implement the FATF Standards on virtual assets and VASPs. It also made it more straightforward to assess jurisdictions' compliance with the revised R.15/INR.15 in the FATF's follow-up process, as jurisdictions only need to be assessed on one revised recommendation.

111.  The FATF also created new definitions of virtual asset and VASP. These definitions were intended to capture the main conduits of virtual asset financial activity at risk for ML/TF activity. They were also intended to build on the pre-existing categories of FIs and designated non-financial businesses and professions (DNFBPs) to ensure there were no gaps in the FATF's coverage of relevant financial assets.

112.  This approach however has unintended drawbacks. By separating VASPs and their AML/CFT obligations, it may create a divide in the FATF Standards between VASPs and the broader category of FI. VASPs are commonly businesses which provide the same financial services as FIs, however those financial services are linked to virtual assets (as opposed to traditional financial assets). From FATF's perspective, the important consideration is that a jurisdiction covers FIs and VASPs in their laws. It does not matter whether they categorise VASPs as their own category or group them with other providers of the same financial service; the important thing is that they are covered by a jurisdiction's AML/CFT regime. However, because the FATF Standards separate VASPs into their own category and consolidate all their requirements in one area, they may reinforce the idea that VASPs are different and

could obfuscate the specific areas where VASPs differ from FIs (e.g. in relation to the travel rule). It also may be leading to persistent views in the private sector of a double standard, where both VASPs and other FIs believe they face more stringent requirements and where VASPs may believe they should have fundamentally different obligations. Similarly, this separation may have created confusion for some supervisors and other authorities, who believe that with each issue they face, such as licensing / registration for example, they need an independent and purpose-built solution for VASPs.

113. This segmented approach has caused challenges in applying concepts such as the definition of VASP to the rapidly-changing virtual assets market. The definition of FI in the FATF Standards is much broader than the definition of VASP, covering eleven different categories of activity. The definition of VASP is narrower, covering five limbs that focus on the activity of exchanges, custodians and entities involved in initial coin offerings. As the virtual asset market matures, more FI services based on virtual assets may be developed and this creates challenges to understanding how the VASP definition applies. For example, while the FATF has considered that central governance bodies of so-called stablecoins are covered by the definition of VASP or a FI, it may be conceptually clearer to understand them as bodies that are 'issuing and managing means of payment' in the FI definition. By separating the activities of VASP from the broader activities of FIs in the FATF Standards, there is less flexibility in the Standards to easily accommodate new services. This issue may become more challenging as there is greater mainstream adoption of virtual assets and the lines between virtual assets and traditional financial assets become more blurred.

114. A second major challenge to the FATF definition of VASP is its application to so-called 'decentralised' structures. Virtual assets enable a greater degree of decentralisation in terms of governance, control, operations and functions than in the traditional financial sector. DApps, DeFi, and decentralised exchanges all have risen in popularity in the last year, with DeFi in particular emerging as a trend. Despite this growth, the FATF assess that decentralized structures remain a small element of the overall virtual assets market, although there is a lack of conclusive evidence to prove this. In addition, at present users of decentralized structures typically have to move assets outside the bounds of this sector in order to use them as a medium of exchange. While decentralized arrangements operating on a public blockchain may have characteristics that lend themselves to investigations using blockchain analysis, other forms of these arrangements can also complicate analytic review. Nonetheless, how the FATF Standards apply to such structures is a challenge, as it may be difficult in some cases to identify the parties involved with clear responsibility for AML/CFT obligations.

115. The FATF's 2019 Guidance set out how the definition of VASP could apply to DApps.[17] The draft revised Guidance, which FATF released for public consultation in March 2021, largely adopts and expands upon the same language. Based on the feedback received to the public consultation, it appears many members of the private sector were unaware of this pre-existing guidance. Nonetheless, there was clear feedback from the private sector that the Guidance needed to better articulate how the FATF Standards apply to DApps and decentralised governance arrangements, particularly which activities do and do not fall within the scope of

---

[17] See paragraph 40 of the FATF Guidance on virtual assets and VASPs, www.fatf-gafi.org/media/fatf/documents/recommendations/RBA-VA-VASPs.pdf.

© FATF/OECD 2021

the definition of a VASP. Feedback from the public consultation highlighted that many projects do not have a central counterparty and that the developers of such protocols should not be considered VASPs. The traceability of public blockchains underpinning DeFi projects was also highlighted, as well as potential blockchain native solutions to support AML/CFT in DeFi projects.

