**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **Criminal No. 21-cr-399 (RDM)** |
| | : | |
| **ROMAN STERLINGOV,** | : | |
| | : | |
| **Defendant.** | : | |

**GOVERNMENT'S OPPOSITION TO DEFENDANT'S**
**NOTICE OF INTENT TO PRESENT EXPERT TESTIMONY**

The United States of America, by and through its counsel, the United States Attorney for the District of Columbia, respectfully opposes the defendant's "Notice of Intent to Present Expert Testimony," ECF No. 122. The defense openly forswears compliance with the 2022 Amendment to Fed. R. Crim. P. 16, fails to disclose the actual substance or basis of its proposed experts' testimony, purports to notice "experts" for areas of testimony in which they lack sufficient—or, in some cases, any apparent—experience, and notices multiple areas of testimony that are not relevant nor admissible under Fed. R. Evid. 401 or 702. This inadequate filing rife with vague and conclusory statements makes it difficult, if not impossible, for the government to adequately prepare for trial, much less the *Daubert* hearing that is now just weeks away. If the defense fails to immediately supplement its notice with a filing and/or reports that satisfy the requirements of Fed. R. Evid. 702 and 703, and Rule 16(b)(1)(C) of the Federal Rules of Criminal Procedure, the court should preclude the purported "experts" from testifying at trial. Even if such a disclosure is promptly made in advance of the upcoming *Daubert* hearing, the court should limit or exclude much of the proposed defense testimony, as it is irrelevant to any factual issue before the jury.

## PROCEDURAL HISTORY

On July 1, 2022, the court scheduled a trial in this matter for January 4, 2023.  On October 24, 2022, the government filed a notice of intent to present expert testimony, setting out in detail the expected testimony of the government's proposed experts.  ECF No. 61.  This notice was supplemented by detailed expert reports and additional documents provided in discovery.  On December 2, 2022, based on the defendant's motion and over the government's objection, trial was continued until September 14, 2023.  *See* Minute Entry (Dec. 2, 2022).  A *Daubert* hearing was rescheduled for April 12, 2023, *id.*, and then subsequently rescheduled to June 16 and 23, 2023.  *See* Minute Order (Jan. 25, 2023).  The Court ordered both parties to file their expert notices no later than May 19, 2023.  *Id.*  On that date, the government filed an amended expert disclosure, complying with amendments to Fed. R. Crim. P. 16 and incorporating by reference detailed reports that were provided to defense.  ECF No. 124.  The defense filed its own expert notice, purporting to notice five experts for a hodgepodge of overlapping topics, with "opinions" expressed as conclusory assertions.  ECF No. 122.

## ARGUMENT

### A.  *Defense Must Provide Details of Proposed Experts Pursuant to Amended Rule 16*

The present version of Rule 16 governing expert disclosures in criminal cases went into effect on December 1, 2022.  In transmitting the amended rule to Congress, the Supreme Court stated that the Amendment "shall govern in all proceedings in criminal cases thereafter commenced and, insofar as just and practicable, all proceedings then pending."  Fed. R. Crim. P. 16 Submission Letter, from Justice John Roberts to the Hon. Nancy Pelosi and the Hon. Kamala Harris, April 11, 2022.  This language conveyed the clear intention that, absent extenuating circumstances, the Rule should be applied to cases pending at the time that the amendment went

into effect.  This logically follows from the amendment's stated purpose, which was to cure perceived deficiencies of expert notices in practice.  *See* Advisory Committee on Criminal Rules, Report of the Advisory Committee on Criminal Rules at 4 (June 1, 2021).  The defense provides no reason why the amended rule, which has been in effect since December 2022, should not control in this case.

The defense claims that it would "not be just" to require the defense to adhere to the current version of Fed. R. Crim. P. 16.  The amended Rule 16 provisions pertaining to expert disclosures went into effect over 6 months ago, and over 9 months prior to the scheduled trial date in this matter.  The amendment's implementation came as no surprise, as the rule change and proposed effective date were submitted to Congress on April 11, 2022—before a trial date had even been set in this matter.  Fed. R. Crim. P. 16 Submission Letter, from Justice John Roberts to the Hon. Nancy Pelosi and the Hon. Kamala Harris, April 11, 2022.  By the time this case was set for trial on July 1, 2022, the impending amendment was well-known and discussed among both prosecutors and defense counsel.

Defense argues that it is not "just and practicable" to apply the amended rule "because the Defense began working on expert testimony before this Amendment came into effect."  ECF No. 122, at 3.  However, with the exception of Mr. Fischbach, the defense "experts" were engaged *after* the new rule went into effect.[1]  Indeed, the defense argued for a trial continuance on the ground that it needed additional time to identify and retain experts.  ECF No. 83 (Def. Mot. To Continue Trial), at 4 ("[T]he Defense needs time to find its own experts and notice the Government

---

[1] The prior defense "experts" retained for earlier stages in the proceeding, Mr. Eric Garland and Mr. Chris Vickery, *see* ECF No. 48-1 (Vickery Decl.); ECF No. 48-2 (Garland Decl.), are evidently no longer expected to testify at trial, as they were not included in the defense notice nor was Rule 16-compliant notice of their testimony otherwise provided.

accordingly.  And the Government will need it's [sic] time to respond to the Defense's notice of

experts.").   The defense reiterated its challenges in identifying experts at the *Monsanto* hearings

in January 2023, advising that the defense needed funds to be released in order to retain experts:

> THE COURT: And the experts have done a fair amount of work to date already, correct?
>
> MR. EKELAND: I haven't gotten the blockchain forensics experts I need because I can't afford it. I've had experts in that I was unhappy with, and they left, and I wasn't happy with the quality of the work. … I've started to talk to experts at a company called Breadcrumbs, which is a Chainalysis competitor, and they're quoting me anywhere something on the low end of $25,000 to like a quarter of a million.

