UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | CRIMINAL NO. 21-cr-399 (RDM) |
| | : | |
| ROMAN STERLINGOV, | : | |
| | : | |
| Defendant. | : | |

## GOVERNMENT'S REPLY IN SUPPORT OF MOTION TO QUASH DEFENSE SUBPOENA TO THE GOVERNMENT PROSECUTOR

The United States of America files the following reply in support of its Motion To Quash the defendant's Rule 17 trial subpoena to government counsel in this case, ECF No. 120.

### A. The Defense Misstates the Administrative History of the Bitcoin Fog Investigation

Without conceding the relevance of administrative trivia relating to the opening of investigations by the Department of Justice or law enforcement agencies, the government writes to correct the record misstated by the defense. In late 2015, the U.S. Attorney's Office for the District of Columbia and the Internal Revenue Service-Criminal Investigation (IRS-CI) opened an investigation into Bitcoin Fog. Neither the FBI nor then-Intelligence Analyst (IA) Pelker was involved in any way in opening this investigation in the District of Columbia, or in any of the initial investigative steps taken out of this District. At the time the investigation was opened, the defendant's name had yet to be identified as the operator of Bitcoin Fog.

Separately, the Philadelphia Field Office of the FBI opened an investigation into Bitcoin Fog in late 2014, assigning it to Special Agent Kathleen Kaderabek. As noted in the government's prior submissions, IA Pelker provided limited support to the FBI investigation team. None of her work as an Intelligence Analyst named the defendant as the operator of Bitcoin Fog. The FBI investigation was transferred from Philadelphia to the FBI's Washington Field Office (WFO) in

January 2016, and was initially assigned to Special Agent Matthew Heise. At some point in January or February 2016, the FBI investigation was merged into the extant IRS-CI investigation led by the U.S. Attorney's Office for the District of Columbia.

It was not until the latter part of that year, in October 2016, that Trial Attorney Pelker joined the Department of Justice as an Honors Attorney in the Computer Crime and Intellectual Property Section. In or about December 2016, she was invited to join the FBI/IRS-CI investigation by personnel at the U.S. Attorney's Office for the District of Columbia. However, she was on detail to the Superior Court Division of the U.S. Attorney's Office from January through August 2017.

In short, there is no merit to the defense theory that this investigation was initiated solely through the efforts of Trial Attorney Pelker, or that she carried it like "her baby"[1] from one stage of her career to another.

**B. The Defendant Still Has Not Shown that Testimony from Trial Attorney Pelker Is Vital to His Case and Cannot Be Obtained from Another Source**

In three complete briefing cycles, the defendant has never acknowledged, let alone addressed, the legal framework governing when a criminal defendant can call his prosecutor as a witness in his case. *See* ECF No. 59 (Def. Mot. *in Limine*), at 14-15; ECF No. 67 (Def. Opp. to Gov't Mot. *in Limine* To Preclude the Defense from Calling Prosecutor as Witness); ECF No. 129 (Def. Opp. to Gov't Mot. To Quash Subpoena to Prosecutor). Such requests are "disfavored" *United States v. Watson*, 952 F.2d 982, 986 (8th Cir. 1991), and for good reason—they are prone

---

[1] The Vonu Podcast, *TVP #184: ChainAnalysis Coercion & Quack Science: The Troubling Case of Roman Sterlingov with Tor Ekeland, Mike Hassard, & SW from Samourai Wallet* (Apr. 29, 2023), at 42:24, available at https://vonupodcast.com/tvp-184-chainanalysis-coercion-quack-science-the-troubling-case-of-roman-sterlingov-with-tor-ekelend-mike-hassard-sw-from-samourai-wallet/.

2

to being abused for strategic advantage instead of genuine need.  *Williamsburg Wax Museum, Inc. v. Historic Figures, Inc.*, 501 F. Supp. 326, 331 n.19 (D.D.C. 1980) ("A party cannot disqualify its opponent's attorneys simply by threatening to call them as witnesses . . . ."). The defendant bears the burden of establishing a "compelling need" to call a prosecutor as a witness by showing that the proposed testimony is both vital to his defense and unavailable through other means.  *United States v. Watson*, 952 F.2d 982, 986 (8th Cir. 1991).  He has failed to do so.

