# Exhibit 1

                    BEFORE THE UNITED STATES DISTRICT COURT
                        FOR THE DISTRICT OF COLUMBIA


UNITED STATES OF AMERICA,            .
                                     .    Case Number 17-238
           Plaintiff,                .
                                     .
      vs.                            .    Washington, D.C.
                                     .    October 16, 2018
TAI TAN NGUYEN,                      .    Afternoon Session
                                     .
           Defendant.                .
- - - - - - - - - - - - - - - - -    .


                        TRANSCRIPT OF JURY TRIAL
                                   DAY 2
               BEFORE THE HONORABLE TREVOR N. McFADDEN
                      UNITED STATES DISTRICT JUDGE


APPEARANCES:

For the Government:          CHRISTOPHER B. BROWN, AUSA
                             ZIA M. FARUQUI, AUSA
                             United States Attorney's Office
                             555 Fourth Street Northwest
                             Washington, D.C. 20530
                             202-252-7566

For the Defendant:           DAVID B. BENOWITZ, ESQ.
                             Price Benowitz LLP
                             409 Seventh Street Northwest
                             Suite 200
                             Washington, D.C. 20004
                             202-417-6000


Official Court Reporter:     SARA A. WICK, RPR, CRR
                             U.S. Courthouse, Room 4704-B
                             333 Constitution Avenue Northwest
                             Washington, D.C. 20001
                             202-354-3284


Proceedings recorded by stenotype shorthand.
Transcript produced by computer-aided transcription.

1          MR. BROWN:  Your Honor, before the jury comes in, just

2    one brief word.  Just a heads-up that we may reconsider, but we

3    anticipate this being the last witness of the government's

4    case-in-chief.  So we anticipate resting.

5          THE COURT:  Okay.  Is defense going to be available

6    and ready to begin today?

7          MR. BENOWITZ:  No, your Honor.  Based upon what we had

8    talked about, that was not my understanding.  So I think we can

9    finish our case, the defense case tomorrow, but I'm kind of

10   caught unaware as far as that.

11         THE COURT:  Okay.  All right.

12       (Jury entered courtroom.)

13         THE COURT:  Good afternoon, ladies and gentlemen.  You

14   may be seated.  Sorry for the delay.

15     The government will call its next witness.

16         MR. BROWN:  The government calls Steve Ehrlich.

17       STEVE EHRLICH, WITNESS FOR THE GOVERNMENT, SWORN

18                     DIRECT EXAMINATION

19         BY MR. BROWN:

20   Q.   Good afternoon, Mr. Ehrlich.

21   A.   Good afternoon.

22   Q.   Could you, please, introduce yourself to the jury.

23   A.   I'm Steve Ehrlich.

24   Q.   And where are you currently employed?

25   A.   I'm employed with the Customs and Border Protection Agency

1    in Washington, D.C.

2    Q.   And what is your current job title?

3    A.   I'm a branch chief within the Office of Admissibility and

4    Passenger Programs.

5    Q.   And Officer Ehrlich, how long have you worked in law

6    enforcement?

7    A.   Since 1982.

8    Q.   And where did your law enforcement career begin?

9    A.   In Hutchinson, Kansas.

10   Q.   And what position did you have in Hutchinson, Kansas?

11   A.   I went from patrolman to lieutenant at Hutchinson Police

12   Department.

13   Q.   And how long were you employed in Hutchinson?

14   A.   Until 1996.

15   Q.   And then -- oh, by the way, in 1996, did you do any

16   security work outside of the Hutchinson Police Department?

17   A.   I did.  I went to the Olympics in Atlanta, Georgia.

18   Q.   And what role did you play there?

19   A.   I was a part of the security detail at the Marriott

20   Marquee, which was the Olympic family hotel.  That's where all

21   of the dignitaries were staying.

22   Q.   And then after 1996, how were you employed?

23   A.   I worked at a small police department in Russell, Kansas,

24   for a period of time.  I had gone there to take over the chief's

25   position.  The chief that was there had invited me up.  He

1    decided he was going to stay.  So I helped with a small

2    department south of Russell at Hoisington, finishing up my

3    career in law enforcement in the state of Kansas.

4    Q.   And how long were you in Hoisington or until what yearish?

5    A.   '98, '99, I believe.

6    Q.   And then after that, what did you do?

7    A.   I worked for the State of Kansas for a period of time at

8    the mental health correctional facility.

9    Q.   And how long were you employed there?

10    A.   About a year and a half.

11    Q.   And then after that, what did you do?

12    A.   My wife became employed by the Border Patrol, and we had to

13    move south to get close to the U.S. border, and I worked for the

14    State of New Mexico for about a year and a half.

15    Q.   And up until what year did you work for the State of New

16    Mexico?

17    A.   2003.

18    Q.   And then when did you enter federal law enforcement?

19    A.   September 7th of 2003.

20    Q.   And what agency did you join?

21    A.   I joined the Immigration and Naturalization Service at the

22    time.

