UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>v.<br><br>ROMAN STERLINGOV,<br><br>*Defendant*. | Criminal Action No. 21-399 (RDM) |

**MEMORANDUM OPINION AND ORDER**

The question before the Court is whether a supplemental protective order previously entered in this case, Dkt. 196, restricts Defendant Roman Sterlingov from viewing certain materials prepared by the government's expert witness, Chainalysis, for the benefit of the defense and produced in September 2023. To date, only counsel has reviewed that material, which provides further detail regarding the heuristics that a Chainalysis software product called Reactor used to cluster blockchain transactions relevant to the charges currently pending against Sterlingov. Although Chainalysis prepared this material for the benefit of Sterlingov's expert, Jonelle Still of Ciphertrace by Mastercard, she has since indicated that she is unwilling to review the materials—regardless of the terms of any protective order. *See* Dkt. 205 at 1. Apparently, Ciphertrace has plans to develop similar heuristics and is concerned that it could be accused of poaching Chainalysis's intellectual property if one of its employees is granted access to Chainalysis's proprietary heuristics and similar heuristics subsequently appear in Ciphertrace's competing software. *See* Sept. 21, 2023 Hrg. Tr. at 10–13. Sterlingov has failed to request that any other testifying or non-testifying expert receive access to the material and, instead, suggests

(without actually saying) that he personally has the requisite expertise to analyze the material in aid of his own defense. *See generally* Dkt. 207.[1]

As it currently stands, the record lacks information sufficient to permit the Court to determine: (1) whether the government has carried its burden of demonstrating that "good cause" exists to deny Sterlingov access to the detailed heuristic information; (2) whether some portions of the materials at issue raise greater concerns than other portions; and (3) whether Sterlingov is entitled to personal access to the information even if good cause for the limitation otherwise exists because he cannot adequately prepare and present his defense without that access (in other words, whether there is a basis to conclude that, in the unique circumstances present here, Sterlingov's Fifth and Sixth Amendment rights trump or limit Federal Rule of Criminal Procedure 16(d)(1)).

To fill this vacuum, the parties are hereby **ORDERED** to appear for a hearing on November 13, 2023, at 1:30 p.m.

## I.

The Court assumes the parties' familiarity with the relevant factual background and procedural history and offers here only one important point of clarification, which bears at least indirectly on the question presented.

According to the defense, the "Court's protective orders have effectively prevented . . . Sterlingov's expert witnesses, specifically Ciphertrace, from reviewing the purportedly sensitive heuristics because of the concern of future intellectual property litigation," Dkt. 207 at 6, and "[p]roprietary and intellectual property interests have been used to effectively preclude the

---

[1] The parties agreed amongst themselves, and the Court adopted an order that no new testifying experts shall be added in this matter. Sept. 21, 2023 Hrg. Tr. at 39–40.

Defense's own choice of experts and its choice of expert review software." *Id.* at 8–9.  Neither assertion is correct.

The relevant terms of the protective order at issue evolved over the course of four hearings held between September 13 and September 21, 2023.  For clarity, the Court summarizes those (and earlier) proceedings and the various representations made at each.  At bottom, the record does not support any suggestion that protective orders have prevented Sterlingov's expert from reviewing the detailed heuristic information.  To the contrary, that choice was made by Still and her employer, Ciphertrace—notwithstanding the Court's repeated invitation to the company to propose any reasonable changes to the protective order and repeated efforts to facilitate Still's access.  In response to these entreaties, Ciphertrace made clear that its objection was not to the terms of the protective order and, instead, that it would not permit Still (or any other Ciphertrace employee) to review the materials because Ciphertrace is developing a competing product and wants to avoid any risk (no matter how small) that it might someday be accused of misappropriating Chainalysis's intellectual property.  Indeed, it adhered to that position even though Still is not employed by Ciphertrace in a technical position, plays no role in product development (and, in fact, during her *Daubert* testimony was unaware of details concerning the heuristics that Ciphertrace itself uses in its own tracing software, *see* Aug. 22, 2023 Hrg. Tr. at 244–47), and even though any Ciphertrace employee who has anything to do with developing new products could be walled off from this case, thereby eliminating any plausible risk of a non-frivolous suit.  Sept. 21, 2023 Hrg. Tr. at 10–13.

