1              IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF COLUMBIA
2
    UNITED STATES OF AMERICA,        ) Criminal Action
3                                    ) No. 1:21-CR-0399
                        Plaintiff,   )
4                                    ) **MOTIONS HEARING**
    vs.                              )
5                                    ) Washington, D.C.
    ROMAN STERLINGOV,                ) **June 23, 2023**
6                                    ) **Time:  10:00 A.M.**
                        Defendant.   )
7
                 **TRANSCRIPT OF MOTIONS HEARING**
8          BEFORE THE HONORABLE JUDGE RANDOLPH D. MOSS
                  UNITED STATES DISTRICT JUDGE
9
                    A P P E A R A N C E S
10
    For the Plaintiff:      CHRISTOPHER BROWN
11                          USAO-DOJ
                            601 D Street, NW
12                          Washington, DC 20001

13                          ALDEN PELKER
                            U.S. DEPARTMENT OF JUSTICE
14                          950 Pennsylvania Avenue, NW
                            Washington, DC 20530
15
    For the Defendant:      TOR EKELAND
16                          MICHAEL HASSARD
                            Tor Ekeland Law, PLLC
17                          30 Wall Street, 8th Floor
                            New York, NY 10005
18

19

20

21  Court Reporter:         Tamara M. Sefranek, RMR, CRR, CRC
                            Official Court Reporter
22                          United States Courthouse, Room 6714
                            333 Constitution Avenue, NW
23                          Washington, DC  20001
                            202-354-3246
24

25

```
1                        I N D E X

2
     WITNESS                                        PAGE
3
     LUKE SCHOLL
4
            Direct Examination
5           By Ms. Pelker                             41

6           Cross-Examination
            By Mr. Ekeland                            73
7
            Redirect Examination
8           By Ms. Pelker                             89

9           Recross-Examination
            By Mr. Ekeland                            94
10
     ELIZABETH BISBEE
11
            Direct Examination
12          By Ms. Pelker                             95

13          Cross-Examination
            By Mr. Ekeland                           119
14
            Redirect Examination
15          By Ms. Pelker                            134

16          Recross-Examination
            By Mr. Ekeland                           139
17

18   EXHIBITS ADMITTED                              PAGE

19   Government Exhibit 1                             45

20   Government Exhibit 2                             58

21   Government Exhibit 3                             60

22   Government Exhibit 4                            104

23   Government Exhibits 5 and 6                     109

24

25
```

```
 1                    P R O C E E D I N G S
 2            THE COURTROOM DEPUTY:  Calling Criminal Case 21-399,
 3    United States of America v. Roman Sterlingov.
 4            Would counsel please state their name for the record,
 5    starting with government counsel.
 6            MS. PELKER:  Good morning, Your Honor.  Alden Pelker
 7    for the United States.
 8            THE COURT:  Good morning.
 9            MR. BROWN:  Good morning, Your Honor.  AUSA
10    Christopher Brown for the government.
11            THE COURT:  Good morning.
12            MR. EKELAND:  Good morning, Your Honor.  Tor Ekeland
13    for Defendant Roman Sterlingov, who is present in court.
14            THE COURT:  All right.  Good morning to all of you.
15            MR. HASSARD:  Good morning, Your Honor.  Michael
16    Hassard for Defendant Roman Sterlingov.
17            THE COURT:  Good morning.  So I know that you have
18    witnesses here today, and I want to accommodate your schedules.
19    So I'll allow -- rather than having the Court dictate which
20    motions we take up and in which order, I'll allow you to tell
21    me which motions you want to take up so that we don't
22    inconvenience witnesses who may have had to travel today.
23            The one thing I did want to take up, though, before
24    opening the floor up to whatever you want to put on, was the
25    motion that we didn't get to last time we were here -- or the
```

1   pair of motions with respect to the subpoena directed at

2   Ms. Pelker and the motion to quash that subpoena, as well as

3   the motion to exclude her testimony.

4          So I'm happy to hear from the parties on that.  I

5   guess I should probably start -- good.  I guess the motion to

6   quash, you're welcome to go first.

7          MR. BROWN:  Yes, Your Honor.  We assume that the

8   Court has read the voluminous briefing on this matter, so I

9   don't want to repeat every point in the briefing.  I do want

10  to, sort of, frame this by addressing the ad hominem nature of

11  the defense counsel's comments towards Ms. Pelker.  It's really

12  unusual in my practice.

13         I've been an AUSA in this district for eight years.

14  I've never seen defense counsel go after their colleagues at

15  the bench in such personal ways.  I think that's important to

16  understand because that frames the context for their subpoena

17  to Ms. Pelker.

18         Their subpoena and their motion to quash do not

19  appear to be in good faith.  And the reason you can tell that

20  is because they have not provided any specific summary of the

21  testimony that they expect to elicit from Ms. Pelker.  They

22  have not addressed the legal framework for calling a prosecutor

23  as a witness.  They have refused to engage in the *Touhy*

24  regulations, the *Touhy* procedures, for calling the Department

25  of Justice prosecutor as a witness.  And this whole thing

1     appears to be a transparent pretext for a motion to disqualify.

2         Now, to address the legal standards here, there are

3     legal standards.  These are cited in our briefing.  It's the

4     2nd Circuit, 7th Circuit, 8th Circuit, 9th Circuit,

5     10th Circuit.  They all agree that to call a prosecutor in a

6     case a defendant has to make a certain showing, and that

7     showing is that the testimony to be taken is vital to their

8     case and that they cannot obtain the same testimony elsewhere

9     through other sources.

10        And through those two showings, they establish a

11    compelling need.  The defense has not offered -- first of all,

12    the defense has not addressed this legal framework at all.

13    They have not offered anything other than sort of generic

14    buzzwords about what they expect to elicit from Ms. Pelker.

15        Number one, they talk about Chainalysis.  Whatever

16    the merits of their theories about Chainalysis and the

17    Department of Justice's contracting relationship with

18    Chainalysis, first of all, it is not vital to the defense case.

19        The cases that recognize a vital interest in calling

20    a prosecutor are very few and far between, and it would be a

21    very unusual situation, such as where the prosecutor may be the

22    only person who sat in on an interview with a witness or a

23    proffer with the defendant, and the prosecutor -- and maybe the

24    agent is no longer available to testify.

25        In those cases, sometimes the prosecutor may be the

1    only witness to a certain key statement that's made by a

2    witness in the case who is otherwise unavailable to testify.

3    This is not that case.  This is, sort of, vagaries of

4    government contracting.  This is -- this sort of sham argument

5    about venue, that my co-counsel is somehow a witness to venue.

6           Of course, venue doesn't depend in any way on where

7    the case was investigated.  It's a legal determination and

8    entirely part of the prosecutor's function as prosecutors in

9    this case.  So we don't think that they've met the compelling

10   needs standard.

11          As a procedural matter, there's a procedural bar set

12   forth in the *Touhy* regulations.  Numerous courts have held that

13   this is a procedure that defendants are required to go through

14   in order to call a Department of Justice witness.  *Touhy*

15   regulations don't say no, categorically, you can't ever call a

16   prosecutor; they just say you have to go through a procedure.

17   You have to provide a written summary of the expected testimony

18   so that the Department of Justice can then make a determination

19   whether certain privileges or protections apply.  So just

20   deliberative process privilege or attorney work product.  The

21   defendants have refused to do so.

22          And, finally, the defendant's motion for

23   disqualification, such as it is -- it's always been sort of

24   indirect -- that is the real agenda, and it is totally

25   meritless.  They claim jury confusion, but they are the only

1    ones who are going to cause jury confusion by calling a

2    prosecutor as a witness.

3          And the normal -- as we've sort of outlined in our

4    briefing, the rationale for the advocate witness rule is simply

5    not present here in a situation where the defense calls a

6    prosecutor as an adverse witness who is testifying under

7    compulsion.  The rationale for the advocate witness rule is

8    that there's a bolstering effect when somebody acts as an

9    advocate and a fact witness, because then there's some

10   confusion.

11         It sort of enhances the advocacy by cloaking them in

12   the aura of somebody who has personal knowledge of the case.

13   That's absolutely not this situation where the advocate is

14   being called adversely by the opposing party.  That's squarely

15   addressed in the 11th Circuit case that we cited.

16         Your Honor, if the Court has questions, I'm happy to

17   address them.  But we think that this is a straightforward case

18   of the defense not meeting a very well-established legal

19   standard to justify calling the prosecutor.

20         THE COURT:  Why don't I let Mr. Ekeland go, and then

21   if he offers some explanation that you'd like to respond to,

22   I'll let you do that.

23         MR. BROWN:  Thank you, Your Honor.

24         THE COURT:  Mr. Ekeland?

25         MR. EKELAND:  Good morning, Your Honor.

1           THE COURT:  Good morning.

2           MR. EKELAND:  Ms. Pelker starts this case as the lead

3    FBI intelligence analyst on it.  On October 28, 2014, she

4    writes an intelligence report all about Bitcoin Fog, which, to

5    my understanding, was distributed on the FBI intranet.

6           This case starts in Philadelphia at the United States

7    Department of Justice.  I think -- I believe it starts at the

8    Russia desk.

9           Ms. Pelker doesn't graduate from law school in

10   Georgetown until 2016.  Somehow -- and it's my understanding,

11   upon information and belief -- she's instrumental in the

12   transfer of this case from Philadelphia to Washington, D.C.,

13   where she graduates law school and then becomes an assistant

14   United States Attorney, who then gets appointed the lead

15   prosecutor on this case.

16          Now, in my decade of doing federal criminal defense,

17   I've never had a case where the lead investigator, the lead FBI

18   agent on the case, is appointed a prosecutor on the case.

19          THE COURT:  I seem to recall 35 or 40 years ago, when

20   I was a law clerk, that Louis Freeh was the lead prosecutor on

21   the Pizza Connection trial and was -- had been an FBI agent

22   beforehand.  I can't say for certain, but I suspect that he was

23   actually involved in the investigation as the FBI agent on the

24   matter before he became the lead prosecutor on that case.  I'm

25   not sure that it's unheard of.

1          MR. EKELAND:  But it's very rare.  And the issue, I

2     think, with saying that *Touhy* applies is that we're not really

3     calling the prosecutor here.  We're attempting to call the lead

4     FBI agent on the case who is a material fact witness, not only

5     to the investigation and what was done with the Chainalysis in

6     the first two years of the case, roughly --

7          THE COURT:  Say again?  I missed what you just said.

8          MR. EKELAND:  I'm sorry.  What?

9          THE COURT:  Can you repeat what you said.  I missed

10    it.

11         MR. EKELAND:  I just said the first -- roughly, the

12    first two years of this investigation, Ms. Pelker is the FBI

13    intelligence analyst on the case, and it's our understanding

14    she's the lead agent on the case.

15         She's interacting with Mr. Bice over at the IRS, who

16    is one of the lead IRS investigators.  She's instrumental, in

17    our understanding, from what we've seen in the discovery,

18    in bringing Chainalysis Reactor and all that analysis over from

19    treasury to DOJ.  She's the driving investigator, as far as we

20    can tell from the discovery, and then all of a sudden she's

21    appointed the prosecutor.

22         I think the Court can see the problem here with -- if

23    the DOJ can do this, then they can just remove material fact

24    witnesses, their agents, from the case by appointing them

25    prosecutors.

1        THE COURT:  It seems to me improbable this was a

2   gamesmanship by the Department of Justice where they made her

3   the lead prosecutor on an important case simply to avoid having

4   her being called as a witness in the case.  That seems a

5   stretch.

6        MR. EKELAND:  Well, I don't know what happened there.

7   Why did that happen?  Why was the -- didn't anybody at DOJ look

8   and say, look, here's the lead FBI intelligence analyst on this

9   case, the person who asked us probably -- I'm guessing right

10  now; speculating a little bit -- asked us to move it from

11  Philadelphia to D.C. --

12        THE COURT:  What does that matter?  Why is that

13  relevant?

14        MR. EKELAND:  Because it's a material fact as to

15  relation to venue, and the defense maintains that --

16        THE COURT:  I'm sorry.  Stop for a second.  You have

17  to explain to me what facts she would offer as a witness on the

18  stand versus her opinion or what was done.  I mean, there's

19  either venue or there's not.  With the -- the venue or not

20  doesn't turn on what the motivation was of the Justice

21  Department; it turns on where the relevant facts occurred.

22        And she's not changing where the relevant facts

23  occurred in some respect.

24        MR. EKELAND:  But if the jury is wondering why

25  they're in D.C., we submit to the Court that --

1          THE COURT:  But motivation is not -- I wouldn't allow

2     that as testimony anyway, what their motivation was for

3     bringing a case in D.C.

4          MR. EKELAND:  Well, it was moved to D.C.

5     from Philadelphia, and we submit that that is a relevant fact

6     for the jury and, of course, if the Court rules that it's not,

7     we'll accept that.

8          THE COURT:  I just -- I guess I don't -- at least you

9     have yet to persuade me why that would be a relevant fact and

10    certainly one that was vital or even important to the defense

11    in the case because venue is just a question of where the

12    events occurred, not what any motivation was, not where it

13    might have been brought otherwise, not where the Department of

14    Justice initially thought about bringing it.  None of that is

15    relevant.

16         MR. EKELAND:  I think it's relevant to the jury in

17    determining whether or not venue is proper because the jury

18    could well conclude that the only reason that the case is in

19    D.C. is because Ms. Pelker wanted it there.  And I think that's

20    a salient fact.

21         THE COURT:  So why not, then, in every criminal case

22    call the prosecutors and say -- in the case and say, look, why

23    are you bringing -- any case where it could have been brought

24    in more than one venue and the prosecutors made a decision, in

25    consultation with the investigators, about where the case

1    should be brought, why not in every case, then, disqualify the

2    prosecutor, put the prosecutor on the stand and say, why did

3    you bring this case in D.C. instead of Northern Virginia?  The

4    transaction took place in both places across the borders.  Why

5    did you bring it here?

6            MR. EKELAND:  Well, I think if the cases involved an

7    FBI investigator who then became an AUSA and appointed the lead

8    prosecutor on the case, and then that FBI investigator was

9    responsible for moving the case to the district, we submit that

10   that is a relevant fact for the jury to consider in making

11   their venue determination.

12           THE COURT:  Why?

13           MR. EKELAND:  Because it shows that that's the only

14   thing -- the only real reason it's there.

15           THE COURT:  Cite me a single case in the history of

16   the United States in which the motivation of the Department of

17   Justice is being considered as a relevant fact by a jury in

18   deciding venue.

19           MR. EKELAND:  I'm not saying it's the motivation.

20   It's the fact of the transfer itself by the investigator to a

21   convenient forum for them.  I don't know of any other case

22   where -- maybe this Freeh case -- I haven't looked at it --

23   where the government has taken their lead FBI investigator and

24   made them a prosecutor in the case.  I can't find one, I mean,

25   in the history of the United States.

 1          THE COURT:  I can go back and check on this.  I think

 2    my recollection is correct that Louis Freeh was, in fact, an

 3    FBI agent who I think investigated this matter -- that ended up

 4    being the longest criminal trial in the history of the federal

 5    system ever -- and then became the lead prosecutor on the case.

 6          MR. EKELAND:  And was that challenged by the defense?

 7          THE COURT:  I don't even -- you haven't shown me an

 8    argument as to why it's relevant.  I don't understand the

 9    relevance of it.

10          MR. EKELAND:  Your Honor, we submit -- and I'll just

11    leave it at this.  We submit that it's relevant that the lead

12    FBI investigator in this case --

13          THE COURT:  Let me just put a little more of a point

14    on this.  I think if you want to disqualify one of the

15    prosecutors in the case, the standard is a high one.

16          And you have to -- I think that whether the standard,

17    as Mr. Brown articulated, is precisely the standard, he is

18    certainly correct that the standard, in general, is that if you

19    want to disqualify a prosecutor by calling the prosecutor, you

20    need to demonstrate that there's a compelling need to do so.

21    And that includes showing me that there's evidence that that

22    person has that you could not obtain elsewhere.

23          I don't see anything that you've done that shows me

24    some element or material fact in this case that would be

25    admissible to the jury where you've shown me or indicated to

1    me, Ms. Pelker is the only person who we can call who would

2    know this.

3         MR. EKELAND:  Yes, Your Honor.  There are facts like

4    that.  Her interactions with Chainalysis and communications

5    about the initial investigation.  Most of the evidence you're

6    seeing in this case comes from the period where she's an FBI

7    intelligence analyst.

8         What I'm hearing now is that we're likely not going

9    to be able to call the main FBI intelligence analyst in this

10   case who was privy to unique knowledge about the investigation,

11   how Chainalysis Reactor was used.

12        THE COURT:  I'm just telling you, you haven't made

13   any showing of that effect.  I just need to know what the

14   specific facts are.

15        MR. EKELAND:  The specific fact is that she's the

16   lead FBI intelligence analyst, who in August -- sorry --

17   October 28, 2014, writes a big report on Bitcoin Fog, says, if

18   you have any questions about it, contact me.  We haven't been

19   given everything.  I think there might be a motion to compel

20   here.

21        But it's clear to us that she's the lead investigator

22   and intelligence analyst on the case, and that's what we're

23   seeking to call her as.  Venue is one issue, but that's not the

24   only issue.  She's the main FBI agent or intelligence

25   analyst -- excuse me -- that interacts with Chainalysis from

1    the beginning.  She's intimately involved.

2         THE COURT:  Why can't you call Chainalysis, then,

3    about those issues?

4         MR. EKELAND:  Because they don't have the unique

5    perspective that she has as an FBI intelligence analyst making

6    decisions for the DOJ.  In every other case, I'm able to

7    cross-examine the FBI investigative agent.

8         I'm saying, for the same compelling reasons that the

9    Constitution allows us to do that, the defense should be able

10   to call the lead FBI intelligence analyst on this case for two

11   years before she becomes a prosecutor.  That's what we're

12   asking.

13        THE COURT:  So tell me -- give me an example, what

14   question you want to ask her that would establish some fact

15   that is material in the case, and not something atmospheric,

16   but some specific fact that you think that she would have

17   access to that you could not obtain otherwise.

18        MR. EKELAND:  Well, for instance, in the criminal

19   complaint, as we'll probably discuss later today, there's an

20   error in the tracing.  And so one of the -- they missed a

21   transaction that Mr. Scholl will correct it in his expert

22   report, but it's a legitimate question.

23        What kind of quality controls; what did you use to

24   verify and validate your information; what other errors are

25   there?  She has intimate knowledge of all of that.

1          THE COURT:  Why couldn't you just call Chainalysis on

2     that?  If it's Chainalysis's analysis that you think is flawed,

3     even if Chainalysis was doing it at the request of the FBI, why

4     can't you just ask Chainalysis those questions?

5          MR. EKELAND:  Because Chainalysis is not the only

6     entity involved in making decisions about this case; in

7     analyzing the investigative reports; in checking the validity

8     of Chainalysis's work.

9          There's first questions, certainly, from

10     Chainalysis -- right? -- how they validated their work; what

11     were their accuracy rates.  But there's also serious questions

12     about how DOJ validated its work and why this mistake, which is

13     central to the criminal complaint and that wasn't corrected

14     until after Mr. Sterlingov was arrested, how that was left in.

15     What was done to validate?  It goes directly to the accuracy

16     and the methodology and the verifiability of the forensics in

17     this case.  That turns entirely, entirely on probabilistic

18     digital forensics.

19          THE COURT:  Is she the one who was doing the

20     forensics, or was it someone else who was doing the forensics?

21          MR. EKELAND:  We haven't gotten enough in discovery.

22          THE COURT:  So maybe your motion is premature then on

23     that.

24          MR. EKELAND:  There's a lot of stuff that's been held

25     back.  I think we'll be filing a motion to compel shortly on

1    that basis.

2              But it's our opinion, Your Honor -- I think we've

3    been clear; I don't want to beat this to death -- that she's a

4    material fact witness as the lead FBI intelligence analyst who

5    has unique knowledge as to DOJ's position, and it's not just

6    enough to call Chainalysis because they're only half the

7    picture.

8              THE COURT:  All right.  Let me hear, then, from

9    Mr. Brown.

10             MR. BROWN:  Yes, Your Honor.  With respect to the

11   question of whom else the defense could call --

12             THE COURT:  Can you just back up before you get to

13   that for a second.

14             Is Mr. Ekeland correct that Ms. Pelker was for two

15   critical years of this investigation the lead FBI intelligence

16   analyst in the case?

17             MR. BROWN:  I think that is a wild exaggeration.  I

18   don't -- there's some record correction that needs to happen

19   with respect to the case history.  We don't concede the

20   relevance of any of this.

21             But to give just a little bit of background, there

22   were actually two Bitcoin Fog investigations.  The first

23   investigation -- so there was an investigation opened between

24   IRS Criminal Investigative Division at the U.S. Attorney's

25   Office for the District of Columbia.  That was opened in 2015.

1    This is explained in our reply in support of our motion to

2    quash.

3            So that was opened in 2015.  The FBI and my

4    co-counsel had nothing whatsoever to do with opening that

5    investigation in the District of Columbia.  Separately, there

6    was an FBI investigation that was opened in Philadelphia; then

7    Intelligence Analyst Pelker provided some support to that

8    investigation.

9            She wrote an intelligence product that was,

10   essentially, open source research about, what is Bitcoin Fog,

11   you know, how -- what are people saying about it on the

12   internet; with some cross-referencing to internal law

13   enforcement databases.  She was not the lead agent.

14           In the FBI, investigations are led by 1811 agents.

15   That lead agent was Kathleen Kaderabek.  The defense has --

16   Special Agent Kaderabek is no longer employed by the FBI.  The

17   defense -- among the many subpoenas they served on the

18   government, there was one for that special agent.  She was the

19   lead investigator initially.

20           At some point in early 2016, January or February

21   2016 -- in January of 2016, the FBI investigation in

22   Philadelphia was transferred to the Washington field office.

23   In January or February, the WFO, the FBI agents from the

24   Washington Field Office, the two investigations sort of

25   discovered each other.  FBI started working with the U.S.

1    Attorney's Office for the District of Columbia and the IRS in a

2    preexisting investigation.

3          It wasn't until nearly the end of that year, October

4    of 2016, that my co-counsel joined the Department of Justice,

5    and initially she didn't even work on this case.  She was

6    invited on it by staff from my office in December of 2016.

7          But she was mostly busy doing a rotation in our

8    superior court division.  So she didn't, sort of, provide a lot

9    of substantive work on the case until a little later into 2016,

10   2017.

11         In terms of was she ever the primary investigator,

12   she wasn't the primary investigator because she wasn't the lead

13   case agent.  What she did on the case was, essentially, open

14   source research.  She never -- in the course of her work as an

15   intelligence analyst, she never identified Roman Sterlingov.

16   There's no attribution of Roman Sterlingov in anything that my

17   co-counsel did.  It's just, this is Bitcoin Fog; we should find

18   out what's going on with Bitcoin Fog.

19         I think that what defense counsel is referring to in,

20   for example, communications with Chainalysis -- well, the

21   defense has also subpoenaed eight other -- that we know of --

22   eight other current and former government employees.  In

23   addition to their ability to cross-examine our case agents and

24   our expert witnesses, they've subpoenaed three IRS agents,

25   including the IRS agent, Devin Beckett, who signed the

1    affidavit in support of the criminal complaint.

2              So if the defense wants to cross-examine somebody

3    about the tracing -- by the way, Trial Attorney Pelker had

4    nothing to do with the tracing that was in the criminal

5    complaint.

6              If they want to cross-examine somebody about the

7    tracing that was in the criminal complaint, they can

8    cross-examine IRS Special Agent Devin Beckett, who is the

9    affiant on that affidavit in support of that criminal

10   complaint.

11             If they want to cross-examine somebody

12   about communications with Aaron Bice, they have subpoenaed

13   Aaron Bice.  They can cross-examine Aaron Bice about his

14   communications in his work, whether for IRS or on behalf of

15   Chainalysis.

16             There's nothing that they can point to -- let me just

17   say with respect to venue, what they're talking about is really

18   not where the case was investigated.  What they're talking

19   about is where and why was the case charged.

20             And in addition to the points the Court has brought

21   up, where the case is charged, that is a legal decision, that

22   is core prosecutorial function that would absolutely be

23   protected under a number of privileges.  I think it belies

24   their claim that they aren't interested in her work as a

25   prosecutor.

1          THE COURT:  Can you describe -- you indicated that

2    she did open source work on Bitcoin Fog.

3          Anything other than that as an FBI agent?  She's

4    welcome to address the Court as well, whatever --

5          MS. PELKER:  Again, without waiving any DOJ privilege

6    that may or may not apply, it was -- my role was to identify

7    significant platforms of money laundering concerns.  Bitcoin

8    Fog was one of those platforms.

9          We write these reports; we send them out to the

10   field; and then the field will occasionally call us with

11   questions about those reports and the services or systems that

12   we've referred out.  I was never assigned to FBI Philadelphia.

13   I was never on that squad.  The case agent would occasionally

14   call in with general questions.

15         THE COURT:  Were you involved in doing any of the --

16   or working with Chainalysis on the tracing analysis?

17         MS. PELKER:  Your Honor, this is -- we'll get at --

18   we'll discuss this later on.

19         This is just a misconception that defense counsel has

20   about Chainalysis's role in this case.  There's a Chainalysis

21   software product and service that FBI gained access to at some

22   point during this case or investigation.  Chainalysis wasn't

23   retained to do tracing on this case, aside from the retention

24   now of Ms. Bisbee for their work.

25         THE COURT:  Were you the one who then used the tool

1    for the FBI, to do the analysis for the FBI?

2           MS. PELKER:  So -- and we produced this to defense

3    counsel.  At some point when we were doing a demo, we were able

4    to see that Bitcoin Fog was identified as receiving funds from

5    darknet markets, and that was noted in a Chainalysis tool.

6    That was the extent of it.

7           We didn't, then, have -- the actual tracing that was

8    done with all of the detailed analysis, including tracing to

9    Mr. Sterlingov and out to all the accounts, was not done by me.

10   It was done later in the investigation by other individuals.

11          THE COURT:  And this first portion of it, when you

12   said we, were there others involved in it?  There's others who

13   can testify as to what was done, or you're the only person who

14   can testify as to what was done?

15          MS. PELKER:  I don't have an independent recollection

16   of it.  My only recollection is when we were putting the

17   discovery together, there's an email from the case agent or a

18   note from the case agent that indicates that she had spoken

19   with me and that, in a demo for Chainalysis, we observed that

20   Bitcoin Fog was receiving funds from different darknet markets.

21          THE COURT:  Okay.  Thank you.

22          MR. BROWN:  And, Your Honor, can I just emphasize

23   that, whatever was done in the past -- the defense is very

24   focused on challenging work that was done during the flow of

25   this investigation, but that's not our evidence at trial.

1          We are going to present witnesses and fresh evidence

2     and everything at trial.  That's going to be the evidence at

3     trial.  There's no direct -- you know, they can -- in the

4     course of many investigations, the government goes down

5     different roads.  We explore different possibilities.

6          That's not -- they can say, well, you went down this

7     road, and that was a mistake.  But that doesn't -- that's not

8     directly relevant to the evidence that we present at trial.

9     There's nothing that Ms. Pelker touched while at FBI that the

10    government intends to introduce affirmatively in our case in

11    chief, or even not affirmatively.  I don't think we would ever,

12    under any circumstance, introduce anything that she touched as

13    part of our case.

14         I think it's clear -- the narrative that the defense

15    wants to tell in this case is careerism; that this case was my

16    co-counsel's baby, all of that.  That's the story that they

17    want to tell to the jury.  That's why they're trying to squeeze

18    in this -- you know, somehow find some relevance hook for just

19    work -- this is not direct evidence of anything.

20              Working with Chainalysis is no different from

21    looking up the same data on a blockchain explorer, which is

22    publicly available.  It's just -- it is using a tool that pulls

23    from a publicly available database.  It's no different from

24    looking up somebody in a CLEAR database or other -- or Accurint

25    or some other, sort of, proprietary databases.

 1          Many people might have done that.  Many attorneys do

 2     that.  You know, I have access to certain law enforcement

 3     tools.  That doesn't make me a material fact witness.  I have

 4     certain firsthand knowledge of this case; any prosecutor does.

 5     That doesn't make the prosecutor a necessary witness in a case.

 6          I think that this sort of illustrates why there is --

 7     there's a heightened standard, because there's so much room for

 8     requests like this to be abused; which I think is exactly

 9     what's going on in this case.

10          THE COURT:  All right.  Thank you.  Mr. Ekeland, you

11     want to respond?

12          MR. EKELAND:  Briefly, Your Honor.  We disagree with

13     the government when the government says that this information

14     and the testimony we're seeking is not directly relevant.

15          And the reason for that is that the software that's

16     being used here, which is -- I think this is one of the first

17     times it's -- if not the first time, it's been directly

18     challenged in any federal court, is a probabilistic heuristic

19     software that's based on assumptions.  So it's not as simple as

20     just entering in a case name and getting the citation and

21     getting some sort of deterministic result.

22          The opinions and attitudes of the people involved and

23     the assumptions that they make and the guesses that they make

24     go directly into interpreting -- not only interpreting the

25     results, but the Chainalysis Reactor software itself.

1          THE COURT:  But this -- in a case where you're not --

2     in a different sort of case, in a murder case, drug-trafficking

3     case, something like that, where you have a case agent who has

4     gone out and looked at the scene, collected the evidence,

5     interviewed the witnesses, I get why that individual's

6     testimony can be critical in a case.

7          This is not that type of case because it's largely a

8     forensics case.  What matters is the forensics that the

9     government puts on in support of its case.  And what the

10    government's motivation was, how it decided to follow up, to

11    pursue something in the first place, I don't really see the

12    relevance of that.

13         It's not as though your position is that Ms. Pelker

14    has some percipient evidence; she saw something; she

15    interviewed somebody.  Assume that she walked in one day into

16    someone's office and said, you know what, I've been out there

17    doing a lot of reading on this and surfing around on the

18    internet, and I really think that Bitcoin Fog is up to no good,

19    and you guys have got to look into that.

20         I don't really see why that would be relevant in the

21    case even if that happened because then someone goes and looks

22    at it and either they find evidence or they don't find

23    evidence, and the forensic evidence either maps it out or it

24    doesn't map it out.

25         And what the motivation was of the government, if --

1    again, I'm not saying there's any truth to this.  If there was

2    a tape recording where Ms. Pelker said, I'm going to make my

3    career on this case, I don't see why that would be relevant in

4    this case in any way.

5              MR. EKELAND:  I submit that it would be relevant

6    because confirmation bias is a scientifically documented

7    phenomenon in relation to this type of forensic science.

8              THE COURT:  Confirmation by whom?  She's not the

9    witness; she's not the analyst; she's not the one who has done

10   the forensics.

11             MR. EKELAND:  For instance, you can have traces with

12   Chainalysis Reactor or other tracing software that points to

13   seven different types of transactions that you can I.D.  So

14   someone's got to pick.  Somebody has to make a decision as to

15   what trace they're going to say, we're going to use here;

16   right?

17             You have to -- everywhere with this software -- I

18   think there's a misconception of the forensics here that it has

19   some kind of scientific certainty.  One of the experts that

20   we're proffering is an expert in confirmation biases who, it's

21   my understanding, trained the FBI on how to avoid confirmation

22   bias with their fingerprint database.

23             The problem is you do not have deterministic software

24   that is executing some kind of equation like E equals MC2 and

25   then giving you a certain result.  As you heard from Cabanas --

1    and the government itself will have to admit and Chainalysis

2    admits -- this is software that's based on assumptions.

3            It's not just assumptions going in -- it's

4    assumptions going in -- it's assumptions going into the

5    operating of the software that's behind the design of the

6    algorithms, and it's assumptions in the interpretation of the

7    software.

8            THE COURT:  So is there any evidence or reason to

9    believe that whoever did the analysis here was biased in some

10   way by something that Ms. Pelker did?

11           MR. EKELAND:  We're certainly entitled to

12   cross-examine on that if she's somebody who was intimately

13   involved in it.

14           THE COURT:  But intimately involved in it -- I mean,

15   I just heard a description, including from Ms. Pelker, about

16   her involvement, and I think intimately involved in it -- first

17   of all, I don't know what the "it" is in all of that.  But it

18   does seem like an overstatement based on what she's described

19   to me and what Mr. Brown has described to me.

20           MR. EKELAND:  Your Honor, essentially, what -- just

21   so we don't spend all day on this and we can get to the other

22   witnesses.  Essentially, the defense submits that Ms. Pelker is

23   one of Mr. Sterlingov's accusers under the Sixth Amendment, and

24   we have a right to call her because she was the intelligence

25   analyst on this case for two years, and she's got unique

1    knowledge of conversations.

2            THE COURT:  You just said she was the intelligence

3    analyst on this case.  That's not what was described to me.

4            MR. EKELAND:  I misspoke, Your Honor.  She was an

5    intelligent analyst on this case starting in 2014 from

6    Philadelphia.  She has conversations, we've seen in the

7    discovery, with Aaron Bice, who is the IRS CI.  She's involved

8    with Chainalysis Reactor.  And because Chainalysis Reactor is a

9    heuristic software, the government's assumptions and guesses

10   come into play there.

11           We're just saying we're entitled to cross-examine her

12   on that point.  We're not looking to examine her on anything as

13   her role as a prosecutor.  We're simply looking to

14   cross-examine her as a witness in this case.

15           THE COURT:  That would disqualify her as the

16   prosecutor in the case.

17           MR. EKELAND:  I'm sorry, what?

18           THE COURT:  That would disqualify her as the

19   prosecutor in the case.  You're saying we're not asking about

20   anything as a prosecutor, but you would seek to disqualify her.

21           MR. EKELAND:  We'd seek to cross-examine her as an

22   FBI intelligence analyst who starts on this case in

23   Philadelphia in 2014 and works on the Bitcoin Fog investigation

24   as an FBI intelligence analyst through 2016 until whenever she

25   becomes a federal prosecutor and is then appointed on this

 1   case.

 2              THE COURT:  Okay.  Thank you.

 3         So the standard for requiring the testimony of a

 4   prosecutor at a trial is that -- the prosecutor -- let me

 5   strike that and start over.

 6         The testimony of a prosecutor in a trial in which she

 7   is participating as counsel is permitted "only if required by

 8   compelling need."  That's *United States v. Tamura* at 694 F.2d

 9   591 at 601 from the 9th Circuit, 1982.

10         And a defendant has an obligation to exhaust other

11   available sources of evidence before a court should sustain a

12   defendant's efforts to call a participating prosecutor as a

13   witness.  And that's *United States v. Prantil* at 764 F.2d 548

14   to 551 from the 9th Circuit, 1985.

15         There's not an absolute bar on calling a prosecutor,

16   but the standard is a demanding one.  For -- among other

17   reasons, it can be used as a means of simply disqualifying a

18   prosecutor in a case.

19         That is, essentially, the standard that Mr. Brown

20   outlined to me, and the defense doesn't point to any contrary

21   law.  In fact -- I'm just pulling up the brief here.  One

22   second here.

23         In fact, I think it only cites to *Crawford* in its

24   brief and certainly doesn't contest that's the correct

25   standard.  I don't think *Crawford* applies here because

1      Ms. Pelker is not a witness against Mr. Sterlingov.  And,

2      therefore, there's no right to confront her because she's not a

3      witness against him.

4             And as far as I can tell, nothing that she has done

5      is being offered affirmatively by the government into evidence

6      in the case.  So the question is just whether that demanding

7      standard has been satisfied here.

8             And the defense, in its opposition brief to the

9      motion -- government's motion to quash -- contains a long quote

10     from *Crawford*, an assertion that Ms. Pelker is the initial

11     accuser of the defendant, and then, essentially, just two pages

12     of analysis, and really only one -- well, there's one page is

13     the venue, which I think is not a serious issue here; and one

14     page on what she could offer relating to the facts in the case.

15            But I don't think that the defense has at this point

16     satisfied its demanding burden of showing that her

17     participation is either vital to the case or that there's a

18     compelling need to have her as a witness, nor has the defense

19     made any showing with respect to whether it has exhausted other

20     available sources of evidence regarding to any issue that might

21     arise.

22            So I'm going to grant the government's motion to

23     quash and the government's motion to preclude calling her as a

24     witness in the case at this time.

25            If, for some reason, in the course of discovery or

1    otherwise in the case, there's a reason to believe that

2    Ms. Pelker has exclusive access to evidence that is of vital

3    importance to the case or where there's a compelling need and

4    she -- that evidence is not available from some other source,

5    the defense is welcome to renew its request to call her as a

6    witness.

7         But based on what I've seen, I'm not yet close to

8    convinced that that demanding standard has been satisfied here;

9    and I don't think that the government's motivation for bringing

10   a case, even who it was in the government who instigated the

11   decision to bring the case -- and I don't have any reason to

12   think that was Ms. Pelker.  But even if it were, I don't see

13   why that is relevant to the essential elements of the case or

14   is relevant to any defense in the case.

15        And, at least, as has been described to me, without

16   any factual rebuttal, her involvement with this particular case

17   as an investigating agent was, by no means, critical and was

18   relatively minimal, nor do I have any reason to think that she

19   has any access to or could offer any evidence, percipient or

20   otherwise, that is not available from some other source in this

21   case.

22        As I indicated, I think the case is largely a

23   forensics case in which the government's motivation is not

24   relevant.  So that's my ruling on it.

25        If there's something else that comes up down the

1    road, the defense can renew its request to call her as a

2    witness.  But it will have to make the showing required under

3    the case law that I described, which requires a particularized

4    showing and not just general assertions that she was an agent

5    involved in the case, but something far more specific than

6    that, and that where the evidence is not available from other

7    sources and where there's a compelling need.

8              What motion do you want to move to next?

9              MS. PELKER:  Your Honor, we spoke with defense

10   counsel earlier this week, and we think that the best way to

11   proceed is to proceed with witnesses and then move on to the

12   additional motions, hoping that we have enough time in the

13   afternoon to finish them.

14             THE COURT:  That's fine.

15             MS. PELKER:  Previously, last week the defense had

16   Mr. Scott here available to testify.  We didn't get to him last

17   week.  We had initially indicated that the government would

18   object to proceeding by Zoom.  We later informed defense

19   counsel that, given the issues with scheduling, that we would

20   be fine with proceeding by Zoom for both Mr. Scott and

21   Mr. Dror.  But we understand that they are not available by

22   Zoom today.

23             So we're seeking to reschedule their testimony as

24   soon as the Court's calendar allows.

25             THE COURT:  I think I will have some time.  In part,

1    I think I'm pretty soon going to have a jury that's out

2    deliberating.  So we can do it while my jury is deliberating.

3            MS. PELKER:  I understand that defense counsel

4    indicated that they would not be available next week, though

5    that would work for the government.

6            THE COURT:  Mr. Ekeland, what do you want to do about

7    scheduling?  The question is, what do you want to do about

8    scheduling for the two witnesses who aren't available today?

9            You need to be at a microphone or else the court

10   reporter never hears it.  Just so you all know, she wears the

11   headphones.  If you speak not into the microphone, she doesn't

12   hear you.

13           MR. EKELAND:  We were hoping we could maybe do

14   something in July.  Next week my schedule is out of control.

15   We also, on top of Mr. Scott and Mr. Dror, I think we've got

16   Mazarin, who we don't know when she is going to be available

17   because --

18           THE COURT:  Let me ask the Deputy Clerk real quick if

19   we can find a date in early July.  How much time do we need?

20           MS. PELKER:  Your Honor, the government does have a

21   number of scheduling conflicts in July, which is part of why we

22   scheduled these now.

23           I think we'll need probably at least 90 minutes for

24   Mr. Scott; and, Dr. Dror, the government would argue that we

25   can -- that there's no relevance to Dr. Dror's testimony and

1      that we could likely exclude him on the papers, but understand

2      if the Court would --

3               THE COURT:  What is the topic he's proposed to

4      testify about?

5               MS. PELKER:  Cognitive bias.

6               THE COURT:  I'm happy to do it in two stages if you

7      want to first argue that and then turn to a *Daubert* hearing if

8      I conclude that it's relevant.  It also may be easier just to

9      do it together because evaluating whether it really is relevant

10     may turn on what he's going to say.

11              MS. PELKER:  Understood, Your Honor, which does bring

12     us to the other issue, which is that the defense disclosures

13     for their experts failed to comply with Rule 16.  We really are

14     having a hard time determining which additional government

15     experts we do need to *Daubert*, because it's just unclear to us

16     who is testifying to what.

17              THE COURT:  Rule 16 was amended fairly recently

18     requiring greater specificity.  I think a lot of counsel are

19     still operating under, sort of past practice, which didn't

20     require as much specificity.

21              Mr. Ekeland, is there more specificity you can

22     provide by updating those notices?

23              MR. EKELAND:  We're happy to update.  We'll go back

24     and look at the rule and update.  There's really -- when I was

25     looking at it, I don't think there really is that much to

1    update.  There's signatures, I think, on the disclosures.

2         THE COURT:  What you need to do now is you need to

3    explain the basis for the opinions.  And that doesn't mean the

4    basis for my opinion is my 27 years of experience in the field.

5    It means, my basis for this expert opinion is this study that

6    was conducted in 1987 by this person that is published in this

7    journal, which is peer-reviewed, and this analysis that I ran

8    using this computer program -- and so it has to be detailed

9    like that.  That's what the rule requires.

10        MS. PELKER:  Not to further belabor this point, Your

11   Honor, because I think we've set it out extensively in the

12   government's opposition to the defense expert notice, but the

13   defense notice doesn't even comply with the old version of the

14   rules.  They indicate that their experts have alternative

15   tracing.  We haven't received a single report from any defense

16   expert.

17        They suggest that each one of their five noticed

18   experts -- four of the five noticed experts have done this

19   tracing.  It's very clear from Dr. Cabanas' testimony last week

20   that he doesn't do blockchain analysis.

21        THE COURT:  I will tell you all that I just had a

22   *Daubert* hearing in this criminal trial that I'm in right now,

23   and I held the defense to the particular studies that revealed

24   or disclosed in the report as the basis for the report.  I did

25   not allow testimony that was based on other studies because

1   you're supposed to disclose the basis for your expert

2   conclusions, and they identified seven or eight articles or

3   books.

4          And when the witness wanted to testify about other

5   articles and books, I said no, because they were not -- it was

6   not disclosed as a basis for the opinion.

7          So I don't want to prejudice the defense.  And if you

8   can promptly update by providing the detail, I would provide

9   you with some opportunity to do so, particularly before we

10  actually get to the hearing.  You have to do so quickly enough

11  so the government has a chance to be prepared for a *Daubert*

12  hearing.  Okay?

13          MR. EKELAND:  Yes, Your Honor.

14          THE COURT:  Okay.

15          MS. PELKER:  And with regard to Ms. Mazarin, we're

16  happy to make her or the government's experts available to the

17  extent that the Court finds that the government has met their

18  burden for -- has actually launched a *Daubert* challenge of any

19  of our non-blockchain forensics experts.  But it's still

20  unclear to us what defense is actually challenging with regard

21  to their testimony about basic computer forensics.

22          THE COURT:  I think that Mr. Ekeland is certainly

23  previewed for us a fair amount of what his views are about the

24  blockchain analysis and why it's not reliable.

25          MS. PELKER:  Yes, Your Honor.  We have both of our

1    blockchain analysis experts here today.  Our understanding --

2    Ms. Mazarin is not testifying about the blockchain analysis.

3            THE COURT:  What is she testifying about?

4            MS. PELKER:  The computer forensics.  Really, just

5    that she reviewed the files on the defendant's computer; this

6    is how you retrieve files from those computers.  She also did

7    an IP address analysis that says this is what an IP address is,

8    and here's where they overlap.

9            THE COURT:  Mr. Ekeland, you want to address whether

10   we need a *Daubert* hearing on those questions, and if so, why?

11           MR. EKELAND:  Given the critical nature of the IP

12   address analysis in this case, we are seeking to challenge it

13   at this point.

14           THE COURT:  But I guess my question is, on what basis

15   is your -- are you questioning whether the ability to identify

16   or draw any conclusions from an IP address doesn't comply

17   with --

18           MR. EKELAND:  It's not a forensically sound method

19   for identifying anybody.

20           THE COURT:  Okay.  Is that a *Daubert* issue, or is it

21   just a -- an argument to the jury?

22           MR. EKELAND:  The reliability and reproducibility of

23   the methodologies used to arrive at an opinion of

24   identification, I would submit --

25           THE COURT:  I suppose, in part, that depends on what

1     the witness says.  If the witness simply says, this is the IP

2     address that I found, then that doesn't sound like that's

3     questionable.

4            If the person says, this is the IP address I found,

5     and from that I know that it must have been Mr. Sterlingov

6     because his name is in the IP address, and people put their

7     names in IP addresses or whatever that might be.  That's a

8     different matter.

9            But I suppose the question is whether there's any --

10    whether it's purely more than a factual nature.  This is what

11    was on the computer file; this is what we pulled up, which

12    doesn't sound terribly controversial; or whether the witness

13    has actually drawn conclusions had from that.

14           Ms. Pelker, I don't know if you can shed light on

15    that question.

16           MS. PELKER:  Yes, Your Honor.  There's an IP overlap

17    analysis in which Mazars de Mazarin finds, basically, notes

18    that -- IP accesses for different accounts and matches them

19    together showing that the same IP was used at this period of

20    time to access this account; this same IP was then used to

21    access this account.  We think that's more appropriate for

22    cross-examination.

23           If that's what defense is specifically challenging,

24    we would note that, to the extent the Court does think that

25    should be subject to *Daubert*, that the examination should be

 1     very limited to just that IP address.

 2             THE COURT:  Mr. Ekeland?

 3             MR. EKELAND:  We would like to *Daubert* Ms. Mazarin on

 4     the methodologies that she used to do her IP address overlap

 5     because there's a lot of guessing and there's a lot of

 6     assumptions in there.

 7             THE COURT:  Okay.  That's fine.  We'll have to

 8     schedule that as well.

 9             MS. PELKER:  That's fine, Your Honor.

10             THE COURT:  It sounds to me like what I probably

11     better do is set aside a day if I have it.  I don't know

12     whether we're going to -- we're not moving with great speed

13     today already.

14             My clerk was just reminding me we also have the

15     motions to dismiss, and I want to make sure I have time to give

16     you for argument on those issues as well, if you want that.  So

17     let me ask the deputy clerk what we have available and maybe if

18     we have a day available, or the next time we have a full day

19     available; maybe when my jury is out deliberating.

20             THE COURTROOM DEPUTY:  So, Your Honor, we have -- in

21     order to try to give everybody enough time, we have July 19th.

22     I don't know if everybody wants to wait that long; Wednesday,

23     July 19th.

24             MS. PELKER:  I'm available, Your Honor.  I believe my

25     co-counsel may not be.

```
1              MR. BROWN:  If it's just witnesses, we can --
2              THE COURT:  If we do that, I guess, maybe what I can
3      do is find an earlier date to do any argument, if we don't get
4      to it today, on the motions to dismiss.
5              MS. PELKER:  So we have two witnesses.  I believe we
6      can do Mr. Scholl prior to lunch, we can proceed with
7      Ms. Bisbee immediately after lunch, and that should still give
8      us time.
9              THE COURT:  Let's see how much progress we make today
10     and we'll figure out how to reschedule the rest of things.  Why
11     don't we move along.  Let me ask, could the court reporter use
12     a break before we call the first witness?  Why don't we take
13     just a five- or ten-minute break, and then you can call your
14     first witness.
15             MS. PELKER:  Yes, Your Honor.
16             (Recess taken.)
17             THE COURT:  All right.  I think our goal ought to be
18     to at least reserve 45 minutes or an hour today for arguments
19     on the motion to dismiss; put on whatever evidence we can and
20     then on the 19th, you can put on the rest of the *Daubert*
21     evidence.
22             Go ahead and call your witness.
23             MS. PELKER:  Thank you, Your Honor.
24             The government calls Mr. Luke Scholl to testify.
25     With the Court's permission, just for ease of exhibits, would
```

 1    you mind if I put the government's exhibit binder on the

 2    witness stand?

 3                 THE COURT:  That's fine.

 4                 MS. PELKER:  Thank you.

 5                 THE COURTROOM DEPUTY:  Would you please raise your

 6    right hand.

 7                 (Witness sworn.)

 8                 THE COURTROOM DEPUTY:  Thank you.  You may be seated.

 9                      DIRECT EXAMINATION OF

10                           LUKE SCHOLL

11    BY MS. PELKER:

12    Q.  Hello, Mr. Scholl.  Could you please state and spell your

13    name for the record.

14    A.  My name is Luke Scholl.  L-u-k-e, S-c-h-o-l-l.

15    Q.  Mr. Scholl, where do you work?

16    A.  I work at the Federal Bureau of Investigation.  I'm

17    currently assigned to the Department of Justice's National

18    Cryptocurrency Enforcement Team.

19    Q.  Could you please briefly describe your educational and

20    professional background, including any degrees that you hold.

21    A.  Yes, ma'am.  I hold a bachelor's in science from the

22    University of Rochester in optics.  I then entered the United

23    States Navy and served as a submarine warfare officer for five

24    years.

25                 I went back to school to get a master's in science in

1    cyber security from Stevens Institute of Technology.

2    Q.  And when did you join the FBI?

3    A.  I started at the FBI in 2014 as an intern, and started

4    full-time in 2015 as a staff operations specialist.

5    Q.  What does your current assignment detailed to the National

6    Cryptocurrency Enforcement Team entail?

7    A.  My current assignment to the National Cryptocurrency

8    Enforcement Team entails providing blockchain analysis support

9    on the team's investigations, as well as expert advice and

10   consultation.

11   Q.  Are you also a member of the FBI's Virtual Currency

12   Response Team?

13   A.  Yes, ma'am, I am.

14   Q.  Could you explain what that team is.

15   A.  The FBI's Virtual Currency Response Team is a team made up

16   of field personnel with expertise in blockchain analysis that

17   can provide support in general investigative techniques,

18   blockchain analysis, and seizure operations to investigations

19   across the FBI.

20   Q.  How long have you been a member of the Virtual Currency

21   Response Team for FBI?

22   A.  I've been a member since the beginning of the Virtual

23   Currency Response Team.  The date escapes me, ma'am.  It should

24   be on the CV.

25   Q.  How long have you been working on virtual currency,

1    generally, for the FBI?

2    A.  I've been working with virtual currency matters with the

3    FBI since 2015.

4    Q.  And what sort of cases and matters have you worked on over

5    those past eight years?

6    A.  I've worked on predominantly computer intrusion cases; I

7    support a cybercriminal squad in -- I supported a cybercriminal

8    squad in Newark.  Those cases include ransomware

9    investigations, distributed denial service attacks, SIM swaps,

10   insider threats, and darknet market investigations.

11   Q.  Have you also received training related to virtual currency

12   and blockchain analysis?

13   A.  Yes, ma'am, I have.

14   Q.  Could you describe, generally, what those trainings entail?

15   A.  Yes, ma'am.  In general, I received multiple trainings from

16   the FBI produced by the FBI in blockchain analysis throughout

17   the last eight years, as well as attending training at

18   conferences put on by the National Cyber Joint Investigative

19   Task Force.  I've also received training from Chainalysis and

20   TRM and received certifications from those companies.

21   Q.  Now, you mentioned that you hold trainings -- hold

22   certifications from Chainalysis, TRM in blockchain analysis.

23          Could you explain briefly what the trainings for

24   those certifications and the certification tests entail.

25   A.  Yes.  Both Chainalysis and TRM now have certification

1    courses; they start with cryptocurrency fundamentals,

2    explaining what a blockchain is, how this all works, and move

3    through investigative techniques and then advanced topics in

4    blockchain analysis.

5    Q.  Do you also give your own trainings and presentations and

6    teach others about cryptocurrency and blockchain analysis?

7    A.  Yes, ma'am, I do.  I've provided trainings to the FBI,

8    locally at my field office, as well as at other field offices.

9    I provided trainings to the FBI's Virtual Currency Response

10   Team.  I've provided training external to the FBI to U.S.

11   Attorney's Offices, as well as the National Cryptocurrency

12   Enforcement Team.

13   Q.  How much of your work, Mr. Scholl, is currently focused on

14   cryptocurrency, including blockchain analysis?

15   A.  The vast majority of my current work is based on blockchain

16   analysis.

17   Q.  I'd like to direct your attention in the binder in front of

18   you to what's marked as Government's Exhibit 1.

19          Is this a copy of your curriculum vitae?

20   A.  Yes, ma'am, it is.

21   Q.  And does that exhibit and document accurately set forth a

22   summary of your experience and qualifications pertaining to

23   your testimony today and your work on this case?

24   A.  Yes, ma'am, it does.

25          MS. PELKER:  Government would move to admit

```
 1      Government's Exhibit 1, Mr. Scholl's CV.

 2                  THE COURT:  Any objection?

 3                  MR. EKELAND:  No, objection, Your Honor.

 4                  THE COURT:  Exhibit 1 is admitted.

 5                  (Government's Exhibit 1 was admitted.)

 6      BY MS. PELKER:

 7      Q.  Mr. Scholl, I'd like to spend a little bit of time going

 8      through some key concepts for cryptocurrency and blockchain

 9      analysis.

10                  Could you explain, in your own words, what is virtual

11      currency?

12      A.  Virtual currency, or cryptocurrency, is a digital currency

13      that is administered and operated by a decentralized network

14      that transmits, validates, and records those transactions.

15      Q.  What are some common types of virtual currency?

16      A.  The most common -- the most popular or well-known type is

17      probably Bitcoin.  There's many others, including Ethereum,

18      Litecoin, Dogecoin.  There are many.

19      Q.  If I want to buy bitcoin, where could I go to get it?

20      A.  Most users would go to an exchange to purchase

21      cryptocurrency.  Such exchanges include Kraken or Coinbase.

22      You would visit their website and create an account and link a

23      bank account and purchase cryptocurrency with your bank

24      account.

25      Q.  And when you say an exchange, do you mean, basically, an
```

1    online financial institution, kind of like a bank, but dealing

2    in virtual currency?

3    A.  Yes, ma'am; I'd say that's accurate.

4    Q.  What type of information would an exchange collect from

5    someone buying cryptocurrency or bitcoin from the exchange?

6    A.  Many of the exchanges include -- collect personal

7    information, including name, date of birth, sometimes phone

8    numbers, but usually email addresses; that sort of personal

9    identifiable information.

10   Q.  In your investigations do you often seek and review records

11   from exchanges?

12   A.  Very frequently we seek information from exchanges, yes,

13   ma'am.

14   Q.  What sort of information do you receive from the exchange?

15   A.  For a subpoena to an exchange for an account, we would

16   receive customer information, that kind of KYC information that

17   we talked about.  We would receive information about who the

18   account belongs to, to include their name and date of birth,

19   email address, that sort of information; as well as activity on

20   the account, including login information, as well as virtual

21   currency transactions, deposits, withdrawals, and trades.

22   Q.  So similar to what you might get from a subpoena from a

23   bank, but dealing in cryptocurrency?

24   A.  Yes, ma'am.

25   Q.  Once people have bought bitcoin on the exchange, can they

1    continue to store funds on an account at the exchange, like a

2    bank account?

3    A.  Yes, ma'am.  Users can elect to keep their funds on their

4    exchange account.

5    Q.  Are there other ways that people can store their bitcoin if

6    they don't want to keep it at the exchange?

7    A.  Yes, ma'am.  Users could store their own bitcoin on a

8    personal wallet, a software application that they can download

9    from the internet, and then transfer funds from their exchange

10   account on to their personal wallet account; that would be on

11   their laptop or mobile device.

12   Q.  Could you explain what a Bitcoin address is.

13   A.  Yes, ma'am.  A Bitcoin address is like an account number.

14   A Bitcoin address is what holds value on the Bitcoin

15   blockchain.  It's a string of numbers and letters that is

16   representative of the public key and -- a private/public key

17   pair like is used in cryptocurrencies.

18   Q.  And does each Bitcoin wallet on someone's computer just

19   have one Bitcoin address in it?

20   A.  A wallet can have a single address, but more commonly,

21   Bitcoin wallets contain multiple addresses.

22   Q.  What happens when a user wants to send funds from their

23   Bitcoin wallet to another user or a business?

24   A.  So, first, a user would have to have received funds in

25   their wallet to make this transaction.  But once those funds

1    are received, they would need to know the address of the person

2    that they were trying to transfer the funds to and determine

3    how much of their bitcoin they'd like to transfer.

4            They would open their wallet application; input the

5    address that they'd like to send funds to; input how much

6    bitcoin they'd like to send; and then click send in their

7    wallet, essentially, and transmit that to the Bitcoin network.

8    Q.  Once that information is transmitted to the Bitcoin network

9    and verified, how is that transaction recorded?

10   A.  The transaction is recorded in the Bitcoin blockchain.  It

11   is mined into a block with other transactions around that time.

12   That transaction is given -- has a unique transaction hash or

13   transaction I.D., which is a unique identifier for the

14   transaction.

15           And the blockchain records the addresses that are

16   involved, how much funds were transferred to and from those

17   addresses, and the fees involved in the transaction.

18   Q.  You mentioned it records the addresses involved.

19           Does each transaction have just one input address

20   spending the funds and one output address receiving the funds?

21   A.  No, ma'am.  A Bitcoin transaction can have just a single

22   input or output address, but it can have any number of input

23   addresses and any number of output addresses.

24   Q.  Could you walk us through an example of a transaction that

25   would have more than one input address.

1    A.  Yes, ma'am.  Let's say that I had a Bitcoin wallet and I

2    received bitcoin two times; the first time I received two

3    bitcoin; and the second time I used a different address to

4    receive three bitcoin.

5             If I wanted to transfer you five bitcoin, I would

6    need to spend both of those inputs that I previously received.

7    So I would create a transaction sending to your address; I

8    would tell my wallet that I want to send five bitcoin.  My

9    wallet would figure out for me that it needs to use both of

10   these addresses and the two bitcoin and the three bitcoin that

11   I previously received, and then construct the transaction and

12   send it to your address.

13   Q.  So if you have an address A with two bitcoin, an address B

14   with three bitcoin, you can send a transaction with five

15   bitcoin because you can combine those two, both address A and

16   address B, in a single transaction?

17   A.  That's correct, ma'am.

18   Q.  And does each transaction have -- why would a transaction

19   have more than one output or receiving address?

20   A.  Most bitcoin transactions have more than one output or

21   receiving address because the Bitcoin network requires you to

22   spend an entire input.  So if I had that three-bitcoin input

23   that I wanted to spend to just send you one bitcoin, I can't

24   spend just one bitcoin from that three-bitcoin input.  I need

25   to spend the entire input.

1          I would send you three -- I would send you one

2     bitcoin; my wallet would create an additional address or a

3     change address that the remaining two bitcoin would get sent

4     to.

5          We often use the example of a coffee shop

6     transaction.  If you wanted to buy a $5 coffee at a coffee shop

7     and you only had a $10 bill in your wallet, you can't just rip

8     the $10 bill in half and hand it to the cashier; you need to

9     spend the entire bill, that entire denomination, and receive

10    change.  So the cashier creates $5 of change and hands it back

11    to you, and it comes back to your wallet.

12    Q.  All of this information would, then, still be recorded on

13    the blockchain that's publicly available?

14    A.  Yes, ma'am.

15    Q.  Could you explain what is blockchain analysis and what's

16    meant by that term.

17    A.  Yes, ma'am.  So all of the bitcoin transactions from 2009

18    until today are recorded on the Bitcoin blockchain.

19         Blockchain analysis is taking the information about

20    those transactions that's been recorded on the blockchain and

21    determining things like where the money came from and where the

22    money went for a specific address or a specific transaction.

23         Part of that includes determining which address in an

24    output is change and which is the payment.  So we try to

25    determine which way control moves in a series of outputs.

1    Q.  Does it also include what's called sometimes co-spend or

2    common input analysis where you're looking at multiple inputs

3    to a transaction?

4    A.  Yes, ma'am, it does.

5    Q.  And when you see multiple inputs to a transaction like what

6    you've previously described, what can that indicate to you

7    about who controls the addresses?

8    A.  In the case of multiple input addresses to a single

9    transaction, that can indicate that both of those addresses are

10   controlled by the same wallet because both of those addresses

11   need to be signed with their private keys at the same time in

12   order to make that transaction.

13   Q.  How do you typically start off your blockchain analysis for

14   a new case that you might be working on?

15   A.  So to start a blockchain analysis investigation, we take

16   whatever identifiers we have; that may be the transaction hash

17   or that unique identifier for a transaction; it may be an

18   address.  I would search that in an online block explorer and

19   take a quick look at how much money is involved in this

20   transaction or how much money is moved through this address

21   and look at where funds came from and where funds go to,

22   depending on the context.

23   Q.  Could you explain what you mean by an online block

24   explorer.

25   A.  Yes, ma'am.  There are many online block explorers that

1    provide a user interface to information from the Bitcoin

2    blockchain.  Some examples are blockchain.com, mempool.space,

3    blockchair.com.  There's websites that you can go to and query

4    information from the Bitcoin blockchain that gets presented on

5    a web interface.

6    Q.  Now, if the Bitcoin blockchain is a public data set that

7    you can go through and manually review yourself, why use one of

8    these online services rather than search the blockchain data

9    file yourself?

10   A.  It's all just about the user interface that it provides.

11   You can conveniently search on this web interface by just

12   having to go through a ton of data.  The Bitcoin blockchain is

13   approximately 500 gigabytes at this point.

14   Q.  Is it fair to say that scrolling through the 500-gigabyte

15   data file looking for each individual address would be a bit

16   labor-intensive?

17   A.  Yes, ma'am.

18          THE COURT:  I'm sorry.  Is there -- I'm going to

19   convey my ignorance on the topic.

20          Is there an administrator for Bitcoin that maintains

21   the blockchain?  Who maintains that?

22          THE WITNESS:  Yeah.  That's a great question, sir.

23   The Bitcoin blockchain is, essentially, administered by the

24   peers of the network; so just users of the network.  This is

25   why we call it a decentralized network.

1          They have rules that they have codified into a

2     protocol.  And as long as the protocol is being enforced, they

3     administer themselves, essentially.

4          THE COURT:  When you say they, who is the they?

5          THE WITNESS:  Anyone using the Bitcoin network.  In

6     particular about administration, anyone who is operating a full

7     node on the Bitcoin blockchain, which is doing things like

8     listening for new transactions, and then validating that that

9     transaction is valid; that it's had the money to send that it

10    is going to send; that it received that input somewhere else;

11    and that it hasn't spent it yet.

12         And the miners go about -- so a miner is a person who

13    creates a block.  They operate a node and they go about trying

14    to collect all those transactions that haven't yet been

15    included in the blockchain and check that they're valid, and

16    then mint them, essentially, into a new block on the

17    blockchain.

18         THE COURT:  Okay.  Thank you.

19    BY MS. PELKER:

20    Q.  Do you have a rough estimate of the number of full nodes on

21    the Bitcoin blockchain?  I know it changes over time.

22    A.  Off the top of my head, I don't, ma'am.  Thousands of full

23    nodes on the Bitcoin blockchain.

24    Q.  Have you yourself at one point run a full node on the

25    Bitcoin blockchain?

1    A.  That's correct, ma'am.  I had a full node running at one

2    point.  I wasn't mining.  I was just listening to every

3    transaction and retaining them.

4    Q.  And each one of these block explorers on the internet also

5    runs a full node or communicates with a full node?

6    A.  I don't know that for a fact, but that's my understanding

7    in general; yes, ma'am.

8    Q.  And the way that the Bitcoin network is set up, the

9    blockchain that would be verified on, say, your full node would

10   be the exact same set of records and data that would be on

11   anyone else's full node; is that right?

12   A.  Yes, ma'am, that's correct.

13   Q.  We spoke -- we've talked about your use of these public

14   online tools available to the public.

15          Do you also use commercial tools like Chainalysis,

16   TRM, and others?

17   A.  Yes, ma'am, I do.

18   Q.  Why use a commercial tool instead of just relying on the

19   publicly available tools?

20   A.  The commercial tools provide several advantages or several

21   features for blockchain analysis.  The first is that they

22   provide clustering of addresses.  Actually, I'll start again.

23          The first thing is that they provide a graphical user

24   interface.  They provide -- instead of just reviewing page

25   after page after page of blockchain data, they put this into a

1    graph that makes it easy to look back and look forward and

2    understand.

3          The second thing that they provide, from my

4    perspective, is clustering or grouping of addresses together,

5    which is part of what we're trying to do in blockchain

6    analysis.  These tools make determinations about which

7    addresses they believe belong to the same entity and present

8    that information in their tool.

9          The third thing that the tools provide is attribution

10   information to a limited extent.  What I mean by that is they

11   can frequently infer or know that some cluster or group of

12   addresses that they've identified belong together, belongs to a

13   particular entity.  So we call that attribution, and that's the

14   third thing they provide.

15         And then the fourth thing is a lot of analysis tools,

16   or analysis tools in general; like -- they can do aggregate

17   flow analysis and calculate things like that quickly.

18   Q.  Does the underlying blockchain data that's in Chainalysis

19   accurately reflect what's actually on the blockchain and

20   available on any other Bitcoin node?

21   A.  Yes, ma'am.  In my experience, the transaction information

22   displayed in Chainalysis matches what you'll find on any block

23   explorer.

24   Q.  In your work, have you also had the occasion to validate

25   the clusters and attributions in Chainalysis?

1    A.  Very frequently, ma'am.  Every time we send a subpoena to

2    an exchange to get back account information, we have the

3    opportunity to check that those Bitcoin addresses that belong

4    to this account at this exchange were properly attributed by

5    Chainalysis to the exchange that we subpoenaed.

6    Q.  So breaking that down a bit more, if you see funds in

7    Chainalysis going to what Chainalysis has clustered and

8    attributed as an exchange, you send the exchange a subpoena for

9    records from that address.

10          Is it your testimony that the response back from the

11   exchange verifying with records from that address that the

12   exchange does control that address a validation of

13   Chainalysis's clustering?

14   A.  Yes, ma'am, I believe it is.

15   Q.  Do you have a -- is this something that you and your

16   colleagues do frequently in your blockchain analysis type

17   cases?

18   A.  Yes, ma'am.  We do this every day.

19   Q.  Do you have a sense of the rough estimate of the volume

20   there?

21   A.  I'd imagine a thousand times a day throughout the FBI; not

22   me personally.

23   Q.  You would be very busy.

24          Were you asked to do blockchain analysis of the sort

25   you've described for the Bitcoin Fog case?

1    A.  Yes, ma'am, I was.

2    Q.  What specifically were you asked to do on Mr. Sterlingov

3    and the Bitcoin Fog investigation?

4    A.  I was asked to conduct a source of funds analysis and

5    determine the amount of funds in Mr. Sterlingov's accounts that

6    came from Bitcoin Fog.  I was also asked to look at specific

7    payments and transactions associated with the investigation.

8    Q.  And we heard testimony from you earlier this year in your

9    declaration regarding your source of funds analysis for some of

10   the accounts.

11        Did you also complete an expert report detailing your

12   work on the tracing?

13   A.  Yes, ma'am, I did.

14   Q.  And I'd like to direct your attention to Government's

15   Exhibit 2.

16        Is this a copy of the report that you completed?

17   A.  Yes, ma'am, it is.

18   Q.  And is that your signature next to the date of December 8,

19   2022, at the bottom?

20   A.  Yes, ma'am, it is.

21   Q.  And does this report accurately reflect your work doing the

22   tracing on this case?

23   A.  Yes, ma'am, it does.

24        MS. PELKER:  Government would seek to admit

25   Government's Exhibit 2.

1          THE COURT:  Any objection?

2          MR. EKELAND:  Yes, Your Honor.  We object because

3     it's not -- the defense objects on the basis that this report

4     is not based on any scientific verifiable methodology that's

5     cited anywhere.  It contains a number of conclusions based on

6     an untested heuristic assumption-based software.

7          Nowhere in it does it cite a single instance of any

8     scientific support for the methodology used, any peer-reviewed

9     papers, or anything except for conclusory statements.  There is

10    no assessment of error rates; there is no scientific analysis

11    of accuracy; and there is nothing that establishes the validity

12    of all of the heuristics used in the report.

13         So on the basis that it is, essentially, unscientific

14    and unvalidated and conclusory, we object.

15         THE COURT:  I mean, I think that's what this hearing

16    is about.  For present purposes, I'm just admitting it for

17    purposes of the *Daubert* hearing.  I'm not admitting it for

18    purposes of trial at this point, but I think it's appropriate

19    to admit it for purposes of the *Daubert* hearing.  That's what

20    we're here to discuss.

21         Exhibit 2 is admitted for purposes of today's

22    hearing.

23         MS. PELKER:  Thank you, Your Honor.

24         (Government's Exhibit 2 was admitted.)

25    BY MS. PELKER:

1    Q.  Mr. Scholl, did the report also include a number of

2    voluminous attachments as well?

3    A.  Yes, ma'am, it did.

4    Q.  Turning your attention to Government's Exhibit 3 in the

5    binder in front of you, if you could look through those several

6    pages.

7         Are these, essentially, screenshots of the different

8    files and the attachments to the report that you provided?

9    A.  Yes, ma'am, they are.

10   Q.  Could you describe, generally, what's included in these

11   attachments.

12   A.  Included in the attachments were all of the addresses that

13   Chainalysis Reactor has attributed to the darknet markets in

14   the report that are discussed, direct transfers from the

15   Bitcoin Fog cluster and Chainalysis to Mr. Sterlingov's

16   accounts, and then information from Mr. Sterlingov's Mycelium

17   wallet and his -- several of his accounts.

18   Q.  And is it accurate to say that each of these are very

19   lengthy CSVs and spreadsheets listing off thousands and

20   thousands of Bitcoin addresses that underlie your analysis?

21   A.  That's correct, ma'am.

22        MS. PELKER:  Government would move to also admit

23   Government's Exhibit 3.

24        THE COURT:  Any objection to admitting Exhibit 3

25   simply for purposes of the *Daubert* hearing?

```
 1                    MR. EKELAND:  No.

 2                    THE COURT:  Okay.  Exhibit 3 is admitted for the

 3       Daubert hearing.

 4                    (Government's Exhibit 3 was admitted.)

 5       BY MS. PELKER:

 6       Q.  Mr. Scholl, could you describe what data sources you

 7       reviewed in conducting your analysis for this case.

 8       A.  Yes, ma'am.  I reviewed undercover transactions that were

 9       conducted by the FBI and IRS CI.  I reviewed an extensive

10       amount of information from the Bitcoin blockchain.  I reviewed

11       records from Mr. Sterlingov's cryptocurrency accounts, as well

12       as some search warrant email returns.

13       Q.  Was part of your work corroborating the group of addresses

14       controlled by Bitcoin Fog?

15       A.  Yes, ma'am, it was.

16       Q.  Attached to your report was a list of over 900,000

17       addresses associated with Bitcoin Fog.

18                    What was the sourcing of those addresses?

19       A.  The 900,000, approximately, addresses that were included in

20       the Bitcoin Fog attachment were exported from Chainalysis.

21       Chainalysis is the source of those 900,000, approximately,

22       addresses.

23       Q.  Did you take additional steps to validate those addresses

24       that they exist and then that they are included, that they are

25       appropriately attributed to Bitcoin Fog?
```

1   A.  Yes, ma'am, I did.

2   Q.  What did you do on that point?

3   A.  First, we used the undercover transactions that the

4   government performed to validate those transactions -- to

5   validate some of those addresses, rather.  And then we compared

6   addresses in Chainalysis to other clusters that were relevant

7   to the investigation to other tools, including TRM.

8   Q.  Speaking specifically to the undercover transactions, is

9   this further detailed starting on page 8 of your report?

10  A.  Yes, ma'am, it is.

11  Q.  And I'd like to draw attention to the chart shown on the

12  bottom of page 10.

13          Could you explain what is shown here.

14  A.  Yes, ma'am.  The chart on the bottom of page 10 in the

15  report displays Bitcoin addresses associated with Bitcoin Fog

16  as they relate to the undercover transactions.

17          First, the FBI undercover payment sent to an address

18  that they received from the Bitcoin Fog service and then

19  withdrew funds from Bitcoin Fog, and then the IRS CI in the

20  same fashion.  The chart attempts to explain what addresses

21  were attributed by Chainalysis and what addresses the

22  government knows belong to Bitcoin Fog.

23  Q.  So is it your testimony that you were able to look at the

24  undercover transactions, outside of anything that Chainalysis

25  said about Bitcoin Fog, and determine that, because in an

1      undercover capacity the funds were going to and from these

2      addresses, that you knew from IRS and FBI that these were

3      Bitcoin Fog addresses?

4      A.   That's correct, ma'am.

5      Q.   And then what's the distinction between this red box that

6      says Bitcoin Fog cluster and then the blue box addresses known

7      to belong to Bitcoin Fog based on undercover transactions?

8      A.   Right.  So the blue box contains all addresses that we know

9      from the undercover transactions belonging to Bitcoin Fog; the

10     red box is those attributed by Chainalysis to Bitcoin Fog.

11           The significance is that there are no addresses that

12     were improperly attributed in this case to Bitcoin Fog cluster.

13     And in one case there is an address that Chainalysis did not

14     attribute to Bitcoin Fog that the government is aware of.  I

15     think that this is consistent with my experience using

16     Chainalysis and its attribution, in general, is that it is

17     generally reliable and conservative in that, if it's not sure

18     if an address belongs to the cluster, the address will not

19     appear in Chainalysis's Bitcoin Fog cluster.

20     Q.   And so that Bitcoin Fog Withdrawal Address 3, how do you

21     know that it is actually associated with Bitcoin Fog?

22     A.   Bitcoin Fog Withdrawal Address 3 was provided to the IRS CI

23     undercover agent -- correction -- is the address that they

24     received funds from.  So the IRS CI undercover goes to the

25     Bitcoin Fog service, makes a withdrawal of their funds from

1    Bitcoin Fog, and provided an address that they wanted to

2    receive the payment to.

3         Bitcoin Fog Withdrawal Address 3 is where that money

4    came from, where Bitcoin Fog -- where the money came out to the

5    withdrawal address the UC was using.

6    Q.  Why is it significant in your analysis that four of the

7    addresses were included in the Bitcoin Fog cluster in

8    Chainalysis but one was not?

9    A.  Again, the four being included in the cluster shows that

10   Chainalysis attribution is accurate.  The one not being

11   included shows that Chainalysis is conservative, that not all

12   addresses that belong to a service are in the cluster, but

13   generally, addresses that are in the cluster belong to the

14   service.

15   Q.  Did you take any other steps, in addition to reviewing the

16   undercover transactions, to validate the cluster of addresses

17   that Chainalysis had identified as the Bitcoin Fog cluster?

18   A.  Yes, ma'am, I did.

19   Q.  And what was that?

20   A.  I reviewed relevant addresses from this investigation in

21   TRM Labs and confirmed the attribution from another private

22   company.

23   Q.  And what is TRM Labs?

24   A.  TRM Labs is a competitor of Chainalysis.  It provides

25   similar blockchain analysis tools.

1    Q.  In addition to validating the Bitcoin Fog cluster, were you

2    also asked to look at transactions between Bitcoin Fog and a

3    variety of darknet markets?

4    Yes, ma'am, I was

5    Q.  How did you do that analysis?

6    A.  I did that analysis using Chainalysis Reactor and its bulk

7    analysis tools.

8    Q.  Why use Chainalysis rather than doing it by hand?

9    A.  The number of transactions involved between these darknet

10   markets and Bitcoin Fog is massive.

11   Q.  We're talking hundreds of thousands of transactions?

12   A.  Yes, ma'am.

13   Q.  Turning your attention to page 18, does the table there

14   summarize your findings?

15   A.  Yes, ma'am, it does.

16   Q.  And is that further detailed in the preceding pages in the

17   report, as well as in the attachments to your report?

18   A.  Yes, ma'am, it is.

19   Q.  Mr. Scholl, did you additionally conduct a source of funds

20   analysis from Mr. Sterlingov's accounts at a variety of

21   exchanges?

22   A.  Yes, ma'am, I did.

23   Q.  Is a source of funds analysis something that you frequently

24   do in your work?

25   A.  Yes, ma'am, it is.

1    Q.  Generally speaking, what was the source of funds deposited

2    into Mr. Sterlingov's various exchange accounts?

3    A.  The analysis showed that there was a significant amount of

4    funds coming from Bitcoin Fog into Mr. Sterlingov's accounts.

5    Q.  Did that include instances where the funds were transferred

6    directly from the Bitcoin Fog cluster to the defendant's

7    accounts at various exchanges?

8    A.  Yes, ma'am, it did.

9    Q.  And in other cases were the funds sent through a series of

10   intermediary addresses before being sent to the exchange?

11   A.  Yes, ma'am.

12   Q.  I'd like to direct your attention to the chart on the

13   bottom of -- or, I guess, the top of page 22.

14          Could you walk us through this chart.

15   A.  Yes, ma'am.  This chart shows the flow of funds that were

16   sent from Bitcoin Fog to Mr. Sterlingov's Kraken account.  The

17   chart shows that there's multiple transactions in between

18   Bitcoin Fog and the Kraken account; in this case six

19   transactions sending funds to Bitcoin addresses outside of

20   Bitcoin Fog and the Kraken account -- so on the blockchain --

21   and the total amount of funds that was ultimately transferred

22   into the Kraken account from Bitcoin Fog.

23   Q.  There's a note at the top of the box -- rectangle on the

24   right-hand side that says peel chain.

25          Could you explain what a peel chain is.

1    A.  Yes, ma'am.  A peel chain is a behavior in transactions in

2    which a large amount of bitcoin that was initially received is

3    spent in relatively smaller subsequent transactions, sending

4    that change that we talked about forward to a new address in

5    the wallet, forming this chain where the next address receives

6    the change and then another payment happens, sending a portion

7    of that funds to the payment address and forwarding change to

8    the next address in the peel chain.

9    Q.  What did your review of this peel chain shown on page 22

10   suggest to you about the addresses in the peel chain?

11   A.  My analysis showed that these addresses were likely

12   controlled by the same wallet.

13   Q.  After writing this report, did you receive additional

14   information about these addresses?

15   A.  Yes, ma'am, I did.

16   Q.  What was that?

17   A.  Received information about the addresses and

18   Mr. Sterlingov's Mycelium wallet.

19   Q.  And why was that significant?

20   A.  It was significant because all of the addresses that I

21   sensed belonged to this peel chain did, in fact, belong to

22   Mr. Sterlingov's Mycelium wallet.

23   Q.  Is it fair to say that that validates your original

24   assessment in your tracing?

25   A.  Yes, ma'am.

1    Q.  Are you generally aware that Mr. Sterlingov has testified

2    and made statements that the source of his funds in his various

3    accounts was, in fact, coming from Bitcoin Fog?

4    A.  I'm generally aware, yes, ma'am.

5    Q.  Does that also further corroborate your analysis and the

6    validation of the Bitcoin Fog cluster?

7    A.  I believe it does, yes, ma'am.

8    Q.  Do the other pages in the report following page 22 through

9    page 34 further describe tracing from Bitcoin Fog to other

10   accounts controlled by Mr. Sterlingov?

11   A.  Yes, ma'am.

12   Q.  Did you apply, generally, the same methodology for those

13   accounts and that work as you just described for the Kraken

14   account and the chart on page 22?

15   A.  Yes, ma'am, I did.

16   Q.  Mr. Scholl, were you also asked to review particular

17   payments for Bitcoin Fog infrastructure?

18   A.  I was.

19   Q.  And in doing that work, did you combine information from

20   the blockchain with records from various virtual currency

21   exchanges and services?

22   A.  Yes, ma'am, I did.

23   Q.  Is it common for you to do that sort of analysis:

24   Combining the records from the blockchain with records from

25   exchanges, financial institutions; seize data sets?

1    A.  Yes, ma'am, that's common.

2    Q.  Directing your attention to page 35 of the report and this

3    chart under the section specific payments, could you walk us

4    through what's shown here on this chart.

5    A.  What's shown here is a movement of funds from an account at

6    Mt. Gox associated with the email address

7    plasma@plasmadivision.com.  Those funds were withdrawn from

8    accounts to the Bitcoin blockchain, made three hops on -- in

9    Bitcoin transactions, were deposited to a second account at

10   Mt. Gox associated with the email address NFS9000@hotmail.com.

11        Those funds were then converted by redemption codes

12   and sent to a third Mt. Gox account where the Bitcoin was

13   converted to U.S. dollars and then withdrawn from the third

14   Mt. Gox account and sent to the Aurum Xchange.  We didn't have

15   information about what specific accounts at the Aurum Xchange

16   they were sent to, but there were similar transactions out of

17   Aurum Xchange to the Liberty Reserve account, Shormint LR

18   account referenced in the report.

19        And then, further, that those funds were subsequently

20   spent at various web service providers.

21   Q.  And just to be very clear, what portion of this tracing was

22   based on information on the Bitcoin blockchain?

23   A.  The green arrows at the top moving from Mt. Gox to the

24   Bitcoin blockchain, and then the one transaction on the Bitcoin

25   blockchain, and then the transaction back to the Mt. Gox

1    account, the second Mt. Gox account, are based on Bitcoin

2    transactions that are recorded on the Bitcoin blockchain.

3    Q.   There are screenshots shown on pages 37 and 38 of your

4    report.

5              Could you explain what those screenshots are.

6    A.   Those screenshots are screenshots from the block explorer

7    mempool.space.  They show those three transactions that I just

8    spoke about as they were recorded on the Bitcoin blockchain.

9    Q.   And this data that you're showing from mempool.space, you

10   could also go and search on the blockchain DAT file as well?

11   A.   Yes, ma'am.

12   Q.   Are these screenshots, just to be clear, from Chainalysis?

13   A.   No, ma'am, they're not.

14   Q.   And does anything on page 35 rely on Chainalysis Reactor?

15   A.   No, ma'am, it does not.

16   Q.   Did you, though, separately review these same transactions

17   in Chainalysis?

18   A.   Yes, ma'am, I did.

19   Q.   And did what was shown in Chainalysis match what was shown

20   on the public block explorer and what's shown on your chart on

21   page 35?

22   A.   Yes, ma'am, it does.

23   Q.   Did you additionally review confirmation emails from

24   Mt. Gox contained in the defendant's Plasma Division email

25   account?

```
 1    A.  Yes, ma'am, I did.

 2    Q.  Is one example shown on page 36 of the report?

 3    A.  Yes, ma'am, it is.

 4    Q.  And were you able to match up what you were seeing in the

 5    records from Mt. Gox, from Liberty Reserve to what you were

 6    seeing outside of those data sets; so from the other data sets,

 7    from the blockchain, and from the emails?

 8    A.  In many cases, yes, ma'am, I was able to corroborate that

 9    information.

10    Q.  And did that further corroborate your tracing and the

11    analysis that's shown on page 35 and elsewhere in your report?

12    A.  Yes, ma'am, it does.

13    Q.  Mr. Scholl, did you also look at early transactions into

14    Bitcoin Fog?

15    A.  Yes, ma'am, I did.

16    Q.  Why focus on these early transactions in a criminal case?

17    A.  Investigators often focus on early transactions, ma'am,

18    looking for potential mistakes.  Generally, throughout an

19    actor's career, as they're gaining experience, their

20    operational security improves, and they make less mistakes.  So

21    we like to look at early transactions while things were still

22    being figured out, potentially.

23    Q.  What did you find when you looked at those early transfers

24    into Bitcoin Fog?

25    A.  I found that the first transaction into the Chainalysis
```

1    Bitcoin Fog cluster contained funds from the same Mt. Gox

2    account.

3    Q.  That's the plasma@plasmadivision account that was opened by

4    the defendant?

5    A.  Yes, ma'am.

6    Q.  Could you turn to page 49 and explain what's shown on the

7    chart there.

8    A.  Page 49 has a chart that displays the path that funds took

9    from the Mt. Gox account into the Bitcoin Fog cluster.

10   Q.  And could you -- did you observe any patterns that stood

11   out to you in the transfer of those funds from the Mt. Gox

12   account into Bitcoin Fog?

13   A.  Yes, ma'am, I did.

14   Q.  Could you explain what that was.

15   A.  There are multiple transactions sending funds to the same

16   addresses, and in some cases a transaction that sends funds to

17   two different addresses within the same wallet.

18   Q.  And what made these particular transactions notable to you?

19   A.  It's notable because it's not a logical way to transact in

20   bitcoin; that it appeared to be an attempt to obscure the

21   source or destination of funds.

22   Q.  Did you also review posts and announcements from

23   Bitcointalk and Twitter announcing the launch of the Bitcoin

24   Fog service in 2011?

25   A.  Yes, ma'am, I did.

1   Q.  Did those posts and the timing of them inform your analysis

2   of these funds transfers?

3   A.  Yes, ma'am, it did.

4   Q.  And what is the significance of the timing of the transfers

5   from Mr. Sterlingov's account at Mt. Gox with regard to the

6   public announcements of Bitcoin Fog?

7   A.  The significance of the timing is that the funds from

8   Mr. Sterlingov's Mt. Gox account reached addresses, I believe,

9   to be controlled by Bitcoin Fog prior to the announcement of

10  the service.

11  Q.  Mr. Scholl, does your report go on to detail analysis of

12  additional transactions, including transactions connected to

13  Bitcoin Fog and Mr. Sterlingov?

14  A.  I'm sorry, ma'am.  Can you repeat that.

15  Q.  Elsewhere in your report, do you also do further analysis

16  of additional transactions connected to Bitcoin Fog and

17  Mr. Sterlingov?

18  A.  Yes, ma'am.

19  Q.  Did you use the same methodology and techniques in that

20  analysis as what you've testified to here?

21  A.  Yes, ma'am, I did.

22  Q.  Mr. Scholl, are you familiar with Monero?

23  A.  Generally, ma'am, yes, I'm familiar with Monero.

24  Q.  And is it accurate that Monero is based on a different

25  underlying code and different blockchain features than Bitcoin

```
 1    is?

 2    A.  Yes, ma'am; that's accurate.

 3    Q.  And would the blockchain analysis techniques described in

 4    your report apply to Monero?

 5    A.  No, ma'am.

 6            MS. PELKER:  Court's indulgence to check in with

 7    Mr. Brown?

 8            THE COURT:  Yes.

 9            MS. PELKER:  Nothing further from the government,

10    Your Honor.

11            THE COURT:  All right.  Thank you.  Mr. Ekeland?

12            MR. EKELAND:  May I proceed, Your Honor?

13            THE COURT:  You may proceed.

14            MR. EKELAND:  Thank you.

15                        CROSS-EXAMINATION OF

16                            LUKE SCHOLL

17    BY MR. EKELAND:

18    Q.  Are you ready, Mr. Scholl?

19    A.  Yes, sir.

20    Q.  Thank you.  You said you received a certification from

21    Chainalysis in a blockchain analysis; did I hear that

22    correctly?

23    A.  Yes, sir.

24    Q.  As part of that certification, you were trained on

25    Chainalysis Reactor; is that correct?
```

1    A.  In some of them, yes, sir.

2    Q.  Can you tell me what the statistical error rate is for

3    Chainalysis Reactor?

4    A.  No, sir, I cannot.

5    Q.  Can you tell me the rate of false positives when it comes

6    to Chainalysis Reactor?

7    A.  No, sir, I cannot.

8    Q.  Can you tell me the rate for false negatives when it comes

9    to Chainalysis Reactor?

10   A.  No, sir, I cannot.

11   Q.  Can you cite me any scientific peer-reviewed papers

12   analyzing the accuracy of Chainalysis?

13   A.  No, sir, I cannot.

14   Q.  So, essentially, if I heard your testimony right, your

15   assessment of the accuracy of Chainalysis Reactor is based

16   solely on your experience?

17   A.  Yes, sir.

18   Q.  And you have no scientific paper or any peer-reviewed paper

19   or any kind of academic paper at all that you can point me to

20   that analyzes and validates the accuracy of Chainalysis

21   Reactor; is that correct?

22   A.  That's correct, sir.

23   Q.  Okay.  So Chainalysis Reactor was what you primarily used

24   in your investigation of Bitcoin Fog; is that correct?

25   A.  I would say of the proprietary tools, it is correct that I

1    used predominantly Chainalysis Reactor, yes, sir.

2    Q.  You also said, I think, you used one from TRM?

3    A.  Yes, sir.

4    Q.  Did you use anything from Excygent, LLC?

5    A.  No, sir, I did not.

6    Q.  So your understanding of -- can you tell the Court what the

7    word heuristic means?

8    A.  Heuristic is like a pattern of behavior that we apply to

9    make determinations, I guess, generally.

10   Q.  Would it be fair to say that a heuristic is an assumption

11   that's made in order to make a probabilistic determination in

12   relation to a particular trace?

13   A.  I don't think that the -- necessarily the heuristic itself

14   is an assumption.  It's a pattern of behavior, but I take --

15   Q.  Would you argue with me that the etymology of the word

16   heuristic comes from the Greek word for guessing?

17   A.  I was not familiar with that.

18   Q.  You would agree with me that there are -- well, you would

19   agree with me that Chainalysis Reactor is a probabilistic

20   software and not deterministic in the sense that it doesn't

21   give you 100 percent accurate results?

22   A.  I would like to clarify.  I think that there's a couple of

23   things that are very accurately portrayed in Chainalysis, and

24   there are things that it applies heuristics to in order to do

25   clustering and things like that.

1           But the transaction data in Chainalysis is not, in my

2     opinion, like, up for debate.  The fact that Bitcoin went from

3     this address to this address, as displayed in Chainalysis, is

4     consistent with the Bitcoin blockchain.  It's the clustering of

5     addresses, I believe, that you're referring to and potentially

6     the attribution of those clusters to an entity.

7           But I think that there's factual information that's

8     displayed in Chainalysis

9     Q.  Precisely.  I mean, you would agree with me saying that

10    Chainalysis is accessing the public blockchain for some of its

11    information; is that correct?

12    A.  Yes.

13    Q.  And what you're saying is that it's -- when it accesses the

14    public blockchain, it portrays information from the public

15    blockchain, that's accurately reflected on the public

16    blockchain?

17    A.  Yes, sir.  I think that maybe we could use an example from

18    the report to talk about that, if you'd like.

19    Q.  We can get to that, but I just want to ask more questions

20    about this because I want to get clear on the distinction.

21           But that's quite a common feature of any number of

22    blockchain tracing software readily available on the internet;

23    that you can just use it to graphically represent the tracing

24    of the blockchain, right?

25    A.  Most block explorers don't do that, but some potentially

1    do, yes.

2    Q.  But what we're -- the proprietary part of Chainalysis comes

3    in is it's -- in its heuristics, correct?

4    A.  Among other things, potentially, but sure.

5    Q.  And would you agree with me that you learned in your

6    training that Chainalysis Reactor primarily uses three types of

7    heuristics, correct?

8    A.  I think that there may potentially be more than that; but,

9    yes, sir.

10   Q.  Can you name me all the heuristics that Chainalysis Reactor

11   uses as you sit here today?

12   A.  No, sir.

13   Q.  But you'd agree with me that the primary heuristic that it

14   uses is called the co-spending?

15   A.  I would agree, yes, sir.

16   Q.  And that's what, I believe, you described earlier to the

17   Court.

18         That's where you assumed that all the inputs to a

19   particular output address or pair of output addresses, if one

20   is a change address, you assume that all those inputs are

21   controlled by the same entity or person, correct?

22   A.  That's what co-spend -- that's what the co-spend heuristic

23   is about, yes, sir.

24   Q.  Right.  And do you know what a coinjoin is?

25   A.  Yes, sir, I do.

1    Q.   What is a coinjoin?

2    A.   A coinjoin is when one or more -- two or more individuals

3    combine their transactions into one large transaction.

4    Q.   And so a coinjoin is an example of where the co-spending

5    heuristic just isn't true, because the coinjoin defeats the

6    underlying assumption that one singular entity controls all the

7    inputs, correct?

8    A.   In general, that's -- that's true that the heuristic

9    doesn't work, but there's ways to detect coinjoins.  I am aware

10   that Chainalysis is identifying those transaction patterns and

11   signatures and in some cases -- well, they're accounting for

12   that in a lot of their clustering.

13   Q.   Can you tell me, as you sit here on the stand today,

14   precisely how Chainalysis deals with the coinjoin problem when

15   it comes to the co-spending heuristic?

16   A.   I can give you examples.  But Ms. Bisbee, I believe, is

17   going to potentially represent Chainalysis after me.

18          But the examples that I would give you are things

19   like Chaumian coinjoins that occur with Wasabi Wallet, for

20   example, where Chainalysis does actually cluster all those

21   addresses and labels it as an entity which is known to perform

22   coinjoins.  And that's something that Chainalysis does with

23   other examples too.

24          In some cases, when a coinjoin is detected but the

25   service -- the specific service or entity is not known, I've

1    seen times when Chainalysis doesn't cluster the co-spends in

2    the coinjoin because it knows that that's a coinjoin and,

3    therefore, we're not going to cluster it.

4    Q.   You said Chainalysis knows.  But you can't specifically

5    tell me how it determines whether something is a coinjoin or is

6    part of a co-spend, correct?

7    A.   Chainalysis knows how Wasabi coinjoins work, or shared

8    coin, whatever coinjoin service.  They can look at those

9    transactions and fingerprint them.

10          But to your point, it's possible that somebody could

11   create a coinjoin that isn't detected by Chainalysis heuristics

12   that I think is --

13   Q.   I'm sorry.  I cut you off.  I didn't mean to cut you off.

14   A.   No.

15   Q.   And so you just agreed with me that a coinjoin is a

16   potential problem for the co-spending heuristic, correct?

17   A.   In general, yes, sir, I agree with that.

18   Q.   And can you cite me any statistics or any kind of

19   scientific peer-reviewed paper addressing the accuracy of

20   Chainalysis Reactor's detection of coinjoins in a co-spending

21   heuristic analysis?

22   A.   No, sir, I cannot.

23   Q.   Okay.  And then the second -- moving on to the second type

24   of heuristic that I understand Chainalysis Reactor to use,

25   that's a behavioral analysis, correct?

1    A.  Something like that, yes, sir.

2    Q.  Something like that.

3    A.  If you're going to describe --

4    Q.  Sure.  I think Ms. Bisbee's report covers this a little

5    bit.  That's basically looking at the timing of transactions;

6    the type of transactions, whether it's a multisag, whether

7    there's a time lock on it; just sort of looking at the -- well,

8    like, the timing and the signatures and stuff like that.  Would

9    you --

10   A.  Yes, sir.

11   Q.  -- agree with me on that?

12        Are you aware of any scientific validation, any kind

13   of peer-reviewed papers attesting to the accuracy of the

14   behavioral heuristic?

15   A.  No, sir, I'm not.

16   Q.  Okay.  And then the -- I believe the third type of

17   heuristic is an intelligence heuristic in the sense of OSINT.

18   Does that sound right to you?

19   A.  Generally, yes, sir.

20   Q.  Right.  So when I say that, you wouldn't disagree with me

21   that the intelligence heuristic is, essentially, one that

22   relies on data scraping from the open internet, correct?

23   A.  I'll let Ms. Bisbee talk to that heuristic, sir.

24   Q.  Is it your testimony here that you really don't understand

25   the intelligence heuristic that's involved in Chainalysis

1    Reactor?

2    A.  I don't know the full extent of what Chainalysis is doing

3    for that heuristic, no, sir.

4    Q.  And have you ever reviewed Chainalysis Reactor's source

5    code?

6    A.  No, sir, I have not.

7    Q.  I want to go quickly to -- I think you covered the -- let

8    me find -- I just need to find the right page here.

9              The initial Mt. Gox transaction that first appears in

10   the criminal complaint; I believe it's on page 35.  And it's on

11   the page in your expert report that starts Section 5, specific

12   payments.  Do you see that?

13   A.  Yes, sir, I do.

14   Q.  Now, that tracing there, that is based on -- it appears in

15   a slightly different form in the original criminal complaint in

16   this matter, correct?

17   A.  I don't recall, but this graph is generated by me.  So it

18   would not have been in the complaint; that's correct.

19   Q.  No.  But did you review the initial criminal complaint in

20   this matter?

21   A.  I did.

22   Q.  Right.  Are you aware that there is a trace that is

23   illustrated in the criminal complaint going from this Mt. Gox

24   Account Number 1 all the way through to the payments out of the

25   Shormint Liberty Reserve account?

1    A.  I actually do not recall that, sir, but I'm happy to look

2    at it.

3    Q.  So when you prepared this report, you didn't review the

4    criminal complaint?

5    A.  I think there are things in this report -- in the

6    declaration and in this report that reference the criminal

7    complaint, but I don't recall all elements of the criminal

8    complaint, sir.

9    Q.  Fair enough.  I just want to walk through this trace

10   slightly just to illustrate some of these points.  You've

11   got -- on that Mt. Gox Account Number 1, you've got 44 bitcoin

12   right there, and you've got a green arrow pointing to a little

13   Bitcoin symbol inside a Bitcoin blockchain with a wallet

14   address.

15           I can't even see what the wallet address begins with.

16   I think it's like 122BU; is that right?  Do you see that?

17   A.  1JZBU, sir.

18   Q.  Now, are you familiar with what a sweep transaction is?

19   A.  Yes, sir, I am.

20   Q.  And a sweep transaction, at least the way I'm defining it,

21   is a transaction with one input and one output, correct?

22   A.  That's correct.

23   Q.  And that's what we're looking at there; there's one input

24   and one out- -- one input address and one output address right

25   there, correct?

1    A.  I mean, in the chart that's the way it appears, sir.  But

2    if you look at page 37, that transaction is the top figure.

3    That's not a sweep, sir.

4    Q.  So on page -- actually, what is on this graph is not

5    accurately depicting what you have on page 37; is that correct?

6    A.  No.  The graph does accurately depict the flow of funds,

7    sir, but the transaction is more complicated than a single

8    address.  You'll notice that at Mt. Gox, I did not put a

9    Bitcoin address initially with that 44 bitcoin.  It wasn't out

10   of an address that was associated with his account because

11   Mt. Gox was operating as a custodial exchange.

12          So that transaction, which appears in Figure 20 at

13   the top of page 37, is not a sweep, sir.  There's two inputs

14   and two outputs.

15   Q.  There's two inputs and there's two outputs; but that's not

16   reflected on your graph?

17   A.  The graph shows the flow of funds.  I did not show all

18   outputs for all transactions.  The graph connects the dots

19   between the plasma@plasmadivision Mt. Gox account and the

20   Liberty Reserve account.

21   Q.  So that graph is not an accurate depiction of all the

22   transactions involved in this trace; is that correct?

23   A.  It doesn't capture all of the information included in the

24   Bitcoin blockchain about those -- all of those addresses.  It

25   captures the information about the flow of funds from the

1   Mt. Gox account to the Liberty Reserve account.

2   Q.  But it doesn't show all the wallet addresses, and it

3   doesn't show the full scope of all the transactions?

4   A.  That's correct.  It shows that funds came out of the

5   Mt. Gox account according to the Mt. Gox records and sent to

6   the address 1JZBU.

7   Q.  You said that Mt. Gox was a custodial wallet, correct?

8   A.  Yes, sir.

9   Q.  And isn't it true that Mt. Gox -- if you were a Mt. Gox

10  accountholder, you didn't actually have a separate wallet; that

11  Mt. Gox was just one, basically, big wallet, correct?

12  A.  I'm not familiar with the backend of Mt. Gox, sir.

13  Q.  You're not familiar with the backend of Mt. Gox?

14  A.  No, sir.

15  Q.  Did you check the accuracy of any of the Mt. Gox data in

16  this case?

17  A.  As it is reflected in this graph, I verified that the

18  Mt. Gox transaction records sending funds in bitcoin to that

19  address, I verified that that was accurately recorded in the

20  Bitcoin blockchain, which confirms the validity of the record.

21  Q.  When you say you accurately checked it, when you were using

22  the Mt. Gox data, did you use the government's Mt. Gox

23  database?

24  A.  Yes, sir, I did.

25  Q.  Did you check the accuracy of the data in that database?

1    A.   The entire database, no, sir.

2    Q.   Okay.  And isn't it true about the blockchain, at least the

3    public blockchain, that it doesn't record any; any personally

4    identifying information linking any person to any transaction?

5    Is that true?

6    A.   I'd say it's true, sir.  The blockchain is pseudonymous.

7    Q.   Right.  So when it comes to making attributions as to

8    people who are controlling, say, the input address or the

9    output address, you basically have to make an educated guess;

10   isn't that true?

11   A.   Not in the case of sending a subpoena to an exchange.  If

12   we've traced funds to an exchange, they can tell me that, yes,

13   this exchange, we were responsible for these transactions, they

14   belong to an account; off-chain -- like, off the exchanges and

15   on the blockchain, I would say that that's true.

16   Q.   Sure.  Essentially, what I'm saying is -- what I'm saying

17   is you have to get external sources of information outside of

18   the blockchain to actually make any kind of personal

19   attribution; is that correct?

20   A.   That is one way to get personal attribution.  There are

21   others, sir.

22   Q.   Right.  That personal identifying information is not

23   contained anywhere in the blockchain?

24   A.   That's correct, sir.

25   Q.   That's why, to make any kind of guesses or any kind of

 1    identification, you need external information?

 2    A.   Such as like we search Mr. Sterlingov's device and find a

 3    wallet there, we attribute those addresses in that wallet to

 4    Mr. Sterlingov; but, yes, sir.

 5    Q.   Did you review those searches of Mr. Sterlingov's devices?

 6    A.   I reviewed the 302.

 7    Q.   The 302.  And you didn't see any actual evidence of him

 8    ever operating Bitcoin Fog, did you?

 9    A.   In the Mycelium wallet, sir?

10    Q.   Anywhere in anything --

11         THE COURT:  I'm sorry.  You're talking over each

12    other, and you're going too quickly.

13         MR. EKELAND:  I'm sorry.  I didn't hear you.

14         THE COURT:  You're talking over each other and going

15    too quickly.

16         MR. EKELAND:  I apologize.

17         THE COURT:  Go ahead.

18         THE WITNESS:  Can you restate the question, sir.

19    BY MR. EKELAND:

20    Q.   I sure can.  Actually, I'm going to withdraw it.

21         So you -- well, the government doesn't have the

22    Bitcoin Fog servers, correct?

23    A.   That's my understanding, yes, sir.

24    Q.   So you've never actually reviewed any information from the

25    Bitcoin Fog servers, correct?

1    A.   That's correct, yes, sir.

2    Q.   And you've never reviewed -- as part of your external

3    information used to confirm your traces, you've never reviewed

4    any communications between Mr. Sterlingov and anyone about

5    operating Bitcoin Fog?

6          THE COURT:   This seems like it's beyond the scope of

7    the *Daubert* hearing.

8          MR. EKELAND:   I'm asking for the basis of his

9    opinions, and he said that he relied on external information

10   because you cannot personally identify anybody from the

11   information within the blockchain.  So I'm trying to find out

12   what he's using to verify his attributions in his expert

13   report.

14         THE COURT:   All right.  I'll allow it.

15         MR. EKELAND:   Thank you, Your Honor.

16   BY MR. EKELAND:

17   Q.   I'll be -- I don't think I have that much more.

18         Did you review any -- as part of your validation of

19   your attribution and your tracing, did you review any

20   eyewitness statements?

21   A.   Not unless you count the undercover transactions, sir.

22   Q.   When you say undercover transaction, you just mean the

23   transaction by the IRS CI where they -- when is that? -- in

24   November 2016?

25   A.   I could look, sir.

1    Q.  Feel free to look at your expert report if that refreshes

2    your recollection.

3    A.  September 2019, sir, is what's referenced in the report.

4    Q.  And so -- and that's not the same transaction reference in

5    the superseding indictment, correct?

6    A.  I'm not sure, sir.

7    Q.  Did you review the superseding indictment before writing

8    the report?

9    A.  I'm not sure, sir.

10   Q.  But your analysis and your trace isn't in the superseding

11   indictment, correct?

12   A.  I was not part -- the first contribution to this case was

13   the declaration for the Monsanto hearing and then this work.

14   I'm not sure of the dates you're referencing, but I believe the

15   answer is no.

16   Q.  Basically, you didn't come on, start working on this case

17   until after Mr. Sterlingov was arrested; is that correct?

18   A.  That's correct, sir.

19            MR. EKELAND:  No further questions, Your Honor.

20            THE COURT:  All right.  Any redirect?

21            MS. PELKER:  Just briefly, Your Honor.  I know we're

22   hitting up against lunchtime.

23            THE COURT:  That's okay.

24                    REDIRECT EXAMINATION OF

25                          LUKE SCHOLL

1    BY MS. PELKER:

2    Q.  Mr. Scholl, Mr. Ekeland asked you a number of questions

3    about existing academic research.

4            Is it fair to say that your work in blockchain

5    analysis is focused on practical applications and that you're

6    not an academic researcher?

7    A.  That's fair to say, yes, ma'am.

8    Q.  And is it possible that there are a number of -- that there

9    is, in fact, academic research that you wouldn't otherwise be

10   aware of or familiar with in your work?

11   A.  I'm sorry.  Can you repeat the question, ma'am.

12   Q.  Is part of your work necessarily involving keeping up with

13   all of the different academic work in the field of blockchain

14   analysis?

15   A.  No, ma'am.

16   Q.  Regarding coinjoin, what is your experience with

17   Chainalysis's accurate detection of coinjoin in blockchain

18   analysis?

19   A.  My experience is that, looking at Wasabi wallet coinjoins,

20   as I described on the cross-examination, I'm familiar with

21   multiple instances where Chainalysis is accounting for

22   coinjoins, but I acknowledge that there are possible -- more,

23   like, one-off kinds of coinjoins that don't necessarily use a

24   service that would be very difficult to detect.

25   Q.  Did you see any indication in your review that there was a

1    coinjoin being performed by Mr. Sterlingov or Bitcoin Fog that

2    would have produced any sort of false positive?

3    A.  No, ma'am.

4          THE COURT:  Can I ask a follow-up question on that.

5    Did you do anything that would have allowed you to make that

6    assessment?

7          THE WITNESS:  I've looked at all of the transactions

8    as discussed in the report in reasonable detail and looked at

9    several transactions at Bitcoin Fog.  Obviously, I've not

10   reviewed every transaction at Bitcoin Fog.

11         So, again, I didn't see any evidence of those

12   large-scale services that do coinjoins that have a pattern

13   where there's, like, 100 input addresses and 100 output

14   addresses or something like that.  It leaves open the

15   possibility that there is a small -- two friends get together

16   and decide to do this thing called a coinjoin and that

17   occurred.

18         In general, my opinion is that it's unlikely that

19   that would change the overarching assessment, but it might

20   change specific transaction amounts or something like that.

21         THE COURT:  How would you know if there was

22   significant coinjoin occurring?

23         THE WITNESS:  Again, most coinjoins -- and this is a

24   little anecdotal, perhaps, here, but most coinjoins are using a

25   service where you can meet up with other people, essentially,

1    to do --

2                    THE COURT:  Like Wasabi Wallet?

3                    THE WITNESS:  Right, sir.  So those have kind of a

4    fingerprint.  You can tell this is not a normal transaction

5    whatsoever.

6                    But if two people were just to find each other on

7    some corner of the internet and decide that they were going to

8    make a coinjoin transaction with two inputs and two outputs,

9    that would be much more difficult to detect.

10                   THE COURT:  Thank you.

11                   THE WITNESS:  Yes, sir.

12   BY MS. PELKER:

13   Q.  Mr. Scholl, defense counsel asked you about the Mt. Gox

14   withdrawals and whether or not it was a sweep.

15                   Could you explain how withdrawals from exchanges like

16   Mt. Gox or others are typically structured and why that

17   pertains to your chart.

18   A.  Withdrawals from exchanges are coming out of addresses that

19   the exchange controls.  They've had an internal ledger that

20   documents how much bitcoin is in your account.  So when you

21   make a deposit to an exchange, those funds aren't just left in

22   your deposit address.

23                   They're swept into the coffers of the exchange, and

24   then the exchange pays out from its coffers when you'd like to

25   make a withdrawal.  So those particular addresses aren't

1    necessarily associated with that Mt. Gox account; they're

2    associated with the exchange in general.

3    Q.  So how can you, in your analysis, be confident that what

4    you've shown on your chart on that page is a withdrawal from

5    the defendant's account at Mt. Gox to that particular Bitcoin

6    address?

7    A.  Do you have the page number available, ma'am?

8    Q.  I believe that's page 35.  And the question is just for

9    that, the withdrawal that defense counsel was asking you about

10   from the Mt. Gox box into the 1JZBU, which is then shown at the

11   screenshot on page 37.  How do you know that that is, in fact,

12   a withdrawal from the defendant's Mt. Gox account to that

13   particular Bitcoin address?

14   A.  Yes, ma'am.  Very clearly in the Mt. Gox records -- at the

15   bottom of page 36, this is documented in the report -- the

16   Mt. Gox records say that there is a withdrawal from this

17   account to Bitcoin address 1JZBU.  And then I'd look at the

18   Bitcoin blockchain, similar date and time; there is a

19   transaction to the same address in the same amount as recorded

20   in the Mt. Gox logs.

21   Q.  To emphasize, what records did you review that were

22   connected to Mr. Sterlingov when conducting your analysis?

23           Did you review records from a number of virtual

24   currency exchanges --

25   A.  Yes, ma'am.

1    Q.   -- that were in Mr. Sterlingov's name?

2    A.   Yes, ma'am, I did.

3    Q.   Did you also review Mr. Sterlingov's emails and the

4    contents of those email accounts?

5    A.   Specific emails, yes, ma'am; not necessarily the entire

6    email account.

7    Q.   Did you review records that were retrieved from his phone

8    seized at the time of his arrest, as well as numerous

9    electronic devices?

10   A.   Again, ma'am, specific records from the phone and the

11   electronic devices -- not all of them -- yes, ma'am.

12   Q.   And the specific records related to the transactions at

13   issue from Mt. Gox, from Kraken, from local bitcoins and from

14   other virtual currency exchanges?

15   A.   Yes, ma'am.

16   Q.   And are those sources set forth in your report, I believe,

17   beginning on page 19?

18   A.   Yes, ma'am, they are.

19              MS. PELKER:  Court's indulgence?

20              THE COURT:  Yes.

21              MS. PELKER:  No further questions from the

22   government.

23              THE COURT:  Thank you.  If you have one or two, I

24   would allow it.

25              MR. EKELAND:  Yes, brief.

```
 1                 THE COURT:  That's fine.
 2                   RECROSS-EXAMINATION OF
 3                      LUKE SCHOLL
 4    BY MR. EKELAND:
 5    Q.  Mr. Scholl, you testified that you weren't familiar with
 6    any kind of academic literature or any kind of peer review of
 7    the accuracy of Chainalysis Reactor; is that correct?
 8    A.  Yes, sir, that's correct.
 9    Q.  Before you ever embarked on using Chainalysis Reactor, did
10    you bother to do any research as to the accuracy of Chainalysis
11    Reactor?
12    A.  No, sir, not specifically.
13                 MR. EKELAND:  No further questions.
14                 THE COURT:  Thank you.  All right.  Let's take our
15    lunch break now and come back at 1:30, and you can call your
16    next witness at 1:30.
17                 MS. PELKER:  Thank you, Your Honor.
18                 THE COURT:  Do you have another copy of the exhibits
19    so my clerk can follow as well?
20                 MS. PELKER:  We don't.
21                 MR. BROWN:  We can email one.
22                 THE COURT:  If you can do that.  If not, I suppose
23    the other thing you can do is use the ELMO when you're working
24    with the witness if you're showing the witness particular
25    pages.
```

 1                  MS. PELKER:  Yes, Your Honor.  We'll work on that.

 2                  THE COURT:  The witness is excused, correct?

 3                  MS. PELKER:  Yes.

 4             (Lunch recess taken at 12:35 p.m. until 1:40 p.m.,

 5             after which the following proceedings were had:)

 6                  MS. PELKER:  Thank you, Your Honor.  The government

 7      calls Ms. Elizabeth Bisbee to the stand.

 8                  And with the Court's permission, we'd request to

 9      return the exhibit binder.

10                  THE COURT:  That's fine.

11                  THE COURTROOM DEPUTY:  Would you please rise and

12      raise your right hand.

13             (Witness sworn.)

14                  THE COURTROOM DEPUTY:  Thank you.  You may be seated.

15                       DIRECT EXAMINATION OF

16                         ELIZABETH BISBEE

17      BY MS. PELKER:

18      Q.  Ms. Bisbee, are you able to hear me all right?

19      A.  Yes, thank you.

20      Q.  Ms. Bisbee, could you please state and spell your name for

21      the record?

22      A.  Yes.  Elizabeth, E-l-i-z-a-b-e-t-h, Bisbee, B-i-s-b-e-e.

23      Q.  Ms. Bisbee, where do you currently work?

24      A.  With Chainalysis.

25      Q.  Could you please briefly explain your educational

1    background, including any degrees that you hold.

2    A.   Yes.  I have a bachelor's of science in human services and

3    a minor in criminal justice from Old Dominion University.  I

4    have a forensic psychology degree; it's a master's of arts from

5    Argosy University; and then an investigative and psychology

6    master's in science from University of Liverpool.

7    Q.   When did you begin working in financial investigations?

8    A.   In 2014.

9    Q.   And when did you join the Drug Enforcement Administration?

10   A.   In 2014.

11   Q.   Could you explain your work with the DEA.

12   A.   Yes.  So I was an intelligence research specialist, which

13   is very similar to an intelligence analyst.  And I was first

14   assigned into a traditional money laundering section where I

15   provided case support for ongoing investigations for both

16   foreign and domestic offices for DEA.

17   Q.   When did you begin working on cases relating to

18   cryptocurrency?

19   A.   Towards the end of 2014.

20   Q.   When you first started working on cases related to

21   cryptocurrency almost a decade ago, how did you set out

22   learning about cryptocurrency?

23   A.   So as I had stated earlier, I worked for traditional money

24   laundering section.  So what that usually entailed was

25   reviewing bank statements and records and being able to do flow

1    analysis for financial records.

2          And my supervisor had gotten a request from the field

3    to support an investigation that included Bitcoin and a darknet

4    market vendor.  He asked for who is interested in it, and I

5    raised my hand.  So I did not have a background with what

6    Bitcoin was or what darknet markets were, so I started just

7    doing initial research.

8          So that research included open source research and

9    understanding what Bitcoin was, how it operated within the

10   space.  Part of that included understanding what and how it was

11   registered onto the public blockchain and what that actually

12   meant.

13         But understanding that also included me doing

14   research onto what scientific methods were actually being

15   leveraged.  So I came across an academic journal article on

16   just being able to trace blockchain transactions and how it was

17   an anonymous form of digital payments.  So leveraged that just

18   to be able to understand a little bit on the fundamental side

19   of what it looked like to follow funds on the blockchain.

20         I also, because I was with the government, had

21   reached out to other government agencies to see what they had

22   done in this space of cryptocurrency and how they had done

23   investigations previously.  So I was able to get information

24   from them to be able to leverage different aspects and

25   components for that.

1          I also just, from the background of being a

2     traditional financial investigator, in order for law

3     enforcement to get records -- do I need to speak up?

4          THE COURT:  No.  It's fine.

5          THE WITNESS:  Okay.  In order to get records for any

6     type of financial institution, you have to serve legal process.

7     And so law enforcement does reach out to financial institutions

8     to get that information.

9          So I leveraged that mentality to be able to do that

10    with exchanges that operate similarly to financial

11    institutions, but for cryptocurrency.  And so I reached out to

12    multiple exchanges just to understand what type of information

13    law enforcement would be able to get, how it actually interacts

14    with the ecosystem, and how valuable that would be in order to,

15    like, conduct the actual investigations.

16          And then I also wanted to figure out how I could

17    actually learn how to trace what the cryptocurrency

18    transactions were looking like.  So I actually obtained my own

19    bitcoin and made transactions in order to actually learn how to

20    follow funds.

21          So piecing all of those different components together

22    is how I was able to then start working on the first

23    investigation that I raised my hand for in order to identify an

24    individual that had been transacting with cryptocurrency.

25    BY MS. PELKER:

1    Q.  After your initial work on that first case back in 2014,

2    did you do additional work on other investigations at DEA

3    involving cryptocurrency?

4    A.  So after that investigation, it became kind of

5    word-of-mouth within DEA.  If you have a cryptocurrency

6    investigation or a component of cryptocurrency or even a

7    darknet market investigation, to reach out to Beth.  And so I

8    became a primary point of contact for many of the

9    investigations that ensued over the time that I was at DEA.

10   Q.  Do you have an estimate of how many cases you worked on

11   while you were at DEA?

12   A.  Yeah.  Approximately 400.

13   Q.  And those involved cryptocurrency specifically?

14   A.  Yes.

15   Q.  Why were there so many cases involving cryptocurrency at

16   DEA at that time?

17   A.  Yes.  So DEA is a single-mission agency.  So they focus on

18   drugs and money laundering.  And so back in 2014, 2015, it was

19   predominantly known that darknet markets were leveraging drug

20   sales, and that was the main service of goods for that.

21        And that was prevalent from the initiation of the

22   takedown of Silk Road, which was the very first darknet

23   marketplace.  Once that was taken down, there was a whole

24   multitude of different marketplaces that came into existence.

25   And so in the cryptocurrency landscape, hand-in-hand with DEA,

1   that's why there were so many cryptocurrency investigations

2   because it was primarily determined for the selling of drugs.

3   Q.  What did your work on these 400 cases entail, generally

4   speaking?

5   A.  So it ran kind of the gamut for it.  Some of it was case

6   initiation support.  So it was always a support function just

7   because I was an intel analyst.  That would either be of

8   providing, like, blockchain analysis support or being able to

9   advise on how to create undercover transactions for the special

10  agents that would be able to conduct that.  So I advised on

11  setting those operations up.

12          I also became, quote-unquote, the seizing agent for

13  DEA when it came to cryptocurrency.  So when there were funds

14  that needed to be seized, I was typically deployed to go and

15  recover those funds and then follow the investigation process

16  for that.

17          So for all of the investigations, I touched different

18  components and aspects of those investigations.

19  Q.  Was blockchain analysis a significant portion of your work

20  while at DEA?

21  A.  Yes.

22  Q.  What methods and tools did you use to conduct your

23  blockchain analysis while with the government?

24  A.  So when I first started doing blockchain analysis, I did

25  everything manual.  So what does manual mean?  It means going

1    to a public block explorer and viewing the transactions and

2    being able to piece them together.

3              So I didn't have a tool to be able to do that.  So I

4    used spreadsheets to be able to follow the funds and find

5    associated addresses to be able to then do that.

6              Along the journey, if you will, of my career at DEA,

7    I then was exposed to other tools and platforms, so commercial

8    tools as well.  So I was very fortunate that I had access to a

9    multitude of commercial tools; Chainalysis being one of them,

10   Ciphertrace, Elliptic and what is now known as Coinbase

11   Analytics.

12   Q.  Did you use open source tools as well during your time at

13   DEA?

14   A.  Yes.

15   Q.  How did you determine that Chainalysis and the other

16   commercial tools were reliable and verifiable for your work?

17   A.  So the reliability for these tools was based off of when we

18   sent legal process or when we were recovering evidence.  So

19   that evidence could be from during a seizure and the recovery

20   of a wallet, identifying all the addresses that are in that

21   wallet, and being able to provide that context.

22             Also, if there were, like, seized data sets that

23   occurred, being able to map that to the information that was

24   derived on the commercially available tools.

25   Q.  During your time at DEA using Chainalysis and these other

1   tools on so many different cases, did you find Chainalysis to

2   be reliable?

3   A.  Yes.  So Chainalysis was the primary tool that I leveraged

4   when I was at DEA.  I, of course, had access to others, but for

5   the attribution aspects, so being able to send legal process to

6   exchanges, Chainalysis had the most reliability for that for

7   accuracy of the records.

8   Q.  In your time at DEA, did you have additional

9   responsibilities related to cryptocurrency beyond supporting

10  individual cases?

11  A.  Yes.  So I also created DEA's -- what is now known as their

12  cyber investigations course, which is a week-long course.  It

13  initially started as just a blockchain analytics course for the

14  intel research specialists that were within DEA.  That, then,

15  grew into doing an entire week.

16          So understanding how to set up your computers in

17  order to do these types of investigations, as well as

18  undercover operations to the blockchain analysis to the seizure

19  of that.

20          So that training, actually, became part of the DEA

21  Academy.  So it's a certified course now that individuals

22  within DEA can take.

23  Q.  When did you move from DEA to Chainalysis?

24  A.  In January of 2021.

25  Q.  Can you tell us a little bit about Chainalysis and what it

1    does, just briefly.

2    A.   Yes.  So Chainalysis is a software company that provides

3    two different types of tools to be able to gain insight into

4    transactions that are occurring on the blockchain.  So those

5    two different tools are the investigative tool, which is known

6    as Reactor, and then there's a compliance tool, which is called

7    KYT.  The KYT is for know your transaction.

8    Q.   What's your current role at Chainalysis?

9    A.   I'm the director of investigation solutions.

10   Q.   What type of work does your team do?

11   A.   So my team focuses on providing case support for the U.S.

12   public sector.  That case support can entail and it -- can

13   entail, like, lead generation, as well as ongoing case support

14   for various investigations for U.S. public sector.

15   Q.   How much of your work involves blockchain analysis?

16   A.   Probably 75 percent.

17   Q.   How do you keep abreast of developments in the field?

18   A.   One, it's my job.  Because in order to be able to do that

19   and do an effective way of managing an investigative team,

20   being able to have access to different journal articles that

21   come out that talk about blockchain analysis, being able to be

22   part of communities; so forums and different things where

23   there's talk about that, as well as the information that is

24   derived from various companies that are within the space.

25   Q.   Have you also given presentations at conferences or

1    trainings regarding your work?

2    A.  Yes, I have.

3    Q.  Do you have a rough estimate of how many?

4    A.  Probably, approximately, more than 50.

5    Q.  Have you testified previously in federal court regarding

6    cryptocurrency and blockchain analysis?

7    A.  Yes, I have.

8    Q.  Have you been qualified as an expert in those topics?

9    A.  Yes, I have.

10   Q.  Directing your attention to Government's Exhibit 4 --

11   there's a tab in the binder in front of you -- is that a copy

12   of your curriculum vitae?

13   A.  Yes.

14   Q.  And does this document accurately set forth the relevant

15   qualifications and professional experience relevant to your

16   testimony today?

17   A.  Yes, it does.

18            MS. PELKER:  Government would move to admit

19   Government's Exhibit 4.

20            THE COURT:  Any objection?

21            MR. EKELAND:  No objection.

22            THE COURT:  Exhibit 4 is admitted.

23            (Government Exhibit 4 was admitted.)

24   BY MS. PELKER:

25   Q.  Ms. Bisbee, could you explain, in your own words, what is

1    blockchain analysis?

2    A.   So blockchain analysis is being able to take information

3    that is on a publicly available ledger, which is known as the

4    blockchain, and being able to assess the flow of funds and the

5    origin and destination of those funds.

6    Q.   Is part of blockchain analysis also identifying groups of

7    addresses held in the same wallet or controlled by the same

8    entity?

9    A.   Yes, it is.

10   Q.   How do you go about identifying a group of addresses or

11   cluster controlled by a particular entity?

12   A.   So there's different aspects to look at for how to

13   determine the ownership, if you will, of the entity that's

14   moving the funds.  The most common one is known as common spend

15   or co-spend.

16          And that's where you have input addresses on one side

17   of the transaction.  And the reason why that is important is

18   because the private keys for -- that allow for transactions to

19   go through, typically, are considered to have to spend at the

20   same time in order for funds to move.

21   Q.   Now, I'd like to direct your attention to pages -- to

22   Government's Exhibit 5, specifically pages 6 through 9.

23          Is Government's Exhibit 5 a report that you put

24   together regarding your work on this case?

25   A.   Yes, it is.

1    Q.  And are some of the different methods that you use for

2    determining the common ownership or clustering of addresses set

3    forth on pages 6 through 9?

4    A.  Yes.  It is how Chainalysis does the clustering, yes.

5    Q.  You spoke about co-spend clustering.

6          Are there other ways that you can use to identify

7    groups of addresses?

8    A.  Yes.  So there is what is known as the behavioral

9    heuristic.  What that is, is the behavior of how the

10   transactions are occurring on the blockchain.

11         So the best way to think about that is, when you put

12   your hand on a table, there's a transfer of your fingerprints.

13   So every time a transaction occurs on the blockchain, there's a

14   digital fingerprint that is left behind.  So the assessment of

15   what that looks like is part of looking at the heuristics.

16         So it's a combination of the digital fingerprint, as

17   well as the address type and how the address is actually

18   operating within that, and then there's also the way that the

19   wallet software actually operates on the blockchain.

20         So as transactions occur on the blockchain, there's

21   change that's stipulated within that.  That's because the

22   Bitcoin protocol operates on what is known as UTXO; so unspent

23   transaction output.  That unspent transaction output is that

24   change and that change address that's indicated.

25         So from prior testimony today, a good example of that

1    is if you're trying to spend something and you have a $20 bill

2    and it costs $10, you can't rip it up.  You have to give the

3    entire thing.

4           So the way that wallet software works on the

5    blockchain is that all funds have to be spent; you can't break

6    up the bitcoin.  So the wallet software will generate a new

7    address to, then, account for that change so that it keeps the

8    ownership within that wallet.

9           So that's called the change address analysis.  It's

10   part of a behavior heuristic that's identified with wallet

11   software.

12   Q.  Now, the underlying data that you're describing for the

13   co-spend heuristic and the behavioral heuristics, that is

14   information -- is that information that's publicly available on

15   the blockchain?

16   A.  Yes, it is.

17   Q.  Could you do this same work or analysis outside of the

18   Chainalysis Reactor software?

19   A.  Yes, you can.  There's several block explorers that allow

20   you to do this.

21   Q.  Chainalysis also uses what's called intelligence-based

22   clustering; is that right?

23   A.  Correct.

24   Q.  Could you explain what's meant by intelligence-based

25   clustering.

1    A.  Yes.  Intelligence-based clustering is where there's

2    addresses that are provided in verifiable data.  So court

3    documents is a good way for that collection to occur, as well

4    as data leaks that are verified, and then third-party

5    relationships that Chainalysis has in order to have the

6    appropriate clustering for those services.

7    Q.  Turning specifically to Bitcoin Fog and this case, what

8    were you hired by the government to do?

9    A.  So I was hired by the government to assess the Chainalysis

10   clustering of eight services, as well as the aggregate flow of

11   funds.

12   Q.  To be clear, did your work involve identifying Roman

13   Sterlingov, the defendant?

14   A.  No.

15   Q.  Did your work involve reviewing Mt. Gox transaction

16   records?

17   A.  No.

18   Q.  Did you complete a report summarizing your findings and

19   detailing your methodology?

20   A.  Yes.

21   Q.  Is that the report that's shown here in Government's

22   Exhibit 5?

23   A.  Yes.

24   Q.  And turning to page 2 of that report, the index, this lists

25   the different services whose clusters you verified starting

1   with Bitcoin Fog and proceeding through a number of darknet

2   markets?

3   A.  Yes, that's correct.

4   Q.  And did the report also include numerous attachments?

5   A.  Yes, it did.

6   Q.  Directing you to Government's Exhibit -- or Tab 6, is this

7   a summary of the different attachments as far as multiple CSV

8   and spreadsheet files that were attached to your report

9   containing the list of Bitcoin addresses for each of those

10  clusters?

11  A.  Yes, it appears so.

12  Q.  And each of these is a voluminous spreadsheet listing out

13  thousands, or even in some cases hundreds of thousands, of

14  Bitcoin addresses?

15  A.  Yes, that's correct.

16          MS. PELKER:  Government would move to admit

17  Exhibit 5, the expert report, as well as Exhibit 6, the

18  attachment list.

19          THE COURT:  Any objection to admitting those exhibits

20  for purposes of today's hearing?

21          MR. EKELAND:  No, Your Honor.

22          THE COURT:  Okay.  Exhibit 5 and Exhibit 6 are

23  admitted.

24          (Government Exhibits 5 and 6 were admitted.)

25  BY MS. PELKER:

1    Q.  Ms. Bisbee, I'd like to direct your attention to page 9 of

2    the report in front of you.

3           Does this describe -- starting with the section

4    Bitcoin Fog, does this describe the set of addresses that

5    you've determined were controlled by Bitcoin Fog and listed in

6    the Bitcoin Fog cluster?

7    A.  Yes.

8    Q.  It references an attachment, BitcoinFog_addresses.csv.

9           Is that one of the attachments containing a list of

10   925,743 addresses that Chainalysis has determined were

11   controlled by Bitcoin Fog?

12   A.  Yes.

13   Q.  Could you explain how you determined that those addresses

14   were associated with Bitcoin Fog.

15   A.  Yes.  So within Chainalysis Reactor, the data that then

16   represents the Bitcoin Fog cluster are those addresses.  And in

17   order to identify the associated addresses, there were two

18   different heuristics that were leveraged to be able to group

19   the association of those addresses.

20          The first heuristic was co-spend, and that's the

21   common spend where there's the inputs versus the outputs and

22   common ownership for that.  So that was one method that was

23   leveraged.

24          Then the second was the behavioral, which looked at,

25   again, the digital fingerprint for the transactions that

1    occurred, as well as the address type and the change address

2    analysis for the operation of the behavioral side.

3    Q.  As part of your work, did you also study the transaction

4    activity of those addresses within the fog cluster as they

5    relate to one another?

6    A.  Yes.

7    Q.  What did you observe regarding the pattern of movement

8    within the Bitcoin Fog cluster?

9    A.  So the -- are we talking -- I'm sorry.  Clarification.  Are

10   we talking about a transaction or just in general?

11   Q.  Whether you observed any pattern of movement of funds

12   within the Bitcoin Fog cluster.

13   A.  Oh, yes.  Sorry.  There was a movement of funds.

14   So there's what is known as the consolidation address.  So,

15   typically, what services will do is they'll have individuals

16   that deposit funds into their platform.  And then, in order to

17   consolidate the funds that they're going to be moving, there's

18   called consolidation addresses.

19          And so those are identified within the movement of

20   the Bitcoin Fog cluster.

21   Q.  And so is it accurate to describe, then, that within this

22   larger universe of 925 [sic] addresses, a subset of those are

23   consolidation addresses?

24   A.  Yes.

25   Q.  And then, were you able to see how the broader universe of

1    those over 900,000 addresses all had common transaction

2    patterns into the -- or across the consolidation addresses?

3    A.  Yes.

4    Q.  And did you also notice other commonalities in the

5    transaction features or wallet types within the Bitcoin Fog

6    cluster?

7    A.  Yes, I did.

8    Q.  Did all of that help you further corroborate the cluster in

9    addition to the co-spend and behavioral heuristics?

10   A.  Yes.

11   Q.  What steps were taken to identify and validate that Bitcoin

12   Fog was the entity that actually controlled this group of

13   addresses?

14   A.  So Chainalysis conducted a transaction with Bitcoin Fog in

15   order to identify a deposit address, so the address that, then,

16   they send the funds to; and also the withdrawal address, so

17   where the funds are being sent to a Chainalysis wallet.

18   Q.  And what is the role of that sort of a test transaction in

19   blockchain analysis?

20   A.  So it allows to be able to identify and confirm a service

21   exists.  It also identifies two different addresses that you

22   can then identify to then put into the heuristics to then

23   determine if they're played together.

24           So, for instance, if there's co-spend, and one of the

25   addresses that was transacted with, then, is part of the

1    co-spend, that then confirms that that is the entity and that

2    that is the cluster; same with the withdrawal.  The input on

3    that withdrawal transaction, again, if it's part of co-spend or

4    change address analysis, it will be grouped together with that;

5    and, again, further confirming the attribution behind that

6    service.

7    Q.  Did you do similar work to identify and verify the clusters

8    of the other darknet markets that are enumerated in this

9    report?

10   A.  Yes, I did.

11   Q.  Is that what's set out in the corresponding sections of the

12   report?

13   A.  Yes, it is.

14   Q.  In addition to verifying or identifying the clusters

15   themselves, were you also asked to do a flow of funds analysis?

16   A.  Yes, I was.

17   Q.  Directing your attention to page 27 of your report, is that

18   what's described here and in the corresponding referenced text,

19   as well as attachments?

20   A.  Yes, that's correct.

21   Q.  Ms. Bisbee, you've heard about co-spend heuristics.  Are

22   there -- and other heuristics.

23           Are there criminal services that actively seek to

24   prevent tracing by law enforcement or by Chainalysis on the

25   blockchain?

1    A.  Yes.

2    Q.  Could you give some examples.

3    A.  Yes.  So mixing services are one.  So coinjoin is one of

4    those tactics that are leveraged.  So coinjoin operates where

5    individuals can pool their -- they can take their input address

6    and put their input addresses with others in order to obfuscate

7    the ownership for the output.

8              So as described earlier with the co-spend analysis

9    and change address analysis, coinjoin does make this more

10   difficult.

11   Q.  So is the goal of coinjoin to, essentially, try to trick

12   law enforcement or others who are doing blockchain analysis to

13   make it harder for them to trace the funds?

14   A.  Yes, it does.

15   Q.  But does Chainalysis detect and control for mixing and

16   coinjoin?

17   A.  Yes, we do.

18   Q.  And did you see any indications that coinjoin was used to

19   create false positives or to obscure the tracing or the

20   accuracy in the clusters at issue in this case?

21   A.  No, I did not.

22   Q.  Is the information that you've relayed in this report also

23   relied on by other users of Chainalysis software relating to

24   the Chainalysis clusters and the underlying information at

25   large?

1    A.  I'm sorry.  Can you restate the question.

2    Q.  Is the underlying information, so the information at

3    Chainalysis Reactor software, also relied on by other users of

4    Chainalysis?

5    A.  Yes.

6    Q.  And how are you able to determine that this is reliable

7    information for your work and that of other investigations?

8    A.  So as I had indicated, there's two different platforms.

9    There's an investigative software and there's also the KYT

10   software.  So that -- all of that data is the same.

11        So for the KYT software, it alerts illicit activity

12   for exchanges so that they can protect their platform.  So if

13   it's wrong, those exchanges, then, are alerting on the wrong

14   thing.  So the reliability of our data is crucial for just the

15   ecosystem in general.

16        On the investigative side, which is what Reactor is

17   for, being able to follow flow of funds in various aspects,

18   it's crucial for the users that have been leveraging Reactor

19   for years.

20        THE COURT:  Can I ask you to review that one more

21   time for me.  I want to make sure I understand what you just

22   said.

23        THE WITNESS:  I can't hear you.

24        THE COURT:  Can you go through that one more time.  I

25   want to make sure I understand what you were saying there.  I

 1    see.  I'm sorry.  Can you hear me now?

 2            THE WITNESS:  Yes.

 3            THE COURT:  I was asking if you could go through that

 4    one more time for me.  I just want to make sure I understood

 5    your analysis.

 6            THE WITNESS:  Yes.  So our data relies on -- our

 7    underlying data surfaces for two different types of software

 8    that we have.  So one of the software is our KYT, which is know

 9    your transaction, which is leveraged by compliance firms; so

10    exchanges in order to be compliant with the policies and

11    regulations.

12            So if the data is incorrect, they then are

13    incorrectly flagging things on their accounts, which they don't

14    want to do.  So that's one of the really valuable things is

15    that they rely on that in order to have credibility within the

16    ecosystem.

17            THE COURT:  So are they giving you feedback when they

18    get false hits and letting you know that they've received a

19    false hit?

20            THE WITNESS:  Yes.

21            THE COURT:  Okay.

22            MS. PELKER:  Court's indulgence.  I think we're just

23    about finished.

24            THE COURT:  Okay.

25            MS. PELKER:  No further questions, Your Honor.

```
1                    THE COURT:  Can I ask you to ask one follow-up
2       question for me.
3                    MS. PELKER:  Yes, Your Honor.
4                    THE COURT:  It's following up on the question I was
5       just asking.  If you can ask if they collect data or maintain
6       information relating to error rate or false positives in light
7       of that feedback they're getting.
8       BY MS. PELKER:
9       Q.  Ms. Bisbee, does Chainalysis collect any information about
10      error rate or false positives, including based on feedback from
11      exchanges?
12      A.  Not to my knowledge.
13                   THE COURT:  Okay.  I'm sorry.  Can you follow up on
14      one more.  I'm curious, she indicated to me that one of the
15      ways they verify or they know that their product is accurate is
16      based on that data.
17                   So if she can explain to me how often or what her
18      sense is of how frequently errors are being flagged and what
19      they do when there's an error.
20                   MS. PELKER:  Yes.
21      BY MS. PELKER:
22      Q.  Ms. Bisbee, could you explain how often, to the extent that
23      you know, errors are flagged by any Chainalysis customer or to
24      the extent -- and what Chainalysis's response reaction would be
25      if such errors were indicated?
```

1    A.  Yes.  So the response that we typically get back is because

2    we have a conservative approach to our clustering.  So if a

3    response is made from whether it's an exchange or from a law

4    enforcement entity, it's typically because we have a

5    conservative approach to the clustering.

6              And so, for instance, for like legal process being

7    served for an exchange, it may be one hop out; so like an

8    intermediary that's not clustered together because it's more of

9    a conservative approach.

10             THE COURT:  Okay.  Thank you.

11   BY MS. PELKER:

12   Q.  What is -- why does Chainalysis think that it's important

13   or valuable to take a conservative approach rather than risk

14   potential false positives?

15   A.  Because you could identify incorrectly and provide

16   information that doesn't allow for streamlined processes for

17   law enforcement and compliance.

18   Q.  And is it important for Chainalysis, for the business at

19   large but also for you, that that information is, in fact,

20   accurate and reliable?

21   A.  Yes.

22   Q.  And have you found it to be accurate, conservative, and

23   reliable in your own use of the tool?

24   A.  Yes.

25             THE COURT:  Thank you.  Mr. Ekeland?

1                   CROSS-EXAMINATION OF

2                     ELIZABETH BISBEE

3     BY MR. EKELAND:

4     Q.  Ms. Bisbee, can you hear me okay?

5     A.  Yeah.  Thank you.

6     Q.  Just let me get settled for a second.  You testified that

7     Chainalysis takes a conservative approach to its clustering.

8               But did I hear you correctly saying that Chainalysis

9     doesn't collect any information on false positive rates with

10    the Chainalysis Reactor software?

11    A.  I wouldn't know if we do or not.  That wouldn't be me that

12    does that.

13    Q.  It's your testimony that you don't know whether or not

14    Chainalysis collects any information as to false positives in

15    relation to the Chainalysis Reactor software; is that correct?

16    A.  That's correct.

17    Q.  And I've got the same question.  As part of its

18    conservative approach, does it collect any statistical

19    information on the occurrence of false negatives from

20    Chainalysis Reactor software?

21    A.  Not to my knowledge.

22    Q.  And as you sit here today, can you even just tell me what

23    the statistical error rate is for Chainalysis Reactor?

24    A.  I would not.

25    Q.  Okay.  And you work -- I just want to get it straight.

1    There's actually two Chainalysis companies, correct?

2    A.  Correct.

3    Q.  There's Chainalysis, Incorporated, which initially

4    developed Chainalysis Reactor; is that correct?

5    A.  Correct.

6    Q.  And you actually work for Chainalysis Global Solutions,

7    correct?

8    A.  Chainalysis Government Solutions.

9    Q.  Government Solutions.  And that is the -- is it a

10   subsidiary of Chainalysis, Incorporated?

11   A.  It is.

12   Q.  And that subsidiary was created solely so that Chainalysis

13   could enter into government contracts in the United States; is

14   that correct?

15   A.  It wasn't solely to do that, no.

16   Q.  But was that part of the reason?

17   A.  It was to service government contracts better, but not

18   solely.

19   Q.  Okay.  And that's who you work for, Chainalysis Government

20   Solutions.  Okay.

21            Now, if I recall your testimony correctly, you've

22   made no attributions regarding Mr. Sterlingov anywhere in your

23   expert report, correct?

24   A.  Correct.

25   Q.  And the only place that Mr. Sterlingov's name appears on

1    your expert report is on the title page, correct?

2    A.  Correct.

3    Q.  The majority of the report, it's really -- if it's fair to

4    say -- divided into two parts.

5         You generally talk about the heuristic underlying the

6    Chainalysis Reactor software, and then you speak about

7    clustering in relation to certain, what you call darknet

8    sites -- is that correct? -- like Agora?

9    A.  So the heuristics are the clustering.

10   Q.  I'm sorry.  I just didn't hear you.

11   A.  The heuristics are the clustering methodology.

12   Q.  Right.  So let's talk about the heuristics.

13        You mentioned that the first heuristic that

14   Chainalysis Reactor uses is the co-spend heuristic, correct?

15   A.  Correct.

16   Q.  And then you testified that coinjoins pose a problem for

17   the co-spend heuristic, correct?

18   A.  That's correct.

19   Q.  And then you testified, I believe, that Chainalysis Reactor

20   uses some sort of algorithm or something that screens for the

21   coinjoins; is that correct?

22   A.  We have controls in place to identify coinjoins, yes.

23   Q.  Can you identify those controls for me.

24   A.  It's based off of the heuristics.  So with the heuristic

25   model as a co-spend and what coinjoin actually is, with

1    coinjoin there's going to be number of inputs and outputs that

2    are equal.  They're typically done in various levels of amounts

3    for that, that are consistent with the service.

4              So some of the services, Wasabi, Samurai Wallet,

5    Joinmarket, are all different mechanisms that utilize coinjoin

6    technology for that.  And so the models that are used for

7    co-spend or common spend heuristic would be able to identify

8    that that's not part of that because of the deterministic

9    availability of the amounts on the inputs and outputs do not

10   make sense for that heuristic.

11   Q.  But my question was something a little bit different.  I

12   was asking if you could actually specifically identify for me

13   what Chainalysis Reactor does in the form of an algorithm or

14   its code or whatever to identify specifically that a coinjoin

15   is present or isn't.

16   A.  So I'm not a developer.

17   Q.  As you sit here today, can you point or direct me to or

18   cite any scientific paper or any kind of peer-reviewed paper or

19   any kind of independent analysis that discusses the accuracy

20   rate of Chainalysis Reactor's coinjoin identification

21   methodology?

22   A.  No.

23   Q.  As a matter of fact, in your entire expert report, you

24   don't cite to a single scientific peer-reviewed paper attesting

25   to the accuracy of Chainalysis Reactor, do you?

1    A.  No.

2    Q.  And can you point me to a single scientific peer-reviewed

3    paper or anything of the sort that attests to the accuracy of

4    the co-spend heuristic as it's implemented in Chainalysis

5    Reactor?

6    A.  So the co-spend heuristic that is identified within Reactor

7    is the co-spend heuristic that is commonly used within the

8    protocol; the Bitcoin protocol.  So there are scientific

9    articles about that that is specific for that.  So --

10   Q.  Can you cite me one today as you sit here on the stand?

11   A.  I wouldn't be able to name the article, but it's the

12   article that I first learned how to do blockchain tracing on.

13   Q.  Is that the Sarah Meiklejohn article?

14   A.  Possibly, yes.

15   Q.  You can't recall what the article was that you read in 2014

16   about co-spend?

17   A.  I know that it was from George Mason University, and I

18   actually sat in a lecture for it.  I just can't recall the

19   title of it or necessarily who the author or authors were.

20   Q.  But Chainalysis Reactor didn't exist in 2014, correct?

21   A.  Correct.

22   Q.  You still -- unless I misheard you, you still can't point

23   me to any independent analysis about the accuracy of

24   Chainalysis's use of the co-spend heuristic in the Reactor

25   software, correct?

1     A.  But it's the same.  So, I mean, you would be able to take

2     any of the information that's in Reactor for a co-spend and put

3     it into a block explorer, and you'd be able to see that it's

4     co-spend.  And then that would be able to be confirmed with the

5     scientific journal article that talks about how co-spend

6     occurs.

7     Q.  But I believe you just testified that Chainalysis Reactor

8     uses proprietary techniques and software to analyze whether or

9     not coinjoin is disrupting the co-spend heuristic, correct?

10    A.  I didn't -- I don't recall saying that.

11    Q.  Well, does Chainalysis Reactor use particular algorithms or

12    source code or software to screen for coinjoins?

13    A.  It does.

14    Q.  And is that proprietary?

15    A.  No.

16    Q.  It's not proprietary.  But you can't -- it's not

17    proprietary, but you can't tell me what it is?

18    A.  It wasn't part of my expert report.

19    Q.  You didn't consider coinjoins when you wrote your expert

20    report?

21    A.  It wasn't part of any of the heuristics for any of the

22    eight services that were identified.

23    Q.  So you didn't consider coinjoins for any of the heuristics

24    that were used to write your expert report; is that your

25    testimony?

1    A.   The heuristics that were identified for those nine services

2    do not include the coinjoin heuristic.

3    Q.   Okay.  So that was co-spend.  The other heuristic, I

4    believe you said, was the behavioral heuristic, correct?  And

5    you said that that was solely based on information from the

6    public blockchain?

7    A.   Yes.

8    Q.   So it's -- nothing in the Chainalysis Reactor behavioral

9    heuristic is proprietary?

10   A.   No.  It's based off of the information of the digital

11   fingerprints that occur for transactions.

12   Q.   Okay.  And then the third heuristic, I think you said, was

13   the intelligence heuristic?

14   A.   Uh-huh.

15   Q.   What sources are you using for that heuristic?

16   A.   So it's verifiable data.  So that can be from court

17   documents; it can be provided by third-party entities; and it

18   can also be from data leaks that are then verified by our

19   research and global intelligence team.

20   Q.   But as you sit here today, can you name me those sources

21   that were used as the basis for your expert report?

22   A.   So if I recall correctly, in the AlphaBay cluster there was

23   intelligence based from --

24   Q.   I'm sorry.  I couldn't hear you.

25   A.   Oh, I'm sorry.  From my recollection in my report, AlphaBay

1    was one of the marketplaces that actually did leverage

2    intelligence heuristic, which was based off of information

3    provided by the U.S. government.

4    Q.  Okay.  And any other sources, or is it just the AlphaBay

5    that you can cite me?

6    A.  I'd have to review my report again to say that.

7    Q.  Okay.  Do you have your expert report in front of you?

8    A.  Yes, I do.

9    Q.  I'm directing your attention to page 9, right under

10   Section 1 where it says Bitcoin Fog.

11   A.  Uh-huh.

12   Q.  Do you see how it says the Bitcoin Fog cluster contains

13   925,743 addresses?

14   A.  Uh-huh.

15   Q.  And then directing your attention to page 13, third

16   paragraph down, that starts with the word "Approximately."

17            Do you see how it says approximately 50.26 percent of

18   the clustering for Bitcoin Fog was dependent on heuristic 1?

19   A.  Yep.

20   Q.  And that's the co-spend heuristic, correct?

21   A.  Correct.

22   Q.  And then you see how it says representing 46,532 addresses

23   that co-spent.  That's, obviously, not 50 percent of 925,000,

24   so could you just explain the math there and how that's

25   working.

1    A.  Yeah, sure.  So with the heuristics that are identified,

2    there's not just one heuristic that's used for clustering.

3    Sometimes there's multiple that are leveraged.  So of the

4    46,532 addresses that were co-spend, those are only co-spend,

5    only.

6    Q.  I'm sorry, the 46,000, or did you say 460,000?

7    A.  No.  46,532.  However, there's 50 percent that have

8    co-spend that also include the second heuristic, which is

9    behavioral.

10   Q.  So what's the heuristic, then, for the other 880,000

11   addresses?

12   A.  It's the behavioral analysis.

13   Q.  So it's the behavioral analysis.  As you sit here today,

14   can you cite me a single scientifically verified or

15   peer-reviewed paper discussing the accuracy of Chainalysis

16   Reactor's use of the behavioral heuristic?

17   A.  Again, so the behavioral heuristic is based off of the way

18   that the transactions occur and the digital fingerprints that

19   are left behind from the interaction of a wallet software.  So

20   that is provable because it's done and replicated time and time

21   again and very reliable.

22   Q.  But as you sit here, you can't name me a single scientific

23   paper that's peer-reviewed that attests to the accuracy of

24   Chainalysis's behavioral heuristic as it's implemented in

25   Chainalysis Reactor, can you?

1    A.  I can't right now, no.  But I can say that the reliability

2    of it is used, and it's a common use case for the Bitcoin

3    protocol, and you can replicate it by looking at the public

4    blockchain.

5    Q.  But you can't cite me a paper --

6            MS. PELKER:  Your Honor, I think this is asked and

7    answered.

8            THE COURT:  That is asked and answered.

9            MR. EKELAND:  Fair enough.

10   BY MR. EKELAND:

11   Q.  Now, one of the things -- it seems to me that all you have,

12   am I correct in saying, you only have anecdotal evidence from

13   your own experience as to the accuracy of Chainalysis Reactor;

14   is that correct?

15   A.  Can you rephrase that question.

16   Q.  Sure.  You don't have scientific, peer-reviewed papers or

17   anything published anywhere attesting to the accuracy of

18   Chainalysis Reactor, do you?

19   A.  No.

20   Q.  It's all just based on your own personal experience; is

21   that correct?

22   A.  No.

23   Q.  What -- so it's not based on -- what is it based on besides

24   your personal experience?

25   A.  So the Chainalysis Reactor, from the certifications that I

1    have from it, as well as being able to do blockchain analysis

2    manually, confirm from the experience that I've had of doing

3    trainings and also have confirmation of those trainings from

4    other users of this and the success that they've also had with

5    their investigations, then indicate that it's not just me

6    that's able to identify that, but other people are able to say

7    that the use of Reactor is reliable.

8    Q.  So you can't cite any scientific papers attesting to its

9    accuracy, but you're saying your training and other people have

10   told you that it's accurate; is that correct?

11   A.  Yes.

12   Q.  And Chainalysis was the vendor -- are you familiar with

13   FTX?

14   A.  Yes.

15   Q.  And Chainalysis was the compliance vendor for FTX, correct?

16   A.  I can't speak to that.

17            MS. PELKER:  We would object to the whole line -- the

18   whole relevance of the ensuing line of questioning related to

19   FTX.

20            THE COURT:  It's hard for me to know until I've heard

21   the questions.  You may be right.  I don't know where he's

22   going with it.

23   BY MR. EKELAND:

24   Q.  Do you know what -- Ms. Bisbee, you know what FTX is

25   correct?

1    A.  Yes.

2    Q.  Can you tell the Court what FTX is.

3    A.  FTX is an exchange that ended up going corrupt.

4    Q.  And Sam Bankman-Fried, I believe is his name, was the head

5    of FTX, correct?

6    A.  Yes.

7    Q.  And he's currently being criminally prosecuted by the

8    United States, correct?

9    A.  Yes.

10   Q.  And Chainalysis was the compliance vendor for FTX, correct?

11           THE COURT:  I guess -- I mean, I just know from news

12   accounts about this, but I didn't believe that there was

13   anything in the news accounts that related to the type of

14   analysis that we're hearing here.

15           So if you can tie this somehow into the reliability

16   of Chainalysis, that's fine.  But --

17           MR. EKELAND:  Certainly, Your Honor.  I'll make a

18   connection.  And that's -- the only evidence that's being

19   offered in this courtroom for the accuracy of Chainalysis

20   Reactor is purely anecdotal.  There's no scientific evidence.

21   They cannot produce any peer-reviewed paper.  There are none

22   cited in the expert report.  Now, I'm being told that we've got

23   anecdotal evidence.

24           So I'm turning to anecdotal evidence of Chainalysis's

25   own clients that it used compliance software for and pointing

1    to what looks like a massive failure.

2            THE COURT:  I guess my question, though, is, is there

3    any evidence or reason to believe that the failure of FTX was

4    in any way related to the type of analysis that Chainalysis

5    does?

6            The fact that FTX -- the founders may have been

7    taking money out of the account, using people's money for

8    improper purposes, withdrawing funds for their own personal

9    uses, I'm not quite sure why that would have anything to do

10   with Chainalysis.

11           It's a little bit -- I'm just asking you to tie it

12   in.  One wouldn't say, for example, that the fact that --

13           MR. EKELAND:  Let me see if I can --

14           THE COURT:  It's only relevant to my mind if it

15   actually has anything to do with what Chainalysis was studying,

16   not whether there was some sort of fraud that was going on that

17   was unrelated to what they were studying.

18           MR. EKELAND:  Well, let me see if I can connect it.

19   If not, I'll drop it.

20           THE COURT:  Okay.

21   BY MR. EKELAND:

22   Q.  So Chainalysis Government Solutions offers private

23   companies compliance services, correct?

24   A.  No.

25   Q.  No, it doesn't?

1    A.  Chainalysis Government Solutions is for U.S. public sector.

2    Q.  I didn't hear you.  I'm sorry.

3    A.  Chainalysis Government Solutions is for U.S. public sector.

4    Q.  Public sector.  So is it Chainalysis, Incorporated that

5    offers compliance services?

6    A.  Yes.

7    Q.  And as part of their compliance services, they use

8    Chainalysis Reactor, correct?

9    A.  Restate the question.

10   Q.  Yes.  As part of Chainalysis's services to its compliance

11   clients, Chainalysis uses Chainalysis Reactor, correct?

12   A.  So for compliance side, they typically will use the KYT,

13   which is know your transaction.  And that's separate from the

14   investigative tool.

15   Q.  But do they use -- you said typically.  Do they use

16   Chainalysis Reactor ever in their compliance work?

17   A.  I wouldn't be able to speak to that.  I don't know.

18   Q.  So you don't know.  Okay.

19            You make a distinction in your report between, I

20   believe it is, indirect tracing and direct tracing; is that

21   correct?

22   A.  Uh-huh.

23   Q.  Could you briefly describe for the Court the difference

24   between the two.

25   A.  Yes.  So it has to do with direct and indirect exposure.

1    So what direct transactions and exposure means is that, when

2    you have one entity transacting directly with another, that's a

3    direct exposure.  When you have an indirect, it means that

4    there's intermediaries in between that; so indirectly

5    associated with the transfer of funds.

6    Q.  And it's fair to say that the more intermediaries or the

7    more hops in a particular transaction you're tracing, the

8    probability of error increases, correct?

9    A.  Yes.

10             MR. EKELAND:  I pass the witness.

11             THE COURT:  Okay.  Thank you.

12             Ms. Pelker, I think the reliability of the tool is,

13   obviously, something that is important for the Court to

14   consider as part of the *Daubert* analysis.  I am curious about

15   whether there's more -- what I've heard thus far is that the

16   witness herself has been able to confirm, by going back and

17   looking at the blockchain itself, that Chainalysis was working

18   properly and also that she gets feedback from clients when

19   they're not spotting something.

20             I think it would be helpful for me if you could

21   explore those issues a little bit more for me so I have some

22   sense of whether the reliability of the tool has been tested in

23   some way even if -- I don't think there's anything wrong with

24   it being anecdotal, but it has to be verifiable or tested in

25   some way.

```
 1                    MS. PELKER:  Yes, Your Honor.
 2                   REDIRECT EXAMINATION OF
 3                      ELIZABETH BISBEE
 4      BY MS. PELKER:
 5      Q.  Ms. Bisbee, you testified that you don't know an exact
 6      number for the error rate in Chainalysis.
 7              But is it also your testimony that you have found in
 8      your own work Chainalysis Reactor to be reliable?
 9      A.  Correct.
10      Q.  And have you received feedback from Chainalysis's
11      customers, whether that's Government Solutions or on the
12      compliance side, about the use of Chainalysis Reactor and the
13      clusters in investigations?
14      A.  Yes.
15      Q.  Could you speak, generally, without divulging any sort of
16      sensitive details on a particular case, about instances where
17      Chainalysis Reactor is used and has been found to be reliable.
18      A.  So in all of the investigations that my team supports, we
19      provide investigative reports to our public sector customers.
20      They're then able to leverage that to further their
21      investigations, and we have never, in the last two and a half
22      years I've been with Chainalysis, ever received anything back
23      that says that it was not correct or that it was incorrectly
24      attributed for the information we provided.
25      Q.  And are you aware whether information from Chainalysis
```

```
 1    Reactor has been used in support of search warrants in criminal
 2    investigations?
 3    A.  Yes.
 4    Q.  And have you received feedback that the information
 5    relating to Chainalysis Reactor, when those search warrants
 6    were executed, was then corroborated by information found in
 7    the search warrant responsive?
 8    A.  Yes.  So I can attest to that when I was at DEA, because I
 9    used Reactor and also supported many search warrants and
10    seizure warrants and was able to corroborate the information
11    with that.
12    Q.  Was there -- were there also instances where you were able
13    to -- either you or agents that you worked with debriefed or
14    proffered the subjects or defendants of investigations whose
15    tracing you or one of your colleagues had done using
16    Chainalysis Reactor?
17    A.  Yes.
18    Q.  And were there -- anecdotally, were there numerous
19    instances where those defendants or subjects then corroborated
20    and admitted to you the information in the tracing?
21    A.  Yes.
22    Q.  And are you aware of how law enforcement uses Chainalysis
23    Reactor in support of thousands of different investigations
24    across the country?
25    A.  Yes.
```

1    Q.  And is Chainalysis also used by investigators globally, as

2    well as those in exchanges and on the compliance side?

3    A.  Yes.

4    Q.  And do you receive feedback from a variety of Chainalysis

5    customers regarding the utility of the tool?

6    A.  Yes.

7    Q.  And have they provided information to you about the tool

8    being accurate and reliable in their investigations?

9    A.  Yes.

10   Q.  And have you had the occasion to also verify that the

11   information in the tool is corroborated by the outside data

12   sets, whether that's the blockchain or information gathered

13   through subpoenas to financial institutions, search warrants,

14   and other sources?

15   A.  Yes.

16   Q.  Ms. Bisbee, defense counsel asked you about lines of

17   academic research.

18           Is it fair to say that your focus in blockchain

19   analytics is not academic research at large?

20   A.  Correct.

21   Q.  Are you aware, though, that there are academic researchers

22   who are very interested in blockchain analysis?

23   A.  Yes

24   Q.  And could you speak to that, generally, again,

25   understanding that you aren't the ones -- you are not someone

1    who is peer-reviewing any of these papers.

2    A.   Yes.  So any type of verifying information for doing an

3    investigation, you want to be able to make sure that you have

4    some sort of source or backing to be able to trust what you're

5    actually doing on the blockchain.  So that requires to be able

6    to review individuals that actually go and test the validity of

7    what's actually occurring on the blockchain.

8              So that includes the different heuristics that are

9    leveraged.  So common, or co-spend, or the change address or

10   behavioral features, as well as the obfuscation techniques that

11   are leveraged in order to help one hinder the ability to

12   actually follow the flow of funds; and then also be able to

13   deter individuals from being able to identify the destination

14   or origin of those funds.

15   Q.   Ms. Bisbee, I wanted to follow up briefly on a specific

16   point that the defense raised regarding the clustering for the

17   Bitcoin Fog cluster discussed on page 13 of your report.

18   A.   Yep.

19   Q.   Those 46,532 addresses, those were addresses that were only

20   identified through the co-spend heuristic; is that right?

21   A.   Correct.

22   Q.   But 50 percent of the addresses in total -- so we're

23   looking at closer to 500,000 addresses -- were identified by

24   both the co-spend heuristic and the behavioral heuristic; is

25   that right?

1    A.  That's correct.

2    Q.  And the specific heuristics of whether it was co-spend only

3    or not co-spend only is set out in the attachment to your

4    report; is that correct?

5    A.  That's correct.

6         MS. PELKER:  Unless the Court has any other questions

7    that we can help -- address any questions with regard to

8    reliability --

9         THE COURT:  If you can ask the witness whether, in

10   her experience, she has identified any cases or anyone has

11   brought to her attention any cases in which there were false

12   positives.

13        I think she's indicated that there may have been

14   false negatives because it's a conservative tool in her view.

15   But I'm curious as to whether she's ever received -- or

16   identified a false positive and, if so, on how many occasions

17   that has occurred.

18   BY MS. PELKER:

19   Q.  Ms. Bisbee, in your work at Chainalysis, has anyone brought

20   to your attention specific instances of false positives where

21   Chainalysis said something was clustered in a way that was not

22   correct?

23   A.  Not to my knowledge.

24        THE COURT:  What about while at the DEA as well?

25   BY MS. PELKER:

```
 1    Q.  While at the DEA, were there any instances?

 2    A.  No, not to my knowledge.

 3    Q.  How many addresses -- or how many clusters and addresses

 4    would you say that you and Chainalysis users who are reporting

 5    directly to you would review on a regular basis?

 6    A.  Thousands.  I mean, a lot.  We service a lot of

 7    investigations.

 8    Q.  Fair to say in your work doing hundreds of investigations

 9    with thousands upon thousands of addresses, you're not aware of

10    a single false positive instance by you or anyone working with

11    you?

12    A.  Not to my knowledge.

13              THE COURT:  Okay.  Thank you.  Mr. Ekeland?

14                       RECROSS-EXAMINATION OF

15                        ELIZABETH BISBEE

16    BY MR. EKELAND:

17    Q.  Ms. Bisbee, can you hear me?

18    A.  Yes, thank you.

19    Q.  Is it your testimony that Chainalysis Reactor is

20    100 percent accurate?

21    A.  No.

22    Q.  Are you aware of any internal analysis at Chainalysis of

23    the error rates for Chainalysis Reactor?

24    A.  No.

25    Q.  And you said it's been used thousands of times?
```

1    A.  Yeah.

2    Q.  And do you individually review each of those cases or

3    instances?

4    A.  No.  But I oversee thousands of investigations.

5    Q.  You oversee.  And you oversee thousands of investigations.

6            But there is no internal analysis at Chainalysis

7    about the accuracy of Chainalysis Reactor; is that correct?

8    A.  It's dependent upon the -- when we send it back to our

9    customers, and we've never gotten a negative response from our

10   customers about the information that we provide.

11   Q.  But you've never -- Chainalysis has never done an analysis

12   of the error rate of its entire use of its entire data set of

13   customers, has it?

14   A.  Not to my knowledge.

15           MR. EKELAND:  No further questions.

16           THE COURT:  All right.  Thank you.  The witness is

17   excused.  You can let her know.  Thank you.

18           (Witness excused.)

19           THE COURT:  Ms. Pelker, I would be interested if

20   there have been -- this witness may not know about it.  I would

21   be interested as to whether the people, in preparing the

22   software or in building the product, have done any -- any

23   efforts to verify the accuracy of the product.

24           MS. PELKER:  We'll definitely look into that further,

25   Your Honor.  Our understanding is that the software -- there

1    are definitely false negatives and that is by design, but that

2    the software is designed to have a zero percent acceptable

3    error rate because they don't view any false positive as an

4    acceptable outcome.  But we can --

5             THE COURT:  If there's somebody who can tell me that

6    or explain that to me or explain to me why that's the case or

7    how it's been designed in order to ensure that, that would be

8    helpful.

9             MS. PELKER:  Yes, Your Honor.

10            THE COURT:  Mr. Ekeland?

11            MR. EKELAND:  Your Honor, we have heard, anecdotally,

12   about false arrests.  Somebody came up to us, I think down in

13   Miami or in Europe, and told us about an instance -- which we

14   haven't looked up and haven't verified -- where somebody in the

15   UK was, essentially, charged with, I believe, trafficking and

16   child pornography based on a Chainalysis Reactor search.  He

17   was arrested.  It's my understanding he was held for months,

18   and then he was just quietly released.

19            THE COURT:  If there's any evidence that you wanted

20   to bring to my attention, I'd be happy to consider that.

21            We have just another 15 minutes before my next

22   hearing.  I did have a couple of questions about the motion to

23   dismiss; maybe I could ask those now.

24            And why don't I start with you, Mr. Brown.  I know

25   it's the defense's motion, but the two questions I had for

1    you -- and I'd be interested in Mr. Ekeland's view on this as

2    well.

3            As I read the case law with respect to the venue

4    question, the majority view seems to be that it is enough

5    simply to allege venue and then a transaction or a relevant

6    event occurred within a jurisdiction, and as long as on the

7    face the indictment alleges that that's the end of the matter.

8    There is some authority for the proposition -- and there's a

9    concurring opinion, I think, from Judge Fletcher from the

10   9th Circuit, who suggests that if the defense comes forward

11   with evidence and says here's the evidence that shows why there

12   can't possibly be venue -- that the Court can take that up at

13   the motion to dismiss stage.  And now I'm just talking about a

14   motion to dismiss an indictment, not, obviously, what happens

15   on the merits of the case.

16           So I'm curious as to whether you -- I guess as to

17   what the government's position is with respect to that and

18   whether the government thinks it's enough simply to allege that

19   there was an act that occurred in the relevant district or

20   whether, at the motion to dismiss stage, we really do something

21   on a venue motion that you don't do with most other motions

22   that start getting into the merits and say, okay, what does the

23   evidence show, and do I think the government can carry its

24   burden if we were at trial.

25           So that was my first question, I guess; what you

1    think the correct standard is and whether I should be, in fact,

2    having almost a minitrial at this point, or at least having a

3    proffer of what the evidence will show at trial and then

4    deciding whether I think it's sufficient, which I, obviously,

5    wouldn't do, for example, with respect to -- if there was

6    adequate evidence of identifying an assailant or something like

7    that.

8              MR. BROWN:  Yes, Your Honor.  I think, to address

9    that question, our starting point is -- I mean, the case law is

10   clear that venue is not in itself an element of the offense

11   that necessarily needs to even be pleaded in an indictment.

12             THE COURT:  Right.

13             MR. BROWN:  So courts do look beyond the four corners

14   of an indictment to see -- if there's a motion challenging

15   venue, courts do look beyond the four corners to see if --

16             THE COURT:  Do they where it's pled in the indictment

17   as it is here other than the Judge Fletcher concurrence?

18             MR. BROWN:  Your Honor, let me say two things.

19   Number one, I don't think -- and I'm not familiar with this

20   concurrence, so I'm a little bit at a disadvantage.

21             THE COURT:  I guess put that aside.  The majority

22   view, I think -- maybe it's more than Judge Fletcher on this.

23   The majority view is, if you plead it, that's sufficient.  But

24   if I'm wrong about that, I want you to let me know.

25             MR. BROWN:  Your Honor, I don't think that there's

 1    any reason to doubt that majority view; that if you plead it,

 2    it's sufficient.  A motion to dismiss -- the general standard

 3    for motion to dismiss an indictment is, you know, is there some

 4    defect that, no matter what the facts, as they fall out, is

 5    there some defect in the way that the case is pled that

 6    categorically makes that indictment infirm.

 7              And I think what you're talking about is, I don't

 8    think that on a motion to dismiss for lack of venue, I don't

 9    think that the Court should engage in that kind of minitrial

10    that you referred to.

11              The second point I wanted to make here, though, is I

12    don't think the Court needs to reach that question because I

13    think the disagreement here is really about the law and how the

14    law applies to facts that are really not in dispute; namely,

15    there were undercover transactions conducted from the District

16    of Columbia.

17              THE COURT:  How many?  There were two; is that it, or

18    was there more than two?

19              MR. BROWN:  There were a number.  I think there

20    are -- at least four.  There's one that's pled in the

21    indictment specifically.  That's in Count 2.

22              There are, I think, more than that referred to in the

23    affidavit in support of the criminal complaint.  There may be

24    two.  There were other transactions that were just pure

25    undercover transactions; they weren't accompanied with the

1       representation of, these are dirty funds.

2               THE COURT:  Right.

3               MR. BROWN:  So there are several transactions in the

4       District of Columbia.  I don't think that the defense is

5       disputing the fact that those transactions occurred.  I

6       understand the defense to be arguing that it doesn't matter or,

7       you know, there's some other evidentiary argument about that.

8               The other fact here is the absence of D.C. licensure

9       and FinCEN registration; registration with Financial Crimes

10      Enforcement Network.  I understand those are also facts that I

11      don't think the defense is disputing.

12              THE COURT:  That may vary from jurisdiction -- I

13      mean, from count to count.  You may be stronger on some counts

14      than others.

15              MR. BROWN:  So those two facts.  The undercover

16      transactions and then the lack of licensure or registration in

17      various combinations address venue for each of the four counts

18      in the indictment.

19              But you're correct that it's not the same argument

20      for each count in the indictment.

21              THE COURT:  And then this relates to the other

22      question I had, which is, is there other evidence of venue that

23      might come in at trial?  I mean, I know that you've now

24      identified maybe four undercover transactions from the District

25      of Columbia, failure to register here.

1          Is there other evidence that may still come in or

2     still even being developed with respect to venue that might

3     make it premature for me to say, this is it, there's these

4     four, and I either conclude this is sufficient or not for

5     purposes of venue?

6          MR. BROWN:  With respect to venue, I don't think that

7     there's any other evidence other than the fact of undercover

8     transactions and the fact --

9          THE COURT:  I'm sorry.  So you think I can and should

10    just rely on those four undercover transactions is all that you

11    have at this point, then?

12         MR. BROWN:  Those four undercover transactions.  We

13    can confirm exactly how many and on what dates there were

14    undercover transactions.

15         THE COURT:  That would be helpful for me to have.  If

16    you want to do something to update me just to let me know

17    exactly what it is you're relying on in that regard.

18         MR. BROWN:  Okay.

19         THE COURT:  And you indicated also that the failure

20    to license or to obtain a license in D.C. was a venue-related

21    event in D.C.  I sort of wonder whether that's right or not

22    because I think the crime is operating a business without a

23    license.  The fact that you didn't get a license isn't

24    sufficient.  You're actually operating the business.  If

25    there's no evidence that you actually operated the business in

1    D.C., the fact that you didn't get a license in D.C. is not

2    going to establish venue.

3           MR. BROWN:  Well, these are -- the crime consists of

4    both operating a business and that omission, that inaction.

5    And the courts have been clear that you don't have to have

6    every element of the offense occur in the same district in

7    order to venue the prosecution in that district.

8           I think it is, actually, correct that an omission in

9    a district, such as the District of Columbia, is sufficient in

10   itself to venue a prosecution.  And the examples are the

11   examples that we cite in our brief; the *Hassanshahi* case, which

12   was in -- a sanctions evasion.  I don't know all the details,

13   but it was a sanctions evasion case.

14          The only event in the District of Columbia was the

15   omission, the failure to obtain a license.  The other parts of

16   that offense, the illegal export or import or whatever it was,

17   based on my reading of that case, the other elements of that

18   offense, did not occur in the District of Columbia.  It had

19   nothing to do with the District of Columbia.

20          Judge Contreras read that and said there is an

21   element of the offense, which is the omission.  The same

22   applies to the civil forfeiture case.

23          THE COURT:  Is the only place that one would apply to

24   get a license to conduct a money-transmitting business in the

25   District of Columbia?  Is that the only place you can go to get

1   a license?

2          MR. BROWN:  For -- so there's a license -- sorry.

3   There's a license which is issued by the D.C. government, the

4   Department of Insurance, Securities and Banking.

5          THE COURT:  Right.

6          MR. BROWN:  And then there's registering as an MSB

7   with the Financial Crimes Enforcement Network.  For the

8   registration crime, yes, the FinCEN is only located in the

9   District of Columbia.

10          THE COURT:  The form has to be actually submitted in

11   D.C.?

12          MR. BROWN:  Yes, Your Honor.  And it's received and

13   read and stored in the District of Columbia.

14          There are many prosecutions under 1960 for failure to

15   obtain FinCEN registration in other districts.  That's because

16   other parts of the offense may touch those districts.  The

17   defendant may be located there; some of the transactions may be

18   there.

19          It just so happens that for our case, you know, our

20   argument about the omission, that is a D.C.-specific omission.

21   But that's been recognized by Judge Contreras, Judge -- former

22   Judge Ketanji Brown Jackson.  The *Johnston v. United States* --

23          THE COURT:  You can call her now Justice if you want.

24          MR. BROWN:  Yes, Your Honor.  And *Johnston v. United*

25   *States*, a Supreme Court case, which is cited in our brief,

1     says:  Where a crime charged is a failure to do a legally

2     required act, the place fixed for its performance fixes the

3     situs of the crime.

4            I would also point the Court to the discussion of

5     this in one of the defendant's leading authorities, the

6     *Auernheimer* case in the 3rd Circuit.  In that case, the court

7     contrasted the situation there with the situation where there

8     is a preexisting legal duty to do something.  The examples were

9     things like failing to file a tax return, failing to show up to

10    a draft registration board, where the offenses punish inaction.

11           I think if you read the text of 1960(b)(1)(A) and

12    (b)(1)(B), those offenses include both actions, namely,

13    operating a money services business or money transmitting

14    business, and inaction; failing to obtain a license, failing to

15    register with FinCEN.  It's both of those.  We do have a

16    preexisting legal duty.

17           I think it's well-established that omission does

18    suffice.

19           THE COURT:  For those counts?

20           MR. BROWN:  Yes, Your Honor.

21           THE COURT:  Okay.

22           MR. BROWN:  For those counts.  And also, as we

23    pointed out in our brief, the failure to register with FinCEN

24    is also another kind of overt act in furtherance of the money

25    laundering conspiracy.

1      Part of registering with FinCEN is subjecting

2  yourself to FinCEN's supervision over your business, which

3  includes supervision of your Bank Secrecy Act compliance, your

4  anti-money laundering obligations.

5      THE COURT:  Can you have an overt act of failing to

6  act jurisdiction?

7      MR. BROWN:  Your Honor, it isn't -- I mean, I think

8  yes.  This is something that an illegal mixing service like

9  Bitcoin Fog deliberately does.  They deliberately do not

10  operate what they call a KYC service provider, know your

11  customer.  There are KYC service providers, like Coinbase,

12  mainstream exchanges; and there are the non-KYC providers, like

13  an illegal mixer, like some other noncompliant exchanges.

14      And I think in this case -- I mean, we would talk

15  about the evidence --

16      THE COURT:  Do you know -- I mean, I can take a look

17  at the case law.  I don't know off the top of my head whether

18  there have been cases in which a court has said, you can have a

19  failure to act that constitutes an overt action, in general,

20  for purposes of a conspiracy.

21      MR. BROWN:  I don't know off the top of my head.  But

22  also the Court doesn't have to decide because that's not our

23  sole basis for an overt act.

24      THE COURT:  Okay.  Let me give Mr. Ekeland time on

25  this as well.  Same questions for you.

1          MR. EKELAND:  I believe we cited in our papers some

2     of the cases, I think in this district, that looked outside the

3     four corners of the indictment for evidence as to venue.  On

4     that point, I would --

5          THE COURT:  Are there any cases, though, in which the

6     indictment actually alleges on its face venue; that they

7     actually go beyond the scope of the indictment itself?

8          MR. EKELAND:  I just didn't hear the question.

9          THE COURT:  Any cases from this district where the

10    indictment itself alleged venue; alleged that acts occurred in

11    the district where the courts went beyond the scope of the

12    indictment?

13         MR. EKELAND:  I don't know off the top of my head.  I

14    would have to go look.

15         I would point out that I believe the venue right is

16    the only right explicitly mentioned twice in the United States

17    Constitution in Article III, the Sixth Amendment.  As a

18    threshold issue, I don't think it's a minor one.

19         THE COURT:  It's certainly not a minor one, but it is

20    also one where the Supreme Court has just reaffirmed in the

21    past week or two weeks that it's not an element of the offense.

22    You're right, it's not a minor right.

23         MR. EKELAND:  But it is an issue for the jury to

24    hear.

25         THE COURT:  It can be.  If it's raised, it can be an

1    issue for the jury.

2              MR. EKELAND:  It's certainly affecting this case

3    because any witnesses that we want to fly in are in Sweden.

4              THE COURT:  That was the other question I was going

5    to ask you that invites -- in your view, is there venue

6    anywhere in the United States?

7              MR. EKELAND:  No, not that I've seen from the

8    discovery because there's no evidence of anything actually

9    happening in the United States.  There's nothing -- there's no

10   evidence that I've seen in the discovery of anything happening

11   in D.C. besides the unilateral acts of the government.

12             And I think the issue there -- and I think this is a

13   very interesting issue, just computer law in general.  They're

14   referring to sort of this undercover transaction.  Where is the

15   mens rea in terms of you're saying there's a crime here?

16   They're sending a message, not getting any response.

17             They're then taking some bitcoin from a government

18   account; allegedly mixing it in Bitcoin Fog, which I believe

19   this Court said that's legal if you're not trying to launder

20   money; and then putting it back in a government account.

21             Where is the mens rea and where is the crime actually

22   in D.C. that justifies a criminal prosecution?  That's not at

23   all clear to me.  There's -- maybe if there was something else

24   in the discovery that showed -- but as a matter of law, I think

25   the way that the indictment is pled, it's just defective

```
 1    legally.

 2              It doesn't meet the locus delicti test; it doesn't

 3    meet the substantial conduct test; and it certainly doesn't

 4    meet the test of my favorite case, United States v.

 5    Auernheimer, of essential conduct.  You don't have anything

 6    happening in D.C., and this is the classic case that I think

 7    the framers were concerned about.

 8              THE COURT:  I really, really doubt the framers were

 9    concerned about international transactions involving

10    cryptocurrency.

11              MR. EKELAND:  But they were concerned about American

12    Revolutionaries being arrested in Philadelphia and taken to

13    London for a jury trial.  That's, I think, one of the main

14    reasons you have the venue clause, and that's why it's in the

15    Constitution twice.

16              THE COURT:  That's -- it doesn't make any sense

17    whatsoever because the venue clause would do nothing whatsoever

18    with respect to restricting the ability of Great Britain to try

19    somebody.  There may be concerns about someone grabbing someone

20    in Great Britain from the United States, but it's not grabbing

21    someone in Philadelphia and bringing them to Great Britain.

22              MR. EKELAND:  It's a concern --

23              THE COURT:  That wouldn't apply at all.

24              MR. EKELAND:  It's a concern about the venire.  It's

25    a recognition by, I think, something like three-quarters of the
```

1    trial lawyers who wrote the Constitution of that important

2    aspect, of that -- that you need to have the trial where the

3    crime actually occurred because that's where the witnesses are.

4              And here, in this case, we have people in Sweden who

5    can come in and testify that Roman wasn't operating Bitcoin

6    Fog.  What do we have to do?  We have to fly them all to the

7    United States.  Some of them are worried they're going to get

8    arrested by the United States Government after they've seen

9    what's happened to Roman.  That's a big factor in this case.

10             The government doesn't have any eyewitnesses at all

11   that can attest to anything happening in this district.

12   Nothing happened in this district except the unilateral acts of

13   the government, and those acts have no mens rea.  I don't

14   understand how you can have criminal venue in this district and

15   have it be constitutional.

16             THE COURT:  All right.  Thank you.  All right.

17             So I guess we're going to reconvene on the 19th.  If

18   the government wants to provide me any update with respect

19   to -- well, I guess two things.  One is anything specific to

20   what the venue allegations are or the facts are with respect to

21   venue; and two, any verification or testing or analysis of the

22   Chainalysis tool that may not have been something that the

23   witnesses themselves had on hand, that would be helpful to

24   have.

25             MS. PELKER:  Yes, Your Honor.  And could we also have

1   the Court enter an order or issue some instruction to defense

2   counsel regarding a deadline for the expert disclosure.

3        THE COURT:  You mean about updating them in light of

4   where I said they could update them?

5        MS. PELKER:  Yes, Your Honor.

6        THE COURT:  Mr. Ekeland, when can you get that done

7   by?

8        MR. EKELAND:  Can we have two weeks?

9        THE COURT:  Is that acceptable to the government?  So

10  that would be July 7th.

11       MS. PELKER:  That will be July 7th.  And just

12  clarification that on July 7th, the government will expect

13  actual reports of the defense blockchain analysis, as well as

14  specifying what witness is testifying to what.

15       THE COURT:  Okay.

16       MR. EKELAND:  I think there's a misconception that we

17  have done this blockchain analysis beyond just looking at the

18  general tracing.  In terms of, like, final expert reports for

19  this case -- because it sounds like the government may need to

20  update their thing if they find anything in terms of verifying

21  stuff -- I would suggest August 14th for final expert reports.

22  That's about a month before the trial.

23       MS. PELKER:  Your Honor, the misconception comes from

24  the defense in their expert disclosure saying that their

25  experts did blockchain analysis and that they're going to use

1     it to rebut the government's experts.

2           The amended rule is very clear.  We had our expert

3     reports done well in advance of the *Daubert* hearing.  We need

4     an opportunity to review the expert reports before the now

5     rescheduled *Daubert* hearing.  We continued the January trial

6     because defense said they needed more time to do these expert

7     reports.  We can't get them less than a month before trial.

8           THE COURT:  I think I agree under the circumstances.

9     I may need to have hearings that any updated expert disclosures

10    or reports should be served on or before the 7th of July.

11          MR. EKELAND:  Okay.

12          THE COURT:  All right.  Thank you.  I will see you

13    all on the 19th.

14               (The hearing adjourned at 3:08 p.m.)

15

16

17

18

19

20

21

22

23

24

25

1                    CERTIFICATE OF OFFICIAL COURT REPORTER

2

3           I, TAMARA M. SEFRANEK, do hereby certify that the

4    above and foregoing constitutes a true and accurate transcript

5    of my stenographic notes and is a full, true and complete

6    transcript of the proceedings to the best of my ability.

7                Dated this 3rd day of July, 2023.

8

9                         /s/ Tamara M. Sefranek_____
                          Tamara M. Sefranek, RMR, CRR, CRC
10                        Official Court Reporter
                          Room 6714
11                        333 Constitution Avenue, N.W.
                          Washington, D.C.  20001
12

13

14

15

16

17

18

19

20

21

22

23

24

25

**$**

**$10** [3] - 50:7, 50:8, 107:2
**$20** [1] - 107:1

**/**

**/s** [1] - 157:9

**1**

**1** [9] - 2:19, 44:18, 45:1, 45:4, 45:5, 81:24, 82:11, 126:10, 126:18
**10** [2] - 61:12, 61:14
**100** [4] - 75:21, 90:13, 139:20
**10005** [1] - 1:17
**104** [1] - 2:22
**109** [1] - 2:23
**10:00** [1] - 1:6
**10th** [1] - 5:5
**119** [1] - 2:13
**11th** [1] - 7:15
**122BU** [1] - 82:16
**12:35** [1] - 95:4
**13** [2] - 126:15, 137:17
**134** [1] - 2:15
**139** [1] - 2:16
**14th** [1] - 155:21
**15** [1] - 141:21
**16** [2] - 34:13, 34:17
**18** [1] - 64:13
**1811** [1] - 18:14
**19** [1] - 93:17
**1960** [1] - 148:14
**1960(b)(1)(A** [1] - 149:11
**1982** [1] - 29:9
**1985** [1] - 29:14
**1987** [1] - 35:6
**19th** [5] - 39:21, 39:23, 40:20, 154:17, 156:13
**1:21-CR-0399** [1] - 1:3
**1:30** [2] - 94:15, 94:16
**1:40** [1] - 95:4
**1JZBU** [4] - 82:17, 84:6, 92:10, 92:17

**2**

**2** [7] - 2:20, 57:15, 57:25, 58:21, 58:24, 108:24, 144:21
**20** [1] - 83:12
**20001** [3] - 1:12, 1:23, 157:11

**2009** [1] - 50:17
**2011** [1] - 71:24
**2014** [12] - 8:3, 14:17, 28:5, 28:23, 42:3, 96:8, 96:10, 96:19, 99:1, 99:18, 123:15, 123:20
**2015** [5] - 17:25, 18:3, 42:4, 43:3, 99:18
**2016** [9] - 8:10, 18:20, 18:21, 19:4, 19:6, 19:9, 28:24, 87:24
**2017** [1] - 19:10
**2019** [1] - 88:3
**202-354-3246** [1] - 1:23
**2021** [1] - 102:24
**2022** [1] - 57:19
**2023** [2] - 1:5, 157:7
**20530** [1] - 1:14
**21-399** [1] - 3:2
**22** [4] - 65:13, 66:9, 67:8, 67:14
**23** [1] - 1:5
**27** [2] - 35:4, 113:17
**28** [2] - 8:3, 14:17
**2nd** [1] - 5:4

**3**

**3** [9] - 2:21, 59:4, 59:23, 59:24, 60:2, 60:4, 62:20, 62:22, 63:3
**30** [1] - 1:17
**302** [2] - 86:6, 86:7
**333** [2] - 1:22, 157:11
**34** [1] - 67:9
**35** [7] - 8:19, 68:2, 69:14, 69:21, 70:11, 81:10, 92:8
**36** [2] - 70:2, 92:15
**37** [5] - 69:3, 83:2, 83:5, 83:13, 92:11
**38** [1] - 69:3
**3:08** [1] - 156:14
**3rd** [2] - 149:6, 157:7

**4**

**4** [5] - 2:22, 104:10, 104:19, 104:22, 104:23
**40** [1] - 8:19
**400** [2] - 99:12, 100:3
**41** [1] - 2:5
**44** [2] - 82:11, 83:9
**45** [2] - 2:19, 40:18
**46,000** [1] - 127:6
**46,532** [4] - 126:22,

127:4, 127:7, 137:19
**460,000** [1] - 127:6
**49** [2] - 71:6, 71:8

**5**

**5** [10] - 2:23, 50:6, 50:10, 81:11, 105:22, 105:23, 108:22, 109:17, 109:22, 109:24
**50** [4] - 104:4, 126:23, 127:7, 137:22
**50.26** [1] - 126:17
**500** [1] - 52:13
**500,000** [1] - 137:23
**500-gigabyte** [1] - 52:14
**548** [1] - 29:13
**551** [1] - 29:14
**58** [1] - 2:20
**591** [1] - 29:9

**6**

**6** [7] - 2:23, 105:22, 106:3, 109:6, 109:17, 109:22, 109:24
**60** [1] - 2:21
**601** [2] - 1:11, 29:9
**6714** [2] - 1:22, 157:10
**694** [1] - 29:8

**7**

**73** [1] - 2:6
**75** [1] - 103:16
**764** [1] - 29:13
**7th** [5] - 5:4, 155:10, 155:11, 155:12, 156:10

**8**

**8** [2] - 57:18, 61:9
**880,000** [1] - 127:10
**89** [1] - 2:8
**8th** [2] - 1:17, 5:4

**9**

**9** [4] - 105:22, 106:3, 110:1, 126:9
**90** [1] - 33:23
**900,000** [4] - 60:16, 60:19, 60:21, 112:1
**925** [1] - 111:22
**925,000** [1] - 126:23
**925,743** [2] - 110:10,

126:13
**94** [1] - 2:9
**95** [1] - 2:12
**950** [1] - 1:14
**9th** [4] - 5:4, 29:9, 29:14, 142:10

**A**

**A.M** [1] - 1:6
**Aaron** [4] - 20:12, 20:13, 28:7
**ability** [5] - 19:23, 37:15, 137:11, 153:18, 157:6
**able** [54] - 14:9, 15:6, 15:9, 22:3, 61:23, 70:4, 70:8, 95:18, 96:25, 97:16, 97:18, 97:23, 97:24, 98:9, 98:13, 98:22, 100:8, 100:10, 101:2, 101:3, 101:4, 101:5, 101:21, 101:23, 102:5, 103:3, 103:18, 103:20, 103:21, 105:2, 105:4, 110:18, 111:25, 112:20, 115:6, 115:17, 122:7, 123:11, 124:1, 124:3, 124:4, 129:1, 129:6, 132:17, 133:16, 134:20, 135:10, 135:12, 137:3, 137:4, 137:5, 137:12, 137:13
**abreast** [1] - 103:17
**absence** [1] - 145:8
**absolute** [2] - 29:15
**absolutely** [2] - 7:13, 20:22
**abused** [1] - 24:8
**academic** [10] - 74:19, 89:3, 89:6, 89:9, 89:13, 94:6, 97:15, 136:17, 136:19, 136:21
**Academy** [1] - 102:21
**accept** [1] - 11:7
**acceptable** [3] - 141:2, 141:4, 155:9
**access** [10] - 15:17, 21:21, 24:2, 31:2, 31:19, 38:20, 38:21, 101:8, 102:4, 103:20
**accesses** [2] - 38:18, 76:13
**accessing** [1] - 76:10

**accommodate** [1] - 3:18
**accompanied** [1] - 144:25
**according** [1] - 84:5
**account** [54] - 38:20, 38:21, 45:22, 45:23, 45:24, 46:15, 46:18, 46:20, 47:1, 47:2, 47:4, 47:10, 47:13, 56:2, 56:4, 65:16, 65:18, 65:20, 65:22, 67:14, 68:5, 68:9, 68:12, 68:14, 68:17, 68:18, 69:1, 69:25, 71:2, 71:3, 71:9, 71:12, 72:5, 72:8, 81:25, 83:10, 83:19, 83:20, 84:1, 84:5, 85:14, 91:20, 92:1, 92:5, 92:12, 92:17, 93:6, 107:7, 131:7, 152:18, 152:20
**Account** [2] - 81:24, 82:11
**accountholder** [1] - 84:10
**accounting** [2] - 78:11, 89:21
**accounts** [20] - 22:9, 38:18, 57:5, 57:10, 59:16, 59:17, 60:11, 64:20, 65:2, 65:4, 65:7, 67:3, 67:10, 67:13, 68:8, 68:15, 93:4, 116:13, 130:12, 130:13
**accuracy** [26] - 16:11, 16:15, 58:11, 74:12, 74:15, 74:20, 79:19, 80:13, 84:15, 84:25, 94:7, 94:10, 102:7, 114:20, 122:19, 122:25, 123:3, 123:23, 127:15, 127:23, 128:13, 128:17, 129:9, 130:19, 140:7, 140:23
**accurate** [16] - 46:3, 59:18, 63:10, 72:24, 73:2, 75:21, 83:21, 89:17, 111:21, 117:15, 118:20, 118:22, 129:10, 136:8, 139:20, 157:4
**accurately** [10] - 44:21, 55:19, 57:21, 75:23, 76:15, 83:5, 83:6, 84:19, 84:21,

104:14
**Accurint** [1] - 23:24
**accuser** [1] - 30:11
**accusers** [1] - 27:23
**acknowledge** [1] -
89:22
**act** [8] - 142:19, 149:2,
149:24, 150:3,
150:5, 150:6,
150:19, 150:23
**Action** [1] - 1:2
**action** [1] - 150:19
**actions** [1] - 149:12
**actively** [1] - 113:23
**activity** [3] - 46:19,
111:4, 115:11
**actor's** [1] - 70:19
**acts** [5] - 7:8, 151:10,
152:11, 154:12,
154:13
**actual** [4] - 22:7, 86:7,
98:15, 155:13
**ad** [1] - 4:10
**addition** [6] - 19:23,
20:20, 63:15, 64:1,
112:9, 113:14
**additional** [9] - 32:12,
34:14, 50:2, 60:23,
66:13, 72:12, 72:16,
99:2, 102:8
**additionally** [2] -
64:19, 69:23
**address** [98] - 5:2,
7:17, 21:4, 37:7,
37:9, 37:12, 37:16,
38:2, 38:4, 38:6,
39:1, 39:4, 46:19,
47:12, 47:13, 47:14,
47:19, 47:20, 48:1,
48:5, 48:19, 48:20,
48:22, 48:25, 49:3,
49:7, 49:12, 49:13,
49:15, 49:16, 49:19,
49:21, 50:2, 50:3,
50:22, 50:23, 51:18,
51:20, 52:15, 56:9,
56:11, 56:12, 61:17,
62:13, 62:18, 62:20,
62:22, 62:23, 63:1,
63:3, 63:5, 64:4,
66:5, 66:7, 66:8,
68:6, 68:10, 76:3,
77:19, 77:20, 82:14,
82:15, 82:24, 83:8,
83:9, 83:10, 84:6,
84:19, 85:8, 85:9,
91:22, 92:6, 92:13,
92:17, 92:19,
106:17, 106:24,
107:7, 107:9, 111:1,

111:14, 112:15,
112:16, 113:4,
114:5, 114:9, 137:9,
138:7, 143:8, 145:17
**addressed** [3] - 4:22,
5:12, 7:15
**addresses** [98] - 38:7,
46:8, 47:21, 48:15,
48:17, 48:18, 48:23,
49:10, 51:7, 51:8,
51:9, 51:10, 54:22,
55:4, 55:7, 55:12,
56:3, 59:12, 59:20,
60:13, 60:17, 60:18,
60:19, 60:22, 60:23,
61:5, 61:6, 61:15,
61:20, 61:21, 62:2,
62:3, 62:6, 62:8,
62:11, 63:7, 63:12,
63:13, 63:16, 63:20,
65:10, 65:19, 66:10,
66:11, 66:14, 66:17,
66:20, 71:16, 71:17,
72:8, 76:5, 77:19,
78:21, 83:24, 84:2,
86:3, 90:13, 90:14,
91:18, 91:25, 101:5,
101:20, 105:7,
105:10, 105:16,
106:2, 106:7, 108:2,
109:9, 109:14,
110:4, 110:10,
110:13, 110:16,
110:17, 110:19,
111:4, 111:18,
111:22, 111:23,
112:1, 112:2,
112:13, 112:21,
112:25, 114:6,
126:13, 126:22,
127:4, 127:11,
137:19, 137:22,
137:23, 139:3, 139:9
**addressing** [2] - 4:10,
79:19
**adequate** [1] - 143:6
**adjourned** [1] - 156:14
**administer** [1] - 53:3
**administered** [2] -
45:13, 52:23
**administration** [2] -
53:6, 96:9
**administrator** [1] -
52:20
**admissible** [1] - 13:25
**admit** [7] - 27:1,
44:25, 57:24, 58:19,
59:22, 104:18,
109:16
**admits** [1] - 27:2

**ADMITTED** [1] - 2:18
**admitted** [11] - 45:4,
45:5, 58:21, 58:24,
60:2, 60:4, 104:22,
104:23, 109:23,
109:24, 135:20
**admitting** [4] - 58:16,
58:17, 59:24, 109:19
**advance** [1] - 156:3
**advanced** [1] - 44:3
**advantages** [1] -
54:20
**adverse** [1] - 7:6
**adversely** [1] - 7:14
**advice** [1] - 42:9
**advise** [1] - 100:9
**advised** [1] - 100:10
**advocacy** [1] - 7:11
**advocate** [4] - 7:4,
7:7, 7:9, 7:13
**affecting** [1] - 152:2
**affiant** [1] - 20:9
**affidavit** [3] - 20:1,
20:9, 144:23
**affirmatively** [3] -
23:10, 23:11, 30:5
**afternoon** [1] - 32:13
**agencies** [1] - 97:21
**agency** [1] - 99:17
**agenda** [1] - 6:24
**agent** [23] - 5:24, 8:18,
8:21, 8:23, 9:4, 9:14,
13:3, 14:24, 15:7,
18:13, 18:15, 18:18,
19:13, 19:25, 21:3,
21:13, 22:17, 22:18,
25:3, 31:17, 32:4,
62:23, 100:12
**Agent** [2] - 18:16, 20:8
**agents** [7] - 9:24,
18:14, 18:23, 19:23,
19:24, 100:10,
135:13
**aggregate** [2] - 55:16,
108:10
**ago** [2] - 8:19, 96:21
**Agora** [1] - 121:8
**agree** [10] - 5:5, 75:18,
75:19, 76:9, 77:5,
77:13, 77:15, 79:17,
80:11, 156:8
**agreed** [1] - 79:15
**ahead** [2] - 40:22,
86:17
**Alden** [1] - 3:6
**ALDEN** [1] - 1:13
**alerting** [1] - 115:13
**alerts** [1] - 115:11
**algorithm** [2] - 121:20,
122:13

**algorithms** [2] - 27:6,
124:11
**allegations** [1] -
154:20
**allege** [2] - 142:5,
142:18
**alleged** [1] - 151:10
**allegedly** [1] - 152:18
**alleges** [2] - 142:7,
151:6
**allow** [9] - 3:19, 3:20,
11:1, 35:25, 87:14,
93:24, 105:18,
107:19, 118:16
**allowed** [1] - 90:5
**allows** [3] - 15:9,
32:24, 112:20
**almost** [2] - 96:21,
143:2
**AlphaBay** [3] - 125:22,
125:25, 126:4
**alternative** [1] - 35:14
**amended** [2] - 34:17,
156:2
**Amendment** [2] -
27:23, 151:17
**AMERICA** [1] - 1:2
**America** [1] - 3:3
**American** [1] - 153:11
**amount** [7] - 36:23,
57:5, 60:10, 65:3,
65:21, 66:2, 92:19
**amounts** [3] - 90:20,
122:2, 122:9
**analysis** [107] - 9:18,
16:2, 21:16, 22:1,
22:8, 27:9, 30:12,
35:7, 35:20, 36:24,
37:1, 37:2, 37:7,
37:12, 38:17, 42:8,
42:16, 42:18, 43:12,
43:16, 43:22, 44:4,
44:6, 44:14, 44:16,
45:9, 50:15, 50:19,
51:2, 51:13, 51:15,
54:21, 55:6, 55:15,
55:16, 55:17, 56:16,
56:24, 57:4, 57:9,
58:10, 59:20, 60:7,
63:6, 63:25, 64:5,
64:6, 64:7, 64:20,
64:23, 65:3, 66:11,
67:5, 67:23, 70:11,
72:1, 72:11, 72:15,
72:20, 73:3, 73:21,
79:21, 79:25, 88:10,
89:5, 89:14, 89:18,
92:3, 92:22, 97:1,
100:8, 100:19,
100:23, 100:24,

102:18, 103:15,
103:21, 104:6,
105:1, 105:2, 105:6,
107:9, 107:17,
111:2, 112:19,
113:4, 113:15,
114:8, 114:9,
114:12, 116:5,
122:19, 123:23,
127:12, 127:13,
129:1, 130:14,
131:4, 133:14,
136:22, 139:22,
140:6, 140:11,
154:21, 155:13,
155:17, 155:25
**analyst** [21] - 8:3,
9:13, 10:8, 14:7,
14:9, 14:16, 14:22,
14:25, 15:5, 15:10,
17:4, 17:16, 19:15,
26:9, 27:25, 28:3,
28:5, 28:22, 28:24,
96:13, 100:7
**Analyst** [1] - 18:7
**analytics** [3] - 101:11,
102:13, 136:19
**analyze** [1] - 124:8
**analyzes** [1] - 74:20
**analyzing** [2] - 16:7,
74:12
**anecdotal** [6] - 90:24,
128:12, 130:20,
130:23, 130:24,
133:24
**anecdotally** [2] -
135:18, 141:11
**announcement** [1] -
72:9
**announcements** [2] -
71:22, 72:6
**announcing** [1] -
71:23
**anonymous** [1] -
97:17
**answer** [1] - 88:15
**answered** [2] - 128:7,
128:8
**anti** [1] - 150:4
**anti-money** [1] - 150:4
**anyway** [1] - 11:2
**apologize** [1] - 86:16
**appear** [2] - 4:19,
62:19
**appeared** [1] - 71:20
**application** [2] - 47:8,
48:4
**applications** [1] - 89:5
**applies** [5] - 9:2,
29:25, 75:24,

144:14, 147:22
**apply** [7] - 6:19, 21:6,
67:12, 73:4, 75:8,
147:23, 153:23
**appointed** [5] - 8:14,
8:18, 9:21, 12:7,
28:25
**appointing** [1] - 9:24
**approach** [6] - 118:2,
118:5, 118:9,
118:13, 119:7,
119:18
**appropriate** [3] -
38:21, 58:18, 108:6
**appropriately** [1] -
60:25
**Argosy** [1] - 96:5
**argue** [3] - 33:24,
34:7, 75:15
**arguing** [1] - 145:6
**argument** [8] - 6:4,
13:8, 37:21, 39:16,
40:3, 145:7, 145:19,
148:20
**arguments** [1] - 40:18
**arise** [1] - 30:21
**arrest** [1] - 93:8
**arrested** [5] - 16:14,
88:17, 141:17,
153:12, 154:8
**arrests** [1] - 141:12
**arrive** [1] - 37:23
**arrow** [1] - 82:12
**arrows** [1] - 68:23
**Article** [1] - 151:17
**article** [6] - 97:15,
123:11, 123:12,
123:13, 123:15,
124:5
**articles** [4] - 36:2,
36:5, 103:20, 123:9
**articulated** [1] - 13:17
**arts** [1] - 96:4
**aside** [3] - 21:23,
39:11, 143:21
**aspect** [1] - 154:2
**aspects** [5] - 97:24,
100:18, 102:5,
105:12, 115:17
**assailant** [1] - 143:6
**assertion** [1] - 30:10
**assertions** [1] - 32:4
**assess** [2] - 105:4,
108:9
**assessment** [6] -
58:10, 66:24, 74:15,
90:6, 90:19, 106:14
**assigned** [3] - 21:12,
41:17, 96:14
**assignment** [2] - 42:5,

42:7
**assistant** [1] - 8:13
**associated** [13] - 57:7,
60:17, 61:15, 62:21,
68:6, 68:10, 83:10,
92:1, 92:2, 101:5,
110:14, 110:17,
133:5
**association** [1] -
110:19
**assume** [3] - 4:7,
25:15, 77:20
**assumed** [1] - 77:18
**assumption** [4] - 58:6,
75:10, 75:14, 78:6
**assumption-based**
[1] - 58:6
**assumptions** [9] -
24:19, 24:23, 27:2,
27:3, 27:4, 27:6,
28:9, 39:6
**atmospheric** [1] -
15:15
**attached** [2] - 60:16,
109:8
**attachment** [4] -
60:20, 109:18,
110:8, 138:3
**attachments** [9] -
59:2, 59:8, 59:11,
59:12, 64:17, 109:4,
109:7, 110:9, 113:19
**attacks** [1] - 43:9
**attempt** [1] - 71:20
**attempting** [1] - 9:3
**attempts** [1] - 61:20
**attending** [1] - 43:17
**attention** [16] - 44:17,
57:14, 59:4, 61:11,
64:13, 65:12, 68:2,
104:10, 105:21,
110:1, 113:17,
126:9, 126:15,
138:11, 138:20,
141:20
**attest** [2] - 135:8,
154:11
**attesting** [4] - 80:13,
122:24, 128:17,
129:8
**attests** [2] - 123:3,
127:23
**attitudes** [1] - 24:22
**Attorney** [2] - 8:14,
20:3
**attorney** [1] - 6:20
**Attorney's** [2] - 17:24,
19:1
**attorney's** [1] - 44:11
**attorneys** [1] - 24:1

**attribute** [2] - 62:14,
86:3
**attributed** [8] - 56:4,
56:8, 59:13, 60:25,
61:21, 62:10, 62:12,
134:24
**attribution** [12] -
19:16, 55:9, 55:13,
62:16, 63:10, 63:21,
76:6, 85:19, 85:20,
87:19, 102:5, 113:5
**attributions** [4] -
55:25, 85:7, 87:12,
120:22
**Auernheimer** [2] -
149:6, 153:5
**August** [2] - 14:16,
155:21
**aura** [1] - 7:12
**Aurum** [3] - 68:14,
68:15, 68:17
**AUSA** [3] - 3:9, 4:13,
12:7
**author** [1] - 123:19
**authorities** [1] - 149:5
**authority** [1] - 142:8
**authors** [1] - 123:19
**availability** [1] - 122:9
**available** [27] - 5:24,
23:22, 23:23, 29:11,
30:20, 31:4, 31:20,
32:6, 32:16, 32:21,
33:4, 33:8, 33:16,
36:16, 39:17, 39:18,
39:19, 39:24, 50:13,
54:14, 54:19, 55:20,
76:22, 92:7, 101:24,
105:3, 107:14
**Avenue** [3] - 1:14,
1:22, 157:11
**avoid** [2] - 10:3, 26:21
**aware** [12] - 62:14,
67:1, 67:4, 78:9,
80:12, 81:22, 89:10,
134:25, 135:22,
136:21, 139:9,
139:22

# B

**b)(1)(B** [1] - 149:12
**B-i-s-b-e-e** [1] - 95:22
**baby** [1] - 23:16
**bachelor's** [2] - 41:21,
96:2
**backend** [2] - 84:12,
84:13
**background** [5] -
17:21, 41:20, 96:1,
97:5, 98:1

**backing** [1] - 137:4
**bank** [7] - 45:23, 46:1,
46:23, 47:2, 96:25,
150:3
**banking** [1] - 148:4
**Bankman** [1] - 130:4
**Bankman-Fried** [1] -
130:4
**bar** [2] - 6:11, 29:15
**based** [32] - 24:19,
27:2, 27:18, 31:7,
35:25, 44:15, 58:4,
58:5, 58:6, 62:7,
68:22, 69:1, 72:24,
74:15, 81:14,
101:17, 107:21,
107:24, 108:1,
117:10, 117:16,
121:24, 125:5,
125:10, 125:23,
126:2, 127:17,
128:20, 128:23,
141:16, 147:17
**basic** [1] - 36:21
**basis** [14] - 17:1, 35:3,
35:4, 35:5, 35:24,
36:1, 36:6, 37:14,
58:3, 58:13, 87:8,
125:21, 139:5,
150:23
**beat** [1] - 17:3
**became** [7] - 8:24,
12:7, 13:5, 99:4,
99:8, 100:12, 102:20
**Beckett** [2] - 19:25,
20:8
**becomes** [3] - 8:13,
15:11, 28:25
**BEFORE** [1] - 1:8
**beforehand** [1] - 8:22
**begin** [2] - 96:7, 96:17
**beginning** [3] - 15:1,
42:22, 93:17
**begins** [1] - 82:15
**behalf** [1] - 20:14
**behavior** [5] - 66:1,
75:8, 75:14, 106:9,
107:10
**behavioral** [17] -
79:25, 80:14, 106:8,
107:13, 110:24,
111:2, 112:9, 125:4,
125:8, 127:9,
127:12, 127:13,
127:16, 127:17,
127:24, 137:10,
137:24
**behind** [4] - 27:5,
106:14, 113:5,
127:19

**belabor** [1] - 35:10
**belief** [1] - 8:11
**belies** [1] - 20:23
**belong** [9] - 55:7,
55:12, 56:3, 61:22,
62:7, 63:12, 63:13,
66:21, 85:14
**belonged** [1] - 66:21
**belonging** [1] - 62:9
**belongs** [3] - 46:18,
55:12, 62:18
**bench** [1] - 4:15
**best** [3] - 32:10,
106:11, 157:6
**Beth** [1] - 99:7
**better** [2] - 39:11,
120:17
**between** [11] - 5:20,
17:23, 62:5, 64:2,
64:9, 65:17, 83:19,
87:4, 132:19,
132:24, 133:4
**beyond** [7] - 87:6,
102:9, 143:13,
143:15, 151:7,
151:11, 155:17
**bias** [3] - 26:6, 26:22,
34:5
**biased** [1] - 27:9
**biases** [1] - 26:20
**Bice** [5] - 9:15, 20:12,
20:13, 28:7
**big** [3] - 14:17, 84:11,
154:9
**bill** [4] - 50:7, 50:8,
50:9, 107:1
**binder** [5] - 41:1,
44:17, 59:5, 95:9,
104:11
**birth** [2] - 46:7, 46:18
**Bisbee** [21] - 21:24,
40:7, 78:16, 80:23,
95:7, 95:18, 95:20,
95:22, 95:23,
104:25, 110:1,
113:21, 117:9,
117:22, 119:4,
129:24, 134:5,
136:16, 137:15,
138:19, 139:17
**BISBEE** [5] - 2:10,
95:16, 119:2, 134:3,
139:15
**Bisbee's** [1] - 80:4
**bit** [12] - 10:10, 17:21,
45:7, 52:15, 56:6,
80:5, 97:18, 102:25,
122:11, 131:11,
133:21, 143:20
**bitcoin** [34] - 45:19,

46:5, 46:25, 47:5,
47:7, 48:3, 48:6,
49:2, 49:3, 49:4,
49:5, 49:8, 49:10,
49:13, 49:14, 49:15,
49:20, 49:22, 49:23,
49:24, 50:2, 50:3,
50:17, 66:2, 71:20,
82:11, 83:9, 84:18,
91:20, 98:19, 107:6,
152:17
**Bitcoin** [157] - 8:4,
14:17, 17:22, 18:10,
19:17, 19:18, 21:2,
21:7, 22:4, 22:20,
25:18, 28:23, 45:17,
47:12, 47:13, 47:14,
47:18, 47:19, 47:21,
47:23, 48:7, 48:8,
48:10, 48:21, 49:1,
49:21, 50:18, 52:1,
52:4, 52:6, 52:12,
52:20, 52:23, 53:5,
53:7, 53:21, 53:23,
53:25, 54:8, 55:20,
56:3, 56:25, 57:3,
57:6, 59:15, 59:20,
60:10, 60:14, 60:17,
60:20, 60:25, 61:15,
61:18, 61:19, 61:22,
61:25, 62:3, 62:6,
62:7, 62:9, 62:10,
62:12, 62:14, 62:19,
62:20, 62:21, 62:22,
62:25, 63:1, 63:3,
63:4, 63:7, 63:17,
64:1, 64:2, 64:10,
65:4, 65:6, 65:16,
65:18, 65:19, 65:20,
65:22, 67:3, 67:6,
67:9, 67:17, 68:8,
68:9, 68:12, 68:22,
68:24, 69:1, 69:2,
69:8, 70:14, 70:24,
71:1, 71:9, 71:12,
71:23, 72:6, 72:9,
72:13, 72:16, 72:25,
74:24, 76:2, 76:4,
82:13, 83:9, 83:24,
84:20, 86:8, 86:22,
86:25, 87:5, 90:1,
90:9, 90:10, 92:5,
92:13, 92:17, 92:18,
97:3, 97:6, 97:9,
106:22, 108:7,
109:1, 109:9,
109:14, 110:4,
110:5, 110:6,
110:11, 110:14,
110:16, 111:8,
111:12, 111:20,

112:5, 112:11,
112:14, 123:8,
126:10, 126:12,
126:18, 128:2,
137:17, 150:9,
152:18, 154:5
**BitcoinFog_
  addresses.csv** [1] -
110:8
**bitcoins** [1] - 93:13
**Bitcointalk** [1] - 71:23
**block** [14] - 48:11,
51:18, 51:23, 51:25,
53:13, 53:16, 54:4,
55:22, 69:6, 69:20,
76:25, 101:1,
107:19, 124:3
**blockchain** [125] -
23:21, 35:20, 36:19,
36:24, 37:1, 37:2,
42:8, 42:16, 42:18,
43:12, 43:16, 43:22,
44:2, 44:4, 44:6,
44:14, 44:15, 45:8,
47:15, 48:10, 48:15,
50:13, 50:15, 50:18,
50:19, 50:20, 51:13,
51:15, 52:2, 52:4,
52:6, 52:8, 52:12,
52:21, 52:23, 53:7,
53:15, 53:17, 53:21,
53:23, 53:25, 54:9,
54:21, 54:25, 55:5,
55:18, 55:19, 56:16,
56:24, 60:10, 63:25,
65:20, 67:20, 67:24,
68:8, 68:22, 68:24,
68:25, 69:2, 69:8,
69:10, 70:7, 72:25,
73:3, 73:21, 76:4,
76:10, 76:14, 76:15,
76:16, 76:22, 76:24,
82:13, 83:24, 84:20,
85:2, 85:3, 85:6,
85:15, 85:18, 85:23,
87:11, 89:4, 89:13,
89:17, 92:18, 97:11,
97:16, 97:19, 100:8,
100:19, 100:23,
100:24, 102:13,
102:18, 103:4,
103:15, 103:21,
104:6, 105:1, 105:2,
105:4, 105:6,
106:10, 106:13,
106:19, 106:20,
107:5, 107:15,
112:19, 113:25,
114:12, 123:12,
125:6, 128:4, 129:1,

133:17, 136:12,
136:18, 136:22,
137:5, 137:7,
155:13, 155:17,
155:25
**blockchain.com** [1] -
52:2
**blockchair.com** [1] -
52:3
**blue** [2] - 62:6, 62:8
**board** [1] - 149:10
**bolstering** [1] - 7:8
**books** [2] - 36:3, 36:5
**borders** [1] - 12:4
**bother** [1] - 94:10
**bottom** [5] - 57:19,
61:12, 61:14, 65:13,
92:15
**bought** [1] - 46:25
**box** [6] - 62:5, 62:6,
62:8, 62:10, 65:23,
92:10
**break** [4] - 40:12,
40:13, 94:15, 107:5
**breaking** [1] - 56:6
**brief** [7] - 29:21,
29:24, 30:8, 93:25,
147:11, 148:25,
149:23
**briefing** [4] - 4:8, 4:9,
5:3, 7:4
**briefly** [8] - 24:12,
41:19, 43:23, 88:21,
95:25, 103:1,
132:23, 137:15
**bring** [5] - 12:3, 12:5,
31:11, 34:11, 141:20
**bringing** [6] - 9:18,
11:3, 11:14, 11:23,
31:9, 153:21
**Britain** [3] - 153:18,
153:20, 153:21
**broader** [1] - 111:25
**brought** [6] - 11:13,
11:23, 12:1, 20:20,
138:11, 138:19
**Brown** [7] - 3:10,
13:17, 17:9, 27:19,
29:19, 73:7, 141:24
**brown** [1] - 148:22
**BROWN** [28] - 1:10,
3:9, 4:7, 7:23, 17:10,
17:17, 22:22, 40:1,
94:21, 143:8,
143:13, 143:18,
143:25, 144:19,
145:3, 145:15,
146:6, 146:12,
146:18, 147:3,
148:2, 148:6,

148:12, 148:24,
149:20, 149:22,
150:7, 150:21
**building** [1] - 140:22
**bulk** [1] - 64:6
**burden** [3] - 30:16,
36:18, 142:24
**Bureau** [1] - 41:10
**business** [10] - 47:23,
118:18, 146:22,
146:24, 146:25,
147:4, 147:24,
149:13, 149:14,
150:2
**busy** [2] - 19:7, 56:23
**buy** [2] - 45:19, 50:6
**buying** [1] - 46:5
**buzzwords** [1] - 5:14
**BY** [26] - 41:11, 45:6,
53:19, 58:25, 60:5,
73:17, 86:19, 87:16,
89:1, 91:12, 94:4,
95:17, 98:25,
104:24, 109:25,
117:8, 117:21,
118:11, 119:3,
128:10, 129:23,
131:21, 134:4,
138:18, 138:25,
139:16

## C

**Cabanas** [1] - 26:25
**Cabanas'** [1] - 35:19
**calculate** [1] - 55:17
**calendar** [1] - 32:24
**cannot** [8] - 5:8, 74:4,
74:7, 74:10, 74:13,
79:22, 87:10, 130:21
**capacity** [1] - 62:1
**capture** [1] - 83:23
**captures** [1] - 83:25
**career** [3] - 26:3,
70:19, 101:6
**careerism** [1] - 23:15
**carry** [1] - 142:23
**case** [161] - 5:6, 5:8,
5:18, 6:2, 6:3, 6:7,
6:9, 7:12, 7:15, 7:17,
8:2, 8:6, 8:12, 8:15,
8:17, 8:18, 8:24, 9:4,
9:6, 9:13, 9:14, 9:24,
10:3, 10:4, 10:9,
11:3, 11:11, 11:18,
11:21, 11:22, 11:23,
11:25, 12:1, 12:3,
12:8, 12:9, 12:15,
12:21, 12:22, 12:24,
13:5, 13:12, 13:15,

13:24, 14:6, 14:10,
14:22, 15:6, 15:10,
15:15, 16:6, 16:17,
17:16, 17:19, 19:5,
19:9, 19:13, 19:23,
20:18, 20:19, 20:21,
21:13, 21:20, 21:22,
21:23, 22:17, 22:18,
23:10, 23:13, 23:15,
24:4, 24:5, 24:9,
24:20, 25:1, 25:2,
25:3, 25:6, 25:7,
25:8, 25:9, 25:21,
26:3, 26:4, 27:25,
28:3, 28:5, 28:14,
28:16, 28:19, 28:22,
29:1, 29:18, 30:6,
30:14, 30:17, 30:24,
31:1, 31:3, 31:10,
31:11, 31:13, 31:14,
31:16, 31:21, 31:22,
31:23, 32:3, 32:5,
37:12, 44:23, 51:8,
51:14, 56:25, 57:22,
60:7, 62:12, 62:13,
65:18, 70:16, 84:16,
85:11, 88:12, 88:16,
96:15, 99:1, 100:5,
103:11, 103:12,
103:13, 105:24,
108:7, 114:20,
128:2, 134:16,
141:6, 142:3,
142:15, 143:9,
144:5, 147:11,
147:13, 147:17,
147:22, 148:19,
148:25, 149:6,
150:14, 150:17,
152:2, 153:4, 153:6,
154:4, 154:9, 155:19
**Case** [1] - 3:2
**cases** [27] - 5:19, 5:25,
12:6, 43:4, 43:6,
43:8, 56:17, 65:9,
70:8, 71:16, 78:11,
78:24, 96:17, 96:20,
99:10, 99:15, 100:3,
102:1, 102:10,
109:13, 138:10,
138:11, 140:2,
150:18, 151:2,
151:5, 151:9
**cashier** [2] - 50:8,
50:10
**categorically** [2] -
6:15, 144:6
**central** [1] - 16:13
**certain** [8] - 5:6, 6:1,
6:19, 8:22, 24:2,

24:4, 26:25, 121:7
**certainly** [10] - 11:10, 13:18, 16:9, 27:11, 29:24, 36:22, 130:17, 151:19, 152:2, 153:3
**certainty** [1] - 26:19
**CERTIFICATE** [1] - 157:1
**certification** [4] - 43:24, 43:25, 73:20, 73:24
**certifications** [4] - 43:20, 43:22, 43:24, 128:25
**certified** [1] - 102:21
**certify** [1] - 157:3
**chain** [9] - 65:24, 65:25, 66:1, 66:5, 66:8, 66:9, 66:10, 66:21, 85:14
**Chainalysis** [197] - 5:15, 5:16, 5:18, 9:5, 9:18, 14:4, 14:11, 14:25, 15:2, 16:1, 16:3, 16:4, 16:5, 16:10, 17:6, 19:20, 20:15, 21:16, 21:20, 21:22, 22:5, 22:19, 23:20, 24:25, 26:12, 27:1, 28:8, 43:19, 43:22, 43:25, 54:15, 55:18, 55:22, 55:25, 56:5, 56:7, 59:13, 59:15, 60:20, 60:21, 61:6, 61:21, 61:24, 62:10, 62:13, 62:16, 63:8, 63:10, 63:11, 63:17, 63:24, 64:6, 64:8, 69:12, 69:14, 69:17, 69:19, 70:25, 73:21, 73:25, 74:3, 74:6, 74:9, 74:12, 74:15, 74:20, 74:23, 75:1, 75:19, 75:23, 76:1, 76:3, 76:8, 76:10, 77:2, 77:6, 77:10, 78:10, 78:14, 78:17, 78:20, 78:22, 79:1, 79:4, 79:7, 79:11, 79:20, 79:24, 80:25, 81:2, 81:4, 89:21, 94:7, 94:9, 94:10, 95:24, 101:9, 101:15, 101:25, 102:1, 102:3, 102:6, 102:23, 102:25, 103:2, 103:8, 106:4, 107:18, 107:21, 108:5, 108:9,

110:10, 110:15, 112:14, 112:17, 113:24, 114:15, 114:23, 114:24, 115:3, 115:4, 117:9, 117:23, 118:12, 118:18, 119:7, 119:8, 119:10, 119:14, 119:15, 119:20, 119:23, 120:1, 120:3, 120:4, 120:6, 120:8, 120:10, 120:12, 120:19, 121:6, 121:14, 121:19, 122:13, 122:20, 122:25, 123:4, 123:20, 124:7, 124:11, 125:8, 127:15, 127:25, 128:13, 128:18, 128:25, 129:12, 129:15, 130:10, 130:16, 130:19, 131:4, 131:10, 131:15, 131:22, 132:1, 132:3, 132:4, 132:8, 132:11, 132:16, 133:17, 134:6, 134:8, 134:12, 134:17, 134:22, 134:25, 135:5, 135:16, 135:22, 136:1, 136:4, 138:19, 138:21, 139:4, 139:19, 139:22, 139:23, 140:6, 140:7, 140:11, 141:16, 154:22
**Chainalysis's** [12] - 16:2, 16:8, 21:20, 56:13, 62:19, 89:17, 117:24, 123:24, 127:24, 130:24, 132:10, 134:10
**challenge** [2] - 36:18, 37:12
**challenged** [2] - 13:6, 24:18
**challenging** [4] - 22:24, 36:20, 38:23, 143:14
**chance** [1] - 36:11
**change** [19] - 50:3, 50:10, 50:24, 66:4, 66:6, 66:7, 77:20, 90:19, 90:20, 106:21, 106:24, 107:7, 107:9, 111:1,

113:4, 114:9, 137:9
**changes** [1] - 53:21
**changing** [1] - 10:22
**charged** [4] - 20:19, 20:21, 141:15, 149:1
**chart** [16] - 61:11, 61:14, 61:20, 65:12, 65:14, 65:15, 65:17, 67:14, 68:3, 68:4, 69:20, 71:7, 71:8, 83:1, 91:17, 92:4
**Chaumian** [1] - 78:19
**check** [6] - 13:1, 53:15, 56:3, 73:6, 84:15, 84:25
**checked** [1] - 84:21
**checking** [1] - 16:7
**chief** [1] - 23:11
**child** [1] - 141:16
**CHRISTOPHER** [1] - 1:10
**Christopher** [1] - 3:10
**CI** [6] - 28:7, 60:9, 61:19, 62:22, 62:24, 87:23
**Ciphertrace** [1] - 101:10
**Circuit** [7] - 5:4, 7:15, 29:9, 29:14, 142:10
**circuit** [3] - 5:4, 5:5, 149:6
**circumstance** [1] - 23:12
**circumstances** [1] - 156:8
**citation** [1] - 24:20
**cite** [12] - 12:15, 58:7, 74:11, 79:18, 122:18, 122:24, 123:10, 126:5, 127:14, 128:5, 129:8, 147:11
**cited** [6] - 5:3, 7:15, 58:5, 130:22, 148:25, 151:1
**cites** [1] - 29:23
**civil** [1] - 147:22
**claim** [2] - 6:25, 20:24
**clarification** [2] - 111:9, 155:12
**clarify** [1] - 75:22
**classic** [1] - 153:6
**clause** [2] - 153:14, 153:17
**clear** [12] - 14:21, 17:3, 23:14, 35:19, 68:21, 69:12, 76:20, 108:12, 143:10, 147:5, 152:23, 156:2
**CLEAR** [1] - 23:24

**clearly** [1] - 92:14
**Clerk** [1] - 33:18
**clerk** [4] - 8:20, 39:14, 39:17, 94:19
**click** [1] - 48:6
**clients** [3] - 130:25, 132:11, 133:18
**cloaking** [1] - 7:11
**close** [1] - 31:7
**closer** [1] - 137:23
**cluster** [33] - 55:11, 59:15, 62:6, 62:12, 62:18, 62:19, 63:7, 63:9, 63:12, 63:13, 63:16, 63:17, 64:1, 65:6, 67:6, 71:1, 71:9, 78:20, 79:1, 79:3, 105:11, 110:6, 110:16, 111:4, 111:8, 111:12, 111:20, 112:6, 112:8, 113:2, 125:22, 126:12, 137:17
**clustered** [3] - 56:7, 118:8, 138:21
**clustering** [23] - 54:22, 55:4, 56:13, 75:25, 76:4, 78:12, 106:2, 106:4, 106:5, 107:22, 107:25, 108:1, 108:6, 108:10, 118:2, 118:5, 119:7, 121:7, 121:9, 121:11, 126:18, 127:2, 137:16
**clusters** [11] - 55:25, 61:6, 76:6, 108:25, 109:10, 113:7, 113:14, 114:20, 114:24, 134:13, 139:3
**co** [50] - 6:5, 18:4, 19:4, 19:17, 23:16, 39:25, 51:1, 77:14, 77:22, 78:4, 78:15, 79:1, 79:6, 79:16, 79:20, 105:15, 106:5, 107:13, 110:20, 112:9, 112:24, 113:1, 113:3, 113:21, 114:8, 121:14, 121:17, 122:5, 122:14, 122:20, 124:9, 125:2

126:23, 127:4, 127:8, 137:9, 137:20, 137:24, 138:2, 138:3
**co-counsel** [5] - 6:5, 18:4, 19:4, 19:17, 39:25
**co-counsel's** [1] - 23:16
**co-spend** [37] - 51:1, 77:22, 79:6, 105:15, 106:5, 107:13, 110:20, 112:9, 112:24, 113:1, 113:3, 113:21, 114:8, 121:14, 121:17, 121:25, 122:7, 123:4, 123:6, 123:7, 123:16, 123:24, 124:2, 124:4, 124:5, 124:9, 125:3, 126:20, 127:4, 127:8, 137:9, 137:20, 137:24, 138:2, 138:3
**co-spending** [5] - 77:14, 78:4, 78:15, 79:16, 79:20
**co-spends** [1] - 79:1
**co-spent** [1] - 126:23
**code** [4] - 72:25, 81:5, 122:14, 124:12
**codes** [1] - 68:11
**codified** [1] - 53:1
**coffee** [3] - 50:5, 50:6
**coffers** [2] - 91:23, 91:24
**cognitive** [1] - 34:5
**coin** [1] - 79:8
**Coinbase** [3] - 45:21, 101:10, 150:11
**coinjoin** [32] - 77:24, 78:1, 78:2, 78:4, 78:5, 78:14, 78:24, 79:2, 79:5, 79:8, 79:11, 79:15, 89:16, 89:17, 90:1, 90:16, 90:22, 91:8, 114:3, 114:4, 114:9, 114:11, 114:16, 114:18, 121:25, 122:1, 122:5, 122:14, 122:20, 124:9, 125:2
**coinjoins** [17] - 78:9, 78:19, 78:22, 79:7, 79:20, 89:19, 89:22, 89:23, 90:12, 90:23, 90:24, 121:16, 121:21, 121:22,

124:12, 124:19, 124:23

**colleagues** [3] - 4:14, 56:16, 135:15

**collect** [7] - 46:4, 46:6, 53:14, 117:5, 117:9, 119:9, 119:18

**collected** [1] - 25:4

**collection** [1] - 108:3

**collects** [1] - 119:14

**Columbia** [13] - 17:25, 18:5, 19:1, 144:16, 145:4, 145:25, 147:9, 147:14, 147:18, 147:19, 147:25, 148:9, 148:13

**COLUMBIA** [1] - 1:1

**combination** [1] - 106:16

**combinations** [1] - 145:17

**combine** [3] - 49:15, 67:19, 78:3

**combining** [1] - 67:24

**coming** [3] - 65:4, 67:3, 91:18

**comments** [1] - 4:11

**commercial** [6] - 54:15, 54:18, 54:20, 101:7, 101:9, 101:16

**commercially** [1] - 101:24

**common** [15] - 45:15, 45:16, 51:2, 67:23, 68:1, 76:21, 105:14, 106:2, 110:21, 110:22, 112:1, 122:7, 128:2, 137:9

**commonalities** [1] - 112:4

**commonly** [2] - 47:20, 123:7

**communicates** [1] - 54:5

**communications** [5] - 14:4, 19:20, 20:12, 20:14, 87:4

**communities** [1] - 103:22

**companies** [4] - 43:20, 103:24, 120:1, 131:23

**company** [2] - 63:22, 103:2

**compared** [1] - 61:5

**compel** [2] - 14:19, 16:25

**compelling** [8] - 5:11, 6:9, 13:20, 15:8,

29:8, 30:18, 31:3, 32:7

**competitor** [1] - 63:24

**complaint** [15] - 15:19, 16:13, 20:1, 20:5, 20:7, 20:10, 81:10, 81:15, 81:18, 81:19, 81:23, 82:4, 82:7, 82:8, 144:23

**complete** [3] - 57:11, 108:18, 157:5

**completed** [1] - 57:16

**compliance** [15] - 103:6, 116:9, 118:17, 129:15, 130:10, 130:25, 131:23, 132:5, 132:7, 132:10, 132:12, 132:16, 134:12, 136:2, 150:3

**compliant** [1] - 116:10

**complicated** [1] - 83:7

**comply** [3] - 34:13, 35:13, 37:16

**component** [1] - 99:6

**components** [3] - 97:25, 98:21, 100:18

**compulsion** [1] - 7:7

**computer** [8] - 35:8, 36:21, 37:4, 37:5, 38:11, 43:6, 47:18, 152:13

**computers** [2] - 37:6, 102:16

**concede** [1] - 17:19

**concepts** [1] - 45:8

**concern** [2] - 153:22, 153:24

**concerned** [3] - 153:7, 153:9, 153:11

**concerns** [2] - 21:7, 153:19

**conclude** [3] - 11:18, 34:8, 146:4

**conclusions** [4] - 36:2, 37:16, 38:13, 58:5

**conclusory** [2] - 58:9, 58:14

**concurrence** [2] - 143:17, 143:20

**concurring** [1] - 142:9

**conduct** [8] - 57:4, 64:19, 98:15, 100:10, 100:22, 147:24, 153:3, 153:5

**conducted** [4] - 35:6, 60:9, 112:14, 144:15

**conducting** [2] - 60:7, 92:22

**conferences** [2] - 43:18, 103:25

**confident** [1] - 92:3

**confirm** [5] - 87:3, 112:20, 129:2, 133:16, 146:13

**confirmation** [6] - 26:6, 26:8, 26:20, 26:21, 69:23, 129:3

**confirmed** [2] - 63:21, 124:4

**confirming** [1] - 113:5

**confirms** [2] - 84:20, 113:1

**conflicts** [1] - 33:21

**confront** [1] - 30:2

**confusion** [3] - 6:25, 7:1, 7:10

**connect** [1] - 131:18

**connected** [3] - 72:12, 72:16, 92:22

**Connection** [1] - 8:21

**connection** [1] - 130:18

**connects** [1] - 83:18

**conservative** [10] - 62:17, 63:11, 118:2, 118:5, 118:9, 118:13, 118:22, 119:7, 119:18, 138:14

**consider** [5] - 12:10, 124:19, 124:23, 133:14, 141:20

**considered** [2] - 12:17, 105:19

**consistent** [3] - 62:15, 76:4, 122:3

**consists** [1] - 147:3

**consolidate** [1] - 111:17

**consolidation** [4] - 111:14, 111:18, 111:23, 112:2

**conspiracy** [2] - 149:25, 150:20

**constitutes** [2] - 150:19, 157:4

**Constitution** [6] - 1:22, 15:9, 151:17, 153:15, 154:1, 157:11

**constitutional** [1] - 154:15

**construct** [1] - 49:11

**consultation** [2] - 11:25, 42:10

**contact** [2] - 14:18, 99:8

**contain** [1] - 47:21

**contained** [3] - 69:24, 71:1, 85:23

**containing** [2] - 109:9, 110:9

**contains** [4] - 30:9, 58:5, 62:8, 126:12

**contents** [1] - 93:4

**contest** [1] - 29:24

**context** [3] - 4:16, 51:22, 101:21

**continue** [1] - 47:1

**continued** [2] - 156:5

**contracting** [2] - 5:17, 6:4

**contracts** [2] - 120:13, 120:17

**contrary** [1] - 29:20

**contrasted** [1] - 149:7

**Contreras** [2] - 147:20, 148:21

**contribution** [1] - 88:12

**control** [4] - 33:14, 50:25, 56:12, 114:15

**controlled** [11] - 51:10, 60:14, 66:12, 67:10, 72:9, 77:21, 105:7, 105:11, 110:5, 110:11, 112:12

**controlling** [1] - 85:8

**controls** [6] - 15:23, 51:7, 78:6, 91:19, 121:22, 121:23

**controversial** [1] - 38:12

**convenient** [1] - 12:21

**conveniently** [1] - 52:11

**conversations** [2] - 28:1, 28:6

**converted** [2] - 68:11, 68:13

**convey** [1] - 52:19

**convinced** [1] - 31:8

**copy** [4] - 44:19, 57:16, 94:18, 104:11

**core** [1] - 20:22

**corner** [1] - 91:7

**corners** [3] - 143:13, 143:15, 151:3

**correct** [101] - 13:2, 13:18, 15:21, 17:14, 29:24, 49:17, 54:1, 54:12, 59:21, 62:4, 73:25, 74:21, 74:22, 74:24, 74:25, 76:11, 77:3, 77:7, 77:21, 78:7, 79:6, 79:16, 79:25, 80:22, 81:16,

81:18, 82:21, 82:22, 82:25, 83:5, 83:22, 84:4, 84:7, 84:11, 85:19, 85:24, 86:22, 86:25, 87:1, 88:5, 88:11, 88:17, 88:18, 94:7, 94:8, 95:2, 107:23, 109:3, 109:15, 113:20, 119:15, 119:16, 120:1, 120:2, 120:4, 120:5, 120:7, 120:14, 120:23, 120:24, 121:1, 121:2, 121:8, 121:14, 121:15, 121:17, 121:18, 121:21, 123:20, 123:21, 123:25, 124:9, 125:4, 126:20, 126:21, 128:12, 128:14, 128:21, 129:10, 129:15, 129:25, 130:5, 130:8, 130:10, 131:23, 132:8, 132:11, 132:21, 133:8, 134:9, 134:23, 136:20, 137:21, 138:1, 138:4, 138:5, 138:22, 140:7, 143:1, 145:19, 147:8

**corrected** [1] - 16:13

**correction** [2] - 17:18, 62:23

**correctly** [4] - 73:22, 119:8, 120:21, 125:22

**corresponding** [2] - 113:11, 113:18

**corroborate** [5] - 67:5, 70:8, 70:10, 112:8, 135:10

**corroborated** [3] - 135:6, 135:19, 136:11

**corroborating** [1] - 60:13

**corrupt** [1] - 130:3

**costs** [1] - 107:2

**counsel** [20] - 3:4, 3:5, 4:14, 6:5, 18:4, 19:4, 19:17, 19:19, 21:19, 22:3, 29:7, 32:10, 32:19, 33:3, 34:18, 39:25, 91:13, 92:9, 136:16, 155:2

**counsel's** [2] - 4:11, 23:16

**Count** [1] - 144:21
**count** [4] - 87:21,
145:13, 145:20
**country** [1] - 135:24
**counts** [4] - 145:13,
145:17, 149:19,
149:22
**couple** [2] - 75:22,
141:22
**course** [10] - 6:6, 11:6,
19:14, 23:4, 30:25,
102:4, 102:12,
102:13, 102:21
**courses** [1] - 44:1
**Court** [29] - 1:21, 1:21,
3:19, 4:8, 7:16, 9:22,
10:25, 11:6, 20:20,
21:4, 34:2, 36:17,
38:24, 75:6, 77:17,
130:2, 132:23,
133:13, 138:6,
142:12, 144:9,
144:12, 148:25,
149:4, 150:22,
151:20, 152:19,
155:1, 157:10
**court** [11] - 3:13, 19:8,
24:18, 29:11, 33:9,
40:11, 104:5, 108:2,
125:16, 149:6,
150:18
**COURT** [164] - 1:1,
3:8, 3:11, 3:14, 3:17,
7:20, 7:24, 8:1, 8:19,
9:7, 9:9, 10:1, 10:12,
10:16, 11:1, 11:8,
11:21, 12:12, 12:15,
13:1, 13:7, 13:13,
14:12, 15:2, 15:13,
16:1, 16:19, 16:22,
17:8, 17:12, 21:1,
21:15, 21:25, 22:11,
22:21, 24:10, 25:1,
26:8, 27:8, 27:14,
28:2, 28:15, 28:18,
29:2, 32:14, 32:25,
33:6, 33:18, 34:3,
34:6, 34:17, 35:2,
35:21, 36:14, 36:22,
37:3, 37:9, 37:14,
37:20, 37:25, 39:2,
39:7, 39:10, 40:2,
40:9, 40:17, 41:3,
45:2, 45:4, 52:18,
53:4, 53:18, 58:1,
58:15, 59:24, 60:2,
73:8, 73:11, 73:13,
86:11, 86:14, 86:17,
87:6, 87:14, 88:20,
88:23, 90:4, 90:21,

91:2, 91:10, 93:20,
93:23, 94:1, 94:14,
94:18, 94:22, 95:2,
95:10, 98:4, 104:20,
104:22, 109:19,
109:22, 115:20,
115:24, 116:3,
116:17, 116:21,
116:24, 117:1,
117:4, 117:13,
118:10, 118:25,
128:8, 129:20,
130:11, 131:2,
131:14, 131:20,
133:11, 138:9,
138:24, 139:13,
140:16, 140:19,
141:5, 141:10,
141:19, 143:12,
143:16, 143:21,
144:17, 145:2,
145:12, 145:21,
146:9, 146:15,
146:19, 147:23,
148:5, 148:10,
148:23, 149:19,
149:21, 150:5,
150:16, 150:24,
151:5, 151:9,
151:19, 151:25,
152:4, 153:8,
153:16, 153:23,
154:16, 155:3,
155:6, 155:9,
155:15, 156:8,
156:12, 157:1
**court's** [3] - 73:6,
93:19, 116:22
**Court's** [3] - 32:24,
40:25, 95:8
**Courthouse** [1] - 1:22
**courtroom** [1] -
130:19
**COURTROOM** [6] -
3:2, 39:20, 41:5,
41:8, 95:11, 95:14
**courts** [5] - 6:12,
143:13, 143:15,
147:5, 151:11
**covered** [1] - 81:7
**covers** [1] - 80:4
**Crawford** [3] - 29:23,
29:25, 30:10
**CRC** [2] - 1:21, 157:9
**create** [6] - 45:22,
49:7, 50:2, 79:11,
100:9, 114:19
**created** [2] - 102:11,
120:12
**creates** [2] - 50:10,

53:13
**credibility** [1] - 116:15
**crime** [8] - 146:22,
147:3, 148:8, 149:1,
149:3, 152:15,
152:21, 154:3
**Crimes** [1] - 145:9
**crimes** [1] - 148:7
**Criminal** [3] - 1:2, 3:2,
17:24
**criminal** [24] - 8:16,
11:21, 13:4, 15:18,
16:13, 20:1, 20:4,
20:7, 20:9, 35:22,
70:16, 81:10, 81:15,
81:19, 81:23, 82:4,
82:6, 82:7, 96:3,
113:23, 135:1,
144:23, 152:22,
154:14
**criminally** [1] - 130:7
**critical** [4] - 17:15,
25:6, 31:17, 37:11
**CROSS** [2] - 73:15,
119:1
**Cross** [2] - 2:6, 2:13
**cross** [14] - 15:7,
18:12, 19:23, 20:2,
20:6, 20:8, 20:11,
20:13, 27:12, 28:11,
28:14, 28:21, 38:22,
89:20
**cross-examination** [1]
- 38:22, 89:20
**CROSS-**
**EXAMINATION** [2] -
73:15, 119:1
**Cross-Examination**
- 2:6, 2:13
**cross-examine** [11] -
15:7, 19:23, 20:2,
20:6, 20:8, 20:11,
20:13, 27:12, 28:11,
28:14, 28:21
**cross-referencing** [1]
- 18:12
**CRR** [2] - 1:21, 157:9
**crucial** [2] - 115:14,
115:18
**cryptocurrencies** [1] -
47:17
**cryptocurrency** [30] -
42:6, 42:7, 44:1,
44:6, 44:14, 45:8,
45:12, 45:21, 45:23,
46:5, 46:23, 60:11,
96:18, 96:21, 96:22,
97:22, 98:11, 98:17,
98:24, 99:3, 99:5,
99:6, 99:13, 99:15,

99:25, 100:1,
100:13, 102:9,
104:6, 153:10
**Cryptocurrency** [2] -
41:18, 44:11
**CSV** [1] - 109:7
**CSVs** [1] - 59:19
**curious** [4] - 117:14,
133:14, 138:15,
142:16
**currency** [17] - 42:11,
42:15, 42:20, 42:23,
42:25, 43:2, 43:11,
44:9, 45:11, 45:12,
45:15, 46:2, 46:21,
67:20, 92:24, 93:14
**current** [5] - 19:22,
42:5, 42:7, 44:15,
103:8
**curriculum** [2] -
44:19, 104:12
**custodial** [2] - 83:11,
84:7
**customer** [3] - 46:16,
117:23, 150:11
**customers** [6] -
134:11, 134:19,
136:5, 140:9,
140:10, 140:13
**cut** [2] - 79:13
**CV** [2] - 42:24, 45:1
**cyber** [3] - 42:1, 43:18,
102:12
**cybercriminal** [2] -
43:7

## D

**D.C** [19] - 1:5, 8:12,
10:11, 10:25, 11:3,
11:4, 11:19, 12:3,
145:8, 146:20,
146:21, 147:1,
148:3, 148:11,
152:11, 152:22,
153:6, 157:11
**D.C.-specific** [1] -
148:20
**darknet** [14] - 22:5,
22:20, 43:10, 59:13,
64:3, 64:9, 97:3,
97:6, 99:7, 99:19,
99:22, 109:1, 113:8,
121:7
**DAT** [1] - 69:10
**data** [34] - 23:21, 52:6,
52:8, 52:12, 52:15,
54:10, 54:25, 55:18,
60:6, 67:25, 69:9,
70:6, 76:1, 80:22,

84:15, 84:22, 84:25,
101:22, 107:12,
108:2, 108:4,
110:15, 115:10,
115:14, 116:6,
116:7, 116:12,
117:5, 117:16,
125:16, 125:18,
136:11, 140:12
**database** [6] - 23:23,
23:24, 26:22, 84:23,
84:25, 85:1
**databases** [2] - 18:13,
23:25
**date** [7] - 33:19, 40:3,
42:23, 46:7, 46:18,
57:18, 92:18
**Dated** [1] - 157:7
**dates** [2] - 88:14,
146:13
**Daubert** [18] - 34:7,
34:15, 35:22, 36:11,
36:18, 37:10, 37:20,
38:25, 39:3, 40:20,
58:17, 58:19, 59:25,
60:3, 87:7, 133:14,
156:3, 156:5
**DC** [3] - 1:12, 1:14,
1:23
**de** [1] - 38:17
**DEA** [23] - 96:11,
96:16, 99:2, 99:5,
99:9, 99:11, 99:16,
99:17, 99:25,
100:13, 100:20,
101:6, 101:13,
101:25, 102:4,
102:8, 102:14,
102:20, 102:22,
102:23, 135:8,
138:24, 139:1
**DEA's** [1] - 102:11
**deadline** [1] - 155:2
**dealing** [2] - 46:1,
46:23
**deals** [1] - 78:14
**death** [1] - 17:3
**debate** [1] - 76:2
**debriefed** [1] - 135:13
**decade** [2] - 8:16,
96:21
**December** [2] - 19:6,
57:18
**decentralized** [2] -
45:13, 52:25
**decide** [3] - 90:16,
91:7, 150:22
**decided** [1] - 25:10
**deciding** [2] - 12:18,
143:4

**decision** [4] - 11:24, 20:21, 26:14, 31:11

**decisions** [2] - 15:6, 16:6

**declaration** [3] - 57:9, 82:6, 88:13

**defeats** [1] - 78:5

**defect** [2] - 144:4, 144:5

**defective** [1] - 152:25

**defendant** [7] - 5:6, 5:23, 29:10, 30:11, 71:4, 108:13, 148:17

**Defendant** [4] - 1:6, 1:15, 3:13, 3:16

**defendant's** [8] - 6:22, 29:12, 37:5, 65:6, 69:24, 92:5, 92:12, 149:5

**defendants** [4] - 6:13, 6:21, 135:14, 135:19

**defense** [55] - 4:11, 4:14, 5:11, 5:12, 5:18, 7:5, 7:18, 8:16, 10:15, 11:10, 13:6, 15:9, 17:11, 18:15, 18:17, 19:19, 19:21, 20:2, 21:19, 22:2, 22:23, 23:14, 27:22, 29:20, 30:8, 30:15, 30:18, 31:5, 31:14, 32:1, 32:9, 32:15, 32:18, 33:3, 34:12, 35:12, 35:13, 35:15, 35:23, 36:7, 36:20, 38:23, 58:3, 91:13, 92:9, 136:16, 137:16, 142:10, 145:4, 145:6, 145:11, 155:1, 155:13, 155:24, 156:6

**defense's** [1] - 141:25

**defining** [1] - 82:20

**definitely** [2] - 140:24, 141:1

**degree** [1] - 96:4

**degrees** [2] - 41:20, 96:1

**deliberately** [2] - 150:9

**deliberating** [2] - 33:2, 39:19

**deliberative** [1] - 6:20

**delicti** [1] - 153:2

**demanding** [4] - 29:16, 30:6, 30:16, 31:8

**demo** [2] - 22:3, 22:19

**demonstrate** [1] -

13:20

**denial** [1] - 43:9

**denomination** [1] - 50:9

**DEPARTMENT** [1] - 1:13

**Department** [12] - 4:24, 5:17, 6:14, 6:18, 8:7, 10:2, 10:21, 11:13, 12:16, 19:4, 41:17, 148:4

**dependent** [2] - 126:18, 140:8

**depict** [1] - 83:6

**depicting** [1] - 83:5

**depiction** [1] - 83:21

**deployed** [1] - 100:14

**deposit** [4] - 91:21, 91:22, 111:16, 112:15

**deposited** [2] - 65:1, 68:9

**deposits** [1] - 46:21

**deputy** [1] - 39:17

**Deputy** [1] - 33:18

**DEPUTY** [6] - 3:2, 39:20, 41:5, 41:8, 95:11, 95:14

**derived** [2] - 101:24, 103:24

**describe** [11] - 21:1, 41:19, 43:14, 59:10, 60:6, 67:9, 80:3, 110:3, 110:4, 111:21, 132:23

**described** [13] - 27:18, 27:19, 28:3, 31:15, 32:3, 51:6, 56:25, 67:13, 73:3, 77:16, 89:20, 113:18, 114:8

**describing** [1] - 107:12

**description** [1] - 27:15

**design** [2] - 27:5, 141:1

**designed** [2] - 141:2, 141:7

**desk** [1] - 8:8

**destination** [3] - 71:21, 105:5, 137:13

**detail** [3] - 36:8, 72:11, 90:8

**detailed** [5] - 22:8, 35:8, 42:5, 61:9, 64:16

**detailing** [2] - 57:11, 108:19

**details** [2] - 134:16, 147:12

**detect** [4] - 78:9,

89:24, 91:9, 114:15

**detected** [2] - 78:24, 79:11

**detection** [2] - 79:20, 89:17

**deter** [1] - 137:13

**determination** [4] - 6:7, 6:18, 12:11, 75:11

**determinations** [2] - 55:6, 75:9

**determine** [8] - 48:2, 50:25, 57:5, 61:25, 101:15, 105:13, 112:23, 115:6

**determined** [4] - 100:2, 110:5, 110:10, 110:13

**determines** [1] - 79:5

**determining** [5] - 11:17, 34:14, 50:21, 50:23, 106:2

**deterministic** [4] - 24:21, 26:23, 75:20, 122:8

**developed** [2] - 120:4, 146:2

**developer** [1] - 122:16

**developments** [1] - 103:17

**device** [2] - 47:11, 86:2

**devices** [3] - 86:5, 93:9, 93:11

**Devin** [2] - 19:25, 20:8

**dictate** [1] - 3:19

**difference** [1] - 132:23

**different** [37] - 22:20, 23:5, 23:20, 23:23, 25:2, 26:13, 38:8, 38:18, 49:3, 59:7, 71:17, 72:24, 72:25, 81:15, 89:13, 97:24, 98:21, 99:24, 100:17, 102:1, 103:3, 103:5, 103:20, 103:22, 105:12, 106:1, 108:25, 109:7, 110:18, 112:21, 115:8, 116:7, 122:5, 122:11, 135:23, 137:8

**difficult** [3] - 89:24, 91:9, 114:10

**digital** [8] - 16:18, 45:12, 97:17, 106:14, 106:16, 110:25, 125:10, 127:18

**DIRECT** [2] - 41:9, 95:15

**Direct** [2] - 2:4, 2:11

**direct** [13] - 23:3, 23:19, 44:17, 57:14, 59:14, 65:12, 105:21, 110:1, 122:17, 132:20, 132:25, 133:1, 133:3

**directed** [1] - 4:1

**directing** [6] - 68:2, 104:10, 109:6, 113:17, 126:9, 126:15

**directly** [8] - 16:15, 23:8, 24:14, 24:17, 24:24, 65:6, 133:2, 139:5

**director** [1] - 103:9

**dirty** [1] - 145:1

**disadvantage** [1] - 143:20

**disagree** [2] - 24:12, 80:20

**disagreement** [1] - 144:13

**disclose** [1] - 36:1

**disclosed** [2] - 35:24, 36:6

**disclosure** [2] - 155:2, 155:24

**disclosures** [3] - 34:12, 35:1, 156:9

**discovered** [1] - 18:25

**discovery** [9] - 9:17, 9:20, 16:21, 22:17, 28:7, 30:25, 152:8, 152:10, 152:24

**discuss** [3] - 15:19, 21:18, 58:20

**discussed** [3] - 59:14, 90:8, 137:17

**discusses** [1] - 122:19

**discussing** [1] - 127:15

**discussion** [1] - 149:4

**dismiss** [10] - 39:15, 40:4, 40:19, 141:23, 142:13, 142:14, 142:20, 144:2, 144:3, 144:8

**displayed** [3] - 55:22, 76:3, 76:8

**displays** [2] - 61:15, 71:8

**dispute** [1] - 144:14

**disputing** [2] - 145:5, 145:11

**disqualification** [1] - 6:23

**disqualify** [7] - 5:1, 12:1, 13:14, 13:19, 28:15, 28:18, 28:20

**disqualifying** [1] - 29:17

**disrupting** [1] - 124:9

**distinction** [3] - 62:5, 76:20, 132:19

**distributed** [2] - 8:5, 43:9

**District** [13] - 17:25, 18:5, 19:1, 144:15, 145:4, 145:24, 147:9, 147:14, 147:18, 147:19, 147:25, 148:9, 148:13

**district** [4] - 4:13, 12:9, 142:19, 147:6, 147:7, 147:9, 151:2, 151:9, 151:11, 154:11, 154:12, 154:14

**DISTRICT** [3] - 1:1, 1:1, 1:8

**districts** [2] - 148:15, 148:16

**divided** [1] - 121:4

**division** [2] - 19:8, 69:24

**Division** [1] - 17:24

**divulging** [1] - 134:15

**document** [2] - 44:21, 104:14

**documented** [2] - 26:6, 92:15

**documents** [3] - 91:20, 108:3, 125:17

**Dogecoin** [1] - 45:18

**DOJ** [7] - 1:11, 9:19, 9:23, 10:7, 15:6, 16:12, 21:5

**DOJ's** [1] - 17:5

**dollars** [1] - 68:13

**domestic** [1] - 96:16

**dominion** [1] - 96:3

**done** [25] - 9:5, 10:18, 13:23, 16:15, 22:8, 22:9, 22:10, 22:13, 22:14, 22:23, 22:24, 24:1, 26:9, 30:4, 35:18, 97:22, 122:2, 127:20, 135:15, 140:11, 140:22, 155:6, 155:17, 156:3

**dots** [1] - 83:18

**doubt** [2] - 144:1, 153:8

**down** [7] - 23:4, 23:6, 31:25, 56:6, 99:23,

126:16, 141:12
**download** [1] - 47:8
**Dr** [3] - 33:24, 33:25, 35:19
**draft** [1] - 149:10
**draw** [2] - 37:16, 61:11
**drawn** [1] - 38:13
**driving** [1] - 9:19
**drop** [1] - 131:19
**Dror** [3] - 32:21, 33:15, 33:24
**Dror's** [1] - 33:25
**drug** [3] - 25:2, 96:9, 99:19
**drug-trafficking** [1] - 25:2
**drugs** [2] - 99:18, 100:2
**during** [5] - 21:22, 22:24, 101:12, 101:19, 101:25
**duty** [2] - 149:8, 149:16

# E

**early** [7] - 18:20, 33:19, 70:13, 70:16, 70:17, 70:21, 70:23
**ease** [1] - 40:25
**easier** [1] - 34:8
**easy** [1] - 55:1
**ecosystem** [3] - 98:14, 115:15, 116:16
**educated** [1] - 85:9
**educational** [2] - 41:19, 95:25
**effect** [2] - 7:8, 14:11
**effective** [1] - 103:19
**efforts** [2] - 29:12, 140:23
**eight** [8] - 4:13, 19:21, 19:22, 36:2, 43:5, 43:17, 108:10, 124:22
**either** [7] - 10:19, 25:22, 25:23, 30:17, 100:7, 135:13, 146:4
**EKELAND** [81] - 1:15, 3:12, 7:25, 8:2, 9:1, 9:8, 9:11, 10:6, 10:14, 10:24, 11:4, 11:16, 12:6, 12:13, 12:19, 13:6, 13:10, 14:3, 14:15, 15:4, 15:18, 16:5, 16:21, 16:24, 24:12, 26:5, 26:11, 27:11, 27:20, 28:4, 28:17, 28:21, 33:13, 34:23, 36:13,

142:7
**ended** [2] - 13:3, 130:3
**enforced** [1] - 53:2
**Enforcement** [2] - 41:18, 145:10
**enforcement** [15] - 18:13, 24:2, 42:6, 42:8, 44:12, 96:9, 98:3, 98:7, 98:13, 113:24, 114:12, 118:4, 118:17, 135:22, 148:7
**engage** [2] - 4:23, 144:9
**enhances** [1] - 7:11
**ensued** [1] - 99:9
**ensuing** [1] - 129:18
**ensure** [1] - 141:7
**entail** [6] - 42:6, 43:14, 43:24, 100:3, 103:12, 103:13
**entailed** [1] - 96:24
**entails** [1] - 42:8
**enter** [2] - 120:13, 155:1
**entered** [1] - 41:22
**entering** [1] - 24:20
**entire** [11] - 49:22, 49:25, 50:9, 85:1, 93:5, 102:15, 107:3, 122:23, 140:12
**entirely** [3] - 6:8, 16:17
**entities** [1] - 125:17
**entitled** [2] - 27:11, 28:11
**entity** [15] - 16:6, 55:7, 55:13, 76:6, 77:21, 78:6, 78:21, 78:25, 105:8, 105:11, 105:13, 112:12, 113:1, 118:4, 133:2
**enumerated** [1] - 113:8
**equal** [1] - 122:2
**equals** [1] - 26:24
**equation** [1] - 26:24
**error** [12] - 15:20, 58:10, 74:2, 117:6, 117:10, 117:19, 119:23, 133:8, 134:6, 139:23, 140:12, 141:3
**errors** [4] - 15:24, 117:18, 117:23, 117:25
**escapes** [1] - 42:23
**essential** [2] - 31:13, 153:5

**essentially** [18] - 18:10, 19:13, 27:20, 27:22, 29:19, 30:11, 48:7, 52:23, 53:3, 53:16, 58:13, 59:7, 74:14, 80:21, 85:16, 90:25, 114:11, 141:15
**establish** [3] - 5:10, 15:14, 147:2
**established** [2] - 7:18, 149:17
**establishes** [1] - 58:11
**estimate** [4] - 53:20, 56:19, 99:10, 104:3
**Ethereum** [1] - 45:17
**etymology** [1] - 75:15
**Europe** [1] - 141:13
**evaluating** [1] - 34:9
**evasion** [2] - 147:12, 147:13
**event** [3] - 142:6, 146:21, 147:14
**events** [1] - 11:12
**everywhere** [1] - 26:17
**evidence** [46] - 13:21, 14:5, 22:25, 23:1, 23:2, 23:8, 23:19, 25:4, 25:14, 25:22, 25:23, 27:8, 29:11, 30:5, 30:20, 31:2, 31:4, 31:19, 32:6, 40:19, 40:21, 86:7, 90:11, 101:18, 101:19, 128:12, 130:18, 130:20, 130:23, 130:24, 131:3, 141:19, 142:11, 142:23, 143:3, 143:6, 145:22, 146:1, 146:7, 146:25, 150:15, 151:3, 152:8, 152:10
**evidentiary** [1] - 145:7
**exact** [2] - 54:10, 134:5
**exactly** [3] - 24:8, 146:13, 146:17
**exaggeration** [1] - 17:17
**EXAMINATION** [8] - 41:9, 73:15, 88:24, 94:2, 95:15, 119:1, 134:2, 139:14
**examination** [3] - 38:22, 38:25, 89:20
**Examination** [8] - 2:4,

2:6, 2:7, 2:9, 2:11, 2:13, 2:14, 2:16
**examine** [12] - 15:7, 19:23, 20:2, 20:6, 20:8, 20:11, 20:13, 27:12, 28:11, 28:12, 28:14, 28:21
**example** [11] - 15:13, 19:20, 48:24, 50:5, 70:2, 76:17, 78:4, 78:20, 106:25, 131:12, 143:5
**examples** [8] - 52:2, 78:16, 78:18, 78:23, 114:2, 147:10, 147:11, 149:8
**except** [2] - 58:9, 154:12
**exchange** [32] - 45:20, 45:25, 46:4, 46:5, 46:14, 46:15, 46:25, 47:1, 47:4, 47:6, 47:9, 56:2, 56:4, 56:5, 56:8, 56:11, 56:12, 65:2, 65:10, 83:11, 85:11, 85:12, 85:13, 91:19, 91:21, 91:23, 91:24, 92:2, 118:3, 118:7, 130:3
**exchanges** [23] - 45:21, 46:6, 46:11, 46:12, 64:21, 65:7, 67:21, 67:25, 85:14, 91:15, 91:18, 92:24, 93:14, 98:10, 98:12, 102:6, 115:12, 115:13, 116:10, 117:11, 136:2, 150:12, 150:13
**exclude** [2] - 4:3, 34:1
**exclusive** [1] - 31:2
**excuse** [1] - 14:25
**excused** [3] - 95:2, 140:17, 140:18
**Excygent** [1] - 75:4
**executed** [1] - 135:6
**executing** [1] - 26:24
**exhaust** [1] - 29:10
**exhausted** [1] - 30:19
**Exhibit** [29] - 2:19, 2:20, 2:21, 2:22, 44:18, 45:1, 45:4, 45:5, 57:15, 57:25, 58:21, 58:24, 59:4, 59:23, 59:24, 60:2, 60:4, 104:10, 104:19, 104:22, 104:23, 105:22, 105:23, 108:22, 109:6, 109:17,

**Ekeland** [22] - 1:16, 2:6, 2:9, 2:13, 2:16, 3:12, 7:20, 7:24, 17:14, 24:10, 33:6, 34:21, 36:22, 37:9, 39:2, 73:11, 89:2, 118:25, 139:13, 141:10, 150:24, 155:6
**Ekeland's** [1] - 142:1
**elect** [1] - 47:3
**electronic** [2] - 93:9, 93:11
**element** [5] - 13:24, 143:10, 147:6, 147:21, 151:21
**elements** [3] - 31:13, 82:7, 147:17
**elicit** [2] - 4:21, 5:14
**Elizabeth** [2] - 95:7, 95:22
**ELIZABETH** [6] - 2:10, 95:16, 95:22, 119:2, 134:3, 139:15
**Elliptic** [1] - 101:10
**ELMO** [1] - 94:23
**elsewhere** [4] - 5:8, 13:22, 70:11, 72:15
**email** [10] - 22:17, 46:8, 46:19, 60:12, 68:6, 68:10, 69:24, 93:4, 93:6, 94:21
**emails** [4] - 69:23, 70:7, 93:3, 93:5
**embarked** [1] - 94:9
**emphasize** [2] - 22:22, 92:21
**employed** [1] - 18:16
**employees** [1] - 19:22
**end** [3] - 19:3, 96:19,

109:22
**exhibit** [3] - 41:1, 44:21, 95:9
**EXHIBITS** [1] - 2:18
**exhibits** [3] - 40:25, 94:18, 109:19
**Exhibits** [2] - 2:23, 109:24
**exist** [2] - 60:24, 123:20
**existence** [1] - 99:24
**existing** [1] - 89:3
**exists** [1] - 112:21
**expect** [3] - 4:21, 5:14, 155:12
**expected** [1] - 6:17
**experience** [14] - 35:4, 44:22, 55:21, 62:15, 70:19, 74:16, 89:16, 89:19, 104:15, 128:13, 128:20, 128:24, 129:2, 138:10
**expert** [31] - 15:21, 19:24, 26:20, 35:5, 35:12, 35:16, 36:1, 42:9, 57:11, 81:11, 87:12, 88:1, 104:8, 109:17, 120:23, 121:1, 122:23, 124:18, 124:19, 124:24, 125:21, 126:7, 130:22, 155:2, 155:18, 155:21, 155:24, 156:2, 156:4, 156:6, 156:9
**expertise** [1] - 42:16
**experts** [11] - 26:19, 34:13, 34:15, 35:14, 35:18, 36:16, 36:19, 37:1, 155:25, 156:1
**explain** [25] - 10:17, 35:3, 42:14, 43:23, 45:10, 47:12, 50:15, 51:23, 61:13, 61:20, 65:25, 69:5, 71:6, 71:14, 91:15, 95:25, 96:11, 104:25, 107:24, 110:13, 117:17, 117:22, 126:24, 141:6
**explained** [1] - 18:1
**explaining** [1] - 44:2
**explanation** [1] - 7:21
**explicitly** [1] - 151:16
**explore** [2] - 23:5, 133:21
**explorer** [8] - 23:21, 51:18, 51:24, 55:23,

69:6, 69:20, 101:1, 124:3
**explorers** [4] - 51:25, 54:4, 76:25, 107:19
**export** [1] - 147:16
**exported** [1] - 60:20
**exposed** [1] - 101:7
**exposure** [3] - 132:25, 133:1, 133:3
**extensive** [1] - 60:9
**extensively** [1] - 35:11
**extent** [7] - 22:6, 36:17, 38:24, 55:10, 81:2, 117:22, 117:24
**external** [5] - 44:10, 85:17, 86:1, 87:2, 87:9
**eyewitness** [1] - 87:20
**eyewitnesses** [1] - 154:10

## F

**F.2d** [2] - 29:8, 29:13
**face** [2] - 142:7, 151:6
**fact** [36] - 7:9, 9:4, 9:23, 10:14, 11:5, 11:9, 11:20, 12:10, 12:17, 12:20, 13:2, 13:24, 14:15, 15:14, 15:16, 17:4, 24:3, 29:21, 29:23, 54:6, 66:21, 67:3, 76:2, 89:9, 92:11, 118:19, 122:23, 131:6, 131:12, 143:1, 145:5, 145:8, 146:7, 146:8, 146:23, 147:1
**factor** [1] - 154:9
**facts** [11] - 10:17, 10:21, 10:22, 14:3, 14:14, 30:14, 144:4, 144:14, 145:10, 145:15, 154:20
**factual** [3] - 31:16, 38:10, 76:7
**failed** [1] - 34:13
**failing** [5] - 149:9, 149:14, 150:5
**failure** [9] - 131:1, 131:3, 145:25, 146:19, 147:15, 148:14, 149:1, 149:23, 150:19
**fair** [12] - 36:23, 52:14, 66:23, 75:10, 82:9, 89:4, 89:7, 121:3, 128:9, 133:6, 136:18, 139:8
**fairly** [1] - 34:17

**faith** [1] - 4:19
**fall** [1] - 144:4
**false** [20] - 74:5, 74:8, 90:2, 114:19, 116:18, 116:19, 117:6, 117:10, 118:14, 119:9, 119:14, 119:19, 138:11, 138:14, 138:16, 138:20, 139:10, 141:1, 141:3, 141:12
**familiar** [11] - 72:22, 72:23, 75:17, 82:18, 84:12, 84:13, 89:10, 89:20, 94:5, 129:12, 143:19
**far** [6] - 5:20, 9:19, 30:4, 32:5, 109:7, 133:15
**fashion** [1] - 61:20
**favorite** [1] - 153:4
**FBI** [53] - 8:3, 8:5, 8:17, 8:21, 8:23, 9:4, 9:12, 10:8, 12:7, 12:8, 12:23, 13:3, 13:12, 14:6, 14:9, 14:16, 14:24, 15:5, 15:7, 15:10, 16:3, 17:4, 17:15, 18:3, 18:6, 18:14, 18:16, 18:21, 18:23, 18:25, 21:3, 21:12, 21:21, 22:1, 23:9, 26:21, 28:22, 28:24, 42:2, 42:3, 42:19, 42:21, 43:1, 43:3, 43:16, 44:7, 44:10, 56:21, 60:9, 61:17, 62:2
**FBI's** [3] - 42:11, 42:15, 44:9
**feature** [1] - 76:21
**features** [4] - 54:21, 72:25, 112:5, 137:10
**February** [2] - 18:20, 18:23
**federal** [5] - 8:16, 13:4, 24:18, 28:25, 104:5
**Federal** [1] - 41:16
**feedback** [7] - 116:17, 117:7, 117:10, 133:18, 134:10, 135:4, 136:4
**fees** [1] - 48:17
**few** [1] - 5:20
**field** [10] - 18:22, 21:10, 35:4, 42:16, 44:8, 89:13, 97:2, 103:17

**Field** [1] - 18:24
**Figure** [1] - 83:12
**figure** [4] - 40:10, 49:9, 83:2, 98:16
**figured** [1] - 70:22
**file** [5] - 38:11, 52:9, 52:15, 69:10, 149:9
**files** [4] - 37:5, 37:6, 59:8, 109:8
**filing** [1] - 16:25
**final** [2] - 155:18, 155:21
**finally** [1] - 6:22
**Financial** [1] - 145:9
**financial** [10] - 46:1, 67:25, 96:7, 97:1, 98:2, 98:6, 98:7, 98:10, 136:13, 148:7
**FinCEN** [6] - 145:9, 148:8, 148:15, 149:15, 149:23, 150:1
**FinCEN's** [1] - 150:2
**findings** [2] - 64:14, 108:18
**fine** [9] - 32:14, 32:20, 39:7, 39:9, 41:3, 94:1, 95:10, 98:4, 130:16
**fingerprint** [6] - 26:22, 79:9, 91:4, 106:14, 106:16, 110:25
**fingerprints** [3] - 106:12, 125:11, 127:18
**finish** [1] - 32:13
**finished** [1] - 116:23
**firms** [1] - 116:9
**first** [35] - 4:6, 5:11, 5:18, 9:6, 9:11, 9:12, 16:9, 17:22, 22:11, 24:16, 24:17, 25:11, 27:16, 34:7, 40:12, 40:14, 47:24, 49:2, 54:21, 54:23, 61:3, 61:17, 70:25, 81:9, 88:12, 96:13, 96:20, 98:22, 99:1, 99:22, 100:24, 110:20, 121:13, 123:12, 142:25
**firsthand** [1] - 24:4
**five** [7] - 35:17, 35:18, 40:13, 41:23, 49:5, 49:8, 49:14
**fixed** [1] - 149:2
**fixes** [1] - 149:2
**flagged** [2] - 117:18, 117:23
**flagging** [1] - 116:13

**flawed** [1] - 16:2
**Fletcher** [3] - 142:9, 143:17, 143:22
**floor** [1] - 3:24
**Floor** [1] - 1:17
**flow** [12] - 22:24, 55:17, 65:15, 83:6, 83:17, 83:25, 96:25, 105:4, 108:10, 113:15, 115:17, 137:12
**fly** [2] - 152:3, 154:6
**focus** [4] - 70:16, 70:17, 99:17, 136:18
**focused** [3] - 22:24, 44:13, 89:5
**focuses** [1] - 103:11
**Fog** [94] - 8:4, 14:17, 17:22, 18:10, 19:17, 19:18, 21:2, 21:8, 22:4, 22:20, 25:18, 28:23, 56:25, 57:3, 57:6, 59:15, 60:14, 60:17, 60:20, 60:25, 61:15, 61:18, 61:19, 61:22, 61:25, 62:3, 62:6, 62:7, 62:9, 62:10, 62:12, 62:14, 62:19, 62:20, 62:21, 62:22, 62:25, 63:1, 63:3, 63:4, 63:7, 63:17, 64:1, 64:2, 64:10, 65:4, 65:6, 65:16, 65:18, 65:20, 65:22, 67:3, 67:6, 67:9, 67:17, 70:14, 70:24, 71:1, 71:9, 71:12, 71:24, 72:6, 72:9, 72:13, 72:16, 74:24, 86:8, 86:22, 86:25, 87:5, 90:1, 90:9, 90:10, 108:7, 109:1, 110:4, 110:5, 110:6, 110:11, 110:14, 110:16, 111:8, 111:12, 111:20, 112:5, 112:12, 112:14, 126:10, 126:12, 126:18, 137:17, 150:9, 152:18, 154:6
**fog** [1] - 111:4
**follow** [12] - 25:10, 90:4, 94:19, 97:19, 98:20, 100:15, 101:4, 115:17, 117:1, 117:13, 137:12, 137:15
**follow-up** [2] - 90:4, 117:1

**following** [3] - 67:8, 95:5, 117:4
**FOR** [1] - 1:1
**force** [1] - 43:19
**foregoing** [1] - 157:4
**foreign** [1] - 96:16
**forensic** [3] - 25:23, 26:7, 96:4
**forensically** [1] - 37:18
**forensics** [12] - 16:16, 16:18, 16:20, 25:8, 26:10, 26:18, 31:23, 36:19, 36:21, 37:4
**forfeiture** [1] - 147:22
**form** [4] - 81:15, 97:17, 122:13, 148:10
**former** [2] - 19:22, 148:21
**forming** [1] - 66:5
**forth** [5] - 6:12, 44:21, 93:16, 104:14, 106:3
**fortunate** [1] - 101:8
**forum** [1] - 12:21
**forums** [1] - 103:22
**forward** [3] - 55:1, 66:4, 142:10
**forwarding** [1] - 66:7
**founders** [1] - 131:6
**four** [12] - 35:18, 63:6, 63:9, 143:13, 143:15, 144:20, 145:17, 145:24, 146:4, 146:10, 146:12, 151:3
**fourth** [1] - 55:15
**frame** [1] - 4:10
**framers** [2] - 153:7, 153:8
**frames** [1] - 4:16
**framework** [2] - 4:22, 5:12
**fraud** [1] - 131:16
**free** [1] - 88:1
**Freeh** [3] - 8:20, 12:22, 13:2
**frequently** [6] - 46:12, 55:11, 56:1, 56:16, 64:23, 117:18
**fresh** [1] - 23:1
**Fried** [1] - 130:4
**friends** [1] - 90:15
**front** [5] - 44:17, 59:5, 104:11, 110:2, 126:7
**FTX** [10] - 129:13, 129:15, 129:19, 129:24, 130:2, 130:3, 130:5, 130:10, 131:3, 131:6

**full** [14] - 39:18, 42:4, 53:6, 53:20, 53:22, 53:24, 54:1, 54:5, 54:9, 54:11, 81:2, 84:3, 157:5
**full-time** [1] - 42:4
**function** [3] - 6:8, 20:22, 100:6
**fundamental** [1] - 97:18
**fundamentals** [1] - 44:1
**funds** [78] - 22:4, 22:20, 47:1, 47:3, 47:9, 47:22, 47:24, 47:25, 48:2, 48:5, 48:16, 48:20, 51:21, 56:6, 57:4, 57:5, 57:9, 61:19, 62:1, 62:24, 62:25, 64:19, 65:3, 65:1, 65:4, 65:5, 65:9, 65:15, 65:19, 65:21, 66:7, 67:2, 68:5, 68:7, 68:11, 68:19, 71:1, 71:8, 71:11, 71:15, 71:16, 71:21, 72:2, 72:7, 83:6, 83:17, 83:25, 84:4, 84:18, 85:12, 91:21, 97:19, 98:20, 100:13, 100:15, 101:4, 105:4, 105:5, 105:14, 105:20, 107:5, 108:11, 111:11, 111:13, 111:16, 111:17, 112:16, 112:17, 113:15, 114:13, 115:17, 131:8, 133:5, 137:12, 137:14, 145:1
**furtherance** [1] - 149:24

# G

**gain** [1] - 103:3
**gained** [1] - 21:21
**gaining** [1] - 70:19
**gamesmanship** [1] - 10:2
**gamut** [1] - 100:5
**gathered** [1] - 136:12
**general** [18] - 13:18, 21:14, 32:4, 42:17, 43:15, 54:7, 55:16, 62:16, 78:8, 79:17, 90:18, 92:2, 111:10, 115:15, 144:2,

150:19, 152:13, 155:18
**generally** [17] - 43:1, 43:14, 59:10, 62:17, 63:13, 65:1, 67:1, 67:4, 67:12, 70:18, 72:23, 75:9, 80:19, 100:3, 121:5, 134:15, 136:24
**generate** [1] - 107:6
**generated** [1] - 81:17
**generation** [1] - 103:13
**generic** [1] - 5:13
**George** [1] - 123:17
**Georgetown** [1] - 8:10
**gigabytes** [1] - 52:13
**given** [5] - 14:19, 32:19, 37:11, 48:12, 103:25
**global** [2] - 120:6, 125:19
**globally** [1] - 136:1
**goal** [2] - 40:17, 114:11
**goods** [1] - 99:20
**government** [58] - 3:5, 3:10, 6:4, 12:23, 18:18, 19:22, 23:4, 23:10, 24:13, 25:9, 25:25, 27:1, 30:5, 31:10, 32:17, 33:5, 33:20, 33:24, 34:14, 36:11, 36:17, 40:24, 44:25, 57:24, 59:22, 61:4, 61:22, 62:14, 73:9, 86:21, 93:22, 95:6, 97:20, 97:21, 100:23, 104:18, 108:8, 108:9, 109:16, 120:8, 120:9, 120:13, 120:17, 120:19, 126:3, 142:18, 142:23, 148:3, 152:11, 152:17, 152:20, 154:10, 154:13, 154:18, 155:9, 155:12, 155:19
**Government** [12] - 2:19, 2:20, 2:21, 2:22, 2:23, 104:23, 109:24, 131:22, 132:1, 132:3, 134:11, 154:8
**government's** [13] - 25:10, 28:9, 30:9, 30:22, 30:23, 31:9, 31:23, 35:12, 36:16,

41:1, 84:22, 142:17, 156:1
**Government's** [15] - 44:18, 45:1, 45:5, 57:14, 57:25, 58:24, 59:4, 59:23, 60:4, 104:10, 104:19, 105:22, 105:23, 108:21, 109:6
**Gox** [44] - 68:6, 68:10, 68:12, 68:14, 68:23, 68:25, 69:1, 69:24, 70:5, 71:1, 71:9, 71:11, 72:5, 72:8, 81:9, 81:23, 82:11, 83:8, 83:11, 83:19, 84:1, 84:5, 84:7, 84:9, 84:11, 84:12, 84:13, 84:15, 84:18, 84:22, 91:13, 91:16, 92:1, 92:5, 92:10, 92:12, 92:14, 92:16, 92:20, 93:13, 108:15
**grabbing** [2] - 153:19, 153:20
**graduate** [1] - 8:9
**graduates** [1] - 8:13
**grant** [1] - 30:22
**graph** [9] - 55:1, 81:17, 83:4, 83:6, 83:16, 83:17, 83:18, 83:21, 84:17
**graphical** [1] - 54:23
**graphically** [1] - 76:23
**Great** [3] - 153:18, 153:20, 153:21
**great** [2] - 39:12, 52:22
**greater** [1] - 34:18
**Greek** [1] - 75:16
**green** [2] - 68:23, 82:12
**grew** [1] - 102:15
**group** [5] - 55:11, 60:13, 105:10, 110:18, 112:12
**grouped** [1] - 113:4
**grouping** [1] - 55:4
**groups** [2] - 105:6, 106:7
**guess** [15] - 4:5, 11:8, 37:14, 40:2, 65:13, 75:9, 85:9, 130:11, 131:2, 142:16, 142:25, 143:21, 154:17, 154:19
**guesses** [3] - 24:23, 28:9, 85:25
**guessing** [3] - 10:9, 39:5, 75:16

**guys** [1] - 25:19

# H

**half** [3] - 17:6, 50:8, 134:21
**hand** [11] - 41:6, 50:8, 64:8, 65:24, 95:12, 97:5, 98:23, 99:25, 106:12, 154:23
**hand-in-hand** [1] - 99:25
**hands** [1] - 50:10
**happy** [7] - 4:4, 7:16, 34:6, 34:23, 36:16, 82:1, 141:20
**hard** [2] - 34:14, 129:20
**harder** [1] - 114:13
**hash** [2] - 48:12, 51:16
**Hassanshahi** [1] - 147:11
**Hassard** [1] - 3:16
**HASSARD** [2] - 1:16, 3:15
**head** [5] - 53:22, 130:4, 150:17, 150:21, 151:13
**headphones** [1] - 33:11
**hear** [16] - 4:4, 17:8, 33:12, 73:21, 86:13, 95:18, 115:23, 116:1, 119:4, 119:8, 121:10, 125:24, 132:2, 139:17, 151:8, 151:24
**heard** [8] - 26:25, 27:15, 57:8, 74:14, 113:21, 129:20, 133:15, 141:11
**hearing** [20] - 14:8, 34:7, 35:22, 36:10, 36:12, 37:10, 58:15, 58:17, 58:19, 58:22, 59:25, 60:3, 87:7, 88:13, 109:20, 130:14, 141:22, 156:3, 156:5, 156:14
**HEARING** [2] - 1:4, 1:7
**hearings** [1] - 156:9
**hears** [1] - 33:10
**heightened** [1] - 24:7
**held** [5] - 6:12, 16:24, 35:23, 105:7, 141:17
**hello** [1] - 41:12
**help** [3] - 112:8, 137:11, 138:7
**helpful** [4] - 133:20,

141:8, 146:15, 154:23
**hereby** [1] - 157:3
**herself** [1] - 133:16
**heuristic** [58] - 24:18, 28:9, 58:6, 75:7, 75:8, 75:10, 75:13, 75:16, 77:13, 77:22, 78:5, 78:8, 78:15, 79:16, 79:21, 79:24, 80:14, 80:17, 80:21, 80:23, 80:25, 81:3, 106:9, 107:10, 107:13, 110:20, 121:5, 121:13, 121:14, 121:17, 121:24, 122:7, 122:10, 123:4, 123:6, 123:7, 123:24, 124:9, 125:2, 125:3, 125:4, 125:9, 125:12, 125:13, 125:15, 126:2, 126:18, 126:20, 127:2, 127:8, 127:10, 127:16, 127:17, 127:24, 137:20, 137:24
**heuristics** [23] - 58:12, 75:24, 77:3, 77:7, 77:10, 79:11, 106:15, 107:13, 110:18, 112:9, 112:22, 113:21, 113:22, 121:9, 121:11, 121:12, 121:24, 124:21, 124:23, 125:1, 127:1, 137:8, 138:2
**high** [1] - 13:15
**hinder** [1] - 137:11
**hired** [2] - 108:8, 108:9
**history** [4] - 12:15, 12:25, 13:4, 17:19
**hit** [1] - 116:19
**hits** [1] - 116:18
**hitting** [1] - 88:22
**hold** [5] - 41:20, 41:21, 43:21, 96:1
**holds** [1] - 47:14
**hominem** [1] - 4:10
**Honor** [59] - 3:6, 3:9, 3:12, 3:15, 4:7, 7:16, 7:23, 7:25, 13:10, 14:3, 17:2, 17:10, 21:17, 22:22, 24:12, 27:20, 28:4, 32:9, 33:20, 34:11, 35:11,

36:13, 36:25, 38:16, 39:9, 39:20, 39:24, 40:15, 40:23, 45:3, 58:2, 58:23, 73:10, 73:12, 87:15, 88:19, 88:21, 94:17, 95:1, 95:6, 109:21, 116:25, 117:3, 128:6, 130:17, 134:1, 140:25, 141:9, 141:11, 143:8, 143:18, 143:25, 148:12, 148:24, 149:20, 150:7, 154:25, 155:5, 155:23
**HONORABLE** [1] - 1:8
**hook** [1] - 23:18
**hop** [1] - 118:7
**hoping** [2] - 32:12, 33:13
**hops** [2] - 68:8, 133:7
**hour** [1] - 40:18
**human** [1] - 96:2
**hundreds** [3] - 64:11, 109:13, 139:8

**I**

**I.D** [2] - 26:13, 48:13
**identifiable** [1] - 46:9
**identification** [3] - 37:24, 86:1, 122:20
**identified** [19] - 19:15, 22:4, 36:2, 55:12, 63:17, 107:10, 111:19, 123:6, 124:22, 125:1, 127:1, 137:20, 137:23, 138:10, 138:16, 145:24
**identifier** [2] - 48:13, 51:17
**identifiers** [1] - 51:16
**identifies** [1] - 112:21
**identify** [19] - 21:6, 37:15, 87:10, 98:23, 106:6, 110:17, 112:11, 112:15, 112:20, 112:22, 113:7, 118:15, 121:22, 121:23, 122:7, 122:12, 122:14, 129:6, 137:13
**identifying** [10] - 37:19, 78:10, 85:4, 85:22, 101:20, 105:6, 105:10, 108:12, 113:14,

143:6
**ignorance** [1] - 52:19
**III** [1] - 151:17
**illegal** [3] - 147:16, 150:8, 150:13
**illicit** [1] - 115:11
**illustrate** [1] - 82:10
**illustrated** [1] - 81:23
**illustrates** [1] - 24:6
**imagine** [1] - 56:21
**immediately** [1] - 40:7
**implemented** [2] - 123:4, 127:24
**import** [1] - 147:16
**importance** [1] - 31:3
**important** [8] - 4:15, 10:3, 11:10, 105:17, 118:12, 118:18, 133:13, 154:1
**improbable** [1] - 10:1
**improper** [1] - 131:8
**improperly** [1] - 62:12
**improves** [1] - 70:20
**IN** [1] - 1:1
**inaction** [3] - 147:4, 149:10, 149:14
**include** [11] - 43:8, 45:21, 46:6, 46:18, 51:1, 59:1, 65:5, 109:4, 125:2, 127:8, 149:12
**included** [13] - 53:15, 59:10, 59:12, 60:19, 60:24, 63:7, 63:9, 63:11, 83:23, 97:3, 97:8, 97:10, 97:13
**includes** [4] - 13:21, 50:23, 137:8, 150:3
**including** [12] - 19:25, 22:8, 27:15, 41:20, 44:14, 45:17, 46:7, 46:20, 61:7, 72:12, 96:1, 117:10
**inconvenience** [1] - 3:22
**incorporated** [2] - 120:3, 120:10
**Incorporated** [1] - 132:4
**incorrect** [1] - 116:12
**incorrectly** [3] - 116:13, 118:15, 134:23
**increases** [1] - 133:8
**independent** [3] - 22:15, 122:19, 123:23
**index** [1] - 108:24
**indicate** [4] - 35:14, 51:6, 51:9, 129:5

**indicated** [11] - 13:25, 21:1, 31:22, 32:17, 33:4, 106:24, 115:8, 117:14, 117:25, 138:13, 146:19
**indicates** [1] - 22:18
**indication** [1] - 89:25
**indications** [1] - 114:18
**indictment** [19] - 88:5, 88:7, 88:11, 142:7, 142:14, 143:11, 143:14, 143:16, 144:3, 144:6, 144:21, 145:18, 145:20, 151:3, 151:6, 151:7, 151:10, 151:12, 152:25
**indirect** [4] - 6:24, 132:20, 132:25, 133:3
**indirectly** [1] - 133:4
**individual** [3] - 52:15, 98:24, 102:10
**individual's** [1] - 25:5
**individually** [1] - 140:2
**individuals** [7] - 22:10, 78:2, 102:21, 111:15, 114:5, 137:6, 137:13
**indulgence** [3] - 73:6, 93:19, 116:22
**infer** [1] - 55:11
**infirm** [1] - 144:6
**inform** [1] - 72:1
**information** [78] - 8:11, 15:24, 24:13, 46:4, 46:7, 46:9, 46:12, 46:14, 46:16, 46:17, 46:19, 46:20, 48:8, 50:12, 50:19, 52:1, 52:4, 55:8, 55:10, 55:21, 56:2, 59:16, 60:10, 66:14, 66:17, 67:19, 68:15, 68:22, 70:9, 76:7, 76:11, 76:14, 83:23, 83:25, 85:4, 85:17, 85:22, 86:1, 86:24, 87:3, 87:9, 87:11, 97:23, 98:8, 98:12, 101:23, 103:23, 105:2, 107:14, 114:22, 114:24, 115:2, 115:7, 117:6, 117:9, 118:16, 118:19, 119:9, 119:14, 119:19,

124:2, 125:5, 125:10, 126:2, 134:24, 134:25, 135:4, 135:6, 135:10, 135:20, 136:7, 136:11, 136:12, 137:2, 140:10
**informed** [1] - 32:18
**infrastructure** [1] - 67:17
**initial** [6] - 14:5, 30:10, 81:9, 81:19, 97:7, 99:1
**initiation** [2] - 99:21, 100:6
**input** [22] - 48:4, 48:5, 48:19, 48:22, 48:25, 49:22, 49:24, 49:25, 51:2, 51:8, 53:10, 82:21, 82:23, 82:24, 85:8, 90:13, 105:16, 113:2, 114:5, 114:6
**inputs** [12] - 49:6, 51:2, 51:5, 77:18, 77:20, 78:7, 83:13, 83:15, 91:8, 110:21, 122:1, 122:9
**inside** [1] - 82:13
**insider** [1] - 43:10
**insight** [1] - 103:3
**instance** [7] - 15:18, 26:11, 58:7, 112:24, 118:6, 139:10, 141:13
**instances** [8] - 65:5, 89:21, 134:16, 135:12, 135:19, 138:20, 139:1, 140:3
**instead** [3] - 12:3, 54:18, 54:24
**instigated** [1] - 31:10
**Institute** [1] - 42:1
**institution** [2] - 46:1, 98:6
**institutions** [4] - 67:25, 98:7, 98:11, 136:13
**instruction** [1] - 155:1
**instrumental** [2] - 8:11, 9:16
**insurance** [1] - 148:4
**intel** [2] - 100:7, 102:14
**Intelligence** [1] - 18:7
**intelligence** [31] - 8:3, 8:4, 9:13, 10:8, 14:7, 14:9, 14:16, 14:22, 14:24, 15:5, 15:10, 17:4, 17:15, 18:9,

19:15, 27:24, 28:2, 28:22, 28:24, 80:17, 80:21, 80:25, 96:12, 96:13, 107:21, 107:24, 108:1, 125:13, 125:19, 125:23, 126:2
**intelligence-based** [3] - 107:21, 107:24, 108:1
**intelligent** [1] - 28:5
**intends** [1] - 23:10
**intensive** [1] - 52:16
**interacting** [1] - 9:15
**interaction** [1] - 127:19
**interactions** [1] - 14:4
**interacts** [2] - 14:25, 98:13
**interest** [1] - 5:19
**interested** [6] - 20:24, 97:4, 136:22, 140:19, 140:21, 142:1
**interesting** [1] - 152:13
**interface** [5] - 52:1, 52:5, 52:10, 52:11, 54:24
**intermediaries** [2] - 133:4, 133:6
**intermediary** [2] - 65:10, 118:8
**intern** [1] - 42:3
**internal** [4] - 18:12, 91:19, 139:22, 140:6
**international** [1] - 153:9
**internet** [7] - 18:12, 25:18, 47:9, 54:4, 76:22, 80:22, 91:7
**interpretation** [1] - 27:6
**interpreting** [2] - 24:24
**interview** [1] - 5:22
**interviewed** [2] - 25:5, 25:15
**intimate** [1] - 15:25
**intimately** [4] - 15:1, 27:12, 27:14, 27:16
**intranet** [1] - 8:5
**introduce** [2] - 23:10, 23:12
**intrusion** [1] - 43:6
**investigated** [3] - 6:7, 13:3, 20:18
**investigating** [1] - 31:17
**Investigation** [1] -

41:16
**investigation** [31] - 8:23, 9:5, 9:12, 14:5, 14:10, 17:15, 17:23, 18:5, 18:6, 18:8, 18:21, 19:2, 21:22, 22:10, 22:25, 28:23, 51:15, 57:3, 57:7, 61:7, 63:20, 74:24, 97:3, 98:23, 99:4, 99:6, 99:7, 100:15, 103:9, 137:3
**investigations** [34] - 17:22, 18:14, 18:24, 23:4, 42:9, 42:18, 42:19, 43:10, 46:10, 96:7, 96:15, 97:23, 98:15, 99:2, 99:9, 100:1, 100:17, 100:18, 102:12, 102:17, 103:14, 115:7, 129:5, 134:13, 134:18, 134:21, 135:2, 135:14, 135:23, 136:8, 139:7, 139:8, 140:4, 140:5
**investigative** [12] - 15:7, 16:7, 42:17, 43:18, 44:3, 96:5, 103:5, 103:19, 115:9, 115:16, 132:14, 134:19
**Investigative** [1] - 17:24
**investigator** [12] - 8:17, 9:19, 12:7, 12:8, 12:20, 12:23, 13:12, 14:21, 18:19, 19:11, 19:12, 98:2
**investigators** [4] - 9:16, 11:25, 70:17, 136:1
**invited** [1] - 19:6
**invites** [1] - 152:5
**involve** [2] - 108:12, 108:15
**involved** [20] - 8:23, 12:6, 15:1, 16:6, 21:15, 22:12, 24:22, 27:13, 27:14, 27:16, 28:7, 32:5, 48:16, 48:17, 48:18, 51:19, 64:9, 80:25, 83:22, 99:13
**involvement** [2] - 27:16, 31:16
**involves** [1] - 103:15
**involving** [4] - 89:12, 99:3, 99:15, 153:9

**IP** [14] - 37:7, 37:11, 37:16, 38:1, 38:4, 38:6, 38:7, 38:16, 38:18, 38:19, 38:20, 39:1, 39:4
**IRS** [15] - 9:15, 9:16, 17:24, 19:1, 19:24, 19:25, 20:8, 20:14, 28:7, 60:9, 61:19, 62:2, 62:22, 62:24, 87:23
**issue** [15] - 9:1, 14:23, 14:24, 30:13, 30:20, 34:12, 37:20, 93:13, 114:20, 151:18, 151:23, 152:1, 152:12, 152:13, 155:1
**issued** [1] - 148:3
**issues** [4] - 15:3, 32:19, 39:16, 133:21
**itself** [9] - 12:20, 24:25, 27:1, 75:13, 133:17, 143:10, 147:10, 151:7, 151:10

## J

**Jackson** [1] - 148:22
**January** [5] - 18:20, 18:21, 18:23, 102:24, 156:5
**job** [1] - 103:18
**Johnston** [2] - 148:22, 148:24
**join** [2] - 42:2, 96:9
**joined** [1] - 19:4
**joinmarket** [1] - 122:5
**joint** [1] - 43:18
**journal** [4] - 35:7, 97:15, 103:20, 124:5
**journey** [1] - 101:6
**Judge** [4] - 142:9, 143:17, 143:22, 148:21
**JUDGE** [2] - 1:8, 1:8
**judge** [3] - 147:20, 148:21, 148:22
**July** [10] - 33:14, 33:19, 33:21, 39:21, 39:23, 155:10, 155:11, 155:12, 156:10, 157:7
**June** [1] - 1:5
**jurisdiction** [3] - 142:6, 145:12, 150:6
**jury** [17] - 6:25, 7:1, 10:24, 11:6, 11:16, 11:17, 12:10, 12:17,

13:25, 23:17, 33:1, 33:2, 37:21, 39:19, 151:23, 152:1, 153:13
**justice** [2] - 96:3, 148:23
**Justice** [9] - 4:25, 6:14, 6:18, 8:7, 10:2, 10:20, 11:14, 12:17, 19:4
**JUSTICE** [1] - 1:13
**Justice's** [2] - 5:17, 41:17
**justifies** [1] - 152:22
**justify** [1] - 7:19

## K

**Kaderabek** [2] - 18:15, 18:16
**Kathleen** [1] - 18:15
**keep** [3] - 47:3, 47:6, 103:17
**keeping** [1] - 89:12
**keeps** [1] - 107:7
**Ketanji** [1] - 148:22
**key** [4] - 6:1, 45:8, 47:16
**keys** [2] - 51:11, 105:18
**kind** [20] - 15:23, 26:19, 26:24, 46:1, 46:16, 74:19, 79:18, 80:12, 85:18, 85:25, 91:3, 94:6, 99:4, 100:5, 122:18, 122:19, 144:9, 149:24
**kinds** [1] - 89:23
**knowledge** [12] - 7:12, 14:10, 15:25, 17:5, 24:4, 28:1, 117:12, 119:21, 138:23, 139:2, 139:12, 140:14
**known** [13] - 45:16, 62:6, 78:21, 78:25, 99:19, 101:10, 102:11, 103:5, 105:3, 105:14, 106:8, 106:22, 111:14
**knows** [4] - 61:22, 79:2, 79:4, 79:7
**Kraken** [7] - 45:21, 65:16, 65:18, 65:20, 65:22, 67:13, 93:13
**KYC** [4] - 46:16, 150:10, 150:11, 150:12

**KYT** [6] - 103:7, 115:9, 115:11, 116:8, 132:12

## L

**labels** [1] - 78:21
**labor** [1] - 52:16
**labor-intensive** [1] - 52:16
**Labs** [3] - 63:21, 63:23, 63:24
**lack** [2] - 144:8, 145:16
**landscape** [1] - 99:25
**laptop** [1] - 47:11
**large** [6] - 66:2, 78:3, 90:12, 114:25, 118:19, 136:19
**large-scale** [1] - 90:12
**largely** [2] - 25:7, 31:22
**larger** [1] - 111:22
**last** [6] - 3:25, 32:15, 32:16, 35:19, 43:17, 134:21
**launch** [1] - 71:23
**launched** [1] - 36:18
**launder** [1] - 152:19
**laundering** [6] - 21:7, 96:14, 96:24, 99:18, 149:25, 150:4
**Law** [1] - 1:16
**law** [22] - 8:9, 8:13, 8:20, 18:12, 24:2, 29:21, 32:3, 98:2, 98:7, 98:13, 113:24, 114:12, 118:3, 118:17, 135:22, 142:3, 143:9, 144:13, 144:14, 150:17, 152:13, 152:24
**lawyers** [1] - 154:1
**lead** [25] - 8:2, 8:14, 8:17, 8:20, 8:24, 9:3, 9:14, 9:16, 10:3, 10:8, 12:7, 12:23, 13:5, 13:11, 14:16, 14:21, 15:10, 17:4, 17:15, 18:13, 18:15, 18:19, 19:12, 103:13
**leading** [1] - 149:5
**leaks** [2] - 108:4, 125:18
**learn** [2] - 98:17, 98:19
**learned** [2] - 77:5, 123:12
**learning** [1] - 96:22

**least** [8] - 11:8, 31:15, 33:23, 40:18, 82:20, 85:2, 143:2, 144:20
**leave** [1] - 13:11
**leaves** [1] - 90:14
**lecture** [1] - 123:18
**led** [1] - 18:14
**ledger** [2] - 91:19, 105:3
**left** [4] - 16:14, 91:21, 106:14, 127:19
**legal** [14] - 4:22, 5:2, 5:3, 5:12, 6:7, 7:18, 20:21, 98:6, 101:18, 102:5, 118:6, 149:8, 149:16, 152:19
**legally** [2] - 149:1, 153:1
**legitimate** [1] - 15:22
**lengthy** [1] - 59:19
**less** [2] - 70:20, 156:7
**letters** [1] - 47:15
**letting** [1] - 116:18
**levels** [1] - 122:2
**leverage** [3] - 97:24, 126:1, 134:20
**leveraged** [11] - 97:15, 97:17, 98:9, 102:3, 110:18, 110:23, 114:4, 116:9, 127:3, 137:9, 137:11
**leveraging** [2] - 99:19, 115:18
**Liberty** [5] - 68:17, 70:5, 81:25, 83:20, 84:1
**license** [11] - 146:20, 146:23, 147:1, 147:15, 147:24, 148:1, 148:2, 148:3, 149:14
**licensure** [2] - 145:8, 145:16
**light** [3] - 38:14, 117:6, 155:3
**likely** [3] - 14:8, 34:1, 66:11
**limited** [2] - 39:1, 55:10
**line** [2] - 129:17, 129:18
**lines** [1] - 136:16
**link** [1] - 45:22
**linking** [1] - 85:4
**list** [4] - 60:16, 109:9, 109:18, 110:9
**listed** [1] - 110:5
**listening** [2] - 53:8, 54:2
**listing** [2] - 59:19,

109:12
**lists** [1] - 108:24
**Litecoin** [1] - 45:18
**literature** [1] - 94:6
**Liverpool** [1] - 96:6
**LLC** [1] - 75:4
**local** [1] - 93:13
**locally** [1] - 44:8
**located** [2] - 148:8, 148:17
**lock** [1] - 80:7
**locus** [1] - 153:2
**logical** [1] - 71:19
**login** [1] - 46:20
**logs** [1] - 92:20
**London** [1] - 153:13
**longest** [1] - 13:4
**look** [27] - 10:7, 10:8, 11:22, 25:19, 34:24, 51:19, 51:21, 55:1, 57:6, 59:5, 61:23, 64:2, 70:13, 70:21, 79:8, 82:1, 83:2, 87:25, 88:1, 92:17, 105:12, 140:24, 143:13, 143:15, 150:16, 151:14
**looked** [9] - 12:22, 25:4, 70:23, 90:7, 90:8, 97:19, 110:24, 141:14, 151:2
**looking** [18] - 23:21, 23:24, 28:12, 28:13, 34:25, 51:2, 52:15, 70:18, 80:5, 80:7, 82:23, 89:19, 98:18, 106:15, 128:3, 133:17, 137:23, 155:17
**looks** [3] - 25:21, 106:15, 131:1
**Louis** [2] - 8:20, 13:2
**LR** [1] - 68:17
**Luke** [2] - 40:24, 41:14
**LUKE** [6] - 2:3, 41:10, 41:14, 73:16, 88:25, 94:3
**Lunch** [1] - 95:4
**lunch** [3] - 40:6, 40:7, 94:15
**lunchtime** [1] - 88:22

**M**

**ma'am** [98] - 41:21, 42:13, 42:23, 43:13, 43:15, 44:7, 44:20, 44:24, 46:3, 46:13, 46:24, 47:3, 47:7, 47:13, 48:21, 49:1,

49:17, 50:14, 50:17, 51:4, 51:25, 52:17, 53:22, 54:1, 54:7, 54:12, 54:17, 55:21, 56:1, 56:14, 56:18, 57:1, 57:13, 57:17, 57:20, 57:23, 59:3, 59:9, 59:21, 60:8, 60:15, 61:1, 61:10, 61:14, 62:4, 63:18, 64:4, 64:12, 64:15, 64:18, 64:22, 64:25, 65:8, 65:11, 65:15, 66:1, 66:15, 66:25, 67:4, 67:7, 67:11, 67:15, 67:22, 68:1, 69:11, 69:13, 69:15, 69:18, 69:22, 70:1, 70:3, 70:8, 70:12, 70:15, 70:17, 71:5, 71:13, 71:25, 72:3, 72:14, 72:18, 72:21, 72:23, 73:2, 73:5, 89:7, 89:11, 89:15, 90:3, 92:7, 92:14, 92:25, 93:2, 93:5, 93:10, 93:11, 93:15, 93:18
**main** [4] - 14:9, 14:24, 99:20, 153:13
**mainstream** [1] - 150:12
**maintain** [1] - 117:5
**maintains** [3] - 10:15, 52:20, 52:21
**majority** [6] - 44:15, 121:3, 142:4, 143:21, 143:23, 144:1
**managing** [1] - 103:19
**manual** [2] - 100:25
**manually** [2] - 52:7, 129:2
**map** [2] - 25:24, 101:23
**maps** [1] - 25:23
**marked** [1] - 44:18
**market** [3] - 43:10, 97:4, 99:7
**marketplace** [1] - 99:23
**marketplaces** [2] - 99:24, 126:1
**markets** [9] - 22:5, 22:20, 59:13, 64:3, 64:10, 97:6, 99:19, 109:2, 113:8
**Mason** [1] - 123:17
**massive** [2] - 64:10, 131:1

**master's** [3] - 41:25, 96:4, 96:6
**match** [2] - 69:19, 70:4
**matches** [2] - 38:18, 55:22
**material** [7] - 9:4, 9:23, 10:14, 13:24, 15:15, 17:4, 24:3
**math** [1] - 126:24
**matter** [13] - 4:8, 6:11, 8:24, 10:12, 13:3, 38:8, 81:16, 81:20, 122:23, 142:7, 144:4, 145:6, 152:24
**matters** [3] - 25:8, 43:2, 43:4
**Mazarin** [5] - 33:16, 36:15, 37:2, 38:17, 39:3
**Mazars** [1] - 38:17
**MC2** [1] - 26:24
**mean** [23] - 10:18, 12:24, 27:14, 35:3, 45:25, 51:23, 55:10, 58:15, 76:9, 79:13, 83:1, 87:22, 100:25, 124:1, 130:11, 139:6, 143:9, 145:13, 145:23, 150:7, 150:14, 150:16, 155:3
**means** [7] - 29:17, 31:17, 35:5, 75:7, 100:25, 133:1, 133:3
**meant** [3] - 50:16, 97:12, 107:24
**mechanisms** [1] - 122:5
**meet** [4] - 90:25, 153:2, 153:3, 153:4
**meeting** [1] - 7:18
**Meiklejohn** [1] - 123:13
**member** [3] - 42:11, 42:20, 42:22
**mempool.space** [3] - 52:2, 69:7, 69:9
**mens** [3] - 152:15, 152:21, 154:13
**mentality** [1] - 98:9
**mentioned** [4] - 43:21, 48:18, 121:13, 151:16
**meritless** [1] - 6:25
**merits** [3] - 5:16, 142:15, 142:22
**message** [1] - 152:16
**met** [2] - 6:9, 36:17
**method** [2] - 37:18,

110:22
**methodologies** [2] - 37:23, 39:4
**methodology** [8] - 16:16, 58:4, 58:8, 67:12, 72:19, 108:19, 121:11, 122:21
**methods** [3] - 97:14, 100:22, 106:1
**Miami** [1] - 141:13
**Michael** [1] - 3:15
**MICHAEL** [1] - 1:16
**microphone** [2] - 33:9, 33:11
**might** [10] - 11:13, 14:19, 24:1, 30:20, 38:7, 46:22, 51:14, 90:19, 145:23, 146:2
**mind** [2] - 41:1, 131:14
**mined** [1] - 48:11
**miner** [1] - 53:12
**miners** [1] - 53:12
**minimal** [1] - 31:18
**mining** [1] - 54:2
**minitrial** [2] - 143:2, 144:9
**minor** [4] - 96:3, 151:18, 151:19, 151:22
**mint** [1] - 53:16
**minute** [1] - 40:13
**minutes** [3] - 33:23, 40:18, 141:21
**misconception** [4] - 21:19, 26:18, 155:16, 155:23
**misheard** [1] - 123:22
**missed** [3] - 9:7, 9:9, 15:20
**mission** [1] - 99:17
**misspoke** [1] - 28:4
**mistake** [2] - 16:12, 23:7
**mistakes** [2] - 70:18, 70:20
**mixer** [1] - 150:13
**mixing** [4] - 114:3, 114:15, 150:8, 152:18
**mobile** [1] - 47:11
**model** [1] - 121:25
**models** [1] - 122:6
**Monero** [4] - 72:22, 72:23, 72:24, 73:4
**money** [19] - 21:7, 50:21, 50:22, 51:19, 51:20, 53:9, 63:3, 63:4, 96:14, 96:23,

99:18, 131:7,
147:24, 149:13,
149:24, 150:4,
152:20
**money-transmitting**
[1] - 147:24
**Monsanto** [1] - 88:13
**month** [2] - 155:22,
156:7
**months** [1] - 141:17
**morning** [10] - 3:6,
3:8, 3:9, 3:11, 3:12,
3:14, 3:15, 3:17,
7:25, 8:1
**MOSS** [1] - 1:8
**most** [11] - 14:5,
45:16, 45:20, 49:20,
76:25, 90:23, 90:24,
102:6, 105:14,
142:21
**mostly** [1] - 19:7
**motion** [27] - 3:25,
4:2, 4:3, 4:5, 4:18,
5:1, 6:22, 14:19,
16:22, 16:25, 18:1,
30:9, 30:22, 30:23,
32:8, 40:19, 141:22,
141:25, 142:13,
142:14, 142:20,
142:21, 143:14,
144:2, 144:3, 144:8
**MOTIONS** [2] - 1:4,
1:7
**motions** [7] - 3:20,
3:21, 4:1, 32:12,
39:15, 40:4, 142:21
**motivation** [10] -
10:20, 11:1, 11:2,
11:12, 12:16, 12:19,
25:10, 25:25, 31:9,
31:23
**mouth** [1] - 99:5
**move** [11] - 10:10,
32:8, 32:11, 40:11,
44:2, 44:25, 59:22,
102:23, 104:18,
105:20, 109:16
**moved** [2] - 11:4,
51:20
**movement** [5] - 68:5,
111:7, 111:11,
111:13, 111:19
**moves** [1] - 50:25
**moving** [6] - 12:9,
39:12, 68:23, 79:23,
105:14, 111:17
**MR** [108] - 3:9, 3:12,
3:15, 4:7, 7:23, 7:25,
8:2, 9:1, 9:8, 9:11,
10:6, 10:14, 10:24,

11:4, 11:16, 12:6,
12:13, 12:19, 13:6,
13:10, 14:3, 14:15,
15:4, 15:18, 16:5,
16:21, 16:24, 17:10,
17:17, 22:22, 24:12,
26:5, 26:11, 27:11,
27:20, 28:4, 28:17,
28:21, 33:13, 34:23,
36:13, 37:11, 37:18,
37:22, 39:3, 40:1,
45:3, 58:2, 60:1,
73:12, 73:14, 73:17,
86:13, 86:16, 86:19,
87:8, 87:15, 87:16,
88:19, 93:25, 94:4,
94:13, 94:21,
104:21, 109:21,
119:3, 128:9,
128:10, 129:23,
130:17, 131:13,
131:18, 131:21,
133:10, 139:16,
140:15, 141:11,
143:8, 143:13,
143:18, 143:25,
144:19, 145:3,
145:15, 146:6,
146:12, 146:18,
147:3, 148:2, 148:6,
148:12, 148:24,
149:20, 149:22,
150:7, 150:21,
151:1, 151:8,
151:13, 151:23,
152:2, 152:7,
153:11, 153:22,
153:24, 155:8,
155:16, 156:11
**MS** [69] - 3:6, 21:5,
21:17, 22:2, 22:15,
32:9, 32:15, 33:3,
33:20, 34:5, 34:11,
35:10, 36:15, 36:25,
37:4, 38:16, 39:9,
39:24, 40:5, 40:15,
40:23, 41:4, 41:11,
44:25, 45:6, 53:19,
57:24, 58:23, 58:25,
59:22, 60:5, 73:6,
73:9, 88:21, 89:1,
91:12, 93:19, 93:21,
94:17, 94:20, 95:1,
95:3, 95:6, 95:17,
98:25, 104:18,
104:24, 109:16,
109:25, 116:22,
116:25, 117:3,
117:8, 117:20,
117:21, 118:11,
128:6, 129:17,

134:1, 134:4, 138:6,
138:18, 138:25,
140:24, 141:9,
154:25, 155:5,
155:11, 155:23
**MSB** [1] - 148:6
**Mt** [44] - 68:6, 68:10,
68:12, 68:14, 68:23,
68:25, 69:1, 69:24,
70:5, 71:1, 71:9,
71:11, 72:5, 72:8,
81:9, 81:23, 82:11,
83:8, 83:11, 83:19,
84:1, 84:5, 84:7,
84:9, 84:11, 84:12,
84:13, 84:15, 84:18,
84:22, 91:13, 91:16,
92:1, 92:5, 92:10,
92:12, 92:14, 92:16,
92:20, 93:13, 108:15
**multiple** [11] - 43:15,
47:21, 51:2, 51:5,
51:8, 65:17, 71:15,
89:21, 98:12, 109:7,
127:3
**multisag** [1] - 80:6
**multitude** [2] - 99:24,
101:9
**murder** [1] - 25:2
**must** [1] - 38:5
**Mycelium** [4] - 59:16,
66:18, 66:22, 86:9

## N

**N.W** [1] - 157:11
**name** [15] - 3:4, 4:20,
38:6, 41:13, 41:14,
46:7, 46:18, 77:10,
93:1, 95:20, 120:25,
123:11, 125:20,
127:22, 130:4
**namely** [2] - 144:14,
149:12
**names** [1] - 38:7
**narrative** [1] - 23:14
**national** [2] - 43:18,
44:11
**National** [3] - 41:17,
42:5, 42:7
**nature** [3] - 4:10,
37:11, 38:10
**Navy** [1] - 41:23
**nearly** [1] - 19:3
**necessarily** [7] -
75:13, 89:12, 89:23,
92:1, 93:5, 123:19,
143:11
**necessary** [1] - 24:5
**need** [27] - 5:11,

13:20, 14:13, 29:8,
30:18, 31:3, 32:7,
33:9, 33:19, 33:23,
34:15, 35:2, 37:10,
48:1, 49:6, 49:24,
50:8, 51:11, 81:8,
86:1, 98:3, 154:2,
155:19, 156:3, 156:9
**needed** [2] - 100:14,
156:6
**needs** [5] - 6:10,
17:18, 49:9, 143:11,
144:12
**negative** [1] - 140:9
**negatives** [4] - 74:8,
119:19, 138:14,
141:1
**network** [11] - 45:13,
48:7, 48:8, 49:21,
52:24, 52:25, 53:5,
54:8, 145:10, 148:7
**never** [14] - 4:14, 8:17,
19:14, 19:15, 21:12,
21:13, 33:10, 86:24,
87:2, 87:3, 134:21,
140:9, 140:11
**New** [1] - 1:17
**new** [5] - 51:14, 53:8,
53:16, 66:4, 107:6
**Newark** [1] - 43:8
**news** [2] - 130:11,
130:13
**next** [9] - 32:8, 33:4,
33:14, 39:18, 57:18,
66:5, 66:8, 94:16,
141:21
**NFS9000@hotmail.**
**com** [1] - 68:10
**nine** [1] - 125:1
**node** [9] - 53:7, 53:13,
53:24, 54:1, 54:5,
54:9, 54:11, 55:20
**nodes** [2] - 53:20,
53:23
**non** [2] - 36:19,
150:12
**non-blockchain** [1] -
36:19
**non-KYC** [1] - 150:12
**noncompliant** [1] -
150:13
**none** [2] - 11:14,
130:21
**normal** [2] - 7:3, 91:4
**Northern** [1] - 12:3
**notable** [2] - 71:18,
71:19
**note** [3] - 22:18,
38:24, 65:23
**noted** [1] - 22:5

**notes** [2] - 38:17,
157:5
**nothing** [12] - 18:4,
20:4, 20:16, 23:9,
30:4, 58:11, 73:9,
125:8, 147:19,
152:9, 153:17,
154:12
**notice** [4] - 35:12,
35:13, 83:8, 112:4
**noticed** [2] - 35:17,
35:18
**notices** [1] - 34:22
**November** [1] - 87:24
**nowhere** [1] - 58:7
**Number** [2] - 81:24,
82:11
**number** [20] - 5:15,
20:23, 33:21, 47:13,
48:22, 48:23, 53:20,
58:5, 59:1, 64:9,
76:21, 89:2, 89:8,
92:7, 92:23, 109:1,
122:1, 134:6,
143:19, 144:19
**numbers** [2] - 46:8,
47:15
**numerous** [4] - 6:12,
93:8, 109:4, 135:18
**NW** [3] - 1:11, 1:14,
1:22
**NY** [1] - 1:17

## O

**obfuscate** [1] - 114:6
**obfuscation** [1] -
137:10
**object** [4] - 32:18,
58:2, 58:14, 129:17
**objection** [5] - 45:2,
45:3, 58:1, 59:24,
104:20, 104:21,
109:19
**objects** [1] - 58:3
**obligation** [1] - 29:10
**obligations** [1] - 150:4
**obscure** [2] - 71:20,
114:19
**observe** [2] - 71:10,
111:7
**observed** [2] - 22:19,
111:11
**obtain** [7] - 5:8, 13:22,
15:17, 146:20,
147:15, 148:15,
149:14
**obtained** [1] - 98:18
**obviously** [5] - 90:9,
126:23, 133:13,

142:14, 143:4
**occasion** [2] - 55:24,
136:10
**occasionally** [2] -
21:10, 21:13
**occasions** [1] -
138:16
**occur** [7] - 78:19,
106:20, 108:3,
125:11, 127:18,
147:6, 147:18
**occurred** [12] - 10:21,
10:23, 11:12, 90:17,
101:23, 111:1,
138:17, 142:6,
142:19, 145:5,
151:10, 154:3
**occurrence** [1] -
119:19
**occurring** [4] - 90:22,
103:4, 106:10, 137:7
**occurs** [2] - 106:13,
124:6
**October** [3] - 8:3,
14:17, 19:3
**OF** [13] - 1:1, 1:2, 1:7,
1:13, 41:9, 73:15,
88:24, 94:2, 95:15,
119:1, 134:2,
139:14, 157:1
**off-chain** [1] - 85:14
**offense** [7] - 143:10,
147:6, 147:16,
147:18, 147:21,
148:16, 151:21
**offenses** [2] - 149:10,
149:12
**offer** [3] - 10:17,
30:14, 31:19
**offered** [4] - 5:11,
5:13, 30:5, 130:19
**offers** [3] - 7:21,
131:22, 132:5
**Office** [3] - 17:25,
18:24, 19:1
**office** [4] - 18:22,
19:6, 25:16, 44:8
**officer** [1] - 41:23
**offices** [3] - 44:8,
44:11, 96:16
**OFFICIAL** [1] - 157:1
**Official** [2] - 1:21,
157:10
**often** [5] - 46:10, 50:5,
70:17, 117:17,
117:22
**Old** [1] - 96:3
**old** [1] - 35:13
**omission** [7] - 147:4,
147:8, 147:15,

147:21, 148:20,
149:17
**once** [4] - 46:25,
47:25, 48:8, 99:23
**one** [96] - 3:23, 5:15,
9:16, 11:10, 11:24,
12:24, 13:14, 13:15,
14:23, 15:20, 16:19,
18:18, 21:8, 21:25,
24:16, 25:15, 26:9,
26:19, 27:23, 29:16,
29:21, 30:12, 30:13,
35:17, 47:19, 48:19,
48:20, 48:25, 49:19,
49:20, 49:23, 49:24,
50:1, 52:7, 53:24,
54:1, 54:4, 62:13,
63:8, 63:10, 68:24,
70:2, 75:2, 77:19,
78:2, 78:3, 78:6,
80:21, 82:21, 82:23,
82:24, 84:11, 85:20,
89:23, 93:23, 94:21,
101:9, 103:18,
105:14, 105:16,
110:9, 110:22,
111:5, 112:24,
114:3, 115:20,
115:24, 116:4,
116:8, 116:14,
117:1, 117:14,
118:7, 123:10,
126:1, 127:2,
128:11, 131:12,
133:2, 135:15,
137:11, 143:19,
144:20, 147:23,
149:5, 151:18,
151:19, 151:20,
153:13, 154:19
**one-off** [1] - 89:23
**ones** [2] - 7:1, 136:25
**ongoing** [2] - 96:15,
103:13
**online** [6] - 46:1,
51:18, 51:23, 51:25,
52:8, 54:14
**open** [8] - 18:10,
19:13, 21:2, 48:4,
80:22, 90:14, 97:8,
101:12
**opened** [5] - 17:23,
17:25, 18:3, 18:6,
71:3
**opening** [2] - 3:24,
18:4
**operate** [2] - 53:13,
98:10, 150:10
**operated** [3] - 45:13,
97:9, 146:25

**operates** [3] - 106:19,
106:22, 114:4
**operating** [12] - 27:5,
34:19, 53:6, 83:11,
86:8, 87:5, 106:18,
146:22, 146:24,
147:4, 149:13, 154:5
**operation** [1] - 111:2
**operational** [1] - 70:20
**operations** [4] - 42:4,
42:18, 100:11,
102:18
**opinion** [9] - 10:18,
17:2, 35:4, 35:5,
36:6, 37:23, 76:2,
90:18, 142:9
**opinions** [3] - 24:22,
35:3, 87:9
**opportunity** [3] - 36:9,
56:3, 156:4
**opposing** [1] - 7:14
**opposition** [2] - 30:8,
35:12
**optics** [1] - 41:22
**order** [25] - 3:20, 6:14,
39:21, 51:12, 75:11,
75:24, 98:2, 98:5,
98:14, 98:19, 98:23,
102:17, 103:18,
105:20, 108:5,
110:17, 111:16,
112:15, 114:6,
116:10, 116:15,
137:11, 141:7,
147:7, 155:1
**origin** [2] - 105:5,
137:14
**original** [2] - 66:23,
81:15
**OSINT** [1] - 80:17
**otherwise** [6] - 6:2,
11:13, 15:17, 31:1,
31:20, 89:9
**ought** [1] - 40:17
**outcome** [1] - 141:4
**outlined** [2] - 7:3,
29:20
**output** [15] - 48:20,
48:22, 48:23, 49:19,
49:20, 50:24, 77:19,
82:21, 82:24, 85:9,
90:13, 106:23, 114:7
**outputs** [8] - 50:25,
83:14, 83:15, 83:18,
91:8, 110:21, 122:1,
122:9
**outside** [7] - 61:24,
65:19, 70:6, 85:17,
107:17, 136:11,
151:2

**overarching** [1] -
90:19
**overlap** [3] - 37:8,
38:16, 39:4
**oversee** [3] - 140:4,
140:5
**overstatement** [1] -
27:18
**overt** [4] - 149:24,
150:5, 150:19,
150:23
**own** [11] - 44:5, 45:10,
47:7, 98:18, 104:25,
118:23, 128:13,
128:20, 130:25,
131:8, 134:8
**ownership** [5] -
105:13, 106:2,
107:8, 110:22, 114:7

**P**

**p.m** [3] - 95:4, 156:14
**page** [41] - 30:12,
30:14, 54:24, 54:25,
61:9, 61:12, 61:14,
64:13, 65:13, 66:9,
67:8, 67:9, 67:14,
68:2, 69:14, 69:21,
70:2, 70:11, 71:6,
71:8, 81:8, 81:10,
81:11, 83:2, 83:4,
83:5, 83:13, 92:4,
92:7, 92:8, 92:11,
92:15, 93:17,
108:24, 110:1,
113:17, 121:1,
126:9, 126:15,
137:17
**PAGE** [2] - 2:2, 2:18
**pages** [9] - 30:11,
59:6, 64:16, 67:8,
69:3, 94:25, 105:21,
105:22, 106:3
**pair** [3] - 4:1, 47:17,
77:19
**paper** [12] - 74:18,
74:19, 79:19,
122:18, 122:24,
123:3, 127:15,
127:23, 128:5,
130:21
**papers** [8] - 34:1,
58:9, 74:11, 80:13,
128:16, 129:8,
137:1, 151:1
**paragraph** [1] - 126:16
**part** [33] - 6:8, 23:13,
32:25, 33:21, 37:25,
50:23, 55:5, 60:13,

73:24, 77:2, 79:6,
87:2, 87:18, 88:12,
89:12, 97:10,
102:20, 103:22,
105:6, 106:15,
107:10, 111:3,
112:25, 113:3,
119:17, 120:16,
122:8, 124:18,
124:21, 132:7,
132:10, 133:14,
150:1
**participating** [2] -
29:7, 29:12
**participation** [1] -
30:17
**particular** [16] - 31:16,
35:23, 53:6, 55:13,
67:16, 71:18, 75:12,
77:19, 91:25, 92:5,
92:13, 94:24,
105:11, 124:11,
133:7, 134:16
**particularized** [1] -
32:3
**particularly** [1] - 36:9
**parties** [1] - 4:4
**parts** [3] - 121:4,
147:15, 148:16
**party** [3] - 7:14, 108:4,
125:17
**pass** [1] - 133:10
**past** [4] - 22:23, 34:19,
43:5, 151:21
**path** [1] - 71:8
**pattern** [5] - 75:8,
75:14, 90:12, 111:7,
111:11
**patterns** [3] - 71:10,
78:10, 112:2
**payment** [5] - 50:24,
61:17, 63:2, 66:6,
66:7
**payments** [6] - 57:7,
67:17, 68:3, 81:12,
81:24, 97:17
**pays** [1] - 91:24
**peel** [7] - 65:24, 65:25,
66:1, 66:8, 66:9,
66:10, 66:21
**peer** [15] - 35:7, 58:8,
74:11, 74:18, 79:19,
80:13, 94:6, 122:18,
122:24, 123:2,
127:15, 127:23,
128:16, 130:21,
137:1
**peer-reviewed** [13] -
35:7, 58:8, 74:11,
74:18, 79:19, 80:13,

122:18, 122:24, 123:2, 127:15, 127:23, 128:16, 130:21
**peer-reviewing** [1] - 137:1
**peers** [1] - 52:24
**PELKER** [70] - 1:13, 3:6, 21:5, 21:17, 22:2, 22:15, 32:9, 32:15, 33:3, 33:20, 34:5, 34:11, 35:10, 36:15, 36:25, 37:4, 38:16, 39:9, 39:24, 40:5, 40:15, 40:23, 41:4, 41:11, 44:25, 45:6, 53:19, 57:24, 58:23, 58:25, 59:22, 60:5, 73:6, 73:9, 88:21, 89:1, 91:12, 93:19, 93:21, 94:17, 94:20, 95:1, 95:3, 95:6, 95:17, 98:25, 104:18, 104:24, 109:16, 109:25, 116:22, 116:25, 117:3, 117:8, 117:20, 117:21, 118:11, 128:6, 129:17, 134:1, 134:4, 138:6, 138:18, 138:25, 140:24, 141:9, 154:25, 155:5, 155:11, 155:23
**Pelker** [31] - 2:5, 2:8, 2:12, 2:15, 3:6, 4:2, 4:11, 4:17, 4:21, 5:14, 8:2, 8:9, 9:12, 11:19, 14:1, 17:14, 18:7, 20:3, 23:9, 25:13, 26:2, 27:10, 27:15, 27:22, 30:1, 30:10, 31:2, 31:12, 38:14, 133:12, 140:19
**Pennsylvania** [1] - 1:14
**people** [13] - 18:11, 24:1, 24:22, 38:6, 46:25, 47:5, 85:8, 90:25, 91:6, 129:6, 129:9, 140:21, 154:4
**people's** [1] - 131:7
**percent** [8] - 75:21, 103:16, 126:17, 126:23, 127:7, 137:22, 139:20, 141:2
**percipient** [2] - 25:14,

31:19
**perform** [1] - 78:21
**performance** [1] - 149:2
**performed** [2] - 61:4, 90:1
**perhaps** [1] - 90:24
**period** [2] - 14:6, 38:19
**permission** [2] - 40:25, 95:8
**permitted** [1] - 29:7
**person** [11] - 5:22, 10:9, 13:22, 14:1, 22:13, 35:6, 38:4, 48:1, 53:12, 77:21, 85:4
**personal** [12] - 4:15, 7:12, 46:6, 46:8, 47:8, 47:10, 85:18, 85:20, 85:22, 128:20, 128:24, 131:8
**personally** [3] - 56:22, 85:3, 87:10
**personnel** [1] - 42:16
**perspective** [2] - 15:5, 55:4
**persuade** [1] - 11:9
**pertaining** [1] - 44:22
**pertains** [1] - 91:17
**phenomenon** [1] - 26:7
**Philadelphia** [11] - 8:6, 8:12, 10:11, 11:5, 18:6, 18:22, 21:12, 28:6, 28:23, 153:12, 153:21
**phone** [3] - 46:7, 93:7, 93:10
**pick** [1] - 26:14
**picture** [1] - 17:7
**piece** [1] - 101:2
**piecing** [1] - 98:21
**Pizza** [1] - 8:21
**place** [7] - 12:4, 25:11, 120:25, 121:22, 147:23, 147:25, 149:2
**places** [1] - 12:4
**Plaintiff** [2] - 1:3, 1:10
**plasma** [1] - 69:24
**plasma@ plasmadivision** [2] - 71:3, 83:19
**plasma@ plasmadivision. com** [1] - 68:7
**platform** [2] - 111:16, 115:12

**platforms** [4] - 21:7, 21:8, 101:7, 115:8
**play** [1] - 28:10
**played** [1] - 112:23
**plead** [2] - 143:23, 144:1
**pleaded** [1] - 143:11
**pled** [4] - 143:16, 144:5, 144:20, 152:25
**PLLC** [1] - 1:16
**point** [30] - 4:9, 13:13, 18:20, 20:16, 21:22, 22:3, 28:12, 29:20, 30:15, 35:10, 37:13, 52:13, 53:24, 54:2, 58:18, 61:2, 74:19, 79:10, 99:8, 122:17, 123:2, 123:22, 137:16, 143:2, 143:9, 144:11, 146:11, 149:4, 151:4, 151:15
**pointed** [1] - 149:23
**pointing** [2] - 82:12, 130:25
**points** [3] - 20:20, 26:12, 82:10
**policies** [1] - 116:10
**pool** [1] - 114:5
**popular** [1] - 45:16
**pornography** [1] - 141:16
**portion** [4] - 22:11, 66:6, 68:21, 100:19
**portrayed** [1] - 75:23
**portrays** [1] - 76:14
**pose** [1] - 121:16
**position** [3] - 17:5, 25:13, 142:17
**positive** [5] - 90:2, 119:9, 138:16, 139:10, 141:3
**positives** [8] - 74:5, 114:19, 117:6, 117:10, 118:14, 119:14, 138:12, 138:20
**possibilities** [1] - 23:5
**possibility** [1] - 90:15
**possible** [3] - 79:10, 89:8, 89:22
**possibly** [2] - 123:14, 142:12
**posts** [2] - 71:22, 72:1
**potential** [5] - 70:18, 79:16, 118:14
**potentially** [6] - 70:22, 76:5, 76:25, 77:4, 77:8, 78:17

**practical** [1] - 89:5
**practice** [2] - 4:12, 34:19
**Prantil** [1] - 29:13
**preceding** [1] - 64:16
**precisely** [3] - 13:17, 76:9, 78:14
**preclude** [1] - 30:23
**predominantly** [3] - 43:6, 75:1, 99:19
**preexisting** [3] - 19:2, 149:8, 149:16
**prejudice** [1] - 36:7
**premature** [2] - 16:22, 146:3
**prepared** [2] - 36:11, 82:3
**preparing** [1] - 140:21
**present** [7] - 3:13, 7:5, 23:1, 23:8, 55:7, 58:16, 122:15
**presentations** [2] - 44:5, 103:25
**presented** [1] - 52:4
**pretext** [1] - 5:1
**pretty** [1] - 33:1
**prevalent** [1] - 99:21
**prevent** [1] - 113:24
**previewed** [1] - 36:23
**previously** [6] - 32:15, 49:6, 49:11, 51:6, 97:23, 104:5
**primarily** [3] - 74:23, 77:6, 100:22
**primary** [5] - 19:11, 19:12, 77:13, 99:8, 102:3
**private** [4] - 51:11, 63:21, 105:18, 131:22
**private/public** [1] - 47:16
**privilege** [2] - 6:20, 21:5
**privileges** [2] - 6:19, 20:23
**privy** [1] - 14:10
**probabilistic** [4] - 16:17, 24:18, 75:11, 75:19
**probability** [1] - 133:8
**problem** [5] - 9:22, 26:23, 78:14, 79:16, 121:16
**procedural** [2] - 6:11
**procedure** [2] - 6:13, 6:16
**procedures** [1] - 4:24
**proceed** [3] - 32:11, 40:6, 73:12, 73:13

**proceeding** [3] - 32:18, 32:20, 109:1
**proceedings** [2] - 95:5, 157:6
**process** [6] - 6:20, 98:6, 100:15, 101:18, 102:5, 118:6
**processes** [1] - 118:16
**produce** [1] - 130:21
**produced** [3] - 22:2, 43:16, 90:2
**product** [6] - 6:20, 18:9, 21:21, 117:15, 140:22, 140:23
**professional** [2] - 41:20, 104:15
**proffer** [2] - 5:23, 143:3
**proffered** [1] - 135:14
**proffering** [1] - 26:20
**program** [1] - 35:8
**progress** [1] - 40:9
**promptly** [1] - 36:8
**proper** [1] - 11:17
**properly** [2] - 56:4, 133:18
**proposed** [1] - 34:3
**proposition** [1] - 142:8
**proprietary** [8] - 23:25, 74:25, 77:2, 124:8, 124:14, 124:16, 124:17, 125:9
**prosecuted** [1] - 130:7
**prosecution** [3] - 147:7, 147:10, 152:22
**prosecutions** [1] - 148:14
**prosecutor** [40] - 4:22, 4:25, 5:5, 5:20, 5:21, 5:23, 5:25, 6:16, 7:2, 7:6, 7:19, 8:15, 8:18, 8:20, 8:24, 9:3, 9:21, 10:3, 12:2, 12:8, 12:24, 13:5, 13:19, 15:11, 20:25, 24:4, 24:5, 28:13, 28:16, 28:19, 28:20, 28:25, 29:4, 29:6, 29:12, 29:15, 29:18
**prosecutor's** [1] - 6:8
**prosecutorial** [1] - 20:22
**prosecutors** [5] - 6:8, 9:25, 11:22, 11:24, 13:15
**protect** [1] - 115:12

**protected** [1] - 20:23
**protections** [1] - 6:19
**protocol** [6] - 53:2, 106:22, 123:8, 128:3
**provable** [1] - 127:20
**provide** [18] - 6:17, 19:8, 34:22, 36:8, 42:17, 52:1, 54:20, 54:22, 54:23, 54:24, 55:3, 55:9, 55:14, 101:21, 118:15, 134:19, 140:10, 154:18
**provided** [14] - 4:20, 18:7, 44:7, 44:9, 44:10, 59:8, 62:22, 63:1, 96:15, 108:2, 125:17, 126:3, 134:24, 136:7
**provider** [1] - 150:10
**providers** [3] - 68:20, 150:11, 150:12
**provides** [3] - 52:10, 63:24, 103:2
**providing** [4] - 36:8, 42:8, 100:8, 103:11
**pseudonymous** [1] - 85:6
**psychology** [2] - 96:4, 96:5
**public** [21] - 47:16, 52:6, 54:13, 54:14, 69:20, 72:6, 76:10, 76:14, 76:15, 85:3, 97:11, 101:1, 103:12, 103:14, 125:6, 128:3, 132:1, 132:3, 132:4, 134:19
**publicly** [6] - 23:22, 23:23, 50:13, 54:19, 105:3, 107:14
**published** [2] - 35:6, 128:17
**pulled** [1] - 38:11
**pulling** [1] - 29:21
**pulls** [1] - 23:22
**punish** [1] - 149:10
**purchase** [2] - 45:20, 45:23
**pure** [1] - 144:24
**purely** [2] - 38:10, 130:20
**purposes** [10] - 58:16, 58:17, 58:18, 58:19, 58:21, 59:25, 109:20, 131:8, 146:5, 150:20
**pursue** [1] - 25:11
**put** [16] - 3:24, 12:2, 13:13, 38:6, 40:19,

40:20, 41:1, 43:18, 54:25, 83:8, 105:23, 106:11, 112:22, 114:6, 124:2, 143:21
**puts** [1] - 25:9
**putting** [2] - 22:16, 152:20

**Q**

**qualifications** [2] - 44:22, 104:15
**qualified** [1] - 104:8
**quality** [1] - 15:23
**quarters** [1] - 153:25
**quash** [6] - 4:2, 4:6, 4:18, 18:2, 30:9, 30:23
**query** [1] - 52:3
**questionable** [1] - 38:3
**questioning** [2] - 37:15, 129:18
**questions** [21] - 7:16, 14:18, 16:4, 16:9, 16:11, 21:11, 21:14, 37:10, 76:19, 88:19, 89:2, 93:21, 94:13, 116:25, 129:21, 138:6, 138:7, 140:15, 141:22, 141:25, 150:25
**quick** [2] - 33:18, 51:19
**quickly** [5] - 36:10, 55:17, 81:7, 86:12, 86:15
**quietly** [1] - 141:18
**quite** [2] - 76:21, 131:9
**quote** [2] - 30:9, 100:12
**quote-unquote** [1] - 100:12

**R**

**raise** [2] - 41:5, 95:12
**raised** [4] - 97:5, 98:23, 137:16, 151:25
**ran** [2] - 35:7, 100:5
**RANDOLPH** [1] - 1:8
**ransomware** [1] - 43:8
**rare** [1] - 9:1
**rate** [10] - 74:2, 74:5, 74:8, 117:6, 117:10, 119:23, 122:20, 134:6, 140:12, 141:3
**rates** [4] - 16:11,

58:10, 119:9, 139:23
**rather** [5] - 3:19, 52:8, 61:5, 64:8, 118:13
**rationale** [2] - 7:4, 7:7
**rea** [3] - 152:15, 152:21, 154:13
**reach** [3] - 98:7, 99:7, 144:12
**reached** [3] - 72:8, 97:21, 98:11
**reaction** [1] - 117:24
**Reactor** [70] - 9:18, 14:11, 24:25, 26:12, 28:8, 59:13, 64:6, 69:14, 73:25, 74:3, 74:6, 74:9, 74:15, 74:21, 74:23, 75:1, 75:19, 77:6, 77:10, 79:24, 81:1, 94:7, 94:9, 94:11, 103:6, 107:18, 110:15, 115:3, 115:16, 115:18, 119:10, 119:15, 119:20, 119:23, 120:4, 121:6, 121:14, 121:19, 122:13, 122:25, 123:5, 123:6, 123:20, 123:24, 124:2, 124:7, 124:11, 125:8, 127:25, 128:13, 128:18, 128:25, 129:7, 130:20, 132:8, 132:11, 132:16, 134:8, 134:12, 134:17, 135:1, 135:5, 135:9, 135:16, 135:23, 139:19, 139:23, 140:7, 141:16
**Reactor's** [4] - 79:20, 81:4, 122:20, 127:16
**read** [6] - 4:8, 123:15, 142:3, 147:20, 148:13, 149:11
**readily** [1] - 76:22
**reading** [2] - 25:17, 147:17
**ready** [1] - 73:18
**reaffirmed** [1] - 151:20
**real** [3] - 6:24, 12:14, 33:18
**really** [20] - 4:11, 9:2, 20:17, 25:11, 25:18, 25:20, 30:12, 34:9, 34:13, 34:24, 34:25, 37:4, 80:24, 116:14, 121:3, 142:20,

144:13, 144:14, 153:8
**reason** [13] - 4:19, 11:18, 12:14, 24:15, 27:8, 30:25, 31:1, 31:11, 31:18, 105:17, 120:16, 131:3, 144:1
**reasonable** [1] - 90:8
**reasons** [3] - 15:8, 29:17, 153:14
**rebut** [1] - 156:1
**rebuttal** [1] - 31:16
**receive** [8] - 46:14, 46:16, 46:17, 49:4, 50:9, 63:2, 66:13, 136:4
**received** [23] - 35:15, 43:11, 43:15, 43:19, 43:20, 47:24, 48:1, 49:2, 49:6, 49:11, 53:10, 61:18, 62:24, 66:2, 66:17, 73:20, 116:18, 134:10, 134:22, 135:4, 138:15, 148:12
**receives** [1] - 66:5
**receiving** [5] - 22:4, 22:20, 48:20, 49:19, 49:21
**recently** [1] - 34:17
**recess** [1] - 95:4
**Recess** [1] - 40:16
**recognition** [1] - 153:25
**recognize** [1] - 5:19
**recognized** [1] - 148:21
**recollection** [5] - 13:2, 22:15, 22:16, 88:2, 125:25
**reconvene** [1] - 154:17
**record** [6] - 3:4, 17:18, 41:13, 84:20, 85:3, 95:21
**recorded** [9] - 48:9, 48:10, 50:12, 50:18, 50:20, 69:2, 69:8, 84:19, 92:19
**recording** [1] - 26:2
**records** [27] - 45:14, 46:10, 48:15, 48:18, 54:10, 56:9, 56:11, 60:11, 67:20, 67:24, 70:5, 84:5, 84:18, 92:14, 92:16, 92:21, 92:23, 93:7, 93:10, 93:12, 96:25, 97:1, 98:3, 98:5, 102:7,

108:16
**recover** [1] - 100:15
**recovering** [1] - 101:18
**recovery** [1] - 101:19
**Recross** [2] - 2:9, 2:16
**RECROSS** [2] - 94:2, 139:14
**Recross-Examination** [2] - 2:9, 2:16
**RECROSS-EXAMINATION** [2] - 94:2, 139:14
**rectangle** [1] - 65:23
**red** [2] - 62:5, 62:10
**redemption** [1] - 68:11
**redirect** [1] - 88:20
**Redirect** [2] - 2:7, 2:14
**REDIRECT** [2] - 88:24, 134:2
**reference** [2] - 82:6, 88:4
**referenced** [3] - 68:18, 88:3, 113:18
**references** [1] - 110:8
**referencing** [2] - 18:12, 88:14
**referred** [3] - 21:12, 144:10, 144:22
**referring** [3] - 19:19, 76:5, 152:14
**reflect** [2] - 55:19, 57:21
**reflected** [3] - 76:15, 83:16, 84:17
**refreshes** [1] - 88:1
**refused** [2] - 4:23, 6:21
**regard** [5] - 36:15, 36:20, 72:5, 138:7, 146:17
**regarding** [11] - 30:20, 57:9, 89:16, 104:1, 104:5, 105:24, 111:7, 120:22, 136:5, 137:16, 155:2
**register** [3] - 145:25, 149:15, 149:23
**registered** [1] - 97:11
**registering** [2] - 148:6, 150:1
**registration** [6] - 145:9, 145:16, 148:8, 148:15, 149:10
**regular** [1] - 139:5
**regulations** [4] - 4:24, 6:12, 6:15, 116:11

**relate** [2] - 61:16, 111:5
**related** [8] - 43:11, 93:12, 96:20, 102:9, 129:18, 130:13, 131:4, 146:20
**relates** [1] - 145:21
**relating** [5] - 30:14, 96:17, 114:23, 117:6, 135:5
**relation** [5] - 10:15, 26:7, 75:12, 119:15, 121:7
**relationship** [1] - 5:17
**relationships** [1] - 108:5
**relatively** [2] - 31:18, 66:3
**relayed** [1] - 114:22
**released** [1] - 141:18
**relevance** [6] - 13:9, 17:20, 23:18, 25:12, 33:25, 129:18
**relevant** [28] - 10:13, 10:21, 10:22, 11:5, 11:9, 11:15, 11:16, 12:10, 12:17, 13:8, 13:11, 23:8, 24:14, 25:20, 26:3, 26:5, 31:13, 31:14, 31:24, 34:8, 34:9, 61:6, 63:20, 104:14, 104:15, 131:14, 142:5, 142:19
**reliability** [9] - 37:22, 101:17, 102:6, 115:14, 128:1, 130:15, 133:12, 133:22, 138:8
**reliable** [12] - 36:24, 62:17, 101:16, 102:2, 115:6, 118:20, 118:23, 127:21, 129:7, 134:8, 134:17, 136:8
**relied** [3] - 87:9, 114:23, 115:3
**relies** [2] - 80:22, 116:6
**rely** [3] - 69:14, 116:15, 146:10
**relying** [2] - 54:18, 146:17
**remaining** [1] - 50:3
**reminding** [1] - 39:14
**remove** [1] - 9:23
**renew** [2] - 31:5, 32:1
**repeat** [4] - 4:9, 9:9, 72:14, 89:11
**rephrase** [1] - 128:15

**replicate** [1] - 128:3
**replicated** [1] - 127:20
**reply** [1] - 18:1
**report** [69] - 8:4, 14:17, 15:22, 35:15, 35:24, 57:11, 57:16, 57:21, 58:3, 58:12, 59:1, 59:8, 59:14, 60:16, 61:9, 61:15, 64:17, 66:13, 67:8, 68:2, 68:18, 69:4, 70:2, 70:11, 72:11, 72:15, 73:4, 76:18, 80:4, 81:11, 82:3, 82:5, 82:6, 87:13, 88:1, 88:3, 88:8, 90:8, 92:15, 93:16, 105:23, 108:18, 108:21, 108:24, 109:4, 109:8, 109:17, 110:2, 113:9, 113:12, 113:17, 114:22, 120:23, 121:1, 121:3, 122:23, 124:18, 124:20, 124:24, 125:21, 125:25, 126:6, 126:7, 130:22, 132:19, 137:17, 138:4
**REPORTER** [1] - 157:1
**Reporter** [3] - 1:21, 1:21, 157:10
**reporter** [2] - 33:10, 40:11
**reporting** [1] - 139:4
**reports** [11] - 16:7, 21:9, 21:11, 134:19, 155:13, 155:18, 155:21, 156:3, 156:4, 156:7, 156:10
**represent** [2] - 76:23, 78:17
**representation** [1] - 145:1
**representative** [1] - 47:16
**representing** [1] - 126:22
**represents** [1] - 110:16
**reproducibility** [1] - 37:22
**request** [5] - 16:3, 31:5, 32:1, 95:8, 97:2
**requests** [1] - 24:8
**require** [1] - 34:20

**required** [4] - 6:13, 29:7, 32:2, 149:2
**requires** [4] - 32:3, 35:9, 49:21, 137:5
**requiring** [2] - 29:3, 34:18
**reschedule** [2] - 32:23, 40:10
**rescheduled** [1] - 156:5
**research** [14] - 18:10, 19:14, 89:3, 89:9, 94:10, 96:12, 97:7, 97:8, 97:14, 102:14, 125:19, 136:17, 136:19
**researcher** [1] - 89:6
**researchers** [1] - 136:21
**Reserve** [5] - 68:17, 70:5, 81:25, 83:20, 84:1
**reserve** [1] - 40:18
**respect** [14] - 4:1, 10:23, 17:10, 17:19, 20:17, 30:19, 142:3, 142:17, 143:5, 146:2, 146:6, 153:18, 154:18, 154:20
**respond** [2] - 7:21, 24:11
**response** [11] - 42:12, 42:15, 42:21, 42:23, 44:9, 56:10, 117:24, 118:1, 118:3, 140:9, 152:16
**responsibilities** [1] - 102:9
**responsible** [2] - 12:9, 85:13
**responsive** [1] - 135:7
**rest** [2] - 40:10, 40:20
**restate** [3] - 86:18, 115:1, 132:9
**restricting** [1] - 153:18
**result** [2] - 24:21, 26:25
**results** [2] - 24:25, 75:21
**retained** [1] - 21:23
**retaining** [1] - 54:3
**retention** [1] - 21:23
**retrieve** [1] - 37:6
**retrieved** [1] - 93:7
**return** [2] - 95:9, 145:9
**returns** [1] - 60:12
**revealed** [1] - 35:23
**review** [25] - 46:10, 52:7, 66:9, 67:16,

69:16, 69:23, 71:22, 81:19, 82:3, 86:5, 87:18, 87:19, 88:7, 89:25, 92:21, 92:23, 93:3, 93:7, 94:6, 115:20, 126:6, 137:6, 139:5, 140:2, 156:4
**reviewed** [25] - 35:7, 37:5, 58:8, 60:7, 60:8, 60:9, 60:10, 63:20, 74:11, 74:18, 79:19, 80:13, 81:4, 86:6, 86:24, 87:2, 87:3, 90:10, 122:18, 122:24, 123:2, 127:15, 127:23, 128:16, 130:21
**reviewing** [5] - 54:24, 63:15, 96:25, 108:15, 137:1
**revolutionaries** [1] - 153:12
**right-hand** [1] - 65:24
**rip** [2] - 50:7, 107:2
**rise** [1] - 95:11
**risk** [1] - 118:13
**RMR** [2] - 1:21, 157:9
**Road** [1] - 99:22
**road** [2] - 23:7, 32:1
**roads** [1] - 23:5
**Rochester** [1] - 41:22
**role** [5] - 21:6, 21:20, 28:13, 103:8, 112:18
**ROMAN** [1] - 1:5
**Roman** [8] - 3:3, 3:13, 3:16, 19:15, 19:16, 108:12, 154:5, 154:9
**room** [1] - 24:7
**Room** [2] - 1:22, 157:10
**rotation** [1] - 19:7
**rough** [3] - 53:20, 56:19, 104:3
**roughly** [2] - 9:6, 9:11
**Rule** [1] - 34:13
**rule** [6] - 7:4, 7:7, 34:17, 34:24, 35:9, 156:2
**rules** [3] - 11:6, 35:14, 53:1
**ruling** [1] - 31:24
**run** [1] - 53:24
**running** [1] - 54:1
**runs** [1] - 54:5
**Russia** [1] - 8:8

**S**

**S-c-h-o-l-l** [1] - 41:14

**sales** [1] - 99:20
**salient** [1] - 11:20
**Sam** [1] - 130:4
**Samurai** [1] - 122:4
**sanctions** [2] - 147:12, 147:13
**Sarah** [1] - 123:13
**sat** [2] - 5:22, 123:18
**satisfied** [3] - 30:7, 30:16, 31:8
**saw** [1] - 25:14
**scale** [1] - 90:12
**scene** [1] - 25:4
**schedule** [2] - 33:14, 39:8
**scheduled** [1] - 33:22
**schedules** [1] - 3:18
**scheduling** [4] - 32:19, 33:7, 33:8, 33:21
**scholl** [1] - 15:21
**Scholl** [18] - 40:6, 40:24, 41:12, 41:14, 41:15, 44:13, 45:7, 59:1, 60:6, 64:19, 67:16, 70:13, 72:11, 72:22, 73:18, 89:2, 91:13, 94:5
**SCHOLL** [5] - 2:3, 41:10, 73:16, 88:25, 94:3
**Scholl's** [1] - 45:1
**school** [3] - 8:9, 8:13, 41:25
**science** [5] - 26:7, 41:21, 41:25, 96:2, 96:6
**scientific** [18] - 26:19, 58:4, 58:8, 58:10, 74:11, 74:18, 79:19, 80:12, 97:14, 122:18, 122:24, 123:2, 123:8, 124:5, 127:22, 128:16, 129:8, 130:20
**scientifically** [2] - 26:6, 127:14
**scope** [4] - 84:3, 87:6, 151:7, 151:11
**Scott** [4] - 32:16, 32:20, 33:15, 33:24
**scraping** [1] - 80:22
**screen** [1] - 124:12
**screens** [1] - 121:20
**screenshot** [1] - 92:11
**screenshots** [6] - 59:7, 69:3, 69:5, 69:6, 69:12
**scrolling** [1] - 52:14
**search** [12] - 51:18,

52:8, 52:11, 60:12, 69:10, 86:2, 135:1, 135:5, 135:7, 135:9, 136:13, 141:16
**searches** [1] - 86:5
**seated** [2] - 41:8, 95:14
**second** [13] - 10:16, 17:13, 29:22, 49:3, 55:3, 68:9, 69:1, 79:23, 110:24, 119:6, 127:8, 144:11
**secrecy** [1] - 150:3
**section** [4] - 68:3, 96:14, 96:24, 110:3
**Section** [2] - 81:11, 126:10
**sections** [1] - 113:11
**sector** [6] - 103:12, 103:14, 132:1, 132:3, 132:4, 134:19
**securities** [1] - 148:4
**security** [2] - 42:1, 70:20
**see** [29] - 9:22, 13:23, 22:4, 25:11, 25:20, 26:3, 31:12, 40:9, 51:5, 56:6, 81:12, 82:15, 82:16, 86:7, 89:25, 90:11, 97:21, 111:25, 114:18, 116:1, 124:3, 126:12, 126:17, 126:22, 131:13, 131:18, 143:14, 143:15, 156:12
**seeing** [3] - 14:6, 70:4, 70:6
**seek** [6] - 28:20, 28:21, 46:10, 46:12, 57:24, 113:23
**seeking** [4] - 14:23, 24:14, 32:23, 37:12
**seem** [2] - 8:19, 27:18
**SEFRANEK** [1] - 157:3
**Sefranek** [3] - 1:21, 157:9, 157:9
**seize** [1] - 67:25
**seized** [3] - 93:8, 100:14, 101:22
**seizing** [1] - 100:12
**seizure** [4] - 42:18, 101:19, 102:18, 135:10
**selling** [1] - 100:2
**send** [18] - 21:9, 47:22, 48:5, 48:6, 49:8, 49:12, 49:14, 49:23, 50:1, 53:9,

53:10, 56:1, 56:8, 102:5, 112:16, 140:8
**sending** [8] - 49:7, 65:19, 66:3, 66:6, 71:15, 84:18, 85:11, 152:16
**sends** [1] - 71:16
**sense** [7] - 56:19, 75:20, 80:17, 117:18, 122:10, 133:22, 153:16
**sensed** [1] - 66:21
**sensitive** [1] - 134:16
**sent** [11] - 50:3, 61:17, 65:9, 65:10, 65:16, 68:12, 68:14, 68:16, 84:5, 101:18, 112:17
**separate** [2] - 84:10, 132:13
**separately** [2] - 18:5, 69:16
**September** [1] - 88:3
**series** [2] - 50:25, 65:9
**serious** [2] - 16:11, 30:13
**serve** [1] - 98:6
**served** [4] - 18:17, 41:23, 118:7, 156:10
**servers** [2] - 86:22, 86:25
**service** [23] - 21:21, 43:9, 61:18, 62:25, 63:12, 63:14, 68:20, 71:24, 72:10, 78:25, 79:8, 89:24, 90:25, 99:20, 112:20, 113:6, 120:17, 122:3, 139:6, 150:8, 150:10, 150:11
**services** [19] - 21:11, 52:8, 67:21, 90:12, 96:2, 108:6, 108:10, 108:25, 111:15, 113:23, 114:3, 122:4, 124:22, 125:1, 131:23, 132:5, 132:7, 132:10, 149:13
**set** [16] - 6:11, 35:11, 39:11, 44:21, 52:6, 54:8, 54:10, 93:16, 96:21, 102:16, 104:14, 106:2, 110:4, 113:11, 138:3, 140:12
**sets** [5] - 67:25, 70:6, 101:22, 136:12
**setting** [1] - 100:11
**settled** [1] - 119:6
**seven** [2] - 26:13, 36:2

**several** [7] - 54:20, 59:5, 59:17, 90:9, 107:19, 145:3
**sham** [1] - 6:4
**shared** [1] - 79:7
**shed** [1] - 38:14
**shop** [2] - 50:5, 50:6
**Shormint** [2] - 68:17, 81:25
**shortly** [1] - 16:25
**show** [7] - 69:7, 83:17, 84:2, 84:3, 142:23, 143:3, 149:9
**showed** [3] - 65:3, 66:11, 152:24
**showing** [1] - 5:6, 5:7, 13:21, 14:13, 30:16, 30:19, 32:2, 32:4, 38:19, 69:9, 94:24
**showings** [1] - 5:10
**shown** [17] - 13:7, 13:25, 61:11, 61:13, 66:9, 68:4, 68:5, 69:3, 69:19, 69:20, 70:2, 70:11, 71:6, 92:4, 92:10, 108:21
**shows** [9] - 12:13, 13:23, 63:9, 63:11, 65:15, 65:17, 83:17, 84:4, 142:11
**sic** [1] - 111:22
**side** [8] - 65:24, 97:18, 105:16, 111:2, 115:16, 132:12, 134:12, 136:2
**signature** [1] - 57:18
**signatures** [2] - 35:1, 78:11, 80:8
**signed** [2] - 19:25, 51:11
**significance** [3] - 62:11, 72:4, 72:7
**significant** [7] - 21:7, 63:6, 65:3, 66:19, 66:20, 90:22, 100:19
**Silk** [1] - 99:22
**SIM** [1] - 43:9
**similar** [6] - 46:22, 63:25, 68:16, 92:18, 96:13, 113:7
**similarly** [1] - 98:10
**simple** [1] - 24:19
**simply** [8] - 7:4, 10:3, 28:13, 29:17, 38:1, 59:25, 142:5, 142:18
**single** [14] - 12:15, 35:15, 47:20, 48:21, 49:16, 51:8, 58:7, 83:7, 99:17, 122:24,

123:2, 127:14, 127:22, 139:10
**single-mission** [1] - 99:17
**singular** [1] - 78:6
**sit** [8] - 77:11, 78:13, 119:22, 122:17, 123:10, 125:20, 127:13, 127:22
**sites** [1] - 121:8
**situation** [5] - 5:21, 7:5, 7:13, 149:7
**situs** [1] - 149:3
**six** [1] - 65:18
**Sixth** [2] - 27:23, 151:17
**slightly** [2] - 81:15, 82:10
**small** [1] - 90:15
**smaller** [1] - 66:3
**software** [40] - 21:21, 24:15, 24:19, 24:25, 26:12, 26:17, 26:23, 27:2, 27:5, 27:7, 28:9, 47:8, 58:6, 75:20, 76:22, 103:2, 106:19, 107:4, 107:6, 107:11, 107:18, 114:23, 115:3, 115:9, 115:10, 115:11, 116:7, 116:8, 119:10, 119:15, 119:20, 121:6, 123:25, 124:8, 124:12, 127:19, 130:25, 140:22, 140:25, 141:2
**sole** [1] - 150:23
**solely** [5] - 74:16, 120:12, 120:15, 120:18, 125:5
**solutions** [5] - 103:9, 120:6, 120:8, 120:9, 120:20
**Solutions** [4] - 131:22, 132:1, 132:3, 134:11
**someone** [7] - 16:20, 25:21, 46:5, 136:25, 153:19, 153:21
**sometimes** [4] - 5:25, 46:7, 51:1, 127:3
**somewhere** [1] - 53:10
**soon** [2] - 32:24, 33:1
**sorry** [22] - 9:8, 10:16, 14:16, 28:17, 52:18, 72:14, 79:13, 86:11, 86:13, 89:11, 111:9, 111:13, 115:1,

116:1, 117:13, 121:10, 125:24, 125:25, 127:6, 132:2, 146:9, 148:2
**sort** [30] - 4:10, 5:13, 6:3, 6:4, 6:23, 7:3, 7:11, 18:24, 19:8, 23:25, 24:6, 24:21, 25:2, 34:19, 43:4, 46:8, 46:14, 46:19, 56:24, 67:23, 80:7, 90:2, 112:18, 121:20, 123:3, 131:16, 134:15, 137:4, 146:21, 152:14
**sound** [4] - 37:18, 38:2, 38:12, 80:18
**sounds** [2] - 39:10, 155:19
**source** [18] - 18:10, 19:14, 21:2, 31:4, 31:20, 57:4, 57:9, 60:21, 64:19, 64:23, 65:1, 67:2, 71:21, 81:4, 97:8, 101:12, 124:12, 137:4
**sources** [11] - 5:9, 29:11, 30:20, 32:7, 60:6, 85:17, 93:16, 125:15, 125:20, 126:4, 136:14
**sourcing** [1] - 60:18
**space** [3] - 97:10, 97:22, 103:24
**speaking** [3] - 61:8, 65:1, 100:4
**Special** [2] - 18:16, 20:8
**special** [2] - 18:18, 100:9
**specialist** [2] - 42:4, 96:12
**specialists** [1] - 102:14
**specific** [21] - 4:20, 14:14, 14:15, 15:16, 32:5, 50:22, 57:6, 68:3, 68:15, 78:25, 81:11, 90:20, 93:5, 93:10, 93:12, 123:9, 137:15, 138:2, 138:20, 154:19
**specifically** [11] - 38:23, 57:2, 61:8, 79:4, 94:12, 99:13, 105:22, 108:7, 122:12, 122:14, 144:21
**specificity** [3] - 34:18,

34:20, 34:21
**specifying** [1] -
155:14
**speculating** [1] -
10:10
**speed** [1] - 39:12
**spell** [2] - 41:12, 95:20
**spend** [50] - 27:21,
45:7, 49:6, 49:22,
49:23, 49:24, 49:25,
50:9, 51:1, 77:22,
79:6, 105:14,
105:15, 105:19,
106:5, 107:1,
107:13, 110:20,
110:21, 112:9,
112:24, 113:1,
113:3, 113:21,
114:8, 121:14,
121:17, 121:25,
122:7, 123:4, 123:6,
123:7, 123:16,
123:24, 124:2,
124:4, 124:5, 124:9,
125:3, 126:20,
127:4, 127:8, 137:9,
137:20, 137:24,
138:2, 138:3
**spending** [6] - 48:20,
77:14, 78:4, 78:15,
79:16, 79:20
**spends** [1] - 79:1
**spent** [5] - 53:11,
66:3, 68:20, 107:5,
126:23
**spoken** [1] - 22:18
**spotting** [1] - 133:19
**spreadsheet** [2] -
109:8, 109:12
**spreadsheets** [2] -
59:19, 101:4
**squad** [3] - 21:13,
43:7, 43:8
**squarely** [1] - 7:14
**squeeze** [1] - 23:17
**staff** [2] - 19:6, 42:4
**stage** [2] - 142:13,
142:20
**stages** [1] - 34:6
**stand** [6] - 10:18,
12:2, 41:2, 78:13,
95:7, 123:10
**standard** [15] - 6:10,
7:19, 13:15, 13:16,
13:17, 13:18, 24:7,
29:3, 29:16, 29:19,
29:25, 30:7, 31:8,
143:1, 144:2
**standards** [2] - 5:2,
5:3

**start** [10] - 4:5, 29:5,
44:1, 51:13, 51:15,
54:22, 88:16, 98:22,
141:24, 142:22
**started** [7] - 18:25,
42:3, 96:20, 97:6,
100:24, 102:13
**starting** [6] - 3:5, 28:5,
61:9, 108:25, 110:3,
143:9
**starts** [6] - 8:2, 8:6,
8:7, 28:22, 81:11,
126:16
**state** [3] - 3:4, 41:12,
95:20
**statement** [1] - 6:1
**statements** [4] - 58:9,
67:2, 87:20, 96:25
**STATES** [3] - 1:1, 1:2,
1:8
**States** [21] - 1:22, 3:3,
3:7, 8:6, 8:14, 12:16,
12:25, 29:8, 29:13,
41:23, 120:13,
130:8, 148:22,
148:25, 151:16,
152:6, 152:9, 153:4,
153:20, 154:7, 154:8
**statistical** [3] - 74:2,
119:18, 119:23
**statistics** [1] - 79:18
**stenographic** [1] -
157:5
**steps** [3] - 60:23,
63:15, 112:11
**Sterlingov** [21] - 3:3,
3:13, 3:16, 16:14,
19:15, 19:16, 22:9,
30:1, 38:5, 57:2,
67:1, 67:10, 72:13,
72:17, 86:4, 87:4,
88:17, 90:1, 92:22,
108:13, 120:22
**STERLINGOV** [1] - 1:5
**Sterlingov's** [18] -
27:23, 57:5, 59:15,
59:16, 60:11, 64:20,
65:2, 65:4, 65:16,
66:18, 66:22, 72:5,
72:8, 86:2, 86:5,
93:1, 93:3, 120:25
**Stevens** [1] - 42:1
**still** [9] - 34:19, 36:19,
40:7, 50:12, 70:21,
123:22, 146:1, 146:2
**stipulated** [1] - 106:21
**stood** [1] - 71:10
**stop** [1] - 10:16
**store** [3] - 47:1, 47:5,
47:7

**stored** [1] - 148:13
**story** [1] - 23:16
**straight** [1] - 119:25
**straightforward** [1] -
7:17
**streamlined** [1] -
118:16
**Street** [2] - 1:11, 1:17
**stretch** [1] - 10:5
**strike** [1] - 29:5
**string** [1] - 47:15
**stronger** [1] - 145:13
**structured** [1] - 91:16
**studies** [2] - 35:23,
35:25
**study** [2] - 35:5, 111:3
**studying** [2] - 131:15,
131:17
**stuff** [3] - 16:24, 80:8,
155:21
**subject** [1] - 38:25
**subjecting** [1] - 150:1
**subjects** [2] - 135:14,
135:19
**submarine** [1] - 41:23
**submit** [7] - 10:25,
11:5, 12:9, 13:10,
13:11, 26:5, 37:24
**submits** [1] - 27:22
**submitted** [1] - 148:10
**subpoena** [9] - 4:1,
4:2, 4:16, 4:18,
46:15, 46:22, 56:1,
56:8, 85:11
**subpoenaed** [4] -
19:21, 19:24, 20:12,
56:5
**subpoenas** [2] -
18:17, 136:13
**subsequent** [1] - 66:3
**subsequently** [1] -
68:19
**subset** [1] - 111:22
**subsidiary** [2] -
120:10, 120:12
**substantial** [1] - 153:3
**substantive** [1] - 19:9
**success** [1] - 129:4
**sudden** [1] - 9:20
**suffice** [1] - 149:18
**sufficient** [6] - 143:4,
143:23, 144:2,
146:4, 146:24, 147:9
**suggest** [3] - 35:17,
66:10, 155:21
**suggests** [1] - 142:10
**summarize** [1] - 64:14
**summarizing** [1] -
108:18
**summary** [4] - 4:20,

6:17, 44:22, 109:7
**superior** [1] - 19:8
**superseding** [3] -
88:5, 88:7, 88:10
**supervision** [2] -
150:2, 150:3
**supervisor** [1] - 97:2
**support** [20] - 18:1,
18:7, 20:1, 20:9,
25:9, 42:8, 42:17,
43:7, 58:8, 96:15,
97:3, 100:6, 100:8,
103:11, 103:12,
103:13, 135:1,
135:23, 144:23
**supported** [2] - 43:7,
135:9
**supporting** [1] - 102:9
**supports** [1] - 134:18
**suppose** [3] - 37:25,
38:9, 94:22
**supposed** [1] - 36:1
**Supreme** [2] - 148:25,
151:20
**surfaces** [1] - 116:7
**surfing** [1] - 25:17
**suspect** [1] - 8:22
**sustain** [1] - 29:11
**swaps** [1] - 43:9
**Sweden** [2] - 152:3,
154:4
**sweep** [5] - 82:18,
82:20, 83:3, 83:13,
91:14
**swept** [1] - 91:23
**sworn** [2] - 41:7,
95:13
**symbol** [1] - 82:13
**system** [1] - 13:5
**systems** [1] - 21:11

**T**

**tab** [1] - 104:11
**Tab** [1] - 109:6
**table** [2] - 64:13,
106:12
**tactics** [1] - 114:4
**takedown** [1] - 99:22
**talks** [1] - 124:5
**Tamara** [3] - 1:21,
157:9, 157:9
**TAMARA** [1] - 157:3
**Tamura** [1] - 29:8
**tape** [1] - 26:2
**task** [1] - 43:19
**tax** [1] - 149:9
**teach** [1] - 44:6
**Team** [1] - 41:18
**team** [15] - 42:6, 42:8,

42:12, 42:14, 42:15,
42:21, 42:23, 44:10,
44:12, 103:10,
103:11, 103:19,
125:19, 134:18
**team's** [1] - 42:9
**techniques** [6] -
42:17, 44:3, 72:19,
73:3, 124:8, 137:10
**technology** [1] - 122:6
**Technology** [1] - 42:1
**ten** [1] - 40:13
**ten-minute** [1] - 40:13
**term** [1] - 50:16
**terms** [4] - 19:11,
152:15, 155:18,
155:20
**terribly** [1] - 38:12
**test** [5] - 112:18,
137:6, 153:2, 153:3,
153:4
**tested** [2] - 133:22,
133:24
**testified** [9] - 67:1,
72:20, 94:5, 104:5,
119:6, 121:16,
121:19, 124:7, 134:5
**testify** [5] - 5:24, 6:2,
22:13, 22:14, 32:16,
34:4, 36:4, 40:24,
154:5
**testifying** [5] - 7:6,
34:16, 37:2, 37:3,
155:14
**testimony** [28] - 4:3,
4:21, 5:7, 5:8, 6:17,
11:2, 24:14, 25:6,
29:3, 29:6, 32:23,
33:25, 35:19, 35:25,
36:21, 44:23, 56:10,
57:8, 61:23, 74:14,
80:24, 104:16,
106:25, 119:13,
120:21, 124:25,
134:7, 139:19
**testing** [1] - 154:21
**tests** [1] - 43:24
**text** [2] - 113:18,
149:11
**THE** [183] - 1:1, 1:1,
1:8, 3:2, 3:8, 3:11,
3:14, 3:17, 7:20,
7:24, 8:1, 8:19, 9:7,
9:9, 10:1, 10:12,
10:16, 11:1, 11:8,
11:21, 12:12, 12:15,
13:1, 13:7, 13:13,
14:12, 15:2, 15:13,
16:1, 16:19, 16:22,
17:8, 17:12, 21:1,

21:15, 21:25, 22:11,
22:21, 24:10, 25:1,
26:8, 27:8, 27:14,
28:2, 28:15, 28:18,
29:2, 32:14, 32:25,
33:6, 33:18, 34:3,
34:6, 34:17, 35:2,
35:21, 36:14, 36:22,
37:3, 37:9, 37:14,
37:20, 37:25, 39:2,
39:7, 39:10, 39:20,
40:2, 40:9, 40:17,
41:3, 41:5, 41:8,
45:2, 45:4, 52:18,
52:22, 53:4, 53:5,
53:18, 58:1, 58:15,
59:24, 60:2, 73:8,
73:11, 73:13, 86:11,
86:14, 86:17, 86:18,
87:6, 87:14, 88:20,
88:23, 90:4, 90:7,
90:21, 90:23, 91:2,
91:3, 91:10, 91:11,
93:20, 93:23, 94:1,
94:14, 94:18, 94:22,
95:2, 95:10, 95:11,
95:14, 98:4, 98:5,
104:20, 104:22,
109:19, 109:22,
115:20, 115:23,
115:24, 116:2,
116:3, 116:6,
116:17, 116:20,
116:21, 116:24,
117:1, 117:4,
117:13, 118:10,
118:25, 128:8,
129:20, 130:11,
131:2, 131:14,
131:20, 133:11,
138:9, 138:24,
139:13, 140:16,
140:19, 141:5,
141:10, 141:19,
143:12, 143:16,
143:21, 144:17,
145:2, 145:12,
145:21, 146:9,
146:15, 146:19,
147:23, 148:5,
148:10, 148:23,
149:19, 149:21,
150:5, 150:16,
150:24, 151:5,
151:9, 151:19,
151:25, 152:4,
153:8, 153:16,
153:23, 154:16,
155:3, 155:6, 155:9,
155:15, 156:8,
156:12

themselves [3] - 53:3,
113:15, 154:23
theories [1] - 5:16
therefore [2] - 30:2,
79:3
they've [7] - 6:9,
19:24, 55:12, 91:19,
116:18, 129:4, 154:8
thinks [1] - 142:18
third [9] - 55:9, 55:14,
68:12, 68:13, 80:16,
108:4, 125:12,
125:17, 126:15
third-party [2] - 108:4,
125:17
thousand [1] - 56:21
thousands [13] -
53:22, 59:19, 59:20,
64:11, 109:13,
135:23, 139:6,
139:9, 139:25,
140:4, 140:5
threats [1] - 43:10
three [11] - 19:24,
49:4, 49:10, 49:14,
49:22, 49:24, 50:1,
68:8, 69:7, 77:6,
153:25
three-bitcoin [2] -
49:22, 49:24
three-quarters [1] -
153:25
threshold [1] - 151:18
throughout [3] -
43:16, 56:21, 70:18
tie [2] - 130:15, 131:11
timing [5] - 72:1, 72:4,
72:7, 80:5, 80:8
title [2] - 121:1, 123:19
today [21] - 3:18, 3:22,
15:19, 32:22, 33:8,
37:1, 39:13, 40:4,
40:9, 40:18, 44:23,
50:18, 77:11, 78:13,
104:16, 106:25,
119:22, 122:17,
123:10, 125:20,
127:13
today's [2] - 58:21,
109:20
together [12] - 22:17,
34:9, 38:19, 55:4,
55:12, 90:15, 98:21,
101:2, 105:24,
112:23, 113:4, 118:8
ton [1] - 52:12
took [2] - 12:4, 71:8
tool [18] - 21:25, 22:5,
23:22, 54:18, 55:8,
101:3, 102:3, 103:5,

103:6, 118:23,
132:14, 133:12,
133:22, 136:5,
136:7, 136:11,
138:14, 154:22
tools [24] - 24:3,
54:14, 54:15, 54:19,
54:20, 55:6, 55:9,
55:15, 55:16, 61:7,
63:25, 64:7, 74:25,
100:22, 101:7,
101:8, 101:9,
101:12, 101:16,
101:17, 101:24,
102:1, 103:3, 103:5
top [10] - 33:15, 53:22,
65:13, 65:23, 68:23,
83:2, 83:13, 150:17,
150:21, 151:13
topic [2] - 34:3, 52:19
topics [2] - 44:3,
104:8
TOR [1] - 1:15
Tor [2] - 1:16, 3:12
total [2] - 65:21,
137:22
totally [1] - 6:24
touch [1] - 148:16
touched [3] - 23:9,
23:12, 100:17
Touhy [5] - 4:23, 4:24,
6:12, 6:14, 9:2
towards [2] - 4:11,
96:19
trace [9] - 26:15,
75:12, 81:22, 82:9,
83:22, 88:10, 97:16,
98:17, 114:13
traced [1] - 85:12
traces [2] - 26:11, 87:3
tracing [30] - 15:20,
20:3, 20:4, 20:7,
21:16, 21:23, 22:7,
22:8, 26:12, 35:15,
35:19, 57:12, 57:22,
66:24, 67:9, 68:21,
70:10, 76:22, 76:23,
81:14, 87:19,
113:24, 114:19,
123:12, 132:20,
133:7, 135:15,
135:20, 155:18
trades [1] - 46:21
traditional [3] - 96:14,
96:23, 98:2
trafficking [2] - 25:2,
141:15
trained [2] - 26:21,
73:24
training [7] - 43:11,

43:17, 43:19, 44:10,
77:6, 102:20, 129:9
trainings [10] - 43:14,
43:15, 43:21, 43:23,
44:5, 44:7, 44:9,
104:1, 129:3
transact [1] - 71:19
transacted [1] -
112:25
transacting [2] -
98:24, 133:2
transaction [73] -
12:4, 15:21, 47:25,
48:9, 48:10, 48:12,
48:13, 48:14, 48:17,
48:19, 48:21, 48:24,
49:7, 49:11, 49:14,
49:16, 49:18, 50:6,
50:22, 51:3, 51:5,
51:9, 51:12, 51:16,
51:17, 51:20, 53:9,
54:3, 55:21, 68:24,
68:25, 70:25, 71:16,
76:1, 78:3, 78:10,
81:9, 82:18, 82:20,
82:21, 83:2, 83:7,
83:12, 84:18, 85:4,
87:22, 87:23, 88:4,
90:10, 90:20, 91:4,
91:8, 92:19, 103:7,
105:17, 106:13,
106:23, 108:15,
111:3, 111:10,
112:1, 112:5,
112:14, 112:18,
113:3, 116:9,
132:13, 133:7,
142:5, 152:14
transactions [78] -
26:13, 45:14, 46:21,
48:11, 49:20, 50:17,
50:20, 53:8, 53:14,
57:7, 60:8, 61:3,
61:4, 61:8, 61:16,
61:24, 62:7, 62:9,
63:16, 64:2, 64:9,
64:11, 65:17, 65:19,
66:1, 66:3, 68:9,
68:16, 69:2, 69:7,
69:16, 70:13, 70:16,
70:17, 70:21, 71:15,
71:18, 72:12, 72:16,
78:3, 79:9, 80:5,
80:6, 83:18, 83:22,
84:3, 85:13, 87:21,
90:7, 90:9, 93:12,
97:16, 98:18, 98:19,
100:9, 101:1, 103:4,
105:18, 106:10,
106:20, 110:25,

125:11, 127:18,
133:1, 144:15,
144:24, 144:25,
145:3, 145:5,
145:16, 145:24,
146:8, 146:10,
146:12, 146:14,
148:17, 153:9
TRANSCRIPT [1] - 1:7
transcript [2] - 157:4,
157:6
transfer [9] - 8:12,
12:20, 47:9, 48:2,
48:3, 49:5, 71:11,
106:12, 133:5
transferred [4] -
18:22, 48:16, 65:5,
65:21
transfers [4] - 59:14,
70:23, 72:2, 72:4
transmit [1] - 48:7
transmits [1] - 45:14
transmitted [1] - 48:8
transmitting [2] -
147:24, 149:13
transparent [1] - 5:1
travel [1] - 3:22
treasury [1] - 9:19
Trial [1] - 20:3
trial [19] - 8:21, 13:4,
22:25, 23:2, 23:3,
23:8, 29:4, 29:6,
35:22, 58:18,
142:24, 143:3,
145:23, 153:13,
154:1, 154:2,
155:22, 156:5, 156:7
trick [1] - 114:11
TRM [9] - 43:20,
43:22, 43:25, 54:16,
61:7, 63:21, 63:23,
63:24, 75:2
true [10] - 78:5, 78:8,
84:9, 85:2, 85:5,
85:6, 85:10, 85:15,
157:4, 157:5
trust [1] - 137:4
truth [1] - 26:1
try [4] - 39:21, 50:24,
114:11, 153:18
trying [7] - 23:17,
48:2, 53:13, 55:5,
87:11, 107:1, 152:19
turn [4] - 10:20, 34:7,
34:10, 71:6
turning [5] - 59:4,
64:13, 108:7,
108:24, 130:24
turns [2] - 10:21,
16:17

180

**twice** [2] - 151:16, 153:15
**Twitter** [1] - 71:23
**two** [49] - 5:10, 9:6, 9:12, 15:10, 17:14, 17:22, 18:24, 27:25, 30:11, 33:8, 34:6, 40:5, 49:2, 49:10, 49:13, 49:15, 50:3, 71:17, 78:2, 83:13, 83:14, 83:15, 90:15, 91:6, 91:8, 93:23, 103:3, 103:5, 110:17, 112:21, 115:8, 116:7, 120:1, 121:4, 132:24, 134:21, 141:25, 143:18, 144:17, 144:18, 144:24, 145:15, 151:21, 154:19, 154:21, 155:8
**type** [16] - 25:7, 26:7, 45:16, 46:4, 56:16, 79:23, 80:6, 80:16, 98:6, 98:12, 103:10, 106:17, 111:1, 130:13, 131:4, 137:2
**types** [7] - 26:13, 45:15, 77:6, 102:17, 103:3, 112:5, 116:7
**typically** [10] - 51:13, 91:16, 100:14, 105:19, 111:15, 118:1, 118:4, 122:2, 132:12, 132:15

---

**U**

**U.S** [10] - 1:13, 17:24, 18:25, 44:10, 68:13, 103:11, 103:14, 126:3, 132:1, 132:3
**UC** [1] - 63:5
**UK** [1] - 141:15
**ultimately** [1] - 65:21
**unavailable** [1] - 6:2
**unclear** [2] - 34:15, 36:20
**under** [10] - 7:6, 20:23, 23:12, 27:23, 32:2, 34:19, 68:3, 126:9, 148:14, 156:8
**undercover** [25] - 60:8, 61:3, 61:8, 61:16, 61:17, 61:24, 62:1, 62:7, 62:9, 62:23, 62:24, 63:16, 87:21, 87:22, 100:9, 102:18, 144:15,

---

144:25, 145:15, 145:24, 146:7, 146:10, 146:12, 146:14, 152:14
**underlie** [1] - 59:20
**underlying** [8] - 55:18, 72:25, 78:6, 107:12, 114:24, 115:2, 116:7, 121:5
**understood** [2] - 34:11, 116:4
**unheard** [1] - 8:25
**unilateral** [2] - 152:11, 154:12
**unique** [7] - 14:10, 15:4, 17:5, 27:25, 48:12, 48:13, 51:17
**United** [21] - 1:22, 3:3, 3:7, 8:6, 8:14, 12:16, 12:25, 29:8, 29:13, 41:22, 120:13, 130:8, 148:22, 148:24, 151:16, 152:6, 152:9, 153:4, 153:20, 154:7, 154:8
**UNITED** [3] - 1:1, 1:2, 1:8
**universe** [2] - 111:22, 111:25
**university** [2] - 96:3, 96:5
**University** [3] - 41:22, 96:6, 123:17
**unless** [3] - 87:21, 123:22, 138:6
**unlikely** [1] - 90:18
**unquote** [1] - 100:12
**unrelated** [1] - 131:17
**unscientific** [1] - 58:13
**unspent** [2] - 106:22, 106:23
**untested** [1] - 58:6
**unusual** [2] - 4:12, 5:21
**unvalidated** [1] - 58:14
**up** [46] - 3:20, 3:21, 3:23, 3:24, 13:3, 17:12, 20:21, 23:21, 23:24, 25:10, 25:18, 29:21, 31:25, 38:11, 42:15, 54:8, 70:4, 76:2, 88:22, 89:12, 90:4, 90:25, 98:3, 100:11, 102:16, 107:2, 107:6, 117:1, 117:4, 117:13, 130:3, 137:15, 141:12, 141:14,

---

142:12, 149:9
**update** [8] - 34:23, 34:24, 35:1, 36:8, 146:16, 154:18, 155:4, 155:20
**updated** [1] - 156:9
**updating** [2] - 34:22, 155:3
**USAO** [1] - 1:11
**USAO-DOJ** [1] - 1:11
**user** [6] - 47:22, 47:23, 47:24, 52:1, 52:10, 54:23
**users** [9] - 45:20, 47:3, 47:7, 52:24, 114:23, 115:3, 115:18, 129:4, 139:4
**uses** [10] - 77:6, 77:11, 77:14, 107:21, 121:14, 121:20, 124:8, 131:9, 132:11, 135:22
**utility** [1] - 136:5
**utilize** [1] - 122:5
**UTXO** [1] - 106:22

---

**V**

**vagaries** [1] - 6:3
**valid** [2] - 53:9, 53:15
**validate** [8] - 15:24, 16:15, 55:24, 60:23, 61:4, 61:5, 63:16, 112:11
**validated** [2] - 16:10, 16:12
**validates** [3] - 45:14, 66:23, 74:20
**validating** [2] - 53:8, 64:1
**validation** [4] - 56:12, 67:6, 80:12, 87:18
**validity** [4] - 16:7, 58:11, 84:20, 137:6
**valuable** [3] - 98:14, 116:14, 118:13
**value** [1] - 47:14
**variety** [3] - 64:3, 64:20, 136:4
**various** [10] - 65:2, 65:7, 67:2, 67:20, 68:20, 103:14, 103:24, 115:17, 122:2, 145:17
**vary** [1] - 145:12
**vast** [1] - 44:15
**vendor** [4] - 97:4, 129:12, 129:15, 130:10

---

**venire** [1] - 153:24
**venue** [40] - 6:5, 6:6, 10:15, 10:19, 11:11, 11:17, 11:24, 12:11, 12:18, 14:23, 20:17, 30:13, 142:3, 142:5, 142:12, 142:21, 143:10, 143:15, 144:8, 145:17, 145:22, 146:2, 146:5, 146:6, 146:20, 147:2, 147:7, 147:10, 151:3, 151:6, 151:10, 151:15, 152:5, 153:14, 153:17, 154:14, 154:20, 154:21
**venue-related** [1] - 146:20
**verifiability** [1] - 16:16
**verifiable** [5] - 58:4, 101:16, 108:2, 125:16, 133:24
**verification** [1] - 154:21
**verified** [9] - 48:9, 54:9, 84:17, 84:19, 108:4, 108:25, 125:18, 127:14, 141:14
**verify** [6] - 15:24, 87:12, 113:7, 117:15, 136:10, 140:23
**verifying** [4] - 56:11, 113:14, 137:2, 155:20
**version** [1] - 35:13
**versus** [2] - 10:18, 110:21
**view** [8] - 138:14, 141:3, 142:1, 142:4, 143:22, 143:23, 144:1, 152:5
**viewing** [1] - 101:1
**views** [1] - 36:23
**Virginia** [1] - 12:3
**virtual** [16] - 42:11, 42:15, 42:20, 42:22, 42:25, 43:2, 43:11, 44:9, 45:10, 45:12, 45:15, 46:2, 46:20, 67:20, 92:23, 93:14
**visit** [1] - 45:22
**vitae** [2] - 44:19, 104:12
**vital** [6] - 5:7, 5:18, 5:19, 11:10, 30:17, 31:2

---

**volume** [1] - 56:19
**voluminous** [3] - 4:8, 59:2, 109:12
**vs** [1] - 1:4

---

**W**

**wait** [1] - 39:22
**waiving** [1] - 21:5
**walk** [4] - 48:24, 65:14, 68:3, 82:9
**walked** [1] - 25:15
**Wall** [1] - 1:17
**Wallet** [3] - 78:19, 91:2, 122:4
**wallet** [42] - 47:8, 47:10, 47:18, 47:20, 47:23, 47:25, 48:4, 48:7, 49:1, 49:8, 49:9, 50:2, 50:7, 50:11, 51:10, 59:17, 66:5, 66:12, 66:18, 66:22, 71:17, 82:13, 82:15, 84:2, 84:7, 84:10, 84:11, 86:3, 86:9, 89:19, 101:20, 101:21, 105:7, 106:19, 107:4, 107:6, 107:8, 107:10, 112:5, 112:17, 127:19
**wallets** [1] - 47:21
**wants** [5] - 20:2, 23:15, 39:22, 47:22, 154:18
**warfare** [1] - 41:23
**warrant** [2] - 60:12, 135:7
**warrants** [5] - 135:1, 135:5, 135:9, 135:10, 136:13
**Wasabi** [5] - 78:19, 79:7, 89:19, 91:2, 122:4
**Washington** [8] - 1:5, 1:12, 1:14, 1:23, 8:12, 18:22, 18:24, 157:11
**ways** [5] - 4:15, 47:5, 78:9, 106:6, 117:15
**wears** [1] - 33:10
**web** [3] - 52:5, 52:11, 68:20
**website** [1] - 45:22
**websites** [1] - 52:3
**Wednesday** [1] - 39:22
**week** [9] - 32:10, 32:15, 32:17, 33:4, 33:14, 35:19,

102:12, 102:15, 151:21
**week-long** [1] - 102:12
**weeks** [2] - 151:21, 155:8
**welcome** [3] - 4:6, 21:4, 31:5
**well-established** [2] - 7:18, 149:17
**well-known** [1] - 45:16
**WFO** [1] - 18:23
**whatsoever** [4] - 18:4, 91:5, 153:17
**whole** [4] - 4:25, 99:23, 129:17, 129:18
**wild** [1] - 17:17
**withdraw** [1] - 86:20
**withdrawal** [13] - 62:20, 62:22, 62:25, 63:3, 63:5, 91:25, 92:4, 92:9, 92:12, 92:16, 112:16, 113:2, 113:3
**withdrawals** [4] - 46:21, 91:14, 91:15, 91:18
**withdrawing** [1] - 131:8
**withdrawn** [2] - 68:7, 68:13
**withdrew** [1] - 61:19
**witness** [48] - 4:23, 4:25, 5:22, 6:1, 6:2, 6:5, 6:14, 7:2, 7:4, 7:6, 7:7, 7:9, 9:4, 10:4, 10:17, 17:4, 24:3, 24:5, 26:9, 28:14, 29:13, 30:1, 30:3, 30:18, 30:24, 31:6, 32:2, 36:4, 38:1, 38:12, 40:12, 40:14, 40:22, 41:2, 41:7, 94:16, 94:24, 95:2, 95:13, 133:10, 133:16, 138:9, 140:16, 140:18, 140:20, 155:14
**WITNESS** [13] - 2:2, 52:22, 53:5, 86:18, 90:7, 90:23, 91:3, 91:11, 98:5, 115:23, 116:2, 116:6, 116:20
**witnesses** [14] - 3:18, 3:22, 9:24, 19:24, 23:1, 25:5, 27:22, 32:11, 33:8, 40:1, 40:5, 152:3, 154:3, 154:23

**wonder** [1] - 146:21
**wondering** [1] - 10:24
**word** [5] - 75:7, 75:15, 75:16, 99:5, 126:16
**word-of-mouth** [1] - 99:5
**words** [2] - 45:10, 104:25
**works** [3] - 28:23, 44:2, 107:4
**worried** [1] - 154:7
**write** [2] - 21:9, 124:24
**writes** [2] - 8:4, 14:17
**writing** [2] - 66:13, 88:7
**written** [1] - 6:17
**wrote** [3] - 18:9, 124:19, 154:1

## X

**Xchange** [3] - 68:14, 68:15, 68:17

## Y

**year** [2] - 19:3, 57:8
**years** [13] - 4:13, 8:19, 9:6, 9:12, 15:11, 17:15, 27:25, 35:4, 41:24, 43:5, 43:17, 115:19, 134:22
**York** [1] - 1:17
**yourself** [4] - 52:7, 52:9, 53:24, 150:2

## Z

**zero** [1] - 141:2
**Zoom** [3] - 32:18, 32:20, 32:22