```
 1                IN THE UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF COLUMBIA
 2
      UNITED STATES OF AMERICA,        )  Criminal Action
 3                                      )  No. 1:21-CR-0399
                         Plaintiff,     )
 4                                      )  MOTIONS HEARING
      vs.                               )
 5                                      )  Washington, D.C.
      ROMAN STERLINGOV,                 )  July 19, 2023
 6                                      )  Time:  10:30 A.M.
                         Defendant.     )
 7
                   TRANSCRIPT OF MOTIONS HEARING
 8        BEFORE THE HONORABLE JUDGE RANDOLPH D. MOSS
                    UNITED STATES DISTRICT JUDGE
 9
                     A P P E A R A N C E S
10
      For the Plaintiff:       CHRISTOPHER BROWN - VIA ZOOM
11                             USAO-DOJ
                               601 D Street, NW
12                             Washington, DC 20001

13                             ALDEN PELKER
                               U.S. DEPARTMENT OF JUSTICE
14                             950 Pennsylvania Avenue, NW
                               Washington, DC 20530
15
      For the Defendant:       TOR EKELAND
16                             MICHAEL HASSARD
                               Tor Ekeland Law, PLLC
17                             30 Wall Street, 8th Floor
                               New York, NY 10005
18

19

20

21    Court Reporter:          Tamara M. Sefranek, RMR, CRR, CRC
                               Official Court Reporter
22                             United States Courthouse, Room 6714
                               333 Constitution Avenue, NW
23                             Washington, DC  20001
                               202-354-3246
24

25
```

```
1                          I N D E X

2

     WITNESS                                        PAGE
3
     DR. ITIEL DROR
4
          Direct Examination
5         By Mr. Ekeland                            33

6         Cross-Examination
          By Mr. Brown                              45
7
          Redirect Examination
8         By Mr. Ekeland                            88

9
     J.W. VERRET
10
          Direct Examination
11        By Mr. Ekeland                            92

12        Cross-Examination
          By Mr. Brown                              131
13

14

15   EXHIBITS ADMITTED                              PAGE

16   Defense Exhibits B, C and D                    32

17

18

19

20

21

22

23

24

25
```

```
1                    P R O C E E D I N G S
2              THE COURTROOM DEPUTY:  Calling Criminal Case
3    No. 21-399, United States of America v. Roman Sterlingov.
4              Would counsel please state your names for the record,
5    starting with government counsel.
6              MS. PELKER:  Good morning, Your Honor.  Alden Pelker
7    for the United States.
8              THE COURT:  Good morning, Ms. Pelker.
9              MS. PELKER:  And I'm joined by Mr. Brown on Zoom.
10             THE COURT:  Mr. Brown, welcome.
11             MR. EKELAND:  Good morning, Your Honor.  Tor Ekeland
12   for defendant, Roman Sterlingov, who is present in court.
13             THE COURT:  Good morning to both of you.
14             MR. HASSARD:  Good morning, Your Honor.  Michael
15   Hassard for defendant, Roman Sterlingov.
16             THE COURT:  Okay.  Good morning to you as well.
17             So I take it that there's some scheduling issues
18   counsel wanted to discuss before we turn to the substance
19   today.
20             MS. PELKER:  Yes, Your Honor.  I think there are a
21   couple housekeeping matters.
22             First and foremost, the government, in our last set
23   of Daubert hearings, if the Court recalls, had planned to put
24   on Ms. Mazars de Mazarin, the FBI computer scientist who did
25   work on this case.  She had a death of a loved one just before
```

1    the first hearing.

2              We had anticipated to have her testify today.

3    Unfortunately -- we let defense counsel know earlier this

4    week -- she has still not yet returned to full-time regular

5    work.  Our expectation is that she will be back and available

6    to testify at trial and for -- if the Court deems it needed --

7    a *Daubert* hearing closer to the trial date.

8              Out of an abundance of caution, the government is

9    also looking at alternatives of having someone who could cover

10   her area of testimony, if needed.  Particularly, the IP address

11   testimony that we understand is the substance of the defense

12   challenge, including potentially having that area of testimony

13   covered by the FBI case agent who is a former computer

14   scientist and with a computer science background.  We hope to

15   give the Court and defense counsel an update on that by early

16   next week.

17             I think one note on that, too, is something that the

18   government would reiterate its position on that this is not the

19   subject -- an appropriate subject of a *Daubert* proceeding.  Our

20   understanding is that the defense is challenging the IP address

21   analysis.  All Ms. Mazars de Mazarin's testimony is is that she

22   reviewed different accounts, different devices, found that the

23   same IP address were accessing various accounts.  She'll

24   testify to that.

25             Defense can cross-examine her and can put on their

1    expert who says that the accesses were too far apart in time,

2    that IP addresses can be used by multiple people.  But that's

3    appropriate for cross-examination at trial, not a *Daubert*

4    inquiry.

5                    THE COURT:  If I understand correctly, what you're

6    saying is that she's not offering an expert opinion at all, but

7    merely fact testimony, that she saw certain digits in a

8    particular order on a particular computer file or history and

9    then went and looked somewhere else and saw the same digits

10   organized in the same order somewhere else.

11                   MS. PELKER:  That's correct.  And her report focuses

12   on certain ones that she found particularly significant because

13   they were close in time.  The defense can argue that they're

14   not significant for XYZ reason.

15                   THE COURT:  Is she offering an opinion that things

16   that are close in time are often associated in some way?

17                   MS. PELKER:  I do believe that that would be an

18   opinion or an analysis she would be offering, yes.

19                   THE COURT:  I suppose, if she's offering an opinion,

20   then there's a question about what the basis is for the

21   opinion.  It may be that much of what she wants to say is --

22   testify to is factual in nature, but to the extent she's

23   offering an opinion, I suppose I'd need to figure out whether

24   there's a sufficient basis for that opinion.

25                   MS. PELKER:  And we would just argue that that can be

1    done on the papers with the face of the report, and we

2    understand what defense counsel's, we think, position and

3    objection is.

4            THE COURT:  Okay.  Well, there also may be --

5    frankly, that is -- assuming that is the only issue, that it is

6    a narrow enough one that, even if we had to do it early in the

7    morning or sometime during the course of trial, it could be

8    done that way as well.

9            MS. PELKER:  The other scheduling issue -- and

10   defense can speak to this further -- there's two other

11   scheduling issues.  Our understanding was that Ms. Mazars de

12   Mazarin was the --

13           THE COURT:  I'm sorry.  Can you say that name and

14   spell it for me again.

15           MS. PELKER:  Yes.  Mazars, M-a-z-a-r-s, de, d-e,

16   Mazarin, M-a-z-a-r-i-n.

17           THE COURT:  Okay.  Thank you.

18           MS. PELKER:  Our understanding was that Ms. Mazars

19   de Mazarin was the only outstanding government expert that had

20   been noticed that the defense intended to challenge through

21   *Daubert* proceedings.  They advised us on Monday that they also

22   intend to challenge Ms. Glave, the forensic accountant, and

23   Mr. Vlahakis, the FinCEN expert.

24           Those are two purely fact witnesses.  They were

25   noticed out of an abundance of caution.  They are not going to

1    be opining on anything.  We're still not clear what the grounds

2    are for any *Daubert* challenge of their testimony.

3              THE COURT:  Okay.

4              MS. PELKER:  And the last scheduling matter is

5    Ms. Still, the defense -- the newly retained defense blockchain

6    expert.  We understand that she was not available today, and so

7    we'd be seeking scheduling of a *Daubert* hearing for her.  That

8    *Daubert* hearing may be unnecessary if we can just get a report

9    of what her work actually is on this case.

10             I know that's been the subject of lengthy

11   discussions.  And at the last hearing, the Court ordered

12   defense counsel to produce any supplemental expert reports by

13   July 7th, and we had discussions about that, including any

14   blockchain analysis report.  We still don't have one.

15             We don't know what she's going to testify to.  We

16   don't anticipate challenging her qualifications, but we don't

17   know what she's going to testify to, so we don't know whether

18   we need to *Daubert* her or not.

19             THE COURT:  All right.  Thank you.  Mr. Ekeland?

20             MR. EKELAND:  Good morning, Your Honor.  To address

21   what counsel just said, to start with Ms. Mazarin, she is

22   offering an opinion as to the IP address attribution.  She --

23   if you look at her disclosure and her report, she says the IP

24   address attribution is -- she uses adjectives like likely and

25   positive.  She also uses a software -- whose name I forget, but

1    it's in the report -- to do that analysis, of which there's no

2    known error rates or accuracy rates, and we're not clear at all

3    on the scientific validity of that software.

4          Essentially, she's offering an opinion as to the fact

5    of whether or not these IP addresses at question here can be

6    attributed to Mr. Sterlingov.  So that's not a question --

7          THE COURT:  Can you explain that to me a little bit

8    more.  What is the process that she's going through to

9    attribute?

10         MR. EKELAND:  She's taking the Mt. Gox database

11   records, which, obviously, we take issue with as inauthentic

12   for all the issues that we've raised in our papers.  She's

13   using the Mt. Gox data and what she's claiming to be IP

14   addresses, logins for Mr. Sterlingov.  And then she's running a

15   software analysis through software to then say that, because of

16   the temporal proximity between the IP address that she's

17   attributing to Mr. Sterlingov, based on the IP address

18   attribution, that because of its temporal proximity to other IP

19   addresses that the government is claiming are associated with

20   the setup of Bitcoin Fog -- and if I recall correctly, the DNS,

21   the clearnet website registration in 2011 -- a completely legal

22   act, by the way.

23         She's saying that it's likely and it's possible that

24   the IP address that she alleges that Mr. Sterlingov used from

25   his Mt. Gox account, based on what we maintain are inauthentic

1    records, is matching email address, IP addresses on a proxy

2    server and that, therefore, the user of -- like an email

3    address, like volfprius@hotmail.com and Roman Sterlingov are

4    the same person.  That's a matter of opinion.  That's

5    speculation.

6          And you can just see that by -- and Mr. Fischbach

7    today, one of our experts that we're proffering, can talk about

8    this a little bit.  That's speculative, and that comes squarely

9    into *Daubert*.  So there's a very strong disagreement here with

10   the government that this is just a simple matter of fact.

11         I think that's one of the underlying problems here

12   with the forensics in this entire case.  The government is

13   taking this approach that, oh, it's just this fact that you

14   look up.  But, as you can see from the government's late-filed

15   newly disclosed expert report that they filed last night from

16   Ms. Bisbee, there's --

17         THE COURT:  That was filed at my request.

18         MR. EKELAND:  Yes, Your Honor.  Not only -- you just

19   asked for additional academic papers or any kind of scientific

20   peer-reviewed stuff.  Ms. Bisbee's declaration has all sorts of

21   new information in it.

22         It's been no secret that from day one, we've been

23   saying that this software has no scientific validation, there's

24   no known error rates, there's nothing.  In her disclosure that

25   was filed at 10:30 last night, we've essentially gotten a whole

1    new expert report with all sorts of information about unnamed

2    data scientists and a whole host of information that we need to

3    address in an expert report; and Ms. Still can do that, and we

4    would like to submit Ms. Still's expert report on -- by Friday,

5    August 18th, if that works for the Court.

6              THE COURT:  That seems like an awfully long time from

7    now given the fact that these are late to start with.  I'm just

8    worried that we start pressing up against trial, and if we have

9    to have a *Daubert* hearing --

10             MR. EKELAND:  Your Honor, there's a massive amount of

11   information that was disclosed last night that has not been

12   previously disclosed.

13             THE COURT:  A massive amount?  Are you talking about

14   the seven or eight pages that were filed with me?

15             MR. EKELAND:  Yes, Your Honor, because they also

16   attached the white paper from Sarah Meiklejohn which contains a

17   whole tracing now.  That paper -- that white paper that they

18   attached, Your Honor, that was commissioned by Chainalysis, and

19   the government and Chainalysis has known about that paper for a

20   year now.

21             We mentioned that paper in our motions in limine.  We

22   mentioned it in our 57-7 motion for sanctions with the Court.

23   And Ms. Bisbee, when she testified -- when she testified on

24   direct, she said that she was -- kept up with all the

25   literature in this area, that she was -- basically, said she

1    was an expert and current on all the literature.

2          THE COURT:  I'm sorry, Mr. Ekeland.  Just to try and

3    make things more efficient here, you have a little bit of a

4    tendency to go off and just make an argument that's unrelated

5    to, sort of, what I'm asking about.  I understand you want to

6    argue the merits of it.

7          I'm just asking about timing now and the work that

8    needs to be done, and you're using that as, sort of, a

9    springboard to attack the government's case.

10         MR. EKELAND:  Your Honor --

11         THE COURT:  I'm sorry.  I'm speaking.  You need to

12   address what my question is, timing, and what the basis is for

13   thinking you need an entire month to prepare an expert report.

14   Particularly given -- frankly, the expert reports that I've

15   received have been scanned, at best, so far.

16         MR. EKELAND:  Your Honor, we need the time because

17   Ms. Still tells me that she's going through, and she's trying

18   to recreate Mr. Scholl's tracing, and there's significant

19   errors and omissions in the tracing.  There's a significant

20   amount of information that was disclosed for the first time

21   last night.

22         If you look at the white paper that specifically

23   addresses this case, there's a tracing in it that we requested

24   the underlying data set for; we have not been given that.

25   We've, essentially, been given a new expert report last night

1    at 10:30, and we need the time in this case that turns entirely

2    on blockchain forensics that both the government's experts

3    admitted they have no known error rates, and now we're getting

4    told something entirely new and different.

5              We filed for a bill of particulars almost a year ago

6    in this case.  And everything is changing.  They've gone down

7    from saying in their press release that Mr. Sterlingov

8    laundered $334 million worth of illicit drug fronts; then in

9    the --

10             THE COURT:  I'm sorry.  You're doing it again.

11             MR. EKELAND:  But, Your Honor, here's the thing.

12   You're asking us to -- everything is changing repeatedly.

13   We're being told, okay, it's easy to write an expert report.

14             Part of the problem, what's taking so much time, we

15   haven't gotten full disclosure from the government, and their

16   case keeps on changing, right?  The trace in the criminal

17   complaint is different from the trace in the Scholl report,

18   which looks like it's different from the trace in the white

19   paper.

20             And we need a month to go through this stuff

21   carefully.  And something else; under Rule 16, if you read the

22   committee notes to the new rule, it says that the Court should

23   give consideration to appointed counsel's needs and the time it

24   takes to find the money to acquire proper experts.  That's part

25   of the reason that we've been slowed down here.

```
 1              We haven't had the funding.  The CJA process is
 2    incredibly slow.
 3              THE COURT:  So the reason that you identified
 4    Ms. Still's late in the process was the funding issue?
 5              MR. EKELAND:  That's one of the issues.
 6              THE COURT:  Can you explain that to me.  I want to
 7    make sure that that's an accurate statement to the Court.
 8              The forms are submitted to me.  I haven't seen
 9    anything submitted requesting authorization for the expert;
10    certainly, not months ago or weeks ago in that regard.  So I'm
11    a little surprised by that.
12              MR. EKELAND:  Your Honor, because it took weeks for
13    us just merely, after we submitted our forms to CJA here, to
14    get on the eVoucher system.  It's an incredibly slow system.
15    What we've been told by the administrators of that system, they
16    have a whole host of cases that they could give us if we wanted
17    to take CJA because other attorneys in this district don't want
18    to work with the CJA system.  It's not an efficient system.
19              THE COURT:  Let me say this.  If you're having any
20    problem getting anything approved promptly, just let me know.
21              MR. EKELAND:  I will then, Your Honor.  That's
22    helpful.  It's also not just what -- it's not just the money.
23    It's also what happened with Mr. Scott.  ████████████████
24    ████████████████████████████
25              MS. PELKER:  Your Honor --
```

1           THE COURT:  Let's not get --

2           MR. EKELAND:  Your Honor, there's a whole host of

3    reasons.  What we're asking for is permission from the Court to

4    submit an expert report from Ms. Still --

5           THE COURT:  I'm not saying that you shouldn't be

6    allowed to.  I'm saying that a month seems an awful lengthy

7    period of time at this point in the case since we're coming up

8    on trial.

9           MR. EKELAND:  Your Honor, everything in this case

10   turns on the blockchain tracing.  And at our last hearing, this

11   Court candidly admitted that you didn't --

12          THE COURT:  I don't admit things.  I mean -- they

13   weren't admitted --

14          MR. EKELAND:  That's actually what you said in the

15   transcript.  You asked if there was an administrator to the

16   blockchain.  And if you're asking --

17          THE COURT:  The courts don't make admissions.  I'm

18   not on one side or the other.  What are you talking about, an

19   admission?

20          MR. EKELAND:  What the Court was saying is that you

21   didn't fundamentally know the basics of the blockchain.  And

22   one of the fundamental facts of the blockchain is that there is

23   no administrator.

24          So what I'm saying is I asked the Court to look at

25   the complexity of the situation and understand that it's just

1    not as simple as some sort of bank account.  And part of

2    *Daubert* is not just whether the methodology is scientifically

3    valid or if there's error rates; it's also if that methodology

4    has been reliably applied.

5          And Scholl's report, I'm being told by Ms. Still, has

6    significant omissions and errors in it, and we're having to

7    hand enter some of the data that was given to us from the

8    government, like in the Mycelium account, because it hasn't

9    been given to us in a form that's easy to work with.

10          So there's a lot of delay here just based on the

11   information that we've gotten.  There's still data -- I think

12   we are going to need to file a motion to compel next week that

13   we haven't gotten.  I think, based on what we're seeing -- with

14   this new expert report and everything, we're going to have to

15   file a motion to compel, and we need to see the source code

16   from Chainalysis.  There's a whole host of things.

17          Someone's liberty is at stake here, and we need to be

18   careful about this tracing because there's nothing simple about

19   this tracing.  You sat in this courtroom.  I was in this

20   courtroom.  Everybody was here when the government's witnesses,

21   both of them, admitted that they couldn't name one scientific

22   paper attesting to the accuracy of this.

23          THE COURT:  Mr. Ekeland, we're going to be here for

24   days if you just -- every time I ask a question about

25   scheduling or timing, you go into a 20-minute spiel about the

16

1       merits of the case.

2               MR. EKELAND:  Your Honor, I'm just simply trying to

3       tell you, it's not as simple as something that can be sat down

4       and be done in a couple of hours.  And that is --

5               THE COURT:  I'm not talking about a couple of hours.

6       I'm talking about whether you need a month when -- what are we

7       at this point? -- seven weeks from trial, something like that.

8               MR. EKELAND:  Your Honor, the government has had

9       seven years.  You know, our client's liberty is at stake.

10              THE COURT:  Would you be okay with adjourning the

11      trial date, then?  Your client is incarcerated.  It seems to me

12      that's what you're kind of pushing for, frankly.

13              MR. EKELAND:  No, Your Honor.  We're two months ahead

14      of trial.  If we get this in August 18th, the government is

15      going to have a month to evaluate it.  And as -- they're always

16      of the opinion that this is very simple, everything is

17      straightforward.

18              They've done the tracing.  What we're doing is we're

19      looking to make sure that their tracing is accurate, right?  If

20      they had done their job and their tracing is accurate, it's not

21      going to be a big deal for them to rebut this.

22              THE COURT:  I'm not concerned about the time the

23      government has for rebuttal.  I'm concerned about, I need to

24      have a *Daubert* hearing, and they, obviously, would need enough

25      time to analyze what you're doing and for me to have a hearing

1    on these issues on the eve of trial when we have a bunch of

2    other *Daubert* hearings we have to have, other motions that we

3    have to decide; a great proliferation of paperwork in this

4    case.

5         I guess the reason I'm asking the question is whether

6    it's realistic that we go to trial on the date that's scheduled

7    given the fact that things are not being narrowed.  They're

8    being dramatically expanded and delayed as we go.

9         MR. EKELAND:  Well, Your Honor, if we need to take

10   some time at the start of trial -- first of all, I'm not clear

11   that this trial is going to take a month.  I'm not clear on

12   what other witnesses the government has besides the experts.

13   This entire trial, the government's case, simply turns on

14   expert testimony based on the forensics.

15        This is not an ancillary issue.  It's critical.  And

16   it deserves the proper time to be analyzed.  What I've been

17   told by Ms. Still is that she needs a month.  This is with,

18   like, four or five people at CipherTrace going through these

19   traces to properly prepare a report.  That was before we got

20   what is, essentially, a new expert report last night from the

21   government.

22        THE COURT:  I have to tell you, I really do have some

23   questions about your candor to the Court right now.  You stood

24   up a minute ago and just told me the reason you needed the

25   month was because of this new expert report; now you tell me

1    you needed a month beforehand, and that is just adding to it.

2                MR. EKELAND:  Your Honor, that's because she's new.

3                THE COURT:  That's not what you said to me.

4                MR. EKELAND:  Your Honor, the expert report requires

5    the time.  Ms. Still tells me -- when she started going through

6    Scholl's report -- and she's new; we had to replace Mr. Scott,

7    right?

8                She tells me that, because of the way that the data

9    was presented by government and the number of omissions and

10   errors that she's seeing from Mr. Scholl's trace, that she

11   needs that time to prepare a proper report.  If we get a report

12   in on August 18th, that's still almost a month before trial.

13               This is the crux of the government's case.  It's not

14   an ancillary issue, Your Honor.  We're simply asking for an

15   opportunity to fairly examine, now, with the witness -- an

16   expert witness that the government admits is qualified, present

17   a proper written report to rebut or examine or whatever, and

18   put forth our defense -- and put on a complete defense against

19   the government's accusations against Mr. Sterlingov.

20               THE COURT:  All right.  Well, let me hear from

21   Ms. Pelker about this.

22               MS. PELKER:  A few things, Your Honor, that I think

23   the Court has already picked up on.  The filing last night was

24   not any sort of substantive addition to anyone's expert report.

25   It was simply intended to be responsive to the Court's prior

1    inquiry.

2              Defense counsel has had months with the government's

3    expert reports, with detailed expert reports, detailed

4    attachments that we filed back in December before the

5    original --

6              THE COURT:  What about the fact that, due to facts

7    beyond the control of the defense, their other expert is not

8    available to testify, so they need a new expert now?

9              MS. PELKER:  I think that that might be better

10   addressed at sidebar, Your Honor, and we did want to speak

11   about the transcript on that matter.  But with everyone on

12   Zoom, based on the Court's preference, whether we address that

13   now or --

14             THE COURT:  I guess I don't think you need to get

15   into the substance of it.  My point was just that they needed a

16   new expert for reasons that may be beyond their control.

17             MS. PELKER:  They are entirely within the defense

18   control.  Your Honor, the defense has been on notice that this

19   expert had -- the government had serious concerns and issues

20   with this expert.  It is not at all clear to the government how

21   this -- Mr. Scott was ever identified as a potential blockchain

22   analysis expert.  He's simply not a blockchain analysis expert.

23   That was always going to be an issue.

24             I understand that it takes some time to put together

25   an expert report, but defense counsel has been on notice,

1    they've had extended periods of time.  They're now looking at

2    another month, more than a month to put together -- from when

3    they actually retained Ms. Still, to put together an expert

4    report that simply is not going to give the government

5    sufficient time to respond.

6          We also have concerns about what the sufficiency of

7    that expert report is going to look like based on the prior

8    iterations with now several rounds of defense counsel coming

9    back and failing to provide any sort of adequate disclosure

10   under Rule 16.

11         I think the government strongly opposes any

12   continuance in this matter.  We have pushed this trial out

13   extensively at defense's request and putting that out --

14   particularly when Mr. Sterlingov is incarcerated.  Even so, the

15   government is going to be prepared to go to trial in September,

16   and we're going to oppose any sort of continuance.

17         THE COURT:  What would you propose that I do with

18   respect to an expert report from Ms. Still?

19         MS. PELKER:  I think setting an early August deadline

20   for the report.  I recognize that Ms. Still likely does need

21   time to go through the report.  She, presumably, has begun that

22   process and needs some time to actually put together a robust

23   report.  But we just think that August 18th is far too late.

24         If the Court doesn't mind, I can grab my phone with

25   my calendar to look at potential dates.

```
 1              THE COURT:  That's fine.  Remind me of the trial
 2      date.
 3              MS. PELKER:  Trial date is September 14th.  The
 4      pretrial conference is currently scheduled for August 30th, but
 5      we understand that that may be rescheduled.
 6              The government would propose August 7th as a
 7      deadline.  That gives Ms. Still almost three weeks, and will
 8      give the government time to review and quickly try to prepare
 9      for a Daubert hearing, if necessary, prior to the pretrial
10      conference.
11              THE COURT:  All right.  What do you propose with
12      scheduling any additional Daubert hearings?  When are we going
13      to do that?
14              MS. PELKER:  Just pending whatever the Court's
15      availability is.  I think rulings on it are going to be
16      helpful, but we are looking at a compressed schedule now into
17      August.
18              THE COURT:  Right.
19              MS. PELKER:  Possibly the week of -- if August 18th
20      is available or, I guess, early the week of the 21st.
21              THE COURT:  Let me just look at my calendar here.
22      Well, I currently have a trial scheduled the week of
23      August 21st, but it may get delayed.  I don't know.  I'll find
24      out in the next day or so.
25              I suppose we could tentatively schedule further
```

1    *Daubert* hearings for that week and possibly into Monday or

2    Tuesday the week of the 28th.  I can't do it after that.  So I

3    think we're going to have to wrap up all the *Daubert* issues no

4    later than the 28th or 29th of August.

5            Would the government be ready for a *Daubert* hearing

6    the week of the 21st if I direct that the defense file the

7    Still expert report on or before the 7th of August?

8            MS. PELKER:  Yes, Your Honor.

9            THE COURT:  Okay.  Then that's what I'll do.  I'm

10   going to order that the expert report be filed on or before

11   August 7th.  And then let's just pick a day when counsel is

12   available the week of the 21st for a *Daubert* hearing.

13           That's all contingent on my trial being put off, but

14   I suspect it is going to get put off.  What days that week are

15   counsel available?

16           MS. PELKER:  The government can be available any day.

17   We have some conflict on the 21st.  I believe Mr. Brown has

18   another hearing.  We can move it if that's the only date that

19   works; otherwise, any other day that week.

20           THE COURT:  Mr. Ekeland, what's your availability

21   that week?

22           MR. EKELAND:  We're available that week of the 21st,

23   Your Honor.

24           THE COURT:  Why don't we do this.  Why don't we

25   schedule time on the 22nd and 23rd, and that's going to be to

1    resolve any outstanding *Daubert* motions that we don't get

2    through today, I guess, or tomorrow, if we're going into

3    tomorrow, in the next -- that will be all of the remaining

4    *Daubert* issues.

5          MR. EKELAND:  I'm sorry, Your Honor.  Did you say we

6    were scheduled tomorrow?

7          THE COURT:  No, no.  I had originally reserved some

8    time for tomorrow if we needed it.  But it sounds to me like

9    you probably are not going to have the witnesses to put on

10   tomorrow anyway.

11         MR. EKELAND:  No.  We weren't planning on being here

12   tomorrow.  We didn't realize that there was time scheduled

13   tomorrow, Your Honor.

14         THE COURT:  That's fine.  So August 22nd and 23rd I'm

15   just going to reserve, assuming my trial is canceled or

16   postponed, for any remaining *Daubert* hearings.  And that will

17   be both for further *Daubert* hearings that are needed with

18   respect to the defense witnesses and the government witnesses

19   that we don't get to before then.

20         That really is pushing up against the schedule

21   because I can't do anything, really -- I have very little

22   availability the last week of August and the first week of

23   September, and then that puts us into the week when the trial

24   is supposed to take place.  And I've got the Judicial

25   Conference of the United States, which is taking place on the

1    11th and 12th of September.  So that puts us right up to the

2    trial date.

3            I guess maybe we should pick another date now for our

4    pretrial conference as well.  I think -- I need to confirm

5    this, but I think I can do it on September 6th, if that works

6    for the parties.  I do have to confirm that, but I think so.

7    Let me just double-check something.

8            MR. EKELAND:  That works for the defense, Your Honor.

9            THE COURT:  Okay.  Just a second here.

10           MS. PELKER:  That works for the government as well.

11           THE COURT:  Give me one moment here.  Yes, I can do

12   it on the 6th.  Should we schedule that for 10:00 a.m., then,

13   on the 6th?

14           MS. PELKER:  That works for the government, Your

15   Honor.

16           THE COURT:  Actually, let's make -- schedule it for

17   11:00.  That will probably be better.  Schedule it for 11:00 on

18   the 6th.

19           All right.  Any other preliminary matters before we

20   turn to the substance of the day?

21           MS. PELKER:  No, Your Honor.  I think just a note on

22   scheduling for today.  My understanding is that we'll have

23   Dr. Dror, followed by Mr. Verret, and then Mr. Fischbach.  And

24   then we still have, if the Court wants to hear, follow-on

25   arguments from some of the motions that we didn't get to on

1    June 16th or 23rd that the Court had initially indicated it

2    wanted to hear; namely, the Mt. Gox authentication, the bill of

3    particulars, and any further follow-up questions or argument

4    that the Court wanted to hear on the issue of venue.

5            THE COURT:  Okay.  All right.  So then why don't we

6    turn to the first witness.

7            MR. EKELAND:  Your Honor, the defense has a couple of

8    things that they'd like to raise.

9            THE COURT:  Okay.

10           MR. EKELAND:  One with regard to the government's

11   supplemental filing on the venue issues.  It was our

12   understanding that the Court had taken that on consideration

13   and the argument was closed.  So either we ask that it be --

14   that the Court strike it as untimely filed or give us an

15   opportunity to reply to the -- they filed a supplemental

16   opposition.

17           We filed our motion to dismiss a year ago on the

18   venue issue, and the Court in its minute order said it had

19   taken the issue into consideration, which the defense took to

20   mean that the argument on it was closed.

21           THE COURT:  So when would you like to file a reply?

22           MR. EKELAND:  Seven days from now.  Does that put us

23   into the middle of next week?

24           THE COURT:  I will give you until July 24th to reply

25   on the venue issue.  It's not really a new issue or a new

1    filing.  I mean, I think what happened is I actually asked the

2    government at the last hearing whether at trial it intended to

3    rely on any additional facts to establish venue beyond the

4    fairly limited ones that were set forth in the motions.  And I

5    think that was responsive to that filing.

6           And, quite frankly, my own take on it is that it's

7    difficult to resolve a venue issue, at least in this context as

8    a pretrial matter, but I take it that both parties want me to

9    do so.  So I need to know what the evidence would be at trial

10   for that purpose.  But if there's any conflicting evidence or

11   new basis to question the evidence the government has

12   proffered, you're welcome to respond to that.

13          MR. EKELAND:  Thank you, Your Honor.  Then just one

14   more issue.

15          Given the filing last night at 10:30, with the

16   additional information from Ms. Bisbee, we would like to recall

17   her as a witness to cross-examine her as to what was filed last

18   night at the upcoming *Daubert* hearings.

19          THE COURT:  All right.  Ms. Pelker?

20          MS. PELKER:  Your Honor, I think defense counsel had

21   ample opportunity to cross-examine Ms. Bisbee on the exact

22   issues that were raised.  This is not new revelatory

23   information.  It simply was being responsive to the Court's

24   question.

25          Defense counsel, frankly, seems intent on using

1    *Daubert* proceedings as civil-style depositions, which is not

2    the purpose of a *Daubert* challenge.  If there's specific

3    additional information that the Court would find helpful in

4    assessing whether this is appropriate trial testimony, we're

5    happy to put that on.

6              THE COURT:  All right.  Mr. Ekeland?

7              MR. EKELAND:  Your Honor, the -- just having read it

8    cursorily last night, there's a wealth of information going

9    directly to the *Daubert* issues in Ms. Bisbee's disclosures.

10   For instance, she discusses the algorithms underlying the

11   Chainalysis Reactor software and its error rates, and she calls

12   the software deterministic and not probabilistic, which goes

13   directly to the error rate, which is a core issue of *Daubert*.

14   She also references numerous unnamed data scientists who worked

15   for Chainalysis, whom she claims verifies the accuracy of the

16   software.

17             There's a whole wealth of information that was not

18   disclosed in the initial cross-examination, in the initial

19   *Daubert* hearing, which goes directly to the issues of the

20   scientific validity and accuracy of the software, the error

21   rate of the software, the rate of false positives, and the rate

22   of false negatives; and the defense submits that we're entirely

23   within our rights to *Daubert* her on that information because it

24   goes directly to the bases of her opinions.

25             THE COURT:  All right.  Well, let me think about this

1    one.  It may be that the thing to do is, if I conclude by trial

2    that there's a need for some brief period of additional

3    questioning, I just allow it outside the presence of the jury

4    in the context of trial.

5           But let me -- I need to go back and reread her

6    testimony to figure out the extent to which what was offered

7    fundamentally changes anything.  I will let you know about

8    that.  I guess my current inclination is not to recall her at

9    the hearing -- the hearings that I've now scheduled, but if

10   there's a need for some brief examination outside the presence

11   of the jury during trial, then I would permit that.  As I said,

12   I'll look at it again, and if I have a different view, I'll let

13   you know.

14          MS. PELKER:  Thank you, Your Honor.  And just to

15   emphasize, last night's filing does not expand what the

16   government intends to elicit from Ms. Bisbee at trial.  That is

17   covered by our previous notice and the disclosure.

18          THE COURT:  Right.  I take it, it was responsive to

19   the question that I had posed?

20          MS. PELKER:  Yes, Your Honor.

21          THE COURT:  Fair enough.  All right.  Mr. Ekeland?

22          MR. EKELAND:  Your Honor, given the filing last night

23   and what was revealed in the *Daubert* hearings and our Rule 16

24   requests that we've made starting September 23rd of 2022, the

25   defense anticipates having to file a motion to compel for

1    discovery from the government, and I'm just wondering if we

2    should set scheduling for that.  We can file our motion

3    sometime next week.

4              Particularly, what we seek is the source code for

5    Chainalysis Reactor given Ms. Bisbee's disclosures last night

6    about the software and the algorithms and the heuristics

7    involved.  Given that we haven't been given any information on

8    its error rates in the filing last night, we would like direct

9    access to the source code, as well as change logs that document

10   the changes made in the software over the course of time that's

11   being used to directly accuse Mr. Sterlingov.

12             THE COURT:  Ms. Pelker?

13             MS. PELKER:  Your Honor, I think that this was

14   extensively discussed and briefed at the June 16th hearing.

15   The Court gave defense counsel clear instructions that their

16   requests were incredibly broad and that if they had specific

17   asks, they should come back to the Court -- first to

18   Chainalysis and the government, and then come back to the

19   Court.  They haven't done so.  They continue to get up and make

20   these grand arguments.

21             THE COURT:  Mr. Ekeland?  I think that's an accurate

22   description of what happened.

23             MR. EKELAND:  Yes.  But we have made a specific

24   request for the source code from the government in our

25   September 23rd, 2022, Rule 16 letter.

1          THE COURT:  No, no, no.  But the point was, I said

2     last time we talked about this, you've asked for everything

3     under the sun.  That's not the way it works here.  This is not

4     civil discovery.  You need to be more specific.

5          If that's what you're asking for and you're saying

6     this is what we really need, then you need to have a

7     conversation with government counsel or send them a letter

8     saying the judge told us to be narrow and more focused; here is

9     our more narrow and more focused request.

10          MR. EKELAND:  Specifically, the defense requests the

11    source code to Chainalysis Reactor and the change logs

12    documenting all changes in the software over the course of the

13    use of Chainalysis Reactor in this investigation.

14          THE COURT:  Okay.  Well, I think it's premature now

15    for me to set a schedule on briefing on the motion on that

16    since you've just made that request at this moment.  If, after

17    discussions and good faith meeting, conferring with the

18    government, there's still a disagreement, then you can file a

19    motion at that point.

20          I would just urge you to make sure you have those

21    conversations promptly.  Ms. Pelker?

22          MS. PELKER:  We can address it afterwards.

23          THE COURT:  Okay.  Should we call the first witness?

24          MR. EKELAND:  Your Honor, just another minor

25    housekeeping thing in terms of the exhibits for today.  Both

1     the government and the defense have agreed to stipulate that

2     the CVs for the expert witnesses are -- come into evidence, and

3     that would be -- Dr. Dror's CV would come in as Exhibit B;

4     Mr. Verret's CV would come in as Exhibit C.

5                    THE COURT:  I'm sorry.  Hold on a second.  Is this

6     the binder I should be looking at?

7                    MR. EKELAND:  Defense experts.  Yes, Your Honor.  We

8     did send the CVs to the Court.  We also have hard copies here

9     if you need them.

10                    THE COURT:  There's been so much paper in this case

11     that has been submitted in such a haphazard way, I have stacks

12     and stacks of materials.  When you say you're referring to X

13     document, usually I would have, like, a binder in front of me

14     that the parties say:  Here are the exhibits we're going to use

15     for examining this witness, and we move the admission of a

16     particular exhibit.

17                    I can't, sort of, go back and start digging through

18     my desk and see if I can find a copy of a CV that someone

19     e-mailed to the Court.

20                    MR. EKELAND:  We have hard copies.

21                    THE COURT:  That's fine.  I just need to have in

22     front of me whatever you're talking about.

23                    MS. PELKER:  Your Honor, I believe the binder in

24     front of you were government exhibits for the defense experts,

25     including ones that we did not get to because of --

```
 1                THE COURT:  Okay.  So then -- perhaps it's this one
 2      here then?
 3                All right.  So I do have a copy now in front of me of
 4      the Dror CV.  Okay.  And I have Mr. Fischbach's CV, and I have
 5      Mr. Verret's CV.  Okay.
 6                MR. EKELAND:  Thank you, Your Honor.  Just for the
 7      record, Exhibit B would be Dr. Dror's CV, Exhibit C would be
 8      Mr. Verret's CV, and Exhibit D would be Mr. Fischbach's, with
 9      Exhibit A having been our expert disclosures as filed on the
10      docket.
11                THE COURT:  Okay.  These are admitted for purposes of
12      today's hearing.
13                (Defense Exhibits B, C, and D were admitted.)
14                MR. EKELAND:  Thank you.  Your Honor, the defense
15      calls Dr. Itiel Dror.
16                THE COURT:  Okay.
17                THE COURTROOM DEPUTY:  Dr. Dror, would you please
18      raise your right hand.
19                (Witness sworn on Zoom.)
20                THE COURTROOM DEPUTY:  Thank you.
21                MR. EKELAND:  Your Honor, may I proceed?
22                THE COURT:  You may.
23                MR. EKELAND:  Thank you.
24                         DIRECT EXAMINATION OF
25                            DR. ITIEL DROR
```

BY MR. EKELAND:

Q.  Dr. Dror, could you state your educational background.

A.  I have a number of degrees, including a master and a
doctorate Ph.D. from Harvard University.

Q.  And do you have --

A.  Can you hear me well?  I just want to make sure you can
hear me well.

Q.  We can hear you.

A.  Okay.  Great.

Q.  And do you have any other additional degrees?

A.  Yes.  I have also a bachelor's and another master's in
philosophy.

Q.  And have you published any academic articles?

A.  Yes.  I've published about over 150 articles.

Q.  What's your primary focus of academic research?

A.  My area of expertise is human cognition.  I'm interested
how people perceive information, how people interpret
information, how they make judgment and decisions.  And when I
talk about it, I'm not really interested in everyday decisions
of everyday people; for example, where people decide to go to
holiday or how do they decide how to hire the babysitter.

        I'm interested in expert decision-making, so the
decision made by experts; and I should also emphasize that I do
not have any interest in experts who are incompetent or
unmotivated or negligent.  So I'm interested, in a nutshell,

1    why smart people do stupid things.  So it's unintentional

2    mistakes of experts who are dedicated and competent.

3    Q.  And in relation to your work on expert decision-making, do

4    you do any work in the area of forensics?

5    A.  Yes.  I do work in a whole range of areas of experts all

6    over the world.  But, for example, in the United States I

7    worked with the U.S. Air Force on pilot decision-making; or in

8    the medical and healthcare domain, I work with MGH,

9    Massachusetts General Hospital.

10            In terms of policing, I've trained homicide

11   detectives in California.  They've taken out the police --

12   investigating police shooting, and it's done by special agents

13   of the DOJ.  So I trained them.

14            Specifically, in forensics, yes, I've worked and

15   trained the FBI, NYPD, LAPD, dozens of different agencies in

16   the United States and other countries.  For example, in the

17   United Kingdom, the SFO, the Serious Fraud Office of the

18   government that investigates major fraud, I trained all their

19   digital forensic examiners.

20            And only yesterday I got invited by the United

21   Kingdom IRS to train all the digital forensics, the 170 digital

22   forensic experts in their IRS of the UK, and we scheduled it

23   for January and February.

24            So I've done a lot of different work in many expert

25   domains, including forensics and digital forensics.

1    Q.  I believe you mentioned that you worked with the FBI.  What

2    was the nature of your work for the FBI?

3    A.  So I've done a variety of stuff, from being invited to

4    train their experts in the forensic lab in Quantico.  They've

5    also funded a lot of my work; grants from the FBI to research

6    forensic errors.  And the FBI, in many of its supports,

7    including, for example, part of the error in the case of the

8    Madrid bomber, what they've done to improve the procedures,

9    they cite and rely on my research and my work.

10   Q.  You mentioned that you trained the FBI on the issue of

11   forensic error.

12            Could you just elaborate a little bit more on what

13   you mean by forensic error.

14   A.  So, again, we're talking about FBI forensic examiners,

15   highly competent, highly capable, highly motivated people, but

16   nevertheless, because of the architecture of the brain, the way

17   the brain processes information, unintentionally, hard-working

18   experts can make mistakes.  So to explain to them when it

19   happens, how it happens, and ways to minimize such mistakes.

20   Q.  And when you said forensic errors and mistakes in relation

21   to law enforcement, can you just give some concrete examples of

22   the kind of forensic errors you see that are made by law

23   enforcement?

24   A.  Law enforcement and forensics.  Law enforcement is not a

25   scientific endeavor, but if we talk about the science of

1   experts, we're talking about fingerprinting, handwriting

2   analysis, digital forensics.  We show that given the same data,

3   the same facts, and it puts that in quotation, can get a

4   totally different conclusion, conflicted conclusion, based on

5   cognitive errors and cognitive bias.

6           And, again, cognitive bias, not the everyday use of

7   bias if it associates with intentional, discriminatory -- we're

8   talking about cognitive bias that makes them make mistakes in

9   their analysis.

10  Q.  Could you just elaborate a little bit more on the concept

11  of cognitive bias and how it's different than the -- I think

12  what you said, the layperson's understanding of what bias is.

13  A.  The everyday use of the word bias that we all hear about

14  is -- and we talk about intentional and implicit,

15  discriminatory bias that comes from stereotypes and prejudice.

16  Here we're talking about the constraints of the human brain; of

17  how the brain processes information and how it distorts our

18  perception, interpretation, judgment, and decision-making.

19  Q.  I think you've read the government's opposition to your

20  expert disclosure.  If you recall, I think one of the things

21  the government says is that you lack experience in blockchain

22  analysis.

23          Does that affect, in your opinion, your ability to

24  assess forensic error in a case like this?

25  A.  I have no experience or expertise in blockchain analysis,

1    but I don't have any expertise in flying a plane, let alone a

2    supersonic fighter plane, or being a medical doctor or a DNA

3    examiner.  I'm looking at the cognitive level.

4           So I'm not talking about incompetence and expert

5    mistakes because I don't know their expertise.  I'm talking

6    about experts who know their domain, who are competent but fall

7    into that meta-expertise when they make a mistake, and it's not

8    because of incompetence.  It has nothing to do with an actual

9    expertise on the topic.

10          That's why I can train U.S. Air Force pilots or

11   medical doctors or DNA examiners where I have no expertise on

12   those specific areas.  I'm talking about how the brain

13   processes information and how that can bias and give rise to

14   errors.

15   Q.  Would it be fair to say that the way that the brain

16   processes information doesn't change with the type of

17   technology that's in front of the person who has the brain?

18   A.  I'm not sure what you're asking.  We all have a brain.  We

19   all have different brains.  There are certain commonalities,

20   but there are certain differences between different domains.

21          But the basic mechanisms of how the brain processes

22   information, what we call top-down/bottom-up processing, is the

23   same for every person.

24   Q.  And would it be fair to say that in a forensic process that

25   involves assumptions and, essentially, guesses, that cognitive

1    bias is a real danger?

2    A.  I don't think necessarily there are guesses or assumptions.

3    Even without guesses and even without assumptions, bias and

4    errors can happen by forensic examiners.

5          For example, if they go backwards, what we call

6    backwards reasoning, instead of letting the data reach the

7    conclusion, they're working backwards from the conclusion and

8    looking for the data to support the hypothesis that they

9    come -- kind of a confirmation bias, so to speak.  If they

10   don't adopt certain procedures, that blinds them to irrelevant

11   information that can bias them, that they don't need for the

12   case, that can influence their judgment, in their decision.

13   Even without assumptions and guesses, they can fall into those

14   cognitive vulnerabilities.

15   Q.  Have you ever done any work on error rates in forensic

16   examinations?

17   A.  Yeah.  We've looked at error rates in a number of domains

18   and bias rates in a number of domains.

19         And, in fact, in a *Daubert* hearing in federal court

20   in the United States, Washington, D.C., there was a *Daubert*

21   hearing on error rates in firearms examination, and the

22   prosecution commissioned me for the *Daubert* hearing in defense

23   of the forensic examiner.  So I was commissioned by the D.C.

24   prosecutor in a *Daubert* hearing on error rates in firearm

25   examination and we have a number of papers on error rates and

```
 1    how complicated and how complex they are.

 2              For example, I have a paper entitled, "The Error in

 3    Error Rates."

 4    Q.  And have you testified in courts besides the one time that

 5    you just referenced?

 6    A.  I don't testify a lot in court.  I'm a scientist.  I like

 7    to be in my lab and to do research, but I like to connect my

 8    research to the real world.

 9              So, yes, I've testified in court a number of times,

10    but not many times in the U.S., in the UK, and other countries.

11    Q.  In any of those instances -- in all those instances, did

12    the Court qualify you as an expert?

13    A.  Yes.  Every time.  It depend if I appeared for the

14    prosecution or the defense, the opposing side made motions to

15    exclude my evidence because it's irrelevant or because it's

16    within the normal knowledge of a juror.  In each and every case

17    in the U.S. and in the UK, I've been accepted by the Court and,

18    in fact, the judges were very interested in cognitive bias and

19    invited me to train them.

20              So I've trained judges in Michigan, I've trained

21    judges in Massachusetts, where I trained the judges to

22    understand cognitive bias.  And then even a Supreme Court judge

23    of Michigan, the Chief Supreme Court Judge of Michigan and I

24    wrote an article together about what cognitive bias is, and

25    that was published in the *Judges' Journal*.
```

1          So this is a very important topic not only for the

2     jurors but for the judges.  As well, I've been invited by the

3     district attorney.  So I've trained the district attorney.

4     They've invited me in New York, in California, in Massachusetts

5     to train the prosecutors about cognitive bias, as well as

6     public defenders.

7          So it's a topic that everyone needs to learn because

8     people do not fully understand that.

9          THE COURT:  Can you give me the name of the case in

10    the District of Columbia where you were qualified as an expert,

11    if you recall?

12         THE WITNESS:  There are two cases.  One case was a

13    *Daubert* hearing.  And the other case was the prosecution and

14    the defense e-mailed me, and both wanted me to be an expert on

15    the same case, and they even agreed to have me as a joint

16    expert.  I think Federal Rule of Evidence 706.

17         But both cases were plea bargained.  I can look it up

18    and see.

19         THE COURT:  In the case where you testified in or

20    qualified, do you remember when that occurred?

21         THE WITNESS:  The two cases I didn't testify because

22    they plea bargained before it got to court.

23         THE COURT:  I see.  Okay.  Thank you.

24         THE WITNESS:  I'm happy to send you the name of the

25    two cases.

```
 1              THE COURT:  Perhaps if you can provide that
 2     information to Mr. Ekeland, and Mr. Ekeland can share that with
 3     the Court.
 4              MR. EKELAND:  Your Honor, I can't find it right now.
 5     I thought we did disclose that.  If we have it, we'll disclose
 6     it.
 7              THE COURT:  I was looking through -- it may be in
 8     here.  I just didn't see it, flipping through the report.
 9     Maybe it's there.
10              MR. EKELAND:  I can't readily find it, but I do
11     remember writing it.  If it hasn't been disclosed, we will
12     disclose it.  We did make a diligent effort to meet the new
13     Rule 16.
14              THE COURT:  Okay.  Thank you.
15              MR. EKELAND:  I remember doing a search for it.
16     We'll get that to the Court or point out where it is.
17              THE COURT:  Thank you.
18     BY MR. EKELAND:
19     Q.  Mr. Dror, one more question before I hand you off to the
20     government.
21              You said, I think -- before Judge Moss asked you this
22     question, you mentioned that there were certain things that the
23     public just didn't understand about cognitive bias that you
24     felt was important.  Could you just elaborate on that a little
25     bit.
```

1    A.  There are six fallacies about bias and about what people

2    think.  One of the fallacies that the general public believe is

3    that people who are biased are bad apples, they're immoral, bad

4    people, and that is wrong because bias affects everyone.  So

5    they think bias is only if we have a cooperative individual.

6            Another misconception, fallacy, is that experts,

7    because they're experts, they are immune from biases, and

8    they're not susceptible.  And experts are susceptible to biases

9    like everybody else.

10           And a third misconception, just to give you a few, is

11   that illusion of control that people believe; if you're aware

12   of bias, you can control cognitive bias.  You can't control how

13   the brain processes information.

14           So these are just a few examples of what people

15   believe about bias, not to mention that it's intentional.

16   Again, we're talking about something totally different.

17   Q.  I think that you mentioned there were six total.  What are

18   the -- was that all of them?

19   A.  There are those three.  There's another one about

20   technological protection.  People believe, including the

21   experts, that if they use technology, then there's no bias

22   because a human is not involved.  That's also incorrect.

23           MR. EKELAND:  Your Honor, I think the case that

24   Dr. Dror was referencing is *United States v. Resper*,

25   R-e-s-p-e-r, and the date I have for that is August 2nd, 2016.

```
 1    I don't have an index number right now, but I believe that's in
 2    this district court.
 3              THE COURT:  Okay.  Thank you.
 4              MR. EKELAND:  And I pass the witness.
 5              THE COURT:  Before we pass the witness, I haven't
 6    really heard yet from the witness -- maybe I have, but what
 7    would you actually propose that he testify to in this case?
 8    You've covered his credentials and the fact that there is such
 9    a thing as cognitive bias and it has different forms.
10              But I'm curious as to what he would actually testify
11    to in the case.  The government can ask those questions or you
12    can.  Either way is fine.
13              MR. EKELAND:  I'm happy to do that to the extent I'm
14    just looking -- it's in our expert disclosure here on page 3 of
15    his -- this is Docket 145.
16    BY MR. EKELAND:
17    Q.  Dr. Dror, are you familiar with the word heuristic; the use
18    of heuristics in the software at issue in this case, namely,
19    Chainalysis Reactor?
20    A.  Before I answer that, can I respond to the judge's comment,
21    please?
22    Q.  Yes, you may.  Of course.
23    A.  This has been raised in court a number of times, what I
24    will testify.  And sometimes the honorable judge decided that I
25    can educate the jurors about cognitive bias and give them tools
```

1        to decide if cognitive bias exists, but not testify about the

2        specific case if there was bias.

3                In other cases, the honorable judge decided that I

4        will give the tools, the understanding, but also, in addition,

5        I will voice an opinion where there was bias in the specific

6        case.  That would be for your decision what you want me to

7        testify for; whether you want me to just educate the jurors and

8        give them tools without voicing an opinion about the specific

9        case, or you will also want my opinion about bias in the

10       specific case.

11               THE COURT:  Well, let me ask you, have you formed an

12       opinion about whether there was bias in this particular case?

13               THE WITNESS:  I haven't finished reviewing all the

14       materials, so I have no opinion.

15               THE COURT:  Okay.

16               THE WITNESS:  Also, I'd like to emphasize, especially

17       coming from the UK, I don't see myself as working for the

18       defense or for the prosecution.  I'm here to help the Court

19       reach a decision, and my focus is on the Court and not the

20       defense or the prosecution and their adversarial views.

21               THE COURT:  All right.  You can continue.

22               MR. EKELAND:  I pass the witness, Your Honor.

23               THE COURT:  Okay.

24                        CROSS-EXAMINATION OF

25                         DR. ITIEL DROR

1    BY MR. BROWN:

2    Q.  Good morning, Dr. Dror.  Can you hear me okay?

3    A.  I can hear you very well.  Thank you.

4    Q.  Thank you.  My name is Chris Brown.  I'm one of the

5    prosecutors on this case.  I'll be asking you a few questions.

6           Maybe to start out, just to be clear, it's your

7    testimony that you have no opinion as to whether there is or is

8    not cognitive bias in this case, right?

9    A.  At this stage I have not formed an opinion because I

10   haven't reviewed the materials yet.

11   Q.  And in the expert disclosure that was filed on your

12   behalf -- do you recall seeing that expert disclosure?

13   A.  Yes.  And I have it in front of me.

14   Q.  And your signature is at the bottom, on page 5 of the

15   disclosure, correct?

16   A.  Yes.

17   Q.  And so you reviewed all, I guess, 16 items of prospective

18   testimony, correct?

19   A.  Yes.

20   Q.  And those 16 items of prospective testimony represent what

21   you plan to testify to at trial, correct?

22   A.  Not what I plan to testify to; what I plan to testify on.

23   Q.  Maybe this is --

24   A.  Semantics, but maybe not.

25   Q.  Yeah.  You are the one with the Ph.D.

1        But just to be clear, for each one of these numbered

2   lists, you plan to express the opinion that is set forth there,

3   correct?

4   A.   Again, there's no opinion.  For example, Item No. 1 says

5   I'm going to testify about cognitive bias.  There's no opinion

6   here.  I'm giving the facts of how the brain processes

7   information, what gives rise to cognitive bias, what are the

8   hallmarks of cognitive bias.

9        So there's no opinion here.  It's testifying on this

10   information.

11   Q.   So, for example, Item No. 7 states, "He will explain" --

12   sorry.

13        Item No. 9:  "He will explain evidence of

14   confirmation bias in the government's discovery."

15   A.   Yes.

16   Q.   That's your prospective testimony, correct?

17   A.   I will look at what it says and what I read it to say, I

18   will look at the government's discovery and look and explain if

19   and what signs of bias exist there.  There may be a little,

20   there may be more, there may be -- I'm not sure.  I haven't

21   gone through it.  I can look at it.

22        THE COURT:  I thought I would cut this short.

23   Mr. Ekeland, would you agree that -- at this point that, to the

24   extent that the witness has not formed any opinions, that it's

25   too late now, and that his opinions have to be set forth in the

1    disclosure.

2              So if he hasn't actually reviewed the materials and

3    formed an opinion, you wouldn't be offering that in the case?

4              MR. EKELAND:  No, Your Honor.  I disagree in the

5    aspect, number one, we're entitled to have Dr. Dror come in as

6    a rebuttal witness.  Number two, we are two months before the

7    trial.

8              THE COURT:  Rebuttal witness.  That's just another

9    way of saying a defense witness, right?

10             MR. EKELAND:  Well, he is a defense witness.

11             THE COURT:  I understand.  But I think we're wasting

12   our time here.  If he hasn't yet reviewed the material and

13   formed opinions, maybe we should just bring him back.

14             But I just think there's no point in -- maybe I would

15   exclude it anyway for the reasons that the witness already

16   indicated.  If it's testifying on the ultimate questions on the

17   case or the questions that are better for the jury.  But it

18   does seem to be kind of a waste of my time to hear at a *Daubert*

19   hearing from a witness who says I haven't looked at the

20   materials yet and, therefore, I haven't formed any opinions

21   about what I'm here to testify about.

22             MR. EKELAND:  Your Honor, one of the issues is we

23   have not gotten full disclosure on the discovery here and just

24   like --

25             THE COURT:  I'm not fighting you on that.  I'm just

1     questioning about the best use of my time.  We're having a

2     *Daubert* hearing on something he's not prepared to testify about

3     yet.  Tell us what his opinions are.

4            MR. EKELAND:  Maybe we do need to recall him, but I

5     think there's two questions when it comes to the *Daubert*

6     hearing.  One, is he qualified to testify as an expert in the

7     area being proffered, and we're proffering him as an expert in

8     cognitive bias.  There doesn't seem to be that there's any

9     question of that.

10           Now, if we want to come back at a later *Daubert*

11    hearing and have him testify as to opinions coming up, that, to

12    me, strikes me as a separate question.

13           THE COURT:  I mean, you have an obligation to file an

14    expert report that sets forth the opinions he's going to offer

15    and the bases for those opinions.  It's a waste of my time to

16    sit here and have a witness say, I haven't formed opinions yet

17    on it because I haven't looked at the evidence.

18           So there are two answers to that.  Either this is

19    premature and we should just stop and you need to file very

20    promptly a supplemental report that sets forth his expert

21    opinions, or you need to tell me you're not intending to offer

22    that at trial.  It has to be one of those two things.

23           MR. EKELAND:  Your Honor, we would like to offer him

24    at trial.  Maybe what we do is we recall him for the later

25    *Daubert* hearing because we -- there's a number of -- discovery

1    we just haven't gotten, so to --

2              THE COURT:  What discovery do you need for this

3    particular witness?

4              MR. EKELAND:  We need to know what -- the underlying

5    heuristic assumptions that are being used in the software as

6    disclosed by Ms. Bisbee last night.  She said there's unnamed

7    data scientists who have done all sorts of work.

8              We need to see the source code for Chainalysis

9    Reactor, which, again, we asked for almost a year ago and it

10   hasn't been produced.

11             THE COURT:  But this witness is not going to review

12   the source code.

13             MR. EKELAND:  What?

14             THE COURT:  This witness is not going to review the

15   source code.

16             MR. EKELAND:  But we can look in conjunction with our

17   other experts that discuss the algorithmic assumptions

18   underlying the heuristics in the case.  The whole problem and

19   the reason we brought him in --

20             THE COURT:  I'm sorry.  We're just wasting time here.

21   If the witness is not ready to testify on this, that's fine,

22   and we just should stop.

23             But then you need to tell me when you're going to

24   file your supplemental expert report and we'll schedule him for

25   the other hearing.

 1            MR. EKELAND:  That's entirely dependent on what we

 2     get from the government.  That's the problem.  We do need to

 3     get the underlying information on the heuristics that we've

 4     been asking for.  We're not asking for new stuff.  This is

 5     stuff we've repeatedly asked for in Rule 16 letters.

 6            THE COURT:  I discussed this with you earlier.  I

 7     told you at the last hearing, or whenever we discussed this,

 8     that your requests were way overbroad and, if there was

 9     particular things you needed, you needed to tell the government

10     about that.  Today, as far as I can tell, is the first time

11     you've done that.

12            MR. EKELAND:  Your Honor, last night was the first

13     time we saw a lot of disclosure from the government.

14            THE COURT:  I've read what the government filed, and

15     that is not credible.

16            MR. EKELAND:  Your Honor, then, we're just going to

17     disagree with the Court, and we're going to register our

18     disagreement on the record, and then we ask that we can recall

19     this witness at the later *Daubert* hearings and file a

20     supplemental disclosure from this expert.

21            It's hard because, depending on what we get from the

22     government, if we have to file a motion to compel, we might

23     have to revisit his opinions based on what's disclosed.  Can we

24     get two weeks on that?

25            THE WITNESS:  May I make a suggestion, please?

```
1                    THE COURT:  Yes.

2                    THE WITNESS:  The defense counselor may not like or

3       the prosecutor may not like it.  Maybe I should only testify

4       what cognitive bias is and give the jurors an understanding and

5       tools for them to decide if there was bias in this case.  But

6       not opinion about this case, but only about the general

7       understanding of what cognitive bias is and how you can

8       determine if it exists; but not offer an opinion about this

9       case.

10                   That's a suggestion.  I don't know.  Maybe everybody

11      doesn't like it.

12                   THE COURT:  Mr. Ekeland?

13                   MR. EKELAND:  If that's amenable to the government

14      and the Court, that's amenable to the defense.

15                   THE COURT:  Mr. Brown?

16                   MR. BROWN:  Your Honor, I agree that any testimony

17      that -- I agree that the witness should not testify about his

18      theories as applied to this case because he has no opinion now.

19      It hasn't been disclosed pursuant to Rule 16.

20                   With respect to the witness's suggestion that he only

21      testify generally about his theories, we oppose that on --

22      really, it's on relevance grounds.  It's not going to be

23      helpful for the jury to hear this sort of abstract theorizing.

24                   We also don't think that the abstract theorizing is

25      necessarily scientifically reliable in itself, and it is
```

1    certainly not -- there's no opinion that represents a reliable

2    application of his theories to the facts of this case if he's

3    not going to opine as to the facts of this case --

4           THE COURT:  I assume you also object to him --

5           MR. BROWN:  -- at the *Daubert* today or at the next

6    hearing on whatever portion of his disclosure the defense

7    actually wants to follow through on.

8           THE WITNESS:  May I make a comment, please?

9           THE COURT:  You may.

10          THE WITNESS:  The United States National Commission

11   on Forensic Science, joined by the Department of Justice and

12   the National Institute of Standards of Technology, has

13   established and published a document about cognitive bias being

14   scientific and effective forensic evidence.

15          I can send you, but it's a document on the U.S.

16   National Commission on Forensic Science.  It's not my theory

17   that has not been validated.  It's been adopted by the United

18   States National Commission on Forensic Science.

19          MR. BROWN:  Mr. Dror, I was giving argument and

20   responding to the Court's question.  It was not an invitation

21   for you to testify.

22          THE COURT:  I'm sorry.  The witness asked me, and I

23   said it was fine for him to say something.  The witness was

24   responding to me.  That's completely fine.

25          Let me ask, Dr. Dror, if you were to offer anything

1    more specific in this case, what is it that would be more

2    specific -- I mean, would you look at particular models and

3    opine on whether a particular model reflects bias, or is it --

4    I'm not quite sure whether that's something you would typically

5    do in any event, or I feel you have the expertise to look at

6    heuristic assumptions and opine whether those were appropriate

7    assumptions or whether they're bias things, or whether your

8    approach is really generally more at a higher level of

9    addressing cognitive bias as a function of human thought versus

10   looking at particular models and deciding whether a particular

11   model is biased or not?

12           THE WITNESS:  I think it's somewhere in the middle.

13   For example, I see cases where the investigator is told by the

14   district attorney, I know this person is guilty, I have -- you

15   need to find it, keep looking so I see something like that.

16           That biases the examiner looking at the data; giving

17   a certain expectation of what they're going to find before they

18   look at it.  So that's an example of things that I look for.

19   But not a specific algorithm, no.

20           THE COURT:  Mr. Brown, why don't I allow you -- if

21   there are further questions you want to ask -- I cut off your

22   examination.  Why don't I allow you to do that.

23           I don't think, for present purposes, that we need to

24   get into the opinions that Dr. Dror has not yet formed in this

25   case, and then we can address whether he should be provided

1    with the opportunity to form further opinions.

2          MR. BROWN:  Very well, Your Honor.  And to be clear,

3    we would be happy to save the entire examination for the next

4    hearing, or we could do this -- sort of the general theorizing

5    today and, if necessary, if Dr. Dror is going to supplement

6    his --

7          THE COURT:  It's not clear to me whether -- at this

8    point whether the defense is seeking to offer him on the more

9    specifics or not.  Mr. Ekeland did say that he would be -- it

10   would be acceptable to him to -- for Dr. Dror to just testify

11   sort of more generally about cognitive bias.

12          But if Mr. Ekeland does want him to testify about the

13   particulars of this case of whether there is evidence of

14   cognitive bias on the particular facts of this case, then

15   that's, obviously, premature; and there's the separate legal

16   question about whether that's a proper subject matter of

17   testimony, in any event.

18          Mr. Ekeland, I don't know if you had anything else

19   you wanted to add on that before Mr. Brown continues?

20          MR. EKELAND:  No, Your Honor.

21          THE COURT:  Am I correct in my understanding that you

22   would be content with Dr. Dror testifying more at the high

23   level, just about cognitive bias more generally?

24          MR. EKELAND:  Yes, Your Honor, with the caveat that

25   if we do get subsequent disclosures that change that opinion,

1    we can raise that with the Court.

2              THE COURT:  You're welcome at any time to raise

3    anything that's appropriate.  I might conclude it's untimely,

4    but you're welcome at any time to raise anything.

5              Okay.  With that in mind, Mr. Brown, I think we're

6    proceeding on the assumption now, I think, that Dr. Dror will

7    testify just at the higher level about cognitive bias without

8    the particulars of this case.  So you're welcome to proceed

9    then, and then the parties can, obviously, make any separate

10   arguments to me with respect to relevance later.

11             MR. BROWN:  Very well, Your Honor.

12   BY MR. BROWN:

13   Q.  Dr. Dror, are you being paid for your work on this case?

14   A.  Yes.

15   Q.  And what are your fees?

16   A.  If you want to know my annual salary, it's capped at

17   $60,000 a year, and any money made above 60,000 goes to paying

18   for research and subsidizing my research.

19             So, actually, I think I'm paid $60,000.  So I'm not

20   getting paid personally any money for this case.  The money

21   goes to pay for research that I do.  Because once I get $60,000

22   in all my cases, in all my training and everything I do, I

23   don't get paid over $60,000 a year, which I think I've already

24   gotten paid.

25   Q.  Thank you for that background.  My question was, what are

1    your fees in this case?

2    A.   The fees, I think, that were done was $15,000 initially for

3    the retainer, and then with a -- it was a bit open, but around

4    another, I believe, $35,000.

5    Q.   And you said your annual salary is capped at $60,000 and

6    any surplus goes to pay for your research.

7            So does that surplus go to the university you work

8    at?

9    A.   I don't work at the university anymore.  I worked at the

10   university until January this year, and then I left the

11   university because too much bureaucracy, too much paperwork, I

12   can't get my research done.

13           So the company, Cognitive Consultants International,

14   that gets the fees from -- mainly from training, research

15   grants, and the company pays me $60,000 a year, and the rest of

16   the money in the company goes to pay for the research.

17   Q.   Who owns Cognitive Consultants International?

18   A.   My wife.

19   Q.   How many times have you testified in U.S. courts?

20   A.   I cannot remember exact number, but I assume over the

21   years, maybe six, seven, eight, maybe ten times.

22   Q.   Okay.  And the case that you mentioned in the District of

23   Columbia, just to be clear about your testimony, for that case

24   you never testified in court, correct?

25   A.   There are two cases, and in both of them I didn't testify

1    in court.

2    Q.  You did not testify in court, correct?

3    A.  Correct.

4    Q.  Is it fair to say that you're selective about which cases

5    you choose to testify in?

6    A.  Yes.  I get dozens of requests, and I just take a few

7    cases.

8    Q.  How did you become involved in this case?

9    A.  I'm not 100 percent sure, but I think that the defense

10   attorney asked another expert on cognitive bias, and he was

11   very, very busy, and he asked me if I want to hear about the

12   case, and I said yes.  And he gave my details to defense

13   counsel.

14   Q.  Is it -- you have not reviewed any discovery in this case,

15   correct?

16   A.  I started to look at a few of the materials that were sent

17   to me, but I have not reviewed all of it or any of it properly.

18   Q.  What portion of the discovery have you reviewed in this

19   case?

20   A.  They sent me many, many files.  So I would say a very, very

21   small portion.

22   Q.  So have you reviewed financial account records?

23   A.  No.  I would not -- I would not review that.  That's not

24   the kind of things that I look for.

25   Q.  Have you reviewed blockchain records or records from

1    cryptocurrency exchanges?

2    A.  First of all, I have not reviewed any files.  The files

3    that I looked at, I believe, were some of the testimonies from

4    the *Daubert* hearing and transcripts.

5    Q.  In your understanding of the case, is it fair to say that

6    your understanding of the case is mostly based on

7    representations made to you by defense counsel?

8    A.  I would say not most, but all.

9    Q.  You also offered training seminars to U.S. law enforcement

10   and law enforcement in other countries, correct?

11   A.  Law enforcement and forensic experts, yes.

12   Q.  And those training seminars are aimed at training forensic

13   technicians, other government personnel on how to reduce

14   cognitive bias; is that right?

15   A.  Yes.

16   Q.  How much money do you or your company, Cognitive

17   Consultants, LLC, make on average per year from these training

18   seminars?

19   A.  I think, if you look at all the countries, not only the

20   United States -- I do them in Australia, in Taiwan, in the

21   Netherlands, Finland -- I would say around 100-, 150,000, but

22   that's a guess.

23          My wife was a banker, and she runs the company.  So

24   she does all the paperwork and all the accounting.  I don't get

25   involved in all the contracts and the paperwork.  I don't like

1    paperwork, and my wife does it.

2    Q.  You testified, "I have no experience or expertise in

3    blockchain analysis"; is that correct?

4    A.  Very correct, yes.

5    Q.  And your undergraduate degree is in philosophy, right?

6    A.  I do also have a supplement undergraduate degree in

7    computer science.  Again, I have no understanding of

8    blockchain.  It's not my area of expertise or my understanding.

9    Q.  Have you ever received any training in blockchain analysis?

10   A.  No.  And I even refuse personally to invest in Bitcoin.  I

11   stay away from it.

12   Q.  Have you ever conducted any blockchain analysis by hand?

13   A.  I have no idea what it is and definitely haven't done it.

14   Q.  And so you haven't ever used a blockchain analysis software

15   tool, have you?

16   A.  No.

17   Q.  Have you ever used any open-source blockchain explorer,

18   like blockchain.com, Blockchair, Breadcrumbs, Wallet Explorer,

19   any of those?

20   A.  I'm happy to continue to answer your question.  But no

21   analysis, no chain block of any kind, of any sort I've ever

22   looked at.

23   Q.  Now, in your research, one of the things that you have

24   examined is whether a forensic technician is examining the

25   sort -- a data point.

```
 1              And that data point contains extraneous or contextual
 2      information that might be a source of cognitive bias; is that
 3      fair to say?
 4      A.  That's part of my research.  But I've also done specific
 5      research in digital forensics, which I published a number of
 6      articles with my Ph.D. student, who is a digital forensic
 7      examiner, where they got hard drives, they got huge emails,
 8      huge data sets.
 9              So we've also looked at that and published a number
10      of scientific peer-reviewed articles specifically on digital
11      forensics.
12      Q.  Well, I'm interested in this question of contextual
13      information, and I want to drill down a little bit more into
14      that.
15              One point that I've read of your work is if -- you
16      look at different kinds of forensic data and different kinds of
17      contextual information, right?
18      A.  Yes.
19      Q.  One example is, I think you contrasted a fingerprint versus
20      a voice print -- the voice sample used for voice-pattern
21      analysis, correct?
22      A.  Can you repeat that, please.
23      Q.  I can repeat it.  Let me try to break it down into smaller
24      pieces.
25              So if a forensic technician is looking at a
```

1    fingerprint, the fingerprint itself is data, but it doesn't

2    contain contextual information, right?  If you're just looking

3    at a fingerprint, there's no extra information about who that

4    person was, what circumstances the fingerprint was made, all of

5    that?  There's no extraneous information, correct?

6    A.  In some types of forensic data, there isn't a fingerprint.

7    In other forensic domains, there are.  Depends on the forensic

8    domain.

9    Q.  And so it depends on the forensic domain.  If you're

10   looking at a voice-pattern analysis or voice-print analysis,

11   that is an example of a data source that contains extraneous

12   information, right?

13   A.  Yes.

14   Q.  So are you familiar with what blockchain data looks like?

15   A.  I can repeat that I have no knowledge or experience with

16   blockchain data, but you're welcome to ask me again.

17           I have no idea; not looked at it.  I don't know what

18   you're talking about when you talk about blockchain data.

19   Q.  So if I just tell you that a Bitcoin address or a

20   transaction hash just contains a bunch of -- a string of

21   letters and numbers, if I just proffer that somebody is looking

22   at a string of letters and numbers, there's no contextual

23   information in that string of letters and numbers, is there?

24   A.  In the data itself, if that's so, there's no contextual

25   information.  But there is a wider level of contextual

1    information.  I can explain if you want.

2    Q.  We'll try to keep moving.

3         I have to ask you, are you familiar with the

4    co-spending heuristic?

5    A.  No.

6    Q.  And so you would have no opinion about whether a -- an

7    examiner looking at a co-spending transaction, you'd have no

8    opinion about whether that transaction that involves

9    co-spending contains extraneous or contextual information that

10   might be the source of cognitive bias?

11   A.  It depends.  For example, our research with digital

12   forensic shows when they have many numbers, if they have a

13   context to expect to find certain patterns, they see those

14   patterns.  If there's a context to expect different patterns,

15   they see different numbers and different patterns.

16        So if it was the same numbers and digits that have no

17   context, what you see, the patterns and the conclusions,

18   especially when they have a huge data set, enables you to

19   misinterpret the data because you see and perceive certain

20   patterns depending on the contextual information that you are

21   given; that we have demonstrated in digital forensics.

22   Q.  And you're generalizing to blockchain analysis of a

23   specific transaction from your work in digital forensics,

24   correct?

25   A.  I would say that the answer depends on the degree of the

1    freedom.  Sometimes if the data set does not lend itself to

2    different interpretation, then we don't have a problem.  When

3    the data set allows different interpretation, then there is

4    bias.

5            The blockchain analysis allows different

6    interpretations, I cannot tell you what because I don't know

7    enough about blockchain analysis.  But that would be my

8    question, whether the data is fit into a very small data or

9    there's leeway for people to see different things in the data.

10   That is the crux of the matter.

11   Q.  Maybe -- actually, if I could ask you to explain your work

12   in digital forensics.  What do you mean by digital forensics?

13   What specific techniques or processes have you studied?

14   A.  So what we've studied is that there -- in one paper there

15   is an investigation about somebody selling company secrets and

16   whether they tried to distort some of the emails and some of

17   the recordings and some of the digital logs, and they get the

18   hard drive and they get all the emails and all the logs, and

19   they have to explore it to determine if there was anything

20   there or not.  So that's for an example of what was done.

21   Q.  So it's specific processes, such as examining emails; is

22   that correct?

23   A.  It was emails and logs of emails and logs of different

24   transactions in the company.  Because I'm not a digital

25   forensic examiner, my collaborator, my Ph.D. student, is a

1    forensic digital examiner, and they built the hard drives and

2    the data sets.  That is the technical part of what is done.

3           And I can send you the two articles if you're

4    interested.

5    Q.  In your research you've spent a considerable amount of time

6    observing forensic work; is that fair to say?

7    A.  Did you say observing?

8    Q.  Observing, yes.

9    A.  I don't know what considerable is, but yes.

10   Q.  How much time would you estimate you've spent talking to or

11   observing the work of fingerprint examiners?

12   A.  Hundreds of hours.  In fact, I have a grant from the FBI to

13   collect standard operating procedures of forensic labs and

14   shadow forensic labs.  I've done quite a lot.  Again, quite a

15   lot is a fluid, nonscientific term.

16          If I had to estimate, hundreds of hours.  But it's

17   across domains.  It's not one forensic domain, but across

18   different forensic domain, and I have not shadowed any digital

19   forensic examiners, in case that's what you want to know.

20   Q.  So you said across digital domains.  So that includes DNA

21   examiners?

22   A.  DNA examiners, fingerprint examiners, CSI examiners,

23   forensic pathologists.

24   Q.  And what about airline pilots, is it fair to say that

25   you've spent a considerable amount of time talking to or

1     observing airline pilots?

2     A.   There are two pieces of work when it comes to aviation.

3     One of them is military, U.S. aviation, which I don't think I

4     can talk about.   And the other one, I'm investigating a plane

5     crash and, again, it's an ongoing investigation which I cannot

6     talk about.   It's aviation.   I have talked to pilots in

7     reference to that, yes.

8     Q.   And in your work, it's not purely anecdotal; you've

9     conducted experimental work.   Is that correct?

10    A.   None of my work is anecdotal.   It's all experimental.

11    Q.   And so you've conducted experiments to identify cognitive

12    bias in fingerprint examination; is that correct?

13    A.   Yes, and not only.

14    Q.   And what other forensic domains have you conducted

15    experimental work in?

16    A.   Fingerprint, DNA, handwriting, digital forensics, forensic

17    anthropology, forensic astrology.   I don't remember off the top

18    of my head all of them, but forensic examiner experts don't

19    like to acknowledge that they're biased.

20         I showed in fingerprinting, the DNA examiner versus

21    fingerprint examiners are not DNA examiners, so I did it in

22    DNA; and then the firearm examiner and anthropology.   So we've

23    done a wide range of a forensic domain, but not all of them.

24    Q.   So a typical experiment might be presenting the same data

25    to different examiners presenting different contextual

1    information and seeing how that affects the result; is that

2    correct?

3    A.  Yes.  And even better, because different examiners have

4    different training which shows the same data to the same

5    examiner twice without their knowledge and gives them different

6    expectations, and they reach different conclusions, the same

7    examiner on the same data.

8            So it's not only between examiners, but the same

9    examiner checking would they reach the same conclusion on the

10   same data when they get different expectations of what they're

11   going to find.

12   Q.  And you mentioned experimental work in digital forensics.

13   Can I ask you to be more specific.

14           What experiments have you run in the field of digital

15   forensics?

16   A.  I think I answered that question, but let me repeat it.

17   We've done a number of experiments where digital experts get

18   hard drives and files and logs, and they have to determine

19   whether there was fraudulent activity there, whether people

20   tried to tamper with the data, whether a person was guilty of

21   sending confidential information.

22           I don't remember all the technical details, but I'm

23   happy to send you and the Court the two articles published in

24   digital investigation and forensic science international

25   digital where I did all the technical details.

 1          THE COURT:  Mr. Brown, can I ask you, how much more

 2    time do you think you're going to need?  The reason I'm asking

 3    is the court reporter has been going for a very long time.  I

 4    don't know whether we need to take a -- or should take a break.

 5    So how much time do you think you'll need to complete your

 6    examination?

 7          MR. BROWN:  Yes, Your Honor.  I think we will need a

 8    fair amount of more time, at least another half an hour, if not

 9    a bit longer.

10          THE COURT:  I assume Mr. Ekeland is going to want

11    some redirect.  Why don't we go ahead and -- let me ask,

12    Dr. Dror, would it be okay with you if we took our lunch break

13    and came back in an hour?  Does that work for your schedule?

14          THE WITNESS:  I'll go and have dinner.  Not a

15    problem.

16          THE COURT:  All right.  Why don't we let you have

17    your dinner; we'll have our lunch.  We'll give the court

18    reporter a break.  It's ten minutes past 12:00 here.  So why

19    don't we come back at 1:15 to continue.

20          Before we do so, Doctor, I have one just general

21    question for you about your testimony thus far.

22          I don't have any doubt that the expectations of an

23    analyst and to what they're going to find can affect the

24    results, at least where there is any subjective element to

25    their analysis.  But what -- beyond that, what can you say in a

1    way that is more quantifying or provides a -- would provide a

2    jury with some assessment of what that actually means?

3          And is that going to vary from circumstance to

4    circumstance, and so it's going to depend on the particular

5    forensics involved, the particular assumptions involved, and in

6    some cases it could be an error rate that is as high as, I

7    suppose, 50 percent when you show people the photograph of the

8    woman in the dress and some people see a green dress and some

9    people see a gold dress.  Maybe that's a 50 percent -- I don't

10   know if error is the right way to think about that.

11         But there are other circumstances in which I imagine

12   it's very, very small.  There's still some circumstances in

13   which a pathologist who is looking at a lab sample might, one

14   out of every thousand times, conclude that something is not

15   malignant when it is, in fact, malignant, and maybe some other

16   background assumptions might do it.

17         How do you quantify this or provide, sort of, a

18   meaningful analytic tool for a jury other than sort of just the

19   background notion that, when there's a subjective element, it

20   can affect your -- the accuracy of what you're doing?

21         THE WITNESS:  There is much more.  I do two or three

22   days of training on this.  So let me very briefly comment and

23   start with your last comment on forensic pathology.

24         We just published a paper last week showing that, if

25   you give the forensic pathologist one theory of what happened,

1    they're supposed to find the evidence to support it.  But if

2    you give them two different hypotheses on the same medical

3    data, then some of them support one theory, some of them

4    support another theory.  So it puts them in a mindset if

5    they're provided one theory.  That's very specific because you

6    mentioned pathology.

7              THE COURT:  Sorry to interrupt you for a second

8    there.  I assume that that varies.  So that if you had a doctor

9    who was just looking at cells to determine whether they were

10   malignant or not, and there are clear markers for that, but

11   it's -- there's some element of -- it's 99 percent science and

12   one percent art in being a pathologist of that type.

13             I assume that you're not going to say that if you

14   said to the doctor or the pathologist, we think this is cancer,

15   that every time they look at it, they're going to say it's

16   cancer even when it's not.  So the question, I guess, is what

17   is the error rate, or how do you get about thinking about the

18   error rate?

19             THE WITNESS:  Okay.  So, again, great question.  I'll

20   answer very briefly.

21             Because we have an article specifically looking at

22   cells to decide if it's a cancerous cell or not.  And the right

23   procedure -- and they're changing it.  They used to get context

24   before looking at the slide, and now they're starting to look

25   at the slide before they get the context.  Because when they

1    get the context, it impacts whether they find cancerous cells

2    or not.

3                    THE COURT:  Right.

4                    THE WITNESS:  In terms of quantifying it, it depends

5    on two things.  A, the level of subjectivity of the judgment.

6    If it's more subjective, you're going to be impacted more.

7    And, two, it's a level of context, because it can be a little

8    context or a big context expectation.

9                    So it depends on the level of context.  So that, too,

10   interacts; the level of expectation context and the level of

11   subjectivity of the domain.  And this is exactly what I can

12   explain to the jurors to give them examples.

13                   THE COURT:  Okay.  That's very helpful.  Thank you.

14                   So why don't we take our lunch break, and we'll come

15   back at 1:15 -- or dinner break.  Thank you.

16                   THE WITNESS:  Thank you.

17                   (Lunch recess from 12:15 p.m. to 1:25 p.m.)

18                   THE COURT:  All right.  Mr. Brown, you may continue.

19   BY MR. BROWN:

20   Q.  Dr. Dror, just to finish the line of questioning we began

21   before lunch, have you ever conducted any experiment to detect

22   cognitive bias in the field of blockchain analysis?

23   A.  No.

24   Q.  Have you ever reviewed any literature involving experiments

25   to detect cognitive bias in blockchain analysis?

1     A.   No.

2     Q.   And to the extent -- to the extent that you're claiming

3     your theories apply to the field of blockchain analysis, you're

4     just extrapolating from first principles; is that fair to say?

5     A.   No, it's not fair to say.

6     Q.   To apply your theories to the field of blockchain analysis,

7     is that based on any scientific or academically peer-reviewed

8     process?

9     A.   First of all, you're saying my theories; not my theories.

10    Well-established principles of anyone who studied the brain and

11    expert performance, so it's not my theories.  It's accepted

12    theories by everyone who studies the brain in human cognition.

13              Point number two, the fundamental does not matter if

14    it's blockchain analysis, fingerprint, DNA, pilots, medical

15    doctors; everyone has a human brain, and I'm talking about the

16    constraints and architecture of the human brain.  So I'm not

17    applying my theories general to this domain.

18              I'm talking about what we know about human

19    processing, how the brain works and how experts process

20    information.

21    Q.   And even if you accept that everybody has cognitive biases,

22    because that's how the human brain works, it is your testimony,

23    isn't it, that cognitive biases express in different ways

24    depending on the data that a forensic technician is reviewing?

25    A.   I'm not sure what you mean by express.  I would say it's

1    manifested differently in different domain.  But the end result

2    of reaching a biased conclusion is the same across domains.

3    Q.  Now, what extra sources of information would you need in

4    this case to form an opinion about the presence or absence of

5    cognitive bias in any of the blockchain analysis in this case?

6    A.  To form a specific opinion about this case, I would need to

7    review the laboratory notes and SOP, standard operating

8    procedures, of the experts who conduct the analyses and examine

9    if they followed best practices, like blinding to irrelevant

10   contextual information, use of linear, sequential and masking,

11   and other things that have been mandated by the U.S. National

12   Commission on Forensic Science, to minimize bias.

13   Q.  Would you review computer source code if it were given to

14   you?

15   A.  No.

16   Q.  Your work also focuses on what you call countermeasures to

17   cognitive bias; isn't that correct?

18   A.  I also try to find ways to minimize bias by understanding

19   when bias arises and also try to develop best practices.

20   Q.  You provide training to forensic technicians and government

21   agencies about how to reduce cognitive bias; isn't that true?

22   A.  Yes.

23   Q.  So even if a forensic discipline is prone to cognitive

24   bias, there's steps that can be taken to improve the outcomes

25   of those processes; is that correct?

1   A.   Yes.   Steps can and should be taken, absolutely.

2   Q.   And you're not aware of what steps may or may not be taken

3   in the field of blockchain analysis, correct?

4   A.   No, I'm not.   Even though some of the general procedures

5   that apply across domain I'm very familiar, like -- example I

6   can give you, if you're interested.

7   Q.   And in this case specifically, you're not aware of what

8   efforts may or may not have been taken to review or validate

9   results of blockchain analysis, right?

10  A.   Correct.

11  Q.   Now, picking up on what the Court was asking before lunch,

12  in a given case, how do you test for the presence or absence of

13  cognitive bias?

14  A.   I'm sorry, I didn't hear you.

15  Q.   In a given case, how do you test for the presence or

16  absence of cognitive bias?

17  A.   In a given case, I look -- for example, I like to receive,

18  if possible, all the emails and corresponding between the

19  investigators and the people doing the actual work.   I look

20  what information was available to the forensic examiner during

21  the work.

22            For example, when they did the work of a -- did the

23  suspect have a criminal record; the detective believes they're

24  guilty; a lot of contextual irrelevant information that the

25  forensic examiner needs not to know and base their decision on

1     the actual data.  So I look for different things that cause a

2     certain expectation not derived from the data itself, for

3     example.

4     Q.  So is it fair to say that this is a subjective evaluation;

5     emails and contextual information and other extraneous

6     materials is subject of judgment about whether or not cognitive

7     bias was present in that case, correct?

8     A.  I would say two things.  First of all, a specific case

9     will -- whether the examiner was exposed to irrelevant

10    information and contextual bias is not a subjective opinion.

11    It's a matter of fact.

12          But what is subjective -- and I would not testify to

13    that in any case -- is did it affect the examiner; would the

14    examiner reach a different conclusion if they were not exposed

15    to the bias.  This, I would -- it's a subjective opinion, and I

16    would never give that.

17    Q.  And we'll get to that.  But staying on the presence or

18    absence of cognitive bias in a given case, is it fair to say

19    that there's no scientific method that you're following to test

20    whether cognitive bias exists?  It's just the subjective

21    judgment that you make based on the presence of emails or any

22    contextual information, right?

23    A.  No.  I think we're confusing or mixing two things together.

24    One is whether the examiner was exposed to information that

25    could have biased him, irrelevant contextual formation.  One --

1    and that is a matter of fact.  This is very simple.

2              For example, in fingerprinting, whether a suspect had

3    a criminal record or not is not relevant to looking at the

4    fingerprints and making a judgment if the pair of fingerprints

5    match.  That is not, kind of, a subjective judgment.

6              However, whether that context biased and to what

7    extent it biased the examiner and did it influence upon the

8    judgment is a subjective decision, evaluation.

9    Q.  Is there any -- this testing, just determining whether or

10   not there is cognitive bias, you're saying you have a

11   100 percent accuracy rate in making that judgment?

12   A.  Again, you're reframing what they're saying in a way that I

13   don't feel comfortable.  I make a presentation in a specific

14   case -- and I understand that in this case I'm not going to do

15   it, but if I do, I make a judgment that, knowing the past

16   criminal record of a suspect, when the fingerprint examiner is

17   comparing fingerprints, is irrelevant contextual information.

18             There's no error rate in determining that because

19   that is determined not by me, because I'm not the fingerprint

20   examiner.  It's determined by the forensic expert themselves.

21   They have to say if it's relevant or not relevant because I'm

22   not a fingerprint examiner.  And they may say it's relevant and

23   have to explain why it's relevant or not.

24             But it's a matter of fact whether this information is

25   needed for the forensic examiner to make a decision about their

1    expertise in the area.

2    Q.  Maybe if I understand you correctly, you're saying it is a

3    matter of fact and there's no room for disagreement about

4    whether contextual information was made available through a

5    forensic technician, but that's a little bit different from

6    saying whether cognitive bias informs the forensic technician's

7    process?

8    A.  First of all, it's a bit more complicated.  If you're

9    asking, one of the problems in many forensic domains is that

10   some things, all or great is not relevant.  But some pieces of

11   information, the forensic examiners themselves don't agree if

12   it's relevant or not; it needs to be used in their decision.

13   That's an added complexity.

14         All I can say is that if they were exposed to

15   irrelevant contextual information, it's got into the brain, and

16   it influenced the cognitive processing.  To what extent, I'm

17   not going to be able to say, and especially whether they would

18   reach a different conclusion if they didn't have the context.

19   This, I will not be able to make an opinion because it's

20   subjective.

21         I can also say -- sometimes I can say that the

22   contextual information would -- a lot of it versus a little,

23   and that would be a subjective judgment.  This, I probably --

24   if I were to voice an opinion on this specific case, I may be

25   able to say that.  But maybe not.  I don't know; depends what I

1    see if I looked at it, which doesn't seem like it.

2    Q.  And in the field of blockchain analysis, you have no basis

3    to draw any opinion about what is or is not irrelevant

4    contextual information, correct?

5    A.  No.  Incorrect.  Because if the detective told the expert

6    in forensic analysis, I know this guy is guilty and I need you

7    to help me prove it, then that is irrelevant contextual

8    information that could bias an examiner and is inappropriate.

9    They don't need to be an expert in blockchain analysis to know

10   that this is irrelevant contextual information, for example.

11   Q.  But you've never spoken to a blockchain analyst or observed

12   any blockchain analysis or reviewed any literature related to

13   blockchain analysis, so you have no -- you're just speculating

14   here that you would know it if you saw it -- is that right? --

15   about whether it's irrelevant contextual information?

16   A.  No.  The first part you're right, and at the risk of

17   repeating myself, no, I have no knowledge of blockchain

18   analysis.  You're correct.

19          The second part you're incorrect because without any

20   understanding of blockchain analysis, I can determine -- and I

21   think any person can determine -- that the detective telling

22   them a person is guilty or not or telling them I want you to

23   work day or night and don't come back to me until you show that

24   there is, because I need your help, that I don't need to be

25   understanding of blockchain analysis, and it's not a

1    speculation to say that that is irrelevant contextual

2    information putting the forensic examiner in chain block [sic]

3    analysis in the frame of mind, in an expectation what they're

4    going to find rather than letting the data itself determine the

5    findings that come with an expectation given to them.

6            And that is bad and that part is bias, and that's not

7    a speculation.

8    Q.  Have you ever tested the efficacy of your trainings to

9    reduce cognitive bias?

10   A.  The procedures that I and others suggest, it's very hard to

11   quantify them.  But, for example, if we suggest in some domains

12   to do everything -- do a lineup, like they do ID parade through

13   witnesses, they don't show a witness one suspect, the suspect,

14   and say, "Is that him?"  They show a few people.  There's an ID

15   parade, which suggests to do it also sometimes in forensic

16   examination.  So when they get the latent prints from the

17   crime, they don't compare it to one, the suspect, but similar

18   to a lineup.

19           So this is a lot of, kind of, basic things that have

20   been adopted in the criminal justice system and other things in

21   the medical domain to reduce bias, but how to measure the

22   efficacy is very complicated.

23   Q.  Is it your testimony that there's just no statistically

24   rigorous way to evaluate a before-and-after case, so before

25   your training and after your training?

1    A.   There is an efficacy and people who take the training agree

2    whether they are biased or not and agree or not whether they

3    should take measures.  If they're taught the measures, there's

4    not any quantification if and to what degree it actually

5    reduces bias.

6    Q.   And so there's no confidence interval or error rate in

7    measuring the efficacy of your training in reducing cognitive

8    bias?

9    A.   Correct.

10   Q.   Now, to be clear, it's your testimony that cognitive bias

11   exists everywhere in all situations, right?

12   A.   Cognitive bias is part of the human brain process, yes.

13   Q.   Just because there's a presence of cognitive bias with a

14   given forensic technician doing the given task, that doesn't

15   necessarily mean the forensic technician comes up with the

16   incorrect result, right?

17   A.   That is absolutely correct.  And in my experimental data, I

18   find that sometimes they get the wrong conclusion, but

19   sometimes they don't.  And as to the measures to minimize them,

20   there is no scientific proven data on that, but the U.S.

21   National Commission on Forensic Science spent a lot of time

22   examining and evaluating the different procedures and has

23   adopted the procedures that have mandated by the U.S. National

24   Commission; which was a group of experts in forensic

25   examination and DOJ and lawyers and judges, and they've all

1    adopted those techniques to minimize cognitive bias.

2              So they have approved this and considered it in

3    detail.

4    Q.  Just to be clear, you can't assign a probability that, you

5    know, given test condition A, there is cognitive bias, there is

6    X percent of arriving at an inaccurate result, right?

7    A.  Absolutely not able to do that.

8    Q.  And so there's no statistically significant prediction in a

9    given case whether cognitive bias will lead to an inaccurate

10   result?

11   A.  No, incorrect.

12             MR. EKELAND:  You're Honor, I'm going to object.

13             THE WITNESS:  You're talking about a specific case

14   that we have article after article, dozens of articles, not

15   only mine, but other scientists, including forensic scientists,

16   which have done the experiment where they give the same data,

17   the same evidence to different examiners and a different

18   context and find statistically significant differences; or

19   giving the same forensic examiner the same data twice with

20   different expectations and findings that are statistically

21   significant they will reach different conclusions.

22             This has been done and published by many people,

23   including myself.  What has not been done in the specific thing

24   you're asking me, given a specific case and specific evidence

25   and specific context, what is the likelihood that they will

1   reach a different conclusion, this we cannot do.

2          THE COURT:  There's an objection.  Mr. Ekeland?

3          MR. EKELAND:  It's just asked and answered on these

4   statistical questions.  I think we've covered that point.

5          THE COURT:  Okay.

6   BY MR. BROWN:

7   Q.  Dr. Dror, going back to your expert disclosure, your

8   disclosure states:  "He will also testify as to the distorting

9   effects of the financial and status incentives involved in the

10  government's use of private forensic investigators, like

11  Chainalysis, and the government's extensive use of publicity to

12  promote this case."

13         Are you prepared to testify as to that today?

14  A.  As I explained, I haven't reviewed the material, so I

15  cannot evaluate and testify without reviewing the materials and

16  evaluate it.  So I have no opinion on that.

17         I will testify on what I find if I'm asked.  I cannot

18  tell you what I will find and what my opinion will be.

19  Q.  So you're not prepared to opine about the government's

20  "extensive use of publicity to promote this case"?

21         MR. EKELAND:  Objection.  Asked and answered, Your

22  Honor.

23         THE COURT:  Overruled.

24         THE WITNESS:  So before I look at it, I cannot have

25  an opinion, no.  I have not looked at it, and I've not looked

1    at what the government has or has not done, so I have no

2    opinion on it.

3    BY MR. BROWN:

4    Q.  Dr. Dror, what percentage of criminal cases would you

5    estimate has some form of cognitive bias in it?

6    A.  If you're including the police investigation, then I would

7    say the vast majority.

8    Q.  And is that based on any experimental work, or is that just

9    your feeling?

10   A.  It's not my feeling, but it's not based on experimental

11   work.  It's based on following detectives and talking to them

12   and looking what information they use and how they use

13   information, and the cross-contamination that happens in

14   criminal investigations where, for example, the police

15   investigating, the DA, and the forensic crime lab are different

16   entities, and often they work very closely and influence one

17   another.  And that happens in many cases, unfortunately.

18   Q.  You're extrapolating from your anecdotal experience and

19   studies, correct?

20   A.  I wouldn't phrase it that way, but yes.

21   Q.  Your expert disclosure states the following:  "He will

22   explain how miscarriages of justice and misleading evidence

23   highlight human error as an issue within forensic science and

24   the threat they pose in this case."

25           I have a hard time following that sentence.  Would

1    you be able to explain it in your own words.

2    A.  Yes.  For example, the Innocence Project in New York that

3    have exonerated hundreds of people who have been convicted

4    wrongly, found and looked what caused the wrongful conviction.

5         And when I read the article, I was hoping that the

6    wrongful conviction was because the defense lawyers didn't do

7    their job, the prosecution didn't disclose evidence.

8    Unfortunately, they found that in about half the cases the

9    people were wrongfully convicted, flawed or exaggerated

10   forensic science evidence contributed to their false

11   conviction.

12   Q.  So when the disclosure talks about a "miscarriage of

13   justice," what you mean is a wrongful conviction; is that fair?

14   A.  Is that what?

15   Q.  You mean to say wrongful conviction is what you're

16   referring to as a miscarriage of justice?

17   A.  Yes.

18   Q.  And you're saying that, based on the Innocence Project

19   data, about 50 percent wrongful convictions sampled there were

20   the result of cognitive bias?

21   A.  That's one example.  There are other examples that I can

22   bring, if you want.  I'm just giving you an illustration of

23   what I mean, but it's based on many more things.  And if you

24   want, I'm happy to elaborate.

25   Q.  Is it fair to say that the inverse of that is not

1    necessarily true?  In other words, the presence of cognitive

2    bias does not mean that 50 percent of the vast majority of

3    criminal cases are wrongful convictions, right?

4    A.  Of course not.

5    Q.  That would be a logical fallacy, right?

6    A.  Absolutely.  Because that was looking not at the random

7    sample; looking specifically on those who were wrongfully

8    convicted.

9    Q.  Now, I have to ask, but have you reviewed the declaration

10   of FBI staff operations specialist Luke Scholl which was

11   previously filed in this case?

12   A.  No, I have not.

13   Q.  If I provide you with a brief summary, I want to ask you if

14   you'd consider this.

15   A.  I prefer not to, because it's the second time you're saying

16   assume blockchain analysis is this or that.  I don't rely on

17   what you say; assume nothing, believe no one, and check

18   everything.

19        So I can't rely on what you tell me is in a document

20   or what is chain block analysis to give my opinion on it before

21   I actually read it and see.  So with all due respect, I would

22   not rely on what you're conveying what you think it means.  If

23   you'd like me to answer, I will.

24        THE COURT:  I think what the -- what Mr. Brown can

25   do, he can pose a hypothetical to you, and it's appropriate

1    with an expert to answer a hypothetical, and he can give you a

2    hypothetical, and you can answer that.

3              THE WITNESS:  Sounds good.

4    BY MR. BROWN:

5    Q.  So if an analyst, hypothetically, were to conduct an

6    analysis tracing funds from the Bitcoin Fog Bitcoin cluster

7    through one or more intermediate accounts to two target

8    accounts and found that a certain large proportion of those

9    funds in the target accounts were derived directly or

10   indirectly from Bitcoin Fog, what steps in that analysis do you

11   think cognitive bias would affect?

12   A.  The question is, first of all, hypothetically speaking,

13   what was he tasked to do, what was he told to do, what

14   knowledge was he given about the investigation, and how much it

15   was driven by the actual data.

16             Also, the question is how many different

17   interpretations are possible on the data that you presented or

18   how much it's one-to-one, or there can be different

19   interpretation of the data.  These are the kinds of things that

20   I would be interested to know to make an evaluation.

21   Q.  Now, moving on to the second question, after you've made an

22   evaluation to the presence or absence of cognitive bias, could

23   you assign a specific probability that the analyst would come

24   out with the correct outcome?

25   A.  No, definitely not able to assign a probability.  I would

1    be able to generally quantify the amount of bias in the case.

2              Also, I would like to say that the fact that there is

3    bias doesn't -- even if the bias is very strong, doesn't mean

4    they've reached the wrong conclusion; they've reached a

5    conclusion, nevertheless.

6    Q.  So if the analyst came up with what was, indeed, the right

7    answer -- let's say the defendant testified in a hearing and

8    confirmed the forensic technician's analysis, his conclusions.

9              What does that tell you about the role of your

10   analysis with cognitive bias and predicting the correct or

11   incorrect outcome?

12   A.  I'm not totally following your question.  It's very

13   general.  I'm not sure what you're asking.  I'm really trying

14   to answer your questions.

15   Q.  Understood.  I appreciate it, and I appreciate that you

16   have not reviewed any of the evidence in this case.

17             If the forensic technician came out with the right

18   answer despite areas where he may be prone to cognitive bias,

19   what role in the analysis is it even plain to say whether

20   cognitive bias exists or not in this process?

21   A.  Well, the problem with the criminal justice system and

22   crime, we don't know if we've reached the right answer because

23   the criminals are not always nice and leave such nice evidence.

24   So it's very problematic.

25             We don't know if it is the right answer or not to

1    begin with.  So I don't find -- and the conclusion, the

2    question is how reliable the conclusion is.

3    Q.  And so, essentially, if he comes up with the right answer,

4    your theory is still right because you're not predicting an

5    incorrect answer; and if he comes up with the incorrect answer,

6    your theory is still right because your theory predicts bad

7    outcomes because of cognitive bias?

8    A.  In case I am in danger of repeating myself, it's not my

9    theory.  You keep referring to my theory.

10           We're talking about established facts agreed by every

11   cognitive neuroscientist, and anyone who studies the brain and

12   human decision-making will say about that.  So it's not my

13   theory.

14           We are affected.  The same thing, we can -- I can

15   give you more examples, but it's going to complicate the

16   matter.  I'm trying to keep it simple.

17           The point is, if they're exposed to bias, that may or

18   may not influence their final decision.

19   Q.  And you have no way of quantifying probability of how that

20   cognitive bias would affect the final decision, correct?

21   A.  Again, at the risk of repeating myself, no, we cannot in a

22   specific case calculate the probability that they would have

23   reached a different conclusion.  But, A, we know and do

24   statistical analysis showing that such context and bias can and

25   does influence their decision.

1          The way to do it, and a court in the United States

2     allowed me to do it, is to hire forensic examiners in the

3     domain and give them the data without context and see what they

4     would find and decide.  And that is the right decision based on

5     the data.

6          So that's something that can be done, and even a

7     court in the United States took up that idea to have

8     independent examiners appointed by the Court, not working for

9     the prosecution or the defense, and not briefed by them, and

10    just get the data and hear their opinion.  That will be the

11    most objective and most reliable conclusion.

12    Q.  And you have never done any of that sort of experiment in

13    the field of blockchain analysis, correct?

14    A.  Correct.

15          MR. BROWN:  Your Honor, no further questions at this

16    time.

17          THE COURT:  All right.  Mr. Ekeland?

18                    REDIRECT EXAMINATION OF

19                       DR. ITIEL DROR

20    BY MR. EKELAND:

21    Q.  Dr. Dror, I just want to follow up on some of the

22    questions, briefly, that Mr. Brown asked you in relation to the

23    creation of expectations and the context given to a forensic

24    investigator.

25          In your expert opinion, if a forensic investigator

1    who has not been involved in the criminal investigation but is

2    brought in after the defendant is arrested and is told that the

3    defendant has been arrested and then is asked to do forensic

4    work in the case, is that a situation where cognitive bias is a

5    concern?

6    A.   Yes.  But to what degree, I would need to get more details.

7    Q.   But it is your testimony that cognitive bias in that

8    situation, because of the context, where the forensic examiner

9    has been told that the defendant has been arrested for the

10   crime, that that potentially will affect the outcome of the

11   forensic examiner's decision?

12   A.   Yes.  And it's not a speculation to say that the forensic

13   examiner doing the blockchain analysis does not need to know if

14   the person was arrested or not.  That is not relevant to their

15   expertise in blockchain analysis.  But it's totally irrelevant

16   contextual information.

17   Q.   And is it your expert opinion that best practices for a

18   forensic investigator brought in to analyze the forensic data

19   in a case after a defendant has been arrested, that it's best

20   practice not to tell that forensic examiner that the individual

21   that they're investigating has been arrested; is that correct?

22   A.   That is correct.  But not only my opinion, but the opinion

23   of the U.S. National Commission on Forensic Science.

24   Q.   Just one more question, just to follow up on what Mr. Brown

25   asked you.

1              In your opinion, in a criminal prosecution where

2      there's a private forensic investigating company, like in this

3      instance Chainalysis Reactor, that has hundreds of millions of

4      dollars' worth of contracts with the government, is that a

5      situation where cognitive bias would come into play with the

6      forensic examiners?

7      A.   It could.  But depending how it's done and what the company

8      has done.  But it could, but not necessarily.

9              MR. EKELAND:  No further questions, Your Honor.

10             THE COURT:  All right.  Thank you.  Dr. Dror, thank

11     you --

12             THE WITNESS:  Can I add something?

13             THE COURT:  You may.

14             THE WITNESS:  Thank you.

15             I know I don't understand the legal questions, but it

16     seems to me to be a very simple decision about generally

17     educating the jurors about cognitive bias because if the DA

18     prosecutor advised me in order to educate him and the public

19     defenders and the judges bring me from London to educate them,

20     so if the judges and the lawyers request an education on

21     cognitive bias, it seems quite clear that the jurors don't know

22     more than the lawyers and the judges.

23             I've done this kind of education to jurors multiple

24     times in the United States, and it's very important that they

25     understand the difference between bias and cognitive bias, that

1  experts are susceptible, and understand the different

2  ingredients and how they work with one another.

3            But, again, there may be legal issues, but to me it

4  seems like a very simple decision.

5            THE COURT:  All right.  Thank you.  So, Dr. Dror, you

6  are excused.  And I don't know if the parties want to make any

7  argument on this now or whether you want to make the argument

8  with respect to particular witnesses later.  I'm happy to

9  proceed however you want.

10            MR. EKELAND:  I would like to reserve that argument

11  for later, Your Honor.

12            THE COURT:  Okay.  Well, while we have the witnesses

13  here, maybe we're better off spending as much of our time with

14  witnesses.  So why don't we just move to the next witness.

15            MR. EKELAND:  Your Honor, may I have five minutes to

16  run to the restroom.

17            THE COURT:  We'll take a few-minute break and come

18  back in about ten minutes.

19            (Recess taken.)

20            THE COURT:  All right.  Mr. Ekeland, you want to call

21  your next witness.

22            MR. EKELAND:  Yes, Your Honor.  The defense calls

23  J.W. Verret.

24            THE COURTROOM DEPUTY:  Hello, Mr. Verret.  Before you

25  sit down, would you raise your right hand.

92

```
 1                    (Witness sworn.)
 2               THE COURTROOM DEPUTY:  Thank you.  Please be seated.
 3               MR. EKELAND:  May I proceed, Your Honor?
 4               THE COURT:  You may, please.
 5               MR. EKELAND:  Thank you.
 6                    DIRECT EXAMINATION OF
 7                         J.W. VERRET
 8     BY MR. EKELAND:
 9     Q.  Mr. Verret, could you -- are you ready, Mr. Verret?
10     A.  Yes.
11     Q.  Mr. Verret, could you just state your educational
12     background for the Court.
13     A.  Sure.  I've got a bachelor's degree from Louisiana State
14     University in accounting.  I have a law degree from Harvard.
15     I have a master's in public policy from the Harvard Kennedy
16     School of Government with a concentration in financial
17     regulation.
18               And you just want the degrees or --
19     Q.  Degrees and any certifications and trainings that you have
20     had that are relevant.
21     A.  Sure.  So I'm licensed to practice law.  I'm a licensed
22     certified public accountant in the state of Virginia.  I hold
23     the CFF designation, Certified Financial Forensics, that is
24     awarded by the AICPA.  I hold the CFE designation, Certified in
25     Fraud Examination, that is awarded by ASCFE, American Society
```

1     of Certified Fraud Examiners; the CVA, which is certified in

2     valuation analysis -- Certified Valuation Analyst.

3              Just to describe those briefly, the CPA you're

4     probably familiar with, Certified Public Accountant.  The CFF

5     designation is awarded by the AICPA.  You have to hold the CPA

6     designation to be a CFF.  You undertake additional training in

7     financial forensics, forensic accounting, and forensics more

8     generally.  And you have to have experience in investigative

9     work to hold the CFF designation.

10             And it was, I guess a simple explanation, created by

11    the AICPA to help CPAs working in forensic accounting.  It's a

12    field that grew out of -- I think originally out of the

13    prohibition and the forensic accountants working on the

14    investigation into Al Capone.  That's where the field harkens

15    back to.  So the CFF helps CPAs to specialize in forensic

16    accounting.

17             And then the CFE is a designation that is somewhat a

18    little like the CFF.  The CFE is -- you don't have to be a CPA

19    to be a CFE.  You just have to have a bachelor's degree.  It's

20    relatively much easier to obtain relative to the CFF.

21             And the CVA is focused on valuation matters that can

22    be -- you know, like valuing something in litigation or

23    something like that.

24    Q.  Just briefly, what kind of training and standards, if any,

25    are involved in the CFF certification?

1    A.  So the training in the CFF designation involves pretty

2    rigorous training in everything from opening investigations,

3    conflicts checks, and engagement letters on the practice side,

4    to initial interviews, scoping out financial forensic

5    investigation, conducting the forensic investigation, much of

6    it on creating the paper trail, necessary paper trail, and

7    learning how to review the paper trail, learning some of the

8    tools that are also used in auditing for the purposes of

9    financial forensics.

10            So, for example, ways to follow money trails, typical

11   topologies of financial fraud or other financial crimes, like

12   the types of schemes that tend to persist in embezzlements or

13   in money laundering or in fraud, things like that, of that

14   nature.

15            And there's training in computer forensics as well,

16   so that you can either make determinations on your own or know

17   what to do with evidence to make sure you maintain the chain of

18   evidence.  You do your best not to ruin the reliability of the

19   computer forensics, and that you know how to collaborate and

20   rely on, if you need to use a digital or computer forensics

21   expert.  There's some training in that aspect as well, as it

22   kind of spans the gamut

23   Q.  Just to --

24   A.  Also, I should say, in the last couple of years, the folks

25   at the AICPA who manage this license are very cognizant of the

1    growing field of cryptocurrency and fraud and compliance.

2            So there's no shortage of classes in continuing

3    education to take in crypto forensics.  And it's the area I've

4    been most excited about for a few years, so I think I might be

5    the only forensic accountant who takes more continuing

6    education than he needs to because I can't get enough of the

7    crypto forensic classes.  Anyway --

8    Q.  So as part of your continuing education as a certified, I

9    think you said fraud forensics -- what's the CFF stand for

10   again?  I'm sorry.

11   A.  Certified in Financial Forensics.

12   Q.  Certified in Financial Forensics.  As part of your

13   continuing education requirements, as I understand you, you've

14   had training in digital currencies in the blockchain; is that

15   correct?

16   A.  Everything from the basics of blockchain, blockchain

17   tracing, types of schemes that criminals use blockchain for;

18   from ransomware, it's used to -- you know, embezzlements and

19   phishing scams and those kinds of things; to understanding

20   blockchain analytics and understanding on-chain data and some

21   applications to decentralized finance, which is a more

22   complicated end of crypto forensics than the issues in this

23   case.

24           So yes is the answer to your question.

25   Q.  And outside of your continuing education classes as part of

1    your CFF certification, what experience do you have in general

2    with the blockchain and cryptocurrencies?

3    A.  So I have a certification from the Wharton School of

4    Business in the economics of blockchain that was an

5    education -- I forget now how many hours went into it.  But it

6    was roughly three months of about 10, 15 hours a week to obtain

7    that certification.

8            THE COURT:  What does that mean, the economics of

9    blockchain?  I thought blockchain was a mode of analysis.  What

10   is the economics of blockchain?

11           THE WITNESS:  So this is understanding --

12   understanding the applications of blockchain to the economy.

13           So right now the clearest cases for blockchain are

14   for payments for the transfer of value over a decentralized

15   computer network and for the storage of data that represents

16   ownership.  So this is what NFTs are about.  This is the

17   pictures that people trade, which is, essentially, digital art

18   traded on the blockchain.  So it's understanding those two

19   applications, the application for gaming, the application of

20   blockchain for real-world assets being represented on-chain.

21           The economy is not there yet, but there are changes

22   in the Uniform Commercial Code going on that I think will

23   eventually get us there to where, rather than a deed to your

24   house being at the courthouse, it exists on-chain.  So that

25   makes it a lot easier to eventually transfer.  So those are the

1    future applications, and we studied some of those.

2              But I found out that -- that part of my education was

3    useful for crypto forensics because it helps me understand how

4    to value things, it helps me understand the legitimate economic

5    projects that are subject to the problems that are endemic to

6    blockchain, like scams, like phishing, like hacking.  Yeah.

7              THE COURT:  That's helpful.  Thank you.

8              THE WITNESS:  Okay.  Sure.

9    BY MR. EKELAND:

10   Q.  I think it might be helpful, Mr. Verret, if you can give us

11   a brief description of your understanding of just what the

12   blockchain is and how it works.

13   A.  Sure.  I think, in answer to your last question, I didn't

14   want to miss that I've also -- in addition to taking continuing

15   education courses, I've also given them in blockchain issues,

16   in addition to my teaching at the law school; teaching forensic

17   accounting at the law school.  I've done more than a few

18   courses for continuing education for attorneys in crypto

19   forensics issues and crypto regulatory issues for the American

20   Bar Association, for the Federalist Society, and those are all

21   online and googleable.

22              In answer to your question, the basics of blockchain,

23   a blockchain is a mode of storing data that involves hashing.

24   So you take a record of something that happened, kind of like

25   the record you would have on a central ledger that you might

1    have on Microsoft Excel, but instead of storing it in one place

2    where you have to rely on the place it's stored and the person

3    who controls where it's stored, the genius of blockchain that

4    was demonstrated, I think, in the Bitcoin blockchain -- and has

5    been in other blockchains to varying extents, depending how

6    good they are -- the genius of it is that the system is

7    designed so that it incentivizes a larger group of

8    decentralized computers controlled by a larger group of people

9    to continue changes to this shared distributed system in a way

10   that rewards -- rewards truthful updates to the chain that --

11   and that makes it very difficult, even if you wanted to, to

12   make an inaccurate or false update to the chain unless you

13   controlled the majority of the nodes.

14          So as the group of nodes grows bigger, that becomes

15   more and more difficult.  And as the individuals running the

16   nodes are -- like in Bitcoin, there are a lot of companies that

17   mine bitcoin that own a lot of bitcoin.  So they would hate to

18   see something bad happen to the reputation of Bitcoin and the

19   bitcoins that they own.

20          So that creates how you have a -- people often use

21   the analogy of made its way into the popular press of Napster.

22   Remember Napster in the '90s?  The idea was you trade music

23   with someone else and that, obviously, had a lot of copyright

24   issues and was illegal in a lot of ways.

25          But the technology itself, it was very interesting.

1    It allowed different people, rather than a central library, it

2    allowed a lot of different people to share what they had in a

3    way that required someone else to share with them.  So it was a

4    precursor to some of the ideas that made their way here.  It

5    itself changed the music industry, I think; led the way for

6    streaming.

7              In the same way, one of the hopes of blockchain is to

8    decentralize economic activity in such a way that would be kind

9    of -- it no longer has to rely on central gatekeepers who can

10   charge economic rents for access to what they control.  So the

11   hope behind some blockchain developers -- and this still has to

12   be realized.

13             There's not much to that hope yet, but you can see

14   how it's logical -- is that it would decentralize social media.

15             So then -- rather than going on Facebook or Twitter

16   or whatever and interacting with people.  But that entire

17   connection is controlled by a central company, and they get to

18   decide what to charge, and they use your data and charge

19   advertisers and whatever.  There's a possibility for an

20   alternative business model where the whole thing exists on a

21   blockchain.  There's no central party that controls it.

22             And so your identity is linked to the chain in such a

23   way that applications can be developed by other programmers who

24   are kind of open-source developers who are interested in

25   building applications they can link to the blockchain, an

1   alternative vision of social media.  That might not work out

2   because it's hard to overcome the established -- I think, the

3   establishment of the big social media companies.

4          But, anyway, you can see how similar applications

5   could develop for other things, like just basic transfer of

6   value to someone.  Bitcoin is very valuable in that way.  It's

7   proven it's very valuable.

8          If you were in Ukraine when the war started and the

9   banks shut down, there are a lot of people who have a story

10  that, you know, I had to get out of there.  I couldn't go to my

11  bank.  If I had had money on me, it would have gotten taken at

12  the border.  You know what, I memorized my seed phrase.  I got

13  to Poland, and then I got access to a computer and access to my

14  Bitcoin.

15         So I walked out of Ukraine with the shirt on my back,

16  walked past guards, and didn't have to worry about the risk of

17  losing that value.  That's one of the benefits of -- I'm kind

18  of going off here, so stop me when I'm talking about --

19  Q.  I do want to ask you one question.  Is it correct to say

20  that when you characterize the blockchain as decentralized,

21  what that means is that there is no central authority or any

22  single person that controls the blockchain?

23  A.  Yes.  And I think that is true of Bitcoin, and it's

24  somewhat true of other blockchains and really not true of some

25  blockchains.  But, obviously, that's probably fairly beyond the

1    scope.

2    Q.  I think I heard you say that your identity is linked

3    somehow to the blockchain.

4         But are you saying that a person has their personally

5    identifying information on the blockchain, or just what are you

6    referring to when you say that?

7    A.  So the ideas that I was talking about that are

8    experimental, that might come in the future, might involve

9    putting personally identifiable information or information

10   about property in the blockchain, but that's not the case now.

11   And I don't want to confuse anyone in talking about Bitcoin

12   because that's not the case for Bitcoin.

13   Q.  For Bitcoin specifically, just what information is kept

14   on-chain, so to speak, on the blockchain?

15   A.  So your -- as a user of Bitcoin, you end up with two

16   primary pieces of information, a public key and a private key.

17   You can think of your private key like your password; you can

18   think of your public key like your bank account, though it's a

19   little more complicated than that.

20        A lot of information is contained on-chain about

21   particular transactions that describe the hash, that describe

22   the date, that describe the number of blocks that have come

23   before and stuff like that.  Basically, you have a public key

24   and a private key.

25        Your private key controls your public key and the

1     assets at your public key.  So it's like your password, it's

2     like your Swiss bank account key.  You can think of it that

3     way.  You don't share your private key with anyone.  You want

4     to keep that secret, especially if you're custodying yourself;

5     you're not leaving it on exchange.  That is the most secret

6     thing that you need to be very careful about, how you custody

7     that.

8            And share it with no one and try to figure out --

9     this is a difficult question -- what do you do with it if you

10    die, how do you make sure your heirs get it, and stuff like

11    that.  That's your private key.

12           Your public key is connected to the UTXOs unspent

13    transaction amounts.  Think of it generally; it's connected to

14    the bitcoin that you own.  The bitcoin you own is connected to

15    your public key.

16           So if I download the Bitcoin blockchain or, more

17    easily, if I use one of the blockchain explorers online that

18    has been described, like blockchain.com, I can look at it as of

19    a current block height, a record of the Bitcoin blockchain.  If

20    I knew your public key, I could learn a lot about you; I could

21    learn a lot of interesting stuff about you, if I know your

22    public key, if you told me what your public key is.

23           If I don't know what's associated with you, then I've

24    got to figure out how to link that with you.  And if I'm trying

25    to link that with you -- we can get into that -- but the

1    easiest way is either you tell me it is linked to you or it's

2    in a KYC'd account and it shows me it's linked to your KYC'd

3    information.  That might allow me to have a reasonable

4    inference that it's linked to you.

5            Or if I see that you've written down the private key,

6    if I find a secret note hidden away in your house, and it says

7    this is my private key, don't show it to anyone, and I see your

8    private key right there, usually it's a reasonable inference

9    that that private key that's associated with the public key and

10   the bitcoins of the public key are under your control and,

11   therefore, owned by you.

12           But I think, generally speaking, what you're getting

13   at and what I'm trying to describe is that attributing

14   ownership of bitcoin is a -- can be a lot easier if I know that

15   you and the public key are linked.  So it's potentially a

16   threat to privacy.  But if I don't know that already, it can be

17   hard to make that link.

18   Q.  Is it fair to say that just simply looking at the

19   blockchain, which as I -- if I'm understanding you correctly is

20   just sort of a digital -- a decentralized digital ledger of

21   transactions, that there's no way just simply to look at the

22   blockchain itself with the information in it and the

23   transactions that are reported in the blockchain and identify

24   anybody without more information outside the blockchain?  Is

25   that correct?

```
1    A.   That's correct.

2    Q.   So I want to turn to the discovery in this case.  And have

3    you reviewed the discovery in this case?

4    A.   I have.

5    Q.   And did you review the deposits to Mr. Sterlingov's Kraken

6    account that the government has alleged are the service fees

7    for Bitcoin Fog?

8    A.   I have.  Yes.

9    Q.   And --

10   A.   And their other cryptocurrency accounts as well.

11   Q.   Did you review those accounts as well?

12   A.   Yes.

13   Q.   In general, do you have an opinion as to the government's

14   assertion, and I believe also the assertion by the government's

15   noticed expert, Ms. Sarah Glave, that the deposits to

16   Mr. Sterlingov's Kraken accounts are service fees from Bitcoin

17   Fog?

18   A.   So my opinion is I cannot determine that they are service

19   fees from Bitcoin Fog, and I have not seen information

20   consistent with that description of what those amounts are.

21   Q.   And why do you think that?

22   A.   Well, a few reasons.  First, there's the question of the

23   missing bitcoin.  So one of the first questions you have to

24   answer in trying to assess what's going on here is, to assess

25   the government's assertion that Mr. Sterlingov ran Bitcoin Fog,
```

1    what are the toll fees, mixing fees for operating Bitcoin Fog.

2    You have to make a determination on that.

3           Maybe you can try to look at clustering and try to

4    get some guess about direct transactions and add them up.  But

5    a very easy and accurate back-of-the-envelope calculation you

6    can make is to say, okay, the government has an assertion about

7    how much bitcoin went through Bitcoin Fog; the government has

8    made that assertion.  About a million bitcoin.

9           The average fee for Bitcoin Fog was -- well, it

10   changed over time, but it was 2 percent, then it was variable

11   between 2 and 3 percent.  You can try to figure out a

12   reasonable estimate of the fees.  Let's say 2 percent is fairly

13   conservative for the low amount of fees you'd expect and,

14   therefore, a low estimate of the fees that are missing.  But

15   you could make an estimate closer to 3 percent or 2.5 percent.

16   Let's go with 2.5.

17          That's 2.5 percent times a million bitcoin going

18   through, right?  Or is it 2.6, 2.7?  I don't know.  24,000

19   bitcoin -- from 24,000 bitcoin to 30,000 bitcoin would be the

20   fees for operating Bitcoin Fog.  That's a lot of bitcoin.

21   That's a lot of money.

22          There was a point at which, in the history of

23   bitcoin, that would make you a billionaire.

24          So -- okay.  Let's go with the lowest number; 24,000

25   bitcoin, roughly speaking.  I don't have my calculator in front

1       of me, so don't say I'm mischaracterizing if it's

2       23,700-something.  Roughly speaking, 2 percent times a million

3       of bitcoin going through, right?

4              So where is the missing bitcoin?  The government's --

5       the documents they have shown demonstrate 1600 bitcoin.  So

6       I've got 21,000, 22,000 bitcoin I can't account for.  So

7       there's 1600 bitcoin that these documents can account for.

8       1600.  But then there's 22,000 bitcoin that -- where did those

9       fees go if he was the operator?

10             I don't see anything to demonstrate to me where that

11      went.  So that's inconsistent with the assertion that he was

12      running the mixer, and that bitcoin -- post mix that the

13      government search was mixed through Bitcoin Fog was fees.  But

14      it is consistent with the assertion, I believe, that he was a

15      user of Bitcoin Fog; that he was just a bitcoin owner who

16      wanted to get some privacy on a network that's very hard to

17      obtain privacy if anyone knows your public key.

18             We can get into how there's a few reasons -- ways

19      people can learn more actual public keys.  You can transact

20      with them or they could hack the exchange that you interact

21      with and that you have KYC'd information at.  Anyway, for a

22      second -- there's a question of missing bitcoin.

23             THE COURT:  Sir, can you define KYC.  You said --

24             THE WITNESS:  Know your customer information.  This

25      is when you give your license to the exchange you interact

1    with.  And KYC is shorthand for, you know, the anti-money

2    laundering regime administered by --

3    BY MR. EKELAND:

4    Q.  And just to be clear, the Kraken account was a KYC account;

5    is that correct?

6    A.  Yes, that's correct.

7    Q.  In your opinion, would somebody who was running a mixer

8    like Bitcoin Fog and if the bitcoin -- would somebody like that

9    deposit their service fees in a KYC Kraken account?

10   A.  See, this is the second reason why, in addition to the

11   missing bitcoin.  The second reason why the evidence I've

12   reviewed is inconsistent with -- just doesn't support the

13   government's assertion that these funds at Kraken and other

14   KYC'd accounts that were mixed at Bitcoin Fog and sent back to

15   a KYC'd exchange -- this is inconsistent with the government's

16   framing that Roman ran Bitcoin Fog.

17        So in crypto privacy -- which is something I'm

18   writing a book about right now for MIT Press.  It's something I

19   teach my students, it's something I care a lot about.  We

20   haven't talked about how I serve on the foundation that does

21   research into the zero-knowledge proof cryptography

22   that underlies some of the private cryptocurrencies that were

23   built to solve this problem in bitcoin.

24        The number one thing you have to know, the first

25   lesson, the rookie thing about crypto privacy is if you use a

1    privacy tool of some kind, that can delink your future

2    transactions from your history.  But the moment you bring it

3    back to something connected to you, you have obviated any

4    benefit you've created from using that privacy tool.

5         Whether it's a mixing tool, like these centralized

6    mixers that existed a long time ago, whether it's a coinjoin,

7    whether it's using a privacy coin, you have to be very careful

8    about what you do after using the privacy tool not to relink it

9    to you if you're trying to keep that private in some way.

10        Now, if Mr. Sterlingov is -- and another point that's

11   important, I think, in forming my opinion, is I've seen the

12   BitcoinFog.com clearnet website, and whoever wrote that -- I

13   don't know who wrote that, but whoever wrote it understands

14   that.  They're very clear that they understand the notion of

15   post-mix privacy and maintaining post-mix privacy.

16        They understand so well, they talk about tracing

17   techniques.  And whoever wrote that was fairly sophisticated in

18   this regard.

19   Q.  Just a real quick question.  When you referenced the

20   BitcoinFog.com clearnet site, are you referring to just a

21   website on the World Wide Web, a normal -- that anybody can

22   access with a normal browser?

23   A.  Sure.  And particularly various iterations of it on the

24   Wayback Machine that can show me what it looked like back in

25   2011, 2012.

1    Q.  And just to follow up, a question on that, was the

2    BitcoinFog.com website, is that the site that you would

3    actually mix your bitcoin on?

4    A.  No.  It's not even clear from the term, that website, that

5    it was necessarily created by whoever was running the mixer.

6    But it described the mixer, it told you how to get to the

7    mixer, and it gave some tips about using it, including not

8    doing anything like sending your post-mix tokens back to your

9    KYC'd account.

10   Q.  Just real briefly, where would it send you?  Where was it

11   pointing you to, to actually do the mixing?

12   A.  So there's various iterations of it on the Wayback Machine.

13   The ones that I saw pointed you to a different kind of website

14   contained on the -- a Tor onion router viewable site on the --

15   people call it the dark web.  It's a pejorative term.  It's a

16   web that's not on the publicly surveilled World Wide Web.

17   Q.  So just to be clear, the clearnet site doesn't mix bitcoin

18   at all?

19   A.  That's correct.  That's correct as well, yes.

20   Q.  Okay.  And then in your expert opinion, are --

21   A.  Can I make one last point that I didn't give to you?

22   Q.  Yes.

23   A.  If you were using -- you have to weigh hypotheticals as

24   a -- in financial forensics and understand which one is more

25   likely, reasonable, and consistent with the evidence.

1          If you were trying to put yourself in Roman's

2     position, if you were a bitcoin owner and you wanted some

3     privacy, you didn't need to hide from Kraken because you trust

4     Kraken.  But you're going to maybe Bitcoin meetups and you're

5     sending some bitcoin to somebody.  But you don't want them to

6     track your wallet, see how much you own.  He was very early,

7     and he had a lot.  Sometimes people get kidnapped for how much

8     they have in bitcoin.

9          If you wanted privacy from people who you interact

10    with in the world, you're not an illicit actor, you're not

11    doing crime, so you're not afraid of Kraken, this KYC'd

12    exchange, knowing that it came from Bitcoin Fog and knowing

13    that it's easily readily subpoenable; that the post mix, post

14    Bitcoin Fog mixed bitcoin or at Kraken, if that's who you are,

15    there would be no reason to send post-mix tokens back to

16    Kraken.

17         Now, if you were some criminal mastermind running a

18    Bitcoin Fog mixer that you know was the subject of government

19    investigations, then you could be very careful about what you

20    did with post-mix tokens, whether they were the result of fees

21    or not.  You wouldn't want that touching anything that was

22    KYC'd.

23         So that's another reasonable inference that suggests

24    to me that Mr. Sterlingov's bitcoin contained in the KYC'd

25    accounts listed in the government's evidence were not the

1    proceeds of running a mixer but were, instead, the proceeds of

2    just using the tool, the privacy tool, to obtain personal

3    privacy.

4    Q.  And from the context of your CFF certification and the

5    standards involved in forensic accounting, is it your opinion

6    that the government's conclusion that Mr. Sterlingov was

7    receiving service fees from Bitcoin Fog, is that forensically

8    sound in your opinion?

9    A.  I don't believe it is forensically sound.  I was expecting

10   to see, when I began to review the evidence, that one of the

11   most common tools used in financial forensics, forensic

12   accounting, is a tool of indirectly finding hidden money,

13   so-called net worth or net income analysis.  I was expecting to

14   see that, and I haven't seen it.

15        And I referenced an article that describes it, I

16   think, in a pretty succinct way in the disclosure.  That's a

17   standard tool of the trade to try to determine whether illicit

18   money that you can't see is somehow present in the form of

19   other assets.  It was converted to some other asset in some way

20   or some other expenditure that will suggest what is missing.

21   And I didn't see any of that analysis either.

22        There was not sufficient data to conduct a net worth

23   or net income analysis in the government's -- the evidence they

24   turned over.

25   Q.  And you've reviewed the government's expert disclosure for,

1    I believe, Ms. Sarah Glave; is that correct?

2    A.  Yes.

3    Q.  And in that expert disclosure, I think she makes a

4    statement saying that one thing she's going to testify to at

5    trial is that Mr. Sterlingov -- the returns that Mr. Sterlingov

6    got from bitcoin are not consistent with the returns that an

7    average bitcoin investor would get.

8              In your opinion, is that a forensically sound

9    conclusion?

10   A.  I didn't see enough evidence in the government's

11   disclosures to come to that conclusion at all.  Not only do I

12   not agree with it, but I think it would be forensically

13   unsound, for example, just given the change in the price of

14   bitcoin from 2011 to the time when Mr. Sterlingov was arrested.

15             In 2011, bitcoin was bouncing around in the $30

16   range, and it's now around $30,000.  But it hit $60,000 at its

17   height; 60-something.  So to get to 1600 bitcoins in 2011, I

18   mean, you multiply that 1600 times 30.  That seems to be within

19   the range of what Mr. Sterlingov could have spent on bitcoin.

20   We don't have a full amount that he spent on bitcoin.

21             Even if you -- you can't make the assumption that he

22   was only buying -- even if you relied on Mt. Gox data -- which

23   I'm not willing to; hopefully, I get a chance to describe why.

24   If you rely on Kraken data -- which, unless there's some reason

25   not to, I'm willing to rely on Kraken data because their

1   reputation with me -- I know them pretty well -- is pretty

2   sound.  But even if you rely on all of that, if -- you still

3   don't know whether or not Roman was buying bitcoin in ways that

4   didn't involve KYC exchanges.

5            He could have been buying them on peer-to-peer

6   platforms.  He could have been receiving them at Bitcoin

7   meetups.  You meet up someone and pull out your wallet and you

8   transfer bitcoin.  We don't know whether he was engaged in

9   one-on-one transactions.  We don't know if he was buying

10  bitcoin on peer-to-peer transactions that do not comply with

11  KYC and that would not be readily subpoenable.

12           And all of that could have gone through the Bitcoin

13  Fog mixer, and that could be some of what we're seeing in --

14  what's in the Kraken account right now.  There's no way to know

15  that.

16  Q.  Is the only way to transfer ownership of bitcoin, is the

17  only way to do that on-chain, so to speak, by recording a

18  transaction on-chain, or are there other ways to transfer

19  ownership and control through Bitcoin that aren't recorded on

20  the blockchain?

21  A.  So one of the things that fascinates me most about

22  blockchain as it touches all the areas I teach in -- as a law

23  professor and as someone who teaches accounting to lawyers --

24  is blockchain changes the nature of ownership itself.

25           Certainly, there are traditional concepts of property

1    law that will still apply no matter the asset, right?  But to

2    the extent you're thinking about something like control, let's

3    say if I wanted to give you a Bitcoin tour today, so you could

4    pull out your wallet, and I could pull out my wallet, and I

5    could transfer it to you, a bitcoin to you, in an on-chain

6    transaction.

7            Or I could just say, here's my private key.  Maybe

8    the fees are high and you trust me.  You trust that I'm not

9    going to secretly keep my private key.  I just say, look, I

10   didn't memorize it.  You trust me.  I can just give it to you.

11   Now it's yours.

12   Q.  And so just to sum up, if somebody -- somebody can transfer

13   ownership of bitcoin by simply transferring or stealing a

14   private key, and it would show up nowhere on the blockchain?

15   A.  Right.  That's right.

16   Q.  And real briefly, you mentioned that you don't trust the

17   Mt. Gox data.  Why is that?

18   A.  So before this -- before I even learned about this case, I

19   knew something about Mt. Gox.

20   Q.  I'm sorry.  One second.  Just explain for the Court what

21   Mt. Gox was.

22   A.  Sure.  Mt. Gox started as an exchange for -- there's always

23   good stories in Bitcoin.  It started as a forum to exchange

24   Magic: The Gathering collecting cards.  That's where the name

25   Mt. Gox came from.

1              It came to be a platform for the exchange of bitcoin.

2     And part of my research for the book on bitcoin privacy and

3     forensics that I'm doing for MIT, I listened to a podcast with

4     Mr. Mark Karpeles, who was the CEO of -- or the

5     owner/CEO/president -- I don't remember the title -- the

6     owner/controller/manager of Mt. Gox at the time it went down.

7     Q.  What time was that, just to put this in a --

8     A.  I can't remember the time it went into bankruptcy, but it

9     was hacked multiple times over the course of 2011, 2012; I

10    think 2014.  I might be getting the dates wrong.  That's my

11    general understanding.  It's very early in Bitcoin.

12             So I listened to a podcast he did recently, last

13    year, after the FTX blowup.  And anybody who wants to can

14    listen to it.  It's on a podcast called *Up Only*.  Popular

15    phrase in Bitcoin.  *Up Only* podcast with Mr. Mark Karpeles.

16             They wanted to talk to him about the FTX event that

17    they want -- given he was at the head of an exchange that went

18    down, the first one.  They wanted to talk about his story.

19    He's talked in-depth about how when he bought Mt. Gox, he was

20    shocked to learn the state of the records that he got.  He said

21    it was a disaster.  That the logs were all wrong, that the

22    servers were all not secure, that the records were off.

23             So much so that he wanted to sue the person -- I

24    think he wanted to sue the person who had sold it to him.  He

25    felt they had violated the terms of the deal because of the

1   state that Mt. Gox was in when he bought it, controlled it.

2         And I know that Mt. Gox was hacked multiple times.

3   Those stories have been relayed quite a bit.  I followed the

4   Mt. Gox bankruptcy.

5   Q.  Why did Mt. Gox go bankrupt?

6   A.  I think it, principally, went bankrupt because of the

7   hacks; because of the bitcoin that was stolen from Mt. Gox.

8         So when I came into this case, I mean, I have those

9   prior -- that prior knowledge from learning about Mt. Gox.

10  It's hard not to know that.  In my role as a forensic

11  accountant and financial forensic analyst -- I guess is a good

12  phrase -- I can't unknow that.  I know that.  I have to trust

13  the integrity of what I'm looking at.

14        Sometimes this can even come up in traditional

15  institutions.  I've been involved in a financial forensic

16  investigation where the reliability of Bank of America's

17  records was at issue because there was some problems with them

18  taking wrongfully endorsed checks, and their compliance system

19  wasn't working.

20        So that can happen in traditional institutions, and

21  you have to make a judgment about the records that you see and

22  whether you rely on them as a forensic investigator.  If that

23  can happen in that context, think about Mt. Gox.  That was --

24  that its own owner described as unreliable and -- own records

25  unreliable before he knew of the hack that hacked bitcoin.

1            I don't feel comfortable relying on Mt. Gox data as

2       part of an assessment in this matter.

3       Q.  Would you consider it forensically sound to -- under the

4       standards you were taught in your CFF certification and

5       everything that you know about forensic accounting and the

6       standards that apply, do you consider it forensically sound to

7       rely on the Mt. Gox data for any kind of financial analysis?

8       A.  I wouldn't rely on Mt. Gox data unless someone else could,

9       in a trustful way, verify for me -- in which case I wouldn't --

10           THE COURT REPORTER:  I'm sorry.  You need to slow

11      down.

12           THE WITNESS:  Sorry.

13           The short answer is, I guess, to repeat what I just

14      said, I wouldn't rely on Mt. Gox data unless someone else

15      independently verified it for me that I could trust, in which

16      case I wouldn't be relying on the Mt. Gox data anymore.  I'd be

17      relying on this third party that could verify it for me.

18      BY MR. EKELAND:

19      Q.  Just to change topics slightly, are you familiar with

20      Chainalysis Reactor?

21      A.  Sure.

22      Q.  And can you just briefly describe your understanding of how

23      Chainalysis Reactor works.

24      A.  My understanding, it's a tool that uses blockchain data, a

25      combination of blockchain data taken from the blockchain itself

1    and from -- in some blockchains from the nodes that Chainalysis

2    runs.

3    Q.  Can you stop for one second.  Could you just explain to the

4    Court what -- for everybody, what a node is.

5    A.  Sure.  A node is just a computer interface that interacts

6    with the blockchain and makes changes to it, or that can make

7    changes to it.  But in the ordinary sense, it just communicates

8    with it and keeps a record of it.

9    Q.  I want to get clear, to go back to the concept of

10   decentralization, when you're saying interacting with the

11   blockchain, where is the blockchain?  Is it a central place, or

12   is it existing on the node, or how does that work?

13   A.  It's -- copies of it are stored on -- for Bitcoin, hundreds

14   of thousands of computers around the world.

15   Q.  Is it fair to say that a copy of the blockchain is stored

16   on every node?

17   A.  Right, yes.  Regularly updated every block.

18   Q.  So any change to the blockchain is a change to the

19   blockchain on every node, and in that sense it's decentralized;

20   is that correct?

21   A.  That's good, yes.  Accurate.

22   Q.  Going back to your knowledge of Chainalysis, you were

23   describing your understanding -- Chainalysis Reactor, how it

24   works, you can continue with that.

25   A.  I should say my understanding of Reactor is based just

1    on -- mostly on Chainalysis's own description of it.  Because

2    they were protective of this tool, such that --

3    Q.  Could I just ask a question about that.  Why would somebody

4    be protective if everything that your software is dealing with

5    it just a matter of public record?

6    A.  I mean, I don't want to cast aspersions.  They might be

7    conflicted.  There might be issues with the tools.  I've seen

8    them say it's all because of proprietary issues, but I don't

9    think that's the whole reason because I know that there are

10   issues with the heuristics that have gone into that tool.  That

11   must be part of --

12   Q.  If I could stop you there and take this bit by bit because

13   this is complex.

14           When you say heuristics going into the tool, what do

15   you mean by heuristics?

16   A.  I'll answer that question, but -- not to be annoying, but

17   there's a point in the last question --

18   Q.  Please finish up the last question, and then we'll --

19   A.  You asked me if I was comfortable relying on Chainalysis.

20   One, I don't know enough about the black box that is Reactor.

21   I do know that it uses blockchain data.  They describe that

22   they use their own nodes and they use data from the nodes that

23   is off-chain, and they use other stuff too.

24           I know at one point they did kind of a honey-pot

25   wallet explorer; that you could use the explorer, but they

 1    don't realize that Chainalysis is actually surveilling the

 2    wallets that connect to explorer.  Anyway, that's all from

 3    their description and from some stuff that is leaked.

 4         You asked me why I wouldn't be comfortable relying on

 5    on it.  One of the reasons is just one of my colleagues -- at a

 6    firm called J.S. Held that I do some stuff with -- we were

 7    talking about building a program where we could do some

 8    pro bono crypto forensics work for families who got hacked and

 9    for law enforcement agencies that came forward that had

10    families that can't afford -- that can't afford tools and that

11    need help.

12         We talked about using Chainalysis Reactor.  And one

13    of my colleagues said, it's unreliable, and I feel more

14    comfortable building my own API, the --

15         THE COURT:  I'm sorry.  Can you slow down a little

16    bit.  You're not talking, I think, carefully.  I apologize.

17    It's very hard for the court reporter when you talk that fast

18    and don't talk clearly.

19         THE WITNESS:  I apologize.  I'm sorry.

20         THE COURT:  Okay.  Go ahead.

21         THE WITNESS:  Based on the representations of my

22    colleague at J.S. Held, he didn't trust Chainalysis Reactor and

23    was more comfortable using his own API to interact with the

24    blockchain.

25         That's another reason why I would not feel

1    comfortable using it.  I also don't know enough about what

2    happens in a black box of Reactor.  I happen to know that -- I

3    assumed -- maybe I might be wrong, but I assumed that they tend

4    to have an exclusive relationship with law enforcement based on

5    the grants they've gotten from the DOJ and the treasury

6    department, and I assume that if I would have called in to use

7    it for defense side work, they would have told me no.  They're

8    very exclusive about who they let take the training and the

9    tools.

10          So for all these reasons, I wouldn't feel comfortable

11    using it.  But I think the most important one is that I know

12    the heuristics that went into the tool, and I know -- I'm

13    pretty familiar with the literature on blockchain forensics and

14    the questions raised about the reliability of those heuristics

15    for anything other than generating initial leads in an

16    investigation.

17    BY MR. EKELAND:

18    Q.  So just briefly, just -- if you could just explain for

19    everybody here what a heuristic is.

20          Is it something that's just a deterministic logical

21    certainty or what?  Is it a --

22    A.  No.  A heuristic is just a fancy word for a guess.  Of

23    course, guesswork is important in any forensic investigation.

24    You've got to make a lot of guesses.

25          I wouldn't rely on it to tell me the fact of

1    something.  I wouldn't rely on it alone.  I think a heuristic

2    is interesting to get started, but if that's all you've got in

3    financial forensics, then you've got nothing.

4    Q.  So what -- are there different types of heuristics?

5    A.  There are different types of -- sure.  I'm familiar with a

6    few that Chainalysis has referenced in the brief report that

7    they provided in this case that are also described in the

8    academic literature that precedes the establishment of that

9    fund.

10           Particularly, the multi-input heuristic and the peel

11   chain heuristic that helps to try to cluster bitcoin public

12   keys together to support an assumption that they all are

13   controlled by the same person.

14   Q.  So if I understand your testimony correctly, there's --

15   clustering is, basically, fancy guesswork; saying that certain

16   bitcoin addresses are all associated with each other.  Is that

17   a correct way to understand it?

18   A.  That's correct, yes.

19   Q.  And when you said that there's -- I forget -- the multi --

20   what did you say, the multi-spend heuristic?

21   A.  Multi-input.

22   Q.  Is that the same as the co-spend?

23   A.  Yes.

24   Q.  Okay.  And so is it your understanding that the co-spend

25   heuristic is one of the primary heuristics that Chainalysis

1    Reactor uses?

2    A.  Yes.  I was anticipating you'd ask me to define it.

3    Q.  Do you think, in your expert opinion, is the co-spend

4    heuristic a reliable heuristic in terms of its accuracy related

5    to its attributions, whether it's clustering or attributing

6    blockchain -- bitcoin transactions to an individual?

7    A.  The thing is, sometimes it's right and sometimes it's

8    wrong.  I don't know the error rate for when it's wrong, and I

9    have not seen anything to demonstrate that in the literature

10   I'm aware of.

11          There are some articles that have it all over the

12   map.  But I have not seen it reliably demonstrated -- error

13   rate reliably demonstrated in the evidence in this case.

14   Sometimes it's right, sometimes it's wrong, which makes it

15   interesting to generate leads in an investigation and learn

16   where to deploy resources or your time.

17          But like I said before, if that's all you've got,

18   you've got nothing.

19   Q.  What are some of the potential problems with the co-spend

20   heuristic?

21   A.  So the co-spend heuristic is based on an assumption that --

22   it's based on the fact that the Bitcoin blockchain -- that the

23   model of how transactions work in Bitcoin is a UTXO model, an

24   unspent transaction amount model.

25          If you want to send it -- bitcoin from a public key,

1    you actually -- if you want to send some of what you have but

2    not all of it to a destination, then you have to send part of

3    it to your destination and then send the rest to another

4    destination that you control; that's associated with your

5    wallet.

6            Wallet software is designed to do this easily for

7    years.  So they don't have to think about it.  They don't even

8    notice it when they send bitcoin.  You don't notice that I have

9    ten bitcoin associated with my wallet and public key that my

10   wallet controls.

11           I send it -- I want to send you one bitcoin.  I don't

12   think about the fact that my wallet -- my public key actually

13   sends the ten bitcoin out, the nine come back to another

14   address I control, one goes to you.  And so --

15   Q.  Would that be the spend and change address?

16   A.  Sure.

17   Q.  So the one I'm sending -- you're sending it to me because

18   you're buying a can of Coke for me; that's the spend address.

19   And then the change address is what's left over; is that

20   correct?

21   A.  Correct.  And because that's a part of what happens in a

22   transaction where one party sends to another, you can derive

23   something from that.

24           You can also -- because you can't send it all --

25   whenever you want to send an amount, it might be the case that

1    you are sending more than the amount of that particular public

2    key, and so the amount of two Bitcoin public keys come together

3    to send the amount that you want to send.

4           So these two basic facts about how the Bitcoin

5    blockchain works leads to the kinds of heuristics that

6    Chainalysis uses; these two leading heuristics:  The

7    multi-input heuristic and the peel chain heuristic.

8           Now, like I said, these are sometimes true, but

9    sometimes not true.  So the multi-input heuristic might not be

10   true if you and I decide, let's say, after the hearing, you

11   know, St. Jude's takes bitcoin donations -- which they do.

12   I've donated to St. Jude's; I love them.  Maybe I say, Tor,

13   let's both send a bitcoin to each -- to St. Jude's; let's do it

14   as a multi-input transaction, and we'll send it together.  We

15   can do that.  In fact, maybe we should do that after the

16   hearing.

17          That would look like the same thing that --

18   Chainalysis might come along and say we're using that

19   heuristic, and they might say both of those belong to J.W.  And

20   you would be wrong.  Because the two inputs come from two

21   different individuals rather than the same individual.

22          The same thing could be true for the assumption that

23   the second destination of a bitcoin transaction is the change

24   address that's used to create the peel chain heuristic.  That

25   could very much not be true because I could decide that I want

1     to send some to you and some to Mike -- I'm sorry -- to

2     co-counsel, in the same transaction.

3              So what might look like Mr. -- Mr. Hassard's public

4     key might look to -- overuse of the peel chain heuristic might

5     look like my change address, but it's not mine anymore because

6     I already sent it to Mike.

7     Q.  Is it fair to say that at every step of a transaction

8     that's being analyzed with this co-spend heuristic, an

9     assumption is involved as to who is controlling the

10    transaction?

11    A.  Yeah.  You're assuming -- with both of those heuristics,

12    you're making assumptions about the inputs and the outputs.

13    And there's a third assumption they're making as well in a lot

14    of the tracing that Chainalysis does and in this case, which is

15    that most of the time when there are multiple hops in a series

16    of transactions, the same person is just resending to a

17    different wallet that they control.  And sometimes that's true.

18    Sometimes it's not true.

19              It could be that I'm sending to someone else in real

20    time, a real person in real life.  And if that does happen,

21    then it confounds one of the assumptions that really underlies

22    Chainalysis's work.

23    Q.  As I believe you testified earlier, isn't it possible that

24    at any stage in a hop, somebody could just simply transfer the

25    private keys, and you wouldn't see anything on-chain?

1    A.   That's true as well.  That's a good point.

2    Q.   Then just briefly, the other -- actually, I do want to ask

3    one more question about the co-spend heuristic.

4             Are you familiar with what a coinjoin is?

5    A.   Sure.

6    Q.   And could you just explain briefly what a coinjoin is for

7    the Court.

8    A.   So the idea behind a coinjoin is to join different public

9    keys together in the same transaction.  We could do that

10   together to send money to St. Jude's, if we want, in the same

11   transaction.  It would save us transaction fees.  Or we could

12   do it to obtain some privacy.

13            We could do it -- and there are tools that do it.  I

14   think it's fair to say that coinjoins were always possible

15   going back to the early days; '09, 2010.  They were always

16   possible.  They became popular when someone wrote about it in a

17   post that I mentioned in my disclosures around 2013.

18            And then I'd say now they are a substantial portion

19   of activity on-chain; involves bitcoins that have been through

20   some kind of a coinjoin to obtain privacy.

21            THE COURT:  When you say a substantial portion, can

22   you quantify that?

23            THE WITNESS:  Well, I don't remember the exact

24   percentage, but one of the articles I mentioned in my

25   disclosure does speak to that and tries to provide an estimate

1    of the Bitcoin UTXOs that have been through one of those

2    coinjoins.

3              I don't remember -- I know that estimate, and that

4    estimate is something north of 500 million, less than a

5    billion, I think.

6              THE COURT:  Can you give me that percentage-wise?  I

7    don't have any benchmark to figure out whether that's a small

8    percentage or a large percentage.  I assume it's not a large

9    percentage, but -- just given the volume of the market.

10             THE WITNESS:  It would be difficult to try to figure

11   out what is coinjoins and what is individuals just inputting

12   together versus a form of coinjoin.  But I think the best

13   estimate I've seen is that article -- Your Honor, I don't

14   remember the percentage off the top of my head, but it's in the

15   article referenced in my disclosure.

16             THE COURT:  Okay.  What is the --

17             THE WITNESS:  About coinjoins.  Coinjoin is in the

18   title, I believe.

19             THE COURT:  But if it's between 500 million and a

20   billion dollars, I think you said, what is the size of the

21   overall --

22             THE WITNESS:  Well, that would depend upon the market

23   cap of bitcoin at the time of that study, and I don't know that

24   offhand either.

25             THE COURT:  Okay.

1    BY MR. EKELAND:

2    Q.  Did you finish with your last answer?  I'll move on.

3    A.  Yes.

4    Q.  What, if anything -- what effect, if anything, does -- do

5    coinjoins have on the co-spend heuristic tracing?

6    A.  So this is something that in the early papers about Bitcoin

7    tracing, early academic papers that talked about this -- and

8    one of the leaders in this literature is Sarah Meiklejohn, who

9    is a -- I think the leader in this literature that led to what

10   was later monetized in what Chainalysis became.  She very early

11   talked about the limitations of the multi-input heuristic.

12           And one of those is that people could be doing

13   coinjoins, which totally confounds this heuristic.  In an

14   assessment that's described in the YouTube video that's linked

15   in my disclosures, I think the quote she has when she describes

16   the past history of that heuristic, that multi-input heuristic,

17   she describes relying on it as potentially horribly dangerous.

18   Q.  I'm sorry.  I didn't hear what you said.

19   A.  As horribly dangerous.  The outcomes it could lead to, the

20   wrongful assertions.

21   Q.  And did you review the supplemental notice of disclosure

22   that the government filed last night that contained a white

23   paper?

24   A.  I did.

25   Q.  And was one of the authors of that white paper Sarah

1    Meiklejohn?

2    A.  Yeah.  I understand it was Sarah and some of her research

3    assistants.  As I understand it, she was previewing that paper

4    at the presentation in the YouTube video described in my

5    disclosures.  I had seen that.

6            I think I had seen that -- actually, might have been

7    before I got on this case, as part of my research for the book.

8    But, yeah, I -- don't quiz me on everything in that article,

9    But I had briefly read it last year when it first came out.

10   Q.  And then -- so when you say that she says in the video, the

11   YouTube video, that this heuristic is horribly unsafe, is she

12   referring to the types of heuristics that she's documenting in

13   that white paper?

14   A.  She is.  And she's referring to the types of heuristics

15   mentioned in Chainalysis's report that has been submitted in

16   this case.

17           MR. EKELAND:  And I just -- I'm going to wrap up,

18   Your Honor, because I'm aware of the time.

19   BY MR. EKELAND:

20   Q.  So then I want to make sure I understood you when you said

21   that Sarah Meiklejohn is one of the or the originator of this

22   type of heuristics, and she's come out and said that they're

23   horribly unsafe?

24   A.  Those are both correct, yes.  I think -- to be fair to her,

25   I think she was describing it as relying on these alone without

1    modification as being horribly unsafe.

2              MR. EKELAND:  I pass the witness, Your Honor.

3              THE COURT:  Okay.  Well, why don't we go ahead and

4    take a break.  It's 3:15.  Why don't we come back at 3:30 and

5    do your cross.

6              (Recess taken.)

7              THE COURT:  All right.  Who is conducting the cross?

8              MS. PELKER:  Mr. Brown.

9              THE COURT:  Mr. Brown.

10             MR. BROWN:  Thank you.

11             THE COURT:  Can you see Mr. Brown on your screen

12   there?

13             THE WITNESS:  No.

14             THE COURT:  All right.  Mr. Brown, you may proceed.

15                      CROSS-EXAMINATION OF

16                          J.W. VERRET

17   BY MR. BROWN:

18   Q.  Good afternoon, Professor Verret.

19   A.  Good afternoon.

20   Q.  Just to note, I believe you can see me, but I can't see

21   you, so I will try to listen carefully to make sure that I know

22   when to ask the next question.

23             THE COURTROOM DEPUTY:  Mr. Brown, hold on.  Let me

24   see if I can fix that.

25   BY MR. BROWN:

1    Q.  To begin with, Professor Verret, you are not a computer

2    hacking expert, are you?

3    A.  No.

4    Q.  And you are not a computer forensics expert, are you?

5    A.  I have been trained in how to use computer forensics as

6    part of a forensic accounting or financial forensic

7    investigation such that I could rely on computer forensics

8    experts.

9         I would not hold myself out as a stand-alone computer

10   forensics expert.  I want to be clear in my answer.

11   Q.  And you are also not a law enforcement expert; is that

12   correct?

13   A.  I would hold myself out as an expert in banking law, which

14   includes components of anti-money laundering KYC that are

15   applicable to this case, but I have not been in law

16   enforcement.  I mean, I've worked on government investigations

17   for Congress, but not in law enforcement, if you define it as

18   the executive branch.

19   Q.  Enforcement of criminal laws; you have no experience in

20   enforcement of criminal laws, correct?

21   A.  Only as I've testified for defendants in criminal cases,

22   and I've been involved in client issues involving violations of

23   criminal law, including theft of cryptocurrency.  But I have

24   not been a law enforcement officer.

25   Q.  And you have no expertise in Department of Justice policy,

1    correct?

2    A.   The internal policies of Department of Justice, no, I

3    wouldn't hold myself out as an expert in DOJ policy.

4    Q.   And have you ever testified in a criminal case before?

5    A.   No.   In a judicial criminal case, no, I have not testified.

6    I have been an expert before, but those matters have settled

7    before testimony was required.

8    Q.   And you've never practiced any sort of criminal law; is

9    that correct?

10   A.   That's correct.

11   Q.   And you've never published any scholarly articles on

12   criminal law, correct?

13   A.   It depends on how you define criminal law.   I've published

14   articles on anti-money laundering issues, as that is a

15   component of banking law, which has criminal applications to

16   it.

17           So I don't think no is an accurate answer to your

18   question.   There are components that touch on criminal law in

19   which I have expertise; particularly, in financial regulation

20   and in banking law.

21           Frankly, to be clear, in some ways securities law can

22   become criminal as well.   So I would hold myself out, for

23   example, as an expert in securities law, which includes the

24   criminal components of security law.

25   Q.   Maybe if I narrow that question.   You're not an expert in

1    criminal investigations?

2    A.   I'm an expert in financial forensic investigations, which

3    can be criminal.

4    Q.   And your academic and professional expertise is in

5    accounting, banking law, and securities law, correct?

6    A.   When you say accounting, I would add forensic accounting

7    and securities law, banking law, and corporate law.

8    Q.   Are you being paid for your work on this case?

9    A.   Yes.  Well, that's an open question.  I have a rate

10   described in an engagement letter.  That rate is $400 an hour.

11   That is roughly half my usual rate.  I usually charge 750 an

12   hour as an expert.  That is half my own rate.

13          Secondly, I did not ask for a retainer in this case,

14   though it's pretty unheard of for me to never have a

15   retainer -- to not have a retainer before I began an expert

16   matter.  And in discussions with counsel, they've made clear,

17   when they've described that the defendant's assets were frozen,

18   they said, look, just to be clear, you might not get paid.  And

19   I told them very specifically that, after reviewing the issues

20   in this case, if this ends up becoming, because of all that,

21   effectively, a pro bono matter, I'm comfortable with that.

22          I haven't been paid anything else, and I haven't been

23   paid anything, I haven't been given a retainer.  I haven't even

24   submitted invoices, actually, at this point, which is not

25   anything I've ever done in a case, including a criminal case.

1          So I have a rate.  That rate is half my normal rate.

2     That rate is $400 an hour.  It's described in an engagement

3     letter.  But I had a conversation with counsel where I told him

4     that I was -- if this, effectively, becomes a pro bono matter,

5     I am comfortable with that outcome.

6          So I'm sorry I'm giving you the fulsome answer, but I

7     think that's the most honest answer I can give you to your

8     question.

9     Q.  And approximately how many hours do you think you've spent

10    on this case to date?

11    A.  I would say the last -- I have to check my records of

12    everything, but at some points as much as 40 or 50 hours during

13    a week; at some weeks as low as 5 or 10 hours during the week

14    for something like the last five or six months.  So a

15    substantial amount of time.

16         THE COURT:  What's your best estimate on total hours

17    you've put in?

18         THE WITNESS:  It's north of 250, 300 hours.

19    BY MR. BROWN:

20    Q.  How did you first become involved in this case?

21    A.  So I listened to a podcast with Mr. Ekeland and Mr. Hassard

22    describing the case, on a crypto privacy podcast.  I listened

23    to it, and I was intrigued by what I heard.  Probably because

24    I'm interested in crypto generally and crypto forensics and, in

25    part, because of the description that counsel offered.  I'm

1    always skeptical about how counsel describe their case because,

2    obviously, they're advocates, and my job is different.

3              So I looked it up, and I read the criminal

4    indictment.  And my reaction to the criminal indictment was,

5    wow, it surprised me that someone could be held on the thin

6    evidence contained in the criminal indictment.

7              And so I reached out to Mr. Hassard and Mr. Ekeland.

8    And I said I'd like to get involved.  You know, here's some of

9    my writings in this area on my *Cointelegraph* column that I

10   referenced in my disclosures.  I think I summarized my bio.  I

11   said I'd love to talk to you more about this, and we started

12   from there.

13   Q.  Was that the *Monero Talk* podcast?

14   A.  That's correct, yes.

15   Q.  And you're writing a book about cryptocurrency privacy,

16   correct?

17   A.  Cryptocurrency privacy and forensics, yes, which I think --

18   Q.  The working title --

19   A.  They're two sides of the same coin.

20   Q.  And the working title of the book is *Hide Money Using*

21   *Crypto*, right?

22   A.  *Hide Money Using Crypto:  Blockchain Privacy and Forensics*

23   is the full working title of the book in the proposal that's

24   being peer-reviewed right now.  But don't hold me to it because

25   I'm sure it will be adjusted over time.

1    Q.  You appeared on the *Monero Talk* podcast on June 4th, 2023,

2    correct?

3    A.  Yes.

4    Q.  And you talked about the book that you were writing --

5    A.  Correct.

6    Q.  -- in that podcast?

7              And you stated that you wanted to, quote, teach

8    normies about crypto privacy?

9    A.  That's correct, yes.

10   Q.  And you also talked about your work on the Zcash

11   Foundation, correct?

12   A.  Correct.

13   Q.  And you stated, I want to get involved in the fight, right?

14   A.  Sure.

15   Q.  Now, you serve on the board of the Zcash Foundation?

16   A.  Correct.

17   Q.  And Zcash is an alternative form of cryptocurrency,

18   alternative to Bitcoin?

19   A.  Alternative to Bitcoin, yes.  A private alternative to

20   bitcoin.

21   Q.  Is Zcash a kind of cryptocurrency that's sometimes referred

22   to as a privacy coin because it does not always have a publicly

23   available blockchain the way Bitcoin does?

24   A.  Correct.

25   Q.  And Zcash is not accepted at many cryptocurrency exchanges

1   because of perceived money laundering risk; is that right?

2   A.   That's not accurate, no.

3   Q.   Is Zcash --

4   A.   To be specific, Zcash --

5           THE COURT:   I'm sorry.   One at a time.

6           THE WITNESS:   Zcash is accepted at Coinbase.   Zcash

7   is accepted at Kraken.   Zcash is accepted at Gemini.   Those are

8   the three leading crypto exchanges in the United States.

9           At one point they were delisted in Europe because of

10  some misperception that they would run up against changes in

11  the travel rule, but those exchanges actually reversed that

12  decision and realized that that was not the case.

13          So your description, I would say, is very much

14  inaccurate.

15  BY MR. BROWN:

16  Q.   Are there any major cryptocurrency exchanges that do not

17  accept Zcash?

18  A.   Overseas, I think that's been an issue in the past.   In

19  other -- maybe in Japan; Asian country, I think.

20  Q.   But it's your testimony that every major cryptocurrency

21  exchange currently accepts Zcash?

22  A.   In the United States, yes.   It's accepted at Coinbase.

23  It's accepted at Gemini and accepted at Kraken, which is -- I

24  would describe as the three major crypto exchanges in the

25  United States.   I know it's not Binance because Binance U.S.

1    has been shut down, effectively.

2    Q.  You serve on the Zcash Foundation board in a purely policy

3    role; is that correct?

4    A.  It's a nonprofit foundation, so I wouldn't describe it as a

5    policy role, no.  It's an oversight role of the foundation.

6    The foundation funds cryptography research in -- in

7    zero-knowledge proof cryptography, which is used in the Zcash

8    blockchain, which is used in other blockchains, and which is

9    used also in a number of applications in regular commerce.

10            I think there are aspects of zero-knowledge proof

11    cryptography in, for example, logins with major social media

12    companies as well.  So it's a wild field.

13            So it funds research by cryptographers and computer

14    science experts and coders that have applications for

15    privacy -- generally in privacy on the Zcash blockchain and

16    with respect to zero-knowledge proof cryptography applications.

17    Q.  Professor Verret, just be aware, I'm trying to let you

18    finish your answers, but please listen to the question asked

19    and try to make sure that you're answering the question that's

20    been asked to you.

21    A.  Sure.  Absolutely.  And when the preface of the question is

22    inaccurate, I feel I need to mention that.

23    Q.  You're not a -- you don't conduct any technical work on

24    behalf of Zcash cryptocurrency, right?

25    A.  I don't perform technical work on behalf of Zcash, that's

1    correct.

2    Q.  You're not a computer programmer; you don't develop Zcash

3    code or maintain the Zcash network, correct?

4    A.  Those three things are correct, yes.

5    Q.  You also don't process Zcash transactions, right?

6    A.  Right.

7    Q.  So your work on the Zcash board is not directed towards

8    technically maintaining the Zcash network as a cryptocurrency,

9    correct?

10   A.  It's indirectly related because it funds the cryptography

11   research that supports those functions, but I do not directly

12   get involved in those functions.

13   Q.  Now, in this case, Professor Verret, have you conducted

14   your own independent blockchain analysis of any aspect?

15   A.  Can you tell me what you mean by blockchain analysis?

16   Q.  Have you conducted any blockchain analysis in this case,

17   any analysis of blockchain --

18   A.  Looking at block explorers, looking at the government's

19   evidence, making assessments of the evidence here and looking

20   at addresses contained in the evidence on blockchain explorers

21   independently, yes, I've done all of that.

22          And I've also had discussions with fellow experts in

23   the case about their work in that capacity as well.

24   Q.  And in your work evaluating transactions or doing other

25   blockchain analysis work that you just testified about, has any

```
 1    of that work been memorialized?

 2    A.  We have had discussions with the experts.  Memorialized --

 3    I mean, we've had emails.  We have an email chain discussion

 4    among the experts.

 5    Q.  I'm asking about you yourself.  Have you ever evaluated any

 6    transactions in this case in a way that you have memorialized

 7    the record of your work?

 8    A.  I would say the language in my disclosures was language

 9    that I wrote or memorializations of my work in this case.

10    Q.  Is it fair to say that you have not conducted an

11    independent blockchain analysis in this case?

12    A.  No, that's not fair to say, no.

13    Q.  And what -- your disclosures, is it fair to say that your

14    disclosures don't actually explain any blockchain tracing that

15    you have done in this case?

16    A.  They explain the results, my opinions based on review of

17    the tracing evidence contained in this case; based on my own

18    review of the documents and based on my own work looking at

19    individual public keys contained in the disclosures on

20    blockchain explorers.

21    Q.  Professor Verret, could I ask you to look at the expert

22    disclosure that you signed and was submitted in this case.

23    A.  I don't have it in front of me.  Can someone --

24              THE COURT:  Can you provide a copy?

25              MR. EKELAND:  Sure.  May I approach, Your Honor?
```

```
1                    THE COURT:  You may.

2                    THE WITNESS:  I have it in front of me.

3        BY MR. BROWN:

4        Q.  Professor Verret, could you point out any blockchain

5        analysis conclusions and the bases therefor contained in this

6        report?

7        A.  Yeah.  Sure.  So I would say No. 1, Item No. 1.  I would

8        describe as blockchain analysis.

9                    THE COURT:  I'm sorry.  I'm sorry to interrupt.  Just

10       for my benefit, what I'm looking for is an actual -- it is my

11       expert opinion that X, Y, and Z and the basis for it.  I base

12       that on the following analysis that I conducted and here is the

13       analysis that I conducted.

14                   That's -- under the rules, that's what I need to see.

15       So if you can point me to anything that says that, that would

16       be helpful.

17                   THE WITNESS:  So I believe what Mr. Brown is getting

18       at is he wants to say that the only blockchain analysis that

19       counts is tracing done in the way that Chainalysis does

20       tracing.  I have not done Chainalysis-level tracing, but I have

21       conducted what I will describe, I believe accurately, as

22       blockchain analysis in reviewing the government's assertions

23       with respect to what the proceeds of the post-mix transfers to

24       Kraken represents, and I believe that involves blockchain

25       analysis.
```

 1          THE COURT:  So you testified on direct that you've

 2    looked at the amount of money that was in the Kraken account,

 3    and you've looked at the -- you've made some estimates as to

 4    how much money you think that Mr. Sterlingov would have earned

 5    were he proprietor of Bitcoin Fog, right?  Is that what you're

 6    talking about there?

 7          THE WITNESS:  Yes, Your Honor.

 8          THE COURT:  Anything other than that?

 9          THE WITNESS:  So I would count as blockchain analysis

10    my opinion that is skeptical of Chainalysis's tracing that is

11    based on the literature review of the heuristics that go

12    into --

13          THE COURT:  Again, on direct you testified that there

14    are certain assumptions that are used in the algorithm like --

15    that relate to coinjoin and things like that, that you think

16    make the algorithm not 100 percent accurate and introduce some

17    potential error rate in the algorithm, although you don't know

18    what that error rate; is that fair?

19          THE WITNESS:  Yes, Your Honor.

20          THE COURT:  Okay.  Anything other than that?

21          THE WITNESS:  As a component of the last thing you

22    talked about, I would say, for example, that my representation

23    that we can't know for sure all of the individual bitcoin

24    purchases Mr. Sterlingov made because he could have made them

25    on a peer-to-peer platform, I would consider that utilizing

1    knowledge of blockchain practices and, therefore, blockchain

2    analysis.

3              THE COURT:  Okay.  I think the problem here is you,

4    Mr. Brown, are just using the phrase blockchain analysis

5    differently.  But you can continue, Mr. Brown.

6              MR. BROWN:  Thank you, Your Honor.

7    BY MR. BROWN:

8    Q.  Just one last question on this thread.  Professor Verret,

9    having reviewed the expert reports from FBI staff operations

10   specialist Luke Scholl and Chainalysis expert Elizabeth Bisbee,

11   are there any specific instances of individual transactions or

12   individual clusters that you -- for which you have conducted an

13   alternative analysis where you can say this transaction didn't

14   occur this way, or this cluster is incorrect for XYZ reasons?

15   A.  Not myself, no.  I'm relying on the -- in part, relying on

16   the opinions of my fellow experts and, in part, relying on the

17   description of the reasons for skepticism that I spoke of on

18   direct and that are contained in the disclosures.

19   Q.  And which other experts' opinions are you relying upon?

20   A.  So, primarily, Mr. Fischbach's.

21   Q.  Now, you mentioned that you --

22   A.  I'm sorry.  Also the new addition to the team from

23   CipherTrace.

24             THE COURT:  Presumably, you're not relying on

25   anything she's done because she hasn't done it yet, though.

```
1              THE WITNESS:  Correct.  I anticipate reliance on the
2       continued things that she will do.  Yes.
3       BY MR. BROWN:
4       Q.  You mentioned that the two reasons why you wouldn't rely on
5       Chainalysis is because it's a black box, as you put it,
6       and because a --
7              THE COURT REPORTER:  I'm sorry.  Can you repeat the
8       question, please.
9              THE COURT:  Yes, can you repeat the question, please.
10      You dropped off.
11      BY MR. BROWN:
12      Q.  You mentioned that you would not personally rely on
13      Chainalysis because it's a black box, as you put it, and
14      because a colleague told you it was unreliable?
15      A.  Those were two of the reasons, but those are not the only
16      reasons.
17      Q.  Okay.  What other reason?
18      A.  Two other reasons.  One, that I'm familiar with the issues
19      with the heuristics that went into Chainalysis's product that I
20      described on direct and that are described in the analysis
21      here.
22             And, secondly, I'm aware of Chainalysis's close
23      relationship with the Department of Justice and the Department
24      of Treasury and the -- the Department of Homeland Security and
25      the sizable grants that they have received, which I anticipate
```

1    would bias their work.

2    Q.  Have you ever personally tested the reliability of

3    Chainalysis; for instance, by looking at a transaction through

4    Chainalysis and comparing it to the same transactional data on

5    a -- on the public blockchain through a blockchain explorer?

6    A.  I can't do that because I don't have access to what I would

7    need to do that.  And doing it once would be insufficient

8    because you would not have a reliable statistically significant

9    sample size.  But -- so no.  That's the reason why the answer

10   to your question is no.

11   Q.  You don't have access because you don't have a Chainalysis

12   license; is that correct?

13   A.  Correct.

14   Q.  Have you ever tested the reliability of a Chainalysis

15   cluster by comparing it to ground truth from a publicly known

16   cluster, say, for a company that accepts bitcoin, like eBay or

17   Kraken?

18   A.  No.

19   Q.  So you have no opinion about the reliability of the

20   clustering in Chainalysis?

21   A.  The clustering relies on the heuristics, and I do have

22   opinions on the heuristics and, thus, I have an opinion on the

23   reliability of the clustering.

24   Q.  Well, that gets to my next question, which is you discussed

25   various heuristics.  I want to start with co-spending.

1          Isn't it true that co-spending heuristic is based on

2     commonly observed patterns of transactional behavior?

3     A.  They are sometimes observed, yes.  I don't know how common

4     they are, and that speaks to the --

5     Q.  But you don't know -- you can't say for co-spends what

6     percentage is true co-spend versus a coinjoin or another?

7     A.  And neither can the government, which is a part of the

8     reason for my skepticism of the evidence.

9     Q.  Just to be clear, the answer to that question was yes?

10    A.  Correct.

11    Q.  Isn't the co-spend heuristics something that was actually

12    brought up in the original Bitcoin white paper by Satoshi

13    Nakamoto?

14    A.  A lot of privacy issues were brought up in the original

15    white paper.  That is something that, I think, is safe to

16    assume was a known issue, and the possibility of coinjoins,

17    similarly, was a known possibility going back pretty far.

18    Q.  Now, talking about the change address heuristic, isn't that

19    also a commonly observed pattern of transactional activity on

20    the blockchain?

21    A.  Again, it is a pattern that is observed often, but I don't

22    know how often.  I don't have a percentage on how often, which

23    goes to the error rate.

24    Q.  You gave a counter-example on direct, which is that you

25    could send -- you could execute one transaction where you're

1  sending two payments to two different people, correct?

2  A.  You could -- yeah.  You could have multiple outputs.

3  Q.  Isn't that exceedingly rare, though?

4  A.  I know that it is very common today.  I don't know

5  percentages for the time period that's at issue in this case.

6  Q.  In order to execute that

7  one-person-sending-to-two-people-simultaneously-type

8  transaction that you described, you would have to have exactly

9  the amount of bitcoin in your sending wallet that you want to

10  divide up between two simultaneous transactions, correct?

11  A.  Sure.

12  Q.  So if you wanted to send five bitcoin to Mr. A and three

13  bitcoin to Mr. B, you would have to have exactly eight bitcoin

14  sitting in your wallet, correct?

15  A.  Or -- I mean --

16  Q.  If we're talking about a situation where there's no change

17  address.

18  A.  Right.  Sure.

19  Q.  And you would also want to make those two transactions

20  simultaneously instead of one after the other, correct?

21  A.  They would occur simultaneously, yes.

22  Q.  And you have no basis to say that these transactions are a

23  common transaction seen on the Bitcoin blockchain, correct?

24  A.  I don't have any basis to say that they are not common.

25  Q.  But you don't have any basis to say that they are, correct?

1    A.  I don't know the percentage of transactions that involve

2    that type of activity.

3    Q.  Now, isn't it true that co-spend heuristic and change

4    heuristic, while there may be exceptions, but these are both

5    commonly accepted within the blockchain analysis community?

6    A.  You say the blockchain analysis community.  It's,

7    basically, just a couple of forensics firms that have a -- kind

8    of an oligopoly on this field that they kind of invented and

9    that they gave a name to.  So it kind of depends on how you

10   describe that.

11          If you're describing literature, I would say those

12   are both commonly discussed, but commonly critiqued as

13   unreliable in and of themselves.

14   Q.  Moving on to coinjoins, this is a transaction where

15   multiple unrelated users pool their transactions -- pool their

16   bitcoin together, and in one transaction they send to the

17   multiple recipients, but each bitcoin wallet is not traceable

18   directly to the recipient wallet, correct?

19   A.  Yes.  Correct.  That's how most coinjoins work, yeah.

20   Q.  So, generally speaking, in order to have a proper coinjoin

21   transaction, you would have to have exactly matching inputs and

22   outputs for each user, correct?

23   A.  Yes.  And those are facilitated by coordinators or for

24   coinjoins or for payjoins, which are a closely related type of

25   spend to coinjoin.

1   Q.  Before we talk about the facilitating services, if you

2   wanted to execute a coinjoin transaction on your own, you know,

3   just you and your friend, that would be very difficult to

4   arrange logistically, correct?

5   A.  You could arrange it via a peer-to-peer platform, the same

6   way peer-to-peer purchase and sale of bitcoin occurred.  The

7   advent of coordinators made it even more easier to facilitate.

8   Q.  So outside of a service, though, it would be logistically

9   tricky, and you would have to agree on the exact moment of the

10  transaction and the exact amounts and exactly how the

11  transaction was going to be split up, correct?

12  A.  Yes.  You would have to agree to those things, like you

13  could if you were at a Bitcoin meetup and playing around with

14  this technology as people did in the early days of Bitcoin.

15  Q.  And so if you wanted to increase the anonymity step by

16  having more inputs and more outputs, that would correspondingly

17  increase the logistical difficulties of arranging one of these

18  coinjoin transactions on your own, correct?

19  A.  Most of the larger coinjoins are -- use coordinators, use

20  coordination.

21  Q.  Now, a transaction with matching inputs and outputs looks

22  different from a traditional co-spend transaction, correct?

23  A.  It can or it can be carefully designed so it doesn't.  I

24  have literature in my disclosure attempting to identify

25  coinjoins.  So what you said can be correct.

1    Q.  Before we get -- but a coinjoin transaction among ten

2    users, for example, will have at least ten outputs; isn't that

3    right?

4    A.  Right.

5    Q.  And maybe more outputs, because there may be change

6    addresses for individual users, correct?

7    A.  Which is why the coordinated coinjoins are easier to

8    identify because of the -- you can use the -- if they have a

9    standard; like if five inputs are standard -- five inputs and

10   five outputs, that attribute can be used to try to identify

11   that particular coordinator of those particular coinjoins, but

12   coinjoins can be designed in different ways as well.

13   Q.  But, necessarily, you're going to have many outputs if you

14   have many inputs, correct?

15   A.  That's correct, yes.

16   Q.  And so that differs from a traditional co-spend transaction

17   where you may have ten inputs and two outputs where one is the

18   spend address and one is the change address?

19   A.  That might be true, yes.

20   Q.  So looking at a coinjoin transaction on the blockchain is

21   going to jump out in a way that a traditional co-spend

22   transaction will not?

23   A.  Again, I will say that it may, depending on how the

24   coinjoin is designed.

25   Q.  In fact, one of the papers cited in your disclosure, the

1    Stockinger [sic] paper from 2022, isn't it true that that paper

2    analyzes characteristics of coinjoins and comes up with a very

3    reliable heuristic to detect coinjoin transactions?

4    A.   That's the paper I just referenced in my last answer to

5    you, and that paper does describe itself as having achieved

6    that result.  I haven't independently tested whether that paper

7    has or not.

8    Q.   And in that paper one of the heuristics looked at

9    transactions that were known to be through one of the coinjoin

10   service providers, Wasabi Wallet, correct?

11   A.   Correct.

12   Q.   And found that 7,325 transactions -- applying the heuristic

13   to detect coinjoins, more than 7,000 transactions were true

14   positives; meaning that the heuristic predicted the coinjoin,

15   and it was confirmed by showing association with Wasabi Wallet.

16   Compared to the 7,325 true positives, there were only 153 false

17   positives and only 8 false negatives; isn't that correct?

18   A.   I don't have it in front of me, but if you tell me that's

19   what's described in the paper, it doesn't sound inaccurate with

20   what I remember reading.

21            But I would say I would not -- the two types of

22   mixing services studied in that paper are very different, and

23   Wasabi is known to be much more easily traceable than Whirlpool

24   or Samurai as described in the paper -- described by the wallet

25   that uses that particular coinjoin pool.  It doesn't surprise

1    me that that is true of Wasabi transactions.

2    Q.  And how do you know that Wasabi is more easily traceable

3    than other coinjoin service providers?

4    A.  Analysis of Wasabi in the wake of the -- of your

5    department's investigation of Lichtenstein and Heather Morgan,

6    which is --

7    Q.  Did you conduct the analysis of Wasabi?

8    A.  I'm sorry?

9    Q.  Did you conduct the analysis of Wasabi?

10   A.  I did not.  But I'm relying on my knowledge of that -- of

11   the questions asked about Wasabi's process.

12   Q.  Was this an academic paper examining Wasabi?

13   A.  This was a presentation over YouTube.  I can try to find it

14   after this proceeding if you're interested in learning more

15   about how to use Wasabi Wallet.  Or whether --

16   Q.  Who gave this presentation over YouTube?

17   A.  This was the -- someone associated with Samurai Wallet; the

18   other coordinator or wallet described in that paper that we're

19   talking about right now.

20   Q.  So the presenter from Samurai Wallet presented evidence

21   that Wasabi was easier to detect than Samurai Wallet; is that

22   accurate?

23   A.  That's correct, yes.

24   Q.  And have you reviewed the underlying data?

25   A.  I have not reviewed the underlying data, but I have

1    reviewed the presentation and found it to be credible.

2    Q.  And you found it to be credible based on the authority of

3    the person giving the presentation or based on the data

4    underlying the presentation?

5    A.  Based on the walk-through of wallet that was used in the

6    particular video.

7    Q.  Is it fair to say that most people who want to conduct a

8    coinjoin transaction use these services that will coordinate

9    and arrange the coinjoin for them?

10   A.  I think that's accurate today, but I don't know whether

11   that was accurate during the earlier time frame at issue in

12   this case.

13   Q.  And Wasabi Wallet and Samurai Wallet are much more recent

14   innovations -- correct? -- much more recent than 2011?

15   A.  That's correct.  They are much more recent than two- -- I

16   think they've come into prominence more recently.

17              THE COURT:  One at a time.

18              THE WITNESS:  I don't recall the date they began.  I

19   think Samurai might go back pretty far.  I think the -- I think

20   the size of the -- we can go back and look at the amount of

21   money going into the Bitcoin Whirlpool that Samurai Wallet

22   works with.  I know it's been recently at about $100 million

23   worth of bitcoin.

24              But I don't know the -- I think it may have started

25   in the mid teens or something around that time frame.  I don't

1   know how far back it goes.  I don't want to give you an

2   inaccurate answer.  I know it has become more and more

3   prominent over time.  I don't know exactly the date that it

4   began.

5   BY MR. BROWN:

6   Q.  But each one of these services, number one, it adds time to

7   the transaction; is that fair to say?

8   A.  Some element of time, yes, just like any bitcoin

9   transaction will take time to load on a new block.

10  Q.  But this is more time than it takes to simply clear a

11  transaction through the Bitcoin output, correct?

12  A.  It depends on if you're remixing, mixing multiple times,

13  doing multiple coinjoins.  But I wouldn't necessarily say --

14              THE COURT:  I'm sorry.  One at a time, please.

15              THE WITNESS:  I wouldn't necessarily say every

16  coinjoin would always take more time than every other

17  bitcoin -- noncoinjoin transaction.  I don't know that to be

18  the case.

19  BY MR. BROWN:

20  Q.  To use a coinjoin service, isn't it true that you have to

21  wait until other users join a pool to execute a given coinjoin

22  transaction?

23  A.  So if there's lots of people already in the pool and people

24  remixing in the pool who have already mixed, then I don't think

25  you would have to wait, no.

1    Q.  So some people take more time for their transactions

2    necessarily, and other people join the pool at the end and they

3    don't have to wait; is that true?

4    A.  I don't know that to be true, no.

5    Q.  So it's your testimony that coinjoin transactions are

6    always executed simultaneously -- instantaneously, or as fast

7    as the Bitcoin network can clear a transaction?

8    A.  That's not what I just said.  I said I don't know your last

9    statement to be true.  You're mischaracterizing me.

10   Q.  I'm not trying to characterize your testimony in any way.

11   I'm just trying to make sure I understand what your testimony

12   is.

13            But is it fair to say that using a coinjoin will add

14   some amount of time to a transaction that you're undertaking?

15   A.  It may.  It may.  But it's also fair to say that it could

16   confound the heuristics, as I've said already, that go into

17   Chainalysis's tracing.

18   Q.  And my question wasn't about heuristics that go into

19   Chainalysis's tracing.  I'm just asking if it takes more time.

20   A.  If it were that easy to use, the dimension of time, to

21   clearly know what is a coinjoin and what is not --

22            THE COURT:  I'm sorry.  That's not his question.  His

23   question is just whether at least some of the time, because of

24   the need to wait for someone else who wants to make a

25   transaction, that it takes some additional time.

```
1              THE WITNESS:  I can see that being true some of the
2    time.
3              THE COURT:  Okay.
4    BY MR. BROWN:
5    Q.  And it also adds fees; isn't that true?
6    A.  With the coordinators, it adds fees.
7    Q.  So if you're using a centralized service, usually there's
8    some sort of fee added to the transaction?
9    A.  That is true.  And my understanding is they take good care
10   to make sure that those fees don't add a traceability aspect to
11   the nature of the coinjoin.
12   Q.  Isn't it true that these coinjoin services, such as Wasabi
13   Wallet or Samurai Wallet, are very well-known on the
14   blockchain; readily identifiable on the blockchain?
15   A.  I don't know that to be true.  I know it to be true that
16   Chainalysis -- blockchain tracing companies generally sell a
17   compliance tool, as I understand, to crypto exchanges that
18   purports to be able to do that; that makes guesses about how
19   many hops away you are from a coinjoin and whether or not a
20   coinjoin has occurred.  I know that that is true.
21              And I know that sometimes they are identifiable, but
22   I think your description was readily identifiable, easily
23   identifiable; I don't know that to be true.
24   Q.  You testified earlier about how identifiable Wasabi Wallet
25   transactions used to be?
```

1    A.  I testified that Wasabi has been described as a potentially

2    traceable tool because of some privacy issues identified in a

3    presentation that I saw.  That doesn't lead me to inference

4    about coinjoins generally; for me at least.

5    Q.  You have no specialized knowledge of any measures that

6    Chainalysis takes to detect or control for coinjoin

7    transactions?

8    A.  I have knowledge about that from -- it's my understanding

9    that they measure the number of hops away from -- they provide

10   tools that are risk management tools, as I've heard them

11   described by representatives from -- could have been

12   Chainalysis, could have been other blockchain --

13            THE COURT:  I'm sorry.  Slow down for the court

14   reporter.

15            THE WITNESS:  I'm sorry.  I have knowledge that they

16   provide a tool that allows -- my understanding is they allow

17   the exchanges to use the data that they provide to make their

18   own risk assessment, and part of that includes whether or not

19   there's a coinjoin in the history of the UTXO for that bitcoin

20   and how many hops away it is from that alleged coinjoin

21   transaction.  I know that exists.  I don't have independent

22   knowledge of its reliability.

23   BY MR. BROWN:

24   Q.  And you have no independent knowledge of whether

25   Chainalysis identifies known coinjoin service providers, such

1    as Wasabi Wallet or Samurai Wallet?

2    A.  No.

3    Q.  And you have no independent knowledge of whether

4    Chainalysis looks for unique features of the coinjoin

5    transaction?

6    A.  Again, the black box nature of Chainalysis's work limits

7    what I know about what they do.

8    Q.  Professor Verret, what portion of the discovery have you

9    reviewed in this case?

10   A.  The portions applicable and necessary for the opinion

11   described in my disclosure, with particular application to

12   expert reports, review of Mr. Sterlingov's bank accounts and

13   crypto accounts, and review of the rest of the disclosures that

14   have been provided.

15           THE COURT:  I just want to make sure I understand --

16   I'm sorry to interrupt.  I want to make sure I understand.

17           You reviewed the expert disclosures in the case, and

18   you reviewed information relating to Mr. Sterlingov's bank

19   accounts and crypto accounts.  Anything else you've reviewed,

20   or is that it?

21           THE WITNESS:  No, that's not it, Your Honor.  I would

22   say all or substantially all of the evidence that counsel

23   has -- that's on the place where it's stored for counsel that I

24   understand to be a comprehensive description of everything the

25   government has turned over.

```
1              THE COURT:  As far as you know, you've reviewed all
2    of the discovery provided in the case?
3              THE WITNESS:  I've reviewed all that's necessary to
4    come to my opinion, and as described, in particular, focus on
5    the accounts and stuff.
6              As far as I know, I've reviewed nearly all of it,
7    yes.
8              THE COURT:  I mean, saying you've reviewed everything
9    necessary to form your opinion doesn't help me because I don't
10   know what that is.  I take it, you're saying, as far as you
11   know, you've reviewed virtually all of the discovery provided
12   in the case?
13             THE WITNESS:  Most or nearly all.
14             THE COURT:  That's helpful.  Thank you.  Sorry,
15   Mr. Brown.
16             MR. BROWN:  I think that covers some of my questions.
17   BY MR. BROWN:
18   Q.  And have you reviewed the financial disclosure produced by
19   the defendant in this case?
20   A.  Which particular financial disclosure?  I've seen his bank
21   accounts and his crypto accounts.
22   Q.  The defendant submitted a, quote, statement of net worth in
23   this proceeding in which he himself represented that he had so
24   many bank accounts and crypto accounts.
25             Have you reviewed that?
```

1    A.  I don't have a particular memory of that particular

2    document, but I might have, particularly if it was stored near

3    the bank accounts and crypto accounts.

4    Q.  And in the discovery that you reviewed, have you reviewed

5    device images from Mr. Sterlingov's seized devices?

6    A.  Some of them, yes.

7    Q.  Which ones?

8    A.  I've seen descriptions of a -- translations of a document

9    from Russian about how to conduct transactions, as I recall.

10   Q.  And that's it?

11   A.  I don't want to say that's it because there's a lot of

12   documents in there.  So it's what I can recall right now as

13   we're sitting here talking.

14   Q.  Did you review records from Mr. Sterlingov's bank accounts

15   at Nordea Bank in Sweden?

16   A.  Yes.

17   Q.  Did you review records of Mr. Sterlingov's bank accounts at

18   N26 Bank in Germany?

19   A.  I don't recall German banking.  Maybe.  I do remember the

20   Nordic bank accounts, yes.

21   Q.  Have you reviewed records of bank accounts belonging to the

22   defendant at Sparkasse Bank in Malta?

23   A.  I do remember some Malta documents, yes.

24   Q.  Were those bank account records or other Malta documents?

25   A.  I just remember Malta.  I do remember Malta.

1   Q.  Have you conducted a full financial analysis of the

2   defendant's financial accounts?

3   A.  I've conducted an analysis of what I've seen.  I don't

4   believe I have enough to conduct a full financial analysis just

5   because I don't -- again, I don't know where the missing

6   bitcoin is that I described in the initial discussion.

7   Q.  And you have no written work product of that financial

8   analysis?

9   A.  That's correct.

10  Q.  It's all in your head?

11  A.  I wouldn't say it's all in my head.  It's all based on a

12  review of what I've seen and calculation of what was there.

13  Frankly, it surprised me as I got into this case that I didn't

14  need to create the kinds of spreadsheets that you usually do in

15  a forensic investigation because of the falsity of the

16  government's evidence in this matter.

17              THE COURT:  Can I interrupt again just for a second.

18  I would have thought that if you were doing an analysis and

19  saying that, based on the amount of cryptocurrency or bitcoin

20  that Mr. Sterlingov originally had, that one would think that

21  he generated so much income over -- based on the growth of that

22  bitcoin over time, and that reasonably matches up with the

23  amount that was in the accounts that were seized.

24              But have you actually done that work where you've

25  said, okay, here's what he originally had, here's what the

1        growth of bitcoin was over time; as far as I can tell, the

2        money was put into it with the accounts on such and such a date

3        in such a way that matches up with the growth of the -- of the

4        bitcoin, and so I can actually make some dollar-figure

5        calculation?

6               THE WITNESS:  Well, first, you have to, early on,

7        rely on the reliability of the Mt. Gox data, which I've said

8        I'm not willing to do; I don't feel I can do.

9               Secondly, the government has described post-mix

10       bitcoin in this Kraken and other destinations as illicit, but I

11       disagree with the contingent that it's illicit at all.

12              THE COURT:  I'm not asking you about your critique of

13       the government's case.  I'm asking about your own affirmative

14       argument where you've said to me, affirmatively, based on the

15       amount of bitcoin that I believe he had at this early stage

16       when the value of bitcoin was quite low and based on my

17       understanding of the growth of bitcoin over time that I think

18       that the most plausible hypothesis is that all the money in the

19       Kraken account came from simply the growth in his original

20       investment in Bitcoin.

21              But to do that analysis or to say that, I assume what

22       you need to do is to say he had X bitcoin on such and such a

23       date, he acquired some more bitcoin on another date, he

24       acquired some more on another date, that grew over time, and

25       here's a transaction into the Kraken account that occurred on

1    such and such a date when the value of the bitcoin would have

2    been as follows, and here's another transaction into the Kraken

3    account on another date.  And you can match it up and say, yes,

4    it is a plausible, if not compelling, hypothesis with the money

5    in the Kraken account or any other accounts that he came --

6    that he has came from the natural growth and the value of

7    Bitcoin from his original investments; which is what I take it

8    you were telling us?

9              THE WITNESS:  I can make a determination about what

10   amount would be reasonable to purchase of bitcoin in the early

11   days that would represent what's contained in Kraken now.  I

12   can't match, sort of, pre-Bitcoin Fog bitcoin and get a full

13   picture of everything he ever bought versus Kraken post Bitcoin

14   Fog because I don't know everything he's ever bought.  So much

15   of Bitcoin is outside of the KYC world altogether.

16             So I just don't know how much he's ever bought or

17   received as transfers from other people; particularly because

18   after it went through Bitcoin Fog, it's untraceable at that

19   point.  So I don't know where it came from.

20             THE COURT:  So in that case, it sounds to me like

21   you're not opining or you don't propose to opine that the

22   money in the -- that the most plausible scenario or hypothesis

23   is that the money in the Kraken account came from the growth of

24   the bitcoin.

25             What you're telling me now is you just don't know one

1      way or the other because you don't have enough information to

2      make that judgment?

3                  THE WITNESS:  That's not accurate.  I'm saying, if I

4      make the reasonable assumption that he spent roughly $20,000,

5      $30,000 over the early couple years of Bitcoin, I can account

6      for what he has in Kraken now.  I think that's a reasonable

7      assumption to make.

8                  I don't know the actual amount he bought originally,

9      but based on that reasonable assumption, I can account for what

10     he has now post Bitcoin Fog.

11                 THE COURT:  I mean, I suppose you could just say, if

12     one were to hypothetically assume that he purchased that

13     amount, you can't say that that's a reasonable assumption.  You

14     have no idea, I assume, how much money he had or anything to

15     make an assumption about what he had.  But you can say --

16                 THE WITNESS:  I have some understanding.  You know,

17     based on my review, certainly, of the Nordic Bank accounts, of

18     some money going in that seemed to be comparable to -- based on

19     a rough estimate of conversion rates, what he was making, if he

20     wanted to go all in, he would have enough money to buy 20,000

21     or 30,000 of bitcoin over the first few years.

22                 I think that assumption is reasonable, but I don't

23     have a full picture of the exact number of bitcoins he

24     purchased.

25                 THE COURT:  I guess what I'm asking, though, is if

1    you've done what you just did, did you not put that down on a

2    piece of paper somewhere and say here's the information from

3    the Nordic Bank accounts on such and such a date, that

4    translates into such value in bitcoin on that date, and here's

5    the growth rate to a particular day that I'm hypothesizing that

6    he took the money out and transferred it into the Kraken

7    account, and that's what the dollar figure would have been?

8              THE WITNESS:  As I said -- Your Honor, I used a

9    calculator, I reviewed the evidence.  It was a pretty

10   simplistic calculation to get what I described; the amount of

11   money going through Bitcoin Fog, the amount of money that would

12   represent fees.  And a review of the post KYC accounts gets me

13   to a total that's similar to the government's total, what's

14   contained in the crypto accounts.  So it's just a couple of

15   numbers.

16             THE COURT:  The answer is no, you didn't write

17   anything down?

18             THE WITNESS:  Yes, sir.

19             THE COURT:  Okay.  Can you describe to me, once

20   again, though, what it is you did with the analysis.  For your

21   starting figure of -- on a particular -- is there a particular

22   date that's your start date, and how much money did you assume

23   that Mr. Sterlingov had on that date that he then used to

24   purchase bitcoin and how many bitcoins he would have bought on

25   that date?

1          THE WITNESS:  Well, I just used the Bitcoin price

2     range, roughly in the 30s in 2011, and a review of historical

3     prices of bitcoin, and I mentioned I would add -- I mentioned

4     that it would be useful to share, potentially, with the jury a

5     historical bitcoin price chart, and then you can make your own

6     reasonable guesses about how much someone in his position would

7     have been able to purchase in the early years and get to a

8     total that gets you to 1600 bitcoin, which is roughly what he

9     has at this point.

10          And then that still leaves you with, of course, also

11     the missing bitcoin.

12          THE COURT:  Did you make an assumption about when he

13     took the money out of Bitcoin Fog and transferred it to the

14     Kraken account?  And I guess it's not all bitcoin.  He has

15     other cryptocurrencies.

16          THE WITNESS:  He has a few other things as well, yes.

17     But assuming the government's totals of the post-Bitcoin Fog

18     transfers, assuming the government's totals, this is what I get

19     to, and then I explain it.  I'm able to draw an opinion based

20     on a reasonable estimate of what you could have purchased

21     bitcoin for in 2011.

22          THE COURT:  So how many bitcoin are you assuming he

23     purchased in 2011?

24          THE WITNESS:  Well, if he bought, let's say, 500 or a

25     thousand, a third or two-thirds.

```
1              THE COURT:  Okay.  That's helpful.  Thank you.
2    Mr. Brown?
3    BY MR. BROWN:
4    Q.  Professor Verret, have you reviewed the defendant's
5    testimony during the hearings in this case on January 13th and
6    January 31st, 2023?
7    A.  I'm not sure if I have reviewed them.  The trial
8    transcripts?
9    Q.  The hearing transcripts for evidentiary hearings --
10   A.  I'm not sure I have.
11   Q.  -- at which the defendant testified.
12              Have you reviewed the defendant's LocalBitcoin
13   account records?
14   A.  I think that was contained in the government's production.
15   So I believe so.
16   Q.  Is that a yes, you have reviewed the LocalBitcoin's account
17   records?
18   A.  Again, I don't remember specifically, but I think I
19   probably did.
20   Q.  Are you aware that the defendant testified during the
21   January hearings that he quit his job in 2013 or 2014, and
22   after that he had, quote, no other significant sources of
23   income?
24   A.  That was relayed to me, yes.
25   Q.  And are you aware that the defendant's sales of bitcoin on
```

1  LocalBitcoin, occurred in 2012 and 2013, and then there was

2  about a two-year hiatus until he started selling bitcoin again

3  in 2015?

4  A.  Well, this would have been on that particular LocalBitcoin

5  account.  I don't know whether he was engaged in any

6  transactions on nondisclosed or non-KYC peer-to-peer platforms

7  or with individuals, in individual transactions.

8  Q.  Are you aware that in Mr. Sterlingov's emails, there are

9  emails from interested buyers of bitcoin from Mr. Sterlingov,

10  and as of -- in mid to late 2013, he told one of them, quote,

11  I've been running out quickly; and by November he told another,

12  quote, I'm out right now, unfortunately, end quote, I sold all

13  mine, and I'll have to wait until the price is down; are you

14  aware of those messages?

15  A.  I don't recall those specifically, no.

16  Q.  Going back to the Kraken analysis, is your analysis,

17  essentially, just a comparison of aggregate numbers on the one

18  hand; you're asking the fee income from Bitcoin Fog, and on the

19  other hand the balances on the Kraken account?

20  A.  It's also a review of the transfers themselves and to

21  determine whether any pattern appeared to be happening in the

22  transfers to his Kraken account.  I couldn't find a discernible

23  pattern other than random blockchain activity.

24  Q.  What pattern are you looking for?

25  A.  Well, first of all, it's hard to discern a pattern with

1    amounts that low relative to the fees except -- expected from

2    someone who is running a mixer, that's mixing as much as what's

3    going through here.  So those amounts are so much smaller than

4    the actual fees that it would be difficult to find a pattern

5    because of the relative size differential.

6         I mean, I can only attribute something like 7 or 8

7    percent of bitcoin to Roman of the percentage that you would

8    expect someone running this mixer to have.  So with that size

9    differential, the total fee is 13 times what the total bitcoin

10   I can attribute to Roman's ownership.

11        Now, it's hard to find patterns.  But I could not

12   find one, mostly probably because of that size differential.

13   Q.  And you're looking -- you're talking about what you would

14   expect from somebody running a mixer.

15        What's your basis for opining about what you would

16   expect from somebody running a mixer?

17   A.  The basis -- again, the basis for all of my opinions is my

18   experience or training that's described in everything I filed.

19   But part of the basis for my opinion is what I've already

20   discussed, which is the average fees for the mixer.

21        THE COURT:  What are the average fees for other

22   mixers?

23        THE WITNESS:  Other mixers, as I understand, are

24   fairly comparable to this one, which is 2 to 2.5 -- 2 to

25   3 percent -- 2 percent at one point, 2 to 3 percent at one

1    point, which probably is a reasonable average of 2.5 percent

2    after it changed.

3    BY MR. BROWN:

4    Q.  All of this analysis, you're assuming that the government's

5    claim is that funds -- fee income from Bitcoin Fog is

6    transferred automatically to the defendant's accounts; is that

7    correct?

8    A.  I'm sorry.  What do you mean by automatically?

9    Q.  In order to -- the theory that you're trying to knock down

10   is that Bitcoin Fog automatically sent fees to Kraken, and

11   you're saying the numbers don't add up; is that fair to say?

12   A.  No.

13   Q.  So if the numbers don't add up, is it because not all fees

14   were automatically sent to Kraken; would that be a possibility?

15   A.  I mean, I hesitate to speculate on why they would not send

16   their fees to Kraken.  I just can't account for the

17   overwhelming majority of the fees.

18   Q.    You're assuming that there's -- you're assuming that

19   there's some claim the government is making that 100 percent of

20   fees were automatically sent to Kraken.

21         Can you point to anywhere in the discovery work

22   papers that you've reviewed other than the podcast where the

23   government has made that assertion?

24   A.  So that's my understanding, is the case -- my understanding

25   of the criminal indictment and the various filings I've

1    reviewed is that the government is asserting that those fees

2    were the result of -- that post-Bitcoin Fog mixed bitcoin was

3    fees from running the mixer.  And I do not find that credible

4    because I do not find it credible that someone would get that

5    much bitcoin, and we would only see less than 7 percent of it.

6         The other 93 percent that at one point is worth a

7    billion dollars would -- we would not see any evidence of it.

8    I mean, that kind of -- that kind of amount of wealth leaves a

9    heck of a wake, and I have not seen any evidence of that wake

10   in anything that I have reviewed or done.

11   Q.  I guess my question is -- goes to the difference between

12   manually withdrawing fee income, like the Bitcoin Fog cluster,

13   versus having some sort of automated process set up.

14        And if it's a manual withdrawal, then how does your

15   pattern analysis make any sense?

16   A.  I could not find pattern analysis, in part, because of the

17   incredible differential between what's in his Kraken accounts

18   and the fees that you would expect someone running the mixer to

19   have.  So I hesitate to speculate on whoever is running the

20   account, whether their withdrawals are automatic or not,

21   because I don't need to speculate about that because I'm

22   comfortable with my opinion that relies on, again, my question

23   about the missing bitcoin.

24   Q.  And you're relying, again, upon your assumptions about what

25   someone running a mixer would do.  It sounds like you don't

1    have any real basis -- no academic or professional basis to

2    opine about what the average person running a mixer -- the

3    darknet mixer would do with the money?

4    A.  I teach money laundering; I write about money laundering.

5    I'm trained in crypto forensics.  So I believe I have an

6    accurate basis to have an opinion about what you would expect

7    from someone running Bitcoin Fog and the amount of wealth you'd

8    expect them to possess and that wealth would leave a wake in

9    some way.

10   Q.  But one claim in your expert disclosure is the following:

11   Someone with the expertise that the creator of Bitcoin Fog has

12   exhibited would not send proceeds from running a mixer back to

13   their own KYC'd accounts.

14            And you go on to claim that they would do something

15   else, like layer money through fake accounts purchased on Tor

16   or trading peer to peer; is that correct?

17   A.  Those are some ways they could try to move it, yes.

18   Q.  Are you aware that a substantial portion of the funds going

19   into the defendant's Kraken accounts were first -- first

20   transited the defendant's LocalBitcoins peer-to-peer sales

21   account?

22   A.  I wouldn't make any assumptions just about the use of

23   LocalBitcoin, but, sure, I am aware of the use of LocalBitcoin.

24   Q.  And you claim that nobody -- no true person running a

25   bitcoin mixer would ever use a KYC account, right?

1    A.  I think they might use a KYC account, and they have been

2    found to use KYC accounts, but not their own.  They would try

3    to move it on a KYC account using a login that you can buy on

4    the dark web and moving that login and then change it for

5    something else and move it out.

6           I think that's more likely for someone running that

7    kind of an operation.

8    Q.  So you're not really saying that they would never --

9    A.  That's one path.  That's one path.  What my opinion is is

10   that you would not -- if you were -- I can understand using --

11   sending post-mix bitcoin intended to be private back to a KYC'd

12   account if you wanted privacy from the world, but you

13   weren't -- there was no predicate crime that would make your

14   mixing potentially money laundering or that would indicate that

15   you were running Bitcoin Fog.  So it doesn't stand to reason to

16   me that someone running that would send post-mix tokens back to

17   the KYC'd account.

18   Q.  Now, you teach money laundering.  So you're familiar with

19   the traditional theory of money laundering where there's

20   placement, layering, and integration; those are the three steps

21   of money laundering?

22   A.  True.

23   Q.  And so isn't that last part, integration, the process of

24   taking your post-laundered funds and placing them into accounts

25   in your own name or in accounts in a way that you can enjoy the

1    fruits of those proceeds?

2    A.  I would not describe -- so if we're not talking about the

3    Kraken account specifically and not using an example of what

4    you're describing, what you're basically describing is an

5    accurate description of the integration stage of money

6    laundering, yes.

7    Q.  So let's say, total hypothetical, there's a mobster who has

8    generated illegal gambling proceeds.  The mobster owns a

9    restaurant.  Commingles the funds from the gambling of the

10   restaurant and then pays himself a salary out of the

11   restaurant.

12        That's an example of integrating post-laundered

13   funds, right?

14   A.  That's a pattern that's been seen in the past, yes.

15   Q.  Now, you have no specialized knowledge --

16   A.  Can I just disclose something?  I anticipated leaving at --

17   starting at 10:00.  I'm sorry.  I have a kid pickup thing.  Is

18   it okay if I need to leave by 5:00, or do I need to make

19   arrangements?  I don't know if we'll go past 5:00.

20        THE COURT:  Mr. Brown, how much more time do you

21   need?

22        MR. BROWN:  Your Honor, I'm sure I will go past 5:00,

23   but maybe not past 5:30.  But if he needs to leave at 5:00, we

24   can reconvene.

25        THE WITNESS:  I have a hard stop at 5:05.

1           MR. EKELAND:  And, Your Honor, I have a 6:00 train I

2     need to catch back to New York.

3           THE COURT:  What do you want to do about finishing

4     things up?  Do you want to do the whole thing remotely to

5     continue, or do you want to do it in person?  It's up to you.

6           MS. PELKER:  Does Your Honor still have the time

7     blocked for tomorrow?  Is that still an option?  Because we

8     have Mr. Fischbach as well who we didn't get to at all today.

9           THE COURT:  I know.  Let's see here.

10          MS. PELKER:  And I'm local.  I'm happy to come in,

11    but I'm also fine with doing it remote.

12          THE COURT:  So I do have some time tomorrow.  I have

13    from 9:00 or 9:30 until 11:00, and then I have a short hearing

14    at 11:00, and then I have from 11:30 until 12:30.

15          So we can reconvene tomorrow morning, and I'll just

16    have to take a break for -- probably be about 15 or 20

17    minutes -- for a status hearing on another case.  So I can do

18    that.

19          MS. PELKER:  Does that work for defense counsel and

20    Mr. Verret?

21          THE COURT:  Mr. Ekeland, if you want to appear

22    remotely like Mr. Brown is today, that's okay with me as well.

23          MR. EKELAND:  I think we'd need to -- excuse me.  I

24    think we'd need to appear remotely, but if we can just check

25    our calendar.

1              THE COURT:  If one of you could be here, if Mr.

2      Hassard could be here maybe, Mr. Ekeland, if you need to be

3      remote.  It would be nice to have somebody sitting here with

4      your client in the room.

5              MR. EKELAND:  Yes.  Can we take five minutes?

6              MR. HASSARD:  I have a flight scheduled to Canada at

7      10:00 tonight.  We'll have to figure this one out.

8              THE COURT:  I'll let you --

9              MR. EKELAND:  I mean -- I'm sorry.  I guess I could

10     cancel the train or just get a hotel overnight and just appear

11     tomorrow and bill it to CJA or something.

12             THE COURT:  If you can do that, I'd appreciate it.

13     We do need to make some progress on all of these *Daubert*

14     hearings we have.

15             MR. HASSARD:  We then also have the issue of the

16     documents that are to be submitted on Friday.  We have

17     deadlines in this case.

18             MR. EKELAND:  I mean, we could deal with that.  I'll

19     just work late.

20             THE COURT:  If you can be here tomorrow morning,

21     Mr. Ekeland, that would, I think, help things.

22             MR. EKELAND:  I will make it happen, Your Honor.

23     What time?

24             THE COURT:  Can the witness be here tomorrow morning?

25             THE WITNESS:  What time was it again?

1          THE COURT:  You tell me.  When can you be here?

2          THE WITNESS:  10:00.

3          THE COURT:  We could start in the morning with --

4          MS. PELKER:  Fischbach is West Coast.

5          THE COURT:  He's West Coast.  I see.  We'll just have

6    to move with some efficiency.

7          I can give you from 10:00 until 12:30 with a short

8    break that I need to take for another status conference.  We

9    can do that, but we have to make sure we move with some

10   efficiency.

11         MR. EKELAND:  From 10:00 to 12:30 tomorrow, and then

12   is that it?

13         THE COURT:  Well, no.  I can pick up after lunch

14   until -- I have a 3:00 meeting that I need to be on.

15         MR. EKELAND:  10:00 and then lunch and until,

16   roughly, 3:00 tomorrow; is that what we're saying?

17         THE COURT:  I can do that.

18         MR. EKELAND:  Okay.  I'll see what I can do.  Yes.

19         THE COURT:  In that case, why don't I just ask

20   Mr. Brown, is this a good breaking point or do you want to go

21   for another five minutes now?  It's up to you.

22         MR. BROWN:  No, Your Honor.  This is a good breaking

23   point.

24         THE COURT:  We'll pick up at 10:00 tomorrow morning

25   again then.  If you can let Mr. Fischbach know.  Let him know

1    that we'll pick him up as soon as we're done with this witness.

2    I don't anticipate needing more than, I hope, 45 minutes or an

3    hour to finish up with this witness here.  Okay.  Let's do

4    that.  We'll just adjourn for the day.

5            So you're welcome to go.  I just ask that you not

6    discuss your testimony until you're done testifying.

7            MS. PELKER:  Your Honor, can we address at sidebar

8    the transcript issue?

9            THE COURT:  Yes, you can.  Why don't we do this.  Why

10   don't you -- we can let you go.  Why don't I go ahead and clear

11   the courtroom instead of having to do a sidebar.

12           Anyone who is not counsel in the case or associated

13   with their counsel in the case, why don't we go and we'll have

14   a sidebar.

15           MS. PELKER:  Thank you, Your Honor.

16           MR. BROWN:  Your Honor, I'm not sure if the sidebar

17   is available via Zoom.  I'm happy to log off.

18           THE COURT:  No.  It's -- is anyone else on Zoom other

19   than Mr. Brown?

20           THE COURTROOM DEPUTY:  There are some other people on

21   the call.

22           MR. HASSARD:  Our experts.

23           THE COURT:  As long as everyone other than Mr. Brown

24   logs off of the Zoom.  You can stay on the Zoom, Mr. Brown.  I

25   think the deputy clerk can make sure that we've dismissed

1    everyone else.

2              THE COURTROOM DEPUTY:  I'm doing it now, Your Honor.

3              MR. BROWN:  Thank you, Your Honor.

4              THE COURTROOM DEPUTY:  Everyone has been removed,

5    Your Honor.

6              THE COURT:  Thank you.

7              (End of public record at 4:50 p.m.)

8              (Sealed proceedings followed.)









(The hearing adjourned July 19, 2023, at 4:55 p.m.

until 10:00 a.m. July 20, 2023.)

1               CERTIFICATE OF OFFICIAL COURT REPORTER

2

3          I, TAMARA M. SEFRANEK, do hereby certify that the

4     above and foregoing constitutes a true and accurate transcript

5     of my stenographic notes and is a full, true and complete

6     transcript of the proceedings to the best of my ability.

7               Dated this 30th day of July, 2023.

8

9                    /s/ Tamara M. Sefranek_____
                     Tamara M. Sefranek, RMR, CRR, CRC
10                   Official Court Reporter
                     Room 6714
11                   333 Constitution Avenue, N.W.
                     Washington, D.C.  20001
12

13

14

15

16

17

18

19

20

21

22

23

24

25

**$**

**$100** [1] - 154:22
**$15,000** [1] - 56:2
**$20,000** [1] - 165:4
**$30** [1] - 112:15
**$30,000** [2] - 112:16, 165:5
**$334** [1] - 12:8
**$35,000** [1] - 56:4
**$400** [2] - 134:10, 135:2
**$60,000** [7] - 55:17, 55:19, 55:21, 55:23, 56:5, 56:15, 112:16

**'**

**'09** [1] - 127:15
**'90s** [1] - 98:22

**/**

**/s** [1] - 185:9

**1**

**1** [3] - 46:4, 142:7
**10** [2] - 96:6, 135:13
**100** [5] - 57:9, 58:21, 75:11, 143:16, 171:19
**10005** [1] - 1:17
**10:00** [9] - 24:12, 175:17, 177:7, 178:2, 178:7, 178:11, 178:15, 178:24, 184:22
**10:30** [4] - 1:6, 9:25, 12:1, 26:15
**11:00** [4] - 24:17, 176:13, 176:14
**11:30** [1] - 176:14
**11th** [1] - 24:1
**12:00** [1] - 67:18
**12:15** [1] - 70:17
**12:30** [3] - 176:14, 178:7, 178:11
**12th** [1] - 24:1
**13** [1] - 170:9
**131** [1] - 2:12
**13th** [1] - 168:5
**145** [1] - 43:15
**14th** [1] - 21:3
**15** [2] - 96:6, 176:16
**150** [1] - 33:14
**150,000** [1] - 58:21
**153** [1] - 152:16
**16** [9] - 12:21, 20:10, 28:23, 29:25, 41:13,

45:17, 45:20, 50:5, 51:19
**1600** [6] - 106:5, 106:7, 106:8, 112:17, 112:18, 167:8
**16th** [2] - 25:1, 29:14
**170** [1] - 34:21
**18th** [5] - 10:5, 16:14, 18:12, 20:23, 21:19
**19** [2] - 1:5, 184:21
**1:15** [2] - 67:19, 70:15
**1:21-CR-0399** [1] - 1:3
**1:25** [1] - 70:17

**2**

**2** [8] - 105:10, 105:11, 105:12, 106:2, 170:24, 170:25
**2.5** [1] - 105:15, 105:16, 105:17, 170:24, 171:1
**2.6** [1] - 105:18
**2.7** [1] - 105:18
**20** [2] - 176:16, 184:22
**20,000** [1] - 165:20
**20-minute** [1] - 15:25
**20001** [3] - 1:12, 1:23, 185:11
**2010** [1] - 127:15
**2011** [10] - 8:21, 108:25, 112:14, 112:15, 112:17, 115:9, 154:14, 167:2, 167:21, 167:23
**2012** [3] - 108:25, 115:9, 169:1
**2013** [4] - 127:17, 168:21, 169:1, 169:10
**2014** [2] - 115:10, 168:21
**2015** [1] - 169:3
**2016** [1] - 42:25
**202-354-3246** [1] - 1:23
**2022** [3] - 28:24, 29:25, 152:1
**2023** [6] - 1:5, 137:1, 168:6, 184:21, 184:22, 185:7
**20530** [1] - 1:14
**21,000** [1] - 106:6
**21-399** [1] - 3:3
**21st** [6] - 21:20, 21:23, 22:6, 22:12, 22:17, 22:22
**22,000** [1] - 106:6,

106:8
**22nd** [2] - 22:25, 23:14
**23,700-something** [1] - 106:2
**23rd** [5] - 22:25, 23:14, 25:1, 28:24, 29:25
**24,000** [3] - 105:18, 105:19, 105:24
**24th** [1] - 25:24
**250** [1] - 135:18
**28th** [2] - 22:2, 22:4
**29th** [1] - 22:4
**2nd** [1] - 42:25

**3**

**3** [5] - 43:14, 105:11, 105:15, 170:25
**30** [2] - 1:17, 112:18
**30,000** [2] - 105:19, 165:21
**300** [1] - 135:18
**30s** [1] - 167:2
**30th** [2] - 21:4, 185:7
**31st** [1] - 168:6
**32** [1] - 2:16
**33** [1] - 2:5
**333** [2] - 1:22, 185:11
**3:00** [2] - 178:14, 178:16
**3:15** [1] - 131:4
**3:30** [1] - 131:4

**4**

**40** [1] - 135:12
**45** [2] - 2:6, 179:2
**4:50** [1] - 180:7
**4:55** [1] - 184:21
**4th** [1] - 137:1

**5**

**5** [2] - 45:14, 135:13
**50** [5] - 68:7, 68:9, 83:19, 84:2, 135:12
**500** [3] - 128:4, 128:19, 167:24
**57-7** [1] - 10:22
**5:00** [4] - 175:18, 175:19, 175:22, 175:23
**5:05** [1] - 175:25
**5:30** [1] - 175:23

**6**

**60,000** [1] - 55:17
**60-something** [1] -

106:8
**112:17**
**601** [1] - 1:11
**6714** [2] - 1:22, 185:10
**6:00** [1] - 176:1
**6th** [4] - 24:5, 24:12, 24:13, 24:18

**7**

**7** [3] - 46:11, 170:6, 172:5
**7,000** [1] - 152:13
**7,325** [2] - 152:12, 152:16
**706** [1] - 40:16
**750** [1] - 134:11
**7th** [4] - 7:13, 21:6, 22:7, 22:11

**8**

**8** [2] - 152:17, 170:6
**88** [1] - 2:8
**8th** [1] - 1:17

**9**

**9** [1] - 46:13
**92** [1] - 2:11
**93** [1] - 172:6
**950** [1] - 1:14
**99** [1] - 69:11
**9:00** [1] - 176:13
**9:30** [1] - 176:13

**A**

**a.m** [2] - 24:12, 184:22
**A.M** [1] - 1:6
**ability** [2] - 36:23, 185:6
**able** [10] - 76:17, 76:19, 76:25, 80:7, 83:1, 85:25, 86:1, 157:18, 167:7, 167:19
**absence** [5] - 72:4, 73:12, 73:16, 74:18, 85:22
**absolutely** [5] - 73:1, 79:17, 80:7, 84:6, 139:21
**abstract** [2] - 51:23, 51:24
**abundance** [2] - 4:8, 6:25
**academic** [8] - 9:19, 33:13, 33:15, 122:8, 129:7, 134:4, 153:12, 173:1

**academically** [1] - 71:7
**accept** [2] - 71:21, 138:17
**acceptable** [1] - 54:10
**accepted** [10] - 39:17, 71:11, 137:25, 138:6, 138:7, 138:22, 138:23, 149:5
**accepts** [2] - 138:21, 146:16
**access** [4] - 29:9, 99:10, 100:13, 108:22, 146:6, 146:11
**accesses** [1] - 5:1
**accessing** [1] - 4:23
**account** [40] - 8:25, 15:1, 15:8, 57:22, 101:18, 102:2, 103:2, 104:6, 106:6, 106:7, 107:4, 107:9, 109:9, 113:14, 143:2, 161:24, 163:19, 163:25, 164:3, 164:5, 164:23, 165:5, 165:9, 166:7, 167:14, 168:13, 168:16, 169:5, 169:19, 169:22, 171:16, 172:20, 173:21, 173:25, 174:1, 174:3, 174:12, 174:17, 175:3
**accountant** [4] - 6:22, 92:22, 95:5, 116:11
**Accountant** [1] - 93:4
**accountants** [1] - 93:13
**accounting** [14] - 58:24, 92:14, 93:7, 93:11, 93:16, 97:17, 111:5, 111:12, 113:23, 117:5, 132:6, 134:5, 134:6
**accounts** [41] - 4:22, 4:23, 85:7, 85:8, 85:9, 104:10, 104:11, 104:16, 107:14, 110:25, 159:12, 159:13, 159:19, 160:5, 160:21, 160:24, 161:3, 161:14, 161:17, 161:20, 161:21, 162:2, 162:23, 163:2,

164:5, 165:17, 166:3, 166:12, 166:14, 171:6, 172:17, 173:13, 173:15, 173:19, 174:2, 174:24, 174:25
**accuracy** [7] - 8:2, 15:22, 27:15, 27:20, 68:20, 75:11, 123:4
**accurate** [16] - 13:7, 16:19, 16:20, 29:21, 105:5, 118:21, 133:17, 138:2, 143:16, 153:22, 154:10, 154:11, 165:3, 173:6, 175:5, 185:4
**accurately** [1] - 142:21
**accusations** [1] - 18:19
**accuse** [1] - 29:11
**achieved** [1] - 152:5
**acknowledge** [1] - 65:19
**acquire** [1] - 12:24
**acquired** [2] - 163:23, 163:24
**act** [1] - 8:22
**Action** [1] - 1:2
**activity** [6] - 66:19, 99:8, 127:19, 147:19, 149:2, 169:23
**actor** [1] - 110:10
**actual** [8] - 37:8, 73:19, 74:1, 85:15, 106:19, 142:10, 165:8, 170:4
**add** [9] - 54:19, 90:12, 105:4, 134:6, 156:13, 157:10, 167:3, 171:11, 171:13
**added** [2] - 76:13, 157:8
**adding** [1] - 18:1
**addition** [6] - 18:24, 44:4, 97:14, 97:16, 107:10, 144:22
**additional** [9] - 9:19, 21:12, 26:3, 26:16, 27:3, 28:2, 33:10, 93:6, 156:25
**address** [28] - 4:10, 4:20, 4:23, 7:20, 7:22, 7:24, 8:16, 8:17, 8:24, 9:1, 9:3, 10:3, 11:12, 19:12,

30:22, 53:25, 61:19, 124:14, 124:15, 124:18, 124:19, 125:24, 126:5, 147:18, 148:17, 151:18, 179:7
**addressed** [1] - 19:10
**addresses** [9] - 5:2, 8:5, 8:14, 8:19, 9:1, 11:23, 122:16, 140:20, 151:6
**addressing** [1] - 53:9
**adds** [3] - 155:6, 157:5, 157:6
**adequate** [1] - 20:9
**adjectives** [1] - 7:24
**adjourn** [1] - 179:4
**adjourned** [1] - 184:21
**adjourning** [1] - 16:10
**adjusted** [1] - 136:25
**administered** [1] - 107:2
**administrator** [2] - 14:15, 14:23
**administrators** [1] - 13:15
**admission** [2] - 14:19, 31:15
**admissions** [1] - 14:17
**admit** [1] - 14:12
**admits** [1] - 18:16
**admitted** [6] - 12:3, 14:11, 14:13, 15:21, 32:11, 32:13
**ADMITTED** [1] - 2:15
**adopt** [1] - 38:10
**adopted** [4] - 52:17, 78:20, 79:23, 80:1
**advent** [1] - 150:7
**adversarial** [1] - 44:20
**advertisers** [1] - 99:19
**advised** [2] - 6:21, 90:18
**advocates** [1] - 136:2
**affect** [7] - 36:23, 67:23, 68:20, 74:13, 85:11, 87:20, 89:10
**affected** [1] - 87:14
**affects** [2] - 42:4, 66:1
**affirmatively** [1] - 163:14
**afford** [1] - 120:10
**afraid** [1] - 110:11
**afternoon** [2] - 131:18, 131:19
**afterwards** [1] - 30:22
**agencies** [3] - 34:15, 72:21, 120:9
**agent** [1] - 4:13

**agents** [1] - 34:12
**aggregate** [1] - 169:17
**ago** [7] - 12:5, 13:10, 17:24, 25:17, 49:9, 108:6
**agree** [9] - 46:23, 51:16, 51:17, 76:11, 79:1, 79:2, 112:12, 150:9, 150:12
**agreed** [3] - 31:1, 40:15, 87:10
**ahead** [5] - 16:13, 67:11, 120:20, 131:3, 179:10
**AICPA** [4] - 92:24, 93:5, 93:11, 94:25
**aimed** [1] - 58:12
**Air** [2] - 34:7, 37:10
**airline** [2] - 64:24, 65:1
**AI** [1] - 93:14
**ALDEN** [1] - 1:13
**Alden** [1] - 3:6
**algorithm** [4] - 53:19, 143:14, 143:16, 143:17
**algorithmic** [1] - 49:17
**algorithms** [2] - 27:10, 29:6
**alleged** [2] - 104:6, 158:20
**alleges** [1] - 8:24
**allow** [5] - 28:3, 53:20, 53:22, 103:3, 158:16
**allowed** [4] - 14:6, 88:2, 99:1, 99:2
**allows** [3] - 63:3, 63:5, 158:16
**almost** [4] - 12:5, 18:12, 21:7, 49:9
**alone** [4] - 37:1, 122:1, 130:25, 132:9
**alternative** [7] - 99:20, 100:1, 137:17, 137:18, 137:19, 144:13
**alternatives** [1] - 4:9
**altogether** [1] - 164:15
**amenable** [2] - 51:13, 51:14
**America** [1] - 3:3
**AMERICA** [1] - 1:2
**America's** [1] - 116:16
**American** [2] - 92:25, 97:19
**amount** [29] - 10:10, 10:13, 11:20, 64:5, 64:25, 67:8, 86:1, 105:13, 112:20, 123:24, 124:25,

125:1, 125:2, 125:3, 135:15, 143:2, 148:9, 154:20, 156:14, 162:19, 162:23, 163:15, 164:10, 165:8, 165:13, 166:10, 166:11, 172:8, 173:7
**amounts** [5] - 102:13, 104:20, 150:10, 170:1, 170:3
**ample** [1] - 26:21
**analogy** [1] - 98:21
**analyses** [1] - 72:8
**analysis** [92] - 4:21, 5:18, 7:14, 8:1, 8:15, 19:22, 36:2, 36:9, 36:22, 36:25, 59:3, 59:9, 59:12, 59:14, 59:21, 60:21, 61:10, 62:22, 63:5, 63:7, 67:25, 70:22, 70:25, 71:3, 71:6, 71:14, 72:5, 73:3, 73:9, 77:2, 77:6, 77:9, 77:12, 77:13, 77:18, 77:20, 77:25, 78:3, 84:16, 84:20, 85:6, 85:10, 86:8, 86:10, 86:19, 87:24, 88:13, 89:13, 89:15, 93:2, 96:9, 111:13, 111:21, 111:23, 117:7, 140:14, 140:15, 140:16, 140:17, 140:25, 141:11, 142:5, 142:8, 142:12, 142:13, 142:18, 142:22, 142:25, 143:9, 144:2, 144:4, 144:13, 145:20, 149:5, 149:6, 153:4, 153:7, 153:9, 162:1, 162:3, 162:4, 162:8, 162:18, 163:21, 166:20, 169:16, 171:4, 172:15, 172:16
**analyst** [6] - 67:23, 77:11, 85:5, 85:23, 86:6, 116:11
**Analyst** [1] - 93:2
**analytic** [1] - 68:18
**analytics** [1] - 95:20
**analyze** [2] - 16:25, 89:18
**analyzed** [2] - 17:16, 126:8
**analyzes** [1] - 152:2

**ancillary** [2] - 17:15, 18:14
**anecdotal** [3] - 65:8, 65:10, 82:18
**annoying** [1] - 119:16
**annual** [2] - 55:16, 56:5
**anonymity** [1] - 150:15
**answer** [31] - 43:20, 59:20, 62:25, 69:20, 84:23, 85:1, 85:2, 86:7, 86:14, 86:18, 86:22, 86:25, 87:3, 87:5, 95:24, 97:13, 97:22, 104:24, 117:13, 119:16, 129:2, 132:10, 133:17, 135:6, 135:7, 146:9, 147:9, 152:4, 155:2, 166:16
**answered** [3] - 66:16, 81:3, 81:21
**answering** [1] - 139:19
**answers** [2] - 48:18, 139:18
**anthropology** [2] - 65:17, 65:22
**anti** [3] - 107:1, 132:14, 133:14
**anti-money** [3] - 107:1, 132:14, 133:14
**anticipate** [4] - 7:16, 145:1, 145:25, 179:2
**anticipated** [2] - 4:2, 175:16
**anticipates** [1] - 28:25
**anticipating** [1] - 123:2
**anyway** [6] - 23:10, 47:15, 95:7, 100:4, 106:21, 120:2
**apart** [1] - 5:1
**API** [2] - 120:14, 120:23
**apologize** [2] - 120:16, 120:19
**appear** [3] - 176:21, 176:24, 177:10
**appeared** [3] - 39:13, 137:1, 169:21
**apples** [1] - 42:3
**applicable** [2] - 132:15, 159:10
**application** [4] - 52:2, 96:19, 159:11
**applications** [11] - 95:21, 96:12, 96:19,

97:1, 99:23, 99:25, 100:4, 133:15, 139:9, 139:14, 139:16
**applied** [2] - 15:4, 51:18
**apply** [5] - 71:3, 71:6, 73:5, 114:1, 117:6
**applying** [2] - 71:17, 152:12
**appointed** [2] - 12:23, 88:8
**appreciate** [3] - 86:15, 177:12
**approach** [3] - 9:13, 53:8, 141:25
**appropriate** [6] - 4:19, 5:3, 27:4, 53:6, 55:3, 84:25
**approved** [2] - 13:20, 80:2
**architecture** [2] - 35:16, 71:16
**area** [10] - 4:10, 4:12, 10:25, 33:16, 34:4, 48:7, 59:8, 76:1, 95:3, 136:9
**areas** [4] - 34:5, 37:12, 86:18, 113:22
**argue** [3] - 5:13, 5:25, 11:6
**argument** [9] - 11:4, 25:3, 25:13, 25:20, 52:19, 91:7, 91:10, 163:14
**arguments** [3] - 24:25, 29:20, 55:10
**arises** [1] - 72:19
**arrange** [3] - 150:4, 150:5, 154:9
**arrangements** [1] - 175:19
**arranging** [1] - 150:17
**arrested** [7] - 89:2, 89:3, 89:9, 89:14, 89:19, 89:21, 112:14
**arriving** [1] - 80:6
**art** [2] - 69:12, 96:17
**article** [9] - 39:24, 69:21, 80:14, 83:5, 111:15, 128:13, 128:15, 130:8
**articles** [11] - 33:13, 33:14, 60:6, 60:10, 64:3, 66:23, 80:14, 123:11, 127:24, 133:11, 133:14
**ASCFE** [1] - 92:25
**Asian** [1] - 138:19
**aspect** [4] - 47:5,

94:21, 140:14, 157:10
**aspects** [1] - 139:10
**aspersions** [1] - 119:6
**asserting** [1] - 172:1
**assertion** [9] - 104:14, 104:25, 105:6, 105:8, 106:11, 106:14, 107:13, 171:23
**assertions** [2] - 129:20, 142:22
**assess** [3] - 36:24, 104:24
**assessing** [1] - 27:4
**assessment** [4] - 68:2, 117:2, 129:14, 158:18
**assessments** [1] - 140:19
**asset** [2] - 111:19, 114:1
**assets** [4] - 96:20, 102:1, 111:19, 134:17
**assign** [3] - 80:4, 85:23, 85:25
**assistants** [1] - 130:3
**associated** [9] - 5:16, 8:19, 102:23, 103:9, 122:16, 124:4, 124:9, 153:17, 179:12
**associates** [1] - 36:7
**association** [1] - 152:15
**Association** [1] - 97:20
**assume** [14] - 52:4, 56:20, 67:10, 69:8, 69:13, 84:16, 84:17, 121:6, 128:8, 147:16, 163:21, 165:12, 165:14, 166:22
**assumed** [2] - 121:3
**assuming** [9] - 6:5, 23:15, 126:11, 167:17, 167:18, 167:22, 171:4, 171:18
**assumption** [14] - 55:6, 112:21, 122:12, 123:21, 125:22, 126:9, 126:13, 165:4, 165:7, 165:9, 165:13, 165:15, 165:22, 167:12
**assumptions** [15] -

37:25, 38:2, 38:3, 38:13, 49:5, 49:17, 53:6, 53:7, 68:5, 68:16, 126:12, 126:21, 143:14, 172:24, 173:22
**astrology** [1] - 65:17
**attached** [2] - 10:16, 10:18
**attachments** [1] - 19:4
**attack** [1] - 11:9
**attempting** [1] - 150:24
**attesting** [1] - 15:22
**attorney** [4] - 40:3, 53:14, 57:10
**attorneys** [2] - 13:17, 97:18
**attribute** [4] - 8:9, 151:10, 170:6, 170:10
**attributed** [1] - 8:6
**attributing** [3] - 8:17, 103:13, 123:5
**attribution** [3] - 7:22, 7:24, 8:18
**attributions** [1] - 123:5
**auditing** [1] - 94:8
**August** [16] - 10:5, 16:14, 18:12, 20:19, 20:23, 21:4, 21:6, 21:17, 21:19, 21:23, 22:4, 22:7, 22:11, 23:14, 23:22, 42:25
**Australia** [1] - 58:20
**authentication** [1] - 25:2
**authority** [2] - 100:21, 154:2
**authorization** [1] - 13:9
**authors** [1] - 129:25
**automated** [1] - 172:13
**automatic** [1] - 172:20
**automatically** [5] - 171:6, 171:8, 171:10, 171:14, 171:20
**availability** [3] - 21:15, 22:20, 23:22
**available** [12] - 4:5, 7:6, 19:8, 21:20, 22:12, 22:15, 22:16, 22:22, 73:20, 76:4, 137:23, 179:17
**Avenue** [3] - 1:14, 1:22, 185:11
**average** [7] - 58:17,

105:9, 112:7, 170:20, 170:21, 171:1, 173:2
**aviation** [3] - 65:2, 65:3, 65:6
**awarded** [4] - 92:24, 92:25, 93:5
**aware** [13] - 42:11, 73:2, 73:7, 123:10, 130:18, 139:17, 145:22, 168:20, 168:25, 169:8, 169:14, 173:18, 173:23
**awful** [1] - 14:6
**awfully** [1] - 10:6

## B

**babysitter** [1] - 33:21
**bachelor's** [3] - 33:11, 92:13, 93:19
**back-of-the-envelope** [1] - 105:5
**background** [6] - 4:14, 33:2, 55:25, 68:16, 68:19, 92:12
**backwards** [3] - 38:5, 38:6, 38:7
**bad** [5] - 42:3, 78:6, 87:6, 98:18
**balances** [1] - 169:19
**Bank** [6] - 116:16, 161:15, 161:18, 161:22, 165:17, 166:3
**bank** [14] - 15:1, 100:11, 101:18, 102:2, 159:12, 159:18, 160:20, 160:24, 161:3, 161:14, 161:17, 161:20, 161:21, 161:24
**banker** [1] - 58:23
**banking** [6] - 132:13, 133:15, 133:20, 134:5, 134:7, 161:19
**bankrupt** [2] - 116:5, 116:6
**bankruptcy** [2] - 115:8, 116:4
**banks** [1] - 100:9
**Bar** [1] - 97:20
**bargained** [2] - 40:17, 40:22
**base** [2] - 73:25, 142:11
**based** [40] - 8:17, 8:25, 15:10, 15:13,

17:14, 19:12, 20:7, 36:4, 50:23, 58:6, 71:7, 74:21, 82:8, 82:10, 82:11, 83:18, 83:23, 88:4, 118:25, 120:21, 121:4, 123:21, 123:22, 141:16, 141:17, 141:18, 143:11, 147:1, 154:2, 154:3, 154:5, 162:11, 162:19, 162:21, 163:14, 163:16, 165:9, 165:17, 165:18, 167:19
**bases** [3] - 27:24, 48:15, 142:5
**basic** [4] - 37:21, 78:19, 100:5, 125:4
**basics** [3] - 14:21, 95:16, 97:22
**basis** [16] - 5:20, 5:24, 11:12, 26:11, 77:2, 142:11, 148:22, 148:24, 148:25, 170:15, 170:17, 170:19, 173:1, 173:6
**became** [2] - 127:16, 129:10
**become** [4] - 57:8, 133:22, 135:20, 155:2
**becomes** [2] - 98:14, 135:4
**becoming** [1] - 134:20
**BEFORE** [1] - 1:8
**before-and-after** [1] - 78:24
**beforehand** [1] - 18:1
**began** [5] - 70:20, 111:10, 134:15, 154:18, 155:4
**begin** [2] - 87:1, 132:1
**begun** [1] - 20:21
**behalf** [3] - 45:12, 139:24, 139:25
**behavior** [1] - 147:2
**behind** [2] - 99:11, 127:8
**believes** [1] - 73:23
**belong** [1] - 125:19
**belonging** [1] - 161:21
**benchmark** [1] - 128:7
**benefit** [2] - 108:4, 142:10
**benefits** [1] - 100:17
**best** [10] - 11:15, 48:1, 72:9, 72:19, 89:17, 89:19, 94:18, 128:12, 135:16,

185:6
**better** [5] - 19:9, 24:17, 47:17, 66:3, 91:13
**between** [10] - 8:16, 37:20, 66:8, 73:18, 90:25, 105:11, 128:19, 148:10, 172:11, 172:17
**beyond** [5] - 19:7, 19:16, 26:3, 67:25, 100:25
**bias** [110] - 36:5, 36:6, 36:7, 36:8, 36:11, 36:12, 36:13, 36:15, 37:13, 38:1, 38:3, 38:9, 38:11, 38:18, 39:18, 39:22, 39:24, 40:5, 41:23, 42:1, 42:4, 42:5, 42:12, 42:15, 42:21, 43:9, 43:25, 44:1, 44:2, 44:5, 44:9, 44:12, 45:8, 46:5, 46:7, 46:8, 46:14, 46:19, 48:8, 51:4, 51:5, 51:7, 52:13, 53:3, 53:7, 53:9, 54:11, 54:14, 54:23, 55:7, 57:10, 58:14, 60:2, 62:10, 63:4, 65:12, 70:22, 70:25, 72:5, 72:12, 72:17, 72:18, 72:19, 72:21, 72:24, 73:13, 73:16, 74:7, 74:10, 74:15, 74:18, 74:20, 75:10, 76:6, 77:8, 78:6, 78:9, 78:21, 79:5, 79:8, 79:10, 79:12, 79:13, 80:1, 80:5, 80:9, 82:5, 83:20, 84:2, 85:11, 85:22, 86:1, 86:3, 86:10, 86:18, 86:20, 87:7, 87:17, 87:20, 87:24, 89:4, 89:7, 90:5, 90:17, 90:21, 90:25, 146:1
**biased** [8] - 42:3, 53:11, 65:19, 72:2, 74:25, 75:6, 75:7, 79:2
**biases** [5] - 42:7, 42:8, 53:16, 71:21, 71:23
**big** [3] - 16:21, 70:8, 100:3
**bigger** [1] - 98:14
**bill** [3] - 12:5, 25:2, 177:11
**billion** [3] - 128:5,

128:20, 172:7
**billionaire** [1] - 105:23
**Binance** [2] - 138:25
**binder** [3] - 31:6, 31:13, 31:23
**bio** [1] - 136:10
**Bisbee** [7] - 9:16, 10:23, 26:16, 26:21, 28:16, 49:6, 144:10
**Bisbee's** [3] - 9:20, 27:9, 29:5
**bit** [15] - 8:7, 9:8, 11:3, 35:12, 36:10, 41:25, 56:3, 60:13, 67:9, 76:5, 76:8, 116:3, 119:12, 120:16
**bitcoin** [111] - 98:17, 102:14, 103:14, 104:23, 105:7, 105:8, 105:17, 105:19, 105:20, 105:23, 105:25, 106:3, 106:4, 106:5, 106:6, 106:7, 106:8, 106:12, 106:15, 106:22, 107:8, 107:11, 107:23, 109:3, 109:17, 110:2, 110:5, 110:8, 110:14, 110:24, 112:6, 112:7, 112:14, 112:15, 112:19, 112:20, 113:3, 113:8, 113:10, 113:16, 114:5, 114:13, 115:1, 115:2, 116:7, 116:25, 122:11, 122:16, 123:6, 123:25, 124:8, 124:9, 124:11, 124:13, 125:11, 125:13, 125:23, 128:23, 137:20, 143:23, 146:16, 148:9, 148:12, 148:13, 149:16, 149:17, 150:6, 154:23, 155:8, 155:17, 158:19, 162:6, 162:19, 162:22, 163:1, 163:4, 163:10, 163:15, 163:16, 163:17, 163:22, 163:23, 164:1, 164:10, 164:12, 164:24, 165:21, 166:4, 166:24, 167:3, 167:5, 167:8,

167:11, 167:14, 167:21, 167:22, 168:25, 169:2, 169:9, 170:7, 170:9, 172:2, 172:5, 172:23, 173:25, 174:11
**Bitcoin** [81] - 8:20, 59:10, 61:19, 85:6, 85:10, 98:4, 98:16, 98:18, 100:6, 100:14, 100:23, 101:11, 101:12, 101:13, 101:15, 102:16, 102:19, 104:7, 104:16, 104:19, 104:25, 105:1, 105:7, 105:9, 105:20, 106:13, 106:15, 107:8, 107:14, 107:16, 110:4, 110:12, 110:14, 110:18, 111:7, 113:6, 113:12, 113:19, 114:3, 114:23, 115:11, 115:15, 118:13, 123:22, 123:23, 125:2, 125:4, 128:1, 129:6, 137:18, 137:19, 137:23, 143:5, 147:12, 148:23, 150:13, 150:14, 154:21, 155:11, 156:7, 163:20, 164:7, 164:12, 164:13, 164:15, 164:18, 165:5, 165:10, 166:11, 167:1, 167:13, 167:17, 169:18, 171:5, 171:10, 172:2, 172:12, 173:7, 173:11, 174:15
**BitcoinFog.com** [3] - 108:12, 108:20, 109:2
**bitcoins** [6] - 98:19, 103:10, 112:17, 127:19, 165:23, 166:24
**black** [5] - 119:20, 121:2, 145:5, 145:13, 159:6
**blinding** [1] - 72:9
**blinds** [1] - 38:10
**block** [7] - 59:21, 78:2, 84:20, 102:19,

118:17, 140:18, 155:9
**Blockchain** [1] - 136:22
**blockchain** [134] - 7:5, 7:14, 12:2, 14:10, 14:16, 14:21, 14:22, 19:21, 19:22, 36:21, 36:25, 57:25, 59:3, 59:8, 59:9, 59:12, 59:14, 59:17, 61:14, 61:16, 61:18, 62:22, 63:5, 63:7, 70:22, 70:25, 71:3, 71:6, 71:14, 72:5, 73:3, 73:9, 77:2, 77:9, 77:11, 77:12, 77:13, 77:17, 77:20, 77:25, 84:16, 88:13, 89:13, 89:15, 95:14, 95:16, 95:17, 95:20, 96:2, 96:4, 96:9, 96:10, 96:12, 96:13, 96:18, 96:20, 97:6, 97:12, 97:15, 97:22, 97:23, 98:3, 98:4, 99:7, 99:11, 99:21, 99:25, 100:20, 100:22, 101:3, 101:5, 101:10, 101:14, 102:16, 102:17, 102:19, 103:19, 103:22, 103:23, 103:24, 113:20, 113:22, 113:24, 114:14, 117:24, 117:25, 118:6, 118:11, 118:15, 118:18, 118:19, 119:21, 120:24, 121:13, 123:6, 123:22, 125:5, 137:23, 139:8, 139:15, 140:14, 140:15, 140:16, 140:17, 140:20, 140:25, 141:11, 141:14, 141:20, 142:4, 142:8, 142:18, 142:22, 142:24, 143:9, 144:1, 144:4, 146:5, 147:20, 148:23, 149:5, 149:6, 151:20, 157:14, 157:16, 158:12, 169:23
**blockchain.com** [2] - 59:18, 102:18
**blockchains** [5] - 98:5, 100:24,

100:25, 118:1, 139:8
**Blockchair** [1] - 59:18
**blocked** [1] - 176:7
**blocks** [1] - 101:22
**blowup** [1] - 115:13
**board** [3] - 137:15, 139:2, 140:7
**bomber** [1] - 35:8
**bono** [3] - 120:8, 134:21, 135:4
**book** [7] - 107:18, 115:2, 130:7, 136:15, 136:20, 136:23, 137:4
**border** [1] - 100:12
**bottom** [1] - 45:14
**bought** [8] - 115:19, 116:1, 164:13, 164:14, 164:16, 165:8, 166:24, 167:24
**bouncing** [1] - 112:15
**box** [5] - 119:20, 121:2, 145:5, 145:13, 159:6
**brain** [20] - 35:16, 35:17, 36:16, 36:17, 37:12, 37:15, 37:17, 37:18, 37:21, 42:13, 46:6, 71:10, 71:12, 71:15, 71:16, 71:19, 71:22, 76:15, 79:12, 87:11
**brains** [1] - 37:19
**branch** [1] - 132:18
**Breadcrumbs** [1] - 59:18
**break** [10] - 60:23, 67:4, 67:12, 67:18, 70:14, 70:15, 91:17, 131:4, 176:16, 178:8
**breaking** [2] - 178:20, 178:22
**brief** [5] - 28:2, 28:10, 84:13, 97:11, 122:6
**briefed** [2] - 29:14, 88:9
**briefing** [1] - 30:15
**briefly** [12] - 68:22, 69:20, 88:22, 93:3, 93:24, 109:10, 114:16, 117:22, 121:18, 127:2, 127:6, 130:9
**bring** [4] - 47:13, 83:22, 90:19, 108:2
**broad** [1] - 29:16
**brought** [5] - 49:19, 89:2, 89:18, 147:12, 147:14

**BROWN** [36] - 1:10, 45:1, 51:16, 52:5, 52:19, 54:2, 55:11, 55:12, 67:7, 70:19, 81:6, 82:3, 85:4, 88:15, 131:10, 131:17, 131:25, 135:19, 138:15, 142:3, 144:6, 144:7, 145:3, 145:11, 155:5, 155:19, 157:4, 158:23, 160:16, 160:17, 168:3, 171:3, 175:22, 178:22, 179:16, 180:3
**Brown** [31] - 2:6, 2:12, 3:9, 3:10, 22:17, 45:4, 51:15, 53:20, 54:19, 55:5, 67:1, 70:18, 84:24, 88:22, 89:24, 131:8, 131:9, 131:11, 131:14, 131:23, 142:17, 144:4, 144:5, 160:15, 168:2, 175:20, 176:22, 178:20, 179:19, 179:23, 179:24
**browser** [1] - 108:22
**building** [3] - 99:25, 120:7, 120:14
**built** [2] - 64:1, 107:23
**bunch** [2] - 17:1, 61:20
**bureaucracy** [1] - 56:11
**business** [1] - 99:20
**Business** [1] - 96:4
**busy** [1] - 57:11
**buy** [2] - 165:20, 174:3
**buyers** [1] - 169:9
**buying** [5] - 112:22, 113:3, 113:5, 113:9, 124:18
**BY** [31] - 33:1, 41:18, 43:16, 45:1, 55:12, 70:19, 81:6, 82:3, 85:4, 88:20, 92:8, 97:9, 107:3, 117:18, 121:17, 129:1, 130:19, 131:25, 135:19, 138:15, 142:3, 144:7, 145:3, 145:11, 155:5, 155:19, 157:4, 158:23, 160:17, 168:3, 171:3

# C

**calculate** [1] - 87:22
**calculation** [4] - 105:5, 162:12, 163:5, 166:10
**calculator** [2] - 105:25, 166:9
**calendar** [3] - 20:25, 21:21, 176:25
**California** [2] - 34:11, 40:4
**Canada** [1] - 177:6
**cancel** [1] - 177:10
**canceled** [1] - 23:15
**cancer** [2] - 69:14, 69:16
**cancerous** [2] - 69:22, 70:1
**candidly** [1] - 14:11
**candor** [1] - 17:23
**cannot** [9] - 56:20, 63:6, 65:5, 81:1, 81:15, 81:17, 81:24, 87:21, 104:18
**cap** [1] - 128:23
**capable** [1] - 35:15
**capacity** [1] - 140:23
**Capone** [1] - 93:14
**capped** [2] - 55:16, 56:5
**cards** [1] - 114:24
**care** [2] - 107:19, 157:9
**careful** [4] - 15:18, 102:6, 108:7, 110:19
**carefully** [4] - 12:21, 120:16, 131:21, 150:23
**case** [145] - 3:25, 4:13, 7:9, 9:12, 11:9, 11:23, 12:1, 12:6, 12:16, 14:7, 14:9, 16:1, 17:4, 17:13, 18:13, 31:10, 35:7, 36:24, 38:12, 39:16, 40:9, 40:12, 40:13, 40:15, 40:19, 42:23, 43:7, 43:11, 43:18, 44:2, 44:6, 44:9, 44:10, 44:12, 45:5, 45:8, 47:3, 47:17, 49:18, 51:5, 51:6, 51:9, 51:18, 52:2, 52:3, 53:1, 53:25, 54:13, 54:14, 55:8, 55:13, 55:20, 56:1, 56:22, 56:23, 57:8, 57:12, 57:14, 57:19, 58:5, 58:6, 64:19,

72:4, 72:5, 72:6, 73:7, 73:12, 73:15, 73:17, 74:7, 74:8, 74:13, 74:18, 75:14, 76:24, 78:24, 80:9, 80:13, 80:24, 81:12, 81:20, 82:24, 84:11, 86:1, 86:16, 87:8, 87:22, 89:4, 89:19, 95:23, 101:10, 101:12, 104:2, 104:3, 114:18, 116:8, 117:9, 117:16, 122:7, 123:13, 124:25, 126:14, 130:7, 130:16, 132:15, 133:4, 133:5, 134:8, 134:13, 134:20, 134:25, 135:10, 135:20, 135:22, 136:1, 138:12, 140:13, 140:16, 140:23, 141:6, 141:9, 141:11, 141:15, 141:17, 141:22, 148:5, 154:12, 155:18, 159:9, 159:17, 160:2, 160:12, 160:19, 162:13, 163:13, 164:20, 168:5, 171:24, 176:17, 177:17, 178:19, 179:12, 179:13
**Case** [1] - 3:2
**cases** [18] - 13:16, 40:12, 40:17, 40:21, 40:25, 44:3, 53:13, 55:22, 56:25, 57:4, 57:7, 68:6, 82:4, 82:17, 83:8, 84:3, 96:13, 132:21
**cast** [1] - 119:6
**catch** [1] - 176:2
**caused** [1] - 83:4
**caution** [2] - 4:8, 6:25
**caveat** [1] - 54:24
**cell** [1] - 69:22
**cells** [3] - 69:9, 69:22, 70:1
**central** [7] - 97:25, 99:1, 99:9, 99:17, 99:21, 100:21, 118:11
**centralized** [2] - 108:5, 157:7
**CEO** [1] - 115:4
**certain** [13] - 5:7, 5:12,

37:19, 37:20, 38:10, 41:22, 53:17, 62:13, 62:19, 74:2, 85:8, 122:15, 143:14
**certainly** [4] - 13:10, 52:1, 113:25, 165:17
**certainty** [1] - 121:21
**CERTIFICATE** [1] - 185:1
**certification** [6] - 93:25, 96:1, 96:3, 96:7, 111:4, 117:4
**certifications** [1] - 92:19
**certified** [5] - 92:22, 93:1, 95:8, 95:11, 95:12
**Certified** [5] - 92:23, 92:24, 93:1, 93:2, 93:4
**certify** [1] - 185:3
**CFE** [4] - 92:24, 93:17, 93:18, 93:19
**CFF** [13] - 92:23, 93:4, 93:6, 93:9, 93:15, 93:18, 93:20, 93:25, 94:1, 95:9, 96:1, 111:4, 117:4
**chain** [23] - 59:21, 78:2, 84:20, 94:17, 95:20, 96:20, 96:24, 98:10, 98:12, 99:22, 101:14, 101:20, 113:17, 113:18, 114:5, 119:23, 122:11, 125:7, 125:24, 126:4, 126:25, 127:19, 141:3
**Chainalysis** [43] - 10:18, 10:19, 15:16, 27:11, 27:15, 29:5, 29:18, 30:11, 30:13, 43:19, 49:8, 81:11, 90:3, 117:20, 117:23, 118:1, 118:22, 118:23, 119:19, 120:1, 120:12, 120:22, 122:6, 122:25, 125:6, 125:18, 126:14, 129:10, 142:19, 142:20, 144:10, 145:5, 145:13, 146:3, 146:4, 146:11, 146:14, 146:20, 157:16, 158:6, 158:12, 158:25, 159:4

**Chainalysis's** [9] - 119:1, 126:22, 130:15, 143:10, 145:19, 145:22, 156:17, 156:19, 159:6
**Chainalysis-level** [1] - 142:20
**challenge** [5] - 4:12, 6:20, 6:22, 7:2, 27:2
**challenging** [2] - 4:20, 7:16
**chance** [1] - 112:23
**change** [18] - 29:9, 30:11, 37:16, 54:25, 112:13, 117:19, 118:18, 124:15, 124:19, 125:23, 126:5, 147:18, 148:16, 149:3, 151:5, 151:18, 174:4
**changed** [3] - 99:5, 105:10, 171:2
**changes** [8] - 28:7, 29:10, 30:12, 96:21, 98:9, 113:24, 118:6, 118:7, 138:10
**changing** [4] - 12:6, 12:12, 12:16, 69:23
**characteristics** [1] - 152:2
**characterize** [2] - 100:20, 156:10
**charge** [4] - 99:10, 99:18, 134:11
**chart** [1] - 167:5
**check** [4] - 24:7, 84:17, 135:11, 176:24
**checking** [1] - 66:9
**checks** [2] - 94:3, 116:18
**Chief** [1] - 39:23
**choose** [1] - 57:5
**Chris** [1] - 45:4
**CHRISTOPHER** [1] - 1:10
**CipherTrace** [2] - 17:18, 144:23
**circumstance** [2] - 68:3, 68:4
**circumstances** [3] - 61:4, 68:11, 68:12
**cite** [1] - 35:9
**cited** [1] - 151:25
**civil** [2] - 27:1, 30:4
**civil-style** [1] - 27:1
**CJA** [5] - 13:1, 13:13, 13:17, 13:18, 177:11
**claim** [5] - 171:5,

171:19, 173:10, 173:14, 173:24
**claiming** [3] - 8:13, 8:19, 71:2
**claims** [1] - 27:15
**classes** [3] - 95:2, 95:7, 95:25
**clear** [28] - 7:1, 8:2, 17:10, 17:11, 19:20, 29:15, 45:6, 46:1, 54:2, 54:7, 56:23, 69:10, 79:10, 80:4, 90:21, 107:4, 108:14, 109:4, 109:17, 118:9, 132:10, 133:21, 134:16, 134:18, 147:9, 155:10, 156:7, 179:10
**clearest** [1] - 96:13
**clearly** [2] - 120:18, 156:21
**clearnet** [4] - 8:21, 108:12, 108:20, 109:17
**clerk** [1] - 179:25
**client** [3] - 16:11, 132:22, 177:4
**client's** [1] - 16:9
**close** [3] - 5:13, 5:16, 145:22
**closed** [2] - 25:13, 25:20
**closely** [2] - 82:16, 149:24
**closer** [2] - 4:7, 105:15
**cluster** [6] - 85:6, 122:11, 144:14, 146:15, 146:16, 172:12
**clustering** [6] - 105:3, 122:15, 123:5, 146:20, 146:21, 146:23
**clusters** [1] - 144:12
**co** [21] - 62:4, 62:7, 62:9, 122:22, 122:24, 123:3, 123:19, 123:21, 126:2, 126:8, 127:3, 129:5, 146:25, 147:1, 147:5, 147:6, 147:11, 149:3, 150:22, 151:16, 151:21
**co-counsel** [1] - 126:2
**co-spend** [14] - 122:22, 122:24, 123:3, 123:19,

123:21, 126:8, 127:3, 129:5, 147:6, 147:11, 149:3, 150:22, 151:16, 151:21
**co-spending** [5] - 62:4, 62:7, 62:9, 146:25, 147:1
**co-spends** [1] - 147:5
**Coast** [2] - 178:4, 178:5
**Code** [1] - 96:22
**code** [10] - 15:15, 29:4, 29:9, 29:24, 30:11, 49:8, 49:12, 49:15, 72:13, 140:3
**coders** [1] - 139:14
**cognition** [2] - 33:16, 71:12
**Cognitive** [3] - 56:13, 56:17, 58:16
**cognitive** [76] - 36:5, 36:6, 36:8, 36:11, 37:3, 37:25, 38:14, 39:18, 39:22, 39:24, 40:5, 41:23, 42:12, 43:9, 43:25, 44:1, 45:8, 46:5, 46:7, 46:8, 48:8, 51:4, 51:7, 52:13, 53:9, 54:11, 54:14, 54:23, 55:7, 57:10, 58:14, 60:2, 62:10, 65:11, 70:22, 70:25, 71:21, 71:23, 72:5, 72:17, 72:21, 72:23, 73:13, 73:16, 74:6, 74:18, 74:20, 75:10, 76:6, 76:16, 78:9, 79:7, 79:10, 79:12, 79:13, 80:1, 80:5, 80:9, 82:5, 83:20, 84:1, 85:11, 85:22, 86:10, 86:18, 86:20, 87:7, 87:11, 87:20, 89:4, 89:7, 90:5, 90:17, 90:21, 90:25
**cognizant** [1] - 94:25
**coin** [3] - 108:7, 136:19, 137:22
**Coinbase** [2] - 138:6, 138:22
**coinjoin** [38] - 108:6, 127:4, 127:6, 127:8, 127:20, 128:12, 128:17, 143:15, 147:6, 149:20, 149:25, 150:2, 150:18, 151:1, 151:20, 151:24,

152:3, 152:9, 152:14, 152:25, 153:3, 154:8, 154:9, 155:16, 155:20, 155:21, 156:5, 156:13, 156:21, 157:11, 157:12, 157:19, 157:20, 158:6, 158:19, 158:20, 158:25, 159:4
**coinjoins** [19] - 127:14, 128:2, 128:11, 128:17, 129:5, 129:13, 147:16, 149:14, 149:19, 149:24, 150:19, 150:25, 151:7, 151:11, 151:12, 152:2, 152:13, 155:13, 158:4
**Cointelegraph** [1] - 136:9
**Coke** [1] - 124:18
**collaborate** [1] - 94:19
**collaborator** [1] - 63:25
**colleague** [2] - 120:22, 145:14
**colleagues** [2] - 120:5, 120:13
**collect** [1] - 64:13
**collecting** [1] - 114:24
**COLUMBIA** [1] - 1:1
**Columbia** [2] - 40:10, 56:23
**column** [1] - 136:9
**combination** [1] - 117:25
**comfortable** [11] - 75:13, 117:1, 119:19, 120:4, 120:14, 120:23, 121:1, 121:10, 134:21, 135:5, 172:22
**coming** [4] - 14:7, 20:8, 44:17, 48:11
**comment** [4] - 43:20, 52:8, 68:22, 68:23
**commerce** [1] - 139:9
**Commercial** [1] - 96:22
**commingles** [1] - 175:9
**Commission** [7] - 52:10, 52:16, 52:18, 72:12, 79:21, 79:24, 89:23

**commissioned** [3] - 10:18, 38:22, 38:23
**committee** [1] - 12:22
**common** [5] - 111:11, 147:3, 148:4, 148:23, 148:24
**commonalities** [1] - 37:19
**commonly** [5] - 147:2, 147:19, 149:5, 149:12
**communicates** [1] - 118:7
**community** [2] - 149:5, 149:6
**companies** [4] - 98:16, 100:3, 139:12, 157:16
**company** [11] - 56:13, 56:15, 56:16, 58:16, 58:23, 63:15, 63:24, 90:2, 90:7, 99:17, 146:16
**comparable** [2] - 165:18, 170:24
**compare** [1] - 78:17
**compared** [1] - 152:16
**comparing** [3] - 75:17, 146:4, 146:15
**comparison** [1] - 169:17
**compel** [4] - 15:12, 15:15, 28:25, 50:22
**compelling** [1] - 164:4
**competent** [3] - 34:2, 35:15, 37:6
**complaint** [1] - 12:17
**complete** [3] - 18:18, 67:5, 185:5
**completely** [2] - 8:21, 52:24
**complex** [2] - 39:1, 119:13
**complexity** [2] - 14:25, 76:13
**compliance** [3] - 95:1, 116:18, 157:17
**complicate** [1] - 87:15
**complicated** [5] - 39:1, 76:8, 78:22, 95:22, 101:19
**comply** [1] - 113:10
**component** [2] - 133:15, 143:21
**components** [3] - 132:14, 133:18, 133:24
**comprehensive** [1] - 159:24
**compressed** [1] -

21:16
**computer** [19] - 3:24, 4:13, 4:14, 5:8, 59:7, 72:13, 94:15, 94:19, 94:20, 96:15, 100:13, 118:5, 132:1, 132:4, 132:5, 132:7, 132:9, 139:13, 140:2
**computers** [2] - 98:8, 118:14
**concentration** [1] - 92:16
**concept** [2] - 36:10, 118:9
**concepts** [1] - 113:25
**concern** [1] - 89:5
**concerned** [2] - 16:22, 16:23
**concerns** [2] - 19:19, 20:6
**conclude** [3] - 28:1, 55:3, 68:14
**conclusion** [19] - 36:4, 38:7, 66:9, 72:2, 74:14, 76:18, 79:18, 81:1, 86:4, 86:5, 87:1, 87:2, 87:23, 88:11, 111:6, 112:9, 112:11
**conclusions** [5] - 62:17, 66:6, 80:21, 86:8, 142:5
**concrete** [1] - 35:21
**condition** [1] - 80:5
**conduct** [9] - 72:8, 85:5, 111:22, 139:23, 153:7, 153:9, 154:7, 161:9, 162:4
**conducted** [14] - 59:12, 65:9, 65:11, 65:14, 70:21, 140:13, 140:16, 141:10, 142:12, 142:13, 142:21, 144:12, 162:1, 162:3
**conducting** [2] - 94:5, 131:7
**conference** [6] - 21:4, 21:10, 24:4, 178:8
**Conference** [1] - 23:25
**conferring** [1] - 30:17
**confidence** [1] - 79:6
**confidential** [1] - 66:21
**confirm** [2] - 24:4, 24:6
**confirmation** [2] -

38:9, 46:14
**confirmed** [2] - 86:8, 152:15
**conflict** [1] - 22:17
**conflicted** [2] - 36:4, 119:7
**conflicting** [1] - 26:10
**conflicts** [1] - 94:3
**confound** [1] - 156:16
**confounds** [2] - 126:21, 129:13
**confuse** [1] - 101:11
**confusing** [1] - 74:23
**Congress** [1] - 132:17
**conjunction** [1] - 49:16
**connect** [2] - 39:7, 120:2
**connected** [4] - 102:12, 102:13, 102:14, 108:3
**connection** [1] - 99:17
**conservative** [1] - 105:13
**consider** [4] - 84:14, 117:3, 117:6, 143:25
**considerable** [3] - 64:5, 64:9, 64:25
**consideration** [3] - 12:23, 25:12, 25:19
**considered** [1] - 80:2
**consistent** [4] - 104:20, 106:14, 109:25, 112:6
**constitutes** [1] - 185:4
**Constitution** [2] - 1:22, 185:11
**constraints** [2] - 36:16, 71:16
**Consultants** [3] - 56:13, 56:17, 58:17
**contain** [1] - 61:2
**contained** [13] - 101:20, 109:14, 110:24, 129:22, 136:6, 140:20, 141:17, 141:19, 142:5, 144:18, 164:11, 166:14, 168:14
**contains** [5] - 10:16, 60:1, 61:11, 61:20, 62:9
**contamination** [1] - 82:13
**content** [1] - 54:22
**context** [23] - 26:7, 28:4, 62:13, 62:14, 62:17, 69:23, 69:25, 70:1, 70:7, 70:8,

70:9, 70:10, 75:6, 76:18, 80:18, 80:25, 87:24, 88:3, 88:23, 89:8, 111:4, 116:23
**contextual** [26] - 60:1, 60:12, 60:17, 61:2, 61:22, 61:24, 61:25, 62:9, 62:20, 65:25, 72:10, 73:24, 74:5, 74:10, 74:22, 74:25, 75:17, 76:4, 76:15, 76:22, 77:4, 77:7, 77:10, 77:15, 78:1, 89:16
**contingent** [2] - 22:13, 163:11
**continuance** [2] - 20:12, 20:16
**continue** [9] - 29:19, 44:21, 59:20, 67:19, 70:18, 98:9, 118:24, 144:5, 176:5
**continued** [1] - 145:2
**continues** [1] - 54:19
**continuing** [7] - 95:2, 95:5, 95:8, 95:13, 95:25, 97:14, 97:18
**contracts** [2] - 58:25, 90:4
**contrasted** [1] - 60:19
**contributed** [1] - 83:10
**control** [14] - 19:7, 19:16, 19:18, 42:11, 42:12, 99:10, 103:10, 113:19, 114:2, 124:4, 124:14, 126:17, 158:6
**controlled** [5] - 98:8, 98:13, 99:17, 116:1, 122:13
**controlling** [1] - 126:9
**controls** [5] - 98:3, 99:21, 100:22, 101:25, 124:10
**conversation** [2] - 30:7, 135:3
**conversations** [1] - 30:21
**conversion** [1] - 165:19
**converted** [1] - 111:19
**conveying** [1] - 84:22
**convicted** [2] - 83:3, 83:9, 84:8
**conviction** [5] - 83:4, 83:6, 83:11, 83:13, 83:15
**convictions** [2] -

83:19, 84:3
**cooperative** [1] - 42:5
**coordinate** [1] - 154:8
**coordinated** [1] - 151:7
**coordination** [1] - 150:20
**coordinator** [2] - 151:11, 153:18
**coordinators** [4] - 149:23, 150:7, 150:19, 157:6
**copies** [3] - 31:8, 31:20, 118:13
**copy** [4] - 31:18, 32:3, 118:15, 141:24
**copyright** [1] - 98:23
**core** [1] - 27:13
**corporate** [1] - 134:7
**correct** [105] - 5:11, 45:15, 45:18, 45:21, 46:3, 46:16, 54:21, 56:24, 57:2, 57:3, 57:15, 58:10, 59:3, 59:4, 60:21, 61:5, 62:24, 63:22, 65:9, 65:12, 66:2, 72:17, 72:25, 73:3, 73:10, 74:7, 77:4, 77:18, 79:9, 79:17, 82:19, 85:24, 86:10, 87:20, 88:13, 88:14, 89:21, 89:22, 95:15, 100:19, 103:25, 104:1, 107:5, 107:6, 109:19, 112:1, 118:20, 122:17, 122:18, 124:20, 124:21, 130:24, 132:12, 132:20, 133:1, 133:9, 133:10, 133:12, 134:5, 136:14, 136:16, 137:2, 137:5, 137:9, 137:11, 137:12, 137:16, 137:24, 139:3, 140:1, 140:3, 140:4, 140:9, 145:1, 146:12, 146:13, 147:10, 148:1, 148:10, 148:14, 148:20, 148:23, 148:25, 149:18, 149:19, 149:22, 150:4, 150:11, 150:18, 150:22, 150:25, 151:6, 151:14, 151:15, 152:10, 152:11,

152:17, 153:23, 154:14, 154:15, 155:11, 162:9, 171:7, 173:16
**correctly** [5] - 5:5, 8:20, 76:2, 103:19, 122:14
**corresponding** [1] - 73:18
**correspondingly** [1] - 150:16
**counsel** [28] - 3:4, 3:5, 3:18, 4:3, 4:15, 7:12, 7:21, 19:2, 19:25, 20:8, 22:11, 22:15, 26:20, 26:25, 29:15, 30:7, 57:13, 58:7, 126:2, 134:16, 135:3, 135:25, 136:1, 159:22, 159:23, 176:19, 179:12, 179:13
**counsel's** [2] - 6:2, 12:23
**counselor** [1] - 51:2
**count** [1] - 143:9
**counter** [1] - 147:24
**counter-example** [1] - 147:24
**countermeasures** [1] - 72:16
**countries** [4] - 34:16, 39:10, 58:10, 58:19
**country** [1] - 138:19
**counts** [1] - 142:19
**couple** [8] - 3:21, 16:4, 16:5, 25:7, 94:24, 149:7, 165:5, 166:14
**course** [8] - 6:7, 29:10, 30:12, 43:22, 84:4, 115:9, 121:23, 167:10
**courses** [2] - 97:15, 97:18
**court** [16] - 3:12, 38:19, 39:6, 39:9, 40:22, 43:2, 43:23, 56:24, 57:1, 57:2, 67:3, 67:17, 88:1, 88:7, 120:17, 158:13
**Court** [48] - 1:21, 1:21, 3:23, 4:6, 4:15, 7:11, 10:5, 10:22, 12:22, 13:7, 14:3, 14:11, 14:20, 14:24, 17:23, 18:23, 20:24, 24:24, 25:1, 25:4, 25:12, 25:14, 25:18, 27:3, 29:15, 29:17, 29:19,

31:8, 31:19, 39:12, 39:17, 39:22, 39:23, 41:3, 41:16, 44:18, 44:19, 50:17, 51:14, 55:1, 66:23, 73:11, 88:8, 92:12, 114:20, 118:4, 127:7, 185:10
**COURT** [194] - 1:1, 3:8, 3:10, 3:13, 3:16, 5:5, 5:15, 5:19, 6:4, 6:13, 6:17, 7:3, 7:19, 8:7, 9:17, 10:6, 10:13, 11:2, 11:11, 12:10, 13:3, 13:6, 13:19, 14:1, 14:5, 14:12, 14:17, 15:23, 16:5, 16:10, 16:22, 17:22, 18:3, 18:20, 19:6, 19:14, 20:17, 21:1, 21:11, 21:18, 21:21, 22:9, 22:20, 22:24, 23:7, 23:14, 24:9, 24:11, 24:16, 25:5, 25:9, 25:21, 25:24, 26:19, 27:6, 27:25, 28:18, 28:21, 29:12, 29:21, 30:1, 30:14, 30:23, 31:5, 31:10, 31:21, 32:1, 32:11, 32:16, 32:22, 40:9, 40:19, 40:23, 41:1, 41:7, 41:14, 41:17, 43:3, 43:5, 44:11, 44:15, 44:21, 44:23, 46:22, 47:8, 47:11, 47:25, 48:13, 49:2, 49:11, 49:14, 49:20, 50:6, 50:14, 51:1, 51:12, 51:15, 52:4, 52:9, 52:22, 53:20, 54:7, 54:21, 55:2, 67:1, 67:10, 67:16, 69:7, 70:3, 70:13, 70:18, 81:2, 81:5, 81:23, 84:24, 88:17, 90:10, 90:13, 91:5, 91:12, 91:17, 91:20, 92:4, 96:8, 97:7, 106:23, 117:10, 120:15, 120:20, 127:21, 128:6, 128:16, 128:19, 128:25, 131:3, 131:7, 131:9, 131:11, 131:14, 135:16, 138:5, 141:24, 142:1, 142:9, 143:1, 143:8, 143:13, 143:20, 144:3, 144:24, 145:7, 145:9,

154:17, 155:14, 156:22, 157:3, 158:13, 159:15, 160:1, 160:8, 160:14, 162:17, 163:12, 164:20, 165:11, 165:25, 166:16, 166:19, 167:12, 167:22, 168:1, 170:21, 175:20, 176:3, 176:9, 176:12, 176:21, 177:1, 177:8, 177:12, 177:20, 177:24, 178:1, 178:3, 178:5, 178:13, 178:17, 178:19, 178:24, 179:9, 179:18, 179:23, 180:6, 185:1
**Court's** [5] - 18:25, 19:12, 21:14, 26:23, 52:20
**courthouse** [1] - 96:24
**Courthouse** [1] - 1:22
**courtroom** [3] - 15:19, 15:20, 179:11
**COURTROOM** [9] - 3:2, 32:17, 32:20, 91:24, 92:2, 131:23, 179:20, 180:2, 180:4
**courts** [3] - 14:17, 39:4, 56:19
**cover** [7] - 4:9
**covered** [4] - 4:13, 28:17, 43:8, 81:4
**covers** [1] - 160:16
**CPA** [3] - 93:3, 93:5, 93:18
**CPAs** [2] - 93:11, 93:15
**crash** [1] - 65:5
**CRC** [2] - 1:21, 185:9
**create** [2] - 125:24, 162:14
**created** [3] - 93:10, 108:4, 109:5
**creates** [1] - 98:20
**creating** [1] - 94:6
**creation** [1] - 88:23
**creator** [1] - 173:11
**credentials** [1] - 43:8
**credible** [5] - 50:15, 154:1, 154:2, 172:3, 172:4
**crime** [6] - 78:17, 82:15, 86:22, 89:10, 110:11, 174:13
**crimes** [1] - 94:11

**Criminal** [2] - 1:2, 3:2
**criminal** [32] - 12:16, 73:23, 75:3, 75:16, 78:20, 82:4, 82:14, 84:3, 86:21, 89:1, 90:1, 110:17, 132:19, 132:20, 132:21, 132:23, 133:4, 133:5, 133:8, 133:12, 133:13, 133:15, 133:18, 133:22, 133:24, 134:1, 134:3, 134:25, 136:3, 136:4, 136:6, 171:25
**criminals** [2] - 86:23, 95:17
**critical** [1] - 17:15
**critique** [1] - 163:12
**critiqued** [1] - 149:12
**cross** [8] - 4:25, 5:3, 26:17, 26:21, 27:18, 82:13, 131:5, 131:7
**Cross** [2] - 2:6, 2:12
**CROSS** [2] - 44:24, 131:15
**cross-contamination** [1] - 82:13
**cross-examination** [2] - 5:3, 27:18
**Cross-Examination** [2] - 2:6, 2:12
**CROSS-EXAMINATION** [2] - 44:24, 131:15
**cross-examine** [3] - 4:25, 26:17, 26:21
**CRR** [2] - 1:21, 185:9
**crux** [2] - 18:13, 63:10
**crypto** [23] - 95:3, 95:7, 95:22, 97:3, 97:18, 97:19, 107:17, 107:25, 120:8, 135:22, 135:24, 137:8, 138:8, 138:24, 157:17, 159:13, 159:19, 160:21, 160:24, 161:3, 166:14, 173:5
**Crypto** [2] - 136:21, 136:22
**cryptocurrencies** [3] - 96:2, 107:22, 167:15
**cryptocurrency** [14] - 58:1, 95:1, 104:10, 132:23, 136:15, 136:17, 137:17, 137:21, 137:25, 138:16, 138:20,

139:24, 140:8, 162:19
**cryptographers** [1] - 139:13
**cryptography** [6] - 107:21, 139:6, 139:7, 139:11, 139:16, 140:10
**CSI** [1] - 64:22
**curious** [1] - 43:10
**currencies** [1] - 95:14
**current** [3] - 11:1, 28:8, 102:19
**cursorily** [1] - 27:8
**custody** [1] - 102:6
**custodying** [1] - 102:4
**customer** [1] - 106:24
**cut** [2] - 46:22, 53:21
**CV** [8] - 31:3, 31:4, 31:18, 32:4, 32:5, 32:7, 32:8
**CVA** [2] - 93:1, 93:21
**CVs** [2] - 31:2, 31:8

# D

**D.C** [4] - 1:5, 38:20, 38:23, 185:11
**DA** [2] - 82:15, 90:17
**danger** [2] - 38:1, 87:8
**dangerous** [2] - 129:17, 129:19
**dark** [2] - 109:15, 174:4
**darknet** [1] - 173:3
**data** [77] - 8:13, 10:2, 11:24, 15:7, 15:11, 18:8, 27:14, 36:2, 38:6, 38:8, 49:7, 53:16, 59:25, 60:1, 60:8, 60:16, 61:1, 61:6, 61:11, 61:14, 61:16, 61:18, 61:24, 62:18, 62:19, 63:1, 63:3, 63:8, 63:9, 64:2, 65:24, 66:4, 66:7, 66:10, 66:20, 69:3, 71:24, 74:1, 74:2, 78:4, 79:17, 79:20, 80:16, 80:19, 83:19, 85:15, 85:17, 85:19, 88:3, 88:5, 88:10, 89:18, 95:20, 96:15, 97:23, 99:18, 111:22, 112:22, 112:24, 112:25, 114:17, 117:1, 117:7, 117:8, 117:14, 117:16, 117:24, 117:25,

119:21, 119:22, 146:4, 153:24, 153:25, 154:3, 158:17, 163:7
**database** [1] - 8:10
**date** [25] - 4:7, 16:11, 17:6, 21:2, 21:3, 22:18, 24:2, 24:3, 42:25, 101:22, 135:10, 154:18, 155:3, 163:2, 163:23, 163:24, 164:1, 164:3, 166:3, 166:4, 166:22, 166:23, 166:25
**Dated** [1] - 185:7
**dates** [2] - 20:25, 115:10
**Daubert** [46] - 3:23, 4:7, 4:19, 5:3, 6:21, 7:2, 7:7, 7:8, 7:18, 9:9, 10:9, 15:2, 16:24, 17:2, 21:9, 21:12, 22:1, 22:3, 22:5, 22:12, 23:1, 23:4, 23:16, 23:17, 26:18, 27:1, 27:2, 27:9, 27:13, 27:19, 27:23, 28:23, 38:19, 38:20, 38:22, 38:24, 40:13, 47:18, 48:2, 48:5, 48:10, 48:25, 50:19, 52:5, 58:4, 177:13
**days** [7] - 15:24, 22:14, 25:22, 68:22, 127:15, 150:14, 164:11
**DC** [3] - 1:12, 1:14, 1:23
**DE** [1] - 6:15
**de** [5] - 3:24, 4:21, 6:11, 6:15, 6:19
**deadline** [2] - 20:19, 21:7
**deadlines** [1] - 177:17
**deal** [3] - 16:21, 115:25, 177:18
**dealing** [1] - 119:4
**death** [1] - 3:25
**December** [1] - 19:4
**decentralization** [1] - 118:10
**decentralize** [2] - 99:8, 99:14
**decentralized** [6] - 95:21, 96:14, 98:8, 100:20, 103:20, 118:19
**decide** [10] - 17:3,

33:20, 33:21, 44:1, 51:5, 69:22, 88:4, 99:18, 125:10, 125:25
**decided** [2] - 43:24, 44:3
**deciding** [1] - 53:10
**decision** [21] - 33:22, 33:23, 34:3, 34:7, 36:18, 38:12, 44:6, 44:19, 73:25, 75:8, 75:25, 76:12, 87:12, 87:18, 87:20, 87:25, 88:4, 89:11, 90:16, 91:4, 138:12
**decision-making** [5] - 33:22, 34:3, 34:7, 36:18, 87:12
**decisions** [2] - 33:18, 33:19
**declaration** [2] - 9:20, 84:9
**dedicated** [1] - 34:2
**deed** [1] - 96:23
**deems** [1] - 4:6
**Defendant** [2] - 1:6, 1:15
**defendant** [12] - 3:12, 3:15, 86:7, 89:2, 89:3, 89:9, 89:19, 160:19, 160:22, 161:22, 168:11, 168:20
**defendant's** [8] - 134:17, 162:2, 168:4, 168:12, 168:25, 171:6, 173:19, 173:20
**defendants** [1] - 132:21
**defenders** [2] - 40:6, 90:19
**Defense** [2] - 2:16, 32:13
**defense** [54] - 4:3, 4:11, 4:15, 4:20, 4:25, 5:13, 6:2, 6:10, 6:20, 7:5, 7:12, 18:18, 19:2, 19:7, 19:17, 19:18, 19:25, 20:8, 22:6, 23:18, 24:8, 25:7, 25:19, 26:20, 26:25, 27:22, 28:25, 29:15, 30:10, 31:1, 31:7, 31:24, 32:14, 38:22, 39:14, 40:14, 44:18, 44:20, 47:9, 47:10, 51:2, 51:14, 52:6, 54:8, 57:9, 57:12, 58:7,

83:6, 88:9, 91:22,
121:7, 176:19
**defense's** [1] - 20:13
**define** [4] - 106:23,
123:2, 132:17,
133:13
**definitely** [2] - 59:13,
85:25
**degree** [8] - 59:5,
59:6, 62:25, 79:4,
89:6, 92:13, 92:14,
93:19
**degrees** [4] - 33:3,
33:10, 92:18, 92:19
**delay** [1] - 15:10
**delayed** [2] - 17:8,
21:23
**delink** [1] - 108:1
**delisted** [1] - 138:9
**demonstrate** [3] -
106:5, 106:10, 123:9
**demonstrated** [4] -
62:21, 98:4, 123:12,
123:13
**DEPARTMENT** [1] -
1:13
**Department** [6] -
52:11, 132:25,
133:2, 145:23,
145:24
**department** [1] - 121:6
**department's** [1] -
153:5
**dependent** [1] - 50:1
**deploy** [1] - 123:16
**deposit** [1] - 107:9
**depositions** [1] - 27:1
**deposits** [2] - 104:5,
104:15
**depth** [1] - 115:19
**deputy** [1] - 179:25
**DEPUTY** [9] - 3:2,
32:17, 32:20, 91:24,
92:2, 131:23,
179:20, 180:2, 180:4
**derive** [1] - 124:22
**derived** [2] - 74:2,
85:9
**describe** [17] - 93:3,
101:21, 101:22,
103:13, 112:23,
117:22, 119:21,
136:1, 138:24,
139:4, 142:8,
142:21, 149:10,
152:5, 166:19, 175:2
**described** [24] -
102:18, 109:6,
116:24, 122:7,
129:14, 130:4,

134:10, 134:17,
135:2, 145:20,
148:8, 152:19,
152:24, 153:18,
158:1, 158:11,
159:11, 160:4,
162:6, 163:9,
166:10, 170:18
**describes** [3] -
111:15, 129:15,
129:17
**describing** [6] -
118:23, 130:25,
135:22, 149:11,
175:4
**description** [11] -
29:22, 97:11,
104:20, 119:1,
120:3, 135:25,
138:13, 144:17,
157:22, 159:24,
175:5
**descriptions** [1] -
161:8
**deserves** [1] - 17:16
**designation** [7] -
92:23, 92:24, 93:5,
93:6, 93:9, 93:17,
94:1
**designed** [5] - 98:7,
124:6, 150:23,
151:12, 151:24
**desk** [1] - 31:18
**despite** [1] - 86:18
**destination** [4] -
124:2, 124:3, 124:4,
125:23
**destinations** [1] -
163:10
**detail** [1] - 80:3
**detailed** [2] - 19:3
**details** [4] - 57:12,
66:22, 66:25, 89:6
**detect** [6] - 70:21,
70:25, 152:3,
152:13, 153:21,
158:6
**detective** [3] - 73:23,
77:5, 77:21
**detectives** [2] - 34:11,
82:11
**determination** [2] -
105:2, 164:9
**determinations** [1] -
94:16
**determine** [10] - 51:8,
63:19, 66:18, 69:9,
77:20, 77:21, 78:4,
104:18, 111:17,
169:21

**determined** [2] -
75:19, 75:20
**determining** [2] -
75:9, 75:18
**deterministic** [2] -
27:12, 121:20
**develop** [3] - 72:19,
100:5, 140:2
**developed** [1] - 99:23
**developers** [2] -
99:11, 99:24
**device** [1] - 161:5
**devices** [2] - 4:22,
161:5
**die** [1] - 102:10
**difference** [2] - 90:25,
172:11
**differences** [2] -
37:20, 80:18
**different** [63] - 4:22,
12:4, 12:17, 12:18,
28:12, 34:15, 34:24,
36:4, 36:11, 37:19,
37:20, 42:16, 43:9,
60:16, 62:14, 62:15,
63:2, 63:3, 63:5,
63:9, 63:23, 64:18,
65:25, 66:3, 66:4,
66:5, 66:6, 66:10,
69:2, 71:23, 72:1,
74:1, 74:14, 76:5,
76:18, 79:22, 80:17,
80:20, 80:21, 81:1,
82:15, 85:16, 85:18,
87:23, 91:1, 99:1,
99:2, 109:13, 122:4,
122:5, 125:21,
126:17, 127:8,
136:2, 148:1,
150:22, 151:12,
152:22
**differential** [4] - 170:5,
170:9, 170:12,
172:17
**differently** [2] - 72:1,
144:5
**differs** [1] - 151:16
**difficult** [7] - 26:7,
98:11, 98:15, 102:9,
128:10, 150:3, 170:4
**difficulties** [1] -
150:17
**digging** [1] - 31:17
**digital** [29] - 34:19,
34:21, 34:25, 36:2,
60:5, 60:6, 60:10,
62:11, 62:21, 62:23,
63:12, 63:17, 63:24,
64:1, 64:18, 64:20,
65:16, 66:12, 66:14,

66:17, 66:24, 66:25,
94:20, 95:14, 96:17,
103:20
**digits** [3] - 5:7, 5:9,
62:16
**diligent** [1] - 41:12
**dimension** [1] -
156:20
**dinner** [3] - 67:14,
67:17, 70:15
**Direct** [2] - 2:4, 2:10
**DIRECT** [2] - 32:24,
92:6
**direct** [9] - 10:24,
22:6, 29:8, 105:4,
143:1, 143:13,
144:18, 145:20,
147:24
**directed** [1] - 140:7
**directly** [8] - 27:9,
27:13, 27:19, 27:24,
29:11, 85:9, 140:11,
149:18
**disagree** [3] - 47:4,
50:17, 163:11
**disagreement** [4] -
9:9, 30:18, 50:18,
76:3
**disaster** [1] - 115:21
**discern** [1] - 169:25
**discernible** [1] -
169:22
**discipline** [1] - 72:23
**disclose** [5] - 41:5,
41:12, 83:7, 175:16
**disclosed** [9] - 9:15,
10:11, 10:12, 11:20,
27:18, 41:11, 49:6,
50:23, 51:19
**disclosure** [32] - 7:23,
9:24, 12:15, 20:9,
28:17, 36:20, 43:14,
45:11, 45:12, 45:15,
47:1, 47:23, 50:13,
50:20, 52:6, 81:7,
81:8, 82:21, 83:12,
111:16, 111:25,
112:3, 127:25,
128:15, 129:21,
141:22, 150:24,
151:25, 159:11,
160:18, 160:20,
173:10
**disclosures** [16] -
27:9, 29:5, 32:9,
54:25, 112:11,
127:17, 129:15,
130:5, 136:10,
141:8, 141:13,
141:14, 141:19,

144:18, 159:13,
159:17
**discovery** [16] - 29:1,
30:4, 46:14, 46:18,
47:23, 48:25, 49:2,
57:14, 57:18, 104:2,
104:3, 159:8, 160:2,
160:11, 161:4,
171:21
**discriminatory** [2] -
36:7, 36:15
**discuss** [3] - 3:18,
49:17, 179:6
**discussed** [6] - 29:14,
50:6, 50:7, 146:24,
149:12, 170:20
**discusses** [1] - 27:10
**discussion** [2] -
141:3, 162:6
**discussions** [6] -
7:11, 7:13, 30:17,
134:16, 140:22,
141:2
**dismiss** [1] - 25:17
**dismissed** [1] -
179:25
**distort** [1] - 63:16
**distorting** [1] - 81:8
**distorts** [1] - 36:17
**distributed** [1] - 98:9
**District** [2] - 40:10,
56:22
**DISTRICT** [3] - 1:1,
1:1, 1:8
**district** [5] - 13:17,
40:3, 43:2, 53:14
**divide** [1] - 148:10
**DNA** [9] - 37:2, 37:11,
64:20, 64:22, 65:16,
65:20, 65:21, 65:22,
71:14
**DNS** [1] - 8:20
**Docket** [1] - 43:15
**docket** [1] - 32:10
**Doctor** [1] - 67:20
**doctor** [3] - 37:2, 69:8,
69:14
**doctorate** [1] - 33:4
**doctors** [2] - 37:11,
71:15
**document** [7] - 29:9,
31:13, 52:13, 52:15,
84:19, 161:2, 161:8
**documenting** [2] -
30:12, 130:12
**documents** [7] -
106:5, 106:7,
141:18, 161:12,
161:23, 161:24,
177:16

**DOJ** [5] - 1:11, 34:13, 79:25, 121:5, 133:3
**dollar** [2] - 163:4, 166:7
**dollar-figure** [1] - 163:4
**dollars** [2] - 128:20, 172:7
**dollars'** [1] - 90:4
**domain** [13] - 34:8, 37:6, 61:8, 61:9, 64:17, 64:18, 65:23, 70:11, 71:17, 72:1, 73:5, 78:21, 88:3
**domains** [11] - 34:25, 37:20, 38:17, 38:18, 61:7, 64:17, 64:20, 65:14, 72:2, 76:9, 78:11
**donated** [1] - 125:12
**donations** [1] - 125:11
**done** [45] - 6:1, 6:8, 11:8, 16:4, 16:18, 16:20, 29:19, 34:12, 34:24, 35:3, 35:8, 38:15, 49:7, 50:11, 56:2, 56:12, 59:13, 60:4, 63:20, 64:2, 64:14, 65:23, 66:17, 80:16, 80:22, 80:23, 82:1, 88:6, 88:12, 90:7, 90:8, 90:23, 97:17, 134:25, 140:21, 141:15, 142:19, 142:20, 144:25, 162:24, 166:1, 172:10, 179:1, 179:6
**double** [1] - 24:7
**double-check** [1] - 24:7
**doubt** [1] - 67:22
**down** [18] - 12:6, 12:25, 16:3, 60:13, 60:23, 91:25, 100:9, 103:5, 115:6, 115:18, 117:11, 120:15, 139:1, 158:13, 166:1, 166:17, 169:13, 171:9
**down/bottom** [1] - 37:22
**download** [1] - 102:16
**dozens** [3] - 34:15, 57:6, 80:14
**DR** [4] - 2:3, 32:25, 44:25, 88:19
**Dr** [24] - 24:23, 31:3, 32:7, 32:15, 32:17,

33:2, 42:24, 43:17, 45:2, 47:5, 52:25, 53:24, 54:5, 54:10, 54:22, 55:6, 55:13, 67:12, 70:20, 81:7, 82:4, 88:21, 90:10, 91:5
**dramatically** [1] - 17:8
**draw** [2] - 77:3, 167:19
**dress** [3] - 68:8, 68:9
**drill** [1] - 60:13
**drive** [1] - 63:18
**driven** [1] - 85:15
**drives** [3] - 60:7, 64:1, 66:18
**dropped** [1] - 145:10
**DROR** [4] - 2:3, 32:25, 44:25, 88:19
**Dror** [25] - 24:23, 32:4, 32:15, 32:17, 33:2, 41:19, 42:24, 43:17, 45:2, 47:5, 52:19, 52:25, 53:24, 54:5, 54:10, 54:22, 55:6, 55:13, 67:12, 70:20, 81:7, 82:4, 88:21, 90:10, 91:5
**Dror's** [2] - 31:3, 32:7
**drug** [1] - 12:8
**due** [2] - 19:6, 84:21
**during** [8] - 6:7, 28:11, 73:20, 135:12, 135:13, 154:11, 168:5, 168:20

## E

**e-mailed** [2] - 31:19, 40:14
**early** [16] - 4:15, 6:6, 20:19, 21:20, 110:6, 115:11, 127:15, 129:6, 129:7, 129:10, 150:14, 163:6, 163:15, 164:10, 165:5, 167:7
**earned** [1] - 143:4
**easier** [6] - 93:20, 96:25, 103:14, 150:7, 151:7, 153:21
**easiest** [1] - 103:1
**easily** [6] - 102:17, 110:13, 124:6, 152:23, 153:2, 157:22
**easy** [4] - 12:13, 15:9, 105:5, 156:20
**eBay** [1] - 146:16
**economic** [3] - 97:4, 99:8, 99:10

**economics** [3] - 96:4, 96:8, 96:10
**economy** [2] - 96:12, 96:21
**educate** [4] - 43:25, 44:7, 90:18, 90:19
**educating** [1] - 90:17
**education** [11] - 90:20, 90:23, 95:3, 95:6, 95:8, 95:13, 95:25, 96:5, 97:2, 97:15, 97:18
**educational** [2] - 33:2, 92:11
**effect** [1] - 129:4
**effective** [1] - 52:14
**effectively** [3] - 134:21, 135:4, 139:1
**effects** [1] - 81:9
**efficacy** [4] - 78:8, 78:22, 79:1, 79:7
**efficiency** [2] - 178:6, 178:10
**efficient** [2] - 11:3, 13:18
**effort** [1] - 41:12
**efforts** [1] - 73:8
**eight** [3] - 10:14, 56:21, 148:13
**either** [7] - 25:13, 43:12, 48:18, 94:16, 103:1, 111:21, 128:24
**eKELAND** [1] - 41:18
**EKELAND** [94] - 1:15, 3:11, 7:20, 8:10, 9:18, 10:10, 10:15, 11:10, 11:16, 12:11, 13:5, 13:12, 13:21, 14:2, 14:9, 14:14, 14:20, 16:2, 16:8, 16:13, 17:9, 18:2, 18:4, 22:22, 23:5, 23:11, 24:8, 25:7, 25:10, 25:22, 26:13, 27:7, 28:22, 29:23, 30:10, 30:24, 31:7, 31:20, 32:6, 32:14, 32:21, 32:23, 33:1, 41:4, 41:10, 41:15, 42:23, 43:4, 43:13, 43:16, 44:22, 47:4, 47:10, 47:22, 48:4, 48:23, 49:4, 49:13, 49:16, 50:1, 50:12, 50:16, 51:13, 54:20, 54:24, 80:12, 81:3, 81:21, 88:20, 90:9, 91:10, 91:15, 91:22, 92:3, 92:5, 92:8,

97:9, 107:3, 117:18, 121:17, 129:1, 130:17, 130:19, 131:2, 141:25, 176:1, 176:23, 177:5, 177:9, 177:18, 177:22, 178:11, 178:15, 178:18
**Ekeland** [28] - 1:16, 2:5, 2:8, 2:11, 3:11, 7:19, 11:2, 15:23, 22:20, 27:6, 28:21, 29:21, 41:2, 46:23, 51:12, 54:9, 54:12, 54:18, 67:10, 81:2, 88:17, 91:20, 135:21, 136:7, 176:21, 177:2, 177:21
**elaborate** [4] - 35:12, 36:10, 41:24, 83:24
**element** [4] - 67:24, 68:19, 69:11, 155:8
**elicit** [1] - 28:16
**Elizabeth** [1] - 144:10
**email** [3] - 9:1, 9:2, 141:3
**emails** [12] - 60:7, 63:16, 63:18, 63:21, 63:23, 73:18, 74:5, 74:21, 141:3, 169:8, 169:9
**embezzlements** [2] - 94:12, 95:18
**emphasize** [3] - 28:15, 33:23, 44:16
**enables** [1] - 62:18
**End** [1] - 180:7
**end** [5] - 72:1, 95:22, 101:15, 156:2, 169:12
**endeavor** [1] - 35:25
**endemic** [1] - 97:5
**endorsed** [1] - 116:18
**ends** [1] - 134:20
**enforcement** [15] - 35:21, 35:23, 35:24, 58:9, 58:10, 58:11, 120:9, 121:4, 132:11, 132:16, 132:17, 132:19, 132:20, 132:24
**engaged** [2] - 113:8, 169:5
**engagement** [3] - 94:3, 134:10, 135:2
**enjoy** [1] - 174:25
**enter** [1] - 15:7
**entire** [5] - 9:12,

11:13, 17:13, 54:3, 99:16
**entirely** [5] - 12:1, 12:4, 19:17, 27:22, 50:1
**entities** [1] - 82:16
**entitled** [2] - 39:2, 47:5
**envelope** [1] - 105:5
**error** [29] - 8:2, 9:24, 12:3, 15:3, 27:11, 27:13, 27:20, 29:8, 35:7, 35:11, 35:13, 36:24, 38:15, 38:17, 38:21, 38:24, 38:25, 68:6, 68:10, 69:17, 69:18, 75:18, 79:6, 82:23, 123:8, 123:12, 143:17, 143:18, 147:23
**Error** [2] - 39:2, 39:3
**errors** [9] - 11:19, 15:6, 18:10, 35:6, 35:20, 35:22, 36:5, 37:14, 38:4
**especially** [4] - 44:16, 62:18, 76:17, 102:4
**essentially** [8] - 8:4, 9:25, 11:25, 17:20, 37:25, 87:3, 96:17, 169:17
**establish** [1] - 26:3
**established** [4] - 52:13, 71:10, 87:10, 100:2
**establishment** [2] - 100:3, 122:8
**estimate** [13] - 64:10, 64:16, 82:5, 105:12, 105:14, 105:15, 127:25, 128:3, 128:4, 128:13, 135:16, 165:19, 167:20
**estimates** [1] - 143:3
**Europe** [1] - 138:9
**evaluate** [4] - 16:15, 78:24, 81:15, 81:16
**evaluated** [1] - 141:5
**evaluating** [2] - 79:22, 140:24
**evaluation** [4] - 74:4, 75:8, 85:20, 85:22
**eve** [1] - 17:1
**event** [3] - 53:5, 54:17, 115:16
**eventually** [2] - 96:23, 96:25
**everyday** [4] - 33:19, 33:20, 36:6, 36:13

**everywhere** [1] - 79:11
**Evidence** [1] - 40:16
**evidence** [38] - 26:9, 26:10, 26:11, 31:2, 39:15, 46:13, 48:17, 52:14, 54:13, 69:1, 80:17, 80:24, 82:22, 83:7, 83:10, 86:16, 86:23, 94:17, 94:18, 107:11, 109:25, 110:25, 111:10, 111:23, 112:10, 123:13, 136:6, 140:19, 140:20, 141:17, 147:8, 153:20, 159:22, 162:16, 166:9, 172:7, 172:9
**evidentiary** [1] - 168:9
**eVoucher** [1] - 13:14
**exact** [6] - 26:21, 56:20, 127:23, 150:9, 150:10, 165:23
**exactly** [6] - 70:11, 148:8, 148:13, 149:21, 150:10, 155:3
**exaggerated** [1] - 83:9
**Examination** [6] - 2:4, 2:6, 2:7, 2:10, 2:12, 92:25
**EXAMINATION** [5] - 32:24, 44:24, 88:18, 92:6, 131:15
**examination** [11] - 5:3, 27:18, 28:10, 38:21, 38:25, 53:22, 54:3, 65:12, 67:6, 78:16, 79:25
**examinations** [1] - 38:16
**examine** [6] - 4:25, 18:15, 18:17, 26:17, 26:21, 72:8
**examined** [1] - 59:24
**examiner** [30] - 37:3, 38:23, 53:16, 60:7, 62:7, 63:25, 64:1, 65:18, 65:20, 65:22, 66:5, 66:7, 66:9, 73:20, 73:25, 74:9, 74:13, 74:14, 74:24, 75:7, 75:16, 75:20, 75:22, 75:25, 77:8, 78:2, 80:19, 89:8, 89:13, 89:20
**examiner's** [1] - 89:11
**examiners** [20] -

34:19, 35:14, 37:11, 38:4, 64:11, 64:19, 64:21, 64:22, 65:21, 65:25, 66:3, 66:8, 76:11, 80:17, 88:2, 88:8, 90:6
**Examiners** [1] - 93:1
**examining** [5] - 31:15, 59:24, 63:21, 79:22, 153:12
**example** [33] - 33:20, 34:6, 34:16, 35:7, 38:5, 39:2, 46:4, 46:11, 53:13, 53:18, 60:19, 61:11, 62:11, 63:20, 73:5, 73:17, 73:22, 74:3, 75:2, 77:10, 78:11, 82:14, 83:2, 83:21, 94:10, 112:13, 133:23, 139:11, 143:22, 147:24, 151:2, 175:3, 175:12
**examples** [5] - 35:21, 42:14, 70:12, 83:21, 87:15
**exceedingly** [1] - 148:3
**Excel** [1] - 98:1
**except** [1] - 170:1
**exceptions** [1] - 149:4
**exchange** [10] - 102:5, 106:20, 106:25, 107:15, 110:12, 114:22, 114:23, 115:1, 115:17, 138:21
**exchanges** [9] - 58:1, 113:4, 137:25, 138:8, 138:11, 138:16, 138:24, 157:17, 158:17
**excited** [1] - 95:4
**exclude** [2] - 39:15, 47:15
**exclusive** [2] - 121:4, 121:8
**excuse** [1] - 176:23
**excused** [1] - 91:6
**execute** [4] - 147:25, 148:6, 150:2, 155:21
**executed** [1] - 156:6
**executive** [1] - 132:18
**Exhibit** [6] - 31:3, 31:4, 32:7, 32:8, 32:9
**exhibit** [1] - 31:16
**exhibited** [1] - 173:12
**EXHIBITS** [1] - 2:15
**exhibits** [3] - 30:25,

31:14, 31:24
**Exhibits** [2] - 2:16, 32:13
**exist** [1] - 46:19
**existed** [1] - 108:6
**existing** [1] - 118:12
**exists** [8] - 44:1, 51:8, 74:20, 79:11, 86:20, 96:24, 99:20, 158:21
**exonerated** [1] - 83:3
**expand** [1] - 28:15
**expanded** [1] - 17:8
**expect** [9] - 62:13, 62:14, 105:13, 170:8, 170:14, 170:16, 172:18, 173:6, 173:8
**expectation** [7] - 4:5, 53:17, 70:8, 70:10, 74:2, 78:3, 78:5
**expectations** [5] - 66:6, 66:10, 67:22, 80:20, 88:23
**expected** [1] - 170:1
**expecting** [2] - 111:9, 111:13
**expenditure** [1] - 111:20
**experience** [9] - 36:21, 36:25, 59:2, 61:15, 82:18, 93:8, 96:1, 132:19, 170:18
**experiment** [4] - 65:24, 70:21, 80:16, 88:12
**experimental** [8] - 65:9, 65:10, 65:15, 66:12, 79:17, 82:8, 82:10, 101:8
**experiments** [4] - 65:11, 66:14, 66:17, 70:24
**expert** [94] - 5:1, 5:6, 6:19, 6:23, 7:6, 7:12, 9:15, 10:1, 10:3, 10:4, 11:1, 11:13, 11:14, 11:25, 12:13, 13:9, 14:4, 15:14, 17:14, 17:20, 17:25, 18:4, 18:16, 18:24, 19:3, 19:7, 19:8, 19:16, 19:19, 19:20, 19:22, 19:25, 20:3, 20:7, 20:18, 22:7, 22:10, 31:2, 32:9, 33:22, 34:3, 34:24, 36:20, 37:4, 39:12, 40:10, 40:14, 40:16, 43:14, 45:11, 45:12, 48:6, 48:7, 48:14,

48:20, 49:24, 50:20, 57:10, 71:11, 75:20, 77:5, 77:9, 81:7, 82:21, 85:1, 88:25, 89:17, 94:21, 104:15, 109:20, 111:25, 112:3, 123:3, 132:2, 132:4, 132:10, 132:11, 132:13, 133:3, 133:6, 133:23, 133:25, 134:2, 134:12, 134:15, 141:21, 142:11, 144:9, 144:10, 159:12, 159:17, 173:10
**expertise** [16] - 33:16, 36:25, 37:1, 37:5, 37:7, 37:9, 37:11, 53:5, 59:2, 59:8, 76:1, 89:15, 132:25, 133:19, 134:4, 173:11
**experts** [34] - 9:7, 12:2, 12:24, 17:12, 31:7, 31:24, 33:23, 33:24, 34:2, 34:5, 34:22, 35:4, 35:18, 36:1, 37:6, 42:6, 42:7, 42:8, 42:21, 49:17, 58:11, 65:18, 66:17, 71:19, 72:8, 79:24, 91:1, 132:8, 139:14, 140:22, 141:2, 141:4, 144:16, 179:22
**experts'** [1] - 144:19
**explain** [19] - 8:7, 13:6, 35:18, 46:11, 46:13, 46:18, 62:1, 63:11, 70:12, 75:23, 82:22, 83:1, 114:20, 118:3, 121:18, 127:6, 141:14, 141:16, 167:19
**explained** [1] - 81:14
**explanation** [1] - 93:10
**explore** [1] - 63:19
**explorer** [5] - 59:17, 119:25, 120:2, 146:5
**Explorer** [1] - 59:18
**explorers** [4] - 102:17, 140:18, 140:20, 141:20
**exposed** [5] - 74:9, 74:14, 74:24, 76:14, 87:17
**express** [3] - 46:2,

71:23, 71:25
**extended** [1] - 20:1
**extensive** [2] - 81:11, 81:20
**extensively** [2] - 20:13, 29:14
**extent** [9] - 5:22, 28:6, 43:13, 46:24, 71:2, 75:7, 76:16, 114:2
**extents** [1] - 98:5
**extra** [2] - 61:3, 72:3
**extraneous** [5] - 60:1, 61:5, 61:11, 62:9, 74:5
**extrapolating** [2] - 71:4, 82:18

**F**

**face** [1] - 6:1
**Facebook** [1] - 99:15
**facilitate** [1] - 150:7
**facilitated** [1] - 149:23
**facilitating** [1] - 150:1
**fact** [23] - 5:7, 6:24, 8:4, 9:10, 9:13, 10:7, 17:7, 19:6, 38:19, 39:18, 43:8, 64:12, 68:15, 74:11, 75:1, 75:24, 76:3, 86:2, 121:25, 123:22, 124:12, 125:15, 151:25
**facts** [10] - 14:22, 19:6, 26:3, 36:3, 46:6, 52:2, 52:3, 54:14, 87:10, 125:4
**factual** [1] - 5:22
**failing** [1] - 20:9
**fair** [29] - 28:21, 37:15, 37:24, 57:4, 58:5, 60:3, 64:6, 64:24, 67:8, 71:4, 71:5, 74:4, 74:18, 83:13, 83:25, 103:18, 118:15, 126:7, 127:14, 130:24, 141:10, 141:12, 141:13, 143:18, 154:7, 155:7, 156:13, 156:15, 171:11
**fairly** [6] - 18:15, 26:4, 100:25, 105:12, 108:17, 170:24
**faith** [1] - 30:17
**fake** [1] - 173:15
**fall** [2] - 37:6, 38:13
**fallacies** [2] - 42:1, 42:2

**fallacy** [2] - 42:6, 84:5
**false** [6] - 27:21, 27:22, 83:10, 98:12, 152:16, 152:17
**falsity** [1] - 162:15
**familiar** [11] - 43:17, 61:14, 62:3, 73:5, 93:4, 117:19, 121:13, 122:5, 127:4, 145:18, 174:18
**families** [2] - 120:8, 120:10
**fancy** [2] - 121:22, 122:15
**far** [12] - 5:1, 11:15, 20:23, 50:10, 67:21, 147:17, 154:19, 155:1, 160:1, 160:6, 160:10, 163:1
**fascinates** [1] - 113:21
**fast** [2] - 120:17, 156:6
**FBI** [12] - 3:24, 4:13, 34:15, 35:1, 35:2, 35:5, 35:6, 35:10, 35:14, 64:12, 84:10, 144:9
**features** [1] - 159:4
**February** [1] - 34:23
**Federal** [1] - 40:16
**federal** [1] - 38:19
**Federalist** [1] - 97:20
**fee** [6] - 105:9, 157:8, 169:18, 170:9, 171:5, 172:12
**fees** [36] - 55:15, 56:1, 56:2, 56:14, 104:6, 104:16, 104:19, 105:1, 105:12, 105:13, 105:14, 105:20, 106:9, 106:13, 107:9, 110:20, 111:7, 114:8, 127:11, 157:5, 157:6, 157:10, 166:12, 170:1, 170:4, 170:20, 170:21, 171:10, 171:13, 171:16, 171:17, 171:20, 172:1, 172:3, 172:18
**fellow** [2] - 140:22, 144:16
**felt** [2] - 41:24, 115:25
**few** [15] - 18:22, 42:10, 42:14, 45:5, 57:6, 57:16, 78:14, 91:17, 95:4, 97:17, 104:22, 106:18, 122:6,
165:21, 167:16
**few-minute** [1] - 91:17
**field** [12] - 66:14, 70:22, 71:3, 71:6, 73:3, 77:2, 88:13, 93:12, 93:14, 95:1, 139:12, 149:8
**fight** [1] - 137:13
**fighter** [1] - 37:2
**fighting** [1] - 47:25
**figure** [11] - 5:23, 28:6, 102:8, 102:24, 105:11, 128:7, 128:10, 163:4, 166:7, 166:21, 177:7
**file** [13] - 5:8, 15:12, 15:15, 22:6, 25:21, 28:25, 29:2, 30:18, 48:13, 48:19, 49:24, 50:19, 50:22
**filed** [18] - 9:14, 9:15, 9:17, 9:25, 10:14, 12:5, 19:4, 22:10, 25:14, 25:15, 25:17, 26:17, 32:9, 45:11, 50:14, 84:11, 129:22, 170:18
**files** [4] - 57:20, 58:2, 66:18
**filing** [8] - 18:23, 25:11, 26:1, 26:5, 26:15, 28:15, 28:22, 29:8
**filings** [1] - 171:25
**final** [2] - 87:18, 87:20
**finance** [1] - 95:21
**financial** [23] - 57:22, 81:9, 92:16, 93:7, 94:4, 94:9, 94:11, 109:24, 111:11, 116:11, 116:15, 117:7, 122:3, 132:6, 133:19, 134:2, 160:18, 160:20, 162:1, 162:2, 162:4, 162:7
**Financial** [3] - 92:23, 95:11, 95:12
**FinCEN** [1] - 6:23
**findings** [2] - 78:5, 80:20
**fine** [8] - 21:1, 23:14, 31:21, 43:12, 49:21, 52:23, 52:24, 176:11
**fingerprint** [15] - 60:19, 61:1, 61:3, 61:4, 61:6, 64:11, 64:22, 65:12, 65:16, 65:21, 71:14, 75:16, 75:19, 75:22
**fingerprinting** [3] - 36:1, 65:20, 75:2
**fingerprints** [3] - 75:4, 75:17
**finish** [5] - 70:20, 119:18, 129:2, 139:18, 179:3
**finished** [1] - 44:13
**finishing** [1] - 176:3
**Finland** [1] - 58:21
**firearm** [2] - 38:24, 65:22
**firearms** [1] - 38:21
**firm** [1] - 120:6
**firms** [1] - 149:7
**first** [28] - 3:22, 4:1, 11:20, 17:10, 23:22, 25:6, 29:17, 30:23, 50:10, 50:12, 58:2, 71:4, 71:9, 74:8, 76:8, 77:16, 85:12, 104:22, 104:23, 107:24, 115:18, 130:9, 135:20, 163:6, 165:21, 169:25, 173:19
**Fischbach** [5] - 9:6, 24:23, 176:8, 178:4, 178:25
**Fischbach's** [3] - 32:4, 32:8, 144:20
**fit** [1] - 63:8
**five** [9] - 17:18, 91:15, 135:14, 148:12, 151:9, 151:10, 177:5, 178:21
**fix** [1] - 131:24
**flawed** [1] - 83:9
**flight** [1] - 177:6
**flipping** [1] - 41:8
**Floor** [1] - 1:17
**fluid** [1] - 64:15
**flying** [1] - 37:1
**focus** [3] - 33:15, 44:19, 160:4
**focused** [3] - 30:8, 30:9, 93:21
**focuses** [2] - 5:11, 72:16
**Fog** [37] - 8:20, 85:6, 85:10, 104:7, 104:17, 104:19, 104:25, 105:1, 105:7, 105:9, 105:20, 106:13, 106:15, 107:8, 107:14, 107:16, 110:12, 110:14, 110:18, 111:7, 113:13, 143:5,
164:12, 164:14, 164:18, 165:10, 166:11, 167:13, 167:17, 169:18, 171:5, 171:10, 172:2, 172:12, 173:7, 173:11, 174:15
**folks** [1] - 94:24
**follow** [7] - 24:24, 25:3, 52:7, 88:21, 89:24, 94:10, 109:1
**follow-on** [1] - 24:24
**follow-up** [1] - 25:3
**followed** [4] - 24:23, 72:9, 116:3, 180:8
**following** [7] - 74:19, 82:11, 82:21, 82:25, 86:12, 142:12, 173:10
**follows** [1] - 164:2
**FOR** [1] - 1:1
**Force** [2] - 34:7, 37:10
**foregoing** [1] - 185:4
**foremost** [1] - 3:22
**forensic** [103] - 6:22, 34:19, 34:22, 35:4, 35:6, 35:11, 35:13, 35:14, 35:20, 35:22, 36:24, 37:24, 38:4, 38:15, 38:23, 52:14, 58:11, 58:12, 59:24, 60:6, 60:16, 60:25, 61:6, 61:7, 61:9, 62:12, 63:25, 64:1, 64:6, 64:13, 64:14, 64:17, 64:18, 64:19, 64:23, 65:14, 65:16, 65:17, 65:18, 65:23, 66:24, 68:23, 68:25, 71:24, 72:20, 72:23, 73:20, 73:25, 75:20, 75:25, 76:5, 76:6, 76:9, 76:11, 77:6, 78:2, 78:15, 79:14, 79:15, 79:24, 80:15, 80:19, 81:10, 82:15, 82:23, 83:10, 86:8, 86:17, 88:2, 88:23, 88:25, 89:3, 89:8, 89:11, 89:12, 89:18, 89:20, 90:2, 90:6, 93:7, 93:11, 93:13, 93:15, 94:4, 94:5, 95:5, 95:7, 97:16, 111:5, 111:11, 116:10, 116:11, 116:15, 116:22, 117:5, 121:23, 132:6, 134:2, 134:6,
162:15
**Forensic** [6] - 52:11, 52:16, 52:18, 72:12, 79:21, 89:23
**forensically** [6] - 111:7, 111:9, 112:8, 112:12, 117:3, 117:6
**Forensics** [4] - 92:23, 95:11, 95:12, 136:22
**forensics** [45] - 9:12, 12:2, 17:14, 34:4, 34:14, 34:21, 34:25, 35:24, 36:2, 60:5, 60:11, 62:21, 62:23, 63:12, 65:16, 66:12, 66:15, 68:5, 93:7, 94:9, 94:15, 94:19, 94:20, 95:3, 95:9, 95:22, 97:3, 97:19, 109:24, 111:11, 115:3, 120:8, 121:13, 122:3, 132:4, 132:5, 132:7, 132:10, 135:24, 136:17, 149:7, 173:5
**forget** [3] - 7:25, 96:5, 122:19
**form** [9] - 15:9, 54:1, 72:4, 72:6, 82:5, 111:18, 128:12, 137:17, 160:9
**formation** [1] - 74:25
**formed** [8] - 44:11, 45:9, 46:24, 47:3, 47:13, 47:20, 48:16, 53:24
**former** [1] - 4:13
**forming** [1] - 108:11
**forms** [3] - 13:8, 13:13, 43:9
**forth** [6] - 18:18, 26:4, 46:2, 46:25, 48:14, 48:20
**forum** [1] - 114:23
**forward** [1] - 120:9
**foundation** [4] - 107:20, 139:4, 139:5, 139:6
**Foundation** [3] - 137:11, 137:15, 139:2
**four** [1] - 17:18
**frame** [3] - 78:3, 154:11, 154:25
**framing** [1] - 107:16
**frankly** [7] - 6:5, 11:14, 16:12, 26:6, 26:25, 133:21, 162:13
**Fraud** [3] - 34:17,

92:25, 93:1
**fraud** [5] - 34:18, 94:11, 94:13, 95:1, 95:9
**fraudulent** [1] - 66:19
**freedom** [1] - 63:1
**Friday** [2] - 10:4, 177:16
**friend** [1] - 150:3
**front** [10] - 31:13, 31:22, 31:24, 32:3, 37:17, 45:13, 105:25, 141:23, 142:2, 152:18
**fronts** [1] - 12:8
**frozen** [1] - 134:17
**fruits** [1] - 175:1
**FTX** [2] - 115:13, 115:16
**full** [10] - 4:4, 12:15, 47:23, 112:20, 136:23, 162:1, 162:4, 164:12, 165:23, 185:5
**full-time** [1] - 4:4
**fully** [1] - 40:8
**fulsome** [1] - 135:6
**function** [1] - 53:9
**functions** [2] - 140:11, 140:12
**fund** [1] - 122:9
**fundamental** [2] - 14:22, 71:13
**fundamentally** [2] - 14:21, 28:7
**funded** [1] - 35:5
**funding** [2] - 13:1, 13:4
**funds** [11] - 85:6, 85:9, 107:13, 139:6, 139:13, 140:10, 171:5, 173:18, 174:24, 175:9, 175:13
**future** [3] - 97:1, 101:8, 108:1

G

**gambling** [2] - 175:8, 175:9
**gaming** [1] - 96:19
**gamut** [1] - 94:22
**gatekeepers** [1] - 99:9
**Gathering** [1] - 114:24
**Gemini** [2] - 138:7, 138:23
**General** [1] - 34:9
**general** [10] - 42:2, 51:6, 54:4, 67:20,

71:17, 73:4, 86:13, 96:1, 104:13, 115:11
**generalizing** [1] - 62:22
**generally** [14] - 51:21, 53:8, 54:11, 54:23, 86:1, 90:16, 93:8, 102:13, 103:12, 135:24, 139:15, 149:20, 157:16, 158:4
**generate** [1] - 123:15
**generated** [2] - 162:21, 175:8
**generating** [1] - 121:15
**genius** [2] - 98:3, 98:6
**German** [1] - 161:19
**Germany** [1] - 161:18
**given** [33] - 10:7, 11:14, 11:24, 11:25, 15:7, 15:9, 17:7, 26:15, 28:22, 29:5, 29:7, 36:2, 62:21, 72:13, 73:12, 73:15, 73:17, 74:18, 78:5, 79:14, 80:5, 80:9, 80:24, 85:14, 88:23, 97:15, 112:13, 115:17, 128:9, 134:23, 155:21
**Glave** [3] - 6:22, 104:15, 112:1
**gold** [1] - 68:9
**googleable** [1] - 97:21
**government** [67] - 3:5, 3:22, 4:8, 4:18, 6:19, 8:19, 9:10, 9:12, 10:19, 12:15, 15:8, 16:8, 16:14, 16:23, 17:12, 17:21, 18:9, 18:16, 19:19, 19:20, 20:4, 20:11, 20:15, 21:6, 21:8, 22:5, 22:16, 23:18, 24:10, 24:14, 26:2, 26:11, 28:16, 29:1, 29:18, 29:24, 30:7, 30:18, 31:1, 31:24, 34:18, 36:21, 41:20, 43:11, 50:2, 50:9, 50:13, 50:14, 50:22, 51:13, 58:13, 72:20, 82:1, 90:4, 104:6, 105:6, 105:7, 106:13, 110:18, 129:22, 132:16, 147:7, 159:25, 163:9, 171:19, 171:23, 172:1

**Government** [1] - 92:16
**government's** [35] - 9:14, 11:9, 12:2, 15:20, 17:13, 18:13, 18:19, 19:2, 25:10, 36:19, 46:14, 46:18, 81:10, 81:11, 81:19, 104:13, 104:14, 104:25, 106:4, 107:13, 107:15, 110:25, 111:6, 111:23, 111:25, 112:10, 140:18, 142:22, 162:16, 163:13, 166:13, 167:17, 167:18, 168:14, 171:4
**Gox** [25] - 8:10, 8:13, 8:25, 25:2, 112:22, 114:17, 114:19, 114:21, 114:22, 114:25, 115:6, 115:19, 116:1, 116:2, 116:4, 116:5, 116:7, 116:9, 116:23, 117:1, 117:7, 117:8, 117:14, 117:16, 163:7
**grab** [1] - 20:24
**grand** [1] - 29:20
**grant** [1] - 64:12
**grants** [4] - 35:5, 56:15, 121:5, 145:25
**great** [4] - 17:3, 33:9, 69:19, 76:10
**green** [1] - 68:8
**grew** [2] - 93:12, 163:24
**ground** [1] - 146:15
**grounds** [2] - 7:1, 51:22
**group** [4] - 79:24, 98:7, 98:8, 98:14
**growing** [1] - 95:1
**grows** [1] - 98:14
**growth** [8] - 162:21, 163:1, 163:3, 163:17, 163:19, 164:6, 164:23, 166:5
**guards** [1] - 100:16
**guess** [18] - 17:5, 19:14, 21:20, 23:2, 24:3, 28:8, 45:17, 58:22, 69:16, 93:10, 105:4, 116:11, 117:13, 121:22, 165:25, 167:14, 172:11, 177:9

**guesses** [7] - 37:25, 38:2, 38:3, 38:13, 121:24, 157:18, 167:6
**guesswork** [2] - 121:23, 122:15
**guilty** [5] - 53:14, 66:20, 73:24, 77:6, 77:22
**guy** [1] - 77:6

H

**hack** [2] - 106:20, 116:25
**hacked** [4] - 115:9, 116:2, 116:25, 120:8
**hacking** [2] - 97:6, 132:2
**hacks** [1] - 116:7
**half** [5] - 67:8, 83:8, 134:11, 134:12, 135:1
**hallmarks** [1] - 46:8
**hand** [7] - 15:7, 32:18, 41:19, 59:12, 91:25, 169:18, 169:19
**handwriting** [2] - 36:1, 65:16
**haphazard** [1] - 31:11
**happy** [10] - 27:5, 40:24, 43:13, 54:3, 59:20, 66:23, 83:24, 91:8, 176:10, 179:17
**hard** [18] - 31:8, 31:20, 35:17, 50:21, 60:7, 63:18, 64:1, 66:18, 78:10, 82:25, 100:2, 103:17, 106:16, 116:10, 120:17, 169:25, 170:11, 175:25
**hard-working** [1] - 35:17
**harkens** [1] - 93:14
**Harvard** [3] - 33:4, 92:14, 92:15
**hash** [2] - 61:20, 101:21
**hashing** [1] - 97:23
**Hassard** [4] - 3:15, 135:21, 136:7, 177:2
**HASSARD** [5] - 1:16, 3:14, 177:6, 177:15, 179:22
**Hassard's** [1] - 126:3
**hate** [1] - 98:17
**head** [5] - 65:18, 115:17, 128:14, 162:10, 162:11

**healthcare** [1] - 34:8
**hear** [16] - 18:20, 24:24, 25:2, 25:4, 33:6, 33:7, 33:8, 36:13, 45:2, 45:3, 47:18, 51:23, 57:11, 73:14, 88:10, 129:18
**heard** [4] - 43:6, 101:2, 135:23, 158:10
**hearing** [40] - 4:1, 4:7, 7:7, 7:8, 7:11, 10:9, 14:10, 16:24, 16:25, 21:9, 22:5, 22:12, 22:18, 26:2, 27:19, 28:9, 29:14, 32:12, 38:19, 38:21, 38:22, 38:24, 40:13, 47:19, 48:2, 48:6, 48:11, 48:25, 49:25, 50:7, 52:6, 54:4, 58:4, 86:7, 125:10, 125:16, 168:9, 176:13, 176:17, 184:21
**HEARING** [2] - 1:4, 1:7
**hearings** [14] - 3:23, 17:2, 21:12, 22:1, 23:16, 23:17, 26:18, 28:9, 28:23, 50:19, 168:5, 168:9, 168:21, 177:14
**Heather** [1] - 153:5
**heck** [1] - 172:9
**height** [2] - 102:19, 112:17
**heirs** [1] - 102:10
**held** [1] - 136:5
**Held** [2] - 120:6, 120:22
**hello** [1] - 91:24
**help** [7] - 44:18, 77:7, 77:24, 93:11, 120:11, 160:9, 177:21
**helpful** [10] - 13:22, 21:16, 27:3, 51:23, 70:13, 97:7, 97:10, 142:16, 160:14, 168:1
**helps** [4] - 93:15, 97:3, 97:4, 122:11
**hereby** [1] - 185:3
**hesitate** [2] - 171:15, 172:19
**heuristic** [36] - 43:17, 49:5, 53:6, 62:4, 121:19, 121:22, 122:1, 122:10,

122:11, 122:20, 122:25, 123:4, 123:20, 123:21, 125:7, 125:9, 125:19, 125:24, 126:4, 126:8, 127:3, 129:5, 129:11, 129:13, 129:16, 130:11, 147:1, 147:18, 149:3, 149:4, 152:3, 152:12, 152:14
**heuristics** [26] - 29:6, 43:18, 49:18, 50:3, 119:10, 119:14, 119:15, 121:12, 121:14, 122:4, 122:25, 125:5, 125:6, 126:11, 130:12, 130:14, 130:22, 143:11, 145:19, 146:21, 146:22, 146:25, 147:11, 152:8, 156:16, 156:18
**hiatus** [1] - 169:2
**hidden** [2] - 103:6, 111:12
**hide** [2] - 110:3, 136:22
**Hide** [1] - 136:20
**high** [3] - 54:22, 68:6, 114:8
**higher** [2] - 53:8, 55:3
**highlight** [1] - 82:23
**highly** [1] - 35:15
**himself** [2] - 160:23, 175:10
**hire** [2] - 33:21, 88:2
**historical** [2] - 167:2, 167:5
**history** [1] - 5:8, 105:22, 108:2, 129:16, 158:19
**hit** [1] - 112:16
**hold** [11] - 31:5, 92:22, 92:24, 93:5, 93:9, 131:23, 132:9, 132:13, 133:3, 133:22, 136:24
**holiday** [1] - 33:21
**Homeland** [1] - 145:24
**homicide** [1] - 34:10
**honest** [1] - 135:7
**honey** [1] - 119:24
**honey-pot** [1] - 119:24
**Honor** [90] - 3:6, 3:11, 3:14, 3:20, 7:20, 9:18, 10:10, 10:15, 10:18, 11:10, 11:16,

12:11, 13:12, 13:21, 13:25, 14:2, 14:9, 16:2, 16:8, 16:13, 17:9, 18:2, 18:4, 18:14, 18:22, 19:10, 19:18, 22:8, 22:23, 23:5, 23:13, 24:8, 24:15, 24:21, 25:7, 26:13, 26:20, 27:7, 28:14, 28:20, 28:22, 29:13, 30:24, 31:7, 31:23, 32:6, 32:14, 32:21, 41:4, 42:23, 44:22, 47:4, 47:22, 48:23, 50:12, 50:16, 51:16, 54:2, 54:20, 54:24, 55:11, 67:7, 80:12, 81:22, 88:15, 90:9, 91:11, 91:15, 91:22, 92:3, 128:13, 130:18, 131:2, 141:25, 143:7, 143:19, 144:6, 159:21, 166:8, 175:22, 176:1, 176:6, 177:22, 178:22, 179:7, 179:15, 179:16, 180:2, 180:3, 180:5
**honorable** [2] - 43:24, 44:3
**HONORABLE** [1] - 1:8
**hop** [1] - 126:24
**hope** [4] - 4:14, 99:11, 99:13, 179:2
**hopefully** [1] - 112:23
**hopes** [1] - 99:7
**hoping** [1] - 83:5
**hops** [4] - 126:15, 157:19, 158:9, 158:20
**horribly** [5] - 129:17, 129:19, 130:11, 130:23, 131:1
**Hospital** [1] - 34:9
**host** [4] - 10:2, 13:16, 14:2, 15:16
**hotel** [1] - 177:10
**hour** [6] - 67:8, 67:13, 134:10, 134:12, 135:2, 179:3
**hours** [11] - 16:4, 16:5, 64:12, 64:16, 96:5, 96:6, 135:9, 135:12, 135:13, 135:16, 135:18
**house** [2] - 96:24, 103:6
**housekeeping** [2] - 3:21, 30:25

**huge** [3] - 60:7, 60:8, 62:18
**human** [12] - 33:16, 36:16, 42:22, 53:9, 71:12, 71:15, 71:16, 71:18, 71:22, 79:12, 82:23, 87:12
**hundreds** [5] - 64:12, 64:16, 83:3, 90:3, 118:13
**hypotheses** [1] - 69:2
**hypothesis** [4] - 38:8, 163:18, 164:4, 164:22
**hypothesizing** [1] - 166:5
**hypothetical** [4] - 84:25, 85:1, 85:2, 175:7
**hypothetically** [3] - 85:5, 85:12, 165:12
**hypotheticals** [1] - 109:23

## I

**ID** [2] - 78:12, 78:14
**idea** [6] - 59:13, 61:17, 88:7, 98:22, 127:8, 165:14
**ideas** [2] - 99:4, 101:7
**identifiable** [6] - 101:9, 157:14, 157:21, 157:22, 157:23, 157:24
**identified** [3] - 13:3, 19:21, 158:2
**identifies** [1] - 158:25
**identify** [5] - 65:11, 103:23, 150:24, 151:8, 151:10
**identifying** [1] - 101:5
**identity** [2] - 99:22, 101:2
**illegal** [2] - 98:24, 175:8
**illicit** [5] - 12:8, 110:10, 111:17, 163:10, 163:11
**illusion** [1] - 42:11
**illustration** [1] - 83:22
**images** [1] - 161:5
**imagine** [1] - 68:11
**immoral** [1] - 42:3
**immune** [1] - 42:7
**impacted** [1] - 70:6
**impacts** [1] - 70:1
**implicit** [1] - 36:14
**important** [2] - 40:1, 41:24, 90:24,

108:11, 121:11, 121:23
**improve** [2] - 35:8, 72:24
**IN** [1] - 1:1
**in-depth** [1] - 115:19
**inaccurate** [7] - 80:6, 80:9, 98:12, 138:14, 139:22, 152:19, 155:2
**inappropriate** [1] - 77:8
**inauthentic** [2] - 8:11, 8:25
**incarcerated** [2] - 16:11, 20:14
**incentives** [1] - 81:9
**incentivizes** [1] - 98:7
**inclination** [1] - 28:8
**includes** [4] - 64:20, 132:14, 133:23, 158:18
**including** [13] - 4:12, 7:13, 31:25, 33:3, 34:25, 35:7, 42:20, 80:15, 80:23, 82:6, 109:7, 132:23, 134:25
**income** [7] - 111:13, 111:23, 162:21, 168:23, 169:18, 171:5, 172:12
**incompetence** [2] - 37:4, 37:8
**incompetent** [1] - 33:24
**inconsistent** [3] - 106:11, 107:12, 107:15
**incorrect** [9] - 42:22, 77:5, 77:19, 79:16, 80:11, 86:11, 87:5, 144:14
**increase** [2] - 150:15, 150:17
**incredible** [1] - 172:17
**incredibly** [3] - 13:2, 13:14, 29:16
**indeed** [1] - 86:6
**independent** [6] - 88:8, 140:14, 141:11, 158:21, 158:24, 159:3
**independently** [3] - 117:15, 140:21, 152:6
**index** [1] - 43:1
**indicate** [1] - 174:14
**indicated** [2] - 25:1, 47:16

**indictment** [4] - 136:4, 136:6, 171:25
**indirectly** [3] - 85:10, 111:12, 140:10
**individual** [10] - 42:5, 89:20, 123:6, 125:21, 141:19, 143:23, 144:11, 144:12, 151:6, 169:7
**individuals** [4] - 98:15, 125:21, 128:11, 169:7
**industry** [1] - 99:5
**inference** [4] - 103:4, 103:8, 110:23, 158:3
**influence** [3] - 38:12, 75:7, 82:16, 87:18, 87:25
**influenced** [1] - 76:16
**information** [78] - 9:21, 10:1, 10:2, 10:11, 11:20, 15:11, 26:16, 26:23, 27:3, 27:8, 27:17, 27:23, 29:7, 33:17, 33:18, 35:17, 36:17, 37:13, 37:16, 37:22, 38:11, 41:2, 42:13, 46:7, 46:10, 50:3, 60:2, 60:13, 60:17, 61:2, 61:3, 61:5, 61:12, 61:23, 61:25, 62:1, 62:9, 62:20, 66:1, 66:21, 71:20, 72:3, 72:10, 73:20, 73:24, 74:5, 74:10, 74:22, 74:24, 75:17, 75:24, 76:4, 76:11, 76:15, 76:22, 77:4, 77:8, 77:10, 77:15, 78:2, 82:12, 82:13, 89:16, 101:5, 101:9, 101:13, 101:16, 101:20, 103:3, 103:22, 103:24, 104:19, 106:21, 106:24, 159:18, 165:1, 166:2
**informs** [1] - 76:6
**ingredients** [1] - 91:2
**initial** [5] - 27:18, 94:4, 121:15, 162:6
**Innocence** [2] - 83:2, 83:18
**innovations** [1] - 154:14
**input** [7] - 122:10, 122:21, 125:7, 125:9, 125:14, 129:11, 129:16

**inputs** [9] - 125:20, 126:12, 149:21, 150:16, 150:21, 151:9, 151:14, 151:17
**inputting** [1] - 128:11
**inquiry** [2] - 5:4, 19:1
**instance** [3] - 27:10, 90:3, 146:3
**instances** [3] - 39:11, 144:11
**instantaneously** [1] - 156:6
**instead** [5] - 38:6, 98:1, 111:1, 148:20, 179:11
**Institute** [1] - 52:12
**institutions** [2] - 116:15, 116:20
**instructions** [1] - 29:15
**insufficient** [1] - 146:7
**integrating** [1] - 175:12
**integration** [3] - 174:20, 174:23, 175:5
**integrity** [1] - 116:13
**intend** [1] - 6:22
**intended** [4] - 6:20, 18:25, 26:2, 174:11
**intending** [1] - 48:21
**intends** [1] - 28:16
**intent** [1] - 26:25
**intentional** [3] - 36:7, 36:14, 42:15
**interact** [4] - 106:20, 106:25, 110:9, 120:23
**interacting** [2] - 99:16, 118:10
**interacts** [2] - 70:10, 118:5
**interest** [1] - 33:24
**interested** [13] - 33:16, 33:19, 33:22, 33:25, 39:18, 60:12, 64:4, 73:6, 85:20, 99:24, 135:24, 153:14, 169:9
**interesting** [4] - 98:25, 102:21, 122:2, 123:15
**interface** [1] - 118:5
**intermediate** [1] - 85:7
**internal** [1] - 133:2
**International** [2] - 56:13, 56:17
**international** [1] - 66:24

**interpret** [1] - 33:17
**interpretation** [4] - 36:18, 63:2, 63:3, 85:19
**interpretations** [2] - 63:6, 85:17
**interrupt** [4] - 69:7, 142:9, 159:16, 162:17
**interval** [1] - 79:6
**interviews** [1] - 94:4
**intrigued** [1] - 135:23
**introduce** [1] - 143:16
**invented** [1] - 149:8
**inverse** [1] - 83:25
**invest** [1] - 59:10
**investigates** [1] - 34:18
**investigating** [5] - 34:12, 65:4, 82:15, 89:21, 90:2
**investigation** [17] - 30:13, 63:15, 65:5, 66:24, 82:6, 85:14, 89:1, 93:14, 94:5, 116:16, 121:16, 121:23, 123:15, 132:7, 153:5, 162:15
**investigations** [6] - 82:14, 94:2, 110:19, 132:16, 134:1, 134:2
**investigative** [1] - 93:8
**investigator** [5] - 53:13, 88:24, 88:25, 89:18, 116:22
**investigators** [2] - 73:19, 81:10
**investment** [1] - 163:20
**investments** [1] - 164:7
**investor** [1] - 112:7
**invitation** [1] - 52:20
**invited** [5] - 34:20, 35:3, 39:19, 40:2, 40:4
**invoices** [1] - 134:24
**involve** [3] - 101:8, 113:4, 149:1
**involved** [17] - 29:7, 42:22, 57:8, 58:25, 68:5, 81:9, 89:1, 93:25, 111:5, 116:15, 126:9, 132:22, 135:20, 136:8, 137:13, 140:12
**involves** [6] - 37:25, 62:8, 94:1, 97:23,

127:19, 142:24
**involving** [2] - 70:24, 132:22
**IP** [13] - 4:10, 4:20, 4:23, 5:2, 7:22, 7:23, 8:5, 8:13, 8:16, 8:17, 8:18, 8:24, 9:1
**irrelevant** [14] - 38:10, 39:15, 72:9, 73:24, 74:9, 74:25, 75:17, 76:15, 77:3, 77:7, 77:10, 77:15, 78:1, 89:15
**IRS** [2] - 34:21, 34:22
**issue** [25] - 6:5, 6:9, 8:11, 13:4, 17:15, 18:14, 19:23, 25:4, 25:18, 25:19, 25:25, 26:7, 26:14, 27:13, 35:10, 43:18, 82:23, 116:17, 138:18, 147:16, 148:5, 154:11, 177:15, 179:8
**issues** [28] - 3:17, 6:11, 8:12, 13:5, 17:1, 19:19, 22:3, 23:4, 25:11, 26:22, 27:9, 27:19, 47:22, 91:3, 95:22, 97:15, 97:19, 98:24, 119:7, 119:8, 119:10, 132:22, 133:14, 134:19, 145:18, 147:14, 158:2
**Item** [3] - 46:4, 46:11, 142:7
**item** [1] - 46:13
**items** [2] - 45:17, 45:20
**iterations** [2] - 20:8, 108:23, 109:12
**ITIEL** [4] - 2:3, 32:25, 44:25, 88:19
**Itiel** [1] - 32:15
**itself** [12] - 51:25, 61:1, 61:24, 63:1, 74:2, 78:4, 98:25, 99:5, 103:22, 113:24, 117:25, 152:5

## J

**J.S** [2] - 120:6, 120:22
**J.W** [5] - 2:9, 91:23, 92:7, 125:19, 131:16
**January** [5] - 34:23, 56:10, 168:5, 168:6, 168:21

**Japan** [1] - 138:19
**job** [4] - 16:20, 83:7, 136:2, 168:21
**join** [3] - 127:8, 155:21, 156:2
**joined** [2] - 3:9, 52:11
**joint** [1] - 40:15
**Journal** [1] - 39:25
**Jude's** [4] - 125:11, 125:12, 125:13, 127:10
**JUDGE** [2] - 1:8, 1:8
**judge** [4] - 30:8, 39:22, 43:24, 44:3
**Judge** [2] - 39:23, 41:21
**judge's** [1] - 43:20
**judges** [9] - 39:18, 39:20, 39:21, 40:2, 79:25, 90:19, 90:20, 90:22
**Judges'** [1] - 39:25
**judgment** [14] - 33:18, 36:18, 38:12, 70:5, 74:6, 74:21, 75:4, 75:5, 75:8, 75:11, 75:15, 76:23, 116:21, 165:2
**Judicial** [1] - 23:24
**judicial** [1] - 133:5
**July** [6] - 1:5, 7:13, 25:24, 184:21, 184:22, 185:7
**jump** [1] - 151:21
**June** [3] - 25:1, 29:14, 137:1
**juror** [1] - 39:16
**jurors** [8] - 40:2, 43:25, 44:7, 51:4, 70:12, 90:17, 90:21, 90:23
**jury** [7] - 28:3, 28:11, 47:17, 51:23, 68:2, 68:18, 167:4
**justice** [5] - 78:20, 82:22, 83:13, 83:16, 86:21
**Justice** [4] - 52:11, 132:25, 133:2, 145:23
**JUSTICE** [1] - 1:13

## K

**Karpeles** [2] - 115:4, 115:15
**keep** [7] - 53:15, 62:2, 87:9, 87:16, 102:4, 108:9, 114:9
**keeps** [2] - 12:16,

118:8
**Kennedy** [1] - 92:15
**kept** [2] - 10:24, 101:13
**key** [33] - 101:16, 101:17, 101:18, 101:23, 101:24, 101:25, 102:1, 102:2, 102:3, 102:11, 102:12, 102:15, 102:20, 102:22, 103:5, 103:7, 103:8, 103:9, 103:10, 103:15, 106:17, 114:7, 114:9, 114:14, 123:25, 124:9, 124:12, 125:2, 126:4
**keys** [6] - 106:19, 122:12, 125:2, 126:25, 127:9, 141:19
**kid** [1] - 175:17
**kidnapped** [1] - 110:7
**kind** [28] - 9:19, 16:12, 35:22, 38:9, 47:18, 57:24, 59:21, 75:5, 78:19, 90:23, 93:24, 94:22, 97:24, 99:8, 99:24, 100:17, 108:1, 109:13, 117:7, 119:24, 127:20, 137:21, 149:7, 149:8, 149:9, 172:8, 174:7
**kinds** [6] - 60:16, 85:19, 95:19, 125:5, 162:14
**Kingdom** [2] - 34:17, 34:21
**knock** [1] - 171:9
**knowing** [3] - 75:15, 110:12
**knowledge** [20] - 39:16, 61:15, 66:5, 77:17, 85:14, 107:21, 116:9, 118:22, 139:7, 139:10, 139:16, 144:1, 153:10, 158:5, 158:8, 158:15, 158:22, 158:24, 159:3, 175:15
**known** [11] - 8:2, 9:24, 10:19, 12:3, 146:15, 147:16, 147:17, 152:9, 152:23, 157:13, 158:25
**knows** [1] - 106:17

**Kraken** [39] - 104:5, 104:16, 107:4, 107:9, 107:13, 110:3, 110:4, 110:11, 110:14, 110:16, 112:24, 112:25, 113:14, 138:7, 138:23, 142:24, 143:2, 146:17, 163:10, 163:19, 163:25, 164:2, 164:5, 164:11, 164:13, 164:23, 165:6, 166:6, 167:14, 169:16, 169:19, 169:22, 171:10, 171:14, 171:16, 171:20, 172:17, 173:19, 175:3
**KYC** [14] - 106:23, 107:1, 107:4, 107:9, 113:4, 113:11, 132:14, 164:15, 166:12, 169:6, 173:25, 174:1, 174:2, 174:3
**KYC'd** [12] - 103:2, 106:21, 107:14, 107:15, 109:9, 110:11, 110:22, 110:24, 173:13, 174:11, 174:17

## L

**lab** [4] - 35:4, 39:7, 68:13, 82:15
**laboratory** [1] - 72:7
**labs** [2] - 64:13, 64:14
**lack** [1] - 36:21
**language** [2] - 141:8
**LAPD** [1] - 34:15
**large** [3] - 85:8, 128:8
**larger** [3] - 98:7, 98:8, 150:19
**last** [42] - 3:22, 7:4, 7:11, 9:15, 9:25, 10:11, 11:21, 11:25, 14:10, 17:20, 18:23, 23:22, 26:2, 26:15, 26:17, 27:8, 28:15, 28:22, 29:5, 29:8, 30:2, 49:6, 50:7, 50:12, 68:23, 68:24, 94:24, 97:13, 109:21, 115:12, 119:17, 119:18, 129:2, 129:22, 130:9, 135:11,
135:14, 143:21, 144:8, 152:4, 156:8, 174:23
**late** [7] - 9:14, 10:7, 13:4, 20:23, 46:25, 169:10, 177:19
**late-filed** [1] - 9:14
**latent** [1] - 78:16
**laundered** [3] - 12:8, 174:24, 175:12
**laundering** [12] - 94:13, 107:2, 132:14, 133:14, 138:1, 173:4, 174:14, 174:18, 174:19, 174:21, 175:6
**Law** [1] - 1:16
**law** [35] - 35:21, 35:22, 35:24, 58:9, 58:10, 58:11, 92:14, 92:21, 97:16, 97:17, 113:22, 114:1, 120:9, 121:4, 132:11, 132:13, 132:15, 132:17, 132:23, 132:24, 133:8, 133:12, 133:13, 133:15, 133:18, 133:20, 133:21, 133:23, 133:24, 134:5, 134:7
**laws** [2] - 132:19, 132:20
**lawyers** [5] - 79:25, 83:6, 90:20, 90:22, 113:23
**layer** [1] - 173:15
**layering** [1] - 174:20
**layperson's** [1] - 36:12
**lead** [3] - 80:9, 129:19, 158:3
**leader** [1] - 129:9
**leaders** [1] - 129:8
**leading** [2] - 125:6, 138:8
**leads** [3] - 121:15, 123:15, 125:5
**leaked** [1] - 120:3
**learn** [6] - 40:7, 102:20, 102:21, 106:19, 115:20, 123:15
**learned** [1] - 114:18
**learning** [4] - 94:7, 116:9, 153:14
**least** [6] - 26:7, 67:8, 67:24, 151:2, 156:23, 158:4
**leave** [4] - 86:23, 173:8, 175:18, 175:23
**leaves** [2] - 167:10, 172:8
**leaving** [2] - 102:5, 175:16
**led** [2] - 99:5, 129:9
**ledger** [2] - 97:25, 103:20
**leeway** [1] - 63:9
**left** [2] - 56:10, 124:19
**legal** [4] - 8:21, 54:15, 90:15, 91:3
**legitimate** [1] - 97:4
**lend** [1] - 63:1
**lengthy** [2] - 7:10, 14:6
**less** [2] - 128:4, 172:5
**lesson** [1] - 107:25
**letter** [4] - 29:25, 30:7, 134:10, 135:3
**letters** [5] - 50:5, 61:21, 61:22, 61:23, 94:3
**letting** [2] - 38:6, 78:4
**level** [11] - 37:3, 53:8, 54:23, 55:7, 61:25, 70:5, 70:7, 70:9, 70:10, 142:20
**liberty** [2] - 15:17, 16:9
**library** [1] - 99:1
**license** [3] - 94:25, 106:25, 146:12
**licensed** [2] - 92:21
**Lichtenstein** [1] - 153:5
**life** [1] - 126:20
**likelihood** [1] - 80:25
**likely** [5] - 7:24, 8:23, 20:20, 109:25, 174:6
**limine** [1] - 10:21
**limitations** [1] - 129:11
**limited** [1] - 26:4
**limits** [1] - 159:6
**line** [1] - 70:20
**linear** [1] - 72:10
**lineup** [2] - 78:12, 78:18
**link** [4] - 99:25, 102:24, 102:25, 103:17
**linked** [7] - 99:22, 101:2, 103:1, 103:2, 103:4, 103:15, 129:14
**listed** [1] - 110:25
**listen** [3] - 115:14,
131:21, 139:18
**listened** [4] - 115:3, 115:12, 135:21, 135:22
**lists** [1] - 46:2
**literature** [12] - 10:25, 11:1, 70:24, 77:12, 121:13, 122:8, 123:9, 129:8, 129:9, 143:11, 149:11, 150:24
**litigation** [1] - 93:22
**LLC** [1] - 58:17
**load** [1] - 155:9
**local** [1] - 176:10
**LocalBitcoin** [5] - 168:12, 169:1, 169:4, 173:23
**LocalBitcoin's** [1] - 168:16
**LocalBitcoins** [1] - 173:20
**log** [1] - 179:17
**logical** [3] - 84:5, 99:14, 121:20
**login** [2] - 174:3, 174:4
**logins** [2] - 8:14, 139:11
**logistical** [1] - 150:17
**logistically** [2] - 150:4, 150:8
**logs** [9] - 29:9, 30:11, 63:17, 63:18, 63:23, 66:18, 115:21, 179:24
**London** [1] - 90:19
**look** [39] - 7:23, 9:14, 11:22, 14:24, 20:7, 20:25, 21:21, 28:12, 40:17, 46:17, 46:18, 46:21, 49:16, 53:2, 53:5, 53:18, 57:16, 57:24, 58:19, 60:16, 69:15, 69:24, 73:17, 73:19, 74:1, 81:24, 102:18, 103:21, 105:3, 114:9, 125:17, 126:3, 126:4, 126:5, 134:18, 141:21, 154:20
**looked** [17] - 5:9, 38:17, 47:19, 48:17, 58:3, 59:22, 60:9, 61:17, 77:1, 81:25, 83:4, 108:24, 136:3, 143:2, 143:3, 152:8
**looking** [36] - 4:9, 16:19, 20:1, 21:16,
31:6, 37:3, 38:8, 41:7, 43:14, 53:10, 53:15, 53:16, 60:25, 61:2, 61:10, 61:21, 62:7, 68:13, 69:9, 69:21, 69:24, 75:3, 82:12, 84:6, 84:7, 103:18, 116:13, 140:18, 140:19, 141:18, 142:10, 146:3, 151:20, 169:24, 170:13
**looks** [4] - 12:18, 61:14, 150:21, 159:4
**losing** [1] - 100:17
**Louisiana** [1] - 92:13
**love** [2] - 125:12, 136:11
**loved** [1] - 3:25
**low** [5] - 105:13, 105:14, 135:13, 163:16, 170:1
**lowest** [1] - 105:24
**Luke** [2] - 84:10, 144:10
**lunch** [8] - 67:12, 67:17, 70:14, 70:17, 70:21, 73:11, 178:13, 178:15

## M

**M-a-z-a-r-i-n** [1] - 6:16
**Machine** [2] - 108:24, 109:12
**Madrid** [1] - 35:8
**Magic** [1] - 114:24
**mailed** [2] - 31:19, 40:14
**maintain** [3] - 8:25, 94:17, 140:3
**maintaining** [2] - 108:15, 140:8
**major** [5] - 34:18, 138:16, 138:20, 138:24, 139:11
**majority** [4] - 82:7, 84:2, 98:13, 171:17
**malignant** [3] - 68:15, 69:10
**Malta** [5] - 161:22, 161:23, 161:24, 161:25
**manage** [1] - 94:25
**management** [1] - 158:10
**mandated** [2] - 72:11, 79:23
**manifested** [1] - 72:1
**manual** [1] - 172:14

**manually** [1] - 172:12
**map** [1] - 123:12
**mark** [2] - 115:4, 115:15
**markers** [1] - 69:10
**market** [2] - 128:9, 128:22
**masking** [1] - 72:10
**Massachusetts** [3] - 34:9, 39:21, 40:4
**massive** [2] - 10:10, 10:13
**master** [1] - 33:3
**master's** [2] - 33:11, 92:15
**mastermind** [1] - 110:17
**match** [3] - 75:5, 164:3, 164:12
**matches** [2] - 162:22, 163:3
**matching** [3] - 9:1, 149:21, 150:21
**material** [2] - 47:12, 81:14
**materials** [8] - 31:12, 44:14, 45:10, 47:2, 47:20, 57:16, 74:6, 81:15
**matter** [21] - 7:4, 9:4, 9:10, 19:11, 20:12, 26:8, 54:16, 63:10, 71:13, 74:11, 75:1, 75:24, 76:3, 87:16, 114:1, 117:2, 119:5, 134:16, 134:21, 135:4, 162:16
**matters** [4] - 3:21, 24:19, 93:21, 133:6
**Mazarin** [5] - 3:24, 6:12, 6:16, 6:19, 7:21
**Mazarin's** [1] - 4:21
**MAZARS** [1] - 6:15
**Mazars** [5] - 3:24, 4:21, 6:11, 6:15, 6:18
**mean** [31] - 14:12, 25:20, 26:1, 35:13, 48:13, 53:2, 63:12, 71:25, 79:15, 83:13, 83:15, 83:23, 84:2, 86:3, 96:8, 112:18, 116:8, 119:6, 119:15, 132:16, 140:15, 141:3, 148:15, 160:8, 165:11, 170:6, 171:8, 171:15, 172:8, 177:9, 177:18

**meaning** [1] - 152:14
**meaningful** [1] - 68:18
**means** [3] - 68:2, 84:22, 100:21
**measure** [2] - 78:21, 158:9
**measures** [4] - 79:3, 79:19, 158:5
**measuring** [1] - 79:7
**mechanisms** [1] - 37:21
**media** [4] - 99:14, 100:1, 100:3, 139:11
**medical** [6] - 34:8, 37:2, 37:11, 69:2, 71:14, 78:21
**meet** [2] - 41:12, 113:7
**meeting** [2] - 30:17, 178:14
**meetup** [1] - 150:13
**meetups** [2] - 110:4, 113:7
**Meiklejohn** [4] - 10:16, 129:8, 130:1, 130:21
**memorializations** [1] - 141:9
**memorialized** [3] - 141:1, 141:2, 141:6
**memorize** [1] - 114:10
**memorized** [1] - 100:12
**memory** [1] - 161:1
**mention** [2] - 42:15, 139:22
**mentioned** [18] - 10:21, 10:22, 35:1, 35:10, 41:22, 42:17, 56:22, 66:12, 69:6, 114:16, 127:17, 127:24, 130:15, 144:21, 145:4, 145:12, 167:3
**merely** [2] - 5:7, 13:13
**merits** [2] - 11:6, 16:1
**messages** [1] - 169:14
**meta** [1] - 37:7
**meta-expertise** [1] - 37:7
**method** [1] - 74:19
**methodology** [2] - 15:2, 15:3
**MGH** [1] - 34:8
**Michael** [1] - 3:14
**MICHAEL** [1] - 1:16
**Michigan** [3] - 39:20, 39:23
**Microsoft** [1] - 98:1
**mid** [2] - 154:25, 169:10

**middle** [2] - 25:23, 53:12
**might** [32] - 19:9, 50:22, 55:3, 60:2, 62:10, 65:24, 68:13, 68:16, 95:4, 97:10, 97:25, 100:1, 101:8, 103:3, 115:10, 119:6, 119:7, 121:3, 124:25, 125:9, 125:18, 125:19, 126:3, 126:4, 130:6, 134:18, 151:19, 154:19, 161:2, 174:1
**Mike** [2] - 126:1, 126:6
**military** [1] - 65:3
**million** [7] - 12:8, 105:8, 105:17, 106:2, 128:4, 128:19, 154:22
**millions** [1] - 90:3
**mind** [3] - 20:24, 55:5, 78:3
**mindset** [1] - 69:4
**mine** [4] - 80:15, 98:17, 126:5, 169:13
**minimize** [5] - 35:19, 72:12, 72:18, 79:19, 80:1
**minor** [1] - 30:24
**minute** [3] - 17:24, 25:18, 91:17
**minutes** [7] - 67:18, 91:15, 91:18, 176:17, 177:5, 178:21, 179:2
**miscarriage** [2] - 83:12, 83:16
**miscarriages** [1] - 82:22
**mischaracterizing** [2] - 106:1, 156:9
**misconception** [2] - 42:6, 42:10
**misinterpret** [1] - 62:19
**misleading** [1] - 82:22
**misperception** [1] - 138:10
**miss** [1] - 97:14
**missing** [9] - 104:23, 105:14, 106:4, 106:22, 107:11, 111:20, 162:5, 167:11, 172:23
**mistake** [1] - 37:7
**mistakes** [6] - 34:2, 35:18, 35:19, 35:20, 36:8, 37:5
**MIT** [2] - 107:18, 115:3

**mix** [13] - 106:12, 108:15, 109:3, 109:8, 109:17, 110:13, 110:15, 110:20, 142:23, 163:9, 174:11, 174:16
**mixed** [5] - 106:13, 107:14, 110:14, 155:24, 172:2
**mixer** [20] - 106:12, 107:7, 109:5, 109:6, 109:7, 110:18, 111:1, 113:13, 170:2, 170:8, 170:14, 170:16, 170:20, 172:3, 172:18, 172:25, 173:2, 173:3, 173:12, 173:25
**mixers** [3] - 108:6, 170:22, 170:23
**mixing** [8] - 74:23, 105:1, 108:5, 109:11, 152:22, 155:12, 170:2, 174:14
**mobster** [2] - 175:7, 175:8
**mode** [2] - 96:9, 97:23
**model** [6] - 53:3, 53:11, 99:20, 123:23, 123:24
**models** [2] - 53:2, 53:10
**modification** [1] - 131:1
**moment** [4] - 24:11, 30:16, 108:2, 150:9
**Monday** [2] - 6:21, 22:1
**Monero** [2] - 136:13, 137:1
**monetized** [1] - 129:10
**money** [43] - 12:24, 13:22, 55:17, 55:20, 56:16, 58:16, 94:10, 94:13, 100:11, 105:21, 107:1, 111:12, 111:18, 127:10, 132:14, 133:14, 138:1, 143:2, 143:4, 154:21, 163:2, 163:18, 164:4, 164:22, 164:23, 165:14, 165:18, 165:20, 166:6, 166:11, 166:22,

167:13, 173:3, 173:4, 173:15, 174:14, 174:18, 174:19, 174:21, 175:5
**Money** [2] - 136:20, 136:22
**month** [12] - 11:13, 12:20, 14:6, 16:6, 16:15, 17:11, 17:17, 17:25, 18:1, 18:12, 20:2
**months** [8] - 13:10, 16:13, 19:2, 47:6, 96:6, 135:14
**Morgan** [1] - 153:5
**morning** [14] - 3:6, 3:8, 3:11, 3:13, 3:14, 3:16, 6:7, 7:20, 45:2, 176:15, 177:20, 177:24, 178:3, 178:24
**MOSS** [1] - 1:8
**Moss** [1] - 41:21
**most** [16] - 58:8, 88:11, 95:4, 102:5, 111:11, 113:21, 121:11, 126:15, 135:7, 149:19, 150:19, 154:7, 160:13, 163:18, 164:22
**mostly** [3] - 58:6, 119:1, 170:12
**motion** [9] - 10:22, 15:12, 15:15, 25:17, 28:25, 29:2, 30:15, 30:19, 50:22
**MOTIONS** [2] - 1:4, 1:7
**motions** [6] - 10:21, 17:2, 23:1, 24:25, 26:4, 39:14
**motivated** [1] - 35:15
**move** [9] - 22:18, 31:15, 91:14, 129:2, 173:17, 174:3, 174:5, 178:6, 178:9
**moving** [4] - 62:2, 85:21, 149:14, 174:4
**MR** [133] - 3:11, 3:14, 7:20, 8:10, 9:18, 10:10, 10:15, 11:10, 11:16, 12:11, 13:5, 13:12, 13:21, 14:2, 14:9, 14:14, 14:20, 16:2, 16:8, 16:13, 17:9, 18:2, 18:4, 22:22, 23:5, 23:11, 24:8, 25:7, 25:10,

25:22, 26:13, 27:7, 28:22, 29:23, 30:10, 30:24, 31:7, 31:20, 32:6, 32:14, 32:21, 32:23, 33:1, 41:4, 41:10, 41:15, 41:18, 42:23, 43:4, 43:13, 43:16, 44:22, 45:1, 47:4, 47:10, 47:22, 48:4, 48:23, 49:4, 49:13, 49:16, 50:1, 50:12, 50:16, 51:13, 51:16, 52:5, 52:19, 54:2, 54:20, 54:24, 55:11, 55:12, 67:7, 70:19, 80:12, 81:3, 81:6, 81:21, 82:3, 85:4, 88:15, 88:20, 90:9, 91:10, 91:15, 91:22, 92:3, 92:5, 92:8, 97:9, 107:3, 117:18, 121:17, 129:1, 130:17, 130:19, 131:2, 131:10, 131:17, 131:25, 135:19, 138:15, 141:25, 142:3, 144:6, 144:7, 145:3, 145:11, 155:5, 155:19, 157:4, 158:23, 160:16, 160:17, 168:3, 171:3, 175:22, 176:1, 176:23, 177:5, 177:6, 177:9, 177:15, 177:18, 177:22, 178:11, 178:15, 178:18, 178:22, 179:16, 179:22, 180:3

**MS** [36] - 3:6, 3:9, 3:20, 5:11, 5:17, 5:25, 6:9, 6:15, 6:18, 7:4, 13:25, 18:22, 19:9, 19:17, 20:19, 21:3, 21:14, 21:19, 22:8, 22:16, 24:10, 24:14, 24:21, 26:20, 28:14, 28:20, 29:13, 30:22, 31:23, 131:8, 176:6, 176:10, 176:19, 178:4, 179:7, 179:15

**Mt** [25] - 8:10, 8:13, 8:25, 25:2, 112:22, 114:17, 114:19, 114:21, 114:22, 114:25, 115:6, 115:19, 116:1, 116:2, 116:4, 116:5,

116:7, 116:9, 116:23, 117:1, 117:7, 117:8, 117:14, 117:16, 163:7

**multi** [9] - 122:10, 122:19, 122:20, 122:21, 125:7, 125:9, 125:14, 129:11, 129:16

**multi-input** [7] - 122:10, 122:21, 125:7, 125:9, 125:14, 129:11, 129:16

**multi-spend** [1] - 122:20

**multiple** [10] - 5:2, 90:23, 115:9, 116:2, 126:15, 148:2, 149:15, 149:17, 155:12, 155:13

**multiply** [1] - 112:18

**music** [2] - 98:22, 99:5

**must** [1] - 119:11

**Mycelium** [1] - 15:8

## N

**N.W** [1] - 185:11

**N26** [1] - 161:18

**Nakamoto** [1] - 147:13

**name** [9] - 6:13, 7:25, 15:21, 40:9, 40:24, 45:4, 114:24, 149:9, 174:25

**namely** [2] - 25:2, 43:18

**names** [1] - 3:4

**Napster** [2] - 98:21, 98:22

**narrow** [4] - 6:6, 30:8, 30:9, 133:25

**narrowed** [1] - 17:7

**National** [8] - 52:10, 52:12, 52:16, 52:18, 72:11, 79:21, 79:23, 89:23

**natural** [1] - 164:6

**nature** [6] - 5:22, 35:2, 94:14, 113:24, 157:11, 159:6

**near** [1] - 161:2

**nearly** [2] - 160:6, 160:13

**necessarily** [10] - 38:2, 51:25, 79:15, 84:1, 90:8, 109:5, 151:13, 155:13, 155:15, 156:2

**necessary** [6] - 21:9, 54:5, 94:6, 159:10, 160:3, 160:9

**need** [73] - 5:23, 7:18, 10:2, 11:11, 11:13, 11:16, 12:1, 12:20, 15:12, 15:15, 15:17, 16:6, 16:23, 16:24, 17:9, 19:8, 19:14, 20:20, 24:4, 26:9, 28:2, 28:5, 28:10, 30:4, 30:6, 31:9, 31:21, 38:11, 48:4, 48:19, 48:21, 49:2, 49:4, 49:8, 49:23, 50:2, 53:15, 53:23, 67:2, 67:4, 67:5, 67:7, 72:3, 72:6, 77:6, 77:9, 77:24, 89:6, 89:13, 94:20, 102:6, 110:3, 117:10, 120:11, 139:22, 142:14, 146:7, 156:24, 162:14, 163:22, 172:21, 175:18, 175:21, 176:2, 176:23, 176:24, 177:2, 177:13, 178:8, 178:14

**needed** [10] - 4:6, 4:10, 17:24, 18:1, 19:15, 23:8, 23:17, 50:9, 75:25

**needing** [1] - 179:2

**needs** [10] - 11:8, 12:23, 17:17, 18:11, 20:22, 40:7, 73:25, 76:12, 95:6, 175:23

**negatives** [2] - 27:22, 152:17

**negligent** [1] - 33:25

**net** [5] - 111:13, 111:22, 111:23, 160:22

**Netherlands** [1] - 58:21

**network** [5] - 96:15, 106:16, 140:3, 140:8, 156:7

**neuroscientist** [1] - 87:11

**never** [8] - 56:24, 74:16, 77:11, 88:12, 133:8, 133:11, 134:14, 174:8

**nevertheless** [2] - 35:16, 86:5

**new** [20] - 9:21, 10:1, 11:25, 12:4, 12:22,

15:14, 17:20, 17:25, 18:2, 18:6, 19:8, 19:16, 25:25, 26:11, 26:22, 41:12, 50:4, 144:22, 155:9

**New** [4] - 1:17, 40:4, 83:2, 176:2

**newly** [2] - 7:5, 9:15

**next** [12] - 4:16, 15:12, 21:24, 23:3, 25:23, 29:3, 52:5, 54:3, 91:14, 91:21, 131:22, 146:24

**NFTs** [1] - 96:16

**nice** [3] - 86:23, 177:3

**night** [17] - 9:15, 9:25, 10:11, 11:21, 11:25, 17:20, 18:23, 26:15, 26:18, 27:8, 28:22, 29:5, 29:8, 49:6, 50:12, 77:23, 129:22

**night's** [1] - 28:15

**nine** [1] - 124:13

**nobody** [1] - 173:24

**node** [5] - 118:4, 118:5, 118:12, 118:16, 118:19

**nodes** [6] - 98:13, 98:14, 98:16, 118:1, 119:22

**non** [1] - 169:6

**non-KYC** [1] - 169:6

**noncoinjoin** [1] - 155:17

**nondisclosed** [1] - 169:6

**none** [1] - 65:10

**nonprofit** [1] - 139:4

**nonscientific** [1] - 64:15

**Nordea** [1] - 161:15

**Nordic** [3] - 161:20, 165:17, 166:3

**normal** [4] - 39:16, 108:21, 108:22, 135:1

**normies** [1] - 137:8

**north** [2] - 128:4, 135:18

**note** [4] - 4:17, 24:21, 103:6, 131:20

**notes** [3] - 12:22, 72:7, 185:5

**nothing** [6] - 9:24, 15:18, 37:8, 84:17, 122:3, 123:18

**notice** [6] - 19:18, 19:25, 28:17, 124:8, 129:21

**noticed** [3] - 6:20,

6:25, 104:15

**notion** [2] - 68:19, 108:14

**November** [1] - 169:11

**nowhere** [1] - 114:14

**number** [22] - 18:9, 33:3, 38:17, 38:18, 38:25, 39:9, 43:1, 43:23, 47:5, 48:25, 56:20, 60:5, 60:9, 66:17, 71:13, 101:22, 105:24, 107:24, 139:9, 155:6, 158:9, 165:23

**Number** [1] - 47:6

**numbered** [1] - 46:5

**numbers** [10] - 61:21, 61:22, 61:23, 62:12, 62:15, 62:16, 166:15, 169:17, 171:11, 171:13

**numerous** [1] - 27:14

**nutshell** [1] - 33:25

**NW** [3] - 1:11, 1:14, 1:22

**NY** [1] - 1:17

**NYPD** [1] - 34:15

## O

**object** [2] - 52:4, 80:12

**objection** [3] - 6:3, 81:2, 81:21

**objective** [1] - 88:11

**obligation** [1] - 48:13

**observed** [5] - 77:11, 147:2, 147:3, 147:19, 147:21

**observing** [5] - 64:6, 64:7, 64:8, 64:11, 65:1

**obtain** [6] - 93:20, 96:6, 106:17, 111:2, 127:12, 127:20

**obviated** [1] - 108:3

**obviously** [7] - 8:11, 16:24, 54:15, 55:9, 98:23, 100:25, 136:2

**occur** [2] - 144:14, 148:21

**occurred** [5] - 40:20, 150:6, 157:20, 163:25, 169:1

**OF** [10] - 1:1, 1:2, 1:7, 1:13, 32:24, 44:24, 88:18, 92:6, 131:15, 185:1

**off-chain** [1] - 119:23

**offer** [6] - 48:14,

48:21, 48:23, 51:8,
52:25, 54:8
**offered** [3] - 28:6,
58:9, 135:25
**offering** [8] - 5:6, 5:15,
5:18, 5:19, 5:23,
7:22, 8:4, 47:3
**offhand** [1] - 128:24
**Office** [1] - 34:17
**officer** [1] - 132:24
**OFFICIAL** [1] - 185:1
**Official** [2] - 1:21,
185:10
**often** [6] - 5:16, 82:16,
98:20, 147:21,
147:22
**oligopoly** [1] - 149:8
**omissions** [3] - 11:19,
15:6, 18:9
**on-chain** [10] - 95:20,
96:20, 96:24,
101:14, 101:20,
113:17, 113:18,
114:5, 126:25,
127:19
**once** [3] - 55:21,
146:7, 166:19
**one** [125] - 3:25, 4:17,
6:6, 7:14, 9:7, 9:11,
9:22, 13:5, 14:18,
14:22, 15:21, 24:11,
25:10, 26:13, 28:1,
32:1, 36:20, 39:4,
40:12, 41:19, 42:2,
42:19, 45:4, 45:25,
46:1, 47:5, 47:22,
48:6, 48:22, 59:23,
60:15, 60:19, 63:14,
64:17, 65:3, 65:4,
67:20, 68:13, 68:25,
69:3, 69:5, 69:12,
74:24, 74:25, 76:9,
78:13, 78:17, 82:16,
83:21, 84:17, 85:7,
85:18, 89:24, 91:2,
98:1, 99:7, 100:17,
100:19, 102:8,
102:17, 104:23,
107:24, 109:21,
109:24, 111:10,
112:4, 113:9,
113:21, 114:20,
115:18, 118:3,
119:20, 119:24,
120:5, 120:12,
121:11, 122:25,
124:11, 124:14,
124:17, 124:22,
126:21, 127:3,
127:24, 128:1,

129:8, 129:12,
129:25, 130:21,
138:5, 138:9, 144:8,
145:18, 147:25,
148:7, 148:20,
149:16, 150:17,
151:17, 151:18,
151:25, 152:8,
152:9, 154:17,
155:6, 155:14,
162:20, 164:25,
165:12, 169:10,
169:17, 170:12,
170:24, 170:25,
172:6, 173:10,
174:9, 177:1, 177:7
**one-on-one** [1] -
113:9
**one-person-sending
-to-two-people-
simultaneously-
type** [1] - 148:7
**one-to-one** [1] - 85:18
**ones** [5] - 5:12, 26:4,
31:25, 109:13, 161:7
**ongoing** [1] - 65:5
**onion** [1] - 109:14
**online** [2] - 97:21,
102:17
**open** [4] - 56:3, 59:17,
99:24, 134:9
**open-source** [2] -
59:17, 99:24
**opening** [1] - 94:2
**operating** [4] - 64:13,
72:7, 105:1, 105:20
**operation** [1] - 174:7
**operations** [2] - 84:10,
144:9
**operator** [1] - 106:9
**opine** [6] - 52:3, 53:3,
53:6, 81:19, 164:21,
173:2
**opining** [3] - 7:1,
164:21, 170:15
**opinion** [70] - 5:6,
5:15, 5:18, 5:19,
5:21, 5:23, 5:24,
7:22, 8:4, 9:4, 16:16,
36:23, 44:5, 44:8,
44:9, 44:12, 44:14,
45:7, 45:9, 46:2,
46:4, 46:5, 46:9,
47:3, 51:6, 51:8,
51:18, 52:1, 54:25,
62:6, 62:8, 72:4,
72:6, 74:10, 74:15,
76:19, 76:24, 77:3,
81:16, 81:18, 81:25,
82:2, 84:20, 88:10,

88:25, 89:17, 89:22,
90:1, 104:13,
104:18, 107:7,
108:11, 109:20,
111:5, 111:8, 112:8,
123:3, 142:11,
143:10, 146:19,
146:22, 159:10,
160:4, 160:9,
167:19, 170:19,
172:22, 173:6, 174:9
**opinions** [19] - 27:24,
46:24, 46:25, 47:13,
47:20, 48:3, 48:11,
48:14, 48:15, 48:16,
48:21, 50:23, 53:24,
54:1, 141:16,
144:16, 144:19,
146:22, 170:17
**opportunity** [4] -
18:15, 25:15, 26:21,
54:1
**oppose** [2] - 20:16,
51:21
**opposes** [1] - 20:11
**opposing** [1] - 39:14
**opposition** [2] - 25:16,
36:19
**option** [1] - 176:7
**order** [8] - 5:8, 5:10,
22:10, 25:18, 90:18,
148:6, 149:20, 171:9
**ordered** [1] - 7:11
**ordinary** [1] - 118:7
**organized** [1] - 5:10
**original** [5] - 19:5,
147:12, 147:14,
163:19, 164:7
**originally** [2] - 23:7,
93:12, 162:20,
162:25, 165:8
**originator** [1] - 130:21
**otherwise** [1] - 22:19
**outcome** [4] - 85:24,
86:11, 89:10, 135:5
**outcomes** [3] - 72:24,
87:7, 129:19
**output** [1] - 155:11
**outputs** [10] - 126:12,
148:2, 149:22,
150:16, 150:21,
151:2, 151:5,
151:10, 151:13,
151:17
**outside** [6] - 28:3,
28:10, 95:25,
103:24, 150:8,
164:15
**outstanding** [2] -
6:19, 23:1

**overall** [1] - 128:21
**overbroad** [1] - 50:8
**overcome** [1] - 100:2
**overnight** [1] - 177:10
**overruled** [1] - 81:23
**overseas** [1] - 138:18
**oversight** [1] - 139:5
**overuse** [1] - 126:4
**overwhelming** [1] -
171:17
**own** [26] - 26:6, 83:1,
94:16, 98:17, 98:19,
102:14, 110:6,
116:24, 119:1,
119:22, 120:14,
120:23, 134:12,
140:14, 141:17,
141:18, 150:2,
150:18, 158:18,
163:13, 167:5,
173:13, 174:2,
174:25
**owned** [1] - 103:11
**owner** [3] - 106:15,
110:2, 116:24
**owner/CEO/
president** [1] - 115:5
**owner/controller/
manager** [1] - 115:6
**ownership** [7] - 96:16,
103:14, 113:16,
113:19, 113:24,
114:13, 170:10
**owns** [2] - 56:17,
175:8

# P

**p.m** [4] - 70:17, 180:7,
184:21
**PAGE** [2] - 2:2, 2:15
**page** [2] - 43:14, 45:14
**pages** [1] - 10:14
**paid** [9] - 55:13, 55:19,
55:20, 55:23, 55:24,
134:8, 134:18,
134:22, 134:23
**pair** [1] - 75:4
**paper** [33] - 10:16,
10:17, 10:19, 10:21,
11:22, 12:19, 15:22,
31:10, 39:2, 63:14,
68:24, 94:6, 94:7,
129:23, 129:25,
130:3, 130:13,
147:12, 147:15,
152:1, 152:4, 152:5,
152:6, 152:8,
152:19, 152:22,
152:24, 153:12,

153:18, 166:2
**papers** [8] - 6:1, 8:12,
9:19, 38:25, 129:6,
129:7, 151:25,
171:22
**paperwork** [5] - 17:3,
56:11, 58:24, 58:25,
59:1
**parade** [2] - 78:12,
78:15
**part** [29] - 12:14,
12:24, 15:1, 35:7,
60:4, 64:2, 77:16,
77:19, 78:6, 79:12,
95:8, 95:12, 95:25,
97:2, 115:2, 117:2,
119:11, 124:2,
124:21, 130:7,
132:6, 135:25,
144:15, 144:16,
147:7, 158:18,
170:19, 172:16,
174:23
**particular** [29] - 5:8,
31:16, 44:12, 49:3,
50:9, 53:2, 53:3,
53:10, 54:14, 68:4,
68:5, 91:8, 101:21,
125:1, 151:11,
152:25, 154:6,
159:11, 160:4,
160:20, 161:1,
166:5, 166:21, 169:4
**particularly** [10] -
4:10, 5:12, 11:14,
20:14, 29:4, 108:23,
122:10, 133:19,
161:2, 164:17
**particulars** [4] - 12:5,
25:3, 54:13, 55:8
**parties** [5] - 24:6,
26:8, 31:14, 55:9,
91:6
**party** [3] - 99:21,
117:17, 124:22
**pass** [4] - 43:4, 43:5,
44:22, 131:2
**password** [2] -
101:17, 102:1
**past** [6] - 67:18, 75:15,
100:16, 129:16,
138:18, 175:14,
175:19, 175:22,
175:23
**path** [2] - 174:9
**pathologist** [4] -
68:13, 68:25, 69:12,
69:14
**pathologists** [1] -
64:23

**pathology** [2] - 68:23, 69:6
**pattern** [12] - 60:20, 61:10, 147:19, 147:21, 169:21, 169:23, 169:24, 169:25, 170:4, 172:15, 172:16, 175:14
**patterns** [8] - 62:13, 62:14, 62:15, 62:17, 62:20, 147:2, 170:11
**pay** [3] - 55:21, 56:6, 56:16
**paying** [1] - 55:17
**payjoins** [1] - 149:24
**payments** [2] - 96:14, 148:1
**pays** [2] - 56:15, 175:10
**peel** [4] - 122:10, 125:7, 125:24, 126:4
**peer** [20] - 9:20, 60:10, 71:7, 113:5, 113:10, 136:24, 143:25, 150:5, 150:6, 169:6, 173:16, 173:20
**peer-reviewed** [4] - 9:20, 60:10, 71:7, 136:24
**peer-to-peer** [7] - 113:5, 113:10, 143:25, 150:5, 150:6, 169:6, 173:20
**pejorative** [1] - 109:15
**PELKER** [37] - 1:13, 3:6, 3:9, 3:20, 5:11, 5:17, 5:25, 6:9, 6:15, 6:18, 7:4, 13:25, 18:22, 19:9, 19:17, 20:19, 21:3, 21:14, 21:19, 22:8, 22:16, 24:10, 24:14, 24:21, 26:20, 28:14, 28:20, 29:13, 30:22, 31:23, 131:8, 176:6, 176:10, 176:19, 178:4, 179:7, 179:15
**Pelker** [6] - 3:6, 3:8, 18:21, 26:19, 29:12, 30:21
**pending** [1] - 21:14
**Pennsylvania** [1] - 1:14
**people** [48] - 5:2, 17:18, 33:17, 33:20, 34:1, 35:15, 40:8, 42:1, 42:3, 42:4, 42:11, 42:14, 42:20, 63:9, 66:19, 68:7,

68:8, 68:9, 73:19, 78:14, 79:1, 80:22, 83:3, 83:9, 96:17, 98:8, 98:20, 99:1, 99:2, 99:16, 100:9, 106:19, 109:15, 110:7, 110:9, 129:12, 148:1, 148:7, 150:14, 154:7, 155:23, 156:1, 156:2, 164:17, 179:20
**per** [1] - 58:17
**perceive** [2] - 33:17, 62:19
**perceived** [1] - 138:1
**percent** [25] - 57:9, 68:7, 68:9, 69:11, 69:12, 75:11, 80:6, 83:19, 84:2, 105:10, 105:11, 105:12, 105:15, 105:17, 106:2, 143:16, 170:7, 170:25, 171:1, 171:19, 172:5, 172:6
**percentage** [11] - 82:4, 127:24, 128:6, 128:8, 128:9, 128:14, 147:6, 147:22, 149:1, 170:7
**percentage-wise** [1] - 128:6
**percentages** [1] - 148:5
**perception** - 36:18
**perform** [1] - 139:25
**performance** [1] - 71:11
**perhaps** [2] - 32:1, 41:1
**period** [3] - 14:7, 28:2, 148:5
**periods** [1] - 20:1
**permission** [1] - 14:3
**permit** [1] - 28:11
**persist** [1] - 94:12
**person** [22] - 9:4, 37:17, 37:23, 53:14, 61:4, 66:20, 77:21, 77:22, 89:14, 98:2, 100:22, 101:4, 115:23, 115:24, 122:13, 126:16, 126:20, 148:7, 154:3, 173:2, 173:24, 176:5
**personal** [1] - 111:2
**personally** [6] - 55:20, 59:10, 101:4, 101:9,

145:12, 146:2
**personnel** [1] - 58:13
**Ph.D** [4] - 33:4, 45:25, 60:6, 63:25
**philosophy** [2] - 33:12, 59:5
**phishing** [2] - 95:19, 97:6
**phone** [1] - 20:24
**photograph** [1] - 68:7
**phrase** [5] - 82:20, 100:12, 115:15, 116:12, 144:4
**pick** [5] - 22:11, 24:3, 178:13, 178:24, 179:1
**picked** [1] - 18:23
**picking** [1] - 73:11
**pickup** [1] - 175:17
**picture** [2] - 164:13, 165:23
**pictures** [1] - 96:17
**piece** [1] - 166:2
**pieces** [4] - 60:24, 65:2, 76:10, 101:16
**pilot** [1] - 34:7
**pilots** [5] - 37:10, 64:24, 65:1, 65:6, 71:14
**place** [6] - 23:24, 23:25, 98:1, 98:2, 118:11, 159:23
**placement** [1] - 174:20
**placing** [1] - 174:24
**plain** [1] - 86:19
**Plaintiff** [2] - 1:3, 1:10
**plan** [4] - 45:21, 45:22, 46:2
**plane** [3] - 37:1, 37:2, 65:4
**planned** [1] - 3:23
**planning** [1] - 23:11
**platform** [3] - 115:1, 143:25, 150:5
**platforms** [2] - 113:6, 169:6
**plausible** [3] - 163:18, 164:4, 164:22
**play** [1] - 90:5
**playing** [1] - 150:13
**plea** [2] - 40:17, 40:22
**PLLC** [1] - 1:16
**podcast** [10] - 115:3, 115:12, 115:14, 115:15, 135:21, 135:22, 136:13, 137:1, 137:6, 171:22
**point** [33] - 14:7, 16:7, 19:15, 30:1, 30:19,

41:16, 46:23, 47:14, 54:8, 59:25, 60:1, 60:15, 71:13, 81:4, 87:17, 105:22, 108:10, 109:21, 119:17, 119:24, 127:1, 134:24, 138:9, 142:4, 142:15, 164:19, 167:9, 170:25, 171:1, 171:21, 172:6, 178:20, 178:23
**pointed** [1] - 109:13
**pointing** [1] - 109:11
**points** [1] - 135:12
**Poland** [1] - 100:13
**police** [4] - 34:11, 34:12, 82:6, 82:14
**policies** [1] - 133:2
**policing** [1] - 34:10
**policy** [5] - 92:15, 132:25, 133:3, 139:2, 139:5
**pool** [7] - 149:15, 152:25, 155:21, 155:23, 155:24, 156:2
**popular** [3] - 98:21, 115:14, 127:16
**portion** [7] - 52:6, 57:18, 57:21, 127:18, 127:21, 159:8, 173:18
**portions** [1] - 159:10
**pose** [2] - 82:24, 84:25
**posed** [1] - 28:19
**position** [4] - 4:18, 6:2, 110:2, 167:6
**positive** [1] - 7:25
**positives** [4] - 27:21, 152:14, 152:16, 152:17
**possess** [1] - 173:8
**possibility** [4] - 99:19, 147:16, 147:17, 171:14
**possible** [6] - 8:23, 73:18, 85:17, 126:23, 127:14, 127:16
**possibly** [2] - 21:19, 22:1
**post** [20] - 106:12, 108:15, 109:8, 110:13, 110:15, 110:20, 127:17, 142:23, 163:9, 164:13, 165:10, 166:12, 167:17,

172:2, 174:11, 174:16, 174:24, 175:12
**post-Bitcoin** [2] - 167:17, 172:2
**post-laundered** [2] - 174:24, 175:12
**post-mix** [9] - 108:15, 109:8, 110:15, 110:20, 142:23, 163:9, 174:11, 174:16
**postponed** [1] - 23:16
**pot** [1] - 119:24
**potential** [4] - 19:21, 20:25, 123:19, 143:17
**potentially** [7] - 4:12, 89:10, 103:15, 129:17, 158:1, 167:4, 174:14
**practice** [3] - 89:20, 92:21, 94:3
**practiced** [1] - 133:8
**practices** [4] - 72:9, 72:19, 89:17, 144:1
**pre** [1] - 164:12
**pre-Bitcoin** [1] - 164:12
**precedes** [1] - 122:8
**precursor** [1] - 99:4
**predicate** [1] - 174:13
**predicted** [1] - 152:14
**predicting** [2] - 86:10, 87:4
**prediction** [1] - 80:8
**predicts** [1] - 87:6
**preface** [1] - 139:21
**prefer** [1] - 84:15
**preference** [1] - 19:12
**prejudice** [1] - 36:15
**preliminary** [1] - 24:19
**premature** [3] - 30:14, 48:19, 54:15
**prepare** [4] - 11:13, 17:19, 18:11, 21:8
**prepared** [4] - 20:15, 48:2, 81:13, 81:19
**presence** [10] - 28:3, 28:10, 72:4, 73:12, 73:15, 74:17, 74:21, 79:13, 84:1, 85:22
**present** [5] - 3:12, 18:16, 53:23, 74:7, 111:18
**presentation** [8] - 75:13, 130:4, 153:13, 153:16, 154:1, 154:3, 154:4, 158:3

**presented** [3] - 18:9, 85:17, 153:20
**presenter** [1] - 153:20
**presenting** [2] - 65:24, 65:25
**press** [2] - 12:7, 98:21
**Press** [1] - 107:18
**pressing** [1] - 10:8
**presumably** [2] - 20:21, 144:24
**pretrial** [4] - 21:4, 21:9, 24:4, 26:8
**pretty** [9] - 94:1, 111:16, 113:1, 121:13, 134:14, 147:17, 154:19, 166:9
**previewing** [1] - 130:3
**previous** [1] - 28:17
**previously** [2] - 10:12, 84:11
**price** [4] - 112:13, 167:1, 167:5, 169:13
**prices** [1] - 167:3
**primarily** [1] - 144:20
**primary** [3] - 33:15, 101:16, 122:25
**principally** [1] - 116:6
**principles** [2] - 71:4, 71:10
**print** [2] - 60:20, 61:10
**prints** [1] - 78:16
**Privacy** [1] - 136:22
**privacy** [28] - 103:16, 106:16, 106:17, 107:17, 107:25, 108:1, 108:4, 108:7, 108:8, 108:15, 110:3, 110:9, 111:2, 111:3, 115:2, 127:12, 127:20, 135:22, 136:15, 136:17, 137:8, 137:22, 139:15, 147:14, 158:2, 174:12
**private** [20] - 81:10, 90:2, 101:16, 101:17, 101:24, 101:25, 102:3, 102:11, 103:5, 103:7, 103:8, 103:9, 107:22, 108:9, 114:7, 114:9, 114:14, 126:25, 137:19, 174:11
**pro** [3] - 120:8, 134:21, 135:4
**probabilistic** [1] - 27:12

**probability** [5] - 80:4, 85:23, 85:25, 87:19, 87:22
**problem** [9] - 12:14, 13:20, 49:18, 50:2, 63:2, 67:15, 86:21, 107:23, 144:3
**problematic** [1] - 86:24
**problems** [5] - 9:11, 76:9, 97:5, 116:17, 123:19
**procedure** [1] - 69:23
**procedures** [4] - 35:8, 38:10, 64:13, 72:8, 73:4, 78:10, 79:22, 79:23
**proceed** [5] - 32:21, 55:8, 91:9, 92:3, 131:14
**proceeding** [4] - 4:19, 55:6, 153:14, 160:23
**proceedings** [4] - 6:21, 27:1, 180:8, 185:6
**proceeds** [6] - 111:1, 142:23, 173:12, 175:1, 175:8
**process** [14] - 8:8, 13:1, 13:4, 20:22, 37:24, 71:8, 71:19, 76:7, 79:12, 86:20, 140:5, 153:11, 172:13, 174:23
**processes** [10] - 35:17, 36:17, 37:13, 37:16, 37:21, 42:13, 46:6, 63:13, 63:21, 72:25
**processing** [5] - 37:22, 71:19, 76:16
**produce** [1] - 7:12
**produced** [2] - 49:10, 160:18
**product** [2] - 145:19, 162:7
**production** [1] - 168:14
**professional** [2] - 134:4, 173:1
**Professor** [3] - 131:18, 132:1, 140:13
**professor** [7] - 113:23, 139:17, 141:21, 142:4, 144:8, 159:8, 168:4
**proffer** [1] - 61:21
**proffered** [2] - 26:12, 48:7

**proffering** [2] - 9:7, 48:7
**program** [1] - 120:7
**programmer** [1] - 140:2
**programmers** [1] - 99:23
**progress** [1] - 177:13
**prohibition** [1] - 93:13
**Project** [2] - 83:2, 83:18
**projects** [1] - 97:5
**proliferation** [1] - 17:3
**prominence** [1] - 154:16
**prominent** [1] - 155:3
**promote** [2] - 81:12, 81:20
**promptly** [3] - 13:20, 30:21, 48:20
**prone** [2] - 72:23, 86:18
**proof** [4] - 107:21, 139:7, 139:10, 139:16
**proper** [6] - 12:24, 17:16, 18:11, 18:17, 54:16, 149:20
**properly** [2] - 17:19, 57:17
**property** [2] - 101:10, 113:25
**proportion** [1] - 85:8
**proposal** [1] - 136:23
**propose** [5] - 20:17, 21:6, 21:11, 43:7, 164:21
**proprietary** [1] - 119:8
**proprietor** [1] - 143:5
**prosecution** [8] - 38:22, 39:14, 40:13, 44:18, 44:20, 83:7, 88:9, 90:1
**prosecutor** [3] - 38:24, 51:3, 90:18
**prosecutors** [2] - 40:5, 45:5
**prospective** [3] - 45:17, 45:20, 46:16
**protection** [1] - 42:20
**protective** [2] - 119:2, 119:4
**prove** [1] - 77:7
**proven** [2] - 79:20, 100:7
**provide** [1] - 20:9, 41:1, 68:1, 68:17, 72:20, 84:13, 127:25, 141:24, 158:9, 158:16,

158:17
**provided** [6] - 53:25, 69:5, 122:7, 159:14, 160:2, 160:11
**providers** [3] - 152:10, 153:3, 158:25
**provides** [1] - 68:1
**proximity** [2] - 8:16, 8:18
**proxy** [1] - 9:1
**Public** [1] - 93:4
**public** [33] - 40:6, 41:23, 42:2, 90:18, 92:15, 92:22, 101:16, 101:18, 101:23, 101:25, 102:1, 102:12, 102:15, 102:20, 102:22, 103:9, 103:10, 103:15, 106:17, 106:19, 119:5, 122:11, 123:25, 124:9, 124:12, 125:1, 125:2, 126:3, 127:8, 141:19, 146:5, 180:7
**publicity** [2] - 81:11, 81:20
**publicly** [3] - 109:16, 137:22, 146:15
**published** [11] - 33:13, 33:14, 39:25, 52:13, 60:5, 60:9, 66:23, 68:24, 80:22, 133:11, 133:13
**pull** [3] - 113:7, 114:4
**purchase** [4] - 150:6, 164:10, 166:24, 167:7
**purchased** [5] - 165:12, 165:24, 167:20, 167:23, 173:15
**purchases** [1] - 143:24
**purely** [3] - 6:24, 65:8, 139:2
**purports** [1] - 157:18
**purpose** [2] - 26:10, 27:2
**purposes** [3] - 32:11, 53:23, 94:8
**pursuant** [1] - 51:19
**pushed** [1] - 20:12
**pushing** [2] - 16:12, 23:20
**put** [20] - 3:23, 4:25, 18:18, 19:24, 20:2, 20:3, 20:22, 22:13, 22:14, 23:9, 25:22,

27:5, 110:1, 115:7, 135:17, 145:5, 145:13, 163:2, 166:1
**puts** [4] - 23:23, 24:1, 36:3, 69:4
**putting** [2] - 20:13, 78:2, 101:9

## Q

**qualifications** [1] - 7:16
**qualified** [4] - 18:16, 40:10, 40:20, 48:6
**qualify** [1] - 39:12
**Quantico** [1] - 35:4
**quantification** [1] - 79:4
**quantify** [4] - 68:17, 78:11, 86:1, 127:22
**quantifying** [3] - 68:1, 70:4, 87:19
**questioning** [3] - 28:3, 48:1, 70:20
**questions** [18] - 17:23, 25:3, 43:11, 45:5, 47:16, 47:17, 48:5, 53:21, 81:4, 86:14, 88:15, 88:22, 90:9, 90:15, 104:23, 121:14, 153:11, 160:16
**quick** [1] - 108:19
**quickly** [2] - 21:8, 169:11
**quit** [1] - 168:21
**quite** [7] - 26:6, 53:4, 64:14, 90:21, 116:3, 163:16
**quiz** [1] - 130:8
**quotation** [1] - 36:3
**quote** [7] - 129:15, 137:7, 160:22, 168:22, 169:10, 169:12

## R

**raise** [6] - 25:8, 32:18, 55:1, 55:2, 55:4, 91:25
**raised** [4] - 8:12, 26:22, 43:23, 121:14
**ran** [2] - 104:25, 107:16
**RANDOLPH** [1] - 1:8
**random** [2] - 84:6, 169:23
**range** [5] - 34:5, 65:23, 112:16,

112:19, 167:2
**ransomware** [1] - 95:18
**rare** [1] - 148:3
**rate** [24] - 27:13, 27:21, 68:6, 69:17, 69:18, 75:11, 75:18, 79:6, 123:8, 123:13, 134:9, 134:10, 134:11, 134:12, 135:1, 135:2, 143:17, 143:18, 147:23, 166:5
**Rates** [1] - 39:3
**rates** [14] - 8:2, 9:24, 12:3, 15:3, 27:11, 29:8, 38:15, 38:17, 38:18, 38:21, 38:24, 38:25, 165:19
**rather** [5] - 78:4, 96:23, 99:1, 99:15, 125:21
**reach** [8] - 38:6, 44:19, 66:6, 66:9, 74:14, 76:18, 80:21, 81:1
**reached** [5] - 86:4, 86:22, 87:23, 136:7
**reaching** [1] - 72:2
**reaction** [1] - 136:4
**Reactor** [16] - 27:11, 29:5, 30:11, 30:13, 43:19, 49:9, 90:3, 117:20, 117:23, 118:23, 118:25, 119:20, 120:12, 120:22, 121:2, 123:1
**read** [10] - 12:21, 27:7, 36:19, 46:17, 50:14, 60:15, 83:5, 84:21, 130:9, 136:3
**readily** [5] - 41:10, 110:13, 113:11, 157:14, 157:22
**reading** [1] - 152:20
**ready** [3] - 22:5, 49:21, 92:9
**real** [10] - 38:1, 39:8, 96:20, 108:19, 109:10, 114:16, 126:19, 126:20, 173:1
**real-world** [1] - 96:20
**realistic** [1] - 17:6
**realize** [2] - 23:12, 120:1
**realized** [2] - 99:12, 138:12
**really** [13] - 17:22, 23:20, 23:21, 25:25,

30:6, 33:19, 43:6, 51:22, 53:8, 86:13, 100:24, 126:21, 174:8
**reason** [17] - 5:14, 12:25, 13:3, 17:5, 17:24, 49:19, 67:2, 107:10, 107:11, 110:15, 112:24, 119:9, 120:25, 145:17, 146:9, 147:8, 174:15
**reasonable** [14] - 103:3, 103:8, 105:12, 109:25, 110:23, 164:10, 165:4, 165:6, 165:9, 165:13, 165:22, 167:6, 167:20, 171:1
**reasonably** [1] - 162:22
**reasoning** [1] - 38:6
**reasons** [13] - 14:3, 19:16, 47:15, 104:22, 106:18, 120:5, 121:10, 144:14, 144:17, 145:4, 145:15, 145:16, 145:18
**rebut** [2] - 16:21, 18:17
**rebuttal** [3] - 16:23, 47:6, 47:8
**receive** [1] - 73:17
**received** [4] - 11:15, 59:9, 145:25, 164:17
**receiving** [2] - 111:7, 113:6
**recent** [3] - 154:13, 154:14, 154:15
**recently** [3] - 115:12, 154:16, 154:22
**recess** [3] - 70:17, 91:19, 131:6
**recipient** [1] - 149:18
**recipients** [1] - 149:17
**recognize** [1] - 20:20
**reconvene** [2] - 175:24, 176:15
**record** [13] - 3:4, 32:7, 50:18, 73:23, 75:3, 75:16, 97:24, 97:25, 102:19, 118:8, 119:5, 141:7, 180:7
**recorded** [1] - 113:19
**recording** [1] - 113:17
**recordings** [1] - 63:17
**records** [7] - 8:11, 9:1, 57:22, 57:25, 115:20, 115:22,

116:17, 116:21, 116:24, 135:11, 161:14, 161:17, 161:21, 161:24, 168:13, 168:17
**recreate** [1] - 11:18
**redirect** [1] - 67:11
**REDIRECT** [1] - 88:18
**Redirect** [1] - 2:7
**reduce** [4] - 58:13, 72:21, 78:9, 78:21
**reduces** [1] - 79:5
**reducing** [1] - 79:7
**reference** [1] - 65:7
**referenced** [7] - 39:5, 108:19, 111:15, 122:6, 128:15, 136:10, 152:4
**references** [1] - 27:14
**referencing** [1] - 42:24
**referred** [1] - 137:21
**referring** [7] - 31:12, 83:16, 87:9, 101:6, 108:20, 130:12, 130:14
**reflects** [1] - 53:3
**reframing** [1] - 75:12
**refuse** [1] - 59:10
**regard** [3] - 13:10, 25:10, 108:18
**regime** [1] - 107:2
**register** [1] - 50:17
**registration** [1] - 8:21
**regular** [2] - 4:4, 139:9
**regularly** [1] - 118:17
**regulation** [2] - 92:17, 133:19
**regulatory** [1] - 97:19
**reiterate** [1] - 4:18
**relate** [1] - 143:15
**related** [4] - 77:12, 123:4, 140:10, 149:24
**relating** [1] - 159:18
**relation** [3] - 34:3, 35:20, 88:22
**relationship** [2] - 121:4, 145:23
**relative** [1] - 93:20, 170:1, 170:5
**relatively** [1] - 93:20
**relayed** [2] - 116:3, 168:24
**release** [1] - 12:7
**relevance** [2] - 51:22, 55:10
**relevant** [9] - 75:3, 75:21, 75:22, 75:23, 76:10, 76:12, 89:14, 92:20

**reliability** [9] - 94:18, 116:16, 121:14, 146:2, 146:14, 146:19, 146:23, 158:22, 163:7
**reliable** [7] - 51:25, 52:1, 87:2, 88:11, 123:4, 146:8, 152:3
**reliably** [3] - 15:4, 123:12, 123:13
**reliance** [1] - 145:1
**relied** [1] - 112:22
**relies** [2] - 146:21, 172:22
**relink** [1] - 108:8
**rely** [21] - 26:3, 35:9, 84:16, 84:19, 84:22, 94:20, 98:2, 99:9, 112:24, 112:25, 113:2, 116:22, 117:7, 117:8, 117:14, 121:25, 122:1, 132:7, 145:4, 145:12, 163:7
**relying** [14] - 117:1, 117:16, 117:17, 119:19, 120:4, 129:17, 130:25, 144:15, 144:16, 144:19, 144:24, 153:10, 172:24
**remaining** [2] - 23:3, 23:16
**remember** [18] - 40:20, 41:11, 41:15, 56:20, 65:17, 66:22, 98:22, 115:5, 115:8, 127:23, 128:3, 128:14, 152:20, 161:19, 161:23, 161:25, 168:18
**remind** [1] - 21:1
**remixing** [2] - 155:12, 155:24
**remote** [2] - 176:11, 177:3
**remotely** [3] - 176:4, 176:22, 176:24
**removed** [1] - 180:4
**rents** [1] - 99:10
**repeat** [7] - 60:22, 60:23, 61:15, 66:16, 117:13, 145:7, 145:9
**repeatedly** [2] - 12:12, 50:5
**repeating** [3] - 77:17, 87:8, 87:21
**replace** [1] - 18:6
**reply** [3] - 25:15, 25:21, 25:24

**report** [42] - 5:11, 6:1, 7:8, 7:14, 7:23, 8:1, 9:15, 10:1, 10:3, 10:4, 11:13, 11:25, 12:13, 12:17, 14:4, 15:5, 15:14, 17:19, 17:20, 17:25, 18:4, 18:6, 18:11, 18:17, 18:24, 19:25, 20:4, 20:7, 20:18, 20:20, 20:21, 20:23, 22:7, 22:10, 41:8, 48:14, 48:20, 49:24, 122:6, 130:15, 142:6
**reported** [1] - 103:23
**REPORTER** [3] - 117:10, 145:7, 185:1
**reporter** [4] - 67:3, 67:18, 120:17, 158:14
**Reporter** [3] - 1:21, 1:21, 185:10
**reports** [6] - 7:12, 11:14, 19:3, 144:9, 159:12
**represent** [3] - 45:20, 164:11, 166:12
**representation** [1] - 143:22
**representations** [2] - 58:7, 120:21
**representatives** [1] - 158:11
**represented** [2] - 96:20, 160:23
**represents** [3] - 52:1, 96:15, 142:24
**reputation** [2] - 98:18, 113:1
**request** [6] - 9:17, 20:13, 29:24, 30:9, 30:16, 90:20
**requested** [1] - 11:23
**requesting** [1] - 13:9
**requests** [5] - 28:24, 29:16, 30:10, 50:8, 57:6
**required** [2] - 99:3, 133:7
**requirements** [1] - 95:13
**requires** [1] - 18:4
**reread** [1] - 28:5
**rescheduled** [1] - 21:5
**research** [24] - 33:15, 35:5, 35:9, 39:7, 39:8, 55:18, 55:21, 56:6, 56:12, 56:14, 56:16, 59:23, 60:4, 60:5, 62:11, 64:5,

107:21, 115:2,
130:2, 130:7, 139:6,
139:13, 140:11
**resending** [1] - 126:16
**reserve** [2] - 23:15,
91:10
**reserved** [1] - 23:7
**resolve** [2] - 23:1, 26:7
**resources** [1] - 123:16
**respect** [8] - 20:18,
23:18, 51:20, 55:10,
84:21, 91:8, 139:16,
142:23
**resper** [1] - 42:24
**RESPER** [1] - 42:25
**respond** [3] - 20:5,
26:12, 43:20
**responding** [2] -
52:20, 52:24
**responsive** [4] -
18:25, 26:5, 26:23,
28:18
**rest** [3] - 56:15, 124:3,
159:13
**restaurant** [3] - 175:9,
175:10, 175:11
**restroom** [1] - 91:16
**result** [9] - 66:1, 72:1,
79:16, 80:6, 80:10,
83:20, 110:20,
152:6, 172:2
**results** [3] - 67:24,
73:9, 141:16
**retained** [2] - 7:5, 20:3
**retainer** [5] - 56:3,
134:13, 134:15,
134:23
**returned** [1] - 4:4
**returns** [2] - 112:5,
112:6
**revealed** [1] - 28:23
**revelatory** [1] - 26:22
**reversed** [1] - 138:11
**review** [24] - 21:8,
49:11, 49:14, 57:23,
72:7, 72:13, 73:8,
94:7, 104:5, 104:11,
111:10, 129:21,
141:16, 141:18,
143:11, 159:12,
159:13, 161:14,
161:17, 162:12,
165:17, 166:12,
167:2, 169:20
**reviewed** [49] - 4:22,
9:20, 45:10, 45:17,
47:2, 47:12, 57:14,
57:17, 57:18, 57:22,
57:25, 58:2, 60:10,
70:24, 71:7, 77:12,

81:14, 84:9, 86:16,
104:3, 107:12,
111:25, 136:24,
144:9, 153:24,
153:25, 154:1,
159:9, 159:17,
159:18, 159:19,
160:1, 160:3, 160:6,
160:8, 160:11,
160:18, 160:25,
161:4, 161:21,
166:9, 168:4, 168:7,
168:12, 168:16,
171:22, 172:1,
172:10
**reviewing** [5] - 44:13,
71:24, 81:15,
134:19, 142:22
**revisit** [1] - 50:23
**rewards** [2] - 98:10
**rights** [1] - 27:23
**rigorous** [2] - 78:24,
94:2
**rise** [2] - 37:13, 46:7
**risk** [6] - 77:16, 87:21,
100:16, 138:1,
158:10, 158:18
**RMR** [2] - 1:21, 185:9
**robust** [1] - 20:22
**role** [6] - 86:9, 86:19,
116:10, 139:3, 139:5
**ROMAN** [1] - 1:5
**Roman** [7] - 3:3, 3:12,
3:15, 9:3, 107:16,
113:3, 170:7
**Roman's** [2] - 110:1,
170:10
**rookie** [1] - 107:25
**Room** [2] - 1:22,
185:10
**room** [2] - 76:3, 177:4
**rough** [1] - 165:19
**roughly** [8] - 96:6,
105:25, 106:2,
134:11, 165:4,
167:2, 167:8, 178:16
**rounds** [1] - 20:8
**router** [1] - 179:4
**ruin** [1] - 94:18
**Rule** [8] - 12:21,
20:10, 28:23, 29:25,
40:16, 41:13, 50:5,
51:19
**rule** [2] - 12:22,
138:11
**rules** [1] - 142:14
**rulings** [1] - 21:15
**run** [3] - 66:14, 91:16,
138:10
**running** [23] - 8:14,

98:15, 106:12,
107:7, 109:5,
110:17, 111:1,
169:11, 170:2,
170:8, 170:14,
170:16, 172:3,
172:18, 172:19,
172:25, 173:2,
173:7, 173:12,
173:24, 174:6,
174:15, 174:16
**runs** [2] - 58:23, 118:2
**Russian** [1] - 161:9

# S

**safe** [1] - 147:15
**salary** [3] - 55:16,
56:5, 175:10
**sale** [1] - 150:6
**sales** [2] - 168:25,
173:20
**sample** [4] - 60:20,
68:13, 84:7, 146:9
**sampled** [1] - 83:19
**Samurai** [9] - 152:24,
153:17, 153:20,
153:21, 154:13,
154:19, 154:21,
157:13, 159:1
**sanctions** [1] - 10:22
**Sarah** [7] - 10:16,
104:15, 112:1,
129:8, 129:25,
130:2, 130:21
**sat** [2] - 15:19, 16:3
**Satoshi** [1] - 147:12
**save** [2] - 54:3, 127:11
**saw** [6] - 5:7, 5:9,
50:13, 77:14,
109:13, 158:3
**scams** [2] - 95:19,
97:6
**scanned** [1] - 11:15
**scenario** [1] - 164:22
**schedule** [10] - 21:16,
21:25, 22:25, 23:20,
24:12, 24:16, 24:17,
30:15, 49:24, 67:13
**scheduled** [8] - 17:6,
21:4, 21:22, 23:6,
23:12, 28:9, 34:22,
177:6
**scheduling** [9] - 3:17,
6:9, 6:11, 7:4, 7:7,
15:25, 21:12, 24:22,
29:2
**schemes** [2] - 94:12,
95:17
**scholarly** [1] - 133:11

**Scholl** [3] - 12:17,
84:10, 144:10
**Scholl's** [4] - 11:18,
15:5, 18:6, 18:10
**school** [2] - 97:16,
97:17
**School** [2] - 92:16,
96:3
**science** [8] - 4:14,
35:25, 59:7, 66:24,
69:11, 82:23, 83:10,
139:14
**Science** [6] - 52:11,
52:16, 52:18, 72:12,
79:21, 89:23
**scientific** [11] - 8:3,
9:19, 9:23, 15:21,
27:20, 35:25, 52:14,
60:10, 71:7, 74:19,
79:20
**scientifically** [2] -
15:2, 51:25
**scientist** [3] - 3:24,
4:14, 39:6
**scientists** [5] - 10:2,
27:14, 49:7, 80:15
**scope** [1] - 101:1
**scoping** [1] - 94:4
**Scott** [3] - 13:23, 18:6,
19:21
**screen** [1] - 131:11
**Sealed** [1] - 180:8
**search** [2] - 41:15,
106:13
**seated** [1] - 92:2
**second** [13] - 24:9,
31:5, 69:7, 77:19,
84:15, 85:21,
106:22, 107:10,
107:11, 114:20,
118:3, 125:23,
162:17
**secondly** [3] - 134:13,
145:22, 163:9
**secret** [4] - 9:22,
102:4, 102:5, 103:6
**secretly** [1] - 114:9
**secrets** [1] - 63:15
**secure** [1] - 115:22
**securities** [4] -
133:21, 133:23,
134:5, 134:7
**Security** [1] - 145:24
**security** [1] - 133:24
**see** [48] - 9:6, 9:14,
15:15, 31:18, 35:22,
40:18, 40:23, 41:8,
44:17, 49:8, 53:13,
53:15, 62:13, 62:15,
62:17, 62:19, 63:9,

68:8, 68:9, 77:1,
84:21, 88:3, 98:18,
99:13, 100:4, 103:5,
103:7, 106:10,
107:10, 110:6,
111:10, 111:14,
111:18, 111:21,
112:10, 116:21,
126:25, 131:11,
131:20, 131:24,
142:14, 157:1,
172:5, 172:7, 176:9,
178:5, 178:18
**seed** [1] - 100:12
**seeing** [5] - 15:13,
18:10, 45:12, 66:1,
113:13
**seek** [1] - 29:4
**seeking** [3] - 7:7, 54:8
77:1
**Sefranek** [3] - 1:21,
185:9, 185:9
**SEFRANEK** [1] -
185:3
**seized** [2] - 161:5,
162:23
**selective** [1] - 57:4
**sell** [1] - 157:16
**selling** [2] - 63:15,
169:2
**semantics** [1] - 45:24
**seminars** [3] - 58:9,
58:12, 58:18
**send** [29] - 30:7, 31:8,
40:24, 52:15, 64:3,
66:23, 109:10,
110:15, 123:25,
124:1, 124:2, 124:3,
124:8, 124:11,
124:24, 124:25,
125:3, 125:13,
125:14, 126:1,
127:10, 147:25,
148:12, 149:16,
171:15, 173:12,
174:16
**sending** [11] - 66:21,
109:8, 110:5,
124:17, 125:1,
126:19, 148:1,
148:7, 148:9, 174:11
**sends** [2] - 124:13,
124:22
**sense** [3] - 118:7,
118:19, 172:15
**sent** [7] - 57:16, 57:20,
107:14, 126:6,
171:10, 171:14,
171:20

**sentence** [1] - 82:25
**separate** [3] - 48:12, 54:15, 55:9
**September** [7] - 20:15, 21:3, 23:23, 24:1, 24:5, 28:24, 29:25
**sequential** [1] - 72:10
**series** [1] - 126:15
**serious** [1] - 19:19
**Serious** [1] - 34:17
**serve** [3] - 107:20, 137:15, 139:2
**server** [1] - 9:2
**servers** [1] - 115:22
**service** [11] - 104:6, 104:16, 104:18, 107:9, 111:7, 150:8, 152:10, 153:3, 155:20, 157:7, 158:25
**services** [5] - 150:1, 152:22, 154:8, 155:6, 157:12
**set** [11] - 3:22, 11:24, 26:4, 29:2, 30:15, 46:2, 46:25, 62:18, 63:1, 63:3, 172:13
**sets** [4] - 48:14, 48:20, 60:8, 64:2
**setting** [1] - 20:19
**settled** [1] - 133:6
**setup** [1] - 8:20
**seven** [5] - 10:14, 16:7, 16:9, 25:22, 56:21
**several** [1] - 20:8
**SFO** [1] - 34:17
**shadow** [1] - 64:14
**shadowed** [1] - 64:18
**share** [6] - 41:2, 99:2, 99:3, 102:3, 102:8, 167:4
**shared** [1] - 98:9
**shirt** [1] - 100:15
**shocked** [1] - 115:20
**shooting** [1] - 34:12
**short** [4] - 46:22, 117:13, 176:13, 178:7
**shortage** [1] - 95:2
**shorthand** [1] - 107:1
**show** [8] - 36:2, 68:7, 77:23, 78:13, 78:14, 103:7, 108:24, 114:14
**showed** [1] - 65:20
**showing** [3] - 68:24, 87:24, 152:15
**shown** [1] - 106:5
**shows** [3] - 62:12,

66:4, 103:2
**shut** [2] - 100:9, 139:1
**sic** [2] - 78:2, 152:1
**side** [4] - 14:18, 39:14, 94:3, 121:7
**sidebar** [5] - 19:10, 179:7, 179:11, 179:14, 179:16
**sides** [1] - 136:19
**signature** [1] - 45:14
**signed** [1] - 141:22
**significant** [10] - 5:12, 5:14, 11:18, 11:19, 15:6, 80:8, 80:18, 80:21, 146:8, 168:22
**signs** [1] - 46:19
**similar** [3] - 78:17, 100:4, 166:13
**similarly** [1] - 147:17
**simple** [10] - 9:10, 15:1, 15:18, 16:3, 16:16, 75:1, 87:16, 90:16, 91:4, 93:10
**simplistic** [1] - 166:10
**simply** [13] - 16:2, 17:13, 18:14, 18:25, 19:22, 20:4, 26:23, 103:18, 103:21, 114:13, 126:24, 155:10, 163:19
**simultaneous** [1] - 148:10
**simultaneously** [4] - 148:7, 148:20, 148:21, 156:6
**single** [1] - 100:22
**sit** [2] - 48:16, 91:25
**site** [4] - 108:20, 109:2, 109:14, 109:17
**sitting** [3] - 148:14, 161:13, 177:3
**situation** [5] - 14:25, 89:4, 89:8, 90:5, 148:16
**situations** [1] - 79:11
**six** [4] - 42:1, 42:17, 56:21, 135:14
**sizable** [1] - 145:25
**size** [6] - 128:20, 146:9, 154:20, 170:5, 170:8, 170:12
**skeptical** [2] - 136:1, 143:10
**skepticism** [2] - 144:17, 147:8
**slide** [2] - 69:24, 69:25
**slightly** [1] - 117:19
**slow** [5] - 13:2, 13:14, 117:10, 120:15,

158:13
**slowed** [1] - 12:25
**small** [4] - 57:21, 63:8, 68:12, 128:7
**smaller** [2] - 60:23, 170:3
**smart** [1] - 34:1
**so-called** [1] - 111:13
**social** [4] - 99:14, 100:1, 100:3, 139:11
**Society** [2] - 92:25, 97:20
**software** [18] - 7:25, 8:3, 8:15, 9:23, 27:11, 27:12, 27:16, 27:20, 27:21, 29:6, 29:10, 30:12, 43:18, 49:5, 59:14, 119:4, 124:6
**sold** [2] - 115:24, 169:12
**solve** [1] - 107:23
**someone** [25] - 4:9, 31:18, 98:23, 99:3, 100:6, 113:7, 113:23, 117:8, 117:14, 126:19, 127:16, 136:5, 141:23, 153:17, 156:24, 167:6, 170:2, 170:8, 172:4, 172:18, 172:25, 173:7, 173:11, 174:6, 174:16
**sometime** [2] - 6:7, 29:3
**sometimes** [19] - 43:24, 63:1, 76:21, 78:15, 79:18, 79:19, 110:7, 116:14, 123:7, 123:14, 125:8, 125:9, 126:17, 126:18, 137:21, 147:3, 157:21
**somewhat** [2] - 93:17, 100:24
**somewhere** [4] - 5:9, 5:10, 53:12, 166:2
**soon** [1] - 179:1
**SOP** [1] - 72:7
**sophisticated** [1] - 108:17
**sorry** [35] - 6:13, 11:2, 11:11, 12:10, 23:5, 31:5, 46:12, 49:20, 52:22, 69:7, 73:14, 95:10, 114:20, 117:10, 117:12, 120:15, 120:19,

126:1, 129:18, 135:6, 138:5, 142:9, 144:22, 145:7, 153:8, 155:14, 156:22, 158:13, 158:15, 159:16, 160:14, 171:8, 175:17, 177:9
**sort** [20] - 11:5, 11:8, 15:1, 18:24, 20:9, 20:16, 31:17, 51:23, 54:4, 54:11, 59:21, 59:25, 68:17, 68:18, 88:12, 103:20, 133:8, 157:8, 164:12, 172:13
**sorts** [3] - 9:20, 10:1, 49:7
**sound** [7] - 111:8, 111:9, 112:8, 113:2, 117:3, 117:6, 162:20
**sounds** [4] - 23:8, 85:3, 164:20, 172:25
**source** [14] - 15:15, 29:4, 29:9, 29:24, 30:11, 49:8, 49:12, 49:15, 59:17, 60:2, 61:11, 62:10, 72:13, 99:24
**sources** [2] - 72:3, 168:22
**spans** [1] - 94:22
**Sparkasse** [1] - 161:22
**speaking** [6] - 11:11, 85:12, 103:12, 105:25, 106:2, 149:20
**speaks** [1] - 147:4
**special** [1] - 34:12
**specialist** [2] - 84:10, 144:10
**specialize** [1] - 93:15
**specialized** [2] - 158:5, 175:15
**specific** [31] - 27:2, 29:16, 29:23, 30:4, 37:12, 44:2, 44:5, 44:8, 44:10, 53:1, 53:2, 53:19, 60:4, 62:23, 63:13, 63:21, 66:13, 69:5, 72:6, 74:8, 75:13, 76:24, 80:13, 80:23, 80:24, 80:25, 85:23, 87:22, 138:4, 144:11
**specifically** [12] - 11:22, 30:10, 34:14, 60:10, 69:21, 73:7, 84:7, 101:13,

134:19, 168:18, 169:15, 175:3
**specifics** [1] - 54:9
**speculate** [3] - 171:15, 172:19, 172:21
**speculating** [1] - 77:13
**speculation** [4] - 9:5, 78:1, 78:7, 89:12
**speculative** [1] - 9:8
**spell** [1] - 6:14
**spend** [19] - 122:20, 122:22, 122:24, 123:3, 123:19, 123:21, 124:15, 124:18, 126:8, 127:3, 129:5, 147:6, 147:11, 149:3, 149:25, 150:22, 151:16, 151:18, 151:21
**spending** [6] - 62:4, 62:7, 62:9, 91:13, 146:25, 147:1
**spends** [1] - 147:5
**spent** [8] - 64:5, 64:10, 64:25, 79:21, 112:19, 112:20, 135:9, 165:4
**spiel** [1] - 15:25
**split** [1] - 150:11
**spoken** [1] - 77:11
**spreadsheets** [1] - 162:14
**springboard** [1] - 11:9
**squarely** [1] - 9:8
**St** [4] - 125:11, 125:12, 125:13, 127:10
**stacks** [2] - 31:11, 31:12
**staff** [2] - 84:10, 144:9
**stage** [4] - 45:9, 126:24, 163:15, 175:5
**stake** [2] - 15:17, 16:9
**stand** [3] - 95:9, 132:9, 174:15
**stand-alone** [1] - 132:9
**standard** [5] - 64:13, 72:7, 111:17, 151:9
**Standards** [1] - 52:12
**standards** [4] - 93:24, 111:5, 117:4, 117:6
**start** [10] - 7:21, 10:7, 10:8, 17:10, 31:17, 45:6, 68:23, 146:25, 166:22, 178:3

210

**started** [9] - 18:5, 57:16, 100:8, 114:22, 114:23, 122:2, 136:11, 154:24, 169:2
**starting** [5] - 3:5, 28:24, 69:24, 166:21, 175:17
**State** [1] - 92:13
**state** [6] - 3:4, 33:2, 92:11, 92:22, 115:20, 116:1
**statement** [4] - 13:7, 112:4, 156:9, 160:22
**states** [3] - 46:11, 81:8, 82:21
**STATES** [3] - 1:1, 1:2, 1:8
**States** [17] - 1:22, 3:3, 3:7, 23:25, 34:6, 34:16, 38:20, 42:24, 52:10, 52:18, 58:20, 88:1, 88:7, 90:24, 138:8, 138:22, 138:25
**statistical** [2] - 81:4, 87:24
**statistically** [5] - 78:23, 80:8, 80:18, 80:20, 146:8
**status** [3] - 81:9, 176:17, 178:8
**stay** [2] - 59:11, 179:24
**staying** [1] - 74:17
**stealing** [1] - 114:13
**stenographic** [1] - 185:5
**step** [2] - 126:7, 150:15
**steps** [5] - 72:24, 73:1, 73:2, 85:10, 174:20
**stereotypes** [1] - 36:15
**STERLINGOV** [1] - 1:5
**Sterlingov** [24] - 3:3, 3:12, 3:15, 8:6, 8:14, 8:17, 8:24, 9:3, 12:7, 18:19, 20:14, 29:11, 104:25, 108:10, 111:6, 112:5, 112:14, 112:19, 143:4, 143:24, 162:20, 166:23, 169:9
**Sterlingov's** [9] - 104:5, 104:16, 110:24, 159:12, 159:18, 161:5, 161:14, 161:17,

169:8
**still** [26] - 4:4, 7:1, 7:5, 7:14, 10:3, 11:17, 15:5, 15:11, 17:17, 18:5, 18:12, 20:3, 20:18, 20:20, 21:7, 24:24, 30:18, 68:12, 87:4, 87:6, 99:11, 113:2, 114:1, 167:10, 176:6, 176:7
**Still** [2] - 14:4, 22:7
**still's** [2] - 10:4, 13:4
**stipulate** [1] - 31:1
**Stockinger** [1] - 152:1
**stolen** [1] - 116:7
**stood** [1] - 17:23
**stop** [6] - 48:19, 49:22, 100:18, 118:3, 119:12, 175:25
**storage** [1] - 96:15
**stored** [6] - 98:2, 98:3, 118:13, 118:15, 159:23, 161:2
**stories** [2] - 114:23, 116:3
**storing** [2] - 97:23, 98:1
**story** [2] - 100:9, 115:18
**straightforward** [1] - 16:17
**streaming** [1] - 99:6
**Street** [2] - 1:11, 1:17
**strike** [1] - 25:14
**strikes** [1] - 48:12
**string** [3] - 61:20, 61:22, 61:23
**strong** [2] - 9:9, 86:3
**strongly** [1] - 20:11
**student** [2] - 60:6, 63:25
**students** [1] - 107:19
**studied** [5] - 63:13, 63:14, 71:10, 97:1, 152:22
**studies** [3] - 71:12, 82:19, 87:11
**study** [1] - 128:23
**stuff** [12] - 9:20, 12:20, 35:3, 50:4, 50:5, 101:23, 102:10, 102:21, 119:23, 120:3, 120:6, 160:5
**stupid** [1] - 34:1
**style** [1] - 27:1
**subject** [7] - 4:19, 7:10, 54:16, 74:6, 97:5, 110:18
**subjective** [12] -

67:24, 68:19, 70:6, 74:4, 74:10, 74:12, 74:15, 74:20, 75:5, 75:8, 76:20, 76:23
**subjectivity** [2] - 70:5, 70:11
**submit** [2] - 10:4, 14:4
**submits** [1] - 27:22
**submitted** [9] - 13:8, 13:9, 13:13, 31:11, 130:15, 134:24, 141:22, 160:22, 177:16
**subpoenable** [2] - 110:13, 113:11
**subsequent** [1] - 54:25
**subsidizing** [1] - 55:18
**substance** [4] - 3:18, 4:11, 19:15, 24:20
**substantial** [4] - 127:18, 127:21, 135:15, 173:18
**substantially** [1] - 159:22
**substantive** [1] - 18:24
**succinct** [1] - 111:16
**sue** [2] - 115:23, 115:24
**sufficiency** [1] - 20:6
**sufficient** [3] - 5:24, 20:5, 111:22
**suggest** [3] - 78:10, 78:11, 111:20
**suggestion** [3] - 50:25, 51:10, 51:20
**suggests** [2] - 78:15, 110:23
**sum** [1] - 114:12
**summarized** [1] - 136:10
**summary** [1] - 84:13
**sun** [1] - 30:3
**supersonic** [1] - 37:2
**supplement** [2] - 54:5, 59:6
**supplemental** [7] - 7:12, 25:11, 25:15, 48:20, 49:24, 50:20, 129:21
**support** [6] - 38:8, 69:1, 69:3, 69:4, 107:12, 122:12
**supports** [2] - 35:6, 140:11
**suppose** [5] - 5:19, 5:23, 21:25, 68:7, 165:11

**supposed** [2] - 23:24, 69:1
**Supreme** [1] - 39:22, 39:23
**surplus** [2] - 56:6, 56:7
**surprise** [1] - 152:25
**surprised** [3] - 13:11, 136:5, 162:13
**surveilled** [1] - 109:16
**surveilling** [1] - 120:1
**susceptible** [3] - 42:8, 91:1
**suspect** [7] - 22:14, 73:23, 75:2, 75:16, 78:13, 78:17
**Sweden** [1] - 161:15
**Swiss** [1] - 102:2
**sworn** [2] - 32:19, 92:1
**system** [10] - 13:14, 13:15, 13:18, 78:20, 86:21, 98:6, 98:9, 116:18

# T

**Taiwan** [1] - 58:20
**talks** [1] - 83:12
**TAMARA** [1] - 185:3
**Tamara** [3] - 1:21, 185:9, 185:9
**tamper** [1] - 66:20
**target** [2] - 85:7, 85:9
**task** [1] - 79:14
**tasked** [1] - 85:13
**taught** [2] - 79:3, 117:4
**teach** [5] - 107:19, 113:22, 137:7, 173:4, 174:18
**teaches** [1] - 113:23
**teaching** [2] - 97:16
**team** [1] - 144:22
**technical** [5] - 64:2, 66:22, 66:25, 139:23, 139:25
**technically** [1] - 140:8
**technician** [7] - 59:24, 60:25, 71:24, 76:5, 79:14, 79:15, 86:17
**technician's** [2] - 76:6, 86:8
**technicians** [2] - 58:13, 72:20
**techniques** [3] - 63:13, 80:1, 108:17
**technological** [1] - 42:20
**Technology** [1] -

52:12
**technology** [4] - 37:17, 42:21, 98:25, 150:14
**teens** [1] - 154:25
**temporal** [2] - 8:16, 8:18
**ten** [8] - 56:21, 67:18, 91:18, 124:9, 124:13, 151:1, 151:2, 151:17
**tend** [2] - 94:12, 121:3
**tendency** [1] - 11:4
**tentatively** [1] - 21:25
**term** [3] - 64:15, 109:4, 109:15
**terms** [5] - 30:25, 34:10, 70:4, 115:25, 123:4
**test** [4] - 73:12, 73:15, 74:19, 80:5
**tested** [4] - 78:8, 146:2, 146:14, 152:6
**testified** [20] - 10:23, 39:4, 39:9, 40:19, 56:19, 56:24, 59:2, 86:7, 126:23, 132:21, 133:4, 133:5, 140:25, 143:1, 143:13, 157:24, 158:1, 168:11, 168:20
**testify** [39] - 4:2, 4:6, 4:24, 5:22, 7:15, 7:17, 19:8, 39:6, 40:21, 43:7, 43:10, 43:24, 44:1, 44:7, 45:21, 45:22, 46:5, 47:21, 48:2, 48:6, 48:11, 49:21, 51:3, 51:17, 51:21, 52:21, 54:10, 54:12, 55:7, 56:25, 57:2, 57:5, 74:12, 81:8, 81:13, 81:15, 81:17, 112:4
**testifying** [4] - 46:9, 47:16, 54:22, 179:6
**testimonies** [1] - 58:3
**testimony** [29] - 4:10, 4:11, 4:12, 4:21, 5:7, 7:2, 17:14, 27:4, 28:6, 45:7, 45:18, 45:20, 46:16, 51:16, 54:17, 56:23, 67:21, 71:22, 78:23, 79:10, 89:7, 122:14, 133:7, 138:20, 156:5, 156:10, 156:11, 168:5, 179:6
**testing** [1] - 75:9

**THE** [264] - 1:1, 1:1, 1:8, 3:2, 3:8, 3:10, 3:13, 3:16, 5:5, 5:15, 5:19, 6:4, 6:13, 6:17, 7:3, 7:19, 8:7, 9:17, 10:6, 10:13, 11:2, 11:11, 12:10, 13:3, 13:6, 13:19, 14:1, 14:5, 14:12, 14:17, 15:23, 16:5, 16:10, 16:22, 17:22, 18:3, 18:20, 19:6, 19:14, 20:17, 21:1, 21:11, 21:18, 21:21, 22:9, 22:20, 22:24, 23:7, 23:14, 24:9, 24:11, 24:16, 25:5, 25:9, 25:21, 25:24, 26:19, 27:6, 27:25, 28:18, 28:21, 29:12, 29:21, 30:1, 30:14, 30:23, 31:5, 31:10, 31:21, 32:1, 32:11, 32:16, 32:17, 32:20, 32:22, 40:9, 40:12, 40:19, 40:21, 40:23, 40:24, 41:1, 41:7, 41:14, 41:17, 43:3, 43:5, 44:11, 44:13, 44:15, 44:16, 44:21, 44:23, 46:22, 47:8, 47:11, 47:25, 48:13, 49:2, 49:11, 49:14, 49:20, 50:6, 50:14, 50:25, 51:1, 51:2, 51:12, 51:15, 52:4, 52:8, 52:9, 52:10, 52:22, 53:12, 53:20, 54:7, 54:21, 55:2, 67:1, 67:10, 67:14, 67:16, 68:21, 69:7, 69:19, 70:3, 70:4, 70:13, 70:16, 70:18, 80:13, 81:2, 81:5, 81:23, 81:24, 84:24, 85:3, 88:17, 90:10, 90:12, 90:13, 90:14, 91:5, 91:12, 91:17, 91:20, 91:24, 92:2, 92:4, 96:8, 96:11, 97:7, 97:8, 106:23, 106:24, 117:10, 117:12, 120:15, 120:19, 120:20, 120:21, 127:21, 127:23, 128:6, 128:10, 128:16, 128:17, 128:19, 128:22, 128:25, 131:3, 131:7, 131:9, 131:11, 131:13,

131:14, 131:23, 135:16, 135:18, 138:5, 138:6, 141:24, 142:1, 142:2, 142:9, 142:17, 143:1, 143:7, 143:8, 143:9, 143:13, 143:19, 143:20, 143:21, 144:3, 144:24, 145:1, 145:7, 145:9, 154:17, 154:18, 155:14, 155:15, 156:22, 157:1, 157:3, 158:13, 158:15, 159:15, 159:21, 160:1, 160:3, 160:8, 160:13, 160:14, 162:17, 163:6, 163:12, 164:9, 164:20, 165:3, 165:11, 165:16, 165:25, 166:8, 166:16, 166:18, 166:19, 167:1, 167:12, 167:16, 167:22, 167:24, 168:1, 170:21, 170:23, 175:20, 175:25, 176:3, 176:9, 176:12, 176:21, 177:1, 177:8, 177:12, 177:20, 177:24, 177:25, 178:1, 178:2, 178:3, 178:5, 178:13, 178:17, 178:19, 178:24, 179:9, 179:18, 179:20, 179:23, 180:2, 180:4, 180:6
**theft** [1] - 132:23
**themselves** [4] - 75:20, 76:11, 149:13, 169:20
**theories** [10] - 51:18, 51:21, 52:2, 71:3, 71:6, 71:9, 71:11, 71:12, 71:17
**theorizing** [3] - 51:23, 51:24, 54:4
**theory** [13] - 52:16, 68:25, 69:3, 69:4, 69:5, 87:4, 87:6, 87:9, 87:13, 171:9, 174:19
**therefor** [1] - 142:5
**therefore** [5] - 9:2, 47:20, 103:11,

105:14, 144:1
**They've** [1] - 40:4
**they've** [13] - 12:6, 16:18, 20:1, 34:11, 35:4, 35:8, 79:25, 86:4, 121:5, 134:16, 134:17, 154:16
**thin** [1] - 136:5
**thinking** [3] - 11:13, 69:17, 114:2
**third** [4] - 42:10, 117:17, 126:13, 167:25
**thirds** [1] - 167:25
**thousand** [2] - 68:14, 167:25
**thousands** [1] - 118:14
**thread** [1] - 144:8
**threat** [2] - 82:24, 103:16
**three** [9] - 21:7, 42:19, 68:21, 96:6, 138:8, 138:24, 140:4, 148:12, 174:20
**timing** [3] - 11:7, 11:12, 15:25
**tips** [1] - 109:7
**title** [5] - 115:5, 128:18, 136:18, 136:20, 136:23
**today** [16] - 3:19, 4:2, 7:6, 9:7, 23:2, 24:22, 30:25, 50:10, 52:5, 54:5, 81:13, 114:3, 148:4, 154:10, 176:8, 176:22
**today's** [1] - 32:12
**together** [13] - 19:24, 20:2, 20:3, 20:22, 39:24, 74:23, 122:12, 125:2, 125:14, 127:9, 127:10, 128:12, 149:16
**tokens** [4] - 109:8, 110:15, 110:20, 174:16
**toll** [1] - 105:1
**tomorrow** [16] - 23:2, 23:3, 23:6, 23:8, 23:10, 23:12, 23:13, 176:7, 176:12, 176:15, 177:11, 177:20, 177:24, 178:11, 178:16, 178:24
**tonight** [1] - 177:7
**took** [6] - 13:12, 25:19, 67:12, 88:7,

166:6, 167:13
**tool** [18] - 59:15, 68:18, 108:1, 108:4, 108:5, 108:8, 111:2, 111:12, 111:17, 117:24, 119:2, 119:10, 119:14, 121:12, 157:17, 158:2, 158:16
**tools** [12] - 43:25, 44:4, 44:8, 51:5, 94:8, 111:11, 119:7, 120:10, 121:9, 127:13, 158:10
**top** [3] - 37:22, 65:17, 128:14
**top-down/bottom-up** [1] - 37:22
**topic** [3] - 37:9, 40:1, 40:7
**topics** [1] - 117:19
**topologies** [1] - 94:11
**TOR** [1] - 1:15
**Tor** [5] - 1:16, 3:11, 109:14, 125:12, 173:15
**total** [8] - 42:17, 135:16, 166:13, 167:8, 170:9, 175:7
**totally** [5] - 36:4, 42:16, 86:12, 89:15, 129:13
**totals** [2] - 167:17, 167:18
**touch** [1] - 133:18
**touches** [1] - 113:22
**touching** [1] - 110:21
**tour** [1] - 114:3
**towards** [1] - 140:7
**trace** [4] - 12:16, 12:17, 12:18, 18:10
**traceability** [1] - 157:10
**traceable** [4] - 149:17, 152:23, 153:2, 158:2
**traces** [1] - 17:19
**tracing** [25] - 10:17, 11:18, 11:19, 11:23, 14:10, 15:18, 15:19, 16:18, 16:19, 16:20, 85:6, 95:17, 108:16, 126:14, 129:5, 129:7, 141:14, 141:17, 142:19, 142:20, 143:10, 156:17, 156:19, 157:16
**track** [1] - 110:6
**trade** [3] - 96:17, 98:22, 111:17

**traded** [1] - 96:18
**trading** [1] - 173:16
**traditional** [7] - 113:25, 116:14, 116:20, 150:22, 151:16, 151:21, 174:19
**trail** [3] - 94:6, 94:7
**trails** [1] - 94:10
**train** [7] - 34:21, 35:4, 37:10, 39:19, 40:5, 176:1, 177:10
**trained** [11] - 34:10, 34:13, 34:15, 34:18, 35:10, 39:20, 39:21, 40:3, 132:5, 173:5
**training** [23] - 55:22, 56:14, 58:9, 58:12, 58:17, 59:9, 66:4, 68:22, 72:20, 78:25, 79:1, 79:7, 93:6, 93:24, 94:1, 94:2, 94:15, 94:21, 95:14, 121:8, 170:18
**trainings** [2] - 78:8, 92:19
**transact** [1] - 106:19
**transaction** [48] - 61:20, 62:7, 62:8, 62:23, 102:13, 113:18, 114:6, 123:24, 124:22, 125:14, 125:23, 126:2, 126:7, 126:10, 127:9, 127:11, 144:13, 146:3, 147:25, 148:8, 148:23, 149:14, 149:16, 149:21, 150:2, 150:10, 150:11, 150:21, 150:22, 151:1, 151:16, 151:20, 151:22, 154:8, 155:7, 155:9, 155:11, 155:17, 155:22, 156:7, 156:14, 156:25, 157:8, 158:21, 159:5, 163:25, 164:2
**transactional** [3] - 146:4, 147:2, 147:19
**transactions** [33] - 63:24, 101:21, 103:21, 103:23, 105:4, 108:2, 113:9, 113:10, 123:6, 123:23, 126:16, 140:5, 140:24, 141:6, 144:11,

148:10, 148:19, 148:22, 149:1, 149:15, 150:18, 152:3, 152:9, 152:12, 152:13, 153:1, 156:1, 156:5, 157:25, 158:7, 161:9, 169:6, 169:7

**transcript** [5] - 14:15, 19:11, 179:8, 185:4, 185:6

**TRANSCRIPT** [1] - 1:7

**transcripts** [3] - 58:4, 168:8, 168:9

**transfer** [9] - 96:14, 96:25, 100:5, 113:8, 113:16, 113:18, 114:5, 114:12, 126:24

**transferred** [3] - 166:6, 167:13, 171:6

**transferring** [1] - 114:13

**transfers** [5] - 142:23, 164:17, 167:18, 169:20, 169:22

**transited** [1] - 173:20

**translates** [1] - 166:4

**translations** [1] - 161:8

**travel** [1] - 138:11

**treasury** [1] - 121:5

**Treasury** [1] - 145:24

**trial** [37] - 4:6, 4:7, 5:3, 6:7, 10:8, 14:8, 16:7, 16:11, 16:14, 17:1, 17:6, 17:10, 17:11, 17:13, 18:12, 20:12, 20:15, 21:1, 21:3, 21:22, 22:13, 23:15, 23:23, 24:2, 26:2, 26:9, 27:4, 28:1, 28:4, 28:11, 28:16, 45:21, 47:7, 48:22, 48:24, 112:5, 168:7

**tricky** [1] - 150:9

**tried** [2] - 63:16, 66:20

**tries** [1] - 127:25

**true** [37] - 72:21, 84:1, 100:23, 100:24, 125:8, 125:9, 125:10, 125:22, 125:25, 126:17, 126:18, 127:1, 147:1, 147:6, 149:3, 151:19, 152:1, 152:13, 152:16, 153:1, 155:20, 156:3, 156:4, 156:9, 157:1, 157:5, 157:9,

157:12, 157:15, 157:20, 157:23, 173:24, 174:22, 185:4, 185:5

**trust** [8] - 110:3, 114:8, 114:10, 114:16, 116:12, 117:15, 120:22

**trustful** [1] - 117:9

**truth** [1] - 146:15

**truthful** [1] - 98:10

**try** [19] - 11:2, 21:8, 60:23, 62:2, 72:18, 72:19, 102:8, 105:3, 105:11, 111:17, 122:11, 128:10, 131:21, 139:19, 151:10, 153:13, 173:17, 174:2

**trying** [13] - 11:17, 16:2, 86:13, 87:16, 102:24, 103:13, 104:24, 108:9, 110:1, 139:17, 156:10, 156:11, 171:9

**Tuesday** [1] - 22:2

**turn** [4] - 3:18, 24:20, 25:6, 104:2

**turned** [2] - 111:24, 159:25

**turns** [3] - 12:1, 14:10, 17:13

**twice** [2] - 66:5, 80:19

**Twitter** [1] - 99:15

**two** [45] - 6:10, 6:24, 16:13, 40:12, 40:21, 40:25, 47:6, 48:5, 48:18, 48:22, 50:24, 56:25, 64:3, 65:2, 66:23, 68:21, 69:2, 70:5, 70:7, 71:13, 74:8, 74:23, 85:7, 96:18, 101:15, 125:2, 125:4, 125:6, 125:20, 136:19, 145:4, 145:15, 145:18, 148:1, 148:7, 148:10, 148:19, 151:17, 152:21, 154:15, 167:25, 169:2

**two-thirds** [1] - 167:25

**two-year** [1] - 169:2

**type** [6] - 37:16, 69:12, 130:22, 148:7, 149:2, 149:24

**types** [6] - 61:6, 94:12, 95:17, 122:4, 122:5, 130:12, 130:14,

152:21

**typical** [2] - 65:24, 94:10

**typically** [1] - 53:4

### U

**U.S** [14] - 1:13, 34:7, 37:10, 39:10, 39:17, 52:15, 56:19, 58:9, 65:3, 72:11, 79:20, 79:23, 89:23, 138:25

**UK** [4] - 34:22, 39:10, 39:17, 44:17

**Ukraine** [2] - 100:8, 100:15

**ultimate** [1] - 47:16

**under** [6] - 12:21, 20:10, 30:3, 103:10, 117:3, 142:14

**undergraduate** [2] - 59:5, 59:6

**underlies** [1] - 107:22, 126:21

**underlying** [9] - 9:11, 11:24, 27:10, 49:4, 49:18, 50:3, 153:24, 153:25, 154:4

**understood** [2] - 86:15, 130:20

**undertake** [1] - 93:6

**undertaking** [1] - 156:14

**unfortunately** [4] - 4:3, 82:17, 83:8, 169:12

**unheard** [1] - 134:14

**Uniform** [1] - 96:22

**unintentional** [1] - 34:1

**unintentionally** [1] - 35:17

**unique** [1] - 159:4

**UNITED** [3] - 1:1, 1:2, 1:8

**United** [19] - 1:22, 3:3, 3:7, 23:25, 34:6, 34:16, 34:17, 34:20, 38:20, 42:24, 52:10, 52:17, 58:20, 88:1, 88:7, 90:24, 138:8, 138:22, 138:25

**University** [2] - 33:4, 92:14

**university** [1] - 56:7, 56:9, 56:10, 56:11

**unknow** [1] - 116:12

**unless** [4] - 98:12, 112:24, 117:8, 117:14

**unmotivated** [1] - 33:25

**unnamed** [3] - 10:1, 27:14, 49:6

**unnecessary** [1] - 7:8

**unrelated** [2] - 11:4, 149:15

**unreliable** [5] - 116:24, 116:25, 120:13, 145:14, 149:13

**unsafe** [3] - 130:11, 130:23, 131:1

**unsound** [1] - 112:13

**unspent** [2] - 102:12, 123:24

**untimely** [2] - 25:14, 55:3

**untraceable** [1] - 164:18

**up** [53] - 9:14, 10:8, 10:24, 14:7, 17:24, 18:23, 22:3, 23:20, 24:1, 25:3, 29:19, 37:22, 40:17, 48:11, 73:11, 79:15, 86:6, 87:3, 87:5, 88:7, 88:21, 89:24, 101:15, 105:4, 109:1, 113:7, 114:12, 114:14, 115:15, 116:14, 119:18, 130:17, 134:20, 136:3, 138:10, 147:12, 147:14, 148:10, 150:11, 152:2, 162:22, 163:3, 164:3, 171:11, 171:13, 172:13, 176:4, 176:5, 178:13, 178:21, 178:24, 179:1, 179:3

**Up** [1] - 115:14

**upcoming** [1] - 26:18

**update** [2] - 4:15, 98:12

**updated** [1] - 118:17

**updates** [1] - 98:10

**urge** [1] - 30:20

**USAO** [1] - 1:11

**USAO-DOJ** [1] - 1:11

**useful** [2] - 97:3, 167:4

**user** [4] - 9:2, 101:15, 106:15, 149:22

**users** [4] - 149:15, 151:2, 151:6, 155:21

**uses** [7] - 7:24, 7:25, 117:24, 119:21,

123:1, 125:6, 152:25

**usual** [1] - 134:11

**utilizing** [1] - 143:25

**UTXO** [2] - 123:23, 158:19

**UTXOs** [2] - 102:12, 128:1

### V

**valid** [1] - 15:3

**validate** [1] - 73:8

**validated** [1] - 52:17

**validation** [1] - 9:23

**validity** [2] - 8:3, 27:20

**valuable** [2] - 100:6, 100:7

**valuation** [2] - 93:2, 93:21

**Valuation** [1] - 93:2

**value** [8] - 96:14, 97:4, 100:6, 100:17, 163:16, 164:1, 164:6, 166:4

**valuing** [1] - 93:22

**variable** [1] - 105:10

**varies** [1] - 69:8

**variety** [1] - 35:3

**various** [5] - 4:23, 108:23, 109:12, 146:25, 171:25

**vary** [1] - 68:3

**varying** [1] - 98:5

**vast** [2] - 82:7, 84:2

**venue** [6] - 25:4, 25:11, 25:18, 25:25, 26:3, 26:7

**verified** [1] - 117:15

**verifies** [1] - 27:15

**verify** [2] - 117:9, 117:17

**VERRET** [3] - 2:9, 92:7, 131:16

**Verret** [17] - 24:23, 91:23, 91:24, 92:9, 92:11, 97:10, 131:18, 132:1, 139:17, 140:13, 141:21, 142:4, 144:8, 159:8, 168:4, 176:20

**Verret's** [3] - 31:4, 32:5, 32:8

**versus** [8] - 53:9, 60:19, 65:20, 76:22, 128:12, 147:6, 164:13, 172:13

**via** [2] - 150:5, 179:17

**VIA** [1] - 1:10

**video** [5] - 129:14,

130:4, 130:10, 130:11, 154:6
**view** [1] - 28:12
**viewable** [1] - 109:14
**views** [1] - 44:20
**violated** [1] - 115:25
**violations** [1] - 132:22
**Virginia** [1] - 92:22
**virtually** [1] - 160:11
**vision** [1] - 100:1
**Vlahakis** [1] - 6:23
**voice** [7] - 44:5, 60:20, 61:10, 76:24
**voice-pattern** [2] - 60:20, 61:10
**voice-print** [1] - 61:10
**voicing** [1] - 44:8
**volfprius@hotmail. com** [1] - 9:3
**volume** [1] - 128:9
**vs** [1] - 1:4
**vulnerabilities** [1] - 38:14

## W

**wait** [5] - 155:21, 155:25, 156:3, 156:24, 169:13
**wake** [4] - 153:4, 172:9, 173:8
**walk** [1] - 154:5
**walk-through** [1] - 154:5
**walked** [2] - 100:15, 100:16
**Wall** [1] - 1:17
**wallet** [18] - 110:6, 113:7, 114:4, 119:25, 124:5, 124:6, 124:9, 124:10, 124:12, 126:17, 148:9, 148:14, 149:17, 149:18, 152:24, 153:18, 154:5
**Wallet** [15] - 59:18, 152:10, 152:15, 153:15, 153:17, 153:20, 153:21, 154:13, 154:21, 157:13, 157:24, 159:1
**wallets** [1] - 120:2
**wants** [6] - 5:21, 24:24, 52:7, 115:13, 142:18, 156:24
**war** [1] - 100:8
**Wasabi** [16] - 152:10, 152:15, 152:23,

153:1, 153:2, 153:4, 153:7, 153:9, 153:12, 153:15, 153:21, 154:13, 157:12, 157:24, 158:1, 159:1
**Wasabi's** [1] - 153:11
**Washington** [6] - 1:5, 1:12, 1:14, 1:23, 38:20, 185:11
**waste** [2] - 47:18, 48:15
**wasting** [2] - 47:11, 49:20
**Wayback** [2] - 108:24, 109:12
**ways** [11] - 35:19, 71:23, 72:18, 94:10, 98:24, 106:18, 113:3, 113:18, 133:21, 151:12, 173:17
**wealth** [5] - 27:8, 27:17, 172:8, 173:7, 173:8
**Web** [2] - 108:21, 109:16
**web** [3] - 109:15, 109:16, 174:4
**website** [6] - 8:21, 108:12, 108:21, 109:2, 109:4, 109:13
**week** [23] - 4:4, 4:16, 15:12, 21:19, 21:20, 21:22, 22:1, 22:2, 22:6, 22:12, 22:14, 22:19, 22:21, 22:22, 23:22, 23:23, 25:23, 29:3, 68:24, 96:6, 135:13
**weeks** [6] - 13:10, 13:12, 16:7, 21:7, 50:24, 135:13
**weigh** [1] - 109:23
**welcome** [7] - 3:10, 26:12, 55:2, 55:4, 55:8, 61:16, 179:5
**well-established** [1] - 71:10
**well-known** [1] - 157:13
**West** [2] - 178:4, 178:5
**Wharton** [1] - 96:3
**Whirlpool** [2] - 152:23, 154:21
**white** [9] - 10:16, 10:17, 11:22, 12:18, 129:22, 129:25, 130:13, 147:12,

147:15
**whole** [12] - 9:25, 10:2, 10:17, 13:16, 14:2, 15:16, 27:17, 34:5, 49:18, 99:20, 119:9, 176:4
**wide** [1] - 65:23
**Wide** [2] - 108:21, 109:16
**wider** [1] - 61:25
**wife** [3] - 56:18, 58:23, 59:1
**wild** [1] - 139:12
**willing** [3] - 112:23, 112:25, 163:8
**wise** [1] - 128:6
**withdrawal** [1] - 172:14
**withdrawals** [1] - 172:20
**withdrawing** [1] - 172:12
**witness** [34] - 18:15, 18:16, 25:6, 26:17, 30:23, 31:15, 32:19, 43:4, 43:5, 43:6, 44:22, 46:24, 47:6, 47:8, 47:9, 47:10, 47:15, 47:19, 48:16, 49:3, 49:11, 49:14, 49:21, 50:19, 51:17, 52:22, 52:23, 78:13, 91:14, 91:21, 131:2, 177:24, 179:1, 179:3
**Witness** [1] - 92:1
**WITNESS** [61] - 2:2, 40:12, 40:21, 40:24, 44:13, 44:16, 50:25, 51:2, 52:8, 52:10, 53:12, 67:14, 68:21, 69:19, 70:4, 70:16, 80:13, 81:24, 85:3, 90:12, 90:14, 96:11, 97:8, 106:24, 117:12, 120:19, 120:21, 127:23, 128:10, 128:17, 128:22, 131:13, 135:18, 138:6, 142:2, 142:17, 143:7, 143:9, 143:19, 143:21, 145:1, 154:18, 155:15, 157:1, 158:15, 159:21, 160:3, 160:13, 163:6, 164:9, 165:3, 165:16, 166:8, 166:18, 167:1, 167:16, 167:24,

170:23, 175:25, 177:25, 178:2
**witness's** [1] - 51:20
**witnesses** [11] - 6:24, 15:20, 17:12, 23:9, 23:18, 31:2, 78:13, 91:8, 91:12, 91:14
**woman** [1] - 68:8
**wondering** [1] - 29:1
**word** [3] - 36:13, 43:17, 121:22
**words** [2] - 83:1, 84:1
**works** [14] - 10:5, 22:19, 24:5, 24:8, 24:10, 24:14, 30:3, 71:19, 71:22, 97:12, 117:23, 118:24, 125:5, 154:22
**World** [2] - 108:21, 109:16
**world** [7] - 34:6, 39:8, 96:20, 110:10, 118:14, 164:15, 174:12
**worried** [1] - 10:8
**worry** [1] - 100:16
**worth** [7] - 12:8, 90:4, 111:13, 111:22, 154:23, 160:22, 172:6
**wow** [1] - 136:5
**wrap** [2] - 22:3, 130:17
**write** [2] - 12:13, 166:16, 173:4
**writing** [4] - 41:11, 107:18, 136:15, 137:4
**writings** [1] - 136:9
**written** [3] - 18:17, 103:5, 162:7
**wrongful** [7] - 83:4, 83:6, 83:13, 83:15, 83:19, 84:3, 129:20
**wrongfully** [3] - 83:9, 84:7, 116:18
**wrongly** [1] - 83:4
**wrote** [7] - 39:24, 108:12, 108:13, 108:17, 127:16, 141:9

## X

**XYZ** [2] - 5:14, 144:14

## Y

**year** [12] - 10:20, 12:5, 25:17, 49:9, 55:17, 55:23, 56:10, 56:15,

58:17, 115:13, 130:9, 169:2
**years** [8] - 16:9, 56:21, 94:24, 95:4, 124:7, 165:5, 165:21, 167:7
**yesterday** [1] - 34:20
**York** [4] - 1:17, 40:4, 83:2, 176:2
**yourself** [3] - 102:4, 110:1, 141:5
**YouTube** [5] - 129:14, 130:4, 130:11, 153:13, 153:16

## Z

**Zcash** [22] - 137:10, 137:15, 137:17, 137:21, 137:25, 138:3, 138:4, 138:6, 138:7, 138:17, 138:21, 139:2, 139:7, 139:15, 139:24, 139:25, 140:2, 140:3, 140:5, 140:7, 140:8
**zero** [4] - 107:21, 139:7, 139:10, 139:16
**zero-knowledge** [4] - 107:21, 139:7, 139:10, 139:16
**Zoom** [7] - 3:9, 19:12, 32:19, 179:17, 179:18, 179:24
**ZOOM** [1] - 1:10