```
1              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF COLUMBIA
2
      UNITED STATES OF AMERICA,       ) Criminal Action
3                                     ) No. 1:21-CR-0399
                       Plaintiff,     )
4                                     ) MOTIONS HEARING
      vs.                             )
5                                     ) Washington, D.C.
      ROMAN STERLINGOV,               ) August 29, 2023
6                                     ) Time:  1:17 P.M.
                       Defendant.     )
7

8               TRANSCRIPT OF MOTIONS HEARING
           BEFORE THE HONORABLE JUDGE RANDOLPH D. MOSS
9                  UNITED STATES DISTRICT JUDGE

10
                    A P P E A R A N C E S
11

12    For the Plaintiff:      CHRISTOPHER BROWN
                              USAO-DOJ
13                            601 D Street, NW
                              Washington, DC 20001
14
                              ALDEN PELKER
15                            U.S. DEPARTMENT OF JUSTICE
                              950 Pennsylvania Avenue, NW
16                            Washington, DC 20530

17                            JEFFREY PEARLMAN
                              DOJ-CRM
18                            U.S. Department of Justice
                              1301 New York Ave. NW
19                            Washington, DC 20005

20    For the Defendant:      TOR EKELAND - Via Zoom
                              MICHAEL HASSARD - Via Zoom
21                            Tor Ekeland Law, PLLC
                              30 Wall Street, 8th Floor
22                            New York, NY 10005

23                            Defendant Roman Sterlingov - Via Zoom

24

25
```

1       **A P P E A R A N C E S (Cont'd.)**

2

 For Chainalysis:   WILLIAM FRENTZEN
3           MORRISON & FOERSTER, LLP
            425 Market Street
4           San Francisco, CA 94105

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21  Court Reporter:   Tamara M. Sefranek, RMR, CRR, CRC
           Official Court Reporter
22          United States Courthouse, Room 6714
           333 Constitution Avenue, NW
23          Washington, DC  20001
           202-354-3246

24

25

```
1                     P R O C E E D I N G S
2               THE COURTROOM DEPUTY:  Criminal Case 21-399, United
3      States of America v. Roman Sterlingov.
4               Would counsel please state their name for the record,
5      starting with government counsel.
6               MS. PELKER:  Good afternoon, Your Honor.  Alden
7      Pelker for the United States.
8               THE COURT:  Good afternoon.
9               MR. BROWN:  Good afternoon.  AUSA Chris Brown for the
10     United States.
11              THE COURT:  Good afternoon.
12              MR. PEARLMAN:  Jeff Pearlman for the government.
13     Good afternoon, Your Honor.
14              THE COURT:  Good afternoon.
15              MR. EKELAND:  Good afternoon, Your Honor.  Tor
16     Ekeland for Defendant Roman Sterlingov, who is present via
17     video link.
18              MR. HASSARD:  Good afternoon, Your Honor.  Michael
19     Hassard for the defendant, Roman Sterlingov, who is present via
20     video link.
21              THE COURT:  Good afternoon to you as well.  Let me
22     start off by asking Mr. Sterlingov if he consents to our
23     proceeding today with his counsel appearing by video link and
24     with him appearing by video link.  Mr. Sterlingov?
25              THE DEFENDANT:  Yes, Your Honor.
```

1          THE COURT:  Okay.  Thank you.  All right.  So we have

2     a lot to cover and, unfortunately, only about 40 minutes at

3     this point.  So we'll just do our best to move as quickly as we

4     can.

5          Anything else that anyone wants to offer with respect

6     to the government's request that the Court enter an order

7     pursuant to Rule 57.7 ordering the parties to comply with that

8     rule?

9          MR. BROWN:  Not for the government, Your Honor.

10          MR. EKELAND:  Nothing from the defense, Your Honor.

11          THE COURT:  So I am going to enter an order directing

12     the parties act in compliance with Rule 57.7.  I do understand

13     that the defense has taken some steps to bring their conduct

14     into conformance with that rule, and I appreciate that.

15          Let's take up the Rule 17(c) issue.  And this is the

16     question, principally, I think at this point of whether

17     Chainalysis should be required to make available for inspection

18     at least a portion of the source code for the program that was

19     used for purposes of doing the analysis in this case and that

20     would form the basis of some of the expert testimony in this

21     case.

22          I know yesterday evening I received a copy of a

23     curriculum vitae of an individual that the defense has

24     identified as somebody who could look at the source code for

25     them.  I suppose my first question is whether the parties have

1    discussed that and they've discussed what it is that Ms. Salah

2    would be looking at and also a suitable protective order.

3           MR. EKELAND:  Your Honor, thank you.  So we had a

4    call yesterday, and the parties are in substantial

5    disagreement, and we couldn't reach any kind of agreement on

6    this point at all.

7           And I think one of the main reasons for that

8    disagreement is that when we spoke with Mr. Laurent Salah, who

9    my understanding is one of the top experts in the world when it

10   comes to blockchain analytic software, we asked him if -- you

11   know, what parts of the source code we should focus on.  And

12   what his answer was to us is that he couldn't answer that

13   question without seeing the entire source code.

14          And so when we presented that to Chainalysis, we

15   were, essentially, told that that was a nonstarter.  And we

16   really didn't get asked that in our discussion.  So pretty much

17   the parties aren't in agreement.

18          The defense currently is asking for all the source

19   code so we can identify what we really need to look at, and

20   it's our understanding that Chainalysis is just refusing on

21   that point.

22          THE COURT:  All right.  And have you discussed a

23   protective order?

24          MR. EKELAND:  We didn't get to that, Your Honor.

25   We're happy to sign any reasonable protective order.  We have

1    no interest in distributing this IP anywhere.  We just simply

2    want to review it for purposes of Mr. Sterlingov's defense.

3              THE COURT:  Have you discussed the protective order

4    with Mr. Salah?  I think that's probably the principal

5    question, about whether he would agree not only to not use the

6    source code, but not to engage in any competitive practices for

7    some period of time in which he might even subconsciously be

8    relying on what he learned from the source code from a

9    potential competitor.

10             MR. EKELAND:  He has signed the protective order

11   that's governing this case.  And while I haven't explicitly

12   discussed with him sort of a noncompete, I don't anticipate

13   that being a problem.  I can't speak for him, but the defense

14   has no problem presenting it to him and asking him.  I wouldn't

15   expect a problem on that front, Your Honor.

16             THE COURT:  All right.  Let me hear from Mr. Frentzen

17   then, please.

18             MR. FRENTZEN:  Thank you, Your Honor.  I appreciate

19   the opportunity to address the Court.

20             So let me address the issue as follows.  And I was

21   here once upon a time when the Court gave some pretty explicit

22   instructions about how to proceed down this road --

23             THE COURT:  We don't have a lot of time today.  I can

24   tell you that I'm aware of the procedural issues and they

25   should have done it earlier.  The truth of the matter is, if I

1    conclude that this is something that is substantially important

2    to the defense in the case, I'm not going to simply say, well,

3    I told you by X date to do this and you didn't do it;

4    therefore, you lose a substantial portion of your defense.  I

5    really want to get to the merits of this.

6              MR. FRENTZEN:  That's what I'm getting to, Your

7    Honor.  Where I'm going is that, in part, what the Court said

8    was find an expert who would be an appropriate expert, not a

9    competitor and somebody who, you know, could be relied upon.

10   Put something in writing that specifies what needs to be looked

11   at and why with some specificity.

12             Have the individual able to follow a protective

13   order -- and I will raise for the Court that a protective order

14   be effective in the first place.  I will address that a little

15   bit as well in terms of concerns about that.

16             What we got in the phone call yesterday, and we got

17   the same CV the night before, and so we've done some digging

18   into the proposed expert.  But, effectively, the phone call, I

19   will tell the Court, went this way.  As you've heard, we need

20   to see everything, and we -- once we get in there and look

21   around, then we'll know what we want to look for.

22             THE COURT:  Isn't that not an unreasonable response

23   where you don't know what you're going to find?  And so if I

24   said to you, you're welcome to select a book off the shelf in

25   my chambers, you say, well, thanks very much, Judge, but I have

1    no idea what books you have on your chambers.  So I wouldn't

2    even know where to begin to know what to ask for.

3              MR. FRENTZEN:  But this is not that situation, Your

4    Honor.  They know and have an understanding of how this type of

5    software operates.  They know and understand and have conferred

6    with countless experts trying to poke holes in the analysis

7    that was done in this case.

8              And what the Court has said repeatedly and what we

9    discussed was, say something about what it is you need to see;

10   what aspect of this that it is you don't get.  Because, recall,

11   this is all -- in terms of the actual analysis and in terms of

12   what is occurring there, these are observable and verifiable

13   activities and analysis with a conclusion.

14             Now, they may have a different expert say we disagree

15   with your conclusion.  But the point is, have some expert say

16   why the source code in particular -- right? -- is proprietary

17   source code, is necessary to be examined and what it is about

18   it.

19             And recall -- I know there's the rant, you know, my

20   guy is being held for this and et cetera, et cetera, and

21   Chainalysis is accusing him, which is totally false.

22             But what we're talking about here in terms of the

23   software is not, you know -- you put in a bunch of things and

24   out pops Mr. Sterlingov.  What we're dealing with here is an

25   analysis on Bitcoin Fog -- Bitcoin Fog and other, if you will,

1    dark markets or exchanges and whether or not Bitcoin Fog was,

2    in large part, handling or dealing with dirty money.

3          My point is, tell us what -- have your expert tell us

4    what it is you need to understand.  We may be able to -- I'm

5    sorry, Your Honor, but if I could just --

6          THE COURT:  Sure.  Go ahead.

7          MR. FRENTZEN:  We may be able to explain that to you.

8    We may be able to then say, we understand what the issue is

9    here, and we will try to clarify it for you.

10         THE COURT:  I can answer that question for you, I

11   think.  Maybe -- I don't know whether you need the answer from

12   the defense or from me.  I can tell you what I think they need

13   to understand.

14         And you can tell me, since you're the one who -- your

15   client is the one who has access to the source code, where they

16   would need to look to find this.  I think what they're entitled

17   to understand is what heuristics applied in this case and any

18   assumptions that applied.  And not simply at 30,000 feet where

19   we simply say there were behavioral heuristics, but where

20   somebody can actually do something with the analysis.

21         Here is a particular behavior, and that behavior

22   received 7 points on a 100-point scale for purposes of

23   determining X, Y, or Z, or however it's weighted in the

24   process.  Someone can look at it and say:  What's the formula?

25   What is the algorithm that spits out the result that X

1    percentage of the activity on Bitcoin Fog was tied to the

2    darknet; in particular, darknet sites?

3           And how do you -- what is the -- what's the formula

4    or algorithms and what are the assumptions so someone can look

5    at it and not just simply say at a general-level behavioral

6    heuristics, but here's a particular behavior and this is how we

7    measured for that behavior in the analysis.

8           MR. FRENTZEN:  Your Honor, first of all, had I had

9    this -- it's a conversation that I can have, and I think there

10   may be a way to respond to what the Court's concern is.  It's

11   not just give us all of the source code and let us examine all

12   of it.

13          And let me get into this because this particular

14   expert, Your Honor, is highly problematic.  I will tell you at

15   least a couple of reasons why, having had only a limited amount

16   of time to take a look at this.

17          But this particular expert, Your Honor, is an

18   individual who actually runs a competitor site.  It is called

19   OXT.  I think the site can be reached at OXT.ME.  It is a

20   blockchain Bitcoin analytics operation that generates links and

21   connections much like other blockchain analytics function.

22          It is actually a competitor, but not just a

23   competitor.  It is a competitor whose mission is effectively to

24   try to put other blockchain analytics  programs out of business

25   or to assist people in evading the detection.  So this is not

 1    just a competitor, but actually sort of someone who sees

 2    themselves as an individual who wants to put, not just

 3    Chainalysis, as far as I can tell, but other blockchain

 4    analytics software out of business.

 5         And if the Court wants to take a look, I can go

 6    through some of the tweets.  There are endless tweets.  The

 7    individual's Twitter handle or X, whatever they're going by

 8    now, is @-L-a-u-r-e-n-t-M-T.

 9         It is full of negative screeds about Chainalysis,

10    negative screeds about blockchain analytics, negative screeds

11    about the DOJ, Department of Treasury.  It accuses DOJ of

12    manufacturing evidence.  It accuses Chainalysis of all sorts of

13    things; a lot of it straight out of -- straight from defense

14    counsel.

15         It also is chock full of this particular case in

16    which the individual has prejudged this case and is an opponent

17    of this particular case.  Not that, you know, somebody can't be

18    out there commentating, but what I'm telling the Court is this

19    is not an unbiased expert who is -- this is a competitor.

20         THE COURT:  I'm less concerned with whether the

21    individual is biased or not because that's an issue that the

22    jury can sort out or not.  I am more concerned with the

23    question about whether the individual is a competitor and

24    actually can abide by a protective order.  That is a more

25    serious issue in my mind.

 1          MR. FRENTZEN:  He is a current active competitor

 2     through an open-source code site, which so far as I understand,

 3     that stuff can't really be effectively shut down.  So I don't

 4     think it's possible for him to be in a noncompete.

 5          But more troubling, Your Honor -- let me just add --

 6     this is an individual who, among his terms of service, so the

 7     Court gets the flavor for it -- and part of the reason why I'm

 8     getting into this is that this is, frankly, an individual who

 9     has no interest in abiding by a protective order from this

10     Court.

11          In the terms and conditions there is all kinds of

12     limitations of warranties, and basically you can't rely on

13     this.  In addition, a restriction of usage, OXT and the

14     proprietary data, blah-blah-blah, is available to all users

15     without restriction with the exception of officers,

16     contractors, subcontractors, or staff acting on behalf of any

17     government or law enforcement agency; officers, contractors,

18     et cetera, et cetera, associated with the investigation of any

19     active criminal proceedings; officers, contracts, et cetera,

20     et cetera, of blockchain analysis entities acting in an

21     official and/or commercial capacity or being contracted by any

22     government or law enforcement agency; or any entity

23     investigating money laundering or unexplained wealth; any user,

24     entity or company corresponding in the above description that

25     uses OXT will be --

```
 1                    THE COURT REPORTER:  Can you slow down, please.
 2                    MR. FRENTZEN:  I'm sorry.  I'm coming in for a
 3      landing.  I apologize.
 4                    -- will be deemed in breach of these terms and
 5      conditions.
 6                    What I'm explaining to the Court here is this is not
 7      an individual who has an interest in complying with the law,
 8      complying with a protective order.  This is somebody whose
 9      active purpose is to evade and try to put out a business,
10      blockchain analytics, by other entities to include Chainalysis.
11                    And so this is an incredibly risky proposition.  This
12      is not an appropriate expert.  He is in the business of not
13      only competing, but trying to defeat Chainalysis.  Handing him
14      the source code is handing him a golden ticket for improper
15      usage.
16                    And let me also point out, so far as I can tell, Your
17      Honor, the individual is French.  I have nothing against the
18      French -- lovely people; it's a lovely country -- but I have
19      worked cases when I was still a prosecutor with the French
20      government, and one thing I know and understand deeply is he's
21      not going to be subject to the Court's protective order.
22                    And even if his conduct rose to the level of
23      criminality in the terms of contempt of court and we were able
24      to show it was him who leaked it -- and I think the Court
25      knows, there are a million ways for somebody who knows what
```

1    they're doing to leak something and have it not be tied back to

2    them.  But let's say that the government were able to figure

3    that out and prove it, he's French.  The French don't extradite

4    their own for anything.

5          So what I'm saying to the Court is, this is not even

6    somebody who is subject to a protective order even if he were

7    inclined to obey, which clearly his entire -- I mean, if the

8    Court spends some time -- and I apologize, because I wouldn't

9    subject you to it otherwise, but if the Court or staff spends

10   some time with his Twitter, I think you'll get a sense of what

11   I'm talking about.

12         And so the whole purpose here, again, is not -- the

13   source code is not the issue here, Your Honor.  That's why they

14   haven't done what you've asked them to do.  An expert is not

15   really going to say, this is going to be useful in terms of

16   doing what the Court has talked about.

17         THE COURT:  Let me pause you here.  I really am short

18   on time today.

19         MR. FRENTZEN:  I understand.  It's a --

20         THE COURT:  You said that there are other

21   alternatives.  What are the other alternatives?

22         MR. FRENTZEN:  Your Honor, what I think I could

23   propose that we do and what could be done in relatively short

24   order is a further specification along the lines of what the

25   Court has discussed.

1          In other words, that the heuristics which

2     Ms. Bisbee -- which Reactor utilized in the analysis that

3     clusters Bitcoin Fog and the other, I think, nine dark markets,

4     for lack of a better phrase, that those -- that those

5     addresses, those transactions could be further specified in

6     terms of which of the behavioral heuristics were utilized.

