<pre>
 1                  IN THE UNITED STATES DISTRICT COURT
                      FOR THE DISTRICT OF COLUMBIA
 2
       UNITED STATES OF AMERICA,      ) Criminal Action
 3                                    ) No. 1:21-CR-0399
                          Plaintiff,  )
 4                                    ) **PRETRIAL CONFERENCE**
       vs.                            )
 5                                    ) Washington, D.C.
       ROMAN STERLINGOV,              ) **September 8, 2023**
 6                                    ) **Time:  1:20 P.M.**
                          Defendant.  )
 7

 8               **TRANSCRIPT OF PRETRIAL CONFERENCE**
           BEFORE THE HONORABLE JUDGE RANDOLPH D. MOSS
 9                  UNITED STATES DISTRICT JUDGE

10                     **A P P E A R A N C E S**

11     For the Plaintiff:      CHRISTOPHER BROWN
                               USAO-DOJ
12                             601 D Street, NW
                               Washington, DC 20001
13
                               ALDEN PELKER
14                             U.S. Department of Justice
                               950 Pennsylvania Avenue, NW
15                             Washington, DC 20530

16                             JEFFREY PEARLMAN
                               DOJ-CRM
17                             U.S. Department of Justice
                               1301 New York Ave. NW
18                             Washington, DC 20005

19     For the Defendant:      TOR EKELAND - **VIA ZOOM**
                               MICHAEL HASSARD - **VIA ZOOM**
20                             Tor Ekeland Law, PLLC
                               30 Wall Street, 8th Floor
21                             New York, NY 10005

22
       Court Reporter:         Tamara M. Sefranek, RMR, CRR, CRC
23                             Official Court Reporter
                               United States Courthouse, Room 6714
24                             333 Constitution Avenue, NW
                               Washington, DC  20001
25                             202-354-3246
</pre>

```
1                    P R O C E E D I N G S
2            THE COURTROOM DEPUTY:  Criminal Case No. 21-399,
3    United States of America v. Roman Sterlingov.
4            Would counsel please state their names for the
5    record, starting with government counsel.
6            MS. PELKER:  Good afternoon, Your Honor.  Alden
7    Pelker for the United States.
8            MR. BROWN:  Good afternoon.  AUSA Chris Brown for the
9    United States.
10           MR. PEARLMAN:  Jeff Pearlman for United States.
11           THE COURT:  All right.  Good afternoon to all of you.
12           MR. EKELAND:  Good afternoon, Your Honor.  Tor
13   Ekeland for Defendant Roman Sterlingov, who is present via
14   video link.
15           MR. HASSARD:  Good afternoon, Your Honor.  Michael
16   Hassard for the defense.
17           THE COURT:  All right.  Good afternoon to all of you.
18   If you could just confirm for the record, Mr. Ekeland, that
19   Mr. Sterlingov consents to proceeding today with his counsel
20   and himself on video and the government counsel present in the
21   courtroom?
22           MR. EKELAND:  Yes, he does, Your Honor.
23           THE COURT:  All right.  We've got a lot to cover, but
24   I did want to let you know, Mr. Ekeland, that I did confer with
25   the United States Marshals Service.  And they are going to be
```

1   able to make arrangements to move Mr. Sterlingov to somewhere

2   where he can have access to a hard drive five days a week --

3   some of that may be on the weekend -- for three hours a day.

4   You will have to get the hard drive to him and drop it off for

5   him to have access to it there, but he will have access to the

6   hard drive, as I said, five days a week there.

7          MR. EKELAND:  Thank you, Your Honor.  We do have

8   another access issue, and that is that the Rappahannock

9   Regional Jail did not give us access to our client over the

10  weekend.  And given that trial is starting and we're going to

11  be tied up in court all day, we cannot visit him during the

12  weekdays, and we need to visit him on the weekend.

13         So I'm just hoping maybe the Court -- we've reached

14  out to the marshals and the jail as well on that.  I'm hoping

15  maybe the Court can speak to the marshals about that.

16         THE COURT:  Well, I did speak to the marshal about

17  that as well.  Actually, there is a period where that jail does

18  allow visitors on, I think, it's on Saturdays.  Hold on a

19  second.  He's going to be moved anyway, but there is Saturday

20  access to counsel at the Rappahannock Jail where he is now.

21         MR. EKELAND:  Your Honor, it's my understanding -- we

22  had our legal assistants reach out to the jail, and it's my

23  understanding that they were told that we could have no access

24  to Mr. Sterlingov at all over the weekend.  I'll double-check

25  with our legal assistants, but that's not my understanding of

1   what we were told by the jail.

2          THE COURT:  Well, let's see here.  I have here a

3   printout from the jail that says -- the printout from the jail,

4   no weekend visits will be scheduled with the exception of

5   attorneys, who may visit on Saturdays from 8:30 a.m. to

6   11:20 a.m.

7          MR. EKELAND:  Perhaps there was some confusion in the

8   communication with my legal assistant.  I'll go back and check.

9          THE COURT:  I'm not sure it would allow a legal

10  assistant, but it would allow the attorneys to be there.

11         In any event, I don't know exactly when he's going to

12  be moved, but he is going to be moved.

13         MR. EKELAND:  Thank you, Your Honor.

14         THE COURT:  All right.  And then I had a question for

15  the government on the authentication of the Mt. Gox documents.

16         MS. PELKER:  Yes, Your Honor.

17         THE COURT:  The papers are a little bit confusing

18  about whether there was a certification from the trustee

19  because the defense at times says, well, the certification from

20  the trustee isn't good enough.  But I didn't see any such

21  certification.

22         MS. PELKER:  It's not the trustee certifying --

23  signing a business record certification.  Our understanding is

24  that under Japanese law, that's not their procedure.  It is a

25  certification from the Japanese government that they got these

1    records from the trustee and the documentation of that transfer

2    back and forth.

3              THE COURT:  But do we need some certification that

4    these are, in fact, the records that were downloaded from the

5    server?

6              What I have here is the certification from the

7    individual from the prosecutor's office saying I went there and

8    I picked up the hard drive from the trustee.  But what I may be

9    missing in the link is something saying, and these are the

10   documents that were downloaded from the server.

11             MS. PELKER:  So I think that we are looking at the

12   full set of circumstances about the server, and that's part of

13   why we included the supplemental information under 901 about

14   why this is authentic; and then if you look at the rules about

15   receiving evidence pursuant to a Mutual Legal Assistance Treaty

16   request that it really goes to, this was an official request

17   from the United States Government to Japan.

18             I can say that when we followed up about the

19   possibility of having the trustee sign a certification, the

20   Japanese said this is our certification.  We are certifying

21   this.  This is what you're getting from Japan.  These are the

22   records of the trustee, and we are certifying as the Japanese

23   government to you that these are the trustee's records.

24             THE COURT:  And was there an MLAT?

25             MS. PELKER:  Yes, Your Honor.

```
1              THE COURT:  So this was produced pursuant to an MLAT?

2              MS. PELKER:  Yes, Your Honor.

3              THE COURT:  So you're at least relying, in part, that

4    on 901 versus 902 with respect to, perhaps, that first step in

5    the chain, and that we may have to actually look at the records

6    themselves as they come into evidence to determine whether

7    there is some indicia in the records themselves that they are

8    what they purport to be; is that fair?

9              MS. PELKER:  I think that they're bolstered from 901.

10   But that we also can rely on the fact that the Japanese -- that

11   they came over as records in response to an MLAT under 3553 as

12   well.

13             THE COURT:  Okay.

14             MS. PELKER:  Yes, Your Honor.

15             THE COURT:  Do I have a copy of the MLAT?  Was that

16   produced to the Court?

17             MS. PELKER:  No, Your Honor.  That was not an MLAT

18   that was specific to our case.

19             THE COURT:  I see.

20             MS. PELKER:  That was an MLAT for another -- sort of

21   an omnibus MLAT that produced the entirety of the records, so

22   that we did not --

23             THE COURT:  I may want to look at that just because,

24   to the extent you're relying on the Japanese government as the

25   government answered our MLAT with this, I may need to know what
```

1    the MLAT said.

2              MS. PELKER:  Understood, Your Honor.

3              THE COURT:  Okay.  And then any comments on the

4    preliminary jury instructions?

5              MS. PELKER:  I'm going to turn that to Mr. Brown.

6              THE COURT:  Mr. Brown?

7              MR. BROWN:  No, Your Honor.  I think the government

8    has no objections to the proposed preliminary instructions.

9              THE COURT:  Okay.  Mr. Ekeland?

10             MR. EKELAND:  Yes, Your Honor.  We just had a few

11   small requests.

12             THE COURT:  Okay.

13             MR. EKELAND:  The main one is that, given that the

14   statute of limitations on all these counts are five years

15   except for the D.C. municipal money laundering statute, which

16   is six years, we think it's important that the jury be told at

17   the outset what the statute of limitations are.

18             They're going to be seeing evidence primarily from

19   2011, 2012.  But what's crucial here is whether or not

20   Mr. Sterlingov was operating or administrating Bitcoin Fog

21   during the relative statutory period, and that would be after

22   2016.  We think it's important that going into this, the jury

23   is thinking about that because, you know, all sorts of stuff

24   can happen.

25             Even arguendo, saying that Mr. Sterlingov did form

1    Bitcoin Fog in 2011/2012.  He could have sold it or given it to

2    somebody.  So we think it's important that the jury is not

3    thinking that they have in mind the relative statutory --

4    statute of limitations.  So we ask that that be added to each

5    preliminary jury instruction.

6          And I found just a couple more things, but I'll wait

7    if the Court wants to just address that.

8          THE COURT:  Well, let me hear from the government on

9    that.

10          MR. BROWN:  Your Honor, statute of limitations is not

11    an element the government is required to prove.  It can be a

12    defense, but I think the danger here is that that -- a statute

13    of limitations defense here is really inextricably intertwined

14    with a withdrawal from a conspiracy defense, which is an

15    affirmative defense on which the defendant bears the burden of

16    proof to show affirmative withdrawal.

17          And I think just for preliminary instructions, we're

18    going to start going down a rabbit hole that will be extremely

19    confusing for the jury.

20          THE COURT:  All right.  Well, Mr. Ekeland, anything

21    else you want to add?

22          MR. EKELAND:  No.  I mean, we're not saying

23    Mr. Sterlingov withdrew from any conspiracy because he was

24    never part of any conspiracy.  We're just saying that it's

25    important for the jury to know the statute of limitations, and

1    we'll leave it at that because we've got a lot of stuff to get

2    to today.

3              THE COURT:  Okay.  Well, I'm not inclined to give the

4    instruction.  Look, you told me -- but I assume as long as the

5    conspiracy continues into the relevant statute that the fact

6    that the conspiracy may have been formed earlier, committed

7    acts earlier, that as long as the conspiracy continued, that

8    there would not be a statute of limitations problem; is that

9    correct?

10             MR. BROWN:  Your Honor, that's my understanding.

11   From the government's side, that's my understanding that

12   conspiracy is considered, really, the classic example of a

13   continuing defense, and the statute of limitations doesn't

14   begin to run until the end of the conspiracy or withdrawal of

15   the particular defendant.

16             THE COURT:  All right.  Mr. Ekeland?

17             MR. EKELAND:  Well, conspiracy can -- as the

18   government and the Court characterized, is the ongoing offense,

19   but that still leaves three other counts.

20             I caution what's left of the conspiracy count, say,

21   if it comes up that the defendant sold the business in 2012,

22   because that pretty much seems like an affirmative act of

23   withdrawal from the conspiracy because it can no longer engage

24   in the object of the conspiracy.

25             So, again, we just would make that the requisite

1    knowledge of the statute of limitations is very important for

2    the jury to consider going into this.

3           THE COURT:  I thought you just told me a minute ago

4    that you're not going to argue that Mr. Sterlingov withdrew

5    from the conspiracy because there was no conspiracy?

6           MR. EKELAND:  That's correct.  But we're speaking

7    here in the hypothetical that the government just raised, Your

8    Honor.  If we're going to, you know, say that conspiracy is an

9    ongoing crime, if the object of the conspiracy disappears

10   outside the statute of limitations, it's hard to argue that the

11   conspiracy is ongoing.

12          MR. BROWN:  Your Honor, I think the issue here is

13   still -- this is an affirmative defense on which the defense

14   bears the burden of proof.  And so, again, in preliminary jury

15   instructions, you know, I think it's sufficient just to say

16   these are the elements of the offense that the government needs

17   to prove beyond a reasonable doubt.

18          Once we start going down the road of, if the

19   defendant, you know, provides argument or evidence about an

20   affirmative defense, then you can consider that to whatever the

21   standard of proof is.  That, I think -- number one, I just

22   don't think talking about affirmative defenses at the outset of

23   the case is going to be very effective.

24          THE COURT:  I do worry that it's just -- it's going

25   to be pulling on a thread in which it's going to get more and

1    more complicated in the preliminary instructions.  As you'll

2    see, I tried to keep the instructions with respect to the

3    elements as simple as possible just for purposes of the

4    preliminary instructions because, as soon as you start going

5    deeper, then -- you know, I could go on for five pages about

6    what a conspiracy is.

7            And I think that there's a greater risk of just

8    confusing the jury by doing that too much upfront.  Obviously,

9    this is an issue, though, that I will have to address in the

10   final jury instructions.

11           Mr. Ekeland, what else do you want to raise?

12           MR. EKELAND:  Yes.  There's -- on page 6, the Court

13   uses the word darknet vendors, darknet administrators.  We'd

14   ask that that just be removed on the same grounds of pretty

15   much what we were talking about yesterday, that we consider it

16   to be a prejudicial word.  It's appealing to people's

17   primordial fear of the dark.

18           And it occurs to the defense that to just use the

19   word internet because the, quote-unquote, darknet is just part

20   of the internet, and that's a more neutral word that won't be

21   appealing to people's prejudices or fear of the dark.

22           THE COURT:  Mr. Brown?

23           MR. BROWN:  Your Honor, the way the indictment is

24   pled refers to darknet vendors and darknet market

25   administrative teams.  That's -- and the Court's preliminary

1    statement is just verbatim from the indictment.

2              THE COURT:  Right.

3              MR. BROWN:  If we had pled he conspired with Ted

4    Bundy, that might be prejudicial, too, but that is -- that

5    would be what he was indicted for.

6              So I think this is just -- this is the facts of the

7    case.  It's not unduly prejudicial.

8              THE COURT:  So I think the way to deal with this is

9    in the voir dire, I do ask about, I think, the darknet and

10   if they -- I think I used that term in the voir dire.  If it

11   comes up in the voir dire that there's an individual who thinks

12   that this word is synonymous with evil, then we can deal with

13   that -- with respect to an individual juror or prospective

14   juror.

15             And if it turns out that they all say, oh, yes, the

16   darknet, that's the most horrible thing ever, then I might have

17   to change the -- we'll know that before I give the preliminary

18   instructions.

19             MR. BROWN:  Yes, Your Honor.  I mean, just one note

20   of caution here.

21             If the issue is that we have a jury full of people

22   who are inflamed by the mere mention of the word darknet, our

23   whole case -- number one, our whole case will involve invoking

24   the term darknet or dark web.

25             THE COURT:  Right.

1          MR. BROWN:  And, number two, these are not -- we

2     didn't come up with these terms.  These are commonly accepted

3     terms to talk about Tor-based hidden services websites

4     selling illicit --

5          THE COURT:  One of the reasons that I don't actually

6     have a problem with this here is that it's clear from this --

7     from these preliminary instructions that what we're talking

8     about is people who are selling illegal drugs or illegally

9     selling drugs in the portion of the internet that is less

10    accessible to people like me who don't really have any idea how

11    you would access that portion of the web or the internet.

12          So it's already an element and a requirement here

13    that the transactions -- underlying transactions have to be

14    ones that involve the illegal manufacture, importation,

15    receiving, concealment, buying, selling, or otherwise dealing

16    with a controlled substance.

17          And so I think, to the extent there's any pejorative

18    implication from using the term darknet, it's clear that what

19    we're talking about here is those who are engaged in

20    clandestine, unlawful activity on the internet.  That's already

21    clear, and it's going to be a necessary finding.  So I'm okay

22    with leaving this in for now.

23          Anything else, Mr. Ekeland?

24          MR. EKELAND:  Yes, Your Honor.  Just two more things.

25    It should be quick.

1    On page 9, which is -- of the Court's preliminary

2    jury instructions, which is page 10 of the docket number, ECF

3    docketing, in Count 2 it uses the word represented.  I think

4    that's a reference to the government transactions.

5    We would just like to add representative to him

6    because it's our position that, you know, the representation

7    has to be made to somebody who has actually got mens rea rather

8    than say to the wall or to nothing.

9    THE COURT:  All right.  Mr. Brown.  It says, "Second,

10   it must prove that the transaction involved property

11   represented to him" -- or "represented by a law enforcement

12   officer to him to be" --

13   MR. BROWN:  Your Honor, two points in response.

14   Number one, what's in the preliminary jury instructions here is

15   faithful to the statutory text, which does not say represented

16   to the defendant or to the person who conducted the

17   transaction.  It just says represented to be the proceeds of

18   specified unlawful activity.

19   And, number two, I think that this does get into case

20   law involving money laundering conspiracies, and I don't have

21   the cases in front of me, but I am familiar with -- there is

22   case law to the effect that in a conspiracy, there is such a

23   thing as imputed knowledge, there's -- you know, there's

24   vicarious liability.

25   There are a lot of other considerations going on in

1    terms of -- such that it's not impossible for there to be a

2    conspiracy for the dirty representation to be made to one

3    member of a conspiracy and for that knowledge to be imputed to

4    another member of the conspiracy.

5          I know Count 2 isn't charged as a conspiracy, but we

6    are -- this is a conspiratorial organization, and so I think

7    that, again, there's no need to introduce, sort of,

8    extra-textual elements into the jury instructions here that are

9    not required by the actual statute.

10         THE COURT:  Mr. Ekeland?

11         MR. EKELAND:  Well, Count 2, I agree with the

12   government, is not a conspiracy count, and the defense's

13   position is very simple.  Representation requires a perceiver.

14   It cannot just be made to nobody or a wall or anything, and I

15   think that's implicit in the statute.  And we'll leave it at

16   that.

17         THE COURT:  I think you're right that it seems

18   unlikely to me that it means that if one simply represents to

19   the Grand Canyon that the proceeds were from an unlawful

20   activity, but, again, these are the preliminary instructions.

21   It sounds like we're going to have to deal with a lot of these

22   issues when we get to the final jury instructions.

23         But I'll note that the very next sentence says that

24   the government must prove that the government acted with the

25   intent to promote the carrying on of specified unlawful

1    activity or with the intent to conceal unspecified -- or the

2    specified unlawful activity.

3              And the first sentence is that the government has to

4    prove the defendant knowingly conducted or tried to conduct a

5    financial transaction.  As I've written it here already, the

6    defendant had to know that he was conducting a financial

7    transaction or attempting to do so and has to also have acted

8    with the intent to carry on a -- to carry on a specified

9    unlawful activity or with the intent to conceal that activity.

10             So I think that largely covers the concerns,

11   Mr. Ekeland, that you raised; although I appreciate you raising

12   this now because it does put us on alert when it comes time for

13   the final jury instructions, we'll have to deal with this.  I

14   may need considerably more briefing and analysis on these

15   questions to figure out exactly how to instruct the jury,

16   ultimately.

17             And it may depend, in part, on how the evidence comes

18   in to figure out how to instruct the jury on this.  But for

19   purposes of the preliminary instructions, I don't think this is

20   misleading.  It's consistent with the statute, and I think that

21   this preliminary instruction is chock full of language of

22   scienter.

23             Anything else, Mr. Ekeland?

24             MR. EKELAND:  Just one final thing.  And I know the

25   Court has tried to keep the preliminary instructions

```
 1   straightforward and simple.

 2           We'd just request a little bit more fulsome

 3   definition of reasonable doubt.  We suggest the one that we put

 4   in our proposed preliminary jury instructions.  And that's it.

 5   We just would like a little bit more definition of reasonable

 6   doubt for the jury.

 7           THE COURT:  What I'll do is I'm just going to do

 8   whatever the Red Book is for preliminary instructions on this.

 9   I assume what I've done is the Red Book, but I'll confirm that.

10           MR. EKELAND:  Thank you, Your Honor.

11           THE COURT:  All right.  Thank you for that.

12           I did go back and look further at Mr. Fischbach's

13   testimony following up on, sort of, the preliminary views that

14   I gave you on a couple of things yesterday.  I think I gave you

15   more definitive views on a number of topics, but there were a

16   couple where I indicated that I wanted to go back and look

17   further.

18           In particular, I wanted to look further at his

19   testimony and the materials that were submitted in support of

20   offering him as an expert witness to see if there was

21   information relating to -- or that would allow him to opine as

22   an expert on the need for the constant maintenance of the site,

23   to explain the high level of information security required for

24   a Tor network site like Bitcoin Fog, and the stacking

25   requirements.
```

1          And if you go back and look at his testimony, he

2     testified that he had never run such an operation and that his

3     disclosures, when he was asked about this, he said, well, they

4     were written by defense counsel, perhaps optimistically.  He

5     did say he worked on something that maybe was analogous, but he

6     didn't specify what that was.

7          And he testified that he could only say that it would

8     take more than one person to run a mixer, and he could not

9     commit on a specific number of people that would be required.

10    And let's see here.

11         So I just didn't see anything in his expert report or

12    testimony or background that would suggest that he is an expert

13    on what was required to run a site like Bitcoin Fog.  And, in

14    fact, if anything, he seemed to disavow expertise on that

15    subject.

16         I realize that he was not terribly prepared at the

17    hearing.  And so if you want to come back and offer some

18    further testimony from him that would change my mind on this,

19    you're welcome to do so at an appropriate time.  But as I look

20    at what he's offered thus far, I didn't see any basis to

21    conclude that he had any expertise regarding Nos. 12, 13, or

22    14.

23         I've already expressed my views with respect to the

24    Mt. Gox documents.  And, in particular, if you look at what he

25    testified to with respect to his knowledge regarding the

 1     Mt. Gox data, all he said was that he had heard from other

 2     experts in the case, I think, that Mt. Gox had been hacked.

 3     Oh, yeah.  The other thing is, going back to the staffing

 4     requirements, for some reason he indicated that he would have

 5     to review the Mt. Gox documents in order to determine what was

 6     necessary to staff Bitcoin Fog, which didn't make any sense.

 7     And when he was confronted with that, all he said was that he

 8     wasn't in any -- not in as simple -- the transcript is a

 9     rough -- a way you're presenting it.  Simply that, until I've

10     seen all the data the government has used to form its opinions,

11     I don't know how accurate or inaccurate these opinions are.

12             He says that I'll water down what counsel said.  It's

13     perhaps -- it was perhaps optimistic with respect to -- this is

14     the question of his expertise regarding the running of sites

15     like Bitcoin Fog.

16             And then, with respect to the Mt. Gox, he says, I'm

17     relying on things that other experts have shown to me that have

18     caused me concern.  Those are probably better addressed

19     directly to them because that's their expertise.  So he's

20     disavowing his own expertise on this with respect to the

21     Mt. Gox documents.

22             And as I indicated at the time that he testified, it

23     says, he just doesn't have the information in front of him to

24     indicate what the basis is for an opinion regarding the Mt. Gox

25     data.  And I'm not convinced that anybody, actually, has that

1    information; that information which would show that there's any

2    reason to believe that the records that are at issue in this

3    case were monkeyed with in any way or that the CEO of Mt. Gox

4    was involved in tampering with the underlying data versus

5    financials.

6        And so I am going to stick with what I previously

7    told you with respect to my skepticism with respect to the

8    Mt. Gox data and that I think -- I don't think that

9    Mr. Fischbach has the expertise to testify with respect to

10   that, or the knowledge base in addition to the expertise.  And

11   that beyond that, I have the 403 concern that I outlined for

12   you yesterday.

13       And then the final thing was about whether he could

14   testify as to Point 20, which was with respect to the inventory

15   conducted by the FBI.  And having reviewed his testimony and

16   his submission to the Court, there's just not any evidence in

17   front of me that he has any expertise on the topic.  So absent

18   something more, I'm not inclined to allow that testimony.

19       So that's where we stand with respect to

20   Mr. Fischbach.  We're, obviously, somewhat tight on time.

21       I defer to you-all as to whether you would want me

22   to -- I can take up Ms. Still now or Mr. Dror, whichever you

23   prefer, Mr. Ekeland.  You're the one who is planning your case.

24       MR. EKELAND:  Ms. Still.

25       THE COURT:  All right.  That's fine.  With

1    Ms. Still -- as I indicated previously with respect to

2    Ms. Still, my general reaction is that, to the extent that

3    she's providing concrete testimony about methodology and saying

4    I did the same tracing and I found this error here or that

5    error or I reached a different result, that all strikes me as

6    fine and within the -- her expertise.  She does strike me that

7    she does have relevant expertise.

8         There's a lot in her expert report that goes beyond

9    that, and it seems to be either speculative or taking the role

10   of the lawyers or the judge or the jury that is just, kind of,

11   fairly argumentative or conclusory.  You know, it would be

12   reckless to do such and such; it would be reckless to rely on

13   that; things of that nature.

14        She talks about the Mt. Gox hack, but I don't

15   necessarily see any evidence that she actually has expertise

16   with respect to the Mt. Gox hack or with the reliability of the

17   Mt. Gox data.  And absent some basis to believe that there

18   was -- that the hack actually affected the records at issue in

19   this case, I think that there is a 403 problem with allowing

20   that testimony.

21        There's aspects of her report that just strike me as

22   more argument than expert opinion; criticizing the government

23   for not having access to data that there's no way the

24   government could have access to.  And the government did

25   everything in its power to gain access to the data, and that it

 1     just was unable to find it or it didn't exist anymore.

 2            And to the extent that she wants to testify in a

 3     concrete analytic way to say that, without this additional

 4     data, which I understand the government wasn't able to obtain,

 5     it's difficult to draw particular conclusions.  I don't see a

 6     problem with that.  But I was somewhat concerned just by the

 7     tone of her expert report, which contains a lot of argument,

 8     and it sounds, as I said, at points more like a lawyer making a

 9     closing argument than it does as an independent -- or as an

10     expert who is just providing an objective opinion.

11            The stuff about Lambos and the meme involving Lambos,

12     I don't see how she has any expertise on whether people who are

13     involved in illegal activity involving Bitcoin drive

14     Lamborghinis versus driving Teslas.  I just don't see any basis

15     for offering an opinion on that.  It doesn't seem that she has

16     studied that issue and done an analysis of what types of cars

17     that people who are engaged in running illegal mixing services

18     drive.

19            I'm not quite sure the best way to, kind of, provide

20     you with further guidance.  I'm happy to hear from you,

21     Mr. Ekeland, if you want to walk through any things where you

22     want my guidance as to what I think is okay and what's not

23     okay.  I think you have, sort of, my general sense for the

24     types of lines that I think should be drawn.

25                 MR. EKELAND:  I think the Court's fairly clear.  I

1   don't think we need to go into the minutia.

2          When it comes to the culture of -- we do -- the

3   defense does submit that she is experienced in that culture.

4   You know, I don't believe 702 requires study.  We believe it

5   says it can be by experience.

6          And I mean, those memes and things are a very, very

7   common part of the culture, and looking at the government's --

8          THE COURT:  I'm sorry to just cut you off here.  It

9   seems to me a meme almost by definition is not proper.  It's

10  just -- I mean, there are memes out there that so fundamentally

11  mischaracterize the world, and that's oftentimes why they are

12  memes.  They're intended to exaggerate something, be funny,

13  make people chuckle, and take a -- something that's happened in

14  some way and exaggerate in a way to a level of absurdity.

15         I don't think that the fact that there are memes

16  regarding people having Lamborghinis is appropriate testimony

17  to say and -- because Mr. Sterlingov didn't have a Lamborghini,

18  he couldn't have possibly been engaged in illegal activity.

19         MR. EKELAND:  Your Honor, I know -- I'm not going to

20  belabor this point, but we submit that she does have the

21  requisite experience to speak on the Bitcoin culture, and that

22  meme is very much a reflection of a particular aspect of that

23  culture that she's very familiar with just by the fact that

24  she's been working in this field for a few years now and

25  travels all over the world and has spent an extensive amount of

 1      time on the internet working with it.  But we'll leave it at

 2      that.

 3              THE COURT:  Okay.  Well, if you want to offer outside

 4      the presence of the jury some basis for me to conclude that

 5      there, actually, is some analytic basis to believe that is more

 6      likely than not or that it tends to prove or disprove a fact as

 7      to whether someone drives a Lamborghini or not -- I suppose if

 8      someone drives a Lamborghini, maybe it is some evidence or

 9      makes it more likely that someone is engaged in illegal

10      activity than someone who doesn't drive a Lamborghini.

11              But I would be quite shocked if it was the case that

12      the fact you don't drive a Lamborghini means that it is less

13      likely than not that you're engaged in illegal activity.  But

14      if she has any study or analysis, any data, anything that would

15      support that.

16              But I just don't think a meme is appropriate.  In

17      fact, I think it's almost the definition of something that is

18      not appropriate under 702.

19              MR. EKELAND:  Well, Your Honor, she's -- she is an --

20      we are offering her as an expert to testify as to her opinion

21      and not fact.

22              THE COURT:  But it's her opinion as to a fact.  I

23      mean, if it's her opinion, I'm happy to instruct the jury:

24      Members of the jury, this is -- I want you to know this is her

25      opinion, it is not fact.  Do not take anything she says as fact

 1     because it's not fact.  It's just her opinion, and we all have

 2     our opinions.

 3               But you don't want me to do that.  You want the jury

 4     to draw factual inferences from what she says.

 5               MR. EKELAND:  We are good on that instruction to the

 6     jury.  We ask that the same be done for the government.

 7               THE COURT:  No.  I was being facetious because I

 8     think it's absurd to suggest that you don't want the jury to

 9     draw factual conclusions from what she's saying.

10               MR. EKELAND:  I want the jury to draw their own

11     factual conclusions based on the expert testimony which --

12               THE COURT:  I think we're wasting our time on this.

13               MR. EKELAND:  Understood, Your Honor.

14               THE COURT:  Unless you can show me some factual basis

15     for the meme, it doesn't come in.

16               MR. EKELAND:  Okay.  Just to get -- for clarity's

17     sake, then, in terms of the expert report, is that something

18     then that we can't show to the jury, or how do we work that?

19               THE COURT:  I don't think the expert report should

20     come into evidence itself.

21               MR. EKELAND:  Okay.  Is that just for this expert

22     report or is this for any of the other government expert

23     reports as well?

24               THE COURT:  Ms. Pelker?

25               MS. PELKER:  Your Honor, the government is not

1    intending to submit its full export reports into evidence.  We

2    wouldn't think that was proper.  We do intend to submit the

3    charts within them as summaries, or demonstratives as

4    appropriate.

5              THE COURT:  I was going to say the same thing for

6    you, Mr. Ekeland.  Obviously, to the extent there are charts or

7    diagrams or things like that, that would be helpful for

8    Ms. Still to offer as part of her testimony that appear in her

9    expert report, you're welcome to offer that, and I will then

10   decide whether to admit it into evidence or at least to permit

11   it to be used as a demonstrative.

12             Each side reserves its ability to object as those

13   come into evidence or come in as demonstratives.

14             MR. EKELAND:  Understood, Your Honor.  I just have

15   one more point on Ms. Still, and then I think we can move on.

16             THE COURT:  Okay.

17             MR. EKELAND:  I'll keep it brief.  It's on the

18   Mt. Gox issue.  The defense just submits that an expert under

19   702 is allowed to rely on hearsay.  There is plenty of hearsay

20   in terms of Mt. Gox being hacked multiple times.  And Ms. Still

21   has reviewed what limited Mt. Gox data was produced to the

22   defense in a spreadsheet form and did come across problems with

23   it, as I believe she mentions in her report.

24             We merely just submit that it would be permissible

25   for her under 702 to testify as to her opinion about the

1     Mt. Gox data.

2           THE COURT:  If she can identify errors in the Mt. Gox

3     data, she's welcome to do that.  That's not a problem at all.

4           And the -- the principal concern that I've raised

5     with respect to the Mt. Gox data is a 403 concern.  As I've

6     said before, if there's a major company in this country that

7     hasn't been hacked, it deserves a gold star.

8           And I think that it is more prejudicial than

9     probative to get into hacks and even get into illegal

10    fraudulent behavior by the CEO of the company unless there's

11    some basis to believe that it affected the data that is at

12    issue in this case.  And so I leave the door open on that.

13          If you can come in and show a connection between the

14    hacks and the data in this case -- but you're going to need

15    somebody who knows something about that.  Every time someone --

16    I've heard anyone testify about this, they've just said, well,

17    I've heard there were hacks.  In fact, even asking you about

18    it, you, who presumably met with each of the experts

19    extensively, have not identified to me any basis to believe

20    that the hacks had anything to do with the data at issue in

21    this case, nor have even you, after having spoken to all the

22    experts in the case, identified to me any basis to believe that

23    any wrongdoing by the CEO had anything to do with the data in

24    this case.

25          So I think that at least as things currently stand,

1    raising questions about the integrity of the data based on

2    hacks or the actions of the CEO is more prejudicial than

3    probative.  If you can show me some connection, that's a

4    different matter.

5           You need somebody who has some basis to know that and

6    some knowledge of that and can actually draw those connections.

7    Otherwise, it's just asking for speculation and casting

8    aspersions on the integrity of the data based on things that

9    are seemingly, as far as I can tell at this point, entirely

10   unconnected.

11          MR. EKELAND:  Your Honor, I'd just like to note that

12   in our submissions to the Court, we do quote Andy Greenberg's

13   book *Tracers in the Dark*, which recounts the fact that

14   Mr. Karpeles gave Michael Gronager, who then just started

15   Chainalysis, a thumb drive with the Mt. Gox data on it.

16          Mr. Gronager reviewed the data, determined that there

17   were deleted files, that it was somehow impure, and then he

18   purportedly asked Mr. Karpeles, do you have a backup data set,

19   and Mr. Karpeles allegedly said, no, this is the only data set,

20   which I think makes this different than every major company in

21   the United States that's been hacked, because every major

22   company in the United States backs up their data.

23          So Mr. Karpeles allegedly told Mr. Gronager, oh, this

24   is the only set of data that we have.  These files were deleted

25   because we were hacked and, moreover, our servers were

1    physically accessed by the hackers.

