```
1                 IN THE UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF COLUMBIA
2
       UNITED STATES OF AMERICA,      ) Criminal Action
3                                     ) No. 1:21-CR-0399
                        Plaintiff,    )
4                                     ) PRETRIAL CONFERENCE
       vs.                            )
5                                     ) Washington, D.C.
       ROMAN STERLINGOV,              )
6                                     ) September 18, 2023
                        Defendant.    ) Time:  11:05 A.M.
7
                   TRANSCRIPT OF PRETRIAL CONFERENCE
8            BEFORE THE HONORABLE JUDGE RANDOLPH D. MOSS
                     UNITED STATES DISTRICT JUDGE
9
                      A P P E A R A N C E S
10
       For the Plaintiff:      CHRISTOPHER BROWN
11                             USAO-DOJ
                               601 D Street, NW
12                             Washington, DC 20001

13                             ALDEN PELKER
                               U.S. DEPARTMENT OF JUSTICE
14                             950 Pennsylvania Avenue, NW
                               Washington, DC 20530
15
                               JEFFREY PEARLMAN
16                             DOJ-CRM
                               U.S. Department of Justice
17                             1301 New York Ave. NW
                               Washington, DC 20005
18
       For the Defendant:      TOR EKELAND
19                             MICHAEL HASSARD
                               TAUSEEF AHMED
20                             Tor Ekeland Law, PLLC
                               30 Wall Street, 8th Floor
21                             New York, NY 10005

22
       Court Reporter:         Tamara M. Sefranek, RMR, CRR, CRC
23                             Official Court Reporter
                               United States Courthouse, Room 6714
24                             333 Constitution Avenue, NW
                               Washington, DC  20001
25                             202-354-3246
```

```
 1                       P R O C E E D I N G S
 2               THE COURTROOM DEPUTY:  Calling Criminal Case
 3     No. 21-399, United States of America v. Roman Sterlingov.
 4               Would counsel please state their names for the
 5     record, starting with government counsel.
 6               MR. BROWN:  Good morning, Your Honor.  AUSA Chris
 7     Brown for the government; and with me at counsel table are my
 8     co-counsel, Alden Pelker and Jeffrey Pearlman.
 9               THE COURT:  Good morning to you.
10               MR. EKELAND:  Good morning, Your Honor.  Tor Ekeland
11     for defendant, Roman Sterlingov, who is present in court.  At
12     counsel table with me is Michael Hassard, and Tauseef Ahmed,
13     whose pro hac vice application is pending with the Court.
14               THE COURT:  All right.  Thank you.
15               Why don't you go ahead and stay at the podium,
16     Mr. Ekeland, and if you want to give me an update.
17               MR. EKELAND:  So as for the trial date, Your Honor,
18     Mr. Sterlingov has elected to go in February.
19               THE COURT:  I'm not sure elected is the right word.
20               MR. EKELAND:  Has chosen to stay with --
21               THE COURT:  That's his preference.  I'll hear from
22     the government on that.  So his preference is to go in
23     February?
24               MR. EKELAND:  Yes, as I believe the -- I believe it
25     was as scheduled on the docket.
```

1          And then I have -- we've reached out again to

2     CipherTrace.  They don't want to appear.  They are counseling

3     Ms. Still not to sign the protective order.  It's my

4     understanding Ms. Still doesn't want to sign the protective

5     order.  I have an email out --

6          THE COURT:  What are the names of the lawyers?  I'm

7     not accustomed to having lawyers say I don't want to appear

8     when a judge requests.  I'd like their names.

9          MR. EKELAND:  I understand that, Your Honor.  I got

10    the name for one of the -- the senior managing counsel to

11    Mastercard last night.  His name is Daniel Torres.  I've

12    emailed him.  I emailed him this morning.  I have been checking

13    my email, and I have not gotten a response back yet.

14         THE COURT:  Okay.  Where does Mr. Torres reside?

15    Where is his office?

16         MR. EKELAND:  I do not know that.

17         THE COURT:  Okay.

18         MR. EKELAND:  But I did inform him that the Court

19    wanted counsel from CipherTrace or Mastercard to appear via

20    Zoom today, and I have not heard back.

21         THE COURT:  I thought you said they declined.

22         MR. EKELAND:  Well, I was told over the weekend that

23    they were declining, then I got an email introduction to

24    Mr. Torres late last night.  I saw it this morning.  And then I

25    emailed him and -- informing him about the Court's request, and

1    I have not heard back yet.

2         THE COURT:  Okay.  Anything else you want to add

3    about where things stand?

4         MR. EKELAND:  Just real briefly on -- just some

5    housekeeping on the record.

6         We printed out the translations for Mr. Sterlingov

7    and gave them to -- in court on Friday to take back so he could

8    read them.  When he got to the jail, they took the translations

9    away from him.

10        So we were -- we were able to bring in other papers.

11   We weren't aware when we visited this weekend -- we were able

12   to visit him.  So we can take papers in to him, straight to the

13   jail.  But the ones that we gave him in court, in terms of the

14   translations, they took away from him, and we still haven't

15   been able to get him a hard drive, but we're working on that.

16        THE COURT:  Okay.  I was thinking a little bit

17   further about the question of Mr. Sterlingov's access to the

18   disclosure that was made by Chainalysis.  And it does seem to

19   me that it's the government's, or perhaps Chainalysis's, burden

20   to show me that there's a reason that Mr. Sterlingov shouldn't

21   be granted access to that material.

22        So I will, for the time being, continue to direct

23   that Mr. Sterlingov not be granted access to that material

24   pending a decision from the Court on whether he should be

25   granted access to it.  But I think I probably need briefing

```
 1    from the parties on that question, and I do think it's the

 2    government's or Chainalysis's burden, and I am concerned about

 3    making sure that we don't interfere with Mr. Sterlingov's

 4    ability to participate in the preparation of his own defense.

 5            So we can set a schedule for that now if you want.

 6    Mr. Brown or Ms. Pelker, when do you think you could or would

 7    want to file something?

 8            MR. BROWN:  Your Honor, would Friday work?

 9            THE COURT:  That would be fine with me.  Why don't I

10    direct that you -- if you let Chainalysis know if they want to

11    file something, they should do it as well on the same schedule,

12    by Friday, September 22nd.  And then when do you want to

13    respond, Mr. Ekeland?

14            MR. EKELAND:  I think we just need a week for that.

15            THE COURT:  The 29th of September.  That's fine.

16            MR. EKELAND:  Yeah.

17            THE COURT:  The faster you respond, the faster I can

18    rule on it, but I understand you want some time.

19            MR. EKELAND:  Your Honor, we are looking, to the

20    extent possible, to find other experts to look at the

21    disclosure and, of course, we would show that to the Court.

22    This is just a -- we're doing what we can on that front.

23            THE COURT:  All right.  Anything else?

24            MR. EKELAND:  No.  I mean, we were -- let me

25    double-check.  No.  I think we're ready to proceed on the other
```

1   pretrial hearings on the experts, and then we have some --

2          THE COURT:  Well, let me hear from the government

3   then on those preliminary matters, and then we can turn to the

4   substantive issues.

5          MR. BROWN:  Your Honor, with respect to the

6   CipherTrace counsel, we can provide a phone number and email

7   right now --

8          THE COURT:  Okay.

9          MR. BROWN:  -- for Jennifer Lorentz, who is a counsel

10  for Mastercard.  Her last name is L-o-r-e-n-t-z.  According to

11  her New York bar contact information, her email is

12  Jennifer.Lorentz@Mastercard.com.  And her phone number is

13  (914) --

14         THE COURT:  Rather than putting that on the record,

15  why don't you just give that to the deputy clerk.

16         MR. BROWN:  Yes, Your Honor.  Your Honor, we just

17  urge that somebody -- we'd be happy to reach out to Ms. Lorentz

18  on our own, but we don't want to, sort of, step out of turn.

19         But Ms. Lorentz, according to her LinkedIn profile

20  and online profile, it appears to be the right attorney with

21  responsibility for CipherTrace and cryptocurrency matters on

22  behalf of Mastercard.  We would like to get to the bottom of

23  this, Your Honor.

24         THE COURT:  I'm happy to get to the bottom of it.

25  What I will say about this is, I think it's disappointing and,

1    quite frankly, disrespectful to the Court that Mastercard has

2    responded in this way.  I hope that counsel will pass on to

3    counsel for Mastercard that this Federal Court is of the view

4    that it's been treated poorly and with a lack of respect from

5    Mastercard in that they were unwilling to even appear to

6    explain to me what their issues are.

7            But that said, I think this is, ultimately, a

8    question between the defense and the defense expert.  And if

9    the defense expert is unwilling to take reasonable steps to

10   look at the evidence, I'm not sure that's the government's

11   problem.  I'm not sure it's my problem.  And that's up to the

12   defense.

13           They've got an expert who is refusing to look at

14   evidence that the defense requested, knowing that a protective

15   order was going to be a condition of providing that

16   information.  And I said that on a number of occasions, and

17   I've had the opportunity to read Ms. Pelker's article over the

18   weekend, in which -- that Mr. Ekeland keeps pointing my

19   attention to, and that article itself talks about the need for

20   protective orders for this type of stuff.

21           So it was obvious there was going to need to be a

22   protective order.  It's a shame that we wasted all our time

23   going through all these steps to try and get information for

24   the defense that the defense is not prepared to look at.  But

25   that's, ultimately, I think, their business.  If they're not

1    willing to look at it, and they don't have an expert who is

2    willing to look at it subject to what I have concluded is a

3    reasonable protective order, and are unwilling to even engage

4    with the Court to explain to me what it is they think needs to

5    change in the protective order to accommodate any concerns, I

6    think that's their problem.

7         And it's disappointing to the Court to see members of

8    the bar behave the way Mastercard lawyers have towards the

9    Court.  As I said, I, frankly, find it to show a lack of

10   respect for the Court.  But, ultimately, they're not parties in

11   this case, and if they're not willing to look at the evidence,

12   that's the defense's problem, not the Court's problem and not

13   the government's problem.

14        MR. BROWN:  Yes, Your Honor.  And the government is

15   simply concerned that this becomes another excuse for further

16   delay in the trial, which brings us to the meat of the subject,

17   which is that the government vehemently protests at delaying

18   this until February.  We can be prepared to go forward on

19   October 10th.

20        There are interests of civilian witnesses -- at least

21   one civilian witness who may have to be flown in, cooperating

22   defendants who may have to be writted in.  It's just that the

23   logistical project of this -- you know, we moved heaven and

24   earth to get this month-long trial ready for September.  We can

25   do it for October, but there is a point at which further delay

1     does start to weigh against the interests of the public in a

2     speedy trial.

3             We would very, very much like to go forward in

4     October, and we're not sure why the -- at this point, if it's

5     Ms. Still refusing to sign the protective order and refusing to

6     review the supplemental discovery that was produced under the

7     Court's direction, at this point, as the Court says, it's not

8     the government's fault that Ms. Still refuses to participate in

9     this process.  And it's --

10            THE COURT:  I suppose the other thing is, I'm not

11    quite sure I see how waiting until February is going to fix

12    this problem.  If she's not willing to look at it, not willing

13    to actually have a discussion with the Court about what needs

14    to be addressed, I don't necessarily see what's going to change

15    between now and February.

16            MR. BROWN:  Yes, Your Honor.

17            THE COURT:  Let me ask Mr. Ekeland about that.  What

18    is going to change between now and February?

19            You have an expert that is refusing to look at the

20    evidence and is refusing to even engage with the Court as to

21    what might be done to address any concerns they have.

22            MR. EKELAND:  Your Honor, again, as I think we noted

23    before, the concern is the anti-competitive language in the

24    protective order, and the concern that it is career-ending for

25    Ms. Still.  That if she goes anywhere --

1          THE COURT:  You're telling me that.  Why can't they

2     come here and tell me that in a way in which I can adjust

3     whatever needs to be adjusted to address their concerns?  And

4     they're not willing to even show up to address that with me.

5          MR. EKELAND:  Your Honor, I can't speak to that.  I

6     wish they were showing up, and I do think it's disrespectful.

7          THE COURT:  But also, what's going to change?  If

8     it's career-ending for Ms. Still -- quite frankly, I will say

9     for the record, my suspicion is that Mastercard has just

10     decided that it has cold feet about this whole case, and that

11     they've decided they actually want to compete with Chainalysis.

12          And so they don't want to come here and testify that

13     what Chainalysis has done is, to use your quote, junk science

14     because, as you've said to me, they are concerned about the

15     protective order because they're trying to market the same

16     product, and they don't want to have their head of

17     investigations come and call something junk science on the

18     stand that they're trying to develop themselves.

19          I don't see how that problem gets fixed between now

20     and February.

21          MR. EKELAND:  Well, I don't -- that's not my

22     understanding of what the issue is.  My understanding of the

23     issue is that they're concerned that they're already developing

24     technology that's going to be similar, if not the same, as

25     what's disclosed in the latest information that's been

1    disclosed, so that they don't even want to take that risk.

2          And this is a unique protective order as -- again, as

3    I think the Court acknowledged, and we can't find anything like

4    this in the criminal context in terms of having noncompetitive

5    language in a protective order.  And this is a criminal case.

6          What can change is maybe we can find some expert to

7    review this that's amenable, or simply we have to exclude it or

8    make a motion to exclude.  I mean, I think it's --

9          THE COURT:  You don't get to make a motion to exclude

10   because you can't find an expert to challenge something who is

11   willing to sign a reasonable protective order.

12         MR. EKELAND:  Your Honor, I do think there's

13   significant due process issues and competitive concerns,

14   essentially, dictating what expert the defense can use as --

15   particularly when we've got a qualified one like Ms. Still.

16         THE COURT:  I'm sorry to interrupt.  If they would

17   just come here and talk to me about it, I would address what

18   their concerns are.  They won't even talk to me about it.  They

19   won't even appear in court.  They're ignoring the Court.

20         I've said, come tell me what your concerns are; I can

21   modify the protective order, if need be, in a way that protects

22   Chainalysis, but also ensures that CipherTrace doesn't face any

23   risk down the road.  But they won't even engage with me on it.

24         So that's not a matter of some onerous or unusual or

25   unfair protective order.  It's a defense witness who is

1    unprepared to engage with the Court, which is what leads me to

2    believe that the problem is more fundamental and why I'd like

3    to actually talk to them, because I think the problem is more

4    fundamental.

5            I can address their concerns about getting sued.  If

6    they'd just come and appear and talk to me about that, I can, I

7    think, put them at ease about that, but they don't want to do

8    that, which is what makes me scratch my head and say -- they

9    don't even talk to me about it.

10           It makes me think -- I've been told by you now that

11   they actually want to compete in the same space with a similar

12   product, that the real problem is they don't want their witness

13   to take the stand and say it's junk science because they want

14   to market the same thing.

15           MR. EKELAND:  Your Honor, I can't -- I don't know

16   what they're thinking beyond what I've been told and what I

17   told the Court.  And I can't speak for them.  I'm a little --

18   honestly, I'm a little shocked that they're not responding to

19   the Court.

20           I'm hoping I can -- Mr. Torres will reply to my

21   email, and we'll get some kind of contact and explanation.

22           THE COURT:  I would try Ms. Lorentz as well.

23           MR. EKELAND:  You know, I do think, though, that it

24   is -- this is a significant issue in terms of the defense being

25   able to review this evidence.  This is not something that we

1  saw coming or we even planned.  It wasn't -- Mr. Sterlingov is

2  not voluntarily here.  The government has voluntarily chosen to

3  use a proprietary vendor with IP that needs to be protected.

4         I do think there is a significant due process issue

5  here, Your Honor, and --

6         THE COURT:  I think -- we're getting ahead of

7  ourselves if you're filing a -- standing here making an oral

8  motion to exclude the testimony.  I think that's ahead of -- I

9  don't think you're making that motion, and we're getting ahead

10 of ourselves.

11        I think the question now is scheduling.  And what is

12 going to change between now and February?  If the issue is the

13 one you've identified, I'll have to decide that question.  But

14 I don't see how that's any different now than it's going to be

15 in February if your expert is refusing to sign the protective

16 order and refusing to even engage with the Court on the issue.

17        MR. EKELAND:  Well, hopefully -- I mean, this issue

18 came up on Friday, and in terms of --

19        THE COURT:  I think it came up earlier than Friday.

20        MR. EKELAND:  I thought on Friday it was the Court --

21 was it Friday morning?

22        THE COURT:  It was Friday when they didn't show up

23 when I asked them to show up.  But I think the issue has been

24 brewing for some time about the protective order.

25        They've certainly known about the protective order

1    for --

2             MR. EKELAND:  Your Honor, about reaching out to

3    Mastercard counsel, right?  I believe Friday -- was it Friday

4    or Thursday morning that we were meeting with Mr. Sterlingov,

5    and we were discussing the continuance, we were trying to reach

6    out.  And then it was the holiday weekend.

7             First, we would ask for another day or two to see if

8    I can actually get ahold of somebody, I can actually talk to

9    somebody, find what's going on.

10            The other thing that would happen is we'd have a

11   little bit of time to resolve the issue of whether or not Mr.

12   Sterlingov himself has a right to look at this evidence, which

13   we just set a briefing schedule for --

14            THE COURT:  But if need be, I can shorten that

15   briefing schedule, and I could resolve that in pretty short

16   order.  That's not a big deal.  Strike that.  It's a big deal,

17   but it's one that doesn't require 50-page briefs.  It requires

18   a 5- or 10-page brief.

19            MR. EKELAND:  I agree with that, Your Honor.  But I

20   think the briefing schedule that the Court has just set is

21   adequate for that.  It gives us time to look for other experts.

22            I know with the current proposed, I think, October

23   date, we've got scheduling conflicts with our experts we just

24   discovered.  We've had problems this entire time getting access

25   to Mr. Sterlingov.  He still doesn't have a hard drive to

1    review discovery.  We tried to get him the translation

2    printouts.  They're confiscated from him.  You know, we've

3    now --

4              THE COURT:  Can I ask you a question about that.

5    About the access and reviewing the discovery, when did you get

6    that discovery that you're talking about?

7              MR. EKELAND:  Well, if the Court recalls, when he was

8    at the Northern Neck Regional Jail, he had a hard drive.

9              THE COURT:  No, no, no.  My question is, when did you

10   receive the discovery from the government?

11             MR. EKELAND:  The translations that they --

12             THE COURT:  No, no.  You've said he hasn't had time

13   to review the discovery, and I'm asking you when you received

14   it.

15             MR. EKELAND:  Oh, we received the discovery a while

16   ago, but he hasn't --

17             THE COURT:  A while ago; like, many months ago,

18   right?

19             MR. EKELAND:  Yes.  But it's three terabytes of data,

20   and there's been new discovery that was produced, such as

21   *Jencks* and numerous other stuff where --

22             THE COURT:  Does he need the hard drive for reviewing

23   the *Jencks* material?

