```
 1                IN THE UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF COLUMBIA
 2
        UNITED STATES OF AMERICA,      ) Criminal Action
 3                                     ) No. 1:21-CR-0399
                         Plaintiff,    )
 4                                     ) MOTION HEARING
        vs.                            )
 5                                     ) Washington, D.C.
        ROMAN STERLINGOV,              )
 6                                     ) September 21, 2023
                         Defendant.    ) Time:  10:00 A.M.
 7

 8              TRANSCRIPT OF MOTION HEARING
            BEFORE THE HONORABLE JUDGE RANDOLPH D. MOSS
 9                 UNITED STATES DISTRICT JUDGE

10
                       A P P E A R A N C E S
11

12      For the Plaintiff:     CHRISTOPHER BROWN
                                USAO-DOJ
13                              601 D Street, NW
                                Washington, DC 20001
14
                                ALDEN PELKER
15                              U.S. DEPARTMENT OF JUSTICE
                                950 Pennsylvania Avenue, NW
16                              Washington, DC 20530

17                              JEFFREY PEARLMAN
                                DOJ-CRM
18                              U.S. Department of Justice
                                1301 New York Ave. NW
19                              Washington, DC 20005

20      For the Defendant:     TOR EKELAND
                                MICHAEL HASSARD
21                              TAUSEEF AHMED
                                Tor Ekeland Law, PLLC
22                              30 Wall Street, 8th Floor
                                New York, NY 10005
23

24

25
```

1                    **A P P E A R A N C E S (Cont'd.)**

2

3    For CipherTrace:          ANTHONY J. JAY, III - **VIA ZOOM**
                               Sheppard Mullin Richter & Hampton, LLP
                               2099 Pennsylvania Avenue, NW
4                              Suite 100
                               Washington, DC 20006

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21
     Court Reporter:           Tamara M. Sefranek, RMR, CRR, CRC
22                             Official Court Reporter
                               United States Courthouse, Room 6714
23                             333 Constitution Avenue, NW
                               Washington, DC  20001
24                             202-354-3246

25

```
 1                    P R O C E E D I N G S

 2              THE COURTROOM DEPUTY:  Calling Criminal Case 21-399,

 3     United States of America v. Roman Sterlingov.

 4              Would counsel please state their names for the

 5     record, starting with government counsel.

 6              MS. PELKER:  Good morning, Your Honor.  Alden Pelker

 7     for the United States, joined at counsel table by Christopher

 8     Brown and Jeffrey Pearlman.

 9              THE COURT:  All right.  Good morning.

10              MR. EKELAND:  Good morning, Your Honor.  Tor Ekeland

11     and Michael Hassard for Defendant Roman Sterlingov, who is

12     present in court.

13              THE COURT:  Okay.  Thank you.  We have counsel for

14     CipherTrace here; if you want to enter an appearance as well,

15     please, by video.

16              MR. JAY:  Good morning, Your Honor.  Joseph Jay for

17     CipherTrace.

18              THE COURT:  Okay.  Thank you for being here.

19              MR. JAY:  Thank you, Your Honor.

20              THE COURT:  Why don't we go ahead and start with

21     Mr. Ekeland.  Why don't you give me an update on where things

22     stand.

23              MR. EKELAND:  I'm sorry.  Is there anything the Court

24     would like me to address in particular right now?  I do have a

25     little bit of housekeeping in relation to access to our client
```

1    and the jail.

2          THE COURT:  I mean, the notion that you would at this

3    point in time just stand up and say, "Is there anything I want

4    you to address" and "There's a little bit of housekeeping," you

5    know what's -- the major issues that are in front of the Court.

6    When are we going to trial?  Who are the experts?  Where do we

7    stand with the trial?

8          I'm happy to address any housekeeping matters.  But

9    there are major issues that I assumed you would be prepared to

10   address today.

11         MR. EKELAND:  I am, Your Honor.  As the Court knows,

12   we've asked for the February trial date.  We've asked for it to

13   be continued until then.  We've submitted to the Court the

14   schedule of our experts.

15         The reason we initially asked them to be under seal

16   is we were asked by one of our experts who has a stalker to not

17   reveal --

18         THE COURT:  You didn't say that in your motion, and

19   you didn't reveal any personal information about their

20   whereabouts or anything like that in the motion.

21         MR. EKELAND:  Your Honor, I did say -- I

22   understood -- we thought the Court -- we should have said that.

23   This was something that came up at one of the hearings before

24   with one of the items.

25         But, regardless, we're still asking for the February

1    trial date, and we -- our understanding was that the Court had

2    a hearing yesterday, and I don't think our position has changed

3    on that.

4            THE COURT:  The October period does remain available

5    at this time.  At this point in time, is Ms. Still your expert

6    or not?

7            MR. EKELAND:  She is, Your Honor.

8            THE COURT:  Okay.

9            MR. EKELAND:  You know, we think there's substantial

10   due process issues with our noticed expert, who is clearly

11   qualified, who, essentially, the government is saying is

12   attempting -- it's our position that the government is

13   attempting to dictate who we -- the defense can have for an

14   expert and how the evidence can be reviewed on purely

15   competitive concerns.

16           And as we've said to this Court before, we think that

17   that is a due process violation, also a Sixth Amendment --

18           THE COURT:  Just back up for a moment here.  You told

19   me previously that Ms. Still had signed the original protective

20   order.  She was fine with that; the company was fine with that.

21   And I said okay, let's hear from the company, and I think we

22   can work with that.

23           And now you've filed something saying that she

24   refuses under any circumstances to look at the disclosures that

25   have been made.  It's nothing the government is doing.  She has

```
 1    said she -- or her company has said they refuse to look at the

 2    information, period.

 3              MR. EKELAND:  I think there's a big difference here.

 4    We went back and looked at the signed protective order last

 5    night, and it was signed by CipherTrace's counsel after review

 6    and nothing -- on behalf of CipherTrace and the employees of

 7    CipherTrace.

 8              And nothing in the original protective order mentions

 9    these proprietary concerns, which are the whole subject area of

10    the new protective order.  And what has changed is that there's

11    an assertion of a proprietary interest and a non- --

12              THE COURT:  Forget the new protective order; just the

13    old protective order.  We've got counsel for CipherTrace here.

14    Just the old protective order; forget the new one.

15              MR. EKELAND:  Yes.

16              THE COURT:  Are we ready to go?  Can she look at the

17    material?

18              MR. EKELAND:  It's my understanding, because there's

19    an assertion that the new material is -- and this is why

20    CipherTrace's counsel is here -- because there's anti- --

21    noncompete language, and there's --

22              THE COURT:  No, no, no.  Forget that.  Throw it -- if

23    I vacate that order, now what do you do?  I'm not really

24    vacating it.  But, hypothetically, if I were to vacate that

25    order, what's the problem?
```

```
 1              MR. EKELAND:  My understanding is that Chainalysis is
 2      asserting that this newly provided information is proprietary
 3      and that that is what changes.  Before we were looking at
 4      evidence in a federal criminal case that nobody said this is
 5      proprietary, there's IP concerns.
 6              THE COURT:  Why do you think CipherTrace was required
 7      to sign a protective order?
 8              MR. EKELAND:  So that the evidence in the case wasn't
 9      disclosed publicly.  But that's different --
10              THE COURT:  It doesn't say that.  I mean, it says
11      that, but it also says that it may be used by the defendant and
12      defense counsel solely in connection with the defense of this
13      case and for no other purpose.
14              MR. EKELAND:  Absolutely, Your Honor.  But what
15      wasn't in any of the disclosures and what's different here is
16      now Chainalysis is asserting that the newly produced
17      information is proprietary, and that, I believe, is the crux of
18      the issue here and what is different.
19              Nobody was balking at it before -- and CipherTrace's
20      counsel reviewed it -- when it was a fairly standard protective
21      order.  But now there's been all these assertions that this is
22      intellectual property.  There's all these things just outside
23      of -- and I believe this is what CipherTrace's counsel here is
24      to discuss -- is Chainalysis came in and said, look, this is
25      IP; this is proprietary.
```

```
1            And it raised all these competitive concerns, which

2     now we're in the position where, essentially, the government

3     gets to pick the private vendor they want to use to prosecute

4     the case, and the defense is being told we can't use the

5     private vendor that we would like to use --

6            THE COURT:  You can use them -- absolutely use them.

7     Not a problem at all.

8            MR. EKELAND:  Well, Your Honor, I think CipherTrace's

9     counsel is here to discuss that.

10           THE COURT:  Okay.  Why don't I hear from him then.

11    You're on mute, I think.

12           MR. JAY:  Your Honor, good morning.

13           THE COURT:  Good morning.

14           MR. JAY:  So I apologize, Your Honor, at the outset.

15    I've just been brought into this in the last couple of days.

16    And while I've tried to familiarize myself as much as I can

17    with the proceedings, I have not been -- I will tell you that

18    I'm not completely up to date on everything that's transpired.

19           From our position, from CipherTrace's position, first

20    of all, to assuage any concerns about the protective order, the

21    protective order -- the original protective order -- I believe

22    that's Docket 18 -- was signed by an authorized signatory for

23    CipherTrace and binds the company and all of its employees to

24    the protective order.

25           We believe that the company has fully abided by and
```

1    all of its employees have fully abided by it, and that they

2    will continue to abide by that protective order.  They

3    understand their obligations.  They serve as experts in a

4    number of criminal cases, and that's not a problem.

5          What I understand is that the expert report that was

6    originally prepared by Ms. Still, a CipherTrace employee, was

7    based on what I would call more run-of-the-mill Rule

8    16/criminal discovery materials.

9          What has caused CipherTrace concern is the assertion

10   by Chainalysis that the additional production materials are

11   different, materially different in some way, that they contain

12   highly sensitive, proprietary and otherwise what we would

13   consider to be near trade secret data.

14         And their concern is illustrated by the very strong

15   revised protective order that has elements that we've not seen

16   in prior protective orders, including the potential -- the idea

17   of a noncompete agreement embedded within the protective order.

18         THE COURT:  That was an earlier draft.  There is no

19   noncompete in this protective order.

20         MR. JAY:  There is the suggestion that the

21   information can't be used for -- I appreciate that, Your Honor.

22         There is a suggestion in the revised protective

23   order, however, that the information cannot be relied upon for

24   any future development of technology, et cetera, et cetera.

25   While we understand that and would agree to that in principle,

1  we're not able -- we believe that entering into such an

2  agreement would expose the company to potential sanction or at

3  least litigation over potential sanction or future litigation

4  just because, as the government put in its brief last night,

5  once you turn that stuff over, that sensitive information, that

6  highly proprietary information over to your competitor, the

7  horse is out of the barn.

8         And we don't want to be in a position where -- the

9  company does not want to be in a position where it's received

10  information that its competitor is calling highly sensitive and

11  proprietary information.  We viewed --

12         THE COURT:  I'm sorry.

13         MR. JAY:  I'm sorry, Your Honor.

14         THE COURT:  My understanding is that Ms. Still is not

15  involved in any way in product development, that she certainly

16  is not a coder, she's not writing or preparing algorithms.

17  When she testified in front of me, she was unaware even of the

18  technology that CipherTrace itself uses, didn't know whether it

19  controlled for CoinJoin, for example, and numerous times she

20  said I'd have to check with an engineer.

21         So from what I've heard from her testimony, she's

22  just not involved in that type of product development.  And so

23  if it was only given to her and perhaps if she only went and

24  looked at the material in some other office space -- so it

25  doesn't even enter CipherTrace's office space -- does that

1    address your concern?

2            MR. JAY:  It may, Your Honor, especially if we -- if

3    you were to agree that the information could be reviewed

4    without the revised protective order; if we went back to

5    complying with the original protective order.

6            THE COURT:  But I will say -- the original protective

7    order, I have to say -- just so you understand -- I don't see a

8    difference.  I think the new one may give Chainalysis a little

9    bit more comfort because it's more express.

10           But as the judge on the case, I understand the

11   original protective order to say that anyone who signs the

12   attachment, which was signed by CipherTrace, is bound not to

13   disclose any of the information and to use it only in

14   connection with the defense of the case and for no other

15   purpose.

16           MR. JAY:  Correct.

17           THE COURT:  That includes competitive purposes.  So

18   the new protective order spells that out in greater detail, but

19   I don't think it actually substantively changes anything

20   because under the old protective order, anything that is

21   disclosed pursuant to the protective order may only be used for

22   purposes of the case and for no other purpose.

23           MR. JAY:  I think I can appreciate that it spells it

24   out in more detail.

25           My concern is that the new protective order says that

1    this information that is going to be provided at this time is

2    different than the nature of the information that was

3    originally provided and that it's more proprietary, more

4    confidential, and potentially raises additional competitive

5    concerns; that the prior production, the information that was

6    relied upon by Ms. Still in preparing her expert report, was

7    not of the same nature.

8         Now, I know the government may take issue with that

9    and I read their filing last evening, but that was at least my

10   understanding.

11        THE COURT:  Well, I do think that there was

12   information that was proprietary that was disclosed, and that

13   was the reason that there was a request and a requirement to

14   sign the protective order.  It is either -- it may be a

15   combination of both being proprietary and law-enforcement

16   sensitive because both your client and Chainalysis assist law

17   enforcement.  And for those who are trying to evade law

18   enforcement to know what algorithms they're using, is

19   law-enforcement sensitive, as well as being proprietary.

20        But I'm just trying to find an -- to get to a

21   solution here.  And perhaps Chainalysis would be okay with

22   proceeding pursuant to the original protective order with my

23   clarification that it bars anyone who -- the information that's

24   disclosed -- from disclosing the information or using it for

25   any purpose other than this litigation.

1          If I clarify that and then provide -- maybe both

2     Chainalysis and CipherTrace would be happier if you found some

3     neutral ground somewhere, an office space somewhere, maybe

4     something that the FBI or the U.S. Attorney's Office could

5     accommodate.  But just some neutral office space where the

6     disclosure can be made, and Ms. Still can come and look at it

7     there and draw any conclusions she has to, and maybe even to

8     make a -- if she wants to do any analysis and run any numbers,

9     have a computer available to her there that would be scrubbed

10    afterwards and she wouldn't take with her.

11         That way you wouldn't have to worry about anyone

12    subsequently claiming that CipherTrace stole Chainalysis's

13    proprietary information, and Chainalysis would be comfortable

14    that its material and information was secure.

15         You think something like that would be workable?

16         MR. JAY:  I would have to check with my client, Your

17    Honor.  But I believe that that's closer to what my client

18    might be able to agree to rather than the existing protective

19    order.

20         If we were to proceed under those terms, I think that

21    might be feasible.  But, again, I'd have to check with my

22    client.

23         THE COURT:  You might tell your client that the judge

24    doesn't see any material difference between the two protective

25    orders.  Under either protective order, it's clear that this

1    information can only be used for the purpose of this case and

2    cannot be disclosed to anybody else.  That's the substance of

3    both protective orders.

4         And, you know, I don't want to get too hung up on

5    what the language is of one or the other because they both

6    provide the same thing in this regard.

7         And it would be a violation of the protective order

8    under -- either protective order for Ms. Still, for example, to

9    come back to CipherTrace and say, oh, you know -- lightning

10   bolt of insight here -- here's what we ought to do.  Let's

11   build this into our software, and we're going to really be able

12   to compete and offer a better product than Chainalysis.  We'll

13   have everything that Chainalysis has, plus what CipherTrace

14   has.

15        Either way, they can't do that.

16        MR. JAY:  No.  And we understand that, Your Honor.

17   Our focus is not so much on the protective order but on the

18   nature of the information and the exposure to CipherTrace if,

19   indeed, it receives the information.

20        Again, when we saw the new protective order and we

21   saw that it -- it's not just highly confidential information,

22   but it's sensitive, proprietary, potential trade secret-level

23   information, that's where our concern ran.  And we don't want

24   to, you know -- Ms. Still certainly stands by her expert

25   report.

1        We are just concerned, and I think Your Honor has

2    offered some solutions that might assuage my client's concerns.

3    But their concerns are, again, receiving this and having it

4    more broadly -- exposing itself potentially to IP litigation or

5    competition concerns down the road after the case is concluded.

6        And so with some of the -- some of the accommodations

7    Your Honor has suggested, we might be able to move past that.

8    I need to confer with my client.

9        THE COURT:  Okay.  Well, I would appreciate it if you

10   would do that.  But my goal here is just to get to a place

11   where everyone's interests are met, and I think that's

12   achievable.

13       I think all Chainalysis is concerned about is making

14   sure that no one takes its proprietary information and uses it

15   to compete against it, which is an entirely reasonable

16   position.  Your client's only concern is making sure that it's

17   not wrongfully subject to suit or sanctions for having

18   misappropriated information, when it didn't, in fact,

19   misappropriate information.

20       And to my mind, the key to that is finding a way just

21   to wall off Ms. Still.  And it's up to you whether there's

22   anyone who could work -- you would want to work with Ms. Still

23   on this, who would live by the same conditions.  But wall off

24   Ms. Still, who is not involved in the product development, let

25   her look at the information at a neutral site in a neutral way;

1        it doesn't have to ever enter your client's offices.

2              And if Ms. Still, you know, attests that she has not

3        disclosed it to anybody other than perhaps in court, to the

4        extent that it comes up in court, and that she's not used it

5        for any other purpose, I think we're in good shape.

6              MR. JAY:  I'll take that back to my client, Your

7        Honor.  It does seem to assuage the concerns that we have.

8              THE COURT:  Okay.  All right.  Thank you.

9              MR. JAY:  Thank you, Your Honor.

10             THE COURT:  Ms. Pelker, you look like you want to add

11       something here.

12             MS. PELKER:  Yes, Your Honor.  I mean, I think first

13       and foremost -- and I understand that Mr. Jay is being brought

14       in and trying to get up to speed, but this is a solution that

15       Your Honor has proposed to defense counsel, and the idea that

16       they haven't talked to CipherTrace and CipherTrace's counsel

17       and explained that this was the proposed solution and that we

18       just continue to be in this waiting and delaying game just

19       continues to emphasize the government's concern here.

20             It sounds as though Ms. Still is going to remain as

21       the government -- as the defense expert.  Whether she wants to

22       review this additional material or not, she -- that is her

23       choice, and the government submits that we should simply go

24       forward on October 10th with or without Ms. Still's review of

25       the material.  She can testify based on her prior review.

1          I do want to address the representations made about

2     the prior protective order.  And the government's very

3     concerned to hear that the protective order attachment was just

4     signed by a CipherTrace attorney, kind of, covering every

5     single CipherTrace employee.

