IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,

Plaintiff,

vs.

ROMAN STERLINGOV,

Defendant.
_____________________________/

Criminal Action No. 1: 21-399

Washington, DC
March 4, 2024

9:38 a.m.

MORNING PROCEEDINGS

TRANSCRIPT OF JURY TRIAL
BEFORE THE HONORABLE RANDOLPH D. MOSS
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Plaintiff:

CATHERINE PELKER
U.S. DEPARTMENT OF JUSTICE
950 Pennsylvania Ave NW
Washington, DC 20530

CHRISTOPHER BRODIE BROWN
DOJ-USAO
601 D Street, N.W.
Suite 5.1527
Washington, DC 20530

JEFFREY PEARLMAN
DOJ-CRM
Ccips
US Dept of Justice
1301 New York Ave NW
Washington, DC 20005

APPEARANCES CONTINUED ON NEXT PAGE

APPEARANCES CONTINUED

For the Defendant:

TOR EKELAND
MICHAEL HASSARD
TOR EKELAND LAW PLLC
30 Wall Street
8th Floor
Brooklyn, NY 10005

Court Reporter:

SHERRY LINDSAY
Official Court Reporter
U.S. District & Bankruptcy Courts
333 Constitution Avenue, NW
Room 6710
Washington, DC 20001

TABLE OF CONTENTS

WITNESSES

Steven Santell

| | |
|---|---|
| Direct examination continued by Ms. Pelker | 5 |
| Cross-examination by Mr. Ekeland | 11 |
| Redirect examination by Ms. Pelker | 27 |

John Verret

| | |
|---|---|
| Direct examination by Mr. Ekeland | 80 |

EXHIBITS

| | |
|---|---|
| Defense Exhibit 130 | 17 |
| Defense Exhibit 129 | 88 |
| Defense Exhibit 128 | 99 |

P R O C E E D I N G S

THE COURTROOM DEPUTY: Criminal case 21-399, *United States of America versus Roman Sterlingov*.

Would counsel please approach the podium state and their name for the record, starting with government counsel.

MR. BROWN: Good morning, Your Honor. AUSA Chris Brown for the government and with me at counsel table are C. Alden Pelker and Jeffrey Pearlman.

THE COURT: All right. Good morning.

MR. EKELAND: Good morning, Your Honor. Tor Ekeland for Defendant Roman Sterlingov, who is present in court. And joining me at counsel table is Michael Hassard.

THE COURT: Good morning.

Do we have the final juror, do you know?

THE COURTROOM DEPUTY: We should.

THE COURT: We were waiting on one last juror.

THE COURTROOM DEPUTY: Yes, Judge.

THE COURT: Anything to raise before we get the jury?

MR. BROWN: No, Your Honor.

THE COURT: All right. We can get the witness back in the witness box.

Okay. And we can get the jury.

(Jury in at 9:27 a.m.)

THE COURT: All right. All right. You may continue.

MS. PELKER: Thank you.

If we could pull up Exhibit 623.

DIRECT EXAMINATION CONTINUED

BY MS. PELKER:

Q. And while that is coming up, Special Agent Santell, when we stopped for the weekend on Friday, you were beginning your testimony about Welcome to Video. Can you remind the jury what Welcome to Video was?

A. Yes. Welcome to Video was a child pornography site allowing users to upload and download child pornography images and videos.

Q. Showing you Exhibit 623, which was previously admitted. Did you review records corresponding to particular users at Welcome to Video who had received funds through Bitcoin Fog?

A. I did.

Q. And are the users whose records you reviewed and their corresponding Bitcoin addresses shown here on this table?

A. They are.

MS. PELKER: If we could pull up Exhibit 623. And 623, and the following exhibits I believe we did -- 624, apologies.

And, Your Honor, we had previously admitted an unredacted version of 624 with Mr. Luke Scholl. And we had cut off the columns. We would just now move to withdraw that exhibit and replace it with this exhibit, which is the same but reflecting the redactions that had been discussed.

THE COURT: All right. With the parties' agreement Exhibit 624 is substituted for the prior exhibit in the redacted form.

BY MS. PELKER:

Q. Special Agent Santell, can you explain to the jury what is shown here in this record?

A. Yes. This is a record of downloaded videos from the username that you can see in column B.

Q. And if we could scroll over to the left. Is that Bitcoin address in column A the deposit address for the assigned user?

A. Yes.

Q. And without speaking to the specifics of the -- you reviewed an unredacted version of this exhibit?

A. Yes.

Q. And without speaking to the specific contents of the columns F, G and H, generally what was this user's activity on Welcome to Video?

A. For child pornography.

Q. Pulling up Exhibit 625 and scrolling over to the left. And what is shown here?

A. This is the downloads for the username in column B Billy Bob 1337.

Q. Is the Bitcoin address in 1AK19 the Welcome to Video deposit address for Billy Bob 1337?

A. That's correct.

Q. If we could pull up Exhibit 626.

THE COURT: So are we doing the same thing for all of those where I should be substituting all of those exhibits?

MS. PELKER: We only admitted 624 through Mr. Scholl.

THE COURT: I see.

MS. PELKER: And then when we admitted the exhibits -- we did admit all of the exhibits on Friday. When we were going back to rectify the exhibit list, we realized there were two versions of the same exhibit.

THE COURT: All right. Fine. Thank you.

BY MS. PELKER:

Q. And, Special Agent Santell, what is shown in this exhibit?

A. The downloads file for the user in column B, user 2A387.

Q. And what are the first several characters of that Bitcoin address in column A?

A. 17DQYVZ.

Q. Pulling up Exhibit 627. And what is the user whose records are shown here?

A. TUKOGB1.

Q. What are the first several characters of this user's Bitcoin address?

A. 12S7WS.

Q. 628A. And can you explain what is shown here?

A. The downloads for Slammer 88.

Q. What are the first couple of characters of the Bitcoin

address for Slammer 88?
A. 12M2V.
Q. Can you read the date in the third row?
A. Yes. 11/11/2017.
Q. And moving now to Exhibit 628B. And is this another record for that same user, Slammer 88?
A. That is correct.
Q. And what is the difference between this record and the record that we saw in 628A?
A. So these are the uploads where the one previous was the downloads.
Q. Can you explain the distinction on Welcome to Video on the uploads and downloads?
A. Yes. Uploading means you are taking some type of child pornography and sending it to the site and downloads would be the reverse where you are downloading it from the site.
Q. Did some Welcome to Video users like Slammer 88 do both?
A. Correct.
Q. Pulling up Exhibit 629. And scrolling to the left. What user and Bitcoin address are shown sheer?
A. User in column B, Geegeegee, G-E-E-G-E-E-E-G-E-E. And the first several of the Bitcoin address would be 12HWC.
Q. Exhibit 630A. What is the user shown here?
A. I-L-B-E-1.
Q. And the first couple of characters of the Bitcoin address?

A. 1MB2M.
Q. Can we scroll down to the bottom of this spreadsheet?
THE COURTROOM DEPUTY: Ms. Pelker, is 630A already in evidence?
MS. PELKER: Yes. I believe we admitted this whole series of 624 through 633, including the subparts.
THE COURTROOM DEPUTY: Okay. Give me one second.
Yes, I see it. You're right.
BY MS. PELKER:
Q. If we could scroll down to the bottom of Ilbe1's download records. Special Agent Santell, is this a list of all of the different videos that Ilbe1 using the Bitcoin address 1MB2 downloaded from Welcome to Video?
A. Yes.
Q. And can you read the date in row 945?
A. 3/4/2018.
Q. If we could pull up 630B. Are these additional records for Ilbe1?
A. That is correct.
Q. What is shown here?
A. This is the uploads for Ilbe1.
Q. If we could pull up Exhibit 631. What user activity is shown here?
A. Derrickk, D-E-R-R-I-C-K-K.
Q. And are these the downloads for the user Derrickk using

the Bitcoin address 1H8?

A. Correct.

MS. PELKER: Exhibit 632. And, Ms. Walker, if we -- we may have not included 632 and 633 in our prior batch admission. Does the Court have a record either way on that?

THE COURTROOM DEPUTY: I have -- because I have two separate exhibit lists. I have up to 633.

MS. PELKER: Okay. Thank you.

BY MS. PELKER:

Q. So directing your attention to 632, which is published to the jury. Can you explain what is shown here?

A. This is the downloads for user Rabdark, R-A-B-D-A-R-K.

Q. Is that using the Bitcoin address 1FCV?

A. Correct.

Q. Can we scroll down to the bottom of this exhibit?

What is the date that is reflected in row 254 for this download?

A. 2/10/2018.

Q. Now, pulling up the last one, Exhibit 633.

And what is shown here?

A. Those are the downloads for WaltonTarget, W-A-L-T-O-N-T-A-R-G-E-T.

Q. Is that using the Bitcoin address 1BMKM?

A. It is.

Q. If we can return to Exhibit 623.

Does this list of Bitcoin Fog users correspond to the Welcome to Video users whose child sexual abuse material downloads we just reviewed?

A. Correct.

MS. PELKER: No further questions, Your Honor.

THE COURT: All right. Mr. Ekeland.

CROSS-EXAMINATION

BY MR. EKELAND:

Q. Good morning, Mr. Santell.

A. Good morning.

MR. EKELAND: May I proceed, Your Honor?

THE COURT: You may.

MR. EKELAND: Thank you.

BY MR. EKELAND:

Q. The government shut down Silk Road in 2013?

A. I believe so, that is correct.

Q. And that was nine years before you became an FBI agent?

A. That's correct.

Q. And that was eight years before Roman Sterlingov was arrested?

A. I believe so.

Q. And you didn't work on this case until after Mr. Sterlingov was arrested?

A. That's correct.

Q. And you did all of that work from your desk?

A. That is correct.
Q. And you never went to Sweden to investigate this case?
A. No.
Q. And you never interviewed any eyewitnesses?
A. No.
Q. And as a matter of fact, you can't name one eyewitness who has ever said that Mr. Sterlingov operated Bitcoin Fog?
MS. PELKER: Objection. Well beyond the scope of this witness' testimony.
THE COURT: Sustained.
BY MR. EKELAND:
Q. Mr. Sterlingov was in Sweden in 2013?
MS. PELKER: Objection; beyond the scope.
THE COURT: Sustained.
BY MR. EKELAND:
Q. Mr. Sterlingov wasn't the administrator of Silk Road, was he?
A. That correct.
Q. That was Ross Ulbricht?
A. Yes.
Q. Mr. Ulbricht is serving a life sentence in a maximum security prison right now?
MS. PELKER: Objection, Your Honor.
THE COURT: Sustained.
BY MR. EKELAND:

Q. You got no evidence of Mr. Sterlingov ever communicating with Mr. Ross Ulbricht?

A. Not to my knowledge.

Q. And you have no evidence of Mr. Sterlingov ever communicating with any darknet market administrators?

A. To my knowledge, no.

Q. And you have no evidence of Mr. Sterlingov administered any darknet marketplaces?

A. From what I reviewed for this trial in terms of the Silk Road and Silk Road 2 and for Welcome to Video, no.

Q. Now, Mr. Sterlingov, I think according to your testimony, did buy some LSD and mescaline in 2011 and 2012 from Silk Road; correct?

A. I believe so, correct.

MR. EKELAND: And, Mr. Hassard, if we could put up Government Exhibit 603S, which I believe is in evidence.

THE COURTROOM DEPUTY: I'm sorry. 603, what letter?

MR. EKELAND: S, as in Sally.

THE COURTROOM DEPUTY: Yes. Yes, it was.

BY MR. EKELAND:

Q. And, Mr. Hassard, if we could scroll over all of the way to the left, the other way.

And this is the record of those transactions; is that correct?

A. Yes.

Q. And the first two transactions those are on July 25th, 2011?

A. Yes. That is the finalized time. It is not when the transaction started.

Q. I see over on the right, are those the July 15th and July 16th, are those the transaction dates?

A. That is when it was created, yeah.

Q. That was before Bitcoin Fog came into existence; correct?

A. I cannot recall the exact date of when Bitcoin Fog came into existence.

Q. And that last one there on May 28th, 2012, that is after Bitcoin Fog came into existence; correct?

A. I cannot recall the date of the exact existence.

Q. And these transactions -- Mr. Hassard, if we could scroll over, I think there is an amount somewhere here. Right there.

These transactions were for, I think, roughly right there, what is that, about 175 US dollars?

A. We could round to that, sure.

Q. Okay. Round about. You can take that down, Mr. Hassard. And if we could put up what is in -- I believe is in evidence as Government Exhibit 603H, as in Harry.

THE COURTROOM DEPUTY: Yes.

BY MR. EKELAND:

Q. And is this a June 13th -- a June 12th, 2013 transaction where Mr. Sterlingov was buying some LSD?

A. Correct.

Q. And between this record and the last one that you looked at, those are all of Mr. Sterlingov's drugs purchases on Silk Road?

A. Of what I reviewed, I believe so, correct.

Q. And, Mr. Hassard, if we could put up Government Exhibit -- what I believe is in evidence of Government Exhibit 603A?

THE COURTROOM DEPUTY: I don't have 603A. Wait a minute. Hold on.

Yes. I'm sorry.

MR. EKELAND: Is it --

THE COURTROOM DEPUTY: Yes.

MR. EKELAND: Thank you.

BY MR. EKELAND:

Q. And, Mr. Santell, you recognize this spreadsheet?

A. I believe so, yes.

Q. And this is a list of all of the transactions that Mr. Sterlingov did on Silk Road minus the -- I think two of the drug transactions; correct?

A. I don't see them side by side, but it seems that is the case.

Q. Directing your attention to this transaction on November 27th, 2011, do you see that?

A. Uh-huh.

Q. Do you see how it says deposit and withdrawal there?

THE COURTROOM DEPUTY: Mr. Ekeland, hold on one second. I don't think 603 is in, 602A, not 603A.

MR. EKELAND: This isn't in evidence?

THE COURTROOM DEPUTY: You're doing 603A?

MR. EKELAND: Yes.

THE COURTROOM DEPUTY: I think 602A is in evidence, not 603.

602A is in evidence, 603 is not.

MR. EKELAND: Well, let me lay a foundation I think and --

THE COURT: I'm sorry.

BY MR. EKELAND:

Q. So, Mr. Santell, you recognize this spreadsheet though; right?

A. I recognize the columns and material of the spreadsheet.

Q. And this spreadsheet is based on the records that the FBI has from Silk Road?

A. I mean, I don't have everything memorized word for word like the reference number or specific amounts, but as far as I can tell the like the data appears to be the same.

Q. And you have no reason to think this is an inaccurate representation of the Silk Road data as produced by the United States government?

A. No.

MR. EKELAND: Your Honor, at this time, the defense

moves to put into evidence what has been marked for identification as Government Exhibit 603A.

THE COURT: I think it should be Defendant's Exhibit, if you are moving it.

MR. EKELAND: Defendant's Exhibit -- this is what has been marked for identification as Government Exhibit 603A to move into evidence as what I believe would be Defendant's Exhibit 130.

THE COURT: 130, any objection?

MS. PELKER: No, Your Honor. I believe there is a different version of this spreadsheet that was admitted. And we were just trying to find the reference number, but we have no objection to just moving this one in.

THE COURT: So Defendant's Exhibit 130 is admitted and may be published to the jury.

(Whereupon, Defendant's Exhibit No. 130 was admitted.)

BY MR. EKELAND:

Q. And thank you.

Mr. Santell, then just directing your attention down to that November 27th, 2011 transaction. Do you see that?

A. Yes.

Q. Do you see there under the time where it says deposit and withdrawal?

A. Uh-huh.

Q. It doesn't indicate that November 27th, 2011, transaction involved any kind of purchase, does it?

A. It just shows deposit and withdrawal.

Q. Mr. Hassard, if we could take that down and put up Government Exhibit 316?

THE COURTROOM DEPUTY: 316.

MR. EKELAND: 316.

MS. PELKER: Your Honor, we are going to object to this line of questioning as beyond the scope of this witness' testimony and expertise.

MR. EKELAND: Your Honor, this witness was brought in to discuss the Silk Road transactions. He testified as to Mr. Sterlingov's Silk Road transactions. And I am merely asking him about his knowledge of Mr. Sterlingov's Silk Road transactions.

THE COURT: You can do so, but I agree. I don't see how Exhibit 316 has anything to do with it. Exhibit 316 is a tracing.

MR. EKELAND: I will connect it.

THE COURT: I am not going to let you until you have established to me there is some basis for asking him about this exhibit, which is way beyond his area of expertise.

MR. EKELAND: Your Honor, the transaction that we last just looked at dated November 27th, 2011 is this transaction right there.

THE COURT: Slower.

MR. EKELAND: You see the underlying transaction, that is the same transaction that we were just talking about.

THE COURT: I think you can ask him about the date. I don't see -- he doesn't know anything about tracing. It is beyond the scope. It is not in his area of expertise.

MR. EKELAND: I am asking him about the transaction.

THE COURT: You can ask him about the date of the transaction, but I don't think he knows anything about the chart.

MR. EKELAND: Can I ask him about the chart and see what he knows about it?

THE COURT: You can ask him about the date. But I don't think you should go beyond that because he is just not an expert in this field at all.

MR. EKELAND: Your Honor, it was just my understanding that the tracing isn't expert testimony in relation to what the Court said in relation to Mr. Price and also Mr. Rovensky when they discussed the -- I am not asking him about the tracing, so why don't I just ask my question and then I will move on.

THE COURT: That is fine.

MR. EKELAND: Thank you.

BY MR. EKELAND:

Q. So, Mr. Santell, do you see the box in the square that is

Silk Road -- labeled Silk Road?

A. Right below the road, yeah.

MS. PELKER: Your Honor, Mr. Ekeland, I'm sorry. The jurors are just indicating they can't actually see this on their screen.

MR. EKELAND: Thank you.

THE COURTROOM DEPUTY: Okay.

MR. EKELAND: Can everybody see it? Thank you.

BY MR. EKELAND:

Q. So, Mr. Santell, you see the box in the Silk Road there?

A. Yes, on the right.

Q. And you see the user it says, Pas, P-A-S?

A. I see it.

Q. That was Mr. Sterlingov's Silk Road username?

A. To my knowledge, yes.

Q. You see the date right above the box where it says November 27th, 2011?

A. Yeah.

Q. That was the same date of the last transaction that we just spoke about?

A. I believe so, correct.

Q. That transaction just involved a deposit and a withdrawal?

A. It showed a deposit and a withdrawal.

Q. And it didn't reference any purchase?

A. It just showed a deposit and withdrawal.

MR. EKELAND: Okay. You can take this down, Mr. Hassard.

BY MR. EKELAND:

Q. Do you recall testifying about some Silk Road vendors on Friday?

A. I do.

Q. But you don't have any evidence of Mr. Sterlingov ever communicating with Symbiosis?

A. I didn't review files for those.

Q. You don't have any evidence of Mr. Sterlingov ever communicating with Tyler Durden?

A. I didn't review anything for that.

Q. I'm sorry. I didn't understand you.

A. I didn't review any messages between the two.

Q. You don't have any evidence of Mr. Sterlingov ever communicating with Budworx?

A. No, I didn't review any messages for those two.

Q. You don't have any evidence of Mr. Sterlingov ever communicating with UK Grow Tek?

A. I don't have any evidence for those messages.

Q. And you don't have any evidence of Mr. Sterlingov ever communicating with, is it RoxiPal?

A. RoxiPal. I didn't review any messages.

Q. And you don't have any evidence of Mr. Sterlingov ever communicating with West Coast RX?

A. I didn't review any messages.

Q. And you don't have any evidence of Mr. Sterlingov communicating with MarijuanaIsMyMuse?

A. I didn't review any messages for those.

Q. Can you tell me the percentage of Silk Road transactions that occurred in Sweden?

MS. PELKER: Objection; relevance.

THE WITNESS: I don't have that data.

MR. EKELAND: Your Honor, they brought in testimony about the locations of certain transactions and certain dealers, so I am merely asking the witness' knowledge of the transaction flow in Silk Road.

THE COURT: I don't -- I mean, I don't -- it is beyond the scope. I don't think this witness has any foundation that he has studied Silk Road's transactions generally across the board. And I think it is beyond the scope. And also I don't think he has established any expertise in the topic of the overall Silk Road transactions, so sustained.

MR. EKELAND: Understood, Your Honor.

BY MR. EKELAND:

Q. Mr. Santell, Silk Road sold clothing?

A. It had an apparel section.

Q. It sold jewelry?

A. Yes. It had a jewelry section.

Q. It sold books?
A. It did have a book section.
Q. Just turning briefly to your attention to Welcome to Video which you just testified to. Do you recall that?
A. Yes.
Q. Welcome to Video operated in South Korea?
A. In South Korea is where the --
Q. And it started in --
THE COURT: You have got to let him finish.
MR. EKELAND: I just didn't hear him.
THE WITNESS: It was South Korea, that is correct.
BY MR. EKELAND:
Q. It started in 2015?
A. I believe so. I don't have the date.
Q. And the South Korean government shut it down in 2018?
A. I believe that is the case.
Q. No funds ever went from Welcome to Video to Bitcoin Fog, did they?
A. From what I reviewed for the case was those spreadsheets.
Q. Only about $989 worth of direct transfers went from Bitcoin Fog to Welcome to Video?
A. If that is the number. I did not review that number.
Q. And you have no evidence that Mr. Sterlingov knew anything about those flows?
A. I only reviewed what is on the spreadsheets.

Q. And only about $846 indirectly went to Bitcoin Fog to Welcome to Video?

MS. PELKER: Objection.

THE COURT: I'm sorry. There is an objection. What is the objection?

MS. PELKER: The witness has testified this is beyond what he reviewed for this case. All he did was review the spreadsheets.

MR. EKELAND: He was testifying about Welcome to Video and its interaction with customers, so I am merely following up on the depth of his knowledge.

THE COURT: I will just remind the jury that questions from lawyers are not evidence in the case. And you should disregard the questions. You should rely on the answers, if there are any.

BY MR. EKELAND:

Q. You have zero evidence of Mr. Sterlingov ever communicating with the administrator of Welcome to Video; correct?

A. I only reviewed what is on the spreadsheets.

Q. There is not a trace of child pornography or anything related to it on any of the devices that Mr. Sterlingov -- that government seized from Mr. Sterlingov?

MS. PELKER: Objection.

THE COURT: Sustained. Beyond the scope. It is just

not what the witness is testifying about.

BY MR. EKELAND:

Q. Turning your attention to Silk Road 2.0. Do you recall testifying about that?

A. Uh-huh.

Q. The government shut down Silk Road 2.0 in 2014?

A. I believe that is correct.

Q. And I think you testified that Mr. Sterlingov had an account on Silk Road 2.0?

A. For Pas, correct.

Q. But that account never conducted a single transaction; correct?

A. The spreadsheet we showed, showed no transaction.

Q. And you have zero evidence that Mr. Sterlingov ever communicated with the administrator of Silk Road 2.0?

A. I didn't review any messages.

Q. In relation to the Silk Road 2.0 vendors, you have got zero evidence that Mr. Sterlingov ever communicated with Chemical Brothers?

A. I didn't review any messages.

THE COURT: I'm sorry. Just to pause here for a second -- the phrasing of the questions here when you say you have zero evidence. I think you can ask what he has reviewed. You shouldn't be asking about sort of the things that may be beyond the scope of his knowledge or his testimony. You can

 ask whether he has reviewed any evidence of it. I think it is important you clarify.

MR. EKELAND: Understood, Your Honor.

BY MR. EKELAND:

Q. Are you aware of any evidence of Mr. Sterlingov communicating with Mario Gram Shoppe?

A. I didn't review any evidence for that.

Q. Are you aware of any evidence of Mr. Sterlingov communicating with Crystal Buddha?

A. I didn't review any evidence for that.

Q. Are you aware of any evidence of Mr. Sterlingov communicating with Shine Cartel?

A. I did not review any evidence of that.

Q. Are you aware of any evidence of Mr. Sterlingov communicating with Budworx?

A. I did not review any evidence of that.

Q. Are you aware of any evidence of Mr. Sterlingov communicating with Trevor Phillips?

A. I did not review any evidence of that.

Q. Are you aware of any evidence of Mr. Sterlingov communicating with any vendor on Silk Road?

A. I did not review any evidence of that.

MR. EKELAND: No further questions, Your Honor.

THE COURT: All right. Any redirect?

MS. PELKER: Just briefly, Your Honor.

REDIRECT EXAMINATION

BY MS. PELKER:

Q. Special Agent Santell, what was it you were asked to review and testify about for your testimony last week and this week?

A. What I testified to, the spreadsheets.

Q. And did you work on the underlying cases for Silk Road, Silk Road 2.0 or Welcome to Video?

A. I did not.

Q. So was your testimony based on your review of the records that were provided to you by those case teams?

A. That is correct.

Q. When Mr. Ekeland was asking you about whether you had seen communications between the defendant and vendors, is your answer based on your review of the particular spreadsheets for your limited testimony here?

A. That is correct.

Q. So do you know, one way or another, if those communications do exist just outside of the spreadsheets that you reviewed?

A. I do not.

MS. PELKER: No further questions, Your Honor.

THE COURT: All right. The witness is excused. Thank you.

THE WITNESS: Thank you.

MS. PELKER: Your Honor, the government rests.

THE COURT: All right. Thank you. So that concludes the government's presentation of the evidence in the case and the defense can call its first witness.

MR. EKELAND: Your Honor, can we get on the phone?

THE COURT: Yeah.

(Conference held at the bench.)

MR. EKELAND: Your Honor, one thing at this point in time, Your Honor, the defense moves for a directed verdict on the basis that the government hasn't met its factual burden and no reasonable juror could conclude based on the government's case that Mr. Sterlingov is guilty.

THE COURT: All right. Government have a response?

MR. PEARLMAN: Your Honor, I am not sure how much you want me to respond at length. But briefly we think that the evidence here is overwhelming. There was a long-running conspiracy that ran from the time that he implemented Bitcoin Fog. And the conspiracy essentially paused just as he was arrested. He essentially incorporated and enabled Bitcoin Fog in October and November 2011. Bitcoin Fog ran for several years. It took in hundreds of millions of dollars. And the administrators of Bitcoin Fog made very clear they were aware where their money were coming from and the defendant himself has statements concerning knowledge of such things as Silk Road and money laundering. The majority of the money sent to

Bitcoin Fog came from darknet markets. And that this was -- there are posts from Akemashite Omedetou that this was to avoid authorities. He misrepresented the proceeds that he had received from Bitcoin Fog in interacting with such exchanges as Bitstamp and which was consistent with someone's seeking to avoid authorities. And it also shows consciousness of guilt. And there is no record, of course, of anyone registering the Bitcoin Fog site. Even though the thing -- even though he had an obligation to register with DISB and FinCEN. And the omission, we would argue, is sufficient to withstand attack under those two charges.

Does Your Honor want me to continue more into the specific charges?

THE COURT: Let me see if Mr. Ekeland has anything else to add at this point.

MR. EKELAND: Just the government hasn't established beyond a reasonable doubt that Mr. Sterlingov is Akemashite Omedetou. None of their witnesses made any particular identification. They were very vague about it. Ms. Mazars even at the end of her testimony changed the conclusion that she mentioned in her expert report. And she even herself said -- and she is the one witness that the government brought in to do the IP analysis, that she wasn't making any attribution. The government keeps saying, oh, it is the totality of the case. But they can't name one specific

instance where there is any evidence of Mr. Sterlingov ever operating Bitcoin Fog. They themselves have said, oh, well, these traces, they are consistent with a peer-to-peer exchange at Bitcoin, the logging in on the user and the Bash scripts that are on Linux, they are consistent with Mr. Sterlingov logging in with his home computer. And they have the burden of proof. And they have not adduced a single shred of evidence that ever shows Mr. Sterlingov operating Bitcoin Fog. Their entire case is innuendo. There is a 10-year period where they don't have any evidence. Their entire case is based on DNS registration they can't even attribute to Mr. Sterlingov except through a convoluted trace where on the first step in that trace going from Mt. Gox account number 1, they admit they don't have the private keys. And it is entirely consistent with the peer-to-peer or the sale of Bitcoin. This entire case is innuendo. The government hasn't met its factual burden.

THE COURT: All right. I am going to deny the motion and conclude there is sufficient evidence for a reasonable jury to conclude beyond a reasonable doubt that Mr. Sterlingov was, in fact, the operator of Bitcoin Fog.

MR. EKELAND: And, Your Honor, aside from that issue, is the issue of the slide deck as the first witness is Professor Verret. And it is my understanding the government still has some objections to the slide deck that we were discussing on Friday.

THE COURT: Okay. Mr. Brown, is that your issue?

MR. BROWN: Yes, Your Honor. And I think our issues are -- I mean, we tried to be very particular in our objections. So I am happy to walk through it. I don't know if it would make sense to give the jury a break to allow us to walk through slide by slide.

THE COURT: I think I better do that. Okay. Thank you.

(End of bench conference.)

THE COURT: All right. Members of the jury, we are going to take a break. I have to address some questions with the lawyers. And rather than making you sit here while I do it, I will let you take a break. And I will remind you, even though the government has now concluded the presentation of the case, don't discuss the case among yourselves, don't conduct any research in any way relating to the case.

Why don't we take a break until 10:25? So I will see you back here at 10:25.

(Jury out at 10:04 a.m.)

THE COURT: All right. Am I going -- I left back in chambers my copy of the notes from the ruling on the *Daubert* hearing and the copies of the transcripts that I went through over the weekend. Should I grab those for this or is it more just a question of whether some of the slides need to be removed?

MR. BROWN: Your Honor, I think it would probably be helpful for the Court to --

THE COURT: So let me step off the bench and grab that. I will be right back.

(Recess taken at 10:05 a.m.)

THE COURT: All right. You may proceed.

MR. BROWN: Yes, Your Honor. So I have a copy of the proffered defense slides in front of me. Our first objection is to the second slide that is entitled, standard forensic principles. And our objection here is that the content of the slides seems to be talking about Professor Verret's qualifications. Our objection is to the reference to the forensic principles. During the pretrial *Daubert* hearings, the Court expressed concerns that to the extent that Professor Verret is purporting to testify as to whether the case or his analysis of the government's case meets or doesn't meet forensic principles, principles of forensic accounting. It is not relevant, because that is not the standard against which the jury is judging the conduct here. And there is a 403 risk of confusing the jury and confusing the issue. So just the reference to forensic principles is --

THE COURT: So maybe we should take these one at a time. Do you want to respond on that, Mr. Ekeland?

MR. EKELAND: I think -- I don't think that this is a 403 issue. I think this is just Professor Verret discussing

the standards that are used in forensic accounting. And I think it would be helpful for the jury to understand that he is just not using an arbitrary methodology, that he is following standards that he has been trained in and he has been certified on. I don't see really what the issue is with simply discussing the industry-wide internationally recognized forensic standards when it comes to accounting. And I will note that the government's expert, Sarah Glave, also had I think some forensic accounting credentials that were noticed to the Court. I don't see this as -- I don't really understand.

THE COURT: The question is are you describing his credentials? Because Mr. Brown is correct that at the *Daubert* hearing I did rule on 403 grounds that Professor Verret should not testify that the tracing that was done here is inconsistent with the standards of forensic accounting or standards of fraud examination.

MR. EKELAND: I don't intend to have him testify as to the tracing not being in accordance with the financial forensic standards. I wasn't --

THE COURT: So I guess I am still puzzled.

MR. EKELAND: He is discussing what standard forensic principles are, what his training are in those principles and what principles he is using to arrive at his expert opinion in this case.

THE COURT: But is that just a -- what I am trying to

figure out is that just a roundabout way of saying what I said you couldn't say? He is not talking about tracing, fair enough. But I think what I held at the *Daubert* hearing was that -- let's see. And I have got it all in front of me here. Was that on the first day of the -- the September 8th day? Does anyone recall?

Do you recall, Mr. Brown?

MR. BROWN: Yes, Your Honor, the September 8th, I believe starting at page 65, there is an extended discussion.

THE COURT: Right. So I guess what I am trying to figure out is whether what you are describing is sort of a roundabout way of doing what I said you couldn't do, of saying, I am trained in these principles, applying these principles, I conclude that the government's evidence doesn't support what they say it supports because in applying these principles, it doesn't support that, which I think is the same thing that I said you couldn't do.

MR. EKELAND: I don't see that conclusion anywhere on this slide. What this is, is an introductory slide discussing his certifications, CPA, his CFS certification, his CFE certification, his CCFI certification and that he is a published professor of banking law. And --

THE COURT: That is

MR. EKELAND: -- he is discussing the forensic principles that he is using to arrive at his conclusions that

he discusses in his testimony. I don't understand how that is problematic.

THE COURT: I think it is because we don't really quite know what the testimony is going to be here. I mean, if he is just at a high level talking about there are standards that we apply, I get your point. If he is saying and one of those standards is that X, Y and Z and the X, Y and Z is what you intend to argue to the jury is missing in this case, then it is a problem for the reasons that I previously gave. On the other hand -- just because I don't think this case is about whether the -- whether and how the standards of forensic accounting apply. It is not an accounting case. For example, it is not a question of whether Pricewaterhouse complied with the relevant accounting principles when it certified a company's records. So that was the concern that I had previously expressed. I am still just not certain from what you are describing here. I guess we won't know up until he testifies. But if he is testifying to the particular standards that we were talking about at the *Daubert* hearing and then says that was the basis for his opinion it seems to me you are doing the same thing I said you couldn't do, if he is just talking about his background and this is how I go about things that is another thing.

MR. EKELAND: He is talking about his background and standards. But I disagree with the Court how this isn't an

accounting issue, because there is significant issues here, particularly in relationship to Mr. Scholl's testimony and how he calculated the exchange rates coming from the Bitcoin Fog. There is valuation issues related to Sarah Glave's testimony as the Court admitted Ms. Glave's charts and valuations, so I think there are actually significant forensic accounting issues.

THE COURT: So tell me what they are. I mean, I said in the past, it is fine for Professor Verret to testify about the numbers and how they add up and how to testify about the value of Bitcoin over time and to testify about, based on his analysis, what he would anticipate the administrator of Bitcoin Fog would have earned. That is all fine.

MR. EKELAND: That is the core of his testimony and that is what we are getting at here. We are not getting -- we went back and read the Court's -- you know, the testimony from the *Daubert* hearing and so what --

THE COURT: I just tell me -- so the question is, okay. Professor Verret, tell me about the standards of forensic accounting, what is he going to say? Is he going to get down to the level of talking about the particular methods that were at issue at the *Daubert* hearing?

MR. EKELAND: He is going to talk about his CPA and CFS certifications, his qualifications -- his CFE certification is listed here. His CCFI certification and that he is a

published professor, banking law, forensic accounting, securities and corporate law. And then if you look at slide 3 one of the arguments that the government is making is that Mr. Sterlingov must have been receiving Bitcoin Fog fees, because according to Ms. Glave's calculations, the numbers don't add up and that there is more money coming out than assets that Mr. Sterlingov has. And here Professor Verret is going to be talking about a net worth income and indirect analysis and how you apply those forensic accounting principles in evaluating a case like that and to Ms. Glave's work. He is directly addressing issues not only just in terms of -- this is direct testimony, but rebuttal from the witnesses that the government has put on, not just Ms. Glave. Mr. Scholl testified about --

THE COURT: Let me just -- so given the description that you just gave, Mr. Brown, is there an objection to that testimony?

MR. BROWN: Yes, Your Honor. And I think the other slide is from the 9/15/23 *Daubert* -- continuation of the Daubert hearing starting at page 60 -- this is actually the extended discussion I was thinking of where the Court says that it is either misleading to the jury or stepping into the shoes of jury to say, look, I am telling you just forensically it is unsound to do this here, because it really is for the jury to decide for itself whether there is sufficient uncertainty that

it calls into question the results.

THE COURT: So I think maybe to sort of try and cut to the chase here on this. If he wants to testify to his background --

MR. BROWN: Yes.

THE COURT: -- that is fine. Where I was having pause is he wants to testify that the results are forensically unsound because they don't comply with some association's methodologies. If he wants to just show the jury through logic and analysis why he thinks the results are unsound, I think that is entirely appropriate. And I have no problem with that.

MR. BROWN: Your Honor, we agree 100 percent if Professor Verret has a different analysis to tell the jury that has been disclosed pretrial, he is welcome to do that. Our concern is just if that gets dressed up as an, you know, these are or are not consistent with forensic standards, that is the 403 issue.

THE COURT: Mr. Ekeland --

MR. BROWN: We would also --

THE COURT: All right. I will let you finish.

MR. BROWN: We would also just reiterate our concern about undisclosed testimony to the extent Professor Verret intends to testify about something like net worth, income, you know, presence of unexplained assets, money laundering habits, typology, crypto privacy behavior patterns. None of that was

in his pretrial disclosure.

THE COURT: Right. And his pretrial disclosures were extensive. We went through them extensively at two different hearings, so I agree if they weren't disclosed they should not come in.

But let me ask, Mr. Ekeland, given the clarification that Professor Verret can talk about his background, talk about his training, and he is welcome to walk the jury through the logic of his view on this and explain to them why he thinks the government's numbers don't add up, is that acceptable?