116. Accordingly, the FATF should further review its draft Guidance to ensure it is providing a clear message on how to apply the standards to decentralized structures, including the definition of a VASP, taking into account the risks, limitations and size of this sector.

117. Depending on how the virtual asset market develops, the FATF may need to further revisit the definition of VASP, R.15/INR.15 or the broader Standards in the future. This could, for example, be driven by further integration between the activities of FIs and VASPs, the mass-adoption of virtual assets and so-called stablecoins, particularly for payments and settlement, reducing the need to exchange virtual assets for fiat currency, and/or further decentralisation in the activities, functions or governance of VASPs that undermines the FATF's focus on risk mitigation through intermediaries as gatekeepers. However, as many jurisdictions have not yet implemented the existing R.15/INR.15, the focus should be on promoting implementation of the current Standards and using the Guidance revision project to provide further clarity on how jurisdictions can implement these definitions in practice.

### Peer-to-peer transactions and AML/CFT intermediaries

118. As set out in Section 4, P2P transfers of virtual assets are not explicitly subject to AML/CFT obligations under the revised FATF Standards, except for those that apply to all individuals (like targeted financial sanctions). In the first 12-month review, the lack of explicit coverage of P2P transactions was a source of concern for a number of jurisdictions.

119. The results of the market metrics work in Section 4 indicates that a potentially significant amount of certain virtual assets is transferred on a P2P basis. The share of illicit transactions also appears potentially higher for P2P transactions, in number and USD volume compared with transactions with VASPs, at least in terms of direct transactions. However, the substantial amount of variation in the data means the size of the P2P sector and its associated ML/TF risk remains unclear.

120. In the absence of clear evidence, and given the strong evidence of the risks posed by deficient or non-compliant VASPs, the FATF's focus on placing AML/CFT controls on intermediaries (such as VASPs) should be maintained for the time being.

121. This does not mean that the FATF will not revise its Standards in the future if there is clear evidence that the ML/TF risks have changed. The FATF's report to the G20 Finance Ministers and Central Bank Governors on so-called stablecoins found that P2P transactions was a particular residual ML/TF risk for virtual assets. That report noted that it is important ML/TF risks are analysed in an ongoing and forward-looking manner and to address these risks before launch.

122. As so-called stablecoins with potential for mass-adoption are launched or other virtual assets achieve mass-adoption, the number and value of P2P transactions could dramatically increase. Such a trend could bring more serious risk, as AML/CFT risk mitigation measures through VASPs and other AML/CFT-obliged

entities would not work sufficiently. A shift to a significantly disintermediated world could potentially pose challenges to the effectiveness of the FATF Standards. If P2P transactions were to increase to the point that were to occur almost entirely on a P2P basis and criminals were able to exist entirely in the virtual asset ecosystem, without ever interacting with VASPs and on- and off-ramps to the traditional fiat economy, the current FATF Standards might need revision to sufficiently mitigate the ML/TF risks.

123.  As set out above, there is no clear evidence yet that the role of VASPs is becoming less important. VASPs currently play an important role in the virtual asset ecosystem. While P2P transfers occur in the ecosystem, VASPs are needed for the exchange or withdrawal of virtual assets for fiat currency. In addition, investigators, blockchain analytic companies, and other parties can generally capture information on P2P transactions generated on public blockchains, which can be transparent and traceable. This information can provide greater visibility of virtual asset transfers than off-chain transfers or transfers on private blockchains, including those carried out by VASPs, and assist in AML/CFT risk mitigation. For example, if the addresses that are used for P2P and peer-VASP transactions could be correctly linked, it will inform the development of risk profiles and identity attribution for unhosted wallets. This may grow over time as more transfers are recorded on public blockchains

124.  Accordingly, it is important that the P2P sector is kept under review, particularly as new virtual assets enter the market or pre-existing virtual assets reach mass-adoption. The ML/TF risks should be monitored in the ongoing and forward-looking manner. It is also important that jurisdictions understand the ML/TF risks and the potential to use analytic tools to mitigate risks associated with the P2P sector, the extent to which P2P transactions occur in their jurisdiction and potential blockchain native AML/CFT solutions. The limitations of this work should also be kept in mind. While this work included three virtual assets, they cannot be taken to be indicative of all virtual assets and their P2P usage and ML/TF risks.