1/13/23 Tr. at 8:21-9:9.  The defense further emphasized that it needed funds to pay Mr. Fischbach,

suggesting that Mr. Fischbach's review was, at best, still in progress.  1/31/23 Tr. at 130:18-20 ("I

know Mr. Fischbach won't work on this case for CJA rates given its complexity and the amount

of hours required.").  Even if that were not the case, the defense has had more than ample time in

the intervening months to prepare an expert notice that conforms to the requirements of the

amended rule.

Furthermore, the defense has been on notice since at least January 2023 that the

government intended to adhere to the requirements of the amended rule in the instant case, and has

not voiced any opposition to such an approach.  On January 10, 2023, the defense purported to

notice Mr. Fischbach as an expert for the January *Monsanto* hearing and for a future *Daubert*

hearing and trial.  ECF No. 107.  The government filed an opposition, including its objection that

the notice was so lacking in detail that it was woefully insufficient to notice testimony at trial under

Rule 16.  ECF No. 111.  In that filing, the government explained that the new rules should govern

the disclosures in this matter:

> In light of the continuance of the trial from January 2023 to September 2023—at the defendant's request and over the government's objection—and given that the

> defense appears to be only in the preliminary stages of engaging potential experts, the government submits that it is just and practicable to require adherence to the amended rule. In anticipation of the amendment, the government's blockchain analysis reports were crafted to comply with the updated text. To the extent the government's other expert notices, filed in October 2022, failed to include the experts' signatures and a detailed listing of their prior testimony and publications as required by the amended rule, the government will supplement the disclosures prior to trial.

ECF No. 111, at 7-8 n. 2.  The defense can hardly be surprised at being expected to adhere to the amended rule.

The defense asserts that applying the amended rule is unjust because the defense needed to "search for funding for the case, and volunteers to staff it.  Without funds to properly staff the case, the transaction time for everything increases."  ECF No. 122, at 3.  It is not at all clear what bearing "transaction time" has on the defense's ability to make fulsome, reciprocal disclosure of its expert testimony pursuant to the Federal Rules of Criminal Procedure.  And this claim is difficult to square with the fact that this Court has made public funding available to the defense through appointment under the Criminal Justice Act (CJA).  ECF No. 118.  Indeed, the defense has had sufficient time following the December 2022 trial continuance (over the government's objection) to embark on a world tour of podcasts, media appearances, and public speaking engagements to make inaccurate claims about this case.

Tellingly, the defense argues that it should not have to adhere to the new rule because, "The Firm made trial strategy decisions under the rubric of the then current version of Rule 16."  ECF 122 at 3.  As noted above, the defense could not have been ignorant of the impending Rule update at the time this case was set for trial.  The only "trial strategy decision" that would explain the defense's refusal to adhere to the amended rule is a "trial strategy" to impermissibly surprise the government at trial – and to disrupt the proceedings by requiring time, mid-trial, to litigate the competence, admissibility, relevance, and permissible scope of the expert testimony.  Such

"insufficient pretrial disclosure of expert witnesses" is precisely the conduct that the Rule was intended to guard against. *See* Advisory Committee on Criminal Rules, Report of the Advisory Committee on Criminal Rules at 4 (June 1, 2021); *see also* Fed. R. Crim. P. 16 advisory committee's note to 2022 amendment ("[The amended rule] is intended to facilitate trial preparation, allowing the parties a fair opportunity to prepare to cross-examine expert witnesses and secure opposing expert testimony if needed."). As the D.C. Circuit has noted in upholding the exclusion of defense experts, "the purpose of Rule 16(b)(1)(C) is to 'minimize surprise that often results from unexpected expert testimony, reduce the need for continuances, and to provide the opponent with a fair opportunity to test the merit of the expert's testimony through focused cross-examination.'" *United States v. Day*, 524 F.3d 1361, 1372 (D.C. Cir. 2008) (quoting Fed. R. Crim. P. 16 advisory committee's note (1993 amendments)).

### B. *Defense Filing Is Insufficiently Detailed Under Either Version of Rule 16*

Whichever version of Rule 16 is applied, the defense disclosure filed at ECF 122 falls far short. The defense disclosure enumerates general topics of testimony but largely fails to specify what the experts are actually going to say about the topics, much less the bases and reasons for any such opinions. This contravenes Fed. R. Crim. P. 16, which requires parties to make fulsome disclosures pertaining to their proposed expert witnesses in advance of trial. Fed. R. Crim. P. 16. Paralleling requirements for government disclosures, the current version of the rule requires that the defense disclose "a complete statement of all opinions that the defendant will elicit from the witness in the defense's case in chief" and "the bases and reasons for them." *Id.* Even the old version of the rule required that disclosures include "a written summary" of the expected testimony, including the expert's opinions and the bases and reasons for them. Fed. R. Crim. P. 16 (2013) (amended 2022). The defense notice falls far short of *either* version of the rule.

The defense notice simply sets forth in vague and conclusory language bold allegations that the defense intends to make concerning the government's case and the evidence. However, the notice fails to explain what the experts have actually *found* and their bases for their determinations. This serious defect renders it impossible for the government to evaluate the defense's proposed expert testimony, determine which areas of testimony merit a full *Daubert* challenge, prepare appropriately for cross-examination, or identify rebuttal witnesses for trial. Even the old version of Rule 16 "requires a summary of the expected testimony, not a list of topics." *United States v. Duvall*, 272 F.3d 825, 828 (7th Cir. 2001). Without an adequate disclosure, the court cannot assess whether the expert findings are "based on sufficient facts or data," whether they are "the product of reliable principles and methods," and whether the expert "reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702(b)-(d); *see, e.g.*, *United States v. Mosquera-Murillo*, 153 F. Supp. 3d 130, 209 (D.D.C. 2015) (sentence vacated on other grounds). If the defense cannot make such a showing, the proposed defense experts should be precluded from testifying.