    First, the defendant has not shown that any of the prospective testimony from Trial Attorney Pelker would be vital to his case.  Even after three briefing cycles and a *Touhy* request, the exact subject matter of Trial Attorney Pelker's prospective testimony remains a mystery. Instead of specific details, the defense has offered buzzwords so general and vague as to be meaningless—promising to cross-examine Trial Attorney Pelker about "venue, forensics, confirmation bias, cognitive bias, the distorting effects of careerism and profiteering on this investigation, and the primacy given to Chainalysis's inaccurate proprietary black-box heuristic blockchain tracing methodologies." ECF No. 129, at 3.  Whatever this means, it only highlights the absence of any testimony of genuine evidentiary value to the defense.  Trial Attorney Pelker was not a percipient witness to any key witness interview, undercover transaction, or physical search; she was not part of the chain of custody for any evidence; she had no unique knowledge of the underlying evidence.

    The defendant makes much of Trial Attorney Pelker's prospective testimony about "venue," claiming that her "involvement in the transfer of this case to Washington D.C." somehow "implicat[es] the constitutional issue of venue."  *Id.* at 8.  This statement is both factually and legally confused.  It is factually inaccurate because, as noted above, Trial Attorney Pelker was not actually involved in opening the Bitcoin Fog investigation in the District of Columbia.  And it is

3

legally irrelevant because no part of the applicable legal standard or the government's venue arguments depend on where the investigating FBI or IRS-CI case agents were geographically located. Instead, venue in the District of Columbia is premised on the undercover transactions conducted in the District, and on the defendant's omissions in the District, including his failure to obtain a money transmitter license from the D.C. Department of Insurance, Securities, and Banking (DISB) or to register as a money transmitting business with the U.S. Department of Treasury, Financial Crimes Enforcement Network (FinCEN).  ECF No. 80, at 4-5; ECF No. 52, at 2-20 (addressing venue arguments).  Nor does the location of the investigating agents have any bearing on the *defendant's* venue arguments.  The defendant has never argued that this case should have been venued in the Eastern District of Pennsylvania, for example, where the original FBI case team was based.  If anything, the defendant has argued (bereft of any sound basis) that there is *no* district in the United States where a case involving an illegal Internet service could be venued.  *See, e.g.*, ECF No. 46, at 12 (arguing that the special venue provision in § 1956(i) "fails in a computer law setting" because of "the rise of the internet and decentralized data ledgers like the Blockchain").

Second, the defendant has not shown that he cannot obtain the same testimony from any other source.  The defendant has not even suggested that Trial Attorney Pelker has *unique* knowledge of, for example, "venue" or "forensics" or "cognitive bias," or even unique knowledge relating to the use of blockchain analysis software sold by Chainalysis.  In the same email containing the subpoena to Trial Attorney Pelker, defense counsel served the government with *eight* other trial subpoenas for current and former law enforcement personnel (IRS-CI Agents Justin Allen, Devon Beckett, and Leo Rovensky; IRS-CI Analyst Aaron Bice; former IRS-CI Agents Matthew Price and Tigran Gambaryan; FBI Staff Operations Specialist Luke Scholl; and

4

former FBI Agent Kathleen Kaderabek).[2] The government is not challenging any of these other subpoenas to those not serving as trial counsel (and merely reserves the right to object to irrelevant and cumulative testimony at trial). The government is aware from filings in this litigation that the defense has served trial subpoenas and Rule 17(c) document subpoenas (without leave of Court) on multiple individuals affiliated with Chainalysis. The defense may well have issued other trial subpoenas and Rule 17(c) subpoenas to third parties outside of the government's knowledge. And the defense will have ample opportunity to cross-examine the government's trial witnesses and its noticed experts (including two blockchain analysis experts), *see* ECF No. 124. It strains credulity to believe that among all these prospective witnesses, there is some vital evidence for the defense, as yet unidentified, to which only Trial Attorney Pelker can testify.

### C. The Defendant Has Not Justified His Failure To Comply with Threshold *Touhy* Regulations

The defendant does not offer any justification for his refusal to submit a formal *Touhy* request to subpoena Trial Attorney Pelker, including an actual summary of the testimony expected to be elicited, in compliance with applicable *Touhy* regulations. As the government explained in its Motion To Quash—and as the defense has failed to address—it is well-established that failure to comply with *Touhy* regulations is sufficient ground to quash a subpoena. ECF No. 120, at 11 (collecting cases).

The defendant has all but abandoned his two original arguments against compliance with *Touhy*. First, the defendant originally relied on his "Sixth Amendment right to confront his accusers." ECF No. 120-3, at 2. As the government explained, the Sixth Amendment Confrontation Clause is a rule of admissibility that *excludes* certain out-of-court testimonial

---

[2] The government could not accept service of the subpoenas on behalf of those employees who have since left government service, former Special Agents Price, Gambaryan, and Kaderabek.

statements; it does not provide a freestanding right to *call* anyone the defendant wishes as a trial witness. Tellingly, the defendant offers no argument in response other than block-quoting an irrelevant passage from *Crawford v. Washington*, 541 U.S. 36 (2004).