23    Q.   And could you just explain to the jury, sort of explain --

24    first of all, does INS or the Immigration and Naturalization

25    Service, does that still exist?

1    A.   No, sir, it does not.

2    Q.   And so what happened to INS?

3    A.   It became a part of Customs and Border Protection under the

4    Department of Homeland Security.

5    Q.   And about when did that happen?

6    A.   It was in the latter part of 2003.

7    Q.   So when you first joined INS at the time in 2003, what

8    formal training did you receive?

9    A.   Formal training was at the Federal Law Enforcement Training

10   Center located in Glynco, Georgia.

11   Q.   And is that sometimes called FLETC for the acronym?

12   A.   Yes.

13   Q.   That's F-L-E-T-C?

14   A.   Yes.

15   Q.   Okay.  And did you take -- oh, were you in an immigration

16   officers training course?

17   A.   Yes, I was.

18   Q.   And what other agencies enrolled their new employees in the

19   immigration officers training course?

20   A.   At the time I was at FLETC, the Bureau of Prisons was

21   there.  Border Patrol was doing training there.  U.S. Secret

22   Service had individuals there.  Immigration and Customs

23   Enforcement was there.

24   Q.   And what are some of the topics that you were trained in

25   when you were at FLETC?

1    A.    Immigration law, Customs law, and agriculture.

2    Q.    And did your formal training include any instruction about

3    carrying cash into or out of the United States?

4    A.    Yes, sir, it did.

5    Q.    Did your formal training include any introduction to the

6    FinCEN Form 105?

7    A.    Yes, it did.

8    Q.    And was it called the FinCEN Form 105 in 2003?

9    A.    There was an overlap.  It was also referred to as the

10   Customs Form 4790, 4790.

11   Q.    And in your training on this form, did you receive training

12   about the legal requirements for filing this form?

13   A.    Yes.

14   Q.    And just to be clear, when I say the word FinCEN, what does

15   that mean to you?

16   A.    FinCEN is a division within the U.S. Treasury Department,

17   the Financial Crimes Enforcement Network.

18   Q.    So let's talk about your first assignment after you went

19   through your formal training at CBP.  Where were you posted?

20   A.    In Columbus, New Mexico.

21   Q.    And was that a port of entry?

22   A.    Yes, it was.

23   Q.    And what were some of your responsibilities there?

24   A.    Part of -- we would rotate from inside of the building

25   doing Immigration work to outside doing Customs Enforcement

1    work.

2    Q.   And by the way, what was your job title at this time?

3    A.   I was just an officer.

4    Q.   "Just an officer."

5    A.   Yes.

6    Q.   So describe some of the -- I guess the outside work that

7    you referenced.  What kind of duties did you have?

8    A.   The outside work would be standing in a little guard shack,

9    and as vehicles would drive up, you would ask them the normal

10   Customs declaration questions, if they were bringing back fruits

11   and vegetables from a foreign country, what the reason either

12   for entering the United States or traveling to the foreign

13   country was, if they were bringing more than $10,000 in cash or

14   monetary instruments with them.

15   Q.   And if somebody said that they were bringing in more than

16   $10,000 in cash or monetary instruments, what then would you do?

17   A.   They would be moved into secondary since we did not have

18   the location to either count the moneys or to take possession of

19   the FinCEN 105.

20   Q.   And so describe, what goes on at secondary?

21   A.   In secondary, what the officers would be looking for on the

22   FinCEN 105 was to see if it had been completed correctly, if all

23   of the information that is required had been inputted, if it was

24   legible enough that an individual could read it to make out what

25   was being put on the form, and then to get the individual to

1    sign that that information that was on the form was true and

2    correct.

3    Q.   And did you ever encounter instances where individuals did

4    not declare that they were carrying more than $10,000 but later

5    on you discovered that they were?

6    A.   Yes.

7    Q.   And describe the circumstances when you would find this

8    sort of situation.

9    A.   We would give the individual an additional chance to amend

10   the form, tell them is this really what you have and then ask

11   again if they wanted to amend the form.  We cannot amend the

12   form.  They have to physically do the amendment themselves.

13   Q.   And when you were working at the border, were there ever

14   any instances where you would participate in searching a

15   passenger or a vehicle that was crossing the border?

16   A.   Yes.

17   Q.   And what are some of the things that you would be looking

18   for when you would conduct those searches?

19   A.   We were looking in the vehicle to check for items hidden in

20   voids in the vehicle.  Some of them were natural voids that are

21   in a vehicle when it's manufactured.  We might be checking

22   through suitcases, under the hood, looking in the air cleaner,

23   checking areas that we had information items might be stored.