Early in the life of this case, and long before the heuristic production now at issue, the Court entered a protective order, which permitted defense counsel to disclose materials provided by the government in discovery to Sterlingov and "persons employed to assist in the defense

3

(including experts)," but which (1) precluded the defense team from using those materials except "in connection with the defense of this case," Dkt. 18 at 1 (Protective Order ¶ 1), (2) required that any defense expert sign the required "acknowledgment form" before retaining copies of any of the materials, *id.* (Protective Order ¶ 2), (3) required that any defense expert sign the "acknowledgment form" before even being shown any "sensitive materials," *id.* at 2 (Protective Order ¶ 8), and (4) allowed defense counsel to show "sensitive materials" to Sterlingov but, with certain exceptions explained in the order, did not permit Sterlingov to keep copies of those materials in his possession, *id.* at 3 (Protective Order ¶ 9). The protective order defined "sensitive materials" to include "non-public information about or relating to third parties and potential witnesses." *Id.* at 2 (Protective Order ¶ 7). The "acknowledgment form" required the expert or other third party to attest that she had read the protective order and "agree[d] to abide by its terms;" it required defense counsel to certify that the disclosure to the expert or other third party was "necessary for the purposes of this litigation;" and it required defense counsel to provide the acknowledgment "to the Court for *ex parte* review upon request by the Court or the United States." *Id.* at 5.

Fast forward nearly two years: On September 9, 2023, in response to the defense's requests for access to the Reactor source code, Chainalysis voluntarily prepared and produced to the government a detailed summary of the heuristics used in the Reactor software for purposes of this case. *See* Dkt. 188 at 1. According to the government, much of this information was already available in the discovery provided in the case, and it stresses that the summary was created only in response to the Court's direction that the defense should have comprehensive access to all of the assumptions used in Chainalysis's expert analysis. *See* Sept. 13, 2023 Hrg. Tr. at 39. Because its heuristics are both proprietary and law-enforcement sensitive, Chainalysis requested

4

that the Court enter a separate protective order limiting the use and disclosure of the detailed, heuristic information. *See* Dkt. 188.[2]

The government relayed Chainalysis's proposed protective order to the defense. *Id.* On September 11, 2023, defense counsel informed the government that they had objections to the proposed protective order. *Id.* At the time, trial was set to commence in a matter of days, so both the government and Chainalysis urged defense counsel to agree to the terms of the proposed protective order as an intermediate measure to facilitate immediate production of the additional heuristic information. Sept. 13, 2023 Hrg. Tr. at 5. Defense counsel was unwilling to do so. As the Court understands it, at that time, defense counsel's primary objection was that the proposed protective order included a five-year noncompete clause. In their view, that condition posed a difficulty for Still and (implausibly) implicated counsel's own ability to represent new clients in future cases involving the blockchain. *See id.*

In response to those objections, Chainalysis filed two proposed protective orders on the docket: the first was written for an unnamed expert and contained a five-year noncompete clause, and the second was written specifically for Still and omitted the noncompete clause. *See* Dkt. 195. The second proposed protective order provided, among other things, that "[a]ll highly

---

[2] On September 13, the Court denied the defense's request for leave to issue a Rule 17(c) subpoena seeking Chainalysis Reactor's source code, Dkt. 155, because, despite numerous opportunities: (1) the defense remained unable to articulate with any specificity why it needed the code itself; (2) the reasons that the defense did give to support its request were unrelated to source code (and in fact persuasive evidence that the defense did not in fact need access to code); and (3) the defense had failed, despite the Court's instructions, to identify an expert in computer code (a) who was subject to the Court's power to compel compliance with a protective order (or, in the alternative, was not a competitor of, or otherwise adverse to, Chainalysis), and (b) who provided the Court, as directed, with a statement *by the expert* explaining what information the expert hoped to glean from the source code and why that information was necessary to the defense. The defense never complied with these requirements, which the Court explained were, on the facts of this case, necessary to meet the requirements of Rule 17(c). *See* Sept. 13, 2023 Hrg. Tr. at 91–114.

5

confidential heuristic information may be used by defense counsel and their expert Jonelle Still solely in connection with the defense of this case, and for no other purpose, and in connection with no other proceeding, without notice to the government, Chainalysis and further order of this Court." Dkt. 195-2 at 3–4 (capitalization altered). The Court has since made clear that it sees no material difference between that second protective order and the protective order that the Court had entered almost two years earlier. *See* Min. Order (Sept. 21, 2023). "Under either protective order, it's clear that this information can only be used for the purpose of this case and cannot be disclosed to anybody else." Sept. 21, 2023 Hrg. Tr. at 13–14.