7          In other words, within the category of behavioral

8     heuristics, which of the transactions -- what were the

9     behavioral heuristics that triggered the clustering in that

10    particular instance, and I think that's something that we could

11    do.  We could provide to the government and that the government

12    could provide, pursuant to Rule 16, which would address the

13    Court's basic concern, which is can we get a more granular

14    definition of what heuristics are being utilized here.

15          THE COURT:  All right.  I want -- I'll come back to

16    you in a minute.

17          MR. FRENTZEN:  Thank you, Your Honor.

18          THE COURT:  I want to ask Mr. Ekeland about the

19    concerns that are raised with respect to this particular expert

20    and whether he really is somebody who meaningfully could be

21    subject to a protective order or whether he is such a

22    substantial competitor that it just would not be possible to

23    meaningfully protect the information.

24          In particular, what I really had in mind was somebody

25    who was not a competitor and also somebody -- I think I

1    mentioned this last time -- somebody who could, for example,

2    sign a protective order saying for five years that they would

3    not operate in the same field.

4            MR. EKELAND:  Well, first, Your Honor, OXT, I

5    believe, is a free, open-source platform to contrast that with

6    Chainalysis, which is a closed-source proprietary platform.  If

7    Chainalysis was open-source, we wouldn't be having this

8    discussion because an open-source software --

9            THE COURT:  I'm really short on time here today.  I

10   really want to get to the --

11           MR. EKELAND:  So, first of all, we disagree that he's

12   a competitor.  That's not clear to us at all.  According to his

13   resume, which we submitted to the Court and the government and

14   Mr. Frentzen, he's a founder of OXT, but he is now a

15   subcontractor that works for them.  And in the interest of --

16           THE COURT:  Would he be willing not to work for them

17   for five years?

18           MR. EKELAND:  That, I'd have to ask him.  I can't

19   speak for him, but we're happy to ask him.  Yeah, I'll ask him

20   that.

21           THE COURT:  What do I do about enforcement?  So if

22   stuff starts appearing in tweets and saying, you're not going

23   to believe how terrible Chainalysis is here, and here are the

24   five things I know as to how terrible it is; they're all

25   proprietary in nature.  How do I enforce that?  What do I do?

1           MR. EKELAND:  Well, the standard enforcement

2      mechanisms, my understanding, is contempt of court --

3           THE COURT:  But if he's a French citizen living in

4      France, what good is that?

5           MR. EKELAND:  Well, I'm sure he wants to travel to

6      the United States.  I am not an expert in extradition law or

7      treaties with France, but France is an old ally of the United

8      States.  I'm sure there would be repercussions.

9           I mean, Your Honor, I'm happy to look into

10     enforcement mechanisms further.  But one of the issues in this

11     space is that anybody who is good in this space is going to

12     have some kind of conflict with Chainalysis because Chainalysis

13     is competing with everybody.  And this is such a new space, and

14     he is one of the top people in the world in this space.

15          THE COURT:  Right.  But I suppose, though, there's a

16     difference, though, between somebody who is just an expert who

17     can read the source code and can say from the source code, here

18     are the assumptions, and we can work out some way in which they

19     may be able to then disclose that as assumptions to others for

20     purposes of the case.

21          But I'm not sure that you need somebody who is

22     writing the competitor's source code or running the competitor

23     or is seeking to undermine Chainalysis in the marketplace

24     either for financial purposes or other purposes; but find

25     somebody who can look at it and say, I'm an expert in reading

 1    source code, and these are the assumptions.

 2          I think Chainalysis has said that they can tell us

 3    with greater specificity what the assumptions or heuristics

 4    are.  But maybe you want someone who can confirm that.  Are

 5    they telling the truth when they say that?  It doesn't have to

 6    be a blockchain expert.

 7          It just has to be somebody who can say, yes, I looked

 8    at the source code and that is correct.  That is, in fact, what

 9    the heuristic provides; that the source code does, in fact, say

10    that if X behavior, then Y result.

11          MR. EKELAND:  Your Honor, first of all, we're not

12    agreeing with Mr. Frentzen's characterization of Mr. Salah as a

13    competitor.  So I just want to --

14          THE COURT:  I take your point.  But I think,

15    regardless of whether he's a financial competitor or not, the

16    point is the same.  If he is somebody whose work and activity

17    in life is attempting to undermine Chainalysis and to promote

18    what he's doing in place of what Chainalysis is doing, it may

19    not be a financial competition, but the same point applies.

20          MR. EKELAND:  Yes, Your Honor.  I think there's two

21    separate issues here.  One is the enforceability of any

22    protective order; and, B, the credibility of any testimony he

23    may put forward.

24          On that latter point, the government is welcome to

25    challenge him.  And on the former point, I think we can easily

1    craft some kind of protective order that's going to prevent the

2    issues here.

3              THE COURT:  I don't know whether this is possible or

4    ethical, but could I require that you post a $500,000 bond and

5    that you forfeit the bond if he leaks something?  I mean, is

6    there some way that I can actually provide enforcement in the

7    United States?

8              MR. EKELAND:  You know, the defense is open to that.

9              THE COURT:  I don't know whether that's ethical or

10   not to do it that way, but I need some way to enforce a

11   protective order.  Having somebody living in France is not

12   going to do it.

13             MR. EKELAND:  We're open to exploring that, Your

14   Honor, assuming we can honor the requisite -- whatever the

15   ethical rules apply.  We're open.  Because A, I don't

16   anticipate any kind of violation of it.

17             And, Your Honor, if the government and Chainalysis

18   aren't going to produce the source code, given the fact that

19   there's no scientific papers or anything attesting to the

20   accuracy, Chainalysis doesn't have any internal data on its

21   error rates at all, the defense thinks they should be excluded

22   entirely, anything from Chainalysis Reactor, because we didn't

23   create this situation.

24             The government is the entity that came in and decided

25   to use proprietary closed-source software as the foundation of

1     their case.  And if the government is unwilling to provide the

2     defendant in a federal criminal case access to the source code

3     by using something like OXT, which is an open-source platform,

4     then it should be excluded, particularly in this case where

5     there's no -- no reliable evidence as to its accuracy.

6               That's why we're asking for the source code in the

7     first place.

8               THE COURT:  Mr. Ekeland, you're pushing on an open

9     door on this point.  I've already indicated that I think you're

10    entitled to look under the hood here.

11              My concern, though, is that I have for weeks and

12    weeks been trying to encourage you to do this in a way that

13    makes sense and, you know, we're on the eve of trial now, and I

14    still am concerned that I don't have a proposal in front of me

15    that is a workable proposal for how you do to.

16              It's not that it's not possible.  It is possible to

17    find somebody who is just an expert in reading source code.

18    We've been told that Chainalysis will give us a list of the

19    specific heuristics that were applied and that somebody can

20    look at the source code and say, does that do that or not.

21              MR. EKELAND:  Your Honor --

22              THE COURT:  Who is not someone who is trying to

23    undermine Chainalysis and where there's concerns that, even if

24    they promise not to use it, it may be very hard for someone who

25    spends a portion of their life criticizing Chainalysis to

1    exclude from that portion of their brain the fact that they've

2    learned that they think they see some flaw in what Chainalysis

3    does.

4              MR. EKELAND:  That's a big assumption about

5    Mr. Salah.  You know, perhaps maybe we should have him in so

6    that the Court and the government can cross him on these

7    issues.

8              But we're confident that he can evaluate the source

9    code and not violate any protective order or bond or whatever

10   the Court chooses to put in place.

11             THE COURT:  I'd be happy to hear from him if you

12   wanted to schedule something.  I would be happy to hear from

13   him.

14             MR. EKELAND:  Okay.  We'll reach out to him and, I

15   guess, reach out to the Court.

16             THE COURT:  But what I will do is I will encourage

17   you, just given the shortness of time here, to be following

18   other paths as well.  And see if, assuming -- operate under the

19   assumption that I'm going to conclude that this expert is just

20   too adverse in a business sense to Chainalysis to have access

21   to their crown jewels and that you need somebody else.

22             So keep looking for that other person, somebody

23   who is just not in the blockchain tracing world who can at

24   least look at the source code and just verify whether it does

25   or doesn't do what Chainalysis says it does or will say it

1    does.  And then if it turns out that it doesn't do it or that

2    you have an expert who says it doesn't do that, you can put

3    that person on the stand to say, here's the assumption, and I

4    looked at the source code and the source code doesn't do that;

5    or we can consider whether there are further steps that need to

6    be taken at that time.

7            MR. EKELAND:  Understood, Your Honor.  Just for the

8    record, the defense would just like to put an objection on the

9    record as to the government using this type of closed-source

10   proprietary black box -- blockchain explorers to prosecute a

11   defendant.  We think it's unconstitutional.

12           THE COURT:  You put that one on the record, I think,

13   about a dozen times so far, so I think you're safe on that.

14           MR. EKELAND:  Thank you.

15           THE COURT:  All right.  Mr. Brown?

16           MR. BROWN:  Your Honor, I know time is short;

17   extremely short.  I just want to be heard.

18           THE COURT:  Yes.

19           MR. BROWN:  May I pass this up?

20           THE COURT:  Thank you.

21           MR. BROWN:  Your Honor, just -- we sent the defense

22   an electronic copy of these tweets.  These are the tweets; just

23   a selection of highlights from their proposed expert.

24           Just two very quick points.  Mr. Laurent [sic] has, I

25   mean, really borderline violent rhetoric directed towards

1    Chainalysis and their testimony in this case.  This hashtag

2    headshot, as in shooting somebody in the head.  Mr. Laurent

3    [sic] retweeted, "If you're so F-ing sure of your work, show me

4    your F-ing source code, punk," which is actually a quote from

5    Mr. Ekeland.

6            This is not an appropriate witness in any sense;

7    certainly, not an appropriate witness to trust with

8    intellectual property from our expert witness.  This is part of

9    their campaign of harassment directed at Chainalysis.  That's

10   point number one.

11           Point number two is the defense is not taking yes for

12   an answer.  I heard counsel for Chainalysis talk about a

13   compromise where they disclose the underlying algorithms and

14   formulas for the relevant heuristics that went into the expert

15   report.  That is -- that would, actually, be more directly

16   tailored to the legitimate defense to the extent that the

17   defense has any sort of legitimate interest in understanding --

18           THE COURT:  All right.  So let me order that that

19   occur.  And that Chainalysis disclose to the government and the

20   government can disclose to the defense the underlying

21   algorithms and heuristics that went into the report.

22           MR. BROWN:  Yes, Your Honor.

23           THE COURT:  I take your point.  I still think -- I

24   think that's an important step, and I appreciate it.

25           I still -- you're welcome to come back up,

1    Mr. Frentzen.  I still think that, if it's possible, I would

2    like to provide some opportunity for a defense expert to be

3    able to look at the source code just to verify that it does

4    what is represented that it does.  As I said, I don't think

5    that needs to be a blockchain expert, and we're running out of

6    time on doing this.  I've provided this advice to the defense

7    numerous times already.

8              Mr. Frentzen?

9              MR. FRENTZEN:  Your Honor, we continue to object to

10   the source code.  And the reason why you haven't gotten an

11   expert to say that is because the experts don't need to see the

12   source code.  That's not really what's at issue here.

13             Just to clarify what just occurred, we are

14   providing -- we are willing to provide, in the hopes that it

15   brings this to a conclusion -- not because we want to keep

16   giving things when nobody tells us any intelligible -- what it

17   is they are looking for, but the heuristics utilized in this

18   particular analysis as it relates to the behavioral heuristics,

19   breaking it down within that as to what were the bases or

20   reasons therefor, not a particular algorithm.  I just want to

21   make that clear.

22             THE COURT:  Okay.  Let me ask Mr. Ekeland.  Taking

23   that offer, is there any additional clarification or

24   specification or specificity that you would seek with respect

25   to that?

1          What we're hearing is the specific behavioral

2     heuristics and assumptions that went into the report as

3     relevant to this case.

4          MR. EKELAND:  Your Honor, we would --

5          THE COURT:  Go ahead.

6          MR. EKELAND:  First, we would like to -- in relation

7     to heuristic No. 1, which is the co-spend heuristic, Ms. Bisbee

8     testified that Chainalysis has particular algorithms to detect

9     CoinJoins.  So we would like to see the source code and any

10    information related to heuristic No. 1.

11         THE COURT:  Right.  Let me ask you to pause there for

12    a second.  Let me ask Mr. Frentzen.

13         Again, putting aside the source code, can you provide

14    further detail or explanation of what was done with respect to

15    CoinJoins?

16         MR. FRENTZEN:  Your Honor, respectfully, their expert

17    agreed with regard to heuristic 1, as far as I can tell,

18    100 percent with our -- with our conclusions.  So I'm not sure

19    what we're fighting about there.

20         In other words, I'm not sure why we would turn over,

21    sort of, that type of information when there's not really a

22    live dispute as to that particular issue.

23         THE COURT:  Mr. Ekeland?

24         MR. EKELAND:  I think Mr. Frentzen mischaracterizes

25    Ms. Still's testimony and our position on that.

1          What Ms. Bisbee's testimony was, was that Chainalysis

2     deploys particular proprietary algorithms, I believe, that

3     detect CoinJoins and eliminate any risk of error.  We would

4     like to see that, as well as information on heuristic 1;

5     heuristic 2, of course, which Ms. Still called the Pac-Man

6     overinclusive behavioral heuristic.

7          And, more interestingly, something that was raised by

8     Mr. Salah, with heuristic No. 3 -- which is their intelligence

9     heuristic -- what we're unclear on here is whether or not

10    heuristic No. 3 and -- in relation to their claims that their

11    software is deterministic -- involves actually manual

12    modification and corrections to the result from the software.

13    This is something that's at least documented, I think, once in

14    Ms. Still's expert report where she refers to, I think, Mr. --

15    IRS CI Beckett that Chainalysis could get back with a fix.

16         This raises the problem in relation to Chainalysis

17    Reactor, in general, as to hearsay.  Because maybe there's an

18    argument that the source code and sort of what they're claiming

19    to be deterministic -- which we don't think is deterministic --

20    is not hearsay.

21         If you've got manual manipulation, as appears to be

22    occurring here, at least implied by the IRS CI Beckett, you

23    have a hearsay objection to this code.  So what we're asking

24    for is information and source code related to heuristic 1,

25    heuristic 2, and heuristic number 3; in particular, any kind of

1     manual manipulation or corrections or fixes.

2              And that's why we're also not just asking for the

3     source code, but the change log as well, which will document

4     changes in the software over the course of time.

5              THE COURT:  All right.  Mr. Frentzen?

6              MR. FRENTZEN:  Your Honor, this laundry list is not

7     something that any expert has presented to us.  It's what the

8     Court said we could actually try to work through.

9              And so I'm standing here after however much time

10    where they haven't done anything -- right? -- I had a phone

11    call yesterday.  We want everything.  Why?  We have to look

12    under the hood and look at everything, which is the very

13    definition of a fishing expedition under Rule 17, right?

14             So no expert has said, here's what we have to say, so

15    that we can say, here's why you don't need to see this, or

16    here's how we can address this problem.  We still don't have

17    what the Court has said now, probably months ago when I was

18    here last, exactly how they could do this.  They came here

19    again; you said how they could do this.  They still haven't

20    done it.  They've proposed possibly the worst expert in the

21    world for this project.

22             THE COURT:  Right.  Put that aside for a second.

23    That's another issue.  I just want to stay focused here.

24             You're right.  They haven't done what I've asked with

25    respect to providing the specificity.  I'm going to take

1    Mr. Ekeland at his word now, and I'm going to hold him to this

2    and his list at this point in time, and the list that he's

3    provided to you.  You can shake your head, and I can just enter

4    an order and tell you to turn over your source code, if that's

5    what you prefer.

6              MR. FRENTZEN:  No, Your Honor.  I'd prefer that we

7    handle this in a way that we get an expert to say these things,

8    not Mr. Ekeland to just rattle off a wish list.  He's done that

9    before.  That's what all of his requests are.  That's what his

10   subpoenas have been.

11             THE COURT:  I'm trying to give you the specificity

12   now by telling you exactly as of today what it is, period.

13   That's the end of the matter.  And I'm going to hold him to it.

14             MR. FRENTZEN:  I understand that.  We just want an

15   opportunity to respond, Your Honor, rather than here's an

16   order, because we're just standing here now and they haven't

17   done what they said they were going to do.  That's what I'm

18   saying.

19             THE COURT:  I will allow you to seek to file a motion

20   to revise this or to change it if you think that it's mistaken

21   in some reason.  But I am going to take you up on your offer

22   with respect to providing the specifics on the heuristics and

23   assumptions that went into heuristic 2.