2            So that -- when I read that, that was the basis for

3    looking into the integrity of the Mt. Gox data.  And then if

4    you just do a review on the internet, you see that the Mt. Gox

5    data set was leaked, which is evidence of them being hacked.

6    And that there's extensive reporting on this issue.

7            And then you combine that with, you know, what we've

8    already discussed about Mr. Karpeles's convictions both in

9    France and in Japan for some kind of data fraud manipulation --

10   I'm going to leave it at that -- but I think it calls the

11   integrity of the Mt. Gox data highly into question.

12           THE COURT:  Well, if you have evidence that you

13   actually want to offer to the Court indicating, as I've said,

14   that the data at issue here itself was changed or altered based

15   on any hacks, I would be all ears to hear that.

16           But from what I've heard thus far, it sounds more

17   likely that what happened is that someone went in or more than

18   one went in, hacked in and stole money out of accounts, which

19   is different from going in and saying, I'm now going to make it

20   look like there's a transaction involving Mr. Sterlingov when

21   that transaction actually involved Ms. Pelker, and I'm going to

22   go in and change that for some reason.

23           I can't see a plausible reason why someone would be

24   changing data in that way.  There's nothing that's been

25   presented to me to suggest it was being done in that way.  What

1   has been suggested to me is that there was a theft.  That's

2   typically what hacks do, go in and steal money.

3            As I said, if you can show me evidence that there was

4   an alteration of the data that is at issue in this case, I'm

5   all ears.

6            MR. EKELAND:  Understood, Your Honor.

7            THE COURT:  So it is -- it's a little after 2:00

8   already.  I do want to give Ms. Pelker a chance to be heard

9   about Ms. Still and whether any further guidance is necessary

10  on that.

11           MS. PELKER:  Yes, Your Honor.  I'll try and be brief.

12  I think that the Court hit the main points.  But just noting

13  that there's a lot of areas within Ms. Still's testimony that

14  just fall outside of blockchain tracing that the government

15  would object to.

16           I think that the opinion that this was a wrongful

17  arrest, anything about FTX, about -- that advertising for

18  privacy is not illegal and the legality of that, anything about

19  wire fraud, data standards, law enforcement best practices;

20  they're just big buckets that are not appropriate for expert

21  testimony.

22           I think that, as the Court forecast after her

23  testimony, that there's a real issue with her presenting

24  anything from the academic articles that she discussed to the

25  jury insofar as it is, potentially, extremely misleading to the

1    jury to suggest -- as I think her paper initially -- her report

2    initially did -- that there's this 60 percent error rate for

3    the heuristics that the government is using here.

4           And when we get into her testimony with just a bit

5    more follow-up, it's clear that these studies are not, in fact,

6    on point with the tracing that the government has done, the

7    heuristics that Chainalysis uses, nor is it clear based on that

8    line of questioning that she sufficiently understands the

9    studies to be able to explain them to the jury or to have -- or

10   that she even, actually, relied on these studies in forming her

11   opinion.

12          In her testimony she indicated that she had not even

13   read all of the studies that she noted in her report.

14          And as far as the errors, Your Honor, I think that at

15   this point the government has -- defense has had extensive and

16   ample opportunities to identify with specificity any errors in

17   the Mt. Gox records.  When Ms. Still was crossed on that, the

18   only, quote-unquote, error that she could provide was that she

19   did not like that the Mt. Gox user ID information had been

20   exported into a single spreadsheet.  That's simply how the

21   trial pulls are done as standard procedure.

22          And she -- it's not clear whether she was even

23   looking at what the trial pulls were for the case or not.  But

24   in any event, at this point the defense, despite ample

25   opportunity, has not identified a single specific error,

1    specific inconsistency, and it would simply be unfair and a

2    clear violation of Rule 16 for the defense to try and somehow

3    spring that on the government mid-trial.

4          THE COURT:  Okay.  Mr. Ekeland?

5          MR. EKELAND:  Just briefly.  Ms. Meiklejohn's paper,

6    "How to Peel a Million"; that was commissioned by Chainalysis

7    in reaction to this case specifically to analyze the data.  I

8    mean, it mentions our client by name.

9          You know, we went and we found it.  So, you know, I

10   think they want to say that it shouldn't be coming in when they

11   commissioned it particularly to address this case, and then

12   they get a result where it's listing error rates that they

13   don't like.  Well, I mean, they paid for it.

14         And Ms. Still is certainly entitled under 702 to rely

15   on hearsay and look at it.  She merely presented an expert

16   summary of what Chainalysis commissioned.

17         So, you know, I don't think -- and she did read that

18   paper.  I think it's a little, you know -- I think that paper

19   is -- she's entirely justified and the defense is entirely

20   justified in relying on the work product of Chainalysis, which

21   I think, effectively, in many ways acts as a government

22   investigator and agent in this case.

23         You know, I'll leave it at that.  And the error

24   rates, you know, I think, are really a prime example of just

25   the wild fluctuation and sort of the random, arbitrary nature

1    of this whole enterprise, which is not scientific.  It's more

2    art than anything.

3              So I just don't -- I don't see it on Ms. Meiklejohn's

4    paper.  As for the --

5              THE COURT:  I'm sorry.  Before you move on to another

6    topic on this, your assertions here did remind me -- and I'll

7    issue my pretrial order shortly.  But I want to remind counsel

8    very clearly that opening statements are not argument.  And

9    saying, for example, the sorts of things you said now would be

10   wholly inappropriate in an opening statement.

11             You can in your opening statement state what the

12   evidence will show.  But it's not your opportunity for argument

13   in the case.  I did want to make that clear.

14             I don't like having to cut counsel off when they're

15   making their opening statements to the jury, but if either side

16   starts engaging in argument instead of, in a professional

17   manner, simply summarizing what they, in good faith, believe

18   the evidence will show, I will cut you off, and I don't want to

19   do it.  I'm just giving you that warning now.

20             But go ahead.

21             MR. EKELAND:  Understood, Your Honor.  I'm not

22   planning on arguing in my opening.  That, as suggested by the

23   Court, is for closing.

24             We've made our point about Ms. Meiklejohn's paper.

25   The defense takes the Court's point that it wants concrete

1     testimony instead of ambiguities or whatnot.

2            So, Your Honor, unless the Court has anything else

3     from the defense, I'm going to stop on this point.

4            THE COURT:  Ms. Pelker, anything else you want to add

5     on this topic?

6            MS. PELKER:  No, Your Honor.  Just that, to the

7     extent that Ms. Still does intend to comment on the paper, as

8     the Court forecasts, there's this potential issue.  We

9     certainly would want to be aware of that in advance of our

10    witnesses' testimony so that we can, potentially, either bring

11    up in advance of the defense case or on cross or rebuttal as

12    necessary the --

13           THE COURT:  What I'd like to do is I want to go back

14    and read her testimony again because you've both characterized

15    it in different ways.  I don't -- my recollection is not strong

16    enough to remember what her knowledge was and how fluent she

17    was in talking about the paper.  So I want to go back and look

18    at that.

19           But I will let you know before you put your witnesses

20    on the stand whether I'm going to allow that or not so you can

21    plan accordingly.

22           MS. PELKER:  Thank you, Your Honor.

23           THE COURT:  All right.  It's ten past 2:00.  I have a

24    couple of other matters that I previously indicated that I need

25    to turn to, and then we can turn back to this at 3:00.

1          Unfortunately, though, Mr. Sterlingov, the jail

2     couldn't accommodate bringing you back on at 3:00.  So the

3     question for you is, do you want us to continue just with your

4     lawyers, or would you rather put this off for another day when

5     you can actually be here with us?

6          THE DEFENDANT:  It sounds like there isn't much more

7     for us to do.  So I consent for you to continue without me with

8     this for this particular --

9          THE COURT:  By this particular, what I will do is --

10     my intent then will be to continue in just reviewing which

11     expert reports come in and what guardrails should exist with

12     respect to the expert testimony.  Is that acceptable to you?

13          THE DEFENDANT:  Yes.

14          THE COURT:  All right.  We'll do that.  We'll come

15     back at 3:00 then to continue with that.  And then I do think

16     that we've got an awful lot that still needs to get done

17     pending trial.  And I do wonder whether we should at least put

18     something on the calendar for either Monday afternoon or

19     Wednesday just to clear up before we actually start any

20     remaining issues that are out there.

21          MS. PELKER:  So, Your Honor, just one thought as a

22     possibility.  I know that we have jury selection on Thursday.

23     But that we're not going to get to openings anyway.  We could

24     come back on -- be here on Friday, or the 15th.  We could come

25     on the 15th --

```
1                  THE COURT:  That's not a bad idea.

2                  MS. PELKER:  -- and then just open on Monday, the

3       18th.

4                  THE COURT:  Mr. Ekeland, what do you think of that?

5                  MR. EKELAND:  I think that's a good idea.  Just so I

6       understand it, jury selection on the 14th, maybe bleeding over

7       into the 15th, and deal with any other outstanding pretrial

8       issues on that Friday, and then we come back and do openings on

9       Monday?

10                 THE COURT:  Correct.

11                 MR. EKELAND:  Yes, Your Honor.  The defense is fine

12      with that.

13                 THE COURT:  I think that's what we should do.  I'm

14      hopeful that we can actually pick the jury on Thursday.  I can

15      tell you that my colleague, Chief Judge Boasberg, would have it

16      done by lunchtime.  And I think as long as we apply ourselves

17      and don't go off on too many tangents, we ought to be able to

18      get this done on Thursday.

19                 That sounds good.  That way, also, that will give you

20      all a little bit of unfettered time for your trial prep between

21      now and Thursday.  I'm going to be getting you some opinions

22      between now and then, and I know there are some things you're

23      waiting to hear from me on.  I will do my best.  This case has

24      a lot of issues.

25                 I'm doing my best to work through them, and I will
```

1   get you opinions as quickly as I can on the open issues.  If

2   there's anything that you really need to hear from me about

3   before you open, make sure that is on my list or that I know

4   it's a priority if it's going to affect how you open in the

5   case.

6          And so tell me if there's something that's

7   outstanding and you said, this is the one thing or the two

8   things, Judge, that I really need to know about because it's

9   going to affect how I open.

10          I will tell you on the venue issue and on the issue

11   relating to the D.C. statute, as I've previously indicated to

12   you -- and I'll get you an opinion on this.  It's always

13   possible that when you finish the opinion -- I'm working on it

14   already, but if you finish it, you have something that changes

15   your mind.

16          But my inclination is to conclude that there is not a

17   venue issue here.  And with respect to whether the D.C. statute

18   applies here or exactly how the treasury regs apply here, I

19   need to work that through.  It has not been -- because it was

20   really -- I raised this sua sponte with the parties and, in

21   fact, the defense hasn't even moved on this ground.  And, in

22   fact, even in their -- in their filing on this, it really

23   continues to talk about venue and doesn't talk about whether

24   the statutes apply or not.

25          My inclination at this point is to proceed on the

 1   theory that those are in the -- those claims are in the case,

 2   but with the understanding that there could still be post-trial

 3   briefing if there's a conviction in which, with further

 4   briefing and further study on it, I might conclude otherwise.

 5           But given the lateness of the day and the fact that

 6   there hasn't been a motion to dismiss those counts, my

 7   inclination would be to proceed unless someone disagrees with

 8   that.  And then, as I said, the defense can file a post-trial

 9   motion if they want to.

10           MS. PELKER:  The government thinks that's a sensible

11   way to proceed, Your Honor.

12           THE COURT:  Okay.  Mr. Ekeland?

13           MR. EKELAND:  The defense agrees as well, Your Honor.

14           THE COURT:  Okay.  Well, thank you all.  We'll come

15   back at 3:00, maybe 3:15 at this point, and continue with the

16   experts.  Thank you.

17           MS. PELKER:  Thank you, Your Honor.

18           MR. HASSARD:  Thank you, Your Honor.

19           (Recess taken at 2:17 p.m. until 3:25 p.m., at which

20   time Defendant Roman Sterlingov waived his presence for the

21   following further proceedings:)

22           THE COURTROOM DEPUTY:  Criminal Case No. 21-CR-399,

23   United States of America v. Roman Sterlingov.

24           Do you want counsel to state their names for the

25   record again, Your Honor?

```
 1                THE COURT:  One counsel for everybody, maybe.

 2                MS. PELKER:  Alden Pelker for the United States,

 3     along with Christopher Brown and Jeffrey Pearlman.

 4                THE COURT:  Thank you.

 5                MR. EKELAND:  Tor Ekeland and Michael Hassard for

 6     Defendant Roman Sterlingov, who has waived his appearance for

 7     this hearing today.

 8                THE COURT:  Thank you.  The next one I had up was

 9     Dr. Dror.  I'm happy to hear argument with respect to Dr. Dror.

10                I will say, the parties don't cite much, if anything,

11     by way of case law on the question of whether testimony of this

12     type is appropriate, and I know -- I think I asked Mr. Ekeland

13     about this during the hearing on Dr. Dror, whether there were

14     cases in which he had previously been qualified as an expert to

15     talk about cognitive bias.

16                And we've gone to look, and I haven't been able to

17     find any of the cases that you referred us to.  So I am curious

18     as to whether anyone can point me to any case in which a

19     witness has either been allowed or not allowed to testify about

20     cognitive biases or any similar type of --

21                MR. EKELAND:  I'm sorry, Your Honor.  The connection

22     just froze up.

23                So the last thing I heard was that the Court couldn't

24     find some of the cases and that you were curious as to -- and

25     then it froze.
```

1           THE COURT:  I'm curious as to whether there are any

2     cases that the parties are aware of dealing either with Dr.

3     Dror or anyone else being allowed or not allowed to testify

4     about cognitive biases or any similar type of scientific

5     phenomenon.

6           MR. EKELAND:  Your Honor, I would have to go back and

7     look.  I mean -- because I just can't recall off the top of my

8     head, and I'm looking at this right now.  We're happy to go

9     back and look and submit anything we find to the Court and, of

10    course, ask him.

11          THE COURT:  Well, I will direct that both parties, if

12    anyone has any case law or anything they want me to look at, to

13    file it by Monday.  But, Mr. Brown, are you going to point me

14    to something now?

15          MR. BROWN:  Your Honor, I'm afraid I don't have it in

16    front of me either.  We're aware -- I remember reading the

17    transcript of Dr. Dror's testimony in a Massachusetts state

18    court, but I don't -- from more than five years ago, so it

19    wouldn't have been in that disclosure.  But I don't recall

20    standing here today if that's testimony at trial or testimony

21    in a pretrial *Daubert*/*Frye*-type hearing.  It's also a different

22    system.

23          In candor, I don't know if this is the same as

24    implicit bias experts.  I know that courts, I think, are

25    divided, but sometimes the experts are admitted to talk about

1    implicit bias.

2          THE COURT:  That strikes me as at least, arguably,

3    analogous.  So that might be helpful to the extent that I can

4    be directed towards that case law.

5          So why don't I go ahead and start with Mr. Ekeland,

6    though, with the understanding that the parties, by Monday at

7    5:00, will provide me with a notice of any additional cases or

8    materials they want me to review on this question.

9          MR. EKELAND:  Certainly, Your Honor.  I believe at

10   the *Daubert* hearing for Dr. Dror, the suggestion was made by

11   him, and if I recall correctly, the Court -- but maybe I'm

12   remembering wrong -- that he could generally testify as to the

13   principle as to what's behind cognitive bias and confirmation

14   bias and let the jury decide just -- essentially, give the jury

15   the tools to decide if that's occurred in this case.

16          And on Wednesday night at about 10:00 p.m., the

17   government gave us a new production of discovery that contained

18   *Jencks* materials, with a lot of *Jencks* statements from

19   witnesses, investigators in this case that -- on our first

20   review of it, to me, strikes the defense as something that the

21   jury, if given sort of the neutral tools from Dr. Dror, were to

22   look at could find that there's a kind of confirmation bias in

23   this case.  Because I think one question that the jury is going

24   to be asking is, essentially, why is this prosecution being

25   brought when, as this Court is well aware, it's the defense's

1    position that there is no corroborating evidence.

2          And I think there's that aspect of this case, and

3    there's also the underlying assumptions that are being used in

4    Chainalysis Reactor in terms of the heuristics, which we

5    maintain are subject to confirmation and cognitive bias.  And,

6    again, I think it also goes to Ms. Mazars' report where I

7    believe the phrase she used is professional guess.

8          I think there are a number of places here where the

9    jury would benefit from Dr. Dror's giving them the tools to

10   evaluate whether or not there's cognitive or confirmation bias

11   without necessarily referring to any particular piece of

12   evidence.

13         THE COURT:  So what would he do?  Would he just say,

14   generally, let me just tell you about confirmation bias and

15   confirmation bias is a known phenomenon, and sometimes it can

16   have a dramatic effect, sometimes it's less dramatic; and here

17   are some examples of the types of circumstances where you can

18   see confirmation bias?

19         MR. EKELAND:  Yes.  I believe in our disclosure for

20   him, that is what -- well, paragraph No. 1, I think, addresses

21   that.

22         The defense expects Dr. Dror to testify, generally,

23   about cognitive bias in forensic science and particularly the

24   role of confirmation and other biases in digital forensic

25   investigations.  And as his CV demonstrates, he has done

1    extensive research in this area, and he has published

2    extensively in this area.  I mean, I think his disclosure

3    speaks for itself on this.

4         I just think it would be very helpful for the jury to

5    have these tools and the -- you know, the defense thinks

6    it's -- the suggestion that he provides the jury the tools

7    without telling the jury how to use them, in a sense, without

8    necessarily identifying any particular instance.

9         Although, I will state, based on the *Jencks* material

10   that we received the other night, I would like, if possible, to

11   have a chance to review that.  And if we do want him to look at

12   that, maybe submit that by Monday -- I believe you said by

13   5:00 p.m. -- along with any case law.

14        THE COURT:  Well, I do think -- I mean, I have to say

15   I'm not sure that's going to be helpful because I'm skeptical

16   of the proposition that it would be proper for him to testify

17   about cognitive bias in particular evidence in this case.  I

18   mean, that does feel too close to standing in the shoes of the

19   jury.  And I also have 403 concerns about that.  You're welcome

20   to make the argument, but I'm skeptical about it.

21        I also am -- putting aside the question about

22   whether this comes in or not -- and I want to look at the case

23   law on that -- I'm particularly skeptical also about some of

24   the stuff that is in the notes, which seems unduly inflammatory

25   and seems to be a 403 issue.

1         He will explain how miscarriages of justice and

2    misleading evidence highlights human error.  You know, I would

3    think it would almost certainly be improper for him to say, you

4    know, let me give you some examples of horrible things that

5    have happened based on cognitive bias, and here's some case in

6    which some poor guy went to jail for 20 years or 50 years based

7    on cognitive bias.

8         Because, you know, if that comes in, then the

9    government ought to be able to offer evidence of the hundreds

10   of thousands of cases in which people were properly convicted

11   based on forensic evidence.  We get way off track doing that.

12   I think that type of thing is almost certainly improper and

13   would be unduly inflammatory.

14        I guess, to me, the question is just whether it would

15   be proper for him to offer, sort of, very -- just a very

16   neutral summary and saying, you know, cognitive bias is

17   something that exists or confirmation bias is something that

18   exists.  I've studied it; this is how it works.

19        And based on my recollection of his testimony, I'm

20   not sure he's in any position in which he can quantify it, but

21   certainly couldn't quantify it for this case.  But that it's

22   something that people need to be sensitive to.

23        I also am skeptical of the proposition that -- even

24   if I allow it -- it will be proper for him to say, this is what

25   the FBI should do.  Because I'm just not sure he has that

1    expertise and is not in a position, frankly, to know whether

2    that's something that, as a practical matter, the FBI can even

3    reasonably do where, you know, agents who are investigating a

4    crime and they have somebody who they think is a suspect.  You

5    say, okay, let's bring in an entirely different team and not

6    tell them who the suspect is and have them do all the analysis.

7         Based on what I've heard from him, I don't think he

8    had that expertise.  He may have provided -- I can't remember,

9    but he may have provided some seminars on his research to law

10   enforcement over the years.

11        But I think that's different from having the

12   experience about how law enforcement operates that would allow

13   him to be prescriptive and to say, this is what law enforcement

14   should do or this is -- this was a flaw in what was done here

15   versus simply in the way that, you know, I've allowed in the

16   past very brief testimony from an expert witness on false

17   confessions.

18        They come in and say, sometimes people do falsely

19   confess, and these are the types of things that can lead to

20   false confessions.  I'm not saying anything about this case.

21        And for me, I guess the question here is whether to

22   allow that type of testimony from Dr. Dror saying, you know,

23   there is such a thing as confirmation bias, there is such a

24   thing as cognitive bias, this is how it works.  And, you know,

25   I'm not saying one way or the other as to whether it was

1    present here or not, but this is what it is, and leave it up to

2    the jury to decide what to do with that.

3            That, to me, is the question as to whether to allow

4    that in.  Mr. Ekeland?

5            MR. EKELAND:  I think it would be -- yes, Your Honor.

6    I think it would be entirely appropriate for the Court to allow

7    that type of neutral testimony it just described given the

8    level of assumption or speculation underlying so much of the

9    conclusions in this case.

10            For instance, if you take a look at that

11    19-transaction hop that the government, I believe, in Dr. --

12    not Dr. Scholl -- In Mr. Scholl's report wants to say is

13    Mr. Sterlingov making one of the first, if not the first,

14    deposits into Bitcoin Fog.

15            You have to make an assumption that at every step in

16    those 19 transactions that Mr. Sterlingov controls the private

17    key; likewise, you have this problem with peel chains.  You

18    have this problem, I think, in general with these types of

19    blockchain analytics where you have to make a lot of

20    assumptions, and I think that's where his testimony becomes

21    relevant.

22            It's relevant in the sense that this case is highly

23    dependent upon speculation, upon guesses, and upon assumptions,

24    and I think that's one of the things that Ms. Mazars de Mazarin

25    was quite honest about.  She said I'm making my best

1    professional guess.

2            And in that sense, I do think that Dr. Dror, who is,

3    I think, at least academically a well-established expert in

4    this field can be helpful to the jury in evaluating the

5    evidence and coming to the decision as to, well, was that guess

6    right?

7            THE COURT:  Okay.  Mr. Brown?

8            MR. BROWN:  Yes, Your Honor.  The government takes

9    the position that any testimony from Dr. Dror should be

10   excluded under Rule 702.  There's a relevance issue, which I

11   think bleeds into the first prong of 702 about whether this

12   would be helpful to the jury.

13           I just want to remind the Court that Dr. Dror, during

14   his testimony, looked at that expert disclosure and disowned it

15   in total.  He said these are things I might testify -- I might

16   opine about in the future, but I have no opinions about this

17   case.

18           THE COURT:  I think -- I mean, for that reason, as

19   well as the reasons I've given otherwise, I don't think we're

20   talking about him opining about the facts of this case.  I

21   think he's stepping into the province of the jury; I think

22   there's a 403 problem with that.  I think that there's a

23   failure to disclose that testimony problem with it.

24           To my mind, as I said before, the only question is

25   whether it would be proper -- what I have in mind is fairly

1       brief testimony.  His direct might be 15 minutes, coming in and

2       simply saying there is such a thing called confirmation bias or

3       cognitive bias.

4            And when you know the result that you think -- when

5       you're aware of the result that you're looking for, studies

6       show that you're more likely, particularly where there are any

7       subjective steps in the process, to reach that result than if

8       you don't know what it is; something of that nature.

9            MR. BROWN:  Yes, Your Honor.  And I think that that

10      actually -- we would have concerns even with that because --

11      and part of this is there's almost a 403 issue with applying

12      his theories to blockchain analysis the way that Mr. Ekeland

13      just walked through.  Because one of the points of his

14      testimony is that to determine whether and how cognitive bias

15      affects a forensic process requires experimental work.  It

16      requires field work, observing -- you know, he's done work with

17      fingerprint analysts, with airline pilots, with all sorts of

18      other forensic technicians to understand the kinds of data that

19      they review.

20           And Dr. Dror admitted during his cross that,

21      depending on the different sort of data, there are more or

22      fewer sources of extraneous contextual information that can

23      lead to cognitive biases.  And he has no understanding of

24      blockchain analysis.  He has no -- he's spent no time observing

25      any blockchain analysis --

1          THE COURT:  Isn't that a two-edged sword?  Wouldn't

2     you be more concerned if he was going to take the stand and

3     say, blockchain analysis is particularly problematic and ought

4     not be relied upon because of all the risks of cognitive bias

5     there because then he really is getting a lot closer to the

6     province of the jury, and it's more prejudicial when he starts

7     talking about the particulars of the evidence in this case?

8          MR. BROWN:  Yes, Your Honor.  Although, then at least

9     he would be -- there would be other issues, but he would be

10    speaking more relevantly to the case and not just telling the

11    jury to use their common sense, which is something they already

12    know how to do.

13         I think just his theories -- the way that his

14    theories work, I think, raises 702 issues on a number of

15    levels.  I mean, number one, the presence or absence of

16    cognitive bias.  And I think the Court -- the Court asked, how

17    do you quantify or provide a meaningful analytic tool to the

18    jury --

19         THE COURT:  Right.

20         MR. BROWN:  -- about whether there's cognitive bias

21    in this case.  This is on page 68 of that transcript.  And the

22    answer he gave was, essentially, a nonanswer.  I can read it,

23    but --

24         THE COURT:  Okay.  Why don't you.

25         MR. BROWN:  It's a word salad.  There is no clear,

1      scientific test for whether cognitive bias exists.  He said

2      that he would have to review emails.  It's, essentially, a

3      vibes-based determination of, A, whether cognitive bias exists.

4      And then the effect of cognitive bias, he can't say with any

5      scientific certainty what effect that would have on the

6      rightness or wrongness of conclusions.

7             In fact, he said sometimes they get the wrong

8      conclusion, but sometimes they don't.  As to -- oh, you can

9      assign a probability that given test condition A, there is

10     cognitive bias and there's X percent of arriving at an

11     inaccurate result; that was the question.  And he agreed with

12     that.

13            And to the next point about, how do you avoid

14     cognitive bias, he does all these trainings to law enforcement

15     and to other investigators about -- steps to reduce cognitive

16     bias, but he was forthright.  He's never tested the efficacy of

17     those.

18            He said there is no scientific proven data on that.

19     Page 79.  No scientific proven data on the efficacy of measures

20     to reduce cognitive bias.

21            So if he's going to get up in front of the jury -- I

22     think the Court has already indicated in no circumstances he

23     would be able to testify, the agents should have done X, they

24     should have done Y.  But if he were to testify that way, he

25     would be testifying about something that he has admitted

1    himself, for which there is no scientific proven data on that.

2         I just think that at every step -- he's either just

3    saying something as a truism -- cognitive bias exists

4    everywhere and anywhere -- or it's kind of I know it when I see

5    it.  And if it exists, there's no predictive value about

6    whether somebody gets the right answer or the wrong answer.

7         So I just don't see how this is helpful to the jury.

8    It's certainly not based on any reproducible, reliable

9    scientific techniques.  Based on his theories, another

10   cognitive bias expert could look at the same situation and say,

11   there is no cognitive bias.  What's the test?  There is no

12   test.

13        The same cognitive bias expert could look at evidence

14   of -- if there is evidence of cognitive bias, is this forensic

15   technician going to get the right answer or the wrong answer?

16   Dr. Dror might say yes; another person would say no.  There is

17   no way to test that.  There is no scientific basis for that.

18        THE COURT:  I'm in agreement with you with respect to

19   trying to quantify it or to say how it applies here.  That was

20   one of the reasons that I indicated that I don't think it

21   should be applied to the facts of this case.

22        Where I'm still unsure and this is what I want to

23   take a look at the case law about is -- it strikes me as a

24   little bit different, for example, than a memory expert who

25   might take the stand and testify about how memory is not as

1          certain as you think it is and people forget things all the

2          time.

3                    Because, at least as to some jurors, it seems to me

4          this may be, sort of, outside their usual ken and that most

5          people understand memory fades over time and you forget things.

6          Anyone who has been around me for any period of time knows that

7          memory is not perfect.

8                    And I think that there probably are some

9          sophisticated jurors out there who understand confirmation

10         bias.  I'm not sure that everyone in the jury pool would be

11         familiar with that notion and would necessarily understand.

12                   I guess the question to my mind is would it be

13         helpful, for some of the jurors at least, to have that context

14         that, I'm not telling you it happened here, I'm not telling

15         you -- I don't purport to be able to quantify it, but I'm

16         telling you, just general context, that there is a concern that

17         I study, that I'm aware of, and that where people know what the

18         result is that they're looking for, they're more likely to get

19         that result than when they don't know what it is.

20                   MR. BROWN:  Yes, Your Honor.  I think our concern is

21         that's really -- I mean, that really is just common sense.

22         It's just like a lot of academic statements they're sort of

23         dressing up.  A common sense observation that everybody knows,

24         which is people dig in their heels.  You know, people don't

25         like to be wrong.

1              That's a jury argument for a lawyer to make.  Our

2       concern is if they put up a Ph.D. with all these degrees and

3       everything, what you're doing is you really are dressing up

4       common sense in the garb of an academic discipline.  And that

5       really is a core concern of *Daubert*.

6              That is the situation where you're concerned about

7       the jury being, sort of, overswayed by the credentials of the

8       person testifying about what is really just a commonsense

9       observation.

10             THE COURT:  All right.  Anything else on this,

11      Mr. Ekeland?

12             MR. EKELAND:  Just that the defense agrees with the

13      Court.  We think it would -- to the extent that the Court is

14      contemplating this and will agree to this, we think Dr. Dror

15      would -- just some short neutral testimony from him regarding a

16      phenomena would be helpful to the jury.

17             I do want to note that the standards that Mr. Brown

18      was citing about not being able to quantify things, no

19      scientific basis, quote-unquote, for Dr. Dror's testimony, all

20      those apply to the government's witnesses and Chainalysis

21      Reactor.  There is no quantification of the error rate.  I'm

22      not going to belabor the point, but it --

23             THE COURT:  Although, there is a difference -- I'm

24      sorry.  One difference, though, is that there's verifiability

25      in a different way with respect to the government's case.

1          And that if -- as Ms. Still will testify, if you

2     think that their tracing was incorrect or you think their

3     analysis was incorrect, you can point to it and say, here's why

4     it was incorrect; here's why that assumption was wrong; here's

5     why CoinJoin changes things; here's why -- we've actually gone

6     out and actually -- they -- they, through Reactor, have

7     assigned a particular address to a particular individual or

8     entity and we've checked them.  It's just wrong.  We can prove

9     it's wrong.

10          So there's a different sort of verifiability that

11     applies to what Chainalysis has done versus the more general

12     assertion that people are more likely to reach the result that

13     they want to reach or that they believe to be the correct

14     result than when they're behind the veil of ignorance.

15          MR. EKELAND:  Your Honor, with the caveat that memory

16     is fallible, if I do recall Dr. Dror's testimony, he was rather

17     adamant at some points about how there are scientific

18     principles at play here.  And one thing that comes into mind is

19     him saying that it matters what an investigator is told

20     beforehand about somebody.  Whether or not they've been told

21     that a person, for instance, has been arrested for a crime or

22     whether they're not told anything, and that there is empirical

23     evidence, and it's some 77 pages long documenting his

24     qualifications in this area.

25          So I don't think it's just a feel-good thing where --

1          THE COURT:  I'm not suggesting that it is in any way

2     quackery or unscientific.  I have no doubt that you can and

3     that you've done studies with particular controls where you

4     say, in this study we told everyone that the subject of the

5     study ate the last cookie in the room as it was passed around.

6          And in some cases that person did do so and in other

7     cases the person didn't do so.  And then you ask everybody

8     going around the table who ate the last cookie.  And if you

9     tell them that it was Bob who ate the last cookie and then you

10    say -- ask everybody what's your recollection of who ate the

11    last cookie, there's probably going to be some confirmation

12    bias there, and you're going to go around the room, and it's

13    going to turn out that nine people say he ate the cookie when

14    you told people in advance it was him and only six did under

15    our control.

16          I don't doubt that there's that type of study.  The

17    question is how transferable it is to this context where he

18    hasn't studied this context and where I have concerns

19    supplanting the role of the jury in this context.  That's what

20    I have to struggle with, whether sort of the general assertion

21    that it can happen at times is meaningful to the jury as

22    applied in this context or not.

23          So that's why I'd love to see whether he's been

24    allowed to testify in cases before.  I'd like to see any

25    opinions on that.  But I'd also like to see any case law

1   dealing with cognitive bias, confirmation bias, implicit bias,

2   anything else that's analogous that might help guide me on this

3   question because I think it's a close call.

4            MR. EKELAND:  We'll take a look, Your Honor.

5            THE COURT:  Okay.  Thanks.  Let's do that by Monday

6   at 5:00, if anyone has anything to offer.

7            All right.  Anything else on Mr. Dror -- or Dr. Dror?

8            MR. BROWN:  No, Your Honor.

9            MR. EKELAND:  No, Your Honor.

10           THE COURT:  All right.  Should we take up Mr. Verret

11  then?

12           MR. EKELAND:  Yes, Your Honor.  I'm just scrolling to

13  his disclosure.

14           THE COURT:  I'm at Docket 122 at pages 24 through 30,

15  which includes a lot of categories and things that he will

16  testify about.  I guess I'd like to go one by one through

17  these.

18           MR. EKELAND:  Your Honor, we did a supplemental

19  disclosure for him, which is at Docket 145, and it starts --

20           THE COURT:  I have that.  Okay.

21           MR. EKELAND:  And then, additionally, I believe there

22  was a PowerPoint attachment as well that's summarizing his

23  proposed testimony.  We're happy to go through this, whatever

24  the Court wants.  Docket No. 145-5.  I'm looking at page 415

25  right now where the numbered paragraphs start.

1          THE COURT:  Okay.  Why don't we go through that then.

2          MR. EKELAND:  Okay.  Paragraph No. 1 says,

3    "Mr. Verret will testify to how the evidence offered by the

4    government is consistent with Sterlingov being early to Bitcoin

5    and using Bitcoin Fog for legitimate personal privacy

6    interests.  He will explain why the government's evidence is

7    not consistent with Mr. Sterlingov running the Bitcoin Fog

8    mixer."