24             MR. EKELAND:  I don't think we've been able to get

25   him the *Jencks* material.  We're trying to get him a hard drive.

1          THE COURT:  You couldn't get him the -- you met with

2     him this weekend and you said you could bring whatever paper

3     you wanted with you.

4          MR. EKELAND:  We brought him an initial set of

5     papers, but they wouldn't let us bring the hard drive with the

6     e-discovery.

7          THE COURT:  That's my question.  But that's not the

8     *Jencks* material; that's something different, right?

9          MR. EKELAND:  No.  We're putting all the discovery on

10    a hard drive for him to review, and he has been able to review

11    it before.  But, basically, for the last couple months, he

12    hasn't had access to the discovery in this case, and he is the

13    defendant in this case.

14         THE COURT:  No, no, I understand that.  But the case

15    was originally set to go to trial in January, and I postponed

16    it to the September date to give you time.

17         But the original schedule is January we were supposed

18    to go to trial.  He's, presumably, had the discovery for months

19    and months.

20         MR. EKELAND:  There have been numerous productions

21    since January.  There's been one on September 6th, August 14th,

22    July 31st.  There's been multiple productions by the government

23    since January.

24         We were just given, like I said, the *Jencks*

25    information, and he needs -- he needs access -- full access and

1    constant access to the discovery, which is over three

2    terabytes.  To prepare for this case.  This notion that he can

3    somehow get the discovery, like, a year ago and be completely

4    prepared, this is -- there's volumes and volumes of discovery,

5    and there's new discovery being produced.

6            This notion that, oh, a year ago he got the

7    discovery, he should have just been ready just like that; we

8    argued that, as a matter of due process, that a defendant

9    should have full access to the discovery for the entire time

10   he's being held pretrial because he has not been found guilty

11   of any crime can.

12           Constantly, we've had nothing but problems with

13   access to our defendant.  And now, what, he's in his third

14   facility because the federal government --

15           THE COURT:  Because I've requested repeatedly to move

16   him at your request because you've objected to where he was.

17   And every time you've requested that, I have gone to the

18   marshal, and I have gotten him moved because you wanted him

19   moved.

20           And when people are moved, there are some lags in

21   getting them access to things when they get moved.

22           MR. EKELAND:  But in every facility it seems

23   there's -- it's not just lags in the access.  There's problems

24   with just full access to the client.

25           THE COURT:  I told you -- I told you, as we sat here

1    on Friday, I wasn't sure that the jail -- I think it was the

2    hard drive -- but I wasn't sure the jail was going to allow

3    Mr. Sterlingov to bring that in himself, and maybe you needed

4    to bring it to him.  I said, go talk to the marshal about what

5    he can bring into the jail when he goes.  I said, I don't know.

6              Evidently, you didn't do that because then he showed

7    up at the jail with something they said he can't bring in and

8    you didn't know he wasn't able to bring it in.

9              MR. EKELAND:  Your Honor, we sat with the marshal in

10   this courtroom, and the marshal reviewed all those paper

11   translations and then let him take it in.  And then the jail

12   said --

13             THE COURT:  Did he say the jail would accept it?

14             MR. EKELAND:  He said the jail wouldn't take the hard

15   drive, so we didn't give the hard drive.  And then he gave us

16   every impression that that would be fine.  Now we can go print

17   that out again.

18             That's -- you know, it's not just as simple as, oh --

19   there's a constant sandbagging of defendants in this system.

20   It's silent and it's unwritten.  Everywhere we turn there's

21   always some sort of obstacle that it's just not as simple as,

22   oh, go talk to the marshal and instantly get taken care of.

23             It's the state facilities that are doing everything

24   they can to hamper and --

25             THE COURT:  I'm sorry.  I'm going to cut you off

1    there.  I just think that's a silly argument.  These state

2    facilities may have problems, but they are not -- there is not

3    a conspiracy in which they are trying to convict Mr. Sterlingov

4    and affirmatively trying to make it difficult for him to defend

5    himself.  There's just no evidence for that, and that's just a

6    silly argument.

7         MR. EKELAND:  I'm not saying it's a conspiracy.  I'm

8    talking about our experience.  And all I know is that over this

9    entire course of Mr. Sterlingov's pretrial detention, it's been

10   difficult to access him.  He's had problems accessing his

11   discovery, and it's been a constant problem.

12        THE COURT:  So how is postponing this until February

13   going to resolve this?  I mean, at your request I postponed the

14   trial from last January.

15        And then you're going to say to me, if there are

16   problems, he needs constant access to it.  There were two weeks

17   when he didn't have access to it and, therefore, we need to

18   postpone the February trial date because he wasn't given

19   constant access to the materials, and it has to be up to date,

20   and if it's not -- there has been some interruption, then you

21   can't go forward.

22        MR. EKELAND:  This Court was the one who suggested

23   the continuance so that Mr. Sterlingov could review the newly

24   produced evidence from Chainalysis.

25        THE COURT:  Right.

1          MR. EKELAND:  What was unforeseen when this happened

2     was the problems that are happening right now.  We submit that

3     Mr. Sterlingov, arguably, has a right to review that evidence.

4     We asked the Court for more time to get experts, and I will

5     reach out to Mastercard to see if we can get some kind of

6     answer on this.

7          The issue, I think, is unique in the sense of the

8     protective order and what's going on here.  When the Court

9     suggested the continuance, we all discussed it, and then, I

10    believe, the Court even entered an order scheduling this trial

11    again for February and tolling the speedy trial.

12         THE COURT:  You may recall what actually happened is

13    I said, I don't think I have anything until February.

14    Mr. Sterlingov says, I really only want a couple of weeks'

15    additional time.  I don't want a continuance until February.

16    And I said, well, that's what I have.  The schedule -- I

17    currently had another trial scheduled for October.

18         I didn't have that time available to proceed when

19    Mr. Sterlingov wanted to.  I was the one who said, I'm sorry,

20    we can't accommodate Mr. Sterlingov's request to postpone for a

21    few weeks, and it would have to be until February; and then I

22    gave him overnight to decide whether he was willing to accept

23    that longer extension of time because that was the only

24    availability.

25         MR. EKELAND:  And that was before the issues arose

1    with the protective order and his ability to review the

2    evidence produced by Chainalysis.

3            And we also did not have time at that point in time,

4    because it was happening so fast, to check the schedules of our

5    experts, and they are not -- most of them are not available

6    during that time period.  So if Mr. Sterlingov is forced to go

7    on October 10th, he will not have had ample opportunity to

8    review the evidence produced by Chainalysis, and we don't know

9    if we'll be able to put his experts on.

10           THE COURT:  That evidence -- I realize there are

11   spreadsheets that someone who is running an analysis might want

12   to go through those spreadsheets.  But I've reviewed the

13   written portions, at least the nonspreadsheet portions of the

14   analysis, in less than an hour.  I mean, it's not -- this was

15   not something that required days and days of review.

16           Now, I understand that an expert might want to,

17   actually, take what's in the spreadsheets and run some analysis

18   on it.  But, presumably, that's not what Mr. Sterlingov is

19   doing.

20           MR. EKELAND:  Well, he can't from his jail cell

21   because he doesn't have access to any computer or any equipment

22   to do that.  I can't speak for what -- how long it would take

23   an expert to review what Chainalysis has been submitted.

24           But I do submit that Mr. Sterlingov is entitled to

25   have a qualified expert review the evidence being used against

1     him and that --

2              THE COURT:  It would have been really nice to sort

3     that out with Chainalysis before spending weeks trying to get

4     the evidence without -- and then Chainalysis simply saying --

5     not Chainalysis -- CipherTrace saying that we're not going to

6     look at it.

7              MR. EKELAND:  CipherTrace and Ms. Still signed the

8     original protective order in this case.

9              What's different about the new protective order is

10    that it has anti-competitive language that everyone is balking

11    at and that, arguably, might cause problems with other experts

12    if we can find one that's amenable to the Court.

13             The fact that we -- the defense is forced to -- is

14    limited in their choice of experts by competitive concerns in a

15    federal criminal case where the primary evidence is from a

16    private vendor.  That's a unique issue.  I can't find it in any

17    of the case law in the federal court.  And the Court has

18    referred us to an intermediate appellate court from New Jersey

19    on a DNA technology case, but--

20             THE COURT:  Did you look at who wrote the amicus

21    briefs?  You disparage that decision as though it's some court

22    that is not deserving of respect.

23             It wrote a thoughtful opinion, and it had amicus

24    briefs in doing that from some of the most distinguished groups

25    across the country.  So I really object to your disparaging

1     that court.

2              MR. EKELAND:  But, Your Honor, is that blockchain

3     technology, or is that a science that's well-established?

4     Because here, we're dealing with something entirely new; a

5     newly emerged -- emergent standardless field, by everyone's own

6     admission, where they can't tell us the error rates or

7     anything.  And there's no scientific evidence that it works.

8              So we maintain that we're entitled to a full review

9     of that.

10             THE COURT:  You are if your expert would only look at

11    it.

12             MR. EKELAND:  Your Honor, our expert doesn't want to

13    end their career because --

14             THE COURT:  That's silly.  It will not end her

15    career.  That is a silly argument.

16             There are tens of thousands, if not hundreds of

17    thousands, of protective orders that are more onerous than this

18    one across industries with highly sensitive information that

19    people sign every single day.

20             All this says is that she can see it, she simply

21    cannot use it, and she cannot disclose it to the others.  She

22    does not design computer code.  She does not design algorithms.

23    It's not what she does for a living.

24             So unless the concern here is that either I or

25    someone else is going to think that she is lying or she is

1   going to violate the order -- unless she violates the order or

2   someone thinks that she is lying and says she didn't violate

3   the order when she did -- I'm sorry -- says she didn't violate

4   the order -- sorry.

5        Let me -- the concern is one- or twofold.  Either she

6   will be falsely accused of violating the protective order or

7   she will violate it.  There's no reason to think that she would

8   inadvertently violate it because it's just not what she does

9   for a living.

10        So the concern is that she could be falsely accused

11   or that she would actually violate it.  I don't think there's

12   any reason to think she's actually going to violate it.  So the

13   concern is just that she would be falsely accused of violating

14   it.

15        MR. EKELAND:  That's not the concern, Your Honor.

16   The concern is that she goes, say, to look for another job in

17   the blockchain space, and they see that this protective order

18   exists.  And the perception with the person or the entity that

19   wants to hire her is she's not worth taking the risk because

20   this protective order exists.

21        And so it's not so much a question of reality as it

22   is perception.  And what the perception is, is that this is a

23   career-ending protective order because potential employers in

24   the future are going to see this, and they're not going to want

25   to take the risk given how aggressive Chainalysis is in this

1    space.

2              THE COURT:  So who has Chainalysis sued?

3              MR. EKELAND:  I don't know.

4              THE COURT:  You say they're so aggressive in this

5    space.  You're suggesting that --

6              MR. EKELAND:  They've been very aggressive about this

7    protective order and the language in it.  They've certainly

8    been very, very -- just the -- just the mere fact of this

9    protective order, I think, shows how aggressive and concerned

10   they are about their IP.

11             So when I think anybody reading that protective

12   order, when Ms. Still goes to look for another job, is going

13   to, justifiably, have the concern and the perception that, you

14   know, maybe she's not worth it.  And that's -- that, I think,

15   is the core of the problem.

16             It's not so much that, oh, she's going to be sitting

17   up there or that she's going to steal the technology.  It's the

18   perception that it's not worth the risk by future employers.

19   It's the perception that this protective order is career-ending

20   even if she would never take those steps.

21             THE COURT:  Why is it that Mastercard is concerned

22   about her changing employers and going to look for a new job?

23             MR. EKELAND:  Mastercard's concern, my

24   understanding -- again, I'm just repeating.  Mastercard's

25   concern is that if she even looks at it and they're working on

1   something similar, they're going to have to stop working on it

2   or risk getting sued.  So they don't want to take the risk.

3          But they're going to be foreclosed from working on IP

4   that they're already working on.

5          THE COURT:  So I understand why Mastercard might be

6   concerned, but I think I can address those concerns for the

7   reasons I've said.

8          I just don't think -- I mean, the fact that this is a

9   criminal case doesn't distinguish it from the tens if not

10  hundreds of thousands, of civil cases where exactly the same

11  concerns exist; yet people find ways to operate with protective

12  orders in place.

13         And you can say the same thing about every time that

14  there is litigation involving Apple and Google and all these

15  companies with very, very valuable IP, and there are people who

16  come in, experts who look at code, look at information that is

17  subject to patent, and they work it out.  It just happens every

18  day.

19         MR. EKELAND:  I think there's a number of different

20  things here.  Number one, first of all, this is a newly

21  emergent technology.  Number two, Ms. Still came in, and she

22  signed the original protective order.

23         And the -- when she came in as an expert and when

24  everybody came in as an expert, they did not contemplate, nor

25  was it in front of them, a protective order with

1    anti-competitive language.

2              THE COURT:  If I say then, fine, we'll just live with

3    the original protective order, but I want you to understand

4    that I understand that protective order to mean that she can

5    only use it for purposes of this case and she cannot disclose

6    it to anybody else and she cannot use it for any other purpose,

7    are we good?  Ready to go?

8              MR. EKELAND:  Well, she's already signed that, Your

9    Honor.  So I would --

10             THE COURT:  Will she look at it, though, with that?

11             MR. EKELAND:  Yes.  I think that's what she already

12   agreed to.  I think what the issue was, is the --

13             THE COURT:  You're telling me, though, that she will

14   look at it, and we'll be ready to go if I just say that?

15             MR. EKELAND:  I have to ask her.  Because as the

16   Court knows, reading the original protective order, to have the

17   anti- --

18             THE COURT:  It's not anti-competitive.  I think

19   that's what the original protective order is reasonably

20   construed to mean.  It would not be much of a protective order

21   if it said, and, oh, by the way, you can disclose this

22   information to others who are not using it for purposes of the

23   case.

24             MR. EKELAND:  Uh-huh.

25             THE COURT:  And it wouldn't be much of a protective

1    order if it said, oh, by the way, you can go use this for your

2    own purposes that are unrelated to the case.

3              MR. EKELAND:  Your Honor, my understanding of what

4    the objection was, was -- if I recall off the top of my head,

5    was the language that says you can't use your thoughts and

6    impressions derived from this, essentially, to compete against

7    Chainalysis.  I can't remember the exact language.

8              Ms. Still's already signed the original protective

9    order, as anybody who has looked at the discovery in this case.

10   I think what led to the balking was this new one, as the Court

11   knows.  But I do think there's another issue.

12             THE COURT:  All right.  So I just want to be clear on

13   this then.  If I say what I just said, we're set to go then?

14             MR. EKELAND:  No.  Because the problem we have now is

15   we have a scheduling problem with our expert.

16             THE COURT:  Who?  Who is unavailable on what day?

17             MR. EKELAND:  All of --

18             THE COURT:  I truly don't believe you, I have to say,

19   as I sit here.  You tell me all of your experts are

20   unavailable.  Mr. Verret is here.  He can take the stand and

21   find out what his availability is right now under oath.

22             MR. EKELAND:  I didn't hear you.

23             THE COURT:  Mr. Verret is sitting right here.  Let's

24   find out his availability under oath right now.  You just told

25   me all of your experts are unavailable for trial.

1          MR. EKELAND:  We asked them on Friday.  We emailed

2     them and asked them their availability for the October dates

3     because we wanted to go in October.  That's one of the things

4     we discovered is that everyone is busy during that period.

5          THE COURT:  Every single one of your experts?

6          MR. EKELAND:  The only one we haven't heard back from

7     is Dror.  Ms. Still is busy in November; Mr. Fischbach is on

8     trial.

9          THE COURT:  He's on trial for the entire month of

10    November?  He's a witness.

11         MR. EKELAND:  He says, "I'm in trial in Missouri from

12    the second week of October through mid-November, for what is

13    already Missouri's most expensive trial in history.  It's not

14    moving, so October is out for me.  The only serious conflict I

15    have in February is on the 23rd, which could be resolved."

16         Mr. Cabanas says, "As for October, November 2023,

17    this could be problematic depending on the specific dates."  So

18    that's a little open.

19         THE COURT:  That's not quite what you just told me a

20    moment ago.

21         MR. EKELAND:  Your Honor, this is moving fast.  I'm

22    looking at the emails that were sent out on Friday.

23         Mr. Verret is here.  And then Ms. Still says,

24    "February works for me"; November does not because she

25    rearranged two months of work for the trial in September and

1   October, "And I'm scheduled to be working out of the country

2   for November and part of December."

3   THE COURT: All right. My final note on this, I want

4   to -- I'm going to have to think about this, and I'll give the

5   government a chance to respond on scheduling.

6   The final note I'll say on this is, I think this

7   notion about the competitive concerns and the protective order

8   is just hard for me to fathom because you yourself said to me

9   on August 22nd, never for a moment did you think that there

10   wouldn't -- that it wouldn't be subject to some kind of

11   protective order in terms of the competitive concerns. That

12   was back in August -- on August 22nd. You said to me, never a

13   moment did you think that it wouldn't be subject to a

14   protective order for competitive concerns.

15   The whole time here you were arguing to me and to

16   Chainalysis that Chainalysis had to turn over its source code;

17   you were saying, no, we understand, of course it's going to be

18   subject to a protective order for competitive concerns.

19   And either you just didn't discuss that with

20   Chainalysis before making those representations to the Court

21   and continuing to press for this information or Chainalysis has

22   had a change of heart -- not Chainalysis -- CipherTrace has had

23   a change of heart of some type.

24   MR. EKELAND: Your Honor, I believe that was before

25   we saw the protective order. I can't control the experts and

1    the company's concerns about the noncompetitive language.

2              I think -- I just think this is a unique issue.

3    Honestly, I don't know what to do about it.

4              THE COURT:  I am -- as is probably pretty clear, I'm

5    not at all convinced that there's a reason to delay the trial

6    because CipherTrace refuses to look at this material, and I

7    think its position with respect to the protective order is very

8    hard to understand.

9              I, quite frankly, think that there's something else

10   going on here because it's so difficult to understand.  It is a

11   very vanilla protective order.  And of all the types of

12   protective orders I have seen in my many years, both practicing

13   and as a judge, this is -- when you're dealing with competitive

14   information or proprietary information, this is about as

15   unonerous as they come.

16             So I just -- everyone knew that the request that you

17   were making for the discovery would be subject to

18   competitive -- to a protective order that would address

19   competitive concerns as you yourself acknowledged, and I think

20   it's entirely reasonable to do that.  And if CipherTrace is

21   behaving unreasonably about that, as I said before, I just

22   don't think that's the Court's problem.

23             With respect to the availability of witnesses, I

24   think I need more specifics on that and would need some sort of

25   detailed showing about who is available and who is not and why

1    they're not available so I can determine whether there are

2    things that can be done to accommodate their schedules and

3    whether we can accommodate them in trial.  And so I'm open to

4    that.