6          I think that the protective order is clear that it's

7     meant to be signed by any individual -- and the attachment uses

8     the term "individual" -- who is going to have access to the

9     material.  And that any individual who is given access needs to

10    review the protective order and agree to be bound by it.

11         And the point here is not for massive amounts of

12    government discovery, which does include sensitive clustering

13    and heuristics information that was already provided in the

14    last batch, to simply be sent over to another company for any

15    employee of the company to do whatever they want with it

16    without each employee who is viewing the material to review the

17    protective order and agree to be bound by it.

18         And the government's concerned that we understood

19    that Ms. Still was being brought on as an expert, and perhaps

20    she needed to engage with a CipherTrace engineer, perhaps she

21    needed to engage with someone else at CipherTrace, but the

22    clear procedure there would be for that person to review the

23    protective order, agree to be bound by it.

24         It sounds like what might have happened is just that

25    this information was sent over to CipherTrace, writ large, and

1    all of the employees at CipherTrace who have now already

2    reviewed Chainalysis's heuristics information may not have

3    reviewed this protective order, may not have agreed to be bound

4    by it.  It doesn't change the company's obligation, but this

5    really is meant to be an individual-signed review and an

6    obligation by defense counsel to ensure that everyone who is

7    reviewing this material reviews the protective order.

8              And I think that you can tell from Ms. Still's

9    report -- and I understand that Mr. Jay may not have had the

10   opportunity to review the report and the transcript in detail,

11   but CipherTrace has already undergone, through Ms. Still, a

12   detailed review and analysis of Chainalysis's heuristics,

13   Chainalysis's clusters, compared them address by address, going

14   through over 900,000 addresses just for the Bitcoin Fog cluster

15   alone, and comparing them address to address to CipherTrace's

16   and how they were clustered.

17             And if that was then just made available to all of

18   the CipherTrace engineers and everyone who is doing clustering,

19   I think that really highlights the need for added specificity

20   in a protective order.

21             THE COURT:  I don't think there's a need -- on this

22   issue, I don't think there's a need for added specificity.  I

23   do think you're right, that the protective order is clear about

24   it.  It says, "No sensitive materials or information contained

25   therein may be disclosed to any person other than the

1    defendant, defense counsel, and persons employed to assist the

2    defense, including experts, except if the person to whom

3    disclosure is made signs the acknowledgment form attached as

4    Attachment A."

5         And then there's other language here as well about

6    "potential witnesses, experts, and their counsel may be shown

7    copies of the material, as necessary, to prepare the defense,

8    but they may not retain copies without signing the

9    acknowledgment form as Attachment A to this order pursuant to

10   the provisions of paragraph 8," which is the paragraph I just

11   read.  And I do think that that is an individual

12   responsibility.

13        And I will ask Mr. Jay if you can confirm with

14   CipherTrace who, in particular, has been -- received the

15   confidential material that was produced pursuant to the earlier

16   protective order and ask that each individual go ahead and sign

17   the acknowledgment and the undertaking not to disclose.

18        I mean, I realize it would have been better to do

19   that beforehand, but at this point -- I do think that the

20   signature by the general counsel is helpful -- but I think each

21   individual should sign it.

22        Yes, Mr. Ekeland?  You're standing up.

23        MR. EKELAND:  Your Honor, we made very clear to

24   everybody that -- involved in this that they had to review the

25   protective order.  We sent copies of the protective order to

1    everybody who -- and I've got records of this -- who worked on

2    this case on behalf of CipherTrace.  And we did not disclose

3    any of the information until CipherTrace's counsel reviewed the

4    protective order, and it's our understanding everybody who has

5    worked on this has reviewed the protective order.

6         We thought it would be sufficient that the counsel

7    for CipherTrace would sign on behalf of those people; the idea

8    being that a corporation is a person, too.  But we're more than

9    happy -- because I've got records of when the protective orders

10   were sent -- to just have every single person who has touched

11   this and reviewed it to sign it.

12        THE COURT:  I think that should happen.  How many

13   people are we talking about?

14        MR. EKELAND:  It's a handful.  I don't know the exact

15   number off the top of my head.

16        THE COURT:  When you say handful, I'm thinking three,

17   four, maybe five?

18        MR. EKELAND:  I think that's, roughly, the number

19   I've got.  I was looking at the files last night.

20        We've been very, very careful with this information

21   and the protective order and the signing of it.  We've made it

22   clear to anybody who is working on this case that they're bound

23   by the protective order, that they must read it before they

24   touch anything and sign it.

25        And in the case of CipherTrace, we thought it would

1    be sufficient that the counsel for the company sign it.  But

2    I've got a record of everybody; I could just go when I'm done

3    here today and send it all out to have them DocuSign.

4              THE COURT:  Well, I guess my view at this point is I

5    would very much appreciate it if CipherTrace could do

6    everything in its power to get past its issues in this case in

7    order to allow Ms. Still not only to be a witness in the case,

8    but to allow her to be a witness who has had the opportunity to

9    review all relevant information.  But, ultimately, that is a

10   question between the defense and the defense expert.

11             I have made clear that I'm prepared to do whatever is

12   necessary to assuage the concerns.  I think the government is

13   prepared to work with us in that.  And I assume, for example,

14   Ms. Pelker, that if I were to ask the government to make office

15   space available and a computer that could be wiped afterwards,

16   that that could be done in a way that would allow Ms. Still to

17   come and do whatever she needs to do on mutual ground.

18             MS. PELKER:  Yes, Your Honor.  We will have to figure

19   out the logistics, but I'm sure that we can talk with

20   CipherTrace and Chainalysis, and they can -- we can all come up

21   with a solution.

22             THE COURT:  If you all want to come and do it in my

23   jury room, that's fine too.  I mean, I'll make space available

24   if you want neutral ground for that as well.

25             Someone has to make available, perhaps, a computer

 1    that can be wiped afterwards to everyone's satisfaction and

 2    have just a computer tech who can look at it and make sure that

 3    it's been wiped so that the government and Chainalysis don't

 4    have access to any work product by Ms. Still; and, vice versa,

 5    Ms. Still doesn't have access or doesn't bring back with her

 6    proprietary information in a way that would raise the concerns

 7    that CipherTrace has with respect to, potentially, exposing

 8    themselves to a suit.

 9            MS. PELKER:  I believe we still have our clean jury

10    laptop since we hoped to be in trial.

11            THE COURT:  So I think that -- I appreciate Mr. Jay

12    being here, and I appreciate your working with us --

13            MR. JAY:  Thank you.

14            THE COURT:  -- on this.  I hope that you're able to

15    work something out with the defense, although I think it is

16    between the defense and its expert at this point.

17            I've made clear that I'm prepared to do whatever is

18    necessary, within reason, to accommodate the concerns of

19    everyone involved and make sure that Chainalysis's information

20    isn't used to compete against Chainalysis, but also to make

21    sure that CipherTrace isn't exposed to suit baselessly.

22            MR. JAY:  Thank you, Your Honor.

23            THE COURT:  Thank you.

24            MR. EKELAND:  I'd just raise one thing that I

25    honestly don't know the answer to because Ms. Still hasn't

1    looked at this information, and that is just we don't know the

2    amount of time it's going to actually take her to evaluate this

3    information.

4          One of the reasons that she was relying on her team

5    at CipherTrace is, as I believe the government said, there's,

6    like, 900,000 addresses.  Some of these matters need to be

7    entered manually.  So I just don't have a sense if, say, we do

8    figure out this whole thing with the clean laptops and a room,

9    when she finally gets to look at it, what amount of work is

10   going to be involved.  And I just want to note that for the

11   record.

12         THE COURT:  Okay.  Yeah.  I have to say, you can note

13   that for the record.  But I think the course of events here,

14   frankly, shows me that the defense has not been moving, once

15   again, as quickly as it can or following what I've been

16   suggesting.

17         And the notion that, as Ms. Pelker noted, that it

18   appears at least the counsel for CipherTrace for the first time

19   is hearing the suggestion that I made days ago about how we

20   might address this problem -- and there were ways to address

21   these issues long ago.

22         I mean, in fact, it really should have been addressed

23   even before the information was disclosed because you

24   acknowledge, of course, there would have to be a protective

25   order to protect the proprietary information, and there already

1   was a protective order in the case.  This is not a -- didn't

2   come as a surprise.  But we are where we are on this.

3        I think that the defense has not done what it has had

4   to do for a long, long time.  And as I said, it goes back to

5   June when I said you need to find an expert, you need to find

6   somebody who can tell us why they have to look at this

7   information in specific.  You need to tell us -- over the

8   summer, I said we need a protective order; you agreed we needed

9   a protective order.  And just none of that happened.

10        But that does bring us to the question of trial date.

11   And I did have some follow-up questions with respect to the

12   October trial date.  First of all, it says Ms. Still is not

13   available.  Quite frankly, I looked at all of her conflicts,

14   and they -- they are business development actions, by and

15   large, where I'm confident that her calendar always looks like

16   that.

17        It's hard for me to believe that there are not other

18   people at CipherTrace who could, if need be, substitute for her

19   for a few days on one of those many trips.

20        And then with respect to Dr. Dror and Mr. Fischbach,

21   I'm still at a little bit of a loss as to why and whether, in

22   fact, Mr. Fischbach is just utterly unavailable until

23   November 24th and when that unavailability began because under

24   the prior schedule, he wasn't going to be in a position to

25   testify until sometime in probably mid-October anyway because

1    the government had to put on its case first; or at least it

2    would have been in October before he would have been -- the

3    defense would have been calling its witnesses, in any event.

4          MR. EKELAND:  It's my understanding that on the

5    initial schedule we were anticipating ending sometime around

6    October 10th.

7          THE COURT:  Right.

8          MR. EKELAND:  And that we would find some time to --

9          THE COURT:  When does the trial that he's involved in

10   begin, in Missouri, I think?

11         MR. EKELAND:  I don't have the exact date in front of

12   me.

13         THE COURT:  I might.  Let me see.

14         MR. EKELAND:  I can get it for the Court.

15         THE COURT:  Well, you didn't provide it to me

16   previously.

17         MS. PELKER:  I believe previously defense counsel had

18   indicated it was starting on -- sometime in mid-October.

19         THE COURT:  The date you provided was October 10th,

20   but I'm not sure that's when he's unavailable.  That's just

21   like from the beginning of the window that I raised.  I'm not

22   sure that that's when the trial actually began.

23         MR. EKELAND:  It was my understanding, from what my

24   experts told me, they would be available for the original trial

25   date.  And then when the issue of the continuance came up,

1    which happened rather fast, we were discussing it, we realized

2    we better check with our experts, and that's when we started

3    getting information about --

4             THE COURT:  What is the name of the case that he's

5    involved in?

6             MR. EKELAND:  I don't have it in front of me right

7    now.

8             MR. HASSARD:  I can get it.

9             THE COURT:  If you can get that for me.  I'd,

10   actually, like to look.  I don't know what the judge's trial

11   calendar is in that case, whether he's sitting every day.  If

12   there are portions of that case that Mr. Fischbach feels he has

13   to sit in on so that he can provide expert testimony in

14   response, there probably are portions that he doesn't have to

15   sit in on.  So we may have to just drill down a little bit more

16   on that.

17            With Dr. Dror, again, I don't really have any

18   specificity of why he's not available for a month and a half.

19   I guess he's available on two days, November 6th and 7th.

20            Part of this is I'm wondering whether what we're

21   dealing with here is the absolute unencumbered convenience of

22   witnesses or whether people are truly unavailable.  When we

23   come time to pick a jury and I tell the jurors they're going to

24   have to sit for a month, there are going to be jurors who are

25   going to say, oh, I was planning on going on a trip.  I'm going

1    to say, "Do you have nonrefundable tickets or not?"  And

2    they're going to say, "Oh, I can refund them."  I'm going to

3    say, "Okay.  I need you to sit."  There are going to be people

4    who are going to say, "I am going to miss work because of

5    this."  I'm going to say, "I'm sorry.  You have to miss work.

6    That's one of the obligations of being a citizen."

7          The same thing with respect to witnesses.  It's just

8    less convenient for Dr. Dror, for example, because he has other

9    things on his plate that he might have to shuffle.  I'm not

10   sure that's an adequate basis for concluding that we have to

11   continue a trial for a lengthy period of time.

12         So I just don't feel I have that sort of specificity

13   yet.  Quite frankly, I'm also not 100 percent confident when

14   you say to me, Judge, they're just unavailable; we checked with

15   them, they're unavailable.  Because you originally said to me

16   that none of your witnesses were available at all during that

17   period of time, and that turned out to be just not true.

18         MR. EKELAND:  Your Honor, I was just relying on what

19   was quickly said to me, so I apologize for that.  I did

20   immediately, I think, look into that and provide the Court with

21   the schedule.  That wasn't intentional.

22         You know, this was moving fast.  We -- this whole

23   issue of the continuance --

24         THE COURT:  If I can say -- just pause there for a

25   second.  The better course is, if you're not sure of something,

1    say you're not sure to the Court rather than give the answer

2    that's convenient and then go back and check later.

3              MR. EKELAND:  I thought that was accurate when I said

4    it, and then I learned that it wasn't, Your Honor.

5              THE COURT:  Okay.  Fair enough.  All I'll say is it

6    was -- it made me scratch my head the second you said it.  I

7    would be a little surprised if you didn't scratch your head if

8    someone whispered that in your ear to say, "Really, not one of

9    our witnesses is available for an entire month?"

10             MR. EKELAND:  They're very busy professionals, and

11   they've been hard to get.  It's been a challenge with this case

12   to find good experts and --

13             THE COURT:  But an example is I did look at the more

14   detailed statement from Ms. Still.  You know, it's just hard

15   for me to believe that you have an expert of her caliber who

16   isn't going to have a calendar that looks like that and where

17   people all the time have their deputy or someone else in the

18   company attend a seminar on their behalf that otherwise they

19   would go to, for example.

20             MR. EKELAND:  Understood, Your Honor.  She made

21   herself available for the original trial date.  I think she's

22   represented she's available in February.

23             I think one of the questions now about the schedule,

24   honestly, is figuring out if we can get this idea of a neutral

25   laptop and a neutral room and her evaluating the stuff and how

1    long it's going to take her to evaluate that stuff.  We still

2    have the briefing issue on whether or not Mr. Sterlingov is

3    going to be able to see this evidence.

4         I have no idea what she's going to say or need to do

5    when she looks at this.  And the Court has ordered, I believe,

6    supplemental expert reports which -- on that --

7         THE COURT:  Yes, I did, that's true.

8         MR. EKELAND:  Assuming -- well, I can't assume.  I'm

9    hoping that those due dates will change and that we can work

10   something out with the government and with CipherTrace that's

11   amenable to the Court where this information can be reviewed

12   and incorporated into the case in a supplemental report that's

13   useful to the Court.

14        Because I also, if I recall correctly, the Court said

15   that it was holding off on ruling on the *Daubert* motions in

16   relation to Chainalysis Reactor, if I'm recalling correctly,

17   until after those supplemental reports.

18        THE COURT:  Well, to give you the opportunity to

19   submit them.  If there's nothing to submit, then I'll just

20   rule, but I did want to provide you with that opportunity.

21        MR. EKELAND:  We would like that opportunity and

22   we're hopeful that -- you know, coming into this, I didn't -- I

23   thought that just this proprietary issue from CipherTrace was

24   just a nonstarter.  Now we can see that there's an option here.

25   So I'm hoping we can figure something out, that Ms. Still can

1    review this stuff in a way that's amenable to CipherTrace and

2    Chainalysis Reactor, and issue a supplemental report that's

3    beneficial to the Court in making its decision.

4            THE COURT:  All right.  Well, I would like to know

5    more specifics.  Maybe I have to, actually, talk to

6    Mr. Fischbach and Dr. Dror.  I find that the game of telephone

7    is not working terribly well, and I think talking, frankly, to

8    Mr. Jay has been very helpful to the Court.  And maybe we just

9    need to get Ms. Still, Mr. Fischbach, and Mr. Dror on Zoom to

10   talk about scheduling.

11           Because I would have hoped that you would have done

12   the pushing back or testing on schedule that I would intend to

13   do and ask people, "Well, can you change that?"  And, "Is that

14   cast in stone?  Is there someone else who can cover that for

15   you?"  It's not evident to me that that's been done.

16           And with respect to Mr. Fischbach, it's not evident

17   to me that he's going to be needed every day at this other

18   trial for over a month.  I'd like to know the trial name, and I

19   can even check, if need be -- if it's federal court -- with the

20   judge out there to figure out what the schedule is in that case

21   and see if I can determine what's going on there.  Whether

22   Mr. Fischbach is needed every day in that case or whether

23   there's going to be some days where, if the judge isn't sitting

24   or the Court is not sitting, or where the parties anticipate

25   the testimony is going to be an issue just unrelated to

1    anything Mr. Fischbach is concerned with -- I assume not

2    everything in that case is going to deal with forensics.

3            I don't know anything about the case, but few cases

4    are 100 percent forensic cases, so I do feel a need to drill

5    down on that.

6            The other thing is, if we're unable to go with the

7    October date, I think I do see one other possibility, which is

8    I have a defendant in a case who has absconded and, therefore,

9    I'm not going to be able to go to trial in that case, it

10   appears.  And so I could have availability for November 27th

11   through December 22nd if we're unable to go with the October

12   date.

13           Obviously, the concern about that is it pushes up

14   against the holidays where, one, we may lose some jurors if you

15   get too close to the holidays.  And we'd really have to be able

16   to make sure that we could finish or we'd have to adjourn and

17   send the jurors home for a week and then come back in January

18   if we didn't really finish as we had hoped.  So that's another

19   possibility if we're not able to go in October.

20           But before I get to that point, I really would like

21   to better understand what the issues are with respect to

22   Dr. Dror and Mr. Fischbach and Ms. Still, and I'd welcome

23   suggestions about how to best get to the bottom of that.  I

24   think maybe just having a conversation with them is the best

25   way to do it probably.

1          I would encourage you, Mr. Ekeland, to work with

2     CipherTrace and the government and Chainalysis as quickly as

3     possible to get Ms. Still access to this material along the

4     terms of what I've discussed.  Perhaps -- I don't know why that

5     couldn't happen by Monday.  There's not a ton to work out to

6     make that happen.

7          So I would just encourage everyone to move as quickly

8     as they can.  And if you need me to modify any protective

9     orders, to issue any orders, to provide any facilities to allow

10     this to happen, just let me know.  I'm around.