MR. EKELAND: Included in that, I am assuming it is okay to talk about the forensic methodologies as, you know, promulgated by -- are you saying that he can't testify as to forensic standards that he learned as part of his certification or are you saying that he can't opine that the government's analysis is forensically unsound, in his opinion?

THE COURT: I don't -- the point that I think I made at the *Daubert* hearing -- and I don't see any reason to depart from that here. And I think I invited you at that time, I said, if you have any case to the contrary, bring it to my attention and you haven't done so. And I think it still goes because you haven't brought any contrary authority to my attention is that he ought not be testifying about what the forensic standards require. He ought to be talking about what the analysis shows. And he can show it and talk about his

background. And he can talk about the analysis he did. It is -- as I said, for 403 purposes, I think it is misleading to the jury -- and certainly I think more prejudicial than probative to suggest that the government's analysis is flawed, because it didn't comply with the standards of an association where that is not what the case is about. And he is perfectly free to explain and maybe I have to get into it to understand this to see what comes in with the testimony. But either the numbers add up or they don't add up. Maybe you can give me an example. But I am not sure -- if the testimony is that it is improper as a matter of forensics to -- give me an example. What would he want to testify to as being forensically unsound?

MR. EKELAND: I am going to elicit his testimony. I don't think it is just as simple as in the Court's characterization -- first of all, I think this is one of the core issues in the case, because it is a primary piece -- it is a primary allegation of the government that one of the allegations is that Mr. Sterlingov must have been operating Bitcoin Fog because the flows of money into his Kraken account, don't match his income.

THE COURT: Right.

MR. EKELAND: That there -- and that kind of analysis is a subjective analysis is my understanding that is based on -- there is financial forensic principles involved in making that kind of analysis like when you are making a net worth

income indirect analysis. And the government's own witness, Sarah Glave, is certified in some of those -- I believe she was a certified forensic examiner, so she should be following those same standards too, so I am a little bit -- I object to the extent that the Court is saying that the forensic standards that the government's own expert, supposedly is certified on and that are standards in the industry, are somehow inapplicable here to the analysis. And I don't think --

THE COURT: Can you give me an example of what you are talking about? I don't really understand.

MR. EKELAND: Perhaps one thing is Ms. Glave is making an assessment with just making the assumption that the only assets that Mr. Sterlingov has comes from his KYC account. And that is in our opinion forensically unsound.

THE COURT: But it is -- I mean, I guess my point on this I don't know whether you need point to some forensic standards or not to make that point. It is just a matter of logic; right? If I said, I went and I looked at Mr. Ekeland's Citibank account and he had $100, which means the man only has $100 to his name. That would clearly be unsound, because you may have an account at Bank of America as well and you may own a house and you may own a car. I think the jury can understand all of that. I just don't see how the -- bringing in the forensic standards necessarily changes that. And I don't see any problem with your offering -- Professor Verret offering

 that type of testimony, which I think the jury can understand.

My only concern is and as I understood it at the *Daubert* hearing, you want to offer testimony and say things like, because they didn't have the key to -- the private key for the particular addresses. If that is forensically unsound to attribute it to him. And that was the type of thing that was causing me concern, because I just think that is more confusing to the jury than it is helpful. And I think that it is more prejudicial -- significantly more prejudicial than probative. So, I mean, it is a little hard for me to answer this in the abstract.

But to the extent that it is diverting the jury's attention from what is at issue in the case by making this a debate about who is right or wrong with respect to the standards, you know, if this was a GAAP case, did they comply with GAAP paragraph 64.3G2, it is just going to confuse the jury and is not helpful in the case. On the other hand, if it -- the accounting doesn't make any sense here, because if you add the numbers up, they just don't add up that way. Perfectly appropriate.

MR. EKELAND: So can he testify that he was following the standards that he was trained in and he learned and when he did his calculations this is how he got the math?

THE COURT: Just tell me what the standard -- you have yet to sort of identify to me what the standard is he

wants to testify that you think is relevant.

MR. EKELAND: He is the expert in that. I am not --

THE COURT: Come on. He is your expert. You know the answer to this question and you are just playing with the Court here.

MR. EKELAND: I am not playing with the Court.

THE COURT: You don't really know what the answer is to the question?

MR. EKELAND: Your Honor --

THE COURT: Come on.

MR. EKELAND: Your Honor, I am not playing with the Court. And I am not -- I honestly with this slide --

THE COURT: We have been debating this for weeks now, months going back into September about the extent he can rely on these standards. Are you are telling me you don't know how his standards relate to the testimony and what the standards are that he wants to talk about?

MR. EKELAND: He wants to talk about the net worth income indirect analysis, the presence of unexplained assets. I am looking at page 3 of the slides, the correlation pattern analysis, money laundering habits and cryptocurrency privacy patterns. And I am not -- I am not -- this slide here with the standard forensic principles. This is an introductory slide where he is talking about his credentials. I am not looking -- and I don't think we need to say, oh, okay, the government

didn't apply -- didn't follow this standard here, although we will submit that that would -- I do consider that relevant. But for the sake of getting through this and getting to his testimony, we will refrain from that. We will try to stick to the math. The government can make its objections. But I do think that just him sort of laying a baseline would be helpful. But if the Court thinks that is, you know, more prejudicial than probative then we will hold back.

THE COURT: I'm sorry. I just can't answer that question in the abstract. And what came out at the *Daubert* hearing caused me concern because of the types of principles that he wanted to rely on my understanding at that point in time. But unless you can tell me what the principles are that he wants to rely on and how they apply in this case, I mean, first of all, that is what the *Daubert* hearing was about and that should have been disclosed. But also I don't know how I rule on that in the abstract unless you can tell me, Judge, he wants to testify that the following step violated the following principle and that matters for the following reason. I can't in the abstract rule on that question.

MR. EKELAND: Well, he is primarily right now testifying in rebuttal to what the government has put on. And he is using standard accounting principles which arguably were disclosed.

One of the things I think is a little confusing and I

think the Court is going back to, we are not talking about the tracing. We are not going -- we understand the Court's point about saying, you know, with the private key problem, you don't have the private key, so this is -- he is focused on the financials in this case and the patterns of -- rebutting the testimony from Mr. Scholl and Mr. Rovensky about, you know, patterns of behavior being consistent with money laundering. So the focus here in this testimony -- and we did, we went back and we looked at the Court's *Daubert* rulings and just really focused on the numbers. So to the extent that you don't want Professor Verret saying that the government is not in accordance with GAAP paragraph 5.23, that is okay, yes, Your Honor. Right, so what I want to take Professor Verret through is his review of the numbers in this case and rebut the testimony from government witnesses saying that what they saw was consistent with the pattern of money laundering, without making any kind of legal conclusion. That is the purpose and focus of the slide deck. That is why we slimmed it down even further after we sent the deck to the government and after Friday. And so that is the principle here, Your Honor.

THE COURT: That is -- I have said in the past I think is fine. And so the question I just still have though is just -- I am not quite sure what the slide about standard forensic principles is intended to elicit. If he wants to talk about his -- if he wants to talk about and you want to bring

out his experience, background, qualifications, I think that is all fine.

MR. EKELAND: I will limit it to that, Your Honor. That is fine. I honestly wasn't trying -- this was an introductory slide. I am not like -- this was not sort of an attempted end run that -- anything that the Court did.

THE COURT: So what about take off the header then that says standard forensic principles and leaving it as his --

MR. EKELAND: That is fine.

Can we do that, Mr. Hassard?

We can certainly do that.

THE COURT: All right. Let me hear from Mr. Brown on what the next concern is.

MR. BROWN: Yes, Your Honor. And hopefully the rest of these are a little more discrete. So the next slide that we have concerns about is slide 8, which is labeled personal privacy.

MR. EKELAND: Slide 8?

MR. BROWN: Just two very discrete objections here. There is a bullet that says most mixing is for personal privacy. I think this was addressed in the September 15th hearing that Professor Verret has not quantified the amount of mixing that is for personal privacy --

THE COURT: Although I thought my recollection was that he was going to testify to simply about a Chainalysis

report that he reviewed. He is nodding his head yes as I say that.

MR. BROWN: If that is all it is then we can move on.

THE COURT: Okay.

MR. BROWN: The bullet about professional responsibility, we have no idea what that means. And I think that is a pretrial disclosure issue.

MR. EKELAND: In terms of professional responsibility, that is simply a reference to the professional responsibility that we all have in terms of confidentiality to our client, I am not --

THE COURT: That is fine.

MR. EKELAND: Okay.

MR. BROWN: I guess, I don't follow confidentiality. Is Professor Verret -- Your Honor, I'm sorry. I am a little nonplussed. Is Professor Verret going to opine that there are professional responsibilities standards that are related to --

THE COURT: I don't think he was talking about -- Mr. Ekeland can correct me, but I thought he was going to testify that essentially there are lots of reasons why you might use, for example, a VPN, which is anonymizing in some respects. And one of the reasons might be that you are trying to protect your employer's information and you may have a professional responsibility. You know, I know, for example, when I connect remotely to the courthouse or court materials, I

need to use a VPN. And it is for maintaining the security of -- the work my employer. Is that it?

MR. EKELAND: That is precisely, except I think it was going to be in the context of the mixers where you may have a duty to protect the confidentiality of the client's funds.

THE COURT: Does he have any knowledge of that expertise on that question? Has he studied the fact -- why people use mixers for professional purposes?

MR. EKELAND: This is just as his experience as a CPA and as a lawyer. So, again, this wasn't -- this is not some major point we are trying to make. So it is just -- it is a reference to your duty of confidentiality to your client and that may be one of the reasons that you want to use something like a mixer or like a VPN just to protect client confidentiality. This is not a hill to die on, Your Honor.

THE COURT: Well, I mean, I do wonder whether he has any knowledge basis or expertise on whether people do, in fact, use mixers for maintaining professional confidentiality. That I just don't know whether he has any expertise. I don't recall it being disclosed in any way as a basis for his or any opinion he was going to express.

MR. EKELAND: I don't think in terms of like some sort of empirical statistical analysis, I am not aware of any. I think this is more his opinion as his duty as a CPA and a lawyer and discussing hypothetical --

THE COURT: Again, I can't say in the practice of law I ever used a mixer to maintain my professional responsibility or to protect my clients in any way. And it doesn't seem to me that is one of those things that is common knowledge you would know that, even as a CPA. So I do worry a little bit about the disclosure as to mixers. As to VPNs, I get it.

MR. EKELAND: We'll just -- why don't we solve the problem by -- we won't have him testify about that in relation to mixers.

THE COURT: Okay. Does that address the concern, Mr. Brown?

MR. BROWN: Yes, Your Honor. We can cross him on that.

THE COURT: All right.

MR. BROWN: The next slide with an objection is slide number 10, which is labeled number 1, post mix KYC.

THE COURT: Yep.

MR. BROWN: And just two issues, operator of Bitcoin Fog is smarter than that. During the September 8th hearing, I think the Court drew a distinction between if you want -- if Professor Verret wants to testify about, you know, how somebody concerned about privacy in general would behave, that is one thing in terms of how they would move their funds either to or from a mixer, I think the Court did limit that. What I would object to is -- and then goes on to say that he says Bitcoin

Fog would not send proceeds. I don't know how he knows what that person would or wouldn't do. There is just no basis for opining about the operator of Bitcoin Fog, what they would do or not do.

And the other issue with that slide, just while I am up here, the gift cards and prepaid phone cards, again, we object for lack of pretrial disclosure. I think this gets into Professor Verret's jailhouse interviews. And our concern is that -- you know, the defense is framing this as quote/unquote rebuttal testimony. Under Rule 16, there is really no such thing as rebuttal expert testimony and it doesn't have to be previously disclosed.

THE COURT: I'm sorry. You're right, the rule has been amended in that regard to make it clear. You are right on that question.

MR. BROWN: Yes. And if they have rebuttal evidence and a competent evidence to introduce it, that is one thing. They have made clear that Professor Verret is not a fact witness.

THE COURT: So Mr. Ekeland.

MR. EKELAND: Your Honor, in relation to the gift cards and prepaid phone cards is information that is in discovery.

THE COURT: Can you give me -- I have got in front of me, the disclosures which included 33 different topics. Can

you show me anything in those disclosures that touches on this?

MR. EKELAND: On the gift cards and prepaid funds, I have to pull up the disclosures.

THE COURT: Okay.

(Pause.)

MR. EKELAND: This goes to his, Professor Verret's testimony about money laundering patterns.

THE COURT: Can you point me to the paragraph?

MR. EKELAND: There is one here where -- paragraph 3, at the end of it, talks about money laundering analysis. And I am still going through this, Your Honor.

THE COURT: That one doesn't seem to be on point, because that is talking about what the government did in other cases, which they didn't do here, which I take it this is not what the slide is about.

MR. EKELAND: What the slide is responding to is -- so the government put in testimony from, I think, Larry Harmon and Ilya Lichtenstein. And they both used prepaid cards. And I believe they used gift cards, I think, in Government Exhibit 45A. I think that is the Harmon or Lichtenstein statement of facts. It -- they used those techniques to money launder. And what the point is here is that Mr. Sterlingov used KYC gift cards and prepaid cards in his own name. And the government has known that because that is in the discovery.

And so what Professor Verret is discussing here in

these slides is simply the fact that he doesn't view that kind of behavior as to be indicative of a pattern of money laundering, again, in rebuttal to Mr. Scholl and Mr. Rovensky saying, oh, we see patterns of money laundering.

THE COURT: So I would want to hear from Mr. Brown. I guess, I don't think it is a huge problem for him to testify that there are other ways, even perhaps ways that are more effective to hide transactions, including by gift cards or prepaid phone cards. I think the first bullet point just strikes me, frankly, as argument for your closing argument.

MR. EKELAND: Take it out.

THE COURT: But what I was having more of a pause there was on the patterns of money laundering. And you need to show me where in the pretrial disclosures it was disclosed that the witness was going to testify based -- relating to patterns of money launderers, in particular patterns of those who have withdrawn money from a site intended to launder funds.

MR. EKELAND: This is -- mainly in rebuttal to Larry Harmon's testimony, Ilya Lichtenstein's testimony --

THE COURT: I think the gift cards and prepaid cards, I think that is fine and you can make argument about that if you want. But he hasn't been disclosed as an expert of patterns of money laundering. I think that is outside the scope of his disclosure.

MR. EKELAND: He was disclosed as a professor of

anti-money laundering law.

THE COURT: So give me -- I have got 33 paragraphs of topics. Point me to the one --

MR. EKELAND: Let's go to the front of his disclosure. Mr. Verret is an expert in crypto forensics --

THE COURT: No. No. No.

MR. EKELAND: -- and anti-money laundering.

THE COURT: I understand what that says. You go down the page it says he is going to testify regarding the following.

MR. EKELAND: Also in the August slide deck that we filed with this Court, I believe on August 7th, or 8th, 2023 all of this was disclosed.

THE COURT: It was in that deck?

MR. EKELAND: What you are seeing here, is this deck is an extremely slimmed down. In that deck -- yes, I have it right here. That is -- that is docket 158-1. It is a 40-page slide deck. The government didn't object at the time. And that has extensive disclosure on these issues in far greater depth. And what we did here after the *Daubert* and everything we just stripped this down and just focused on the financial --

THE COURT: Does it have a disclosure in there with respect to patterns of money laundering?

MR. EKELAND: Let me take a look, yeah. I think there is but let me just pull out the exhibit.

THE COURT: I am not sure there is even a mention of gift cards or prepaid phone cards in that deck.

MR. EKELAND: Your Honor, it is -- my thing is double sided here so -- there is a lot of slides in illicit funds, but I mean -- I don't -- I don't see the actual slide that specifically says on the top money laundering. But I do see a lot of slides talking about tracing and the illicit funds that --

THE COURT: I guess the question is whether he was disclosed as an expert on patterns of money laundering, unless you can point me to something --

MR. EKELAND: I would -- just that again is part of his certification as a certified fraud examiner, forensic examiner, anti-money laundering, law professor at George Mason. I think it is in -- I mean, it is part of his training as a certified --

THE COURT: Right. I understand. The whole point of disclosures is to go through this process pretrial and if necessary to have *Daubert* hearings and deal with all of that. And, you know, we could have somebody with all sorts of training who appears as an expert, but it doesn't mean that person can then because they say, you know, I was an astrophysicist before I was an accountant and here are the five accounting principles I am going to testify about and then show up at trial and say, I indicated I was an astrophysicist and I

want to talk about astrophysics now.

MR. EKELAND: I think if it is implicit in being a professor in anti-money laundering that you would understand as part of that that part of recognizing money laundering is recognizing the patterns. And also this is not something -- the Court itself said when it came to Mr. Scholl and I believe it was Mr. Rovensky, the defense objected to them testifying about patterns of money laundering. I believe the Court specifically said that wasn't expert testimony and that they could testify on that -- on those points just simply as their knowledge as an investigator. So to that extent, we submit that Professor Verret wouldn't be doing anything more than what the Court allowed Mr. Scholl or Mr. Rovensky to do.

THE COURT: Again, I am at a little bit of a disadvantage because I don't know what you mean by patterns of money laundering.

MR. EKELAND: Well --

THE COURT: Go ahead.

MR. EKELAND: I'm sorry. I think this is ineptly phrased. I think if we just use a concrete example of like the gift cards and the prepaid phone cards, I think what Professor Verret is testifying to is having a KYC prepaid phone card or having a prepaid gift card is not the kind of behavior that somebody who is trying to money launder may necessarily do because it readily identifies you.

THE COURT: Well, I guess the question is whether he has any experience or training or background to know that. I get the common sense point, of saying, that, you know, had you bought a gift card, it would have been harder to trace you. Whether he has studied the behavior of money launderers and that was disclosed in a way that would have allowed some sort of evaluation in his qualifications is what is causing me concern.

MR. EKELAND: Your Honor --

THE COURT: To the extent that he wants to testify rather than taking money out and putting it in a KYC account, one could have done even more to hide one's identity by doing things like buying gift cards. That strikes me perhaps as more on the factual side of the marker. But what I am concerned is whether he actually has studied and has any basis to say this is how money launderers behave and whether that was disclosed.

MR. EKELAND: I think that was disclosed. That is all part of his certifications.

THE COURT: But we are going around in circles on it. I have got a 33-paragraph disclosure here. And I am just asking you to point me to where it is there. And the fact that his background isn't sufficient -- your expert is raising his hand in the background. If you want to talk to him, you are welcome to.

MR. EKELAND: Certainly, Your Honor. May I have a

moment?

THE COURT: I do want to get moving here. We are taking an awful lot of time on this. You can talk to him.

MR. EKELAND: Thank you, Your Honor.

(Pause.)

THE COURT: All right. Mr. Ekeland.

MR. EKELAND: Yes. Professor Verret informed me that actually he was asked about patterns of money laundering at the *Daubert* hearing. And that Mr. Brown asked him about patterns of money laundering involving pizza parlors and whatnot. And then also the publications that were disclosed, as part of -- I think it was one of his supplemental expert disclosures listing publications -- include publications in discussing money laundering and patterns of money laundering.

So to sum up, it is my understanding that, A, this was raised at *Daubert* and discussed. And Mr. Brown did cross Professor Verret on this issue. And then, number two, the publications that were disclosed as part of his expert disclosure cover academic articles that cover --

THE COURT: Can you point me to those articles?

MR. EKELAND: Now I have to go find the supplemental disclosure. I believe --

May I consult with Professor Verret?

THE COURT: But we really do need to get moving.

MR. EKELAND: I understand, Your Honor. If we could

limit it to what you were saying about the gift cards.

In his CV --

THE COURT: I am really just -- what I am concerned about is in the actual 33 topics that were identified for testimony.

MR. EKELAND: Well, we -- I am just going to repeat myself on that point.

THE COURT: And I will just repeat myself. Where we have 33 specific topics and the Court spends hours going through each of those topics, you can't come in and say, but his CV said that he is experienced in this particular field and that is what we want to offer him on. If that is the way the system worked, then the whole pretrial process would collapse and the whole *Daubert* process would collapse. You could then show up at trial and testify on anything that falls within your CV and that is just not the process.

MR. EKELAND: We submit that this was discussed at the *Daubert* hearing, that he was noticed as an anti-money laundering expert, that it was very clear from the *Daubert* hearings that he was going to be talking about money laundering or Mr. Brown wouldn't have crossed him on that issue.

And, additionally, to the extent that the Court has allowed Mr. Scholl and Mr. Rovensky and other government fact witnesses to testify about patterns of money laundering behavior, we submit that Professor Verret should be allowed to

rebut that testimony because neither Mr. Scholl or Mr. Rovensky were noticed as experts in money laundering. And the Court specifically ruled that was not expert testimony.

THE COURT: All right. Mr. Brown.

MR. BROWN: Your Honor, first of all, Mr. Scholl was first was specifically noticed and qualified as an expert in the modus operandi of cyber criminals and hiding activity on the blockchain. The Court will recall there was a specific colloquy about that during Mr. Scholl's testimony. And he was so qualified.

THE COURT: What about --

MR. BROWN: There is --

THE COURT: -- Mr. Rovensky?

MR. BROWN: I don't think Agent Rovensky testified as to sort of typologies of money laundering in this way. And, Your Honor, I think that there is a broader concern here, which will relate to another slide, which is it is one thing for an FBI analyst or an IRS agent to provide lay testimony about just factually what looks like money laundering or what they encountered in their investigations. The problem here is we have a Harvard-trained law professor who is purporting to instruct the jury about what is or is not money laundering. We have counts. Count 1 is labeled conspiracy to commit money laundering. Count 2 is labeled money laundering. There is a -- I think this is a little bit of an apples to oranges

comparison, because you have a law professor who is going to be opining about what is or is not money laundering. And I think that raises 403 issues in ways -- as well as just disclosure issues in ways that are not --

THE COURT: I don't think what we are talking about is the legal question of what constitutes money laundering or not. I think we are just talking about whether he can testify about particular types of behavior that you would expect to see from a money launderer.

MR. BROWN: If that is his testimony, I question what the basis for it is.

THE COURT: That is what I was raising more, I'm not sure what the basis is for that testimony. And if it would have been disclosed, we could have addressed it at a *Daubert* hearing. But let me ask you, Mr. Ekeland, you indicated that you examined Professor Verret on these topics. What is your response to that?

MR. BROWN: Yes, Your Honor. Asking questions at a *Daubert* hearing is not waiver of, you know, an objection to the idea that expert is qualified to testify on a subject matter.

THE COURT: If it was explored there, it would be harmless to allow him to testify if it was, in fact, explored.

MR. BROWN: I believe what Mr. Ekeland is referring to is when I was questioning Professor Verret about his claim that no money launderer would ever send funds to a KYCed

 account. And I questioned him, you know, you teach money laundering, you are familiar with the theory of placement, layering and integration. And isn't the classic stage of integration, taking the funds after they have been laundered and then integrating them into a true name account, an attributable account.

THE COURT: Right.

MR. BROWN: That is the extent of the questioning. That is not conceding that Professor Verret has any expertise. I think the crux of the question was to expose that he was purporting to opine about things that just are actually contrary to well accepted and standard principles of the theory of money laundering, not the practice, but the academic theory of it.

THE COURT: Yeah. So it does come back to mind on this. So we have to move on, on this. I am not aware of any study that Professor Verret has relied upon or performed relating to behavior of those engaged in money laundering. And so I don't see any basis to permit the testimony relating to how people engaged in money laundering generally behave. But if he wants to testify that one could have hidden one's self by -- even further by using gift cards or prepaid phone cards, I will allow that. That strikes me as perhaps similar to some of the stuff that I have allowed already. And it is somewhere in the twilight between something that is expert and fact in

nature. And I will allow him to testify with respect to that.

MR. EKELAND: I'm sorry. I just didn't hear you, Your Honor, when you said what you would allow -- I wanted to make sure I heard it.

THE COURT: Fair enough. I said I would allow him to testify that one could have hidden one's self further by using gift cards or prepaid phone cards or things like that. I don't see any basis for him to testify with respect to how money launderers typically behave, because there has been no disclosure of any study or analysis on that question, which would then be subject to *Daubert* as to what the foundation was for any such study or so forth, nor is there any evidence or indication that Professor Verret has personal experience with money laundering or even -- you know, as an investigator might having seen hundreds of cases that he could draw on.

Okay. What is next?

MR. BROWN: Your Honor, slides 12, 13 and 14, which are labeled number 3, To the Moon, Bit Coast Adventures; number 4, Code Reactor; and number 5, putting money. Our objections to these are -- this all -- this all appears to be, you know, the jailhouse interview, you know, quote/unquote rebuttal testimony. We don't see a pretrial disclosure for any of those three slides.

THE COURT: All right. Mr. Ekeland. Again, I am going to ask you to go back to the 33 disclosures and tell me

which ones you are relying on.

MR. EKELAND: Let me grab the deck then.

THE COURT: Take your time.

MR. EKELAND: Okay. First, this is rebuttal. First, this is not -- we removed everything in -- to any of the forensic interviews. When you are looking at slide number 12 here, To the Moon, failed business, that is just Professor Verret's conclusions based on what he has reviewed in the discovery in what, you know, the government has as well?

THE COURT: But where is that in the disclosures?

MR. EKELAND: In his disclosures?

THE COURT: Yes.

MR. EKELAND: Well, this is -- you know, the government has asserted in this case that Mr. Sterlingov was using To the Moon as a money laundering front.

THE COURT: But you have known that all along.

MR. EKELAND: What?

THE COURT: You have known that; right?

MR. EKELAND: Yes.

THE COURT: Yeah.

MR. EKELAND: Well, I mean, not specifically like the government's put it forward in terms of like the -- I can't remember what the Code Reactor invoices and not necessarily with the specifics.

THE COURT: I think on the Code Reactor stuff, that

may well fall within the disclosure and the permissible testimony just with the -- and the accounting where Mr. Sterlingov's money came from. And so if that is all that is, that strikes me as okay, if you are just showing that here are these invoices and they add up to X dollars and they show income that he was earning that should have been included or should be included in any analysis of the flow of funds.

Is that all that is about?

MR. EKELAND: That is my understanding is that his view of all of basically the Code Reactor invoices and the testimony that I think Ms. Glave gave on that. She has some slides on that. And he was going to look at those slides.

THE COURT: I am not sure what the client privacy aspect of that is though.

MR. EKELAND: That is him testifying that -- it is going back the client privacy thing is that what he is seeing in there is consistent with Mr. Sterlingov attempting to just keep his clients' addresses private.

THE COURT: I don't think there is any disclosure on that. And also I think you can argue that to the jury.

MR. EKELAND: So we'll take it out.

THE COURT: But what about the To the Moon and the putting money?

MR. EKELAND: So To the Moon is just, again, based on his analysis of the information that is already in discovery.

His just, you know, CPA, CFF, CFE, view of what he thinks these -- what he sees there. And then how he thinks it is not a front for money laundering. Those are his -- I mean, you are seeing his opinions right there, that it is a failed business with minimal cash flow, it was never functional and it wasn't a front for money laundering. And just for clarity's sake, it is my understanding To the Moon and Bitcoin Ventures are essentially the same thing.

MR. BROWN: Your Honor, I think that -- I mean, just what Mr. Ekeland said right there, that these are the same businesses, number one, that is not in evidence. And so I -- and number 2, there is a disclosure issue here. We are learning for the first time what Professor Verret intends to testify to here. And it is --

THE COURT: So the slides from August 2023 include a slide that says, no indication Sterlingov received Bitcoin Fog fees for seven reasons. This is at 158-1 at 28. And then it says, doesn't fit money laundering pattern, To the Moon LLC wasn't used for integration of laundered funds. Why not? To the Moon appears to instead simply be a failed business venture.

MR. EKELAND: And, again, the slide deck we are looking at right now is just an edited down version, a more concise version of that August slide deck. And also in response to the Court's *Daubert* ruling. So I mean, that is

disclosure.

THE COURT: Mr. Brown, why isn't that sufficient?

MR. BROWN: Your Honor, we don't concede that the defendant's August slide deck count as part of their disclosure. We had Professor Verret testify for two days in July based on his disclosures docketed at 145-5. This slide deck, number one, it is a slide deck. It is demonstrative. Number two, it was submitted after Professor Verret's *Daubert* testimony. There was no real vetting of the *Daubert* proceedings. We didn't waive our objections to this.

And, number two, this precedes the Court's September 8 and September 18th review of Professor Verret's permissible scope of testimony in which this was not at all discussed or approved by the Court.

MR. EKELAND: Your Honor, the government is correct in that they never objected to this. It is styled. It does say clearly on the title of document, docket number 158, supplemental expert disclosure for defense expert JW Verret. And that is what this slide deck was attached to. This was in August of 2023. The government never lodged any objection to this slide deck. The first objection we got to the slide deck was when we refined it, sent it via email to the government here during trial. And as the Court has pointed out, the slide deck does disclose those opinions. And it was our understanding that the Court -- this was filed -- the Court was

going to issue a written ruling on the Daubert hearing. And this was submitted, you know, before that happened and before the *Daubert* was finalized. We understand the Court has been very busy with its docket. But this is expert disclosure. And the government failed to object to it. And the information is included in the slide deck.

THE COURT: I am not sure your expectation is going to be a written ruling has anything to do with this. Because as I said before, I did go through, at least with respect to Professor Verret, give you line by line rulings. Probably substantially more extensive than you would get in virtually any *Daubert* opinion of going through these things and giving you extensive analysis of it, so I don't see that.

But I do think that there was something that was labeled as a supplemental disclosure, which occurred and which we probably should have taken up previously. But it seems to me that it would be appropriate for -- I don't see how Professor Verret would have any knowledge or basis for testifying with respect to whether the To the Moon was functional or not, that falls within his expertise or not. I don't see a basis for him testifying that it wasn't a front for money laundering. But based on the disclosure, if you want to introduce some cash flow analysis relating to To the Moon and whether it was a successful or unsuccessful business, I will allow that.

MR. EKELAND: So just for clarity's sake, should we take out the, not a front for money laundering on that slide.

THE COURT: I don't know what his basis would be for saying that. It seems to me there is a 403 issue too, because I am not sure there was even a contention that it ever was a front for money laundering. But if you want to talk about the cash flow to To the Moon, I will allow that.

MR. EKELAND: I think I might proffer, the argument is very simple. There is only $56,000 total or 56,000 Euros, I think it was, total going through To the Moon over a two-month period. And that is an insignificant sum in the face of what the operator of Bitcoin Fog should have had. And I think what the opinion is simply is that it is not a front for money laundering, because it is not laundering anywhere near the volume of what you would --

THE COURT: I don't think the government has alleged that it was a front for money laundering. I don't think anyone has suggested it. That is why I think it was a 403 issue.

MR. EKELAND: It is my understanding that is what they are trying to get at with To the Moon.

THE COURT: I can ask Mr. Brown, is that an argument the government is making?

MR. BROWN: Your Honor, I mean, our argument is that all of the defendant's KYC accounts are part of the, you know, his integration of his laundered proceeds.

THE COURT: Using laundered money for some purpose is one thing. I think that the concern is a front for money laundering, you know, that brings to my mind is -- you know, the car wash in "Breaking Bad" or something like that. And you have created something as a purported legitimate business in order to run large quantities of dirty money through it, a business out the other side showing up as profits from the other side in order to launder the funds. That is how I understand the phrase, not a front for money laundering.

MR. BROWN: Your Honor, so two points. Number 1, in fairness, I think the fact that the defendant did have a Kraken account in the name of his VPN business that received the large majority of funds just from Bitcoin Fog. I think that is -- that does raise some sense of that, but I think --

THE COURT: I see.

MR. BROWN: -- more to the point, Your Honor, the government doesn't have any issue with Professor Verret presenting the cash flow analysis if he has done it or, you know, an analysis of these transactions. But I think what Mr. Ekeland just said is really more attorney argument for them to argue. You know, Professor Verret should not be the one arguing, you know, this shows he is not money laundering. This shows he is not -- it is a -- whatever it is. I think that should be reserved for attorney argument. Professor Verret should be able to do the math. He should be able to present

his expert analysis. We have no issue with that. It is just, you know, these attorney arguments.

MR. EKELAND: Your Honor, if I may?

THE COURT: Go ahead.

MR. EKELAND: We removed on number 3, we removed Bitcoast Adventures just to deal with any potential evidentiary issues with Bitcoast Adventures not having been put into evidence by the government. And then remove the last bullet point not -- was not a front for money laundering. And then keep what he talks about here just analysis of the cash flow and that his opinion --

THE COURT: That is acceptable to me, if it is acceptable to you.

MR. BROWN: Yes, Your Honor.

THE COURT: And you, Mr. Ekeland?

MR. EKELAND: That is acceptable, yes, Your Honor. Mr. Hassard, if you would make those changes.

THE COURT: All right. What is next?

MR. EKELAND: We are removing Bitcoast Adventures and then we are taking out the last bullet point where it says not a front for money laundering. And I don't know, because we didn't actually get specific slide objections from the government, so I will leave it to Mr. Brown.

THE COURT: Do we still have the putting money issue, I think?

MR. BROWN: Yes, Your Honor.

THE COURT: What is the issue there?

MR. BROWN: For all three of these, putting money, it is the same issue, just lack of pretrial disclosure. This appears to be some sort of backdoor hearsay from Professor Verret's jailhouse interviews. You know, and best fix for the problem, we are not sure what he even intends to say. This is a disclosure issue and, you know, this was not the scope of his disclosed expert testimony.

THE COURT: All right. Where was this disclosed, Mr. Ekeland?

MR. EKELAND: I think this is just rebuttal to the putting money. And I don't know if this is -- I don't think this is -- I think the first time it came out may have been in the slide. This is just simply rebuttal to the government's testimony that somehow this is exotic or unusual behavior. I think Mr. Scholl and I want to say maybe Rovensky or Price, I am not sure, were discussing this putting money as if it is some sort of money laundering layering technique. And what this is the -- reflects that Professor Verret was very easily able to go on to Bitcoin Talk, which the government has full access to and was able to just find about 10 posts where people were just discussing this and how this was actually not, again, any kind of exotic money laundering technique, but a very common thing at the time.

THE COURT: Mr. Brown.

MR. BROWN: Your Honor, if Professor Verret is purporting to speak as an expert on Bitcoin transactional patterns in 2011, that was absolutely not disclosed. If he is purporting to testify as a fact witness that conflicts with the defense representations in open court when I asked them if Professor Verret was a fact witness. And as a fact witness, he is not -- he would have to proffer competent admissible evidence to any of this. And we don't think he is, number one, competent to speak to that. And we don't think that there is admissible evidence to speak to any of this.

THE COURT: I'm sorry. I take it that what you are talking about here, Mr. Ekeland, are conversations on Bitcoin Talk that are not already in the record?

MR. EKELAND: I am not sure if they are in the record or not, because I don't have off the top of my head a full knowledge of what is in the record from Bitcoin Talk. They are publicly accessible. I don't know that for sure. This is not something that --

THE COURT: I mean, if they are in the record already, I suppose you could point to them in your closing and just simply show what is in the record already on this.

MR. EKELAND: I would have to check that. I can't tell the Court.

THE COURT: And I do wonder, actually -- I mean, I

was thinking to myself, well, maybe Professor Verret could be a fact witness in the sense, almost like a paralegal, I went and I pulled this down offline and this is what it says. My only concern about that is, is there a hearsay problem with what is in those conversations?

MR. EKELAND: I think it would be effect on listener. It wouldn't be going to show that it wasn't necessarily money laundering, but it would just show that this is what people were doing when they heard about it. They learned about this technique and they went and they did it.

THE COURT: All right. Mr. Brown.

MR. BROWN: Your Honor, with respect to the exhibits that are in the defense exhibits they have disclosed to us, there is no indication whatsoever that Akemashite Omedetou or Mr. Sterlingov ever viewed any of the posts that the defense has proffered as their defense exhibits. So I don't think that there would be a hearsay exemption. I think what the defense is trying to do is try to backdoor incompetent hearsay through a contorted view of Rule 16 by saying, well, experts can rely on inadmissible hearsay and, therefore, they can have an expert who has never been disclosed, who has no expertise on this testify to inadmissible hearsay that should not be admitted because there is no exception for it and it is not relevant to this case because there is no evidence whatsoever that the defendant saw these posts.

 THE COURT: Okay. I am not going to allow this slide and the testimony on this topic on the grounds that it is undisclosed expert testimony. And the defense wants to come back to me with some hearsay exception to offer some fact testimony, I would consider that. But I don't think this is appropriate expert testimony because I think you acknowledged yourself, Mr. Ekeland, that it was not previously disclosed and I don't think that it is sufficient to say, well, we are offering this as rebuttal. Because that would mean the defense never has to engage in the disclosures the Rule 16, in fact, require.

And Rule 16 was amended recently to make clear that rebuttal testimony is included. And all of the cases that you have cited about rebuttal were cases involving the government in its rebuttal case, which were not about the defense case. So I don't think it is appropriate for these reasons. And as I said, if there is some hearsay exception and you have someone who just wants to authenticate materials that are on Bitcoin Talk and there is a basis for that coming in under a hearsay exception, I would be open to considering that.

MR. EKELAND: Understood, Your Honor. I just want to put on the record an objection to Rule 16 as applied as just violating a criminal defendant's constitutional rights to put on a complete defense.

THE COURT: Okay.

MR. EKELAND: With that, we can move on to the next slide.