125.  The research conducted by the seven companies for the FATF has provided a useful big picture on the market metrics of P2P transactions for the first time. The work has provided a baseline of information on the size of the P2P sector, while also revealing the challenges and limitations inherent in work of this kind focused on the P2P sector. Ideally this type of research would need coverage, timeliness, accuracy and reliability. On accuracy, the level of variation between the companies' data is extremely high. On coverage, the data used for this work does not generally include ML/TF activity that originates in fiat currency, other virtual assets, or may not include suspicious flows between different blockchains or virtual assets. There may be challenges for VASPs to identify and mitigate risks posed by transactions to/from non-obligated entities in a large number of daily transactions. Using multiple vendors, tools and methodologies may be a way to avoid biased results caused by over-reliance on one source of analysis.

126.  In addition, it is not currently known the extent to which ML/TF activity with virtual assets that derives from fiat currency is occurring. It also remains a relatively short time (two years) since the FATF revised its Standards and trends in terms of P2P and ML/TF may take several more years to become apparent.

127.  Hence, jurisdictions and private sectors need to consider ways to identify and mitigate risks posed by P2P in advance. The release of the revised Guidance by November 2021 will assist in providing more information on P2P risk and

mitigation, by providing guidance to jurisdictions on P2P transactions and the options they may wish to mitigate the ML/TF risks as appropriate.

## Travel rule implementation

128.  As set out in Section 3, there has not been sufficient progress in the global implementation of the travel rule. Two years after the FATF revised its Standards, the vast majority of jurisdictions have not introduced travel rule requirements. This has acted as a disincentive to the private sector, particularly many VASPs, to invest in the necessary technology solutions and compliance infrastructure to comply with the travel rule. Hence, while there has been progress in the private sector in the development of standards, protocols and technology solutions for travel rule compliance, there is still a substantial way to go for there to be sufficient technological solutions to enable the efficient and effective implementation of the travel rule globally.

129.  The lack of implementation by jurisdictions has given rise to the 'sunrise issue'. As identified in the first 12-month review, jurisdictions are implementing the travel rule at different speeds. Therefore, there will be a transitional period where some VASPs must comply with the travel rule, while others do not. This transitional period is a challenge for VASPs that have travel rule requirements, both in terms of potential competitive disadvantages and the approach they should take for the transfer of travel rule information with their unregulated counterparts. This is another reason that driving implementation of the travel rule by jurisdictions should be a near-term priority. A rapid increase in the number of implementing jurisdictions would greatly reduce the sunrise issue.

130.  The FATF will release updated Guidance that includes more information on the travel rule by November 2021. This Guidance should help provide further clarity for jurisdictions and the private sector on how to implement the travel rule and address the issues highlighted in the first 12-month review report.

131.  With this further clarification from the FATF, all jurisdictions should take action to implement the travel rule. Rapid implementation by all jurisdictions will act as the catalyst to promote the development of technical solutions and compliance by VASPs. Jurisdictions may implement the travel rule in a staged approach to ensure that their VASPs have sufficient notice to implement the necessary systems. For example, requirements may be introduced with a 'grace period' where the requirements are introduced but not yet enforced. Alternatively, jurisdictions may allow for the introduction of partial or temporary measures for a transitional period. Strong communication and cooperation between a jurisdiction and its VASP sector is essential to the successful introduction of travel rule requirements and management of the sunrise issue.

## Overall implementation

132.  Outside of the travel rule, there has been greater implementation of the broader AML/CFT regulatory regime for VASPs since the first 12 month review. As set out in Section 3, 74% of FATF members and 33% of reporting FSRB members reported that they have passed the necessary laws/regulations to permit or prohibit VASPs.

133.  While the rate of overall implementation is greater compared to the travel rule, there is not yet sufficient implementation to enable a global AML/CFT regime for

© FATF/OECD 2021

VASPs. Only 35 of the 58 jurisdictions that have AML/CFT regimes permitting or prohibiting VASPs have an operational regime. The level of implementation from the non-responding jurisdictions is also likely much lower. The lack of regulation or the lack of enforcement of regulation in jurisdictions is allowing for jurisdictional arbitrage. This is a risk as it disadvantages those VASPs that are complying with AML/CFT obligations while providing criminals and other illicit actors with channels for ML/TF activity.