For example, the defense provides notice that Mr. Scott will "explain why Chainalysis's and the Government's investigation was flawed from its outset." ECF No. 122, at 19. This is an intentionally provocative conclusory statement, but it fails to explain what *expert insight* Mr. Scott is going to provide, and what principles or methods he applied to come to his conclusion. (The government separately argues below that such empty commentary, made by individuals unfamiliar with law enforcement investigations and lacking the appropriate expertise or basis for such a finding, should be excluded under Rules 401, 402, and 702.) The defense's disclosure reads as a series of headlines, encouraging the reader to wonder what lies behind each salacious assertion

and conspiracy theory.  However, that is not the purpose of an expert disclosure, and is not sufficient to satisfy the expert disclosure requirements of Rule 16.

Indeed, the purported areas of expert testimony appear to be copied and pasted virtually word for word from one defense expert to the next.  The defense claims, for example, that Mr. Fischbach (a computer forensics technician), Mr. Scott (a purported information security specialist), and Mr. Verrett (a law professor) will all testify identically about "what is involved in operating a .onion site and custodial mixer like Bitcoin Fog," including "the need for constant maintenance of the site" and "the staffing requirements to run an enterprise like Bitcoin Fog." ECF No. 122, at 15, 21-22, 29-30.  (Of course, this is setting aside whether there even is a field of expertise or a reliable principle method that would yield an opinion, admissible under Rule 702, about what is "needed" to run a criminal mixer enterprise.)  The same three defense experts are also supposed to testify identically about subjects as diverse as Mt. Gox data and blockchain tracing; Mr. Fischbach and Mr. Scott about government contracting procedures; and Mr. Scott and Mr. Verrett about the defendant's Kraken account.  *Id.* At 13-14, 16, 18-19, 21-22, 24-26.  This copy-and-paste approach raises significant questions about whether these experts have actually reviewed the defense disclosures and are prepared to offer mirror-image expert testimony about such wide-ranging subjects—and whether each applied reliable principles and methods sufficient to reach such conclusion.  The government is entitled to *voir dire* each defense expert to determine whether the defense disclosure is accurate and to discover what the witnesses' actual opinions and reasons/bases really are.

i.   *Defense Blockchain Analysis*

Perhaps most egregiously, the defense makes numerous references to "the Defense's blockchain tracing" and indicates that multiple defense experts have conducted tracing using other

blockchain analysis software tools—"OXT," a known open-source blockchain analysis platform, as well as "other forensic tracing software"—which they claim "fails to verify" the Government's analysis.  ECF No. 122, at 6 (Dr. Cabañas), 14 (Mr. Fischbach), 18 (Mr. Scott), 26 (Mr. Verret). The defense claims that Mr. Scott "will discuss his efforts to replicate the Government's tracing methods for crucial aspects of their case."  *Id.* at 17.  Yet the defense has not produced any record of such efforts—no report from Mr. Scott or anyone else on the case setting out the defense's supposed alternative tracing.   The defense also claims that it will present evidence that the government's clustering methodologies "can result in multiple different outcomes," but does not identify what those outcomes are, or even specify whether these have any relation to Mr. Sterlingov or the tracing at issue in this case.  *Id.* at 13 (Mr. Fischbach).  Similarly, the defense claims that Dr. Cabañas "will explain how different blockchain forensic tracing softwares make contradictory cluster attributions for identical addresses," *id.* at 6, but provides no further details regarding the specifics of the testimony or Dr. Cabañas' methodology for making such an assessment.  The defense to date has failed to produce any such tracing, analysis, or report to the government, despite an obligation to do so under Rule 16.  This stands in contrast to the significant discovery of blockchain analysis and reports that the government has provided to the defense to comply with its obligations under Rule 16.[2]

The defense blockchain analysis disclosure appears nearly identical across multiple defense witnesses—a deficiency repeated in other areas of the defense filing.  The structure of the defense notice suggests that multiple experts will testify to this analysis and the purported findings;

---

[2] The government's blockchain analysis is detailed in extensive discovery, including numerous charts, spreadsheets, and graphs, a 65-page report from government expert Luke Scholl and a 29-page report from government expert Beth Bisbee, each accompanied by voluminous records set forth in attachments.

it is unclear whether this is the defense's true intention or an unintended product of the defense's copy-paste practice obscuring which expert will testify to which finding.  Indeed, if the defense expert notice is to be taken at face value, the government should have received records showing tracing conducted individually by Dr. Cabañas, Mr. Fischbach, Mr. Scott, and Mr. Verret, on OXT and other unnamed tracing platforms, all supporting the same supposed conclusions.  The government again renews its demands for reciprocal discovery under Rule 16.  If the defense continues to fail to adhere to the rule, it should be precluded from putting forth such testimony at trial.

ii.     *Beta Test Transactions*

The defense disclosure claims that the defense will offer an alternative explanation for Mr. Sterlingov's early beta transactions with Bitcoin Fog, but the defense refuses to state what that alternative explanation actually is.  The defense claims that multiple experts will "explain that there are multiple possible results for the Government's and Chainalysis's forensics attributing the purported beta transactions to Mr. Sterlingov."  ECF No. 122, at 7 (Dr. Cabañas), 15 (Mr. Fischbach), 20 (Mr. Scott).  The defense claims that Mr. Verret will testify to "how the transactions which the government describes with that phrase are unlikely to represent testing of a privacy mixer, and how there are multiple other reasonable explanations for what motivated those transactions."  *Id.* at 25.  But the defense disclosure does not identify those "multiple possible results" or "multiple other reasonable explanations."  Nor does the defense explain how those purported opinions are the "product of reliable principles and methods," Fed. R. Evid. 702(c), and thus even admissible opinions under the Rule.

### iii.  *Statistical Analysis*

The defense notice suggests that Dr. Cabañas has conducted a statistical assessment of blockchain analysis.  ECF No. 122, at 8 ("The Defense expects Dr. Cabañas to testify to the statistical difficulties with calibrating blockchain forensics … He will explain the mathematical difficulties of properly calibrating the false positive rate of the Government's digital forensics. … The Defense expects Dr. Cabañas to testify to the mathematical issues of the different probabilistic blockchain heuristic methodologies used for tracing.").  This disclosure merely states Dr. Cabañas' supposed *conclusions* in the most general terms, without providing any insight into their details or the basis for them, or Dr. Cabañas' methodology in making his assessment.  The government has received no additional information from the defense regarding Dr. Cabañas' work on the case.  If Dr. Cabañas has in fact conducted a statistical analysis of the government's blockchain analysis, the defense should produce it forthwith so that the government can assess the basis for the finding, prepare for cross-examination, and identify and prepare an appropriate rebuttal witness.  If no such study has been done, then the defense has failed to show that there is sufficient basis for Dr. Cabañas' testimony or that he has employed a sound methodology, and he should be precluded from testifying at trial.