Shifting away from the Confrontation Clause, the defendant now observes that the Sixth Amendment's Compulsory Process Clause provides authority for calling witnesses in his defense (an undisputed fact highlighted in the government's opening motion, ECF No. 120, at 17 n.10). But such requests still have to be justified on their merits—begging the question whether the defendant can satisfy the "compelling need" standard to call a government prosecutor as a defense witness.[3] Indeed, whatever the merits of the defense request standing on its own, the Compulsory Process Clause does not displace threshold *Touhy* procedures required before obtaining testimony from a Department of Justice witness. *See United States v. Marino*, 658 F.2d 1120, 1125 (6th Cir. 1981); *United States v. Allen*, 554 F.2d 398, 406-07 (10th Cir. 1977).

Second, the defendant originally argued that complying with *Touhy* would impermissibly force him to reveal his "defense strategy," but he seems to have waived this argument by failing to raise it in his opposition. In any event, courts have rejected the idea that it is impermissible to require a defendant to comply with procedural rules that require pretrial disclosure of certain

---

[3] The defendant claims Judge Kollar-Kotelly's decision in *United States v. Michel*, 2023 U.S. Dist. LEXIS 36992 (D.D.C. Mar. 6, 2023), required only a "plausible showing of materiality," ECF No. 129, at 7, when in fact it applied the standard formulation that "a defendant must nevertheless demonstrate that a subpoenaed witness's testimony will be both 'material' and 'favorable' to his defense," 2023 U.S. Dist. LEXIS 36992, at *7. In that case, Judge Kollar-Kotelly also rejected a defendant's request to subpoena former President Obama because the defendant sought testimony that did not directly relate to elements of the charged offenses and would cause jury confusion. *See id.* at *13 ("By focusing on motive, when motive does not impact an element of the charged offense, Defendant would impermissibly risk confusing the jury regarding the key facts at issue."). The same logic applies here, where the defendant seeks testimony that, to the extent the subject matter is known at all, does not impact any elements of the charged offenses and is highly likely to distract the jury with side-issues.

6

defenses or strategies, *see United States v. Mubayyid*, 2007 WL 1826067, at *2 (D. Mass. June 22, 2007), such as (here) a highly unusual request to subpoena his own prosecutor. And defense counsel have been anything but shy about their litigation strategy—just the opposite, they have repeatedly and publicly held forth with *ad hominem* attacks and inaccurate thoughts about the merits, witnesses, and evidence in this case. *See generally* ECF No. 121, at 1-4 (collecting examples).

Rather than justify his refusal to comply with *Touhy* regulations, the defendant devotes several pages of his opposition (at 9-11) to abstract arguments about deliberative process privilege and attorney work product privilege. As the government explained, however, these are fact-specific questions that cannot be decided in the abstract. *See In re Sealed Case*, 121 F.3d 729, 737-38 (D.C. Cir. 1997); *see also Bloche v. Dep't of Defense*, 414 F. Supp. 3d 6, 36 (D.D.C. 2019) ("[I]n practice, the deliberative process privilege is highly context-specific: the propriety of its application is dependent upon the individual document and the role it plays in the administrative process.") (citation omitted). The government's intent in raising these issues is not to obtain an advisory opinion based on the defendant's vague representations about the scope of the anticipated testimony, but to flag the critical concerns underlying the applicable *Touhy* regulations. The defendant's generalized arguments only underscore the need for a specific, concrete summary of the testimony being sought from Trial Attorney Pelker.[4]

---

[4] The defendant attempts to shift the burden to the government by alleging unspecified discovery disputes and suggesting that the government should have produced some sort of privilege log. ECF No. 129, at 3, 7, 9-11. First, the defendant has not articulated any reason why prosecutor communications are relevant and discoverable under Rule 16. Second, there is no outstanding discovery dispute ripe for this Court's attention. On September 23, 2022, the defense sent a 104-item discovery demand letter to the government. On October 4, 2022, the government responded, noting that many of the defense demands seemed to call for documents already produced in discovery, and asking the defense to provide more detail and explanation for several other categories of documents. In particular, the government made the following request:

The defendant also argues (at 11) that the defendant's "Sixth and Fifth Amendment rights" supersede any government claim of privilege. But the opposite is true. It is well-settled, even by the defendant's own authorities, that "the Sixth Amendment does not provide 'an unfettered right to offer testimony that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence.'" *United States v. Ramos*, 763 F.3d 45, 53 (1st Cir. 2014) (quoting *United States v. Gary*, 74 F.3d 304, 308-09 (1st Cir. 1996), and *Taylor v. Illinois*, 484 U.S. 400, 410 (1988)).