24   Q.   And would one of the items that you are looking for be

25   currency?

1    A.    Yes.

2    Q.    And why would that be?

3    A.    Normally, an individual who is not wanting to report it is

4    trying to hide it from us.  Some of it could be that they either

5    don't understand the fact that you can carry as much cash as you

6    want, you just have to report it, or they're trying to hide it

7    from us because they didn't want to report it because it could

8    be being used for some kind of illicit operation.

9    Q.    And as far as you can recall, what's the most amount of

10   cash that you ever encountered working at the border?

11   A.    It was 10s of thousands, maybe 20- or 30,000.  I don't

12   recall the exact amount.

13   Q.    Now, after you -- oh, how long were you in this position in

14   New Mexico?

15   A.    I was on the southern border for just a little over five

16   years.

17   Q.    And then -- so that takes us up until about 2008; is that

18   right?

19   A.    That's correct.

20   Q.    And then in 2008, what was your next position?

21   A.    I moved to Washington, D.C., and worked for the National

22   Targeting Center, which is also a subdivision of Customs and

23   Border Protection.

24   Q.    And what was your job position there?

25   A.    I worked as a targeter.  I would get manifests of the

1    flights, go over those manifests to make sure that there were

2    not any individuals who were on a terrorist watch list or

3    individuals who might have warrants arriving into the U.S.

4    Q.    And how long did you serve in that position at the National

5    Targeting Center?

6    A.    I was there almost seven years.

7    Q.    So that's 2008 until what year?

8    A.    About 2014, yes.

9    Q.    Oh, 2014.  And then in 2014, what did you do?

10    A.    I took a position at the Ronald Reagan Building, the

11    headquarters for Customs and Border Protection.

12    Q.    And is that the same position that you are in now?

13    A.    I originally came as a program manager for the CMIR

14    program, the Currency and Monetary Instrument Reporting program.

15    Q.    And just in your understanding, is CMIR the same thing as a

16    FinCEN Form 105?

17    A.    The CMIR is the actual program.  The FinCEN, the document,

18    actually, is what drives it, but they are often used the same,

19    CMIR and FinCEN 105.

20    Q.    And so describe to the jury, what are some of the

21    responsibilities that you had as the program manager for the

22    CMIR program?

23    A.    We ran the day-to-day program, making sure that the field

24    had the supplies they needed to complete filing of the FinCEN

25    105.  And by that, I mean we can either mail the forms in to a

1   place called Coleman Data in Akron, Ohio, or we could digitally

2   fax.  It's called a digital sender.  It's basically an encrypted

3   fax machine.  Those go into a system of record, and then the

4   following day, Coleman Data employees would download that

5   document and then input that into our system of record, the CBP

6   system of record.

7   Q.   And how long were you in that position where you were

8   working with the CMIR program?

9   A.   Well, I still have work in it until they get somebody else

10  to take the program over.

11  Q.   So that's --

12  A.   Today.

13  Q.   -- about 2014 until today?

14  A.   To today.

15  Q.   Now, in your career, Officer Ehrlich, just ballpark figure,

16  about how many FinCEN Form 105s do you think that you've seen or

17  reviewed?

18  A.   Several hundred, at the very least.

19       MR. BROWN:  Your Honor, we move at this time to

20  qualify Steve Ehrlich and have him declared as an expert on the

21  FinCEN Form 105.

22       MR. BENOWITZ:  No objection.

23       THE COURT:  Just a moment.

24  Well, I'm not finding my instruction for you all on an

25  expert witness.  I've got it here somewhere.  Great.  Here it

is.

Ladies and gentlemen, ordinarily, a witness may not testify as to his opinions or conclusions. There is an exception for expert witnesses who are allowed to give opinions and the reasons for them because they become an expert in some art, science, profession, or calling.

In this case Steve Ehrlich is testifying as an expert concerning Treasury Department Form FinCEN 105.

You are not bound by an expert's opinion. If you find the opinion is not based on sufficient education or experience, that the reasons supporting the opinion are not sound, or that the opinion is outweighed by other evidence, you may completely or partially disregard the opinion. You should consider this evidence with all the other evidence in the case and give it as much weight as you think it fairly deserves.

Thank you.

MR. BROWN: Your Honor, the government moves to admit and publish Government Exhibit 34 pursuant to the parties' stipulation.

THE COURT: I think this is already in, but you can go ahead.

MR. BROWN: If it hasn't been admitted.

BY MR. BROWN:

Q. Officer Ehrlich, I'm showing you what's been marked as Government Exhibit 34. Let me zoom out so you can see the whole

1     document.  There are two pages here.