A.     **The September 13 Hearing**

On September 13, the day before jury selection was set to begin, the parties appeared before the Court. Defense counsel had still not viewed the heuristic production because of their continued objections to the proposed protective order. The Court's objective at the September 13 hearing was simple: "Mr. Ekeland, what can I do to get this [material] in your hands as quickly as possible?" Hrg. Tr. at 6.[3] At the hearing, it was not clear that defense counsel had actually reviewed the revised proposed protective order from Chainalysis; notably, counsel continued strenuously to object to a five-year noncompete, prompting the Court to inform him that the alternative version proposed by Chainalysis no longer included the five-year noncompete for Still or defense counsel. *See id.* at 10.

---

[3] The Court stated: "I'm giving you every break I possibly can. But you have to [avoid] doing everything you can possibly [do] to get to a 'no' answer. You have to be looking at how to get to the 'yes' answer and find ways to actually make this work rather than—quite frankly, it feels at times that you're more concerned with just having an appellate issue than actually getting what you need in the case. Every time I try [to] accommodate you in some way, you don't accept that; and you don't accept the Court's invitations to do things that will actually get you what need. So, all I'm trying to do right now is get you what you need." *Id.* at 9–10.

6

With that clarification, defense counsel objected that the protective order was too restrictive with respect to the conditions of Still's access and use. Specifically, counsel stated that Still and her "superiors at CipherTrace" were concerned that the protective order would not allow her to "run" the new information "through CipherTrace's software" on Ciphertrace's own computers. *Id.* at 8. That limitation would not work "for [Still and Ciphertrace]," defense counsel argued, "because they need to take the data and use CipherTrace's systems to evaluate the stuff." *Id.* In response, the Court noted that neither defense counsel nor Still had yet seen the materials at issue, making it difficult for them to form any views about whether and how they might use it. *Id.* To that end, the Court entered an order providing that defense counsel "can look at [the production;] that your colleagues from your law firm can look at it; [but] that [you] may not disclose it or discuss . . . the contents of it with anybody else, absent further order of the Court." *Id.* at 12. The Court then recessed to allow defense counsel to review the detailed heuristic production to facilitate a more productive conversation regarding next steps.

The proceedings resumed. With the benefit of both sides having reviewed the heuristic production, the Court heard argument on the protective order proposed to govern Still's review of that information. The Court then entered Chainalysis's second proposed protective order (the one drafted specifically to address the concerns voiced by defense counsel and Still about the noncompete clause), with one further modification made in response to defense counsel's then-most-recent objection. *See* Dkt. 196. The modified version of the protective order allowed Still to seek leave of Court to "run" the Chainalysis data through Ciphertrace computers as needed. *See id.* at 2. Having addressed each of the concerns raised by the defense, it appeared that the matter was settled.

B.     The September 15 Hearing

At a hearing two days later, however, defense counsel informed the Court that Still and Ciphertrace remained unwilling to look at the heuristic production. In defense counsel's words, it would be a "career killer" for Still to review the material, given Ciphertrace's "perception of the threat, whether or not it's real," that it would risk "contempt of court" or suit by Chainalysis if Still were allowed to review the material and Ciphertrace were, someday, to market its own version of Reactor's behavioral heuristic. Sept. 15, 2023 Hrg. Tr. (Rough at 8). The Court expressed doubts about the plausibility of that concern, noting that Still had testified at her *Daubert* hearing that she is not employed by Ciphertrace in any technical capacity and, thus, that her review of the heuristic production would not pose a realistic threat to Chainalysis or to Ciphertrace—her review would not, for example, pose the classic risk of, say, a software engineer trying to "unsee" the solution to a problem. *Id.*

Nonetheless, in yet further effort to assuage Ciphertrace's concerns and to facilitate disclosure, the Court added that Still could "be walled off" from others at Ciphertrace regarding the heuristics; she could review the materials off site; and the Court could "accommodate [Ciphertrace's] concerns and [could] come up with ways in which their risk [would be] extremely minimal." *Id.* at 14; *see also id.* at 8–9. Despite the Court's best efforts, however, defense counsel represented that Ciphertrace remained unwilling to permit Still to look at the heuristic production. *Id.* at 12 ("From my understanding and I don't want to put words in their mouths, [Ciphertrace] is simply looking at this and saying, we don't even want to take the risk."). At that point, rather than continuing to play a game of telephone, the Court invited a Ciphertrace representative to address the Court on behalf of the company. *Id.* at 12, 18. The Court stated: "If that's their bottom line, I think I can provide them with whatever assurances we can and we can

8

put measures [in place] to try and minimize that risk, for example, as I said, by having Ms. Still go to Chainalysis and look at [the heuristic production] there." *Id.* at 12. That invitation was first made after lunch on September 15, 2023.