24             With respect to heuristic 1, I'm going to ask that

25   you do the same thing with respect to CoinJoins.  You can tell

1   the government what the procedures were or process was for

2   CoinJoins.

3           And then with respect to heuristic 3, if there were

4   manual corrections that were made, I'm going to request that

5   you just identify the types of manual corrections that were

6   made for the government so that the government can disclose

7   that as well.

8           And that's the list that I've gotten from

9   Mr. Ekeland.  He's had his opportunity.  That's it.

10          MR. FRENTZEN:  So this is the end of the matter, Your

11  Honor?

12          THE COURT:  Well, I still need to figure out, once

13  you do this, as to whether there's any need and whether

14  there's someone who is -- an appropriate person, if they want,

15  to be able to look at the source code and just confirm that it

16  does what you say it does.  You're going to tell him what it

17  does here.

18          I agree with you and I have concerns about

19  Mr. Laurent [sic], and I've provided warnings to the defense on

20  numerous occasions on the type of expert, a person they should

21  provide.  From what I've seen today, he doesn't seem to satisfy

22  that.

23          But if they can go to the University of Maryland

24  computer science program and just find somebody who is an

25  expert in computer code in whatever language the problem is

1   written in who can look at the computer code and say either it

2   does or it doesn't do what you say, I would be open to that

3   still.  But I'm not going to order that yet because I'm not

4   convinced that Mr. Laurent is the person to do that, and time

5   is running out for the defense.  They have not yet convinced me

6   that they have somebody who is an appropriate expert to do that

7   type of analysis.

8          MR. FRENTZEN:  So the first thing I came here

9   prepared to discuss and to offer to the Court, and so we will

10  make that --

11         THE COURT:  I appreciate that.

12         MR. FRENTZEN:  The others, Your Honor, I would like

13  an opportunity -- because I'm just standing here --

14         THE COURT:  I understand.  You have to talk to your

15  client.

16         MR. FRENTZEN:  I want to be able to confer with the

17  client --

18         THE COURT:  I understand.

19         MR. FRENTZEN:  -- talk about what possible issues

20  there are and be able to return to the Court about those --

21         THE COURT:  That's fair.

22         MR. FRENTZEN:  -- in the hope that this will conclude

23  this entire foray.

24         THE COURT:  That's fair under the circumstances.  If

25  it turns out that for some reason what I've ordered is

1    problematic, I'll just direct that you tell me -- when? --

2    Monday, Tuesday to file a report with the Court letting me

3    know?

4              MR. FRENTZEN:  I think -- sorry, Your Honor.  What

5    day is today?  I think Tuesday would be great if we can have --

6              THE COURT:  By Tuesday, you'll file a report letting

7    me know if there's a problem with that.

8              MR. FRENTZEN:  Thank you, Your Honor.

9              THE COURT:  Okay.  I appreciate this.  I realize

10   you're a third party here.  But it is -- you're a third party

11   where you're not quite the core of the case, as Mr. Ekeland has

12   suggested, but it's a significant part of the case.

13             I do think it's fair that the defense have the

14   opportunity to test the assumptions and make sure they

15   understand the assumptions that have gone into the analysis.

16             MR. FRENTZEN:  We will take a look at the additional

17   requests, and we'll report back to the Court.  Thank you, Your

18   Honor.

19             THE COURT:  Thank you.  Let me be clear.  I mean --

20   well, I guess they are -- I guess there are requests in the

21   sense that it's not discovery that I can direct that you

22   produce.

23             But it's more than, I think, just a request because I

24   think if we're not able to work something out like this, then I

25   may be in a position where I just have to direct that all the

1    source code get turned over, just so you can convey that to

2    your client.  I need to get some resolution here so that the --

3              MR. FRENTZEN:  I understand that, Your Honor.  But I

4    think putting the onus on the folks that have been doing what

5    they're supposed to do rather than the ones who haven't is a

6    fundamental problem here, Your Honor.  It's created a situation

7    where we are doing this like this rather than having some

8    expert say, here's why we need to see the following portions of

9    the source code, which is all the Court said, from somebody who

10   has not got a dog in the fight.  And we don't have that.

11             So, instead, we're here with the Court saying we may

12   be forced to just turn it all over if we don't capitulate to a

13   last-minute -- you know, throw up a bunch of issues by counsel.

14   I'm sorry, Your Honor, but it's just not --

15             THE COURT:  I'm sorry to say this to you.  I think

16   your attitude towards this is not sufficiently deferential to

17   the due process concerns in this case.  If we're going to go to

18   the cost of trying this case and the government is going to the

19   cost and we're going to have a jury who is going to sit here,

20   I'm going to try this case in a way in which -- is not only

21   consistent with due process and the rights of the defendant to

22   a fair trial, but also in a way in which, if there is a

23   conviction, the conviction is going to hold up.

24             None of us have an interest in trying a case and

25   having the Court of Appeals saying what I'm saying right now,

1      which is that the defense has some right to look under the hood

2      to understand the assumptions that are going to a key piece of

3      evidence that's being used against them.

4              MR. FRENTZEN:  I hear everything the Court is saying.

5      I'm trying to be properly deferential to the Court.  I hope the

6      Court sees that.

7              THE COURT:  I don't, frankly.  You seem diffident.

8              MR. FRENTZEN:  I apologize then, Your Honor.  My

9      issue is with a process being laid out and then not being

10      followed and, thus, putting everybody else at this point.  It's

11      not with the Court.  It's with that particular -- that's where

12      that issue comes from.  Let me say that, first of all.

13              Then just, if I may, I think part of the problem is

14      that no expert -- right? -- no person who knows and understands

15      will put on paper, here's why the source code needs to be seen.

16      And, fundamentally, that's because it's not really an issue,

17      Your Honor.  And it's not something that under Rule 16 or under

18      Rule 17(c) is something that needs to be seen.

19              In other words, there's not an expert who has put pen

20      to paper, as the Court has said repeatedly should happen.  And

21      that's because an expert -- it's not the issue.  The issue is

22      not in the source code, Your Honor.  This is independently

23      verifiable.

24              THE COURT:  Well, the issue may not be in the source

25      code.  When you say it's independently verifiable, how is it

1    independently verifiable?

2              MR. FRENTZEN:  I'm saying that the functional -- that

3    the activity is all viewable on the blockchain.  It is all

4    independently verifiable.  That's my point, Your Honor.

5    It's -- and I'm sorry.  I know the Court has short time.

6              But, look, fingerprint analysis, we all agree, is --

7    it's admitted in hundreds of courts every day.  Firearm tool

8    mark examinations, even DNA, if it's not an exact match, but

9    you have a mixture, for example, admitted every day,

10   everywhere.

11             And you have situations in which there are verifiable

12   portions of that but then there are conclusions that are made

13   from the verifiable information, and all the information here

14   is verifiable and knowable and testable, and somebody else

15   could reach a different conclusion.  That's what I'm saying,

16   Your Honor.

17             THE COURT:  Okay.  All right.  You know where I stand

18   on this issue now.  And, hopefully, we'll be able to reach

19   closure on this sooner rather than later.

20             And I will say to Mr. Ekeland that, although I'm

21   pushing hard on Chainalysis here, I do agree with Mr. Frentzen

22   that a large portion of the problem and the fact that we're

23   dealing with this at the last minute is the fact that the

24   defense has not complied with the Court's orders about how to

25   proceed here.

1          If at the end of the day you don't get everything

2     you're looking for, it's not going to be because I haven't

3     tried to get it to you.  It's going to be because you haven't

4     taken me up on the offer of how to do it properly.  But we'll

5     see where we go with this.  I hope we're able to reach some

6     resolution.  Thank you.

7          MR. FRENTZEN:  Thank you, Your Honor.

8          THE COURT:  So I have a number of other issues on my

9     plate and, unfortunately, I'm already slightly late on my next

10    matter.  But let me just tell you the issue, I think, that is

11    probably highest on my list.

12         I think, with respect to the *Frye* issue, we can just

13    handle that at the pretrial conference.  In fact, I think it's

14    better to do it with Mr. Sterlingov in the courtroom.

15         On venue, I have been working on this.  I will tell

16    you, just for purposes of your trial preparation, that I think

17    it is very likely that the Court will conclude that I do

18    have -- there is venue in this District with respect to -- I'm

19    just looking for the indictment.  I think it's the first three

20    counts -- all of the federal law counts of the indictment.  I

21    do, though, have questions.  And I'm -- thank you.

22         So it's Counts 1, 2, and 3.  And I'll get you a

23    written opinion on this.  I've been spending a lot of time

24    thinking about it, and I'm pretty confident that there is venue

25    with respect to those three counts.

1          With respect to Count 4 and one of the theories for

2     Count 3, because, as you may recall off the top of your head,

3     one of the theories for why there was failure to obtain a

4     license for purposes of Count 3 is that there was a state law

5     licensing requirement.

6          And I am, frankly, a little puzzled about whether

7     there really is a requirement under D.C. law for somebody who

8     conducts -- who physically is outside the District of Columbia,

9     has no offices within the District of Columbia and who only

10    touches the District of Columbia in the sense that someone

11    engages in an internet transaction while sitting in the

12    District of Columbia, and perhaps only does so on two or three

13    or four occasions, but only just a handful of occasions that we

14    know of from the District of Columbia and where it wouldn't

15    even be clear to the, potentially, regulated party that those

16    transactions were coming from the District of Columbia.

17    They're just coming from an IP address somewhere.  Is there

18    really, as a matter of D.C. law, a registration requirement?

19    And I, actually, went on to the website, which is cited in -- I

20    think in Judge Howell's opinion, in the *Harmon* case, and there

21    were a handful of businesses, arguably, that were registered

22    under circumstances like that.

23          We're talking about maybe 10 or 15 companies in the

24    world registered under those circumstances.  And when I read

25    the statute, it's not at all clear to me from the statute that

1    it applies under these circumstances.  I'll get my copy of the

2    statute here.

3          I don't think it's a venue question, but I do -- I

4    really do instruct the jury on the law.  And as a matter of

5    law, I just wasn't sure that, even excepting the government's

6    allegations in the case that Mr. Sterlingov was a person who

7    was engaged in the business of money transmission without a

8    license, and that if you then look at the various statutes that

9    require a license under D.C. -- and I may have left some of

10   these on my desk -- but, you know, they're written very much in

11   brick-and-mortar-type terms.  And that the disclosure has to

12   say where in the District of Columbia, what's the address that

13   your business is located at, things like that.

14         And it does seem that it would be capturing enormous

15   breadth under those circumstances because I assume that a

16   similar analysis wouldn't only apply to money transacting

17   businesses, but I suspect there are similar D.C. statutes that

18   deal with regulating businesses and licensing your business in

19   general.

20         And does that mean that, if I'm sitting in D.C. and I

21   engage in an online transaction with a company that is located

22   in Switzerland and I'm the only person who has ever engaged in

23   that transaction, it's a Swiss company with Swiss offices, but

24   they're selling something online, and they're not registered to

25   do business in D.C., have they violated those statutes?

1          There's just no analysis at all of this anywhere.  If

2     that doesn't apply, then the subsection (a) provision for

3     purposes of 1960 wouldn't apply.  You would still have

4     1960(b)(1)(B) and (b)(1)(C).  But even as to (b)(1)(B), I

5     started tracing that back as well.  And that's a complicated

6     question about when you're required to register under the

7     treasury regulations or the statute, and the statute directs --

8     1960 directs you to Title 31, 5330.

9          And then 5330 defines a money transmitting business

10     to mean any business that quite broadly involves -- it involves

11     the informal money transfer -- informal money transfer system

12     or network of people who engage as a business in facilitating

13     the transfer of money domestically or internationally.  So that

14     seems quite sweeping.

15          But it's conjunctive, and it says, "And is required

16     to file reports under 5313."  And then if you go to 5313, 5313

17     talks about domestic financial institutions.

18          And domestic financial institutions are then defined

19     in 5312.  And, again, a financial institution is defined quite

20     broadly to include a licensed -- somewhat circularly, a

21     licensed sender of money or any other person who engages as a

22     business in the transmission of funds.  So that seems quite

23     broad.

24          But then it's unclear to me what the difference is

25     between a domestic financial institution and a foreign

 1    financial institution, and I didn't see a definition of that.

 2    There's a definition of domestic financial agency and foreign

 3    financial agency.

 4            And then, of course, there are all of the governing

 5    regulations, the Department of Treasury regulations, which I

 6    glanced at but did not dive into.

 7            And this is not all for purposes, Mr. Brown, of

 8    putting you to the test on the spot here, but I did want to

 9    flag this issue for both parties.  I think I probably need a

10    brief from both parties on the question of, as a matter of D.C.

11    law, whether licensing really does apply under these

12    circumstances.

13            When I looked at the statutes, as I said, they may be

14    older, but they're written in very brick-and-mortar-type terms.

15    And I do worry that if you construed the statute to mean that

16    anyone who engages in a transfer of funds on the internet where

17    somebody in D.C. participates in that or, even if their IP

18    address isn't necessarily readily discernible as D.C., whether

19    it means that there are potentially thousands of companies out

20    there that are engaged in criminal activity that are unaware of

21    that.

22            When I went to look at the registrations that I found

23    online, it looked like, at least in some of the cases, there

24    were cases that actually had local offices.  Virtually, I think

25    all of them, they actually had at least registered agents in

1    D.C.  Maybe that's a requirement, that you have the registered

2    agent in order to license in the first place.

3          But I don't know whether you-all have even reached

4    out to the D.C. regulatory folks to ask them whether they think

5    it applies under these circumstances, but it struck me as a

6    little bit ambitious.

7          MR. BROWN:  Your Honor, that last comment raises some

8    other issues that Judge Howell actually addressed in some of

9    her other opinions in the *Harmon* case about whether federal

10   courts determine federal law or whether administrative agencies

11   are entitled to --

12         THE COURT:  That is an issue that I probably,

13   hopefully, will not need to get into here.  I really meant that

14   more as a sanity check of, is that their understanding of the

15   law or not?  Are they applying the law that way or not?

16         MR. BROWN:  And, Your Honor, I would say we did look

17   in the course of the *Harmon* litigation at the kinds of, in

18   particular, virtual currency companies that were registered as

19   money transmitting businesses in D.C., and there were multiple

20   companies that I'm 99 percent positive do not have a

21   brick-and-mortar presence here.

22         THE COURT:  As I said, I saw -- there might have been

23   maybe as many as two dozen, but there were not a ton of them.

24   Given the number of companies out there that engage in money

25   transactions, you would expect, if people were really doing it,

1    perhaps thousands.

2          MR. BROWN:  Your Honor, I mean, bear in mind, this

3    applies to money transmitting businesses, so not just anybody

4    who happens to be transmitting money.  It's not at all unusual

5    for -- like any major money transmitting business will get

6    licensed in all 50 states or they will affiliate with agents

7    who have licenses.  That's a pretty typical practice, as is

8    screening for IP addresses.

9          There are cryptocurrency exchanges that claim not to

10   do business with U.S. customers, and so they screen for U.S. IP

11   addresses.  Bitcoin Fog did not do any of those things, and it

12   was available in the District of Columbia.

13         I'd also direct the Court -- I mean, we're happy to

14   provide briefing, but I'd also direct the Court's attention

15   specifically to Judge Collyer's opinions in the *E-Gold*

16   litigation, which I think is relevant both for -- although she

17   didn't necessarily rule on the D.C. Money Transmitters Act, she

18   did address quite -- in quite specific detail the applicability

19   of the Bank Secrecy Act, statutory and regulatory definitions

20   as applied to a virtual currency company, E-Gold, that had no

21   brick-and-mortar presence in the United States and found that

22   they did, indeed, apply.

23         THE COURT:  And as I said, I want to walk through the

24   analysis under Section 1960(b)(1)(B) and just make sure I

25   understand it.  And I believe that there may be Treasury

1    Department regulations that actually deal with --

2          MR. BROWN:  Yes, Your Honor.

3          THE COURT:  -- money transacting companies and

4    virtual money transacting companies and Bitcoin-type entities.

5    But I just need to make sure I understand that and that I'm

6    walked through that.

7          As to that one, I really just am agnostic in the

8    sense that I haven't been able to connect all the dots yet in

9    my own mind.

10         With respect to the D.C. one, though, I'm just -- you

11   may be right in the end.  I'm just a little bit more skeptical

12   there because it does seem to have enormous reach, and I guess

13   the question is whether, as a matter of D.C. law, one is

14   engaged in the business of money transacting if one enters into

15   a transaction with somebody, of the millions of transactions

16   that you may engage in, one or two of them happen to be with

17   somebody who is sitting in D.C.

18         It's one of these challenging questions of the

19   internet age.

20         MR. BROWN:  Yes, Your Honor.  I think -- think about

21   PayPal.  I'm sure PayPal does not have a brick-and-mortar

22   office building in D.C.