9          THE COURT:  So that both strikes me as conclusory in

10   the province of the jury but also just not an adequate

11   disclosure.  He's going to testify that the government is

12   wrong.  But I don't see, sort of, like what he's going to

13   testify about and why; any of the whys as to any of that.

14         MR. EKELAND:  I believe that comes both later in the

15   disclosure and also in his PowerPoint, if I'm recalling

16   correctly.  And what the -- he will testify to -- and, again,

17   Your Honor, the defense takes your points on the concreteness

18   and ambiguity.

19         But that the government seems to have a theory that

20   the deposits into Mr. Sterlingov's KYC Kraken account are

21   royalty or service fees from Bitcoin Fog.

22         And Mr. Verret's analysis means to show that, in his

23   expert opinion, those are just entirely consistent with

24   Mr. Sterlingov being an early adopter of Bitcoin, then Bitcoin

25   appreciating, and then him using Bitcoin Fog for privacy

1    purposes.  Because I believe later the concept of wrench

2    attacks -- which are just people coming and physically

3    attacking you to get your wallet based on knowing what -- how

4    much Bitcoin you had, because maybe you did a transaction with

5    them or something.

6            THE COURT:  Let me just pause for a second here.  I

7    think as No. 1 is framed, it's just too vague.  But to the

8    extent that Mr. Verret wants to testify -- and my recollection

9    is he had not really -- the problem is he hadn't done any of

10   the analysis or he -- I think I asked him if he put anything on

11   paper, and he said he didn't put anything on paper is my

12   recollection.

13           So I'm just not sure of what his math was or how the

14   government is supposed to evaluate his math.  I mean, I think

15   it's appropriate expert testimony to say, here's what the value

16   of Bitcoin was at a particular point, although you've argued

17   you can't do that.  But putting that aside, assuming you can

18   value Bitcoin at particular points and show the increase in the

19   value of Bitcoin and say that, had he invested X dollars in

20   Bitcoin at this point, it would have grown to such and such a

21   dollar figure over time.  I don't see a problem with that.

22           Although, my recollection is that, when asked about

23   it, he sort of -- it was kind of hard to believe that he didn't

24   actually put anything on paper to do that type of analysis.

25           MR. EKELAND:  Your Honor, we'd refer to the Court to

1    his 35-page -- or 35-slide PowerPoint.

2              THE COURT:  I've got that in front of me as well.

3    Why don't you show me where that is in there.  Where is the

4    math?

5              MR. EKELAND:  If you look at slides evaluating claim

6    No. 1.  That is slide -- let me see here.  So there's Slide 1,

7    2, 3, 4, 5.  I think it's the 6th slide in.  You'll see a chart

8    where you see the math on the appreciation of Bitcoin at one

9    point; after 12 years it's appreciated some 221 -- 320,000 --

10             THE COURT:  That's okay.  That doesn't say anything

11   about, sort of, any individual growth of -- doesn't even tell

12   me what year one is.

13             MR. EKELAND:  Well, year one is the first year that

14   Bitcoin exists.

15             THE COURT:  All right.

16             MR. EKELAND:  Which Satoshi writes his paper in --

17   what is it? -- 2008 --

18             THE COURT:  Subject to hearing from the government, I

19   don't have a problem with him offering that chart and offering

20   that in as evidence.

21             That's a little bit different from saying, though,

22   that he's concluded that Mr. Sterlingov's assets are entirely

23   consistent with him having engaged in purely private

24   transactions or not having been an administrator.  Showing what

25   the growth of Bitcoin is over time, that strikes me as --

 1    assuming that there's a proper foundation for that, it strikes

 2    me as appropriate expert testimony.

 3            MR. EKELAND:  Agreed, Your Honor.  I would submit to

 4    the Court that -- that we think that the level of the

 5    disclosures -- Mr. Verret's disclosures are far more fulsome

 6    than the government's proposed accountant, Ms. Glave.  She

 7    really doesn't disclose with any depth or any concreteness the

 8    level of her opinions.

 9            I mean, we've gotten her summary slides, which we're

10    reviewing.  We're in a position, if she's going to come in and

11    be able to testify as to those slides that -- you know, the

12    slides that we have go to a higher level --

13            THE COURT:  I've told you, subject to my hearing from

14    the government, I'm okay with the slide.  What I'm concerned

15    about is just the, sort of, conclusory assertion without any

16    other analysis of saying that the evidence offered by the

17    government is consistent with Mr. Sterlingov having been an

18    early investor in Bitcoin, and this is all for legitimate

19    personal and privacy interests.

20            Also, I don't mind someone saying that here are the

21    reasons -- you know, based on my experience and expertise,

22    these are the reasons why people might use a mixer.  Saying

23    that what Mr. Sterlingov did is consistent with those purposes

24    strikes me as, in essence -- and maybe Mr. Sterlingov is going

25    to take the stand -- I don't know.

1          But it feels a little bit like him taking the stand

2     through an expert, and I don't think the expert can testify to

3     what Mr. Sterlingov was thinking or what his purpose was.  But

4     if he wants to talk in general about here are the various

5     reasons why people do it, and then the government should be

6     able to on cross-examination say one of the other reasons that

7     people do it, of course, is to commit crimes, correct?  And if

8     he says no to that question, he's not going to be terribly

9     credible with the jury.

10          MR. EKELAND:  Understood, Your Honor.  It might be

11     beneficial if we just keep going down his disclosures.  I

12     think, perhaps, the level of detail the Court is looking for is

13     contained there.  If not, the Court will let us know.

14          THE COURT:  Okay.

15          MR. EKELAND:  So paragraph 2 says, "Mr. Verret will

16     testify to two key points related to the government's assertion

17     that funds transferred back to Mr. Sterlingov's KYC -- short

18     for know your customer -- Kraken accounts from Bitcoin Fog were

19     fees generated by the operator of Bitcoin Fog.

20          "First, Mr. Verret will show that the Bitcoin Fog

21     fees were many times larger from the total crypto assets ever

22     attributed to Sterlingov.  Second, Mr. Verret will explain that

23     the government has shown no noncrypto assets owned by

24     Mr. Sterlingov whose source is unaccounted for."

25          THE COURT:  All right.  Again, I think, to the -- to

1     the extent he's actually done the math -- and as I said, I

2     recall being very surprised that he said he hadn't actually put

3     anything on paper and done any math.  So I'm not sure how he

4     can say some of this.

5             But I mean, I guess I can say it as well.  That it

6     does -- may be in the province of the jury, but yes, a forensic

7     accountant can say that the government asserts that there were

8     transactions of X hundred million dollars by Bitcoin Fog, and

9     the government asserts that the administrator's fee was X

10    percent.  And if you do the math, that comes out to X millions

11    of dollars.

12            You know, I think he's -- the problem is at times he

13    acts more like a lawyer than a witness.  I would have real

14    problems if he says, that shows that the government's theory is

15    wrong or that -- where is the money then?  Why isn't he driving

16    a Porsche then?  That just feels like argument to me; not any

17    expert testimony.

18            But if he's just doing the math, I don't see a

19    problem with that.

20            MR. EKELAND:  Agreed, Your Honor.  Again, I'd refer

21    the Court to his PowerPoint, which, I believe, is tracking his

22    expert disclosures somewhat.  And the slide after -- where he

23    does the math on Bitcoin's appreciation, it says the value --

24    he finds, number one, did Sterlingov receive Bitcoin Fog fees.

25    You know, you see him talking about the historical value of

1    Bitcoin today.

2           And you can scroll through the next few slides where

3    he's discussing, for instance, evaluating Claim 1, did

4    Sterlingov receive Bitcoin Fog fees.  Sterlingov's financial

5    records do not fit the patterns of money laundering for three

6    reasons.  You know, he's got the -- his opinion that the --

7    Reason No. 2, no explainable -- unexplainable asset holdings,

8    which I believe just looking at the disclosure, of between .6

9    billion to $1.4 billion in personal wealth of the Bitcoin Fog

10   operator.  Which he can testify that he's basing that on, I

11   believe, what's been said about the Bitcoin Fog operator's

12   supposed service fees, I believe, disclosed, if I'm recalling

13   correctly, in the criminal complaint and elsewhere in the

14   government's documentation.

15          Certainly, as a certified forensic examiner and CPA,

16   you know, he can concretely testify about these things.

17          THE COURT:  Some of this strikes me as fairly

18   unremarkable in which you probably could get, basically, any

19   accountant to testify to.  I'm not saying it's improper, but

20   any accountant to say, here's what the government says that the

21   number of transactions were; here's what the percentage was;

22   and it would come to X million dollars, and this is how much

23   money the government has found.

24          Now, it doesn't prove a whole lot, because I'm sure

25   the government's position is that there are other funds that

1    are just hidden away that they haven't been able to find at

2    this point.  But, I mean, that strikes me as fair game.

3              As I said before, my concern is more when he starts

4    making arguments and acting more like the lawyer in the case.

5    And I haven't looked carefully at the slides, but my suspicion

6    is that the slides may just include things that cross the line

7    where he's acting more as an advocate or a lawyer than as an

8    expert and he's just making arguments.

9              We'll just have to -- whether the slides come in or

10   we -- it's an issue for another day, and I'll let you confer

11   with the government about that.  It may be that there's some

12   portions that can come in and some can't.  To the extent it's

13   just argument or lawyer's argument, you know, I don't think

14   it's proper.

15             The reason I'm raising this now isn't so much because

16   I'm looking at the slides as we're sitting here now and saying

17   that I see this.  But I remember his testimony, and I remember

18   being struck that he just struck me as an advocate and not an

19   expert in many of the things he was saying.  And some of

20   the stuff -- I mean, that whole story about his son and his son

21   saying to him, Dad, why isn't he driving some fancy car?  And

22   then I said, well, you know, he did have a Tesla.  And he said

23   a Tesla wouldn't count.  It felt like I was arguing with a

24   lawyer -- having a conversation with a lawyer versus an expert

25   who was actually expressing opinions based on some type of

1    expertise.

2            So that's the concern I have with his testimony, just

3    policing that and making sure that he is -- if he's doing

4    forensics and counting numbers and doing math, that's

5    completely fine.  But if he's then saying, this, therefore,

6    proves or shows that he didn't do it or where is it then and

7    why hasn't the government found it, that sounds like what your

8    closing argument says, not what an expert witness says.

9            MR. EKELAND:  Understood, Your Honor.

10           THE COURT:  Okay.  I'm happy to keep going through

11   these.

12           MR. EKELAND:  I believe we -- we're on No. 3 now, if

13   I recall correctly.

14           THE COURT:  Yes.

15           MR. EKELAND:  "Mr. Verret will testify that the

16   account balance in Mr. Sterlingov's seized accounts show less

17   than 10 percent of the amount that someone running Bitcoin Fog

18   would be expected to have.  Mr. Verret will testify that an

19   objective investigator in a case like this would typically use

20   net worth analysis and/or net income analysis to show a large

21   magnitude of assets owned by a suspect that had no known income

22   source net of expenses or known assets net of liabilities to

23   explain them," and then he's got citations.

24           THE COURT:  This does strike me, quite frankly, as --

25   to the extent my role under *Daubert* is, sort of, policing

1    misleading the jury with things that seem dressed up in expert

2    terms in ways that really aren't, I mean, I worry a little bit

3    about this.

4              As I've said a half dozen times already, to the

5    extent he wants to testify and say, I've done the math here and

6    it's $300 million in transactions, and this is what the

7    percentage administrator fee allegedly was, and this is how

8    much money you would expect him to have, fine.

9              But to then go on and -- I really don't know what the

10   net worth analysis and net income analysis actually adds to

11   that.  I don't think that there's a question here about whether

12   we're talking about net worth or income.  I don't see how

13   that's particularly relevant or helpful to the jury here.

14             But my concern is that this suggests -- and there's

15   suggestion of this -- is, look, I'm a forensic scientist here,

16   and I'm telling you that it's X dollars, and this is what --

17   this is what the math would be.  And, look, there's only Y

18   dollars in the account, Q.E.D., he didn't do it; which is just

19   very different from saying that you would expect him to have --

20   I mean, it's kind of obvious, and I don't have a problem with

21   this.

22             If, in fact, he was the administrator and he

23   personally was getting paid X percent, $300 million in

24   transactions, you would expect him to have -- plus, with the

25   appreciation of Bitcoin on top of it, you would expect him to

 1     have X millions of dollars.  That's fine.

 2              But it starts to get dressed up in sounding like he's

 3     saying, based on my expertise he didn't do it because these two

 4     accounts don't match up, and I think that's the step that

 5     I'm -- that I think is causing me pause.  To the extent it's

 6     dressed up in financial jargon to make it sound like he has

 7     reached some sort of scientific conclusion that it can't have

 8     been Mr. Sterlingov, that's problematic.

 9              I think what's obvious here is that if the

10     government's theory is right, either the government is wrong or

11     there are other assets out there, something happened to the

12     other assets.  That doesn't strike me as particularly

13     controversial.

14              But I don't really see how this -- a lot of this

15     jargon and analysis adds anything, and I think it potentially

16     misleads the jury into thinking that you would -- that, as a

17     matter of forensics, you can just look at this and say he

18     didn't do it because it's not in this account.

19          MR. EKELAND:  My understanding of what he's doing

20     here is that he's applying the standards that he was trained

21     in.  It's very rigorous training in becoming a certified fraud

22     examiner.

23              And what he's -- the, quote-unquote, jargon he's

24     using are the standards that he was taught to employ while

25     doing a financial analysis, and I don't read this as him

1      stating an ultimate conclusion regarding Mr. Sterlingov's guilt

2      or innocence.

3           But I read this as him saying, this is the type of

4      analysis that you apply, per my training as a CFE, and the

5      government didn't use the standards here in analyzing

6      Mr. Sterlingov's finances and --

7           THE COURT:  There's just no relevance to that, and

8      there's a risk of misleading the jury with that.  Because I

9      don't believe the government is arguing otherwise.  The

10     government is not saying we've done the math and, in fact,

11     we've accounted for every dollar he would have earned on our

12     theory of the case.

13          And so to say -- I'm not sure I understand the

14     relevance of saying that the government didn't use the proper

15     CFE tools for purposes of tracing the funds, when the

16     government isn't arguing that it's accounted for all the funds

17     that it says were earned.

18          The problem is that it's creating a false impression

19     that that's what the government is saying here and, therefore,

20     the government's case is wrong because -- here the government

21     says and suggests that it's found all the money, and that's

22     crazy.  And if you apply the net worth analysis instead of

23     using a net income analysis, it's going to show X.  It doesn't

24     matter which of those things you do.  It's going to come out

25     exactly the same, which is they have not accounted for all the

 1   funds.

 2            MR. EKELAND:  Your Honor, we submit it does matter.

 3   We submit it is relevant, and particularly in light of the

 4   proposed expert testimony from Ms. Glave and her summary

 5   slides.  And we're concerned that she's going to come in and

 6   argue a whole bunch of conclusions that weren't disclosed in

 7   her expert disclosure.

 8            It's very thin in comparison to Mr. Verret's based on

 9   our initial review of her slide deck.  And we think that she

10   may come in and try to opine that there's no way Mr. Sterlingov

11   can have the assets that he had just by being an early investor

12   in Bitcoin.  That's hard for us to tell because there's nothing

13   clear in her disclosure.

14            Again, we ask if Professor Verret is going to be held

15   to these standards, that those same standards apply to

16   Ms. Glave.

17            THE COURT:  That's a fair point, Mr. Ekeland.  We

18   have the advantage here that she's going to testify first.  And

19   if there's something that Mr. Verret has to offer to contradict

20   something that she's testified to -- so if she takes the stand

21   and testifies that the amount of funds that were in the Kraken

22   accounts or the other accounts that were seized is more than

23   you would believe that he would have if he was simply relying

24   on the accreted value of Bitcoin over time, I think it's fair

25   that Mr. Verret can respond to that and say, no, actually, it

1     is consistent with the amount of money that you would expect to

2     find based on the accreted value of the Bitcoin over time.  I

3     think that's perfectly fine.

4          What I'm objecting to is, sort of, the sum notion

5     that there's some equation here and that he's dressing it up in

6     a way that makes it sound like everything the government has

7     seized must be all the assets that were out there and that this

8     is a matter of accounting.  You've got your assets and

9     liabilities side and, you know, I've done the math here.

10          On the one side here is what his assets were, and on

11     the other side here is what he, ultimately, had; and,

12     therefore, it proves that he didn't commit any crime because

13     if -- you would have expected to find additional money in those

14     accounts.  By dressing that up in the terms of accounting and

15     so on versus just the commonsense point, which I think the jury

16     can draw on its own.

17          But I think your point is a fair one, and maybe we

18     just have to wait and see what the government's witnesses say.

19     I think it's fair that Mr. Verret be allowed to respond to that

20     and take issue with what they say.

21          MR. EKELAND:  Understood, Your Honor.  Would you like

22     to continue --

23          THE COURT:  Yes.

24          MR. EKELAND:  -- on the disclosure?  So I believe

25     we're on paragraph No. 4 now.

1           "Mr. Verret will testify to the pattern of transfers

2    from what Chainalysis describes as the 'Bitcoin Fog cluster' to

3    accounts owned by Mr. Sterlingov and how they do not show any

4    recognizable pattern that might in some way link

5    Mr. Sterlingov" -- I think there's a word missing here -- "to

6    the operation of Bitcoin Fog.  Mr. Verret will rely upon his

7    training as a certified valuation analyst and experience as

8    chief economist and senior counsel for the U.S. House Financial

9    Services Committee to show how the government's attributions

10   appear to be just a random pattern more in line with a regular

11   Bitcoin investor using Bitcoin Fog to obtain some measure of

12   personal privacy."

13          THE COURT:  All right.  I'll wait to hear what the

14   government has to say on this one.  I think we've already

15   touched on 5.

16          MR. BROWN:  Your Honor, are you asking for me to --

17          THE COURT:  If you want to address it, you're welcome

18   to address 4 now if you like.  Given how many there are, this

19   may be easier to do it one at a time.

20          MR. BROWN:  Very good, Your Honor.

21          On No. 4, first of all, to the extent Mr. Verret is

22   planning to testify about Bitcoin transfers from the Bitcoin

23   Fog cluster, he made it very clear that what he considers

24   blockchain analysis is not actually what Mr. Scholl,

25   Ms. Bisbee, or Ms. Still do.  This is totally outside of any

1    sort of expertise that he has.

2          The latter part of this -- and recognizable pattern,

3    I don't know what a recognizable pattern is.  He certainly

4    didn't testify about it.  He certainly doesn't have any basis

5    or knowledge, and it has not been disclosed.

6          The attributions appear to be just a random pattern

7    more in line with a regular Bitcoin investor using Bitcoin Fog

8    to obtain some measure of personal privacy.  This is just -- I

9    mean, again, he's talking about doing some sort of pattern

10   recognition blockchain transactions for which he has no

11   experience, no expertise.  And I don't think he has any

12   expertise in what is or is not a regular Bitcoin user versus a

13   Bitcoin -- the operator of a darknet service.

14         That's something that affects a lot of these other --

15   these other proposed disclosures.

16         THE COURT:  All right.  Mr. Ekeland?  What is

17   Mr. Verret's expertise regarding Bitcoin Fog clusters and the

18   sort of tracing of transactions involving Bitcoin?

19         MR. EKELAND:  You know, I mean, his CV references his

20   experience with digital currencies in general.

21         And as I believe the Court referenced, when it came

22   to Ms. Bisbee, he doesn't -- you don't need an in-depth

23   knowledge of, say, the tracing software or anything, and I

24   think he certainly understands the --

25         THE COURT:  Has he done tracing one way or the other,

1      even with someone else's software?

2              MR. EKELAND:  That, I would have to -- I won't speak

3      off the top of my head on that.  That's entirely possible.  It

4      wouldn't surprise me.  I think he sits on the Zcash Foundation,

5      if I recall correctly.

6              And I know he does have extensive experience with

7      cryptocurrencies and teaches it -- you know, classes in

8      relation to cryptocurrency at the law school he teaches at.

9      He's not somebody -- I mean, I think, arguably, he has as much

10     experience as any of the other government witnesses in terms of

11     just general knowledge of cryptocurrency.

12             I don't think the basic concepts of -- you know,

13     service fees being paid out of the Bitcoin Fog cluster, that

14     concept is, essentially, the same as any kind of royalty

15     payments, and I think, you know -- the Court made the analogy

16     in one of their previous hearings that this is just a little

17     bit like any other financial, kind of, fraud case.  I think in

18     this aspect, that's right.

19             You would -- what he's saying is you would expect

20     what he sees in his expert opinion as a certified fraud

21     examiner doesn't match what he would expect to see from

22     somebody who is getting royalty payments from what the

23     government has, essentially, characterized as a money

24     laundering scheme.

25             That, I don't think, turns on the nature of the

1     technology so much as just basic understanding, you know, from

2     a fraud examiner's viewpoint of particular patterns which are

3     recognizable across technology.

4              THE COURT:  Although, I have to say, maybe this just

5     goes to the weight of the evidence.  I'll have to think about

6     that.

7              But it strikes me as, sort of, absurd to suggest that

8     you get somebody who is running an illegal exchange, and

9     they're getting paid a percentage on it.  To think that they're

10    going to then have that traceable paycheck at the end of the

11    month -- and here's my paycheck; every month it goes into some

12    other account outside of the mixer.

13             And the whole point of this is you're dealing --

14    allegedly dealing with sophisticated people who are hiding

15    transactions.  And the notion that -- all this testimony is to

16    say, well, look, if he were doing this -- I know people who get

17    royalties on their textbooks, and my colleagues do, and every

18    month they get a check for $42.30 that shows up in their bank

19    account, and you don't see anything like that here for him.

20             That just strikes me as so ill-informed as to suggest

21    a lack of expertise, if that's what the testimony is with

22    respect to people who are engaged in illegal -- I mean, if

23    that's all he's saying, I would have expected every month for

24    him to be getting a check or a payment that came out for --

25    based on his illegal gains.

1            And maybe -- I don't know if you know what he means

2       by the recognizable pattern, but if that's what he means, it

3       just doesn't seem like there's much of a basis for that

4       assertion.

5            MR. EKELAND:  I don't think that's necessarily what

6       he means.  I think what he's testifying to is that this is

7       completely compatible with normal innocent behavior.  And one

8       of the issues here that I think is -- that the government is

9       sort of appealing to this -- kind of the darknet and the, sort

10      of, exotic nature of this technology, I think, in the hopes

11      that the jury -- because most people don't understand this

12      technology.

13           I think the reason that his expert testimony here is

14      so crucial is that what he's saying here is that there's

15      nothing necessarily nefarious about what's going on here, and

16      we would expect if he was getting royalty payments and that

17      these represented the royalty payments, first of all, it

18      doesn't add up right.

19           Now, if there's some mystery pool of assets that

20      hasn't been discovered, the government has the burden of proof

21      there.  Of course, they can argue in closing to the jury that

22      maybe somehow --

23           THE COURT:  I think I've said now more than a dozen

24      times probably that if it's just that math, I'm completely fine

25      with it.  And then you can argue to the jury and the government

1    can argue to the jury what conclusions to draw from that.  That

2    is five minutes of testimony.

3         And I was able to confirm that, in fact, Mr. Verret

4    did testify at the *Daubert* hearing that he's never used any

5    blockchain tracing tool.  So to the extent that he's purporting

6    to express opinions with respect to blockchain tracing, I don't

7    see any basis to conclude that he has expertise in the area.

8         And with respect to recognizable patterns, I guess

9    I'd like to know a little bit from you, Mr. Ekeland, what

10   the -- what that pattern is.  What is the pattern that he's

11   using?

12        MR. EKELAND:  If I can just back up to his training,

13   Your Honor.  Since he testified, I do know that he's gone

14   through CipherTrace's training, which is a two-day training on

15   blockchain tracing.  But in terms of the pattern, we -- the

16   government can cross on that.

17        I don't know if he's referring to any sort of

18   standard pattern from, like, his CFE training or not.  But one

19   thing that --

20        THE COURT:  The answer to my question is you don't

21   know what pattern he's looking at then?

22        MR. EKELAND:  No, I don't.

23        THE COURT:  Okay.

24        MR. EKELAND:  Your Honor, if I may add that the

25   government has noticed Larry Harmon as a witness.  And I think

1    on Friday, you know, there's going to be some issues that the

2    defense is going to have with the government's noticed

3    witnesses in terms of relevance and 403 issues.

4         One of the things we anticipate them using Mr. Harmon

5    to testify about is to say, well, you know, I disguised my

6    service fees I got from Helix as normal user fees; and, you

7    know, that puts us in the strange position where, you know,

8    it's almost like the defense is being given the burden of proof

9    to show that what looks completely normal and what's, you know,

10   consistent with completely innocent behavior is somehow

11   everywhere and every turn in this case being construed in the

12   negative and nefarious.

13        That's what I think Mr. Verret is getting at.  That

14   this is really -- from his expert opinion as a certified fraud

15   examiner, this is consistent with innocent behavior.  You need

16   something more than this kind of speculation.  You need some

17   sort of corroborative evidence to go any further.

18        THE COURT:  The point that you've just made now is

19   just argument.  I don't think it's expert testimony.

20        And as I said, I did think that when he was on the

21   stand, he sounded more like a defense lawyer than he did like

22   an expert to me.  That was one of the concerns I had.

23        I do think it's a fair point that he should be

24   entitled to rebut testimony from the government.  If the

25   government says -- offers testimony that there are certain

1    patterns that are nefarious, he, I think, should be allowed to

2    testify and say it's not nefarious if he has a basis for doing

3    so.

4          And I'm going to have to look at this more carefully

5    to conclude whether he has the expertise with respect to any

6    tracing.  As I said, he did testify that he's never used any

7    tracing tool in the past.  I'm not sure that a two-day

8    course -- I'd have to look a little bit more carefully to say

9    whether that's sufficient.

10          MR. BROWN:  Your Honor, there's also a disclosure

11    issue.  And whatever pattern he claims to have identified has

12    not been disclosed to the government.

13          Your Honor, setting aside -- let's assume arguendo

14    that he did have -- he was qualified to do blockchain tracing.

15    Like many of these things, the government has no objection to

16    him performing calculations or number crunching.  It's taking

17    that next step where -- and a lot of this is, really -- the way

18    that it's framed is kind of a no true Scotsman fallacy where he

19    says no true operator of Bitcoin Fog would do X.  That's a back

20    door to make these arguments about the evidence.

21          The government has no objection to him simply putting

22    up calculations that he's qualified to make and leaving it at

23    that, and then defense counsel can make arguments at closing

24    about what that proves.

25          THE COURT:  All right.  Let's move on to 6 then.

1          MR. EKELAND:  Yes, Your Honor.  No. 6.  I guess we're

2    skipping 5?

3          THE COURT:  5, I thought, we already addressed.

4          MR. EKELAND:  We did, Your Honor.  I agree.  I'm

5    sorry.

6          MR. BROWN:  I'm sorry to interrupt, Your Honor.  On

7    5, we have no objection, but I want to point out that defense

8    counsel has raised doubts about whether you can value Bitcoin

9    from 2009.  I'm not sure if that's inconsistent with the

10   previous positions taken.

11         THE COURT:  I think I noted that a moment ago myself,

12   but we'll see how that plays out.

13         MR. BROWN:  We don't object to that.

14         THE COURT:  All right.  6?

15         MR. EKELAND:  Yes, Your Honor.  "Mr. Verret will

16   explain how the creator of the Bitcoin Fog service displays an

17   expert-level knowledge of blockchain privacy concepts, like

18   anonymity set, transaction history, and post-mix privacy.

19   Mr. Verret will explain these concepts and how he teaches them

20   to students at George Mason University.

21         "He'll emphasize how someone with the expertise that

22   the creator of Bitcoin Fog has exhibited would not send the

23   proceeds from running a mixer back to their own KYC'd accounts.

24         "Mr. Verret will testify that a skilled privacy

25   programmer would be significantly likely to send any proceeds

1    into account logins purchasable on the Tor network sites and

2    then swap them out or transfer them from there.  Mr. Verret

3    will also testify that an alternative to that method would be

4    to trade the proceeds peer to peer to effectively obfuscate

5    their source."

6             THE COURT:  So I'll let Mr. Brown address this as

7    well.  But my reaction to this is that some of this seems okay.

8    Again, it feels like he's stepping over the line and being an

9    advocate.

10            So if he wants to testify -- or if you want him to

11   testify and say that here are the various ways in which someone

12   who is seeking to hide their identity in obtaining a login on

13   the Tor network could do so in a way in which no one would be

14   able to trace and know who they are, that strikes me as fine.

15            If he knows the tools and the ways that people could

16   do it -- and a theory here is that the government argues that

17   Mr. Sterlingov let his guard down in some way and engaged in

18   some transactions in which they know that he originally bought

19   the -- I can't remember what it was -- but the credentials for

20   Bitcoin Fog -- or what is the -- what is it that he purchased?

21            MR. EKELAND:  It's the -- the government is alleging

22   and we're disputing that Mr. Sterlingov in 2011 purchased,

23   basically, the domain name for the clearnet website.

24            THE COURT:  Right.  That's what it was.  You know, if

25   he wants to say, here are the ways in which someone can

 1      purchase a domain name in which it's not traceable, that's

 2      fine.

 3             And then you can argue to the jury and say the

 4      government's theory here in this case is that Mr. Sterlingov is

 5      the most brilliant fraudster ever to exist, and he's hidden his

 6      assets and done X, Y; and yet, you heard Mr. Verret testify

 7      that he easily could have done the following things.  Why would

 8      somebody who is trying to hide their identity -- that's

 9      perfectly fine for your argument.

10             It's not -- the witness ought not be arguing to the

11      jury about those, sort of, inferences and how they play with

12      respect to the ultimate questions in the case.  But he can --

13      certainly, I don't see any problem with him testifying saying,

14      I teach my students that if you want to hide your identity when

15      you're purchasing a domain name, here's how you go about doing

16      it.  And the government can cross on that, and that's fine.

17             Then you can use that as a tool however you like in

18      arguing the case to the jury.  I just -- what I'd object to is

19      him putting himself into Mr. Sterlingov's shoes and saying --

20      you could assume that Mr. Sterlingov didn't -- he's smarter

21      than that; here's all the things he could have done.  The

22      government must be wrong about this, because Mr. Sterlingov

23      could have done it; or that he says Bitcoin Fog would not send

24      proceeds -- I don't know how he knows what that person would or

25      wouldn't do.

1          I mean -- so I think he can testify that all the

2     things you can do to hide your identity, and then you can argue

3     to the jury about whether someone who was allegedly a

4     sophisticated money launderer would commit such a misstep as to

5     allow his identity to be revealed.

6          MR. EKELAND:  Yeah.  I think I understand the Court's

7     point in terms of ultimately testifying to ultimate conclusions

8     for the jury.  I would just ask for a little nuance

9     explanation, if I may, for my understanding.

10          So when he's -- in No. 6 he says, for instance, will

11    testify that a skilled privacy programmer would significantly

12    likely send any proceeds into an account, logins, purchasing a

13    Tor network, such and such, is it -- in the Court's eyes, is it

14    permissible to say, well, you know, I teach privacy at George

15    Mason University, I'm an expert in this area, and in my expert

16    opinion it's highly unlikely that somebody who shows the level

17    of sophistication I'm seeing with Bitcoin Fog would put their

18    money in a know your customer Kraken account?

19          THE COURT:  I think if you want --

20          MR. EKELAND:  Expressing it in --

21          THE COURT:  I think that if you want to testify to

22    that, I would require some hard data or studies.  And if he can

23    say that, you know, I've looked at 100 cases and in every

24    single one of the hundred cases, this is what they did, I think

25    he can testify to that.

 1          As soon as he starts saying, this is what someone

 2     would do, that feels to me more like argument to the jury from

 3     counsel versus him saying, I can tell you, based on my

 4     experience of looking at a hundred cases, this is how every one

 5     of those hundred cases was done.  Is that fair?

 6          MR. EKELAND:  Understood.  Understood, Your Honor.

 7          THE COURT:  Okay.

 8          MR. EKELAND:  No. 7?

 9          THE COURT:  Let me see if Mr. Brown had anything else

10     he wanted to add on this.

11          MR. BROWN:  Your Honor, I think the guardrails that

12     the Court just outlined are totally acceptable to the

13     government.  It's just, to the extent it sort of strays into

14     nobody like Mr. Sterlingov or nobody who runs Bitcoin Fog would

15     do X; but if I understand the Court, that's where the boundary

16     line is.

17          THE COURT:  That is correct.  I do worry -- and I

18     think, Mr. Ekeland, this is going to be your responsibility to

19     make sure that the witness doesn't stray into this stuff

20     because the last thing I want to be doing in front of the jury

21     is myself being the one to have to restrain the witness and

22     saying -- say to the jury -- saying to the witness, that's not

23     appropriate testimony, I'm going to strike it and direct that

24     the jury disregard anything, perhaps even say that there's not

25     an adequate foundation for that testimony.

1          So I don't want to be in a position in which he's

2    blurting things out, and then I'm trying to do cleanup

3    afterwards.  That's going to be your responsibility to make

4    sure we don't have to do that.

5          MR. EKELAND:  Understood, Your Honor.

6          THE COURT:  All right.  7?

7          MR. EKELAND:  Mr. Verret -- paragraph 7.  "Mr. Verret

8    will testify that, because Mt. Gox was repeatedly hacked,

9    there's a distinct possibility that a third-party hacker may

10   have used Sterlingov's Mt. Gox account" -- and I think it's

11   missing a word here -- "the purpose of obfuscating his own

12   unlawful transaction."

13         THE COURT:  I think we've covered this topic with

14   others already.  And my view is the same with respect to this.

15   In fact, my recollection is that Mr. Verret, if anything, knew

16   less than others about Mt. Gox.  He may have been the one who

17   said he saw a YouTube or something about it at some point, but

18   I don't think he knows anything about what files were hacked,

19   how they were affected.

20         And I think that it's more prejudicial than probative

21   to say that I heard that there were hacks, and if there were

22   hacks, it's always possible that it affected the data in this

23   case, where there's not a basis for drawing anything beyond,

24   sort of, the most rank form of speculation.

25         I think that's the case here.  So my view is the same

1    with respect to this one as I've indicated otherwise.