5          But the final thing is, with respect to Ms. Still, to

6    the extent she needs time to look at the information, I

7    understand that.  But if she's not willing to look at the

8    information, that's not a very persuasive argument.

9          MR. EKELAND:  Is the Court saying that she can look

10   at the information under the old protective -- the protective

11   order that she signed?

12         THE COURT:  I guess I would kind of like to know what

13   her position is on that.  I might be prepared to say that.  I

14   probably should let Chainalysis be heard, but I might be

15   prepared to say that with the understanding, though, that I

16   read that protective order to mean that she cannot use it for

17   any reason other than this case and that she cannot disclose it

18   to anybody else, including other people who work for

19   CipherTrace.

20         MR. EKELAND:  Okay.  And then -- but the

21   noncompetitive language that's in the --

22         THE COURT:  I don't, frankly, see any difference

23   between the noncompetitive language and what I've just said.

24         MR. EKELAND:  Well, I have trouble -- then why is

25   there a new protective order if there's no difference between

1     the two?  What's the difference?

2                THE COURT:  I think, perhaps, to be more explicit and

3     clear about it.

4                MR. EKELAND:  More explicit and clear about what?

5                THE COURT:  About that she's not supposed to use it

6     for any purpose other than this case, including, paren,

7     competing against Chainalysis or anyone else, end paren, and

8     that she cannot disclose it to anyone else, paren, including

9     other colleagues who work at Chainalysis without first

10    obtaining -- who work for CipherTrace without first obtaining

11    permission from the Court, end paren.

12               MR. EKELAND:  That's a new feature, because we've

13    been having people sign a protective order to look at evidence

14    in this case, and they've agreed to be governed by it.  And

15    she's got people at CipherTrace.

16               THE COURT:  If that's her problem, come tell me that

17    and tell me who they are, and I can tell them whether they can

18    look at it or not.  No one has told me that that's the problem.

19               This is not, sort of, freeform of you make three

20    arguments, they fall; you make three other arguments and then

21    you say the problems are different.  It's hard for me to

22    believe that's really what their problem is when they won't

23    engage with me.  And when, after hours of debate about this,

24    this is the first time you even mentioned that as an issue.

25               MR. EKELAND:  We're now going back to the original

1    protective order, and this is the first time that we've heard

2    that there's restrictions on who can sign that protective

3    order.  And so that raises the issue of, okay, well, then now

4    what's being -- we're getting told is that Ms. Still is the

5    only person at CipherTrace who can look at stuff, look at this

6    new evidence.  That's fine.

7         But that's different than having a protective order

8    before that we can give to people and sign and say you agree to

9    be bound by this by contempt of court if you disclose any of

10   this discovery.  Now, if I understand what the Court is saying,

11   if she wants to look at this under the old protective order, we

12   need to get permission to have anybody else at CipherTrace look

13   at it as well to help her with these spreadsheets and entering

14   the data --

15        THE COURT:  As far as I can tell, no one at

16   CipherTrace wants to look at this, and they don't want anyone

17   else looking at it because they're afraid they're going to get

18   sued.  No one has come to me and said she can't do what she

19   needs to do.

20        Maybe that's the case, and she needs a technician to

21   help her who is prepared to sign it; I would be open to that.

22   This is just -- this is evolving.  And every time I try and

23   address an issue, there's just another issue that comes up.

24        MR. EKELAND:  Well, yeah, because -- it's

25   complicated, and it's the first time this kind of --

```
 1                    THE COURT:  It's not --
 2                    MR. EKELAND:  -- blockchain software has been used
 3       anywhere.
 4                    THE COURT:  I'm sorry.  It's not complicated.
 5       I guarantee you that in the time that we have been discussing
 6       this issue, a hundred protective orders like this one have been
 7       signed across the country without any problem.
 8                    MR. EKELAND:  I disagree, because I think the context
 9       is different here.  I think the context -- I do think --
10                    THE COURT:  I'm sorry to interrupt.  But the context
11       is not any different from CipherTrace's perspective.  It may be
12       different for Mr. Sterlingov's perspective, and Mr. Sterlingov
13       has rights that may be heightened because this is a criminal
14       case, and there are greater due process concerns.  That's all
15       about Mr. Sterlingov and what he's entitled to.
16                    It has nothing to do with the competitive concerns
17       that CipherTrace has identified.  It's not a defendant in a
18       criminal case.  It has no Sixth Amendment rights; it has no
19       Fifth Amendment rights.  It's just a question of whether a
20       business concern is willing to sign something that businesses
21       sign over and over again every day.
22                    MR. EKELAND:  But they agreed to the original
23       protective order.  Their lawyers reviewed the original
24       protective order.
25                    Now, what's happening is that the new protective
```

1    order, after they've done substantial work, after they've come

2    in, after Ms. Still has reviewed this stuff, after we've

3    discovered all this new stuff about Chainalysis Reactor and

4    given a new production, then late in the game, this new

5    protective order is coming in for us to review the information.

6              THE COURT:  So is your position then that CipherTrace

7    thought when it was doing all this work earlier, no problem; we

8    can share this with our people who are building the new

9    algorithm; we can use this for whatever purposes.  What a

10   boondoggle; we're going to get to look at the IP of our

11   principal competitor.

12             MR. EKELAND:  No, not at all.

13             THE COURT:  So what's changed for them?

14             MR. EKELAND:  Again, like -- the perception -- first

15   of all, that now this language in the new protective order,

16   that it's going to bar them from working on stuff that they're

17   already working on.  They've got liability --

18             THE COURT:  It's not.

19             MR. EKELAND:  -- for IP -- what?

20             THE COURT:  It's not.  I'm telling them it's not.

21   And if they want me to tell them it's not --

22             MR. EKELAND:  Let me make my best efforts to get them

23   on the phone.

24             THE COURT:  I've asked that for quite a while now,

25   and I gave you the whole weekend to try and arrange that.

1          MR. EKELAND:  We've been doing that.  We reached out

2     on Friday, and it was a holiday weekend.  Now I reached out,

3     and I asked the Court's indulgence for another day to just try

4     to get ahold of somebody because this is not within my control.

5          I do not control CipherTrace's lawyers.  I do not

6     control Mastercard's lawyers.

7          THE COURT:  Okay.  No, I understand that.  I

8     understand that.

9          All right.  Well, I think we've spent more than

10    enough time on this for now.  The couple -- a couple other

11    things I just wanted to touch base on.

12         Mr. Ahmed has not filed a renewed motion pro hac, so

13    that's something that's on your plate to take care of.

14         MR. EKELAND:  Your Honor, we're happy to refile it.

15    We were looking at it.  It does include the motion from

16    Ms. Radack, and that's from the court's website, the form we

17    used, but I'm happy to --

18         THE COURT:  You say -- I didn't read it as a motion

19    from her.  What I read, it said, just -- it was a line at the

20    bottom that said sponsoring attorney.  It looked like it was

21    actually a motion from Mr. Ahmed, if I was reading it

22    correctly.

23         MR. EKELAND:  I'll go look at it again.  Your Honor,

24    I'm happy to resubmit it.  And the answer to your question is

25    yes.

```
1              THE COURT:  That's just a checklist item.  And then I
2    did, as promised, read the Korver-Pelker article over the
3    weekend, the attribution and cryptocurrency cases, and nothing
4    I read in that changes my view at all on that.
5              I don't think that that article is plausibly read to
6    suggest that a necessary condition of doing blockchain tracing
7    is that you have hard evidence of who holds the private key.  I
8    just I didn't see that.  The article states the obvious, which
9    is that that is very helpful if you actually knew who -- who
10   has the private key.
11             I think that citing to that article and relying on
12   that is, frankly, either a 403 problem -- it's really a 403
13   problem and even, potentially, a 401 issue.  But it feels to me
14   like it's just an opportunity to take a dig at Ms. Pelker that
15   is not advancing the case at all.  The proposition is one that
16   is just entirely obvious.
17             So I don't see any reason to be citing in any of the
18   expert reports to Ms. Pelker's article.
19             MR. EKELAND:  Understood, Your Honor.  Just for
20   clarification, I don't think it was being cited for the
21   proposition that it's necessary to have that type of evidence,
22   but that it's, I think, important.  But understood, Your Honor.
23             THE COURT:  I don't think anyone disagrees that that
24   is helpful information and that it is the type of information
25   that any investigator would very much like to have if they had
```

1    it.  I just don't think that's even a contested question.  And,

2    certainly, nothing you need to cite to Ms. Pelker for.

3         To the extent you want to rely on that proposition,

4    I'm sure there are plenty of other sources or ways to convey

5    that.  I don't think you need Ms. Pelker saying so.  It feels

6    to me as though it's intended to prejudice the jury by

7    suggesting, oh, even Ms. Pelker agrees with our case.  I just

8    don't think that's -- I think that's more prejudicial than

9    probative.

10         I think the probativeness is extremely small, and I

11   don't see any reason to drag Ms. Pelker into it given how small

12   the probativeness is, particularly given the fact that it's

13   such an obvious proposition that I am confident that there are

14   plenty of other sources to point to for that.

15         MR. EKELAND:  Your Honor will just note our objection

16   for the record and we'll move on.

17         THE COURT:  That's fine.  Okay.  All right.

18         So I think we were going to use today to talk about a

19   couple other remaining experts; Ms. Glave, Mr. Cabanas, and a

20   couple of other pending motions, which I'm happy to do.

21         MR. EKELAND:  Your Honor?

22         THE COURT:  Yes.

23         MR. EKELAND:  We do have -- we can address this in

24   briefing, if necessary, or if we can't get to it today, we do

25   have some objections to the government's proposed witnesses

1    based on their witness list.  Because we don't -- we think

2    they're basically 401, 403, and 702 objections; some of the

3    witnesses that the government has proposed.

4              We just don't see how they're fact witnesses.

5    They're bringing corroborating witnesses that have no knowledge

6    of anything that Mr. Sterlingov did, and we're concerned that

7    the government is, essentially, trying to backdoor in expert

8    testimony through some of these witnesses that they haven't

9    noticed.

10             THE COURT:  Okay.  Well, I am -- there's nothing in

11   front of me on that at the moment, but we can talk about

12   whether it's something we need to address pretrial or it's

13   something that can be addressed as the witnesses are called.

14             MR. EKELAND:  We're happy to brief it or do it

15   orally.  I defer to the Court on what the best way the Court

16   thinks is to handle our objections.

17             THE COURT:  Okay.  How long have you known those were

18   the witnesses?

19             MR. EKELAND:  We've been doing the research since we

20   got the witness --

21             THE COURT:  No, no.  My question was, how long have

22   you known those were the witnesses?

23             MR. EKELAND:  We got the witness list on -- what was

24   it -- on the -- what was the first date?  On the 14th?  Is that

25   when we distributed them?

```
 1                THE COURT:  On September 14th?

 2                MR. EKELAND:  Is that the date they were exchanged?

 3                MR. BROWN:  Your Honor, yes, that's when the witness

 4       lists were exchanged.

 5                But two quick points.  To the extent that the

 6       defense's purported objections to witnesses writ large have to

 7       do with certain cooperating defendants, cooperating witnesses,

 8       we would ask that that be done under seal.  And number two,

 9       there was a disclosure of two cooperating witnesses, I believe,

10       in mid-August; so much earlier than this.

11                THE COURT:  Okay.  All right.  Well, we can come back

12       to this as appropriate.

13                So why don't we go ahead and take a break and then

14       come back and talk about Ms. Glave and Mr. Cabanas and the

15       willful blindness issue that the government has raised in a

16       motion in limine.

17                And then I will continue to give some thought to what

18       to do about the trial date, but I would encourage you, Mr.

19       Ekeland, to continue to reach out to CipherTrace.  But as I

20       said, I ultimately think, even though their counsel has behaved

21       badly here, it's ultimately an issue between you and your

22       witness.  If they're not willing to look at the material, I

23       can't compel them to do that.  Yes, Mr. Brown?

24                MR. BROWN:  Your Honor, we don't want to get between

25       defense counsel and their witness.  We would be happy to reach
```

1    out directly to CipherTrace counsel to see if we can

2    short-circuit -- use our good offices to connect them with

3    Chainalysis and short-circuit some of these concerns that -- as

4    far as I know, it's just been a game of telephone.

5              We haven't actually heard from CipherTrace counsel.

6    Mr. Ekeland -- he stated that he did not actually speak with

7    anyone from CipherTrace counsel.  This all seems to be mediated

8    through -- secondhand through Ms. Still's statements.  We think

9    we may just be able to cut through that, if possible.

10             THE COURT:  I will leave that up to you and

11   Mr. Ekeland.  I do think you shouldn't reach out to the defense

12   expert unless Mr. Ekeland agrees.  But I appreciate your

13   efforts to try and address this because I think it's in

14   everyone's interest just to have CipherTrace look at the

15   material.  I don't think they're going to get sued.  I'm not

16   going to hold them in contempt unless someone violates the

17   protective order.

18             So I just don't think there's an issue here.  As I've

19   said more times than I should have already, I think that this

20   is a very vanilla protective order when you're dealing with

21   proprietary information, and I'm puzzled as to why CipherTrace

22   is so concerned.

23             All right.  Why don't we come back then, and we'll

24   pick up with Ms. Glave and Mr. Cabanas.  15 minutes.

25             (Recess taken.)

1          THE COURT:  All right.  So, unfortunately, I think we

2    only have about 15 minutes before the lunch break because our

3    court reporter is covering a trial this afternoon, and she

4    needs time to have lunch before she returns to the trial.

5          I'm happy to use the 15 minutes we have, and we could

6    either start with Ms. Glave, or I'm happy to hear argument with

7    respect to the government's willful blindness motion in limine.

8    Maybe that's the more discrete item, so maybe that's the

9    easiest place to start.  This is Docket 66.

10         MR. BROWN:  Yes, Your Honor, on the willful

11   blindness.  Your Honor, the government asks not only for a jury

12   instruction but also for permission to refer to the concept of

13   willful blindness in its opening statement.

14         This is relevant to the whole story of what Bitcoin

15   Fog is and what it did.  Here, I think, as set forth in our

16   pleadings, the Supreme Court in *Global-Tech* has pretty clearly

17   laid out what comprises an acceptable willful blindness

18   instruction and also that a willful blindness instruction is

19   appropriate here; namely, that there's a subjective belief of a

20   high probability of a known risk, and then a deliberate action

21   to avoid confirming that risk.

22         This is something that is particularly apt in a

23   money-laundering situation given not only the legislative

24   history that we cited in our briefing, but just the plain text

25   of the statute, which talks about knowledge that the funds come

1    from "some" unlawful activity; not knowledge about the

2    particular unlawful activity.

3            Here, as we've proffered in our briefing, in terms of

4    subjective belief of the high probability, the defendant had

5    knowledge, extensive knowledge, about darknet markets.  He was

6    a Silk Road user himself.  He was a Tor user.  He was very well

7    aware of the use of Tor to -- as a vehicle for obtaining

8    illegal drugs.

9            He was very knowledgeable about the use of mixers,

10   and he took deliberate steps in terms of creating Bitcoin Fog

11   as an entity that was deliberately designed to avoid confirming

12   knowledge that it was processing the proceeds of illegal

13   activity.  And that included erasing logs, designing the system

14   so that no customer information would be kept, designing a

15   system that would sit on Tor, on the darknet, and that would

16   pledge never to cooperate with authorities.

17           We think that, in terms of what's been proffered,

18   it's sufficient to at least allow us to refer to the concept in

19   openings.  And in terms of jury instructions, we understand

20   final jury instructions may wait until the Court sees how the

21   evidence comes in, but we think that the final jury instruction

22   on willful blindness will be well-supported.

23           THE COURT:  Just to make sure I understand, the

24   evidence of deliberate action, in your view, is going to be,

25   essentially, the entire design of Bitcoin Fog in the erasing of

1   the logs?

2          MR. BROWN:  Yes, Your Honor.  It's that sort of

3   actively designing an entire apparatus to avoid collecting any

4   information that would confirm that the institution is, in

5   fact, doing business on behalf of those laundering the proceeds

6   of illegal activity.

7          So, yes, all of those.  Deletion of logs, not

8   collecting customer information, pledging not to cooperate with

9   the authorities, never to produce information to the

10  authorities; these are really classic examples of the sort of

11  ostrich head in the sand behavior that the willful blindness

12  instruction was really designed to address.

13         THE COURT:  What would you propose saying to the jury

14  in openings?

15         MR. BROWN:  In openings, simply saying -- something

16  to the effect that the Court will instruct you that

17  Mr. Sterlingov didn't need to know exactly what the illegal

18  activity was, but if he -- and, essentially, repeat the

19  elements of the willful blindness instruction.  He was aware of

20  a high probability that this was the case, and he took

21  deliberate actions in designing Bitcoin Fog to avoid collecting

22  customer information, collecting logs, and so forth.

23         THE COURT:  Although, that's a little bit different

24  than the standard deliberate actions to avoid learning himself

25  of that fact.

1          MR. BROWN:  Yes, Your Honor.  So -- that's fair.

2    And, certainly, in openings we wouldn't get into great detail.

3    This would be, essentially, a passing reference.

4          But it is helpful to the jury to understand because

5    this is going to be a long trial; it will be a complicated

6    trial.  And while we intend to introduce evidence of his direct

7    knowledge, that's very close to evidence of the willful

8    blindness standard.

9          You know, circumstantial evidence of direct knowledge

10   is also circumstantial evidence of willful blindness in a lot

11   of ways.  I think it will be helpful to the jury to understand

12   that they can be listening to -- for evidence, in fact, not

13   only of actual knowledge, but of these two elements of the

14   willful blindness standard of -- knowledge of a high -- high --

15   subjective belief of the high probability of a specific risk,

16   and then deliberate actions for him to avoid personally

17   confirming that that fact exists.

18         So I think it would be helpful for the jury to know

19   that going into the evidence.

20         THE COURT:  Would you prepare it in the same breath,

21   to say to the jury that the judge will -- I don't want you

22   substituting for me, but the judge will or you will be

23   instructed or you'll be told that willful blindness requires

24   more than recklessness and more than negligence.  It requires

25   that the defendant subjectively believed there was a high

1    probability of the facts alleged and that he took deliberate

2    actions to avoid learning of those facts.

3           My concern is just that, unless you juxtapose the

4    *Global-Tech* standard against the recklessness is not enough,

5    you can see a jury, in listening to the evidence come in, and

6    think to itself, well, it sure seemed like he was reckless.  We

7    were just told that if he was deliberately avoiding learning

8    about this, that's enough, and not drawing that fine

9    distinction for themselves.

10          So I'm just wondering, if you do this, it will be

11   appropriate to be clear about this.

12          MR. BROWN:  Your Honor, if instructed, of course, we

13   would draw that distinction.