11          All right.  Anything else, Mr. Ekeland?

12          MR. EKELAND:  I just want to -- just so I'm clear on

13     the steps with Dr. Dror and Mr. Fischbach and Ms. Still in

14     terms of the scheduling, does the Court want us to go talk to

15     them and then -- or does the Court, actually, want them to

16     appear via Zoom for a Zoom hearing to address the issues?

17          THE COURT:  Well, I'm interested in your suggestion,

18     and then I'll hear from the government's suggestion about that.

19          MR. EKELAND:  I'm happy to go back and talk to them

20     and maybe -- if they are adamant about their unavailability on

21     these dates, then perhaps we schedule a Zoom hearing where the

22     Court can talk to them.

23          I mean, I think just my biggest concern from the

24     defense side is just the amount of time it would take to review

25     the latest heuristic information, which I don't have any sense

1    of.  I know that if it's going to be done from a room in D.C.,

2    Ms. Still lives on the West Coast, and she's traveling a lot.

3    If it's something that can be done virtually, that is going to

4    speed things up.  I just don't have a sense of --

5         THE COURT:  Maybe it's something that can be set up

6    in California or wherever she is as well.  I don't know the

7    answer to that.  You'd have to consult with the government and

8    Chainalysis about that.

9         MR. EKELAND:  We'll work on that.  That's something

10   we can -- for everybody to talk about.  I'll reach out and --

11        THE COURT:  I also, though, suspect given

12   Ms. Still's -- the nature of her job, I suspect she's on the

13   East Coast a fair amount?

14        MR. EKELAND:  She travels all over quite a lot, like,

15   extensively.  I just don't -- I don't know the vagaries of all

16   of that in relation to reviewing stuff.  I'm just going to have

17   to -- we're just all going to have to talk on that front.

18        THE COURT:  All right.  Ms. Pelker?

19        MS. PELKER:  So I think the government's just

20   concerned that we are going to continue being in the same

21   holding pattern of not knowing whether we're going on

22   October 10th, not knowing whether we're going right after

23   Thanksgiving.

24        Looking at Ms. Still's representations about her

25   travel schedule previously -- and I think that the Court raised

1    this -- it's not clear to the government, if she's claiming

2    that she's going to adhere to this travel schedule, when she

3    would even be available to do the in-person review.

4          And the question is just, is Ms. Still going to

5    continue to be the defense expert on this case?  In all candor,

6    the government very much wants Ms. Still to just stay on as an

7    expert.  We can go to trial with Ms. Still whether she reviews

8    the new material or not.

9          But just looking logistically, if she's saying that

10   she is not available for any trial beginning October 10th

11   because she can't do anything the entire month of October and

12   November, it's not clear when she's doing this sort of review,

13   and then we look at a real issue of even sticking to the

14   February trial date.

15         Because defense is going to say that they need more

16   time; they're going to keep trying to push out the deadlines

17   for the reports.  I think that we just need a very firm, clear

18   deadline of when it is that government, defense, CipherTrace,

19   Chainalysis are going to work something out.  And if

20   CipherTrace isn't okay with the agreement, then that's their

21   decision and defense's decision just not to review the

22   material, and we just need to go forward with what we have or

23   not.

24         THE COURT:  So I don't disagree with you as to

25   anything you've just said.  I think the only question that

1     remains, though, is, okay, what do I do in light of all of

2     that?  Do I just say, we're going to trial in October no matter

3     what even if Mr. Fischbach is truly, in fact, absolutely

4     unavailable and even if Dr. Dror isn't available until

5     November 6th -- which may be after we're done with the case --

6     and Ms. Still truly is not available just going forward, or do

7     I need to get to the bottom of that?

8          Or should I just pick the November to December date

9     or the February date and say, categorically, we're sticking to

10    this.  I have given the defense extension after extension,

11    break after break; this is it.  I'm telling you, absent some

12    type of national calamity, we're going forward.

13          MS. PELKER:  I think the government would still

14    really push for the October date.  Looking at Ms. Still's

15    conflicts, these are training conferences and business

16    development that, like Your Honor said, could easily be staffed

17    by someone else at CipherTrace.

18          And the idea that Mr. Fischbach couldn't fly in for a

19    day -- our understanding is that the trial is in Kansas City.

20    He can just fly directly from Kansas City into DCA, testify --

21    I understand defense is going to want prep time.  There has to

22    be a day that he can come in and testify.

23          THE COURT:  I just --

24          MS. PELKER:  The government still doesn't think that

25    Dr. Dror's testimony is relevant.  But also, defense is the one

1    who chose this expert, who is based in the UK and has this

2    amorphous availability.

3            THE COURT:  Dr. Dror, I have to tell you, the defense

4    raised the possibility of him testifying remotely.  If that

5    were acceptable to the government -- and I haven't passed on

6    that, whether I allow it or not.  If the government were to

7    agree to him testifying remotely, given the time difference

8    between here and the UK, it's hard to believe that he couldn't

9    appear to testify here and that he would have obligations that

10   would preclude him from testifying at what would be 9:00 p.m.

11   or 10:00 p.m. in the UK.

12           I still need, I think -- Mr. Hassard perhaps can tell

13   me this.  Do you know the name of the case that Mr. Fischbach

14   is involved in?

15           MR. HASSARD:  Yes.  He's involved in KS v. Chandler

16   from October 16th to November 10th; and in CA v. Morgan

17   November 13th to November 23rd.  I believe those are referring

18   to Kansas and California.

19           THE COURT:  I'm sorry.  One is in Kansas and one is

20   in --

21           MR. HASSARD:  One is Kansas, the other one is

22   California.  It's *Kansas v. Chandler* and *California v. Morgan.*

23           THE COURT:  Is it Kansas or is it KSV v. Chandler?

24           MR. HASSARD:  It's KS.

25           THE COURT:  Oh, I see.  *Kansas v. Chandler.*

1          MR. HASSARD:  October 16th to November 10th.  And

2     *California v. Morgan*, November 13th to November 23rd.

3          THE COURT:  *Kansas v. Chandler* sounds like it's

4     probably a criminal prosecution brought in state court.  Do you

5     have a docket number for that, by any chance?

6          MR. HASSARD:  I don't, but I can get it for you.

7          THE COURT:  Okay.

8          MS. PELKER:  And the government will check with its

9     witnesses, but we'd just ask that the defense also check with

10    their witnesses on availability.  And I know that the Monday

11    after Thanksgiving until the Friday before Christmas is going

12    to be tough for witness availability, but we --

13         THE COURT:  Is your preference to do -- if I conclude

14    that we're not ready to go in October, is your preference to do

15    the earlier date or just to wait until February and just say

16    let's lock that in and that's done and that is final?

17         MS. PELKER:  We would just have to check with our

18    witnesses, Your Honor.  We can call them -- if we wanted to

19    take a 15-minute recess, we can try and call them and check.

20    We had not thought that the December window would be a

21    possibility, but we can check with them.

22         THE COURT:  I would like to take maybe even a little

23    bit more than a 15-minute break.  I really do want to pin this

24    down.

25         It is ten minutes of 11:00 now.  What if we take a

1      break with until a quarter of 12:00.  You can do your best to

2      reach your witnesses and, Mr. Ekeland, if you can give me

3      greater specificity about Dr. Dror and Mr. Fischbach and

4      Ms. Still about October or -- and November, November to

5      December, about all that.  And I really want to know how cast

6      in stone those dates are.  And you can let them know that I may

7      want to, actually, hear directly from them if I'm uncertain

8      about that -- about whether any of the dates have any

9      flexibility at all.

10             And then, Mr. Jay, if I could ask you, in the

11     meantime, if you could reach out to your client, perhaps just

12     to get at least some initial feedback on whether the

13     accommodation that I proposed is something that you think is

14     potentially workable and whether we can -- whether we should be

15     spending the time and effort finding some neutral ground to do

16     this along the lines that I've discussed, or whether your

17     client is going to come back to you and say, no, under no

18     circumstances.  You could even rip up the protective order and

19     you could disclose it just to Ms. Still under the most secure

20     circumstances, we are never under any circumstances going to

21     let her look at this; that would be helpful for us just to know

22     that.  We can use that for purposes of our planning.

23             MR. JAY:  Yes, Your Honor.  I'll do that.

24             THE COURT:  Okay.  Thanks.  Why don't we take that

25     break, and if you-all can use it as best you can to try and

1    contact as many people as you can.  I'm hopeful you'll be able

2    to do as much as possible.

3          And then when we come back, I'd like to set a trial

4    for one of those three dates and be firm about it, and we're

5    just going to stick with that and go forward.  Because this

6    isn't the way the system is supposed to work, and it doesn't

7    reflect well on the system to just be engaged in a constant

8    process of changing things, revising things.

9          I think that it's important that we just have some

10   certainty about this and report.

11         MS. PELKER:  The government would just ask for the

12   record that if it does end up being the February date, that

13   defense has a conversation with their client and understands

14   that the government is going to oppose any new expert coming

15   in.

16         If something comes up with Ms. Still between what

17   would be the October date and February, the defense has had

18   their chance to put forward an expert and have an expert

19   report.  If CipherTrace now comes back and decides they're not

20   comfortable with Ms. Still's work continuing on this case for

21   the next five months, that's -- we can't keep going through

22   more *Daubert* hearings.

23         THE COURT:  I think that Mr. Sterlingov has heard you

24   on that.  That's your position on that.  I think you've made

25   that clear to him.  Yes?

1          MR. EKELAND:  I would just ask the same of the

2     government, that they don't -- we'd just ask for the record the

3     same of the government, that there's no new experts coming.

4          THE COURT:  I'm happy to have a rule.  If you all are

5     in agreement on this, I'm happy to categorically say no new

6     experts.

7          MR. EKELAND:  Yes, Your Honor.

8          THE COURT:  Okay.  That's adopted then.  No new

9     experts with the consent of the parties -- at the request of

10    the parties.

11         Thank you.  I will see you all after you've had a

12    chance to make some calls.

13         (Recess taken.)

14         THE COURT:  All right.  What has everyone learned

15    over the break?  Why don't I go ahead and start with Mr. Jay.

16    Any update?

17         MR. JAY:  Good morning again, Your Honor.

18         THE COURT:  Good morning.

19         MR. JAY:  Yes.  I have preliminarily conferred with

20    my client.  We believe that CipherTrace wants to be helpful

21    here and is willing to do what it needs to in order to be as

22    helpful as possible.

23         I believe that -- and we can confirm this by tomorrow

24    with defense counsel.  But that we would take Your Honor up on

25    the suggestion of a clean room for review of the additional

1     material subject to it being subject to the existing protective

2     order at Docket 18, and at least some agreement or

3     acknowledgment from Chainalysis that, as long as CipherTrace

4     follows the provisions and abides by that protective order,

5     they do not intend to bring any kind of lawsuit against us,

6     against CipherTrace.  That's the first point.

7         THE COURT:  So that, obviously, is beyond my control.

8     Obviously, I mean -- let me put it this way.

9         If I were counsel for Chainalysis, I, obviously,

10    wouldn't say I'm not going to bring any lawsuit against

11    CipherTrace for anything, writ large, because who knows; maybe

12    CipherTrace was going through the garbage at Chainalysis in the

13    back of the alley, you know, stealing trade secrets.

14        If what you mean by that more likely is that if

15    Ms. Still reviews the material in a clean room, she doesn't say

16    or describe what she's seen to anyone else at CipherTrace and

17    she is not involved in developing any new products, any

18    algorithms, any code or anything like that, then it seems to me

19    the risk of any lawsuit is -- the risk of any nonfrivolous

20    lawsuit is vanishingly small, if that's what the request is.

21        MR. JAY:  That is --

22        THE COURT:  I can't make Chainalysis say anything.

23    But you will have a federal judge on record -- you can tell

24    your client that a federal judge on record saying that any

25    lawsuit that was brought based on Ms. Still's review of the

1    material in a clean room, if she does not disclose that

2    material or use it for any purposes other than this litigation,

3    would be frivolous.  I think that's a statement I am happy to

4    put on the record because I believe that to be the case.

5         You can't sue somebody for complying with a court

6    order to review something in a secure way where it's not going

7    to be used in any manner that is anti-competitive.

8         MR. JAY:  That's exactly what I was getting at, Your

9    Honor.  You put it much better than I did.

10        THE COURT:  Let me put it this way.  I've said this

11   on the record.  If for some reason Chainalysis disagrees with

12   that, Chainalysis can tell us that it disagrees and why.

13        It seems to me that's a fairly self-evident

14   statement.  Okay.

15        MR. JAY:  The other two points, Your Honor.  First

16   off, we will have all of the people who have worked on the

17   expert report individually sign the protective order.  The

18   government raised that point.  And we will have that done

19   promptly --

20        THE COURT:  Thank you.

21        MR. JAY:  -- working with defense counsel.

22        And the final point, Your Honor, is I received

23   assurances from my client that they will do everything they can

24   to make sure that Ms. Still has time to promptly review this

25   material and then to appear at trial.

1          THE COURT:  That is most appreciated.  So thank you

2     very much.  You've been helpful here.  Thank you.

3          Does that include being prepared and available for

4     trial in October?

5          MR. JAY:  That does, Your Honor.

6          THE COURT:  All right.  Thank you.

7          MR. JAY:  Again, I have to asterisk that a little

8     bit.  We don't know what the additional data is.  But so long

9     as it's reasonable, yes, that October date would be available.

10          THE COURT:  All right.  Thank you.  Ms. Pelker, you

11     want to pick things up.

12          MS. PELKER:  Yes, Your Honor.  The government thinks

13     it's a very positive development and puts us well on track for

14     the October 10th trial date.  We did have an opportunity to

15     very briefly talk with Chainalysis counsel who expressed their

16     concerns that, to the extent that we are modifying any of the

17     terms from the new amended protective order, that would be

18     viewed as making -- as alleviating any of the restrictions on

19     the use of the information, that they would be strong- --

20     understandably strongly opposed to that and just don't want to

21     end up in additional protracted protective order litigation.

22          THE COURT:  So here's what I propose doing with

23     respect to that.

24          I will enter a minute order clarifying that the

25     original protective order applies to each individual who

1    receives access to information pursuant to the protective

2    order.  Each individual who receives access must sign the

3    acknowledgment, as we've discussed today, and clarifying what I

4    believe to already be the case, but clarifying that the

5    protective order precludes anybody who receives sensitive

6    information pursuant to the protective order may not disclose

7    that information to anyone else who is not also subject to the

8    nondisclosure obligations under the protective order and may

9    not use that material or information for any purpose whatsoever

10   other than this case, which I think addresses the concerns, and

11   I think it's what the original protective order provided.  And

12   I don't think it differs in material respects from the

13   subsequent protective order.

14        But I'm happy to be clear about that, and I can do

15   that in a minute order on the record.  And then if Chainalysis

16   has further concerns, they can raise that with me.  But I do

17   think that that addresses any issue, and I think it's

18   consistent both with the original protective order and the

19   subsequent one.

20        MS. PELKER:  I agree, Your Honor.  I think that --

21   just the other one point, that it sounds like CipherTrace

22   wants, possibly even more than the government does, is a

23   restriction on taking any of the information provided in this

24   new highly sensitive production and putting it back on

25   CipherTrace's systems.

1          So it sounds as though they don't want to do that.

2     We just would want a protective order that specifies that.

3          THE COURT:  Mr. Jay nodded his head yes as you were

4     saying that.  Why don't I do that right on the record now.

5          I will order that the disclosure of the most recent

6     production from Chainalysis to the government and then to the

7     defense of the heuristics and the related material may be

8     disclosed to Ms. Still and anyone working with Ms. Still who

9     signs the acknowledgment under the original protective order

10    with my clarification as to what that means.  But that

11    information shall not -- the data and files shall not be taken

12    into the possession of CipherTrace, and none of those materials

13    shall be loaded onto any CipherTrace computer system.

14         MS. PELKER:  Your Honor, one point there is just

15    that, to the extent that anyone working with Ms. Still seems to

16    invite the possibility for Ms. Still and defense counsel to

17    bring in other individuals who may give rise to the same

18    concerns that some of the previously proposed individuals who

19    defense had suggested could review the materials.

20         THE COURT:  What I meant by that was another employee

21    of CipherTrace.  Again, Mr. Jay is nodding his head.  It's just

22    if she needs some technical assistance in loading something

23    onto the clean computer, wiping of the clean computer, entering

24    data or something of that nature.

25         I think we at this point in time are pretty clear

1    that CipherTrace has a very strong interest in not exposing

2    anyone who may be used in developing their own programming to

3    that type of restrictions.

4              MS. PELKER:  Yes.  I understand the Court's intent.

5    I just wanted to make sure that the language --

6              THE COURT:  Thank you.

7              MS. PELKER:  Your Honor, I think with this put in

8    place -- and the government will work with CipherTrace,

9    defense, and Chainalysis to ensure that Ms. Still has an

10   opportunity to review this as quickly as possible -- we still

11   have three weeks before the October trial date, and we think

12   that, with this issue now on track to be addressed, and it

13   sounds as though this will also address a fair amount of the

14   defense witness availability concerns, that there's nothing

15   standing in the way of us being able to move forward with an

16   October 10th trial date.  It sounds like Ms. Still can,

17   hopefully, be available.

18             It is a long trial period, and there's a fair amount

19   of flexibility as far as exact timing for witnesses.

20   Mr. Fischbach, we understand, may be in trial for some portion

21   of that.  Certainly, at some point within the month-long trial

22   period, the time period for the defense case, Mr. Fischbach can

23   come in for the day.

24             It doesn't sound as though the defense has really put

25   forward any true showing of witness unavailability for the

1    entire time period.

2         THE COURT:  Would you be amenable if the defense were

3    to request to take a witness -- a defense witness, actually,

4    during the government's case if it turns out that Mr. Fischbach

5    is only available during your case and the defense asks, can we

6    offer him sometime before you rest, is that something the

7    government would be open to?

8         MS. PELKER:  I think we'd want a very clear showing

9    of exactly why that was the only possibility or option.  I'd

10   have to talk with my co-counsel.

11        If that were truly the only thing that were standing

12   in the way of us going in October, we would just want the

13   record to be clear of exactly why that was the case, but I'm

14   happy to take it back to co-counsel to discuss.

15        THE COURT:  All right.  Thank you.  Mr. Ekeland?

16        MR. EKELAND:  Your Honor, one concern that the

17   defense has about the use of the data is -- my concern is it --

18   that Ms. Still is going to want to be able to use Inspector to

19   do, say, simple traces or confirming data.