THE COURT: And I will note for the record that there is no reason in the world this could not have been previously disclosed. I take your point that there could be something that comes as a sufficient surprise that the defense just didn't have any basis to anticipate it and it would be a due process problem. But there is nothing about this that suggests this type of surprise, so even if there were an as-applied exception to the Rule 16 disclosure requirements, I conclude it doesn't apply here.

All right. Anything else, Mr. Brown?

MR. BROWN: Your Honor, just the very last slide. We object to the statement, no financial forensic evidence that Mr. Sterlingov operated Bitcoin Fog.

THE COURT: Oh, I'm sorry. Going back to the To the Moon slide, are you taking the never functional off of that?

MR. EKELAND: This is slide number -- we can take that off.

THE COURT: All right. So my apologies on the last slide.

I'm sorry?

MR. EKELAND: And then --

I was talking to Mr. Hassard, Your Honor. I wasn't saying anything to the Court.

THE COURT: All right.

MR. BROWN: Then just the very last slide, no financial forensic evidence that Mr. Sterlingov operated Bitcoin Fog. I think that is exactly what the Court told Mr. Ekeland. Professor Verret cannot testify to, he cannot testify to the sufficiency or insufficiency of the government's evidence, let alone testify so based on forensic financial standards. That is a 403 and a 702 issue. It is just not helpful to the jury. And it will lead to jury confusion and it is undue prejudice that substantially outweighs any probative value. He is just commenting on the sufficiency of the evidence.

THE COURT: Mr. Ekeland.

MR. EKELAND: The defense submits this is permissible under Federal Rule of Evidence 704. And that Professor Verret is -- it is entirely okay for him to testify as to his ultimate conclusion and his opinion as to whether or not Mr. Sterlingov was operating Bitcoin Fog based on the financial evidence that he has examined.

THE COURT: So I think that is going to come out through everything else that is in the slides before this one, to the extent it is appropriate. But I do think you should drop this slide. It is the same thing that I have problems with a lot of your questions on cross-examination, where you put the government witness on there and you cross-examine the

government witness you say, so you have no evidence of that? So there is no evidence that, you have no evidence this, you have no evidence that. And I think that ultimately is a question for the jury. And I think it raises a 703 problem, particularly I think also as Mr. Brown has indicated when you are dealing with somebody who is going to be coming up as a Harvard law graduate, professor and saying, I am opining that there is no evidence in this case. I think the more appropriate thing for him to do is to describe the evidence. And he is entirely welcome to do that. But I don't think you should include the final slide.

MR. EKELAND: All right. We'll take it out.

THE COURT: So are we ready to bring the jury back?

MR. EKELAND: Can we have just a short moment to make sure we get the slide deck together? And I just want to make sure I get everything proper for --

THE COURT: Mr. Brown.

MR. BROWN: Your Honor, it would be helpful for them to do that and then send it to us so we can take a quick look and we can save time in front of the jury.

THE COURT: Let's do this quickly and get the jury back so let's take a 10-minute break.

(Recess taken at 11:25 a.m.)

THE COURT: All right. Just a quick update on jurors before we call the jury -- let me start over. Just a quick

update on jurors before we call the jury in. I remind you, we are finishing at 3:30 today, because there was a juror who had an appointment.

For the rest of the week, there is a juror that has requested if we can finish by 4:30 tomorrow. It doesn't strike me as the greatest excuse, just for a dinner. Someone else -- it is less of a problem on that same day. On Wednesday, juror number 9, who is the juror who has been late virtually almost every day, has an entirely legitimate medical issue, has a doctor's appointment in the morning and had asked if we could start at 11:00. It may be -- that is also the juror who at times has been asleep. And I think it may be worth thinking about whether we should continue with that juror or not. But I will let you all think about that and let me know what you want me to do.

And on Thursday, we have a request to end by 4:30.

MR. EKELAND: Your Honor, I just want to remind the Court that Mr. Fischbach needs to look at the devices today with Mr. Sterlingov. So we were thinking that would happen after Professor Verret's testimony.

THE COURT: If we are finishing at 3:30 today, that would work well.

MR. EKELAND: Depending on the government's cross, I think that is totally doable.

THE COURT: I do think that Mr. Fischbach should be

ready to start today if we finish with Professor Verret before 3:30. Because we want to keep things moving. Over the lunch break, if you want to look at the devices, you are welcome to do that.

MR. EKELAND: We would rather not have to start his testimony and then not be able to talk to him about his review of the devices.

THE COURT: I think we have to keep things moving here. So if we are done, I think we should start. And if he needs some time to look at the devices, you can talk to him.

MR. EKELAND: After Mr. Fischbach, it would just be Mr. Sterlingov, just so the Court knows, hopefully we are on track to finish this week.

THE COURT: All right. Okay. Sounds good. Let's get the jury.

(Jury in at 11:37 a.m.)

THE COURT: All right. Mr. Ekeland, the defense may call its first witness.

MR. EKELAND: The defense calls Professor Verret, JW Verret.

JOHN WALLACE VERRET, sworn.

THE WITNESS: So help me, God.

THE COURTROOM DEPUTY: Thank you. Please be seated.

MR. EKELAND: May I proceed, Your Honor?

THE COURT: You may.

MR. EKELAND: Thank you.

DIRECT EXAMINATION

BY MR. EKELAND:

Q. Professor Verret, could you just introduce yourself to the jury, spelling your name?

A. Sure. My name is John Wallace Verret; J-O-H-N, W-A-L-L-A-C-E, V-E-R-R-E-T. And I go by JW.

Q. And, Professor Verret, could you describe your educational background?

A. I went to undergrad at LSU, where I got a degree in accounting. I went to Harvard Law School, where I got a JD, juris doctorate. I got a master's degree from the Harvard Kennedy School of Government in public policy with a specialization in financial regulation policy. And I have a certificate in the Economics of Blockchain from the Wharton School of Business.

Q. And could you describe for the jury, your professional experience?

A. Sure. I -- when I graduated from law school, I -- well, while I was in law school, I served as an intern for Judge Martin Feldman in the Eastern District of Louisiana. After law school, I clerked for the Delaware Court of Chancery for a year, which is a court that specializes in corporate law issues. I then practiced at a firm in DC called Skadden Arps doing internal investigations and accounting fraud

investigations for companies that had issues with the SEC, the Securities and Exchange Commission, stock market regulator. After that, I took a job as a professor at George Mason Law School at the Antonin Scalia School of Law over in Arlington, Virginia. I have been a professor ever since. I have done a number of other things during that time and I have taken leave from the university a few times and went back to my teacher job after.

The first time I took leave, was in 2011 where I went to teach at Stanford Law School for a semester. So I taught securities banking corporate law over at Stanford and served as a fellow over at the Hoover Institute while I was there. And then I came back to teaching at the same place.

In my teaching at George Mason Law School, I taught cases in forensic and financial accounting in securities law, banking law, corporate law. In 2013, I took some leave again from teaching and went and worked on Capitol Hill, where I worked from 2013 to 2015 for the US House Financial Services Committee. I served as the chief economist and as senior counsel for that committee. My role leading the -- on the House side, congressional oversight of the Federal Reserve, the monetary policy. I worked in some securities law issues, SEC issues there as well. And I also worked on some issues on oversight of the Treasury Department, which included within the subcommittee I worked with, oversight of anti-money laundering

laws, sanctions law, something called the Export Import Bank and a few other things within Treasury, but not the tax issues. I did that from 2013 to 2015.

While I was there, I also led an investigation into wrong doing at the Federal Reserve that ultimate -- leaks of confidential information at the Federal Reserve. Led that investigation. Eventually the FBI got involved. And that led to the resignation of the Federal Reserve Bank of Richmond as part of what eventually happened with all of that.

I went back to teaching in 2015. And I have been a full time professor there teaching the same topics there since then. I got tenure in 2016. I also practice as an attorney defending clients in corporate issues, securities issues. And I have done some crypto work as an attorney. And I wear a few different hats. I also wear a hat as a forensic accountant in litigation support. I have been doing that for a while, working on cases involving the different things that forensic accountants work on.

I also sit on a nonprofit board call the Zcash Foundation. The Zcash Foundation supports a blockchain called the Zcash blockchain. Zcash is also the name of the coin or the token on the Zcash blockchain. Zcash was founded as a fork of the Bitcoin blockchain. Some of the people involved in Bitcoin early on were a little concerned about the fact that Bitcoin can be traced. On the blockchain, transactions can be traced

on the blockchain and that Bitcoin is not fully anonymous. So they created the Zcash blockchain. It takes the Bitcoin blockchain and just adds some more cryptography on top of it to make all of the transfers potentially completely private and anonymous and untraceable, if you want to use the function, though you can also do transparent functions on the Zcash blockchain. Anyway the Zcash foundation was created to support academics innovating in the cryptography that is used in the Zcash blockchain.

THE COURT: I'm sorry to interrupt. You are -- I think we have gotten a little offtrack on the qualifications.

BY MR. EKELAND:

Q. So while you were in Congress, Professor Verret, did you do any work related to Bitcoin while you were at Congress?

A. Yes. So I led the first briefing, to my knowledge, in Congress to members of Congress about Bitcoin in 2013.

Q. And then in terms of your trainings and certification related to accounting what, if any, trainings and certifications have you taken and do you hold?

A. I am a certified public accountant. I also hold a credential called the CFF that is only available to certified public accountants. CFF stands for certified in financial forensics. I hold the CFE credential, that is certified fraud examiner. I hold a credential called the CVA, that is certified valuation analyst. And I hold a credential called

the CCFI, that is certified cryptocurrency forensic investigator.

Q. And who issues the CPA certification?

A. The Virginia State Board of Accountancy is what issued it to me.

Q. And who issues the -- I believe you said the CFF. What does that stand for again?

A. The CFF certified in financial forensics is issued by the AICPA, the Association of International CPAs.

Q. Who issues the CFE?

A. The Association of Certified Fraud Examiners.

Q. And then the CVA, who issues that?

A. That is the Association of Certified Valuation Analysts.

Q. And the CCFI?

A. That is issued by the McAfee Institute, an institute associated with McAfee that does the antivirus software.

Q. And that is a -- the CCFI, what does that stand for again?

A. Certified cryptocurrency forensic investigator.

Q. And have you published any publications?

A. Yes.

Q. Could you give a brief summary of what you have published?

A. I don't remember the total offhand, but maybe 15, 16 publications in journals and law reviews about topics in my field. Securities, corporate. One article about anti-money laundering. I have one article coming out about

cryptocurrency, although I haven't published specifically about cryptocurrency in the past. Most of it is about securities law, corporate law and banking law.

Q. And have you published any books?

A. I haven't published any books yet, but I am working on a book now that is in peer review with MIT Press.

Q. And have you ever testified before in court?

A. Not in court, no.

Q. And are you being paid for your testimony today?

A. I am working on a rate of $450 an hour. And I have sent one invoice for that. But I haven't been paid yet. I didn't ask for a retainer in this case, an upfront retainer. And informed counsel that owing to the realities of this case, I won't be seeking to be paid for any work since the September invoice I have done. I have maybe 300 hours of work. And I have told counsel those will all be just pro bono hours.

Q. How much was your last invoice for?

A. It was for $110,000. I also informed counsel that I think it probably unlikely I will be paid on that invoice. I informed counsel I am willing to negotiate that down. I don't want that invoice to stand in the way of something -- someone -- I don't want that invoice to be a hindrance to anyone. I will leave it there. Yeah.

MR. EKELAND: So, Your Honor, at this time, the defense moves to qualify Professor Verret as an expert in

 financial forensics, forensic accounting and cryptocurrency.

(Conference held at the bench.)

MR. BROWN: Your Honor, we have no objection to the first -- Your Honor, we have no objection to the first two topics. We do object to qualifying Professor Verret as an expert in cryptocurrency based on the *Daubert* hearings.

MR. EKELAND: Your Honor, we did notice him as an expert in cryptocurrency. He is well versed. He is a member of the Zcash Foundation. He uses cryptocurrency. He is writing a book on cryptocurrency. He has got a cryptocurrency forensic investigator certification from McAfee. I think he has got a solid foundation.

THE COURT: Is he offering any expert testimony on cryptocurrency or are you just going to throw all of this --

MR. EKELAND: I think to the extent that it comes in on the periphery, I think everything he is testifying about we have disclosed and we went through in the slide deck. But to the extent that he does need to opine on, say, the valuation of Bitcoin and the calculation of like --

THE COURT: I don't think you have to be an expert on cryptocurrency. I think his accounting is sufficient for those purposes. Okay.

MR. EKELAND: Okay.

(End of bench conference.)

THE COURT: The Court concludes that Professor Verret

 is qualified to testify as an expert on financial forensics and forensic accounting.

MR. EKELAND: Thank you, Your Honor.

BY MR. EKELAND:

Q. Professor Verret, did you prepare anything to aid the jury in understanding your testimony here today?

A. Yes. I prepared PowerPoint slides.

Q. Mr. Hassard, could you put up what is not in evidence as Defendant's Exhibit 129.

THE COURTROOM DEPUTY: I'm sorry. What is the number?

MR. EKELAND: 129.

THE COURTROOM DEPUTY: I don't have a 129. It stopped at 106. Do you have an updated one?

MR. EKELAND: I have to give you an updated one. This is 129 and it is not in evidence.

BY MR. EKELAND:

Q. And can you see that, Professor?

A. Yes.

Q. Mr. Hassard, could you just click through it really quick for him.

Do you recognize that?

A. I do.

Q. Is that a fair and accurate depiction of the slide deck you prepared for your testimony today?

A. Yes.
Q. Do you think that will help the jury in understanding your testimony here today?
A. Yes. I hope so, yes.
MR. EKELAND: Your Honor, at this time the defense would like to move what has been marked for identification as Defendant's Exhibit 129, just to publish to the jury as a demonstrative.
THE COURT: All right. Exhibit 129 may be published to the jury as a demonstrative.
(Whereupon, Defense Exhibit No. 129 was admitted.)
BY MR. EKELAND:
Q. And Mr. Hassard, if we could go to the next slide.
THE COURT: You can continue.
You can continue.
MR. EKELAND: May I proceed, Your Honor?
THE COURT: You may.
BY MR. EKELAND:
Q. Professor Verret, could you explain what is on this slide keeping in mind what we discussed?
We just lost the connection.
THE COURTROOM DEPUTY: I'm sorry. Just give me one second.
THE WITNESS: Yes. The first two bullet points just describe the standards that I work under. And using the CFF

and CFE credentials, they are mostly the same. And the three significant elements of these are objectivity, integrity, and relying on sufficient and reliable information.

BY MR. EKELAND:

Q. And these are the standards you were trained in when you got your certifications?

A. That is correct.

Q. And what are the last two bullet points? What are those in reference to?

A. Those just mention that the CCFI certification has a set of principles that were provided when we were trained in it. There was a treatise that we used to study for it. And it includes principles similar to the CPA and CFE, but as applied to cryptocurrency investigations.

Q. And, Mr. Hassard, if we could go to the next slide, please.

So, Professor Verret, you have reviewed the discovery in this case?

A. Yes.

Q. And you have been listening to the testimony in this case?

A. Yes, I have.

Q. And you are aware that the government has --

A. -- just to be exact, I wasn't here for every single testimony, but the ones relevant to my testimony I was here for.

Q. And you have looked into the issue of whether you think Mr. Sterlingov received fees from Bitcoin Fog?

A. Yes.

Q. And what is your opinion of whether or not he received fees from Bitcoin Fog?

A. I do not believe he received fees from Bitcoin Fog.

Q. And what is the basis for your opinion?

A. The basis is the five tools --

MR. BROWN: Objection, Your Honor.

THE COURT: Why don't you ask him to walk through his calculations and his analysis.

BY MR. EKELAND:

Q. Could you take the jury through your calculations and analysis as to why you reached that conclusion?

A. Yes.

Could we go to the next slide?

This is a calculation of what the operator of Bitcoin Fog would have earned and what is unexplained based on what we know from the evidence, what it appears from the evidence Mr. Sterlingov ever owned.

One of the tools in financial forensics, in fact, I would say the primary tool --

MR. BROWN: Objection, Your Honor.

THE COURT: Yeah. I think we should just walk through the calculations.

THE WITNESS: I will start with what I am most certain about, what is easiest to estimate and what I am most sure about, measuring how much the operator of Bitcoin Fog would have earned measured in Bitcoin. That is the easiest thing to do. It doesn't require much professional judgment to get there.

MR. BROWN: Objection, Your Honor.

Can we pick up the phone, please?

(Conference held at the bench.)

MR. BROWN: Your Honor, the witness -- the witness keeps trying to sneak in references to his professional standards and accounting practices. We have no objection to him testifying to the analysis he did. But we do object vehemently to what we have just been over with the *Daubert* discussion about framing this as a question of his professional certification and his professional methodologies.

MR. EKELAND: Is he -- he is noticed as an expert in financial forensics. I don't think he is intentionally doing it. If the Court wants to instruct him, I certainly haven't instructed him to be doing this. But, I mean, I don't think it is any secret that he is a CPA and holds all of these certifications. And I think he is merely commenting that he is just following his standard practice.

THE COURT: He sat here through this whole thing. He is a Harvard law graduate who practiced law. He knows what is

going on here. I do think that he is trying undermine my ruling on those issues, so I will just remind him that he sat through our discussions and that he should abide by my rulings.

MR. EKELAND: Your Honor -- I mean, Your Honor knows what to say, just to stick to the math and his calculations.

THE COURT: I have done that twice already and it doesn't work so far.

MR. EKELAND: Understood.

(End of bench conference.)

THE COURT: I am going to remind the witness. You were here when I discussed some rulings on some issues and you should abide by my rulings.

THE WITNESS: Okay.

THE COURT: You can continue.

BY MR. EKELAND:

Q. Could you remind -- could you just go through how you calculated your number here on this page?

A. Sure. I start with estimating the earnings of the operator of Bitcoin Fog, measuring them in Bitcoin before measuring them in dollars. The operator of Bitcoin Fog, as I understand, Bitcoin Fog mixed 1.2 million Bitcoin. 1.2 million Bitcoin went through Fog. The fee for Bitcoin Fog was at first 2 percent and then went to a range of 1 to 3 percent. But the average there is still 2 percent. I view a 2 percent estimate as conservative, though it might stretch to 3 percent. The

transactions I have seen in evidence all are above 2 percent. So it could be 2 percent, it may be 3 percent. I think 2 percent is the one where I would focus most. 2 percent times 1.2 million Bitcoin yields 24,000 Bitcoin that the operator of Fog should have earned, but that might be as high as 36,000 Bitcoin.

Q. Could it be also at the 1 percent, if it was all at the 1 percent range, what would those numbers come out to be?

A. Those would be 12,000 Bitcoin. Though I find that unlikely, given that the average is 2 percent and given that the transactions I have seen are all above 2 percent. The next number there is taken from the Glave -- Ms. Glave's exhibit.

Q. Could you remind the jury again just who Ms. Glave was?

A. She was an accountant for the -- on detail to the IRS who provided an exhibit during her testimony.

Q. And she testified here in front of the jury?

A. That is correct.

The number that she offers for the amount of Bitcoin Mr. Sterlingov ever owned was 2,707, a little less than --

MR. BROWN: Objection, misstates the evidence.

THE COURT: Sustained.

So I am going to strike the answer.

BY MR. EKELAND:

Q. Do you see there it says estimate implied under Glave estimate of 2,707 BTC, how did you arrive at that calculation?

A. I took that number from her exhibit.

Q. And that was the exhibit that she displayed in Court?

A. That is correct.

Q. And that was published to the jury?

A. That is my understanding.

Q. And so could you continue and just take us through the rest of the slide?

A. So the first thing that is apparent in this calculation is the difference between the 24,000 to 36,000 Bitcoin that the operator of Fog would have earned, did earn, versus the 2,707 number that is included in the Glave report from Mr. Sterlingov's Bitcoin holdings over the time period of the report.

The next thing to consider is what to do for the purposes of the calculation with the amount of Bitcoin that remains in the Bitcoin Fog cluster. Now, I think the best way to characterize the Bitcoin that is still sitting in the Bitcoin Fog cluster what has alleged to be the Bitcoin Fog cluster described as that 98 percent of it is customer funds and the other 2 percent of it is fees. But just to be generous in the calculation and as conservative as I can be, you can also subtract that 24,000. So, in other words, to measure what is missing, take the 24,000 or 36,000, but let's focus on 24. Take the 24,000 subtract the 2,707 Bitcoin that the Glave estimate puts in Mr. Sterlingov's hands, subtract the full

1,354 in the Bitcoin Fog cluster, even though probably not all of it is fees or most of it is fees, but subtract it anyway to be careful. That comes to proceeds unaccounted for of 19,939 Bitcoin. That amount -- and stopping there, that shows what the Fog operator earned measured in Bitcoin. It shows what Ms. Glave's exhibit puts in Mr. Sterlingov's hands. It draws a contrast between those two things. It gets a calculation for proceeds unaccounted for in Bitcoin. And, therefore, we have not had to do any estimates putting it into dollars yet. Though I did that as well.

One more thing about this slide is just the highest amount in dollars that that 19,000 could be, if measured either at the price just before trial or at the peak in 2021, would be $975 million that is unaccounted for. Or at the peak in 2021, that would be $1.34 billion unaccounted for measured in dollars rather than measured in Bitcoin. That is the ceiling of what that unaccounted for Bitcoin could be valued at in dollars.

Q. When you say it is unaccounted for, could you just explain that -- what you mean by that a little more?

A. In this slide, I defined unaccounted for as what the Fog operator earned, minus what the Glave report identified as Sterlingov Bitcoin minus what is left in the Bitcoin Fog cluster, that yields what the Fog operator -- funds the Fog operator earned that are unaccounted for.

Q. And you -- is it correct to say that you just didn't find

those unaccounted for Bitcoin in any of the records you reviewed related to Mr. Sterlingov's finances?

A. That is correct.

Q. Is there anything else you would like to share with the jury from this slide?

A. No.

Q. Can we move to the next slide, Mr. Hassard? Could you explain this next slide to the jury?

A. This is a slide that shows percentage returns for Bitcoin investments. This is as of the middle of last year. The price has gone up since that time, so all of the prices would be significantly higher. But it demonstrates the scale of wealth that you could earn if you bought Bitcoin in -- in -- at the very bottom of the 14-year mark, the percentage return you could earn if you earned in the very first year of Bitcoin's existence which is here 3.9 billion percent returns.

Q. What was the first year that you could buy Bitcoin?

A. Well, basically 2010.

This shows in a 12-year mark, if you were buying in 2011, the percentage you could earn was 221,320 thousand percent, versus gold that earned 21 percent, versus the S&P 500, the basic stock market index that was 253 percent. So it shows the scale of earnings that are possible, the astronomical earnings that are possible if you were an early buyer of Bitcoin who held on.

Q. What was the source for the value of Bitcoin that you used for this calculations -- these calculations here?

A. So for those, I actually prepared my own chart using a source called Messari, that is one of the accepted sources in the industry.

Q. What is the reference to the website down there on the bottom?

A. That is another -- this is another chart that I obtained for a website called Casebitcoin. It was consistent with what I prepared with my own monthly chart.

Q. And is there anything else you would like to share with the jury in relation to this slide?

A. No.

Q. Mr. Hassard, if we could go to the next slide.

And what is Bitcoin pizza day?

A. So this is a date that has become an annual tradition for Bitcoiners that remembers an event that happened in the history of Bitcoin, May 22nd, 2020 [sic]. This is the first time in record that someone actually used Bitcoin to pay for something. And they spent 10,000 Bitcoin to buy a couple of pizzas. I have in the slide those 10,000 Bitcoin that bought two pizzas would be worth 480 million today. That is the value at the start of trial. Today that would be more like 620 million. It has gone through a lot -- it happens to have gone up a lot through the trial. So the 10,000 Bitcoin that bought a couple

of pizzas in 2010, would be worth 480 million at the start of trial, 620 million today.

This phenomenon demonstrates to me that at the time, 2010, Bitcoin was just like a hobbyist toy. It wasn't what it is now and people didn't know then what it would be now. So it was kind of like a trading card or something where tens of thousands of Bitcoin were transferred around as kind of a game. And so that shows you the scale of what is possible if you were early in Bitcoin.

Q. And related to that, I want to take a step back and go back to the discussion about the -- well, the appreciation in Bitcoin. And, Mr. Hassard, if we could put up what is not in evidence as Defendant's Exhibit 128.

And do you recognize that spreadsheet?

A. I do.

Q. And what is it?

A. This is an effort --

Q. Just briefly, what is it?

A. Sure. This is an effort to take the Bitcoin we know the Fog operator --

Q. Professor Verret, this hasn't been published to the jury yet. I want to find out, do you recognize that spreadsheet?

A. I do.

Q. Are those your calculations of what you considered to be the potential fee earnings of the Bitcoin Fog operator?

MR. BROWN: Objection; leading.

THE COURT: It is leading, but I think he is trying expedite things to lay the foundation, so I will allow it.

THE WITNESS: This is a calculation of the Fog operator's earnings in dollars.

BY MR. EKELAND:

Q. Based on the information that you -- in discovery in this case?

A. Based on the information in the discovery in this case including Mr. Scholl's calculations.

Q. And this is a fair and accurate representation of the spreadsheet that you did these calculations on?

A. Correct.

MR. EKELAND: Your Honor, at this time the defense moves to publish what has been marked for identification as Defendant's Exhibit 18 as a demonstrative to the jury.

THE COURT: Any objection?

MR. BROWN: No objection.

THE COURT: Defendant's Exhibit 128 may be published as a demonstrative.

(Whereupon, Defense Exhibit No. 128 was admitted.)

BY MR. EKELAND:

Q. And I think the jury can see it. Professor Verret, can you just take the jury through this spreadsheet and explain -- just explain your calculations without reference to any other

standards, just how you did the math?

A. This is an effort to translate the Fog operator's earnings in Bitcoin into dollars. When I saw that Mr. Scholl's estimate makes an assumption that the Fog operator instantly sells the Bitcoin they earn and turns it into dollars -- this yielded, as I recall, an estimate at a 2 percent fee of just under 8 million, 7.7 million, if I remember correctly. That is based on the assumption that the Fog operator sells their Bitcoin that they earn from the 2 percent fee or 3 percent, whatever, instantly into dollars. I have not seen evidence that did occur.

MR. BROWN: Objection.

THE COURT: Sustained. I will strike the answer.

THE WITNESS: I feel that the best way to follow what I have been trained to do --

MR. BROWN: Objection.

THE COURT: If you could just walk through your calculations with regard to your calculations.

THE WITNESS: I created calculations assuming that the Fog operator would not have instantly sold their Bitcoin. But what the totals would have been if they had held on for a year, 2 years, 3 years and 4 years.

That -- this does not include the assumption they held all of the way to the end to the billion dollar number I provided earlier. But that instead they sold a year after they

earned it, 2 years after they earned, 3 years after they earned it, 4 years after they earned. So that is what is at the top of the columns immediate sale versus -- which was Mr. Scholl's numbers -- against those, the columns compare a 1-year holding period, a 2-year holding period, a 3-year holding period, and a 4-year holding period. And for each fee, they give you totals at the bottom. For a 1 percent year, if they held for one year, the Fog operator held for one year since they earned it, they would have gotten 10.4 million. For 2 years, 21.3 million, for 3 years, 40.1 million; for 4 years 57.67 million. That is at the 1 percent fee, which I do not believe is the best fee to use.

At the 2 percent fee, if the Fog operator held for 1 year the Bitcoin they earned, they would have earned $20 million in US dollars; for two years, $42 million; for 3 years, $80 million; and for 4 years, $115 million.

You will see some black lines here just because it is not possible to hold a holding period when we are not that far along yet. And then for the 3 percent fee, there are estimates at 1 year of 31 million; a 2-year holding period of 64 million; at a 4-year [sic] holding period of 120 million; and a 4-year holding period of 173 million at a 3 percent fee.

BY MR. EKELAND:

Q. Based on your review of the evidence and what you have seen and what you know of Mr. Sterlingov's assets, do you know

how much approximately he had in terms of assets?

A. The number in the Glave exhibit that she testified to, as I recall, was just south of 2 million. It was about 1.8 million.

Q. Is there anything else that you would like to share with the jury about this exhibit?

A. Just that I believe that the 80- to $120 million is the most likely of these possibilities.

Q. Why is that?

A. Because I think the 2 percent fee is conservative. I think the 3-year holding period tends to be the average that Bitcoin holders hold.

MR. BROWN: Objection, based on Rule 16.

THE COURT: Sustained. The answer is stricken as well.

When I am striking an answer, the jury should just ignore the answer.

BY MR. EKELAND:

Q. Anything else you would like to share with the jury about this chart?

A. No.

Q. Mr. Hassard, if we could just go back to the slide deck in Defendant's Exhibit 129.

And I think we had stopped at Bitcoin pizza day. Is there anything else you would like to share with the jury about

 Bitcoin pizza day?

A. No.

But I think in response to your last question --

MR. BROWN: Objection, Your Honor.

THE COURT: Just wait for a question.

THE WITNESS: I'm sorry.

BY MR. EKELAND:

Q. Is there anything you would like to clarify about your response to my last question?

A. The other thing I did in creating the chart --

MR. BROWN: Objection. Is this about Bitcoin pizza day or a different question?

THE COURT: Do you want to go back to the chart?

BY MR. EKELAND:

Q. Mr. Hassard, could you please put up what has been published to the jury as Defendant's Exhibit 128.

Is there anything else, Professor Verret, that you would like to say about this chart?

A. This chart is what is called an income analysis.

MR. BROWN: Objection, based on Rule 16.

THE COURT: I will allow that. But I think that was the only question, was there anything to be clarified? He has clarified, it was an income chart.

BY MR. EKELAND:

Q. Yes. Is there anything else you would like to clarify

about this?

THE COURT: I think it would be better if you could ask more specific questions. Rather than just, you know, basically is there anything you want to say. So if you want to ask more a specific question, that is fine.

BY MR. EKELAND:

Q. I think we can take this down. Can we, Mr. Hassard, go back to the slide deck. And I think the last slide was -- let's move on to the next slide. Go to slide number 7. So can you explain what this slide is about?

A. This slide mentions that Mr. Sterlingov again, 2,707 Bitcoin, are put in his hands by the Glave exhibit. Bitcoin was as low as 40 cents in 2010, 2011 for a sustained period in records. It went even lower at that point. There was a point really early on where it didn't even have a market price. And so Bitcoin purchased as early as that could have been purchased with a couple thousand dollars in cash.

Q. Can we move on to the next slide, Mr. Hassard.

So what is this slide about and why is it -- why are we talking about personal privacy?

A. I would not infer from use of a mixer that use of the mixer is necessarily illegitimate. I am familiar with use of mixers that are about other reasons. One of them just owes to the fact that Bitcoin is traceable on the blockchain. Any time you interact with someone and they have your public key, they

can trace everything associated with that public key. It is like putting your checking account and your bank account out for the world to see. And I am familiar and read indictments of people where --

MR. BROWN: Objection.

THE WITNESS: -- where they were --

MR. BROWN: Object to reference to indictments under Rule 16.

THE COURT: Sustained.

MR. EKELAND: Your Honor, we did have two witnesses testify from the government who were indicted for Bitcoin-related crimes.

THE COURT: That is fine. That is in evidence and the witness was here and heard that, that is fine too.

BY MR. EKELAND:

Q. So, Professor Verret, did you hear the testimony of I believe it was Larry Dean Harmon?

A. Yes.

Q. Did you gain any insights into the operation in terms of fees in relation to operating a mixer from Mr. Harmon's testimony?

A. I did.

Q. Could you share those insights with the jury?

A. I am aware that Mr. Harmon testified that most of his earnings were from running the Helix mixer. I am aware that

Helix operated from 2014 to 2017. I am aware that Helix was a smaller mixer than Bitcoin Fog. I am aware that Mr. Harmon testified that he earned $220 million from running Helix.

MR. BROWN: Objection. That is not in the record.

MR. EKELAND: Your Honor, that is in the record because I specifically asked -- it is in the statement of facts that the government I believe entered into evidence. He also testified about that amount, having to forfeit it.

THE COURT: But perhaps -- this may be okay, but I feel like we have shifted gears here because you were asking about questions about using mixers. And now we have switched to him testifying about -- this stuff before about how much profit you might make from using a mixer.

MR. EKELAND: That is in reference because the indictments were brought up and the government objected to the indictment, so I decided to go and discuss --

THE COURT: All right. I will allow it.

BY MR. EKELAND:

Q. Just before we go back to the slide, wrapping up with what you learned from Mr. Harmon, could you just sum that up briefly for the jury and then we'll go back to the slide?

A. The testimony from Mr. Harmon indicates that the Helix mixer had less volume than Fog and earned for Mr. Harmon $200 million. That is consistent with my own estimates of using a 3-year holding period, what the Fog operator would have

 earned in my own chart.

THE COURT: Is there an objection?

MR. BROWN: Yes, Your Honor. I think this does go back to Rule 16 issue.

THE COURT: It does. And I am going to strike the last portion of the answer with respect to the 3-year holding period. So I am going to strike that. For the three years, I don't think there is a basis for that. I am going to strike that.

BY MR. EKELAND:

Q. Turning back to the slide here on personal privacy. Why are you saying most mixing is for personal privacy? What is your basis for saying that?

A. I have reviewed a Chainalysis report that says most mixing is for personal privacy or otherwise not illicit.

Q. What is -- you have got the word op sec there. Why is that there?

A. I understand that one of the reasons to use a mixer is for operational security to prevent hacking, things like of that nature and kidnapping and other worse things.

Q. And then what -- why did you have a professional responsibility on this slide and just very general --

THE COURT: Can you pick up here?

(Conference held at the bench.)

THE COURT: You are talking about mixing now. And I

thought we had agreed he was only going to talk about professional responsibility with respect to the use of the VPN and he didn't have any analysis or basis for saying that people used mixers for personal -- or responsibility purposes.

MR. EKELAND: Yeah. I am not trying to do that. And I will steer to the VPN. I will just --

THE COURT: If you ask him an open-ended question and after him sitting here and hearing me rule on it and he starts talking about mixers again, I am going to admonish him in front of the jury. You should be aware of that.

MR. EKELAND: I am just going to --

(End of bench conference.)

BY MR. EKELAND:

Q. Let's move on to the next slide, Mr. Hassard.

So can you just explain what this slide is about and why you are reaching this conclusion?

A. I reviewed four different patterns of transactions to see whether those patterns were consistent with trying to hide something.

Q. And could we go to the next slide, Mr. Hassard?

What do you mean here, number one, by post mix KYC?

A. Everything I have seen in the evidence shows that Mr. Sterlingov when he used gift cards --

MR. BROWN: Objection.

THE COURT: Sustained.

That is not my understanding of what this was about.

MR. EKELAND: Could we pick up the phone?

(Conference held at the bench.)

MR. EKELAND: I'm sorry. Can I get clarification on what goes in?

THE COURT: The only thing we talked about, you know, extensively earlier today was that he was going to testify generally, not that Mr. Sterlingov, but that generally one could hide one's identity by purchasing a gift card instead of putting money into a KYC account. That is all we talked about. He sat here through the whole thing.

I have to say that I do think that he is perhaps acting more as a lawyer here, but not in a way that is abiding by my instructions and my rulings. He sat through the whole thing and all we talked about. And when you explained what this was for, was for purposes of showing that it could be an extra layer of protection could be taken when withdrawing money from a mixer is by purchasing gift cards with it, not anything about what Mr. Sterlingov did. There was no discussion of that whatsoever.

MR. EKELAND: I honestly must have misunderstood. I will steer him from talking about anything in relation to the evidence of Mr. Sterlingov and just keeping this in general terms if that is what the Court is requiring.

THE COURT: Well, if you never mentioned this

before -- you are saying, what I am requiring -- we could take a break now and go back to it. We have had a lengthy discussion about this. And all we talked about was this being evidence of how someone could take greater precautions in withdrawing money from a mixer. Your never said a word about Mr. Sterlingov when we went through that.

MR. EKELAND: I do believe I did mention that the evidence showed that Mr. Sterlingov only used KYC debit cards and prepaid cards. And that is what, you know, this -- is the basis of his conclusion. But I will ask him to testify generally without any reference to Mr. Sterlingov on this point and go through this -- the slides that way. But that -- I think is just a misunderstanding on our part, Your Honor.

THE COURT: Okay. All right.

(End of bench conference.)

BY MR. EKELAND:

Q. Professor Verret, just in general, without reference to your review of the discovery and just in relation to just general behavior that people might engage in, why do you have your number 1 reason here labeled post mix KYC?

A. In general, it is not a good idea to send post mix Bitcoin that have already been mixed back to something associated with you, like an account where you have KYC and given your license if you are trying to hide from that entity.

Q. And then why do you reference again, just in general,

terms and general practices, without any -- discussing the discovery at all, why are you referencing gift cards and prepaid phone cards there?

A. Gift cards could be useful to hide money, if you use an intermediary straw purchaser to go and put the money on the gift card or the debit card or the prepaid card for you in smaller amounts than what you need to move. But I don't believe it would be helpful to that purpose, if you are using your own name and KYCing your own information and using it for your own personal spending.