134. All jurisdictions therefore must implement and enforce AML/CFT requirements for VASPs as soon as possible. The jurisdictions that have not implemented AML/CFT requirements for VASPs typically stated that they do not have any virtual asset activity or VASPs or they have limited capacity to introduce requirements. Accordingly, implementing the revised FATF Standards on virtual assets and VASPs is not a priority. This will be true for some jurisdictions, but it is unlikely that this is true for all non-implementing jurisdictions, and in any case, should be determined by a thorough and careful risk assessment. It will be a difficult claim to justify if a jurisdiction has not conducted a risk assessment or has not undertaken market research to understand their exposure to VASP activity. Virtual assets are readily accessible through the internet. The global nature of the underpinning technology of virtual assets and the ease and speed at which VASPs can establish or move operations around the world means that a jurisdiction which takes no action could become a 'safe haven' for unregulated VASPs.

135. Nonetheless, the FATF recognises that jurisdictions must prioritise reforms to their AML/CFT system in line with their identified ML/TF risks, pre-existing AML/CFT regime context and domestic institutional structure. Therefore, jurisdictions with capacity restraints may wish to prioritise certain aspects of implementation of R.15/INR.15. At the very least, such jurisdictions should understand the ML/TF risks associated with virtual assets and VASPs and their exposure to VASP activities. If they do not consider that they can effectively regulate VASPs, they should consider prohibiting VASPs through law while they develop this expertise, so they do not become a safe haven for unregulated VASPs. A jurisdiction that prohibits VASPs should ensure that it has the technical capacity and resources to enforce such a prohibition, to avoid driving the sector underground and making it even more opaque to authorities. To be clear, prohibiting VASPs does not exempt jurisdictions from their over-arching obligations to implement all parts of the FATF Standards. This is instead suggested a practical guidance to help build a more effective global system.

136. In implementing AML/CFT regimes for VASPs, the FATF and jurisdictions should be aware of the intersection and potential impact AML/CFT requirements have on other regulatory requirements and policy areas, such as data protection and privacy, financial inclusion, derisking, consumer and investor protection and financial innovation. The FATF is committed to financial inclusion and is aware that applying an overly rigid, rules-based approach to AML/CFT safeguards when providing financial services can have the unintended consequence of excluding legitimate consumers and businesses from the regulated financial system.[18]

---

[18]     See the FATF's 2017 Guidance on AML/CFT and financial inclusion for further information: www.fatf-gafi.org/media/fatf/content/images/Updated-2017-FATF-2013-Guidance.pdf

© FATF/OECD 2021

Accordingly, the FATF applies a risk-based approach to AML/CFT regulation, including of virtual assets and VASPs.

## Proliferation financing obligations

137. In October 2020, the FATF revised the Standards to require jurisdictions, FIs and DNFBPs to identify and assess the risks of potential breaches, non-implementation or evasion of the targeted financial sanctions (related to proliferation financing, and to take action to mitigate these risks. This involved revisions to Recommendation 1 (R.1) and its Interpretive Note on risk. During the discussion, delegations agreed to add proliferation financing obligations to R.1, and to R.15 in order to apply the corresponding obligations to VASPs at a later date following the 12-month review. With the end of the second 12-month review, the FATF should introduce the necessary technical amendments to INR.15 to align the proliferation financing obligations across FIs, DNFBPs, and VASPs.

© FATF/OECD 2021

**SECTION SIX:
FINDINGS AND NEXT STEPS**

138.  Overall, many jurisdictions and the VASP sector have continued to make progress in implementing the revised FATF Standards on virtual assets and VASPs. 74% of the FATF membership reported that they have now incorporated the revised FATF Standards into their domestic law and there has been some progress on technology solutions for the travel rule. However, challenges still remain. Many jurisdictions' AML/CFT regime for VASPs are not yet operational and some have not yet established regimes, particularly amongst the FATF's broader Global Network. The level of progress amongst non-reporting FSRB members also remains unknown.