The defense disclosure also references supposed statistical assessments conducted by Mr. Scott,[3] claiming that Mr. Scott "will explain why the heuristic clustering methodologies employed by the Government and Chainalysis are subject to a significant amount of statistical bias."  ECF No. 122, at 21.  Again, if Mr. Scott has conducted any sort of study regarding statistical bias in the government's blockchain analysis, the defense must produce it to the government under Rule 16.

[3] Furthermore, Mr. Scott does not appear to have the requisite education, expertise, or experience in statistics to make such an analysis, discussed further in section D, below.

If no such assessment has been done, Mr. Scott has no basis to testify to it as such. And if the defense cannot or will not produce Mr. Scott's work to the government, the defense should be barred from presenting it at trial.

The defense similarly claims that Mr. Verret will "explain how the clustering methodologies and heuristic techniques applied in this investigation are often in error." ECF No. 122, at 27. The defense does not provide any further information about this line of testimony. It is unclear—though seems improbable—that Mr. Verret has conducted any sort of study regarding error rates in blockchain analysis. Claiming that the techniques "applied in this investigation" are "often" in error begs the question of what techniques Mr. Verret has included in his assessment and how Mr. Verret defines "often." No such detail is included in the defense filing. Similarly, it is highly unclear what Mr. Verret's basis is for concluding that "clustering is only applicable for generating leads, is far too speculative to prove anything specific, and cannot be relied upon to accurately identify a specific cryptocurrency user." *Id.* at 27.

iv.     *Additional Areas of Testimony*

The issues with the defense's vague, ambiguous testimony description continue throughout the notice and are not limited to the specific areas annotated above. For example, the defense submits that Mr. Scott[4] and Mr. Verret will "explain how the deposits, withdrawals, and trades are inconsistent with the Government's service fee payment theory." ECF No. 122, at 20 (Mr. Scott), 24 (Mr. Verret). If the defense intends for their experts to testify such a conclusion, the defense must explain the experts' alternative theory and explanation. The defense indicates vaguely that Dr. Dror will testify to "evidence of confirmation bias from the Government's discovery." ECF

---

[4] Furthermore, Mr. Scott lacks the needed qualifications or basis for making such a financial assessment.

No. 122, at 11.  To satisfy the requirements of Rule 16, the defense must identify what this supposed evidence *is*; no such clues are available outside the defense's hand-waving remarks.

Mr. Fischbach's, Mr. Verret's, and Mr. Scott's anticipated testimony all supposedly include insight into "the staffing requirements to run an enterprise like Bitcoin Fog" and other aspects of operating a custodial cryptocurrency mixer.  ECF No. 122, at 15 (Mr. Fischbach), 21 (Mr. Scott), 30 (Mr. Verret).  The defense does not identify what Mr. Fischbach's, Mr. Scott's, or Mr. Verret's opinions actually *are* regarding staffing requirements, or what insight they intend to share about operating a mixer.  (Nor are any of the witnesses qualified to make any such assessment, as discussed further below.)

The defense claims that Mr. Scott will "explain how the Mt. Gox data has been distorted" and will "explain why the Mt. Gox data cannot be relied upon to derive accurate results." ECF No. 122, at 21.  But the filing provides no hint as to what Mr. Scott's findings are or the basis for Mr. Scott's supposed familiarity with Mt. Gox.  The defense notice of Mr. Fischbach and Mr. Verret's proposed testimony regarding Mt. Gox suffers from the same flaw.  *See id.* at 13 (Mr. Fischbach), 25-26 (Mr. Verret).  The defense also claims that Mr. Scott "will explain the benefits of using mixing services."  *Id.* at 19.  The defense should enumerate the "benefits" on which Mr. Scott intends to opine, so that the government can appropriately prepare to rebut the assertion.

v.    *Rebuttal*

The defense notice indicates that multiple defense witnesses will testify "in rebuttal to the Government's anticipated expert testimony," ECF No. 122, at 8 (Dr. Cabañas), 11 (Dr. Dror), 16 (Mr. Fischbach), 22 (Mr. Scott), 30 (Mr. Verret), but does not provide any detail as to *what* the defense experts will actually say.  The government has made fulsome, detailed disclosures of its anticipated expert testimony, and defense has vigorously challenged the government's findings in

numerous filings; the defense can hardly claim to be ignorant of the subject matter or details of the government's expert testimony.  Rule 16 requires the defense to provide a detailed statement regarding its anticipated expert testimony; the defense cannot simply state that their expert will disagree with the government's experts with no further detail, which is in effect what the defendant has noticed in his filing.

### C. *Defendant Fails to Show (or Even Attempt to Show) How the Proposed Testimony Is Admissible Under Rule 702*

Proposed expert testimony must be admissible under the standards of Rule 702, which requires a proponent to meet four factors:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

In particular, the Rule 702 exception to the general restriction on opinion testimony requires that the expert demonstrate they reached the proposed opinion using reliable principles and methodology:

> The inquiry must focus on principles and methodology rather than on the conclusions they generate. *Daubert*, 509 U.S. at 595; *Ambrosini v. Labarracrue*, 101 F.3d 129, 140 (D.C. Cir. 1996); *Raynor v. Merrell Pharm. Inc.*, 104 F.3d 1371, 1375 (D.C. Cir. 1997). Trial courts must make certain that an expert 'employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.' *Kumho Tire Co.*, 526 U.S. at 152, 119 S.Ct. 1167. Expert testimony that rests solely on 'subjective belief or unsupported speculation' is not reliable. *Daubert*, 509 U.S. at 590. A court may refuse to admit expert testimony if it concludes that 'there is simply too great an analytical gap between the data and the opinion-proffered.' *Gen. Electric Co.*, 522 U.S. at 146.