The defendant disingenuously claims (at 9) that "none of the sought after testimony involves Ms. Pelker's role as a belated prosecutor on this case," but that is simply not true. To take one example, the defendant has repeatedly promised to question Trial Attorney Pelker about "venue." ECF No. 129, at 3, 6, 8; ECF No. 67, at 6. To the extent the defendant seeks to elicit testimony about where the case was *investigated*, that is irrelevant, as explained above. To the extent the defendant seeks to elicit testimony about why the case was *charged* in the District of Columbia, however, that is entirely a question of attorney deliberation and legal work product. The decision to charge a case in one district rather than another is a classic prosecutorial function. *See, e.g.*, *United States v. Walker*, 665 F.3d 212, 223 (1st Cir. 2011) ("Venue requirements for criminal cases are set by statute. Where, as here, those requirements are satisfied, the choice of venue is in the first instance a matter of prosecutorial discretion.") (citations omitted).

The defense team knows all of this. Their interest in eliciting testimony from Trial Attorney Pelker about "venue" is not about venue at all—it is a thinly-veiled pretext for them to

---

> Certain requests call for the production of "communications" between various parties, including attorneys, government employees, and other parties. . . . Other than any prospective *Jencks* production, however, the nature and basis of these defense requests for "communications" is unclear. For each such request, please (1) explain the legal basis for the request, and (2) explain how these "communications" are relevant and material to preparation of the defense.

The defense never responded.

make *ad hominem* arguments to the jury about alleged "careerism and profiteering" on the part of the prosecution team, ECF No. 129, at 3. The two men on the defense team have already previewed this gender-coded attack on Trial Attorney Pelker in their numerous podcast appearances—claiming that this case is "her baby" and "has been following her" throughout her career.[5] Their strategy necessarily depends on eliciting testimony—and making arguments to the jury—about Trial Attorney Pelker's work on this case as a Department of Justice attorney. It is disingenuous for the defense to claim that they are not seeking testimony related to Trial Attorney Pelker's legal career when, in fact, that seems to be the very point of their proposed (but irrelevant) examination.[6]

### D. The Defense Subpoena Is a Pretext for Their Motion To Disqualify

Finally, the defendant argues that Trial Attorney Pelker should be disqualified in order to avoid jury confusion "as to whether the lawyer is testifying as a witness or arguing as an advocate." ECF No. 129, at 12. This case illustrates the dangers of allowing lawyers to subpoena opposing counsel based on wafer-thin pretext, only to turn around and seek disqualification based on an alleged conflict that they themselves have created. *See Williamsburg Wax Museum, Inc. v. Historic Figures, Inc.*, 501 F. Supp. 326, 331 (D.D.C. 1980) ("[C]ourts must also not be oblivious to the fact that, particularly in recent years, motions for disqualification have increasingly been used for strategic litigation advantage."). While motions to disqualify opposing counsel are always "highly disfavored" and "examined with a skeptical eye," *United States v. Crowder*, 313 F. Supp. 3d 135, 141 (D.D.C. 2018), the particular circumstances of this request—seeking testimony explained only in the vaguest of terms, based on the most tenuous theories of relevance, and transparently motivated to secure a litigation advantage at trial—warrant a particularly probing

---

[5] The Vonu Podcast, *supra*, at 42:24.

[6] To be clear, such *ad hominem* attacks are completely inappropriate, and the Court should rule *in limine* that the defense should be precluded from making such arguments in front of the jury.

inquiry.  The defense cannot satisfy this "extraordinarily high burden," *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 965 F. Supp. 2d 104, 110 (D.D.C. 2013) (quotations omitted).  The government reserves its right to submit supplemental briefing and argument in the event the Court orders Trial Attorney Pelker to testify, in light of the particular subject matter of the testimony.  But even at this preliminary stage, the defendant's frivolous request should be rejected.