2        Do you recognize what this document is?

3     A.   Yes.

4     Q.   And what is it?

5     A.   It is a 2011 version of the FinCEN 105.

6     Q.   And so you mentioned it's the 2011 version.  Would this

7     have been the version that was in circulation in April of 2016?

8     A.   Yes.

9     Q.   I'm going to -- zooming in to Part I -- do you see it

10     says "Part I" here?

11     A.   Yes.

12     Q.   So what are some of the fields that someone would need to

13     fill in when they are filling out this form?

14     A.   Part I is for the individual who is physically in front of

15     the officer, who is either entering into the United States cash

16     or monetary instruments or thus importing and/or the individual

17     who might be exporting or leaving the U.S.

18     Q.   And what sort of identifying information does the form

19     require?

20     A.   It asks for the name of the individual, last, first, and

21     middle name.  And then it asks in number 2, which is up towards

22     the top of the form, an identification number, which is normally

23     a Social Security number but some people put a worker ID number.

24     I have seen border crossing card numbers.  A number of

25     identifiers go into number 2.

1    3 asks for date of birth, month, day, and year.  And then 4

2    is for a permanent address in the United States or abroad.  It

3    asks for a permanent address, United States or abroad, because

4    both U.S. citizens and foreign individuals would fill out the

5    same form.

6        And then 5 is your country or countries of citizenship.  5

7    is the address while in the United States, if you do not reside

8    here.  7 asks for a passport number and a country of issuance.

9    8 is, if you have a U.S. visa, the date that it was issued.  9

10   is the place in the United States where the visa was issued.

11       And then 10 is immigration alien number.  Again, you might

12   see a border crossing card number there or normally an "A"

13   number, the alien file number for an individual.

14   Q.   I would like to direct your attention to block 11.  Do you

15   see where that is?

16   A.   Yes.

17   Q.   I'm going to point to it with my pen.  Is that block 11

18   that I am pointing to with my pen?

19   A.   Yes.

20   Q.   Could you read what it says right there after 11?

21   A.   It says, "If currency or monetary instrument is accompanied

22   by a person, complete 11a or 11b, but not both."

23   Q.   And if you look at the next line, could you just sort of

24   explain what that means in kind of plain English?  How is

25   somebody supposed to fill out block 11?

1    A.   If they are leaving the United States, thus taking money

2    outside of the United States, they're exporting it.  So they

3    would fill in block A.  They would fill in that they're

4    departing from whichever location they're leaving the U.S. and

5    then fill in the arriving point in the foreign country that

6    they're going to.

7    Q.   And then if we skip down to Part III, do you see Part III?

8    A.   Yes.

9    Q.   And what is the information that someone is supposed to put

10   into Part III of this form?

11   A.   The currency and monetary instrument that they are carrying

12   and the amount.

13   Q.   And we will drill down into what those are in just a

14   second.  And then if you look at Part IV, what does Part IV call

15   for?

16   A.   It calls for the signature of the person and then instructs

17   them that, under the penalties of perjury, that they are

18   declaring that they have examined the report and, to the best of

19   their knowledge and belief, it is true and correct and complete.

20   Q.   And then below that, there's a field that says "Customs and

21   Border Protection use only."

22        Do you see that?

23   A.   Yes.

24   Q.   And what is some of the information that is filled in below

25   there?

A.   We mark whether -- if it's a shipment, whether it's coming

inbound or outbound of the United States, whether it's coming in

or out.  We will put the port code, the actual location that

we're at physically when we deal with the form.  And then we do

some checks in our systems of record under the "CBP query" box

and check yes or no.  It's usually always yes.

    And then if we had to count the moneys, we would check yes

or no, and then whether it was a voluntary report, yes or no,

and then date, airline, flight or the vessel, or if they're on a

land border and traveling by car, there's information for the

license plate, state and the plate number, and then finally, the

inspector who looked over the form and their badge number.

Q.   And just to be clear, all of these fields below where it

says "Customs and Border Protection use only," who would be the

person filling out that part of the form?

A.   Normally, it's the officer who is actually collecting the

form.

Q.   And then just very briefly, I showed you this was a

two-page document.

A.   Yes.

Q.   Do you recognize the second page here?

A.   That is the instructions on the back of the document.

Q.   So is there anything for a traveler to fill out on the

second page?

A.   No.

Q.   And is this second page sometimes printed on the back of that first page?

A.   Yes.

Q.   So stepping back for a minute, could you explain to the jurors, generally speaking, what is it that causes somebody to fill out one of these forms?

A.   There are a number of things.  Air travelers coming from foreign normally will be handed a blue and gray form on the aircraft called a 6059B, which is the general declaration that asks the questions about what are you bringing back from foreign, gifts.  It's trying to get at if you have anything that is dutiable that would need to collect duty and, thus, take you into a separate line.  It asks agriculture questions, in case you're bringing back some prohibited product.  It asks also about having been around livestock to protect our agriculture here.  And then finally, it talks about bringing in excess of $10,000 in monetary instruments or cash.