As the hearing progressed, defense counsel kept the Court informed about various unsuccessful efforts to get in touch with a Ciphertrace lawyer through Still, prompting the Court to request that somebody from the company be made available by Zoom at 3:30 p.m. on September 15. *Id.* at 27. By 4:25 p.m., when the Court adjourned for the day, counsel for Ciphertrace had not appeared and had not responded in any way to the Court's invitation.

### C.     The September 18 Hearing

The following Monday, September 18, the parties returned. At the start of the hearing, defense counsel informed the Court that: "[W]e've reached out again to CipherTrace. They don't want to appear. They are counseling Ms. Still not to sign the protective order. It's my understanding that Ms. Still doesn't want to sign the protective order." Sept. 18, 2023 Hrg. Tr. (Rough at 2). The Court responded:

> . . . I think this is ultimately a question between the defense and the defense expert[,] and [if] the defense expert is unwilling to take reasonable steps to look at the evidence, I'm not sure that's the government's problem. I'm not sure it's my problem. And that's up to the defense. They've got an expert who is refusing to look at evidence that the defense requested, knowing that a protective order was going to be a condition of providing that information . . . .
>
> It's a shame that we wasted all our time going through all these steps to get the information for the defense [and] that the defense [expert] is not prepared to look at [it]. That's ultimately, I think, their business. If they're not willing to look at it and . . . [the defense expert] is unwilling to engage with the Court to explain to me what it is they think that needs to change in the protective order to accommodate any concerns, I think that's their problem . . . .

*Id.* at 6–7. The Court was clear that it was prepared, if necessary, to "modify the [protective] order" in order to accommodate Ciphertrace's concerns, but "they won't even engage with me on

9

it." *Id.* at 10.  Finally, toward the end of the September 18 hearing, which stretched into the afternoon, defense counsel informed the Court that counsel for Ciphertrace had requested permission to appear on Thursday, September 21 to discuss the proposed protective order. *Id.* at 112–13.[4]

On September 20, defense counsel filed on the public docket a notice informing the Court that "[n]either Ciphertrace nor Ms. Still may accept, receive, handle, analyze, or otherwise opine on any of the heuristic date from Chainalysis, Inc., *regardless of the scope of any protective order*." Dkt. 199 at 1 (emphasis added).  The notice further stated that "Ciphertrace and Ms. Still must respectfully decline the Court's invitation to review and opine on proprietary data of a competitor." *Id.* at 2.

**D.    The September 21 Hearing**

On September 21, outside counsel for Ciphertrace, Joseph Jay of Sheppard Mullin, appeared by Zoom.  Hrg. Tr. at 3.  Defense counsel argued that there was a "substantial due process issue[]" because the government was "attempting to dictate" who "the defense can have for an expert and how the evidence can be reviewed on purely competitive concerns." *Id.*  In response, before hearing from Jay, the Court clarified that it was the defense that had filed a notice "saying that [Still] refused *under any circumstances* to look at the disclosures that have been made.  It's nothing the government is doing." *Id.* (emphasis added).

The Court then heard from Jay, who expressed Ciphertrace's concern that the protective order adopted by the Court on September 13, Dkt. 196, refers to the heuristic production as proprietary data, which, in his view, risked exposing Ciphertrace to "potential sanction or at least

---

[4] In the interim, the government had requested permission to reach out to Ciphertrace directly using contact information it had found on the Internet in an effort to facilitate the company's appearance, and the defense consented to that limited form of contact. *Id.* at 74.

10

litigation over potential sanction or future litigation because . . . once you turn that stuff over, sensitive information . . . the horse is out of the barn." *Id.* at 9–10.  The Court reiterated its confusion about this argument, given the Court's understanding (which neither defense counsel nor Jay has ever disputed) that "Ms. Still is not involved in *any way* in product development, that she is certainly not a coder, [and that] she's not writing or preparing algorithms." [5] *Id.* at 10 (emphasis added).  The Court then proposed a solution.