23         THE COURT:  But PayPal probably engages in many

24   thousands of transactions in D.C. every year versus where, I

25   don't know -- there may be thousands in this case -- we don't

1   know, but we know there are at least a couple.

2            MR. BROWN:  The statute doesn't speak in terms of

3   quantum of transactions.

4            THE COURT:  No.  But the word business may --

5            MR. BROWN:  To be sure, yeah.  Business is defined

6   generally not in terms of the quantum of transactions, but in

7   terms of, are you doing this -- are you open to the public for

8   arm's length transactions, are you doing this to make money.

9   That distinguishes a business from an individual engaged in --

10           THE COURT:  So for present purposes, why don't we

11  just come up with a date for briefing on this topic.  I know

12  you-all have a lot on your plates now as we're getting ready

13  for trial.  Why don't you tell me what is workable from your

14  perspective.

15           I think it probably makes sense for the government to

16  go first and then for the defense to have an opportunity to

17  respond since it's your theory.

18           MR. BROWN:  Your Honor, is it your intention to

19  address this at the pretrial conference in terms of jury

20  instructions?

21           THE COURT:  That probably does -- we certainly need

22  to resolve this before I instruct the jury or even -- I have

23  had cases in which, by the time you get to the final jury

24  instructions, that they depart from the preliminary.  But it

25  would be ideal to resolve it, if I can, before I get the

1    preliminary instructions.

2             MR. BROWN:  Yes, Your Honor.  We would certainly want

3    to be able to tell the jury in opening statements which counts

4    we're proceeding on.

5             THE COURT:  Exactly.

6             MR. BROWN:  If that's the case, if we could have

7    until Monday.  I know Monday is a holiday.

8             THE COURT:  That's fine with me.  I'll direct that

9    the government file its brief with respect to the applicability

10   of 1960(a) -- I'm sorry -- (b)(1)(B) and the D.C. statute, and

11   that you do so on or before the 4th of September.  And that the

12   defense respond on or before the 6th.

13            MR. BROWN:  Yes, Your Honor.

14            THE COURT:  Obviously, Mr. Ekeland, in the meantime,

15   even though that's a short turnaround, you can be doing your

16   research on this topic, and if --  but it will give you a

17   chance to at least see what the government says before you have

18   to file your brief.  All right?

19            MR. EKELAND:  Understood.

20            THE COURT:  I've already run substantially over

21   today.  But the other issue I wanted to touch on was to find

22   out where the parties are with respect to the question of

23   authentication of documents and whether the parties are able to

24   narrow the universe or whether you need me to rule on all, I

25   don't know, 100 different documents we're talking about.

1          MS. PELKER:  Your Honor, at this point the government

2     is still waiting to hear back from the defense on all of the

3     authentications.  If we haven't heard one way or another, we'll

4     be asking the Court to rule on the admissibility based on the

5     902 certifications at the pretrial conference.

6          THE COURT:  All right.  Mr. Ekeland, when can you

7     respond?  Because your response at this point has been three

8     pages of not substantive.  It borders on conceded, I think.

9     The only thing that you've said more substantively was not even

10    in the briefing on the authentication issue but was in briefing

11    on another issues where, in passing, you indicated that the

12    Mt. Gox documents were not authentic.

13          But I should say, just so -- to help guide you --

14    because I know everyone has a lot of work to do between now and

15    trial -- I do think that the defense is mistaken or is

16    conflating authentication with accuracy.  And you're free to

17    argue that the records are inaccurate in some way and they've

18    been hacked, that someone tampered with them in some way.

19          But authentication is just whether the records are

20    what they purport to be, which that is, are these the records

21    that are maintained or were maintained on a particular date by

22    Mt. Gox or the trustee as of that date.  And they -- records

23    may or may not be accurate, but they either are or are not the

24    records that were maintained by Mt. Gox on that date.

25          With that said, Mr. Ekeland, when can you file any --

1    if you have any more specific -- well, first of all, ideally,

2    you would get back to the government and tell the government,

3    yes, you agree or stipulate as to authentication as to some

4    subgroup of the documents.

5         But if there are others where you're not prepared to

6    stipulate as to authentication, I need a specific legal

7    analysis as to why they're not authentic with particular

8    reasons, and I need it soon because, again, we're running out

9    of time.

10        MR. EKELAND:  Well, why don't we provide that on

11   Monday when the government provides us their brief on the money

12   transmission issue?

13        THE COURT:  Okay.  So you'll file with the Court then

14   any specific objections you have?

15        MR. EKELAND:  Yes.  What is that, September 4th?

16        THE COURT:  Yes.

17        MR. EKELAND:  Yes, Your Honor.

18        THE COURT:  Okay.  I would encourage you beforehand

19   just as a -- frankly, as a service to our jury that we're going

20   to have sitting here through trial and for the Court that if

21   there are things where you can stipulate, I would encourage you

22   to do so just because it doesn't serve the interests of

23   judicial economy to have to bring in an expert to take the

24   stand and say, yes, these are the records we maintained, any

25   cross-examination, no, no cross-examination, thank you.  You

1    can leave.  Okay?

2            MS. PELKER:  Thank you, Your Honor.

3            MR. EKELAND:  Understood, Your Honor.  Just to

4    flag --

5            THE COURT:  Go ahead.

6            MR. EKELAND:  Just to flag one thing.  I'll revisit

7    this, this week, but we do expect there to be an issue with the

8    matter of the Russian translations, and I believe the last time

9    we were in court, the Court mentioned that the Court might be

10   able to provide a neutral translator.  That's the most

11   substantial thing that I can think of right now.

12           THE COURT:  All right.  So the parties are not in

13   agreement about the translations?  I suppose you can offer your

14   competing translations, but if the parties agree to have a

15   court-certified translator look at them and translate them,

16   that's okay with the Court as well.  But both parties, I guess,

17   would have to agree to that.

18           MS. PELKER:  The government still hasn't heard what

19   defense's issues or concerns with the translations are, which

20   language it is, what documents they're in.  We're happy to

21   discuss any of it.

22           If it's a small wording choice, it may not be a big

23   deal.  I suspect if defense is raising it, then --

24           THE COURT:  I will then direct that the defense

25   identify on or before Tuesday to the government any specific

1   objections it has with respect to the government's

2   translations.  And then, hopefully, you can resolve any of

3   those differences.  And if you can't, then we'll figure out at

4   the pretrial conference what to do about it.

5           MS. PELKER:  Thank you, Your Honor.

6           THE COURT:  Anything else before we adjourn today?  I

7   know you've got a lot of work to do.  I'm trying to at least

8   give you some guidance to make it more efficient.

9           MS. PELKER:  We appreciate that, Your Honor.  Nothing

10  else from the government.

11          THE COURT:  Okay.  Thank you.  Mr. Ekeland?

12          MR. EKELAND:  Nothing from the defense.

13          THE COURT:  Thank you all.

14              (The hearing adjourned at 2:25 p.m.)

15

16

17

18

19

20

21

22

23

24

25

CERTIFICATE OF OFFICIAL COURT REPORTER


I, TAMARA M. SEFRANEK, do hereby certify that the above and foregoing constitutes a true and accurate transcript of my stenographic notes and is a full, true and complete transcript of the proceedings to the best of my ability.

Dated this 5th day of September, 2023.


/s/ Tamara M. Sefranek_____
Tamara M. Sefranek, RMR, CRR, CRC
Official Court Reporter
Room 6714
333 Constitution Avenue, N.W.
Washington, D.C.  20001

## $

**$500,000** [1] - 19:4

## /

**/s** [1] - 49:9

## 1

**1** [7] - 25:7, 25:10, 25:17, 26:4, 26:24, 28:24, 35:22
**10** [1] - 36:23
**100** [2] - 25:18, 44:25
**100-point** [1] - 9:22
**10005** [1] - 1:22
**1301** [1] - 1:18
**15** [1] - 36:23
**16** [2] - 15:12, 33:17
**17** [1] - 27:13
**17(c** [2] - 4:15, 33:18
**1960** [2] - 38:3, 38:8
**1960(a** [1] - 44:10
**1960(b)(1)(B** [2] - 38:4, 41:24
**1:17** [1] - 1:6
**1:21-CR-0399** [1] - 1:3

## 2

**2** [4] - 26:5, 26:25, 28:23, 35:22
**20001** [3] - 1:13, 2:23, 49:11
**20005** [1] - 1:19
**202-354-3246** [1] - 2:23
**2023** [2] - 1:5, 49:7
**20530** [1] - 1:16
**21-399** [1] - 3:2
**29** [1] - 1:5
**2:25** [1] - 48:14

## 3

**3** [7] - 26:8, 26:10, 26:25, 29:3, 35:22, 36:2, 36:4
**30** [1] - 1:21
**30,000** [1] - 9:18
**31** [1] - 38:8
**333** [2] - 2:22, 49:11

## 4

**4** [1] - 36:1
**40** [1] - 4:2
**425** [1] - 2:3
**4th** [2] - 44:11, 46:15

## 5

**50** [1] - 41:6
**5312** [1] - 38:19
**5313** [1] - 38:16
**5330** [2] - 38:8, 38:9
**57.7** [2] - 4:7, 4:12
**5th** [1] - 49:7

## 6

**601** [1] - 1:13
**6714** [2] - 2:22, 49:10
**6th** [1] - 44:12

## 7

**7** [1] - 9:22

## 8

**8th** [1] - 1:21

## 9

**902** [1] - 45:5
**94105** [1] - 2:4
**950** [1] - 1:15
**99** [1] - 40:20

## A

**abide** [1] - 11:24
**abiding** [1] - 12:9
**ability** [1] - 49:6
**able** [18] - 7:12, 9:4, 9:7, 9:8, 13:23, 14:2, 17:19, 24:3, 29:15, 30:16, 30:20, 31:24, 34:18, 35:5, 42:8, 44:3, 44:23, 47:10
**access** [3] - 9:15, 20:2, 21:20
**according** [1] - 16:12
**accuracy** [3] - 19:20, 20:5, 45:16
**accurate** [2] - 45:23, 49:4
**accuses** [2] - 11:11, 11:12
**accusing** [1] - 8:21
**Act** [2] - 41:17, 41:19
**act** [1] - 4:12
**acting** [2] - 12:16, 12:20
**Action** [1] - 1:2
**active** [3] - 12:1, 12:19, 13:9
**activities** [1] - 8:13
**activity** [4] - 10:1,
18:16, 34:3, 39:20
**actual** [1] - 8:11
**add** [1] - 12:5
**addition** [1] - 12:13
**additional** [2] - 24:23, 31:16
**address** [10] - 6:19, 6:20, 7:14, 15:12, 27:16, 36:17, 37:12, 39:18, 41:18, 43:19
**addressed** [1] - 40:8
**addresses** [3] - 15:5, 41:8, 41:11
**adjourn** [1] - 48:6
**adjourned** [1] - 48:14
**administrative** [1] - 40:10
**admissibility** [1] - 45:4
**admitted** [2] - 34:7, 34:9
**adverse** [1] - 21:20
**advice** [1] - 24:6
**affiliate** [1] - 41:6
**afternoon** [9] - 3:6, 3:8, 3:9, 3:11, 3:13, 3:14, 3:15, 3:18, 3:21
**age** [1] - 42:19
**agencies** [1] - 40:10
**agency** [4] - 12:17, 12:22, 39:2, 39:3
**agent** [1] - 40:2
**agents** [2] - 39:25, 41:6
**agnostic** [1] - 42:7
**ago** [1] - 27:17
**agree** [7] - 6:5, 29:18, 34:6, 34:21, 46:3, 47:14, 47:17
**agreed** [1] - 25:17
**agreeing** [1] - 18:12
**agreement** [3] - 5:5, 5:17, 47:13
**ahead** [3] - 9:6, 25:5, 47:5
**ALDEN** [1] - 1:14
**Alden** [1] - 3:6
**algorithm** [1] - 9:25, 24:20
**algorithms** [5] - 10:4, 23:13, 23:21, 25:8, 26:2
**allegations** [1] - 37:6
**allow** [1] - 28:19
**ally** [1] - 17:7
**alternatives** [2] - 14:21
**ambitious** [1] - 40:6
**America** [1] - 3:3

**AMERICA** [1] - 1:2
**amount** [1] - 10:15
**analysis** [17] - 4:19, 8:6, 8:11, 8:13, 8:25, 9:20, 10:7, 12:20, 15:2, 24:18, 30:7, 31:15, 34:6, 37:16, 38:1, 41:24, 46:7
**analytic** [1] - 5:10
**analytics** [6] - 10:20, 10:21, 10:24, 11:4, 11:10, 13:10
**answer** [5] - 5:12, 9:10, 9:11, 23:12
**anticipate** [2] - 6:12, 19:16
**apologize** [3] - 13:3, 14:8, 33:8
**Appeals** [1] - 32:25
**appearing** [3] - 3:23, 3:24, 16:22
**applicability** [2] - 41:18, 44:9
**applied** [4] - 9:17, 9:18, 20:19, 41:20
**applies** [4] - 18:19, 37:1, 40:5, 41:3
**apply** [6] - 19:15, 37:16, 38:2, 38:3, 39:11, 41:22
**applying** [1] - 40:15
**appreciate** [6] - 4:14, 6:18, 23:24, 30:11, 31:9, 48:9
**appropriate** [6] - 7:8, 13:12, 23:6, 23:7, 29:14, 30:6
**arguably** [1] - 36:21
**argue** [1] - 45:17
**argument** [1] - 26:18
**arm's** [1] - 43:8
**aside** [2] - 25:13, 27:22
**aspect** [1] - 8:10
**assist** [1] - 10:25
**associated** [1] - 12:18
**assume** [1] - 37:15
**assuming** [2] - 19:14, 21:18
**assumption** [3] - 21:4, 21:19, 22:3
**assumptions** [11] - 9:18, 10:4, 17:18, 17:19, 18:1, 18:3, 25:2, 28:23, 31:14, 31:15, 33:2
**attempting** [1] - 18:17
**attention** [1] - 41:14
**attesting** [1] - 19:19
**attitude** [1] - 32:16

**August** [1] - 1:5
**AUSA** [1] - 3:9
**authentic** [2] - 45:12, 46:7
**authentication** [6] - 44:23, 45:10, 45:16, 45:19, 46:3, 46:6
**authentications** [1] - 45:3
**available** [3] - 4:17, 12:14, 41:12
**Ave** [1] - 1:18
**Avenue** [3] - 1:15, 2:22, 49:11
**aware** [1] - 6:24

## B

**b)(1)(B** [2] - 38:4, 44:10
**b)(1)(C)** [1] - 38:4
**Bank** [1] - 41:19
**based** [1] - 45:4
**bases** [1] - 24:19
**basic** [1] - 15:13
**basis** [1] - 4:20
**bear** [1] - 41:2
**Beckett** [2] - 26:15, 26:22
**BEFORE** [1] - 1:8
**beforehand** [1] - 46:18
**begin** [1] - 8:2
**behalf** [1] - 12:16
**behavior** [5] - 9:21, 10:6, 10:7, 18:10
**behavioral** [8] - 9:19, 10:5, 15:6, 15:7, 15:9, 24:18, 25:1, 26:6
**best** [2] - 4:3, 49:6
**better** [2] - 15:4, 35:14
**between** [3] - 17:16, 38:25, 45:14
**biased** [1] - 11:21
**big** [2] - 21:4, 47:22
**Bisbee** [2] - 15:2, 25:7
**Bisbee's** [1] - 26:1
**bit** [3] - 7:15, 40:6, 42:11
**Bitcoin** [8] - 8:25, 9:1, 10:1, 10:20, 15:3, 41:11, 42:4
**Bitcoin-type** [1] - 42:4
**black** [1] - 22:10
**blah** [3] - 12:14
**blah-blah-blah** [1] - 12:14
**blockchain** [3] - 5:10, 10:20, 10:21, 10:24,