2              MR. EKELAND:  Understood, Your Honor.  No. 8.  "Mr.

3    Verret will testify that privacy measures are regularly

4    employed by users of cryptocurrency and that efforts to

5    maintain financial privacy are not, as the government

6    repeatedly suggests in their filings, something suspicious or

7    illicit in and of itself."

8              I think part of this is this disclosure was for the

9    *Daubert* hearings.  I don't think he needs to reference

10   government filings at trial.  But I think the point being is

11   that he's just going to testify in general.  I think this would

12   be helpful for the jury to know that, you know --

13             THE COURT:  I have no objection with him testifying

14   that at times people use cryptocurrency for purposes of

15   maintaining their financial privacy that is unrelated to

16   illicit activity.

17             As I said, I mean, I think that that will invite,

18   inevitably, the question on cross-examination, which I'm sure

19   you will be prepared for of saying you would concede, wouldn't

20   you, that people do also at times use cryptocurrency to hide

21   illegal activity?  You've heard of Silk Road, for example,

22   you've heard of -- and you rattle off the list.  And that's all

23   fair game both ways.

24             But I think that it's a fair point for him to draw

25   that they're not everything; not every use of cryptocurrency is

1          for purposes of hiding illicit gains or activity.

2                    Okay.  9?

3                    MR. EKELAND:  No. 9.  "Mr. Verret will testify that

4          'wrench attacks' (assaults and kidnapping) against Bitcoin

5          holders are a real threat to crypto users, in part, because it

6          is easier for a kidnapper or thief to demand that the victim

7          transfer large quantities of money in the low-friction

8          environment of crypto self-custody relative to the higher

9          friction environment of withdrawing large quantities of cash

10         out of a bank.

11                   "See as one example DOJ, U.S. Attorney's Office,

12         Southern District of New York, press release 'Two men charged

13         with a plan to commit house -- home invasion robbery for tens

14         of millions of dollars in Bitcoin.'"

15                   Then there's a hyperlink.  And it says, "Mr. Verret

16         will testify that privacy measures, such as mixing services,

17         are one way that crypto users prevent such attack."

18                   THE COURT:  Mr. Brown?

19                   MR. BROWN:  Your Honor, I'm not sure how much basis

20         there is for this.  Frankly, the government doesn't object to

21         this.

22                   THE COURT:  I mean, that's a little bit of my

23         reaction to it as well.  Again, I think that this is -- just

24         invites cross-examination of, okay -- of the millions of

25         transactions, how many times has this occurred, to your

1    knowledge?  But if he wants to offer it, that seems okay.

2                 MR. BROWN:  Yes, sir.

3                 THE COURT:  All right.  10?

4                 MR. EKELAND:  Paragraph 10.  "Mr. Verret will testify

5    that totalitarian regimes around the world have used blockchain

6    tracing to abuse human rights protestors."  And I think this is

7    just sort of a subcategory of paragraph 9.

8                 THE COURT:  That doesn't seem right to me.  That

9    strikes to me as -- I don't know.  But this feels a little bit

10   to me like you're suggesting to the jury that Chainalysis and

11   those folks are sort of somehow in cahoots with totalitarian

12   regimes.  It seems like an attack on blockchain analysis.

13                MR. EKELAND:  That's not the point, Your Honor.  As

14   Chainalysis itself in one of the reports we referenced states,

15   90 percent of users of mixers do so for legitimate privacy

16   concerns.

17                And so what the -- I think the defense is getting at

18   here is that, you know, the government wants -- and I'm sure

19   this is -- I expect them to do this in their case.  They want

20   to paint all these privacy tools, like the Tor network

21   and mixers, as some sort of criminality -- for criminal

22   purposes, when the majority of people who use the tools use

23   them for legitimate reasons.  These are concrete examples of

24   their uses; safety, protecting your assets, and -- I mean, the

25   Tor network itself is used all over the world by political

1    dissidents.

2         So what this testimony goes to -- and I think it

3    would be helpful for the jury to understand -- is that there's

4    legitimate uses for these privacy tools, and there's a lot of

5    people who use them for those reasons.

6         THE COURT:  Let's back up for a minute.  Is that

7    quantifiable in any way?  Does he know -- does he have any

8    knowledge one way or the other about whether -- has he

9    interviewed people?  What is his basis for saying lots of

10   people use it for this purpose?

11        MR. EKELAND:  Chainalysis has reported that.

12        THE COURT:  I'm not asking you what your basis is.

13   I'm asking what his basis is for it.

14        MR. EKELAND:  I can't say off the top of his [sic]

15   head because I can't speak for him on that point, Your Honor.

16        THE COURT:  And how often has this happened?  I mean,

17   at least you gave me an example with No. 9.

18        Are there examples that you can point me to where

19   totalitarian regimes have used blockchain analysis to abuse

20   human rights protestors?

21        MR. EKELAND:  We're happy to -- well, on there --

22   we're happy to submit that if we can -- what we can find to the

23   Court by Monday at 5:00 on it.

24        THE COURT:  I mean, the problem is this is supposed

25   to be disclosed in the expert reports.  Has he pointed to

1    anything or identified anything?

2           It's getting a little late to be, sort of -- I don't

3    want your testimony.  I want his testimony on his things.  So

4    the question is, is there anything that he's identified?

5           MR. EKELAND:  Not that I'm aware of off the top of my

6    head, Your Honor.

7           THE COURT:  All right.  Well, I'm not going to allow

8    it at this point.  If you can point me to something that he's

9    actually relied upon or identified, then it's okay.

10          MR. EKELAND:  Understood, Your Honor.

11          THE COURT:  11?

12          MR. EKELAND:  No. 11.  "Mr. Verret will testify that

13   the Bitcoin Fog mixing service was an early tool to address

14   these legitimate privacy concerns and that, according to the

15   government's own estimates" -- I believe here he's referring to

16   the Chainalysis report, which isn't the government -- "most of

17   the activity in the Bitcoin Fog mixer was legitimate."

18          THE COURT:  Well, if he wants to point to the

19   Chainalysis report and he's actually relied on a Chainalysis

20   report that says most of it is legitimate, I don't see a

21   problem with it.  Mr. Brown?

22          MR. BROWN:  Your Honor, we don't disagree.  I would

23   point out the first part -- well, two additional points.

24          With defense counsel's clarification that he's

25   referring to Chainalysis estimates, not the government's, I

1    think that helps --

2              THE COURT:  Right.

3              MR. BROWN:  -- me to understand what that is supposed

4    to be saying.

5              The first clause of this, it just seems like he's

6    just commenting about the case.  You know, we don't object if

7    he wants to bring up a Chainalysis study that says, if it does,

8    most of the activity in Bitcoin Fog was legitimate.  I question

9    whether that's an accurate representation of whatever

10   Chainalysis is saying.  It might be that it's not known to be

11   illegitimate, which is not the same as saying --

12             THE COURT:  This ought to be tied to whatever

13   Chainalysis said and whatever report he's relying upon.  He's

14   allowed to bring that to the jury's attention.

15             MR. BROWN:  Yes.

16             THE COURT:  12?

17             MR. EKELAND:  No. 12.  "Mr. Verret will testify to

18   the findings in multiple public reports, including those done

19   by government contractor Chainalysis, and testify that most

20   transactions sent through mixing services like Bitcoin Fog are

21   done for legitimate privacy concerns and are not illicit.

22   Mr. Verret will describe how comparable analysis of BSA/AML

23   regimes by international financial regulatory bodies

24   demonstrate that a comparable percentage of illicit finance

25   runs through traditional banking institutions and how simply

1    using Bitcoin Fog would not lead one to automatically suspect

2    that using it was somehow illicit."

3          And there he cites the Chainalysis report, crypto

4    mixer usage reaches all-time highs in 2022.  There's a

5    hyperlink.  And then there's an article from the Organization

6    for Economic Development and Cooperation entitled, I believe,

7    "Illicit Financial Flows from Developing Countries Measuring

8    OECD Responses."

9          And then there's a couple more articles cited.  I

10   think that goes just to what we were talking about before.

11         THE COURT:  My answer on this is the same, which is I

12   think commentary and argument concerns me, but to the extent he

13   wants to simply report what are in these studies to the jury,

14   he's entitled to do so.  And then you can argue to the jury

15   what inferences to draw from that.

16         So if he has reliable sources and wants to note that,

17   according to OECD reports, for example, that there is such a --

18   X volume of money laundering occurs through brick-and-mortar

19   banking institutions around the world, that's fine.  If he

20   wants to cite to a Chainalysis report and quote from it as to

21   whatever it says, that's fine.

22         I would just ask that he stick to whatever those

23   reports say and not twist what's in the reports but rather just

24   simply report what they say.

25         Any objection to that, Mr. Brown?

1          MR. BROWN:  No objection, Your Honor.

2          MR. EKELAND:  Understood, Your Honor.

3          THE COURT:  Paragraph 13?

4          MR. EKELAND:  Paragraph 13.  "Mr. Verret will testify

5    that attribution property ownership is a vital element to

6    financial forensic investigations done in compliance with

7    recognized standards.  Mr. Verret will rely upon his CFF and

8    CFE designations, his experience as a fraud examiner, and his

9    review of the DOJ's published best practice that directs

10   employees of federal agencies how to appropriately collect and

11   process material in crypto financial forensics investigations."

12          And he cites, See Michele R. Korver, C. Alden Pelker,

13   and Elizabeth Poteat -- if I'm saying that right -- and the

14   title in quotations is "Attribution in Cryptocurrency Cases,"

15   Department of Justice Journal of Law and Practice, from

16   February 2019 at page 233.  And he gives a hyperlink.

17          THE COURT:  Can you explain to me a little bit more

18   of what this means.  I'm not sure I follow.

19          Do you simply mean that you -- if you think somebody

20   is stealing, you want to find the goods?

21          MR. EKELAND:  I think, if I understand this

22   correctly, Your Honor, is that what he's trying to say is you

23   have to identify -- before you're going to do some sort of

24   forensic financial analysis of somebody like I believe

25   Ms. Glave is going to attempt -- or attempt to testify to, you

1    need to identify and attribute all the assets you can.  And

2    he's merely, I think, referring to the standards that are

3    recognized and are discussed in the DOJ manual as part of

4    financial forensic analysis.

5              THE COURT:  All right.  Mr. Brown?

6              MR. BROWN:  Your Honor, just two quick points.

7    Number one, I'm not sure just the relevance of he'll testify

8    about the attribution of property ownership is a vital element,

9    et cetera, et cetera.  And also just, to the extent that he's

10   relying on some characterization of DOJ policies, he testified

11   explicitly he's not -- he has no expertise in DOJ policies.

12   "The internal policies of Department of Justice, no, I wouldn't

13   hold myself out as an expert in DOJ policy."  That's a direct

14   quote; page 133.  It's also not a policy doc.

15             THE COURT:  I'm sorry?

16             MR. BROWN:  It's also not a policy document.

17             THE COURT:  Right.  You know, I probably ought to

18   take a look at the document here.  I am concerned that it's,

19   frankly, just being used to take a shot at Ms. Pelker, and that

20   it's of borderline relevance.  I will take a look at it and see

21   whether I really think it is relevant here or whether it's more

22   the nature of trying to take a shot at Ms. Pelker.  So I will

23   look at that.

24             MR. EKELAND:  Your Honor?

25             THE COURT:  Yes.

1          MR. EKELAND:  I think what he's talking about is best

2     established practices in relationship to property attribution,

3     not necessarily DOJ policy; but understood.

4          THE COURT:  Also, I mean, if this really is a

5     recognized practice of all of the documents out there that

6     might support recognized practice, the notion that he would

7     cite to a Department of Justice Journal of Law and Practice

8     article that, apparently, is just published online, at least --

9          MR. BROWN:  Your Honor --

10          THE COURT:  -- it makes my antenna go up to say that

11     this is more about taking a shot at Ms. Pelker than it is at

12     establishing what the recognized practice is.

13          If this really is a recognized standard, there's got

14     to be something beyond an article that Ms. Pelker's name is on

15     that is published online to support that proposition.  If the

16     only source for it is the article that Ms. Pelker has published

17     online, then I'm less convinced that this is some established

18     recognized standard.

19          MR. EKELAND:  I take the "See" in the citation to

20     indicate that it's not an exclusive list of just one article,

21     but he's -- understood, Your Honor.

22          THE COURT:  Okay.  I'm doubtful about -- certainly,

23     about citing to the Pelker article on this, and I'm not sure I

24     understand the point.  But I will take a look at this one a

25     little more carefully.

```
 1              MR. EKELAND:  Thank you, Your Honor.
 2              THE COURT:  Let me just pause for a second here.  The
 3    court reporter has been going a long time now, and we're only
 4    up to 14.  She was handling all the other matters that you
 5    weren't handling.
 6              So I guess what I'm inclined to do, if it's okay with
 7    the court reporter, is do maybe another two of these, and then
 8    I think we're going to maybe have to put the rest of it off
 9    until Friday.
10              MR. BROWN:  Very well, Your Honor.  We do have a few
11    questions and housekeeping items before we break for the day.
12              THE COURT:  Well, maybe we should do that instead.
13    Why don't we pause here and do those matters, and we can come
14    back to this on Friday.
15              MR. BROWN:  So, Your Honor, we had one question in
16    terms of witness sequencing.
17              THE COURT:  Yes.
18              MR. BROWN:  The question has to do with out-of-order
19    witnesses, in particular relating to our translators.  For
20    example, we will have translations that we want to introduce
21    into evidence.  And given the defense position, we're prepared
22    to offer our translators as witnesses, but we want to get the
23    Court's position about whether the translators need to proceed
24    or whether we can admit translated documents conditionally
25    subject to the translators coming in.
```

1          THE COURT:  Mr. Ekeland, what's your view on that?

2          MR. EKELAND:  That's a -- can I reserve on that?

3     Otherwise, I'm going to be inclined to say I want the

4     translator to come up first before the document is

5     conditionally offered.

6          We are hoping -- I'm hoping to talk to Mr. Pearlman

7     over the weekend and early next week via email to try and

8     resolve these translation issues, or at least whittle them down

9     to where there's a clear disagreement.  And I'm hoping that

10    access to our client -- which has really, I think, been the

11    hurdle here -- will alleviate this problem.

12         So if I have to take a position right now, then I'm

13    going to say we want the translator up first to be able to

14    challenge anything before it's offered.  But I would rather try

15    and get through the weekend and try to work something out

16    before I would take that position.

17         MR. BROWN:  Your Honor, this is -- setting aside the

18    translation issue substantively, this is more of just a trial

19    management question.  And, relatedly, the other sequencing

20    question is to the extent that there are electronic -- there

21    are documents, for example, retrieved from an electronic

22    device, you know, would we have to lay the full groundwork, the

23    chain of custody and the extraction before hearing testimony

24    about those documents?

25         The issue here, especially for the devices, is we

1    will have to recall witnesses multiple times just the way --

2    the nature of the way the evidence has to come in.

3                    THE COURT:  Right.

4                    MR. BROWN:  We would have to call a witness to talk

5    about the electronic device extraction, call another witness to

6    talk about what was found on it, call that first witness to

7    talk about interpreting the terms or whatever are in the notes

8    that were retrieved from the device that was in the possession

9    of Mr. Sterlingov.

10                   It would be just in terms of trial management; given

11   that this is a very long trial to begin with, it would be just

12   much more efficient to be able to take some evidence out of

13   order in that sense.

14                   THE COURT:  Why don't I leave it like this.  Why

15   don't you or Mr. Pearlman confer with Mr. Ekeland about this

16   over the weekend.  I'm going to direct that the parties file a

17   joint status report on Monday by 5:00 p.m.  I know you've got a

18   lot going on.

19                   But particularly with respect to the translation,

20   Mr. Ekeland, it's going to make a difference to me of what the

21   nature of the differences of opinion are.  And if it's a

22   difference of opinion about whether a word in French is best

23   translated to mean deposit or put, it's going to be very hard

24   for me to see any prejudice to putting that in front of the

25   jury -- putting it in front of the jury; and then you can, if

1    need be, put your witness on the stand and the government can

2    put its witness on the stand and you-all can dispute whether

3    the word is put or deposit.  And that's all fine, and it's not

4    going to cause any prejudice to take that out of turn that way.

5            On the other hand, if there's evidence that might,

6    actually, be excluded -- it seems unlikely to me that I'm going

7    to then conclude that the evidence ought to be excluded.  It's

8    much more likely that I'm going to say it's up to the jury to

9    decide whether the better translation is the word put or

10   deposit.  And I suspect both are legitimate translations or

11   interpretations and that one may fit the context better, and

12   the jury can decide.

13           On the other hand, if there is evidence which could

14   be highly prejudicial where there's a significant question

15   about whether it should come in or not, and -- hypothetically,

16   there's a note in Russian from Mr. Sterlingov that says, great

17   idea, I'm going to create Bitcoin Fog to launder money -- and

18   there's a chain of custody question about whether that actually

19   was his or somebody else's, I'm not going to say, well,

20   conditionally let's put it in and then I'll decide later

21   whether it's properly admitted or not.  It's going to depend on

22   the context.

23           So I'll let you confer.  Tell me what the actual

24   disputes are about, if there are any that remain, and then I

25   can decide.  I may have to decide.  I know you need some

1    guidance as to when to have people here, but we can also talk

2    about this a little bit on Thursday and Friday, if need be, if

3    it's a matter of just figuring out when to have folks here.

4            But, hopefully, the parties can work things out.  I

5    think the bottom line is --  and I hope this is the parties'

6    attitude about this as well -- if it makes a difference, I

7    understand why you might want to determine admissibility first.

8    If it doesn't make any difference, let's do what is easiest for

9    the jury and is going to get us through the case as quickly as

10   possible.

11           MR. BROWN:  Very good.

12           THE COURT:  I'm sorry.  Mr. Ekeland, was there

13   something you wanted to say?

14           MR. EKELAND:  Mr. Brown can proceed, and then I can

15   say what I was going to say.

16           MR. BROWN:  I didn't want to interrupt.  I can't see

17   Mr. Ekeland, so I don't know when he's starting to speak.

18           We have another matter to raise before we leave, but

19   if Mr. Ekeland wants to respond.

20           THE COURT:  Anything on that issue before we turn to

21   the next matter, Mr. Ekeland?

22           MR. EKELAND:  Just very quickly.  It's -- hopefully,

23   the main issue with the translations is just our client being

24   able to review them.  He asked us to hold off on certifying

25   them until -- because of what little he was able to review.

1    Hopefully, this move and getting access to him will take care

2    of that.

3              And I just want to confirm that the Court's not

4    expecting an answer for that by Monday at 5:00.  I don't know

5    if we're, realistically, going to be able to have the kind of

6    contact that we need with our client in order to do that.

7    That's all.

8              THE COURT:  I'm just going to ask that you do your

9    best.  If the jail won't let you see your client, there's

10   nothing I can do about that, and I understand.  And I don't

11   know when he's moving as well.  I can't promise you that's

12   going to happen tonight or tomorrow or sometime next week.  I

13   don't know the answer to that question.  I think it's one of

14   those things that the Marshals Service prefers not to

15   necessarily share.

16             MR. BROWN:  Your Honor, from the government's side,

17   the sooner we get guidance on this, the better.  We do have to

18   make travel arrangements for out-of-town witnesses, and it's --

19   it's been a challenge to, sort of, play this three-dimensional

20   chess of trying to schedule different witnesses.

21             THE COURT:  Right.  If we need to convene sometime

22   next week even before Thursday to discuss some of these issues,

23   we can do so.

24             MR. BROWN:  Yes, Your Honor.

25             THE COURT:  Ms. Pelker?

 1              MS. PELKER:  Yes, Your Honor.  Just a brief follow-up

 2      on Your Honor's concern about the Mt. Gox authentication

 3      question.

 4              THE COURT:  Yes, thank you.

 5              MS. PELKER:  I was able to reach out to our Office of

 6      International Affairs who relayed the Court's concern about the

 7      lack of certification from the trustee.  The Tokyo prosecutor's

 8      office was much more interested in the Court's concerns than in

 9      anything raised by me.

10              And so we are -- again, it's, obviously, on a

11      condensed timeline.  We are endeavoring to obtain that business

12      record certification from the Mt. Gox trustee.  Japan inquired

13      as to whether there -- the standard treaty form which tracks

14      the typical 902(11) business records form language is what the

15      Court is looking for or if there's anything additional that the

16      Court, in particular, wanted in any sort of representation from

17      the trustee.

18              THE COURT:  I think what I was looking for is just

19      someone to tell me that what is on the hard drive is what was

20      downloaded from the system -- from the Mt. Gox system.

21              MS. PELKER:  Understood, Your Honor.  Thank you.

22              THE COURT:  I appreciate that.  I appreciate the fact

23      that the Japanese government is, actually, responsive to what I

24      think.

25              MS. PELKER:  Again, Your Honor, no promises; they

1    still have to go through their processes.  They did take this

2    very seriously and are endeavoring to --

3            THE COURT:  I appreciate that.  Also, if you can get

4    to me as well the MLAT, if there was any response to the MLAT

5    other than simply providing the certifications, that would be

6    helpful to have as well.

7            MS. PELKER:  Yes, Your Honor.  We may need to do some

8    additional follow-up on that.  The MLAT wasn't issued for our

9    case.  It is not part of our discovery.

10           THE COURT:  I see.

11           MS. PELKER:  It's for another case.  There may be

12   the -- we'll just have to follow up with that prosecutor in the

13   Office of International Affairs about what we're --

14           THE COURT:  If it's something that needs to be filed

15   under seal, I understand, particularly if it relates to another

16   case.

17           MS. PELKER:  Understood, Your Honor.

18           THE COURT:  All right.  Anything else before we

19   adjourn then?  It is Friday afternoon at 5:05.

20           MS. PELKER:  Nothing from the government, Your Honor.

21           THE COURT:  Mr. Ekeland, anything else?

22           MR. EKELAND:  Nothing from the defense, Your Honor.

23           THE COURT:  Thank you all and thank you for the court

24   staff for a very full day today.  Have a nice weekend everyone.

25           (The hearing adjourned at 5:08 p.m.)

1                    CERTIFICATE OF OFFICIAL COURT REPORTER

2

3              I, TAMARA M. SEFRANEK, do hereby certify that the

4      above and foregoing constitutes a true and accurate transcript

5      of my stenographic notes and is a full, true and complete

6      transcript of the proceedings to the best of my ability.

7                    Dated this 12th day of September, 2023.

8

9                         /s/ Tamara M. Sefranek_____
                          Tamara M. Sefranek, RMR, CRR, CRC
10                        Official Court Reporter
                          Room 6714
11                        333 Constitution Avenue, N.W.
                          Washington, D.C.  20001
12

13

14

15

16

17

18

19

20

21

22

23

24

25

## $

**$300** [2] - 66:6, 66:23
**$42.30** [1] - 74:18

## '

**'Bitcoin** [1] - 71:2
**'Two** [1] - 86:12
**'wrench** [1] - 86:4

## /

**/s** [1] - 103:9

## 1

**1** [6] - 42:20, 57:2,
58:7, 59:6, 63:3
**1.4** [1] - 63:9
**10** [4] - 14:2, 65:17,
87:3, 87:4
**100** [1] - 82:23
**10005** [1] - 1:20
**10:00** [1] - 41:16
**11** [2] - 89:11, 89:12
**11:20** [1] - 4:6
**12** [4] - 18:21, 59:9,
90:16, 90:17
**122** [1] - 56:14
**12th** [1] - 103:7
**13** [3] - 18:21, 92:3,
92:4
**1301** [1] - 1:17
**133** [1] - 93:14
**14** [2] - 18:22, 95:4
**145** [1] - 56:19
**145-5** [1] - 56:24
**14th** [1] - 36:6
**15** [1] - 48:1
**15th** [3] - 35:24, 35:25,
36:7
**16** [1] - 32:2
**18th** [1] - 36:3
**19** [1] - 46:16
**19-transaction** [1] -
46:11
**1:20** [1] - 1:6
**1:21-CR-0399** [1] - 1:3

## 2

**2** [6] - 14:3, 15:5,
15:11, 59:7, 61:15,
63:7
**20** [2] - 20:14, 44:6
**20001** [3] - 1:12, 1:24,
103:11
**20005** [1] - 1:17
**2008** [1] - 59:17

**2009** [1] - 79:9
**2011** [2] - 7:19, 80:22
**2011/2012** [1] - 8:1
**2012** [2] - 7:19, 9:21
**2016** [1] - 7:22
**2019** [1] - 92:16
**202-354-3246** [1] -
1:25
**2022** [1] - 91:4
**2023** [2] - 1:5, 103:7
**20530** [1] - 1:14
**21-399** [1] - 2:2
**21-CR-399** [1] - 38:22
**221** [1] - 59:9
**233** [1] - 92:16
**24** [1] - 56:14
**2:00** [2] - 30:7, 34:23
**2:17** [1] - 38:19

## 3

**3** [2] - 59:7, 65:12
**30** [2] - 1:20, 56:14
**320,000** [1] - 59:9
**333** [2] - 1:24, 103:11
**35-page** [1] - 59:1
**35-slide** [1] - 59:1
**3553** [1] - 6:11
**3:00** [4] - 34:25, 35:2,
35:15, 38:15
**3:15** [1] - 38:15
**3:25** [1] - 38:19

## 4

**4** [4] - 59:7, 70:25,
71:18, 71:21
**403** [8] - 20:11, 21:19,
27:5, 43:19, 43:25,
47:22, 48:11, 77:3
**415** [1] - 56:24

## 5

**5** [5] - 59:7, 71:15,
79:2, 79:3, 79:7
**50** [1] - 44:6
**5:00** [6] - 41:7, 43:13,
56:6, 88:23, 97:17,
100:4
**5:05** [1] - 102:19
**5:08** [1] - 102:25

## 6

**6** [6] - 11:12, 63:8,
78:25, 79:1, 79:14,
82:10
**60** [1] - 31:2
**601** [1] - 1:11

**6714** [2] - 1:23, 103:10
**68** [1] - 49:21
**6th** [1] - 59:7

## 7

**7** [3] - 83:8, 84:6, 84:7
**702** [8] - 23:4, 24:18,
26:19, 26:25, 32:14,
47:10, 47:11, 49:14
**77** [1] - 54:23
**79** [1] - 50:19

## 8

**8** [2] - 1:5, 85:2
**8:30** [1] - 4:5
**8th** [1] - 1:20

## 9

**9** [5] - 14:1, 86:2, 86:3,
87:7, 88:17
**90** [1] - 87:15
**901** [3] - 5:13, 6:4, 6:9
**902** [1] - 6:4
**902(11** [1] - 101:14
**950** [1] - 1:14

## A

**a.m** [2] - 4:5, 4:6
**ability** [2] - 26:12,
103:6
**able** [20] - 3:1, 22:4,
31:9, 36:17, 39:16,
44:9, 50:23, 52:15,
53:18, 60:11, 61:6,
64:1, 76:3, 80:14,
96:13, 97:12, 99:24,
99:25, 100:5, 101:5
**absence** [1] - 49:15
**absent** [2] - 20:17,
21:17
**absurd** [2] - 25:8, 74:7
**absurdity** [1] - 23:14
**abuse** [2] - 87:6, 88:19
**academic** [3] - 30:24,
52:22, 53:4
**academically** [1] -
47:3
**acceptable** [2] -
35:12, 83:12
**accepted** [1] - 13:2
**access** [13] - 3:2, 3:5,
3:8, 3:9, 3:20, 3:23,
13:11, 21:23, 21:24,
21:25, 96:10, 100:1
**accessed** [1] - 29:1
**accessible** [1] - 13:10

**accommodate** [1] -
35:2
**according** [2] - 89:14,
91:17
**accordingly** [1] -
34:21
**account** [10] - 57:20,
65:16, 66:18, 67:18,
74:12, 74:19, 80:1,
82:12, 82:18, 84:10
**accountant** [4] - 60:6,
62:7, 63:19, 63:20
**accounted** [2] - 68:11,
68:16, 68:25
**accounting** [2] - 70:8,
70:14
**accounts** [9] - 29:18,
61:18, 65:16, 67:4,
69:22, 70:14, 71:3,
79:23
**accreted** [2] - 69:24,
70:2
**accurate** [3] - 19:11,
90:9, 103:4
**act** [1] - 9:22
**acted** [2] - 15:24, 16:7
**acting** [2] - 64:4, 64:7
**Action** [1] - 1:2
**actions** [1] - 28:2
**activity** [16] - 13:20,
14:18, 15:20, 16:1,
16:2, 16:9, 22:13,
23:18, 24:10, 24:13,
85:16, 85:21, 86:1,
89:17, 90:8
**acts** [2] - 9:7, 32:21,
62:13
**actual** [2] - 15:9, 98:23
**adamant** [1] - 54:17
**add** [6] - 8:21, 14:5,
34:4, 75:18, 76:24,
83:10
**added** [1] - 8:4
**addition** [1] - 20:10
**additional** [6] - 22:3,
41:7, 70:13, 89:23,
101:15, 102:8
**additionally** [1] -
56:21
**address** [8] - 8:7,
11:9, 32:11, 54:7,
71:17, 71:18, 80:6,
89:13
**addressed** [2] - 19:18,
79:3
**addresses** [1] - 42:20
**adds** [2] - 66:10, 67:15
**adequate** [2] - 57:10,
83:25
**adjourn** [1] - 102:19

**adjourned** [1] - 102:25
**administrating** [1] -
7:20
**administrative** [1] -
11:25
**administrator** [3] -
59:24, 66:7, 66:22
**administrator's** [1] -
62:9
**administrators** [1] -
11:13
**admissibility** [1] -
99:7
**admit** [2] - 26:10,
95:24
**admitted** [4] - 40:25,
48:20, 50:25, 98:21
**adopter** [1] - 57:24
**advance** [3] - 34:9,
34:11, 55:14
**advantage** [1] - 69:18
**advertising** [1] - 30:17
**advocate** [3] - 64:7,
64:18, 80:9
**Affairs** [2] - 101:6,
102:13
**affect** [2] - 37:4, 37:9
**affected** [4] - 21:18,
27:11, 84:19, 84:22
**affects** [2] - 48:15,
72:14
**afraid** [1] - 40:15
**afternoon** [8] - 2:6,
2:8, 2:11, 2:12, 2:15,
2:17, 35:18, 102:19
**afterwards** [1] - 84:3
**agencies** [1] - 92:10
**agent** [1] - 32:22
**agents** [2] - 45:3,
50:23
**ago** [3] - 10:3, 40:18,
79:11
**agree** [3] - 15:11,
53:14, 79:4
**agreed** [3] - 50:11,
60:3, 62:20
**agreement** [1] - 51:18
**agrees** [2] - 38:13,
53:12
**ahead** [2] - 33:20, 41:5
**airline** [1] - 48:17
**ALDEN** [1] - 1:13
**Alden** [3] - 2:6, 39:2,
92:12
**alert** [1] - 16:12
**all-time** [1] - 91:4
**allegedly** [5] - 28:19,
28:23, 66:7, 74:14,
82:3
**alleging** [1] - 80:21

**alleviate** [1] - 96:11
**allow** [13] - 3:18, 4:9, 4:10, 17:21, 20:18, 34:20, 44:24, 45:12, 45:22, 46:3, 46:6, 82:5, 89:7
**allowed** [10] - 26:19, 39:19, 40:3, 45:15, 55:24, 70:19, 78:1, 90:14
**allowing** [1] - 21:19
**almost** [6] - 23:9, 24:17, 44:3, 44:12, 48:11, 77:8
**alteration** [1] - 30:4
**altered** [1] - 29:14
**alternative** [1] - 80:3
**ambiguities** [1] - 34:1
**ambiguity** [1] - 57:18
**America** [2] - 2:3, 38:23
**AMERICA** [1] - 1:2
**amount** [4] - 23:25, 65:17, 69:21, 70:1
**ample** [2] - 31:16, 31:24
**analogous** [3] - 18:5, 41:3, 56:2
**analogy** [1] - 73:15
**analysis** [28] - 16:14, 22:16, 24:14, 45:6, 48:12, 48:24, 48:25, 49:3, 54:3, 57:22, 58:10, 58:24, 60:16, 65:20, 66:10, 67:15, 67:25, 68:4, 68:22, 68:23, 71:24, 87:12, 88:19, 90:22, 92:24, 93:4
**analyst** [1] - 71:7
**analysts** [1] - 48:17
**analytic** [3] - 22:3, 24:5, 49:17
**analytics** [1] - 46:19
**analyze** [1] - 32:7
**analyzing** [1] - 68:5
**Andy** [1] - 28:12
**anonymity** [1] - 79:18
**answer** [9] - 49:22, 51:6, 51:15, 76:20, 91:11, 100:4, 100:13
**answered** [1] - 6:25
**antenna** [1] - 94:10
**anticipate** [1] - 77:4
**anyway** [2] - 3:19, 35:23
**appealing** [3] - 11:16, 11:21, 75:9
**appear** [3] - 26:8, 71:10, 72:6

**appearance** [1] - 39:6
**applied** [2] - 51:21, 55:22
**applies** [3] - 37:18, 51:19, 54:11
**apply** [7] - 36:16, 37:18, 37:24, 53:20, 68:4, 68:22, 69:15
**applying** [2] - 48:11, 67:20
**appreciate** [4] - 16:11, 101:22, 102:3
**appreciated** [1] - 59:9
**appreciating** [1] - 57:25
**appreciation** [3] - 59:8, 62:23, 66:25
**appropriate** [11] - 18:19, 23:16, 24:16, 24:18, 26:4, 30:20, 39:12, 46:6, 58:15, 60:2, 83:23
**appropriately** [1] - 92:10
**arbitrary** [1] - 32:25
**area** [5] - 43:1, 43:2, 54:24, 76:7, 82:15
**areas** [1] - 30:13
**arguably** [2] - 41:2, 73:9
**argue** [9] - 10:4, 10:10, 69:6, 75:21, 75:25, 76:1, 81:3, 82:2, 91:14
**argued** [1] - 58:16
**arguendo** [2] - 7:25, 78:13
**argues** [1] - 80:16
**arguing** [6] - 33:22, 64:23, 68:9, 68:16, 81:10, 81:18
**argument** [18] - 10:19, 21:22, 22:7, 22:9, 33:8, 33:12, 33:16, 39:9, 43:20, 53:1, 62:16, 64:13, 65:8, 77:19, 81:9, 83:2, 91:12
**argumentative** [1] - 21:11
**arguments** [4] - 64:4, 64:8, 78:20, 78:23
**arrangements** [2] - 3:1, 100:18
**arrest** [1] - 30:17
**arrested** [1] - 54:21
**arriving** [1] - 50:10
**art** [1] - 33:2
**article** [6] - 91:5, 94:8, 94:14, 94:16, 94:20,