14          THE COURT:  Right.

15          MR. BROWN:  Obviously, the concern is then, we --

16   what is merely intended to be a passing reference to help the

17   jury frame the evidence coming in, now we've introduced two

18   more relevant standards of scienter, recklessness and

19   negligence, and that may end up being confusing to the jury.

20          I think in the opening statement --

21          THE COURT:  I think that's what Mr. Ekeland's

22   argument is with respect to -- as to your proposal and your

23   motion as well is -- maybe his most persuasive argument -- is

24   that to start talking about the legal standards and the willful

25   blindness without more leaves the risk that the jury will sit

1    there for three weeks or more hearing the evidence and do so in

2    a way that lacks some of the nuance of what the law actually is

3    on the topic.

4         MR. BROWN:  Yes, Your Honor.  We could also simply

5    refer to the Court will instruct you -- something to the effect

6    of the Court will instruct you on the concept of willful

7    blindness and how that may apply in this case and leave it at

8    that without, sort of, articulating the *Global-Tech* standard.

9         THE COURT:  Sort of leave the whole thing out of it.

10   You'll hear at the end of the case about something called

11   willful blindness.  For now, I'm just going to tell you the

12   judge is going to instruct you on it.  I'm just trying to get

13   my head around how this would work.

14        MR. BROWN:  I mean, we could certainly -- we will

15   take whatever direction the Court gives us.  But we do think

16   that -- at the very least, I think it would be helpful to

17   mention to the jury -- and this may not even be a willful

18   blindness concept.  It may just be the relevant mens rea.

19        We could mention to the jury that Mr. Sterlingov

20   himself doesn't need to know which specified unlawful activity

21   these financial transactions -- the proceeds of -- he doesn't

22   need to know which specified unlawful activity generated the

23   illegal proceeds.

24        THE COURT:  Right.

25        MR. BROWN:  He just has to know that some unlawful

1    activity generated those.  That's really just hewing to the

2    text and the relevant mens rea as laid out in the statute.

3              THE COURT:  Will that be sufficient from your

4    perspective to do it that way?

5              MR. BROWN:  For opening statements, yes, Your Honor.

6              THE COURT:  Maybe that reduces the need to get into

7    this.  My concern about it is just that it's a little bit like

8    the sweater where you start pulling on the thread and you pull

9    a little bit more and then you say, well, we need to say a

10   little bit more about this so the jury understands, and it just

11   ends up with more and more.

12             But if it's just hewing to the language of the

13   statute like that, that may be simpler.

14             MR. BROWN:  Yes, Your Honor.  And, certainly, for

15   opening statements, we would -- we can live with that.  We

16   still ask for a willful blindness instruction in our final

17   instructions.

18             THE COURT:  Right.

19             MR. BROWN:  But that's -- we can address that when we

20   get to it.

21             THE COURT:  I think, at least on some version of the

22   facts, it would be appropriate.  I think it's one advantage to

23   waiting until the end on that.

24             We'll know whether the facts support the willful

25   blindness or the evidence -- not the facts, but the evidence

1       supports a willful blindness instruction where the jury could

2       at least reasonably conclude that there was willful blindness.

3                   All right.  Let me hear from Mr. Ekeland on this.

4                   MR. EKELAND:  As to the opening and the government

5       referring to willful blindness, we submit that that is

6       impermissible argument, that it lacks foundation.  That there

7       is no evidence that we can see in the discovery of

8       Mr. Sterlingov designing Bitcoin Fog, nor is there any evidence

9       of Mr. Sterlingov operating Bitcoin Fog.

10                  THE COURT:  I read that in your response, and it

11      struck me as it just -- I understand that's your position in

12      the case.  It just struck me as not responsive to this

13      particular motion, because this motion takes as a given that

14      the government will be able to carry its burden.

15                  For example, if I were to agree with you right now --

16      you know, there's no such thing as summary judgment, I suppose,

17      but it's -- if I agreed with you, what is there to try in the

18      case?

19                  MR. EKELAND:  Well, they can -- in the opening they

20      can refer to the evidence that they expect to show the jury in

21      the trial.

22                  THE COURT:  Right.  But they say that that evidence

23      will allow a reasonable jury to conclude beyond a reasonable

24      doubt that Mr. Sterlingov did operate Bitcoin Fog.

25                  MR. EKELAND:  That's argument.  Isn't that for

1      closing?

2              THE COURT:  No, no, no.  I'm just saying that the

3      jury -- I'm just saying that the government's view of the

4      evidence is different than your view of the evidence.

5              MR. EKELAND:  Yes.

6              THE COURT:  I don't think that it's -- okay.

7              MR. EKELAND:  I'm sorry.

8              THE COURT:  I don't think it's improper evidence to

9      say that we -- or improper argument to say, we submit to you

10     that the evidence will show that Mr. Sterlingov was -- created

11     Bitcoin Fog and operated Bitcoin Fog.  Here's what that

12     evidence is.

13             I don't think that's -- I mean, you're right.  It's

14     leaning towards argument, but I don't think that's the type of

15     argument that's precluded.  There's, obviously, some limited

16     level of argument that is in an opening because it's implicit

17     in whatever facts you're arguing -- you're telling the jury

18     that they're going to hear it.

19             MR. EKELAND:  Well, I think that's an interesting

20     question and, obviously, the position that the defense takes is

21     that this is impermissible argument because it goes, you know,

22     beyond what they can permissibly say the evidence will show.

23             For instance, if they -- they can say we disagree,

24     but they can say the evidence will show you that Mr. Sterlingov

25     registered the domain name for Bitcoin Fog in 2011.  Now, of

1      course, the defense disagrees.  But that's permissible.

2              But to go from the domain name registration to maybe

3      what they allege or the beta transactions and then to jump now

4      from that without more to he designed Bitcoin Fog, when I don't

5      think they're going to be able to say the evidence will show

6      you that on date X Mr. Sterlingov wrote ten pages of notes

7      related to Bitcoin Fog; that's -- at least I haven't seen that

8      in the discovery.

9              So the question is, is what are the boundaries here

10     as permissible argument in opening?

11             THE COURT:  I think, once again, we're a little bit

12     shifted from what -- the motion that's actually in front of me.

13     The motion in front of me is just about the willful blindness.

14             I mean, I understand your point is you think the

15     government is not going to be able to establish relevant facts

16     in the case or prove facts in the case.  But for present

17     purposes, I think we just need to focus on whether a willful

18     blindness instruction is appropriate.

19             MR. EKELAND:  Yes.  But I'm addressing them saying --

20     wanting to use it in the opening.

21             So we're saying that -- that's a separate question

22     than whether the jury charges warrant it.  I agree with the

23     Court saying, I think that's -- the willful blindness

24     instruction -- and I think willful blindness should just be

25     limited if it comes into the jury charge, and that that is a

1    question for the jury charge conference after the government

2    has put on its case.  I think if it comes in in the opening,

3    it's going to unduly prejudice Mr. Sterlingov.  It's unduly --

4    it's impermissible argument.  And the jury is going to be

5    thinking the entire time, maybe he just ignored everything and

6    somehow this happened.

7         I don't think it has a place in the opening.  Whether

8    it has a place as a jury charge, again, I think we have to just

9    see what happens at trial; and I think that's, sort of, the

10   crux of it.

11        It doesn't -- it doesn't have a basis.  There's no

12   basis beyond argument for it to be in the opening.  And in

13   order to see if it comes in as a jury charge, I think we need

14   to see what happens at trial.

15        THE COURT:  Okay.  Thank you.  Mr. Brown?  I don't

16   actually have the statute in front of me.  But assuming that

17   you're correct -- you don't need to grab it.

18        I was going to say, assuming you're correct -- which

19   I suspect you are -- in the assertion that to be convicted of

20   money laundering, one doesn't need to know specifically what --

21   which of the underlying crimes were committed, but that it was

22   one of the list of crimes that fall within the scope of the

23   statute, but without necessarily knowing whether it was illegal

24   drug sales or whatever else might be on the list.

25        Assuming that's correct, are you okay, then, if I

1    just grant in part and deny in part the motion and say, don't

2    get into willful blindness because it's a little complicated

3    for -- on the law for openings; but you're welcome to explain

4    to the jury in your opening statement that the government is

5    not required to prove that he knew which transactions were, but

6    the evidence is going to show that there were transactions that

7    can be traced to the following sites, for example.  And then

8    the evidence that those sites were involved in the following

9    types of transactions and there was evidence that Mr.

10   Sterlingov, or the operator of Bitcoin Fog, knew that that was

11   the case and, in fact, there was evidence that Mr. Sterlingov

12   himself engaged in transactions on Silk Road or whatever it

13   might be.

14            But doing it in that fashion, would that address your

15   concerns?

16            MR. BROWN:  Yes, Your Honor.  Yes.  We would be happy

17   to simply refer to the statutory element as it appears here,

18   which refers to knowledge that the financial transaction

19   represents the proceeds of some form of unlawful activity.

20   We'd be happy to, to the extent we address it in our openings,

21   use that formulation and renew our request for a willful

22   blindness instruction.

23            THE COURT:  Okay.  That's what I'll go ahead and do.

24   I will grant in part and deny in part the motion with the

25   understanding that you'll follow the path that we just

1     discussed.

2                MR. BROWN:  Yes, Your Honor.

3                THE COURT:  Well, let's go ahead and break for lunch

4     now.  Why don't we come back at quarter of 2:00 then.  We'll

5     take up the two expert motions.

6                I would ask you to continue over the lunch break to

7     do what you can with respect to scheduling.  I really do want

8     to be able to pin this down.  And, Mr. Ekeland, to the extent

9     that there are witnesses that are critical to the defense that

10    are unavailable -- critical or not, to the extent there are

11    defense witnesses who are unavailable during the relevant time,

12    I need you to walk me through that one by one and tell me what

13    their availability is, why they're unavailable.

14               I may see whether there are ways to address that

15    unavailability either in the scheduling with me, or sometimes

16    I've even reached out to other judges for scheduling purposes

17    to do what we can to see if we can address those concerns.  I

18    can't do that unless I know specifically for each witness what

19    their problem is, when they're unavailable.  Some of them it

20    may not actually be an issue because it wouldn't occur when the

21    defense case would be put on anyway.

22               On the other side of the equation, I guess, I

23    understand clearly that the government strongly objects to

24    postponing the trial until February.  It would be helpful for

25    me to know -- ask the same question of the government.

1              Is there anyone in February who is just unavailable

2    or where it's going to present some unique prejudice to the

3    government other than the fact that delay is always prejudiced

4    to wait until February?  I will see you all after lunch.

5              (The hearing adjourned at 12:40 p.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    CERTIFICATE OF OFFICIAL COURT REPORTER

 2

 3          I, TAMARA M. SEFRANEK, do hereby certify that the

 4   above and foregoing constitutes a true and accurate transcript

 5   of my stenographic notes and is a full, true and complete

 6   transcript of the proceedings to the best of my ability.

 7              Dated this 9th day of December, 2023.

 8

 9                        /s/ Tamara M. Sefranek_____
                          Tamara M. Sefranek, RMR, CRR, CRC
10                        Official Court Reporter
                          Room 6714
11                        333 Constitution Avenue, N.W.
                          Washington, D.C.  20001
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**/**

**/s** [1] - 57:9

**1**

**10-page** [1] - 14:18
**10005** [1] - 1:21
**10th** [2] - 8:19, 21:7
**11:05** [1] - 1:6
**12:40** [1] - 56:5
**1301** [1] - 1:17
**14th** [3] - 16:21, 40:24, 41:1
**15** [3] - 42:24, 43:2, 43:5
**18** [1] - 1:6
**1:21-CR-0399** [1] - 1:3

**2**

**20001** [3] - 1:12, 1:24, 57:11
**20005** [1] - 1:17
**2011** [1] - 51:25
**202-354-3246** [1] - 1:25
**2023** [3] - 1:6, 29:16, 57:7
**20530** [1] - 1:14
**21-399** [1] - 2:3
**22nd** [3] - 5:12, 30:9, 30:12
**23rd** [1] - 29:15
**29th** [1] - 5:15
**2:00** [1] - 55:4

**3**

**30** [1] - 1:20
**31st** [1] - 16:22
**333** [2] - 1:24, 57:11

**4**

**401** [2] - 38:13, 40:2
**403** [3] - 38:12, 40:2

**5**

**5** [1] - 14:18
**50-page** [1] - 14:17

**6**

**601** [1] - 1:11
**66** [1] - 43:9
**6714** [2] - 1:23, 57:10
**6th** [1] - 16:21

**7**

**702** [1] - 40:2

**8**

**8th** [1] - 1:20

**9**

**914** [1] - 6:13
**950** [1] - 1:14
**9th** [1] - 57:7

**A**

**A.M** [1] - 1:6
**ability** [3] - 5:4, 21:1, 57:6
**able** [13] - 4:10, 4:11, 4:15, 12:25, 15:24, 16:10, 18:8, 21:9, 42:9, 50:14, 52:5, 52:15, 55:8
**accept** [2] - 18:13, 20:22
**acceptable** [1] - 43:17
**access** [20] - 4:17, 4:21, 4:23, 4:25, 14:24, 15:5, 16:12, 16:25, 17:1, 17:9, 17:13, 17:21, 17:23, 17:24, 19:10, 19:16, 19:17, 19:19, 21:21
**accessing** [1] - 19:10
**accommodate** [4] - 8:5, 20:20, 32:2, 32:3
**according** [2] - 6:10, 6:19
**accurate** [1] - 57:4
**accused** [3] - 24:6, 24:10, 24:13
**accustomed** [1] - 3:7
**acknowledged** [2] - 11:3, 31:19
**action** [2] - 43:20, 44:24
**Action** [1] - 1:2
**actions** [4] - 45:21, 45:24, 46:16, 47:2
**actively** [1] - 45:3
**activity** [9] - 44:1, 44:2, 44:13, 45:6, 45:18, 48:20, 48:22, 49:1, 54:19
**actual** [1] - 46:13
**add** [1] - 4:2
**additional** [1] - 20:15
**address** [17] - 9:21,

10:3, 10:4, 11:17, 12:5, 26:6, 31:18, 34:23, 39:23, 40:12, 42:13, 45:12, 49:19, 54:14, 54:20, 55:14, 55:17
**addressed** [2] - 9:14, 40:13
**addressing** [1] - 52:19
**adequate** [1] - 14:21
**adjourned** [1] - 56:5
**adjust** [1] - 10:2
**adjusted** [1] - 10:3
**admission** [1] - 23:6
**advancing** [1] - 38:15
**advantage** [1] - 49:22
**affirmatively** [1] - 19:4
**afraid** [1] - 34:17
**afternoon** [1] - 43:3
**aggressive** [4] - 24:25, 25:4, 25:6, 25:9
**ago** [6] - 15:16, 15:17, 17:3, 17:6, 29:20
**agree** [4] - 14:19, 34:8, 50:15, 52:22
**agreed** [4] - 27:12, 33:14, 35:22, 50:17
**agrees** [2] - 39:7, 42:12
**ahead** [7] - 2:15, 13:6, 13:8, 13:9, 41:13, 54:23, 55:3
**AHMED** [1] - 1:19
**Ahmed** [3] - 2:12, 37:12, 37:21
**ahold** [2] - 14:8, 37:4
**ALDEN** [1] - 1:13
**Alden** [1] - 2:8
**algorithm** [1] - 36:9
**algorithms** [1] - 23:22
**allege** [1] - 52:3
**alleged** [1] - 47:1
**allow** [3] - 18:2, 44:18, 50:23
**amenable** [2] - 11:7, 22:12
**Amendment** [2] - 35:18, 35:19
**AMERICA** [1] - 1:2
**America** [1] - 2:3
**amicus** [2] - 22:20, 22:23
**ample** [1] - 21:7
**analysis** [3] - 21:11, 21:14, 21:19
**answer** [2] - 20:6, 37:24
**anti** [5] - 9:23, 22:10, 27:1, 27:17, 27:18

**anti-competitive** [4] - 9:23, 22:10, 27:1, 27:18
**anyway** [1] - 55:21
**apparatus** [1] - 45:3
**appear** [6] - 3:2, 3:7, 3:19, 7:5, 11:19, 12:6
**appellate** [1] - 22:18
**Apple** [1] - 26:14
**application** [1] - 2:13
**apply** [1] - 48:7
**appreciate** [1] - 42:12
**appropriate** [5] - 41:12, 43:19, 47:11, 49:22, 52:18
**apt** [1] - 43:22
**arguably** [2] - 20:3, 22:11
**argued** [1] - 17:8
**arguing** [2] - 30:15, 51:17
**argument** [17] - 19:1, 19:6, 23:15, 32:8, 43:6, 47:22, 47:23, 50:6, 50:25, 51:9, 51:14, 51:15, 51:16, 51:21, 52:10, 53:4, 53:12
**arguments** [2] - 33:20
**arose** [1] - 20:25
**arrange** [1] - 36:25
**article** [7] - 7:17, 7:19, 38:2, 38:5, 38:8, 38:11, 38:18
**articulating** [1] - 48:8
**assertion** [1] - 53:19
**assuming** [3] - 53:16, 53:18, 53:25
**attention** [1] - 7:19
**attorney** [2] - 6:20, 37:20
**attribution** [1] - 38:3
**August** [5] - 16:21, 30:9, 30:12, 41:10
**AUSA** [1] - 2:6
**authorities** [3] - 44:16, 45:9, 45:10
**availability** [6] - 20:24, 28:21, 28:24, 29:2, 31:23, 55:13
**available** [4] - 20:18, 21:5, 31:25, 32:1
**Ave** [1] - 1:17
**Avenue** [3] - 1:14, 1:24, 57:11
**avoid** [7] - 43:21, 44:11, 45:3, 45:21, 45:24, 46:16, 47:2
**avoiding** [1] - 47:7

**aware** [3] - 4:11, 44:7, 45:19

**B**

**backdoor** [1] - 40:7
**badly** [1] - 41:21
**balking** [2] - 22:10, 28:10
**bar** [3] - 6:11, 8:8, 36:16
**base** [1] - 37:11
**based** [1] - 40:1
**basis** [2] - 53:11, 53:12
**becomes** [1] - 8:15
**BEFORE** [1] - 1:8
**behalf** [2] - 6:22, 45:5
**behave** [1] - 8:8
**behaved** [1] - 41:20
**behaving** [1] - 31:21
**behavior** [1] - 45:11
**belief** [3] - 43:19, 44:4, 46:15
**best** [3] - 36:22, 40:15, 57:6
**beta** [1] - 52:3
**between** [7] - 7:8, 9:15, 9:18, 10:19, 13:12, 32:23, 32:25, 41:21, 41:24
**beyond** [4] - 12:16, 50:23, 51:22, 53:12
**big** [2] - 14:16
**bit** [7] - 4:16, 14:11, 45:23, 49:7, 49:9, 49:10, 52:11
**Bitcoin** [13] - 43:14, 44:10, 44:25, 45:21, 50:8, 50:9, 50:24, 51:11, 51:25, 52:4, 52:7, 54:10
**blindness** [28] - 41:15, 43:7, 43:11, 43:13, 43:17, 43:18, 44:22, 45:11, 45:19, 46:8, 46:10, 46:14, 46:23, 47:25, 48:7, 48:11, 48:18, 49:16, 49:25, 50:1, 50:2, 50:5, 52:13, 52:18, 52:23, 52:24, 54:2, 54:22
**blockchain** [3] - 23:2, 24:17, 35:2, 38:6
**boondoggle** [1] - 36:10
**bottom** [3] - 6:22, 6:24, 37:20
**bound** [1] - 34:9
**boundaries** [1] - 52:9