20        I don't know what she might want to do to check the

21   stuff, but I think the way I'm hearing it now and what my

22   concern is, is that it's simply going to be limited to looking

23   at the data in the room and that that's going to exclude her

24   from being able to use CipherTrace Inspector.

25        Now, I don't know if she's -- without her having

1    looked at that, I'm not going to know what she's going to want

2    to do.

3            THE COURT:  So if it turns out that there are

4    particular addresses that she wants to run through -- or

5    particular addresses, I suppose, that she wants to run through

6    CipherTrace's software, you or she can just come back to me at

7    that point in time and say, we're not disclosing anything

8    that's proprietary here.  There's just these hundred addresses,

9    and we'd like to run them ourselves, these hundred addresses,

10   and see if we get the same results.  Just come back to me with

11   that.

12           MR. EKELAND:  Essentially, anything she wants, we'll

13   come to the Court before.  So the understanding will be she'll

14   go and look at the stuff, and if she needs to use Inspector for

15   anything, we'll come to the Court for the Court's permission

16   beforehand.

17           THE COURT:  Yes, correct.  My only concern here,

18   which I think is the same concern that CipherTrace has, is just

19   making sure that there's no disclosure of proprietary

20   information.  So if it's just a group of addresses, my

21   suspicion is that's not going to be a problem.

22           MR. EKELAND:  Yeah.  Understood.  I mean, the concern

23   is -- again, without having her look at it, there might be a

24   gray area or something where we just need to --

25           THE COURT:  Let me say this with clarity.  If there

1    is a gray area in any of this, come to me first rather than

2    sort of making any assumptions about what I might think.  I am

3    100 percent available.  And if you have any questions, you're

4    uncertain about anything, it's always safer, frankly, to ask

5    first because this is not a circumstance in which the aphorism

6    that it's better to act and apologize rather than ask first,

7    this is not an example of that.  It's much better to ask first.

8    So any uncertainty, just come to me.

9              MR. EKELAND:  With that in mind and with everything,

10   you know, that's happening in setting up the clean room and the

11   supplemental expert report and the briefing on whether or not

12   Mr. Sterlingov can review the evidence as well and what

13   we've -- Mr. Hassard has more details on the schedules.

14             I know Ms. Still is available in October and, I

15   think, December.  And Dr. Cabanas, I think, is available in

16   October and for the November, December dates.  I think -- and

17   Mr. Hassard has more information and details; he's got the

18   docket numbers on the cases.

19             I think the issue we're having is with

20   Mr. Fischbach's trial schedule in October, but I do think he

21   would be available in December and, of course, everyone is

22   available in February.

23             My one hesitation about -- or concern about the

24   December date is if we -- looking at that, we start

25   November 27th, I believe the Court said, and then we

1    potentially, maybe, are resting, like, right before the

2    holiday.  I am concerned about the jury being out for a week.

3         I understand the Court's concern with wanting to

4    bring this to trial as soon as possible, but I think October is

5    difficult for some of our experts, like we discussed before.

6    Mr. Hassard has more information on that.

7         December seems fairly open, and then February, as we

8    said before, I think, everyone is available.

9         THE COURT:  All right.  Mr. Hassard, let me know what

10   else you have.

11        MR. HASSARD:  So during the break I contacted each of

12   our experts and inquired as to their availability for the time

13   period from November 27th to December 22nd, and I have the

14   results from that.

15        JW Verret, he can make himself available at any time

16   during those dates.  Francisco Cabanas, Dr. Francisco Cabanas,

17   can make himself available for any time during those dates.

18   Dr. Dror is unavailable to testify in person between

19   November 27th and December 22nd, but he is available for remote

20   testimony on December 4th, 8th, 11th, 12th, 13th, 14th, 15th.

21        Jonelle Still will be training Euro Pol until

22   December 5th, after which she has some flexibility.  She's

23   supposed to be taking a mental health break.  It's ordered by

24   CipherTrace.  So she's expecting to be off at that time period.

25        And as for --

 1          THE COURT:  I'm not entirely sure what that means.  I

 2   mean, whether she actually is suffering from some -- I also

 3   would like to take a mental health break.  We put in very long

 4   hours and would be -- probably would be much better at my job

 5   if I took a couple of weeks off, but that doesn't mean that I

 6   can push trial schedules around for that reason.

 7          But on the other hand, if she really is suffering

 8   from some medical condition or related condition, that's a

 9   different matter.

10          MR. HASSARD:  As I understand it, mental health break

11   time periods are enforced by CipherTrace.  They want their

12   employees to be fresh, so they encourage employees to take time

13   off.

14          THE COURT:  I mean, I will propose that to the

15   judicial conference.

16          MR. HASSARD:  As for Jeff Fischbach, I'd like to

17   correct the record.  The California trial is a federal trial,

18   not a state trial.  The docket is 21-CR-00094.  It's TLN,

19   *United States v. Morgan*.  It begins November 13th.  And

20   Mr. Fischbach expects it to last until November 23rd, which

21   would then give him the last week of November to be available

22   during the time period that I've asked him about.

23          He does think that maybe it will extend into

24   December, meaning that his availability won't open up until

25   December, but he has stressed upon me that he has plans with

1    his family in December and that he would really prefer to be

2    available to attend to his family matters after he completes

3    the trial in California.

4            THE COURT:  Okay.  What about his availability in

5    October?

6            MR. HASSARD:  The October date, that will be the same

7    as our submission on Docket 200, which I can read into the

8    record if you'd like.

9            THE COURT:  You don't have to read it.  I've read

10   that.  I went and I found the case and the judge in the case.

11   I don't mind calling her and checking on, sort of, what their

12   trial schedule is if you don't actually know.  Do you know

13   whether they're sitting five days a week?

14           MR. HASSARD:  Are you talking about the *Kansas v.*

15   *Chandler* case or the *U.S. v. Morgan* case?

16           THE COURT:  The *Kansas v. Chandler* case.

17           MR. HASSARD:  I don't know much about that case.  I

18   know the docket number.

19           THE COURT:  Well, I think that's the question right

20   now.  It sounds to me like we're available to go in October

21   except for two possibilities.  One is that Ms. Still may look

22   at the data and say I just can't possibly review the material

23   in the time we have.

24           I am doubtful that's the case because, as I said, I

25   was able to review the written portions, not the data itself,

1   obviously, but the descriptions of the methodology in probably

2   less than an hour myself.  And I understand that she may need

3   to run some analysis of the numbers and see -- and confirm that

4   it does what Chainalysis says it does, but I would be surprised

5   if that couldn't be done relatively quickly.  So that's issue

6   one.

7            And then issue two is whether Mr. Fischbach really

8   needs to be sitting in the trial in Kansas City every single

9   day for six weeks.

10           MR. HASSARD:  I have the dates he's given me for the

11   Kansas City -- for the *Kansas v. Chandler* trial; October 16th

12   to November 10th.

13           THE COURT:  I think that's the issue where I need

14   some additional information about whether there are two days

15   during that period of time when he could come testify here.

16           MR. HASSARD:  I can ask him.

17           THE COURT:  Or I could -- I thought that's what we

18   were doing over the break.

19           MR. HASSARD:  He appears adamant to be there for the

20   entire time.

21           THE COURT:  Can we get him on the phone now or Zoom?

22   See if he can join the Zoom with the Court right now?

23           MR. HASSARD:  He did mention to me he was in a

24   meeting at the top of the hour, so I believe he may be in a

25   meeting presently.  But I can try to see if he can do a Zoom

1    for us this afternoon.

2              THE COURT:  All right.  Because I think that may be

3    the one open issue at this point.  So I would like to talk to

4    him about what his availability is.

5              We all have to work around our schedules and other

6    demands.  So I'd like to know exactly what it is and why he

7    needs to be sitting there every day.  Obviously, he's not going

8    to be testifying every day.  It may be, as a rebuttal or an

9    expert witness, he wants to hear the testimony of the

10   government's witness on the same subject matter.

11             But I assume that witness is not going to be

12   testifying every day or that he's not going to be responding to

13   other testimony.  So I guess I would like to know whether he

14   really needs to be there every day and, if so, why.

15             MR. HASSARD:  I'm sure he'll want to be here for

16   every day of this trial, if possible.  I know he does like to

17   listen to everybody's testimony.

18             THE COURT:  All right.  Well, he can explain that to

19   me.  Let's see if we can get him sometime --

20             MR. HASSARD:  I'll send him a request for Zoom.

21             THE COURT:  I'd like to get him in by Zoom this

22   afternoon if we can --

23             MR. HASSARD:  Okay.

24             THE COURT:  -- and talk to him about that.

25             All right.  Anything else before we adjourn?

1          MS. PELKER:  Your Honor, just that it would be

2     helpful for the government to start setting up the logistics

3     for review as soon as possible if we could get confirmation

4     that a clean room or a setup in D.C. versus trying to get

5     something set up in San Francisco, understanding that we may

6     have limited options if it's not in D.C.

7          We would very much like to do whatever we can to try

8     and facilitate an expedited review.

9          THE COURT:  That's a good point.  Mr. Jay, do you

10    know where Ms. Still would like to do this?

11         MR. JAY:  I've been told by counsel that she will do

12    it wherever the Court finds it most convenient.

13         THE COURT:  I have to say, I am extremely

14    appreciative of everything that you and the folks at

15    CipherTrace have done to try and facilitate things here, so

16    thank you.  We appreciate that.

17         All right.  Let me ask the deputy clerk if there's a

18    time that we can come back this afternoon.

19         THE COURTROOM DEPUTY:  Your Honor, you want to take

20    an hour lunch and come back at 1:30?

21         THE COURT:  Maybe at 2:00 just to make sure that

22    there's time to make sure we can get Mr. Fischbach at 2:00?

23    Okay.

24         Any reason that we'll need Mr. Jay, or can I let

25    Mr. Jay get on with his day at this point?

1          MS. PELKER:  Nothing from the government, Your Honor.

2          MR. EKELAND:  Nothing from the defense, Your Honor.

3          THE COURT:  Okay.  Mr. Jay, thank you very much for

4     your participation.  It was very productive, and I really do

5     appreciate your help.

6          MR. JAY:  Thank you, Your Honor.

7          THE COURT:  So let's come back at 2:00 and,

8     hopefully, just pin down where we are with respect to

9     Mr. Fischbach.  If Mr. Fischbach is not available at 2:00, I

10    would appreciate, Mr. Hassard, if you can figure out what time

11    this afternoon he is available, let the government know, let

12    the deputy clerk know, and we may have to adjust the timing

13    when we come back.  I'd like to do it at 2:00 if we can, and

14    we'll see where we stand then.

15         MR. HASSARD:  I'll do my best, Your Honor.

16         THE COURT:  Anything else that you want to raise,

17    anyone wants to raise before we break?  Mr. Ekeland, anything

18    else?

19         MR. EKELAND:  Not from us, Your Honor.

20         MS. PELKER:  Nothing from the government, Your Honor.

21         THE COURT:  All right.  We're making some progress.

22    Thank you all.

23              (The hearing adjourned at 12:15 p.m.)

24

25

1               CERTIFICATE OF OFFICIAL COURT REPORTER

2

3          I, TAMARA M. SEFRANEK, do hereby certify that the

4     above and foregoing constitutes a true and accurate transcript

5     of my stenographic notes and is a full, true and complete

6     transcript of the proceedings to the best of my ability.

7               Dated this 25th day of September, 2023.

8

9                         /s/ Tamara M. Sefranek_____
                          Tamara M. Sefranek, RMR, CRR, CRC
10                        Official Court Reporter
                          Room 6714
11                        333 Constitution Avenue, N.W.
                          Washington, D.C.  20001

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## /

**/s** [1] - 57:9

## 1

**100** [4] - 2:4, 27:13, 31:4, 49:3
**10005** [1] - 1:22
**10:00** [2] - 1:6, 36:11
**10th** [10] - 16:24, 25:6, 25:19, 33:22, 34:10, 36:16, 37:1, 43:14, 46:16, 53:12
**11:00** [1] - 37:25
**11th** [1] - 50:20
**12:00** [1] - 38:1
**12:15** [1] - 56:23
**12th** [1] - 50:20
**1301** [1] - 1:18
**13th** [4] - 36:17, 37:2, 50:20, 51:19
**14th** [1] - 50:20
**15-minute** [1] - 37:19, 37:23
**15th** [1] - 50:20
**16/criminal** [1] - 9:8
**16th** [3] - 36:16, 37:1, 53:11
**18** [2] - 8:22, 41:2
**1:21-CR-0399** [1] - 1:3
**1:30** [1] - 55:20

## 2

**200** [1] - 52:7
**20001** [3] - 1:13, 2:23, 57:11
**20005** [1] - 1:19
**20006** [1] - 2:4
**202-354-3246** [1] - 2:24
**2023** [2] - 1:6, 57:7
**20530** [1] - 1:16
**2099** [1] - 2:3
**21** [1] - 1:6
**21-399** [1] - 3:2
**21-CR-00094** [1] - 51:18
**22nd** [3] - 31:11, 50:13, 50:19
**23rd** [3] - 36:17, 37:2, 51:20
**24th** [1] - 24:23
**25th** [1] - 57:7
**27th** [4] - 31:10, 49:25, 50:13, 50:19
**2:00** [5] - 55:21, 55:22, 56:7, 56:9, 56:13

## 3

**30** [1] - 1:22
**333** [2] - 2:23, 57:11

## 4

**4th** [1] - 50:20

## 5

**5th** [1] - 50:22

## 6

**601** [1] - 1:13
**6714** [2] - 2:22, 57:10
**6th** [2] - 26:19, 35:5

## 7

**7th** [1] - 26:19

## 8

**8** [1] - 19:10
**8th** [2] - 1:22, 50:20

## 9

**900,000** [2] - 18:14, 23:6
**950** [1] - 1:15
**9:00** [1] - 36:10

## A

**A.M** [1] - 1:6
**abide** [1] - 9:2
**abided** [2] - 8:25, 9:1
**abides** [1] - 41:4
**ability** [1] - 57:6
**able** [14] - 10:1, 13:18, 14:11, 15:7, 22:14, 29:3, 31:9, 31:15, 31:19, 39:1, 46:15, 47:18, 47:24, 52:25
**absconded** [1] - 31:8
**absent** [1] - 35:11
**absolute** [1] - 26:21
**absolutely** [3] - 7:14, 8:6, 35:3
**acceptable** [1] - 36:5
**access** [8] - 3:25, 17:8, 17:9, 22:4, 22:5, 32:3, 44:1, 44:2
**accommodate** [2] - 13:5, 22:18
**accommodation** [1] -

38:13
**accommodations** [1] - 15:6
**accurate** [2] - 28:3, 57:4
**achievable** [1] - 15:12
**acknowledge** [1] - 23:24
**acknowledgment** [6] - 19:3, 19:9, 19:17, 41:3, 44:3, 45:9
**act** [1] - 49:6
**Action** [1] - 1:2
**actions** [1] - 24:14
**adamant** [2] - 32:20, 53:19
**add** [1] - 16:10
**added** [2] - 18:19, 18:22
**additional** [7] - 9:10, 12:4, 16:22, 40:25, 43:8, 43:21, 53:14
**address** [14] - 3:24, 4:4, 4:8, 4:10, 11:1, 17:1, 18:13, 18:15, 23:20, 32:16, 46:13
**addressed** [2] - 23:22, 46:12
**addresses** [9] - 18:14, 23:6, 44:10, 44:17, 48:4, 48:5, 48:8, 48:9, 48:20
**adequate** [1] - 27:10
**adhere** [1] - 34:2
**adjourn** [2] - 31:16, 34:25
**adjourned** [1] - 56:23
**adjust** [1] - 56:12
**adopted** [1] - 40:8
**afternoon** [4] - 54:1, 54:22, 55:18, 56:11
**afterwards** [3] - 13:10, 21:15, 22:1
**ago** [2] - 23:19, 23:21
**agree** [8] - 9:25, 11:3, 13:18, 17:10, 17:17, 17:23, 36:7, 44:20
**agreed** [2] - 18:3, 24:8
**agreement** [5] - 9:17, 10:2, 34:20, 40:5, 41:2
**ahead** [3] - 3:20, 19:16, 40:15
**AHMED** [1] - 1:21
**Alden** [1] - 3:6
**ALDEN** [1] - 1:14
**algorithms** [3] - 10:16, 12:18, 41:18
**alleviating** [1] - 43:18
**alley** [1] - 41:13

**allow** [5] - 21:7, 21:8, 21:16, 32:9, 36:6
**alone** [1] - 18:15
**amenable** [3] - 29:11, 30:1, 47:2
**amended** [1] - 43:17
**Amendment** [1] - 5:17
**America** [1] - 3:3
**AMERICA** [1] - 1:2
**amorphous** [1] - 36:2
**amount** [6] - 23:2, 23:9, 32:24, 33:13, 46:13, 46:18
**amounts** [1] - 17:11
**analysis** [3] - 13:8, 18:12, 53:3
**answer** [3] - 22:25, 28:1, 33:7
**ANTHONY** [1] - 2:2
**anti** [2] - 6:20, 42:7
**anti-competitive** [1] - 42:7
**anticipate** [1] - 30:24
**anticipating** [1] - 25:5
**anyway** [1] - 24:25
**aphorism** [1] - 49:5
**apologize** [3] - 8:14, 27:19, 49:6
**appear** [2] - 32:16, 36:9, 42:25
**appearance** [1] - 3:14
**applies** [1] - 43:25
**appreciate** [9] - 9:21, 11:23, 15:9, 21:5, 22:11, 22:12, 55:16, 56:5, 56:10
**appreciated** [1] - 43:1
**appreciative** [1] - 55:14
**area** [3] - 6:9, 48:24, 49:1
**asserting** [2] - 7:2, 7:16
**assertion** [2] - 6:11, 6:19, 9:9
**assertions** [1] - 7:21
**assist** [2] - 12:16, 19:1
**assistance** [1] - 45:22
**assuage** [4] - 8:20, 15:2, 16:7, 21:12
**assume** [4] - 21:13, 29:8, 31:1, 54:11
**assumed** [1] - 4:9
**assuming** [1] - 29:8
**assumptions** [1] - 49:2
**assurances** [1] - 42:23
**asterisk** [1] - 43:7
**attached** [1] - 19:3