Q. Is there anything else you would like to comment on about your first reason here?

A. No.

Q. If we could go to the next slide, Mr. Hassard. And then what do you mean by here, the mystery of the missing Bitcoin.

A. The Bitcoin operator had 24,000 to 36,000 Bitcoin. That shows a lot of Bitcoin that they would need to try to hide measured in dollars, whatever one believes the right measure of dollars is. I believe that is a lot of dollars to try to hide. And that would require a pretty sophisticated operation to move funds of that scale.

Q. Is there anything else that you want to say about this slide?

If we could go to the next slide, Mr. Hassard.

A. No.

Q. And could you just explain why you're referencing To the Moon here? And, again, just in general terms even though --

A. To the Moon VPN was as I understand it, a VPN service to be paid for in Bitcoin. There was a Kraken account associated with To the Moon. There was some Bitcoin in a Kraken account.

Q. Was that Kraken account -- do you know if that was a KYC Kraken account?

A. That is correct. It was KYCed under Mr. Sterlingov, as I understand.

Q. And did you review the cash flow flowing to and from To the Moon and out of that Kraken account, in relation to the To the Moon Kraken account?

A. I reviewed funds initially sent to the Kraken account to see the account. I did not see any evidence of client cash flows for that business.

Q. And these two bullet points here, why do you have them there?

A. I didn't find any evidence of clients. I didn't find any evidence of an attempt to hide some money along with client bills to hide money underneath bills for a service.

Q. Is there anything else you would like to say about To the Moon?

A. No.

Q. Could we move on to the next slide. Code Reactor, what is -- can you remind the jury what Code Reactor is?

A. I understand Code Reactor to be associated -- doing business name for freelance work by Mr. Sterlingov.

Q. Do you recall Ms. Glave's testimony about the Code Reactor invoice or invoices?

A. Yes.

Q. Mr. Hassard, if we could take down this slide and put up what is in evidence I believe as Government Exhibit 305. And if we could go to -- I think it is page 9. And do you recognize this, Professor Verret?

A. I do.

Q. And could you describe to the jury your understanding of -- well, what is this?

A. I understand this to be a summary of invoices found on Mr. Sterlingov's computer for Code Reactor.

Q. And do you know who prepared this summary?

A. I do. It was in Ms. Glave's exhibit.

Q. That was the exhibit that was published to the jury while she was testifying?

A. That is my understanding.

Q. And what is your understanding of this invoice or this -- I'm sorry -- this table, Code Reactor invoice summary?

A. This shows a total of $56,000 for all of the invoices associated with Code Reactor. This shows that they were dated over a series over three years. And they showed -- or I guess purport to show transfers from Bitcoin to addresses. That is

 not in the chart. It is below the chart.

Q. And what, if anything, do you conclude from the amount of money that went through Code Reactor?

A. That that amount of money is consistent with a small side business. It is not consistent with an effort to inflate a business and hide money on the scale that I have discussed in the estimates of the Fog operator's earnings.

MR. EKELAND: Pass the witness, Your Honor.

THE COURT: I was going to ask you, if now was a good time for a break. Do you want to pick up, Mr. Ekeland?

(Conference held at the bench.)

THE COURT: So, Mr. Ekeland, if you want to ask -- I didn't want to sort of get into behavioral testimony with respect to what Mr. Sterlingov was doing, because I don't think there was any disclosure with respect to that. But if you wanted to ask the witness whether Mr. Sterlingov bought any prepaid cards or anything like that based on -- if he was here for all of the testimony to hear that, that is okay with me. And then the other thing is that as we discussed before with respect to To the Moon, if you wanted to do the same thing with To the Moon that you just did with respect to the following, with respect to just the money there and whether that revealed extra money that was inconsistent, I would allow that as well in a similar fashion to what you just did, I think is okay.

MR. EKELAND: Okay. Then can I just not pass the

 witness and put him on hold for the lunch, while I think about that. I am not sure if I need to do it. But I would like to think about it.

THE COURT: We will take the lunch break then and you can come back and ask any follow-up questions if you have any at that point.

MR. EKELAND: Thank you, Your Honor.

(End of bench conference.)

THE COURT: We are going to take a lunch break now. It is 12:36. Why don't we come back at 1:45. Don't discuss the case even among yourselves. Don't conduct any type of research and steer clear of everyone associated with the case. Have a nice lunch. And I am sure you can repeat my words by now easily.

(Jury out at 12:36 p.m.)

THE COURT: The witness can take your lunch break as well. I ask that you not discuss your testimony until it is complete.

Anything to raise before we break?

MR. BROWN: Your Honor, we suggest that while we are on the lunch break, if the defense wants Mr. Fischbach to examine electronic devices, we have them here. We'd like to get this over with, because we don't want to send the jury home a half day.

THE COURT: Not only that, I think that it is

important because I think I am pressing the jury to be here -- I don't want to suggest that is not important. But also I remain concerned about time, even though we are moving along at a reasonable pace here. Because I don't have any idea how long the jury will deliberate, but also we haven't told the jury and we are not going to tell the jury if they come back with a conviction that they are going to have to sit again for another, perhaps, mini trial and another deliberation with respect to the forfeiture issues, if there were a conviction.

MR. EKELAND: Your Honor, can we pick up the phone? I need to talk about something private.

THE COURT: Okay.

(Conference held at the bench.)

MR. EKELAND: So Mr. Fischbach is a type 1 diabetic and for that reason he needs to eat his lunch. It is important that he eats his lunch.

THE COURT: Of course. I still think there is plenty of time for that. We are taking an hour and ten minute break. There is plenty of time for him to have lunch and he should definitely do so. I don't want him to do anything that is at odds with his health. I think there is still time to review the devices. And if we need a little bit more time before we start after lunch, we can do that as well.

MR. EKELAND: Okay. Your Honor, so he can take his lunch and then come back and start his review?

 THE COURT: Yeah. We ask him not to linger over it, but yes, he should take his lunch.

MR. EKELAND: Your Honor, I am assuming the marshals are going to let Mr. Sterlingov be with Mr. Fischbach as they review the devices.

THE COURT: I will ask that when we get off the phone.

(End of bench conference.)

THE COURT: If I could ask the marshal if Mr. Fischbach can be with the defendant when he goes through these devices, none of them are dangerous devices. They are phones and computers and things like that. He needs to be able to review them with the defendant. Is that acceptable? Can you find a way to do that, either in the courtroom or in the back room here?

THE MARSHAL: We'll have to get approval from a supervisor to take them downstairs.

THE COURT: You can't bring them downstairs. We could do it in the courtroom here or just right back here.

THE MARSHAL: I will still have to get approval from one of the supervisors.

THE COURT: Let me know if you need my involvement in that.

THE MARSHAL: Okay.

MR. BROWN: Your Honor, our FBI agent is -- and we

would like one of the attorneys to be present if the defense is handling these electronic devices. So we just ask that we keep the courtroom unlocked and we allow Special Agent Lund as well as an attorney for the government to be present during the examination of the devices.

THE COURT: That is fine. There may be need to be shuttling back and forth if Mr. Fischbach wants to have some confidential conversation with Mr. Sterlingov, but they can accommodate that, I'm sorry.

MR. BROWN: Yes, Your Honor.

THE COURT: All right. Have a good lunch, everyone.

(Recess taken at 12:40 p.m.)

C E R T I F I C A T E

I, SHERRY LINDSAY, Official Court Reporter, certify that the foregoing constitutes a true and correct transcript of the record of proceedings in the above-entitled matter.

Dated this 5th day of March, 2024.

Sherry Lindsay, RPR
Official Court Reporter

**BY MR. EKELAND: [41]** 11/8 11/14 12/11 12/15 12/25 13/20 14/23 15/14 16/12 17/18 19/24 20/9 21/3 22/21 23/12 24/16 25/2 26/4 80/3 83/12 87/4 87/17 88/12 88/18 89/4 90/12 92/15 93/23 99/6 99/22 101/23 102/18 103/7 103/14 103/24 104/6 105/15 106/18 107/10 108/13 110/16
**BY MS. PELKER: [6]** 5/3 6/4 7/11 9/9 10/9 27/2
**MR. BROWN: [63]** 4/6 4/19 31/2 32/1 32/7 34/8 37/18 38/5 38/12 38/19 38/21 46/14 46/19 47/3 47/5 47/14 49/12 49/15 49/18 50/16 59/5 59/12 59/14 60/10 60/18 60/23 61/8 62/17 65/9 66/3 68/23 69/10 69/16 70/14 71/1 71/3 72/2 73/12 75/13 76/2 77/18 86/3 90/9 90/23 91/7 91/10 93/20 99/1 99/18 100/12 100/16 102/13 103/4 103/11 103/20 105/5 105/7 106/4 107/3 108/24 115/20 117/25 118/10
**MR. EKELAND: [157]**
**MR. PEARLMAN: [1]** 28/14
**MS. PELKER: [21]** 4/25 5/18 7/4 7/6 9/5 10/3 10/8 11/5 12/8 12/13 12/23 17/10 18/8 20/3 22/7 24/3 24/6 24/24 26/25 27/22 28/1
**THE COURT: [221]**
**THE COURTROOM DEPUTY: [20]** 4/2 4/15 4/17 9/3 9/7 10/6 13/17 13/19 14/22 15/8 15/12 16/1 16/4 16/6 18/6 20/7 79/23 87/10 87/13 88/22
**THE MARSHAL: [3]** 117/16 117/20 117/24
**THE WITNESS: [12]** 22/8 23/11 27/25 79/22 88/24 91/1 92/13 99/4 100/14 100/19 103/6 105/6

**$**

**$1.34 [1]** 95/15
**$1.34 billion [1]** 95/15
**$100 [2]** 41/19 41/20
**$110,000 [1]** 85/18
**$115 [1]** 101/16
**$115 million [1]** 101/16
**$120 [1]** 102/7
**$120 million [1]** 102/7
**$20 [1]** 101/14
**$200 [1]** 106/24
**$200 million [1]** 106/24
**$220 [1]** 106/3
**$220 million [1]** 106/3
**$42 [1]** 101/15
**$42 million [1]** 101/15
**$450 [1]** 85/10
**$56,000 [2]** 68/9 113/22
**$80 [1]** 101/16
**$80 million [1]** 101/16
**$846 [1]** 24/1
**$975 [1]** 95/13
**$989 [1]** 23/20

**1**

**1 percent [2]** 93/7 101/11
**1,354 [1]** 95/1
**1-year [1]** 101/4
**1.2 million [3]** 92/21 92/21 93/4
**1.8 million [1]** 102/4
**10 [2]** 49/16 71/22
**10,000 [3]** 97/20 97/21 97/25
**10-minute [1]** 77/22
**10-year [1]** 30/9
**10.4 [1]** 101/9
**100 percent [1]** 38/12
**10005 [1]** 2/4
**106 [1]** 87/14
**10:04 [1]** 31/19
**10:05 [1]** 32/5
**10:25 [2]** 31/17 31/18
**11 [1]** 3/4
**11/11/2017 [1]** 8/4
**11:00 [1]** 78/11
**11:25 [1]** 77/23
**11:37 [1]** 79/16
**12 [2]** 62/17 63/6
**12,000 [1]** 93/9
**12-year [1]** 96/19
**120 million [1]** 101/21
**128 [5]** 3/11 98/13 99/19 99/21 103/16
**129 [9]** 3/10 87/9 87/12 87/13 87/16 88/7 88/9 88/11 102/23
**12:36 [2]** 115/10 115/15
**12:40 [1]** 118/12
**12HWC [1]** 8/22
**12M2V [1]** 8/2
**12S7WS [1]** 7/22
**12th [1]** 14/24
**13 [1]** 62/17
**130 [5]** 3/10 17/8 17/9 17/14 17/16
**1301 [1]** 1/20
**1337 [2]** 6/22 6/24
**13th [1]** 14/24
**14 [1]** 62/17
**14-year [1]** 96/14
**145-5 [1]** 66/6
**15 [1]** 84/22
**158 [1]** 66/17
**158-1 [2]** 53/17 65/17
**15th [2]** 14/5 46/21
**16 [11]** 50/10 73/19 74/10 74/12 74/22 75/10 84/22 102/13 103/20 105/8 107/4
**16th [1]** 14/6
**17 [1]** 3/10
**173 million [1]** 101/22
**175 [1]** 14/17
**17DQYVZ [1]** 7/16
**18 [1]** 99/16
**18th [1]** 66/12
**19,000 [1]** 95/12
**19,939 [1]** 95/3
**1:45 [1]** 115/10
**1AK19 [1]** 6/23
**1BMKM [1]** 10/23
**1FCV [1]** 10/13
**1H8 [1]** 10/1
**1MB2 [1]** 9/12
**1MB2M [1]** 9/1

**2**

**2 percent [14]** 92/23 92/24 92/24 93/1 93/2 93/3 93/3 93/10 93/11 94/20 100/6 100/9 101/13 102/10
**2,707 [5]** 93/19 93/25 94/10 94/24 104/11
**2-year [2]** 101/5 101/20
**2.0 [6]** 25/3 25/6 25/9 25/15 25/17 27/8
**2/10/2018 [1]** 10/18
**20001 [1]** 2/9
**20005 [1]** 1/21
**2010 [4]** 96/18 98/1 98/3 104/13
**2011 [12]** 13/12 14/2 15/23 17/21 18/1 18/24 20/17 28/20 72/4 81/9 96/19 104/13
**2012 [2]** 13/12 14/11
**2013 [7]** 11/15 12/12 14/24 81/16 81/18 82/3 83/16
**2014 [2]** 25/6 106/1
**2015 [4]** 23/13 81/18 82/3 82/10
**2016 [1]** 82/12
**2017 [2]** 8/4 106/1
**2018 [3]** 9/16 10/18 23/15
**2020 [1]** 97/18
**2021 [2]** 95/13 95/14
**2023 [3]** 53/12 65/15 66/20
**2024 [2]** 1/5 119/10
**20530 [2]** 1/14 1/17
**21 percent [1]** 96/21
**21-399 [2]** 1/4 4/2
**21.3 [1]** 101/9
**221,320 [1]** 96/20
**22nd [1]** 97/18
**23 [1]** 37/19
**24 [1]** 94/23
**24,000 [6]** 93/4 94/9 94/22 94/23 94/24 111/16
**253 percent [1]** 96/22
**254 [1]** 10/16
**25th [1]** 14/1
**27 [1]** 3/5
**27th [5]** 15/23 17/21 18/1 18/24 20/17
**28 [1]** 65/17
**28th [1]** 14/11
**2A387 [1]** 7/13

**3**

**3 percent [4]** 92/23 92/25 93/2 100/9
**3-year [4]** 101/5 102/11 106/25 107/6
**3.9 billion percent [1]** 96/16
**3/4/2018 [1]** 9/16
**30 [1]** 2/3
**300 [1]** 85/15
**305 [1]** 113/7
**31 [1]** 101/20
**316 [5]** 18/5 18/6 18/7 18/17 18/17
**33 [5]** 50/25 53/2 58/4 58/9 62/25
**33-paragraph [1]** 56/20
**333 [1]** 2/8
**36,000 [4]** 93/5 94/9 94/23 111/16
**399 [2]** 1/4 4/2
**3:30 [3]** 78/2 78/21 79/2

**4**

**4-year [3]** 101/6 101/21 101/21
**40 [1]** 104/13
**40-page [1]** 53/17
**40.1 [1]** 101/10
**403 [9]** 32/19 32/25 33/13 38/17 40/2 60/3 68/4 68/18 76/8
**45A [1]** 51/20
**480 [1]** 98/1
**480 million [1]** 97/22
**4:30 [2]** 78/5 78/16

**5**

**5.1527 [1]** 1/17
**5.23 [1]** 45/12
**500 [1]** 96/21
**56,000 [1]** 68/9
**57.67 million [1]** 101/10
**5th [1]** 119/10

**6**

**60 [1]** 37/20
**601 [1]** 1/16
**602A [3]** 16/2 16/6 16/8
**603 [4]** 13/17 16/2 16/7 16/8
**603A [6]** 15/7 15/8 16/2 16/4 17/2 17/6
**603H [1]** 14/21
**603S [1]** 13/16
**620 million [2]** 97/23 98/2
**623 [5]** 5/1 5/11 5/18 5/19 10/25
**624 [5]** 5/19 5/22 6/2 7/4 9/6
**625 [1]** 6/19
**626 [1]** 7/1
**627 [1]** 7/17
**628A [2]** 7/23 8/9
**628B [1]** 8/5
**629 [1]** 8/19
**630A [2]** 8/23 9/3
**630B [1]** 9/17
**631 [1]** 9/22

**6**

**632 [3]** 10/3 10/4 10/10
**633 [4]** 9/6 10/4 10/7 10/19
**64 [1]** 101/20
**64.3G2 [1]** 42/16
**65 [1]** 34/9
**6710 [1]** 2/8

**7**

**7.7 million [1]** 100/7
**702 [1]** 76/8
**703 [1]** 77/4
**704 [1]** 76/15
**7th [1]** 53/12

**8**

**80 [2]** 3/7 102/7
**88 [5]** 3/10 7/24 8/1 8/6 8/17
**8th [5]** 2/4 34/5 34/8 49/19 53/12

**9**

**9/15/23 [1]** 37/19
**945 [1]** 9/15
**950 [1]** 1/14
**98 [1]** 94/19
**99 [1]** 3/11
**9:27 [1]** 4/23
**9:38 [1]** 1/6

**A**

**a.m [6]** 1/6 4/23 31/19 32/5 77/23 79/16
**abide [2]** 92/3 92/12
**abiding [1]** 109/13
**able [6]** 69/25 69/25 71/21 71/22 79/6 117/12
**about [168]**
**above [4]** 20/16 93/1 93/11 119/5
**above-entitled [1]** 119/5
**absolutely [1]** 72/4
**abstract [4]** 42/11 44/10 44/17 44/20
**abuse [1]** 11/2
**academic [2]** 57/19 61/13
**academics [1]** 83/8
**acceptable [5]** 39/10 70/12 70/13 70/16 117/13
**accepted [2]** 61/12 97/4
**access [1]** 71/22
**accessible [1]** 72/18
**accommodate [1]** 118/9
**accordance [2]** 33/18 45/12
**according [2]** 13/11 37/5
**account [24]** 25/9 25/11 30/13 40/19 41/13 41/19 41/21 56/11 61/1 61/5 61/6 69/12 105/2 105/2 109/10 110/23 112/4 112/5 112/6 112/7 112/11 112/12 112/13 112/14
**Accountancy [1]** 84/4
**accountant [4]** 54/23 82/15 83/20 93/14
**accountants [2]** 82/18 83/22
**accounting [25]** 32/17 33/1 33/7 33/9 33/15 35/12 35/12 35/14 36/1 36/6 36/20 37/1 37/9 42/18 44/23 54/24 64/2 80/11 80/25 81/15 83/18 86/1 86/21 87/2 91/12
**accounts [1]** 68/24
**accurate [2]** 87/24 99/11
**acknowledged [1]** 74/6
**across [1]** 22/16
**acting [1]** 109/13
**Action [1]** 1/3
**activity [3]** 6/16 9/22 59/7
**actual [2]** 54/5 58/4
**actually [11]** 20/4 36/6 37/20 56/15 57/8 61/11 70/22 71/23 72/25 97/3 97/19
**add [9]** 29/15 36/10 37/6 39/10 40/9 40/9 42/19 42/19 64/5
**additional [1]** 9/17
**additionally [1]** 58/22
**address [16]** 6/10 6/16 6/23 6/24 7/15 7/21 8/1 8/20 8/22 8/25 9/12 10/1 10/13 10/23 31/11 49/10
**addressed [2]** 46/21 60/14
**addresses [4]** 5/16 42/5 64/18 113/25
**addressing [1]** 37/11
**adds [1]** 83/3
**adduced [1]** 30/7
**administered [1]** 13/7
**administrator [4]** 12/16 24/18 25/15 36/12
**administrators [2]** 13/5 28/22
**admissible [2]** 72/8 72/11
**admission [1]** 10/5
**admit [2]** 7/7 30/13
**admitted [12]** 5/11 5/21 7/4 7/6 9/5 17/11 17/14 17/14 36/5 73/22 88/11 99/21
**admonish [1]** 108/9
**Adventures [4]** 62/18 70/6 70/7 70/19
**after [18]** 11/22 14/11 45/19 45/19 53/20 61/4 66/8 78/20 79/11 80/21 81/3 81/8 100/25 101/1 101/1 101/2 108/8 116/23
**again [19]** 48/10 49/1 50/6 52/3 54/12 55/14 62/24 64/24 65/22 71/23 81/16 84/7 84/17 93/13 104/11 108/9 110/25 112/2 116/7
**against [2]** 32/18 101/4
**agent [10]** 5/4 6/5 7/12 9/11 11/17 27/3 59/14 59/18 117/25 118/3
**agree [3]** 18/16 38/12 39/4
**agreed [1]** 108/1
**agreement [1]** 6/1
**ahead [2]** 55/18 70/4
**AICPA [1]** 84/9
**aid [1]** 87/5
**Akemashite [3]** 29/2 29/17 73/14
**Alden [1]** 4/8
**all [86]** 4/9 4/20 4/24 4/24 6/1 7/2 7/3 7/7 7/10 9/11 11/6 11/25 13/21 15/3 15/17 19/15 24/7 26/24 27/23 28/2 28/13 30/17 31/10 31/20 32/6 34/4 36/13 38/20 40/15 41/23 44/15 46/2 46/12 47/3 47/10 49/14 53/13 54/19 54/20 56/18 57/6 59/4 59/5 62/20 62/20 62/24 63/16 64/3 64/8 64/10 66/13 68/24 70/18 71/3 71/10 73/11 74/13 75/12 75/20 76/1 77/12 77/24 78/14 79/14 79/17 82/9 83/4 85/16 86/14 88/9 91/21 93/1 93/7 93/11 95/1 96/11 100/24 106/17 109/10 109/15 110/3 110/14 111/2 113/22 114/18 118/11
**allegation [1]** 40/17
**allegations [1]** 40/18
**alleged [2]** 68/16 94/18
**allow [14]** 31/5 60/22 61/23 62/1 62/3 62/5 67/25 68/7 74/1 99/3 103/21 106/17 114/23 118/3
**allowed [5]** 55/13 56/6 58/23 58/25 61/24
**allowing [1]** 5/9
**almost [2]** 73/2 78/8
**alone [1]** 76/7
**along [4]** 63/16 101/19 112/19 116/3
**already [8]** 9/3 61/24 64/25 72/14 72/21 72/22 92/6 110/22
**also [28]** 19/19 22/17 29/6 33/8 38/19 38/21 44/16 53/11 55/5 57/11 64/20 65/24 77/5 78/11 81/23 82/4 82/12 82/15 82/19 82/21 83/6 83/20 85/18 93/7 94/21 106/7 116/2 116/5
**although [3]** 44/1 46/24 85/1
**am [78]** 18/13 18/20 19/7 19/19 22/11 24/10 28/14 30/17 31/4 31/20 33/20 33/25 34/10 34/13 35/16 37/23 39/11 40/10 40/13 41/4 43/2 43/6 43/11 43/12 43/20 43/22 43/22 43/24 45/23 46/5 47/11 47/15 48/23 50/5 51/11 54/1 54/24 55/14 56/14 56/20 58/3 58/3 58/6 61/16 62/24 64/13 67/7 68/5 71/18 72/15 74/1 77/7 83/20 85/5 85/10 85/20 91/1 91/2 92/10 93/22 102/16 104/22 105/3 105/24 105/25 106/1 106/2 107/5 107/7 107/8 108/5 108/9 108/11 110/1 115/2 115/13 116/1 117/3
**amended [2]** 50/14 74/12
**AMERICA [3]** 1/3 4/3 41/21
**among [2]** 31/15 115/11
**amount [9]** 14/15 46/22 93/18 94/15 95/4 95/11 106/8 114/2 114/4
**amounts [2]** 16/19 111/7
**analysis [33]** 29/23 32/16 36/12 37/9 38/10 38/13 39/16 39/25 40/1 40/4 40/22 40/23 40/25 41/1 41/8 43/19 43/21 48/23 51/10 62/10 64/7 64/25 67/13 67/23 69/18 69/19 70/1 70/10 90/11 90/14 91/13 103/19 108/3
**analyst [2]** 59/18 83/25
**Analysts [1]** 84/13
**annual [1]** 97/16
**anonymizing [1]** 47/21
**anonymous [2]** 83/1 83/5
**another [8]** 8/5 27/18 35/23 59/17 97/8 97/8 116/8 116/8
**answer [11]** 27/15 42/10 43/4 43/7 44/9 93/22 100/13 102/14 102/16 102/17 107/6
**answers [1]** 24/15
**anti [7]** 53/1 53/7 54/14 55/3 58/18 81/25 84/24
**anti-money [7]** 53/1 53/7 54/14 55/3 58/18 81/25 84/24
**anticipate [2]** 36/12 75/7
**antivirus [1]** 84/16
**Antonin [1]** 81/4
**any [109]** 12/4 13/5 13/8 17/9 18/2 20/24 21/7 21/10 21/14 21/15 21/17 21/18 21/20 21/21 21/23 21/24 22/1 22/2 22/4 22/14 22/17 24/15 24/22 25/16 25/20 26/1 26/5 26/7 26/8 26/10 26/11 26/13 26/14 26/16 26/17 26/19 26/20 26/21 26/22 26/24 29/18 29/23 30/1 30/10 31/16 31/16 39/18 39/20 39/22 41/25 42/18 45/17 48/6 48/17 48/19 48/20 48/20 48/23 49/3 56/2 56/15 61/9 61/16 61/19 62/8 62/10 62/12 62/12 62/22 63/5 64/7 64/19 66/20 67/12 67/18 69/17 70/6 71/24 72/9 72/11 73/15 75/7 76/10 83/14 83/18 84/19 85/4 85/5 85/14 86/13 91/21 95/9 96/1 99/17 99/25 104/24 105/19 108/3 110/11 111/1 112/14 112/18 112/18 114/15 114/16 115/5 115/5 115/11 116/4
**anyone [4]** 29/7 34/6 68/17 85/23
**anything [35]** 4/18 18/17 19/5 19/9 21/12 23/23 24/21 29/14 46/6 51/1 55/12 58/15 67/8 75/12 75/25 87/5 96/4 97/11 102/5 102/19 102/25 103/8 103/17 103/22 103/25 104/4 109/18 109/22 111/11 111/22 112/21 114/2 114/17 115/19 116/20
**anything to [1]** 103/22
**anyway [2]** 83/7 95/2
**anywhere [2]** 34/18 68/14
**apologies [2]** 5/20 75/20
**apparel [1]** 22/23
**apparent [1]** 94/8
**APPEARANCES [3]** 1/12 1/23 2/1

## A

**appears [6]** 16/20 54/21 62/20 65/20 71/5 90/19
**apples [1]** 59/25
**applied [3]** 74/22 75/9 89/13
**apply [6]** 35/6 35/12 37/9 44/1 44/14 75/11
**applying [2]** 34/13 34/15
**appointment [2]** 78/3 78/10
**appreciation [1]** 98/11
**approach [1]** 4/4
**appropriate [7]** 38/11 42/20 67/17 74/6 74/16 76/22 77/9
**approval [2]** 117/16 117/20
**approved [1]** 66/14
**approximately [1]** 102/1
**arbitrary [1]** 33/3
**are [154]**
**area [2]** 18/22 19/6
**arguably [1]** 44/23
**argue [4]** 29/10 35/8 64/20 69/21
**arguing [1]** 69/22
**argument [8]** 52/10 52/10 52/21 68/8 68/21 68/23 69/20 69/24
**arguments [2]** 37/3 70/2
**Arlington [1]** 81/4
**around [2]** 56/19 98/7
**Arps [1]** 80/24
**arrested [3]** 11/20 11/23 28/19
**arrive [3]** 33/23 34/25 93/25
**article [2]** 84/24 84/25
**articles [2]** 57/19 57/20
**as [150]**
**as-applied [1]** 75/9
**aside [1]** 30/21
**ask [26]** 19/4 19/8 19/11 19/13 19/20 25/23 26/1 39/6 60/15 62/25 68/21 85/12 90/10 104/3 104/5 108/7 110/10 114/9 114/12 114/16 115/5 115/17 117/1 117/6 117/9 118/2
**asked [6]** 27/3 57/8 57/9 72/6 78/10 106/6
**asking [10]** 18/14 18/21 19/7 19/19 22/11 25/24 27/13 56/21 60/18 106/10
**asleep [1]** 78/12
**aspect [1]** 64/14
**asserted [1]** 63/14
**assessment [1]** 41/12
**assets [6]** 37/7 38/24 41/13 43/19 101/25 102/1
**assigned [1]** 6/10
**associated [7]** 84/16 105/1 110/22 112/4 113/1 113/23 115/12
**association [4]** 40/5 84/9 84/11 84/13
**association's [1]** 38/8
**assuming [3]** 39/11 100/19 117/3
**assumption [4]** 41/12 100/4 100/8 100/23
**astronomical [1]** 96/23
**astrophysicist [2]** 54/23 54/25
**astrophysics [1]** 55/1
**attached [1]** 66/19
**attack [1]** 29/10
**attempt [1]** 112/19
**attempted [1]** 46/6
**attempting [1]** 64/17
**attention [8]** 10/10 15/22 17/20 23/3 25/3 39/21 39/23 42/13
**attorney [6]** 69/20 69/24 70/2 82/12 82/14 118/4
**attorneys [1]** 118/1
**attributable [1]** 61/6
**attribute [2]** 30/11 42/6
**attribution [1]** 29/24
**August [6]** 53/11 53/12 65/15 65/24 66/4 66/20
**August 2023 [1]** 65/15
**August 7th [1]** 53/12
**AUSA [1]** 4/6
**authenticate [1]** 74/18
**authorities [2]** 29/3 29/6
**authority [1]** 39/22
**available [1]** 83/21
**Ave [2]** 1/14 1/20
**Avenue [1]** 2/8
**average [3]** 92/24 93/10 102/11
**avoid [2]** 29/2 29/6
**aware [15]** 26/5 26/8 26/11 26/14 26/17 26/20 28/22 48/23 61/16 89/22 105/24 105/25 106/1 106/2 108/10
**awful [1]** 57/3

## B

**back [38]** 4/20 7/8 31/18 31/20 32/4 36/16 43/14 44/8 45/1 45/8 61/15 62/25 64/16 74/4 75/16 77/13 77/22 81/7 81/13 82/10 98/10 98/11 102/22 103/13 104/8 106/19 106/21 107/4 107/11 110/2 110/22 115/5 115/10 116/6 116/25 117/15 117/19 118/7
**backdoor [2]** 71/5 73/18
**background [10]** 35/22 35/24 38/4 39/7 40/1 46/1 56/2 56/22 56/23 80/9
**Bad [1]** 69/4
**bank [4]** 41/21 82/1 82/8 105/2
**banking [5]** 34/22 37/1 81/11 81/15 85/3
**Bankruptcy [1]** 2/7
**based [23]** 16/16 27/10 27/15 28/11 30/10 36/11 40/23 52/15 63/8 64/24 66/6 67/22 76/7 76/18 86/6 90/18 99/7 99/9 100/7 101/24 102/13 103/20 114/17
**baseline [1]** 44/6
**Bash [1]** 30/4
**basic [1]** 96/22
**basically [3]** 64/10 96/18 104/4
**basis [22]** 18/21 28/10 35/20 48/17 48/20 50/2 56/15 60/11 60/13 61/19 62/8 67/18 67/21 68/3 74/19 75/7 90/7 90/8 107/8 107/13 108/3 110/10
**batch [1]** 10/4
**be [113]** 7/3 8/15 8/22 16/20 17/3 17/7 17/15 25/24 25/24 31/3 31/24 32/1 32/4 32/11 33/2 35/4 37/8 39/23 39/24 41/3 41/20 44/6 47/22 48/4 48/13 50/11 51/12 52/2 55/12 58/20 58/25 60/1 60/21 62/11 62/20 64/7 65/20 67/8 67/17 68/3 69/21 69/24 69/25 69/25 71/5 73/1 73/6 73/7 73/17 73/22 74/20 75/5 75/7 77/6 77/18 78/11 78/12 78/25 79/6 79/11 79/23 82/25 82/25 85/14 85/14 85/16 85/19 85/22 86/20 88/9 89/23 91/20 93/2 93/2 93/5 93/7 93/8 93/9 94/18 94/20 94/21 95/3 95/12 95/13 95/15 95/17 96/11 97/22 97/23 98/1 98/5 98/24 99/19 102/11 103/22 104/2 106/9 108/10 109/16 109/17 111/4 111/8 112/4 113/1 113/13 116/1 117/4 117/10 117/12 118/1 118/4 118/6 118/6
**became [1]** 11/17
**because [48]** 10/6 19/14 32/18 33/12 34/15 35/3 35/10 36/1 37/5 37/24 38/8 39/22 40/5 40/16 40/19 41/20 42/4 42/7 42/18 44/11 51/13 51/24 54/22 55/15 55/25 59/1 60/1 62/9 67/8 68/4 68/14 70/21 72/16 73/23 73/24 74/6 74/9 78/2 79/2 101/17 102/10 106/6 106/10 106/14 114/14 115/23 116/1 116/4
**become [1]** 97/16
**been [38]** 5/25 17/1 17/6 33/4 33/4 37/4 38/14 40/18 43/13 44/16 50/14 52/22 56/4 60/14 61/4 62/9 64/6 67/3 70/7 71/14 73/21 75/4 78/8 78/12 81/5 82/10 82/16 85/11 88/6 89/20 91/14 98/21 99/15 100/15 100/21 103/15 104/16 110/22
**before [22]** 1/9 4/18 11/17 11/19 14/8 54/23 67/2 67/2 67/9 76/21 77/25 78/1 79/1 85/7 92/19 95/13 106/12 106/19 110/1 114/19 115/19 116/22
**beginning [1]** 5/5
**behave [4]** 49/22 56/16 61/20 62/9
**behavior [10]** 38/25 45/7 52/2 55/23 56/5 58/25 60/8 61/18 71/16 110/19
**behavioral [1]** 114/13
**being [7]** 33/18 40/12 45/7 48/20 55/2 85/9 110/3
**believe [34]** 5/19 9/5 11/16 11/21 13/14 13/16 14/20 15/5 15/7 15/16 17/7 17/10 20/21 23/14 23/16 25/7 34/9 41/2 51/19 53/12 55/6 55/8 57/22 60/23 84/6 90/6 101/11 102/7 105/17 106/7 110/7 111/8 111/19 113/7
**believes [1]** 111/18
**below [2]** 20/2 114/1
**bench [15]** 28/7 31/9 32/3 86/2 86/24 91/9 92/9 107/24 108/12 109/3 110/15 114/11 115/8 116/13 117/8
**best [4]** 71/6 94/16 100/14 101/12
**better [2]** 31/7 104/2
**between [8]** 8/8 15/2 21/14 27/14 49/20 61/25 94/9 95/7
**beyond [13]** 12/8 12/13 18/9 18/22 19/6 19/14 22/14 22/16 24/6 24/25 25/25 29/17 30/19
**billion [3]** 95/15 96/16 100/24
**bills [2]** 112/20 112/20
**Billy [2]** 6/21 6/24
**bit [6]** 41/4 49/5 55/14 59/25 62/18 116/22
**Bitcoast [3]** 70/6 70/7 70/19
**Bitcoin [137]**
**Bitcoin's [1]** 96/15
**Bitcoin-related [1]** 105/12
**Bitcoiners [1]** 97/17
**Bitstamp [1]** 29/5
**black [1]** 101/17
**blockchain [13]** 59/8 80/15 82/20 82/21 82/22 82/23 82/25 83/1 83/2 83/3 83/7 83/9 104/24
**board [3]** 22/16 82/19 84/4
**Bob [2]** 6/22 6/24
**bono [1]** 85/16
**book [3]** 23/2 85/6 86/10
**books [3]** 23/1 85/4 85/5
**both [2]** 8/17 51/18
**bottom [6]** 9/2 9/10 10/15 96/14 97/7 101/7
**bought [5]** 56/4 96/13 97/21 97/25 114/16
**box [4]** 4/21 19/25 20/10 20/16
**break [14]** 31/5 31/11 31/13 31/17 77/22 79/3 110/2 114/10 115/4 115/9 115/16 115/19 115/21 116/18
**Breaking [1]** 69/4
**brief [1]** 84/21
**briefing [1]** 83/15
**briefly [5]** 23/3 26/25 28/15 98/18 106/20
**bring [4]** 39/20 45/25 77/13 117/18
**bringing [1]** 41/23
**brings [1]** 69/3
**broader [1]** 59/16
**BRODIE [1]** 1/15
**Brooklyn [1]** 2/4
**Brothers [1]** 25/19
**brought [5]** 18/11 22/9 29/22

**B**

**brought... [2]** 39/22 106/15
**BROWN [21]** 1/15 4/7 31/1 33/12 34/7 37/16 46/12 49/11 52/5 57/9 57/16 58/21 59/4 66/2 68/21 70/23 72/1 73/11 75/12 77/5 77/17
**BTC [1]** 93/25
**Buddha [1]** 26/9
**Budworx [2]** 21/16 26/15
**bullet [8]** 46/20 47/5 52/9 70/8 70/20 88/24 89/8 112/16
**burden [3]** 28/10 30/6 30/16
**business [12]** 63/7 65/4 65/20 67/24 69/5 69/7 69/12 80/16 112/15 113/2 114/5 114/6
**businesses [1]** 65/11
**busy [1]** 67/4
**buy [3]** 13/12 96/17 97/20
**buyer [1]** 96/24
**buying [3]** 14/25 56/13 96/19