139.  Similar to the first 12-month review, there is no need to amend R.15/INR.15 to address developments in the virtual asset sector. While there are many areas where both jurisdictions and the private sector seek further clarity, FATF's forthcoming revised Guidance on virtual assets and VASPs will assist jurisdictions and the private sector in implementing the revised FATF Standards. This revised Guidance will clarify FATF expectations around the most challenging issues relating to the revised FATF Standards, such as defining who is a VASP and implementing the travel rule. The FATF will need to monitor this area for any significant change to the market structure or ML/TF risk profile of virtual assets and VASPs, such as in relation to P2P transactions. If this occurs, the FATF should consider whether amendments to the revised Standards are warranted.

140.  Going forward, the FATF should prioritise promoting implementation of the revised FATF Standards by jurisdictions. All jurisdictions need to implement the revised FATF Standards, including travel rule requirements, as quickly as possible. Therefore, this review recommends the FATF undertake the following actions focused on virtual assets and VASPs:

a.  The FATF should focus on the effective implementation of the current FATF Standards on virtual assets and VASPs across the Global Network. Members of the FATF and its broader Global Network should implement the revised FATF Standards (R.15/INR.15) as a matter of priority. The FATF should publish its revised Guidance on virtual assets and VSAPs for the public and private sectors by November 2021. This will provide revised FATF Guidance on the definition of virtual asset and VASP, so-called stablecoins, P2P transactions, registration and licensing of VASPs, the travel rule and international co-operation amongst VASP supervisors, which will aid with implementation. FATF members, particularly those which are

© FATF/OECD 2021

Case 1:21-cr-00399-RDM   Document 122-2   Filed 05/19/23   Page 44 of 47

leaders in the field of AML/CFT regulation of VASPs, should work collaboratively with the private sector and with other jurisdictions to facilitate implementation. The VACG should also focus on supporting this implementation agenda and should place particular emphasis on actions to help mitigate the risk of ransomware-related virtual asset use. The VACG should engage with the private sector after the publication of the revised FATF Guidance and report to the FATF's Policy Development Group on progress in implementation by June 2022.

b.  The FATF should accelerate implementation of the travel rule by the private sector as a priority. To facilitate this, FATF members should implement the travel rule into their domestic legislation as soon as possible, including consideration of a staged approach to implementation as appropriate. FATF members, particularly those which are leaders in the field of AML/CFT regulation of VASPs, should work collaboratively with the private sector and each other to facilitate this. FATF members shall discuss implementation status through outreach by June 2022.

c.  The FATF should monitor the virtual asset and VASP sector for any material changes or developments that necessitate further revision or clarification of the FATF Standards, considering the fast changing business and technological environment including through its revised Guidance project While not further revising the Standards at this point in time, the FATF should introduce a technical amendment to INR.15 to reflect the changes to R.1 regarding proliferation financing.

© FATF/OECD 2021

## Annex 1.A. Recommendation 15 and its Interpretive Note and FATF Definitions

### Recommendation 15 – New Technologies

Countries and financial institutions should identify and assess the money laundering or terrorist financing risks that may arise in relation to (a) the development of new products and new business practices, including new delivery mechanisms, and (b) the use of new or developing technologies for both new and pre-existing products. In the case of financial institutions, such a risk assessment should take place prior to the launch of the new products, business practices or the use of new or developing technologies. They should take appropriate measures to manage and mitigate those risks.

To manage and mitigate the risks emerging from virtual assets, countries should ensure that virtual asset service providers are regulated for AML/CFT purposes, and licensed or registered and subject to effective systems for monitoring and ensuring compliance with the relevant measures called for in the FATF Recommendations.

### Interpretive Note to Recommendation 15

For the purposes of applying the FATF Recommendations, countries should consider virtual assets as "property," "proceeds," "funds," "funds or other assets," or other "corresponding value." Countries should apply the relevant measures under the FATF Recommendations to virtual assets and virtual asset service providers (VASPs).

In accordance with Recommendation 1, countries should identify, assess, and understand the money laundering and terrorist financing risks emerging from virtual asset activities and the activities or operations of VASPs. Based on that assessment, countries should apply a risk-based approach to ensure that measures to prevent or mitigate money laundering and terrorist financing are commensurate with the risks identified. Countries should require VASPs to identify, assess, and take effective action to mitigate their money laundering and terrorist financing risks.