*United States v. Rogers*, No. CRIM.A. 05-292(RWR), 2006 WL 5249745, at *5 (D.D.C. July 17, 2006) (quoting *Groobert v. Georgetown College*, 219 F.Supp.2d 1, 6 (D.D.C.2001)); *see also United States v. Smith*, No. CR 19-324 (BAH), 2020 WL 5995100, at *24 (D.D.C. Oct. 9, 2020) ("the party offering the expert need not prove that the expert's opinions are correct but rather that the expert is a qualified person who has reached her opinions in a methodologically reasonable manner.") (citations omitted); *Walen v. United States*, No. CV 15-1718 (BAH), 2019 WL 4261160, at *14 (D.D.C. Sept. 9, 2019) ("[T]he party offering the expert need not prove that the expert's opinions are correct but rather that the expert is a qualified person who has reached his opinions in a methodologically reasonable manner.") (citations omitted).

In *Rogers*, the District Court properly excluded proposed defense expert testimony. *Id*. at *5 ("the defendant has presented no factual evidence about standards [the expert] applied to make his assessments, how they are subject to verification or review, why they are reliable, or the known or potential rate of error in employing his assessment methods."). Likewise, the Circuit found proposed defense expert testimony properly excluded when the defense "proffer failed to clarify the basis for and reliability of [the expert's] testimony" and thus "failed to meet the basic requirements of Rule 702." *United States v. Bostick*, 791 F.3d 127, 151 (D.C. Cir. 2015).

Notably, in *United States v. Day*, 524 F.3d 1361, 1371 (D.C. Cir. 2008), the Circuit found no error, noting that "the District Court did not abuse its discretion when it excluded [proposed defense expert] testimony" for several reasons: First, that the defense expert's "report did not meet the requirements of Rule 16" which "made it virtually impossible for the Government to engage in meaningful cross-examination at the *Daubert* hearing." *Id*. at 1371-72. Second, the District Court there did not abuse its discretion to conclude that the appropriate sanction for the Rule 16 violation was exclusion of the testimony. *Id*. at 1372. There, the District Court noted it did not

believe the defense counsel had acted in good faith—and the Circuit affirmed, adding that, "in order to justify the exclusion of evidence as a sanction for failure to comply with a discovery rule, the trial judge *need not* find that the noncomplying counsel acted in 'bad faith.'" *Id*. at 1372 (citing *United States v. Johnson*, 970 F.2d 907, 911 (D.C. Cir. 1992). As *Day* noted, "[t]he Supreme Court has held that exclusion of evidence and testimony can be a proper sanction, even against a criminal defendant." *Id.* at 1372 (citing *Taylor v. Illinois*, 484 U.S. 400, 414–16 (1988)). *See also United States v. Anderson-Bagshaw*, 509 F. App'x 396, 411 (6th Cir. 2012) (no abuse of discretion in excluding expert where the defense "failed to specify the bases for [the expert's] opinions"); *United States v. Concessi*, 38 F. App'x 866, 868 (4th Cir. 2002) (no abuse of discretion in excluding expert where defense "failed to describe the witnesses opinions or provide the bases and reasons for the witnesses' opinions."); *see generally United States v. Ulbricht*, No. 14-CR-68 KBF, 2015 WL 413318, at *5 (S.D.N.Y. Feb. 1, 2015), *aff'd*, 858 F.3d 71 (2d Cir. 2017) (collecting cases for the propositions that "[a] failure to provide timely disclosure can result in preclusion" and "a failure to provide the required level of detail as to the expert's opinions and the bases, reasons, and sources of those opinions can also lead to preclusion").

Similarly, here, nowhere in defendant's filing does the defense purport to show, much less recognize the requirement that they meet, the obligation under Rule 702(c) in this regard—for any of the proposed experts or any of their proposed categories of opinion testimony. Nor does the defense show how any of the proposed opinions are—as Rule 702(d) requires—the product of "reliably appl[ying]" those non-existent principles and methods to the facts of the case. As the proponent of the expert evidence, the defense should be required to file a supplemental expert notice and be prepared to carry their burden of establishing the admissibility requirements under Rule 702(c) and (d).

**D.** *Certain Proposed Testimony Is Not Relevant And Should Be Excluded Under Rules 702, 402, and 403*

Further, expert testimony, like any testimony presented at trial, must be relevant.  Under Rule 401, evidence is relevant if it "has any tendency to make a fact more or less probable than it would be without the evidence," *and* "the fact is of consequence in determining the action." Fed. R. Evid. 401.  *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 587 (1993) (defining relevant evidence as that which has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.").  "Evidence which is not relevant is not admissible." Fed. R. Evid. 402. Expert testimony is specifically permissible where it "will help the trier of fact to understand the evidence or to determine a fact in issue."  Fed. R. Evid. 702.  *See United States v. Eiland*, No. 04-379 RCL, 2006 WL 2844921, at *5 (D.D.C. Oct. 2, 2006), *aff'd*, 738 F.3d 338 (D.C. Cir. 2013). The testimony offered by the expert "must be sufficiently related to the facts of the case such that it will aid the jury in resolving the factual dispute."  *Lauzon v. Senco Prods., Inc.*, 270 F.3d 681, 694 (8th Cir. 2001) (citing *Daubert*, 509 U.S. at 591).  The trial judge is charged with "ensuing that the expert's testimony both rests on a reliable foundation *and is relevant to the task at hand.*"  *Daubert,* 509 U.S. at 582 (1993) (emphasis added).  *See also Vadala v. Teledyne Indus., Inc.*, 44 F.3d 36, 39 (1st Cir. 1995).