As a preliminary matter, it bears emphasis that there is nothing remotely improper or unusual in having a prosecutor involved in a criminal investigation.  Prosecutors review evidence developed during the course of an investigation, draft legal process, prepare search warrant applications, advise law enforcement agents about investigative steps such as undercover transactions, participate in debriefings and witness interviews, obtain subpoenas and present witnesses in grand jury, and more.  In virtually every federal case, prosecutors have "personal knowledge," ECF No. 129, at 4, about the course of the investigation, the tools used, and the evidence obtained.  In this case, Trial Attorney Pelker's "personal knowledge" of the investigation is no different in kind from the derivative knowledge any prosecutor might have of an ongoing investigation.  As noted above, Trial Attorney Pelker's work as an FBI employee did not make her a percipient witness or provide her with any unique knowledge about the underlying evidence.  If open-source research or mere familiarity with the evidence and tools used in an investigation were sufficient to convert her into a "material fact witness," *id.*, then every prosecutor in every complex criminal case would be a necessary witness for the defense.  That is not the law.  *See United States v. Hosford*, 782 F.2d 936, 938 (11th Cir. 1986) ("[M]ere first-hand knowledge of facts that will be proved at trial is not a per se bar to representation.").

Indeed, while prosecutors always have some first-hand familiarity with the evidence in a case, courts have developed well-worn rules against prosecutors expressing personal opinions

about the evidence or vouching for witnesses. (The same rules apply to defense attorneys.) "[S]uch comments can convey the impression that evidence not presented to the jury, but known to the prosecutor, supports the charges against the defendant and can thus jeopardize the defendant's right to be tried solely on the basis of the evidence presented to the jury . . . ." *United States v. Young*, 470 U.S. 1, 18 (1985). In the ordinary course, the rules against personal opinion and vouching—policed by opposing counsel and the Court—are sufficient to prevent jury confusion arising from a prosecutor's "personal knowledge" of an investigation.

Here, the only way Trial Attorney Pelker's "personal knowledge" of the investigation could pose a risk of jury confusion is if the defendant—not the government—makes it an issue by calling her as a witness. *Cf. United States v. Esformes*, 60 F.4th 621, 634 (11th Cir. 2023) ("Even if it were error for [the prosecutor] to have testified at the hearing before the magistrate judge, [the defendant] invited that error when he called her to the stand, and he cannot complain about it now."). Even if Trial Attorney Pelker is not called as a witness, the Court should address the danger of jury confusion by issuing an order precluding the defense from mentioning the fact of her prior FBI employment in front of the jury.

Further, the traditional concerns animating the advocate-witness rule and D.C. Rule of Professional Conduct 3.7 are simply not present when a prosecutor is called as an adverse witness for the defense, testifying as a hostile witness and under compulsion. Those rules are intended to guard against the unfair bolstering effect when a lawyer appears as both a fact witness and advocate in *favor* of his client. *See* Comment 2 to D.C. R. Prof. Conduct 3.7 ("A witness is required to testify on the basis of personal knowledge, while an advocate is expected to explain and comment on evidence given by others. It may not be clear whether a statement by an advocate-witness should be taken as proof or as an analysis of the proof."); *Hosford*, 782 F.2d at 939 ("[I]t would

11

be improper for a government attorney who has independent personal knowledge about facts that will be controverted at the trial to act as prosecutor . . . if he uses that inside information to testify indirectly by implying to the jury that he has special knowledge or insight."); *Esformes*, 60 F.4th at 635 ("The classic case involves an advocate testifying against the defendant at trial."). But here, the defense will undoubtedly seek to undermine Trial Attorney Pelker's credibility as a witness, and her testimony will only highlight the *limits* of her personal knowledge. That is the very opposite of what the advocate-witness rule is intended to address. Because Trial Attorney Pelker's respective roles as a witness and advocate would be at cross purposes, the traditional rule would not be implicated. *See, e.g.*, *Esformes*, 60 F.4th at 635 (denying challenge based on advocate-witness rule where the testifying prosecutor "was not serving as both an advocate and a witness in the way that the traditional rule envisions, and so her actions were consistent with the rule's requirements"). To hold otherwise would be to reward the defendant's gamesmanship and encourage frivolous opposing counsel subpoenas on the eve of trial.

**CONCLUSION**

For the foregoing reasons, the Court should quash the defendant's trial subpoena to the government prosecutor in this case, Trial Attorney Pelker. In addition, the Court should issue an order precluding the defense from referring in any way to Trial Attorney Pelker's prior employment as an FBI Intelligence Analyst in front of the jury.

                  Respectfully submitted,
                  MATTHEW M. GRAVES
                  UNITED STATES ATTORNEY
                  D.C. Bar No. 481052

BY:    */s/ Christopher B. Brown*
                  Christopher B. Brown, D.C. Bar No. 1008763
                  Assistant United States Attorney
                  U.S. Attorney's Office for the District of Columbia
                  601 D Street, N.W.
                  Washington, D.C. 20530
                  (202) 252-7153
                  Christopher.Brown6@usdoj.gov