     The other way, which is normally at the locations, smaller locations or at the land border, those questions are asked by the officer who is standing in the little guard shack or in the primary as you walk through the port of entry.

Q.   And then if somebody answers in the affirmative, either written or to an officer, that they are carrying more than $10,000 in currency, would that then trigger a requirement to file this form?

187

1    A.   It would trigger -- they're required to ask first to see if
2    they had already filled it out and had it in their possession.
3    Or if they did not, we would move them into secondary where they
4    could obtain a form.
5    Q.   And how much money again does somebody have to be carrying
6    in order for them to have to file one of these forms?
7    A.   Once they exceed $10,000 in cash or monetary instrument,
8    $10,001 would trigger the need to file the form.
9    Q.   And so when we refer to cash, is it fair to say that is
10   currency?
11   A.   Cash is the cash or the paper money or the coins that are
12   in circulation in the U.S. or a foreign country.
13   Q.   And does that have to be U.S. dollars, or can it be a
14   foreign currency?
15   A.   It can be a foreign currency.
16   Q.   And if it is a foreign currency, how would you figure out
17   whether or not the $10,000 threshold has been met?
18   A.   We use whatever the current exchange rate is for that
19   particular foreign currency to make that determination.
20   Q.   And then in terms of monetary instruments, could you give
21   an example of a couple things that might qualify as a monetary
22   instrument that might trigger the requirement to file this form?
23   A.   Travelers checks, money orders are the normal, checks made
24   out to the bearer that are endorsed.
25   Q.   And how about things that are not monetary instruments?  Is

1  a wire transfer a monetary instrument?

2  A.   No.

3  Q.   And is there a reason why the government might want a

4  traveler to file a Form 105 if they're carrying currency but not

5  if they're making a wire transfer?

6  A.   The wire transfer already has information on both ends that

7  the money has moved.  With carrying cash and coming through a

8  port of entry, there's no one that knows that until the form is

9  filed.

10  Q.   Does the Form 105 only apply if somebody is crossing the

11  border into or out of the United States?

12  A.   No.  It also covers those who receive cash or monetary

13  instrument by mail or if it's shipped to them.

14  Q.   And so the critical fact is what?  Is it the movement of

15  cash or currency or monetary instruments?

16  A.   Yes, it's the movement of cash into or out of the United

17  States.

18  Q.   And why is it that the government might be concerned about

19  knowing whether or not somebody is bringing currency into the

20  United States?

21  A.   Some of it could be monetary -- or money laundering.  It

22  could be that the individual is coming in to purchase farm

23  machinery or looking at how well the economy of the United

24  States is doing.

25  Q.   And how about money going outside of the United States?

1    Why would the government be interested in whether people are
2    carrying currency out of the United States?
3    A.   Again, some of it is to see the value of the dollar.  Is it
4    going out and would then appear to be that the U.S. economy is
5    doing well.  They could be taking it out for vacations, or it
6    could be some illicit movement of moneys from drug trade,
7    terrorism.
8    Q.   And based on your experience, why would an illicit activity
9    like drugs or terrorism involve currency going out of the
10   country?
11   A.   Because the drugs would be sold in the U.S., and then the
12   moneys that were made for them would be traveling outside the
13   United States.
14   Q.   Now let's talk about exceptions to the Form 105 filing
15   requirement.  As far as you're aware, are there any exceptions
16   for individuals carrying currency across the border?
17   A.   No.
18   Q.   Now, are there any exceptions for U.S. diplomats carrying
19   currency across the border?
20   A.   No.
21   Q.   Are there any exceptions for members of federal law
22   enforcement to carry currency across the border?
23   A.   No.
24   Q.   Are there any exceptions to the FinCEN Form 105?
25   A.   Bank-to-bank transfers.

Q.   Now, how are Form 105s actually collected at the border?

A.   Officers will pick those up from the individual as they are coming into the U.S., if they say they have in excess of $10,000.  Once they are picked up, they are either mailed to or through the use of a digital sender, that encrypted fax, are sent to Coleman Data.

Q.   And if somebody is leaving the country and they need to file a FinCEN Form 105, how would they do that?

A.   They would contact the CBP officers in the airport or at the land border or even at maritime border to file the form.

Q.   And if somebody is leaving through an airport going to another country, is there always going to be a CBP officer at that airport?

A.   Yes.

Q.   And are there ever any signs at airports to advise outbound travelers about the FinCEN Form 105 requirement for going out of the country?

A.   Yes, there is.

Q.   And at any airports in the United States, would there be actual forms that you could pick up to fill out a FinCEN Form 105?