The Court asked Jay if Ciphertrace would allow Still to review the materials offsite, with the use of a computer that could subsequently be wiped clean, subject to the terms of the original protective order that the Court had entered nearly two years earlier and that Ciphertrace had already agreed to abide by, Dkt. 18.  *See* Sept. 21, 2023 Hrg. Tr. at 11–13.  "That way you wouldn't have to worry about anyone subsequently claiming that CipherTrace stole Chainalysis's proprietary information, and Chainalysis would be comfortable that its material and information was secure." *Id.* at 13.

Jay indicated that he would have to check with his client, but that he thought that approach would be feasible.  *Id.*  After a brief recess, Jay reported that he had "preliminarily conferred with [his] client" and that Ciphertrace would "take [the Court] up on the suggestion of a clean room for review of the additional material subject to it being subject to the existing protective order at Docket 18."  *Id.* at 40–41.  To accommodate Ciphertrace and Chainalysis, the Court stated that it would enter a minute order clarifying that the original protective order, Dkt. 18, and the most recent protective order, Dkt. 196, are materially the same.  *Id.* at 43–44.  When

---

[5] The Court also notes that Ciphertrace, a sophisticated company owned by Mastercard, could not plausibly have believed before this time that Chainalysis's heuristics were anything but proprietary.

11

the Court broke for lunch, Jay and the government had just begun to discuss the location of a potential clean room in California.  *See id.* at 55.

The Court subsequently entered the following minute order:

> This **ORDER** clarifies that the original protective order entered in this case, Dkt. 18, applies to each and every individual who has viewed or will view information provided by Chainalysis; each and every individual must personally sign Attachment A attached to Dkt. 18.  The Court further clarifies what it has always understood to be true: Any individual who receives information provided by Chainalysis (1) may not disclose that information to any other person who is not subject to the protective order at Dkt. 18 and who has not also signed Attachment A and (2) may not use that information for any purpose other than in connection with this case. The Court further understands that, at the request of counsel for Ciphertrace and counsel for Chainalysis, the material from Chainalysis that the government first offered to produce to the Defense on September 9 or 10, 2023 will be viewed by Ms. Still (and any other Ciphertrace employee working with her who signs Attachment A and abides by the conditions herein) at a neutral location to be agreed upon by the parties, shall not be removed from that location, and shall not be downloaded on any computers or servers other than those mutually agreed upon by the parties.  It is further **ORDERED** that those who have received or will receive access to the Chainalysis material first offered for production by the government on September 9 or 10, 2023 shall not disclose or discuss that information with anyone who is not a signatory to the protective order at Dkt. 196 without prior leave of Court.

Minute Order (Sept. 21, 2023).

To the Court's surprise, however, defense counsel filed a notice the very next day stating that Jay had informed him that, "upon further consultation with his client, Ciphertrace, neither Ms. Still nor Ciphertrace are willing and able to review the latest discovery produced by Chainalysis." Dkt. 205 at 1.  With respect to Still and Ciphertrace's review of the detailed heuristic information, that ended the matter.

As this background demonstrates, defense counsel's assertion that the Court's protective orders have prevented Still from reviewing the heuristic production is inaccurate.  To the contrary, this Court did everything in its power to accommodate the needs of Still and

12

Ciphertrace and to assuage their concerns. In the face of these efforts, Still and Ciphertrace ultimately concluded that they were unwilling to review the material at issue, and they have made clear to the Court that their refusal is based on their own competitive concerns and not based on the protective order, whatever form it might take. Their choice not to review the heuristic production is just that—their choice. The same can be said, moreover, of defense counsel's failure to seek authorization to disclose the detailed heuristic information to any non-testifying expert—that is defense counsel's choice.[6] Finally, the Court notes that none of this should have come as a surprise to the defense, which sought detailed information relating to the workings of Chainalysis's Reactor without first exploring whether its expert was willing to review that material or making efforts to identify an expert who was willing to do so.[7]

## II.

The defense argues that the most recent protective order, which focuses on the detailed heuristic material should not be construed to prevent disclosure of the materials to Sterlingov himself. Although less than clear, this argument can be understood in one of two ways—or perhaps both ways: First, the request might simply reflect the reasonable premise that a defendant in a criminal case should, absent compelling reason, have access to all evidence and related information regarding the case against him. Second, against the background discussed above, the defense's request might—without saying as much—be premised on the notion that

---

[6] Although the parties have agreed, and the Court has ordered, that it is now too late to designate any new testifying experts, defense counsel has not asked that any of its current testifying experts review the material, nor has defense counsel identified any new, non-testifying expert who might review the material to assist the defense.