11:3, 11:10, 12:20,
13:10, 18:6, 21:23,
22:10, 24:5, 34:3
**bond** [3] - 19:4, 19:5,
21:9
**book** [1] - 7:24
**books** [1] - 8:1
**borderline** [1] - 22:25
**borders** [1] - 45:8
**box** [1] - 22:10
**brain** [1] - 21:1
**breach** [1] - 13:4
**breadth** [1] - 37:15
**breaking** [1] - 24:19
**brick** [5] - 37:11,
39:14, 40:21, 41:21,
42:21
**brick-and-mortar** [3] -
40:21, 41:21, 42:21
**brick-and-mortar-
type** [2] - 37:11,
39:14
**brief** [4] - 39:10, 44:9,
44:18, 46:11
**briefing** [4] - 41:14,
43:11, 45:10
**bring** [2] - 4:13, 46:23
**brings** [1] - 24:15
**broad** [1] - 38:23
**broadly** [2] - 38:10,
38:20
**Brown** [3] - 3:9, 22:15,
39:7
**BROWN** [18] - 1:12,
3:9, 4:9, 22:16,
22:19, 22:21, 23:22,
40:7, 40:16, 41:2,
42:2, 42:20, 43:2,
43:5, 43:18, 44:2,
44:6, 44:13
**building** [1] - 42:22
**bunch** [2] - 8:23,
32:13
**business** [19] - 10:24,
11:4, 13:9, 13:12,
21:20, 37:7, 37:13,
37:18, 37:25, 38:9,
38:10, 38:12, 38:22,
41:5, 41:10, 42:14,
43:4, 43:5, 43:9
**businesses** [5] -
36:21, 37:17, 37:18,
40:19, 41:3

---

# C

**CA** [1] - 2:4
**campaign** [1] - 23:9
**capacity** [1] - 12:21
**capitulate** [1] - 32:12

**capturing** [1] - 37:14
**Case** [1] - 3:2
**case** [26] - 4:19, 4:21,
6:11, 7:2, 8:7, 9:17,
11:15, 11:16, 11:17,
17:20, 20:1, 20:2,
20:4, 23:1, 25:3,
31:11, 31:12, 32:17,
32:18, 32:20, 32:24,
36:20, 37:6, 40:9,
42:25, 44:6
**cases** [4] - 13:19,
39:23, 39:24, 43:23
**category** [1] - 15:7
**certainly** [3] - 23:7,
43:21, 44:2
**CERTIFICATE** [1] -
49:1
**certifications** [1] -
45:5
**certified** [1] - 47:15
**certify** [1] - 49:3
**cetera** [6] - 8:20,
12:18, 12:19, 12:20
**Chainalysis** [37] - 2:2,
4:17, 5:14, 5:20,
8:21, 11:3, 11:9,
11:12, 13:10, 13:13,
16:6, 16:7, 16:23,
17:12, 17:23, 18:2,
18:17, 18:18, 19:17,
19:20, 19:22, 20:18,
20:23, 20:25, 21:2,
21:20, 21:25, 23:1,
23:9, 23:12, 23:19,
25:8, 26:1, 26:15,
26:16, 34:21
**challenge** [1] - 18:25
**challenging** [1] -
42:18
**chambers** [2] - 7:25,
8:1
**chance** [1] - 44:17
**change** [2] - 27:3,
28:20
**changes** [1] - 27:4
**characterization** [1] -
18:12
**check** [1] - 40:14
**chock** [1] - 11:15
**choice** [1] - 47:22
**chooses** [1] - 21:10
**Chris** [1] - 3:9
**CHRISTOPHER** [1] -
1:12
**CI** [2] - 26:15, 26:22
**circularly** [1] - 38:20
**circumstances** [7] -
30:24, 36:22, 36:24,
37:1, 37:15, 39:12,

40:5
**cited** [1] - 36:19
**citizen** [1] - 17:3
**claim** [1] - 41:9
**claiming** [1] - 26:18
**claims** [1] - 26:10
**clarification** [1] -
24:23
**clarify** [2] - 9:9, 24:13
**clear** [5] - 16:12,
24:21, 31:19, 36:15,
36:25
**clearly** [1] - 14:7
**client** [4] - 9:15, 30:15,
30:17, 32:2
**closed** [2] - 16:6,
19:25, 22:9
**closed-source** [3] -
16:6, 19:25, 22:9
**closure** [1] - 34:19
**clustering** [1] - 15:9
**clusters** [1] - 15:3
**co** [1] - 25:7
**co-spend** [1] - 25:7
**code** [48] - 4:18, 4:24,
5:11, 5:13, 5:19, 6:6,
6:8, 8:16, 8:17, 9:15,
10:11, 12:2, 13:14,
14:13, 17:17, 17:22,
18:1, 18:8, 18:9,
19:18, 20:2, 20:6,
20:17, 20:20, 21:9,
21:24, 22:4, 23:4,
24:3, 24:10, 24:12,
25:9, 25:13, 26:18,
26:23, 26:24, 27:3,
28:4, 29:15, 29:25,
30:1, 32:1, 32:9,
33:15, 33:22, 33:25
**CoinJoins** [5] - 25:9,
25:15, 26:3, 28:25,
29:2
**Collyer's** [1] - 41:15
**Columbia** [8] - 36:8,
36:9, 36:10, 36:12,
36:14, 36:16, 37:12,
41:12
**COLUMBIA** [1] - 1:1
**coming** [3] - 13:2,
36:16, 36:17
**comment** [1] - 40:7
**commentating** [1] -
11:18
**commercial** [1] -
12:21
**companies** [7] -
36:23, 39:19, 40:18,
40:20, 40:24, 42:3,
42:4
**company** [4] - 12:24,

37:21, 37:23, 41:20
**competing** [3] - 13:13,
17:13, 47:14
**competition** [1] -
18:19
**competitive** [1] - 6:6
**competitor** [16] - 6:9,
7:9, 10:18, 10:22,
10:23, 11:1, 11:19,
11:23, 12:1, 15:22,
15:25, 16:12, 17:22,
18:13, 18:15
**competitor's** [1] -
17:22
**complete** [1] - 49:5
**compliance** [1] - 4:12
**complicated** [1] - 38:5
**complied** [1] - 34:24
**comply** [1] - 4:7
**complying** [2] - 13:7,
13:8
**compromise** [1] -
23:13
**computer** [3] - 29:24,
29:25, 30:1
**conceded** [1] - 45:8
**concern** [3] - 10:10,
15:13, 20:11
**concerned** [2] - 11:20,
11:22, 20:14
**concerns** [6] - 7:15,
15:19, 20:23, 29:18,
32:17, 47:19
**conclude** [4] - 7:1,
21:19, 30:22, 35:17
**conclusion** [4] - 8:13,
8:15, 24:15, 34:15
**conclusions** [2] -
25:18, 34:12
**conditions** [2] - 12:11,
13:5
**conduct** [2] - 4:13,
13:22
**conducts** [1] - 36:8
**confer** [1] - 30:16
**conference** [4] -
35:13, 43:19, 45:5,
48:4
**conferred** [1] - 8:5
**confident** [1] - 21:8,
35:24
**confirm** [2] - 18:4,
29:15
**conflating** [1] - 45:16
**conflict** [1] - 17:12
**conformance** [1] -
4:14
**conjunctive** [1] -
38:15
**connect** [1] - 42:8

**connections** [1] -
10:21
**consents** [1] - 3:22
**consider** [1] - 22:5
**consistent** [1] - 32:21
**constitutes** [1] - 49:4
**Constitution** [1] -
2:22, 49:11
**construed** [1] - 39:15
**Cont'd** [1] - 2:1
**contempt** [2] - 13:23,
17:2
**continue** [1] - 24:9
**contracted** [1] - 12:21
**contractors** [2] -
12:16, 12:17
**contracts** [1] - 12:19
**contrast** [1] - 16:5
**conversation** [1] -
10:9
**convey** [1] - 32:1
**conviction** [2] - 32:23
**convinced** [2] - 30:4,
30:5
**copy** [3] - 4:22, 22:22,
37:1
**core** [1] - 31:11
**correct** [1] - 18:8
**corrections** [4] -
26:12, 27:1, 29:4,
29:5
**corresponding** [1] -
12:24
**cost** [2] - 32:18, 32:19
**counsel** [6] - 3:4, 3:5,
3:23, 11:14, 23:12,
32:13
**Count** [3] - 36:1, 36:2,
36:4
**countless** [1] - 8:6
**country** [1] - 13:18
**counts** [4] - 35:20,
35:25, 44:3
**Counts** [1] - 35:22
**couple** [2] - 10:15,
43:1
**course** [4] - 26:5,
27:4, 39:4, 40:17
**Court** [48] - 2:21, 2:21,
4:6, 6:19, 6:21, 7:7,
7:13, 7:19, 8:8, 11:5,
11:18, 12:7, 12:10,
13:6, 13:24, 14:5,
14:8, 14:9, 14:16,
14:25, 16:13, 21:6,
21:10, 21:15, 27:8,
27:17, 30:9, 30:20,
31:2, 31:17, 32:9,
32:11, 32:25, 33:4,
33:5, 33:6, 33:11,

33:20, 34:5, 35:17, 41:13, 45:4, 46:13, 46:20, 47:9, 47:16, 49:10

**court** [4] - 13:23, 17:2, 47:9, 47:15

**COURT** [83] - 1:1, 3:8, 3:11, 3:14, 3:21, 4:1, 4:11, 5:22, 6:3, 6:16, 6:23, 7:22, 9:6, 9:10, 11:20, 13:1, 14:17, 14:20, 15:15, 15:18, 16:9, 16:16, 16:21, 17:3, 17:15, 18:14, 19:3, 19:9, 20:8, 20:22, 21:11, 21:16, 22:12, 22:15, 22:18, 22:20, 23:18, 23:23, 24:22, 25:5, 25:11, 25:23, 27:5, 27:22, 28:11, 28:19, 29:12, 30:11, 30:14, 30:18, 30:21, 30:24, 31:6, 31:9, 31:19, 32:15, 33:7, 33:24, 34:17, 35:8, 40:12, 40:22, 41:23, 42:3, 42:23, 43:4, 43:10, 43:21, 44:5, 44:8, 44:14, 44:20, 45:6, 46:13, 46:16, 46:18, 47:5, 47:12, 47:24, 48:6, 48:11, 48:13, 49:1

**Court's** [5] - 10:10, 13:21, 15:13, 34:24, 41:14

**court-certified** [1] - 47:15

**Courthouse** [1] - 2:22

**courtroom** [1] - 35:14

**COURTROOM** [1] - 3:2

**courts** [2] - 34:7, 40:10

**cover** [1] - 4:2

**craft** [1] - 19:1

**CRC** [2] - 2:21, 49:9

**create** [1] - 19:23

**created** [1] - 32:6

**credibility** [1] - 18:22

**Criminal** [1] - 1:2

**criminal** [4] - 3:2, 12:19, 20:2, 39:20

**criminality** [1] - 13:23

**criticizing** [1] - 20:25

**CRM** [1] - 1:17

**cross** [3] - 21:6, 46:25

**cross-examination** [2] - 46:25

**crown** [1] - 21:21

**CRR** [2] - 2:21, 49:9

**cryptocurrency** [1] - 41:9

**currency** [2] - 40:18, 41:20

**current** [1] - 12:1

**curriculum** [1] - 4:23

**customers** [1] - 41:10

**CV** [1] - 7:17

---

**D**

**D.C** [21] - 1:5, 36:7, 36:18, 37:9, 37:17, 37:20, 37:25, 39:10, 39:17, 39:18, 40:1, 40:4, 40:19, 41:17, 42:10, 42:13, 42:17, 42:22, 42:24, 44:10, 49:11

**dark** [2] - 9:1, 15:3

**darknet** [2] - 10:2

**data** [2] - 12:14, 19:20

**date** [5] - 7:3, 43:11, 45:21, 45:22, 45:24

**Dated** [1] - 49:7

**DC** [4] - 1:13, 1:16, 1:19, 2:23

**deal** [3] - 37:18, 42:1, 47:23

**dealing** [3] - 8:24, 9:2, 34:23

**decided** [1] - 19:24

**deemed** [1] - 13:4

**deeply** [1] - 13:20

**defeat** [1] - 13:13

**Defendant** [4] - 1:6, 1:20, 1:23, 3:16

**defendant** [4] - 3:19, 20:2, 22:11, 32:21

**DEFENDANT** [1] - 3:25

**defense** [32] - 4:10, 4:13, 4:23, 5:18, 6:2, 6:13, 7:2, 7:4, 9:12, 11:13, 19:8, 19:21, 22:8, 22:21, 23:11, 23:16, 23:17, 23:20, 24:2, 24:6, 29:19, 30:5, 31:13, 33:1, 34:24, 43:16, 44:12, 45:2, 45:15, 47:23, 47:24, 48:12

**defense's** [1] - 47:19

**deferential** [2] - 32:16, 33:5

**defined** [3] - 38:18, 38:19, 43:5

**defines** [1] - 38:9

**definition** [4] - 15:14,

27:13, 39:1, 39:2

**definitions** [1] - 41:19

**depart** [1] - 43:24

**DEPARTMENT** [1] - 1:15

**Department** [4] - 1:18, 11:11, 39:5, 42:1

**deploys** [1] - 26:2

**DEPUTY** [1] - 3:2

**description** [1] - 12:24

**desk** [1] - 37:10

**detail** [2] - 25:14, 41:18

**detect** [2] - 25:8, 26:3

**detection** [1] - 10:25

**determine** [1] - 40:10

**determining** [1] - 9:23

**deterministic** [3] - 26:11, 26:19

**difference** [2] - 17:16, 38:24

**differences** [1] - 48:3

**different** [3] - 8:14, 34:15, 44:25

**diffident** [1] - 33:7

**digging** [1] - 7:17

**direct** [7] - 31:1, 31:21, 31:25, 41:13, 41:14, 44:8, 47:24

**directed** [2] - 22:25, 23:9

**directing** [1] - 4:11

**directly** [1] - 23:15

**directs** [2] - 38:7, 38:8

**dirty** [1] - 9:2

**disagree** [2] - 8:14, 16:11

**disagreement** [2] - 5:5, 5:8

**discernible** [1] - 39:18

**disclose** [5] - 17:19, 23:13, 23:19, 23:20, 29:6

**disclosure** [1] - 37:11

**discovery** [1] - 31:21

**discuss** [2] - 30:9, 47:21

**discussed** [7] - 5:1, 5:22, 6:3, 6:12, 8:9, 14:25

**discussion** [2] - 5:16, 16:8

**dispute** [1] - 25:22

**distinguishes** [1] - 43:9

**distributing** [1] - 6:1

**DISTRICT** [3] - 1:1, 1:1, 1:9

**District** [9] - 35:18, 36:8, 36:9, 36:10,

36:12, 36:14, 36:16, 37:12, 41:12

**dive** [1] - 39:6

**DNA** [1] - 34:8

**document** [1] - 27:3

**documented** [1] - 26:13

**documents** [5] - 44:23, 44:25, 45:12, 46:4, 47:20

**dog** [1] - 32:10

**DOJ** [4] - 1:12, 1:17, 11:11

**DOJ-CRM** [1] - 1:17

**domestic** [4] - 38:17, 38:18, 38:25, 39:2

**domestically** [1] - 38:13

**done** [11] - 6:25, 7:17, 8:7, 14:14, 14:23, 25:14, 27:10, 27:20, 27:24, 28:8, 28:17

**door** [1] - 20:9

**dots** [1] - 42:8

**down** [4] - 6:22, 12:3, 13:1, 24:19

**dozen** [2] - 22:13, 40:23

**due** [2] - 32:17, 32:21

---

**E**

**E-Gold** [2] - 41:15, 41:20

**easily** [1] - 18:25

**economy** [1] - 46:23

**effective** [1] - 7:14

**effectively** [3] - 7:18, 10:23, 12:3

**efficient** [1] - 48:8

**either** [4] - 17:24, 30:1, 45:23

**EKELAND** [30] - 1:20, 3:15, 4:10, 5:3, 5:24, 6:10, 16:4, 16:11, 16:18, 17:1, 17:5, 18:11, 18:20, 19:8, 19:13, 20:21, 21:4, 21:14, 22:7, 22:14, 25:4, 25:6, 25:24, 44:19, 46:10, 46:15, 46:17, 47:3, 47:6, 48:12

**Ekeland** [16] - 1:21, 3:16, 15:18, 20:8, 23:5, 24:22, 25:23, 28:1, 28:8, 29:9, 31:11, 34:20, 44:14, 45:6, 45:25, 48:11