94:23
**articles** [2] - 30:24, 91:9
**aside** [4] - 43:21, 58:17, 78:13, 96:17
**aspect** [3] - 23:22, 42:2, 73:18
**aspects** [1] - 21:21
**aspersions** [1] - 28:8
**assaults** [1] - 86:4
**assertion** [5] - 54:12, 55:20, 60:15, 61:16, 75:4
**assertions** [1] - 33:6
**asserts** [2] - 62:7, 62:9
**asset** [1] - 63:7
**assets** [15] - 59:22, 61:21, 61:23, 65:21, 65:22, 67:11, 67:12, 69:11, 70:7, 70:8, 70:10, 75:19, 81:6, 87:24, 93:1
**assign** [1] - 50:9
**assigned** [1] - 54:7
**Assistance** [1] - 5:15
**assistant** [2] - 4:8, 4:10
**assistants** [2] - 3:22, 3:25
**assume** [4] - 9:4, 17:9, 78:13, 81:20
**assuming** [2] - 58:17, 60:1
**assumption** [3] - 46:8, 46:15, 54:4
**assumptions** [3] - 42:3, 46:20, 46:23
**ate** [5] - 55:5, 55:8, 55:9, 55:10, 55:13
**attachment** [1] - 56:22
**attack** [2] - 86:17, 87:12
**attacking** [1] - 58:3
**attacks** [1] - 58:2
**attacks'** [1] - 86:4
**attempt** [2] - 92:25
**attempting** [1] - 16:7
**attention** [1] - 90:14
**attitude** [1] - 99:6
**Attorney's** [1] - 86:11
**attorneys** [2] - 4:5, 4:10
**attribute** [1] - 93:1
**attributed** [1] - 61:22
**attribution** [3] - 92:5, 93:8, 94:2
**Attribution** [1] - 92:14
**attributions** [2] - 71:9, 72:6
**AUSA** [1] - 2:8

**authentic** [1] - 5:14
**authentication** [2] - 4:15, 101:2
**automatically** [1] - 91:1
**Ave** [1] - 1:17
**Avenue** [3] - 1:14, 1:24, 103:11
**avoid** [1] - 50:13
**aware** [7] - 34:9, 40:2, 40:16, 41:25, 48:5, 52:17, 89:5
**awful** [1] - 35:16

## B

**background** [1] - 18:12
**backs** [1] - 28:22
**backup** [1] - 28:18
**bad** [1] - 36:1
**balance** [1] - 65:16
**bank** [2] - 74:18, 86:10
**banking** [2] - 90:25, 91:19
**base** [1] - 20:10
**based** [23] - 13:3, 25:11, 28:1, 28:8, 29:14, 31:7, 43:9, 44:5, 44:6, 44:11, 44:19, 45:7, 50:3, 51:8, 51:9, 58:3, 60:21, 64:25, 67:3, 69:8, 70:2, 74:25, 83:3
**basic** [2] - 73:12, 74:1
**basing** [1] - 63:10
**basis** [23] - 18:20, 19:24, 21:17, 22:14, 24:4, 24:5, 25:14, 27:11, 27:19, 27:22, 28:5, 29:2, 51:17, 53:19, 72:4, 75:3, 76:7, 78:2, 84:23, 86:19, 88:9, 88:12, 88:13
**bears** [2] - 8:15, 10:14
**becomes** [1] - 46:20
**becoming** [1] - 67:21
**BEFORE** [1] - 1:8
**beforehand** [1] - 54:20
**begin** [2] - 9:14, 97:11
**behavior** [4] - 27:10, 75:7, 77:10, 77:15
**behind** [2] - 41:13, 54:14
**belabor** [2] - 23:20, 53:22
**beneficial** [1] - 61:11

**benefit** [1] - 42:9
**best** [10] - 22:19, 30:19, 36:23, 36:25, 46:25, 92:9, 94:1, 97:22, 100:9, 103:6
**better** [4] - 19:18, 98:9, 98:11, 100:17
**between** [4] - 27:13, 36:20, 36:22, 63:8
**beyond** [5] - 10:17, 20:11, 21:8, 84:23, 94:14
**bias** [42] - 39:15, 40:24, 41:1, 41:13, 41:14, 41:22, 42:5, 42:10, 42:14, 42:15, 42:18, 42:23, 43:17, 44:5, 44:7, 44:16, 44:17, 45:23, 45:24, 48:2, 48:3, 48:14, 49:4, 49:16, 49:20, 50:1, 50:3, 50:4, 50:10, 50:14, 50:16, 50:20, 51:3, 51:10, 51:11, 51:13, 51:14, 52:10, 55:12, 56:1
**biases** [4] - 39:20, 40:4, 42:24, 48:23
**big** [1] - 30:20
**billion** [2] - 63:9
**Bisbee** [2] - 71:25, 72:22
**bit** [16] - 4:17, 17:2, 17:5, 31:4, 36:20, 51:24, 59:21, 61:1, 66:2, 73:17, 76:9, 78:8, 86:22, 87:9, 92:17, 99:2
**Bitcoin** [67] - 7:20, 8:1, 17:24, 18:13, 19:6, 19:15, 22:13, 23:21, 46:14, 57:4, 57:5, 57:7, 57:21, 57:24, 57:25, 58:4, 58:16, 58:18, 58:19, 58:20, 59:8, 59:14, 59:25, 60:18, 61:18, 61:19, 61:20, 62:8, 62:24, 63:1, 63:4, 63:9, 63:11, 65:17, 66:25, 69:12, 69:24, 70:2, 71:6, 71:11, 71:22, 72:7, 72:12, 72:13, 72:17, 72:18, 73:13, 78:19, 79:8, 79:16, 79:22, 80:20, 81:23, 82:17, 83:14, 86:4, 86:14, 89:13, 89:17, 90:8, 90:20, 91:1, 98:17

**Bitcoin's** [1] - 62:23
**bleeding** [1] - 36:6
**bleeds** [1] - 47:11
**blockchain** [16] -
30:14, 46:19, 48:12,
48:24, 48:25, 49:3,
71:24, 72:10, 76:5,
76:6, 76:15, 78:14,
79:17, 87:5, 87:12,
88:19
**blurting** [1] - 84:2
**Boasberg** [1] - 36:15
**Bob** [1] - 55:9
**bodies** [1] - 90:23
**bolstered** [1] - 6:9
**book** [1] - 28:13
**Book** [2] - 17:8, 17:9
**borderline** [1] - 93:20
**bottom** [1] - 99:5
**bought** [1] - 80:18
**boundary** [1] - 83:15
**break** [1] - 95:11
**brick** [1] - 91:18
**brick-and-mortar** [1] -
91:18
**brief** [5] - 26:17,
30:11, 45:16, 48:1,
101:1
**briefing** [3] - 16:14,
38:3, 38:4
**briefly** [1] - 32:5
**brilliant** [1] - 81:5
**bring** [4] - 34:10, 45:5,
90:7, 90:14
**bringing** [1] - 35:2
**brought** [1] - 41:25
**BROWN** [43] - 1:10,
2:8, 7:7, 8:10, 9:10,
10:12, 11:23, 12:3,
12:19, 13:1, 14:13,
40:15, 47:8, 48:9,
49:8, 49:20, 49:25,
52:20, 56:8, 71:16,
71:20, 78:10, 79:6,
79:13, 83:11, 86:19,
87:2, 89:22, 90:3,
90:15, 92:1, 93:6,
93:16, 94:9, 95:10,
95:15, 95:18, 96:17,
97:4, 99:11, 99:16,
100:16, 100:24
**Brown** [16] - 2:8, 7:5,
7:6, 11:22, 14:9,
39:3, 40:13, 47:7,
53:17, 80:6, 83:9,
86:18, 89:21, 91:25,
93:5, 99:14
**BSA/AML** [1] - 90:22
**buckets** [1] - 30:20
**bunch** [1] - 69:6

**Bundy** [1] - 12:4
**burden** [4] - 8:15,
10:14, 75:20, 77:8
**business** [4] - 4:23,
9:21, 101:11, 101:14
**buying** [1] - 13:15

**C**

**cahoots** [1] - 87:11
**calculations** [2] -
78:16, 78:22
**calendar** [1] - 35:18
**candor** [1] - 40:23
**cannot** [2] - 3:11,
15:14
**Canyon** [1] - 15:19
**car** [1] - 64:21
**care** [1] - 100:1
**carefully** [4] - 64:5,
78:4, 78:8, 94:25
**carry** [2] - 16:8
**carrying** [1] - 15:25
**cars** [1] - 22:16
**Case** [2] - 2:2, 38:22
**case** [69] - 6:18, 10:23,
12:7, 12:23, 14:19,
14:22, 19:2, 20:3,
20:23, 21:19, 24:11,
27:12, 27:14, 27:21,
27:22, 27:24, 30:4,
31:23, 32:7, 32:11,
32:22, 33:13, 34:11,
36:23, 37:5, 38:1,
39:11, 39:18, 40:12,
41:4, 41:15, 41:19,
41:23, 42:2, 43:13,
43:17, 43:22, 44:5,
44:21, 45:20, 46:9,
46:22, 47:17, 47:20,
49:7, 49:10, 49:21,
51:21, 51:23, 53:25,
55:25, 64:4, 65:19,
68:12, 68:20, 73:17,
77:11, 81:4, 81:12,
81:18, 84:23, 84:25,
87:19, 90:6, 99:9,
102:9, 102:11,
102:16
**Cases** [1] - 92:14
**cases** [14] - 14:21,
39:14, 39:17, 39:24,
40:2, 41:7, 44:10,
55:6, 55:7, 55:24,
82:23, 82:24, 83:4,
83:5
**cash** [1] - 86:9
**casting** [1] - 28:7
**categories** [1] - 56:15
**caused** [1] - 19:18

**causing** [1] - 67:5
**caution** [2] - 9:20,
12:20
**caveat** [1] - 54:15
**CEO** [4] - 20:3, 27:10,
27:23, 28:2
**certain** [2] - 52:1,
77:25
**certainly** [13] - 32:14,
34:9, 41:9, 44:3,
44:12, 44:17, 51:8,
63:15, 72:3, 72:4,
72:24, 81:13, 94:22
**certainty** [1] - 50:5
**CERTIFICATE** [1] -
103:1
**certification** [11] -
4:18, 4:19, 4:21,
4:23, 4:25, 5:3, 5:6,
5:19, 5:20, 101:7,
101:12
**certifications** [1] -
102:5
**certified** [5] - 63:15,
67:21, 71:7, 73:20,
77:14
**certify** [1] - 103:3
**certifying** [4] - 4:22,
5:20, 5:22, 99:24
**cetera** [2] - 93:9
**CFE** [4] - 68:4, 68:15,
76:18, 92:8
**CFF** [1] - 92:7
**chain** [3] - 6:5, 96:23,
98:18
**Chainalysis** [22] -
28:15, 31:7, 32:6,
32:16, 32:20, 42:4,
53:20, 54:11, 71:2,
87:10, 87:14, 88:11,
89:16, 89:19, 89:25,
90:7, 90:10, 90:13,
90:19, 91:3, 91:20
**chains** [1] - 46:17
**challenge** [2] - 96:14,
100:19
**chance** [2] - 30:8,
43:11
**change** [3] - 12:17,
18:18, 29:22
**changed** [1] - 29:14
**changes** [2] - 37:14,
54:5
**changing** [1] - 29:24
**characterization** [1] -
93:10
**characterized** [3] -
9:18, 34:14, 73:23
**charged** [2] - 15:5,
86:12

**chart** [2] - 59:7, 59:19
**charts** [2] - 26:3, 26:6
**check** [4] - 3:24, 4:8,
74:18, 74:24
**checked** [1] - 54:8
**chess** [1] - 100:20
**chief** [1] - 71:8
**Chief** [1] - 36:15
**chock** [1] - 16:21
**Chris** [1] - 2:8
**CHRISTOPHER** [1] -
1:10
**Christopher** [1] - 39:3
**chuckle** [1] - 23:13
**CipherTrace's** [1] -
76:14
**circumstances** [3] -
5:12, 42:17, 50:22
**citation** [1] - 94:19
**citations** [1] - 65:23
**cite** [3] - 39:10, 91:20,
94:7
**cited** [1] - 91:9
**cites** [2] - 91:3, 92:12
**citing** [2] - 53:18,
94:23
**claim** [1] - 59:5
**Claim** [1] - 63:3
**claims** [2] - 38:1,
78:11
**clandestine** [1] -
13:20
**clarification** [1] -
89:24
**clarity's** [1] - 25:16
**classes** [1] - 73:7
**classic** [1] - 9:12
**clause** [1] - 90:5
**cleanup** [1] - 84:2
**clear** [14] - 13:6,
13:18, 13:21, 22:25,
31:5, 31:7, 31:22,
32:2, 33:13, 35:19,
49:25, 69:13, 71:23,
96:9
**clearly** [1] - 33:8
**clearnet** [1] - 80:23
**client** [6] - 3:9, 32:8,
96:10, 99:23, 100:6,
100:9
**close** [2] - 43:18, 56:3
**closer** [1] - 49:5
**closing** [5] - 22:9,
33:23, 65:8, 75:21,
78:23
**cluster** [2] - 71:23,
73:13
**cluster'** [1] - 71:2
**clusters** [1] - 72:17

**cognitive** [31] - 39:15,
39:20, 40:4, 41:13,
42:5, 42:10, 42:23,
43:17, 44:5, 44:7,
44:16, 45:24, 48:3,
48:14, 48:23, 49:4,
49:16, 49:20, 50:1,
50:3, 50:4, 50:10,
50:14, 50:15, 50:20,
51:3, 51:10, 51:11,
51:13, 51:14, 56:1
**CoinJoin** [1] - 54:5
**colleague** [1] - 36:15
**colleagues** [1] - 74:17
**collect** [1] - 92:10
**COLUMBIA** [1] - 1:1
**combine** [1] - 29:7
**coming** [5] - 32:10,
47:5, 48:1, 58:2,
95:25
**comment** [1] - 34:7
**commentary** [1] -
91:12
**commenting** [1] - 90:6
**comments** [1] - 7:3
**commissioned** [3] -
32:6, 32:11, 32:16
**commit** [6] - 18:9,
61:7, 70:12, 82:4,
86:13
**committed** [1] - 9:6
**Committee** [1] - 71:9
**common** [5] - 23:7,
49:11, 52:21, 52:23,
53:4
**commonly** [1] - 13:2
**commonsense** [2] -
53:8, 70:15
**communication** [1] -
4:8
**company** [4] - 27:6,
27:10, 28:20, 28:22
**comparable** [2] -
90:22, 90:24
**comparison** [1] - 69:8
**compatible** [1] - 75:7
**complaint** [1] - 63:13
**complete** [1] - 103:5
**completely** [5] - 65:5,
75:7, 75:24, 77:9,
77:10
**compliance** [1] - 92:6
**complicated** [1] - 11:1
**conceal** [2] - 16:1,
16:9
**concealment** [1] -
13:15
**concede** [1] - 85:19
**concept** [2] - 58:1,
73:14

concepts [3] - 73:12, 79:17, 79:19
concern [13] - 19:18, 20:11, 27:4, 27:5, 52:16, 52:20, 53:2, 53:5, 64:3, 65:2, 66:14, 101:2, 101:6
concerned [6] - 22:6, 49:2, 53:6, 60:14, 69:5, 93:18
concerns [10] - 16:10, 43:19, 48:10, 55:18, 77:22, 87:16, 89:14, 90:21, 91:12, 101:8
conclude [7] - 18:21, 24:4, 37:16, 38:4, 76:7, 78:5, 98:7
concluded [1] - 59:22
conclusion [3] - 50:8, 67:7, 68:1
conclusions [8] - 22:5, 25:9, 25:11, 46:9, 50:6, 69:6, 76:1, 82:7
conclusory [3] - 21:11, 57:9, 60:15
concrete [4] - 21:3, 22:3, 33:25, 87:23
concretely [1] - 63:16
concreteness [2] - 57:17, 60:7
condensed [1] - 101:11
condition [1] - 50:9
conditionally [3] - 95:24, 96:5, 98:20
conduct [1] - 16:4
conducted [3] - 14:16, 16:4, 20:15
conducting [1] - 16:6
confer [4] - 2:24, 64:10, 97:15, 98:23
CONFERENCE [2] - 1:4, 1:7
confess [1] - 45:19
confessions [2] - 45:17, 45:20
confirm [4] - 2:18, 17:9, 76:3, 100:3
confirmation [14] - 41:13, 41:22, 42:5, 42:10, 42:14, 42:15, 42:18, 42:24, 44:17, 45:23, 48:2, 52:9, 55:11, 56:1
confronted [1] - 19:7
confusing [3] - 4:17, 8:19, 11:8
confusion [1] - 4:7
connection [3] -

27:13, 28:3, 39:21
connections [1] - 28:6
consent [1] - 35:7
consents [1] - 2:19
consider [3] - 10:2, 10:20, 11:15
considerably [1] - 16:14
considerations [1] - 14:25
considered [1] - 9:12
considers [1] - 71:23
consistent [10] - 16:20, 57:4, 57:7, 57:23, 59:23, 60:17, 60:23, 70:1, 77:10, 77:15
conspiracies [1] - 14:20
conspiracy [24] - 8:14, 8:23, 8:24, 9:5, 9:6, 9:7, 9:12, 9:14, 9:17, 9:20, 9:23, 9:24, 10:5, 10:8, 10:9, 10:11, 11:6, 14:22, 15:2, 15:3, 15:4, 15:5, 15:12
conspiratorial [1] - 15:6
conspired [1] - 12:3
constant [1] - 17:22
constitutes [1] - 103:4
Constitution [2] - 1:24, 103:11
construed [1] - 77:11
contact [1] - 100:6
contained [2] - 41:17, 61:13
contains [1] - 22:7
contemplating [1] - 53:14
context [8] - 52:13, 52:16, 55:17, 55:18, 55:19, 55:22, 98:11, 98:22
contextual [1] - 48:22
continue [6] - 35:3, 35:7, 35:10, 35:15, 38:15, 70:22
continued [1] - 9:7
continues [2] - 9:5, 37:23
continuing [1] - 9:13
contractor [1] - 90:19
contradict [1] - 69:19
control [1] - 55:15
controlled [1] - 13:16
controls [2] - 46:16, 55:3
controversial [1] -

67:13
convene [1] - 100:21
conversation [1] - 64:24
convicted [1] - 44:10
conviction [1] - 38:3
convictions [1] - 29:8
convinced [2] - 19:25, 94:17
cookie [5] - 55:5, 55:8, 55:9, 55:11, 55:13
Cooperation [1] - 91:6
copy [1] - 6:15
core [1] - 53:5
correct [6] - 9:9, 10:6, 36:10, 54:13, 61:7, 83:17
correctly [6] - 41:11, 57:16, 63:13, 65:13, 73:5, 92:22
corroborating [1] - 42:1
corroborative [1] - 77:17
counsel [15] - 2:4, 2:5, 2:19, 2:20, 3:20, 18:4, 19:12, 33:7, 33:14, 38:24, 39:1, 71:8, 78:23, 79:8, 83:3
counsel's [1] - 89:24
count [3] - 9:20, 15:12, 64:23
Count [3] - 14:3, 15:5, 15:11
counting [1] - 65:4
Countries [1] - 91:7
country [1] - 27:6
counts [3] - 7:14, 9:19, 38:6
couple [5] - 8:6, 17:14, 17:16, 34:24, 91:9
course [4] - 40:10, 61:7, 75:21, 78:8
court [5] - 3:11, 40:18, 95:3, 95:7, 102:23
Court [42] - 1:22, 1:23, 3:13, 3:15, 6:16, 8:7, 9:18, 11:12, 16:25, 20:16, 28:12, 29:13, 30:12, 30:22, 33:23, 34:2, 34:8, 39:23, 40:9, 41:11, 41:25, 46:6, 47:13, 49:16, 50:22, 53:13, 56:24, 58:25, 60:4, 61:12, 61:13, 62:21, 72:21, 73:15, 83:12, 83:15, 88:23, 101:15,

101:16, 103:10
COURT [170] - 1:1, 2:11, 2:17, 2:23, 3:16, 4:2, 4:9, 4:14, 4:17, 5:3, 5:24, 6:1, 6:3, 6:13, 6:15, 6:19, 6:23, 7:3, 7:6, 7:9, 7:12, 8:8, 8:20, 9:3, 9:16, 10:3, 10:24, 11:22, 12:2, 12:8, 12:25, 13:5, 14:9, 15:10, 15:17, 17:7, 17:11, 20:25, 23:8, 24:3, 24:22, 25:7, 25:12, 25:14, 25:19, 25:24, 26:5, 26:16, 27:2, 29:12, 30:7, 32:4, 33:5, 34:4, 34:13, 34:23, 35:9, 35:14, 36:1, 36:4, 36:10, 36:13, 38:12, 38:14, 39:1, 39:4, 39:8, 40:1, 40:11, 41:2, 42:13, 43:14, 47:7, 47:18, 49:1, 49:19, 49:24, 51:18, 53:10, 53:23, 55:1, 56:5, 56:10, 56:14, 56:20, 57:1, 57:9, 58:6, 59:2, 59:10, 59:15, 59:18, 60:13, 61:14, 61:25, 63:17, 65:10, 65:14, 65:24, 68:7, 69:17, 70:23, 71:13, 71:17, 72:16, 72:25, 74:4, 75:23, 76:20, 76:23, 77:18, 78:25, 79:3, 79:11, 79:14, 80:6, 80:24, 82:19, 82:21, 83:7, 83:9, 83:17, 84:6, 84:13, 85:13, 86:18, 86:22, 87:3, 87:8, 88:6, 88:12, 88:16, 88:24, 89:7, 89:11, 89:18, 90:2, 90:12, 90:16, 91:11, 92:3, 92:17, 93:5, 93:15, 93:17, 93:25, 94:4, 94:10, 94:22, 95:2, 95:12, 95:17, 96:1, 97:3, 97:14, 99:12, 99:20, 100:8, 100:21, 100:25, 101:4, 101:18, 101:22, 102:3, 102:10, 102:14, 102:18, 102:21, 102:23, 103:1
Court's [10] - 11:25, 14:1, 22:25, 33:25,

82:6, 82:13, 95:23, 100:3, 101:6, 101:8
Courthouse [1] - 1:23
courtroom [1] - 2:21
COURTROOM [2] - 2:2, 38:22
courts [1] - 40:24
cover [1] - 2:23
covered [1] - 84:13
covers [1] - 16:10
CPA [1] - 63:15
crazy [1] - 68:22
CRC [2] - 1:22, 103:9
create [1] - 98:17
creating [1] - 68:18
creator [2] - 79:16, 79:22
credentials [2] - 53:7, 80:19
credible [1] - 61:9
crime [4] - 10:9, 45:4, 54:21, 70:12
crimes [1] - 61:7
criminal [4] - 2:2, 38:22, 63:13, 87:21
Criminal [1] - 1:2
criminality [1] - 87:21
criticizing [1] - 21:22
CRM [1] - 1:16
cross [8] - 34:11, 48:20, 61:6, 64:6, 76:16, 81:16, 85:18, 86:24
cross-examination [3] - 61:6, 85:18, 86:24
crossed [1] - 31:17
CRR [2] - 1:22, 103:9
crucial [2] - 7:19, 75:14
crunching [1] - 78:16
crypto [6] - 61:21, 86:5, 86:8, 86:17, 91:3, 92:11
cryptocurrencies [1] - 73:7
cryptocurrency [6] - 73:8, 73:11, 85:4, 85:14, 85:20, 85:25
Cryptocurrency [1] - 92:14
culture [5] - 23:2, 23:3, 23:7, 23:21, 23:23
curious [3] - 39:17, 39:24, 40:1
currencies [1] - 72:20
custody [3] - 86:8, 96:23, 98:18
customer [2] - 61:18, 82:18

**cut** [3] - 23:8, 33:14, 33:18
**CV** [2] - 42:25, 72:19

# D

**D.C** [5] - 1:5, 7:15, 37:11, 37:17, 103:11
**Dad** [1] - 64:21
**danger** [1] - 8:12
**Dark** [1] - 28:13
**dark** [3] - 11:17, 11:21, 12:24
**darknet** [12] - 11:13, 11:19, 11:24, 12:9, 12:16, 12:22, 12:24, 13:18, 72:13, 75:9
**data** [42] - 19:1, 19:10, 19:25, 20:4, 20:8, 21:17, 21:23, 21:25, 22:4, 24:14, 26:21, 27:1, 27:3, 27:5, 27:11, 27:14, 27:20, 27:23, 28:1, 28:8, 28:15, 28:16, 28:18, 28:19, 28:22, 28:24, 29:3, 29:5, 29:9, 29:11, 29:14, 29:24, 30:4, 30:19, 32:7, 48:18, 48:21, 50:18, 50:19, 51:1, 82:22, 84:22
**Dated** [1] - 103:7
**Daubert** [5] - 41:10, 53:5, 65:25, 76:4, 85:9
**Daubert/Frye** [1] - 40:21
**Daubert/Frye-type** - 40:21
**days** [2] - 3:2, 3:6
**DC** [4] - 1:12, 1:14, 1:17, 1:24
**de** [1] - 46:24
**deal** [5] - 12:8, 12:12, 15:21, 16:13, 36:7
**dealing** [5] - 13:15, 40:2, 56:1, 74:13, 74:14
**decide** [9] - 26:10, 41:14, 41:15, 46:2, 98:9, 98:12, 98:20, 98:25
**decision** [1] - 47:5
**deck** [1] - 69:9
**deeper** [1] - 11:5
**DEFENDANT** [2] - 35:6, 35:13
**defendant** [7] - 8:15, 9:15, 9:21, 10:19,

14:16, 16:4, 16:6
**Defendant** [5] - 1:6, 1:18, 2:13, 38:20, 39:6
**defense** [40] - 2:16, 4:19, 8:12, 8:13, 8:14, 8:15, 9:13, 10:13, 10:20, 11:18, 18:4, 23:3, 26:18, 26:22, 31:15, 31:24, 32:2, 32:19, 33:25, 34:3, 34:11, 36:11, 37:21, 38:8, 38:13, 41:20, 42:22, 43:5, 53:12, 57:17, 77:2, 77:8, 77:21, 78:23, 79:7, 87:17, 89:24, 95:21, 102:22
**defense's** [2] - 15:12, 41:25
**defenses** [1] - 10:22
**defer** [1] - 20:21
**definition** [4] - 17:3, 17:5, 23:9, 24:17
**definitive** [1] - 17:15
**degrees** [1] - 53:2
**deleted** [2] - 28:17, 28:24
**demand** [1] - 86:6
**demonstrate** [1] - 90:24
**demonstrates** [1] - 42:25
**demonstrative** [1] - 26:11
**demonstratives** [2] - 26:3, 26:13
**Department** [5] - 1:13, 1:16, 92:15, 93:12, 94:7
**dependent** [1] - 46:23
**deposit** [3] - 97:23, 98:3, 98:10
**deposits** [2] - 46:14, 57:20
**depth** [2] - 60:7, 72:22
**DEPUTY** [2] - 2:2, 38:22
**describe** [1] - 90:22
**described** [1] - 46:7
**describes** [1] - 71:2
**deserves** [1] - 27:7
**designations** [1] - 92:8
**despite** [1] - 31:24
**detail** [1] - 61:12
**determination** [1] - 50:3
**determine** [4] - 6:6, 19:5, 48:14, 99:7

**determined** [1] - 28:16
**Developing** [1] - 91:7
**Development** [1] - 91:6
**device** [3] - 96:22, 97:5, 97:8
**devices** [1] - 96:25
**diagrams** [1] - 26:7
**difference** [6] - 53:23, 53:24, 97:20, 97:22, 99:6, 99:8
**differences** [1] - 97:21
**different** [15] - 21:5, 28:4, 28:20, 29:19, 34:15, 40:21, 45:5, 45:11, 48:21, 51:24, 53:25, 54:10, 59:21, 66:19, 100:20
**difficult** [1] - 22:5
**dig** [1] - 52:24
**digital** [2] - 42:24, 72:20
**dimensional** [1] - 100:19
**dire** [3] - 12:9, 12:10, 12:11
**direct** [5] - 40:11, 48:1, 83:23, 93:13, 97:16
**directed** [1] - 41:4
**directly** [1] - 19:19
**directs** [1] - 92:9
**dirty** [1] - 15:2
**disagree** [1] - 89:22
**disagreement** [1] - 96:9
**disagrees** [1] - 38:7
**disappears** [1] - 10:9
**disavow** [1] - 18:14
**disavowing** [1] - 19:20
**discipline** [1] - 53:4
**disclose** [2] - 47:23, 60:7
**disclosed** [5] - 63:12, 69:6, 72:5, 78:12, 88:25
**disclosure** [14] - 40:19, 42:19, 43:2, 47:14, 56:13, 56:19, 57:11, 57:15, 63:8, 69:7, 69:13, 70:24, 78:10, 85:8
**disclosures** [6] - 18:3, 60:5, 61:11, 62:22, 72:15
**discovered** [1] - 75:20
**discovery** [2] - 41:17, 102:9
**discuss** [1] - 100:22

**discussed** [3] - 29:8, 30:24, 93:3
**discussing** [1] - 63:3
**disguised** [1] - 77:5
**dismiss** [1] - 38:6
**disowned** [1] - 47:14
**displays** [1] - 79:16
**disprove** [1] - 24:6
**dispute** [1] - 98:2
**disputes** [1] - 98:24
**disputing** [1] - 80:22
**disregard** [1] - 83:24
**dissidents** [1] - 88:1
**distinct** [1] - 84:9
**DISTRICT** [3] - 1:1, 1:1, 1:8
**District** [1] - 86:12
**divided** [1] - 40:25
**doc** [1] - 93:14
**docket** [2] - 14:2, 56:24
**Docket** [2] - 56:14, 56:19
**docketing** [1] - 14:3
**document** [3] - 93:16, 93:18, 96:4
**documentation** [2] - 5:1, 63:14
**documenting** [1] - 54:23
**documents** [9] - 4:15, 5:10, 18:24, 19:5, 19:21, 94:5, 95:24, 96:21, 96:24
**DOJ** [8] - 1:11, 1:16, 86:11, 93:3, 93:10, 93:11, 93:13, 94:3
**DOJ's** [1] - 92:9
**DOJ-CRM** [1] - 1:16
**dollar** [2] - 58:21, 68:11
**dollars** [8] - 58:19, 62:8, 62:11, 63:22, 66:16, 66:18, 67:1, 86:14
**domain** [3] - 80:23, 81:1, 81:15
**done** [31] - 17:9, 22:16, 25:6, 29:25, 31:6, 31:21, 35:16, 36:16, 36:18, 42:25, 45:14, 48:16, 50:23, 50:24, 54:11, 55:3, 58:9, 62:1, 62:3, 66:5, 68:10, 70:9, 72:25, 81:6, 81:7, 81:21, 81:23, 83:5, 90:18, 90:21, 92:6
**door** [2] - 27:12, 78:20
**double** [1] - 3:24

**double-check** [1] - 3:24
**doubt** [5] - 10:17, 17:3, 17:6, 55:2, 55:16
**doubtful** [1] - 94:22
**doubts** [1] - 79:8
**down** [6] - 8:18, 10:18, 19:12, 61:11, 80:17, 96:8
**downloaded** [3] - 5:4, 5:10, 101:20
**dozen** [2] - 66:4, 75:23
**Dr** [21] - 39:9, 39:13, 40:2, 40:17, 41:10, 41:21, 42:9, 42:22, 45:22, 46:11, 46:12, 47:2, 47:9, 47:13, 48:20, 51:16, 53:14, 53:19, 54:16, 56:7
**dramatic** [2] - 42:16
**draw** [9] - 22:5, 25:4, 25:9, 25:10, 28:6, 70:16, 76:1, 85:24, 91:15
**drawing** [1] - 84:23
**drawn** [1] - 22:24
**dressed** [3] - 66:1, 67:2, 67:6
**dressing** [4] - 52:23, 53:3, 70:5, 70:14
**drive** [10] - 3:2, 3:4, 3:6, 5:8, 22:13, 22:18, 24:10, 24:12, 28:15, 101:19
**drives** [2] - 24:7, 24:8
**driving** [3] - 22:14, 62:15, 64:21
**drop** [1] - 3:4
**Dror** [17] - 20:22, 39:9, 39:13, 40:3, 41:10, 41:21, 42:22, 45:22, 47:2, 47:9, 47:13, 48:20, 51:16, 53:14, 56:7
**Dror's** [4] - 40:17, 42:9, 53:19, 54:16
**drugs** [2] - 13:8, 13:9
**during** [5] - 3:11, 7:21, 39:13, 47:13, 48:20

# E

**early** [6] - 57:4, 57:24, 60:18, 69:11, 89:13, 96:7
**earned** [2] - 68:11, 68:17
**ears** [2] - 29:15, 30:5
**easier** [2] - 71:19, 86:6

**easiest** [1] - 99:8
**easily** [1] - 81:7
**ECF** [1] - 14:2
**Economic** [1] - 91:6
**economist** [1] - 71:8
**edged** [1] - 49:1
**effect** [4] - 14:22,
42:16, 50:4, 50:5
**effective** [1] - 10:23
**effectively** [2] - 32:21,
80:4
**efficacy** [2] - 50:16,
50:19
**efficient** [1] - 97:12
**efforts** [1] - 85:4
**either** [9] - 21:9,
33:15, 34:10, 35:18,
39:19, 40:2, 40:16,
51:2, 67:10
**EKELAND** [103] - 1:18,
2:12, 2:22, 3:7, 3:21,
4:7, 4:13, 7:10, 7:13,
8:22, 9:17, 10:6,
11:12, 13:24, 15:11,
16:24, 17:10, 20:24,
22:25, 23:19, 24:19,
25:5, 25:10, 25:13,
25:16, 25:21, 26:14,
26:17, 28:11, 30:6,
32:5, 33:21, 36:5,
36:11, 38:13, 39:5,
39:21, 40:6, 41:9,
42:19, 46:5, 53:12,
54:15, 56:4, 56:9,
56:12, 56:18, 56:21,
57:2, 57:14, 58:25,
59:5, 59:13, 59:16,
60:3, 61:10, 61:15,
62:20, 65:9, 65:12,
65:15, 67:19, 69:2,
70:21, 70:24, 72:19,
73:2, 75:5, 76:12,
76:22, 76:24, 79:1,
79:4, 79:15, 80:21,
82:6, 82:20, 83:6,
83:8, 84:5, 84:7,
85:2, 86:3, 87:4,
87:13, 88:11, 88:14,
88:21, 89:5, 89:10,
89:12, 90:17, 92:2,
92:4, 92:21, 93:24,
94:1, 94:19, 95:1,
96:2, 99:14, 99:22,
102:22
**Ekeland** [36] - 1:19,
2:13, 2:18, 2:24, 7:9,
8:20, 9:16, 11:11,
13:23, 15:10, 16:11,
16:23, 20:23, 22:21,
26:6, 32:4, 36:4,