**break** [4] - 41:13, 43:2, 55:3, 55:6
**breath** [1] - 46:20
**brewing** [1] - 13:24
**brief** [2] - 14:18, 40:14
**briefing** [7] - 4:25, 14:13, 14:15, 14:20, 39:24, 43:24, 44:3
**briefly** [1] - 4:4
**briefs** [3] - 14:17, 22:21, 22:24
**bring** [8] - 4:10, 16:2, 16:5, 18:3, 18:4, 18:5, 18:7, 18:8
**bringing** [1] - 40:5
**brings** [1] - 8:16
**brought** [1] - 16:4
**Brown** [4] - 2:7, 5:6, 41:23, 53:15
**BROWN** [24] - 1:10, 2:6, 5:8, 6:5, 6:9, 6:16, 8:14, 9:16, 41:3, 41:24, 43:10, 45:2, 45:15, 46:1, 47:12, 47:15, 48:4, 48:14, 48:25, 49:5, 49:14, 49:19, 54:16, 55:2
**building** [1] - 36:8
**burden** [3] - 4:19, 5:2, 50:14
**business** [3] - 7:25, 35:20, 45:5
**businesses** [1] - 35:20
**busy** [2] - 29:4, 29:7

---

**C**

**Cabanas** [4] - 29:16, 39:19, 41:14, 42:24
**cannot** [7] - 23:21, 27:5, 27:6, 32:16, 32:17, 33:8
**care** [2] - 18:22, 37:13
**career** [6] - 9:24, 10:8, 23:13, 23:15, 24:23, 25:19
**career-ending** [4] - 9:24, 10:8, 24:23, 25:19
**carry** [1] - 50:14
**Case** [1] - 2:2
**case** [34] - 8:11, 10:10, 11:5, 16:12, 16:13, 16:14, 17:2, 22:8, 22:15, 22:17, 22:19, 26:9, 27:5, 27:23, 28:2, 28:9, 32:17, 33:6, 33:14, 34:20,

35:14, 35:18, 38:15, 39:7, 45:20, 48:7, 48:10, 50:12, 50:18, 52:16, 53:2, 54:11, 55:21
**cases** [2] - 26:10, 38:3
**cell** [1] - 21:20
**certain** [1] - 41:7
**certainly** [6] - 13:25, 25:7, 39:2, 46:2, 48:14, 49:14
**CERTIFICATE** [1] - 57:1
**certify** [1] - 57:3
**Chainalysis** [25] - 4:18, 5:10, 10:11, 10:13, 11:22, 19:24, 21:2, 21:8, 21:23, 22:3, 22:4, 22:5, 24:25, 25:2, 28:7, 30:16, 30:20, 30:21, 30:22, 32:14, 33:7, 33:9, 36:3, 43:2
**Chainalysis's** [2] - 4:19, 5:2
**challenge** [1] - 11:10
**chance** [1] - 30:5
**change** [8] - 8:5, 9:14, 9:18, 10:7, 11:6, 13:12, 30:22, 30:23
**changed** [1] - 36:13
**changes** [1] - 38:4
**changing** [1] - 25:22
**charge** [4] - 52:25, 53:1, 53:8, 53:13
**charges** [1] - 52:22
**check** [2] - 5:25, 21:4
**checking** [1] - 3:12
**checklist** [1] - 38:1
**choice** [1] - 22:14
**chosen** [2] - 2:20, 13:2
**Chris** [1] - 2:6
**CHRISTOPHER** [1] - 1:10
**CipherTrace** [24] - 3:2, 3:19, 6:6, 6:21, 11:22, 22:5, 22:7, 30:22, 31:6, 31:20, 32:19, 33:10, 33:15, 34:5, 34:12, 34:16, 35:17, 36:6, 41:19, 42:1, 42:5, 42:7, 42:14, 42:21
**CipherTrace's** [2] - 35:11, 37:5
**circuit** [2] - 42:2, 42:3
**circumstantial** [2] - 46:9, 46:10
**cite** [1] - 39:2

**cited** [2] - 38:20, 43:24
**citing** [2] - 38:11, 38:17
**civil** [1] - 26:10
**civilian** [2] - 8:20, 8:21
**clarification** [1] - 38:20
**classic** [1] - 45:10
**clear** [5] - 28:12, 31:4, 33:3, 33:4, 47:11
**clearly** [2] - 43:16, 55:23
**clerk** [1] - 6:15
**client** [1] - 17:24
**close** [1] - 46:7
**closing** [1] - 51:1
**co** [1] - 2:8
**co-counsel** [1] - 2:8
**code** [3] - 23:22, 26:16, 30:16
**cold** [1] - 10:10
**colleagues** [1] - 33:9
**collecting** [4] - 45:3, 45:8, 45:21, 45:22
**COLUMBIA** [1] - 1:1
**coming** [3] - 13:1, 36:5, 47:17
**committed** [1] - 53:21
**companies** [1] - 26:15
**company's** [1] - 31:1
**compel** [1] - 41:23
**compete** [3] - 10:11, 12:11, 28:6
**competing** [1] - 33:7
**competitive** [14] - 9:23, 11:13, 22:10, 22:14, 27:1, 27:18, 30:7, 30:11, 30:14, 30:18, 31:13, 31:18, 31:19, 35:16
**competitor** [1] - 36:11
**complete** [1] - 57:5
**completely** [1] - 17:3
**complicated** [4] - 34:25, 35:4, 46:5, 54:2
**comprises** [1] - 43:17
**computer** [2] - 21:21, 23:22
**concept** [4] - 43:12, 44:18, 48:6, 48:18
**concern** [15] - 9:23, 9:24, 23:24, 24:5, 24:10, 24:13, 24:15, 24:16, 25:13, 25:23, 25:25, 35:20, 47:3, 47:15, 49:7
**concerned** [9] - 5:2, 8:15, 10:14, 10:23, 25:9, 25:21, 26:6,

40:6, 42:22
**concerns** [21] - 8:5, 9:21, 10:3, 11:13, 11:18, 11:20, 12:5, 22:14, 26:6, 26:11, 30:7, 30:11, 30:14, 30:18, 31:1, 31:19, 35:14, 35:16, 42:3, 54:15, 55:17
**conclude** [2] - 50:2, 50:23
**concluded** [1] - 8:2
**condition** [2] - 7:15, 38:6
**CONFERENCE** [2] - 1:4, 1:7
**conference** [1] - 53:1
**confident** [1] - 39:13
**confirm** [1] - 45:4
**confirming** [3] - 43:21, 44:11, 46:17
**confiscated** [1] - 15:2
**conflict** [1] - 29:14
**conflicts** [1] - 14:23
**confusing** [1] - 47:19
**connect** [1] - 42:2
**conspiracy** [2] - 19:3, 19:7
**constant** [5] - 17:1, 18:19, 19:11, 19:16, 19:19
**constantly** [1] - 17:12
**constitutes** [1] - 57:4
**Constitution** [2] - 1:24, 57:11
**construed** [1] - 27:20
**contact** [2] - 6:11, 12:21
**contemplate** [1] - 26:24
**contempt** [2] - 34:9, 42:16
**contested** [1] - 39:11
**context** [4] - 11:4, 35:8, 35:9, 35:10
**continuance** [4] - 14:5, 19:23, 20:9, 20:15
**continue** [4] - 4:22, 41:17, 41:19, 55:6
**continuing** [1] - 30:21
**control** [4] - 30:25, 37:4, 37:5, 37:6
**convey** [1] - 39:4
**convict** [1] - 19:3
**convicted** [1] - 53:19
**convinced** [1] - 31:5
**cooperate** [2] - 44:16, 45:8
**cooperating** [4] -

8:21, 41:7, 41:9
**core** [1] - 25:15
**correct** [3] - 53:17, 53:18, 53:25
**correctly** [1] - 37:22
**corroborating** [1] - 40:5
**counsel** [17] - 2:4, 2:5, 2:7, 2:8, 2:12, 3:10, 3:19, 6:6, 6:9, 7:2, 7:3, 14:3, 41:20, 41:25, 42:1, 42:5, 42:7
**counseling** [1] - 3:2
**country** [3] - 22:25, 30:1, 35:7
**couple** [6] - 16:11, 20:14, 37:10, 39:19, 39:20
**course** [5] - 5:21, 19:9, 30:17, 47:12, 52:1
**COURT** [117] - 1:1, 2:9, 2:14, 2:19, 2:21, 3:6, 3:14, 3:17, 3:21, 4:2, 4:16, 5:9, 5:15, 5:17, 5:23, 6:2, 6:8, 6:14, 6:24, 9:10, 9:17, 10:1, 10:7, 11:9, 11:16, 12:22, 13:6, 13:19, 13:22, 14:14, 15:4, 15:9, 15:12, 15:17, 15:22, 16:1, 16:7, 16:14, 17:15, 17:25, 18:13, 18:25, 19:12, 19:25, 20:12, 21:10, 22:2, 22:20, 23:10, 23:14, 25:2, 25:4, 25:21, 26:5, 27:2, 27:10, 27:13, 27:18, 27:25, 28:12, 28:16, 28:18, 28:23, 29:5, 29:9, 29:19, 30:3, 31:4, 32:12, 32:22, 33:2, 33:5, 33:16, 34:15, 35:1, 35:4, 35:10, 36:6, 36:13, 36:18, 36:20, 36:24, 37:7, 37:18, 38:1, 38:23, 39:17, 39:22, 40:10, 40:17, 40:21, 41:1, 41:11, 42:10, 43:1, 44:23, 45:13, 45:23, 46:20, 47:14, 47:21, 48:9, 48:24, 49:3, 49:6, 49:18, 49:21, 50:10, 50:22, 51:2, 51:6, 51:8, 52:11, 53:15, 54:23, 55:3,

57:1

**Court** [46] - 1:22, 1:23, 2:13, 3:18, 4:24, 5:21, 7:1, 7:3, 8:4, 8:7, 8:9, 8:10, 9:7, 9:13, 9:20, 11:3, 11:19, 12:1, 12:17, 12:19, 13:16, 13:20, 14:20, 15:7, 19:22, 20:4, 20:8, 20:10, 22:12, 22:17, 27:16, 28:10, 30:20, 32:9, 33:11, 34:10, 40:15, 43:16, 44:20, 45:16, 48:5, 48:6, 48:15, 52:23, 57:10

**court** [10] - 2:11, 4:7, 4:13, 11:19, 22:17, 22:18, 22:21, 23:1, 34:9, 43:3

**court's** [1] - 37:16

**Court's** [5] - 3:25, 8:12, 9:7, 31:22, 37:3

**Courthouse** [1] - 1:23

**courtroom** [1] - 18:10

**COURTROOM** [1] - 2:2

**covering** [1] - 43:3

**CRC** [2] - 1:22, 57:9

**created** [1] - 51:10

**creating** [1] - 44:10

**crime** [1] - 17:11

**crimes** [2] - 53:21, 53:22

**criminal** [6] - 11:4, 11:5, 22:15, 26:9, 35:13, 35:18

**Criminal** [2] - 1:2, 2:2

**critical** [2] - 55:9, 55:10

**CRM** [1] - 1:16

**CRR** [2] - 1:22, 57:9

**crux** [1] - 53:10

**cryptocurrency** [2] - 6:21, 38:3

**current** [1] - 14:22

**customer** [3] - 44:14, 45:8, 45:22

**cut** [2] - 18:25, 42:9

## D

**D.C** [2] - 1:5, 57:11

**Daniel** [1] - 3:11

**darknet** [2] - 44:5, 44:15

**data** [2] - 15:19, 34:14

**date** [9] - 2:17, 14:23, 16:16, 19:18, 19:19,

40:24, 41:2, 41:18, 52:6

**Dated** [1] - 57:7

**dates** [2] - 29:2, 29:17

**days** [2] - 21:15

**DC** [4] - 1:12, 1:14, 1:17, 1:24

**deal** [2] - 14:16

**dealing** [3] - 23:4, 31:13, 42:20

**debate** [1] - 33:23

**December** [2] - 30:2, 57:7

**decide** [2] - 13:13, 20:22

**decided** [2] - 10:10, 10:11

**decision** [2] - 4:24, 22:21

**declined** [1] - 3:21

**declining** [1] - 3:23

**defend** [1] - 19:4

**defendant** [7] - 2:11, 16:13, 17:8, 17:13, 35:17, 44:4, 46:25

**Defendant** [2] - 1:6, 1:18

**defendants** [3] - 8:22, 18:19, 41:7

**defense** [19] - 5:4, 7:8, 7:9, 7:12, 7:14, 7:24, 11:14, 11:25, 12:24, 22:13, 41:25, 42:11, 51:20, 52:1, 55:9, 55:11, 55:21

**defense's** [2] - 8:12, 41:6

**defer** [1] - 40:15

**delay** [4] - 8:16, 8:25, 31:5, 56:3

**delaying** [1] - 8:17

**deletion** [1] - 45:7

**deliberate** [7] - 43:20, 44:10, 44:24, 45:21, 45:24, 46:16, 47:1

**deliberately** [2] - 44:11, 47:7

**deny** [2] - 54:1, 54:24

**DEPARTMENT** [1] - 1:13

**Department** [1] - 1:16

**DEPUTY** [1] - 2:2

**deputy** [1] - 6:15

**derived** [1] - 28:6

**deserving** [1] - 22:22

**design** [3] - 23:22, 44:25

**designed** [3] - 44:11, 45:12, 52:4

**designing** [5] - 44:13,

44:14, 45:3, 45:21, 50:8

**detail** [1] - 46:2

**detailed** [1] - 31:25

**detention** [1] - 19:9

**determine** [1] - 32:1

**develop** [1] - 10:18

**developing** [1] - 10:23

**dictating** [1] - 11:14

**difference** [3] - 32:22, 32:25, 33:1

**different** [11] - 13:14, 16:8, 22:9, 26:19, 33:21, 34:7, 35:9, 35:11, 35:12, 45:23, 51:4

**difficult** [3] - 19:4, 19:10, 31:10

**dig** [1] - 38:14

**direct** [4] - 4:22, 5:10, 46:6, 46:9

**direction** [2] - 9:7, 48:15

**directly** [1] - 42:1

**disagree** [2] - 35:8, 51:23

**disagrees** [2] - 38:23, 52:1

**disappointing** [2] - 6:25, 8:7

**disclose** [6] - 23:21, 27:5, 27:21, 32:17, 33:8, 34:9

**disclosed** [2] - 10:25, 11:1

**disclosure** [3] - 4:18, 5:21, 41:9

**discovered** [3] - 14:24, 29:4, 36:3

**discovery** [24] - 9:6, 15:1, 15:5, 15:6, 15:10, 15:13, 15:15, 15:20, 16:6, 16:9, 16:12, 16:18, 17:1, 17:3, 17:4, 17:5, 17:7, 17:9, 19:11, 28:9, 31:17, 34:10, 50:7, 52:8

**discrete** [1] - 43:8

**discuss** [1] - 30:19

**discussed** [2] - 20:9, 55:1

**discussing** [2] - 14:5, 35:5

**discussion** [1] - 9:13

**disparage** [1] - 22:21

**disparaging** [2] - 22:25

**disrespectful** [2] - 7:1, 10:6

**distinction** [2] - 47:9, 47:13

**distinguish** [1] - 26:9

**distinguished** [1] - 22:24

**distributed** [1] - 40:25

**DISTRICT** [3] - 1:1, 1:1, 1:8

**DNA** [1] - 22:19

**Docket** [1] - 43:9

**docket** [1] - 2:25

**DOJ** [2] - 1:11, 1:16

**DOJ-CRM** [1] - 1:16

**domain** [2] - 51:25, 52:2

**done** [5] - 9:21, 10:13, 32:2, 36:1, 41:8

**double** [1] - 5:25

**double-check** [1] - 5:25

**doubt** [1] - 50:24

**down** [2] - 11:23, 55:8

**drag** [1] - 39:11

**draw** [1] - 47:13

**drawing** [1] - 47:8

**drive** [10] - 4:15, 14:25, 15:8, 15:22, 15:25, 16:5, 16:10, 18:2, 18:15

**Dror** [1] - 29:7

**drug** [1] - 53:24

**drugs** [1] - 44:8

**due** [4] - 11:13, 13:4, 17:8, 35:14

**during** [3] - 21:6, 29:4, 55:11

## E

**e-discovery** [1] - 16:6

**earth** [1] - 8:24

**ease** [1] - 12:7

**easiest** [1] - 43:9

**effect** [2] - 45:16, 48:5

**efforts** [2] - 36:22, 42:13

**either** [6] - 23:24, 24:5, 30:19, 38:12, 43:6, 55:15

**EKELAND** [93] - 1:18, 2:10, 2:17, 2:20, 2:24, 3:9, 3:16, 3:18, 3:22, 4:4, 5:14, 5:16, 5:19, 5:24, 9:22, 10:5, 10:21, 11:12, 12:15, 12:23, 13:17, 13:20, 14:2, 14:19, 15:7, 15:11, 15:15, 15:19, 15:24, 16:4, 16:9, 16:20, 17:22,

18:9, 18:14, 19:7, 19:22, 20:1, 20:25, 21:20, 22:7, 23:2, 23:12, 24:15, 25:3, 25:6, 25:23, 26:19, 27:8, 27:11, 27:15, 27:24, 28:3, 28:14, 28:17, 28:22, 29:1, 29:6, 29:11, 29:21, 30:24, 32:9, 32:20, 32:24, 33:4, 33:12, 33:25, 34:24, 35:2, 35:8, 35:22, 36:12, 36:14, 36:19, 36:22, 37:1, 37:14, 37:23, 38:19, 39:15, 39:21, 39:23, 40:14, 40:19, 40:23, 41:2, 50:4, 50:19, 50:25, 51:5, 51:7, 51:19, 52:19