**attachment** [3] - 11:12, 17:3, 17:7
**Attachment** [2] - 19:4, 19:9
**attempting** [2] - 5:12, 5:13
**attend** [2] - 28:18, 52:2
**attests** [1] - 16:2
**attorney** [1] - 17:4
**Attorney's** [1] - 13:4
**authorized** [1] - 8:22
**availability** [3] - 31:10, 36:2, 37:10, 37:12, 46:14, 50:12, 51:24, 52:4, 54:4
**available** [36] - 5:4, 13:9, 18:17, 21:15, 21:23, 21:25, 24:13, 25:24, 26:18, 26:19, 27:16, 28:9, 28:21, 28:22, 34:3, 34:10, 35:4, 35:6, 43:3, 43:9, 46:17, 47:5, 49:3, 49:14, 49:15, 49:21, 49:22, 50:8, 50:15, 50:17, 50:19, 51:21, 52:2, 52:20, 56:9, 56:11
**Ave** [1] - 1:18
**Avenue** [4] - 1:15, 2:3, 2:23, 57:11

## B

**balking** [1] - 7:19
**barn** [1] - 10:7
**bars** [1] - 12:23
**based** [4] - 9:7, 16:25, 36:1, 41:25
**baselessly** [1] - 22:21
**basis** [1] - 27:10
**batch** [1] - 17:14
**BEFORE** [1] - 1:8
**beforehand** [2] - 19:19, 48:16
**began** [2] - 24:23, 25:22
**begin** [1] - 25:10
**beginning** [2] - 25:21, 34:10
**begins** [1] - 51:19
**behalf** [4] - 6:6, 20:2, 20:7, 28:18
**beneficial** [1] - 30:3
**best** [6] - 31:23, 31:24, 38:1, 38:25, 56:15, 57:6
**better** [9] - 14:12, 19:18, 26:2, 27:25,

31:21, 42:9, 49:6, 49:7, 51:4
**between** [6] - 13:24, 21:10, 22:16, 36:8, 39:16, 50:18
**beyond** [1] - 41:7
**big** [1] - 6:3
**biggest** [1] - 32:23
**binds** [1] - 8:23
**bit** [7] - 3:25, 4:4, 11:9, 24:21, 26:15, 37:23, 43:8
**Bitcoin** [1] - 18:14
**bolt** [1] - 14:10
**bottom** [2] - 31:23, 35:7
**bound** [6] - 11:12, 17:10, 17:17, 17:23, 18:3, 20:22
**break** [12] - 35:11, 37:23, 38:1, 38:25, 40:15, 50:11, 50:23, 51:3, 51:10, 53:18, 56:17
**brief** [1] - 10:4
**briefing** [2] - 29:2, 49:11
**briefly** [1] - 43:15
**bring** [6] - 22:5, 24:10, 41:5, 41:10, 45:17, 50:4
**broadly** [1] - 15:4
**brought** [5] - 8:15, 16:13, 17:19, 37:4, 41:25
**Brown** [1] - 3:8
**BROWN** [1] - 1:12
**build** [1] - 14:11
**business** [2] - 24:14, 35:15
**busy** [1] - 28:10

---

**C**

**CA** [1] - 36:16
**Cabanas** [3] - 49:15, 50:16
**calamity** [1] - 35:12
**calendar** [3] - 24:15, 26:11, 28:16
**caliber** [1] - 28:15
**California** [7] - 33:6, 36:18, 36:22, 37:2, 51:17, 52:3
**candor** [1] - 34:5
**cannot** [2] - 9:23, 14:2
**careful** [1] - 20:20
**Case** [1] - 3:2
**case** [45] - 7:4, 7:8, 7:13, 8:4, 11:10,

11:14, 11:22, 14:1, 15:5, 20:2, 20:22, 20:25, 21:6, 21:7, 24:1, 25:1, 26:4, 26:11, 26:12, 28:11, 29:12, 30:20, 30:22, 31:2, 31:3, 31:8, 31:9, 34:5, 35:5, 36:13, 39:20, 42:4, 44:4, 44:10, 46:22, 47:4, 47:5, 47:13, 52:10, 52:15, 52:16, 52:17, 52:24
**cases** [4] - 9:4, 31:3, 31:4, 49:18
**cast** [2] - 30:14, 38:5
**categorically** [2] - 35:9, 40:5
**caused** [1] - 9:9
**certainly** [3] - 10:15, 14:24, 46:21
**certainty** [1] - 39:10
**CERTIFICATE** [1] - 57:1
**certify** [1] - 57:3
**cetera** [2] - 9:24
**Chainalysis** [31] - 7:1, 7:16, 7:24, 9:10, 11:8, 12:16, 12:21, 13:2, 13:13, 14:12, 14:13, 15:13, 21:20, 22:3, 22:20, 29:16, 30:2, 32:2, 33:8, 34:19, 41:3, 41:9, 41:12, 41:22, 42:11, 42:12, 43:15, 44:15, 45:6, 46:9, 53:4
**Chainalysis's** [5] - 13:12, 18:2, 18:12, 18:13, 22:19
**challenge** [1] - 28:11
**chance** [3] - 37:5, 39:18, 40:12
**Chandler** [8] - 36:15, 36:22, 36:23, 36:25, 37:3, 52:15, 52:16, 53:11
**change** [3] - 18:4, 29:9, 30:13
**changed** [2] - 5:2, 6:10
**changes** [2] - 7:3, 11:19
**changing** [1] - 39:8
**check** [12] - 10:20, 13:16, 13:21, 26:2, 28:2, 30:19, 37:8, 37:9, 37:17, 37:19, 37:21, 47:20
**checked** [1] - 27:14

---

**checking** [1] - 52:11
**choice** [1] - 16:23
**chose** [1] - 36:1
**Christmas** [1] - 37:11
**CHRISTOPHER** [1] - 1:12
**Christopher** [1] - 3:7
**CipherTrace** [62] - 2:2, 3:14, 3:17, 6:6, 6:7, 6:13, 7:6, 8:23, 9:6, 9:9, 10:18, 11:12, 13:2, 13:12, 14:9, 14:13, 14:18, 16:16, 17:4, 17:5, 17:20, 17:21, 17:25, 18:1, 18:11, 18:18, 19:14, 20:2, 20:7, 20:25, 21:5, 21:20, 22:7, 22:21, 23:5, 23:18, 24:18, 29:10, 29:23, 30:1, 32:2, 34:18, 34:20, 35:17, 39:19, 40:20, 41:3, 41:6, 41:11, 41:12, 41:16, 44:21, 45:12, 45:13, 45:21, 46:1, 46:8, 47:24, 48:18, 50:24, 51:11, 55:15
**CipherTrace's** [12] - 6:5, 6:20, 7:19, 7:23, 8:8, 8:19, 10:25, 16:16, 18:15, 20:3, 44:25, 48:6
**circumstance** [1] - 49:5
**circumstances** [4] - 5:24, 38:18, 38:20
**citizen** [1] - 27:6
**City** [4] - 35:19, 35:20, 53:8, 53:11
**claiming** [2] - 13:12, 34:1
**clarification** [2] - 12:23, 45:10
**clarify** [1] - 13:1
**clarifying** [3] - 43:24, 44:3, 44:4
**clarity** [1] - 48:25
**clean** [9] - 22:9, 23:8, 40:25, 41:15, 42:1, 45:23, 49:10, 55:4
**clear** [17] - 13:25, 17:6, 17:22, 18:23, 19:23, 20:22, 21:11, 22:17, 32:12, 34:1, 34:12, 34:17, 39:25, 44:14, 45:25, 47:8, 47:13
**clearly** [1] - 5:10
**clerk** [2] - 55:17, 56:12

---

**client** [14] - 3:25, 12:16, 13:16, 13:17, 13:22, 13:23, 15:8, 16:6, 38:11, 38:17, 39:13, 40:20, 41:24, 42:23
**client's** [3] - 15:2, 15:16, 16:1
**close** [1] - 31:15
**closer** [1] - 13:17
**cluster** [1] - 18:14
**clustered** [1] - 18:16
**clustering** [2] - 17:12, 18:18
**clusters** [1] - 18:13
**co** [2] - 47:10, 47:14
**co-counsel** [2] - 47:10, 47:14
**Coast** [2] - 33:2, 33:13
**code** [1] - 41:18
**coder** [1] - 10:16
**CoinJoin** [1] - 10:19
**COLUMBIA** [1] - 1:1
**combination** [1] - 12:15
**comfort** [1] - 11:9
**comfortable** [2] - 13:13, 39:20
**coming** [3] - 29:22, 39:14, 40:3
**company** [11] - 5:20, 5:21, 6:1, 8:23, 8:25, 10:2, 10:9, 17:14, 17:15, 21:1, 28:18
**company's** [1] - 18:4
**compared** [1] - 18:13
**comparing** [1] - 18:15
**compete** [3] - 14:12, 15:15, 22:20
**competition** [1] - 15:5
**competitive** [5] - 5:15, 8:1, 11:17, 12:4, 42:7
**competitor** [2] - 10:6, 10:10
**complete** [1] - 57:5
**completely** [1] - 8:18
**completes** [1] - 52:2
**complying** [1] - 11:5, 42:5
**computer** [7] - 13:9, 21:15, 21:25, 22:2, 45:13, 45:23
**concern** [17] - 9:9, 9:14, 11:1, 11:25, 14:23, 15:16, 16:19, 31:13, 32:23, 47:16, 47:17, 47:22, 48:17, 48:18, 48:22, 49:23, 50:3

---

**concerned** [7] - 15:1, 15:13, 17:3, 17:18, 31:1, 33:20, 50:2
**concerns** [18] - 5:15, 6:9, 7:5, 8:1, 8:20, 12:5, 15:2, 15:3, 15:5, 16:7, 21:12, 22:6, 22:18, 43:16, 44:10, 44:16, 45:18, 46:14
**conclude** [1] - 37:13
**concluded** [1] - 15:5
**concluding** [1] - 27:10
**conclusions** [1] - 13:7
**condition** [2] - 51:8
**conditions** [1] - 15:23
**confer** [1] - 15:8
**conference** [1] - 51:15
**conferences** [1] - 35:15
**conferred** [1] - 40:19
**confident** [2] - 24:15, 27:13
**confidential** [3] - 12:4, 14:21, 19:15
**confirm** [3] - 19:13, 40:23, 53:3
**confirmation** [1] - 55:3
**confirming** [1] - 47:19
**conflicts** [2] - 24:13, 35:15
**connection** [2] - 7:12, 11:14
**consent** [1] - 40:9
**consider** [1] - 9:13
**consistent** [1] - 44:18
**constant** [1] - 39:7
**constitutes** [1] - 57:4
**Constitution** [2] - 2:23, 57:11
**consult** [1] - 33:7
**Cont'd** [1] - 2:1
**contact** [1] - 39:1
**contacted** [1] - 50:11
**contain** [1] - 9:11
**contained** [1] - 18:24
**continuance** [2] - 25:25, 27:23
**continue** [5] - 9:2, 16:18, 27:11, 33:20, 34:5
**continued** [1] - 4:13
**continues** [1] - 16:19
**continuing** [1] - 39:20
**control** [1] - 41:7
**controlled** [1] - 10:19
**convenience** [1] - 26:21
**convenient** [3] - 27:8,

28:2, 55:12
**conversation** [2] -
31:24, 39:13
**copies** [3] - 19:7, 19:8,
19:25
**corporation** [1] - 20:8
**correct** [3] - 11:16,
48:17, 51:17
**correctly** [2] - 29:14,
29:16
**counsel** [30] - 3:4, 3:5,
3:7, 3:13, 6:5, 6:13,
6:20, 7:12, 7:20,
7:23, 8:9, 16:15,
16:16, 18:6, 19:1,
19:6, 19:20, 20:3,
20:6, 21:1, 23:18,
25:17, 40:24, 41:9,
42:21, 43:15, 45:16,
47:10, 47:14, 55:11
**couple** [2] - 8:15, 51:5
**course** [4] - 23:13,
23:24, 27:25, 49:21
**COURT** [108] - 1:1,
3:9, 3:13, 3:18, 3:20,
4:2, 4:18, 5:4, 5:8,
5:18, 6:12, 6:16,
6:22, 7:6, 7:10, 8:6,
8:10, 8:13, 9:18,
10:12, 10:14, 11:6,
11:17, 12:11, 13:23,
15:9, 16:8, 16:10,
18:21, 20:12, 20:16,
21:4, 21:22, 22:11,
22:14, 22:23, 23:12,
25:7, 25:9, 25:13,
25:15, 25:19, 26:4,
26:9, 27:24, 28:5,
28:13, 29:7, 29:18,
30:4, 32:17, 33:5,
33:11, 33:18, 34:24,
35:23, 36:3, 36:19,
36:23, 36:25, 37:3,
37:7, 37:13, 37:22,
38:24, 39:23, 40:4,
40:8, 40:14, 40:18,
41:7, 41:22, 42:10,
42:20, 43:1, 43:6,
43:10, 43:22, 45:3,
45:20, 46:6, 47:2,
47:15, 48:3, 48:17,
48:25, 50:9, 51:1,
51:14, 52:4, 52:9,
52:16, 52:19, 53:13,
53:17, 53:21, 54:2,
54:18, 54:21, 54:24,
55:9, 55:13, 55:21,
56:3, 56:7, 56:16,
56:21, 57:1
**court** [6] - 3:12, 16:3,

16:4, 30:19, 37:4,
42:5
**Court** [29] - 2:21, 2:22,
3:23, 4:5, 4:11, 4:13,
4:22, 5:1, 5:16,
25:14, 27:20, 28:1,
29:5, 29:11, 29:13,
29:14, 30:3, 30:8,
30:24, 32:14, 32:15,
32:22, 33:25, 48:13,
48:15, 49:25, 53:22,
55:12, 57:10
**Court's** [3] - 46:4,
48:15, 50:3
**Courthouse** [1] - 2:22
**COURTROOM** [2] -
3:2, 55:19
**cover** [1] - 30:14
**covering** [1] - 17:4
**CRC** [2] - 2:21, 57:9
**criminal** [3] - 7:4, 9:4,
37:4
**Criminal** [2] - 1:2, 3:2
**CRM** [1] - 1:17
**CRR** [2] - 2:21, 57:9
**crux** [1] - 7:17

**D**

**D.C** [5] - 1:5, 33:1,
55:4, 55:6, 57:11
**data** [9] - 9:13, 43:8,
45:11, 45:24, 47:17,
47:19, 47:23, 52:22,
52:25
**date** [24] - 4:12, 5:1,
8:18, 24:10, 24:12,
25:11, 25:19, 25:25,
28:21, 31:7, 31:12,
34:14, 35:8, 35:9,
35:14, 37:15, 39:12,
39:17, 43:9, 43:14,
46:11, 46:16, 49:24,
52:6
**Dated** [1] - 57:7
**dates** [9] - 29:9, 32:21,
38:6, 38:8, 39:4,
49:16, 50:16, 50:17,
53:10
**Daubert** [2] - 29:15,
39:22
**days** [7] - 8:15, 23:19,
24:19, 26:19, 30:23,
52:13, 53:14
**DC** [5] - 1:13, 1:16,
1:19, 2:4, 2:23
**DCA** [1] - 35:20
**deadline** [1] - 34:18
**deadlines** [1] - 34:16
**deal** [1] - 31:2

**dealing** [1] - 26:21
**December** [16] -
31:11, 35:8, 37:20,
38:5, 49:15, 49:16,
49:21, 49:24, 50:7,
50:13, 50:19, 50:20,
50:22, 51:24, 51:25,
52:1
**decides** [1] - 39:19
**decision** [3] - 30:3,
34:21
**defendant** [3] - 7:11,
19:1, 31:8
**Defendant** [3] - 1:6,
1:20, 3:11
**defense** [44] - 5:13,
7:12, 8:4, 11:14,
16:15, 16:21, 18:6,
19:1, 19:2, 19:7,
21:10, 22:15, 22:16,
23:14, 24:3, 25:3,
25:17, 32:24, 34:5,
34:15, 34:18, 35:10,
35:21, 35:25, 36:3,
37:9, 39:13, 39:17,
40:24, 42:21, 45:7,
45:16, 45:19, 46:9,
46:14, 46:22, 46:24,
47:2, 47:3, 47:5,
47:17, 56:2
**defense's** [1] - 34:21
**delaying** [1] - 16:18
**demands** [1] - 54:6
**DEPARTMENT** [1] -
1:15
**Department** [1] - 1:18
**deputy** [3] - 28:17,
55:17, 56:12
**DEPUTY** [2] - 3:2,
55:19
**describe** [1] - 41:16
**descriptions** [1] - 53:1
**detail** [3] - 11:18,
11:24, 18:10
**detailed** [2] - 18:12,
28:14
**details** [2] - 49:13,
49:17
**determine** [1] - 30:21
**developing** [2] -
41:17, 46:2
**development** [7] -
9:24, 10:15, 10:22,
15:24, 24:14, 35:16,
43:13
**dictate** [1] - 5:13
**difference** [4] - 6:3,
11:8, 13:24, 36:7
**different** [7] - 7:9,
7:15, 7:18, 9:11,

12:2, 51:9
**differs** [1] - 44:12
**difficult** [1] - 50:5
**directly** [2] - 35:20,
38:7
**disagree** [1] - 34:24
**disagrees** [2] - 42:11,
42:12
**disclose** [6] - 11:13,
19:17, 20:2, 38:19,
42:1, 44:6
**disclosed** [9] - 7:9,
11:21, 12:12, 12:24,
14:2, 16:3, 18:25,
23:23, 45:8
**disclosing** [2] - 12:24,
48:7
**disclosure** [4] - 13:6,
19:3, 45:5, 48:19
**disclosures** [2] - 5:24,
7:15
**discovery** [2] - 9:8,
17:12
**discuss** [3] - 7:24, 8:9,
47:14
**discussed** [4] - 32:4,
38:16, 44:3, 50:5
**discussing** [1] - 26:1
**DISTRICT** [3] - 1:1,
1:1, 1:9
**docket** [4] - 37:5,
49:18, 51:18, 52:18
**Docket** [3] - 8:22,
41:2, 52:7
**DocuSign** [1] - 21:3
**DOJ** [2] - 1:12, 1:17
**DOJ-CRM** [1] - 1:17
**done** [12] - 21:2,
21:16, 24:3, 30:11,
30:15, 33:1, 33:3,
35:5, 37:16, 42:18,
53:5, 55:15
**doubtful** [1] - 52:24
**down** [5] - 15:5, 26:15,
31:5, 37:24, 56:8
**Dr** [13] - 24:20, 26:17,
27:8, 30:6, 31:22,
32:13, 35:4, 35:25,
36:3, 38:3, 49:15,
50:16, 50:18
**draft** [1] - 9:9
**draw** [1] - 13:7
**drill** [2] - 26:15, 31:4
**Dror** [11] - 24:20,
26:17, 27:8, 30:6,
30:9, 31:22, 32:13,
35:4, 36:3, 38:3,
50:18
**Dror's** [1] - 35:25
**due** [5] - 5:10, 5:17,