**C**

**calculated [2]** 36/3 92/17
**calculation [8]** 86/19 90/17 93/25 94/8 94/15 94/21 95/7 99/4
**calculations [15]** 37/5 42/23 90/11 90/13 90/25 92/5 97/2 97/2 98/24 99/10 99/12 99/25 100/18 100/18 100/19
**call [5]** 28/4 77/25 78/1 79/18 82/19
**called [9]** 80/24 82/1 82/20 83/21 83/24 83/25 97/4 97/9 103/19
**calls [2]** 38/1 79/19
**came [9]** 14/8 14/9 14/12 29/1 44/10 55/6 64/3 71/14 81/13
**can [96]** 4/20 4/22 5/6 6/5 6/8 7/23 8/3 8/12 9/2 9/15 10/11 10/15 10/25 14/19 16/20 18/16 19/4 19/8 19/11 19/13 20/8 21/1 22/5 25/23 25/25 28/4 28/5 39/7 39/25 40/1 40/9 41/9 41/22 42/1 42/21 43/14 44/5 44/13 44/17 46/10 46/11 47/3 47/19 49/12 50/24 50/25 51/8 52/21 54/11 54/22 57/3 57/20 60/7 64/20 68/21 73/19 73/20 75/1 75/18 77/14 77/19 77/20 78/5 79/10 82/25 82/25 83/6 87/18 88/14 88/15 91/8 92/14 94/21 94/21 96/7 99/23 99/23 104/7 104/7 104/9 104/18 105/1 107/23 108/15 109/4 112/25 114/25 115/5 115/13 115/16 116/10 116/23 116/24 117/10 117/13 118/8
**can't [13]** 12/6 20/4 29/25 30/11 39/13 39/15 44/9 44/19 49/1 58/10 63/22 72/23 117/18
**cannot [4]** 14/9 14/13 76/5 76/5
**Capitol [1]** 81/17
**car [2]** 41/22 69/4
**card [8]** 55/22 55/23 56/4 98/6 109/9 111/6 111/6 111/6
**cards [31]** 50/6 50/6 50/22 50/22 51/2 51/18 51/19 51/23 51/23 52/8 52/9 52/20 52/20 54/2 54/2 55/21 55/21 56/13 58/1 61/22 61/22 62/7 62/7 108/23 109/18 110/8 110/9 111/2 111/3 111/4 114/17
**careful [1]** 95/3
**Cartel [1]** 26/12
**case [47]** 4/2 11/22 12/2 15/21 23/16 23/19 24/7 24/13 27/11 28/3 28/12 29/25 30/9 30/10 30/15 31/15 31/15 31/16 32/15 32/16 33/24 35/8 35/10 35/12 37/10 39/20 40/6 40/16 42/13 42/15 42/17 44/14 45/5 45/14 63/14 73/24 74/15 74/15 77/8 85/12 85/13 89/18 89/20 99/8 99/9 115/11 115/12
**Casebitcoin [1]** 97/9
**cases [7]** 27/7 51/14 62/15 74/13 74/14 81/14 82/17
**cash [8]** 65/5 67/23 68/7 69/18 70/10 104/17 112/10 112/14
**CATHERINE [1]** 1/13
**caused [1]** 44/11
**causing [2]** 42/7 56/7
**CCFI [6]** 34/21 36/25 84/1 84/14 84/17 89/10
**Ccips [1]** 1/19
**ceiling [1]** 95/16
**cents [1]** 104/13
**certain [4]** 22/10 22/10 35/16 91/2
**certainly [4]** 40/3 46/11 56/25 91/19
**certificate [1]** 80/15
**certification [12]** 34/20 34/21 34/21 36/24 36/25 39/14 54/13 83/17 84/3 86/11 89/10 91/16
**certifications [6]** 34/20 36/24 56/18 83/19 89/6 91/22
**certified [17]** 33/4 35/14 41/2 41/3 41/6 54/13 54/16 83/20 83/21 83/22 83/23 83/25 84/1 84/8 84/11 84/13 84/18
**certify [1]** 119/3
**CFE [7]** 34/20 36/24 65/1 83/23 84/10 89/1 89/13
**CFF [6]** 65/1 83/21 83/22 84/6 84/8 88/25
**CFS [2]** 34/20 36/24
**Chainalysis [2]** 46/25 107/14
**chambers [1]** 31/21
**Chancery [1]** 80/22
**changed [1]** 29/20
**changes [2]** 41/24 70/17
**characterization [1]** 40/15
**characterize [1]** 94/17
**characters [4]** 7/14 7/20 7/25 8/25
**charges [2]** 29/11 29/13
**chart [14]** 19/10 19/11 97/3 97/8 97/10 102/20 103/10 103/13 103/18 103/19 103/23 107/1 114/1 114/1
**charts [1]** 36/5
**chase [1]** 38/3
**check [1]** 72/23
**checking [1]** 105/2
**Chemical [1]** 25/19
**chief [1]** 81/19
**child [6]** 5/8 5/9 6/18 8/14 11/2 24/21
**Chris [1]** 4/6
**CHRISTOPHER [1]** 1/15
**circles [1]** 56/19
**cited [1]** 74/14
**Citibank [1]** 41/19
**claim [1]** 60/24
**clarification [2]** 39/6 109/4
**clarified [2]** 103/22 103/23
**clarify [3]** 26/2 103/8 103/25
**clarity's [2]** 65/6 68/1
**classic [1]** 61/3
**clear [6]** 28/22 50/14 50/18 58/19 74/12 115/12
**clearly [2]** 41/20 66/17
**clerked [1]** 80/22
**click [1]** 87/20
**client [7]** 47/11 48/12 48/14 64/13 64/16 112/14 112/19
**client's [1]** 48/5
**clients [3]** 49/3 82/13 112/18
**clients' [1]** 64/18
**closing [2]** 52/10 72/21
**clothing [1]** 22/22
**cluster [5]** 94/16 94/18 94/18 95/1 95/23
**Coast [2]** 21/25 62/18
**Code [12]** 62/19 63/23 63/25 64/10 112/24 112/25 113/1 113/3 113/14 113/21 113/23 114/3
**coin [1]** 82/21
**collapse [2]** 58/13 58/14
**colloquy [1]** 59/9
**COLUMBIA [1]** 1/1
**column [6]** 6/8 6/10 6/21 7/13 7/15 8/21
**columns [5]** 5/23 6/16 16/15 101/3 101/4
**come [12]** 39/5 43/3 43/10 58/10 61/15 74/3 76/20 93/8 115/5 115/10 116/6 116/25
**comes [6]** 33/7 40/8 41/13 75/6 86/15 95/3
**coming [7]** 5/4 28/23 36/3 37/6 74/19 77/6 84/25
**comment [1]** 111/11
**commenting [2]** 76/11 91/22
**Commission [1]** 81/2
**commit [1]** 59/23
**committee [2]** 81/19 81/20
**common [3]** 49/4 56/3 71/25
**communicated [2]** 25/15 25/18
**communicating [16]** 13/1 13/5 21/8 21/11 21/16 21/19 21/22 21/25 22/3 24/18 26/6 26/9 26/12 26/15 26/18 26/21
**communications [2]** 27/14 27/19
**companies [1]** 81/1
**company's [1]** 35/15
**compare [1]** 101/4
**comparison [1]** 60/1
**competent [3]** 50/17 72/8 72/10
**complete [2]** 74/24 115/18
**completely [1]** 83/4
**complied [1]** 35/13
**comply [3]** 38/8 40/5 42/15
**computer [2]** 30/6 113/14
**computers [1]** 117/12
**concede [1]** 66/3
**conceding [1]** 61/9
**concern [13]** 35/15 38/15 38/21 42/2 42/7 44/11 46/13 49/10 50/8 56/8 59/16 69/2 73/4
**concerned [5]** 49/22 56/14 58/3 82/24 116/3
**concerning [1]** 28/24
**concerns [2]** 32/14 46/16
**concise [1]** 65/24
**conclude [6]** 28/11 30/18 30/19 34/14 75/10 114/2
**concluded [1]** 31/14
**concludes [2]** 28/2 86/25
**conclusion [7]** 29/20 34/18 45/17 76/17 90/14 108/16 110/10
**conclusions [2]** 34/25 63/8
**concrete [1]** 55/20
**conduct [3]** 31/15 32/19 115/11
**conducted [1]** 25/11
**conference [14]** 28/7 31/9 86/2 86/24 91/9 92/9 107/24 108/12 109/3 110/15 114/11 115/8 116/13 117/8
**confidential [2]** 82/6 118/8
**confidentiality [6]** 47/10 47/14 48/5 48/12 48/15 48/18
**conflicts [1]** 72/5
**confuse [1]** 42/16
**confusing [4]** 32/20 32/20 42/8 44/25
**confusion [1]** 76/9
**Congress [4]** 83/13 83/14 83/16 83/16
**congressional [1]** 81/21
**connect [2]** 18/19 47/25
**connection [1]** 88/21
**consciousness [1]** 29/6
**conservative [3]** 92/25 94/21 102/10
**consider [3]** 44/2 74/5 94/14
**considered [1]** 98/24
**considering [1]** 74/20
**consistent [13]** 29/5 30/3 30/5

C

**consistent... [10]** 30/14 38/16 45/7 45/16 64/17 97/9 106/24 108/18 114/4 114/5
**conspiracy [3]** 28/17 28/18 59/23
**constitutes [2]** 60/6 119/4
**Constitution [1]** 2/8
**constitutional [1]** 74/23
**consult [1]** 57/23
**content [1]** 32/10
**contention [1]** 68/5
**contents [2]** 3/1 6/15
**context [1]** 48/4
**continuation [1]** 37/19
**continue [7]** 4/24 29/12 78/13 88/14 88/15 92/14 94/6
**continued [4]** 1/23 2/1 3/4 5/2
**contorted [1]** 73/19
**contrary [3]** 39/20 39/22 61/12
**contrast [1]** 95/7
**conversation [1]** 118/8
**conversations [2]** 72/13 73/5
**conviction [2]** 116/7 116/9
**convoluted [1]** 30/12
**copies [1]** 31/22
**copy [2]** 31/21 32/7
**core [2]** 36/14 40/16
**corporate [7]** 37/2 80/23 81/11 81/16 82/13 84/24 85/3
**correct [39]** 6/25 8/7 8/18 9/19 10/2 10/14 11/4 11/16 11/18 11/24 12/1 12/18 13/13 13/14 13/24 14/8 14/12 15/1 15/5 15/19 20/21 23/11 24/19 25/7 25/10 25/12 27/12 27/17 33/12 47/19 66/15 89/7 93/17 94/3 95/25 96/3 99/13 112/8 119/4
**correctly [1]** 100/7
**correlation [1]** 43/20
**correspond [1]** 11/1
**corresponding [2]** 5/12 5/16
**could [80]** 5/1 5/18 6/9 7/1 9/10 9/17 9/22 13/15 13/21 14/14 14/18 14/20 15/6 18/4 28/11 54/20 55/10 56/12 57/25 58/14 60/14 61/21 62/6 62/15 72/21 73/1 75/4 75/5 78/10 80/4 80/8 80/17 84/21 87/8 87/20 88/13 88/19 89/15 90/13 90/16 92/16 92/16 93/2 93/7 93/13 94/6 95/12 95/17 95/18 96/7 96/13 96/15 96/17 96/20 97/14 98/12 100/17 102/22 103/15 104/2 104/16 105/23 106/20 108/20 109/2 109/9 109/16 109/17 110/1 110/4 111/4 111/14 111/24 112/1 112/24 113/6 113/8 113/11 117/9 117/19
**couldn't [4]** 34/2 34/12 34/17 35/21
**counsel [9]** 4/4 4/5 4/7 4/12 81/20 85/13 85/16 85/18 85/20
**count [3]** 59/23 59/24 66/4
**counts [1]** 59/23
**couple [5]** 7/25 8/25 97/20 97/25 104/17
**course [2]** 29/7 116/17
**court [51]** 1/1 2/6 2/7 4/11 10/5 19/18 32/2 32/14 33/10 35/25 36/5 37/21 41/5 43/5 43/6 43/12 44/7 45/1 46/6 47/25 49/20 49/24 53/12 55/6 55/8 55/13 58/9 58/22 59/2 59/8 66/14 66/23 66/25 66/25 67/3 72/6 72/24 75/25 76/4 78/18 79/12 80/22 80/23 85/7 85/8 86/25 91/19 94/2 109/24 119/3 119/13
**Court's [6]** 36/16 40/14 45/2 45/9 65/25 66/11
**courthouse [1]** 47/25
**courtroom [3]** 117/14 117/19 118/3
**Courts [1]** 2/7
**cover [2]** 57/19 57/19
**CPA [9]** 34/20 36/23 48/9 48/24 49/5 65/1 84/3 89/13 91/21
**CPAS [1]** 84/9
**created [5]** 14/7 69/5 83/2 83/7 100/19
**creating [1]** 103/10
**credential [4]** 83/21 83/23 83/24 83/25
**credentials [4]** 33/9 33/12 43/24 89/1
**crimes [1]** 105/12
**criminal [3]** 1/3 4/2 74/23
**criminals [1]** 59/7
**CRM [1]** 1/19
**cross [7]** 3/4 11/7 49/12 57/16 76/24 76/25 78/23
**cross-examination [3]** 3/4 11/7 76/24
**cross-examine [1]** 76/25
**crossed [1]** 58/21
**crux [1]** 61/10
**crypto [3]** 38/25 53/5 82/14
**cryptocurrency [14]** 43/21 84/1 84/18 85/1 85/2 86/1 86/6 86/8 86/9 86/10 86/10 86/14 86/21 89/14
**cryptography [2]** 83/3 83/8
**Crystal [1]** 26/9
**customer [1]** 94/19
**customers [1]** 24/10
**cut [2]** 5/22 38/2
**CV [3]** 58/2 58/11 58/16
**CVA [2]** 83/24 84/12
**cyber [1]** 59/7

D

**D-E-R-R-I-C-K-K [1]** 9/24
**dangerous [1]** 117/11
**darknet [3]** 13/5 13/8 29/1
**data [3]** 16/20 16/22 22/8
**date [12]** 8/3 9/15 10/16 14/9 14/13 19/4 19/8 19/13 20/16 20/19 23/14 97/16
**dated [3]** 18/24 113/23 119/10
**dates [1]** 14/6
**Daubert [32]** 31/21 32/13 33/12 34/3 35/19 36/17 36/22 37/19 37/20 39/18 42/3 44/10 44/15 45/9 53/20 54/19 57/9 57/16 58/14 58/18 58/19 60/14 60/19 62/11 65/25 66/8 66/9 67/1 67/3 67/12 86/6 91/14
**day [10]** 34/5 34/5 78/7 78/9 97/15 102/24 103/1 103/12 115/24 119/10
**days [1]** 66/5
**DC [6]** 1/5 1/14 1/17 1/21 2/9 80/24
**deal [2]** 54/19 70/6
**dealers [1]** 22/11
**dealing [1]** 77/6
**Dean [1]** 105/17
**debate [1]** 42/14
**debating [1]** 43/13
**debit [2]** 110/8 111/6
**decide [1]** 37/25
**decided [1]** 106/16
**deck [26]** 30/22 30/24 45/18 45/19 53/11 53/14 53/15 53/16 53/18 54/2 63/2 65/22 65/24 66/4 66/7 66/7 66/19 66/21 66/21 66/24 67/6 77/15 86/17 87/24 102/22 104/8
**defendant [9]** 1/7 2/2 4/11 27/14 28/23 69/11 73/25 117/10 117/13
**defendant's [15]** 17/3 17/5 17/7 17/14 17/16 66/4 68/24 74/23 87/9 88/7 98/13 99/16 99/19 102/23 103/16
**defending [1]** 82/12
**defense [30]** 3/10 3/10 3/11 16/25 28/4 28/9 32/8 50/9 55/7 66/18 72/6 73/13 73/15 73/16 73/17 74/3 74/9 74/15 74/24 75/6 76/14 79/17 79/19 85/25 88/5 88/11 99/14 99/21 115/21 118/1
**defined [1]** 95/20
**definitely [1]** 116/20
**degree [2]** 80/10 80/12
**Delaware [1]** 80/22
**deliberate [1]** 116/5
**deliberation [1]** 116/8
**demonstrates [2]** 96/12 98/3
**demonstrative [5]** 66/7 88/8 88/10 99/16 99/20
**deny [1]** 30/17
**depart [1]** 39/18
**DEPARTMENT [2]** 1/13 81/24
**Depending [1]** 78/23
**depiction [1]** 87/24
**deposit [8]** 6/10 6/24 15/25 17/23 18/3 20/22 20/23 20/25
**Dept [1]** 1/20
**depth [2]** 24/11 53/20
**Derrickk [2]** 9/24 9/25
**describe [5]** 77/9 80/8 80/17 88/25 113/11
**described [1]** 94/19
**describing [3]** 33/11 34/11 35/17
**description [1]** 37/15
**desk [1]** 11/25
**detail [1]** 93/14
**devices [12]** 24/22 78/18 79/3 79/7 79/10 115/22 116/22 117/5 117/11 117/11 118/2 118/5
**diabetic [1]** 116/14
**did [54]** 5/12 5/14 5/19 7/7 8/17 11/25 13/12 15/18 23/2 23/18 23/22 24/7 26/13 26/16 26/19 26/22 27/7 27/9 33/13 40/1 42/15 42/23 45/8 46/6 49/24 51/13 53/20 57/16 67/9 69/11 73/10 82/3 83/13 86/7 87/5 91/13 93/25 94/10 95/10 99/12 100/1 100/10 103/10 105/10 105/16 105/19 105/22 107/21 109/19 110/7 112/10 112/14 114/21 114/24
**didn't [33]** 11/22 20/24 21/9 21/12 21/13 21/14 21/17 21/23 22/1 22/4 23/10 25/16 25/20 26/7 26/10 40/5 42/4 44/1 44/1 51/14 53/18 62/2 66/10 70/22 75/7 85/11 95/25 98/5 104/15 108/3 112/18 112/18 114/13
**die [1]** 48/15
**difference [2]** 8/8 94/9
**different [9]** 9/12 17/11 38/13 39/3 50/25 82/15 82/17 103/12 108/17
**dinner [1]** 78/6
**direct [6]** 3/4 3/7 5/2 23/20 37/12 80/2
**directed [1]** 28/9
**directing [3]** 10/10 15/22 17/20
**directly [1]** 37/11
**dirty [1]** 69/6
**disadvantage [1]** 55/15
**disagree [1]** 35/25
**DISB [1]** 29/9
**disclose [1]** 66/24
**disclosed [25]** 38/14 39/4 44/16 44/24 48/20 50/12 52/14 52/22 52/25 53/13 54/10 56/6 56/16 56/17 57/11 57/18 60/14 71/9 71/10 72/4 73/13 73/21 74/7 75/5 86/17
**disclosure [27]** 39/1 47/7 49/6 50/7 52/24 53/5 53/19 53/22 56/20 57/19 57/22 60/3 62/10 62/22 64/1 64/19 65/12 66/1 66/5 66/18 67/4 67/15 67/22 71/4 71/8 75/10 114/15
**disclosures [12]** 39/2 50/25 51/1 51/3 52/14 54/18 57/12 62/25 63/10 63/11 66/6 74/10
**discovery [9]** 50/23 51/24 63/9

## D

**discovery... [6]** 64/25 89/17 99/7 99/9 110/18 111/2
**discrete [2]** 46/15 46/19
**discuss [5]** 18/12 31/15 106/16 115/10 115/17
**discussed [9]** 5/25 19/19 57/16 58/17 66/14 88/20 92/11 114/6 114/19
**discusses [1]** 35/1
**discussing [12]** 30/25 32/25 33/6 33/21 34/19 34/24 48/25 51/25 57/13 71/18 71/23 111/1
**discussion [6]** 34/9 37/21 91/15 98/11 109/19 110/3
**discussions [1]** 92/3
**displayed [1]** 94/2
**disregard [1]** 24/14
**distinction [2]** 8/12 49/20
**DISTRICT [5]** 1/1 1/1 1/10 2/7 80/21
**diverting [1]** 42/12
**DNS [1]** 30/10
**do [103]** 4/14 4/14 8/17 15/23 15/25 17/21 17/23 18/16 18/17 19/25 21/4 21/6 23/4 25/3 27/18 27/19 27/21 29/23 31/7 31/12 32/23 34/7 34/12 34/17 35/21 37/24 38/14 44/2 44/5 46/10 46/11 48/16 48/17 49/5 50/2 50/3 50/4 51/14 54/6 55/13 55/24 57/2 57/24 67/8 67/14 69/25 70/24 72/25 73/18 76/22 77/9 77/10 77/19 77/21 78/15 78/25 79/4 83/6 83/14 83/19 86/5 87/14 87/22 87/23 88/2 90/6 91/5 91/13 92/1 93/24 94/14 95/9 98/14 98/15 98/22 98/23 100/15 101/11 101/25 103/13 108/5 108/21 109/12 110/7 110/19 110/25 111/15 112/6 112/16 113/3 113/8 113/10 113/15 113/16 114/2 114/10 114/20 115/2 116/20 116/20 116/23 117/14 117/19
**doable [1]** 78/24
**docket [3]** 53/17 66/17 67/4
**docketed [1]** 66/6
**doctor's [1]** 78/10
**doctorate [1]** 80/12
**document [1]** 66/17
**does [19]** 10/5 11/1 18/2 29/12 34/6 48/6 49/10 53/22 61/15 66/16 66/24 69/14 84/7 84/16 84/17 86/18 100/23 107/3 107/5
**doesn't [17]** 18/1 19/5 32/16 34/14 34/16 42/18 49/3 50/11 51/12 52/1 54/21 65/18 69/17 75/11 78/5 91/5 92/7
**doing [14]** 7/2 16/4 34/12 35/20 55/12 56/12 73/9 80/25 82/5 82/16 91/18 91/20 113/1 114/14
**DOJ [2]** 1/16 1/19
**DOJ-CRM [1]** 1/19
**DOJ-USAO [1]** 1/16
**dollar [1]** 100/24
**dollars [17]** 14/17 28/21 64/5 92/20 95/9 95/12 95/15 95/17 99/5 100/3 100/5 100/10 101/15 104/17 111/18 111/19 111/19
**don't [112]** 15/8 15/20 16/2 16/18 18/16 19/5 19/9 19/14 19/20 21/7 21/10 21/15 21/18 21/20 21/21 21/24 22/2 22/8 22/13 22/13 22/14 22/17 23/14 30/10 30/14 31/4 31/15 31/15 31/17 32/24 33/5 33/10 33/17 34/18 35/1 35/3 35/10 37/6 38/8 39/10 39/17 39/18 40/9 40/14 40/20 41/8 41/10 41/16 41/23 41/24 42/19 43/7 43/15 43/25 44/16 45/3 45/10 47/14 47/18 48/19 48/19 48/22 49/7 50/1 52/6 54/5 54/5 55/15 59/14 60/5 61/19 62/7 62/22 64/19 66/3 67/13 67/17 67/21 68/8 68/16 68/17 70/21 71/13 71/13 72/9 72/10 72/16 72/18 73/16 74/5 74/8 74/16 77/10 84/22 85/20 85/22 86/20 87/13 90/10 91/18 91/20 107/8 111/7 114/14 115/10 115/10 115/11 115/23 116/2 116/4 116/20
**done [9]** 33/14 39/21 56/12 69/18 79/9 81/5 82/14 85/15 92/6
**double [1]** 54/3
**doubt [2]** 29/17 30/19
**down [21]** 9/2 9/10 10/15 11/15 14/19 17/20 18/4 21/1 23/15 25/6 36/21 45/18 53/8 53/16 53/21 65/23 73/3 85/20 97/6 104/7 113/6
**download [3]** 5/9 9/10 10/17
**downloaded [2]** 6/7 9/13
**downloading [1]** 8/16
**downloads [10]** 6/21 7/13 7/24 8/11 8/13 8/15 9/25 10/12 10/21 11/3
**downstairs [2]** 117/17 117/18
**draw [1]** 62/15
**draws [1]** 95/6
**dressed [1]** 38/15
**drew [1]** 49/20
**drop [1]** 76/23
**drug [1]** 15/19
**drugs [1]** 15/3
**due [1]** 75/7
**Durden [1]** 21/11
**during [7]** 32/13 49/19 59/9 66/23 81/6 93/15 118/4
**duty [3]** 48/5 48/12 48/24

## E

**each [2]** 58/10 101/6
**earlier [2]** 100/25 109/7
**early [5]** 82/24 96/24 98/9 104/15 104/16
**earn [6]** 94/10 96/13 96/15 96/20 100/5 100/9
**earned [20]** 36/13 90/18 91/4 93/5 94/10 95/5 95/21 95/24 96/15 96/21 101/1 101/1 101/1 101/2 101/8 101/14 101/14 106/3 106/23 107/1
**earning [1]** 64/6
**earnings [8]** 92/18 96/23 96/23 98/25 99/5 100/2 105/25 114/7
**easiest [2]** 91/2 91/4
**easily [2]** 71/20 115/14
**Eastern [1]** 80/21
**eat [1]** 116/15
**eats [1]** 116/16
**Economics [1]** 80/15
**economist [1]** 81/19
**edited [1]** 65/23
**educational [1]** 80/8
**effect [1]** 73/6
**effective [1]** 52/8
**effort [4]** 98/17 98/19 100/2 114/5
**eight [1]** 11/19
**either [6]** 10/5 37/22 40/8 49/23 95/12 117/14
**EKELAND [30]** 2/2 2/3 3/4 3/7 4/10 11/6 16/1 20/3 27/13 29/14 32/23 38/18 39/6 47/19 50/20 57/6 60/15 60/23 62/24 65/10 69/20 70/15 71/11 72/13 74/7 76/5 76/13 79/17 114/10 114/12
**Ekeland's [1]** 41/18
**electronic [2]** 115/22 118/2
**elements [1]** 89/2
**elicit [2]** 40/13 45/24
**else [14]** 29/15 75/12 76/21 78/6 96/4 97/11 102/5 102/19 102/25 103/17 103/25 111/11 111/22 112/21
**email [1]** 66/22
**empirical [1]** 48/23
**employer [1]** 48/2
**employer's [1]** 47/23
**enabled [1]** 28/19
**encountered [1]** 59/20
**end [12]** 29/20 31/9 46/6 51/10 78/16 86/24 92/9 100/24 108/12 110/15 115/8 117/8
**ended [1]** 108/7
**engage [2]** 74/10 110/19
**engaged [2]** 61/18 61/20
**enough [2]** 34/3 62/5
**entered [1]** 106/7
**entire [3]** 30/9 30/10 30/15
**entirely [5]** 30/14 38/11 76/16 77/10 78/9
**entitled [2]** 32/9 119/5
**entity [1]** 110/24
**essentially [4]** 28/18 28/19 47/20 65/8
**established [3]** 18/21 22/17 29/16
**estimate [7]** 91/2 92/24 93/24 93/25 94/25 100/3 100/6
**estimates [4]** 95/9 101/19 106/24 114/7
**estimating [1]** 92/18
**Euros [1]** 68/9
**evaluating [1]** 37/10
**evaluation [1]** 56/7
**even [22]** 29/8 29/8 29/20 29/21 30/11 31/13 45/18 49/5 52/7 54/1 56/12 61/22 62/14 68/5 71/7 75/9 95/1 104/14 104/15 112/2 115/11 116/3
**event [1]** 97/17
**eventually [2]** 82/7 82/9
**ever [23]** 12/7 13/1 13/4 21/7 21/10 21/15 21/18 21/21 21/24 23/17 24/17 25/14 25/18 30/1 30/8 49/2 60/25 68/5 73/15 81/5 85/7 90/20 93/19
**every [2]** 78/9 89/23
**everybody [1]** 20/8
**everyone [2]** 115/12 118/11
**everything [8]** 16/18 53/20 63/5 76/21 77/16 86/16 105/1 108/22
**evidence [85]** 9/4 13/1 13/4 13/7 13/16 14/20 15/7 16/3 16/6 16/8 17/1 17/7 21/7 21/10 21/15 21/18 21/20 21/21 21/24 22/2 23/23 24/13 24/17 25/14 25/18 25/23 26/1 26/5 26/7 26/8 26/10 26/11 26/13 26/14 26/16 26/17 26/19 26/20 26/22 28/3 28/16 30/1 30/7 30/10 30/18 34/14 50/16 50/17 62/12 65/11 70/8 72/9 72/11 73/24 75/14 76/3 76/7 76/12 76/15 76/18 77/1 77/2 77/2 77/3 77/8 77/9 87/8 87/16 90/19 90/19 93/1 93/20 98/13 100/10 101/24 105/13 106/7 108/22 109/23 110/4 110/8 112/14 112/18 112/19 113/7
**evidentiary [1]** 70/6
**exact [3]** 14/9 14/13 89/23
**exactly [1]** 76/4
**examination [11]** 3/4 3/4 3/5 3/7 5/2 11/7 27/1 33/16 76/24 80/2 118/5
**examine [2]** 76/25 115/22
**examined [2]** 60/16 76/19
**examiner [4]** 41/3 54/13 54/14 83/24
**Examiners [1]** 84/11
**example [7]** 35/12 40/10 40/11 41/9 47/21 47/24 55/20
**except [2]** 30/11 48/3
**exception [5]** 73/23 74/4 74/17 74/20 75/10
**exchange [3]** 30/3 36/3 81/2
**exchanges [1]** 29/4
**excuse [1]** 78/6
**excused [1]** 27/23

E

**exemption [1]** 73/17
**exhibit [64]** 3/10 3/10 3/11 5/1 5/11 5/18 5/24 5/24 6/2 6/2 6/13 6/19 7/1 7/8 7/9 7/12 7/17 8/5 8/19 8/23 9/22 10/3 10/7 10/15 10/19 10/25 13/16 14/21 15/6 15/7 17/2 17/3 17/5 17/6 17/8 17/14 17/16 18/5 18/17 18/17 18/22 51/20 53/25 87/9 88/7 88/9 88/11 93/12 93/15 94/1 94/2 95/6 98/13 99/16 99/19 99/21 102/2 102/6 102/23 103/16 104/12 113/7 113/16 113/17
**Exhibit 305 [1]** 113/7
**Exhibit 316 [3]** 18/5 18/17 18/17
**Exhibit 45A [1]** 51/20
**Exhibit 603A [3]** 15/7 17/2 17/6
**Exhibit 603H [1]** 14/21
**Exhibit 603S [1]** 13/16
**Exhibit 623 [4]** 5/1 5/11 5/18 10/25
**Exhibit 624 [1]** 6/2
**Exhibit 625 [1]** 6/19
**Exhibit 626 [1]** 7/1
**Exhibit 627 [1]** 7/17
**Exhibit 628B [1]** 8/5
**Exhibit 629 [1]** 8/19
**Exhibit 630A [1]** 8/23
**Exhibit 631 [1]** 9/22
**Exhibit 632 [1]** 10/3
**Exhibit 633 [1]** 10/19
**exhibits [8]** 3/9 5/19 7/3 7/7 7/7 73/12 73/13 73/16
**exist [1]** 27/19
**existence [5]** 14/8 14/10 14/12 14/13 96/16
**exotic [2]** 71/16 71/24
**expect [1]** 60/8
**expectation [1]** 67/7
**expedite [1]** 99/3
**experience [5]** 46/1 48/9 56/2 62/13 80/18
**experienced [1]** 58/11
**expert [38]** 19/15 19/17 29/21 33/8 33/23 41/6 43/2 43/3 50/11 52/22 53/5 54/10 54/21 55/9 56/22 57/12 57/18 58/19 59/3 59/6 60/20 61/25 66/18 66/18 67/4 70/1 71/9 72/3 73/20 74/3 74/6 85/25 86/6 86/8 86/13 86/20 87/1 91/17
**expertise [10]** 18/10 18/22 19/6 22/17 48/7 48/17 48/19 61/9 67/20 73/21
**experts [2]** 59/2 73/19
**explain [14]** 6/5 7/23 8/12 10/11 39/9 40/7 88/19 95/18 96/8 99/24 99/25 104/10 108/15 112/1
**explained [1]** 109/15
**explored [2]** 60/21 60/22
**Export [1]** 82/1
**expose [1]** 61/10
**express [1]** 48/21
**expressed [2]** 32/14 35/16
**extended [2]** 34/9 37/21
**extensive [4]** 39/3 53/19 67/11 67/13
**extensively [2]** 39/3 109/7
**extent [13]** 32/14 38/22 41/5 42/12 43/14 45/10 55/11 56/10 58/22 61/8 76/22 86/15 86/18
**extra [2]** 109/17 114/23
**extremely [1]** 53/16
**eyewitness [1]** 12/6
**eyewitnesses [1]** 12/4

F

**face [1]** 68/11
**fact [20]** 12/6 30/20 48/7 48/17 50/18 52/1 56/21 58/23 60/22 61/25 69/11 72/5 72/7 72/7 73/2 74/4 74/10 82/24 90/21 104/24
**facts [2]** 51/21 106/6
**factual [3]** 28/10 30/16 56/14
**factually [1]** 59/19
**failed [4]** 63/7 65/4 65/20 67/5
**fair [4]** 34/2 62/5 87/24 99/11
**fairness [1]** 69/11
**fall [1]** 64/1
**falls [2]** 58/15 67/20
**familiar [3]** 61/2 104/22 105/3
**far [4]** 16/19 53/19 92/7 101/18
**fashion [1]** 114/24
**FBI [5]** 11/17 16/16 59/18 82/7 117/25
**Federal [5]** 76/15 81/21 82/5 82/6 82/8
**fee [11]** 92/22 98/25 100/6 100/9 101/6 101/11 101/12 101/13 101/19 101/22 102/10
**feel [2]** 100/14 106/10
**fees [9]** 37/4 65/17 90/2 90/5 90/6 94/20 95/2 95/2 105/20
**Feldman [1]** 80/21
**fellow [1]** 81/12
**few [3]** 81/7 82/2 82/14
**field [3]** 19/15 58/11 84/24
**figure [2]** 34/1 34/11
**file [1]** 7/13
**filed [2]** 53/12 66/25
**files [1]** 21/9
**final [2]** 4/14 77/11
**finalized [2]** 14/3 67/3
**finances [1]** 96/2
**financial [16]** 33/18 40/24 53/21 75/14 76/3 76/7 76/18 80/14 81/15 81/18 83/22 84/8 86/1 87/1 90/21 91/18
**financials [1]** 45/5
**FinCEN [1]** 29/9
**find [9]** 17/12 57/21 71/22 93/9 95/25 98/22 112/18 112/18 117/14
**fine [15]** 7/10 19/22 36/9 36/13 38/6 45/22 46/2 46/4 46/9 47/12 52/21 104/5 105/13 105/14 118/6
**finish [5]** 23/9 38/20 78/5 79/1 79/13
**finishing [2]** 78/2 78/21
**firm [1]** 80/24
**first [33]** 7/14 7/20 7/25 8/22 8/25 14/1 28/4 30/12 30/22 32/8 34/5 40/15 44/15 52/9 59/5 59/6 63/4 63/4 65/13 66/21 71/14 79/18 81/9 83/15 86/4 86/4 88/24 92/22 94/8 96/15 96/17 97/18 111/12
**Fischbach [8]** 78/18 78/25 79/11 115/21 116/14 117/4 117/10 118/7
**fit [1]** 65/18
**five [2]** 54/23 90/8
**five tools [1]** 90/8
**fix [1]** 71/6
**flawed [1]** 40/4
**Floor [1]** 2/4
**flow [8]** 22/12 64/7 65/5 67/23 68/7 69/18 70/10 112/10
**flowing [1]** 112/10
**flows [3]** 23/24 40/19 112/15
**focus [4]** 45/8 45/18 93/3 94/23
**focused [3]** 45/4 45/10 53/21
**Fog [66]** 5/13 11/1 12/7 14/8 14/9 14/12 23/17 23/21 24/1 28/18 28/19 28/20 28/22 29/1 29/4 29/8 30/2 30/8 30/20 36/3 36/13 37/4 40/19 49/19 50/1 50/3 65/16 68/12 69/13 75/15 76/4 76/18 90/2 90/5 90/6 90/17 91/3 92/19 92/20 92/21 92/22 92/22 93/5 94/10 94/16 94/18 94/18 95/1 95/5 95/20 95/22 95/23 95/23 98/20 98/25 99/4 100/2 100/4 100/8 100/20 101/8 101/13 106/2 106/23 106/25 114/7
**follow [4]** 44/1 47/14 100/14 115/5
**follow-up [1]** 115/5
**following [11]** 5/19 24/11 33/3 41/3 42/21 44/18 44/18 44/19 53/10 91/23 114/21
**foregoing [1]** 119/4
**forensic [42]** 32/9 32/13 32/17 32/17 32/21 33/1 33/7 33/9 33/15 33/19 33/21 34/24 35/11 36/6 36/20 37/1 37/9 38/16 39/12 39/14 39/24 40/24 41/3 41/5 41/16 41/24 43/23 45/24 46/8 54/13 63/6 75/14 76/3 76/7 81/15 82/15 82/17 84/1 84/18 86/1 86/11 87/2
**forensically [6]** 37/23 38/7 39/16 40/12 41/14 42/5
**forensics [8]** 40/11 53/5 83/23 84/8 86/1 87/1 90/21 91/18
**forfeit [1]** 106/8
**forfeiture [1]** 116/9
**fork [1]** 82/22
**form [1]** 6/3
**forth [2]** 62/12 118/7
**forward [1]** 63/22
**found [1]** 113/13
**foundation [9]** 16/9 22/15 62/11 82/19 82/20 83/7 86/9 86/12 99/3
**founded [1]** 82/22
**four [1]** 108/17
**framing [2]** 50/9 91/15
**frankly [1]** 52/10
**fraud [5]** 33/15 54/13 80/25 83/23 84/11
**free [1]** 40/7
**freelance [1]** 113/2
**Friday [5]** 5/5 7/7 21/5 30/25 45/20
**front [19]** 32/8 34/4 50/24 53/4 63/15 65/3 65/6 67/21 68/2 68/6 68/13 68/17 69/2 69/9 70/9 70/21 77/20 93/16 108/9
**full [4]** 71/21 72/16 82/10 94/25
**fully [1]** 83/1
**function [1]** 83/5
**functional [3]** 65/5 67/20 75/17
**functions [1]** 83/6
**funds [18]** 5/13 23/17 48/5 49/23 51/2 52/17 54/4 54/7 60/25 61/4 64/7 65/19 69/8 69/13 94/19 95/23 111/21 112/13
**further [6]** 11/5 26/23 27/22 45/19 61/22 62/6