VASPs should be required to be licensed or registered. At a minimum, VASPs should be required to be licensed or registered in the jurisdiction(s) where they are created.[19] In cases where the VASP is a natural person, they should be required to be licensed or registered in the jurisdiction where their place of business is located. Jurisdictions may also require VASPs that offer products and/or services to customers in, or conduct operations from, their jurisdiction to be licensed or registered in this jurisdiction. Competent authorities should take the necessary legal or regulatory measures to prevent criminals or their associates from holding, or being the beneficial owner of, a significant or controlling interest, or holding a management function in, a VASP. Countries should take action to identify natural or legal persons that carry out VASP activities without the requisite license or registration, and apply appropriate sanctions.

A country need not impose a separate licensing or registration system with respect to natural or legal persons already licensed or registered as financial institutions (as defined by the FATF Recommendations) within that country, which, under such license or

---

[19]   References to creating a legal person include incorporation of companies or any other mechanism that is used.

© FATF/OECD 2021

registration, are permitted to perform VASP activities and which are already subject to the full range of applicable obligations under the FATF Recommendations.

Countries should ensure that VASPs are subject to adequate regulation and supervision or monitoring for AML/CFT and are effectively implementing the relevant FATF Recommendations, to mitigate money laundering and terrorist financing risks emerging from virtual assets. VASPs should be subject to effective systems for monitoring and ensuring compliance with national AML/CFT requirements. VASPs should be supervised or monitored by a competent authority (not a SRB), which should conduct risk-based supervision or monitoring. Supervisors should have adequate powers to supervise or monitor and ensure compliance by VASPs with requirements to combat money laundering and terrorist financing including the authority to conduct inspections, compel the production of information, and impose sanctions. Supervisors should have powers to impose a range of disciplinary and financial sanctions, including the power to withdraw, restrict or suspend the VASP's license or registration, where applicable.

Countries should ensure that there is a range of effective, proportionate and dissuasive sanctions, whether criminal, civil or administrative, available to deal with VASPs that fail to comply with AML/CFT requirements, in line with Recommendation 35. Sanctions should be applicable not only to VASPs, but also to their directors and senior management.

With respect to preventive measures, the requirements set out in Recommendations 10 to 21 apply to VASPs, subject to the following qualifications:

a) R.10 – The occasional transactions designated threshold above which VASPs are required to conduct CDD is USD/EUR 1 000.

b) R.16 – Countries should ensure that originating VASPs obtain and hold required and accurate originator information and required beneficiary information[20] on virtual asset transfers, submit[21] the above information to the beneficiary VASP or financial institution (if any) immediately and securely, and make it available on request to appropriate authorities. Countries should ensure that beneficiary VASPs obtain and hold required originator information and required and accurate beneficiary information on virtual asset transfers, and make it available on request to appropriate authorities. Other requirements of R.16 (including monitoring of the availability of information, and taking freezing action and prohibiting transactions with designated persons and entities) apply on the same basis as set out in R.16. The same obligations apply to financial institutions when sending or receiving virtual asset transfers on behalf of a customer.

Countries should rapidly, constructively, and effectively provide the widest possible range of international co-operation in relation to money laundering, predicate offences, and terrorist financing relating to virtual assets, on the basis set out in Recommendations 37 to 40. In particular, supervisors of VASPs should exchange information promptly and constructively with their foreign counterparts, regardless of the supervisors' nature or status and differences in the nomenclature or status of VASPs.

---

[20] As defined in INR. 16, paragraph 6, or the equivalent information in a virtual asset context.

[21] The information can be submitted either directly or indirectly. It is not necessary for this information to be attached directly to virtual asset transfers.

© FATF/OECD 2021

**FATF Glossary**

A **virtual asset** is a digital representation of value that can be digitally traded, or transferred, and can be used for payment or investment purposes. Virtual assets do not include digital representations of fiat currencies, securities and other financial assets that are already covered elsewhere in the FATF Recommendations.

**Virtual asset service provider** means any natural or legal person who is not covered elsewhere under the Recommendations, and as a business conducts one or more of the following activities or operations for or on behalf of another natural or legal person:

i.   exchange between virtual assets and fiat currencies;

ii.  exchange between one or more forms of virtual assets;

iii. transfer[22] of virtual assets;

iv.  safekeeping and/or administration of virtual assets or instruments enabling control over virtual assets; and

v.   participation in and provision of financial services related to an issuer's offer and/or sale of a virtual asset.

---

[22]   In this context of virtual assets, transfer means to conduct a transaction on behalf of another natural or legal person that moves a virtual asset from one virtual asset address or account to another.

© FATF/OECD 2021