In analyzing whether an expert's opinion is sufficiently related to the facts of the case, instead of being a mere assertion without proof, the Supreme Court has observed, "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *GE v. Joiner*, 522 U.S. 136, 146 (1997).  That is, an analysis of relevancy cannot be limited to an assertion by the expert or defense counsel that the expert's perspective pertains to an issue that the defense seeks to raise,

absent actual relevance.   Similar to the analysis for determining whether anticipated expert testimony is reliable, the Court, as gatekeeper, must assess whether an expert's proposed testimony would make a fact in consequence more or less probable.   This requires application of specific facts of the case and surrounding circumstances.   Numerous defense experts' opinions set forth in the defense filing are not sufficiently related to the facts of this case and lack any tendency to make the existence of a fact of consequence—to wit, whether the defendant operated Bitcoin Fog as a money laundering and money transmitting platform—more or less probable than it would be without the evidence.Multiple areas of noticed testimony have no bearing on the instant facts of this case and would not assist the jury in its efforts to understand the evidence or to determine a fact in issue.   In particular, the court should preclude as not relevant:

- General testimony regarding "confirmation bias" in law enforcement;

- Testimony regarding federal contracting processes, or government procurement of Chainalysis Reactor software;

- Discovery disputes[5] (*see, e.g.*, ECF No. 122, at 14 ("[Mr. Fischbach] will explain how review and analysis of the source code of Chainalysis Reactor and all digital blockchain forensic programs used in this case is necessary for Mr. Sterlingov to challenge his accusers and mount a complete defense.")); and

- Testimony regarding the cryptocurrency exchange FTX.

The testimony of Dr. Dror should be excluded or significantly limited, as it is largely irrelevant to the issues at trial and risks confusing the issues, and impermissibly encroaches on the

---

[5] As explained in the Government's Motion *In Limine* To Preclude Certain Impermissible Defense Arguments and Evidence, ECF No. 65, issues relating to discovery are irrelevant to the guilt or innocence of the defendant and are likely to distract the jury. *See* ECF No. 65, at 10 (collecting cases).

role of the jury.   The defense asserts that Dr. Dror will highlight supposed "confirmation bias" by the government and "will explain how miscarriages of justice and misleading evidence highlight human error as an issue within forensic science."  ECF No. 122, at 11.  Such testimony is designed by the defense to confuse and inflame the jury and are not proper areas of expert testimony under Rule 702.  The defense can cross-examine the government's witnesses regarding any potential errors that the defense alleges exist in their analysis.  Allowing a witness to make generic and sweeping statements about "miscarriage of justice" serves only to appeal to jurors' emotions and raises the same issues and concerns that the government highlighted in its Motion *In Limine* to Preclude Certain Impermissible Defense Arguments and Evidence, ECF 65.  "Exclusion based on unfair prejudice is particularly important in the case of expert evidence, which 'can be both powerful and quite misleading because of the difficulty in evaluating it.'" *United States v. Mosquera-Murillo*, 153 F. Supp. 3d 130, 209 (D.D.C. 2015) (quoting *Daubert*, 509 U.S. at 595).  Furthermore, testimony from Dr. Dror's that the government investigators in this case suffered from confirmation bias would constitute impermissible expert commentary on the credibility of other witnesses' testimony.  "Expert testimony should not be permitted if it concerns a subject improper for expert testimony, for example, one that invades the province of the jury." *United States v. Binder*, 769 F.2d 595, 602 (9th Cir. 1985).  "The jury, not the expert, evaluates credibility." *Mar Oil Co. v. Korpan*, 973 F. Supp. 2d 775, 786-87 (N.D. Ohio 2013); *see also Greenwell v. Boatwright*, 184 F.3d 492, 496 (6th Cir. 1999).

While the defense will have an appropriately robust opportunity to probe the government's blockchain analysis in this matter, areas of the defense disclosure discussing Chainalysis go far beyond anything relevant to the jury's assessment of the evidence in the instant case.  As the government has argued previously:

> To be sure, it would be one thing to challenge a witness's conclusions, based on the underlying transactional records recorded on the Bitcoin blockchain, which may have been calculated or graphed with the assistance of a tool produced by Chainalysis (similar to tools produced by other vendors as well as open-source tools). In much the same way, if the government offered testimony from a forensic accountant who performed sophisticated equations using Microsoft Excel, the defendant would be well within his rights in challenging the witness's math or conclusions—perhaps by using another tool to perform the same analysis of the underlying records. But conspiracy theories about the government's acquisition of Microsoft Office, or its decision to use Excel rather than another software tool, bear no relationship to any "fact that is of consequence in determining the action."

ECF No. 120, at 9.  The defense continues its fixation with Chainalysis the company—rather than the government's use of the Reactor software created by Chainalysis—by indicating that multiple experts will testify that Chainalysis and other tracing firms "failed to identify any criminality occurring at FTX."  *Id.* at 7 (Dr. Cabañas), 29 (Mr. Verret).  FTX was a large cryptocurrency exchange which collapsed in November 2022 and whose executive was indicted in the following month in the Southern District of New York on charges that he defrauded FTX customers and investors by misappropriating company funds.  It is not clear why the defense blames FTX's collapse on any action or inaction by a blockchain tracing firm,  or why this would be in any way relevant to the question of Mr. Sterlingov's guilt.  Similarly, testimony from Dr. Cabañas that "blockchain surveillance software like Chainalysis Reactor cannot scale with the rise in global cryptocurrency activity," *id.* at 5, should be excluded, as defense views of Chainalysis' ability to scale in the future has absolutely no bearing on whether the government has accurately traced Mr. Sterlingov's transactions.

Defense's meaningless assertions on these topics are not helpful to the finders of fact, and indeed serve the contrary purpose of confusing the issue and distracting the jury.  The Court should rule these lines of inquiry inadmissible under Fed. R. Evid. 702 and 403 and exclude testimony on these points at trial.  *See United States v. Dotson*, 799 F.2d 189, 192–93 (5th Cir. 1986) (noting

that opinion testimony of "meaningless assertions" may be excluded for lack of helpfulness); *Joiner*, 522 U.S. at 146 ("A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.").