A.   Yes, there would.

Q.   And what if somebody leaves without filing a FinCEN Form 105 and then after they've traveled to a foreign country they want to go ahead and file that form?  How would they go about

1   doing that?

2   A.   They can fill the form out and mail it to the Commissioner

3   of -- on the form, it says of Customs, but it's actually Customs

4   and Border Protection.

5   Q.   And where is that address?

6   A.   It is the -- it lists a general address with the D.C.,

7   Washington, D.C., ZIP code of 20229.  They normally make their

8   way to either my office or over to the facility in Springfield.

9   Q.   And where is your office?

10   A.   Washington, D.C., at the Ronald Reagan Building.

11   Q.   And is the FinCEN Form 105 available on the Internet?

12   A.   Yes, it is.

13   Q.   And so if somebody wanted to file one of these, could they

14   just Google it?

15   A.   Yes.

16   Q.   And they could print it up and file the form that way?

17   A.   Yes.

18   Q.   Now, are travelers ever stopped or arrested at the border

19   based on a failure to file currency -- or failure to declare

20   currency?

21   A.   Yes.

22   Q.   And what typically happens during a stop like this?

23   A.   The money normally is taken as evidence, and the individual

24   may receive civil penalty or could be arrested.

25   Q.   And if there's a Customs officer who is just looking at a

1    traveler and the traveler has a bundle of cash, is there some

2    way that the Customs officer could figure out whether or not

3    that's more than $10,000?

4    A.    It depends on the denomination, but a 7/8-inch stack of 5s

5    is about $1,000, and then 7/8 inch of $100 bills would be about

6    $20,000.

7    Q.    So if about 7/8 of an inch is $20,000 in $100 bills, I

8    guess, would four times that width -- and I'm not good at math,

9    but would that be about $80,000 in $100 bills?

10   A.    Yes, about 3-1/2 to 4 inches.

11   Q.    And in terms of the information that's collected via the

12   FinCEN Form 105, how is that information actually used in the

13   United States government?

14   A.    It's used in a number of ways.  It's used to track money

15   coming into and out of the United States.

16   Q.    So what federal agencies would be interested in that

17   information?

18   A.    Department of Commerce has some interest.  The Department

19   of Treasury, of course.  Some of it, they want to keep track of

20   how much paper money is actually moving or circulating in the

21   United States.

22   Q.    And is there a significant percentage of paper money that's

23   circulating outside of the United States?

24   A.    There is.

25   Q.    Do you happen to know about what the percentage is?

1    A.   I don't know, but because of what I do, there's oftentimes

2    pallets of cash that receive FinCEN documents.

3    Q.   So if somebody was moving a pallet of cash for legitimate

4    reasons, they would still have to file one of these FinCEN Form

5    105s?

6    A.   Yes.

7    Q.   Now, from a law enforcement perspective, how are these

8    FinCEN Form 105s used?

9    A.   They can be used in an investigation for drug trafficking,

10    money laundering, or possible funding of terrorism.

11    Q.   And does a traveler have to be under suspicion already for

12    them to have to file one of these forms?

13    A.   No.

14    Q.   Is this form sometimes the first indication of illegal

15    activity?

16    A.   It could be, yes.

17    Q.   Are there legitimate reasons why somebody might carry more

18    than $10,000 across the U.S. border?

19    A.   Yes.  On the southern border, we saw it a lot with the

20    Amish farmers from Mexico would actually be bringing the cash up

21    to buy field equipment and then take it back across the Mexican

22    border.

23    Q.   And from a law enforcement perspective, if you encountered

24    somebody who was using -- or who was transporting cash for

25    legitimate purposes, like your Amish farmers, and they did file

1    a FinCEN Form 105, would there be any further scrutiny from law

2    enforcement?

3    A.    No.

4    Q.    Officer Ehrlich, are you familiar with a CTR, a Currency

5    Transaction Report?

6    A.    Yes.

7    Q.    And just explain to the jury, what's the difference between

8    a CTR and a FinCEN Form 105?

9    A.    The simple answer is the CTR is filed and deals with

10   transactions that occur in the bank.  The FinCEN 105 deals with

11   the actual monetary movement across the borders, either into or

12   out of the United States.

13   Q.    And who files the CTR?

14   A.    I don't honestly know.

15   Q.    And who files the FinCEN Form 105?

16   A.    The individual who is bringing the money into or out of the

17   United States.

18            MR. BROWN:  No further questions.

19            THE COURT:  Mr. Benowitz?

20            MR. BENOWITZ:  Yes.  Thank you.

21                    CROSS-EXAMINATION

22            BY MR. BENOWITZ:

23   Q.    Good afternoon.

24   A.    Good afternoon.

25   Q.    My name is David Benowitz.  I will be asking you some

1    questions.