[7] Nor can the defense plausibly suggest that no qualified expert would agree to review the material or, if necessary, to comply with a reasonable protective order. The Court, for example, repeatedly has suggested to counsel (without success) that they might seek the assistance of an academic rather than a competitor of Chainalysis.

13

Sterlingov is himself an expert on the blockchain and on how blockchain transactions might (or might not) be traced and might, in essence, seek to allow Sterlingov to serve as his own non-testifying expert (in lieu of Still, Ciphertrace, or anyone else).

Provided there is good cause, the law grants district courts broad discretion to fashion protective orders under Federal Rule of Criminal Procedure 16(d)(1), which provides that "[a]t any time the court may, for good cause, deny, restrict, or defer discovery or inspection, or grant other appropriate relief." *See United States v. Johnson*, 314 F. Supp. 3d 248, 251 (D.D.C. 2018); *United States v. Cordova*, 806 F.3d 1085, 1090 (D.C. Cir. 2015). The government bears the burden of showing good cause and must do so with specificity. *See Johnson*, 314 F. Supp. 3d at 351. Good cause may be based on the safety of witnesses and others, a particular danger of perjury or witness intimidation, and the protection of information vital to national security. *See Cordova*, 806 F.3d at 1090. The commentary to Rule 16(d) adds that good cause might also include "the protection of business enterprises from economic reprisals." Fed. R. Crim. P. 16 (advisory committee's note to 1966 amendment).

Here, the government argues that good cause exists for two reasons: (1) to prevent inadvertent disclosure of sensitive law enforcement techniques and (2) to prevent the defendant or others from developing criminal countermeasures to blockchain analysis. Dkt. 206 at 4. Sterlingov answers that precluding his "personal review of the evidence directly relevant to a core issue in this case—the inaccuracy of Chainalysis Reactor software and its lack of scientific validity—violates [his] Fifth Amendment due process rights, particularly his right to put on a complete defense, and his Sixth Amendment rights to effective assistance of counsel and to confront his accusers." Dkt. 207 at 2. He adds that his "defense attorneys do not have the technical skills to effectively review the material, and even if they did, it would still require

14

extensive discussion with Mr. Sterlingov." *Id.* at 6. And he further argues that the heuristics constitute *Brady* material and that the government has failed to establish good cause to limit the disclosure of that material. *Id.* at 5–8.

Sterlingov's *Brady* argument is a bit of a red herring, since the materials at issue were prepared by a third-party merely to assist the defense, and it has, in fact, been provided to the defense. Beyond that issue, however, the briefing and factual record before the Court are too sparse to permit the Court to determine whether good cause exists for Rule 16 purposes under the present circumstances and whether, even if it does, Sterlingov is nonetheless entitled under the Fifth and Sixth Amendments to receive access to the detailed heuristics.

Among other things, the government has indicated that there is at least some overlap between the detailed heuristic production and the government's prior disclosures. *See* Sept. 13, 2023 Hrg. Tr. at 60, 84. But because Sterlingov has had access to those prior disclosures, and because it seems likely that some of the more detailed heuristic information will be revealed at trial (if not on direct, then on cross-examination of Elizabeth Bisbee of Chainalysis), it is unclear what harm would result from disclosing the detailed heuristics to Sterlingov now. Similarly, although the government expresses concern about educating Sterlingov (or others with whom he may have contact) about how to evade blockchain tracing, it is not apparent how real this risk is. It is unclear, for example, how the additional detail would make it easier to evade blockchain tracing, how frequently methodologies change (and thus how quickly the information at issue may become outdated)[8]; and it is unclear whether this risk applies to all of the information at

---

[8] All the more so because Bisbee's expert report suggests that at least one of the heuristics at issue, Heuristic 2, was custom-built for Bitcoin Fog. In describing that heuristic, her report states that "[w]allets have distinctive ways of handling fees and change addresses," so Chainalysis is able to "investigate[] a service's particular transaction patterns" and "develop clustering algorithms specific to that service." Gov't's Ex. 20 at 6 (Bisbee Expert Report).