**electronic** [1] - 22:22

**eliminate** [1] - 26:3

**encourage** [4] - 20:12, 21:16, 46:18, 46:21

**end** [4] - 28:13, 29:10, 35:1, 42:11

**endless** [1] - 11:6

**enforce** [2] - 16:25, 19:10

**enforceability** [1] - 18:21

**enforcement** [6] - 12:17, 12:22, 16:21, 17:1, 17:10, 19:6

**engage** [5] - 6:6, 37:21, 38:12, 40:24, 42:16

**engaged** [5] - 37:7, 37:22, 39:20, 42:14, 43:9

**engages** [4] - 36:11, 38:21, 39:16, 42:23

**enormous** [2] - 37:14, 42:12

**enter** [3] - 4:6, 4:11, 28:3

**enters** [1] - 42:14

**entire** [3] - 5:13, 14:7, 30:23

**entirely** [1] - 19:22

**entities** [3] - 12:20, 13:10, 42:4

**entitled** [2] - 9:16, 20:10, 40:11

**entity** [3] - 12:22, 12:24, 19:24

**error** [2] - 19:21, 26:3

**essentially** [1] - 5:15

**et** [6] - 8:20, 12:18, 12:19, 12:20

**ethical** [3] - 19:4, 19:9, 19:15

**evade** [1] - 13:9

**evading** [1] - 10:25

**evaluate** [1] - 21:8

**eve** [1] - 20:13

**evening** [1] - 4:22

**everywhere** [1] - 34:10

**evidence** [3] - 11:12, 20:5, 33:3

**exact** [1] - 34:8

**exactly** [3] - 27:18, 28:12, 44:5

**examination** [2] - 46:25

**examinations** [1] - 34:8

**examine** [1] - 10:11

**examined** [1] - 8:17

**example** [2] - 16:1,

34:9
**excepting** [1] - 37:5
**exception** [1] - 12:15
**exchanges** [2] - 9:1, 41:9
**exclude** [1] - 21:1
**excluded** [2] - 19:21, 20:4
**expect** [3] - 6:15, 40:25, 47:7
**expedition** [1] - 27:13
**expert** [40] - 4:20, 7:8, 7:18, 8:14, 8:15, 9:3, 10:14, 10:17, 11:19, 13:12, 14:14, 15:19, 17:6, 17:16, 17:25, 18:6, 20:17, 21:19, 22:2, 22:23, 23:8, 23:14, 24:2, 24:5, 24:11, 25:16, 26:14, 27:7, 27:14, 27:20, 28:7, 29:20, 29:25, 30:6, 32:8, 33:4, 33:19, 33:21, 46:23
**experts** [3] - 5:9, 8:6, 24:11
**explain** [1] - 9:7
**explaining** [1] - 13:6
**explanation** [1] - 25:14
**explicit** [1] - 6:21
**explicitly** [1] - 6:11
**explorers** [1] - 22:10
**exploring** [1] - 19:13
**extent** [1] - 23:16
**extradite** [1] - 14:3
**extradition** [1] - 17:6
**extremely** [1] - 22:17

---

**F**

**F-ing** [2] - 23:3, 23:4
**facilitating** [1] - 38:12
**fact** [7] - 18:8, 18:9, 19:18, 21:1, 34:22, 34:23, 35:13
**failure** [1] - 36:3
**fair** [4] - 30:21, 30:24, 31:13, 32:22
**false** [1] - 8:21
**far** [5] - 11:3, 12:2, 13:16, 22:13, 25:17
**federal** [4] - 20:2, 35:20, 40:9, 40:10
**feet** [1] - 9:18
**field** [1] - 16:3
**fight** [1] - 32:10
**fighting** [1] - 25:19
**figure** [3] - 14:2, 29:12, 48:3

**file** [8] - 28:19, 31:2, 31:6, 38:16, 44:9, 44:18, 45:25, 46:13
**final** [1] - 43:23
**financial** [10] - 17:24, 18:15, 18:19, 38:17, 38:18, 38:19, 38:25, 39:1, 39:2, 39:3
**fine** [1] - 44:8
**fingerprint** [1] - 34:6
**firearm** [1] - 27:1
**first** [14] - 4:25, 7:14, 10:8, 16:4, 16:11, 18:11, 20:7, 25:6, 30:8, 33:12, 35:19, 40:2, 43:16, 46:1
**fishing** [1] - 27:13
**five** [3] - 16:2, 16:17, 16:24
**fix** [1] - 26:15
**fixes** [1] - 27:4
**flag** [3] - 39:9, 47:4, 47:6
**flavor** [1] - 12:7
**flaw** [1] - 21:2
**Floor** [1] - 1:21
**focus** [1] - 5:11
**focused** [1] - 27:23
**FOERSTER** [1] - 2:3
**Fog** [6] - 8:25, 9:1, 10:1, 15:3, 41:11
**folks** [2] - 32:4, 40:4
**follow** [1] - 7:12
**followed** [1] - 33:10
**following** [2] - 21:17, 32:8
**follows** [1] - 6:20
**FOR** [1] - 1:1
**foray** [1] - 30:23
**forced** [1] - 32:12
**foregoing** [1] - 49:4
**foreign** [2] - 38:25, 39:2
**forfeit** [1] - 19:5
**form** [1] - 4:20
**former** [1] - 18:25
**formula** [2] - 9:24, 10:3
**formulas** [1] - 23:14
**forward** [1] - 18:23
**foundation** [1] - 19:25
**founder** [1] - 16:14
**four** [1] - 36:13
**France** [4] - 17:4, 17:7, 19:11
**Francisco** [1] - 2:4
**frankly** [4] - 12:8, 33:7, 36:6, 46:19
**free** [2] - 16:5, 45:16

**French** [6] - 13:17, 13:18, 13:19, 14:3, 17:3
**Frentzen** [6] - 6:16, 16:14, 24:1, 24:8, 25:12, 25:24, 27:5, 34:21
**FRENTZEN** [30] - 2:2, 6:18, 7:6, 8:3, 9:7, 10:8, 12:1, 13:2, 14:19, 14:22, 15:17, 24:9, 25:16, 27:6, 28:6, 28:14, 29:10, 30:8, 30:12, 30:16, 30:19, 30:22, 31:4, 31:8, 31:16, 32:3, 33:4, 33:8, 34:2, 35:7
**Frentzen's** [1] - 18:12
**front** [2] - 6:15, 20:14
**Frye** [1] - 35:12
**full** [3] - 11:9, 11:15, 49:5
**function** [1] - 10:21
**functional** [1] - 34:2
**fundamental** [1] - 32:6
**fundamentally** [1] - 33:16
**funds** [2] - 38:22, 39:16

---

**G**

**general** [3] - 10:5, 26:17, 37:19
**general-level** [1] - 10:5
**generally** [1] - 43:6
**generates** [1] - 10:20
**given** [3] - 19:18, 21:17, 40:24
**glanced** [1] - 39:6
**Gold** [2] - 41:15, 41:20
**golden** [1] - 13:14
**governing** [2] - 6:11, 39:4
**government** [32] - 3:5, 3:12, 4:9, 12:17, 12:22, 13:20, 14:2, 15:11, 16:13, 18:24, 19:17, 19:24, 20:1, 21:6, 22:9, 23:19, 23:20, 29:1, 29:6, 32:18, 43:15, 44:9, 44:17, 45:1, 46:2, 46:11, 47:18, 47:25, 48:10
**government's** [3] - 4:6, 37:5, 48:1
**Gox** [3] - 45:12, 45:22,

45:24
**granular** [1] - 15:13
**great** [1] - 31:5
**greater** [1] - 18:3
**guess** [5] - 21:15, 31:20, 42:12, 47:16
**guidance** [1] - 48:8
**guide** [1] - 45:13
**guy** [1] - 8:20

---

**H**

**hacked** [1] - 45:18
**handful** [2] - 36:13, 36:21
**handing** [2] - 13:13, 13:14
**handle** [3] - 11:7, 28:7, 35:13
**handling** [1] - 9:2
**happy** [7] - 5:25, 16:19, 17:9, 21:11, 21:12, 41:13, 47:20
**harassment** [1] - 23:9
**hard** [2] - 20:24, 34:21
**Harmon** [3] - 36:20, 40:9, 40:17
**hashtag** [1] - 23:1
**Hassard** [1] - 3:19
**HASSARD** [2] - 1:20, 3:18
**head** [3] - 23:2, 28:3, 36:2
**headshot** [1] - 23:2
**hear** [5] - 6:16, 21:11, 21:12, 33:4, 45:2
**heard** [5] - 7:19, 22:17, 23:12, 45:3, 47:18
**hearing** [2] - 25:1, 48:14
**HEARING** [2] - 1:4, 1:8
**hearsay** [3] - 26:17, 26:20, 26:23
**held** [1] - 8:20
**help** [1] - 45:13
**hereby** [1] - 49:3
**heuristic** [17] - 18:9, 25:7, 25:10, 25:17, 26:4, 26:5, 26:6, 26:8, 26:9, 26:10, 26:24, 26:25, 28:23, 28:24, 29:3
**heuristics** [16] - 9:17, 9:19, 10:6, 15:1, 15:6, 15:8, 15:9, 15:14, 18:3, 20:19, 23:14, 23:21, 24:17, 24:18, 25:2, 28:22

**highest** [1] - 35:11
**highlights** [1] - 22:23
**highly** [1] - 10:14
**hold** [3] - 28:1, 28:13, 32:23
**holes** [1] - 8:6
**holiday** [1] - 44:7
**honor** [1] - 19:14
**Honor** [67] - 3:6, 3:13, 3:15, 3:18, 3:25, 4:9, 4:10, 5:3, 5:24, 6:15, 6:18, 7:7, 8:4, 9:5, 10:8, 10:14, 10:17, 12:5, 13:17, 14:13, 14:22, 15:17, 16:4, 17:9, 18:11, 18:20, 19:14, 19:17, 20:21, 22:7, 22:16, 22:21, 23:22, 24:9, 25:4, 25:16, 27:6, 28:6, 28:15, 29:11, 30:12, 31:4, 31:8, 31:18, 32:3, 32:6, 32:14, 33:8, 33:17, 33:22, 34:4, 34:16, 35:7, 40:7, 40:16, 41:2, 42:2, 42:20, 43:18, 44:2, 44:13, 45:1, 46:17, 47:2, 47:3, 48:5, 48:9
**HONORABLE** [1] - 1:8
**hood** [3] - 20:10, 27:12, 33:11
**hope** [3] - 30:22, 33:5, 35:5
**hopefully** [3] - 34:18, 40:13, 48:2
**hopes** [1] - 24:14
**Howell** [1] - 40:8
**Howell's** [1] - 36:20
**hundreds** [1] - 34:7

---

**I**

**idea** [1] - 8:1
**ideal** [1] - 43:25
**ideally** [1] - 46:1
**identified** [1] - 4:24
**identify** [3] - 5:19, 29:5, 47:25
**implied** [1] - 26:22
**important** [2] - 7:1, 23:24
**improper** [1] - 13:14
**IN** [1] - 1:1
**inaccurate** [1] - 45:17
**inclined** [1] - 14:7
**include** [2] - 13:10, 38:20
**incredibly** [1] - 13:11

**indeed** [1] - 41:22
**independently** [4] - 33:22, 33:25, 34:1, 34:4
**indicated** [2] - 20:9, 45:11
**indictment** [2] - 35:19, 35:20
**individual** [12] - 4:23, 7:12, 10:18, 11:2, 11:16, 11:21, 11:23, 12:6, 12:8, 13:7, 13:17, 43:9
**individual's** [1] - 11:7
**informal** [2] - 38:11
**information** [7] - 15:23, 25:10, 25:21, 26:4, 26:24, 34:13
**ing** [2] - 23:3, 23:4
**inspection** [1] - 4:17
**instance** [1] - 15:10
**instead** [1] - 32:11
**institution** [3] - 38:19, 38:25, 39:1
**institutions** [2] - 38:17, 38:18
**instruct** [2] - 37:4, 43:22
**instructions** [4] - 6:22, 43:20, 43:24, 44:1
**intellectual** [1] - 23:8
**intelligence** [1] - 26:8
**intelligible** [1] - 24:16
**intention** [1] - 43:18
**interest** [6] - 6:1, 12:9, 13:7, 16:15, 23:17, 32:24
**interestingly** [1] - 26:7
**interests** [1] - 46:22
**internal** [1] - 19:20
**internationally** [1] - 38:13
**internet** [3] - 36:11, 39:16, 42:19
**investigating** [1] - 12:23
**investigation** [1] - 12:18
**involves** [3] - 26:11, 38:10
**IP** [5] - 6:1, 36:17, 39:17, 41:8, 41:10
**IRS** [2] - 26:15, 26:22
**issue** [24] - 4:15, 6:20, 9:8, 11:21, 11:25, 14:13, 24:12, 25:22, 27:23, 33:9, 33:12, 33:16, 33:21, 33:24, 34:18, 35:10, 35:12,

39:9, 40:12, 44:21, 45:10, 46:12, 47:7
**issues** [14] - 6:24, 17:10, 18:21, 19:2, 21:7, 30:19, 32:13, 35:8, 40:8, 45:11, 47:19

---
## J
---

**Jeff** [1] - 3:12
**JEFFREY** [1] - 1:17
**jewels** [1] - 21:21
**Judge** [4] - 7:25, 36:20, 40:8, 41:15
**JUDGE** [2] - 1:8, 1:9
**judicial** [1] - 46:23
**jury** [8] - 11:22, 32:19, 37:4, 43:19, 43:22, 43:23, 44:3, 46:19
**JUSTICE** [1] - 1:15
**Justice** [1] - 1:18

---
## K
---

**keep** [2] - 21:22, 24:15
**key** [1] - 33:2
**kind** [5] - 5:5, 17:12, 19:1, 19:16, 26:25
**kinds** [2] - 12:11, 40:17
**knowable** [1] - 34:14
**knows** [3] - 13:25, 33:14

---
## L
---

**L-a-u-r-e-n-t-M-T** [1] - 11:8
**lack** [1] - 15:4
**laid** [1] - 33:9
**landing** [1] - 13:3
**language** [2] - 29:25, 47:20
**large** [2] - 9:2, 34:22
**last** [6] - 16:1, 27:18, 32:13, 34:23, 40:7, 47:8
**last-minute** [1] - 32:13
**late** [1] - 35:9
**latter** [1] - 18:24
**laundering** [1] - 12:23
**laundry** [1] - 27:6
**Laurent** [5] - 5:8, 22:24, 23:2, 29:19, 30:4
**Law** [1] - 1:21
**law** [15] - 12:17, 12:22, 13:7, 17:6, 35:20, 36:4, 36:7, 36:18,

37:4, 37:5, 39:11, 40:10, 40:15, 42:13
**leak** [1] - 14:1
**leaked** [1] - 13:24
**leaks** [1] - 19:5
**learned** [2] - 6:8, 21:2
**least** [10] - 4:18, 10:15, 21:24, 26:13, 26:22, 39:23, 39:25, 43:1, 44:17, 48:7
**leave** [1] - 47:1
**left** [1] - 37:9
**legal** [1] - 46:6
**legitimate** [2] - 23:16, 23:17
**length** [1] - 43:8
**less** [1] - 11:20
**letting** [2] - 31:2, 31:6
**level** [2] - 10:5, 13:22
**license** [4] - 36:4, 37:8, 37:9, 40:2
**licensed** [3] - 38:20, 38:21, 41:6
**licenses** [1] - 41:7
**licensing** [3] - 36:5, 37:18, 39:11
**life** [2] - 18:17, 20:25
**likely** [1] - 35:17
**limitations** [1] - 12:12
**limited** [1] - 10:15
**lines** [1] - 14:24
**link** [4] - 3:17, 3:20, 3:23, 3:24
**links** [1] - 10:20
**list** [7] - 20:18, 27:6, 28:2, 28:8, 29:8, 35:11
**litigation** [2] - 40:17, 41:16
**live** [1] - 25:22
**living** [2] - 17:3, 19:11
**LLP** [1] - 2:3
**local** [1] - 39:24
**located** [2] - 37:13, 37:21
**log** [1] - 27:3
**look** [26] - 4:24, 5:19, 7:20, 7:21, 9:16, 9:24, 10:4, 10:16, 11:5, 17:9, 17:25, 20:10, 20:20, 21:24, 24:3, 27:11, 27:12, 29:15, 30:1, 31:16, 33:1, 34:6, 37:8, 39:22, 40:16, 47:15
**looked** [5] - 7:10, 18:7, 22:4, 39:13, 39:23
**looking** [5] - 5:2, 21:22, 24:17, 35:2,

35:19
**lose** [1] - 7:4
**lovely** [2] - 13:18

---
## M
---

**main** [1] - 5:7
**maintained** [4] - 45:21, 45:24, 46:24
**major** [1] - 41:5
**Man** [1] - 26:5
**manipulation** [2] - 26:21, 27:1
**manual** [5] - 26:11, 26:21, 27:1, 29:4, 29:5
**manufacturing** [1] - 11:12
**mark** [1] - 34:8
**Market** [1] - 2:3
**marketplace** [1] - 17:23
**markets** [2] - 9:1, 15:3
**Maryland** [1] - 29:23
**match** [1] - 34:8
**matter** [9] - 6:25, 28:13, 29:10, 35:10, 36:18, 37:4, 39:10, 42:13, 47:8
**mean** [10] - 14:7, 17:9, 19:5, 22:25, 31:19, 37:20, 38:10, 39:15, 41:2, 41:13
**meaningfully** [2] - 15:20, 15:23
**means** [1] - 39:19
**meant** [1] - 40:13
**meantime** [1] - 44:14
**measured** [1] - 10:7
**mechanisms** [2] - 17:2, 17:10
**mentioned** [2] - 16:1, 47:9
**merits** [1] - 7:5
**MICHAEL** [1] - 1:20
**Michael** [1] - 3:18
**might** [3] - 6:7, 40:22, 47:9
**million** [1] - 13:25
**millions** [1] - 42:15
**mind** [4] - 11:25, 15:24, 41:2, 42:9
**minute** [3] - 15:16, 32:13, 34:23
**minutes** [1] - 4:2
**mischaracterizes** [1] - 25:24
**mission** [1] - 10:23
**mistaken** [2] - 28:20, 45:15