38:12, 39:5, 39:12,
41:5, 46:4, 48:12,
53:11, 69:17, 72:16,
76:9, 83:18, 96:1,
97:15, 97:20, 99:12,
99:17, 99:19, 99:21,
102:21
**electronic** [3] - 96:20,
96:21, 97:5
**element** [4] - 8:11,
13:12, 92:5, 93:8
**elements** [3] - 10:16,
11:3, 15:8
**Elizabeth** [1] - 92:13
**elsewhere** [1] - 63:13
**email** [1] - 96:7
**emails** [1] - 50:2
**emphasize** [1] - 79:21
**empirical** [1] - 54:22
**employ** [1] - 67:24
**employed** [1] - 85:4
**employees** [1] - 92:10
**end** [2] - 9:14, 74:10
**endeavoring** [2] -
101:11, 102:2
**enforcement** [6] -
14:11, 30:19, 45:10,
45:12, 45:13, 50:14
**engage** [1] - 9:23
**engaged** [8] - 13:19,
22:17, 23:18, 24:9,
24:13, 59:23, 74:22,
80:17
**engaging** [1] - 33:16
**enterprise** [1] - 33:1
**entirely** [8] - 28:9,
32:19, 45:5, 46:6,
57:23, 59:22, 73:3
**entirety** [1] - 6:21
**entitled** [4] - 32:14,
77:24, 91:6, 91:14
**entity** [1] - 54:8
**environment** [2] -
86:8, 86:9
**equation** [1] - 70:5
**error** [9] - 21:4, 21:5,
31:2, 31:18, 31:25,
32:12, 32:23, 44:2,
53:21
**errors** [3] - 27:2,
31:14, 31:16
**especially** [1] - 96:25
**essence** [1] - 60:24
**essentially** [6] - 41:14,
41:24, 49:22, 50:2,
73:14, 73:23
**established** [3] - 47:3,
94:2, 94:17
**establishing** [1] -
94:12

**estimates** [2] - 89:15,
89:25
**et** [2] - 93:9
**evaluate** [2] - 42:10,
58:14
**evaluating** [3] - 47:4,
59:5, 63:3
**event** [2] - 4:11, 31:24
**everywhere** [2] - 51:4,
77:11
**evidence** [41] - 5:15,
6:6, 7:18, 10:19,
16:17, 20:16, 21:15,
24:8, 25:20, 26:1,
26:10, 26:13, 29:5,
29:12, 30:3, 33:12,
33:18, 42:1, 42:12,
43:17, 44:2, 44:9,
44:11, 47:5, 49:7,
51:13, 51:14, 54:23,
57:3, 57:6, 59:20,
60:16, 74:5, 77:17,
78:20, 95:21, 97:2,
97:12, 98:5, 98:7,
98:13
**evil** [1] - 12:12
**exactly** [4] - 4:11,
16:15, 37:18, 68:25
**exaggerate** [2] -
23:12, 23:14
**examination** [3] -
61:6, 85:18, 86:24
**examiner** [5] - 63:15,
67:22, 73:21, 77:15,
92:8
**examiner's** [1] - 74:2
**example** [10] - 9:12,
32:24, 33:9, 51:24,
85:21, 86:11, 88:17,
91:17, 95:20, 96:21
**examples** [4] - 42:17,
44:4, 87:23, 88:18
**except** [1] - 7:15
**exception** [1] - 4:4
**exchange** [1] - 74:8
**excluded** [3] - 47:10,
98:6, 98:7
**exclusive** [1] - 94:20
**exhibited** [1] - 79:22
**exist** [3] - 22:1, 35:11,
81:5
**exists** [7] - 44:17,
44:18, 50:1, 50:3,
51:3, 51:5, 59:14
**exotic** [1] - 75:10
**expect** [9] - 66:8,
66:19, 66:24, 66:25,
70:1, 73:19, 73:21,
75:16, 87:19
**expected** [3] - 65:18,

70:13, 74:23
**expecting** [1] - 100:4
**expects** [1] - 42:22
**expenses** [1] - 65:22
**experience** [11] - 23:5,
23:21, 45:12, 60:21,
71:7, 72:11, 72:20,
73:6, 73:10, 83:4,
92:8
**experienced** [1] - 23:3
**experimental** [1] -
48:15
**expert** [51] - 17:20,
17:22, 18:11, 18:12,
21:8, 21:22, 22:7,
22:10, 24:20, 25:11,
25:17, 25:19, 25:21,
25:22, 26:9, 26:18,
30:20, 32:15, 35:11,
35:12, 39:14, 45:16,
47:3, 47:14, 51:10,
51:13, 51:24, 57:23,
58:15, 60:2, 61:2,
62:17, 62:22, 64:8,
64:19, 64:24, 65:8,
66:1, 69:4, 69:7,
73:20, 75:13, 77:14,
77:19, 77:22, 79:17,
82:15, 88:25, 93:13
**expert-level** [1] -
79:17
**expertise** [26] - 18:14,
18:21, 19:14, 19:19,
19:20, 20:9, 20:10,
20:17, 21:6, 21:7,
21:15, 22:12, 45:1,
45:8, 60:21, 65:1,
67:3, 72:1, 72:11,
72:12, 72:17, 74:21,
76:7, 78:5, 79:21,
93:11
**experts** [7] - 19:2,
19:17, 27:18, 27:22,
38:16, 40:24, 40:25
**explain** [9] - 17:23,
31:9, 44:1, 57:6,
61:22, 65:23, 79:16,
79:19, 92:17
**explainable** [1] - 63:7
**explanation** [1] - 82:9
**explicitly** [1] - 93:11
**export** [1] - 26:1
**exported** [1] - 31:20
**express** [1] - 76:6
**expressed** [1] - 18:23
**expressing** [2] -
64:25, 82:20
**extensive** [5] - 23:25,
29:6, 31:15, 43:1,
73:6

**extensively** [2] -
27:19, 43:2
**extent** [20] - 6:24,
13:17, 21:2, 22:2,
26:6, 34:7, 41:3,
53:13, 58:8, 62:1,
64:12, 65:25, 66:5,
67:5, 71:21, 76:5,
83:13, 91:12, 93:9,
96:20
**extra** [1] - 15:8
**extra-textual** [1] - 15:8
**extraction** [2] - 96:23,
97:5
**extraneous** [1] - 48:22
**extremely** [2] - 8:18,
30:25
**eyes** [1] - 82:13

**F**

**facetious** [1] - 25:7
**fact** [26] - 5:14, 6:10,
9:5, 18:14, 23:15,
23:23, 24:6, 24:12,
24:17, 24:21, 24:22,
24:25, 25:1, 27:17,
28:13, 31:5, 37:21,
37:22, 38:5, 50:7,
66:22, 68:10, 76:3,
84:15, 101:22
**facts** [3] - 12:6, 47:20,
51:21
**factual** [4] - 25:4,
25:9, 25:11, 25:14
**fades** [1] - 52:5
**failure** [1] - 47:23
**fair** [6] - 6:8, 64:2,
69:17, 69:24, 70:17,
70:19, 77:23, 83:5,
85:23, 85:24
**fairly** [4] - 21:11,
22:25, 47:25, 63:17
**faith** [1] - 33:17
**faithful** [1] - 14:15
**fall** [1] - 30:14
**fallacy** [1] - 78:18
**fallible** [1] - 54:16
**false** [3] - 45:16,
45:20, 68:18
**falsely** [1] - 45:18
**familiar** [3] - 14:21,
23:23, 52:11
**fancy** [1] - 64:21
**far** [5] - 18:20, 28:9,
29:16, 31:14, 60:5
**FBI** [3] - 20:15, 44:25,
45:2
**fear** [2] - 11:17, 11:21
**February** [1] - 92:16

**federal** [1] - 92:10
**fee** [2] - 62:9, 66:7
**feel-good** [1] - 54:25
**fees** [9] - 57:21, 61:19, 61:21, 62:24, 63:4, 63:12, 73:13, 77:6
**felt** [1] - 64:23
**few** [4] - 7:10, 23:24, 63:2, 95:10
**fewer** [1] - 48:22
**field** [3] - 23:24, 47:4, 48:16
**figure** [3] - 16:15, 16:18, 58:21
**figuring** [1] - 99:3
**file** [3] - 38:8, 40:13, 97:16
**filed** [1] - 102:14
**files** [3] - 28:17, 28:24, 84:18
**filing** [1] - 37:22
**filings** [2] - 85:6, 85:10
**final** [5] - 11:10, 15:22, 16:13, 16:24, 20:13
**finance** [1] - 90:24
**finances** [1] - 68:6
**financial** [13] - 16:5, 16:6, 63:4, 67:6, 67:25, 73:17, 85:5, 85:15, 90:23, 92:6, 92:11, 92:24, 93:4
**Financial** [2] - 71:8, 91:7
**financials** [1] - 20:5
**findings** [1] - 90:18
**fine** [15] - 20:25, 21:6, 36:11, 65:5, 66:8, 67:1, 70:3, 75:24, 80:14, 81:2, 81:9, 81:16, 91:19, 91:21, 98:3
**fingerprint** [1] - 48:17
**finish** [2] - 37:13, 37:14
**first** [17] - 6:4, 16:3, 41:19, 46:13, 47:11, 59:13, 61:20, 69:18, 71:21, 75:17, 89:23, 90:5, 96:4, 96:13, 97:6, 99:7
**Fischbach** [2] - 20:9, 20:20
**Fischbach's** [1] - 17:12
**fit** [2] - 63:5, 98:11
**five** [6] - 3:2, 3:6, 7:14, 11:5, 40:18, 76:2
**flaw** [1] - 45:14
**Floor** [1] - 1:20

**Flows** [1] - 91:7
**fluctuation** [1] - 32:25
**fluent** [1] - 34:16
**Fog** [40] - 7:20, 8:1, 17:24, 18:13, 19:6, 19:15, 46:14, 57:5, 57:7, 57:21, 57:25, 61:18, 61:19, 61:20, 62:8, 62:24, 63:4, 63:9, 63:11, 65:17, 71:2, 71:6, 71:11, 71:23, 72:7, 72:17, 73:13, 78:19, 79:16, 79:22, 80:20, 81:23, 82:17, 83:14, 89:13, 89:17, 90:8, 90:20, 91:1, 98:17
**folks** [2] - 87:11, 99:3
**follow** [5] - 31:5, 92:18, 101:1, 102:8, 102:12
**follow-up** [3] - 31:5, 101:1, 102:8
**followed** [1] - 5:18
**following** [3] - 17:13, 38:21, 81:7
**FOR** [1] - 1:1
**forecast** [1] - 30:22
**forecasts** [1] - 34:8
**foregoing** [1] - 103:4
**forensic** [12] - 42:23, 42:24, 44:11, 48:15, 48:18, 51:14, 62:6, 63:15, 66:15, 92:6, 92:24, 93:4
**forensics** [3] - 65:4, 67:17, 92:11
**forget** [2] - 52:1, 52:5
**form** [6] - 7:25, 19:10, 26:22, 84:24, 101:13, 101:14
**formed** [1] - 9:6
**forming** [1] - 31:10
**forth** [1] - 5:2
**forthright** [1] - 50:16
**Foundation** [1] - 73:4
**foundation** [2] - 60:1, 83:25
**framed** [1] - 58:7, 78:18
**France** [1] - 29:9
**frankly** [4] - 45:1, 65:24, 86:20, 93:19
**fraud** [8] - 29:9, 30:19, 67:21, 73:17, 73:20, 74:2, 77:14, 92:8
**fraudster** [1] - 81:5
**fraudulent** [1] - 27:10
**French** [1] - 97:22
**friction** [2] - 86:7, 86:9

**Friday** [7] - 35:24, 36:8, 77:1, 95:9, 95:14, 99:2, 102:19
**front** [9] - 14:21, 19:23, 20:17, 40:16, 50:21, 59:2, 83:20, 97:24, 97:25
**froze** [2] - 39:22, 39:25
**FTX** [1] - 30:17
**full** [7] - 5:12, 12:21, 16:21, 26:1, 96:22, 102:24, 103:5
**fulsome** [2] - 17:2, 60:5
**fundamentally** [1] - 23:10
**funds** [6] - 61:17, 63:25, 68:15, 68:16, 69:1, 69:21
**funny** [1] - 23:12
**future** [1] - 47:16

# G

**gain** [1] - 21:25
**gains** [2] - 74:25, 86:1
**game** [2] - 64:2, 85:23
**garb** [1] - 53:4
**general** [10] - 21:2, 22:23, 46:18, 52:16, 54:11, 55:20, 61:4, 72:20, 73:11, 85:11
**generally** [3] - 41:12, 42:14, 42:22
**generated** [1] - 61:19
**George** [2] - 79:20, 82:14
**given** [12] - 3:10, 7:13, 8:1, 38:5, 41:21, 46:7, 47:19, 50:9, 71:18, 77:8, 95:21, 97:10
**Glave** [4] - 60:6, 69:4, 69:16, 92:25
**gold** [1] - 27:7
**goods** [1] - 92:20
**government** [88] - 2:5, 2:20, 4:15, 4:25, 5:23, 6:24, 6:25, 7:7, 8:8, 8:11, 9:18, 10:7, 10:16, 14:4, 15:12, 15:24, 16:3, 19:10, 21:22, 21:24, 22:4, 25:6, 25:22, 25:25, 30:14, 31:3, 31:6, 31:15, 32:3, 32:21, 38:10, 41:17, 44:9, 46:11, 47:8, 57:4, 57:11, 57:19, 58:14,

59:18, 60:14, 60:17, 61:5, 61:23, 62:7, 62:9, 63:20, 63:23, 64:11, 65:7, 67:10, 68:5, 68:9, 68:10, 68:14, 68:16, 68:19, 68:20, 70:6, 71:14, 73:10, 73:23, 75:8, 75:20, 75:25, 76:16, 76:25, 77:24, 77:25, 78:12, 78:15, 78:21, 80:16, 80:21, 81:16, 81:22, 83:13, 85:5, 85:10, 86:20, 87:18, 89:16, 90:19, 98:1, 101:23, 102:20
**Government's** [1] - 5:17
**government's** [19] - 9:11, 23:7, 53:20, 53:25, 57:6, 60:6, 61:16, 62:14, 63:14, 63:25, 67:10, 68:20, 70:18, 71:9, 77:2, 81:4, 89:15, 89:25, 100:16
**Gox** [31] - 4:15, 18:24, 19:1, 19:2, 19:5, 19:16, 19:21, 19:24, 20:3, 20:8, 21:14, 21:16, 21:17, 26:18, 26:20, 26:21, 27:1, 27:2, 27:5, 28:15, 29:3, 29:4, 29:11, 31:17, 31:19, 84:8, 84:10, 84:16, 101:2, 101:12, 101:20
**Grand** [1] - 15:19
**great** [1] - 98:16
**greater** [1] - 11:7
**Greenberg's** [1] - 28:12
**Gronager** [3] - 28:14, 28:16, 28:23
**ground** [1] - 37:21
**grounds** [1] - 11:14
**groundwork** [1] - 96:22
**grown** [1] - 58:20
**growth** [2] - 59:11, 59:25
**guard** [1] - 80:17
**guardrails** [2] - 35:11, 83:11
**guess** [11] - 42:7, 44:14, 45:21, 47:1, 47:5, 52:12, 56:16, 62:5, 76:8, 79:1, 95:6
**guesses** [1] - 46:23
**guidance** [5] - 22:20,

22:22, 30:9, 99:1, 100:17
**guide** [1] - 56:2
**guilt** [1] - 68:1
**guy** [1] - 44:6

# H

**hack** [3] - 21:14, 21:16, 21:18
**hacked** [9] - 19:2, 26:20, 27:7, 28:21, 28:25, 29:5, 29:18, 84:8, 84:18
**hacker** [1] - 84:9
**hackers** [1] - 29:1
**hacks** [9] - 27:9, 27:14, 27:17, 27:20, 28:2, 29:15, 30:2, 84:21, 84:22
**half** [1] - 66:4
**hand** [2] - 98:5, 98:13
**handling** [2] - 95:4, 95:5
**happy** [8] - 22:20, 24:23, 39:9, 40:8, 56:23, 65:10, 88:21, 88:22
**hard** [10] - 3:2, 3:4, 3:6, 5:8, 10:10, 58:23, 69:12, 82:22, 97:23, 101:19
**Harmon** [2] - 76:25, 77:4
**HASSARD** [3] - 1:19, 2:15, 38:18
**Hassard** [2] - 2:16, 39:5
**head** [4] - 40:8, 73:3, 88:15, 89:6
**hear** [7] - 8:8, 22:20, 29:15, 36:23, 37:2, 39:9, 71:13
**heard** [11] - 19:1, 27:16, 27:17, 29:16, 30:8, 39:23, 45:7, 81:6, 84:21, 85:21, 85:22
**hearing** [10] - 18:17, 39:7, 39:13, 40:21, 41:10, 59:18, 60:13, 76:4, 96:23, 102:25
**hearings** [2] - 73:16, 85:9
**hearsay** [3] - 26:19, 32:15
**heels** [1] - 52:24
**held** [1] - 69:14
**Helix** [1] - 77:6
**help** [1] - 56:2

**helpful** [13] - 26:7, 41:3, 43:4, 43:15, 47:4, 47:12, 51:7, 52:13, 53:16, 66:13, 85:12, 88:3, 102:6
**helps** [1] - 90:1
**hereby** [1] - 103:3
**heuristics** [3] - 31:3, 31:7, 42:4
**hidden** [3] - 13:3, 64:1, 81:5
**hide** [5] - 80:12, 81:8, 81:14, 82:2, 85:20
**hiding** [2] - 74:14, 86:1
**high** [1] - 17:23
**higher** [2] - 60:12, 86:8
**highlights** [1] - 44:2
**highly** [4] - 29:11, 46:22, 82:16, 98:14
**highs** [1] - 91:4
**himself** [3] - 2:20, 51:1, 81:19
**historical** [1] - 62:25
**history** [1] - 79:18
**hit** [1] - 30:12
**hold** [3] - 3:18, 93:13, 99:24
**holders** [1] - 86:5
**holdings** [1] - 63:7
**hole** [1] - 8:18
**home** [1] - 86:13
**honest** [1] - 46:25
**Honor** [107] - 2:6, 2:12, 2:15, 2:22, 3:7, 3:21, 4:13, 4:16, 5:25, 6:2, 6:14, 6:17, 7:2, 7:7, 7:10, 8:10, 9:10, 10:8, 10:12, 11:23, 12:19, 13:24, 14:13, 17:10, 23:19, 24:19, 25:13, 25:25, 26:14, 28:11, 30:6, 30:11, 31:14, 33:21, 34:2, 34:6, 34:22, 35:21, 36:11, 38:11, 38:13, 38:17, 38:18, 38:25, 39:21, 40:6, 40:15, 41:9, 46:5, 47:8, 48:9, 49:8, 52:20, 54:15, 56:4, 56:8, 56:9, 56:12, 56:18, 57:17, 58:25, 60:3, 61:10, 62:20, 65:9, 69:2, 70:21, 71:16, 71:20, 76:13, 76:24, 78:10, 78:13, 79:1, 79:4, 79:6, 79:15, 83:6, 83:11,

84:5, 85:2, 86:19, 87:13, 88:15, 89:6, 89:10, 89:22, 92:1, 92:2, 92:22, 93:6, 93:24, 94:9, 94:21, 95:1, 95:10, 95:15, 96:17, 100:16, 100:24, 101:1, 101:21, 101:25, 102:7, 102:17, 102:20, 102:22
**Honor's** [1] - 101:2
**HONORABLE** [1] - 1:8
**hop** [1] - 46:11
**hope** [1] - 99:5
**hopeful** [1] - 36:14
**hopefully** [3] - 99:4, 99:22, 100:1
**hopes** [1] - 75:10
**hoping** [5] - 3:13, 3:14, 96:6, 96:9
**horrible** [2] - 12:16, 44:4
**hours** [1] - 3:3
**House** [1] - 71:8
**house** [1] - 86:13
**housekeeping** [1] - 95:11
**human** [3] - 44:2, 87:6, 88:20
**hundred** [4] - 62:8, 82:24, 83:4, 83:5
**hundreds** [1] - 44:9
**hurdle** [1] - 96:11
**hyperlink** [3] - 86:15, 91:5, 92:16
**hypothetical** [1] - 10:7
**hypothetically** [1] - 98:15

## I

**ID** [1] - 31:19
**idea** [4] - 13:10, 36:1, 36:5, 98:17
**identified** [7] - 27:19, 27:22, 31:25, 78:11, 89:1, 89:4, 89:9
**identify** [4] - 27:2, 31:16, 92:23, 93:1
**identifying** [1] - 43:8
**identity** [5] - 80:12, 81:8, 81:14, 82:2, 82:5
**ignorance** [1] - 54:14
**ill** [1] - 74:20
**ill-informed** [1] - 74:20
**illegal** [13] - 13:8, 13:14, 22:13, 22:17,

23:18, 24:9, 24:13, 27:9, 30:18, 74:8, 74:22, 74:25, 85:21
**illegally** [1] - 13:8
**illegitimate** [1] - 90:11
**Illicit** [1] - 91:7
**illicit** [7] - 13:4, 85:7, 85:16, 86:1, 90:21, 90:24, 91:2
**implication** [1] - 13:18
**implicit** [4] - 15:15, 40:24, 41:1, 56:1
**important** [7] - 7:16, 7:22, 8:2, 8:25, 10:1
**importation** [1] - 13:14
**impossible** [1] - 15:1
**impression** [1] - 68:18
**improper** [4] - 44:3, 44:12, 63:19
**impure** [1] - 28:17
**imputed** [2] - 14:23, 15:3
**IN** [1] - 1:1
**in-depth** [1] - 72:22
**inaccurate** [2] - 19:11, 50:11
**inappropriate** [1] - 33:10
**inclination** [1] - 37:16, 37:25, 38:7
**inclined** [4] - 9:3, 20:18, 95:6, 96:3
**include** [1] - 64:6
**included** [1] - 5:13
**includes** [1] - 56:15
**including** [1] - 90:18
**income** [5] - 65:20, 65:21, 66:10, 66:12, 68:23
**inconsistency** [1] - 32:1
**inconsistent** [1] - 79:9
**incorrect** [3] - 54:2, 54:3, 54:4
**increase** [1] - 58:18
**independent** [1] - 22:9
**indicate** [2] - 19:24, 94:20
**indicated** [10] - 17:16, 19:4, 19:22, 21:1, 31:12, 34:24, 37:11, 50:22, 51:20, 85:1
**indicating** [1] - 29:13
**indicia** [1] - 6:7
**indicted** [1] - 12:5
**indictment** [2] - 11:23, 12:1
**individual** [5] - 5:7, 12:11, 12:13, 54:7,

59:11
**inevitably** [1] - 85:18
**inextricably** [1] - 8:13
**inferences** [2] - 25:4, 81:11, 91:15
**inflamed** [1] - 12:22
**inflammatory** [2] - 43:24, 44:13
**information** [8] - 5:13, 17:21, 17:23, 19:23, 20:1, 31:19, 48:22
**informed** [1] - 74:20
**initial** [1] - 69:9
**innocence** [1] - 68:2
**innocent** [3] - 75:7, 77:10, 77:15
**inquired** [1] - 101:12
**insofar** [1] - 30:25
**instance** [5] - 43:8, 46:10, 54:21, 63:3, 82:10
**instead** [4] - 33:16, 34:1, 68:22, 95:12
**institutions** [2] - 90:25, 91:19
**instruct** [3] - 16:15, 16:18, 24:23
**instruction** [4] - 8:5, 9:4, 16:21, 25:5
**instructions** [20] - 7:4, 7:8, 8:17, 10:15, 11:1, 11:2, 11:4, 11:10, 12:18, 13:7, 14:2, 14:14, 15:8, 15:20, 15:22, 16:13, 16:19, 16:25, 17:4, 17:8
**integrity** [4] - 28:1, 28:8, 29:3, 29:11
**intend** [2] - 26:2, 34:7
**intended** [1] - 23:12
**intending** [1] - 26:1
**intent** [5] - 15:25, 16:1, 16:8, 16:9, 35:10
**interested** [1] - 101:8
**interests** [2] - 57:6, 60:19
**internal** [1] - 93:12
**international** [1] - 90:23
**International** [2] - 101:6, 102:13
**internet** [7] - 11:19, 11:20, 13:9, 13:11, 13:20, 24:1, 29:4
**interpretations** [1] - 98:11
**interpreting** [1] - 97:7
**interrupt** [2] - 79:6,

99:16
**intertwined** [1] - 8:13
**interviewed** [1] - 88:9
**introduce** [2] - 15:7, 95:20
**invasion** [1] - 86:13
**inventory** [1] - 20:14
**invested** [1] - 58:19
**investigating** [1] - 45:3
**investigations** [3] - 42:25, 92:6, 92:11
**investigator** [3] - 32:22, 54:19, 65:19
**investigators** [2] - 41:19, 50:15
**investor** [4] - 60:18, 69:11, 71:11, 72:7
**invite** [1] - 85:17
**invites** [1] - 86:24
**invoking** [1] - 12:23
**involve** [2] - 12:23, 13:14
**involved** [4] - 14:10, 20:4, 22:13, 29:21
**involving** [5] - 14:20, 22:11, 22:13, 29:20, 72:18
**issue** [29] - 3:8, 10:12, 11:9, 12:21, 20:2, 21:18, 22:16, 26:18, 27:12, 27:20, 29:6, 29:14, 30:4, 30:23, 33:7, 34:8, 37:10, 37:17, 43:25, 47:10, 48:11, 64:10, 70:20, 78:11, 96:18, 96:25, 99:20, 99:23
**issued** [1] - 102:8
**issues** [12] - 15:22, 35:20, 36:8, 36:24, 37:1, 49:9, 49:14, 75:8, 77:1, 77:3, 96:8, 100:22
**items** [1] - 95:11
**itself** [6] - 25:20, 29:14, 43:3, 85:7, 87:14, 87:25

## J

**Jail** [2] - 3:9, 3:20
**jail** [9] - 3:14, 3:17, 3:22, 4:1, 4:3, 35:1, 44:6, 100:9
**Japan** [4] - 5:17, 5:21, 29:9, 101:12
**Japanese** [7] - 4:24, 4:25, 5:20, 5:22, 6:10, 6:24, 101:23

**jargon** [3] - 67:6, 67:15, 67:23
**Jeff** [1] - 2:10
**JEFFREY** [1] - 1:15
**Jeffrey** [1] - 39:3
**Jencks** [3] - 41:18, 43:9
**joint** [1] - 97:17
**Journal** [2] - 92:15, 94:7
**judge** [1] - 21:10
**Judge** [2] - 36:15, 37:8
**JUDGE** [2] - 1:8, 1:8
**juror** [2] - 12:13, 12:14
**jurors** [3] - 52:3, 52:9, 52:13
**jury** [92] - 7:4, 7:16, 7:22, 8:2, 8:5, 8:19, 8:25, 10:2, 10:14, 11:8, 11:10, 12:21, 14:2, 14:14, 15:8, 15:22, 16:13, 16:15, 16:18, 17:4, 17:6, 21:10, 24:4, 24:23, 24:24, 25:3, 25:6, 25:8, 25:10, 25:18, 30:25, 31:1, 31:9, 33:15, 35:22, 36:6, 36:14, 41:14, 41:21, 41:23, 42:9, 43:4, 43:6, 43:7, 43:19, 46:2, 47:4, 47:12, 47:21, 49:6, 49:11, 49:18, 50:21, 51:7, 52:10, 53:1, 53:7, 53:16, 55:19, 55:21, 57:10, 61:9, 62:6, 66:1, 66:13, 67:16, 68:8, 70:15, 75:11, 75:21, 75:25, 76:1, 81:3, 81:11, 81:18, 82:3, 82:8, 83:2, 83:20, 83:22, 83:24, 85:12, 87:10, 88:3, 91:13, 91:14, 97:25, 98:8, 98:12, 99:9
**jury's** [1] - 90:14
**justice** [1] - 44:1
**Justice** [5] - 1:13, 1:16, 92:15, 93:12, 94:7
**justified** [2] - 32:19, 32:20

## K

**Karpeles** [4] - 28:14, 28:18, 28:19, 28:23
**Karpeles's** [1] - 29:8

**keep** [5] - 11:2, 16:25, 26:17, 61:11, 65:10
**ken** [1] - 52:4
**key** [2] - 46:17, 61:16
**kidnapper** [1] - 86:6
**kidnapping** [1] - 86:4
**kind** [13] - 21:10, 22:19, 29:9, 41:22, 51:4, 58:23, 66:20, 73:14, 73:17, 75:9, 77:16, 78:18, 100:5
**kinds** [1] - 48:18
**knowing** [1] - 58:3
**knowingly** [1] - 16:4
**knowledge** [13] - 10:1, 14:23, 15:3, 18:25, 20:10, 28:6, 34:16, 72:5, 72:23, 73:11, 79:17, 87:1, 88:8
**known** [4] - 42:15, 65:21, 65:22, 90:10
**knows** [6] - 27:15, 52:6, 52:23, 80:15, 81:24, 84:18
**Korver** [1] - 92:12
**Kraken** [4] - 57:20, 61:18, 69:21, 82:18
**KYC** [2] - 57:20, 61:17
**KYC'd** [1] - 79:23

## L

**lack** [2] - 74:21, 101:7
**Lamborghini** [5] - 23:17, 24:7, 24:8, 24:10, 24:12
**Lamborghinis** [2] - 22:14, 23:16
**Lambos** [2] - 22:11
**language** [2] - 16:21, 101:14
**large** [3] - 65:20, 86:7, 86:9
**largely** [1] - 16:10
**larger** [1] - 61:21
**Larry** [1] - 76:25
**last** [6] - 39:23, 55:5, 55:8, 55:9, 55:11, 83:20
**late** [1] - 89:2
**lateness** [1] - 38:5
**latter** [1] - 72:2
**launder** [1] - 98:17
**launderer** [1] - 82:4
**laundering** [5] - 7:15, 14:20, 63:5, 73:24, 91:18
**Law** [3] - 1:19, 92:15, 94:7
**law** [17] - 4:24, 14:11,

14:20, 14:22, 30:19, 39:11, 40:12, 41:4, 43:13, 43:23, 45:9, 45:12, 45:13, 50:14, 51:23, 55:25, 73:8
**lawyer** [8] - 22:8, 53:1, 62:13, 64:4, 64:7, 64:24, 77:21
**lawyer's** [1] - 64:13
**lawyers** [2] - 21:10, 35:4
**lay** [1] - 96:22
**lead** [3] - 45:19, 48:23, 91:1
**leaked** [1] - 29:5
**least** [12] - 6:3, 26:10, 27:25, 35:17, 41:2, 47:3, 49:8, 52:3, 52:13, 88:17, 94:8, 96:8
**leave** [9] - 9:1, 15:15, 24:1, 27:12, 29:10, 32:23, 46:1, 97:14, 99:18
**leaves** [1] - 9:19
**leaving** [2] - 13:22, 78:22
**left** [1] - 9:20
**legal** [4] - 3:22, 3:25, 4:8, 4:9
**Legal** [1] - 5:15
**legality** [1] - 30:18
**legitimate** [11] - 57:5, 60:18, 87:15, 87:23, 88:4, 89:14, 89:17, 89:20, 90:8, 90:21, 98:10
**less** [6] - 13:9, 24:12, 42:16, 65:16, 84:16, 94:17
**level** [9] - 17:23, 23:14, 46:8, 60:4, 60:8, 60:12, 61:12, 79:17, 82:16
**levels** [1] - 49:15
**liabilities** [2] - 65:22, 70:9
**liability** [1] - 14:24
**light** [1] - 69:3
**likely** [10] - 24:6, 24:9, 24:13, 29:17, 48:6, 52:18, 54:12, 79:25, 82:12, 98:8
**likewise** [1] - 46:17
**limitations** [10] - 7:14, 7:17, 8:4, 8:10, 8:13, 8:25, 9:8, 9:13, 10:1, 10:10
**limited** [1] - 26:21
**line** [7] - 31:8, 64:6,

71:10, 72:7, 80:8, 83:16, 99:5
**lines** [1] - 22:24
**link** [3] - 2:14, 5:9, 71:4
**list** [3] - 37:3, 85:22, 94:20
**listing** [1] - 32:12
**login** [1] - 80:12
**logins** [2] - 80:1, 82:12
**look** [36] - 5:14, 6:5, 6:23, 9:4, 17:12, 17:16, 17:18, 18:1, 18:19, 18:24, 29:20, 32:15, 34:17, 39:16, 40:7, 40:9, 40:12, 41:22, 43:11, 43:22, 46:10, 51:10, 51:13, 51:23, 56:4, 59:5, 66:15, 66:17, 67:17, 74:16, 78:4, 78:8, 93:18, 93:20, 93:23, 94:24
**looked** [3] - 47:14, 64:5, 82:23
**looking** [15] - 5:11, 23:7, 29:3, 31:23, 40:8, 48:5, 52:18, 56:24, 61:12, 63:8, 64:16, 76:21, 83:4, 101:15, 101:18
**looks** [1] - 77:9
**love** [1] - 55:23
**low** [1] - 86:7
**low-friction** [1] - 86:7
**lunchtime** [1] - 36:16