**ekeland** [1] - 41:19

**Ekeland** [11] - 1:20, 2:10, 2:16, 5:13, 7:18, 9:17, 42:6, 42:11, 42:12, 50:3, 55:8

**Ekeland's** [1] - 47:21

**elected** [2] - 2:18, 2:19

**element** [1] - 54:17

**elements** [2] - 45:19, 46:13

**email** [6] - 3:5, 3:13, 3:23, 6:6, 6:11, 12:21

**emailed** [4] - 3:12, 3:25, 29:1

**emails** [1] - 29:22

**emerged** [1] - 23:5

**emergent** [2] - 23:5, 26:21

**employers** [3] - 24:23, 25:18, 25:22

**encourage** [1] - 41:18

**end** [7] - 23:13, 23:14, 33:7, 33:11, 47:19, 48:10, 49:23

**ending** [4] - 9:24, 10:8, 24:23, 25:19

**ends** [1] - 49:11

**engage** [6] - 8:3, 9:20, 11:23, 12:1, 13:16, 33:23

**engaged** [1] - 54:12

**ensures** [1] - 11:22

**entered** [1] - 20:10

**entering** [1] - 34:13

**entire** [7] - 14:24, 17:9, 19:9, 29:9, 44:25, 45:3, 53:5

**entirely** [3] - 23:4,

31:20, 38:16
**entitled** [3] - 21:24, 23:8, 35:15
**entity** [2] - 24:18, 44:11
**equation** [1] - 55:22
**equipment** [1] - 21:21
**erasing** [2] - 44:13, 44:25
**error** [1] - 23:6
**essentially** [6] - 11:14, 28:6, 40:7, 44:25, 45:18, 46:3
**establish** [1] - 52:15
**established** [1] - 23:3
**everywhere** [1] - 18:20
**evidence** [49] - 7:10, 7:14, 8:11, 9:20, 12:25, 14:12, 19:5, 19:24, 20:3, 21:2, 21:8, 21:10, 21:25, 22:4, 22:15, 23:7, 33:13, 34:6, 38:7, 38:21, 44:21, 44:24, 46:6, 46:7, 46:9, 46:10, 46:12, 46:19, 47:5, 47:17, 48:1, 49:25, 50:7, 50:8, 50:20, 50:22, 51:4, 51:8, 51:10, 51:12, 51:22, 51:24, 52:5, 54:6, 54:8, 54:9, 54:11
**evidently** [1] - 18:6
**evolving** [1] - 34:22
**exact** [1] - 28:7
**exactly** [2] - 26:10, 45:17
**example** [2] - 50:15, 54:7
**examples** [1] - 45:10
**exchanged** [2] - 41:2, 41:4
**exclude** [4] - 11:7, 11:8, 11:9, 13:8
**excuse** [1] - 8:15
**exist** [1] - 26:11
**exists** [3] - 24:18, 24:20, 46:17
**expect** [1] - 50:20
**expensive** [1] - 29:13
**experience** [1] - 19:8
**expert** [21] - 7:8, 7:9, 7:13, 8:1, 9:19, 11:6, 11:10, 11:14, 13:15, 21:16, 21:23, 21:25, 23:10, 23:12, 26:23, 26:24, 28:15, 38:18, 40:7, 42:12, 55:5

**experts** [15] - 5:20, 6:1, 14:21, 14:23, 20:4, 21:5, 21:9, 22:11, 22:14, 26:16, 28:19, 28:25, 29:5, 30:25, 39:19
**explain** [3] - 7:6, 8:4, 54:3
**explanation** [1] - 12:21
**explicit** [2] - 33:2, 33:4
**extension** [1] - 20:23
**extensive** [1] - 44:5
**extent** [7] - 5:20, 32:6, 39:3, 41:5, 54:20, 55:8, 55:10
**extremely** [1] - 39:10

## F

**face** [1] - 11:22
**facilities** [2] - 18:23, 19:2
**facility** [2] - 17:14, 17:22
**fact** [11] - 22:13, 25:8, 26:8, 39:12, 40:4, 45:5, 45:25, 46:12, 46:17, 54:11, 56:3
**facts** [8] - 47:1, 47:2, 49:22, 49:24, 49:25, 51:17, 52:15, 52:16
**fair** [1] - 46:1
**fall** [2] - 33:20, 53:22
**falsely** [3] - 24:6, 24:10, 24:13
**far** [2] - 34:15, 42:4
**fashion** [1] - 54:14
**fast** [2] - 21:4, 29:21
**faster** [2] - 5:17
**fathom** [1] - 30:8
**fault** [1] - 9:8
**feature** [1] - 33:12
**February** [20] - 2:18, 2:23, 8:18, 9:11, 9:15, 9:18, 10:20, 13:12, 13:15, 19:12, 19:18, 20:11, 20:13, 20:15, 20:21, 29:15, 29:24, 55:24, 56:1, 56:4
**Federal** [1] - 7:3
**federal** [3] - 17:14, 22:15, 22:17
**feet** [1] - 10:10
**few** [1] - 20:21
**field** [1] - 23:5
**Fifth** [1] - 35:19
**file** [2] - 5:7, 5:11
**filed** [1] - 37:12

**filing** [1] - 13:7
**final** [6] - 30:3, 30:6, 32:5, 44:20, 44:21, 49:16
**financial** [2] - 48:21, 54:18
**fine** [7] - 5:9, 5:15, 18:16, 27:2, 34:6, 39:17, 47:8
**first** [9] - 14:7, 26:20, 33:9, 33:10, 33:24, 34:1, 34:25, 36:14, 40:24
**Fischbach** [1] - 29:7
**fix** [1] - 9:11
**fixed** [1] - 10:19
**Floor** [1] - 1:20
**flown** [1] - 8:21
**focus** [1] - 52:17
**Fog** [13] - 43:15, 44:10, 44:25, 45:21, 50:8, 50:9, 50:24, 51:11, 51:25, 52:4, 52:7, 54:10
**follow** [1] - 54:25
**following** [2] - 54:7, 54:8
**FOR** [1] - 1:1
**forced** [2] - 21:6, 22:13
**foreclosed** [1] - 26:3
**foregoing** [1] - 57:4
**form** [2] - 37:16, 54:19
**formulation** [1] - 54:21
**forth** [2] - 43:15, 45:22
**forward** [3] - 8:18, 9:3, 19:21
**foundation** [1] - 50:6
**frame** [1] - 47:17
**frankly** [6] - 7:1, 8:9, 10:8, 31:9, 32:22, 38:12
**freeform** [1] - 33:19
**Friday** [14] - 4:7, 5:8, 5:12, 13:18, 13:19, 13:20, 13:21, 13:22, 14:3, 18:1, 29:1, 29:22, 37:2
**front** [6] - 5:22, 26:25, 40:11, 52:12, 52:13, 53:16
**full** [5] - 16:25, 17:9, 17:24, 23:8, 57:5
**fundamental** [2] - 12:2, 12:4
**funds** [1] - 43:25
**future** [2] - 24:24, 25:18

## G

**game** [2] - 36:4, 42:4
**generated** [2] - 48:22, 49:1
**given** [8] - 16:24, 19:18, 24:25, 36:4, 39:11, 39:12, 43:23, 50:13
**Glave** [4] - 39:19, 41:14, 42:24, 43:6
**Global** [3] - 43:16, 47:4, 48:8
**Global-Tech** [3] - 43:16, 47:4, 48:8
**Google** [1] - 26:14
**governed** [1] - 33:14
**government** [23] - 2:5, 2:7, 2:22, 6:2, 8:14, 8:17, 13:2, 15:10, 16:22, 17:14, 30:5, 40:3, 40:7, 41:15, 43:11, 50:4, 50:14, 52:15, 53:1, 54:4, 55:23, 55:25, 56:3
**government's** [8] - 4:19, 5:2, 7:10, 8:13, 9:8, 39:25, 43:7, 51:3
**grab** [1] - 53:17
**grant** [2] - 54:1, 54:24
**granted** [3] - 4:21, 4:23, 4:25
**great** [1] - 46:2
**greater** [1] - 35:14
**groups** [1] - 22:24
**guarantee** [1] - 35:5
**guess** [2] - 32:12, 55:22
**guilty** [1] - 17:10

## H

**hac** [2] - 2:13, 37:12
**hamper** [1] - 18:24
**handle** [1] - 40:16
**happy** [12] - 6:17, 6:24, 37:14, 37:17, 37:24, 39:20, 40:14, 41:25, 43:5, 43:6, 54:16, 54:20
**hard** [14] - 4:15, 14:25, 15:8, 15:22, 15:25, 16:5, 16:10, 18:2, 18:14, 18:15, 30:8, 31:8, 33:21, 38:7
**HASSARD** [1] - 1:19
**Hassard** [1] - 2:12
**head** [5] - 10:16, 12:8, 28:4, 45:11, 48:13

**hear** [7] - 2:21, 6:2, 28:22, 43:6, 48:10, 50:3, 51:18
**heard** [6] - 3:20, 4:1, 29:6, 32:14, 34:1, 42:5
**hearing** [2] - 48:1, 56:5
**hearings** [1] - 6:1
**heart** [2] - 30:22, 30:23
**heaven** [1] - 8:23
**heightened** [1] - 35:13
**held** [1] - 17:10
**help** [3] - 34:13, 34:21, 47:16
**helpful** [7] - 38:9, 38:24, 46:4, 46:11, 46:18, 48:16, 55:24
**hereby** [1] - 57:3
**hewing** [2] - 49:1, 49:12
**high** [7] - 43:20, 44:4, 45:20, 46:14, 46:15, 46:25
**highly** [1] - 23:18
**himself** [7] - 14:12, 18:3, 19:5, 44:6, 45:24, 48:20, 54:12
**hire** [1] - 24:19
**history** [2] - 29:13, 43:24
**hold** [1] - 42:16
**holds** [1] - 38:7
**holiday** [2] - 14:6, 37:2
**honestly** [2] - 12:18, 31:3
**Honor** [45] - 2:6, 2:10, 2:17, 3:9, 5:8, 5:19, 6:5, 6:16, 6:23, 8:14, 9:16, 9:22, 10:5, 11:12, 12:15, 13:5, 14:2, 14:19, 18:9, 23:2, 23:12, 24:15, 27:9, 28:3, 29:21, 30:24, 37:14, 37:23, 38:19, 38:22, 39:15, 39:21, 41:3, 41:24, 43:10, 43:11, 45:2, 46:1, 47:12, 48:4, 49:5, 49:14, 54:16, 55:2
**HONORABLE** [1] - 1:8
**hope** [1] - 7:2
**hopefully** [1] - 13:17
**hoping** [1] - 12:20
**hour** [1] - 21:14
**hours** [1] - 33:23
**housekeeping** [1] -

4:5
**hundred** [1] - 35:6
**hundreds** [2] - 23:16,
26:10

# I

**identified** [2] - 13:13,
35:17
**ignored** [1] - 53:5
**ignoring** [1] - 11:19
**illegal** [6] - 44:8,
44:12, 45:6, 45:17,
48:23, 53:23
**impermissible** [3] -
50:6, 51:21, 53:4
**implicit** [1] - 51:16
**important** [1] - 38:22
**impression** [1] - 18:16
**impressions** [1] - 28:6
**improper** [2] - 51:8,
51:9
**IN** [1] - 1:1
**inadvertently** [1] -
24:8
**include** [1] - 37:15
**included** [1] - 44:13
**including** [3] - 32:18,
33:6, 33:8
**indulgence** [1] - 37:3
**industries** [1] - 23:18
**inform** [1] - 3:18
**information** [23] -
6:11, 7:16, 7:23,
10:25, 16:25, 23:18,
26:16, 27:22, 30:21,
31:14, 32:6, 32:8,
32:10, 36:5, 38:24,
42:21, 44:14, 45:4,
45:8, 45:9, 45:22
**informing** [1] - 3:25
**initial** [1] - 16:4
**instance** [1] - 51:23
**instantly** [1] - 18:22
**institution** [1] - 45:4
**instruct** [4] - 45:16,
48:5, 48:6, 48:12
**instructed** [2] - 46:23,
47:12
**instruction** [11] -
43:12, 43:18, 44:21,
45:12, 45:19, 49:16,
50:1, 52:18, 52:24,
54:22
**instructions** [3] -
44:19, 44:20, 49:17
**intend** [1] - 46:6
**intended** [2] - 39:6,
47:16
**interest** [1] - 42:14

**interesting** [1] - 51:19
**interests** [2] - 8:20,
9:1
**interfere** [1] - 5:3
**intermediate** [1] -
22:18
**interrupt** [2] - 11:16,
35:10
**interruption** [1] -
19:20
**introduce** [1] - 46:6
**introduced** [1] - 47:17
**introduction** [1] - 3:23
**investigations** [1] -
10:17
**investigator** [1] -
38:25
**involved** [1] - 54:8
**involving** [1] - 26:14
**IP** [6] - 13:3, 25:10,
26:3, 26:15, 36:10,
36:19
**issue** [24] - 10:22,
10:23, 12:24, 13:4,
13:12, 13:16, 13:17,
13:23, 14:11, 20:7,
22:16, 27:12, 28:11,
31:2, 33:24, 34:3,
34:23, 35:6, 38:13,
41:15, 41:21, 42:18,
55:20
**issues** [4] - 6:4, 7:6,
11:13, 20:25
**item** [2] - 38:1, 43:8
**itself** [2] - 7:19, 47:6

# J

**Jail** [1] - 15:8
**jail** [10] - 4:8, 4:13,
18:1, 18:2, 18:5,
18:7, 18:11, 18:13,
18:14, 21:20
**January** [1] - 16:15,
16:17, 16:21, 16:23,
19:14
**Jeffrey** [1] - 2:8
**JEFFREY** [1] - 1:15
**Jencks** [5] - 15:21,
15:23, 15:25, 16:8,
16:24
**Jennifer** [1] - 6:9
**Jennifer.Lorentz@
Mastercard.com** [1]
- 6:12
**Jersey** [1] - 22:18
**job** [3] - 24:16, 25:12,
25:22
**judge** [5] - 3:8, 31:13,
46:21, 46:22, 48:12

**JUDGE** [2] - 1:8, 1:8
**judges** [1] - 55:16
**judgment** [1] - 50:16
**July** [1] - 16:22
**jump** [1] - 52:3
**junk** [3] - 10:13, 10:17,
12:13
**jury** [29] - 39:6, 43:11,
44:19, 44:20, 44:21,
45:13, 46:4, 46:11,
46:18, 46:21, 47:5,
47:17, 47:19, 47:25,
48:17, 48:19, 49:10,
50:1, 50:20, 50:23,
51:3, 51:17, 52:22,
52:25, 53:1, 53:4,
53:8, 53:13, 54:4
**JUSTICE** [1] - 1:13
**Justice** [1] - 1:16
**justifiably** [1] - 25:13
**juxtapose** [1] - 47:3

# K

**keeps** [1] - 7:18
**kept** [1] - 44:14
**key** [2] - 38:7, 38:10
**kind** [5] - 12:21, 20:5,
30:10, 32:12, 34:25
**knowing** [2] - 7:14,
53:23
**knowledge** [11] - 40:5,
43:25, 44:1, 44:5,
44:12, 46:7, 46:9,
46:13, 46:14, 54:18
**knowledgeable** [1] -
44:9
**known** [4] - 13:25,
40:17, 40:22, 43:20
**knows** [2] - 27:16,
28:11
**Korver** [1] - 38:2
**Korver-Pelker** [1] -
38:2

# L

**L-o-r-e-n-t-z** [1] - 6:10
**lack** [2] - 7:4, 8:9
**lacks** [2] - 48:2, 50:6
**lags** [2] - 17:20, 17:23
**laid** [2] - 43:17, 49:2
**language** [12] - 9:23,
11:5, 22:10, 25:7,
27:1, 28:5, 28:7,
31:1, 32:21, 32:23,
36:15, 49:12
**large** [1] - 41:6
**last** [5] - 3:11, 3:24,
6:10, 16:11, 19:14

**late** [2] - 3:24, 36:4
**latest** [1] - 10:25
**laundering** [3] - 43:23,
45:5, 53:20
**Law** [1] - 1:20
**law** [3] - 22:17, 48:2,
54:3
**lawyers** [6] - 3:6, 3:7,
8:8, 35:23, 37:5,
37:6
**leads** [1] - 12:1
**leaning** [1] - 51:14
**learning** [3] - 45:24,
47:2, 47:7
**least** [7] - 8:20, 21:13,
44:18, 48:16, 49:21,
50:2, 52:7
**leave** [3] - 42:10, 48:7,
48:9
**leaves** [1] - 47:25
**led** [1] - 28:10
**legal** [1] - 47:24
**legislative** [1] - 43:23
**less** [1] - 21:14
**level** [1] - 51:16
**liability** [1] - 36:17
**limine** [2] - 41:16, 43:17
**limited** [3] - 22:14,
51:15, 52:25
**line** [1] - 37:19
**LinkedIn** [1] - 6:19
**list** [4] - 40:1, 40:23,
53:22, 53:24
**listening** [2] - 46:12,
47:5
**lists** [1] - 41:4
**litigation** [1] - 26:14
**live** [2] - 27:2, 49:15
**living** [2] - 23:23, 24:9
**logistical** [1] - 8:23
**logs** [4] - 44:13, 45:1,
45:7, 45:22
**look** [36] - 5:20, 7:10,
7:13, 7:24, 8:1, 8:2,
8:11, 9:12, 9:19,
14:12, 14:21, 22:6,
22:20, 23:10, 24:16,
25:12, 25:22, 26:16,
27:10, 27:14, 31:6,
32:6, 32:7, 32:9,
33:13, 33:18, 34:5,
34:11, 34:12, 34:16,
36:10, 37:23, 41:22,
42:14
**looked** [2] - 28:9,
37:20
**looking** [4] - 5:19,
29:22, 34:17, 37:15
**looks** [1] - 25:25
**Lorentz** [4] - 6:9, 6:17,

6:19, 12:22
**lunch** [5] - 43:2, 43:4,
55:3, 55:6, 56:4
**lying** [2] - 23:25, 24:2

# M

**maintain** [1] - 23:8
**managing** [1] - 3:10
**market** [2] - 10:15,
12:14
**markets** [1] - 44:5
**marshal** [5] - 17:18,
18:4, 18:9, 18:10,
18:22
**Mastercard** [13] -
3:11, 3:19, 6:10,
6:22, 7:1, 7:3, 7:5,
8:8, 10:9, 14:3, 20:5,
25:21, 26:5
**Mastercard's** [3] -
25:23, 25:24, 37:6
**material** [8] - 4:21,
4:23, 15:23, 15:25,
16:8, 31:6, 41:22,
42:15
**materials** [1] - 19:19
**matter** [2] - 11:24,
17:8
**matters** [2] - 6:3, 6:21
**mean** [12] - 5:24, 11:8,
13:17, 19:13, 21:14,
26:8, 27:4, 27:20,
32:16, 48:14, 51:13,
52:14
**meat** [1] - 8:16
**mediated** [1] - 42:7
**meeting** [1] - 14:4
**members** [1] - 8:7
**mens** [2] - 48:18, 49:2
**mention** [2] - 48:17,
48:19
**mentioned** [1] - 33:24
**mere** [1] - 25:8
**merely** [1] - 47:16
**met** [1] - 16:1
**MICHAEL** [1] - 1:19
**Michael** [1] - 2:12
**mid** [2] - 29:12, 41:10
**mid-August** [1] -
41:10
**mid-November** [1] -
29:12
**might** [9] - 9:21,
21:11, 21:16, 22:11,
26:5, 32:13, 32:14,
53:24, 54:13
**minutes** [3] - 42:24,
43:2, 43:5
**Missouri** [1] - 29:11