29:9
**during** [8] - 27:16,
47:4, 47:5, 50:11,
50:16, 50:17, 51:22,
53:15

**E**

**ear** [1] - 28:8
**easily** [1] - 35:16
**East** [1] - 33:13
**effort** [1] - 38:15
**either** [4] - 12:14,
13:25, 14:8, 14:15
**EKELAND** [42] - 1:20,
3:10, 3:23, 4:11,
4:21, 5:7, 5:9, 6:3,
6:15, 6:18, 7:1, 7:8,
7:14, 6:8, 19:23,
20:14, 20:18, 22:24,
25:4, 25:8, 25:11,
25:14, 25:23, 26:6,
27:18, 28:3, 28:10,
28:20, 29:8, 29:21,
32:12, 32:19, 33:9,
33:14, 40:1, 40:7,
47:16, 48:12, 48:22,
49:9, 56:2, 56:19
**Ekeland** [9] - 1:21,
3:10, 3:21, 19:22,
32:1, 32:11, 38:2,
47:15, 56:17
**elements** [1] - 9:15
**embedded** [1] - 9:17
**emphasize** [1] - 16:19
**employed** [1] - 19:1
**employee** [5] - 9:6,
17:5, 17:15, 17:16,
45:20
**employees** [6] - 6:6,
8:23, 9:1, 18:1,
51:12
**encourage** [3] - 32:1,
32:7, 51:12
**end** [2] - 39:12, 43:21
**ending** [1] - 25:5
**enforced** [1] - 51:11
**enforcement** [4] -
12:15, 12:17, 12:18,
12:19
**engage** [2] - 17:20,
17:21
**engaged** [1] - 39:7
**engineer** [2] - 10:20,
17:20
**engineers** [1] - 18:18
**ensure** [2] - 18:6, 46:9
**enter** [4] - 3:14, 10:25,
16:1, 43:24
**entered** [1] - 23:7

**entering** [2] - 10:1, 45:23
**entire** [4] - 28:9, 34:11, 47:1, 53:20
**entirely** [2] - 15:15, 51:1
**especially** [1] - 11:2
**essentially** [3] - 5:11, 8:2, 48:12
**et** [2] - 9:24
**Euro** [1] - 50:21
**evade** [1] - 12:17
**evaluate** [2] - 23:2, 29:1
**evaluating** [1] - 28:25
**evening** [1] - 12:9
**event** [1] - 25:3
**events** [1] - 23:13
**evidence** [5] - 5:14, 7:4, 7:8, 29:3, 49:12
**evident** [3] - 30:15, 30:16, 42:13
**exact** [3] - 20:14, 25:11, 46:19
**exactly** [4] - 42:8, 47:9, 47:13, 54:6
**example** [7] - 10:19, 14:8, 21:13, 27:8, 28:13, 28:19, 49:7
**except** [2] - 19:2, 52:21
**exclude** [1] - 47:23
**existing** [2] - 13:18, 41:1
**expecting** [1] - 50:24
**expects** [1] - 51:20
**expedited** [1] - 55:8
**expert** [23] - 5:5, 5:10, 5:14, 9:5, 12:6, 14:24, 16:21, 17:19, 21:10, 22:16, 24:5, 26:13, 28:15, 29:6, 34:5, 34:7, 36:1, 39:14, 39:18, 42:17, 49:11, 54:9
**experts** [14] - 4:6, 4:14, 4:16, 9:3, 19:2, 19:6, 25:24, 26:2, 28:12, 40:3, 40:6, 40:9, 50:5, 50:12
**explain** [1] - 54:18
**explained** [1] - 16:17
**expose** [1] - 10:2
**exposed** [1] - 22:21
**exposing** [3] - 15:4, 22:7, 46:1
**exposure** [1] - 14:18
**express** [1] - 11:9
**expressed** [1] - 43:15
**extend** [1] - 51:23

**extension** [2] - 35:10
**extensively** [1] - 33:15
**extent** [3] - 16:4, 43:16, 45:15
**extremely** [1] - 55:13

## F

**facilitate** [2] - 55:8, 55:15
**facilities** [1] - 32:9
**fact** [4] - 15:18, 23:22, 24:22, 35:3
**fair** [4] - 28:5, 33:13, 46:13, 46:18
**fairly** [3] - 7:20, 42:13, 50:7
**familiarize** [1] - 8:16
**family** [2] - 52:1, 52:2
**far** [1] - 46:19
**fast** [2] - 26:1, 27:22
**FBI** [1] - 13:4
**feasible** [1] - 13:21
**February** [10] - 4:12, 4:25, 28:22, 34:14, 35:9, 37:15, 39:12, 39:17, 49:22, 50:7
**federal** [5] - 7:4, 30:19, 41:23, 41:24, 51:17
**feedback** [1] - 38:12
**few** [2] - 24:19, 31:3
**figure** [5] - 21:18, 23:8, 29:25, 30:20, 56:10
**figuring** [1] - 28:24
**filed** [1] - 5:23
**files** [2] - 20:19, 45:11
**filing** [1] - 12:9
**final** [2] - 37:16, 42:22
**finally** [1] - 23:9
**fine** [3] - 5:20, 21:23
**finish** [2] - 31:16, 31:18
**firm** [2] - 34:17, 39:4
**first** [11] - 8:19, 16:12, 23:18, 24:12, 25:1, 41:6, 42:15, 49:1, 49:5, 49:6, 49:7
**Fischbach** [23] - 24:20, 24:22, 26:12, 30:6, 30:9, 30:16, 30:22, 31:1, 31:22, 32:13, 35:3, 35:18, 36:13, 38:3, 46:20, 46:22, 47:4, 51:16, 51:20, 53:7, 55:22, 56:9
**Fischbach's** [1] - 49:20

**five** [3] - 20:17, 39:21, 52:13
**flexibility** [3] - 38:9, 46:19, 50:22
**Floor** [1] - 1:22
**fly** [2] - 35:18, 35:20
**focus** [1] - 14:17
**Fog** [1] - 18:14
**folks** [1] - 55:14
**follow** [1] - 24:11
**follow-up** [1] - 24:11
**following** [1] - 23:15
**follows** [1] - 41:4
**FOR** [1] - 1:1
**foregoing** [1] - 57:4
**foremost** [1] - 16:13
**forensic** [1] - 31:4
**forensics** [1] - 31:2
**forget** [3] - 6:12, 6:14, 6:22
**form** [2] - 19:3, 19:9
**forward** [8] - 16:24, 34:22, 35:6, 35:12, 39:5, 39:18, 46:15, 46:25
**four** [1] - 20:17
**Francisco** [2] - 50:16, 55:5
**frankly** [5] - 23:14, 24:13, 27:13, 30:7, 49:4
**fresh** [1] - 51:12
**Friday** [1] - 37:11
**frivolous** [1] - 42:3
**front** [5] - 4:5, 10:17, 25:11, 26:6, 33:17
**full** [1] - 57:5
**fully** [2] - 8:25, 9:1
**future** [2] - 9:24, 10:3

## G

**game** [2] - 16:18, 30:6
**garbage** [1] - 41:12
**general** [1] - 19:20
**given** [6] - 10:23, 17:9, 33:11, 35:10, 36:7, 53:10
**goal** [1] - 15:10
**government** [40] - 3:5, 5:11, 5:12, 5:25, 8:2, 10:4, 12:8, 16:21, 16:23, 17:12, 21:12, 21:14, 22:3, 23:5, 25:1, 29:10, 32:2, 33:7, 34:1, 34:6, 34:18, 35:13, 35:24, 36:5, 36:6, 37:8, 39:11, 39:14, 40:2, 40:3, 42:18, 43:12,

44:22, 45:6, 46:8, 47:7, 55:2, 56:1, 56:11, 56:20
**government's** [7] - 16:19, 17:2, 17:18, 32:18, 33:19, 47:4, 54:10
**gray** [2] - 48:24, 49:1
**greater** [2] - 11:18, 38:3
**ground** [4] - 13:3, 21:17, 21:24, 38:15
**group** [1] - 48:20
**guess** [3] - 21:4, 26:19, 54:13

## H

**half** [1] - 26:18
**Hampton** [1] - 2:3
**hand** [1] - 51:7
**handful** [2] - 20:14, 20:16
**happier** [1] - 13:2
**happy** [8] - 4:8, 20:9, 32:19, 40:4, 40:5, 42:3, 44:14, 47:14
**hard** [4] - 24:17, 28:11, 28:14, 36:8
**Hassard** [7] - 3:11, 36:12, 49:13, 49:17, 50:6, 50:9, 56:10
**HASSARD** [21] - 1:20, 26:8, 36:15, 36:21, 36:24, 37:1, 37:6, 50:11, 51:10, 51:16, 52:6, 52:14, 52:17, 53:10, 53:16, 53:19, 53:23, 54:15, 54:20, 54:23, 56:15
**HONORABLE** [1] - 1:8
**hope** [2] - 22:14
**hoped** [3] - 22:10, 30:11, 31:18
**hopeful** [2] - 29:22, 39:1
**hopefully** [2] - 46:17, 56:8
**hoping** [2] - 29:9, 29:25
**horse** [1] - 10:7
**hour** [3] - 53:2, 53:24, 55:20
**hours** [1] - 51:4
**housekeeping** [3] - 3:25, 4:4, 4:8
**hundred** [2] - 48:8, 48:9
**hung** [1] - 14:4
**hypothetically** [1] - 6:24

**hereby** [1] - 57:3
**herself** [1] - 28:21
**hesitation** [1] - 49:23
**heuristic** [1] - 32:25
**heuristics** [4] - 17:13, 18:2, 18:12, 45:7
**highlights** [1] - 18:19
**highly** [5] - 9:12, 10:6, 10:10, 14:21, 44:24
**himself** [2] - 50:15, 50:17
**holding** [2] - 29:15, 33:21
**holiday** [1] - 50:2
**holidays** [2] - 31:14, 31:15
**home** [1] - 31:17
**honestly** [2] - 22:25, 28:24
**Honor** [51] - 3:6, 3:10, 3:16, 3:19, 4:11, 4:21, 5:7, 7:14, 8:8, 8:12, 8:14, 9:21, 10:13, 11:2, 13:17, 14:16, 15:1, 15:7, 16:7, 16:9, 16:12, 16:15, 19:23, 21:18, 22:22, 27:18, 28:4, 28:20, 35:16, 37:18, 38:23, 40:7, 40:17, 40:24, 42:9, 42:15, 42:22, 43:5, 43:12, 44:20, 45:14, 46:7, 47:16, 55:1, 55:19, 56:1, 56:2, 56:6, 56:15, 56:19, 56:20

## I

**idea** [6] - 9:16, 16:15, 20:7, 28:24, 29:4, 35:18
**III** [1] - 2:2
**illustrated** [1] - 9:14
**immediately** [1] - 27:20
**important** [1] - 39:9
**IN** [1] - 1:1
**in-person** [1] - 34:3
**include** [2] - 17:12, 43:3
**includes** [1] - 11:17
**including** [2] - 9:16, 19:2
**incorporated** [1] - 29:12
**indeed** [1] - 14:19
**indicated** [1] - 25:18
**individual** [9] - 17:7, 17:8, 17:9, 18:5, 19:11, 19:16, 19:21, 43:25, 44:2
**individual-signed** [1] - 18:5
**individually** [1] - 42:17
**individuals** [2] - 45:17, 45:18
**information** [57] - 4:19, 6:2, 7:2, 7:17, 9:21, 9:23, 10:5, 10:6, 10:10, 10:11, 11:3, 11:13, 12:1, 12:2, 12:5, 12:12, 12:23, 12:24, 13:13, 13:14, 14:1, 14:18, 14:19, 14:21, 14:23, 15:14, 15:18, 15:19, 15:25, 17:13, 17:25, 18:2, 18:24, 20:3, 20:20, 21:9, 22:6, 22:19, 23:1, 23:3, 23:23, 23:25, 24:7, 26:3, 29:11, 32:25, 43:19, 44:1, 44:6, 44:7, 44:9, 44:23, 45:11, 48:20, 49:17, 50:6, 53:14
**initial** [2] - 25:5, 38:12
**inquired** [1] - 50:12
**insight** [1] - 14:10
**Inspector** [3] - 47:18, 47:24, 48:14
**intellectual** [1] - 7:22
**intend** [2] - 30:12, 41:5
**intent** [1] - 46:4

**intentional** [1] - 27:21
**interest** [2] - 6:11, 46:1
**interested** [1] - 32:17
**interests** [1] - 15:11
**invite** [1] - 45:16
**involved** [11] - 10:15, 10:22, 15:24, 19:24, 22:19, 23:10, 25:9, 26:5, 36:14, 36:15, 41:17
**IP** [3] - 7:5, 7:25, 15:4
**issue** [18] - 7:18, 12:8, 18:22, 25:25, 27:23, 29:2, 29:23, 30:2, 30:25, 32:9, 34:13, 44:17, 46:12, 49:19, 53:5, 53:7, 53:13, 54:3
**issues** [7] - 4:5, 4:9, 5:10, 21:6, 23:21, 31:21, 32:16
**items** [1] - 4:24
**itself** [3] - 10:18, 15:4, 52:25

## J

**jail** [1] - 4:1
**January** [1] - 31:17
**JAY** [27] - 2:2, 3:16, 3:19, 8:12, 8:14, 9:20, 10:13, 11:2, 11:16, 11:23, 13:16, 14:16, 16:6, 16:9, 22:13, 22:22, 38:23, 40:17, 40:19, 41:21, 42:8, 42:15, 42:21, 43:5, 43:7, 55:11, 56:6
**Jay** [14] - 3:16, 16:13, 18:9, 19:13, 22:11, 30:8, 38:10, 40:15, 45:3, 45:21, 55:9, 55:24, 55:25, 56:3
**Jeff** [1] - 51:16
**JEFFREY** [1] - 1:17
**Jeffrey** [1] - 3:2
**job** [2] - 33:12, 51:4
**join** [1] - 53:22
**joined** [1] - 3:7
**Jonelle** [1] - 50:21
**Joseph** [1] - 3:16
**JUDGE** [2] - 1:8, 1:9
**judge** [7] - 11:10, 13:23, 30:20, 30:23, 41:23, 41:24, 52:10
**Judge** [1] - 27:14
**judge's** [1] - 26:10
**judicial** [1] - 51:15

**June** [1] - 24:5
**jurors** [4] - 26:23, 26:24, 31:14, 31:17
**jury** [4] - 21:23, 22:9, 26:23, 50:2
**JUSTICE** [1] - 1:15
**Justice** [1] - 1:18
**JW** [1] - 50:15

## K

**Kansas** [14] - 35:19, 35:20, 36:18, 36:19, 36:21, 36:22, 36:23, 36:25, 37:3, 52:14, 52:16, 53:8, 53:11
**keep** [2] - 34:16, 39:21
**key** [1] - 15:20
**kind** [2] - 17:4, 41:5
**knowing** [2] - 33:21, 33:22
**knows** [2] - 4:11, 41:11
**KS** [2] - 36:15, 36:24
**KSV** [1] - 36:23

## L

**language** [4] - 6:21, 14:5, 19:5, 46:5
**laptop** [2] - 22:10, 28:25
**laptops** [1] - 23:8
**large** [3] - 17:25, 24:15, 41:11
**last** [8] - 6:4, 8:15, 10:4, 12:9, 17:14, 20:19, 51:20, 51:21
**latest** [1] - 32:25
**Law** [1] - 1:21
**law** [4] - 12:15, 12:16, 12:17, 12:19
**law-enforcement** [2] - 12:15, 12:19
**lawsuit** [5] - 41:5, 41:10, 41:19, 41:20, 41:25
**learned** [2] - 28:4, 40:14
**least** [6] - 10:3, 12:9, 23:18, 25:1, 38:12, 41:2
**lengthy** [1] - 27:11
**less** [2] - 27:8, 53:2
**level** [1] - 14:22
**light** [1] - 35:1
**lightning** [1] - 14:9
**likely** [1] - 41:14
**limited** [2] - 47:22, 55:6

**lines** [1] - 38:16
**listen** [1] - 54:17
**litigation** [6] - 10:3, 12:25, 15:4, 42:2, 43:21
**live** [1] - 15:23
**lives** [1] - 33:2
**LLP** [1] - 2:3
**loaded** [1] - 45:13
**loading** [1] - 45:22
**lock** [1] - 37:16
**logistically** [1] - 34:9
**logistics** [2] - 21:19, 55:2
**look** [18] - 5:24, 6:1, 6:16, 7:24, 13:6, 15:25, 16:10, 22:2, 23:9, 24:6, 26:10, 27:20, 28:13, 34:13, 38:21, 48:14, 48:23, 52:21
**looked** [5] - 6:4, 10:24, 23:1, 24:13, 48:1
**looking** [7] - 7:3, 20:19, 33:4, 34:9, 35:14, 47:22, 49:24
**looks** [3] - 24:15, 28:16, 29:5
**lose** [1] - 31:14
**loss** [1] - 24:21
**lunch** [1] - 55:20

## M

**major** [2] - 4:5, 4:9
**manner** [1] - 42:7
**manually** [1] - 23:7
**massive** [1] - 17:11
**material** [24] - 6:17, 6:19, 10:24, 13:14, 13:24, 16:22, 16:25, 17:9, 17:16, 18:7, 19:7, 19:15, 32:3, 34:8, 34:22, 41:1, 41:15, 42:1, 42:2, 42:25, 44:9, 44:12, 45:7, 52:22
**materially** [1] - 9:11
**materials** [5] - 9:8, 9:10, 18:24, 45:12, 45:19
**matter** [3] - 35:2, 51:9, 54:10
**matters** [4] - 4:8, 23:6, 52:2
**mean** [13] - 4:2, 7:10, 16:12, 19:18, 21:23, 23:22, 32:23, 41:8, 41:14, 48:22, 51:2,