G

**G-E-E-G-E-E-E-G-E-E [1]** 8/21
**GAAP [3]** 42/15 42/16 45/12
**gain [1]** 105/19
**game [1]** 98/7
**gave [3]** 35/9 37/16 64/11
**gears [1]** 106/10
**Geegeegee [1]** 8/21
**general [9]** 49/22 107/22 109/23 110/17 110/19 110/21 110/25 111/1 112/2
**generally [6]** 6/16 22/16 61/20 109/8 109/8 110/11
**generous [1]** 94/20
**George [3]** 54/14 81/3 81/14
**get [25]** 4/18 4/20 4/22 28/5 35/6 36/21 40/7 49/6 56/3 57/2 57/24 67/11 68/20 70/22 77/15 77/16 77/21 79/15 91/6 109/4 114/13 115/23 117/6 117/16 117/20
**gets [3]** 38/15 50/7 95/7
**getting [4]** 36/15 36/15 44/3 44/3
**gift [21]** 50/6 50/21 51/2 51/19 51/23 52/8 52/20 54/2 55/21 55/23 56/4 56/13 58/1 61/22 62/7 108/23 109/9 109/18 111/2 111/4 111/6
**give [12]** 9/7 31/5 40/9 40/11 41/9 50/24 53/2 67/10 84/21 87/15 88/22 101/6
**given [5]** 37/15 39/6 93/10 93/10

**G**

**given... [1]** 110/23
**giving [1]** 67/12
**Glave [13]** 33/8 37/13 41/2 41/11 64/11 93/12 93/13 93/24 94/11 94/24 95/21 102/2 104/12
**Glave's [8]** 36/4 36/5 37/5 37/10 93/12 95/6 113/3 113/16
**go [33]** 19/14 35/22 53/4 53/8 54/18 55/18 57/21 62/25 67/9 70/4 71/21 80/7 88/13 89/15 90/16 92/16 97/14 98/10 102/22 103/13 104/7 104/9 106/16 106/19 106/21 107/3 108/20 110/2 110/12 111/5 111/14 111/24 113/8
**God [1]** 79/22
**goes [5]** 39/21 49/25 51/6 109/5 117/10
**going [59]** 7/8 18/8 18/20 30/13 30/17 31/11 31/20 35/4 36/20 36/20 36/23 37/8 40/13 42/16 43/14 45/1 45/2 46/25 47/16 47/19 48/4 48/21 51/11 52/15 53/9 54/24 56/19 58/6 58/9 58/20 60/1 62/25 64/12 64/16 67/1 67/7 67/12 68/10 73/7 74/1 75/16 76/20 77/6 86/14 92/1 92/10 93/22 107/5 107/7 107/8 108/1 108/9 108/11 109/7 114/9 115/9 116/6 116/7 117/4
**gold [1]** 96/21
**gone [3]** 96/11 97/24 97/24
**good [10]** 4/6 4/9 4/10 4/13 11/9 11/10 79/14 110/21 114/9 118/11
**got [18]** 13/1 23/9 25/17 34/4 42/23 50/24 53/2 56/20 66/21 80/10 80/11 80/12 82/7 82/12 86/10 86/12 89/6 107/16
**gotten [2]** 83/11 101/9
**government [60]** 4/5 4/7 11/15 13/16 14/21 15/6 15/7 16/23 17/2 17/6 18/5 23/15 24/23 25/6 28/1 28/10 28/13 29/16 29/22 29/24 30/16 30/23 31/14 37/3 37/13 40/17 43/25 44/5 44/22 45/11 45/15 45/19 51/13 51/17 51/19 51/24 53/18 58/23 63/9 63/14 66/15 66/20 66/22 67/5 68/16 68/22 69/17 70/8 70/23 71/21 74/14 76/25 77/1 80/13 89/22 105/11 106/7 106/15 113/7 118/4
**government's [14]** 28/3 28/11 32/16 33/8 34/14 39/10 39/15 40/4 41/1 41/6 63/22 71/15 76/6 78/23
**Gox [1]** 30/13
**grab [3]** 31/23 32/3 63/2
**graduate [2]** 77/7 91/25
**graduated [1]** 80/19
**Gram [1]** 26/6
**greater [2]** 53/19 110/4
**greatest [1]** 78/6
**grounds [2]** 33/13 74/2
**Grow [1]** 21/19
**guess [9]** 33/20 34/10 35/17 41/15 47/14 52/6 54/9 56/1 113/24
**guess my [1]** 41/15
**guilt [1]** 29/6
**guilty [1]** 28/12

**H**

**habits [2]** 38/24 43/21
**hacking [1]** 107/19
**had [27]** 5/13 5/21 5/22 5/25 22/23 22/25 25/8 27/13 29/3 29/8 33/8 35/15 41/19 56/3 66/5 68/12 78/2 78/10 81/1 95/9 100/21 102/1 102/24 106/23 108/1 110/2 111/16
**half [1]** 115/24
**hand [3]** 35/10 42/17 56/23
**handling [1]** 118/2
**hands [3]** 94/25 95/6 104/12
**happen [1]** 78/19
**happened [3]** 67/2 82/9 97/17
**happens [1]** 97/24
**happy [1]** 31/4
**hard [1]** 42/10
**harder [1]** 56/4
**harmless [1]** 60/22
**Harmon [8]** 51/17 51/20 105/17 105/24 106/2 106/20 106/22 106/23
**Harmon's [2]** 52/19 105/20
**Harry [1]** 14/21
**Harvard [5]** 59/21 77/7 80/11 80/12 91/25
**Harvard-trained [1]** 59/21
**has [74]** 12/7 16/17 17/1 17/5 18/17 22/14 22/15 22/17 24/6 25/23 26/1 28/24 29/14 30/24 31/14 33/4 33/4 37/7 37/13 38/13 38/14 41/13 41/19 44/22 46/22 48/7 48/16 48/19 50/13 51/24 53/19 56/2 56/5 56/15 56/15 58/22 61/9 61/17 62/9 62/13 63/8 63/9 63/14 64/11 66/23 67/3 67/8 68/16 68/18 69/18 71/21 73/16 73/21 73/21 74/10 76/19 77/5 78/4 78/8 78/9 78/9 78/12 86/10 86/12 88/6 89/10 89/22 94/18 96/11 97/16 97/24 99/15 103/15 103/22
**hasn't [5]** 28/10 29/16 30/16 52/22 98/21
**HASSARD [28]** 2/2 4/12 13/15 13/21 14/14 14/19 15/6 18/4 21/2 46/10 70/17 75/24 87/8 87/20 88/13 89/15 96/7 97/14 98/12 102/22 103/15 104/7 104/18 108/14 108/20 111/14 111/24 113/6
**hat [1]** 82/15
**hats [1]** 82/15
**have [197]**
**haven't [7]** 39/21 39/22 85/1 85/5 85/11 91/19 116/5
**having [7]** 38/6 52/12 55/22 55/23 62/15 70/7 106/8
**he [179]**
**head [2]** 47/1 72/16
**header [1]** 46/7
**health [1]** 116/21
**hear [6]** 23/10 46/12 52/5 62/2 105/16 114/18
**heard [3]** 62/4 73/9 105/14
**hearing [19]** 31/22 33/13 34/3 35/19 36/17 36/22 37/20 39/18 42/3 44/11 44/15 46/22 49/19 57/9 58/18 60/15 60/19 67/1 108/8
**hearings [5]** 32/13 39/4 54/19 58/20 86/6
**hearsay [9]** 71/5 73/4 73/17 73/18 73/20 73/22 74/4 74/17 74/19
**held [14]** 28/7 34/3 86/2 91/9 96/25 100/21 100/24 101/7 101/8 101/13 107/24 109/3 114/11 116/13
**Helix [5]** 105/25 106/1 106/1 106/3 106/22
**help [2]** 79/22 88/2
**helpful [8]** 32/2 33/2 42/8 42/17 44/6 76/9 77/18 111/8
**her [4]** 29/20 29/21 93/15 94/1
**here [93]** 5/16 6/6 6/20 7/18 7/23 8/23 9/20 9/23 10/11 10/20 14/15 25/21 25/22 27/16 28/16 31/12 31/18 32/10 32/19 33/14 34/4 35/4 35/17 36/1 36/15 36/25 37/7 37/24 38/3 39/19 41/8 42/18 43/5 43/22 44/1 45/8 45/20 46/19 50/6 51/9 51/14 51/22 51/25 53/15 53/17 53/20 54/4 54/23 56/20 57/2 59/16 59/20 63/7 64/4 65/12 65/14 66/23 70/10 72/13 75/11 79/9 87/6 88/3 89/23 89/24 91/24 92/1 92/11 92/17 93/16 96/16 97/2 101/17 105/14 106/10 107/11 107/23 108/8 108/21 109/11 109/13 110/20 111/12 111/15 112/2 112/16 114/17 115/22 116/1 116/4 117/15 117/19 117/19
**herself [1]** 29/21
**hidden [2]** 61/21 62/6
**hide [11]** 52/8 56/12 108/18 109/9 110/24 111/4 111/17 111/19 112/19 112/20 114/6
**hiding [1]** 59/7
**high [2]** 35/5 93/5
**higher [1]** 96/12
**highest [1]** 95/11
**hill [2]** 48/15 81/17
**him [49]** 18/14 18/21 19/4 19/7 19/8 19/11 19/13 19/20 23/9 23/10 33/17 42/6 44/6 49/8 49/12 52/6 56/23 57/3 57/9 58/12 58/21 60/22 61/1 62/1 62/5 62/8 64/15 67/21 76/16 77/9 79/6 79/10 86/7 87/21 90/10 91/13 91/19 91/20 92/2 106/12 108/7 108/8 108/9 109/22 110/10 115/1 116/19 116/20 117/1
**himself [1]** 28/23
**hindrance [1]** 85/22
**his [106]** 18/14 18/22 19/6 24/11 25/25 25/25 30/6 32/15 33/11 33/22 33/23 34/20 34/20 34/20 34/21 34/25 35/1 35/20 35/22 35/24 36/11 36/14 36/23 36/24 36/24 36/25 38/3 39/1 39/2 39/7 39/8 39/9 39/14 39/16 39/25 40/13 40/19 40/20 41/13 41/20 42/23 43/16 43/24 44/3 45/14 45/25 46/1 46/8 47/1 48/9 48/20 48/24 48/24 51/6 51/23 52/24 53/4 54/13 54/15 56/7 56/18 56/22 56/22 57/12 57/18 58/2 58/11 60/10 60/24 63/11 64/9 64/18 64/25 65/1 65/3 65/4 66/6 67/20 68/3 68/25 68/25 69/12 70/1 70/11 71/8 76/16 76/17 79/5 79/6 86/21 90/10 90/11 91/11 91/15 91/16 91/23 92/5 104/12 105/24 110/10 116/15 116/16 116/21 116/24 116/25 117/2
**history [1]** 97/17
**hobbyist [1]** 98/4
**hold [11]** 15/9 16/1 44/8 83/19 83/20 83/23 83/24 83/25 101/18 102/12 115/1
**holders [1]** 102/12
**holding [11]** 101/4 101/5 101/5 101/6 101/18 101/20 101/21 101/22 102/11 106/25 107/6
**holdings [1]** 94/12
**holds [1]** 91/21
**home [2]** 30/6 115/23
**honestly [3]** 43/12 46/4 109/21
**Honor [99]** 4/6 4/10 4/19 5/21 11/5 11/11 12/23 16/25 17/10 18/8 18/11 18/23 19/16 20/3 22/9 22/20 26/3 26/23 26/25 27/22 28/1 28/5 28/8 28/9 28/14 29/12 30/21 31/2 32/1 32/7 34/8 37/18 38/12 43/9 43/11 45/13 45/20 46/3 46/14 47/15 48/15 49/12 50/21 51/11 54/3 56/9 56/25 57/4 57/25 59/5 59/16 60/18 62/3 62/17 65/9 66/3 66/15 68/23 69/10 69/16 70/3 70/14 70/16 71/1 72/2 73/12 74/21 75/13 75/24 77/18 78/17 79/24 85/24 86/3 86/4 86/7 87/3 88/5 88/16 90/9 90/23 91/7 91/10 92/4 92/4 99/14 103/4 105/10 106/5 107/3 110/13 114/8 115/7 115/20 116/10 116/24 117/3 117/25 118/10
**HONORABLE [1]** 1/9
**Hoover [1]** 81/12
**hope [1]** 88/4
**hopefully [2]** 46/14 79/12
**hour [2]** 85/10 116/18
**hours [3]** 58/9 85/15 85/16
**house [3]** 41/22 81/18 81/21
**how [35]** 15/25 18/17 28/14 35/1

**H**

**how... [31]** 35/11 35/22 35/25 36/2 36/10 36/10 37/9 41/23 42/23 43/15 44/14 44/16 49/21 49/23 50/1 56/16 61/20 62/8 65/2 67/17 69/8 71/23 85/17 91/3 92/16 93/25 100/1 102/1 106/12 110/4 116/4
**huge [1]** 52/6
**huh [3]** 15/24 17/25 25/5
**hundreds [2]** 28/21 62/15
**hypothetical [1]** 48/25

**I**

**I am [1]** 47/11
**I'm [23]** 13/17 15/10 16/11 20/3 21/13 24/4 25/21 44/9 47/15 50/13 55/19 60/12 62/2 72/12 75/16 75/22 83/10 87/10 88/22 103/6 109/4 113/21 118/9
**I-L-B-E-1 [1]** 8/24
**idea [4]** 47/6 60/20 110/21 116/4
**identification [5]** 17/2 17/6 29/19 88/6 99/15
**identified [2]** 58/4 95/21
**identifies [1]** 55/25
**identify [1]** 42/25
**identity [2]** 56/12 109/9
**ignore [1]** 102/17
**Ilbe1 [3]** 9/12 9/18 9/21
**Ilbe1's [1]** 9/10
**illegitimate [1]** 104/22
**illicit [3]** 54/4 54/7 107/15
**Ilya [2]** 51/18 52/19
**images [1]** 5/9
**immediate [1]** 101/3
**implemented [1]** 28/17
**implicit [1]** 55/2
**implied [1]** 93/24
**Import [1]** 82/1
**important [4]** 26/2 116/1 116/2 116/15
**improper [1]** 40/11
**inaccurate [1]** 16/21
**inadmissible [2]** 73/20 73/22
**inapplicable [1]** 41/8
**include [4]** 57/13 65/15 77/11 100/23
**included [9]** 10/4 39/11 50/25 64/6 64/7 67/6 74/13 81/24 94/11
**includes [1]** 89/13
**including [3]** 9/6 52/8 99/10
**income [8]** 37/8 38/23 40/20 41/1 43/19 64/6 103/19 103/23
**incompetent [1]** 73/18
**inconsistent [2]** 33/14 114/23
**incorporated [1]** 28/19
**index [1]** 96/22
**indicate [1]** 18/1
**indicated [3]** 54/25 60/15 77/5
**indicates [1]** 106/22
**indicating [1]** 20/4
**indication [3]** 62/13 65/16 73/14
**indicative [1]** 52/2
**indicted [1]** 105/11
**indictment [1]** 106/16
**indictments [3]** 105/3 105/7 106/15
**indirect [3]** 37/8 41/1 43/19
**indirectly [1]** 24/1
**industry [3]** 33/6 41/7 97/5
**industry-wide [1]** 33/6
**ineptly [1]** 55/19
**infer [1]** 104/21
**inflate [1]** 114/5
**information [9]** 47/23 50/22 64/25 67/5 82/6 89/3 99/7 99/9 111/9
**informed [4]** 57/7 85/13 85/18 85/20
**initially [1]** 112/13
**innovating [1]** 83/8
**innuendo [2]** 30/9 30/16
**insights [2]** 105/19 105/23
**insignificant [1]** 68/11
**instance [1]** 30/1
**instantly [3]** 100/4 100/10 100/20
**instead [3]** 65/20 100/25 109/9
**institute [3]** 81/12 84/15 84/15
**instruct [2]** 59/22 91/19
**instructed [1]** 91/20
**instructions [1]** 109/14
**insufficiency [1]** 76/6
**integrating [1]** 61/5
**integration [4]** 61/3 61/4 65/19 68/25
**integrity [1]** 89/2
**intend [2]** 33/17 35/8
**intended [2]** 45/24 52/17
**intends [3]** 38/23 65/13 71/7
**intentionally [1]** 91/18
**interact [1]** 104/25
**interacting [1]** 29/4
**interaction [1]** 24/10
**intermediary [1]** 111/5
**intern [1]** 80/20
**internal [1]** 80/25
**International [1]** 84/9
**internationally [1]** 33/6
**interrupt [1]** 83/10
**interview [1]** 62/21
**interviewed [1]** 12/4
**interviews [3]** 50/8 63/6 71/6
**introduce [3]** 50/17 67/23 80/4
**introductory [3]** 34/19 43/23 46/5
**investigate [1]** 12/2
**investigation [2]** 82/4 82/7
**investigations [4]** 59/20 80/25 81/1 89/14
**investigator [5]** 55/11 62/14 84/2 84/18 86/11
**investments [1]** 96/10
**invited [1]** 39/19
**invoice [9]** 85/11 85/15 85/17 85/19 85/21 85/22 113/4 113/20 113/21
**invoices [6]** 63/23 64/5 64/10 113/4 113/13 113/22
**involved [5]** 18/2 20/22 40/24 82/7 82/23
**involvement [1]** 117/22
**involving [3]** 57/10 74/14 82/17
**IP [1]** 29/23
**IRS [2]** 59/18 93/14
**is [699]**
**isn't [6]** 16/3 19/17 35/25 56/22 61/3 66/2
**issue [28]** 30/21 30/22 31/1 32/20 32/25 33/5 36/1 36/22 38/17 42/13 47/7 50/5 57/17 58/21 65/12 67/1 68/4 68/18 69/17 70/1 70/24 71/2 71/4 71/8 76/8 78/9 90/1 107/4
**issued [3]** 84/4 84/8 84/15
**issues [26]** 31/2 36/1 36/4 36/7 37/11 40/16 49/18 53/19 60/3 60/4 70/7 80/24 81/1 81/22 81/23 81/23 82/2 82/13 82/13 84/3 84/6 84/10 84/12 92/2 92/11 116/9
**it [314]**
**its [8]** 24/10 28/4 28/10 30/16 44/5 67/4 74/15 79/18
**itself [2]** 37/25 55/6

**J**

**J-O-H-N [1]** 80/6
**jailhouse [3]** 50/8 62/21 71/6
**JD [1]** 80/11
**JEFFREY [2]** 1/18 4/8
**jewelry [2]** 22/24 22/25
**job [2]** 81/3 81/7
**John [3]** 3/6 79/21 80/6
**joining [1]** 4/12
**journals [1]** 84/23
**JUDGE [4]** 1/10 4/17 44/17 80/20
**judging [1]** 32/19
**judgment [1]** 91/5
**July [4]** 14/1 14/5 14/6 66/6
**July 15th [1]** 14/5
**July 16th [1]** 14/6
**July 25th [1]** 14/1
**June [2]** 14/24 14/24
**June 12th [1]** 14/24
**June 13th [1]** 14/24
**juris [1]** 80/12
**juror [9]** 4/14 4/16 28/11 78/2 78/4 78/7 78/8 78/11 78/13
**jurors [3]** 20/4 77/24 78/1
**jury [74]** 1/9 4/18 4/22 4/23 5/6 6/5 10/11 17/15 24/12 30/18 31/5 31/10 31/19 32/19 32/20 33/2 35/8 37/22 37/23 37/24 38/9 38/13 39/8 40/3 41/22 42/1 42/8 42/17 59/22 64/20 76/9 76/9 77/4 77/13 77/20 77/21 77/25 78/1 79/15 79/16 80/5 80/17 87/5 88/2 88/7 88/10 90/13 93/13 93/16 94/4 96/5 96/8 97/12 98/21 99/16 99/23 99/24 102/6 102/16 102/19 102/25 103/16 105/23 106/21 108/10 112/25 113/11 113/17 115/15 115/23 116/1 116/5 116/5 116/6
**jury's [1]** 42/12
**just [181]**
**JUSTICE [2]** 1/13 1/20
**JW [3]** 66/18 79/19 80/7

**K**

**keep [5]** 64/18 70/10 79/2 79/8 118/2
**keeping [2]** 88/20 109/23
**keeps [2]** 29/24 91/11
**Kennedy [1]** 80/13
**key [6]** 42/4 42/4 45/3 45/4 104/25 105/1
**keys [1]** 30/14
**kidnapping [1]** 107/20
**kind [9]** 18/2 40/22 40/25 45/17 52/1 55/23 71/24 98/6 98/7
**knew [1]** 23/23
**know [65]** 4/14 19/5 27/18 31/4 35/4 35/17 36/16 38/15 38/24 39/12 41/16 42/15 43/3 43/7 43/15 44/7 44/16 45/3 45/6 47/24 47/24 48/19 49/5 49/21 50/1 50/9 54/20 54/22 55/15 56/2 56/3 60/19 61/1 62/14 62/20 62/21 63/9 63/13 65/1 67/2 68/3 68/24 69/3 69/3 69/19 69/21 69/22 70/2 70/21 71/6 71/8 71/13 72/18 78/14 90/18 98/5 98/19 101/25 101/25 104/3 109/6 110/9 112/6 113/15 117/22
**knowledge [15]** 13/3 13/6 18/14 20/15 22/11 24/11 25/25 28/24 48/6 48/17 49/4 55/11 67/18 72/17 83/15
**known [3]** 51/24 63/16 63/18
**knows [6]** 19/9 19/12 50/1 79/12 91/25 92/4
**Korea [3]** 23/6 23/7 23/11
**Korean [1]** 23/15
**Kraken [9]** 40/19 69/11 112/4 112/5 112/6 112/7 112/11 112/12 112/13
**KYC [12]** 41/13 49/16 51/23 55/22 56/11 68/24 108/21 109/10 110/8 110/20 110/23 112/6
**KYCed [2]** 60/25 112/8
**KYCing [1]** 111/9

**L**

**labeled [8]** 20/1 46/16 49/16 59/23 59/24 62/18 67/15 110/20
**lack [2]** 50/7 71/4
**large [2]** 69/6 69/12
**Larry [3]** 51/17 52/18 105/17
**last [19]** 4/16 10/19 14/11 15/2

**L**

**last... [15]** 18/24 20/19 27/4 70/8 70/20 75/13 75/20 76/2 85/17 89/8 96/10 103/3 103/9 104/8 107/6
**late [1]** 78/8
**launder [4]** 51/22 52/17 55/24 69/8
**laundered [4]** 61/4 65/19 68/25 69/1
**launderer [2]** 60/9 60/25
**launderers [4]** 52/16 56/5 56/16 62/9
**laundering [61]** 28/25 38/24 43/21 45/7 45/16 51/7 51/10 52/3 52/4 52/13 52/23 53/1 53/7 53/23 54/6 54/10 54/14 55/3 55/4 55/8 55/16 57/8 57/10 57/14 57/14 58/19 58/20 58/24 59/2 59/15 59/19 59/22 59/24 59/24 60/2 60/6 61/2 61/13 61/18 61/20 62/14 63/15 65/3 65/6 65/18 67/22 68/2 68/6 68/14 68/14 68/17 69/3 69/9 69/22 70/9 70/21 71/19 71/24 73/8 81/25 84/25
**law [31]** 2/3 34/22 37/1 37/2 49/1 53/1 54/14 59/21 60/1 77/7 80/11 80/19 80/20 80/21 80/23 81/3 81/4 81/10 81/11 81/14 81/15 81/16 81/16 81/22 82/1 84/23 85/3 85/3 85/3 91/25 91/25
**laws [1]** 82/1
**lawyer [3]** 48/10 48/25 109/13
**lawyers [2]** 24/13 31/12
**lay [3]** 16/9 59/18 99/3
**layer [1]** 109/17
**layering [2]** 61/3 71/19
**laying [1]** 44/6
**lead [1]** 76/9
**leading [3]** 81/20 99/1 99/2
**leaks [1]** 82/5
**learned [4]** 39/14 42/22 73/9 106/20
**learning [1]** 65/13
**least [1]** 67/9
**leave [5]** 70/23 81/6 81/9 81/16 85/23
**leaving [1]** 46/8
**led [4]** 82/4 82/6 82/7 83/15
**left [6]** 6/9 6/19 8/19 13/22 31/20 95/22
**legal [2]** 45/17 60/6
**legitimate [2]** 69/5 78/9
**length [1]** 28/15
**lengthy [1]** 110/2
**less [3]** 78/7 93/19 106/23
**let [20]** 16/9 18/20 23/9 29/14 31/13 32/3 37/15 38/20 39/6 46/12 53/24 53/25 60/15 63/2 76/7 77/25 78/14 78/14 117/4 117/22
**let's [8]** 34/4 53/4 77/21 77/22 79/14 94/23 104/9 108/14
**letter [1]** 13/17
**level [2]** 35/5 36/21
**license [1]** 110/23
**Lichtenstein [2]** 51/18 51/20
**Lichtenstein's [1]** 52/19
**life [1]** 12/21
**like [43]** 8/17 16/19 16/20 37/10 38/23 40/25 42/4 46/5 48/14 48/14 48/22 55/20 56/13 59/19 62/7 63/21 63/22 69/4 73/2 86/19 88/6 96/4 97/11 97/23 98/4 98/6 102/5 102/19 102/25 103/8 103/18 103/25 105/2 106/10 107/19 110/23 111/11 112/21 114/17 115/2 115/22 117/12 118/1
**likely [1]** 102/8
**limit [3]** 46/3 49/24 58/1
**limited [1]** 27/16
**LINDSAY [3]** 2/6 119/3 119/12
**line [3]** 18/9 67/10 67/10
**lines [1]** 101/17
**linger [1]** 117/1
**Linux [1]** 30/5
**list [4]** 7/8 9/11 11/1 15/17
**listed [1]** 36/25
**listener [1]** 73/6
**listening [1]** 89/20
**listing [1]** 57/12
**lists [1]** 10/7
**litigation [1]** 82/16
**little [13]** 41/4 42/10 44/25 46/15 47/15 49/5 55/14 59/25 82/24 83/11 93/19 95/19 116/22
**LLC [1]** 65/18
**locations [1]** 22/10
**lodged [1]** 66/20
**logging [2]** 30/4 30/6
**logic [3]** 38/9 39/9 41/18
**long [2]** 28/16 116/4
**long-running [1]** 28/16
**look [8]** 37/2 37/23 53/24 64/12 77/19 78/18 79/3 79/10
**looked [5]** 15/2 18/24 41/18 45/9 90/1
**looking [4]** 43/20 43/24 63/6 65/23
**looks [1]** 59/19
**lost [1]** 88/21
**lot [8]** 54/4 54/7 57/3 76/24 97/24 97/24 111/17 111/19
**lots [1]** 47/20
**Louisiana [1]** 80/21
**low [1]** 104/13
**lower [1]** 104/14
**LSD [2]** 13/12 14/25
**LSU [1]** 80/10
**Luke [1]** 5/22
**lunch [14]** 79/2 115/1 115/4 115/9 115/13 115/16 115/21 116/15 116/16 116/19 116/23 116/25 117/2 118/11
**Lund [1]** 118/3

**M**

**made [4]** 28/22 29/18 39/17 50/18
**mainly [1]** 52/18
**maintain [1]** 49/2
**maintaining [2]** 48/1 48/18
**major [1]** 48/11
**majority [2]** 28/25 69/13
**make [14]** 31/5 41/17 42/18 44/5 48/11 50/14 52/21 62/4 70/17 74/12 77/14 77/15 83/4 106/13
**makes [1]** 100/4
**making [10]** 29/23 31/12 37/3 40/24 40/25 41/12 41/12 42/13 45/17 68/22
**man [1]** 41/19
**March [2]** 1/5 119/10
**MarijuanaIsMyMuse [1]** 22/3
**Mario [1]** 26/6
**mark [2]** 96/14 96/19
**marked [4]** 17/1 17/6 88/6 99/15
**marker [1]** 56/14
**market [4]** 13/5 81/2 96/22 104/15
**marketplaces [1]** 13/8
**markets [1]** 29/1
**marshal [1]** 117/9
**marshals [1]** 117/3
**Martin [1]** 80/21
**Mason [3]** 54/14 81/3 81/14
**master's [1]** 80/12
**match [1]** 40/20
**material [2]** 11/2 16/15
**materials [2]** 47/25 74/18
**math [5]** 42/23 44/5 69/25 92/5 100/1
**matter [5]** 12/6 40/11 41/17 60/20 119/5
**matters [1]** 44/19
**maximum [1]** 12/21
**may [33]** 4/24 10/4 11/11 11/12 14/11 17/15 26/24 32/6 41/21 41/21 41/22 47/23 48/4 48/13 55/24 56/25 57/23 64/1 70/3 71/14 78/11 78/12 79/17 79/24 79/25 88/9 88/16 88/17 93/2 97/18 99/19 106/9 118/6
**maybe [8]** 32/22 38/2 40/7 40/9 71/17 73/1 84/22 85/15
**Mazars [1]** 29/19
**McAfee [3]** 84/15 84/16 86/11
**me [68]** 4/7 4/12 9/7 16/9 18/21 22/5 28/15 29/12 29/14 32/3 32/8 34/4 35/20 36/8 36/18 36/19 37/15 39/6 40/9 40/11 41/9 42/7 42/10 42/24 42/25 43/15 44/11 44/13 44/17 46/12 47/19 49/3 50/24 50/25 51/1 51/8 52/10 52/14 53/2 53/3 53/24 53/25 54/11 56/7 56/13 56/21 57/7 57/20 60/15 61/23 62/25 63/2 64/4 67/17 68/4 70/12 74/4 77/25 78/6 78/14 78/15 79/22 84/5 88/22 98/3 108/8 114/18 117/22
**mean [26]** 16/18 22/13 31/3 35/4 36/8 41/15 42/10 44/14 48/16 54/5 54/15 54/21 55/15 63/21 65/3 65/9 65/25 68/23 72/20 72/25 74/9 91/20 92/4 95/19 108/21 111/15
**means [3]** 8/14 41/19 47/6
**measure [2]** 94/22 111/18
**measured [6]** 91/4 95/5 95/12 95/15 95/16 111/18
**measuring [3]** 91/3 92/19 92/20
**medical [1]** 78/9
**meet [1]** 32/16
**meets [1]** 32/16
**member [1]** 86/8
**members [2]** 31/10 83/16
**memorized [1]** 16/18
**mention [3]** 54/1 89/10 110/7
**mentioned [2]** 29/21 109/25
**mentions [1]** 104/11
**merely [4]** 18/13 22/11 24/10 91/22
**mescaline [1]** 13/12
**messages [8]** 21/14 21/17 21/20 21/23 22/1 22/4 25/16 25/20
**Messari [1]** 97/4
**met [2]** 28/10 30/16
**methodologies [3]** 38/9 39/12 91/16
**methodology [1]** 33/3
**methods [1]** 36/21
**MICHAEL [2]** 2/2 4/12
**middle [1]** 96/10
**might [8]** 47/21 47/22 62/14 68/8 92/25 93/5 106/13 110/19
**million [27]** 92/21 92/21 93/4 95/14 97/22 97/23 98/1 98/2 100/7 100/7 101/9 101/10 101/10 101/10 101/15 101/15 101/16 101/16 101/20 101/20 101/21 101/22 102/3 102/4 102/7 106/3 106/24
**millions [1]** 28/21
**mind [3]** 61/15 69/3 88/20
**mini [1]** 116/8
**minimal [1]** 65/5
**minus [3]** 15/18 95/21 95/22
**minute [3]** 15/9 77/22 116/18
**misleading [2]** 37/22 40/2
**misrepresented [1]** 29/3
**missing [3]** 35/8 94/23 111/15
**misstates [1]** 93/20
**misunderstanding [1]** 110/13
**misunderstood [1]** 109/21
**MIT [1]** 85/6
**mix [4]** 49/16 108/21 110/20 110/21
**mixed [2]** 92/21 110/22
**mixer [13]** 48/14 49/2 49/24 104/21 104/22 105/20 105/25 106/2

**M**

**mixer... [5]** 106/13 106/23 107/18 109/18 110/5
**mixers [9]** 48/4 48/8 48/18 49/6 49/9 104/23 106/11 108/4 108/9
**mixing [5]** 46/20 46/23 107/12 107/14 107/25
**modus [1]** 59/7
**moment [2]** 57/1 77/14
**monetary [1]** 81/22
**money [95]** 28/23 28/25 28/25 37/6 38/24 40/19 43/21 45/7 45/16 51/7 51/10 51/21 52/2 52/4 52/13 52/16 52/17 52/23 53/1 53/7 53/23 54/6 54/10 54/14 55/3 55/4 55/8 55/16 55/24 56/5 56/11 56/16 57/8 57/10 57/13 57/14 58/18 58/20 58/24 59/2 59/15 59/19 59/22 59/23 59/24 60/2 60/6 60/9 60/25 61/1 61/13 61/18 61/20 62/8 62/14 62/19 63/15 64/3 64/23 65/3 65/6 65/18 67/22 68/2 68/6 68/13 68/17 69/1 69/2 69/6 69/9 69/22 70/9 70/21 70/24 71/3 71/13 71/18 71/19 71/24 73/7 81/25 84/24 109/10 109/17 110/5 111/4 111/5 112/19 112/20 114/3 114/4 114/6 114/22 114/23
**month [1]** 68/10
**monthly [1]** 97/10
**months [1]** 43/14
**Moon [22]** 62/18 63/7 63/15 64/22 64/24 65/7 65/18 65/20 67/19 67/23 68/7 68/10 68/20 75/17 112/2 112/3 112/5 112/11 112/12 112/22 114/20 114/21
**more [29]** 29/12 31/23 37/6 40/3 42/7 42/9 42/9 44/7 46/15 48/24 52/7 52/12 55/12 56/12 56/13 60/12 65/23 67/11 69/16 69/20 77/8 83/3 95/11 95/19 97/23 104/3 104/5 109/13 116/22
**morning [8]** 1/7 4/6 4/9 4/10 4/13 11/9 11/10 78/10
**MOSS [1]** 1/9
**most [10]** 46/20 85/2 91/1 91/2 93/3 95/2 102/8 105/24 107/12 107/14
**mostly [1]** 89/1
**motion [1]** 30/17
**move [15]** 5/23 17/7 19/21 47/3 49/23 61/16 75/1 88/6 96/7 104/9 104/18 108/14 111/7 111/20 112/24
**moves [4]** 17/1 28/9 85/25 99/15
**moving [8]** 8/5 17/4 17/13 57/2 57/24 79/2 79/8 116/3
**Mr [22]** 3/4 3/7 7/4 36/2 37/13 45/6 45/6 52/3 53/5 55/6 55/13 58/23 59/1 59/5 59/9 71/17 74/7 76/13 99/10 100/3 101/3 118/8
**Mr. [178]**
**Mr. Brown [19]** 31/1 33/12 34/7 37/16 46/12 49/11 52/5 57/9 57/16 58/21 59/4 66/2 68/21 70/23 72/1 73/11 75/12 77/5 77/17
**Mr. Ekeland [23]** 11/6 16/1 20/3 27/13 29/14 32/23 38/18 39/6 47/19 50/20 57/6 60/15 60/23 62/24 65/10 69/20 70/15 71/11 72/13 76/5 79/17 114/10 114/12
**Mr. Ekeland's [1]** 41/18
**Mr. Fischbach [8]** 78/18 78/25 79/11 115/21 116/14 117/4 117/10 118/7
**Mr. Harmon [5]** 105/24 106/2 106/20 106/22 106/23
**Mr. Harmon's [1]** 105/20
**Mr. Hassard [26]** 13/15 13/21 14/14 14/19 15/6 18/4 21/2 46/10 70/17 75/24 87/8 87/20 88/13 89/15 96/7 97/14 98/12 102/22 103/15 104/7 104/18 108/14 108/20 111/14 111/24 113/6
**Mr. Luke [1]** 5/22
**Mr. Price [1]** 19/18
**Mr. Ross [1]** 13/2
**Mr. Rovensky [7]** 19/19 52/3 55/7 55/13 58/23 59/1 59/13
**Mr. Santell [7]** 11/9 15/15 16/13 17/20 19/25 20/10 22/22
**Mr. Sterlingov [66]** 11/23 12/7 12/12 12/16 13/1 13/4 13/7 13/11 14/25 15/18 21/7 21/10 21/15 21/18 21/21 21/24 22/2 23/23 24/17 24/22 24/23 25/8 25/14 25/18 26/5 26/8 26/11 26/14 26/17 26/20 28/12 29/17 30/1 30/5 30/8 30/11 30/19 37/4 37/7 40/18 41/13 51/22 63/14 64/17 73/15 75/15 76/3 76/17 78/19 79/12 90/2 90/20 93/19 104/11 108/23 109/8 109/19 109/23 110/6 110/8 110/11 112/8 113/2 114/14 114/16 117/4
**Mr. Sterlingov's [11]** 15/3 18/13 18/14 20/14 64/3 94/12 94/25 95/6 96/2 101/25 113/14
**Mr. Ulbricht [1]** 12/21
**Ms [3]** 3/4 3/5 29/19
**Ms. [13]** 9/3 10/3 36/5 37/5 37/10 37/13 41/11 64/11 93/12 93/13 95/6 113/3 113/16
**Ms. Glave [4]** 37/13 41/11 64/11 93/13
**Ms. Glave's [7]** 36/5 37/5 37/10 93/12 95/6 113/3 113/16
**Ms. Pelker [1]** 9/3
**Ms. Walker [1]** 10/3
**Mt. [1]** 30/13
**Mt. Gox [1]** 30/13
**much [6]** 28/14 85/17 91/3 91/5 102/1 106/12
**must [3]** 37/4 40/18 109/21
**my [48]** 13/3 13/6 19/16 19/20 20/15 30/23 31/21 39/20 39/22 40/23 41/15 42/2 44/12 46/24 48/2 49/2 49/3 54/3 57/15 64/9 65/7 68/19 69/3 72/16 73/3 75/20 80/6 81/7 81/14 81/20 83/15 84/23 89/24 92/1 92/3 92/12 94/5 97/3 97/10 103/9 106/24 107/1 109/1 109/14 109/14 113/19 115/13 117/22
**myself [3]** 58/7 58/8 73/1
**mystery [1]** 111/15