### E. *Numerous Defense Experts Lack Requisite Expertise or Credentials for Proposed Areas of Testimony*

The defense notice suggests that its experts each possess extraordinary breadth of expertise, covering a wide expanse of overlapping topics. However, this is not borne out upon review of each individual's bona fides. Each expert's testimony should be limited to areas in which they possess actual expertise; if they lack the requisite qualifications or experience *on the topics at issue*, they should not be permitted to testify.

### i.    *Contracting*

Mr. Fischbach and Mr. Scott are both slated to testify about "the Chainalysis contracting process." ECF No. 122, at 16 (Mr. Fischbach), 22 (Mr. Scott). Neither Mr. Fischbach nor Mr. Scott are experts in government contracting. They have no basis to opine that the government "appears not to have followed general standards in contracting procedures when signing contracts with Chainalysis," *id.* at 16 (Mr. Fischbach), or make a legal assessment of any DOJ contract with Chainalysis, *id.* at 22 (Mr. Scott). And, lacking any insight into the government contracting process or use of Chainalysis, Mr. Fischbach is unqualified to opine that the U.S. government made "no attempts … to evaluate the efficacy of Chainalysis' blockchain tracing methodologies." *Id.* at 16. Mr. Scott similarly cannot be qualified as an expert to testify about the contracting process, or "how the development of Excygent, LLC and its subsequent sale to Chainalysis fails to meet the minimum disclosure requirements set out by law." *Id.* at 22.

ii.     *Blockchain Analysis*

The defense notice suggests that Mr. Fischbach, Mr. Scott, Mr. Verret, and Dr. Cabañas will all testify as experts regarding blockchain analysis.  The government has noted its concerns regarding Mr. Scott specifically below.  Mr. Verret may well have the needed expertise from his work as a forensic accountant, though his familiarity with blockchain analysis specifically is not clear from the defense disclosure or accompanying curriculum vitae.  Dr. Cabañas is a cryptocurrency investor and enthusiast, but nothing in his expert disclosure or curriculum vitae indicates that he has any background or experience in blockchain analysis, which is a specific specialty, or even bitcoin; Dr. Cabañas is heavily focused on monero, a cryptocurrency with a non-transparent blockchain that stands in stark contrast to the blockchain used to trace Mr. Sterlingov's transactions with Bitcoin Fog.   And the government renews its challenge to Mr. Fischbach's qualifications to discuss blockchain analysis and cryptocurrency set forth in its prior objection, ECF No. 111, at 10:

> To the extent that the defense intends to offer Mr. Fischbach as an expert in blockchain analysis or cryptocurrency, Mr. Fischbach appears to lack the necessary skills or background for qualification as an expert in that area.  Mr. Fischbach's practice is focused on personal electronic device forensics and analysis of cell phone location information.  The government is unaware of any credentials, training, or expertise in cryptocurrency held by Mr. Fischbach.  No such expertise is reflected on Mr. Fischbach's curriculum vitae, and the government has not located any reference to such work on Mr. Fischbach's company website.  The defense notice indicates that Mr. Fischbach has "over a decade of experience with various cryptocurrencies, as well as with methods of buying, selling, mining, and valuation," but provides no detail regarding this supposed experience, and does not suggest that he has any experience in tracking or tracing cryptocurrency transactions.   To the best of the government's knowledge, Mr. Fischbach's extensive work as a defense consultant has not involved work related to cryptocurrency.  Indeed, the language of the notice would be consistent with Mr. Fischbach being merely a casual user of cryptocurrency in a personal capacity.  If the defense intends to offer Mr. Fischbach as an expert in blockchain analysis, the defense must promptly supplement its expert notice and provide detail of Mr. Fischbach's work and expertise in the area; the government anticipates that it would

likely challenge Mr. Fischbach's credentials and findings pertaining to blockchain analysis under *Daubert*.

ECF No. 111 at 10. Of note, in the months that have passed since the government first objected to Mr. Fischbach's credentials, the defense has not provided a single report from Mr. Fischbach or evidence of any work in the blockchain analysis field.

### iii. Subjective Commentary on Law Enforcement Investigation

The defense filing suggests that one or more of its experts intends to provide sweepingly generalized assessments of their view of the quality of the government investigation. However, not a single defense expert has expertise in law enforcement investigations; as such, they are unqualified to offer general opinions on the conduct of the instant investigation. Furthermore, the defense's proposed gratuitous commentary on the perceived quality of the government case, and attacking it as "flawed" without grounding that allegation in specifics, does not assist the trier of fact in evaluating Mr. Sterlingov's involvement in Bitcoin Fog. For example, the defense provides notice that Mr. Scott will "explain why Chainalysis's and the Government's investigation was flawed from its outset." ECF No. 122 at 19. Certainly, the defense can highlight any flaws through vigorous cross-examination of the government's witnesses. However, a general opinion that the government's investigation was flawed—made by individuals without expertise in law enforcement investigations and lacking the appropriate experience or basis for such a finding—should be excluded under Rules 401, 402, and 702.

### iv. Cognitive Bias

Dr. Dror may well be an expert in other areas of confirmation bias research, but his proposed testimony as noticed by the defense would delve into the specific issue of confirmation bias *in blockchain analysis*. The government has not identified any specific study or focus that Dr. Dror has been involved in regarding cognitive bias in blockchain analysis. (And, if Dr. Dror's

testimony is simply a broad, generic statement that everyone in the world can be biased—without a specific tie to the facts at issue *in this case*—the testimony is irrelevant.)  Dr. Dror's limited insight into this investigation would not be sufficient for him to make an informed assessment of the existence of any supposed confirmation bias in the government's case.