2         Now, is it Mr. Ehrlich or Agent Ehrlich?

3    A.   Either one is fine.

4    Q.   All right.  Now, when someone is coming into the country,

5    flying in from outside the country, they get the form on the

6    plane that the flight attendants hand out; isn't that right?

7    A.   That is correct.

8    Q.   Okay.  And that is the 6059B form?

9    A.   That is correct.

10   Q.   And if someone who is coming in from outside the United

11   States fills out that 6059B form and says I have $12,000 in

12   cash, they then get moved to secondary; is that right?

13   A.   Yes.

14   Q.   Okay.  And that's where they would then receive the FinCEN

15   105?

16   A.   If they don't already have one themselves, yes.

17   Q.   Okay.  But to be clear, the FinCEN 105 is not given out on

18   the plane?

19   A.   No.

20   Q.   Okay.  So either a person would -- either a traveler coming

21   into the United States would have to know about the form, the

22   FinCEN 105, or they would be given it in secondary if they

23   declared more than $10,000 on the 6059B form; is that right?

24   A.   The 6059 instructs them about the carrying of the cash.

25   They don't find out about that form until after.

1    Q.   Okay.

2    A.   In secondary.

3    Q.   Okay.  Let me rephrase it, then.

4    A.   Okay.

5    Q.   So if I'm a traveler and I have $15,000 on me and I'm

6    coming from outside the United States and I'm flying in and I

7    don't have a FinCEN 105 because I don't know about it, I fill

8    out the 6059B form, and I say I have $15,000 on me.  I will then

9    be given a FinCEN 105 at Customs in secondary; is that right?

10   A.   Correct.

11   Q.   Okay.  And unless I happen to know about the FinCEN 105

12   before I get on the plane and bring one of my own; is that

13   correct?

14   A.   That's correct.

15   Q.   Okay.  And to be clear, if I'm leaving the country with

16   $15,000 or more -- I'm sorry, $10,000 or more and I leave the

17   United States and I don't fill out the FinCEN 105, I've got

18   basically 15 days to mail a form in; is that right?

19   A.   No.

20   Q.   No?

21   A.   No.  If you go outside the country and you forget to file

22   one, you need to file one as soon as that revelation hits you,

23   because you were supposed to have filed it prior to leaving the

24   U.S., either the day of filling it out and then walking it to

25   the officer or at the time that you are actually getting ready

197

1   to get on the plane to be handing it in.

2   Q.   We already have Government's Exhibit 34 on the monitor.

3   I'm going to just turn to page 2.  I just want to get some

4   clarification on this.  I'm going to point to section A on the

5   FinCEN 105.

6        Do you see that?

7   A.   Yes.

8   Q.   That says "recipients"?

9   A.   Yes.

10  Q.   Is that big enough for everybody?  Let me go a little bit

11  bigger.

12       Now, what section A on page 2 of the FinCEN 105 says is,

13  "Each person who receives currency or other monetary instruments

14  in the United States shall file FinCEN Form 105 within 15 days

15  after receipt of the currency or monetary instruments."

16  A.   That's if they are physically in the United States and that

17  money is mailed to them, they have 15 days.  If you're going

18  outside of the United States, the money did not come in to you.

19  Q.   I'm sorry.  So you're saying that what section A means is

20  that if you receive currency by mail?

21  A.   Yes.

22  Q.   So if I go to a bank and get $10,000, I don't have 15 days?

23  A.   No.

24  Q.   But does it say it there, or is that just the

25  interpretation by you?

1    A.    No.  It says, "Each person who receives currency or other

2    monetary instruments in the United States shall file FinCEN Form

3    105 within 15 days after receipt of the currency or monetary

4    instruments with the Customs officer in charge at any port," the

5    recipient being the individual who received a mail or the

6    shipment of cash.

7         If you're physically carrying it, you have to report it at

8    the time that you're exiting or entering the United States.

9    Q.    All right.  Court's indulgence.

10        Now, I want to focus you back on page 1 of the FinCEN 105,

11   to section 11.  This deals with if the currency or the monetary

12   instrument is accompanied by a person; is that correct?

13   A.    Yes.

14   Q.    And so 11A says -- essentially deals with the situation if

15   the money leaves the United States; is that right?

16   A.    Section A is for money leaving, exporting.

17   Q.    So exporting, leaving the United States; is that right?

18   A.    Yes.

19   Q.    Okay.  And so the person who is filling out the form would

20   have to say when they departed from the U.S.?

21   A.    No.  They put -- in A, they put where they're departing

22   from.

23   Q.    Oh, where they're departing from?

24   A.    Where.

25   Q.    Okay.  And then the next box over, they would have to say

1    where they're going?  Is that what --

2    A.   What foreign city or country they're arriving at.

3    Q.   Okay.  So in other words, even though it says "arrived at,"

4    they have to put that in before they go?