15

issue or only a subset.  Nor can the Court discern on the present record whether disclosing the detailed heuristics to Sterlingov would pose a material risk to Chainalysis's proprietary interests, or whether anything short of full disclosure will serve the interests at stake and, if so, whether a limited disclosure will protect the interests of the government and Chainalysis.

Finally, to the extent that Sterlingov maintains that, even if good cause exists under Rule 16, his Fifth and Sixth Amendment rights nonetheless entitle him to access to the detailed heuristic material, he needs better to explain his position.  With respect to the governing law, he fails to cite any case law addressing the intersection of Rule 16 and the Constitution; indeed, other than referring, in general, to *Daubert* and *Brady*, he fails to cite a single case in his opposition.  And, with respect to the facts, he fails to explain in any detail why he needs access to the detailed heuristics to satisfy due process or his right to counsel.  To the extent he maintains that only he can fill the role of a non-testifying expert on the heuristics, for example, he needs to explain why that is the case.  The Court appreciates that defense counsel may lack the expertise necessary to understand the detailed heuristics but, presumably, other non-testifying experts (who would be willing to sign a reasonable protective order) are available.  To the extent Sterlingov is uniquely situated to assist the defense (and thus to ensure that the trial comports with due process), the Court needs to understand why.  If the defense needs to make that showing in an *ex parte* filing, counsel should seek leave to do so.

In short, the government and the defense both raise—or at least allude to—important considerations that weigh on the pending motion.  Both, however, need to do more to explain and to support their respective positions.

To provide the parties with the opportunity to address these issues, the Court hereby **ORDERS** the parties to appear for a hearing on November 13, 2023 to address the parties'

respective interests. The parties should be prepared to address the questions posed above and to provide the Court with the technical details necessary to decide whether good cause exists to preclude or to limit disclosure. To the extent necessary to address these questions, the parties should ensure that technical or other witnesses are available to testify.

A final note: At the September 21, 2023, hearing, the Court learned that while a Ciphertrace "authorized signatory" had signed the "acknowledgement form" attached to the original protective order, Dkt. 18, no individual at Ciphertrace, including Still, had done so. Hrg. Tr. at 8. At that same hearing, Jay informed the Court that Ciphertrace would "have all of the people who have worked on the expert report individually sign the protective order . . . promptly." *Id.* at 42. That commitment was reaffirmed in a notice filed by defense counsel on September 22, which stated that "Ciphertrace is taking steps to immediately have all persons, including Ms. Still and those who assisted her or reviewed discovery in this matter, to personally sign the acknowledgement to the protective order in this case (Dkt. No. 18) and will promptly provide undersigned counsel with copies of such acknowledgements." Dkt. 205 at 1–2. To date, the Court has not received any update regarding this issue.

In light of this uncertainty, the Court hereby **ORDERS** that counsel for the defense file *ex parte* with the Court signed acknowledgment forms for all individuals, other than counsel of record, who have, directly or indirectly, (1) received copies of any non-public material disclosed by the government or (2) seen any "sensitive materials" produced by the government on or before November 10, 2023.[9]

---

[9] Chainalysis has requested that the Court clarify that "both the original protective order and the Heuristic Information Protective Order prohibit any disclosure or use outside of this case of the materials subject to the protective orders." Dkt. 208 at 1. That is already clear from both protective orders, Dkt. 18; Dkt. 196, and the Minute Order entered on September 21, 2023. Chainalysis seems particularly concerned with Ciphertrace employees apart from Still reviewing

17

**SO ORDERED**.

/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge

Date:  November 4, 2023

---

the heuristic production, Dkt. 208 at 4, but Ciphertrace has already been clear that *no* Ciphertrace employee has been or will be permitted to review that material.  *See* Dkt. 205.

Chainalysis also requests that, "if the defendant proposes a new expert to review the materials . . . this individual should not be a Chainalysis competitor and should be bound by the terms of the [original Proposed] Heuristic Information Protective Order at ECF No. 195-1," that is the proposed protective order which contains the five-year noncompete clause. Dkt. 208 at 1. Because the defense has not requested that any other expert receive access to the detailed heuristic information, the Court need not consider that hypothetical concern at this juncture.

18