**mixture** [1] - 34:9
**modification** [1] - 26:12
**Monday** [4] - 31:2, 44:7, 46:11
**Money** [1] - 41:17
**money** [19] - 9:2, 12:23, 37:7, 37:16, 38:9, 38:11, 38:13, 38:21, 40:19, 40:24, 41:3, 41:4, 41:5, 42:3, 42:4, 42:14, 43:8, 46:11
**months** [1] - 27:17
**MORRISON** [1] - 2:3
**mortar** [5] - 37:11, 39:14, 40:21, 41:21, 42:21
**MOSS** [1] - 1:8
**most** [1] - 47:10
**motion** [1] - 28:19
**MOTIONS** [2] - 1:4, 1:8
**move** [1] - 4:3
**MR** [77] - 3:9, 3:12, 3:15, 3:18, 4:9, 4:10, 5:3, 5:24, 6:10, 6:18, 7:6, 8:3, 9:7, 10:8, 12:1, 13:2, 14:19, 14:22, 15:17, 16:4, 16:11, 16:18, 17:1, 17:5, 18:11, 18:20, 19:8, 19:13, 20:21, 21:4, 21:14, 22:7, 22:14, 22:16, 22:19, 22:21, 23:22, 24:9, 25:4, 25:6, 25:16, 25:24, 27:6, 28:6, 28:14, 29:10, 30:8, 30:12, 30:16, 30:19, 30:22, 31:4, 31:8, 31:16, 32:3, 33:4, 33:8, 34:2, 35:7, 40:7, 40:16, 41:2, 42:2, 42:20, 43:2, 43:5, 43:18, 44:2, 44:6, 44:13, 44:19, 46:10, 46:15, 46:17, 47:3, 47:6, 48:12
**MS** [6] - 3:6, 45:1, 47:2, 47:18, 48:5, 48:9
**Mt** [3] - 45:12, 45:22, 45:24
**multiple** [1] - 40:19

---
## N
---

**N.W** [1] - 49:11
**name** [1] - 3:4

**narrow** [1] - 44:24
**nature** [1] - 16:25
**necessarily** [2] - 39:18, 41:17
**necessary** [1] - 8:17
**need** [24] - 5:19, 7:19, 8:9, 9:4, 9:11, 9:12, 9:16, 17:21, 19:10, 21:21, 22:5, 24:11, 27:15, 29:12, 29:13, 32:2, 32:8, 39:9, 40:13, 42:5, 43:21, 44:24, 46:6, 46:8
**needs** [4] - 7:10, 24:5, 33:15, 33:18
**negative** [3] - 11:9, 11:10
**network** [1] - 38:12
**neutral** [1] - 47:10
**New** [2] - 1:18, 1:22
**new** [1] - 17:13
**next** [1] - 35:9
**night** [1] - 7:17
**nine** [1] - 15:3
**nobody** [1] - 24:16
**noncompete** [2] - 6:12, 12:4
**none** [1] - 32:24
**nonstarter** [1] - 5:15
**notes** [1] - 49:5
**nothing** [4] - 4:10, 13:17, 48:9, 48:12
**number** [5] - 23:10, 23:11, 26:25, 35:8, 40:24
**numerous** [2] - 24:7, 29:20
**NW** [4] - 1:13, 1:15, 1:18, 2:22
**NY** [1] - 1:22

### O

**obey** [1] - 14:7
**object** [1] - 24:9
**objection** [2] - 22:8, 26:23
**objections** [2] - 46:14, 48:1
**observable** [1] - 8:12
**obtain** [1] - 36:3
**obviously** [1] - 44:14
**occasions** [3] - 29:20, 36:13
**occur** [1] - 23:19
**occurred** [1] - 24:13
**occurring** [2] - 8:12, 26:22
**OF** [5] - 1:1, 1:2, 1:8, 1:15, 49:1

**offer** [6] - 4:5, 24:23, 28:21, 30:9, 35:4, 47:13
**office** [1] - 42:22
**officers** [3] - 12:15, 12:17, 12:19
**offices** [3] - 36:9, 37:23, 39:24
**official** [1] - 12:21
**Official** [2] - 2:21, 49:10
**OFFICIAL** [1] - 49:1
**old** [1] - 17:7
**older** [1] - 39:14
**once** [4] - 6:21, 7:20, 26:13, 29:12
**one** [20] - 5:7, 5:9, 9:14, 9:15, 13:20, 17:10, 17:14, 18:21, 22:12, 23:10, 36:1, 36:3, 42:7, 42:10, 42:13, 42:14, 42:16, 42:18, 45:3, 47:6
**ones** [1] - 32:5
**online** [3] - 37:21, 37:24, 39:23
**onus** [1] - 32:4
**open** [11] - 12:2, 16:5, 16:7, 16:8, 19:8, 19:13, 19:15, 20:3, 20:8, 30:2, 43:7
**open-source** [5] - 12:2, 16:5, 16:7, 16:8, 20:3
**opening** [1] - 44:3
**operate** [2] - 16:3, 21:18
**operates** [1] - 8:5
**operation** [1] - 10:20
**opinion** [2] - 35:23, 36:20
**opinions** [2] - 40:9, 41:15
**opponent** [1] - 11:16
**opportunity** [7] - 6:19, 24:2, 28:15, 29:9, 30:13, 31:14, 43:16
**order** [26] - 4:6, 4:11, 5:2, 5:23, 5:25, 6:3, 6:10, 7:13, 11:24, 12:9, 13:8, 13:21, 14:6, 14:24, 15:21, 16:2, 18:22, 19:1, 19:11, 21:9, 23:18, 28:4, 28:16, 30:3, 40:2
**ordered** [1] - 30:25
**ordering** [1] - 4:7
**orders** [1] - 34:24
**otherwise** [1] - 14:9

**outside** [1] - 36:8
**overinclusive** [1] - 26:6
**own** [2] - 14:4, 42:9
**OXT** [6] - 10:19, 12:13, 12:25, 16:4, 16:14, 20:3
**OXT.ME** [1] - 10:19

### P

**P.M** [1] - 1:6
**p.m** [1] - 48:14
**Pac** [1] - 26:5
**Pac-Man** [1] - 26:5
**pages** [1] - 45:8
**paper** [2] - 33:15, 33:20
**papers** [1] - 19:19
**part** [6] - 7:7, 9:2, 12:7, 23:8, 31:12, 33:13
**participates** [1] - 39:17
**particular** [21] - 8:16, 9:21, 10:2, 10:6, 10:13, 10:17, 11:15, 11:17, 15:10, 15:19, 15:24, 24:18, 24:20, 25:8, 25:22, 26:2, 26:25, 33:11, 40:18, 45:21, 46:7
**particularly** [1] - 20:4
**parties** [12] - 4:7, 4:12, 4:25, 5:4, 5:17, 39:9, 39:10, 44:22, 44:23, 47:12, 47:14, 47:16
**parts** [1] - 5:11
**party** [3] - 31:10, 36:15
**pass** [1] - 22:19
**passing** [1] - 45:11
**paths** [1] - 21:18
**pause** [2] - 14:17, 25:11
**PayPal** [3] - 42:21, 42:23
**PEARLMAN** [2] - 1:17, 3:12
**Pearlman** [1] - 3:12
**Pelker** [1] - 3:7
**PELKER** [7] - 1:14, 3:6, 45:1, 47:2, 47:18, 48:5, 48:9
**pen** [1] - 33:19
**Pennsylvania** [1] - 1:15
**people** [5] - 10:25, 13:18, 17:14, 38:12, 40:25

**percent** [2] - 25:18, 40:20
**percentage** [1] - 10:1
**perhaps** [3] - 21:5, 36:12, 41:1
**period** [2] - 6:7, 28:12
**person** [9] - 21:22, 22:3, 29:14, 29:20, 30:4, 33:14, 37:6, 37:22, 38:21
**perspective** [1] - 43:14
**phone** [3] - 7:16, 7:18, 27:10
**phrase** [1] - 15:4
**physically** [1] - 36:8
**piece** [1] - 33:2
**place** [5] - 7:14, 18:18, 20:7, 21:10, 40:2
**Plaintiff** [2] - 1:3, 1:12
**plate** [1] - 35:9
**plates** [1] - 43:12
**platform** [3] - 16:5, 16:6, 20:3
**PLLC** [1] - 1:21
**point** [21] - 4:3, 4:16, 5:6, 5:21, 8:15, 9:3, 13:16, 18:14, 18:16, 18:19, 18:24, 18:25, 20:9, 23:10, 23:11, 23:23, 28:2, 33:10, 34:4, 45:1, 45:7
**points** [2] - 9:22, 22:24
**poke** [1] - 8:6
**pops** [1] - 8:24
**portion** [5] - 4:18, 7:4, 20:25, 21:1, 34:22
**portions** [2] - 32:8, 34:12
**position** [2] - 25:25, 31:25
**positive** [1] - 40:20
**possible** [7] - 12:4, 15:22, 19:3, 20:16, 24:1, 30:19
**possibly** [1] - 27:20
**post** [1] - 19:4
**potential** [1] - 6:9
**potentially** [2] - 36:15, 39:19
**practice** [1] - 41:7
**practices** [1] - 6:6
**prefer** [2] - 28:5, 28:6
**prejudged** [1] - 11:16
**preliminary** [2] - 43:24, 44:1
**preparation** [1] - 35:16
**prepared** [2] - 30:9,

46:5
**presence** [2] - 40:21, 41:21
**present** [3] - 3:16, 3:19, 43:10
**presented** [2] - 5:14, 27:7
**presenting** [1] - 6:14
**pretrial** [4] - 35:13, 43:19, 45:5, 48:4
**pretty** [4] - 5:16, 6:21, 35:24, 41:7
**prevent** [1] - 19:1
**principal** [1] - 6:4
**principally** [1] - 4:16
**problem** [10] - 6:13, 6:14, 6:15, 26:16, 27:16, 29:25, 31:7, 32:6, 33:13, 34:22
**problematic** [2] - 10:14, 31:1
**procedural** [1] - 6:24
**procedures** [1] - 29:1
**proceed** [2] - 6:22, 34:25
**proceeding** [2] - 3:23, 44:4
**proceedings** [2] - 12:19, 49:6
**process** [5] - 9:24, 29:1, 32:17, 32:21, 33:9
**produce** [2] - 19:18, 31:22
**program** [2] - 4:18, 29:24
**programs** [1] - 10:24
**project** [1] - 27:21
**promise** [1] - 20:24
**promote** [1] - 18:17
**properly** [2] - 33:5, 35:4
**property** [1] - 23:8
**proposal** [2] - 20:14, 20:15
**propose** [1] - 14:23
**proposed** [3] - 7:18, 22:23, 27:20
**proposition** [1] - 13:11
**proprietary** [7] - 8:16, 12:14, 16:6, 16:25, 19:25, 22:10, 26:2
**prosecute** [1] - 22:10
**prosecutor** [1] - 13:19
**protect** [1] - 15:23
**protective** [18] - 5:2, 5:23, 5:25, 6:3, 6:10, 7:12, 7:13, 11:24, 12:9, 13:8, 13:21,

14:6, 15:21, 16:2, 18:22, 19:1, 19:11, 21:9
**prove** [1] - 14:3
**provide** [11] - 15:11, 15:12, 19:6, 20:1, 24:2, 24:14, 25:13, 29:21, 41:14, 46:10, 47:10
**provided** [3] - 24:6, 28:3, 29:19
**provides** [2] - 18:9, 46:11
**providing** [3] - 24:14, 27:25, 28:22
**provision** [1] - 38:2
**public** [1] - 43:7
**punk** [1] - 23:4
**purport** [1] - 45:20
**purpose** [2] - 13:9, 14:12
**purposes** [11] - 4:19, 6:2, 9:22, 17:20, 17:24, 35:16, 36:4, 38:3, 39:7, 43:10
**pursuant** [2] - 4:7, 15:12
**pushing** [1] - 20:8, 34:21
**put** [13] - 7:10, 8:23, 10:24, 11:2, 13:9, 18:23, 21:10, 22:2, 22:8, 22:12, 27:22, 33:15, 33:19
**putting** [4] - 25:13, 32:4, 33:10, 39:8
**puzzled** [1] - 36:6

### Q

**quantum** [2] - 43:3, 43:6
**questions** [2] - 35:21, 42:18
**quick** [1] - 22:24
**quickly** [1] - 4:3
**quite** [7] - 31:11, 38:10, 38:14, 38:19, 38:22, 41:18
**quote** [1] - 23:4

### R

**raise** [1] - 7:13
**raised** [2] - 15:19, 26:7
**raises** [2] - 26:16, 40:7
**raising** [1] - 47:23
**RANDOLPH** [1] - 1:8
**rant** [1] - 8:19

**rates** [1] - 19:21
**rather** [4] - 28:15, 32:5, 32:7, 34:19
**rattle** [1] - 28:8
**reach** [7] - 5:5, 21:14, 21:15, 34:15, 34:18, 35:5, 42:12
**reached** [2] - 10:19, 40:3
**Reactor** [3] - 15:2, 19:22, 26:17
**read** [2] - 17:17, 36:24
**readily** [1] - 39:18
**reading** [2] - 17:25, 20:17
**ready** [1] - 43:12
**realize** [1] - 31:9
**really** [21] - 5:16, 5:19, 7:5, 12:3, 14:15, 14:17, 15:20, 15:24, 16:9, 16:10, 22:25, 24:12, 25:21, 33:16, 36:7, 36:18, 37:4, 39:11, 40:13, 40:25, 42:7
**reason** [4] - 12:7, 24:10, 28:21, 30:25
**reasonable** [1] - 5:25
**reasons** [4] - 5:7, 10:15, 24:20, 46:8
**received** [2] - 4:22, 9:22
**record** [4] - 3:4, 22:8, 22:9, 22:12
**records** [6] - 45:17, 45:19, 45:20, 45:22, 45:24, 46:24
**refers** [1] - 26:14
**refusing** [1] - 5:20
**regard** [1] - 25:17
**regardless** [1] - 18:15
**register** [1] - 38:6
**registered** [6] - 36:21, 36:24, 37:24, 39:25, 40:1, 40:18
**registration** [1] - 36:18
**registrations** [1] - 39:22
**regulated** [1] - 36:15
**regulating** [1] - 37:18
**regulations** [4] - 38:7, 39:5, 42:1
**regulatory** [2] - 40:4, 41:19
**related** [2] - 25:10, 26:24
**relates** [1] - 24:18
**relation** [3] - 25:6, 26:10, 26:16

**relatively** [1] - 14:23
**relevant** [3] - 23:14, 25:3, 41:16
**reliable** [1] - 20:5
**relied** [1] - 7:9
**rely** [1] - 12:12
**relying** [1] - 6:8
**repeatedly** [2] - 8:8, 33:20
**repercussions** [1] - 17:8
**report** [7] - 23:15, 23:21, 25:2, 26:14, 31:2, 31:6, 31:17
**REPORTER** [2] - 13:1, 49:1
**Reporter** [3] - 2:21, 2:21, 49:10
**reports** [1] - 38:16
**represented** [1] - 24:4
**request** [3] - 4:6, 29:4, 31:23
**requests** [2] - 28:9, 31:17, 31:20
**require** [2] - 19:4, 37:9
**required** [3] - 4:17, 38:6, 38:15
**requirement** [4] - 36:5, 36:7, 36:18, 40:1
**requisite** [1] - 19:14
**research** [1] - 44:16
**resolution** [2] - 32:2, 35:6
**resolve** [3] - 43:22, 43:25, 48:2
**respect** [17] - 4:5, 15:19, 24:24, 25:14, 27:25, 28:22, 28:24, 28:25, 29:3, 35:12, 35:18, 35:25, 36:1, 42:10, 44:9, 44:22, 48:1
**respectfully** [1] - 25:16
**respond** [5] - 10:10, 28:15, 43:17, 44:12, 45:7
**response** [2] - 7:22, 45:7
**restriction** [2] - 12:13, 12:15
**result** [3] - 9:25, 18:10, 26:12
**resume** [1] - 16:13
**return** [1] - 30:20
**retweeted** [1] - 23:3
**review** [1] - 6:2
**revise** [1] - 28:20
**revisit** [1] - 47:6