## M

**magnitude** [1] - 65:21
**main** [3] - 7:13, 30:12, 99:23
**maintain** [2] - 42:5, 85:5
**maintaining** [1] - 85:15
**maintenance** [1] - 17:22
**major** [3] - 27:6, 28:20, 28:21
**majority** [1] - 87:22
**management** [2] - 96:19, 97:10
**manipulation** [1] - 29:9
**manner** [1] - 33:17
**manual** [1] - 93:3
**manufacture** [1] - 13:14

**market** [1] - 11:24
**marshal** [1] - 3:16
**Marshals** [2] - 2:25, 100:14
**marshals** [2] - 3:14, 3:15
**Mason** [2] - 79:20, 82:15
**Massachusetts** [1] - 40:17
**match** [2] - 67:4, 73:21
**material** [2] - 43:9, 92:11
**materials** [3] - 17:19, 41:8, 41:18
**math** [15] - 58:13, 58:14, 59:4, 59:8, 62:1, 62:3, 62:10, 62:18, 62:23, 65:4, 66:5, 66:17, 68:10, 70:9, 75:24
**matter** [9] - 28:4, 45:2, 67:17, 68:24, 69:2, 70:8, 99:3, 99:18, 99:21
**matters** [4] - 34:24, 54:19, 95:4, 95:13
**Mazarin** [1] - 46:24
**Mazars** [1] - 46:24
**Mazars'** [1] - 42:6
**mean** [34] - 8:22, 12:19, 23:6, 23:10, 24:23, 32:8, 32:13, 40:7, 43:2, 43:14, 43:18, 47:18, 49:15, 52:21, 58:14, 60:9, 62:5, 64:2, 64:20, 66:2, 66:20, 72:9, 72:19, 73:9, 74:22, 82:1, 85:17, 86:22, 87:24, 88:16, 88:24, 92:19, 94:4, 97:23
**meaningful** [2] - 49:17, 55:21
**means** [7] - 15:18, 24:12, 57:22, 75:1, 75:2, 75:6, 92:18
**measure** [2] - 71:11, 72:8
**measures** [3] - 50:19, 85:3, 86:16
**Measuring** [1] - 91:7
**Meiklejohn's** [3] - 32:5, 33:3, 33:24
**member** [2] - 15:3, 15:4
**members** [1] - 24:24
**meme** [5] - 22:11, 23:9, 23:22, 24:16,

25:15
**memes** [4] - 23:6, 23:10, 23:12, 23:15
**memory** [5] - 51:24, 51:25, 52:5, 52:7, 54:15
**men** [1] - 86:12
**mens** [1] - 14:7
**mention** [1] - 12:22
**mentions** [2] - 26:23, 32:8
**mere** [1] - 12:22
**merely** [3] - 26:24, 32:15, 93:2
**met** [1] - 27:18
**method** [1] - 80:3
**methodology** [1] - 21:3
**MICHAEL** [1] - 1:19
**Michael** [3] - 2:15, 28:14, 39:5
**Michele** [1] - 92:12
**mid** [1] - 32:3
**mid-trial** [1] - 32:3
**might** [17] - 12:4, 12:16, 38:4, 41:3, 47:15, 48:1, 51:16, 51:25, 56:2, 60:22, 61:10, 71:4, 90:10, 94:6, 98:5, 99:7
**million** [4] - 62:8, 63:22, 66:6, 66:23
**Million** [1] - 32:6
**millions** [4] - 62:10, 67:1, 86:14, 86:24
**mind** [8] - 8:3, 18:18, 37:15, 47:24, 47:25, 52:12, 54:18, 60:20
**minute** [2] - 10:3, 88:6
**minutes** [2] - 48:1, 76:2
**minutia** [1] - 23:1
**miscarriages** [1] - 44:1
**mischaracterize** [1] - 23:11
**misleading** [5] - 16:20, 30:25, 44:2, 66:1, 68:8
**misleads** [1] - 67:16
**missing** [3] - 5:9, 71:5, 84:11
**misstep** [1] - 82:4
**mix** [1] - 79:18
**mixer** [7] - 18:8, 57:8, 60:22, 74:12, 79:23, 89:17, 91:4
**mixers** [2] - 87:15, 87:21
**mixing** [4] - 22:17,

86:16, 89:13, 90:20
**MLAT** [12] - 5:24, 6:1, 6:11, 6:15, 6:17, 6:20, 6:21, 6:25, 7:1, 102:4, 102:8
**moment** [1] - 79:11
**Monday** [10] - 35:18, 36:2, 36:9, 40:13, 41:6, 43:12, 56:5, 88:23, 97:17, 100:4
**money** [17] - 7:15, 14:20, 29:18, 30:2, 62:15, 63:5, 63:23, 66:8, 68:21, 70:1, 70:13, 73:23, 82:4, 82:18, 86:7, 91:18, 98:17
**monkeyed** [1] - 20:3
**month** [4] - 74:11, 74:18, 74:23
**moreover** [1] - 28:25
**mortar** [1] - 91:18
**MOSS** [1] - 1:8
**most** [9] - 12:16, 52:4, 75:11, 81:5, 84:24, 89:16, 89:20, 90:8, 90:19
**motion** [2] - 38:6, 38:9
**move** [5] - 3:1, 26:15, 33:5, 78:25, 100:1
**moved** [4] - 3:19, 4:12, 37:21
**moving** [1] - 100:11
**MR** [147] - 2:8, 2:10, 2:12, 2:15, 2:22, 3:7, 3:21, 4:7, 4:13, 7:7, 7:10, 7:13, 8:10, 8:22, 9:10, 9:17, 10:6, 10:12, 11:12, 11:23, 12:3, 12:19, 13:1, 13:24, 14:13, 15:11, 16:24, 17:10, 20:24, 22:25, 23:19, 24:19, 25:5, 25:10, 25:13, 25:16, 25:21, 26:14, 26:17, 28:11, 30:6, 32:5, 33:21, 36:5, 36:11, 38:13, 38:18, 39:5, 39:21, 40:6, 40:15, 41:9, 42:19, 46:5, 47:8, 48:9, 49:8, 49:20, 49:25, 52:20, 53:12, 54:15, 56:4, 56:8, 56:9, 56:12, 56:18, 56:21, 57:2, 57:14, 58:25, 59:5, 59:13, 59:16, 60:3, 61:10, 61:15, 62:20, 65:9, 65:12, 65:15, 67:19,

69:2, 70:21, 70:24, 71:16, 71:20, 72:19, 73:2, 75:5, 76:12, 76:22, 76:24, 78:10, 79:1, 79:4, 79:6, 79:13, 79:15, 80:21, 82:6, 82:20, 83:6, 83:8, 83:11, 84:5, 84:7, 85:2, 86:3, 86:19, 87:2, 87:4, 87:13, 88:11, 88:14, 88:21, 89:5, 89:10, 89:12, 89:22, 90:3, 90:15, 90:17, 92:1, 92:2, 92:4, 92:21, 93:6, 93:16, 93:24, 94:1, 94:9, 94:19, 95:1, 95:10, 95:15, 95:18, 96:2, 96:17, 97:4, 99:11, 99:14, 99:16, 99:22, 100:16, 100:24, 102:22
**MS** [29] - 2:6, 4:16, 4:22, 5:11, 5:25, 6:2, 6:9, 6:14, 6:17, 6:20, 7:2, 7:5, 25:25, 30:11, 34:6, 34:22, 35:21, 36:2, 38:10, 38:17, 39:2, 101:1, 101:5, 101:21, 101:25, 102:7, 102:11, 102:17, 102:20
**Mt** [31] - 4:15, 18:24, 19:1, 19:2, 19:5, 19:16, 19:21, 19:24, 20:3, 20:8, 21:14, 21:16, 21:17, 26:18, 26:20, 26:21, 27:1, 27:2, 27:5, 28:15, 29:3, 29:4, 29:11, 31:17, 31:19, 84:8, 84:10, 84:16, 101:2, 101:12, 101:20
**multiple** [3] - 26:20, 90:18, 97:1
**municipal** [1] - 7:15
**must** [4] - 14:10, 15:24, 70:7, 81:22
**Mutual** [1] - 5:15
**mystery** [1] - 75:19

## N

**N.W** [1] - 103:11
**name** [5] - 32:8, 80:23, 81:1, 81:15, 94:14
**names** [2] - 2:4, 38:24
**nature** [8] - 21:13,

32:25, 48:8, 73:25, 75:10, 93:22, 97:2, 97:21
**necessarily** [8] - 21:15, 42:11, 43:8, 52:11, 75:5, 75:15, 94:3, 100:15
**necessary** [4] - 13:21, 19:6, 30:9, 34:12
**need** [25] - 3:12, 5:3, 6:25, 15:7, 16:14, 17:22, 23:1, 27:14, 28:5, 34:24, 37:2, 37:8, 37:19, 44:22, 72:22, 77:15, 77:16, 93:1, 95:23, 98:1, 98:25, 99:2, 100:6, 100:21, 102:7
**needs** [4] - 10:16, 35:16, 85:9, 102:14
**nefarious** [4] - 75:15, 77:12, 78:1, 78:2
**negative** [1] - 77:12
**net** [9] - 65:20, 65:22, 66:10, 66:12, 68:22, 68:23
**network** [6] - 17:24, 80:1, 80:13, 82:13, 87:20, 87:25
**neutral** [5] - 11:20, 41:21, 44:16, 46:7, 53:15
**never** [5] - 8:24, 18:2, 50:16, 76:4, 78:6
**new** [1] - 41:17
**New** [3] - 1:17, 1:20, 86:12
**next** [9] - 15:23, 39:8, 50:13, 63:2, 78:17, 96:7, 99:21, 100:12, 100:22
**nice** [1] - 102:24
**night** [2] - 41:16, 43:10
**nine** [1] - 55:13
**nobody** [3] - 15:14, 83:14
**nonanswer** [1] - 49:22
**noncrypto** [1] - 61:23
**normal** [3] - 75:7, 77:6, 77:9
**Nos** [1] - 18:21
**note** [6] - 12:19, 15:23, 28:11, 53:17, 91:16, 98:16
**noted** [2] - 31:13, 79:11
**notes** [3] - 43:24, 97:7, 103:5
**nothing** [7] - 14:8,

29:24, 69:12, 75:15, 100:10, 102:20, 102:22
**notice** [1] - 41:7
**noticed** [2] - 76:25, 77:2
**noting** [1] - 30:12
**notion** [4] - 52:11, 70:4, 74:15, 94:6
**nuance** [1] - 82:8
**number** [15] - 10:21, 12:23, 13:1, 14:2, 14:14, 14:19, 17:15, 18:9, 42:8, 49:14, 49:15, 62:24, 63:21, 78:16, 93:7
**numbered** [1] - 56:25
**numbers** [1] - 65:4
**NW** [4] - 1:11, 1:14, 1:17, 1:24
**NY** [1] - 1:20

## O

**obfuscate** [1] - 80:4
**obfuscating** [1] - 84:11
**object** [9] - 9:24, 10:9, 26:12, 30:15, 79:13, 81:18, 86:20, 90:6
**objecting** [1] - 70:4
**objection** [6] - 78:15, 78:21, 79:7, 85:13, 91:25, 92:1
**objections** [1] - 7:8
**objective** [2] - 22:10, 65:19
**observation** [2] - 52:23, 53:9
**observing** [2] - 48:16, 48:24
**obtain** [4] - 22:4, 71:11, 72:8, 101:11
**obtaining** [1] - 80:12
**obvious** [2] - 66:20, 67:9
**obviously** [4] - 11:8, 20:20, 26:6, 101:10
**occurred** [2] - 41:15, 86:25
**occurs** [2] - 11:18, 91:18
**OECD** [2] - 91:8, 91:17
**OF** [4] - 1:1, 1:2, 1:7, 103:1
**offense** [2] - 9:18, 10:16
**offer** [11] - 18:17, 24:3, 26:8, 26:9, 29:13, 44:9, 44:15, 56:6,

69:19, 87:1, 95:22
**offered** [5] - 18:20, 57:3, 60:16, 96:5, 96:14
**offering** [5] - 17:20, 22:15, 24:20, 59:19
**offers** [1] - 77:25
**office** [2] - 5:7, 101:8
**Office** [3] - 86:11, 101:5, 102:13
**officer** [1] - 14:12
**OFFICIAL** [1] - 103:1
**Official** [2] - 1:23, 103:10
**official** [1] - 5:16
**often** [1] - 88:16
**oftentimes** [1] - 23:11
**omnibus** [1] - 6:21
**once** [1] - 10:18
**one** [61] - 7:13, 10:21, 12:19, 12:23, 13:5, 14:14, 15:2, 15:18, 16:24, 17:3, 18:8, 20:23, 26:15, 29:18, 35:21, 37:7, 39:1, 39:8, 41:23, 45:25, 46:13, 46:24, 48:13, 49:15, 51:20, 53:24, 54:18, 56:16, 59:8, 59:12, 59:13, 61:6, 62:24, 70:10, 70:17, 71:14, 71:19, 72:25, 73:16, 75:7, 76:18, 77:4, 77:22, 80:13, 82:24, 83:4, 83:21, 84:16, 85:1, 86:11, 86:17, 87:14, 88:8, 91:1, 93:7, 94:20, 94:24, 95:15, 98:11, 100:13
**ones** [1] - 13:14
**ongoing** [3] - 9:18, 10:9, 10:11
**online** [3] - 94:8, 94:15, 94:17
**open** [6] - 27:12, 36:2, 37:1, 37:3, 37:4, 37:9
**opening** [5] - 33:8, 33:10, 33:11, 33:15, 33:22
**openings** [2] - 35:23, 36:8
**operates** [1] - 45:12
**operating** [1] - 7:20
**operation** [2] - 18:2, 71:6
**operator** [4] - 61:19, 63:10, 72:13, 78:19
**operator's** [1] - 63:11

**opine** [3] - 17:21, 47:16, 69:10
**opining** [1] - 47:20
**opinion** [21] - 19:24, 21:22, 22:10, 22:15, 24:20, 24:22, 24:23, 24:25, 25:1, 26:25, 30:16, 31:11, 37:12, 37:13, 57:23, 63:6, 73:20, 77:14, 82:16, 97:21, 97:22
**opinions** [10] - 19:10, 19:11, 25:2, 36:21, 37:1, 47:16, 55:25, 60:8, 64:25, 76:6
**opportunities** [1] - 31:16
**opportunity** [2] - 31:25, 33:12
**optimistic** [1] - 19:13
**optimistically** [1] - 18:4
**order** [5] - 19:5, 33:7, 95:18, 97:13, 100:6
**Organization** [1] - 91:5
**organization** [1] - 15:6
**originally** [1] - 80:18
**otherwise** [7] - 13:15, 28:7, 38:4, 47:19, 68:9, 85:1, 96:3
**ought** [7] - 36:17, 44:9, 49:3, 81:10, 90:12, 93:17, 98:7
**ourselves** [1] - 36:16
**out-of-order** [1] - 95:18
**out-of-town** [1] - 100:18
**outlined** [2] - 20:11, 83:12
**outset** [2] - 7:17, 10:22
**outside** [6] - 10:10, 24:3, 30:14, 52:4, 71:25, 74:12
**outstanding** [2] - 36:7, 37:7
**overswayed** [1] - 53:7
**own** [6] - 19:20, 25:10, 70:16, 79:23, 84:11, 89:15
**owned** [3] - 61:23, 65:21, 71:3
**ownership** [2] - 92:5, 93:8

---

## P

**P.M** [1] - 1:6

**p.m** [6] - 38:19, 41:16, 43:13, 97:17, 102:25
**page** [8] - 11:12, 14:1, 14:2, 49:21, 50:19, 56:24, 92:16, 93:14
**pages** [3] - 11:5, 54:23, 56:14
**paid** [4] - 32:13, 66:23, 73:13, 74:9
**paint** [1] - 87:20
**paper** [13] - 31:1, 32:5, 32:18, 33:4, 33:24, 34:7, 34:17, 58:11, 58:24, 59:16, 62:3
**papers** [1] - 4:17
**Paragraph** [1] - 92:4
**paragraph** [8] - 42:20, 57:2, 61:15, 70:25, 84:7, 87:4, 87:7, 92:3
**paragraphs** [1] - 56:25
**part** [14] - 5:12, 6:3, 8:24, 11:19, 16:17, 23:7, 26:8, 48:11, 72:2, 85:8, 86:5, 89:23, 93:3, 102:9
**particular** [18] - 9:15, 17:18, 18:24, 22:5, 23:22, 35:8, 35:9, 42:11, 43:8, 43:17, 54:7, 55:3, 58:16, 58:18, 74:2, 95:19, 101:16
**particularly** [10] - 32:11, 42:23, 43:23, 48:6, 49:3, 66:13, 67:12, 69:3, 97:19, 102:15
**particulars** [1] - 49:7
**parties** [7] - 37:20, 39:10, 40:2, 40:11, 41:6, 97:16, 99:4
**parties'** [1] - 99:5
**party** [1] - 84:9
**passed** [1] - 55:5
**past** [3] - 34:23, 45:16, 78:7
**pattern** [14] - 71:1, 71:4, 71:10, 72:2, 72:3, 72:6, 72:9, 75:2, 76:10, 76:15, 76:18, 76:21, 78:11
**patterns** [4] - 63:5, 74:2, 76:8, 78:1
**pause** [4] - 58:6, 67:5, 95:2, 95:13
**paycheck** [2] - 74:10, 74:11
**payment** [1] - 74:24
**payments** [4] - 73:15,

73:22, 75:16, 75:17
**Pearlman** [4] - 2:10, 39:3, 96:6, 97:15
**PEARLMAN** [2] - 1:15, 2:10
**peel** [1] - 46:17
**Peel** [1] - 32:6
**peer** [2] - 80:4
**pejorative** [1] - 13:17
**Pelker** [13] - 2:7, 25:24, 29:21, 30:8, 34:4, 39:2, 92:12, 93:19, 93:22, 94:11, 94:16, 94:23, 100:25
**PELKER** [30] - 1:13, 2:6, 4:16, 4:22, 5:11, 5:25, 6:2, 6:9, 6:14, 6:17, 6:20, 7:2, 7:5, 25:25, 30:11, 34:6, 34:22, 35:21, 36:2, 38:10, 38:17, 39:2, 101:1, 101:5, 101:21, 101:25, 102:7, 102:11, 102:17, 102:20
**Pelker's** [1] - 94:14
**pending** [1] - 35:17
**Pennsylvania** [1] - 1:14
**people** [35] - 12:21, 13:8, 13:10, 18:9, 22:12, 22:17, 23:13, 23:16, 44:10, 44:22, 45:18, 52:1, 52:5, 52:17, 52:24, 54:12, 55:13, 55:14, 58:2, 60:22, 61:5, 61:7, 74:14, 74:16, 74:22, 75:11, 80:15, 85:14, 85:20, 87:22, 88:5, 88:9, 88:10, 99:1
**people's** [2] - 11:16, 11:21
**per** [1] - 68:4
**perceiver** [1] - 15:13
**percent** [6] - 31:2, 50:10, 62:10, 65:17, 66:23, 87:15
**percentage** [4] - 63:21, 66:7, 74:9, 90:24
**perfect** [1] - 52:7
**perfectly** [2] - 70:3, 81:9
**performing** [1] - 78:16
**perhaps** [7] - 4:7, 6:4, 18:4, 19:13, 61:12, 83:24
**period** [3] - 3:17, 7:21, 52:6

**permissible** [2] - 26:24, 82:14
**permit** [1] - 26:10
**person** [8] - 14:16, 18:8, 51:16, 53:8, 54:21, 55:6, 55:7, 81:24
**personal** [5] - 57:5, 60:19, 63:9, 71:12, 72:8
**personally** [1] - 66:23
**Ph.D** [1] - 53:2
**phenomena** [1] - 53:16
**phenomenon** [2] - 40:5, 42:15
**phrase** [1] - 42:7
**physically** [2] - 29:1, 58:2
**pick** [1] - 36:14
**picked** [1] - 5:8
**piece** [1] - 42:11
**pilots** [1] - 48:17
**places** [1] - 42:8
**Plaintiff** [2] - 1:3, 1:10
**plan** [2] - 34:21, 86:13
**planning** [3] - 20:23, 33:22, 71:22
**plausible** [1] - 29:23
**play** [3] - 54:18, 81:11, 100:19
**plays** [1] - 79:12
**pled** [2] - 11:24, 12:3
**plenty** [1] - 26:19
**PLLC** [1] - 1:19
**plus** [1] - 66:24
**Point** [1] - 20:14
**point** [39] - 23:20, 26:15, 28:9, 31:6, 31:15, 31:24, 33:24, 33:25, 34:3, 37:25, 38:15, 39:18, 40:13, 50:13, 53:22, 54:3, 58:16, 58:20, 59:9, 64:2, 69:17, 70:15, 70:17, 74:13, 77:18, 77:23, 79:7, 82:7, 84:17, 85:10, 85:24, 87:13, 88:15, 88:18, 89:8, 89:18, 89:23, 94:24
**pointed** [1] - 88:25
**points** [10] - 14:13, 22:8, 30:12, 48:13, 54:17, 57:17, 58:18, 61:16, 89:23, 93:6
**policies** [3] - 93:10, 93:11, 93:12
**policing** [2] - 65:3, 65:25

**policy** [4] - 93:13, 93:14, 93:16, 94:3
**political** [1] - 87:25
**pool** [2] - 52:10, 75:19
**poor** [1] - 44:6
**Porsche** [1] - 62:16
**portion** [2] - 13:9, 13:11
**portions** [1] - 64:12
**position** [14] - 14:6, 15:13, 42:1, 44:20, 45:1, 47:9, 60:10, 63:25, 77:7, 84:1, 95:21, 95:23, 96:12, 96:16
**positions** [1] - 79:10
**possession** [1] - 97:8
**possibility** [3] - 5:19, 35:22, 84:9
**possible** [6] - 11:3, 37:13, 43:10, 73:3, 84:22, 99:10
**possibly** [1] - 23:18
**post** [3] - 38:2, 38:8, 79:18
**post-mix** [1] - 79:18
**post-trial** [2] - 38:2, 38:8
**Poteat** [1] - 92:13
**potential** [1] - 34:8
**potentially** [3] - 30:25, 34:10, 67:15
**power** [1] - 21:25
**PowerPoint** [4] - 56:22, 57:15, 59:1, 62:21
**practical** [1] - 45:2
**practice** [4] - 92:9, 94:5, 94:6, 94:12
**Practice** [2] - 92:15, 94:7
**practices** [2] - 30:19, 94:2
**predictive** [1] - 51:5
**prefer** [1] - 20:23
**prefers** [1] - 100:14
**prejudice** [2] - 97:24, 98:4
**prejudices** [1] - 11:21
**prejudicial** [8] - 11:16, 12:4, 12:7, 27:8, 28:2, 49:6, 84:20, 98:14
**preliminary** [19] - 7:4, 7:8, 8:5, 8:17, 10:14, 11:1, 11:4, 11:25, 12:17, 13:7, 14:1, 14:14, 15:20, 16:19, 16:21, 16:25, 17:4, 17:8, 17:13

**prep** [1] - 36:20
**prepared** [3] - 18:16, 85:19, 95:21
**prescriptive** [1] - 45:13
**presence** [3] - 24:4, 38:20, 49:15
**present** [3] - 2:13, 2:20, 46:1
**presented** [2] - 29:25, 32:15
**presenting** [2] - 19:9, 30:23
**press** [1] - 86:12
**presumably** [1] - 27:18
**PRETRIAL** [2] - 1:4, 1:7
**pretrial** [3] - 33:7, 36:7, 40:21
**pretty** [2] - 9:22, 11:14
**prevent** [1] - 86:17
**previous** [2] - 73:16, 79:10
**previously** [5] - 20:6, 21:1, 34:24, 37:11, 39:14
**primarily** [1] - 7:18
**prime** [1] - 32:24
**primordial** [1] - 11:17
**principal** [1] - 27:4
**principle** [1] - 41:13
**principles** [1] - 54:18
**printout** [2] - 4:3
**priority** [1] - 37:4
**privacy** [20] - 30:18, 57:5, 57:25, 60:19, 71:12, 72:8, 79:17, 79:18, 79:24, 82:11, 82:14, 85:3, 85:5, 85:15, 86:16, 87:15, 87:20, 88:4, 89:14, 90:21
**private** [2] - 46:16, 59:23
**probability** [1] - 50:9
**probative** [3] - 27:9, 28:3, 84:20
**problem** [20] - 9:8, 13:6, 21:19, 22:6, 27:3, 46:17, 46:18, 47:22, 47:23, 58:9, 52:1, 59:19, 62:12, 62:19, 66:20, 68:18, 81:13, 88:24, 89:21, 96:11
**problematic** [2] - 49:3, 67:8
**problems** [2] - 26:22, 62:14

**procedure** [2] - 4:24, 31:21
**proceed** [5] - 37:25, 38:7, 38:11, 95:23, 99:14
**proceeding** [1] - 2:19
**proceedings** [2] - 38:21, 103:6
**proceeds** [7] - 14:17, 15:19, 79:23, 79:25, 80:4, 81:24, 82:12
**process** [3] - 48:7, 48:15, 92:11
**processes** [1] - 102:1
**produced** [4] - 6:1, 6:16, 6:21, 26:21
**product** [1] - 32:20
**production** [1] - 41:17
**professional** [3] - 33:16, 42:7, 47:1
**Professor** [1] - 69:14
**programmer** [2] - 79:25, 82:11
**promise** [1] - 100:11
**promises** [1] - 101:25
**promote** [1] - 15:25
**prong** [1] - 47:11
**proof** [5] - 8:16, 10:14, 10:21, 75:20, 77:8
**proper** [9] - 23:9, 26:2, 43:16, 44:15, 44:24, 47:25, 60:1, 64:14, 68:14
**properly** [2] - 44:10, 98:21
**property** [4] - 14:10, 92:5, 93:8, 94:2
**proposed** [6] - 7:8, 17:4, 56:23, 60:6, 69:4, 72:15
**proposition** [3] - 43:16, 44:23, 94:15
**prosecution** [1] - 41:24
**prosecutor** [1] - 102:12
**prosecutor's** [2] - 5:7, 101:7
**prospective** [1] - 12:13
**protecting** [1] - 87:24
**protestors** [2] - 87:6, 88:20
**prove** [8] - 8:11, 10:17, 14:10, 15:24, 16:4, 24:6, 54:8, 63:24
**proven** [2] - 50:18, 50:19, 51:1
**proves** [3] - 65:6,

70:12, 78:24
**provide** [4] - 22:19, 31:18, 41:7, 49:17
**provided** [2] - 45:8, 45:9
**provides** [2] - 10:19, 43:6
**providing** [3] - 21:3, 22:10, 102:5
**province** [4] - 47:21, 49:6, 57:10, 62:6
**public** [1] - 90:18
**published** [5] - 43:1, 92:9, 94:8, 94:15, 94:16
**pulling** [1] - 10:25
**pulls** [2] - 31:21, 31:23
**purchasable** [1] - 80:1
**purchase** [1] - 81:1
**purchased** [2] - 80:20, 80:22
**purchasing** [2] - 81:15, 82:12
**purely** [1] - 59:23
**purport** [2] - 6:8, 52:15
**purportedly** [1] - 28:18
**purporting** [1] - 76:5
**purpose** [3] - 61:3, 84:11, 88:10
**purposes** [8] - 11:3, 16:19, 58:1, 60:23, 68:15, 85:14, 86:1, 87:22
**pursuant** [2] - 5:15, 6:1
**put** [18] - 16:12, 17:3, 34:19, 35:4, 35:17, 53:2, 58:10, 58:11, 58:24, 62:2, 82:17, 95:8, 97:23, 98:1, 98:2, 98:3, 98:9, 98:20
**puts** [1] - 77:7
**putting** [6] - 43:21, 58:17, 78:21, 81:19, 97:24, 97:25

**Q**

**Q.E.D** [1] - 66:18
**quackery** [1] - 55:2
**qualifications** [1] - 54:24
**qualified** [3] - 39:14, 78:14, 78:22
**quantifiable** [1] - 88:7
**quantification** [1] - 53:21

**quantify** [6] - 44:20, 44:21, 49:17, 51:19, 52:15, 53:18
**quantities** [2] - 86:7, 86:9
**questioning** [1] - 31:8
**questions** [4] - 16:15, 28:1, 81:12, 95:11
**quick** [2] - 13:25, 93:6
**quickly** [3] - 37:1, 99:9, 99:22
**quite** [4] - 22:19, 24:11, 46:25, 65:24
**quotations** [1] - 92:14
**quote** [7] - 11:19, 28:12, 31:18, 53:19, 67:23, 91:20, 93:14
**quote-unquote** [4] - 11:19, 31:18, 53:19, 67:23

**R**

**rabbit** [1] - 8:18
**raise** [2] - 11:11, 99:18
**raised** [6] - 10:7, 16:11, 27:4, 37:20, 79:8, 101:9
**raises** [1] - 49:14
**raising** [3] - 16:11, 28:1, 64:15
**RANDOLPH** [1] - 1:8
**random** [3] - 32:25, 71:10, 72:6
**rank** [1] - 84:24
**Rappahannock** [2] - 3:8, 3:20
**rate** [2] - 31:2, 53:21
**rates** [2] - 32:12, 32:24
**rather** [5] - 14:7, 35:4, 54:16, 91:23, 96:14
**rattle** [1] - 85:22
**rea** [1] - 14:7
**reach** [5] - 3:22, 48:7, 54:12, 54:13, 101:5
**reached** [3] - 3:13, 21:5, 67:7
**reaches** [1] - 91:4
**reaction** [4] - 21:2, 32:7, 80:7, 86:23
**Reactor** [3] - 42:4, 53:21, 54:6
**read** [7] - 29:2, 31:13, 32:17, 34:14, 49:22, 67:25, 68:3
**reading** [1] - 40:16
**real** [3] - 30:23, 62:13, 86:5
**realistically** [1] - 100:5
**realize** [1] - 18:16

**really** [26] - 5:16, 8:13, 9:12, 13:10, 32:24, 37:2, 37:8, 37:20, 37:22, 49:5, 52:21, 53:3, 53:5, 53:8, 58:9, 60:7, 66:2, 66:9, 67:14, 77:14, 78:17, 93:21, 94:4, 94:13, 96:10
**reason** [7] - 19:4, 20:2, 29:22, 29:23, 47:18, 64:15, 75:13
**Reason** [1] - 63:7
**reasonable** [3] - 10:17, 17:3, 17:5
**reasonably** [1] - 45:3
**reasons** [10] - 13:5, 47:19, 51:20, 60:21, 60:22, 61:5, 61:6, 63:6, 87:23, 88:5
**rebut** [1] - 77:24
**rebuttal** [1] - 34:11
**recalling** [2] - 57:15, 63:12
**receive** [2] - 62:24, 63:4
**received** [1] - 43:10
**receiving** [2] - 5:15, 13:15
**Recess** [1] - 38:19
**reckless** [2] - 21:12
**recognition** [1] - 72:10
**recognizable** [6] - 71:4, 72:2, 72:3, 74:3, 75:2, 76:8
**recognized** [7] - 92:7, 93:3, 94:5, 94:6, 94:12, 94:13, 94:18
**recollection** [7] - 34:15, 44:19, 55:10, 58:8, 58:12, 58:22, 84:15
**record** [5] - 2:5, 2:18, 4:23, 38:25, 101:12
**records** [13] - 5:1, 5:4, 5:22, 5:23, 6:5, 6:7, 6:11, 6:21, 20:2, 21:18, 31:17, 63:5, 101:14
**recounts** [1] - 28:13
**Red** [2] - 17:8, 17:9
**reduce** [2] - 50:15, 50:20
**refer** [2] - 58:25, 62:20
**reference** [2] - 14:4, 85:9
**referenced** [2] - 72:21, 87:14
**references** [1] - 72:19

**referred** [1] - 39:17
**referring** [5] - 42:11, 76:17, 89:15, 89:25, 93:2
**refers** [1] - 11:24
**reflection** [1] - 23:22
**regarding** [8] - 18:21, 18:25, 19:14, 19:24, 23:16, 53:15, 68:1, 72:17
**regimes** [4] - 87:5, 87:12, 88:19, 90:23
**Regional** [1] - 3:9
**regs** [1] - 37:18
**regular** [3] - 71:10, 72:7, 72:12
**regularly** [1] - 85:3
**regulatory** [1] - 90:23
**related** [1] - 61:16
**relatedly** [1] - 96:19
**relates** [1] - 102:15
**relating** [1] - 17:21, 37:11, 95:19
**relation** [1] - 73:8
**relationship** [1] - 94:2
**relative** [3] - 7:21, 8:3, 86:8
**relayed** [1] - 101:6
**release** [1] - 86:12
**relevance** [6] - 47:10, 68:7, 68:14, 77:3, 93:7, 93:20
**relevant** [7] - 9:5, 21:7, 46:21, 46:22, 66:13, 69:3, 93:21
**relevantly** [1] - 49:10
**reliability** [1] - 21:16
**reliable** [2] - 51:8, 91:16
**relied** [4] - 31:10, 49:4, 89:9, 89:19
**rely** [6] - 6:10, 21:12, 26:19, 32:14, 71:6, 92:7
**relying** [7] - 6:3, 6:24, 19:17, 32:20, 69:23, 90:13, 93:10
**remain** [1] - 98:24
**remaining** [1] - 35:20
**remember** [6] - 34:16, 40:16, 45:8, 64:17, 80:19
**remembering** [1] - 41:12
**remind** [3] - 33:6, 33:7, 47:13
**removed** [1] - 11:14
**repeatedly** [2] - 84:8, 85:6
**report** [22] - 18:11,

21:8, 21:21, 22:7, 25:17, 25:19, 25:22, 26:9, 26:23, 31:1, 31:13, 42:6, 46:12, 89:16, 89:19, 89:20, 90:13, 91:3, 91:13, 91:20, 91:24, 97:17
**reported** [1] - 88:11
**REPORTER** [1] - 103:1
**Reporter** [3] - 1:22, 1:23, 103:10
**reporter** [2] - 95:3, 95:7
**reporting** [1] - 29:6
**reports** [9] - 25:23, 26:1, 35:11, 87:14, 88:25, 90:18, 91:17, 91:23
**representation** [5] - 14:6, 15:2, 15:13, 90:9, 101:16
**representative** [1] - 14:5
**represented** [6] - 14:3, 14:11, 14:15, 14:17, 75:17
**represents** [1] - 15:18
**reproducible** [1] - 51:8
**request** [3] - 5:16, 17:2
**requests** [1] - 7:11
**require** [1] - 82:22
**required** [5] - 8:11, 15:9, 17:23, 18:9, 18:13
**requirement** [1] - 13:12
**requirements** [2] - 17:25, 19:4
**requires** [4] - 15:13, 23:4, 48:15, 48:16
**requisite** [2] - 9:25, 23:21
**research** [2] - 43:1, 45:9
**reserve** [1] - 96:2
**reserves** [1] - 26:12
**resolve** [1] - 96:8
**respect** [29] - 6:4, 11:2, 12:13, 18:23, 18:25, 19:13, 19:16, 19:20, 20:7, 20:9, 20:14, 20:19, 21:1, 21:16, 27:5, 35:12, 37:17, 39:9, 51:18, 53:25, 74:22, 76:6, 76:8, 78:5, 81:12, 84:14, 85:1, 97:19