**Missouri's** [1] - 29:13
**mixers** [1] - 44:9
**modify** [1] - 11:21
**moment** [4] - 29:20, 30:9, 30:13, 40:11
**money** [2] - 43:23, 53:20
**money-laundering** [1] - 43:23
**month** [2] - 8:24, 29:9
**month-long** [1] - 8:24
**months** [5] - 15:17, 16:11, 16:18, 16:19, 29:25
**morning** [7] - 2:6, 2:9, 2:10, 3:12, 3:24, 13:21, 14:4
**MOSS** [1] - 1:8
**most** [4] - 21:5, 22:24, 29:13, 47:23
**motion** [17] - 11:8, 11:9, 13:8, 13:9, 37:12, 37:15, 37:18, 37:21, 41:16, 43:7, 47:23, 50:13, 52:12, 52:13, 54:1, 54:24
**motions** [2] - 39:20, 55:5
**move** [2] - 17:15, 39:16
**moved** [5] - 8:23, 17:18, 17:19, 17:20, 17:21
**moving** [2] - 29:14, 29:21
**MR** [115] - 2:6, 2:10, 2:17, 2:20, 2:24, 3:9, 3:16, 3:18, 3:22, 4:4, 5:8, 5:14, 5:16, 5:19, 5:24, 6:5, 6:9, 6:16, 8:14, 9:16, 9:22, 10:5, 10:21, 11:12, 12:15, 12:23, 13:17, 13:20, 14:2, 14:19, 15:7, 15:11, 15:15, 15:19, 15:24, 16:4, 16:9, 16:20, 17:22, 18:9, 18:14, 19:7, 19:22, 20:1, 20:25, 21:20, 22:7, 23:2, 23:12, 24:15, 25:3, 25:6, 25:23, 26:19, 27:8, 27:11, 27:15, 27:24, 28:3, 28:14, 28:17, 28:22, 29:1, 29:6, 29:11, 29:21, 30:24, 32:9, 32:20, 32:24, 33:4, 33:12, 33:25, 34:24, 35:2, 35:8, 35:22, 36:12,

36:14, 36:19, 36:22, 37:1, 37:14, 37:23, 38:19, 39:15, 39:21, 39:23, 40:14, 40:19, 40:23, 41:2, 41:3, 41:24, 43:10, 45:2, 45:15, 46:1, 47:12, 47:15, 48:4, 48:14, 48:25, 49:5, 49:14, 49:19, 50:4, 50:19, 50:25, 51:5, 51:7, 51:19, 52:19, 54:16, 55:2
**multiple** [1] - 16:22

**N**

**N.W** [1] - 57:11
**name** [5] - 3:10, 3:11, 6:10, 51:25, 52:2
**namely** [1] - 43:19
**names** [3] - 2:4, 3:6, 3:8
**necessarily** [2] - 9:14, 53:23
**necessary** [3] - 38:6, 38:21, 39:24
**Neck** [1] - 15:8
**need** [24] - 4:25, 5:14, 7:19, 7:21, 11:21, 14:14, 15:22, 19:17, 31:24, 34:12, 39:2, 39:5, 40:12, 45:17, 48:20, 48:22, 49:6, 49:9, 52:17, 53:13, 53:17, 53:20, 55:12
**needed** [1] - 18:3
**needs** [11] - 8:4, 9:13, 10:3, 13:3, 16:25, 19:16, 32:6, 34:19, 34:20, 43:4
**negligence** [2] - 46:24, 47:19
**never** [5] - 25:20, 30:9, 30:12, 44:16, 45:9
**new** [15] - 15:20, 17:5, 22:9, 23:4, 25:22, 28:10, 32:25, 33:12, 34:6, 35:25, 36:3, 36:4, 36:8, 36:15
**New** [4] - 1:17, 1:21, 6:11, 22:18
**newly** [3] - 19:23, 23:5, 26:20
**nice** [1] - 22:2
**night** [2] - 3:11, 3:24
**noncompetitive** [4] - 11:4, 31:1, 32:21, 32:23
**nonspreadsheet** [1] -

21:13
**Northern** [1] - 15:8
**note** [3] - 30:3, 30:6, 39:15
**noted** [1] - 9:22
**notes** [2] - 52:6, 57:5
**nothing** [5] - 17:12, 35:16, 38:3, 39:2, 40:10
**noticed** [1] - 40:9
**notion** [3] - 17:2, 17:6, 30:7
**November** [6] - 29:7, 29:10, 29:12, 29:16, 29:24, 30:2
**nuance** [1] - 48:2
**number** [7] - 6:6, 6:12, 7:16, 26:19, 26:20, 26:21, 41:8
**numerous** [2] - 15:21, 16:20
**NW** [4] - 1:11, 1:14, 1:17, 1:24
**NY** [1] - 1:21

**O**

**oath** [2] - 28:21, 28:24
**object** [1] - 22:25
**objected** [1] - 17:16
**objection** [2] - 28:4, 39:15
**objections** [4] - 39:25, 40:2, 40:16, 41:6
**objects** [1] - 55:23
**obstacle** [1] - 18:21
**obtaining** [3] - 33:10, 44:7
**obvious** [4] - 7:21, 38:8, 38:16, 39:13
**obviously** [3] - 47:15, 51:15, 51:20
**occasions** [1] - 7:16
**occur** [1] - 55:20
**October** [12] - 8:19, 8:25, 9:4, 14:22, 20:17, 21:7, 29:2, 29:3, 29:12, 29:14, 29:16, 30:1
**OF** [5] - 1:1, 1:2, 1:7, 1:13, 57:1
**office** [1] - 3:15
**offices** [1] - 42:2
**OFFICIAL** [1] - 57:1
**Official** [2] - 1:23, 57:10
**old** [2] - 32:10, 34:11
**once** [1] - 52:11
**one** [26] - 3:10, 8:21, 11:15, 13:13, 14:17,

16:21, 19:22, 20:19, 22:12, 23:18, 24:5, 26:20, 28:10, 29:3, 29:5, 29:6, 33:18, 34:15, 34:18, 35:6, 38:15, 49:22, 53:20, 53:22, 55:12
**onerous** [2] - 11:24, 23:17
**ones** [1] - 4:13
**online** [1] - 6:20
**open** [3] - 29:18, 32:3, 34:21
**opening** [13] - 43:13, 47:20, 49:5, 49:15, 50:4, 50:19, 51:16, 52:10, 52:20, 53:2, 53:7, 53:12, 54:4
**openings** [6] - 44:19, 45:14, 45:15, 46:2, 54:3, 54:20
**operate** [2] - 26:11, 50:24
**operated** [1] - 51:11
**operating** [1] - 50:9
**operator** [1] - 22:23
**opinion** [1] - 22:23
**opportunity** [3] - 7:17, 21:7, 38:14
**oral** [1] - 13:7
**orally** [1] - 40:15
**order** [68] - 3:3, 3:5, 7:15, 7:22, 8:3, 8:5, 9:5, 9:24, 10:15, 11:2, 11:5, 11:11, 11:21, 11:25, 13:16, 13:24, 13:25, 14:16, 20:8, 20:10, 21:1, 22:8, 22:9, 24:1, 24:3, 24:4, 24:6, 24:17, 24:20, 24:23, 25:7, 25:9, 25:12, 25:19, 26:22, 26:25, 27:3, 27:4, 27:16, 27:19, 27:20, 28:1, 28:9, 30:7, 30:11, 30:14, 30:18, 30:25, 31:7, 31:11, 31:18, 32:11, 32:16, 32:25, 33:13, 34:1, 34:3, 34:7, 34:11, 35:23, 35:24, 36:1, 36:5, 36:15, 42:17, 42:20, 53:13
**orders** [5] - 7:20, 23:17, 26:12, 31:12, 35:6
**original** [10] - 16:17, 22:8, 26:22, 27:3, 27:16, 27:19, 28:8,

33:25, 35:22, 35:23
**originally** [1] - 16:15
**ostrich** [1] - 45:11
**ourselves** [2] - 13:7, 13:10
**overnight** [1] - 20:22
**own** [4] - 5:4, 6:18, 23:5, 28:2

**P**

**p.m** [1] - 56:5
**pages** [1] - 52:6
**paper** [2] - 16:2, 18:10
**papers** [3] - 4:10, 4:12, 16:5
**paren** [4] - 33:6, 33:7, 33:8, 33:11
**part** [5] - 30:2, 54:1, 54:24
**participate** [2] - 5:4, 9:8
**particular** [2] - 44:2, 50:13
**particularly** [3] - 11:15, 39:12, 43:22
**parties** [2] - 5:1, 8:10
**pass** [1] - 7:2
**passing** [2] - 46:3, 47:16
**patent** [1] - 26:17
**path** [1] - 54:25
**Pearlman** [1] - 2:8
**PEARLMAN** [1] - 1:15
**Pelker** [8] - 2:8, 5:6, 38:2, 38:14, 39:2, 39:5, 39:7, 39:11
**PELKER** [1] - 1:13
**Pelker's** [2] - 7:17, 38:18
**pending** [3] - 2:13, 4:24, 39:20
**Pennsylvania** [1] - 1:14
**people** [9] - 17:20, 23:19, 26:11, 26:15, 32:18, 33:13, 33:15, 34:8, 36:8
**perception** [7] - 24:18, 24:22, 25:13, 25:18, 25:19, 36:14
**perhaps** [2] - 4:19, 33:2
**period** [2] - 21:6, 29:4
**permissible** [2] - 52:1, 52:10
**permissibly** [1] - 51:22
**permission** [3] - 33:11, 34:12, 43:12

**person** [2] - 24:18, 34:5
**personally** [1] - 46:16
**perspective** [3] - 35:11, 35:12, 49:4
**persuasive** [2] - 32:8, 47:23
**phone** [3] - 6:6, 6:12, 36:23
**pick** [1] - 42:24
**pin** [1] - 55:8
**place** [4] - 26:12, 43:9, 53:7, 53:8
**plain** [1] - 43:24
**Plaintiff** [2] - 1:3, 1:10
**planned** [1] - 13:1
**plate** [1] - 37:13
**plausibly** [1] - 38:5
**pleadings** [1] - 43:16
**pledge** [1] - 44:16
**pledging** [1] - 45:8
**plenty** [2] - 39:4, 39:14
**PLLC** [1] - 1:20
**podium** [1] - 2:15
**point** [6] - 8:25, 9:4, 9:7, 21:3, 39:14, 52:14
**pointing** [1] - 7:18
**points** [1] - 41:5
**poorly** [1] - 7:4
**portions** [2] - 21:13
**position** [5] - 31:7, 32:13, 36:6, 50:11, 51:20
**possible** [2] - 5:20, 42:9
**postpone** [2] - 19:18, 20:20
**postponed** [2] - 16:15, 19:13
**postponing** [2] - 19:12, 55:24
**potential** [1] - 24:23
**potentially** [1] - 38:13
**practicing** [1] - 31:12
**precluded** [1] - 51:15
**preference** [2] - 2:21, 2:22
**prejudice** [3] - 39:6, 53:3, 56:2
**prejudiced** [1] - 56:3
**prejudicial** [1] - 39:8
**preliminary** [1] - 6:3
**preparation** [1] - 5:4
**prepare** [2] - 17:2, 46:20
**prepared** [6] - 7:24, 8:18, 17:4, 32:13, 32:15, 34:21

**present** [3] - 2:11, 52:16, 56:2
**press** [1] - 30:21
**presumably** [2] - 16:18, 21:18
**pretrial** [4] - 6:1, 17:10, 19:9, 40:12
**PRETRIAL** [2] - 1:4, 1:7
**pretty** [3] - 14:15, 31:4, 43:16
**primary** [1] - 22:15
**principal** [1] - 36:11
**print** [1] - 18:16
**printed** [1] - 4:6
**printouts** [1] - 15:2
**private** [3] - 22:16, 38:7, 38:10
**pro** [2] - 2:13, 37:12
**probability** [5] - 43:20, 44:4, 45:20, 46:15, 47:1
**probative** [1] - 39:9
**probativeness** [2] - 39:10, 39:12
**problem** [24] - 7:11, 8:6, 8:12, 8:13, 9:12, 10:19, 12:2, 12:3, 12:12, 19:11, 25:15, 28:14, 28:15, 31:22, 33:16, 33:18, 33:22, 35:7, 36:7, 38:12, 38:13, 55:19
**problematic** [1] - 29:17
**problems** [9] - 14:24, 17:12, 17:23, 19:2, 19:10, 19:16, 20:2, 22:11, 33:21
**proceed** [2] - 5:25, 20:18
**proceedings** [1] - 57:6
**proceeds** [5] - 44:12, 45:5, 48:21, 48:23, 54:19
**process** [5] - 9:9, 11:13, 13:4, 17:8, 35:14
**processing** [1] - 44:12
**produce** [1] - 45:9
**produced** [6] - 9:6, 15:20, 17:5, 19:24, 21:2, 21:8
**product** [2] - 10:16, 12:12
**production** [1] - 36:4
**productions** [2] - 16:20, 16:22
**proffered** [2] - 44:3, 44:17

**profile** [2] - 6:19, 6:20
**project** [1] - 8:23
**promised** [1] - 38:2
**proposal** [1] - 47:22
**propose** [1] - 45:13
**proposed** [3] - 14:22, 39:25, 40:3
**proposition** [4] - 38:15, 38:21, 39:3, 39:13
**proprietary** [3] - 13:3, 31:14, 42:21
**protected** [1] - 13:3
**protective** [67] - 3:3, 3:4, 7:14, 7:20, 7:22, 8:3, 8:5, 9:5, 9:24, 10:15, 11:2, 11:5, 11:11, 11:21, 11:25, 13:15, 13:24, 13:25, 20:8, 21:1, 22:8, 22:9, 23:17, 24:6, 24:17, 24:20, 24:23, 25:7, 25:9, 25:11, 25:19, 26:11, 26:22, 26:25, 27:3, 27:4, 27:16, 27:19, 27:20, 27:25, 28:8, 30:7, 30:11, 30:14, 30:18, 30:25, 31:7, 31:11, 31:12, 31:18, 32:10, 32:16, 32:25, 33:13, 34:1, 34:2, 34:7, 34:11, 35:6, 35:23, 35:24, 35:25, 36:5, 36:15, 42:17, 42:20
**protects** [1] - 11:21
**protests** [1] - 8:17
**prove** [2] - 52:16, 54:5
**provide** [1] - 6:6
**providing** [1] - 7:15
**public** [1] - 9:1
**pull** [1] - 49:8
**pulling** [1] - 49:8
**purported** [1] - 41:6
**purpose** [2] - 27:6, 33:6
**purposes** [6] - 27:5, 27:22, 28:2, 36:9, 52:17, 55:16
**put** [4] - 12:7, 21:9, 53:2, 55:21
**putting** [2] - 6:14, 16:9
**puzzled** [1] - 42:21

## Q

**qualified** [2] - 11:15, 21:25
**quarter** [1] - 55:4
**quick** [1] - 41:5

**quite** [6] - 7:1, 9:11, 10:8, 29:19, 31:9, 36:24
**quote** [1] - 10:13

## R

**Radack** [1] - 37:16
**raised** [1] - 41:15
**raises** [1] - 34:3
**RANDOLPH** [1] - 1:8
**rates** [1] - 23:6
**rather** [1] - 6:14
**rea** [2] - 48:18, 49:2
**reach** [6] - 6:17, 14:5, 20:5, 41:19, 41:25, 42:11
**reached** [4] - 3:1, 37:1, 37:2, 55:16
**reaching** [1] - 14:2
**Reactor** [1] - 36:3
**read** [9] - 4:8, 7:17, 32:16, 37:18, 37:19, 38:2, 38:4, 38:5, 50:10
**reading** [3] - 25:11, 27:16, 37:21
**ready** [5] - 5:25, 8:24, 17:7, 27:7, 27:14
**real** [2] - 4:4, 12:12
**reality** [1] - 24:21
**realize** [1] - 21:10
**really** [9] - 20:14, 22:2, 22:25, 33:22, 38:12, 45:10, 45:12, 49:1, 55:7
**rearranged** [1] - 29:25
**reason** [7] - 4:20, 24:7, 24:12, 31:5, 32:17, 38:17, 39:11
**reasonable** [6] - 7:9, 8:3, 11:11, 31:20, 50:23
**reasonably** [2] - 27:19, 50:2
**reasons** [1] - 26:7
**receive** [1] - 15:10
**received** [3] - 15:13, 15:15
**recess** [1] - 42:25
**reckless** [1] - 47:6
**recklessness** [3] - 46:24, 47:4, 47:18
**record** [5] - 2:5, 4:5, 6:14, 10:9, 39:16
**reduces** [1] - 49:6
**refer** [5] - 43:12, 44:18, 48:5, 50:20, 54:17
**reference** [1] - 46:3,

47:16
**referred** [1] - 22:18
**referring** [1] - 50:5
**refers** [1] - 54:18
**refile** [1] - 37:14
**refuses** [2] - 9:8, 31:6
**refusing** [7] - 7:13, 9:5, 9:19, 9:20, 13:15, 13:16
**Regional** [1] - 15:8
**registered** [1] - 51:25
**registration** [1] - 52:2
**related** [1] - 52:7
**relevant** [6] - 43:14, 47:18, 48:18, 49:2, 52:15, 55:11
**rely** [1] - 39:3
**relying** [1] - 38:11
**remaining** [1] - 39:19
**remember** [1] - 28:7
**renew** [1] - 54:21
**renewed** [1] - 37:12
**repeat** [1] - 45:18
**repeatedly** [1] - 17:15
**repeating** [1] - 25:24
**reply** [1] - 12:20
**reporter** [1] - 43:3
**REPORTER** [1] - 57:1
**Reporter** [3] - 1:22, 1:23, 57:10
**reports** [1] - 38:18
**representations** [1] - 30:20
**represents** [1] - 54:19
**request** [6] - 3:25, 17:16, 19:13, 20:20, 31:16, 54:21
**requested** [3] - 7:14, 17:15, 17:17
**requests** [1] - 3:8
**require** [1] - 14:17
**required** [2] - 21:15, 54:5
**requires** [3] - 14:17, 46:23, 46:24
**research** [1] - 40:19
**reside** [1] - 3:14
**resolve** [3] - 14:11, 14:15, 19:13
**resolved** [1] - 29:15
**respect** [10] - 6:5, 7:4, 8:10, 22:22, 31:7, 31:23, 32:5, 43:7, 47:22, 55:7
**respond** [3] - 5:13, 5:17, 30:5
**responded** [1] - 7:2
**responding** [1] - 12:18