**51:5, 51:14
**meaning** [1] - 51:24
**means** [2] - 45:10, 51:1
**meant** [3] - 17:7, 18:5, 45:20
**meantime** [1] - 38:11
**medical** [1] - 51:8
**meeting** [2] - 53:24, 53:25
**mental** [3] - 50:23, 51:3, 51:10
**mention** [1] - 53:23
**mentions** [1] - 6:8
**met** [1] - 15:11
**methodology** [1] - 53:1
**Michael** [1] - 3:11
**MICHAEL** [1] - 1:20
**mid** [2] - 24:25, 25:18
**mid-October** [2] - 24:25, 25:18
**might** [12] - 13:18, 13:21, 13:23, 15:2, 15:7, 17:24, 23:20, 25:13, 27:9, 47:20, 48:23, 49:2
**mill** [1] - 9:7
**mind** [3] - 15:20, 49:9, 52:11
**minute** [2] - 43:24, 44:15
**minutes** [1] - 37:25
**misappropriate** [1] - 15:19
**misappropriated** [1] - 15:18
**miss** [2] - 27:4, 27:5
**Missouri** [1] - 25:10
**modify** [1] - 32:8
**modifying** [1] - 43:16
**moment** [1] - 5:18
**Monday** [2] - 32:5, 37:10
**month** [6] - 26:18, 26:24, 28:9, 30:18, 34:11, 46:21
**month-long** [1] - 46:21
**months** [1] - 39:21
**Morgan** [5] - 36:16, 36:22, 37:2, 51:19, 52:15
**morning** [8] - 3:6, 3:9, 3:10, 3:16, 8:12, 8:13, 40:17, 40:18
**MOSS** [1] - 1:8
**most** [4] - 38:19, 43:1, 45:5, 55:12
**MOTION** [2] - 1:4, 1:8

**motion** [2] - 4:18, 4:20
**motions** [1] - 29:15
**move** [3] - 15:7, 32:7, 46:15
**moving** [2] - 23:14, 27:22
**MR** [86] - 3:10, 3:16, 3:19, 3:23, 4:11, 4:21, 5:7, 5:9, 6:3, 6:15, 6:18, 7:1, 7:8, 7:14, 8:8, 8:12, 8:14, 9:20, 10:13, 11:2, 11:16, 11:23, 13:16, 14:16, 16:6, 16:9, 19:23, 20:14, 20:18, 22:13, 22:22, 22:24, 25:4, 25:8, 25:11, 25:14, 25:23, 26:6, 26:8, 27:18, 28:3, 28:10, 28:20, 29:8, 29:21, 32:12, 32:19, 33:9, 33:14, 36:15, 36:21, 37:1, 37:6, 38:23, 40:1, 40:7, 40:17, 40:19, 41:21, 42:8, 42:15, 42:21, 43:5, 43:7, 47:16, 48:12, 48:22, 49:9, 50:11, 51:10, 51:16, 52:6, 52:14, 52:17, 53:10, 53:16, 53:19, 53:23, 54:15, 54:20, 54:23, 55:11, 56:2, 56:6, 56:15, 56:19
**MS** [20] - 3:6, 16:12, 21:18, 22:9, 25:17, 33:19, 35:13, 35:24, 37:8, 37:17, 39:11, 43:12, 44:20, 45:14, 46:4, 46:7, 47:8, 55:1, 56:1, 56:20
**Mullin** [1] - 2:3
**must** [2] - 20:23, 44:2
**mute** [1] - 8:11
**mutual** [1] - 21:17

**N**

**N.W** [1] - 57:11
**name** [3] - 26:4, 30:18, 36:13
**names** [1] - 3:4
**national** [1] - 35:12
**nature** [5] - 12:2, 12:7, 14:18, 33:12, 45:24
**near** [1] - 9:13
**necessary** [3] - 19:7, 21:12, 22:18
**need** [25] - 15:8, 18:19, 18:21, 18:22,

23:6, 24:5, 24:7, 24:8, 24:18, 27:3, 29:4, 30:9, 30:19, 31:4, 32:8, 34:15, 34:17, 34:22, 35:7, 36:12, 48:24, 53:2, 53:13, 55:24
**needed** [5] - 17:20, 17:21, 24:8, 30:17, 30:22
**needs** [8] - 17:9, 21:17, 40:21, 45:22, 48:14, 53:8, 54:7, 54:14
**neutral** [8] - 13:3, 13:5, 15:25, 21:24, 28:24, 28:25, 38:15
**never** [1] - 38:20
**new** [16] - 6:10, 6:12, 6:14, 6:19, 11:8, 11:18, 11:25, 14:20, 34:8, 39:14, 40:3, 40:5, 40:8, 41:17, 43:17, 44:24
**New** [2] - 1:18, 1:22
**newly** [2] - 7:2, 7:16
**next** [1] - 39:21
**night** [3] - 6:5, 10:4, 20:19
**nobody** [2] - 7:4, 7:19
**non** [1] - 6:11
**noncompete** [3] - 6:21, 9:17, 9:19
**nondisclosure** [1] - 44:8
**none** [3] - 24:9, 27:16, 45:12
**nonfrivolous** [1] - 41:19
**nonrefundable** [1] - 27:1
**nonstarter** [1] - 29:24
**note** [2] - 23:10, 23:12
**noted** [1] - 23:17
**notes** [1] - 57:5
**nothing** [8] - 5:25, 6:6, 6:8, 29:19, 46:14, 56:1, 56:2, 56:20
**noticed** [1] - 5:10
**notion** [1] - 4:2, 23:17
**November** [22] - 24:23, 26:19, 31:10, 34:12, 35:5, 35:8, 36:16, 36:17, 37:1, 37:2, 38:4, 49:16, 49:25, 50:13, 50:19, 51:19, 51:20, 51:21, 53:12
**number** [5] - 9:4, 20:15, 20:18, 37:5,

52:18
**numbers** [3] - 13:8, 49:18, 53:3
**numerous** [1] - 10:19
**NW** [5] - 1:13, 1:15, 1:18, 2:3, 2:23
**NY** [1] - 1:22

**O**

**obligation** [2] - 18:4, 18:6
**obligations** [4] - 9:3, 27:6, 36:9, 44:8
**obviously** [6] - 31:13, 41:7, 41:8, 41:9, 53:1, 54:7
**October** [35] - 5:4, 16:24, 24:12, 24:25, 25:2, 25:6, 25:18, 25:19, 31:7, 31:11, 31:19, 33:22, 34:10, 34:11, 35:2, 35:14, 36:16, 37:1, 37:14, 38:4, 39:17, 43:4, 43:9, 43:14, 46:11, 46:16, 47:12, 49:14, 49:16, 49:20, 50:4, 52:5, 52:6, 52:20, 53:11
**OF** [5] - 1:1, 1:2, 1:8, 1:15, 57:1
**offer** [2] - 14:12, 47:6
**offered** [1] - 15:2
**office** [5] - 10:24, 10:25, 13:3, 13:5, 21:14
**Office** [1] - 13:4
**offices** [1] - 16:1
**OFFICIAL** [1] - 57:1
**Official** [2] - 2:22, 57:10
**old** [3] - 6:13, 6:14, 11:20
**once** [2] - 10:5, 23:14
**one** [29] - 4:16, 4:23, 4:24, 6:14, 11:8, 14:5, 15:14, 22:24, 23:4, 24:19, 27:6, 28:8, 28:23, 31:7, 31:14, 35:25, 36:19, 36:21, 39:4, 44:19, 44:21, 45:14, 47:16, 49:23, 52:21, 53:6, 54:3
**open** [4] - 47:7, 50:7, 51:24, 54:3
**opportunity** [7] - 18:10, 21:8, 29:18, 29:20, 29:21, 43:14,

46:10
**oppose** [1] - 39:14
**opposed** [1] - 43:20
**option** [2] - 29:24, 47:9
**options** [1] - 55:6
**order** [80] - 5:20, 6:4, 6:8, 6:10, 6:12, 6:13, 6:14, 6:23, 6:25, 7:7, 7:21, 8:20, 8:21, 8:24, 9:2, 9:15, 9:17, 9:19, 9:23, 11:4, 11:5, 11:7, 11:11, 11:18, 11:20, 11:21, 11:25, 12:14, 12:22, 13:19, 13:25, 14:7, 14:8, 14:17, 14:20, 17:2, 17:3, 17:6, 17:10, 17:17, 17:23, 18:3, 18:7, 18:20, 18:23, 19:9, 19:16, 19:25, 20:4, 20:5, 20:21, 20:23, 21:7, 23:25, 24:1, 24:8, 24:9, 38:18, 40:21, 41:2, 41:4, 42:6, 42:17, 43:17, 43:21, 43:24, 43:25, 44:2, 44:5, 44:6, 44:8, 44:11, 44:13, 44:15, 44:18, 45:2, 45:5, 45:9
**ordered** [2] - 29:5, 50:23
**orders** [6] - 9:16, 13:25, 14:3, 20:9, 32:9
**original** [13] - 5:19, 6:8, 8:21, 11:5, 11:6, 11:11, 12:22, 25:24, 28:21, 43:25, 44:11, 44:18, 45:9
**originally** [3] - 9:6, 12:3, 27:15
**otherwise** [2] - 9:12, 28:18
**ought** [1] - 14:10
**ourselves** [1] - 48:9
**outset** [1] - 8:14
**outside** [1] - 7:22
**own** [1] - 46:2

**P**

**p.m** [3] - 36:10, 36:11, 56:23
**paragraph** [2] - 19:10
**part** [1] - 26:20
**participation** [1] - 56:4

**particular** [4] - 3:24, 19:14, 48:4, 48:5
**parties** [3] - 30:24, 40:9, 40:10
**passed** [1] - 36:5
**past** [2] - 15:7, 21:6
**pattern** [1] - 33:21
**pause** [1] - 27:24
**PEARLMAN** [1] - 1:17
**Pearlman** [1] - 3:8
**PELKER** [21] - 1:14, 3:6, 16:12, 21:18, 22:9, 25:17, 33:19, 35:13, 35:24, 37:8, 37:17, 39:11, 43:12, 44:20, 45:14, 46:4, 46:7, 47:8, 55:1, 56:1, 56:20
**Pelker** [6] - 3:6, 16:10, 21:14, 23:17, 33:18, 43:10
**Pennsylvania** [2] - 1:15, 2:3
**people** [9] - 20:7, 20:13, 24:18, 26:22, 27:3, 28:17, 30:13, 39:1, 42:16
**percent** [3] - 27:13, 31:4, 49:3
**perhaps** [10] - 10:23, 12:21, 16:3, 17:19, 17:20, 21:25, 32:4, 32:21, 36:12, 38:11
**period** [12] - 5:4, 6:2, 27:11, 27:17, 46:18, 46:22, 47:1, 50:13, 50:24, 51:22, 53:15
**periods** [1] - 51:11
**permission** [1] - 48:15
**person** [7] - 17:22, 18:25, 19:2, 20:8, 20:10, 34:3, 50:18
**personal** [1] - 4:19
**persons** [1] - 19:1
**phone** [1] - 53:21
**pick** [4] - 8:3, 26:23, 35:8, 43:11
**pin** [2] - 37:23, 56:8
**place** [2] - 15:10, 46:8
**Plaintiff** [1] - 1:3, 1:12
**planning** [2] - 26:25, 38:22
**plans** [1] - 51:25
**plate** [1] - 27:9
**PLLC** [1] - 1:21
**plus** [1] - 14:13
**point** [18] - 4:3, 5:5, 17:11, 19:19, 21:4, 22:16, 31:20, 41:6, 42:18, 42:22, 44:21,

45:14, 45:25, 46:21, 48:7, 54:3, 55:9, 55:25
**points** [1] - 42:15
**Pol** [1] - 50:21
**portion** [1] - 46:20
**portions** [3] - 26:12, 26:14, 52:25
**position** [10] - 5:2, 5:12, 8:2, 8:19, 10:8, 10:9, 15:16, 24:24, 39:24
**positive** [1] - 43:13
**possession** [1] - 45:12
**possibilities** [1] - 52:21
**possibility** [6] - 31:7, 31:19, 36:4, 37:21, 45:16, 47:9
**possible** [7] - 32:3, 39:2, 40:22, 46:10, 50:4, 54:16, 55:3
**possibly** [2] - 44:22, 52:22
**potential** [5] - 9:16, 10:2, 10:3, 14:22, 19:6
**potentially** [5] - 12:4, 15:4, 22:7, 38:14, 50:1
**power** [1] - 21:6
**preclude** [1] - 36:10
**precludes** [1] - 44:5
**prefer** [1] - 52:1
**preference** [2] - 37:13, 37:14
**preliminarily** [1] - 40:19
**prep** [1] - 35:21
**prepare** [1] - 19:7
**prepared** [6] - 4:9, 9:6, 21:11, 21:13, 22:17, 43:3
**preparing** [2] - 10:16, 12:6
**present** [1] - 3:12
**presently** [1] - 53:25
**pretty** [1] - 45:25
**previously** [5] - 5:19, 25:16, 25:17, 33:25, 45:18
**principle** [1] - 9:25
**private** [2] - 8:3, 8:5
**problem** [5] - 6:25, 8:7, 9:4, 23:20, 48:21
**procedure** [1] - 17:22
**proceed** [1] - 13:20
**proceeding** [1] - 12:22

**proceedings** [2] - 8:17, 57:6
**process** [3] - 5:10, 5:17, 39:8
**produced** [2] - 7:16, 19:15
**product** [5] - 10:15, 10:22, 14:12, 15:24, 22:4
**production** [4] - 9:10, 12:5, 44:24, 45:6
**productive** [1] - 56:4
**products** [1] - 41:17
**professionals** [1] - 28:10
**programming** [1] - 46:2
**progress** [1] - 56:21
**promptly** [2] - 42:19, 42:24
**property** [1] - 7:22
**propose** [2] - 43:22, 51:14
**proposed** [4] - 16:15, 16:17, 38:13, 45:18
**proprietary** [21] - 6:9, 6:11, 7:2, 7:5, 7:17, 7:25, 9:12, 10:6, 10:11, 12:3, 12:12, 12:15, 12:19, 13:13, 14:22, 15:14, 22:6, 23:25, 29:23, 48:8, 48:19
**prosecute** [1] - 8:3
**prosecution** [1] - 37:4
**protect** [1] - 23:25
**protective** [76] - 5:19, 6:4, 6:8, 6:10, 6:12, 6:13, 6:14, 7:7, 7:20, 8:20, 8:21, 8:24, 9:2, 9:15, 9:16, 9:17, 9:19, 9:22, 11:4, 11:5, 11:6, 11:11, 11:18, 11:20, 11:21, 11:25, 12:14, 12:22, 13:18, 13:24, 13:25, 14:3, 14:7, 14:8, 14:17, 14:20, 17:2, 17:3, 17:6, 17:10, 17:17, 17:23, 18:3, 18:7, 18:20, 18:23, 19:16, 19:25, 20:4, 20:5, 20:9, 20:21, 20:23, 23:24, 24:1, 24:8, 24:9, 32:8, 38:18, 41:1, 41:4, 42:17, 43:17, 43:21, 43:25, 44:1, 44:5, 44:6, 44:8, 44:11, 44:13, 44:18, 45:2,

45:9
**protracted** [1] - 43:21
**provide** [7] - 13:1, 14:6, 25:15, 26:13, 27:20, 29:20, 32:9
**provided** [7] - 7:2, 12:1, 12:3, 17:13, 25:19, 44:11, 44:23
**provisions** [2] - 19:10, 41:4
**publicly** [1] - 7:9
**purely** [1] - 5:14
**purpose** [7] - 7:13, 11:15, 11:22, 12:25, 14:1, 16:5, 44:9
**purposes** [4] - 11:17, 11:22, 38:22, 42:2
**pursuant** [6] - 11:21, 12:22, 19:9, 19:15, 44:1, 44:6
**push** [3] - 34:16, 35:14, 51:6
**pushes** [1] - 31:13
**pushing** [1] - 30:12
**put** [10] - 10:4, 25:1, 39:18, 41:8, 42:4, 42:9, 42:10, 46:7, 46:24, 51:3
**puts** [1] - 43:13
**putting** [1] - 44:24

**Q**

**qualified** [1] - 5:11
**quarter** [1] - 38:1
**questions** [3] - 24:11, 28:23, 49:3
**quickly** [6] - 23:15, 27:19, 32:2, 32:7, 46:10, 53:5
**quite** [3] - 24:13, 27:13, 33:14

**R**

**raise** [5] - 22:6, 22:24, 44:16, 56:16, 56:17
**raised** [5] - 8:1, 25:21, 33:25, 36:4, 42:18
**raises** [1] - 12:4
**ran** [1] - 14:23
**RANDOLPH** [1] - 1:8
**rather** [5] - 13:18, 26:1, 28:1, 49:1, 49:6
**reach** [3] - 33:10, 38:2, 38:11
**Reactor** [2] - 29:16, 30:2
**read** [6] - 12:9, 19:11,

20:23, 52:7, 52:9
**ready** [2] - 6:16, 37:14
**real** [1] - 34:13
**realize** [1] - 19:18
**realized** [1] - 26:1
**really** [18] - 6:23, 14:11, 18:5, 18:19, 23:22, 26:17, 31:15, 31:18, 31:20, 35:14, 37:23, 38:5, 46:24, 51:7, 52:1, 53:7, 54:14, 56:4
**Really** [1] - 28:8
**reason** [6] - 4:15, 12:13, 22:18, 42:11, 51:6, 55:24
**reasonable** [2] - 15:15, 43:9
**reasons** [1] - 23:4
**rebuttal** [1] - 54:8
**recalling** [1] - 29:16
**received** [3] - 10:9, 19:14, 42:22
**receives** [4] - 14:19, 44:1, 44:2, 44:5
**receiving** [1] - 15:3
**recent** [1] - 45:5
**recess** [2] - 37:19, 40:13
**record** [15] - 3:5, 21:2, 23:11, 23:13, 39:12, 40:2, 41:23, 41:24, 42:4, 42:11, 44:15, 45:4, 47:13, 51:17, 52:8
**records** [2] - 20:1, 20:9
**referring** [1] - 36:17
**reflect** [1] - 39:7
**refund** [1] - 27:2
**refuse** [1] - 6:1
**refuses** [1] - 5:24
**regard** [1] - 14:6
**regardless** [1] - 4:25
**related** [2] - 45:7, 51:8
**relation** [3] - 3:25, 29:16, 33:16
**relatively** [1] - 53:5
**relevant** [2] - 21:9, 35:25
**relied** [2] - 9:23, 12:6
**relying** [2] - 23:4, 27:18
**remain** [2] - 5:4, 16:20
**remains** [1] - 35:1
**remote** [1] - 50:19
**remotely** [2] - 36:4, 36:7
**report** [11] - 9:5, 12:6, 14:25, 18:9, 18:10,