**N**

**N.W [1]** 1/16
**name [12]** 4/5 12/6 29/25 41/20 51/23 61/5 69/12 80/5 80/6 82/21 111/9 113/2
**nature [2]** 62/1 107/20
**near [1]** 68/14
**necessarily [5]** 41/24 55/24 63/23 73/7 104/22
**necessary [1]** 54/19
**need [14]** 31/24 41/16 43/25 48/1 52/13 57/24 86/18 111/7 111/17 115/2 116/11 116/22 117/22 118/6
**needs [4]** 78/18 79/10 116/15 117/12
**negotiate [1]** 85/20
**neither [1]** 59/1
**net [4]** 37/8 38/23 40/25 43/18
**never [11]** 12/2 12/4 25/11 65/5 66/16 66/20 73/21 74/10 75/17 109/25 110/5
**New [1]** 1/20
**next [22]** 1/23 46/13 46/15 49/15 62/16 70/18 75/1 88/13 89/15 90/16 93/11 94/14 96/7 96/8 97/14 104/9 104/18 108/14 108/20 111/14 111/24 112/24
**nice [1]** 115/13
**nine [1]** 11/17
**no [62]** 1/4 4/19 11/5 12/3 12/5 13/1 13/4 13/6 13/7 13/10 16/21 16/24 17/10 17/13 17/16 21/17 23/17 23/23 25/13 26/23 27/22 28/11 29/7 38/11 47/6 50/2 50/10 53/6 53/6 53/6 60/25 62/9 65/16 66/9 70/1 73/14 73/21 73/23 73/24 75/4 75/14 76/2 77/1 77/2 77/3 77/8 85/8 86/3 86/4 88/11 91/12 96/6 97/13 99/18 99/21 102/21 103/2 109/19 111/13 111/25 112/23
**nodding [1]** 47/1
**none [3]** 29/18 38/25 117/11
**nonplussed [1]** 47/16
**nonprofit [1]** 82/19
**not [156]**
**note [2]** 33/8 75/3
**notes [1]** 31/21
**nothing [1]** 75/8
**notice [1]** 86/7
**noticed [5]** 33/9 58/18 59/2 59/6 91/17
**November [6]** 15/23 17/21 18/1 18/24 20/17 28/20
**November 2011 [1]** 28/20
**November 27th [4]** 15/23 17/21 18/1 20/17
**now [21]** 5/23 8/5 10/19 12/22 13/11 31/14 43/13 44/21 55/1 57/21 65/23 85/6 94/16 98/4 98/5 106/11 107/25 110/2 114/9 115/9 115/14
**number [35]** 16/19 17/12 23/22 23/22 30/13 49/16 49/16 57/17 62/18 62/18 62/19 63/6 65/11 65/12 66/7 66/8 66/11 66/17 69/10 70/5 72/9 75/18 78/8 81/6 87/11 92/17 93/12 93/18 94/1 94/11 100/24 102/2 104/9 108/21 110/20
**numbers [9]** 36/10 37/5 39/10 40/9 42/19 45/10 45/14 93/8 101/4
**NW [3]** 1/14 1/20 2/8
**NY [1]** 2/4

**O**

**object [10]** 18/8 41/4 49/25 50/7 53/18 67/5 75/14 86/5 91/13 105/7
**objected [3]** 55/7 66/16 106/15
**objection [39]** 12/8 12/13 12/23 17/9 17/13 22/7 24/3 24/4 24/5 24/24 32/8 32/10 32/12 37/16 49/15 60/19 66/20 66/21 74/22 86/3 86/4 90/9 90/23 91/7 91/12 93/20 99/1 99/17 99/18 100/12 100/16 102/13 103/4 103/11 103/20 105/5 106/4 107/2 108/24
**objections [7]** 30/24 31/4 44/5 46/19 62/19 66/10 70/22
**objectivity [1]** 89/2
**obligation [1]** 29/9
**obtained [1]** 97/8
**occur [1]** 100/11
**occurred [2]** 22/6 67/15
**October [1]** 28/20
**odds [1]** 116/21
**off [7]** 5/23 32/3 46/7 72/16 75/17 75/19 117/6
**offer [3]** 42/3 58/12 74/4
**offering [4]** 41/25 41/25 74/9 86/13
**offers [1]** 93/18
**offhand [1]** 84/22
**Official [3]** 2/7 119/3 119/13
**offline [1]** 73/3
**offtrack [1]** 83/11
**oh [5]** 29/24 30/2 43/25 52/4 75/16
**okay [34]** 4/22 9/7 10/8 14/19 20/7 21/1 31/1 31/7 36/19 39/12 43/25 45/12 47/4 47/13 49/10 51/4

**O**

**okay... [18]** 62/16 63/4 64/4 74/1 74/25 76/16 79/14 86/22 86/23 92/13 106/9 110/14 114/18 114/24 114/25 116/12 116/24 117/24
**Omedetou [3]** 29/2 29/18 73/14
**omission [1]** 29/10
**one [58]** 4/16 8/10 9/7 10/19 12/6 14/11 15/2 16/1 17/13 27/18 28/8 29/22 29/25 32/22 35/6 37/3 40/15 40/17 41/11 44/25 47/22 48/13 49/4 49/22 50/17 51/9 51/12 53/3 56/12 57/12 59/17 61/21 62/6 65/11 66/7 69/2 69/21 72/9 76/21 84/24 84/25 85/11 87/14 87/15 88/22 90/21 93/3 95/11 97/4 101/7 101/8 104/23 107/18 108/21 109/8 111/18 117/21 118/1
**one's [4]** 56/12 61/21 62/6 109/9
**ones [2]** 63/1 89/24
**only [17]** 7/4 23/20 23/25 24/1 24/20 37/11 41/13 41/19 42/2 68/9 73/3 83/21 103/22 108/1 109/6 110/8 115/25
**op [1]** 107/16
**open [3]** 72/6 74/20 108/7
**open-ended [1]** 108/7
**operandi [1]** 59/7
**operated [5]** 12/7 23/6 75/15 76/3 106/1
**operating [5]** 30/2 30/8 40/18 76/18 105/20
**operation [2]** 105/19 111/20
**operational [1]** 107/19
**operator [23]** 30/20 49/18 50/3 68/12 90/17 91/3 92/19 92/20 93/4 94/10 95/5 95/21 95/23 95/24 98/20 98/25 100/4 100/8 100/20 101/8 101/13 106/25 111/16
**operator's [3]** 99/5 100/2 114/7
**opine [4]** 39/15 47/16 61/11 86/18
**opining [3]** 50/3 60/2 77/7
**opinion [12]** 33/23 35/20 39/16 41/14 48/20 48/24 67/12 68/13 70/11 76/17 90/4 90/7
**opinions [2]** 65/4 66/24
**oranges [1]** 59/25
**order [2]** 69/6 69/8
**other [19]** 13/22 35/10 37/18 42/17 50/5 51/13 52/7 58/23 69/7 69/8 81/6 82/2 94/20 94/22 99/25 103/10 104/23 107/20 114/19
**otherwise [1]** 107/15
**ought [2]** 39/23 39/24
**our [18]** 10/4 31/2 31/3 32/8 32/10 32/12 38/14 38/21 41/14 47/11 50/8 62/19 66/10 66/24 68/23 92/3 110/13 117/25
**out [23]** 31/19 34/1 34/11 37/6 44/10 46/1 52/11 53/25 56/11 64/21 66/23 68/2 69/7 70/20 71/14 76/20 77/12 84/25 93/8 98/22 105/2 112/11 115/15
**outside [2]** 27/19 52/23
**outweighs [1]** 76/10
**over [19]** 6/9 6/19 13/21 14/5 14/15 31/23 36/11 68/10 77/25 79/2 81/4 81/11 81/12 91/14 94/12 113/24 113/24 115/23 117/1
**overall [1]** 22/18
**oversight [3]** 81/21 81/24 81/25
**overwhelming [1]** 28/16
**owes [1]** 104/23
**owing [1]** 85/13
**own [12]** 41/1 41/6 41/21 41/22 51/23 97/3 97/10 106/24 107/1 111/9 111/9 111/10
**owned [2]** 90/20 93/19

**P**

**p.m [2]** 115/15 118/12
**pace [1]** 116/4
**page [8]** 1/23 34/9 37/20 43/20 53/9 53/17 92/17 113/8
**page 60 [1]** 37/20
**paid [5]** 85/9 85/11 85/14 85/19 112/4
**paragraph [5]** 42/16 45/12 51/8 51/9 56/20
**paragraphs [1]** 53/2
**paralegal [1]** 73/2
**parlors [1]** 57/10
**part [12]** 39/14 54/12 54/15 55/4 55/4 56/18 57/11 57/18 66/4 68/24 82/9 110/13
**particular [10]** 5/12 27/15 29/18 31/3 35/18 36/21 42/5 52/16 58/11 60/8
**particularly [2]** 36/2 77/5
**parties' [1]** 6/1
**Pas [2]** 20/12 25/10
**pass [2]** 114/8 114/25
**past [3]** 36/9 45/21 85/2
**pattern [4]** 43/20 45/16 52/2 65/18
**patterns [22]** 38/25 43/22 45/5 45/7 51/7 52/4 52/13 52/15 52/16 52/23 53/23 54/10 55/5 55/8 55/15 57/8 57/9 57/14 58/24 72/4 108/17 108/18
**pause [5]** 25/21 38/7 51/5 52/12 57/5
**paused [1]** 28/18
**pay [1]** 97/19
**peak [2]** 95/13 95/14
**PEARLMAN [2]** 1/18 4/8
**peer [5]** 30/3 30/3 30/15 30/15 85/6
**PELKER [5]** 1/13 3/4 3/5 4/8 9/3
**Pennsylvania [1]** 1/14
**people [10]** 48/8 48/17 61/20 71/22 73/8 82/23 98/5 105/4 108/3 110/19
**percent [30]** 38/12 92/23 92/23 92/24 92/24 92/25 93/1 93/2 93/2 93/3 93/3 93/7 93/8 93/10 93/11 94/19 94/20 96/16 96/20 96/21 96/22 100/6 100/9 100/9 101/7 101/11 101/13 101/19 101/22 102/10
**percentage [4]** 22/5 96/9 96/14 96/20
**perfectly [2]** 40/6 42/20
**performed [1]** 61/17
**perhaps [7]** 41/11 52/7 56/13 61/23 106/9 109/12 116/8
**period [15]** 30/9 68/11 94/12 101/5 101/5 101/5 101/6 101/18 101/20 101/21 101/22 102/11 104/13 106/25 107/7
**periphery [1]** 86/16
**permissible [3]** 64/1 66/13 76/14
**permit [1]** 61/19
**person [2]** 50/2 54/22
**personal [10]** 46/16 46/20 46/23 62/13 104/20 107/11 107/12 107/15 108/4 111/10
**phenomenon [1]** 98/3
**Phillips [1]** 26/18
**phone [14]** 28/5 50/6 50/22 52/9 54/2 55/21 55/22 61/22 62/7 91/8 109/2 111/3 116/10 117/7
**phones [1]** 117/12
**phrase [1]** 69/9
**phrased [1]** 55/20
**phrasing [1]** 25/22
**pick [5]** 91/8 107/23 109/2 114/10 116/10
**piece [1]** 40/16
**pizza [5]** 57/10 97/15 102/24 103/1 103/11
**pizzas [3]** 97/20 97/21 98/1
**place [1]** 81/13
**placement [1]** 61/2
**Plaintiff [2]** 1/4 1/13
**playing [3]** 43/4 43/6 43/11
**please [5]** 4/4 79/23 89/16 91/8 103/15
**plenty [2]** 116/17 116/19
**PLLC [1]** 2/3
**podium [1]** 4/4
**point [30]** 28/8 29/15 35/6 39/17 41/15 41/16 41/17 44/12 45/2 48/11 51/8 51/12 51/22 52/9 53/3 54/11 54/17 56/3 56/21 57/20 58/7 69/16 70/9 70/20 72/21 75/5 104/14 104/14 110/11 115/6
**pointed [1]** 66/23
**points [5]** 55/10 69/10 88/24 89/8 112/16
**policy [3]** 80/13 80/14 81/22
**pornography [5]** 5/8 5/9 6/18 8/15 24/21
**portion [1]** 107/6
**possibilities [1]** 102/8
**possible [4]** 96/23 96/24 98/8 101/18
**post [4]** 49/16 108/21 110/20 110/21
**posts [4]** 29/2 71/22 73/15 73/25
**potential [2]** 70/6 98/25
**potentially [1]** 83/4
**PowerPoint [1]** 87/7
**practice [4]** 49/1 61/13 82/12 91/23
**practiced [2]** 80/24 91/25
**practices [2]** 91/12 111/1
**precautions [1]** 110/4
**precedes [1]** 66/11
**precisely [1]** 48/3
**prejudice [1]** 76/10
**prejudicial [4]** 40/3 42/9 42/9 44/7
**prepaid [17]** 50/6 50/22 51/2 51/18 51/23 52/9 52/20 54/2 55/21 55/22 55/23 61/22 62/7 110/9 111/3 111/6 114/17
**prepare [1]** 87/5
**prepared [5]** 87/7 87/25 97/3 97/10 113/15
**presence [2]** 38/24 43/19
**present [4]** 4/11 69/25 118/1 118/4
**presentation [2]** 28/3 31/14
**presenting [1]** 69/18
**Press [1]** 85/6
**pressing [1]** 116/1
**pretrial [11]** 32/13 38/14 39/1 39/2 47/7 50/7 52/14 54/18 58/13 62/22 71/4
**pretty [1]** 111/20
**prevent [1]** 107/19
**previous [1]** 8/10
**previously [8]** 5/11 5/21 35/9 35/16 50/12 67/16 74/7 75/4
**price [5]** 19/18 71/17 95/13 96/10 104/15
**prices [1]** 96/11
**Pricewaterhouse [1]** 35/13
**primarily [1]** 44/21
**primary [3]** 40/16 40/17 90/22
**principle [2]** 44/19 45/20
**principles [25]** 32/10 32/13 32/17 32/17 32/21 33/22 33/22 33/23 34/13 34/13 34/15 34/25 35/14 37/9 40/24 43/23 44/11 44/13 44/23 45/24 46/8 54/24 61/12 89/11 89/13
**principles is [1]** 32/21
**prior [2]** 6/2 10/4
**prison [1]** 12/22
**privacy [12]** 38/25 43/21 46/17 46/21 46/23 49/22 64/13 64/16 104/20 107/11 107/12 107/15
**private [7]** 30/14 42/4 45/3 45/4

**P**

**private... [3]** 64/18 83/4 116/11
**pro [1]** 85/16
**probably [5]** 32/1 67/10 67/16 85/19 95/1
**probative [4]** 40/4 42/10 44/8 76/10
**problem [12]** 35/9 38/11 41/25 45/3 49/8 52/6 59/20 71/7 73/4 75/8 77/4 78/7
**problematic [1]** 35/2
**problems [1]** 76/23
**proceed [4]** 11/11 32/6 79/24 88/16
**proceedings [3]** 1/7 66/10 119/5
**proceeds [5]** 29/3 50/1 68/25 95/3 95/8
**process [5]** 54/18 58/13 58/14 58/16 75/8
**produced [1]** 16/22
**professional [15]** 47/5 47/8 47/9 47/17 47/24 48/8 48/18 49/2 80/17 91/5 91/11 91/15 91/16 107/21 108/2
**professor [80]** 30/23 32/11 32/14 32/25 33/13 34/22 36/9 36/19 37/1 37/7 38/13 38/22 39/7 41/25 45/11 45/13 46/22 47/15 47/16 49/21 50/8 50/18 51/6 51/25 52/25 54/14 55/3 55/12 55/21 57/7 57/17 57/23 58/25 59/21 60/1 60/16 60/24 61/9 61/17 62/13 63/7 65/13 66/5 66/8 66/12 67/10 67/18 69/17 69/21 69/24 71/5 71/20 72/2 72/7 73/1 76/5 76/15 77/7 78/20 79/1 79/19 80/4 80/8 81/3 81/5 82/11 83/13 85/25 86/5 86/25 87/5 87/18 88/19 89/17 98/21 99/23 103/17 105/16 110/17 113/9
**proffer [2]** 68/8 72/8
**proffered [2]** 32/8 73/16
**profit [1]** 106/13
**profits [1]** 69/7
**promulgated [1]** 39/13
**proof [1]** 30/7
**proper [1]** 77/16
**protect [4]** 47/23 48/5 48/14 49/3
**protection [1]** 109/17
**provide [1]** 59/18
**provided [4]** 27/11 89/11 93/15 100/25
**public [5]** 80/13 83/20 83/22 104/25 105/1
**publications [6]** 57/11 57/13 57/13 57/18 84/19 84/23
**publicly [1]** 72/18
**publish [2]** 88/7 99/15
**published [15]** 10/10 17/15 34/22 37/1 84/19 84/21 85/1 85/4 85/5 88/9 94/4 98/21 99/19 103/16 113/17
**pull [7]** 5/1 5/18 7/1 9/17 9/22 51/3 53/25
**pulled [1]** 73/3
**pulling [4]** 6/19 7/17 8/19 10/19
**purchase [2]** 18/2 20/24
**purchased [2]** 104/16 104/16
**purchaser [1]** 111/5
**purchases [1]** 15/3
**purchasing [2]** 109/9 109/18
**purport [1]** 113/25
**purported [1]** 69/5
**purporting [5]** 32/15 59/21 61/11 72/3 72/5
**purpose [3]** 45/17 69/1 111/8
**purposes [6]** 40/2 48/8 86/22 94/14 108/4 109/16
**put [20]** 13/15 14/20 15/6 17/1 18/4 37/13 44/22 51/17 63/22 70/7 74/22 74/23 76/25 87/8 98/12 103/15 104/12 111/5 113/6 115/1
**puts [2]** 94/25 95/6
**putting [10]** 60/11 62/19 64/23 70/24 71/3 71/13 71/18 95/9 105/2 109/10
**puzzled [1]** 33/20

**Q**

**qualifications [5]** 32/12 36/24 46/1 56/7 83/11
**qualified [4]** 59/6 59/10 60/20 87/1
**qualify [1]** 85/25
**qualifying [1]** 86/5
**quantified [1]** 46/22
**quantities [1]** 69/6
**question [28]** 19/20 31/24 33/11 35/13 36/18 38/1 43/4 43/8 44/10 44/20 45/22 48/7 50/15 54/9 56/1 60/6 60/10 61/10 62/10 77/4 91/15 103/3 103/5 103/9 103/12 103/22 104/5 108/7
**questioned [1]** 61/1
**questioning [3]** 18/9 60/24 61/8
**questions [12]** 11/5 24/13 24/14 25/22 26/23 27/22 31/11 60/18 76/24 104/3 106/11 115/5
**quick [4]** 77/19 77/24 77/25 87/20
**quickly [1]** 77/21
**quite [2]** 35/4 45/23
**quote [2]** 50/9 62/21
**quote/unquote [2]** 50/9 62/21

**R**

**R-A-B-D-A-R-K [1]** 10/12
**Rabdark [1]** 10/12
**raise [3]** 4/18 69/14 115/19
**raised [1]** 57/16
**raises [2]** 60/3 77/4
**raising [2]** 56/22 60/12
**ran [2]** 28/17 28/20
**RANDOLPH [1]** 1/9
**range [2]** 92/23 93/8
**rate [1]** 85/10
**rates [1]** 36/3
**rather [5]** 31/12 56/11 79/5 95/16 104/3
**reached [1]** 90/14
**reaching [1]** 108/16
**Reactor [12]** 62/19 63/23 63/25 64/10 112/24 112/25 113/1 113/3 113/14 113/21 113/23 114/3
**read [4]** 8/3 9/15 36/16 105/3
**readily [1]** 55/25
**ready [2]** 77/13 79/1
**real [1]** 66/9
**realities [1]** 85/13
**realized [1]** 7/8
**really [13]** 33/5 33/10 35/3 37/24 41/10 43/7 45/9 50/10 57/24 58/3 69/20 87/20 104/15
**reason [7]** 16/21 39/18 44/19 75/4 110/20 111/12 116/15
**reasonable [5]** 28/11 29/17 30/18 30/19 116/4
**reasons [8]** 35/9 47/20 47/22 48/13 65/17 74/16 104/23 107/18
**rebut [2]** 45/14 59/1
**rebuttal [15]** 37/12 44/22 50/10 50/11 50/16 52/3 52/18 62/21 63/4 71/12 71/15 74/9 74/13 74/14 74/15
**rebutting [1]** 45/5
**recall [12]** 14/9 14/13 21/4 23/4 25/3 34/6 34/7 48/19 59/8 100/6 102/3 113/3
**received [7]** 5/13 29/4 65/16 69/12 90/2 90/4 90/6
**receiving [1]** 37/4
**recently [1]** 74/12
**Recess [3]** 32/5 77/23 118/12
**recognize [7]** 15/15 16/13 16/15 87/22 98/14 98/22 113/9
**recognized [1]** 33/6
**recognizing [2]** 55/4 55/5
**recollection [1]** 46/24
**record [21]** 4/5 6/6 6/7 8/6 8/8 8/9 10/5 13/23 15/2 29/7 72/14 72/15 72/17 72/20 72/22 74/22 75/3 97/19 106/4 106/5 119/5
**records [10]** 5/12 5/15 7/18 9/11 9/17 16/16 27/10 35/15 96/1 104/14
**rectify [1]** 7/8
**redacted [1]** 6/3
**redactions [1]** 5/25
**redirect [3]** 3/5 26/24 27/1
**reference [15]** 16/19 17/12 20/24 32/12 32/21 47/9 48/12 89/9 97/6 99/25 105/7 106/14 110/11 110/17 110/25
**references [1]** 91/11
**referencing [2]** 111/2 112/1
**referring [1]** 60/23
**refined [1]** 66/22
**reflected [1]** 10/16
**reflecting [1]** 5/25
**reflects [1]** 71/20
**refrain [1]** 44/4
**regard [2]** 50/14 100/18
**regarding [1]** 53/9
**register [1]** 29/9
**registering [1]** 29/7
**registration [1]** 30/11
**regulation [1]** 80/14
**regulator [1]** 81/2
**reiterate [1]** 38/21
**relate [2]** 43/16 59/17
**related [8]** 24/22 36/4 47/17 83/14 83/18 96/2 98/10 105/12
**relating [5]** 31/16 52/15 61/18 61/19 67/23
**relation [10]** 19/18 19/18 25/17 49/8 50/21 97/12 105/20 109/22 110/18 112/11
**relationship [1]** 36/2
**relevance [1]** 22/7
**relevant [6]** 32/18 35/14 43/1 44/2 73/23 89/24
**reliable [1]** 89/3
**relied [1]** 61/17
**rely [5]** 24/14 43/14 44/12 44/14 73/19
**relying [2]** 63/1 89/3
**remain [1]** 116/3
**remains [1]** 94/15
**remember [3]** 63/23 84/22 100/7
**remembers [1]** 97/17
**remind [10]** 5/6 24/12 31/13 78/1 78/17 92/2 92/10 92/16 93/13 112/25
**remotely [1]** 47/25
**remove [1]** 70/8
**removed [4]** 31/25 63/5 70/5 70/5
**removing [1]** 70/19
**repeat [3]** 58/6 58/8 115/13
**replace [1]** 5/24
**report [6]** 29/21 47/1 94/11 94/13 95/21 107/14
**Reporter [4]** 2/6 2/7 119/3 119/13
**representation [2]** 16/22 99/11
**representations [1]** 72/6
**request [1]** 78/16
**requested [1]** 78/5
**require [4]** 39/24 74/11 91/5 111/20
**requirements [1]** 75/10
**requiring [2]** 109/24 110/1
**research [2]** 31/16 115/12
**Reserve [4]** 81/21 82/5 82/6 82/8
**reserved [1]** 69/24
**resignation [1]** 82/8
**respect [15]** 42/14 53/23 62/1 62/8 67/9 67/19 73/12 107/6 108/2

**R**

**respect... [6]** 114/14 114/15 114/20 114/21 114/22 116/9
**respects [1]** 47/22
**respond [2]** 28/15 32/23
**responding [1]** 51/16
**response [5]** 28/13 60/17 65/25 103/3 103/9
**responsibilities [1]** 47/17
**responsibility [8]** 47/6 47/9 47/10 47/24 49/2 107/22 108/2 108/4
**rest [3]** 46/14 78/4 94/7
**rests [1]** 28/1
**results [3]** 38/1 38/7 38/10
**retainer [2]** 85/12 85/12
**return [2]** 10/25 96/14
**returns [2]** 96/9 96/16
**revealed [1]** 114/22
**reverse [1]** 8/16
**review [32]** 5/12 21/9 21/12 21/14 21/17 21/23 22/1 22/4 23/22 24/7 25/16 25/20 26/7 26/10 26/13 26/16 26/19 26/22 27/4 27/10 27/15 45/14 66/12 79/6 85/6 101/24 110/18 112/10 116/21 116/25 117/5 117/13
**reviewed [19]** 5/15 6/13 11/3 13/9 15/5 23/19 23/25 24/7 24/20 25/23 26/1 27/20 47/1 63/8 89/17 96/2 107/14 108/17 112/13
**reviews [1]** 84/23
**Richmond [1]** 82/8
**right [64]** 4/9 4/20 4/24 4/24 6/1 7/10 9/8 11/6 12/22 14/5 14/15 14/16 16/14 18/25 20/2 20/11 20/16 26/24 27/23 28/2 28/13 30/17 31/10 31/20 32/4 32/6 34/10 38/20 39/2 40/21 41/18 42/14 44/21 45/13 46/12 49/14 50/13 50/14 53/17 54/17 57/6 59/4 61/7 62/24 63/18 65/4 65/10 65/23 70/18 71/10 73/11 75/12 75/20 76/1 77/12 77/24 79/14 79/17 88/9 106/17 110/14 111/18 117/19 118/11
**rights [1]** 74/23
**risk [1]** 32/19
**road [31]** 11/15 12/16 13/10 13/10 13/12 15/4 15/18 16/17 16/22 18/12 18/13 18/14 20/1 20/1 20/2 20/10 20/14 21/4 22/5 22/12 22/18 22/22 25/3 25/6 25/9 25/15 25/17 26/21 27/7 27/8 28/24
**Road's [1]** 22/15
**role [1]** 81/20
**ROMAN [4]** 1/6 4/3 4/11 11/19
**room [2]** 2/8 117/15
**Ross [2]** 12/19 13/2
**roughly [1]** 14/16
**round [2]** 14/18 14/19
**roundabout [2]** 34/1 34/12
**Rovensky [10]** 19/19 45/6 52/3 55/7 55/13 58/23 59/1 59/13 59/14 71/17
**row [3]** 8/3 9/15 10/16
**RoxiPal [2]** 21/22 21/23
**RPR [1]** 119/12
**rule [16]** 33/13 44/17 44/20 50/10 50/13 73/19 74/10 74/12 74/22 75/10 76/15 102/13 103/20 105/8 107/4 108/8
**ruled [1]** 59/3
**ruling [5]** 31/21 65/25 67/1 67/8 92/2
**rulings [6]** 45/9 67/10 92/3 92/11 92/12 109/14
**run [2]** 46/6 69/6
**running [3]** 28/16 105/25 106/3
**RX [1]** 21/25

**S**

**said [24]** 12/7 19/18 29/22 30/2 34/1 34/12 34/17 35/21 36/8 39/20 40/2 41/18 45/21 55/6 55/9 58/11 62/3 62/5 65/10 67/9 69/20 74/17 84/6 110/5
**sake [3]** 44/3 65/6 68/1
**sale [2]** 30/15 101/3
**Sally [1]** 13/18
**same [19]** 5/24 7/2 7/9 8/6 16/20 19/3 20/19 34/16 35/21 41/4 65/8 65/10 71/4 76/23 78/7 81/13 82/11 89/1 114/20
**sanctions [1]** 82/1
**Santell [13]** 3/3 5/4 6/5 7/12 9/11 11/9 15/15 16/13 17/20 19/25 20/10 22/22 27/3
**Sarah [3]** 33/8 36/4 41/2
**sat [4]** 91/24 92/2 109/11 109/14
**save [1]** 77/20
**saw [4]** 8/9 45/15 73/25 100/3
**say [29]** 25/22 34/2 34/15 36/20 37/23 42/3 43/25 47/1 49/1 49/25 54/22 54/25 56/15 58/10 66/17 71/7 71/17 74/8 77/1 86/18 90/22 92/5 95/18 95/25 103/18 104/4 109/12 111/22 112/21
**saying [21]** 29/24 34/1 34/12 35/6 39/13 39/15 41/5 45/3 45/11 45/15 52/4 56/3 58/1 68/4 73/19 75/25 77/7 107/12 107/13 108/3 110/1
**says [18]** 15/25 17/23 20/12 20/16 35/19 37/21 46/8 46/20 49/25 53/8 53/9 54/6 65/16 65/18 70/20 73/3 93/24 107/14
**scale [5]** 96/12 96/23 98/8 111/21 114/6
**Scalia [1]** 81/4
**Scholl [11]** 5/22 7/4 37/13 45/6 52/3 55/6 55/13 58/23 59/1 59/5 71/17
**Scholl's [5]** 36/2 59/9 99/10 100/3 101/3
**school [10]** 80/11 80/13 80/16 80/19 80/20 80/22 81/4 81/4 81/10 81/14
**scope [11]** 12/8 12/13 18/9 19/6 22/14 22/17 24/25 25/25 52/24 66/13 71/8
**screen [1]** 20/5
**scripts [1]** 30/4
**scroll [6]** 6/9 9/2 9/10 10/15 13/21 14/14
**scrolling [2]** 6/19 8/19
**seated [1]** 79/23
**sec [3]** 81/1 81/22 107/16
**second [5]** 9/7 16/2 25/22 32/9 88/23
**secret [1]** 91/21
**section [3]** 22/23 22/25 23/2
**securities [8]** 37/2 81/2 81/11 81/15 81/22 82/13 84/24 85/2
**security [3]** 12/22 48/1 107/19
**see [49]** 6/8 7/5 9/8 14/5 15/20 15/23 15/25 17/21 17/23 18/16 19/2 19/5 19/11 19/25 20/4 20/8 20/10 20/12 20/13 20/16 29/14 31/17 33/5 33/10 34/4 34/18 39/18 40/8 41/23 41/24 52/4 54/5 54/6 60/8 61/19 62/8 62/22 67/13 67/17 67/21 69/15 87/18 93/24 99/23 101/17 105/3 108/17 112/14 112/14
**seeing [3]** 53/15 64/16 65/4
**seeking [2]** 29/5 85/14
**seem [2]** 49/3 51/12
**seems [5]** 15/20 32/11 35/20 67/16 68/4
**seen [7]** 27/13 62/15 93/1 93/11 100/10 101/25 108/22
**sees [1]** 65/2
**seized [1]** 24/23
**self [2]** 61/21 62/6
**sells [2]** 100/4 100/8
**semester [1]** 81/10
**send [5]** 50/1 60/25 77/19 110/21 115/23
**sending [1]** 8/15
**senior [1]** 81/19
**sense [5]** 31/5 42/18 56/3 69/14 73/2
**sent [5]** 28/25 45/19 66/22 85/10 112/13
**sentence [1]** 12/21
**separate [1]** 10/7
**September [8]** 34/5 34/8 43/14 46/21 49/19 66/12 66/12 85/14
**September 15th [1]** 46/21
**September 18th [1]** 66/12
**September 8 [1]** 66/12
**September 8th [3]** 34/5 34/8 49/19
**series [2]** 9/6 113/24
**served [3]** 80/20 81/11 81/19
**service [2]** 112/3 112/20
**Services [1]** 81/18
**serving [1]** 12/21
**set [1]** 89/10
**seven [1]** 65/17
**several [4]** 7/14 7/20 8/22 28/20
**sexual [1]** 11/2
**share [6]** 96/4 97/11 102/5 102/19 102/25 105/23
**she [13]** 29/21 29/21 29/22 29/23 41/2 41/3 64/11 93/14 93/16 93/18 94/2 102/2 113/18
**sheer [1]** 8/20
**SHERRY [3]** 2/6 119/3 119/12
**shifted [1]** 106/10
**Shine [1]** 26/12
**shoes [1]** 37/22
**Shoppe [1]** 26/6
**short [1]** 77/14
**should [36]** 4/15 7/3 17/3 19/14 24/14 24/14 31/23 32/22 33/13 39/4 41/3 44/16 58/25 64/6 64/7 67/16 68/1 68/12 69/21 69/24 69/25 69/25 73/22 76/22 77/11 78/13 78/25 79/9 90/24 92/3 92/12 93/5 102/16 108/10 116/19 117/2
**shouldn't [1]** 25/24
**show [11]** 38/9 39/25 51/1 52/14 54/24 58/15 64/5 72/22 73/7 73/8 113/25
**showed [6]** 20/23 20/25 25/13 25/13 110/8 113/24
**showing [4]** 5/11 64/4 69/7 109/16
**shown [12]** 5/16 6/6 6/20 7/12 7/18 7/23 8/20 8/23 9/20 9/23 10/11 10/20
**shows [16]** 18/3 29/6 30/8 39/25 69/22 69/23 95/4 95/5 96/9 96/19 96/22 98/8 108/22 111/17 113/22 113/23
**shred [1]** 30/7
**shut [3]** 11/15 23/15 25/6
**shuttling [1]** 118/7
**sic [2]** 97/18 101/21
**side [7]** 15/20 15/20 56/14 69/7 69/8 81/21 114/4
**sided [1]** 54/4
**significant [3]** 36/1 36/6 89/2
**significantly [2]** 42/9 96/12
**Silk [31]** 11/15 12/16 13/9 13/10 13/12 15/3 15/18 16/17 16/22 18/12 18/13 18/14 20/1 20/1 20/10 20/14 21/4 22/5 22/12 22/15 22/18 22/22 25/3 25/6 25/9 25/15 25/17 26/21 27/7 27/8 28/24
**similar [3]** 61/23 89/13 114/24
**simple [2]** 40/14 68/9
**simply [9]** 33/5 46/25 47/9 52/1 55/10 65/20 68/13 71/15 72/22
**since [5]** 81/5 82/11 85/14 96/11 101/8