  *v.*  *Dr. Cabañas*

  Dr. Cabañas appears to be a retired physicist turned real estate investor who is interested in cryptocurrencies.  The defense disclosure indicates that Dr. Cabañas is a contributor to Monero, but it provides very limited insight into what those contributions involve.  As the website managed by the Monero Core Team advises, "Monero is open source and permissionless; contributors are welcome and encouraged."  Improving Monero, *https://www.getmonero.org/get-started/contributing/* (last visited June 2, 2023).  Dr. Cabañas' work reportedly includes work for the Monero Core Team, but that work does not necessarily translate to any expertise relevant to his proposed areas of testimony pertaining to Bitcoin Fog.  The government intends to *voir dire* Dr. Cabañas to better understand his work in the cryptocurrency space, including his support of the Monero Core Team, what projects he has worked or is working on for the Monero Core Team or otherwise, any work pertaining to blockchain analysis, and his expertise regarding Bitcoin specifically.

  *vi.*  *Jonathan Scott*

  The defense noticed Mr. Jonathan Scott as a potential expert witness.  Mr. Scott's curriculum vitae suggests that he has experience in the cryptocurrency space as well as in digital forensics.  However, upon an initial review, the government has significant concerns regarding Mr. Scott's purported credentials.  Mr. Scott has cycled through multiple online Ph.D. programs, including a stint at "Northcentral University."  According to open-source information, including

Mr. Scott's own colorful Twitter feed and self-drafted blog posts, he was removed from that Ph.D. program for code of conduct violations following complaints from other researchers and the cybersecurity community.  The government has been made aware of allegations that Mr. Scott falsely claimed consent in order to acquire access to personally identifying information and sensitive private information in the custody of an academic research institution.  The government is still investigating these allegations, but it appears that this action led to his dismissal from Northcentral University.  Mr. Scott's CV claims that he was the "#1 Hacker in the US on Hackerone.com," a website hosting a bug bounty program for identifying software vulnerabilities, but the government has been made aware of allegations that Mr. Scott was subsequently banned from the same website.  Mr. Scott's CV includes statements that the government has been unable to verify—including expansive descriptions of existing qualifications and the significance or nature of certain experiences.  The government is also aware that Mr. Scott appears to have past relevant history, and litigation, under a prior name which was omitted from his curriculum vitae. The government urges this Court to require strict adherence to Rule 16 for all of the defense experts, but particularly Mr. Scott.  Mr. Scott should be required to approve and sign a detailed disclosure of his proposed testimony and his qualifications, to be filed with the Court.  Mr. Scott should note his full professional and academic history, including universities at which he has enrolled and withdrawn—voluntarily or after misconduct allegations—and specify all names that he has used personally and professionally.  The defense should provide the required Rule 16 disclosures of Mr. Scott's publications to include all publications that he has put forth *under any name*.

These significant concerns about not just Mr. Scott's credentials and experience, but his candor and academic integrity, call for a particularly searching *Daubert* inquiry—and illustrate the

importance of meeting Rule 16's disclosure requirements in a timely manner. The government intends to challenge Mr. Scott's qualification as an expert and seeks to *voir dire* him under oath at the June *Daubert* hearing. Mr. Scott should be prepared to provide names and contact information for individuals who can verify the credentials listed on his CV. The government hereby provides notice that, pending the findings at the *Daubert* hearing, it may call individuals from those companies or organizations to rebut Mr. Scott's characterization of his work or association. Similarly, the government may call individuals who can testify to specific instances or allegations of misconduct or misrepresentations made by Mr. Scott.

###    F.   *Defense Testimony is Duplicative and Impermissibly Cumulative*

The defense has noticed multiple "experts" that it claims will testify to the exact same thing. For example, no fewer than four experts will supposedly testify to *identical finding*s with regard to the defense's blockchain analysis. ECF No. 122, at 6 (Dr. Cabañas), 4 (Mr. Fischbach), 18 (Mr. Scott), 26 (Mr. Verret). These same four experts are expected to testify to unidentified alternative explanations for the beta testing transactions. *Id.* at 7 (Dr. Cabañas), 15 (Mr. Fischbach), 20 (Mr. Scott), 25 (Mr. Verret). Indeed, much of the defense notice filing appears to be the same testimony description repeated verbatim for the description of multiple witnesses. Such testimony would be unnecessarily cumulative, serving only to waste the Court's and the jury's time in what is already expected to be a protracted trial. *See* Fed. R. Evid. 403. "Unnecessarily similar and cumulative expert testimony may create the risk that a jury will resolve differences in expert opinion by 'counting heads' instead of by giving fair consideration to the quality and credibility of each expert's opinions." *Sunstar, Inc. v. Alberto—Culver Co*., Inc., 2004 U.S. Dist. LEXIS 16855, 2004 WL 1899927, at *25 (N.D. Ill. Aug. 23, 2004). The Court should require the defense to specify which opinions or areas of testimony will be covered by which

expert(s).  To avoid wasting time and needlessly presenting cumulative evidence, the Court should preclude the defense from repeating the same testimony through multiple witnesses pursuant to Rule 403.

## **CONCLUSION**

For the foregoing reasons, the Court should order the defendant to file a supplemented expert disclosure no later than June 9, 2023, to permit the government sufficient time to prepare for the scheduled *Daubert* hearing.  If the defense fails to provide sufficient notice, the Court should exclude all defense experts for lack of adequate notice and failure to adhere to Rule 16. Even if the defective notice is promptly cured, the Court should substantially limit the scope of testimony from all proposed defense experts to ensure that the testimony is relevant and non-cumulative, and that any testifying experts hew to their actual areas of expertise.  The government reserves the right to *voir dire* the defense experts at the June *Daubert* hearings and may raise further objections based on their testimony.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar No. 481052

BY:    */s/ Christopher B. Brown*
       Christopher B. Brown, D.C. Bar No. 1008763
       Assistant United States Attorney
       U.S. Attorney's Office for the District of Columbia
       601 D Street, N.W.
       Washington, D.C. 20530
       (202) 252-7153
       Christopher.Brown6@usdoj.gov

       */s/ C. Alden Pelker*
       C. Alden Pelker, Maryland Bar
       Trial Attorney, U.S. Department of Justice
       Computer Crime & Intellectual Property Section
       1301 New York Ave., N.W., Suite 600
       Washington, D.C. 20005
       (202) 616-5007
       Catherine.Pelker@usdoj.gov