5    A.   They normally would have that information from their ticket

6    where they're headed to.

7    Q.   All right.  And down at the bottom of the FinCEN 105, on

8    the right side, it says "count verified."  Do you see that box?

9    A.   Yes.

10   Q.   So does that mean that, if necessary, a CBP officer will

11   use a money-counting machine to count the money?

12   A.   It could be any number of ways to verify.

13   Q.   All right.  Is that one of the ways?

14   A.   Yes.

15   Q.   Now, when Mr. Brown was asking you questions, you said that

16   there are signs at airports that indicate that FinCEN Form 105s

17   are available; is that right?

18   A.   That one needs to be filled out, that you have to report

19   the movement of excess of $10,000 into or out of the United

20   States.

21   Q.   Okay.  So at Honolulu International Airport, where is that

22   sign?

23   A.   I don't know where the sign is at Honolulu.  They're

24   normally working in conjunction with the airport.  You might see

25   them at the carousels where you pick up luggage.  They can be in

1  any number of locations around the federal inspection area right

2  where CBP is at.

3  Q.  Okay.  So to take your example, if they were at the luggage

4  carousel, in most airports the luggage carousel is where people

5  are arriving; isn't that right?  That's where people go when

6  they arrive?

7  A.  Yes.

8  Q.  Not when they're leaving?

9  A.  Yes.

10  Q.  And you said that when someone is leaving the country and

11  they have money that they need to declare, they would contact a

12  Customs and border patrol officer at an airport; correct?

13  A.  Customs and Border Protection, yes.

14  Q.  Customs and Border Protection, excuse me.  So if, for

15  example, someone was flying out of Honolulu International

16  Airport and they were leaving the United States, they wouldn't

17  be going through Customs, though; right?

18  A.  No.  But the normal operation, as you're leaving the United

19  States and you present your passport to the ticket agent, that

20  starts the process where they usually let you know that you

21  would have to report.

22      Then also, the gate agent, as I've had happen to me on a

23  number of occasions, will ask if I am traveling with in excess

24  of $10,000, or there might be a sign on the desk.

25  Q.  Okay.  I just want to be clear.  You're saying a gate agent

1   has asked you, in other words, as you're going on the plane if

2   you have in excess of $10,000 in cash?

3   A.    Not as I'm going on the plane.  At the desk by the gate.

4   Q.    Oh, okay.  So just to be clear, you're talking about when

5   you walk up to the gate, and there's the reception area where

6   there's usually a ticket agent?  Is that what you're talking

7   about, right before the gate when you get on the plain?

8   A.    That's one of the locations, yes.

9   Q.    So what about when you have an e-ticket?

10  A.    You still -- if you're doing an e-ticket, then I'm -- I'm

11  trying to think of the number of ways that you would have been

12  notified if you use an e-ticket.  You're still going to have to

13  report that information to the CBP officer.

14  Q.    If you know; right?

15  A.    Correct.

16  Q.    Isn't it fair to say that the process of notifying people

17  that they need to report excess of $10,000 is much more

18  organized -- I'm sorry, is much more public when you're coming

19  into the country than when you're leaving the country?

20  A.    No, I wouldn't say that.

21  Q.    Really?  So you wouldn't agree that when the flight

22  attendants hand every adult on a flight coming into the United

23  States and on the form it indicates that if you have more than

24  $10,000 in cash you need to declare it, isn't that much more

25  public than what you've talked about here for leaving the

1    country?

2    A.    Well, by -- the individual coming into the U.S., they've

3    got to exit.  We've caught them on the way in.  If they're

4    taking the money back out, they would already have that

5    knowledge.

6    Q.    All right.  Court's indulgence.

7          I have nothing further.  No further questions.  Thank you.

8              THE COURT:  Thank you, Mr. Benowitz.

9    Mr. Brown, any redirect?

10             MR. BROWN:  No redirect, your Honor.

11             THE COURT:  All right.  May this witness be excused?

12             MR. BROWN:  Yes, your Honor.

13             MR. BENOWITZ:  Yes.

14             THE COURT:  Officer Ehrlich, thank you for your

15   testimony.  You are excused.

16             MR. BROWN:  Your Honor, the government rests.

17             THE COURT:  Ladies and gentlemen of the jury, the

18   government has rested.  That means that its case-in-chief is

19   finished.  So we are making good progress on the trial.  You all

20   are going to be excused for the day.  Before you leave, I want

21   to remind you of a couple of things that we've discussed before.

22         Until I submit this case to you at the end of my final

23   instructions, you must not discuss it with anyone, not with

24   other jurors, the parties, witnesses, attorneys, anyone involved

25   in the trial, your family, friends, or anyone else.  Second, do