**rhetoric** [1] - 22:25
**rights** [1] - 32:21
**risk** [1] - 26:3
**risky** [1] - 13:11
**RMR** [2] - 2:21, 49:9
**road** [1] - 6:22
**ROMAN** [1] - 1:5
**Roman** [4] - 1:23, 3:3, 3:16, 3:19
**Room** [2] - 2:22, 49:10
**rose** [1] - 13:22
**Rule** [7] - 4:7, 4:12, 4:15, 15:12, 27:13, 33:17, 33:18
**rule** [5] - 4:8, 4:14, 41:17, 44:24, 45:4
**rules** [1] - 19:15
**run** [1] - 44:20
**running** [4] - 17:22, 24:5, 30:5, 46:8
**runs** [1] - 10:18
**Russian** [1] - 47:8

### S

**safe** [1] - 22:13
**Salah** [6] - 5:1, 5:8, 6:4, 18:12, 21:5, 26:8
**San** [1] - 2:4
**sanity** [1] - 40:14
**satisfy** [1] - 29:21
**saw** [1] - 40:22
**scale** [1] - 9:22
**schedule** [1] - 21:12
**science** [1] - 29:24
**scientific** [1] - 19:19
**screeds** [3] - 11:9, 11:10
**screen** [1] - 41:10
**screening** [1] - 41:8
**second** [2] - 25:12, 27:22
**Secrecy** [1] - 41:19
**Section** [1] - 41:24
**see** [12] - 7:20, 8:9, 21:2, 21:18, 24:11, 25:9, 26:4, 27:15, 32:8, 35:5, 39:1, 44:17
**seeing** [1] - 5:13
**seek** [2] - 24:24, 28:19
**seeking** [1] - 17:23
**seem** [4] - 29:21, 33:7, 37:14, 42:12
**sees** [2] - 11:1, 33:6
**Sefranek** [3] - 2:21, 49:9, 49:9
**SEFRANEK** [1] - 49:3
**select** [1] - 7:24

**selection** [1] - 22:23
**selling** [1] - 37:24
**sender** [1] - 38:21
**sense** [8] - 14:10, 20:13, 21:20, 23:6, 31:21, 36:10, 42:8, 43:15
**sent** [1] - 22:21
**separate** [1] - 18:21
**September** [3] - 44:11, 46:15, 49:7
**serious** [1] - 11:25
**serve** [1] - 46:22
**service** [2] - 12:6, 46:19
**shake** [1] - 28:3
**shelf** [1] - 7:24
**shooting** [1] - 23:2
**short** [7] - 14:17, 14:23, 16:9, 22:16, 22:17, 34:5, 44:15
**shortness** [1] - 21:17
**show** [2] - 13:24, 23:3
**shut** [1] - 12:3
**sic** [3] - 22:24, 23:3, 29:19
**sign** [2] - 5:25, 16:2
**signed** [1] - 6:10
**significant** [1] - 31:12
**similar** [2] - 37:16, 37:17
**simply** [5] - 6:1, 7:2, 9:18, 9:19, 10:5
**sit** [1] - 32:19
**site** [3] - 10:18, 10:19, 12:2
**sites** [1] - 10:2
**sitting** [4] - 36:11, 37:20, 42:17, 46:20
**situation** [3] - 8:3, 19:23, 32:6
**situations** [1] - 34:11
**skeptical** [1] - 42:11
**slightly** [1] - 35:9
**slow** [1] - 13:1
**small** [1] - 47:22
**software** [9] - 5:10, 8:5, 8:23, 11:4, 16:8, 19:25, 26:11, 26:12, 27:4
**someone** [9] - 9:24, 10:4, 11:1, 18:4, 20:22, 20:24, 29:14, 36:10, 45:18
**somewhat** [1] - 38:20
**somewhere** [1] - 36:17
**soon** [1] - 46:8
**sooner** [1] - 34:19
**sorry** [7] - 9:5, 13:2,

31:4, 32:14, 32:15, 34:5, 44:10
**sort** [6] - 6:12, 11:1, 11:22, 23:17, 25:21, 26:18
**sorts** [1] - 11:12
**source** [52] - 4:18, 4:24, 5:11, 5:13, 5:18, 6:6, 6:8, 8:16, 8:17, 9:15, 10:11, 12:2, 13:14, 14:13, 16:5, 16:6, 16:7, 16:8, 17:17, 17:22, 18:1, 18:8, 18:9, 19:18, 19:25, 20:2, 20:3, 20:6, 20:17, 20:20, 21:8, 21:24, 22:4, 22:9, 23:4, 24:3, 24:10, 24:12, 25:9, 25:13, 26:18, 26:24, 27:3, 28:4, 29:15, 32:1, 32:9, 33:15, 33:22, 33:24
**space** [4] - 17:11, 17:13, 17:14
**specific** [7] - 20:19, 25:1, 41:18, 46:1, 46:6, 46:14, 47:25
**specifically** [1] - 41:15
**specification** [2] - 14:24, 24:24
**specificity** [5] - 7:11, 18:3, 24:24, 27:25, 28:11
**specifics** [1] - 28:22
**specified** [1] - 15:5
**specifies** [1] - 7:10
**spend** [1] - 25:7
**spending** [1] - 35:23
**spends** [3] - 14:8, 14:9, 20:25
**spits** [1] - 9:25
**spot** [1] - 39:8
**staff** [2] - 12:16, 14:9
**stand** [3] - 22:3, 34:17, 46:24
**standard** [1] - 17:1
**standing** [3] - 27:9, 28:16, 30:13
**start** [1] - 3:22
**started** [1] - 38:5
**starting** [1] - 3:5
**starts** [1] - 16:22
**state** [2] - 3:4, 36:4
**statements** [1] - 44:3
**STATES** [3] - 1:1, 1:2, 1:9
**states** [1] - 41:6
**States** [8] - 2:22, 3:3, 3:7, 3:10, 17:6, 17:8,

19:7, 41:21
**statute** [8] - 36:25, 37:2, 38:7, 39:15, 43:2, 44:10
**statutes** [4] - 37:8, 37:17, 37:25, 39:13
**statutory** [1] - 41:19
**stay** [1] - 27:23
**stenographic** [1] - 49:5
**step** [1] - 23:24
**steps** [2] - 4:13, 22:5
**STERLINGOV** [1] - 1:5
**Sterlingov** [9] - 1:23, 3:3, 3:16, 3:19, 3:22, 3:24, 8:24, 35:14, 37:6
**Sterlingov's** [1] - 6:2
**still** [13] - 13:19, 20:14, 23:23, 23:25, 24:1, 26:5, 27:16, 27:19, 29:12, 30:3, 38:3, 45:2, 47:18
**still's** [2] - 25:25, 26:14
**stipulate** [3] - 46:3, 46:6, 46:21
**straight** [2] - 11:13
**Street** [3] - 1:13, 1:21, 2:3
**struck** [1] - 40:5
**stuff** [2] - 12:3, 16:22
**subconsciously** [1] - 6:7
**subcontractor** [1] - 16:15
**subcontractors** [1] - 12:16
**subgroup** [1] - 46:4
**subject** [4] - 13:21, 14:6, 14:9, 15:21
**submitted** [1] - 16:13
**subpoenas** [1] - 28:10
**subsection** [1] - 38:2
**substantial** [4] - 5:4, 7:4, 15:22, 47:11
**substantially** [2] - 7:1, 44:20
**substantive** [1] - 45:8
**substantively** [1] - 45:9
**sufficiently** [1] - 32:16
**suggested** [1] - 31:12
**suitable** [1] - 5:2
**suppose** [3] - 4:25, 17:15, 47:13
**supposed** [1] - 32:5
**suspect** [2] - 37:17, 47:23
**sweeping** [1] - 38:14

**Swiss** [2] - 37:23
**Switzerland** [1] - 37:22
**system** [1] - 38:11

**T**

**tailored** [1] - 23:16
**talks** [1] - 38:17
**Tamara** [3] - 2:21, 49:9, 49:9
**TAMARA** [1] - 49:3
**tampered** [1] - 45:18
**terms** [16] - 7:15, 8:11, 8:22, 12:6, 12:11, 13:4, 13:23, 14:15, 15:6, 37:11, 39:14, 43:2, 43:6, 43:7, 43:19
**terrible** [2] - 16:23, 16:24
**test** [2] - 31:14, 39:8
**testable** [1] - 34:14
**testified** [1] - 25:8
**testimony** [5] - 4:20, 18:22, 23:1, 25:25, 26:1
**THE** [86] - 1:1, 1:1, 1:8, 3:2, 3:8, 3:11, 3:14, 3:21, 3:25, 4:1, 4:11, 5:22, 6:3, 6:16, 6:23, 7:22, 9:6, 9:10, 11:20, 13:1, 14:17, 14:20, 15:15, 15:18, 16:9, 16:16, 16:21, 17:3, 17:15, 18:14, 19:3, 19:9, 20:8, 20:22, 21:11, 21:16, 22:12, 22:15, 22:18, 22:20, 23:18, 23:23, 24:22, 25:5, 25:11, 25:23, 27:5, 27:22, 28:11, 28:19, 29:12, 30:11, 30:14, 30:18, 30:21, 30:24, 31:6, 31:9, 31:19, 32:15, 33:7, 33:24, 34:17, 35:8, 40:12, 40:22, 41:23, 42:3, 42:23, 43:4, 43:10, 43:21, 44:5, 44:8, 44:14, 44:20, 45:6, 46:13, 46:16, 46:18, 47:5, 47:12, 47:24, 48:6, 48:11, 48:13
**themselves** [1] - 11:2
**theories** [2] - 36:1, 36:3
**theory** [2] - 43:17
**therefor** [1] - 24:20

**therefore** [1] - 7:4
**they've** [4] - 5:1, 21:1, 27:20, 45:17
**thinking** [1] - 35:24
**thinks** [1] - 19:21
**third** [2] - 31:10
**thousands** [4] - 39:19, 41:1, 42:24, 42:25
**three** [4] - 35:19, 35:25, 36:12, 45:7
**throw** [1] - 32:13
**ticket** [1] - 13:14
**tied** [2] - 10:1, 14:1
**Title** [1] - 38:8
**today** [9] - 3:23, 6:23, 14:18, 16:9, 28:12, 29:21, 31:5, 44:21, 48:6
**ton** [1] - 40:23
**tool** [1] - 34:7
**top** [3] - 5:9, 17:14, 36:2
**topic** [2] - 43:11, 44:16
**TOR** [1] - 1:20
**Tor** [2] - 1:21, 3:15
**totally** [1] - 8:21
**touch** [1] - 44:21
**touches** [1] - 36:10
**towards** [2] - 22:25, 32:16
**tracing** [2] - 21:23, 38:5
**transacting** [4] - 37:16, 42:3, 42:4, 42:14
**transaction** [4] - 36:11, 37:21, 37:23, 42:15
**transactions** [9] - 15:5, 15:8, 36:16, 40:25, 42:15, 42:24, 43:3, 43:6, 43:8
**transcript** [2] - 49:4, 49:6
**TRANSCRIPT** [1] - 1:8
**transfer** [4] - 38:11, 38:13, 39:16
**translate** [1] - 47:15
**translations** [5] - 47:8, 47:13, 47:14, 47:19, 48:2
**translator** [2] - 47:10, 47:15
**transmission** [3] - 37:7, 38:22, 46:12
**Transmitters** [1] - 41:17
**transmitting** [5] - 38:9, 40:19, 41:3,

41:4, 41:5
**travel** [1] - 17:5
**Treasury** [3] - 11:11, 39:5, 41:25
**treasury** [1] - 38:7
**treaties** [1] - 17:7
**trial** [6] - 20:13, 32:22, 35:16, 43:13, 45:15, 46:20
**tried** [1] - 35:3
**triggered** [1] - 15:9
**troubling** [1] - 12:5
**true** [2] - 49:4, 49:5
**trust** [1] - 23:7
**trustee** [1] - 45:22
**truth** [2] - 6:25, 18:5
**try** [5] - 9:9, 10:24, 13:9, 27:8, 32:20
**trying** [9] - 8:6, 13:13, 20:12, 20:22, 28:11, 32:18, 32:24, 33:5, 48:7
**Tuesday** [4] - 31:2, 31:5, 31:6, 47:25
**turn** [3] - 25:20, 28:4, 32:12
**turnaround** [1] - 44:15
**turned** [1] - 32:1
**turns** [2] - 22:1, 30:25
**tweets** [5] - 11:6, 16:22, 22:22
**Twitter** [2] - 11:7, 14:10
**two** [6] - 18:20, 22:24, 23:11, 36:12, 40:23, 42:16
**type** [8] - 8:4, 22:9, 25:21, 29:20, 30:7, 37:11, 39:14, 42:4
**types** [1] - 29:5
**typical** [1] - 41:7

**U**

**U.S** [3] - 1:15, 41:10
**u.S** [1] - 1:18
**unaware** [1] - 39:20
**unbiased** [1] - 11:19
**unclear** [2] - 26:9, 38:24
**unconstitutional** [1] - 22:11
**under** [19] - 20:10, 21:18, 27:12, 27:13, 30:24, 33:1, 33:17, 36:7, 36:22, 36:24, 37:1, 37:9, 37:15, 38:6, 38:16, 39:11, 40:5, 41:24
**underlying** [2] - 23:13,

23:20
**undermine** [3] - 17:23, 18:17, 20:23
**understood** [3] - 22:7, 44:19, 47:3
**unexplained** [1] - 12:23
**unfortunately** [2] - 4:2, 35:9
**United** [8] - 2:22, 3:2, 3:7, 3:10, 17:6, 17:7, 19:7, 41:21
**UNITED** [3] - 1:1, 1:2, 1:9
**universe** [1] - 44:24
**University** [1] - 29:23
**unreasonable** [1] - 7:22
**unusual** [1] - 41:4
**unwilling** [1] - 20:1
**up** [8] - 4:15, 22:19, 23:25, 28:21, 32:13, 32:23, 35:4, 43:11
**usage** [2] - 12:13, 13:15
**USAO** [1] - 1:12
**USAO-DOJ** [1] - 1:12
**useful** [1] - 14:15
**user** [1] - 12:23
**users** [1] - 12:14
**uses** [1] - 12:25
**utilized** [4] - 15:2, 15:6, 15:14, 24:17

## V

**various** [1] - 37:8
**venue** [4] - 35:15, 35:18, 35:24, 37:3
**verifiable** [8] - 8:12, 33:23, 33:25, 34:1, 34:4, 34:11, 34:13, 34:14
**verify** [2] - 21:24, 24:3
**versus** [1] - 42:24
**via** [2] - 3:16, 3:19
**Via** [3] - 1:20, 1:20, 1:23
**video** [4] - 3:17, 3:20, 3:23, 3:24
**viewable** [1] - 34:3
**violate** [1] - 21:9
**violated** [1] - 37:25
**violation** [1] - 19:16
**violent** [1] - 22:25
**virtual** [3] - 40:18, 41:20, 42:4
**virtually** [1] - 39:24
**vitae** [1] - 4:23
**vs** [1] - 1:4

## W

**waiting** [1] - 45:2
**walk** [1] - 41:23
**walked** [1] - 42:6
**Wall** [1] - 1:21
**wants** [4] - 4:5, 11:2, 11:5, 17:5
**warnings** [1] - 29:19
**warranties** [1] - 12:12
**Washington** [6] - 1:5, 1:13, 1:16, 1:19, 2:23, 49:11
**ways** [1] - 13:25
**wealth** [1] - 12:23
**website** [1] - 36:19
**week** [1] - 47:7
**weeks** [2] - 20:11, 20:12
**weighted** [1] - 9:23
**welcome** [3] - 7:24, 18:24, 23:25
**whole** [1] - 14:12
**WILLIAM** [1] - 2:2
**willing** [2] - 16:16, 24:14
**wish** [1] - 28:8
**witness** [3] - 23:6, 23:7, 23:8
**word** [2] - 28:1, 43:4
**wording** [1] - 47:22
**words** [4] - 15:1, 15:7, 25:20, 33:19
**workable** [2] - 20:15, 43:13
**works** [1] - 16:15
**world** [5] - 5:9, 17:14, 21:23, 27:21, 36:24
**worry** [1] - 39:15
**worst** [1] - 27:20
**writing** [2] - 7:10, 17:22
**written** [4] - 30:1, 35:23, 37:10, 39:14

## Y

**year** [1] - 42:24
**years** [2] - 16:2, 16:17
**yesterday** [4] - 4:22, 5:4, 7:16, 27:11
**York** [2] - 1:18, 1:22
**you-all** [2] - 40:3, 43:12

## Z

**Zoom** [3] - 1:20, 1:20, 1:23