**respond** [3] - 69:25, 70:19, 99:19
**response** [3] - 6:11, 14:13, 102:4
**Responses** [1] - 91:8
**responsibility** [2] - 83:18, 84:3
**responsive** [1] - 101:23
**rest** [1] - 95:8
**restrain** [1] - 83:21
**result** [10] - 21:5, 32:12, 48:4, 48:5, 48:7, 50:11, 52:18, 52:19, 54:12, 54:14
**retrieved** [2] - 96:21, 97:8
**revealed** [1] - 82:5
**review** [11] - 19:5, 29:4, 41:8, 41:20, 43:11, 48:19, 50:2, 69:9, 92:9, 99:24, 99:25
**reviewed** [3] - 20:15, 26:21, 28:16
**reviewing** [2] - 35:10, 60:10
**rightness** [1] - 50:6
**rights** [2] - 87:6, 88:20
**rigorous** [1] - 67:21
**risk** [2] - 11:7, 68:8
**risks** [1] - 49:4
**RMR** [2] - 1:22, 103:9
**Road** [1] - 85:21
**road** [1] - 10:18
**robbery** [1] - 86:13
**role** [4] - 21:9, 42:24, 55:19, 65:25
**ROMAN** [1] - 1:5
**Roman** [5] - 2:3, 2:13, 38:20, 38:23, 39:6
**room** [2] - 55:5, 55:12
**Room** [2] - 1:23, 103:10
**rough** [1] - 19:9
**royalties** [1] - 74:17
**royalty** [5] - 57:21, 73:14, 73:22, 75:16, 75:17
**Rule** [2] - 32:2, 47:10
**rules** [1] - 5:14
**run** [4] - 9:14, 18:2, 18:8, 18:13
**running** [6] - 19:14, 22:17, 57:7, 65:17, 74:8, 79:23
**runs** [2] - 83:14, 90:25
**Russian** [1] - 98:16

**S**

**safety** [1] - 87:24
**sake** [1] - 25:17
**salad** [1] - 49:25
**Satoshi** [1] - 59:16
**Saturday** [1] - 3:19
**Saturdays** [2] - 3:18, 4:5
**saw** [1] - 84:17
**schedule** [1] - 100:20
**scheduled** [1] - 4:4
**scheme** [1] - 73:24
**scholl** [1] - 71:24
**Scholl** [1] - 46:12
**Scholl's** [1] - 46:12
**school** [1] - 73:8
**science** [1] - 42:23
**scienter** [1] - 16:22
**scientific** [12] - 33:1, 40:4, 50:1, 50:5, 50:18, 50:19, 51:1, 51:9, 51:17, 53:19, 54:17, 67:7
**scientist** [1] - 66:15
**Scotsman** [1] - 78:18
**scroll** [1] - 63:2
**scrolling** [1] - 56:12
**seal** [1] - 102:15
**Second** [1] - 14:9
**second** [4] - 3:19, 58:6, 61:22, 95:2
**security** [1] - 17:23
**See** [2] - 92:12, 94:19
**see** [45] - 4:2, 4:20, 6:19, 11:2, 17:20, 18:10, 18:11, 18:20, 22:14, 29:4, 29:23, 33:3, 42:18, 51:4, 51:7, 55:23, 55:24, 55:25, 57:12, 58:21, 59:6, 59:7, 59:8, 62:18, 62:25, 64:17, 66:12, 67:14, 70:18, 73:21, 74:19, 76:7, 79:12, 81:13, 83:9, 86:11, 89:20, 93:20, 97:24, 99:16, 100:9, 102:10
**seeing** [2] - 7:18, 82:17
**seeking** [1] - 80:12
**seem** [4] - 22:15, 66:1, 75:3, 87:8
**seemingly** [1] - 28:9
**sees** [1] - 73:20
**Sefranek** [3] - 1:22, 103:9, 103:9
**SEFRANEK** [1] -

103:3
**seized** [3] - 65:16, 69:22, 70:7
**selection** [2] - 35:22, 36:6
**self** [1] - 86:8
**self-custody** [1] - 86:8
**selling** [4] - 13:4, 13:8, 13:9, 13:15
**seminars** [1] - 45:9
**send** [4] - 79:22, 79:25, 81:23, 82:12
**senior** [1] - 71:8
**sense** [10] - 19:6, 22:23, 43:7, 46:22, 47:2, 49:11, 52:21, 52:23, 53:4, 97:13
**sensible** [1] - 38:10
**sensitive** [1] - 44:22
**sent** [1] - 90:20
**sentence** [2] - 15:23, 16:3
**September** [2] - 1:5, 103:7
**sequencing** [2] - 95:16, 96:19
**seriously** [1] - 102:2
**server** [3] - 5:5, 5:10, 5:12
**servers** [1] - 28:25
**Service** [2] - 2:25, 100:14
**service** [7] - 57:21, 63:12, 72:13, 73:13, 77:6, 79:16, 89:13
**services** [4] - 13:3, 22:17, 86:16, 90:20
**Services** [1] - 71:9
**set** [6] - 5:12, 28:18, 28:19, 28:24, 29:5, 79:18
**setting** [2] - 78:13, 96:17
**share** [1] - 100:15
**shocked** [1] - 24:11
**shoes** [2] - 43:18, 81:19
**short** [2] - 53:15, 61:17
**shortly** [1] - 33:7
**shot** [3] - 93:19, 93:22, 94:11
**show** [20] - 8:16, 20:1, 25:14, 25:18, 27:13, 28:3, 30:3, 33:12, 33:18, 48:6, 57:22, 58:18, 59:3, 61:20, 65:16, 65:20, 68:23, 71:3, 71:9, 77:9
**showing** [1] - 59:24

**shown** [2] - 19:17, 61:23
**shows** [4] - 62:14, 65:6, 74:18, 82:16
**sic** [1] - 88:14
**side** [7] - 9:11, 26:12, 33:15, 70:9, 70:10, 70:11, 100:16
**sign** [1] - 5:19
**significant** [1] - 98:14
**significantly** [2] - 79:25, 82:11
**signing** [1] - 4:23
**Silk** [1] - 85:21
**similar** [2] - 39:20, 40:4
**simple** [4] - 11:3, 15:13, 17:1, 19:8
**simply** [14] - 15:18, 19:9, 31:20, 32:1, 33:17, 45:15, 48:2, 69:23, 78:21, 90:25, 91:13, 91:24, 92:19, 102:5
**single** [3] - 31:20, 31:25, 82:24
**site** [3] - 17:22, 17:24, 18:13
**sites** [2] - 19:14, 80:1
**sits** [1] - 73:4
**sitting** [1] - 64:16
**situation** [2] - 51:10, 53:6
**six** [2] - 7:16, 55:14
**skeptical** [4] - 43:15, 43:20, 43:23, 44:23
**skepticism** [1] - 20:7
**skilled** [2] - 79:24, 82:11
**skipping** [1] - 79:2
**slide** [5] - 59:6, 59:7, 60:14, 62:22, 69:9
**Slide** [1] - 59:6
**slides** [10] - 59:5, 60:9, 60:11, 60:12, 63:2, 64:5, 64:6, 64:9, 64:16, 69:5
**small** [1] - 7:11
**smarter** [1] - 81:20
**software** [2] - 72:23, 73:1
**sold** [2] - 8:1, 9:21
**someone** [1] - 24:7, 24:8, 24:9, 24:10, 27:15, 29:17, 29:23, 38:7, 60:20, 65:17, 73:1, 79:21, 80:11, 80:25, 82:3, 83:1, 101:19
**sometime** [2] -

100:12, 100:21
**sometimes** [6] - 40:25, 42:15, 42:16, 45:18, 50:7, 50:8
**somewhat** [3] - 20:20, 22:6, 62:22
**somewhere** [1] - 3:1
**son** [2] - 64:20
**soon** [2] - 11:4, 83:1
**sooner** [1] - 100:17
**sophisticated** [3] - 52:9, 74:14, 82:4
**sophistication** [1] - 82:17
**sorry** [8] - 23:8, 33:5, 39:21, 53:24, 79:5, 79:6, 93:15, 99:12
**sort** [38] - 6:20, 15:7, 17:13, 22:23, 32:25, 41:21, 44:15, 48:21, 52:4, 52:22, 53:7, 54:10, 55:20, 57:12, 58:23, 59:11, 60:15, 65:25, 67:7, 70:4, 72:1, 72:9, 72:18, 74:7, 75:9, 76:17, 77:17, 81:11, 83:13, 84:24, 87:7, 87:11, 87:21, 89:2, 92:23, 100:19, 101:16
**sorts** [3] - 7:23, 33:9, 48:17
**sound** [2] - 67:6, 70:6
**sounded** [1] - 77:21
**sounding** [1] - 67:2
**sounds** [6] - 15:21, 22:8, 29:16, 35:6, 36:19, 65:7
**source** [4] - 61:24, 65:22, 80:5, 94:16
**sources** [2] - 48:22, 91:16
**Southern** [1] - 86:12
**speaking** [2] - 10:6, 49:10
**speaks** [1] - 43:3
**specific** [4] - 6:18, 18:9, 31:25, 32:1
**specifically** [2] - 32:7
**specificity** [1] - 31:16
**specified** [4] - 14:18, 15:25, 16:2, 16:8
**specify** [1] - 18:6
**speculation** [5] - 28:7, 46:8, 46:23, 77:16, 84:24
**speculative** [1] - 21:9
**spent** [2] - 23:25, 48:24
**spoken** [1] - 27:21

**sponte** [1] - 37:20
**spreadsheet** [2] - 26:22, 31:20
**spring** [1] - 32:3
**stacking** [1] - 17:24
**staff** [2] - 19:6, 102:24
**staffing** [1] - 19:3
**stand** [11] - 20:19, 27:25, 34:20, 49:2, 51:25, 60:25, 61:1, 69:20, 77:21, 98:1, 98:2
**standard** [6] - 10:21, 31:21, 76:18, 94:13, 94:18, 101:13
**standards** [5] - 30:19, 53:17, 67:20, 67:24, 68:5, 69:15, 92:7, 93:2
**standing** [2] - 40:20, 43:18
**star** [1] - 27:7
**start** [6] - 8:18, 10:18, 11:4, 35:19, 41:5, 56:25
**started** [1] - 28:14
**starting** [3] - 2:5, 3:10, 99:17
**starts** [6] - 33:16, 49:6, 56:19, 64:3, 67:2, 83:1
**state** [5] - 2:4, 33:11, 38:24, 40:17, 43:9
**statement** [3] - 12:1, 33:10, 33:11
**statements** [4] - 33:8, 33:15, 41:18, 52:22
**STATES** [3] - 1:1, 1:2, 1:8
**states** [1] - 87:14
**States** [11] - 1:23, 2:3, 2:7, 2:9, 2:10, 2:25, 5:17, 28:21, 28:22, 38:23, 39:2
**stating** [1] - 68:1
**status** [1] - 97:17
**statute** [17] - 7:14, 7:15, 7:17, 8:4, 8:10, 8:12, 8:25, 9:5, 9:8, 9:13, 10:1, 10:10, 15:9, 15:15, 16:20, 37:11, 37:17
**statutes** [1] - 37:24
**statutory** [3] - 7:21, 8:3, 14:15
**steal** [1] - 30:2
**stealing** [1] - 92:20
**stenographic** [1] - 103:5
**step** [5] - 6:4, 46:15,

51:2, 67:4, 78:17
**stepping** [2] - 47:21, 80:8
**steps** [2] - 48:7, 50:15
**STERLINGOV** [1] - 1:5
**Sterlingov** [40] - 2:3, 2:13, 2:19, 3:1, 3:24, 7:20, 7:25, 8:23, 10:4, 23:17, 29:20, 35:1, 38:20, 38:23, 39:6, 46:13, 46:16, 57:4, 57:7, 57:24, 60:17, 60:23, 60:24, 61:3, 61:22, 61:24, 62:24, 63:4, 67:8, 69:10, 71:3, 71:5, 80:17, 80:22, 81:4, 81:20, 81:22, 83:14, 97:9, 98:16
**Sterlingov's** [9] - 57:20, 59:22, 61:17, 63:4, 65:16, 68:1, 68:6, 81:19, 84:10
**stick** [2] - 20:6, 91:22
**still** [19] - 9:19, 10:13, 20:22, 20:24, 21:1, 21:2, 26:8, 26:15, 26:20, 30:9, 31:17, 32:14, 34:7, 35:16, 38:2, 51:22, 54:1, 71:25, 102:1
**still's** [1] - 30:13
**stole** [1] - 29:18
**stop** [1] - 34:3
**story** [1] - 64:20
**straightforward** [1] - 17:1
**strange** [1] - 77:7
**stray** [1] - 83:19
**strays** [1] - 83:13
**Street** [2] - 1:11, 1:20
**strike** [5] - 21:6, 21:21, 65:24, 67:12, 83:23
**strikes** [14] - 21:5, 41:2, 41:20, 51:23, 57:9, 59:25, 60:1, 60:24, 63:17, 64:22, 74:7, 74:20, 80:14, 87:9
**strong** [1] - 34:15
**struck** [2] - 64:18
**struggle** [1] - 55:20
**students** [2] - 79:20, 81:14
**studied** [3] - 22:16, 44:18, 55:18
**studies** [8] - 31:5, 31:9, 31:10, 31:13, 48:5, 55:3, 82:22,

91:13
**study** [8] - 23:4, 24:14, 38:4, 52:17, 55:4, 55:5, 55:16, 90:7
**stuff** [6] - 7:23, 9:1, 22:11, 43:24, 64:20, 83:19
**sua** [1] - 37:20
**subcategory** [1] - 87:7
**subject** [6] - 18:15, 42:5, 55:4, 59:18, 60:13, 95:25
**subjective** [1] - 48:7
**submission** [1] - 20:16
**submissions** [1] - 28:12
**submit** [11] - 23:3, 23:20, 26:1, 26:2, 26:24, 40:9, 43:12, 60:3, 69:2, 69:3, 88:22
**submits** [1] - 26:18
**submitted** [1] - 17:19
**substance** [1] - 13:16
**substantively** [1] - 96:18
**sufficient** [2] - 10:15, 78:9
**sufficiently** [1] - 31:8
**suggest** [7] - 17:3, 18:12, 25:8, 29:25, 31:1, 74:7, 74:20
**suggested** [2] - 30:1, 33:22
**suggesting** [2] - 55:1, 87:10
**suggestion** [3] - 41:10, 43:6, 66:15
**suggests** [3] - 66:14, 68:21, 85:6
**sum** [1] - 70:4
**summaries** [1] - 26:3
**summarizing** [2] - 33:17, 56:22
**summary** [4] - 32:16, 44:16, 60:9, 69:4
**supplanting** [1] - 55:19
**supplemental** [2] - 5:13, 56:18
**support** [4] - 17:19, 24:15, 94:6, 94:15
**suppose** [1] - 24:7
**supposed** [4] - 58:14, 63:12, 88:24, 90:3
**surprise** [1] - 73:4
**surprised** [1] - 62:2
**suspect** [5] - 45:4, 45:6, 65:21, 91:1,

98:10
**suspicion** [1] - 64:5
**suspicious** [1] - 85:6
**swap** [1] - 80:2
**sword** [1] - 49:1
**synonymous** [1] - 12:12
**system** [3] - 40:22, 101:20

### T

**table** [1] - 55:8
**talks** [1] - 21:14
**TAMARA** [1] - 103:3
**Tamara** [3] - 1:22, 103:9, 103:9
**tampering** [1] - 20:4
**tangents** [1] - 36:17
**taught** [1] - 67:24
**teach** [2] - 81:14, 82:14
**teaches** [3] - 73:7, 73:8, 79:19
**team** [1] - 45:5
**teams** [1] - 11:25
**technician** [1] - 51:15
**technicians** [1] - 48:18
**techniques** [1] - 51:9
**technology** [4] - 74:1, 74:3, 75:10, 75:12
**Ted** [1] - 12:3
**ten** [1] - 34:23
**tends** [1] - 24:6
**tens** [1] - 86:13
**term** [3] - 12:10, 12:24, 13:18
**terms** [15] - 13:2, 13:3, 15:1, 25:17, 26:20, 42:4, 66:2, 70:14, 73:10, 76:15, 77:3, 82:7, 95:16, 97:7, 97:10
**terribly** [2] - 18:16, 61:8
**Tesla** [2] - 64:22, 64:23
**Teslas** [1] - 22:14
**test** [5] - 50:1, 50:9, 51:11, 51:12, 51:17
**tested** [1] - 50:16
**testified** [7] - 18:2, 18:7, 18:25, 19:22, 69:20, 76:13, 93:10
**testifies** [1] - 69:21
**testify** [61] - 20:9, 20:14, 22:2, 24:20, 26:25, 27:16, 39:19, 40:3, 41:12, 42:22,

43:16, 47:15, 50:23, 50:24, 51:25, 54:1, 55:24, 56:16, 57:3, 57:11, 57:13, 57:16, 58:8, 60:11, 61:2, 61:16, 63:10, 63:16, 63:19, 65:15, 65:18, 66:5, 69:18, 71:1, 71:22, 72:4, 76:4, 77:5, 78:2, 78:6, 79:24, 80:3, 80:10, 80:11, 81:6, 82:1, 82:11, 82:21, 82:25, 84:8, 85:3, 85:11, 86:3, 86:16, 87:4, 89:12, 90:17, 90:19, 92:4, 92:25, 93:7
**testifying** [6] - 50:25, 53:8, 75:6, 81:13, 82:7, 85:13
**testimony** [58] - 17:13, 17:19, 18:1, 18:12, 18:18, 20:15, 20:18, 21:3, 21:20, 23:16, 25:11, 26:8, 30:13, 30:21, 30:23, 31:4, 31:12, 34:1, 34:10, 34:14, 35:12, 39:11, 40:17, 40:20, 44:19, 45:16, 45:22, 46:7, 46:20, 47:9, 47:14, 47:23, 48:1, 48:14, 53:15, 53:19, 54:16, 56:23, 58:15, 60:2, 62:17, 64:17, 65:2, 69:4, 74:15, 74:21, 75:13, 76:2, 77:19, 77:24, 77:25, 83:23, 83:25, 88:2, 89:3, 96:23
**text** [1] - 14:15
**textbooks** [1] - 74:17
**textual** [1] - 15:8
**THE** [175] - 1:1, 1:1, 1:8, 2:2, 2:11, 2:17, 2:23, 3:16, 4:2, 4:9, 4:14, 4:17, 5:3, 5:24, 6:1, 6:3, 6:13, 6:15, 6:19, 6:23, 7:3, 7:6, 7:9, 7:12, 8:8, 8:20, 9:3, 9:16, 10:3, 10:24, 11:22, 12:2, 12:8, 12:25, 13:5, 14:9, 15:10, 15:17, 17:7, 17:11, 20:25, 23:8, 24:3, 24:22, 25:7, 25:12, 25:14, 25:19, 25:24, 26:5, 26:16, 27:2, 29:12, 30:7, 32:4, 33:5,

34:4, 34:13, 34:23, 35:6, 35:9, 35:13, 35:14, 36:1, 36:4, 36:10, 36:13, 38:12, 38:14, 38:22, 39:1, 39:4, 39:8, 40:1, 40:11, 41:2, 42:13, 43:14, 47:7, 47:18, 49:1, 49:19, 49:24, 51:18, 53:10, 53:23, 55:1, 56:5, 56:10, 56:14, 56:20, 57:1, 57:9, 58:6, 59:2, 59:10, 59:15, 59:18, 60:13, 61:14, 61:25, 63:17, 65:10, 65:14, 65:24, 68:7, 69:17, 70:23, 71:13, 71:17, 72:16, 72:25, 74:4, 75:23, 76:20, 76:23, 77:18, 78:25, 79:3, 79:11, 79:14, 80:6, 80:24, 82:19, 82:21, 83:7, 83:9, 83:17, 84:6, 84:13, 85:13, 86:18, 86:22, 87:3, 87:8, 88:6, 88:12, 88:16, 88:24, 89:7, 89:11, 89:18, 90:2, 90:12, 90:16, 91:11, 92:3, 92:17, 93:5, 93:15, 93:17, 93:25, 94:4, 94:10, 94:22, 95:2, 95:12, 95:17, 96:1, 97:3, 97:14, 99:12, 99:20, 100:8, 100:21, 100:25, 101:4, 101:18, 101:22, 102:3, 102:10, 102:14, 102:18, 102:21, 102:23
**theft** [1] - 30:1
**themselves** [2] - 6:6, 6:7
**theories** [4] - 48:12, 49:13, 49:14, 51:9
**theory** [7] - 38:1, 57:19, 62:14, 67:10, 68:12, 80:16, 81:4
**therefore** [3] - 65:5, 68:19, 70:12
**they've** [2] - 27:16, 54:20
**thief** [1] - 86:6
**thin** [1] - 69:8
**thinking** [4] - 7:23, 8:3, 61:3, 67:16
**thinks** [3] - 12:11, 38:10, 43:5

**third** [1] - 84:9
**third-party** [1] - 84:9
**thousands** [1] - 44:10
**thread** [1] - 10:25
**threat** [1] - 86:5
**three** [4] - 3:3, 9:19, 63:5, 100:19
**three-dimensional** [1] - 100:19
**thumb** [1] - 28:15
**Thursday** [6] - 35:22, 36:14, 36:18, 36:21, 99:2, 100:22
**tied** [2] - 3:11, 90:12
**tight** [1] - 20:20
**timeline** [1] - 101:11
**title** [1] - 92:14
**today** [6] - 2:19, 9:2, 39:7, 40:20, 63:1, 102:24
**Tokyo** [1] - 101:7
**tomorrow** [1] - 100:12
**tone** [1] - 22:7
**tonight** [1] - 100:12
**tool** [5] - 49:17, 76:5, 78:7, 81:17, 89:13
**tools** [10] - 41:15, 41:21, 42:9, 43:5, 43:6, 68:15, 80:15, 87:20, 87:22, 88:4
**top** [5] - 40:7, 66:25, 73:3, 88:14, 89:5
**topic** [2] - 20:17, 33:6, 34:5, 84:13
**topics** [1] - 17:15
**Tor** [9] - 1:19, 2:12, 13:3, 17:24, 80:1, 80:13, 82:13, 87:20, 87:25
**tor** [1] - 39:5
**TOR** [1] - 1:18
**Tor-based** [1] - 13:3
**total** [2] - 47:15, 61:21
**totalitarian** [3] - 87:5, 87:11, 88:19
**totally** [2] - 71:25, 83:12
**touched** [1] - 71:15
**towards** [1] - 41:4
**town** [1] - 100:18
**trace** [1] - 80:14
**traceable** [2] - 74:10, 81:1
**Tracers** [1] - 28:13
**tracing** [15] - 21:4, 30:14, 31:6, 54:2, 68:15, 72:18, 72:23, 72:25, 76:5, 76:6, 76:15, 78:6, 78:7, 78:14, 87:6

**track** [1] - 44:11
**tracking** [1] - 62:21
**tracks** [1] - 101:13
**trade** [1] - 80:4
**traditional** [1] - 90:25
**trained** [1] - 67:20
**training** [7] - 67:21,
68:4, 71:7, 76:12,
76:14, 76:18
**trainings** [1] - 50:14
**transaction** [9] -
14:10, 14:17, 16:5,
16:7, 29:20, 29:21,
58:4, 79:18, 84:12
**transactions** [15] -
13:13, 14:4, 46:16,
59:24, 62:8, 63:21,
66:6, 66:24, 72:10,
72:18, 74:15, 80:18,
86:25, 90:20
**transcript** [5] - 19:8,
40:17, 49:21, 103:4,
103:6
**TRANSCRIPT** [1] - 1:7
**transfer** [3] - 5:1, 80:2,
86:7
**transferable** [1] -
55:17
**transferred** [1] - 61:17
**transfers** [2] - 71:1,
71:22
**translated** [2] - 95:24,
97:23
**translation** [4] - 96:8,
96:18, 97:19, 98:9
**translations** [3] -
95:20, 98:10, 99:23
**translator** [2] - 96:4,
96:13
**translators** [4] - 95:19,
95:22, 95:23, 95:25
**travel** [1] - 100:18
**travels** [1] - 23:25
**treasury** [1] - 37:18
**Treaty** [1] - 5:15
**treaty** [1] - 101:13
**trial** [13] - 3:10, 31:21,
31:23, 32:3, 35:17,
36:20, 38:2, 38:8,
40:20, 85:10, 96:18,
97:10, 97:11
**tried** [3] - 11:2, 16:4,
16:25
**true** [4] - 78:18, 78:19,
103:4, 103:5
**truism** [1] - 51:3
**trustee** [10] - 4:18,
4:20, 4:22, 5:1, 5:8,
5:19, 5:22, 101:7,
101:12, 101:17

**trustee's** [1] - 5:23
**try** [6] - 30:11, 32:2,
69:10, 96:7, 96:14,
96:15
**trying** [6] - 51:19,
81:8, 84:2, 92:22,
93:22, 100:20
**turn** [7] - 7:5, 34:25,
55:13, 77:11, 98:4,
99:20
**turns** [2] - 12:15,
73:25
**twist** [1] - 91:23
**two** [13] - 13:1, 13:24,
14:13, 14:19, 37:7,
49:1, 61:16, 67:3,
76:14, 78:7, 89:23,
93:6, 95:7
**two-day** [2] - 76:14,
78:7
**two-edged** [1] - 49:1
**type** [11] - 39:12,
39:20, 40:4, 40:21,
44:12, 45:22, 46:7,
55:16, 58:24, 64:25,
68:3
**types** [5] - 22:16,
22:24, 42:17, 45:19,
46:18
**typical** [1] - 101:14
**typically** [2] - 30:2,
65:19

# U

**U.S** [3] - 1:13, 71:8,
86:11
**u.S** [1] - 1:16
**ultimate** [3] - 68:1,
81:12, 82:7
**ultimately** [3] - 16:16,
70:11, 82:7
**unable** [1] - 22:1
**unaccounted** [1] -
61:24
**unconnected** [1] -
28:10
**under** [11] - 4:24, 5:13,
6:11, 24:18, 26:18,
26:25, 32:14, 47:10,
55:14, 65:25, 102:15
**underlying** [4] - 13:13,
20:4, 42:3, 46:8
**understood** [18] - 7:2,
25:13, 26:14, 30:6,
33:21, 61:10, 65:9,
70:21, 83:6, 84:5,
85:2, 89:10, 92:2,
94:3, 94:21, 101:21,
102:17

**unduly** [3] - 12:7,
43:24, 44:13
**unexplainable** [1] -
63:7
**unfair** [1] - 32:1
**unfettered** [1] - 36:20
**unfortunately** [1] -
35:1
**UNITED** [3] - 1:1, 1:2,
1:8
**United** [11] - 1:23, 2:3,
2:7, 2:9, 2:10, 2:25,
5:17, 28:21, 28:22,
38:23, 39:2
**University** [2] - 79:20,
82:15
**unlawful** [7] - 13:20,
14:18, 15:19, 15:25,
16:2, 16:9, 84:12
**unless** [4] - 25:14,
27:10, 34:2, 38:7
**unlikely** [3] - 15:18,
82:16, 98:6
**unquote** [4] - 11:19,
31:18, 53:19, 67:23
**unrelated** [1] - 85:15
**unremarkable** [1] -
63:18
**unscientific** [1] - 55:2
**unspecified** [1] - 16:1
**unsure** [1] - 51:22
**up** [40] - 3:11, 5:8,
5:18, 9:21, 12:11,
13:2, 17:13, 20:22,
28:22, 31:5, 34:11,
35:19, 39:8, 39:22,
46:1, 50:21, 52:23,
53:2, 53:3, 56:10,
66:1, 67:2, 67:4,
67:6, 70:5, 70:14,
74:18, 75:18, 76:12,
78:22, 88:6, 90:7,
94:10, 95:4, 96:4,
96:13, 98:8, 101:1,
102:8, 102:12
**upfront** [1] - 11:8
**usage** [1] - 91:4
**USAO** [1] - 1:11
**USAO-DOJ** [1] - 1:11
**user** [3] - 31:19,
72:12, 77:6
**users** [4] - 85:4, 86:5,
86:17, 87:15
**uses** [5] - 11:13, 14:3,
31:7, 87:24, 88:4
**usual** [1] - 52:4

# V

**vague** [1] - 58:7

**valuation** [1] - 71:7
**value** [9] - 51:5, 58:15,
58:18, 58:19, 62:23,
62:25, 69:24, 70:2,
79:8
**various** [2] - 61:4,
80:11
**veil** [1] - 54:14
**vendors** [2] - 11:13,
11:24
**venue** [3] - 37:10,
37:17, 37:23
**verbatim** [1] - 12:1
**verifiability** [2] -
53:24, 54:10
**Verret** [34] - 56:10,
57:3, 58:8, 61:15,
61:20, 61:22, 65:15,
65:18, 69:14, 69:19,
69:25, 70:19, 71:1,
71:6, 71:21, 76:3,
77:13, 79:15, 79:19,
79:24, 80:2, 81:6,
84:7, 84:15, 85:3,
86:3, 86:15, 87:4,
89:12, 90:17, 90:22,
92:4, 92:7
**Verret's** [4] - 57:22,
60:5, 69:8, 72:17
**versus** [9] - 6:4, 20:4,
22:14, 45:15, 54:11,
64:24, 70:15, 72:12,
83:3
**VIA** [2] - 1:18, 1:19
**via** [2] - 2:13, 96:7
**vibes** [1] - 50:3
**vibes-based** [1] - 50:3
**vicarious** [1] - 14:24
**victim** [1] - 86:6
**video** [2] - 2:14, 2:20
**view** [3] - 84:14,
84:25, 96:1
**viewpoint** [1] - 74:2
**views** [3] - 17:13,
17:15, 18:23
**violation** [1] - 32:2
**visit** [3] - 3:11, 3:12,
4:5
**visitors** [1] - 3:18
**visits** [1] - 4:4
**vital** [2] - 92:5, 93:8
**voir** [3] - 12:9, 12:10,
12:11
**volume** [1] - 91:18
**vs** [1] - 1:4

# W

**wait** [3] - 8:6, 70:18,
71:13

**waiting** [1] - 36:23
**waived** [2] - 38:20,
39:6
**walk** [1] - 22:21
**walked** [1] - 48:13
**Wall** [1] - 1:20
**wall** [2] - 14:8, 15:14
**wallet** [1] - 58:3
**wants** [18] - 8:7, 22:2,
33:25, 46:12, 56:24,
58:8, 61:4, 66:5,
80:10, 80:25, 87:1,
87:18, 89:18, 90:7,
91:13, 91:16, 91:20,
99:19
**warning** [1] - 33:19
**Washington** [6] - 1:5,
1:12, 1:14, 1:17,
1:24, 103:11
**wasting** [1] - 25:12
**water** [1] - 19:12
**ways** [7] - 32:21,
34:15, 66:2, 80:11,
80:15, 80:25, 85:23
**wealth** [1] - 63:9
**web** [2] - 12:24, 13:11
**website** [1] - 80:23
**websites** [1] - 13:3
**Wednesday** [2] -
35:19, 41:16
**week** [5] - 3:2, 3:6,
96:7, 100:12, 100:22
**weekdays** [1] - 3:12
**weekend** [9] - 3:3,
3:10, 3:12, 3:24, 4:4,
96:7, 96:15, 97:16,
102:24
**weight** [1] - 74:5
**welcome** [5] - 18:19,
26:9, 27:3, 43:19,
71:17
**well-established** [1] -
47:3
**whatnot** [1] - 34:1
**whichever** [1] - 20:22
**whittle** [1] - 96:8
**whole** [7] - 12:23,
33:1, 63:24, 64:20,
69:6, 74:13
**wholly** [1] - 33:10
**whys** [1] - 57:13
**wild** [1] - 32:25
**wire** [1] - 30:19
**withdrawal** [4] - 8:14,
8:16, 9:14, 9:23
**withdrawing** [1] - 86:9
**withdrew** [2] - 8:23,
10:4
**witness** [16] - 17:20,
39:19, 45:16, 62:13,

65:8, 76:25, 81:10, 83:19, 83:21, 83:22, 95:16, 97:4, 97:5, 97:6, 98:1, 98:2

**witnesses** [11] - 34:19, 41:19, 53:20, 70:18, 73:10, 77:3, 95:19, 95:22, 97:1, 100:18, 100:20

**witnesses'** [1] - 34:10

**wonder** [1] - 35:17

**word** [13] - 11:13, 11:16, 11:19, 11:20, 12:12, 12:22, 14:3, 49:25, 71:5, 84:11, 97:22, 98:3, 98:9

**works** [2] - 44:18, 45:24

**world** [5] - 23:11, 23:25, 87:5, 87:25, 91:19

**worry** [3] - 10:24, 66:2, 83:17

**worth** [4] - 65:20, 66:10, 66:12, 68:22

**wrench** [1] - 58:1

**writes** [1] - 59:16

**written** [2] - 16:5, 18:4

**wrongdoing** [1] - 27:23

**wrongful** [1] - 30:16

**wrongness** [1] - 50:6

## Y

**year** [3] - 59:12, 59:13

**years** [8] - 7:14, 7:16, 23:24, 40:18, 44:6, 45:10, 59:9

**yesterday** [3] - 11:15, 17:14, 20:12

**York** [3] - 1:17, 1:20, 86:12

**you-all** [2] - 20:21, 98:2

**YouTube** [1] - 84:17

## Z

**Zcash** [1] - 73:4

**ZOOM** [2] - 1:18, 1:19