**response** [2] - 3:13, 50:10
**responsibility** [1] - 6:21
**responsive** [1] - 50:12
**restrictions** [1] - 34:2
**resubmit** [1] - 37:24
**returns** [1] - 43:4
**review** [16] - 9:6, 11:7, 12:25, 15:1, 15:13, 16:10, 19:23, 20:3, 21:1, 21:8, 21:15, 21:23, 21:25, 23:8, 36:5
**reviewed** [4] - 18:10, 21:12, 35:23, 36:2
**reviewing** [2] - 15:5, 15:22
**rights** [3] - 35:13, 35:18, 35:19
**risk** [11] - 11:1, 11:23, 24:19, 24:25, 25:18, 26:2, 43:20, 43:21, 46:15, 47:25
**RMR** [2] - 1:22, 57:9
**road** [1] - 11:23
**Road** [2] - 44:6, 54:12
**Roman** [2] - 2:3, 2:11
**ROMAN** [1] - 1:5
**Room** [2] - 1:23, 57:10
**rule** [1] - 5:18
**run** [1] - 21:17
**running** [1] - 21:11

## S

**sales** [1] - 53:24
**sand** [1] - 45:11
**sandbagging** [1] - 18:19
**sat** [2] - 17:25, 18:9
**saw** [3] - 3:24, 13:1, 30:25
**schedule** [7] - 5:5, 5:11, 14:13, 14:15, 14:20, 16:17, 20:16
**scheduled** [3] - 2:25, 20:17, 30:1
**schedules** [2] - 21:4, 32:2
**scheduling** [8] - 13:11, 14:23, 20:10, 28:15, 30:5, 55:7, 55:15, 55:16
**science** [4] - 10:13, 10:17, 12:13, 23:3
**scienter** [1] - 47:18
**scientific** [1] - 23:7
**scope** [1] - 53:22
**scratch** [1] - 12:8
**seal** [1] - 41:8
**second** [1] - 29:12
**secondhand** [1] - 42:8
**see** [24] - 8:7, 9:11, 9:14, 10:19, 13:14, 14:7, 20:5, 23:20, 24:17, 24:24, 32:22, 38:8, 38:17, 39:11, 40:4, 42:1, 47:5, 50:7, 53:9, 53:13, 53:14, 55:14, 55:17, 56:4
**seem** [1] - 4:18
**sees** [1] - 44:20
**SEFRANEK** [1] - 57:3
**Sefranek** [3] - 1:22, 57:9, 57:9
**senior** [1] - 3:10
**sense** [1] - 20:7
**sensitive** [1] - 23:18
**sent** [1] - 29:22
**separate** [1] - 52:21
**September** [8] - 1:6, 5:12, 5:15, 8:24, 16:16, 16:21, 29:25, 41:1
**serious** [1] - 29:14
**set** [7] - 5:5, 14:13, 14:20, 16:4, 16:15, 28:13, 43:15
**shame** [1] - 7:22
**share** [1] - 36:8
**shifted** [1] - 52:12
**shocked** [1] - 12:18
**short** [3] - 14:15, 42:2, 42:3
**short-circuit** [2] - 42:2, 42:3
**shorten** [1] - 14:14
**show** [12] - 4:20, 5:21, 8:9, 10:4, 13:22, 13:23, 50:20, 51:10, 51:22, 51:24, 52:5, 54:6
**showed** [1] - 18:6
**showing** [2] - 10:6, 31:25
**shows** [1] - 25:9
**side** [1] - 55:22
**sign** [12] - 3:3, 3:4, 9:5, 11:11, 13:15, 23:19, 33:13, 34:2, 34:8, 34:21, 35:20, 35:21
**signed** [6] - 22:7, 26:22, 27:8, 28:8, 32:11, 35:7
**significant** [3] - 11:13, 12:24, 13:4
**silent** [1] - 18:20
**Silk** [2] - 44:6, 54:12
**silly** [4] - 19:1, 19:6, 23:14, 23:15
**similar** [3] - 10:24, 12:11, 26:1
**simple** [2] - 18:18, 18:21
**simpler** [1] - 49:13
**simply** [7] - 8:15, 11:7, 22:4, 23:20, 45:15, 48:4, 54:17
**single** [2] - 23:19, 29:5
**sit** [3] - 28:19, 44:15, 47:25
**sites** [2] - 54:7, 54:8
**sitting** [2] - 25:16, 28:23
**situation** [1] - 43:23
**Sixth** [1] - 35:18
**small** [2] - 39:10, 39:11
**software** [1] - 35:2
**someone** [4] - 21:11, 23:25, 24:2, 42:16
**sometimes** [1] - 55:15
**sorry** [8] - 11:16, 18:25, 20:19, 24:3, 24:4, 35:4, 35:10, 51:7
**sort** [10] - 6:18, 18:21, 22:2, 31:24, 33:19, 45:2, 45:10, 48:8, 48:9, 53:9
**source** [1] - 30:16
**sources** [2] - 39:4, 39:14
**space** [4] - 12:11, 24:17, 25:1, 25:5
**specific** [2] - 29:17, 46:15
**specifically** [2] - 53:20, 55:18
**specifics** [1] - 31:24
**specified** [2] - 48:20, 48:22
**speedy** [2] - 9:2, 20:11
**spending** [1] - 22:3
**spent** [1] - 37:9
**sponsoring** [1] - 37:20
**spreadsheets** [4] - 21:11, 21:12, 21:17, 34:13
**stand** [4] - 4:3, 10:18, 12:13, 28:20
**standard** [5] - 45:24, 46:8, 46:14, 47:4, 48:8
**standardless** [1] - 23:5
**standards** [2] - 47:18, 47:24
**standing** [1] - 13:7
**start** [5] - 9:1, 43:6, 43:9, 47:24, 49:8
**starting** [1] - 2:5
**state** [3] - 2:4, 18:23, 19:1
**statement** [3] - 43:13, 47:20, 54:4
**statements** [3] - 42:8, 49:5, 49:15
**STATES** [3] - 1:1, 1:2, 1:8
**states** [1] - 38:8
**States** [2] - 1:23, 2:3
**statute** [5] - 43:25, 49:2, 49:13, 53:16, 53:23
**statutory** [1] - 54:17
**stay** [2] - 2:15, 2:20
**steal** [1] - 25:17
**stenographic** [1] - 57:5
**step** [1] - 6:18
**steps** [4] - 7:9, 7:23, 25:20, 44:10
**STERLINGOV** [1] - 1:5
**Sterlingov** [32] - 2:3, 2:11, 2:18, 4:6, 4:20, 4:23, 14:4, 14:12, 14:25, 18:3, 19:3, 19:23, 20:3, 20:14, 20:19, 21:6, 21:18, 21:24, 35:12, 35:15, 40:6, 45:17, 48:19, 50:8, 50:9, 50:24, 51:10, 51:24, 52:6, 53:3, 54:10, 54:11
**sterlingov** [1] - 13:1
**Sterlingov's** [5] - 4:17, 5:3, 19:9, 20:20, 35:12
**still** [18] - 3:3, 3:4, 4:14, 9:5, 9:8, 9:25, 10:8, 11:15, 14:25, 22:7, 25:12, 26:21, 29:7, 29:23, 32:5, 34:4, 36:2, 49:16
**still's** [2] - 28:8, 42:8
**stop** [1] - 26:1
**story** [1] - 43:14
**straight** [1] - 4:12
**Street** [2] - 1:11, 1:20
**strike** [1] - 14:16
**strongly** [1] - 55:23
**struck** [2] - 50:11, 50:12
**stuff** [6] - 7:20, 15:21, 34:5, 36:2, 36:3, 36:16
**subject** [7] - 8:2, 8:16, 26:17, 30:10, 30:13, 30:18, 31:17
**subjective** [3] - 43:19, 44:4, 46:15
**subjectively** [1] - 46:25
**submit** [4] - 20:2, 21:24, 50:5, 51:9
**submitted** [1] - 21:23
**substantial** [1] - 36:1
**substantive** [1] - 6:4
**substituting** [1] - 46:22
**sued** [5] - 12:5, 25:2, 26:2, 34:18, 42:15
**sufficient** [2] - 44:18, 49:3
**suggest** [1] - 38:6
**suggested** [2] - 19:22, 20:9
**suggesting** [2] - 25:5, 39:7
**summary** [1] - 50:16
**supplemental** [1] - 9:6
**support** [1] - 49:24
**supported** [1] - 44:22
**supports** [1] - 50:1
**suppose** [2] - 9:10, 50:16
**supposed** [2] - 16:17, 33:5
**Supreme** [1] - 43:16
**suspect** [1] - 53:19
**suspicion** [1] - 10:9
**sweater** [1] - 49:8
**system** [3] - 18:19, 44:13, 44:15

## T

**table** [2] - 2:7, 2:12
**talks** [2] - 7:19, 43:25
**TAMARA** [1] - 57:3
**Tamara** [3] - 1:22, 57:9, 57:9
**Tauseef** [1] - 2:12
**TAUSEEF** [1] - 1:19
**Tech** [3] - 43:16, 47:4, 48:8
**technician** [1] - 34:20
**technology** [5] - 10:24, 22:19, 23:3, 25:17, 26:21
**telephone** [1] - 42:4
**ten** [1] - 52:6
**tens** [2] - 23:16, 26:9
**terabytes** [2] - 15:19, 17:2

**terms** [9] - 4:13, 11:4, 12:24, 13:18, 30:11, 44:3, 44:10, 44:17, 44:19
**testify** [1] - 10:12
**testimony** [2] - 13:8, 40:8
**text** [2] - 43:24, 49:2
**THE** [119] - 1:1, 1:1, 1:8, 2:2, 2:9, 2:14, 2:19, 2:21, 3:6, 3:14, 3:17, 3:21, 4:2, 4:16, 5:9, 5:15, 5:17, 5:23, 6:2, 6:8, 6:14, 6:24, 9:10, 9:17, 10:1, 10:7, 11:9, 11:16, 12:22, 13:6, 13:19, 13:22, 14:14, 15:4, 15:9, 15:12, 15:17, 15:22, 16:1, 16:7, 16:14, 17:15, 17:25, 18:13, 18:25, 19:12, 19:25, 20:12, 21:10, 22:2, 22:20, 23:10, 23:14, 25:2, 25:4, 25:21, 26:5, 27:2, 27:10, 27:13, 27:18, 27:25, 28:12, 28:16, 28:18, 28:23, 29:5, 29:9, 29:19, 30:3, 31:4, 32:12, 32:22, 33:2, 33:5, 33:16, 34:15, 35:1, 35:4, 35:10, 36:6, 36:13, 36:18, 36:20, 36:24, 37:7, 37:18, 38:1, 38:23, 39:17, 39:22, 40:10, 40:17, 40:21, 41:1, 41:11, 42:10, 43:1, 44:23, 45:13, 45:23, 46:20, 47:14, 47:21, 48:9, 48:24, 49:3, 49:6, 49:18, 49:21, 50:10, 50:22, 51:2, 51:6, 51:8, 52:11, 53:15, 54:23, 55:3
**themselves** [2] - 10:18, 47:9
**therefore** [1] - 19:17
**they've** [9] - 7:13, 10:11, 13:25, 25:6, 25:7, 33:14, 36:1, 36:17
**thinking** [3] - 4:16, 12:16, 53:5
**thinks** [1] - 24:2, 40:16
**third** [1] - 17:13
**thoughtful** [1] - 22:23

**thoughts** [1] - 28:5
**thousands** [3] - 23:16, 23:17, 26:10
**thread** [1] - 49:8
**three** [5] - 15:19, 17:1, 33:19, 33:20, 48:1
**Thursday** [1] - 14:4
**today** [3] - 3:20, 39:18, 39:24
**tolling** [1] - 20:11
**took** [5] - 4:8, 4:14, 44:10, 45:20, 47:1
**top** [1] - 28:4
**topic** [1] - 48:3
**TOR** [1] - 1:18
**Tor** [4] - 1:20, 44:6, 44:7, 44:15
**tor** [1] - 2:10
**Torres** [4] - 3:11, 3:14, 3:24, 12:20
**touch** [1] - 37:11
**towards** [2] - 8:8, 51:14
**traced** [1] - 54:7
**tracing** [1] - 38:6
**transaction** [1] - 54:18
**transactions** [6] - 48:21, 52:3, 54:5, 54:6, 54:9, 54:12
**TRANSCRIPT** [1] - 1:7
**transcript** [2] - 57:4, 57:6
**translation** [1] - 15:1
**translations** [5] - 4:6, 4:8, 4:14, 15:11, 18:11
**treated** [1] - 7:4
**trial** [28] - 2:17, 8:16, 8:24, 9:2, 16:15, 16:18, 19:14, 19:18, 20:10, 20:11, 20:17, 28:25, 29:8, 29:9, 29:11, 29:13, 29:25, 31:5, 32:3, 41:18, 43:3, 43:4, 46:5, 46:6, 50:21, 53:9, 53:14, 55:24
**tried** [1] - 15:1
**trouble** [1] - 32:24
**true** [2] - 57:4, 57:5
**truly** [1] - 28:18
**try** [7] - 7:23, 12:22, 34:22, 36:25, 37:3, 42:13, 50:17
**trying** [9] - 10:15, 10:18, 14:5, 15:25, 19:3, 19:4, 22:3, 40:7, 48:12
**turn** [4] - 6:3, 6:18, 18:20, 30:16

**two** [11] - 14:7, 19:16, 26:21, 29:25, 33:1, 41:5, 41:8, 41:9, 46:13, 47:17, 55:5
**twofold** [1] - 24:5
**type** [5] - 7:20, 30:23, 38:21, 38:24, 51:14
**types** [1] - 31:11, 54:9

## U

**U.S** [1] - 1:13
**u.S** [1] - 1:16
**ultimately** [5] - 7:7, 7:25, 8:10, 41:20, 41:21
**unavailability** [1] - 55:15
**unavailable** [8] - 28:16, 28:20, 28:25, 55:10, 55:11, 55:13, 55:19, 56:1
**under** [6] - 9:6, 28:21, 28:24, 32:10, 34:11, 41:8
**underlying** [1] - 53:21
**understood** [2] - 38:19, 38:22
**unduly** [1] - 53:3
**unfair** [1] - 11:25
**unforeseen** [1] - 20:1
**unfortunately** [1] - 43:1
**unique** [5] - 11:2, 20:7, 22:16, 31:2, 56:2
**UNITED** [3] - 1:1, 1:2, 1:8
**United** [2] - 1:23, 2:3
**unlawful** [6] - 44:1, 44:2, 48:20, 48:22, 48:25, 54:19
**unless** [6] - 23:24, 24:1, 42:12, 42:16, 47:3, 55:18
**unonerous** [1] - 31:15
**unprepared** [1] - 12:1
**unreasonably** [1] - 31:21
**unrelated** [1] - 28:2
**unusual** [1] - 11:24
**unwilling** [3] - 7:5, 7:9, 8:3
**unwritten** [1] - 18:20
**up** [16] - 7:11, 10:4, 10:6, 13:18, 13:19, 13:22, 13:23, 18:7, 19:19, 25:17, 34:23, 42:10, 42:24, 47:19, 49:11, 55:5

**update** [1] - 2:16
**urge** [1] - 6:17
**USAO** [1] - 1:11
**USAO-DOJ** [1] - 1:11
**user** [1] - 44:6

## V

**valuable** [1] - 26:15
**vanilla** [2] - 31:11, 42:20
**vehemently** [1] - 8:17
**vehicle** [1] - 44:7
**vendor** [2] - 13:3, 22:16
**Verret** [3] - 28:20, 28:23, 29:23
**version** [1] - 49:21
**via** [1] - 3:19
**vice** [1] - 2:13
**view** [5] - 7:3, 38:4, 44:24, 51:3, 51:4
**violate** [7] - 24:1, 24:2, 24:3, 24:7, 24:8, 24:11, 24:12
**violates** [2] - 24:1, 42:16
**violating** [2] - 24:6, 24:13
**visit** [1] - 4:12
**visited** [1] - 4:11
**volumes** [1] - 17:4
**voluntarily** [2] - 13:2
**vs** [1] - 1:4

## W

**wait** [2] - 44:20, 56:4
**waiting** [2] - 9:11, 49:23
**walk** [1] - 55:12
**Wall** [1] - 1:20
**wants** [3] - 24:19, 34:11, 34:16
**warrant** [1] - 52:22
**Washington** [6] - 1:5, 1:12, 1:14, 1:17, 1:24, 57:11
**wasted** [1] - 7:22
**ways** [4] - 26:11, 39:4, 46:11, 55:14
**website** [1] - 37:16
**week** [2] - 5:14, 29:12
**weekend** [8] - 3:22, 4:11, 7:18, 14:6, 16:2, 36:25, 37:2, 38:3
**weeks** [4] - 19:16, 20:21, 22:3, 48:1
**weeks'** [1] - 20:14

**weigh** [1] - 9:1
**welcome** [1] - 54:3
**well-established** [1] - 23:3
**well-supported** [1] - 44:22
**whole** [5] - 10:10, 30:15, 36:25, 43:14, 48:9
**willful** [28] - 41:15, 43:7, 43:10, 43:13, 43:17, 43:18, 44:22, 45:11, 45:19, 46:7, 46:10, 46:14, 46:23, 47:24, 48:6, 48:11, 48:17, 49:16, 49:24, 50:1, 50:2, 50:5, 52:13, 52:17, 52:23, 52:24, 54:2, 54:21
**willing** [11] - 8:1, 8:2, 8:11, 9:12, 10:4, 11:11, 20:22, 32:7, 35:20, 41:22
**wish** [1] - 10:6
**witness** [11] - 8:21, 11:25, 12:12, 29:10, 40:1, 40:20, 40:23, 41:3, 41:22, 41:25, 55:18
**witnesses** [15] - 8:20, 31:23, 39:25, 40:3, 40:4, 40:5, 40:8, 40:13, 40:18, 40:22, 41:6, 41:7, 41:9, 55:9, 55:11
**wondering** [1] - 47:10
**word** [1] - 2:19
**works** [2] - 23:7, 29:24
**worth** [3] - 24:19, 25:14, 25:18
**writ** [1] - 41:6
**writted** [1] - 8:22
**written** [1] - 21:13
**wrote** [3] - 22:20, 22:23, 52:6

## Y

**year** [2] - 17:3, 17:6
**years** [1] - 31:12
**York** [3] - 1:17, 1:21, 6:11
**yourself** [2] - 30:8, 31:19

## Z

**Zoom** [1] - 3:20