29:12, 30:2, 39:10, 39:19, 42:17, 49:11
**Reporter** [3] - 2:21, 2:22, 57:10
**REPORTER** [1] - 57:1
**reports** [3] - 29:6, 29:17, 34:17
**representations** [2] - 17:1, 33:24
**represented** [1] - 28:22
**request** [5] - 12:13, 40:9, 41:20, 47:3, 54:20
**required** [1] - 7:6
**requirement** [1] - 12:13
**respect** [8] - 22:7, 24:11, 24:20, 27:7, 30:16, 31:21, 43:23, 56:8
**respects** [1] - 44:12
**responding** [1] - 54:12
**response** [1] - 26:14
**responsibility** [1] - 19:12
**rest** [1] - 47:6
**resting** [1] - 50:1
**restriction** [1] - 44:23
**restrictions** [2] - 43:18, 46:3
**results** [2] - 48:10, 50:14
**retain** [1] - 19:8
**reveal** [2] - 4:17, 4:19
**review** [28] - 6:5, 16:22, 16:24, 16:25, 17:10, 17:16, 17:22, 18:5, 18:10, 18:12, 19:24, 21:9, 30:1, 32:24, 34:3, 34:12, 34:21, 40:25, 41:25, 42:6, 42:24, 45:19, 46:10, 49:12, 52:22, 52:25, 55:3, 55:8
**reviewed** [9] - 5:14, 7:20, 11:3, 18:2, 18:3, 20:3, 20:5, 20:11, 29:11
**reviewing** [2] - 18:7, 33:16
**reviews** [3] - 18:7, 34:7, 41:15
**revised** [3] - 9:15, 9:22, 11:4, 11:4
**revising** [1] - 39:8
**Richter** [1] - 2:3
**rip** [1] - 38:18
**rise** [1] - 45:17

**risk** [2] - 41:19
**RMR** [2] - 2:21, 57:9
**road** [1] - 15:5
**Roman** [2] - 3:3, 3:11
**ROMAN** [1] - 1:5
**room** [10] - 21:23,
23:8, 28:25, 33:1,
40:25, 41:15, 42:1,
47:23, 49:10, 55:4
**Room** [2] - 2:22, 57:10
**roughly** [1] - 20:18
**Rule** [1] - 9:7
**rule** [2] - 29:20, 40:4
**ruling** [1] - 29:15
**run** [6] - 9:7, 13:8,
48:4, 48:5, 48:9,
53:3
**run-of-the-mill** [1] -
9:7

# S

**safer** [1] - 49:4
**San** [1] - 55:5
**sanction** [2] - 10:2,
10:3
**sanctions** [1] - 15:17
**satisfaction** [1] - 22:1
**saw** [2] - 14:20, 14:21
**schedule** [12] - 4:14,
24:24, 25:5, 27:21,
28:23, 30:12, 30:20,
32:21, 33:25, 34:2,
49:20, 52:12
**schedules** [3] - 49:13,
51:6, 54:5
**scheduling** [2] -
30:10, 32:14
**scratch** [2] - 28:6,
28:7
**scrubbed** [1] - 13:9
**seal** [1] - 4:15
**second** [2] - 27:25,
28:6
**secret** [2] - 9:13, 14:22
**secret-level** [1] -
14:22
**secrets** [1] - 41:13
**secure** [3] - 13:14,
38:19, 42:6
**see** [15] - 11:7, 13:24,
25:13, 29:3, 29:24,
30:21, 31:7, 36:25,
40:11, 48:10, 53:3,
53:22, 53:25, 54:19,
56:14
**seem** [1] - 16:7
**Sefranek** [3] - 2:21,
57:9, 57:9
**SEFRANEK** [1] - 57:3

**self** [1] - 42:13
**self-evident** [1] -
42:13
**seminar** [1] - 28:18
**send** [3] - 21:3, 31:17,
54:20
**sense** [3] - 23:7,
32:25, 33:4
**sensitive** [10] - 9:12,
10:5, 10:10, 12:16,
12:19, 14:22, 17:12,
18:24, 44:5, 44:24
**sent** [4] - 17:14, 17:25,
19:25, 20:10
**September** [2] - 1:6,
57:7
**serve** [1] - 9:3
**set** [3] - 33:5, 39:3,
55:5
**setting** [2] - 49:10,
55:2
**setup** [1] - 55:4
**shall** [3] - 45:11, 45:13
**shape** [1] - 16:5
**Sheppard** [1] - 2:3
**showing** [2] - 46:25,
47:8
**shown** [1] - 19:6
**shows** [1] - 23:14
**shuffle** [1] - 27:9
**side** [1] - 32:24
**sign** [10] - 7:7, 12:14,
19:16, 19:21, 20:7,
20:11, 20:24, 21:1,
42:17, 44:2
**signatory** [1] - 8:22
**signature** [1] - 19:20
**signed** [8] - 5:19, 6:4,
6:5, 8:22, 11:12,
17:4, 17:7, 18:5
**signing** [2] - 19:8,
20:21
**signs** [3] - 11:11, 19:3,
45:9
**simple** [1] - 47:19
**simply** [3] - 16:23,
17:14, 47:22
**single** [3] - 17:5,
20:10, 53:8
**sit** [4] - 26:13, 26:15,
26:24, 27:3
**site** [1] - 15:25
**sitting** [6] - 26:11,
30:23, 30:24, 52:13,
53:8, 54:7
**six** [1] - 53:9
**Sixth** [1] - 5:17
**small** [1] - 41:20
**software** [2] - 14:11,
48:6

**solely** [1] - 7:12
**solution** [4] - 12:21,
16:14, 16:17, 21:21
**solutions** [1] - 15:2
**someone** [6] - 17:21,
21:25, 28:8, 28:17,
30:14, 35:17
**sometime** [5] - 24:25,
25:5, 25:18, 47:6,
54:19
**somewhere** [2] - 13:3
**soon** [2] - 50:4, 55:3
**sorry** [5] - 3:23, 10:12,
10:13, 27:5, 36:19
**sort** [4] - 27:12, 34:12,
49:2, 52:11
**sound** [1] - 46:24
**sounds** [8] - 16:20,
17:24, 37:3, 44:21,
45:1, 46:13, 46:16,
52:2
**space** [6] - 10:24,
10:25, 13:3, 13:5,
21:15, 21:23
**specific** [1] - 24:7
**specificity** [5] - 18:19,
18:22, 26:18, 27:12,
38:3
**specifics** [1] - 30:5
**specifies** [1] - 45:2
**speed** [2] - 16:14, 33:4
**spells** [2] - 11:18,
11:23
**spending** [1] - 38:15
**staffed** [1] - 35:16
**stalker** [1] - 4:16
**stand** [4] - 3:22, 4:3,
4:7, 56:14
**standard** [1] - 7:20
**standing** [3] - 19:22,
46:15, 47:11
**stands** [1] - 14:24
**start** [4] - 3:20, 40:15,
49:24, 55:2
**started** [1] - 26:2
**starting** [2] - 3:5,
25:18
**state** [3] - 3:4, 37:4,
51:18
**statement** [3] - 28:14,
42:3, 42:14
**STATES** [3] - 1:1, 1:2,
1:9
**States** [4] - 2:22, 3:3,
3:7, 51:19
**stay** [1] - 34:6
**stealing** [1] - 41:13
**stenographic** [1] -
57:5
**steps** [1] - 32:13

**STERLINGOV** [1] - 1:5
**Sterlingov** [5] - 3:3,
3:11, 29:2, 39:23,
49:12
**stick** [1] - 39:5
**sticking** [2] - 34:13,
35:9
**Still** [3] - 30:9, 34:7,
50:21
**still** [53] - 4:25, 5:5,
5:19, 9:6, 10:14,
12:6, 13:6, 14:8,
14:24, 15:21, 15:22,
15:24, 16:2, 16:20,
17:19, 18:11, 21:7,
21:16, 22:4, 22:5,
22:9, 22:25, 24:12,
24:21, 28:14, 29:1,
29:25, 31:22, 32:3,
32:13, 33:2, 34:4,
34:6, 35:6, 35:13,
35:24, 36:12, 38:4,
38:19, 39:16, 41:15,
42:24, 45:8, 45:15,
45:16, 46:9, 46:10,
46:16, 47:18, 49:14,
52:21, 55:10
**still's** [7] - 16:24, 18:8,
33:12, 33:24, 35:14,
39:20, 41:25
**stole** [1] - 13:12
**stone** [2] - 30:14, 38:6
**Street** [2] - 1:13, 1:22
**stressed** [1] - 51:25
**strong** [3] - 9:14,
43:19, 46:1
**strongly** [1] - 43:20
**stuff** [7] - 10:5, 28:25,
29:1, 30:1, 33:16,
47:21, 48:14
**subject** [6] - 6:9,
15:17, 41:1, 44:7,
54:10
**submission** [1] - 52:7
**submit** [2] - 29:19
**submits** [1] - 16:23
**submitted** [1] - 4:13
**subsequent** [2] -
44:13, 44:19
**subsequently** [1] -
13:12
**substance** [1] - 14:2
**substantial** [1] - 5:9
**substantively** [1] -
11:19
**substitute** [1] - 24:18
**sue** [1] - 42:5
**suffering** [2] - 51:2,
51:7
**sufficient** [1] - 20:6,

21:1
**suggested** [2] - 15:7,
45:19
**suggesting** [1] - 23:16
**suggestion** [6] - 9:20,
9:22, 23:19, 32:17,
32:18, 40:25
**suggestions** [1] -
31:23
**suit** [3] - 15:17, 22:8,
22:21
**Suite** [1] - 2:4
**summer** [1] - 24:8
**supplemental** [5] -
29:6, 29:12, 29:17,
30:2, 49:11
**suppose** [1] - 48:5
**supposed** [2] - 39:6,
50:23
**surprise** [1] - 24:2
**surprised** [2] - 28:7,
53:4
**suspect** [2] - 33:11,
33:12
**suspicion** [1] - 48:21
**system** [3] - 39:6,
39:7, 45:13
**systems** [1] - 44:25

# T

**table** [1] - 3:7
**TAMARA** [1] - 57:3
**Tamara** [3] - 2:21,
57:9, 57:9
**TAUSEEF** [1] - 1:21
**team** [1] - 23:4
**tech** [1] - 22:2
**technical** [1] - 45:22
**technology** [2] - 9:24,
10:18
**telephone** [1] - 30:6
**ten** [1] - 37:25
**term** [1] - 17:8
**terms** [4] - 13:20,
32:4, 32:14, 43:17
**terribly** [1] - 30:7
**testified** [1] - 10:17
**testify** [7] - 16:25,
24:25, 35:20, 35:22,
36:9, 50:18, 53:15
**testifying** [5] - 36:4,
36:7, 36:10, 54:8,
54:12
**testimony** [8] - 10:21,
26:13, 30:25, 35:25,
50:20, 54:9, 54:13,
54:17
**testing** [1] - 30:12
**Thanksgiving** [2] -

33:23, 37:11
**THE** [111] - 1:1, 1:1,
1:8, 3:2, 3:9, 3:13,
3:18, 3:20, 4:2, 4:18,
5:4, 5:8, 5:18, 6:12,
6:16, 6:22, 7:6, 7:10,
8:6, 8:10, 8:13, 9:18,
10:12, 10:14, 11:6,
11:17, 12:11, 13:23,
15:9, 16:8, 16:10,
18:21, 20:12, 20:16,
21:4, 21:22, 22:11,
22:14, 22:23, 23:12,
25:7, 25:9, 25:13,
25:15, 25:19, 26:4,
26:9, 27:24, 28:5,
28:13, 29:7, 29:18,
30:4, 32:17, 33:5,
33:11, 33:18, 34:24,
35:23, 36:3, 36:19,
36:23, 36:25, 37:3,
37:7, 37:13, 37:22,
38:24, 39:23, 40:4,
40:8, 40:14, 40:18,
41:7, 41:22, 42:10,
42:20, 43:1, 43:6,
43:10, 43:22, 45:3,
45:20, 46:6, 47:2,
47:15, 48:3, 48:17,
48:25, 50:9, 51:1,
51:14, 52:4, 52:9,
52:16, 52:19, 53:13,
53:17, 53:21, 54:2,
54:18, 54:21, 54:24,
55:9, 55:13, 55:19,
55:21, 56:3, 56:7,
56:16, 56:21
**themselves** [1] - 22:8
**therefore** [1] - 31:8
**therein** [1] - 18:25
**they've** [1] - 28:11
**thinking** [1] - 20:16
**thinks** [1] - 43:12
**three** [3] - 20:16, 39:4,
46:11
**throw** [1] - 6:22
**tickets** [1] - 27:1
**timing** [1] - 46:19,
56:12
**TLN** [1] - 51:18
**today** [3] - 4:10, 21:3,
44:3
**tomorrow** [1] - 40:23
**ton** [1] - 32:5
**took** [1] - 51:5
**top** [2] - 20:15, 53:24
**TOR** [1] - 1:20
**Tor** [2] - 1:21, 3:10
**touch** [1] - 20:24
**touched** [1] - 20:10

**tough** [1] - 37:12
**traces** [1] - 47:19
**track** [2] - 43:13, 46:12
**trade** [3] - 9:13, 14:22,
41:13
**training** [2] - 35:15,
50:21
**transcript** [3] - 18:10,
57:4, 57:6
**TRANSCRIPT** [1] - 1:8
**transpired** [1] - 8:18
**travel** [2] - 33:25, 34:2
**traveling** [1] - 33:2
**travels** [1] - 33:14
**trial** [41] - 4:6, 4:7,
4:12, 5:1, 22:10,
24:10, 24:12, 25:9,
25:22, 25:24, 26:10,
27:11, 28:21, 30:18,
31:9, 34:7, 34:10,
34:14, 35:2, 35:19,
39:3, 42:25, 43:4,
43:14, 46:11, 46:16,
46:18, 46:20, 46:21,
49:20, 50:4, 51:6,
51:17, 51:18, 52:3,
52:12, 53:8, 53:11,
54:16
**tried** [1] - 8:16
**trip** [1] - 26:25
**trips** [1] - 24:19
**true** [5] - 27:17, 29:7,
46:25, 57:4, 57:5
**truly** [4] - 26:22, 35:3,
35:6, 47:11
**try** [5] - 37:19, 38:25,
53:25, 55:7, 55:15
**trying** [5] - 12:17,
12:20, 16:14, 34:16,
55:4
**turn** [1] - 10:5
**turned** [1] - 27:17
**turns** [2] - 47:4, 48:3
**two** [6] - 13:24, 26:19,
42:15, 52:21, 53:7,
53:14
**type** [3] - 10:22, 35:12,
46:3

### U

**U.S** [3] - 1:15, 13:4,
52:15
**u.S** [1] - 1:18
**UK** [3] - 36:1, 36:8,
36:11
**ultimately** [1] - 21:9
**unable** [2] - 31:6,
31:11
**unavailability** [3] -

24:23, 32:20, 46:25
**unavailable** [7] -
24:22, 25:20, 26:22,
27:14, 27:15, 35:4,
50:18
**unaware** [1] - 10:17
**uncertain** [2] - 38:7,
49:4
**uncertainty** [1] - 49:8
**under** [12] - 4:15, 5:24,
11:20, 13:20, 13:25,
14:8, 24:23, 38:17,
38:19, 38:20, 44:8,
45:9
**undergone** [1] - 18:11
**understandably** [1] -
43:20
**understood** [4] - 4:22,
17:18, 28:20, 48:22
**undertaking** [1] -
19:17
**unencumbered** [1] -
26:21
**UNITED** [3] - 1:1, 1:2,
1:9
**United** [4] - 2:22, 3:3,
3:7, 51:19
**unrelated** [1] - 30:25
**up** [25] - 4:3, 4:23,
5:18, 8:18, 14:4,
15:21, 16:4, 16:14,
19:22, 21:20, 24:11,
25:25, 31:13, 33:4,
33:5, 38:18, 39:12,
39:16, 40:24, 43:11,
43:21, 49:10, 51:24,
55:2, 55:5
**update** [2] - 3:21,
40:16
**USAO** [1] - 1:12
**USAO-DOJ** [1] - 1:12
**useful** [1] - 29:13
**uses** [3] - 10:18,
15:14, 17:7
**utterly** [1] - 24:22

### V

**vacate** [2] - 6:23, 6:24
**vacating** [1] - 6:24
**vagaries** [1] - 33:15
**vanishingly** [1] -
41:20
**vendor** [2] - 8:3, 8:5
**Verret** [1] - 50:15
**versa** [1] - 22:4
**versus** [1] - 55:4
**via** [1] - 32:16
**VIA** [1] - 2:2
**vice** [1] - 22:4

**video** [1] - 3:15
**view** [1] - 21:4
**viewed** [2] - 10:11,
43:18
**viewing** [1] - 17:16
**violation** [2] - 5:17,
14:7
**virtually** [1] - 33:3
**vs** [1] - 1:4

### W

**wait** [1] - 37:15
**waiting** [1] - 16:18
**Wall** [1] - 1:22
**wall** [2] - 15:21, 15:23
**wants** [10] - 13:8,
16:21, 34:6, 40:20,
44:22, 48:4, 48:5,
48:12, 54:9, 56:17
**Washington** [7] - 1:5,
1:13, 1:16, 1:19, 2:4,
2:23, 57:11
**ways** [1] - 23:20
**week** [4] - 31:17, 50:2,
51:21, 52:13
**weeks** [3] - 46:11,
51:5, 53:9
**welcome** [1] - 31:22
**West** [1] - 33:2
**whatsoever** [1] - 44:9
**whereabouts** [1] -
4:20
**whispered** [1] - 28:8
**whole** [3] - 6:9, 23:8,
27:22
**willing** [1] - 40:21
**window** [2] - 25:21,
37:20
**wiped** [3] - 21:15,
22:1, 22:3
**wiping** [1] - 45:23
**witness** [1] - 21:7,
21:8, 37:12, 46:14,
46:25, 47:3, 54:9,
54:10, 54:11
**witnesses** [11] - 19:6,
25:3, 26:22, 27:7,
27:16, 28:9, 37:9,
37:10, 37:18, 38:2,
46:19
**wondering** [1] - 26:20
**workable** [2] - 13:15,
38:14
**worry** [1] - 13:11
**writ** [2] - 17:25, 41:11
**writing** [1] - 10:16
**written** [1] - 52:25
**wrongfully** [1] - 15:17

### Y

**yesterday** [1] - 5:2
**York** [2] - 1:18, 1:22
**you-all** [1] - 38:25

### Z

**ZOOM** [1] - 2:2
**Zoom** [9] - 30:9,
32:16, 32:21, 53:21,
53:22, 53:25, 54:20,
54:21