**S**

**single [3]** 25/11 30/7 89/23
**sit [3]** 31/12 82/19 116/7
**site [5]** 5/8 8/15 8/16 29/8 52/17
**sitting [2]** 94/17 108/8
**Skadden [1]** 80/24
**Slammer [4]** 7/24 8/1 8/6 8/17
**slide [89]** 30/22 30/24 31/6 31/6 32/9 34/19 34/19 37/2 37/19 43/12 43/22 43/23 45/18 45/23 46/5 46/15 46/16 46/18 49/15 49/15 50/5 51/15 51/16 53/11 53/18 54/5 59/17 63/6 65/16 65/22 65/24 66/4 66/6 66/7 66/19 66/21 66/21 66/23 67/6 68/2 70/22 71/15 74/1 75/2 75/13 75/17 75/18 75/21 76/2 76/23 77/11 77/15 86/17 87/24 88/13 88/19 89/15 90/16 94/7 95/11 95/20 96/5 96/7 96/8 96/9 97/12 97/14 97/21 102/22 104/8 104/8 104/9 104/9 104/10 104/11 104/18 104/19 106/19 106/21 107/11 107/22 108/14 108/15 108/20 111/14 111/23 111/24 112/24 113/6
**slides [15]** 31/24 32/8 32/11 43/20 52/1 54/4 54/7 62/17 62/23 64/12 64/12 65/15 76/21 87/7 110/12
**slimmed [2]** 45/18 53/16
**Slower [1]** 19/1
**small [1]** 114/4
**smaller [2]** 106/2 111/7
**smarter [1]** 49/19
**sneak [1]** 91/11
**so [128]**
**so what [1]** 36/17
**software [1]** 84/16
**sold [5]** 22/22 22/24 23/1 100/20 100/25
**solid [1]** 86/12
**solve [1]** 49/7
**some [40]** 8/14 8/17 13/12 14/25 18/21 21/4 30/24 31/11 31/24 33/9 38/8 41/2 41/16 47/21 48/10 48/22 56/6 61/23 64/11 67/23 69/1 69/14 71/5 71/19 74/4 74/4 74/17 79/10 81/16 81/22 81/23 82/14 82/23 83/3 92/11 92/11 101/17 112/5 112/19 118/7
**somebody [4]** 49/21 54/20 55/24 77/6
**somehow [2]** 41/7 71/16
**someone [6]** 74/17 78/6 85/22 97/19 104/25 110/4
**someone's [1]** 29/5
**something [17]** 38/23 48/13 54/11 55/5 61/25 67/14 69/4 69/5 72/19 75/5 82/1 85/21 97/19 98/6 108/19 110/22 116/11
**somewhere [2]** 14/15 61/24
**sophisticated [1]** 111/20
**sorry [22]** 13/17 15/10 16/11 20/3 21/13 24/4 25/21 44/9 47/15 50/13 55/19 62/2 72/12 75/16 75/22 83/10 87/10 88/22 103/6 109/4 113/21 118/9
**sort [12]** 25/24 34/11 38/2 42/25 44/6 46/5 48/23 56/6 59/15 71/5 71/19 114/13
**sorts [1]** 54/20
**Sounds [1]** 79/14
**source [2]** 97/1 97/4
**sources [1]** 97/4
**south [5]** 23/6 23/7 23/11 23/15 102/3
**speak [3]** 72/3 72/10 72/11
**speaking [2]** 6/12 6/15
**Special [6]** 5/4 6/5 7/12 9/11 27/3 118/3
**specialization [1]** 80/14
**specializes [1]** 80/23
**specific [9]** 6/15 16/19 29/13 29/25 58/9 59/8 70/22 104/3 104/5
**specifically [7]** 54/6 55/9 59/3 59/6 63/21 85/1 106/6
**specifics [2]** 6/12 63/24
**spelling [1]** 80/5
**spending [1]** 111/10
**spends [1]** 58/9
**spent [1]** 97/20
**spoke [1]** 20/20
**spreadsheet [11]** 9/2 15/15 16/13 16/15 16/16 17/11 25/13 98/14 98/22 99/12 99/24
**spreadsheets [7]** 23/19 23/25 24/8 24/20 27/6 27/15 27/19
**square [1]** 19/25
**stage [1]** 61/3
**stand [3]** 84/7 84/17 85/21
**standard [12]** 32/9 32/18 33/21 42/24 42/25 43/23 44/1 44/23 45/23 46/8 61/12 91/23
**standards [32]** 33/1 33/4 33/7 33/15 33/15 33/19 35/5 35/7 35/11 35/18 35/25 36/19 38/16 39/14 39/24 40/5 41/4 41/5 41/7 41/17 41/24 42/15 42/22 43/15 43/16 43/16 47/17 76/8 88/25 89/5 91/12 100/1
**stands [1]** 83/22
**Stanford [2]** 81/10 81/11
**start [11]** 77/25 78/11 79/1 79/5 79/9 91/1 92/18 97/23 98/1 116/23 116/25
**started [3]** 14/4 23/8 23/13
**starting [3]** 4/5 34/9 37/20
**starts [1]** 108/8
**state [2]** 4/4 84/4
**statement [3]** 51/21 75/14 106/6
**statements [1]** 28/24
**STATES [5]** 1/1 1/3 1/10 4/3 16/23
**statistical [1]** 48/23
**steer [3]** 108/6 109/22 115/12
**step [4]** 30/12 32/3 44/18 98/10
**stepping [1]** 37/22
**STERLINGOV [73]** 1/6 4/3 4/11 11/19 11/23 12/7 12/12 12/16 13/1 13/4 13/7 13/11 14/25 15/18 21/7 21/10 21/15 21/18 21/21 21/24 22/2 23/23 24/17 24/22 24/23 25/8 25/14 25/18 26/5 26/8 26/11 26/14 26/17 26/20 28/12 29/17 30/1 30/5 30/8 30/11 30/19 37/4 37/7 40/18 41/13 51/22 63/14 64/17 65/16 73/15 75/15 76/3 76/17 78/19 79/12 90/2 90/20 93/19 95/22 104/11 108/23 109/8 109/19 109/23 110/6 110/8 110/11 112/8 113/2 114/14 114/16 117/4 118/8
**Sterlingov's [11]** 15/3 18/13 18/14 20/14 64/3 94/12 94/25 95/6 96/2 101/25 113/14
**Steven [1]** 3/3
**stick [2]** 44/4 92/5
**still [12]** 30/24 33/20 35/16 39/21 45/22 51/11 70/24 92/24 94/17 116/17 116/21 117/20
**stock [2]** 81/2 96/22
**stopped [3]** 5/5 87/14 102/24
**stopping [1]** 95/4
**straw [1]** 111/5
**Street [2]** 1/16 2/3
**stretch [1]** 92/25
**stricken [1]** 102/14
**strike [6]** 78/5 93/22 100/13 107/5 107/7 107/8
**strikes [4]** 52/10 56/13 61/23 64/4
**striking [1]** 102/16
**stripped [1]** 53/21
**studied [4]** 22/15 48/7 56/5 56/15
**study [4]** 61/17 62/10 62/12 89/12
**stuff [3]** 61/24 63/25 106/12
**styled [1]** 66/16
**subcommittee [1]** 81/25
**subject [2]** 60/20 62/11
**subjective [1]** 40/23
**submit [4]** 44/2 55/11 58/17 58/25
**submits [1]** 76/14
**submitted [2]** 66/8 67/2
**subparts [1]** 9/6
**substantially [2]** 67/11 76/10
**substituted [1]** 6/2
**substituting [1]** 7/3
**subtract [4]** 94/22 94/24 94/25 95/2
**successful [1]** 67/24
**such [4]** 28/24 29/4 50/10 62/12
**sufficiency [2]** 76/6 76/11
**sufficient [9]** 29/10 30/18 37/25 56/22 66/2 74/8 75/6 86/21 89/3
**suggest [3]** 40/4 115/20 116/2
**suggested [1]** 68/18
**suggests [1]** 75/8
**Suite [1]** 1/17
**sum [3]** 57/15 68/11 106/20
**summary [4]** 84/21 113/13 113/15 113/21
**supervisor [1]** 117/17
**supervisors [1]** 117/21
**supplemental [4]** 57/12 57/21 66/18 67/15
**support [4]** 34/14 34/16 82/16 83/7
**supports [2]** 34/15 82/20
**suppose [1]** 72/21
**supposedly [1]** 41/6
**sure [23]** 14/18 28/14 40/10 45/23 54/1 60/13 62/4 64/13 67/7 68/5 71/7 71/18 72/15 72/18 77/15 77/16 80/6 80/19 91/3 92/18 98/19 115/2 115/13
**surprise [2]** 75/6 75/9
**sustained [11]** 12/10 12/14 12/24 22/19 24/25 93/21 100/13 102/14 104/13 105/9 108/25
**Sweden [3]** 12/2 12/12 22/6
**switched [1]** 106/11
**sworn [1]** 79/21
**Symbiosis [1]** 21/8
**system [1]** 58/13

**T**

**table [5]** 2/11 4/7 4/12 5/16 113/21
**take [38]** 14/19 18/4 21/1 31/11 31/13 31/17 32/22 45/13 46/7 51/14 52/11 53/24 63/3 64/21 68/2 72/12 75/5 75/18 77/12 77/19 77/22 90/13 94/6 94/23 94/24 98/10 98/19 99/24 104/7 110/1 110/4 113/6 115/4 115/9 115/16 116/24 117/2 117/17
**taken [8]** 32/5 67/16 77/23 81/6 83/19 93/12 109/17 118/12
**takes [1]** 83/2
**taking [7]** 8/14 56/11 57/3 61/4 70/20 75/17 116/18
**talk [22]** 36/23 39/7 39/7 39/12 39/25 40/1 43/17 43/18 45/24 45/25 55/1 56/23 57/3 68/6 71/21 72/14 72/17 74/19 79/6 79/10 108/1 116/11
**talked [4]** 109/6 109/10 109/15 110/3
**talking [25]** 19/3 32/11 34/2 35/5 35/19 35/21 35/24 36/21 37/8 39/24 41/10 43/24 45/1 47/18 51/13 54/7 58/20 60/5 60/7 72/13 75/24 104/20 107/25 108/9 109/22
**talks [2]** 51/10 70/10
**taught [2]** 81/10 81/14
**tax [1]** 82/2
**teach [2]** 61/1 81/10

**T**

**teacher [1]** 81/7
**teaching [5]** 81/13 81/14 81/17 82/10 82/11
**teams [1]** 27/11
**technique [3]** 71/19 71/24 73/10
**techniques [1]** 51/21
**Tek [1]** 21/19
**tell [12]** 16/20 22/5 36/8 36/18 36/19 38/13 42/24 44/13 44/17 62/25 72/24 116/6
**telling [2]** 37/23 43/15
**ten [1]** 116/18
**tends [1]** 102/11
**tens [1]** 98/6
**tenure [1]** 82/12
**terms [13]** 13/9 37/11 47/8 47/10 48/22 49/23 63/22 83/17 102/1 105/19 109/24 111/1 112/2
**testified [13]** 18/12 23/4 24/6 25/8 27/6 37/14 59/14 85/7 93/16 102/2 105/24 106/3 106/8
**testifies [1]** 35/18
**testify [46]** 27/4 32/15 33/14 33/17 36/9 36/10 36/11 38/3 38/7 38/23 39/13 40/12 42/21 43/1 44/18 46/25 47/20 49/8 49/21 52/6 52/15 53/9 54/24 55/10 56/10 58/15 58/24 60/7 60/20 60/22 61/21 62/1 62/6 62/8 65/14 66/5 72/5 73/22 76/5 76/6 76/7 76/16 87/1 105/11 109/7 110/10
**testifying [16]** 21/4 24/9 25/1 25/4 35/18 39/23 44/22 55/7 55/22 64/15 67/19 67/21 86/16 91/13 106/12 113/18
**testimony [75]** 5/6 12/9 13/11 18/10 19/17 22/9 25/25 27/4 27/10 27/16 29/20 35/1 35/4 36/2 36/4 36/14 36/16 37/12 37/17 38/22 40/8 40/10 40/13 42/1 42/3 43/16 44/4 45/6 45/8 45/15 50/10 50/11 51/7 51/17 52/19 52/19 55/9 58/5 59/1 59/3 59/9 59/18 60/10 60/13 61/19 62/22 64/2 64/11 66/9 66/13 71/9 71/16 74/2 74/3 74/5 74/6 74/13 78/20 79/6 85/9 86/13 87/6 87/25 88/3 89/20 89/24 89/24 93/15 105/16 105/21 106/22 113/3 114/13 114/18 115/17
**than [16]** 31/12 37/6 40/3 42/8 42/9 44/8 49/19 55/12 56/11 67/11 93/19 95/16 104/3 106/2 106/23 111/7
**thank [18]** 4/25 7/10 10/8 11/13 15/13 17/19 19/23 20/6 20/8 27/24 27/25 28/2 31/7 57/4 79/23 80/1 87/3 115/7
**that [774]**
**That's [3]** 6/25 11/18 11/24
**their [14]** 4/5 5/15 20/5 28/23 29/18 30/8 30/10 49/23 55/10 59/20 66/4 73/16 100/8 100/20
**them [18]** 15/20 39/3 39/9 55/7 61/5 69/20 72/6 72/21 77/18 92/19 92/20 104/23 112/16 115/22 117/11 117/13 117/17 117/18
**themselves [1]** 30/2
**then [44]** 7/6 17/20 19/21 35/8 35/19 37/2 44/8 46/7 47/3 49/25 54/22 54/24 57/11 57/17 58/13 58/14 61/5 62/11 63/2 65/2 65/17 70/8 70/9 70/20 75/23 76/2 77/19 79/6 80/24 81/13 82/11 83/17 84/12 92/23 98/5 101/19 106/21 107/21 110/25 111/14 114/19 114/25 115/4 116/25
**theory [3]** 61/2 61/12 61/13
**there [123]**
**therefore [2]** 73/20 95/8
**these [35]** 8/10 9/17 9/25 14/14 14/16 30/3 32/22 34/13 34/13 34/15 38/15 43/15 46/15 52/1 53/19 60/16 62/20 64/5 65/2 65/10 67/12 69/19 70/2 71/3 73/25 74/16 89/2 89/5 91/21 97/2 99/12 102/8 112/16 117/11 118/2
**they [83]** 5/17 19/19 20/4 22/9 23/18 28/22 29/19 29/25 30/2 30/3 30/5 30/6 30/7 30/9 30/11 30/13 30/13 34/15 36/8 36/10 38/8 39/4 39/4 40/9 42/4 42/15 42/19 44/14 45/15 49/23 50/3 50/16 50/18 51/14 51/18 51/19 51/21 54/22 55/9 59/19 61/4 64/5 64/5 66/16 68/20 72/15 72/17 72/20 73/9 73/9 73/10 73/10 73/13 73/20 83/2 89/1 97/20 100/5 100/9 100/21 100/23 100/25 100/25 101/1 101/1 101/2 101/6 101/7 101/8 101/9 101/14 101/14 104/25 104/25 105/6 111/17 113/23 113/24 116/6 116/7 117/4 117/11 118/8
**thing [30]** 7/2 28/8 29/8 34/16 35/21 35/23 41/11 42/6 49/23 50/11 50/17 54/3 59/17 64/16 65/8 69/2 71/25 76/23 77/9 91/5 91/24 94/8 94/14 95/11 103/10 109/6 109/11 109/15 114/19 114/20
**things [20]** 25/24 28/24 35/22 42/3 44/25 49/4 56/13 61/11 62/7 67/12 79/2 79/8 81/6 82/2 82/17 95/7 99/3 107/19 107/20 117/12
**think [171]**
**thinking [4]** 37/21 73/1 78/12 78/19
**thinks [5]** 38/10 39/9 44/7 65/1 65/2
**third [1]** 8/3
**this [258]**
**those [52]** 7/3 7/3 10/21 13/23 14/1 14/5 14/6 15/3 21/9 21/17 21/20 22/4 23/19 23/24 27/11 27/18 29/11 31/23 33/22 35/7 37/9 41/2 41/3 49/4 51/1 51/21 52/16 55/10 57/20 58/10 61/18 62/22 64/12 65/3 66/24 70/17 73/5 85/16 86/21 89/8 89/10 92/2 93/8 93/9 95/7 96/1 97/3 97/21 98/24 101/4 105/23 108/18
**though [13]** 16/13 29/8 29/8 31/14 45/22 64/14 83/6 92/25 93/9 95/1 95/10 112/2 116/3
**thought [3]** 46/24 47/19 108/1
**thousand [2]** 96/20 104/17
**thousands [1]** 98/7
**three [5]** 62/23 71/3 89/1 107/7 113/24
**through [41]** 5/13 7/4 9/6 30/12 31/4 31/6 31/22 38/9 39/3 39/8 44/3 45/13 51/11 54/18 58/10 67/9 67/12 68/10 69/6 73/18 76/21 86/17 87/20 90/10 90/13 90/25 91/24 92/3 92/16 92/22 94/6 97/24 97/25 99/24 100/17 109/11 109/14 110/6 110/12 114/3 117/10
**throw [1]** 86/14
**Thursday [1]** 78/16
**time [34]** 14/3 16/25 17/23 28/9 28/17 32/23 36/11 39/19 44/13 53/18 57/3 63/3 65/13 71/14 71/25 77/20 79/10 81/6 81/9 82/11 85/24 88/5 94/12 96/11 97/18 98/3 99/14 104/24 114/10 116/3 116/18 116/19 116/21 116/22
**times [3]** 78/12 81/7 93/3
**title [1]** 66/17
**today [12]** 78/2 78/18 78/21 79/1 85/9 87/6 87/25 88/3 97/22 97/23 98/2 109/7
**together [1]** 77/15
**token [1]** 82/21
**told [3]** 76/4 85/16 116/5
**tomorrow [1]** 78/5
**too [3]** 41/4 68/4 105/14
**took [5]** 28/21 81/3 81/9 81/16 94/1
**tool [1]** 90/22
**tools [2]** 90/8 90/21
**top [4]** 54/6 72/16 83/3 101/2
**topic [2]** 22/18 74/2
**topics [9]** 50/25 53/3 58/4 58/9 58/10 60/16 82/11 84/23 86/5
**TOR [3]** 2/2 2/3 4/10
**total [4]** 68/9 68/10 84/22 113/22
**totality [1]** 29/25
**totally [1]** 78/24
**totals [2]** 100/21 101/6
**touches [1]** 51/1
**toy [1]** 98/4
**trace [5]** 24/21 30/12 30/13 56/4 105/1
**traceable [1]** 104/24
**traced [2]** 82/25 82/25
**traces [1]** 30/3
**tracing [9]** 18/18 19/5 19/17 19/20 33/14 33/18 34/2 45/2 54/7
**track [1]** 79/13
**trading [1]** 98/6
**tradition [1]** 97/16
**trained [7]** 33/4 34/13 42/22 59/21 89/5 89/11 100/15
**training [5]** 33/22 39/8 54/15 54/21 56/2
**trainings [2]** 83/17 83/18
**transaction [17]** 14/4 14/6 14/24 15/22 17/21 18/1 18/23 18/25 19/2 19/3 19/7 19/9 20/19 20/22 22/12 25/11 25/13
**transactional [1]** 72/3
**transactions [19]** 13/23 14/1 14/14 14/16 15/17 15/19 18/12 18/13 18/15 22/5 22/10 22/15 22/18 52/8 69/19 82/25 93/1 93/11 108/17
**transcript [2]** 1/9 119/4
**transcripts [1]** 31/22
**transferred [1]** 98/7
**transfers [3]** 23/20 83/4 113/25
**translate [1]** 100/2
**transparent [1]** 83/6
**Treasury [2]** 81/24 82/2
**treatise [1]** 89/12
**Trevor [1]** 26/18
**trial [10]** 1/9 13/9 54/25 58/15 66/23 95/13 97/23 97/25 98/2 116/8
**tried [1]** 31/3
**true [2]** 61/5 119/4
**try [5]** 38/2 44/4 73/18 111/17 111/19
**trying [15]** 17/12 33/25 34/10 46/4 47/22 48/11 55/24 68/20 73/18 91/11 92/1 99/2 108/5 108/18 110/24
**TUKOGB1 [1]** 7/19
**turning [3]** 23/3 25/3 107/11
**turns [1]** 100/5
**twice [1]** 92/6
**twilight [1]** 61/25
**two [24]** 7/9 10/6 14/1 15/18 21/14 21/17 29/11 39/3 46/19 49/18 57/17 66/5 66/8 66/11 68/10 69/10 86/4 88/24 89/8 95/7 97/21 101/15 105/10 112/16
**two-month [1]** 68/10
**Tyler [1]** 21/11
**type [6]** 8/14 42/1 42/6 75/9 115/11 116/14
**types [2]** 44/11 60/8
**typically [1]** 62/9
**typologies [1]** 59/15
**typology [1]** 38/25

**U**

**Uh [3]** 15/24 17/25 25/5
**Uh-huh [3]** 15/24 17/25 25/5
**UK [1]** 21/19
**Ulbricht [3]** 12/19 12/21 13/2
**ultimate [2]** 76/16 82/5
**ultimately [1]** 77/3
**unaccounted [9]** 95/3 95/8 95/14 95/15 95/17 95/18 95/20 95/24 96/1
**uncertainty [1]** 37/25
**under [10]** 17/23 29/11 50/10 74/19 76/15 88/25 93/24 100/6 105/7 112/8
**undergrad [1]** 80/10
**underlying [2]** 19/2 27/7
**undermine [1]** 92/1
**underneath [1]** 112/20
**understand [21]** 21/13 33/2 33/10 35/1 40/7 41/10 41/22 42/1 45/2 53/8 54/17 55/3 57/25 67/3 69/9 92/21 107/18 112/3 112/9 113/1 113/13
**understanding [16]** 19/17 30/23 40/23 44/12 57/15 64/9 65/7 66/25 68/19 87/6 88/2 94/5 109/1 113/11 113/19 113/20
**understood [5]** 22/20 26/3 42/2 74/21 92/8
**undisclosed [2]** 38/22 74/3
**undue [1]** 76/10
**unexplained [3]** 38/24 43/19 90/18
**UNITED [5]** 1/1 1/3 1/10 4/2 16/22
**university [1]** 81/7
**unless [3]** 44/13 44/17 54/10
**unlikely [2]** 85/19 93/10
**unlocked [1]** 118/3
**unquote [2]** 50/9 62/21
**unredacted [2]** 5/22 6/13
**unsound [8]** 37/24 38/8 38/10 39/16 40/12 41/14 41/20 42/5
**unsuccessful [1]** 67/24
**until [5]** 11/22 18/20 31/17 35/17 115/17
**untraceable [1]** 83/5
**unusual [1]** 71/16
**up [49]** 5/1 5/4 5/18 6/19 7/1 7/17 8/19 9/17 9/22 10/7 10/19 13/15 14/20 15/6 18/4 24/11 35/17 36/10 37/6 38/15 39/10 40/9 40/9 42/19 42/19 50/6 51/3 54/25 57/15 58/15 64/5 67/16 69/7 77/6 87/8 91/8 96/11 97/24 98/12 103/15 106/15 106/19 106/20 107/23 109/2 113/6 114/10 115/5 116/10
**update [2]** 77/24 78/1
**updated [2]** 87/14 87/15
**upfront [1]** 85/12
**upload [1]** 5/9
**Uploading [1]** 8/14
**uploads [3]** 8/10 8/13 9/21
**upon [1]** 61/17
**us [8]** 1/20 14/17 31/5 73/13 77/19 81/18 94/6 101/15
**USAO [1]** 1/16
**use [14]** 47/21 48/1 48/8 48/13 48/18 55/20 83/5 101/12 104/21 104/21 104/22 107/18 108/2 111/4
**used [14]** 33/1 49/2 51/18 51/19 51/21 51/23 65/19 83/8 89/12 97/1 97/19 108/4 108/23 110/8
**useful [1]** 111/4
**user [13]** 6/10 7/13 7/13 7/17 8/6 8/20 8/21 8/23 9/22 9/25 10/12 20/12 30/4
**user's [2]** 6/16 7/20
**username [3]** 6/8 6/21 20/14
**users [6]** 5/9 5/12 5/15 8/17 11/1 11/2
**uses [1]** 86/9
**using [19]** 9/12 9/25 10/13 10/23 33/3 33/23 34/25 44/23 61/22 62/6 63/15 69/1 88/25 97/3 106/11 106/13 106/25 111/8 111/9

**V**

**V-E-R-R-E-T [1]** 80/7
**vague [1]** 29/19
**valuation [4]** 36/4 83/25 84/13 86/18
**valuations [1]** 36/5
**value [4]** 36/11 76/11 97/1 97/22
**valued [1]** 95/17
**vehemently [1]** 91/14
**vendor [1]** 26/21
**vendors [3]** 21/4 25/17 27/14
**venture [1]** 65/21
**Ventures [1]** 65/7
**verdict [1]** 28/9
**Verret [66]** 3/6 30/23 32/15 32/25 33/13 36/9 36/19 37/7 38/13 38/22 39/7 41/25 45/11 45/13 46/22 47/15 47/16 49/21 50/18 51/25 53/5 55/12 55/22 57/7 57/17 57/23 58/25 60/16 60/24 61/9 61/17 62/13 65/13 66/5 66/18 67/10 67/18 69/17 69/21 69/24 71/20 72/2 72/7 73/1 76/5 76/15 79/1 79/19 79/20 79/21 80/4 80/6 80/8 83/13 85/25 86/5 86/25 87/5 88/19 89/17 98/21 99/23 103/17 105/16 110/17 113/9
**Verret is [1]** 53/5
**Verret's [8]** 32/11 50/8 51/6 63/8 66/8 66/12 71/6 78/20
**versed [1]** 86/8
**version [5]** 5/22 6/13 17/11 65/23 65/24
**versions [1]** 7/9
**versus [5]** 4/3 94/10 96/21 96/21 101/3
**very [14]** 28/22 29/19 31/3 46/19 58/19 67/4 68/9 71/20 71/24 75/13 76/2 96/14 96/15 107/22
**vetting [1]** 66/9
**via [1]** 66/22
**Video [19]** 5/6 5/7 5/8 5/13 6/17 6/23 8/12 8/17 9/13 11/2 13/10 23/3 23/6 23/17 23/21 24/2 24/10 24/18 27/8
**videos [3]** 5/10 6/7 9/12
**view [6]** 39/9 52/1 64/10 65/1 73/19 92/24
**viewed [1]** 73/15
**violated [1]** 44/18
**violating [1]** 74/23
**Virginia [2]** 81/5 84/4
**virtually [2]** 67/11 78/8
**volume [2]** 68/15 106/23
**VPN [8]** 47/21 48/1 48/14 69/12 108/2 108/6 112/3 112/3
**VPNs [1]** 49/6
**vs [1]** 1/5

**W**

**W-A-L-L-A-C-E [1]** 80/7
**W-A-L-T-O-N-T-A-R-G-E-T [1]** 10/22
**wait [2]** 15/8 103/5
**waiting [1]** 4/16
**waive [1]** 66/10
**waiver [1]** 60/19
**walk [6]** 31/4 31/6 39/8 90/10 90/24 100/17
**Walker [1]** 10/3
**Wall [1]** 2/3
**WALLACE [2]** 79/21 80/6
**WaltonTarget [1]** 10/21
**want [40]** 28/15 29/12 32/23 40/12 42/3 45/10 45/13 45/25 48/13 49/20 52/5 52/22 55/1 56/23 57/2 58/12 67/22 68/6 71/17 74/21 77/15 78/14 78/17 79/2 79/3 83/5 85/21 85/22 98/10 98/22 103/13 104/4 104/4 111/22 114/10 114/12 114/13 115/23 116/2 116/20
**wanted [4]** 44/12 62/3 114/16 114/20
**wants [18]** 38/3 38/7 38/9 43/1 43/17 43/18 44/14 44/18 45/24 45/25 49/21 56/10 61/21 74/3 74/18 91/19 115/21 118/7
**was [194]**
**wash [1]** 69/4
**Washington [5]** 1/5 1/14 1/17 1/21 2/9
**wasn't [13]** 12/16 29/23 33/19 46/4 48/10 55/9 65/5 65/19 67/21 73/7 75/24 89/23 98/4
**way [21]** 10/5 13/21 13/22 18/22 27/18 31/16 34/1 34/12 42/19 48/20 49/3 56/6 58/12 59/15 85/21 94/16 100/14 100/24 109/13 110/12 117/14
**ways [4]** 52/7 52/7 60/3 60/4
**we [234]**
**we get [1]** 28/5
**We'd [1]** 115/22
**we'll [5]** 49/7 64/21 77/12 106/21 117/16
**wealth [1]** 96/12
**wear [2]** 82/14 82/15
**website [2]** 97/6 97/9
**Wednesday [1]** 78/7
**week [4]** 27/4 27/5 78/4 79/13
**weekend [2]** 5/5 31/23
**weeks [1]** 43/13
**welcome [24]** 5/6 5/7 5/8 5/13 6/17 6/23 8/12 8/17 9/13 11/2 13/10 23/3 23/6 23/17 23/21 24/2 24/9 24/18 27/8 38/14 39/8 56/24 77/10 79/3
**well [32]** 12/8 16/9 30/2 41/21 44/21 48/16 55/17 56/1 58/6 60/3 61/12 63/9 63/13 63/21 64/1 73/1 73/19 74/8 78/22 80/19 81/23 86/8 95/10 96/18 98/11 102/15 109/25 113/12 114/23 115/17 116/23 118/3
**went [23]** 12/2 23/17 23/20 24/1 31/22 36/16 39/3 41/18 45/8 73/2 73/10 80/10 80/11 81/7 81/9 81/17 82/10 86/17 92/22 92/23 104/14 110/6 114/3
**were [49]** 4/16 5/5 7/8 7/9 14/16 17/12 19/3 27/3 27/11 28/22 28/23 29/19 30/24 33/9 35/19 36/22 39/2 44/23 57/11 57/18 58/1 58/4 59/2 71/18 71/23 73/9 74/14 74/15 75/9 78/19 82/24 83/13 83/14 89/5 89/11 89/11 92/11 96/19 96/24 98/7 98/8 105/6 105/11 105/25 106/10 106/15 108/18 113/23 116/9
**weren't [1]** 39/4
**West [1]** 21/25
**Wharton [1]** 80/15
**what [229]**
**whatever [3]** 69/23 100/9 111/18
**whatnot [1]** 57/10
**whatsoever [3]** 73/14 73/24 109/20
**when [36]** 5/4 7/6 7/7 14/3 14/7 14/9 19/19 25/22 27/13 33/7 35/14 40/25 42/22 47/25 55/6 60/24 62/3 63/6 66/22 72/6 73/9 77/5 80/19 89/5 89/11 92/11 95/18 100/3 101/18 102/16 108/23 109/15 109/17 110/6 117/6 117/10
**where [36]** 7/3 8/10 8/16 14/25 17/23 20/16 23/7 28/23 30/1 30/9 30/12 37/21 38/6 40/6 43/24 48/4 51/9 52/14 56/21 58/8 63/10 64/2 70/20 71/10 71/22 76/24 80/10 80/11 81/9 81/17 93/3 98/6 104/15 105/4 105/6 110/23
**Whereupon [3]** 17/16 88/11 99/21
**whether [28]** 26/1 27/13 31/24

**W**

**whether... [25]** 32/15 34/11 35/11 35/11 35/13 37/25 41/16 48/16 48/17 48/19 54/9 56/1 56/5 56/15 56/16 60/7 67/19 67/24 76/17 78/13 90/1 90/4 108/18 114/16 114/22
**which [33]** 5/11 5/24 10/10 13/16 18/22 23/4 29/5 32/18 34/16 41/19 42/1 44/23 46/16 47/21 49/16 50/25 51/14 51/14 59/16 59/17 62/10 62/17 63/1 66/13 67/15 67/15 71/21 74/15 80/23 81/24 96/16 101/3 101/11
**while [12]** 5/4 31/12 50/5 80/20 81/12 82/4 82/16 83/13 83/14 113/17 115/1 115/20
**who [27]** 4/11 5/13 12/6 42/14 52/16 54/21 55/24 59/21 60/1 73/21 73/21 74/18 77/6 78/2 78/8 78/8 78/11 84/3 84/6 84/10 84/12 91/25 93/13 93/14 96/24 105/11 113/15
**whole [7]** 9/5 54/17 58/13 58/14 91/24 109/11 109/14
**whose [3]** 5/15 7/17 11/2
**why [26]** 19/20 31/17 38/10 39/9 45/18 47/20 48/7 49/7 65/19 66/2 68/18 90/10 90/14 102/9 104/19 104/19 107/11 107/16 107/21 108/15 110/19 110/25 111/2 112/1 112/16 115/10
**wide [1]** 33/6
**will [44]** 18/19 19/21 24/12 31/13 31/13 31/17 32/4 33/7 38/20 44/2 44/4 44/4 44/8 46/3 58/8 59/8 59/17 61/23 62/1 67/24 68/7 70/23 75/3 76/9 78/14 85/16 85/19 85/23 88/2 91/1 92/2 99/3 100/13 101/17 103/21 106/17 108/6 108/6 109/22 110/10 115/4 116/5 117/6 117/20
**willing [1]** 85/20
**withdraw [1]** 5/23
**withdrawal [6]** 15/25 17/24 18/3 20/22 20/23 20/25
**withdrawing [2]** 109/17 110/5
**withdrawn [1]** 52/17
**within [5]** 58/15 64/1 67/20 81/24 82/2
**without [7]** 6/12 6/15 45/16 99/25 110/11 110/17 111/1
**withstand [1]** 29/10
**witness [28]** 4/20 4/21 18/11 22/14 24/6 25/1 27/23 28/4 29/22 30/22 41/1 50/19 52/15 72/5 72/7 72/7 73/2 76/25 77/1 79/18 91/10 91/10 92/10 105/14 114/8 114/16 115/1 115/16
**witness' [3]** 12/9 18/9 22/11
**witnesses [6]** 3/2 29/18 37/12 45/15 58/24 105/10
**won't [3]** 35/17 49/8 85/14
**wonder [2]** 48/16 72/25
**word [4]** 16/18 16/18 107/16 110/5
**words [2]** 94/22 115/13
**work [14]** 11/22 11/25 27/7 37/10 48/2 78/22 82/14 82/18 83/14 85/14 85/15 88/25 92/7 113/2
**worked [6]** 58/13 81/17 81/17 81/22 81/23 81/25
**working [3]** 82/17 85/5 85/10
**world [2]** 75/4 105/3
**worry [1]** 49/5
**worse [1]** 107/20
**worth [8]** 23/20 37/8 38/23 40/25 43/18 78/12 97/22 98/1
**would [96]** 4/4 5/23 8/15 8/22 17/7 29/10 31/5 32/1 33/2 36/12 36/13 38/19 38/21 40/12 41/20 44/2 44/6 49/4 49/22 49/23 49/24 50/1 50/2 50/3 52/5 54/12 55/3 56/4 56/6 58/13 58/14 60/8 60/13 60/21 60/25 62/3 62/5 62/11 67/11 67/17 67/18 68/3 68/15 70/17 72/8 72/23 73/6 73/8 73/17 74/5 74/9 74/20 75/7 77/18 78/19 78/22 79/5 79/11 88/6 90/18 90/21 91/4 93/3 93/8 93/9 94/10 95/13 95/15 96/4 96/11 97/11 97/22 97/23 98/1 98/5 100/20 100/21 101/9 101/14 102/5 102/19 102/25 103/8 103/17 103/25 104/2 104/21 106/25 111/8 111/11 111/17 111/20 112/21 114/23 115/2 118/1
**wouldn't [4]** 50/2 55/12 58/21 73/7
**wrapping [1]** 106/19
**writing [1]** 86/10
**written [2]** 67/1 67/8
**wrong [2]** 42/14 82/4

**Y**

**yeah [11]** 14/7 20/2 20/18 28/6 53/24 61/15 63/20 85/23 90/24 108/5 117/1
**year [24]** 30/9 80/23 96/10 96/14 96/15 96/17 96/19 100/22 100/25 101/4 101/5 101/5 101/6 101/7 101/8 101/8 101/14 101/20 101/20 101/21 101/21 102/11 106/25 107/6
**years [17]** 11/17 11/19 28/21 100/22 100/22 100/22 101/1 101/1 101/2 101/9 101/10 101/10 101/15 101/15 101/16 107/7 113/24
**Yep [1]** 49/17
**yes [61]** 4/17 5/8 6/7 6/11 6/14 8/4 8/14 9/5 9/8 9/14 12/20 13/19 13/19 13/25 14/3 14/22 15/10 15/12 15/16 16/5 17/22 20/11 20/15 22/25 23/5 31/2 32/7 34/8 37/18 38/5 45/12 46/14 47/1 49/12 50/16 53/16 57/7 60/18 63/12 63/19 70/14 70/16 71/1 83/15 84/20 87/7 87/19 88/1 88/4 88/4 88/24 89/19 89/21 90/3 90/15 103/25 105/18 107/3 113/5 117/2 118/10
**yet [6]** 42/25 85/5 85/11 95/9 98/22 101/19
**yielded [1]** 100/5
**yields [2]** 93/4 95/23
**York [1]** 1/20
**you [431]**
**you reached [1]** 90/14
**you until [1]** 18/20
**you're [4]** 9/8 16/4 50/13 112/1
**your [166]**
**yourself [2]** 74/7 80/4
**yourselves [2]** 31/15 115/11

**Z**

**Zcash [11]** 82/19 82/20 82/20 82/21 82/22 82/22 83/2 83/6 83/7 83/9 86/9
**zero [4]** 24/17 25/14 25/18 25/23