UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | CRIMINAL NO. 21-cr-399 (RDM) |
| | : | |
| ROMAN STERLINGOV, | : | |
| | : | |
| Defendant. | : | |

## GOVERNMENT'S REPLY IN SUPPORT OF MOTION
## FOR PRELIMINARY ORDER OF FORFEITURE

The proposed Preliminary Order of Forfeiture is compelled by the plain text of the applicable forfeiture statute, which requires that the Court "shall order" that the defendant "forfeit to the United States any property, real or personal, involved in such offense, or any property traceable to such property," 18 U.S.C. § 982(a)(1); by this Court's prior decision construing this statute to include all deposits into Bitcoin Fog, ECF No. 116; and by the jury's verdicts finding the defendant guilty on all counts and finding the six specific properties listed in the Forfeiture Allegation of the Superseding Indictment subject to forfeiture as property "involved in" the defendant's money laundering and unlicensed money transmitting business offenses.

The defense offers no basis for this Court to reconsider its prior construction of § 982(a)(1)—which is amply supported by decisions in the D.C. Circuit and other courts—or to second-guess the jury's verdicts. Instead, the defense raises an affirmative constitutional claim and a handful of novel and meritless challenges that are foreclosed by the plain text of the statute and binding precedent.

## ARGUMENT

**I.    The Proposed Forfeiture Is Supported by the Plain Text of the Forfeiture Statute and Is Proportional to the Defendant's Crimes**

The defendant argues (at 5-8) the proposed forfeiture money judgment of $395,563,025.39 is constitutionally excessive under the Eighth Amendment. Significantly, the defendant does *not* dispute that $395,563,025.39 accurately measures the volume of funds "involved in" the Bitcoin Fog money laundering conspiracy and unlicensed money transmitting business, pursuant to 18 U.S.C. § 982(a)(1) and this Court's prior analysis of the statute in ruling on the defendant's *Monsanto* motion, *see* ECF No. 116. Instead, the defendant argues that imposing this money judgment would be unconstitutional as applied for the reasons outlined in his opposition. The defendant's constitutional arguments ignore the governing legal framework and fall well short of establishing a constitutional violation.

"The burden rests on the defendant to show the unconstitutionality of the forfeiture." *United States v. Castello*, 611 F.3d 116, 120 (2d Cir. 2010). The D.C. Circuit has cautioned that this is a high bar: "'[J]udgments about the appropriate punishment for an offense belong in the first instance to the legislature,'" and "[i]n authorizing large forfeiture judgments for" money laundering offenses, among others, "Congress determined that the offenses are grave, which carries significant weight in our analysis." *United States v. Bikundi*, 926 F.3d 761, 795 (D.C. Cir. 2019) (quoting *Collins v. SEC*, 736 F.3d 521, 527 (D.C. Cir. 2013), and *United States v. Bajakajian*, 524 U.S. 321, 336 (1998)).

Accordingly, in order to show that a punitive forfeiture violates the Eighth Amendment, the defendant must show that "it is grossly disproportional to the gravity of a defendant's offense."

2

*Bajakajian*, 524 U.S. at 334.[1]  This inquiry is guided by four factors identified by the Supreme Court in *Bajakajian*: "(1) the essence of the crime; (2) whether the defendant fit into the class of persons for whom the statute was principally designed; (3) the maximum sentence and fine that could have been imposed; and (4) the nature of the harm caused by the defendant's conduct." *United States v. Bikundi*, 926 F.3d 761, 795 (D.C. Cir. 2019) (citing *Bajakajian*, 524 U.S. at 337-40; *United States v. Varrone*, 554 F.3d 327, 331 (2d Cir. 2009)).  "These factors hardly establish a discrete analytic process, but we have reviewed them briefly to see if there are danger signals when upholding a civil penalty challenged under the Excessive Fines Clause." *Bikundi*, 926 F.3d at 795 (cleaned up).  Here, each factor weighs in favor of enforcing the broad statutory mandate of § 982(a)(1):

### A. The Essence of the Crime

First, the essence of the defendant's crimes is gravely serious.  In *Bikundi*, the D.C. Circuit considered a husband-wife pair who orchestrated a health care fraud and money laundering scheme lasting approximately five years, resulting in fraudulent billings of more than $80 million, and found that the essence of their crimes was "grave"—based on the extent of the fraud and the fact

---

[1] The defendant repeatedly argues the proposed forfeiture order is "punitive," *e.g.*, ECF No. 305 at 5 ("Here, the Government's proposed asset forfeiture is punitive . . . ."), ("The fact that the Government double counts in its asset forfeiture demand evidences its punitive nature."), but the fact that a forfeiture is "punitive" is merely a threshold condition establishing that the Eighth Amendment applies in the first place—it has no bearing on whether the forfeiture violates the Eighth Amendment's Excessive Fines Clause.  *See Bajakajian*, 524 U.S. at 331 (noting that traditional *in rem* forfeitures "were viewed as nonpunitive" and so "were considered to occupy a place outside the domain of the Excessive Fines clause"); *e.g.*, *United States v. Davis*, 648 F.3d 84, 96-97 (2d Cir. 2011) (finding that forfeiture of stolen art was "remedial, not punitive" and therefore fell outside scope of Eighth Amendment).  Even assuming *arguendo* that the proposed forfeiture order is "punitive," it is in no way grossly disproportional to the gravity of the offense under *Bajakajian*.  *E.g.*, *Bikundi*, 926 F.3d at 795 ("[E]ven if the forfeitures are punitive, and thus the Excessive Fines Clause applies, the forfeitures do not run afoul of the Clause at the second step.").

that, "far from being a one-off violation, the scheme lasted for years and involved numerous misdeeds." 926 F.3d at 795. The same reasoning applies here with even more force: Roman Sterlingov operated the one of the Darknet's largest and most significant Bitcoin money laundering services for nearly ten years. He processed more than $400 million in laundered Bitcoin transactions, *see* Ex. 308—of which at least $67 million was *directly* traceable to or from known Darknet markets, including the child sexual abuse material (CSAM) Darknet site Welcome to Video, *see* Ex. 601:

| Counterparty Name | | Directly Sent to BITCOIN FOG | Indirectly Sent to BITCOIN FOG | Directly Received from BITCOIN FOG | Indirectly Received from BITCOIN FOG |
|---|---|---|---|---|---|
| SILK ROAD | BTC | 377102.7388 | 101783.57 | 106522.7697 | 51273.39 |
| | USD | $9,724,911 | $10,340,446 | $2,321,637 | $1,471,025 |
| SILK ROAD 2.0 | BTC | 22863.74065 | 12438.155 | 11274.31369 | 4320.23 |
| | USD | $12,582,929 | $6,463,629 | $5,852,300 | $2,534,628 |
| ALPHABAY | BTC | 5700.845981 | 2826.69 | 3651.443827 | 2638.945 |
| | USD | $3,062,842 | $1,868,844 | $1,679,212 | $1,342,528 |
| AGORA | BTC | 41972.36366 | 25679.985 | 26398.44487 | 10027.08 |
| | USD | $14,231,729 | $8,624,142 | $8,588,675 | $3,389,947 |
| NUCLEUS | BTC | 5240.193979 | 2820.15 | 2829.752662 | 1463.475 |
| | USD | $1,438,077 | $886,452 | $802,798 | $400,639 |
| ABRAXAS | BTC | 4116.93734 | 1895.51 | 2066.420789 | 903.39 |
| | USD | $1,027,249 | $558,194 | $516,058 | $229,535 |
| PANDORA | BTC | 2032.569964 | 418.28 | 553.2503671 | 401.155 |
| | USD | $1,254,828 | $238,695 | $299,141 | $260,550 |
| SHEEP | BTC | 7646.828974 | 2747.84 | 1547.522515 | 1925.09 |
| | USD | $2,788,483 | $1,494,597 | $361,895 | $551,001 |
| BLACK BANK | BTC | 2918.068006 | 2146.795 | 1632.1633 | 947.065 |
| | USD | $912,669 | $1,043,156 | $427,255 | $280,495 |
| WELCOME TO VIDEO | BTC | 0 | 0 | 2.47269674 | 1.675 |
| | USD | $0 | $0 | $989 | $846 |

The scale of harm facilitated by the defendant's conduct—including tens of millions of dollars in illegal drug transactions, trafficking of CSAM images, and laundering stolen funds from victims including the cryptocurrency exchange Bitfinex—is vast.

4

### B. Whether the Defendant Fits into the Class of Persons for Whom the Statutes Are Designed

Second, Roman Sterlingov is precisely the kind of defendant for whom these criminal statutes were designed. In *Bajakajian*, the Supreme Court found that a defendant who committed a currency reporting offense was not within the class of persons targeted by the same forfeiture statute here, 18 U.S.C. § 982(a)(1), because the defendant in that case "[was] not a money launderer, a drug trafficker, or a tax evader." 524 U.S at 338. By contrast, Roman Sterlingov was a money launderer. He operated a massive Bitcoin money laundering service, and he was charged with and convicted of money laundering and unlicensed money transmitting business offenses. He therefore falls squarely within the class of persons to which Congress intended § 982(a)(1) to apply. *See Bikundi*, 926 F.3d at 795-96 ("Florence and Michael fall squarely within the class of criminals targeted by the relevant forfeiture statutes: health care fraudsters and money launderers."); *United States v. Waked Hatum*, 969 F.3d 1156, 1168 (11th Cir. 2020) ("Mr. Waked is within the class of persons whom the money laundering statutes were meant to cover. He was not merely an intermediary. He was a sophisticated party who carried out a multi-million-dollar money laundering scheme over the course of several years.").

### C. The Maximum Sentence and Fine that Could Be Imposed

Third, "[t]he statutes of conviction and the Sentencing Guidelines authorize heavy prison sentences and fines." *Bikundi*, 926 F.3d at 796. In particular, the money laundering offenses charged in Counts One and Two each carry a statutory maximum sentence of 20 years of imprisonment, 18 U.S.C. § 1956(a)(1), (a)(3), (h); and the unlicensed money transmitting business offense charged in Count Three carries an additional five years, 18 U.S.C. § 1960(a). The money laundering conspiracy charged in Count One also carries a fine of up to "twice the value of the property involved in the transaction." 18 U.S.C. § 1956(a)(1), (h). Where the statute explicitly

5

authorizes a fine of *twice* the value of property involved in the money laundering conspiracy, a forfeiture of one-half that amount cannot be considered grossly disproportional. *See Bikundi*, 926 F.3d at 796.

### D. The Nature of the Harm Caused by the Defendant's Conduct

Fourth, the defendant's conduct caused profound harm. The defendant facilitated more than $67 million in illicit drug transactions, as well as transactions to gain access to CSAM images on Welcome to Video. Indeed, evidence introduced at trial showed the defendant was not just aware but *dismissive* of the online trafficking of CSAM images—writing on a Russian cybercrime forum that "drugs are sold ***and (unfortunately) child pornography***" through the Tor network, and that such illegal commerce was carried on using Bitcoin:



Ex. 55.a, at 34 (translated, emphasis added). Significantly the defendant posted this on September 22, 2011, just weeks before the launch of Bitcoin Fog on October 11, 2011. At trial, defense counsel tried to minimize the Welcome to Video connection because Bitcoin Fog only laundered payments by users of the site *to* Welcome to Video, and not payments coming *from* the Welcome to Video wallet. *See* 2/26/24 Tr. at 70:12-13 ("Q. And Welcome to Video. Welcome to Video never—no one ever sent money from Welcome to Video to Bitcoin Fog; correct?"). But even a single dollar spent to gain access to CSAM images is intolerable. The defendant's role in

facilitating crimes against children, combined with the staggering volume of Darknet drug market transactions processed through his laundering service, makes this last factor weigh heavily in favor of imposing the statutory forfeiture penalty that Congress intended.

## II. The Defendant's Remaining Arguments Fail To Establish Gross Disproportionality

The defendant ignores the *Bajakajian* factors altogether, and instead asks this Court to declare a statutory penalty unconstitutional based on novel and unprecedented arguments.

The defendant argues (at 5) that Bitcoin Fog was just a "software service" that "did not rely upon legal funds to hide illicit sources or illegal funds." *See also* ECF No. 305, at 8-9. This has it exactly wrong. As this Court previously recognized—and as the jury necessarily concluded in finding all of the specific properties subject to forfeiture—Bitcoin Fog worked as a mixer by pooling together Bitcoin from many users, including any "legal" deposits. "Each deposit of funds into Bitcoin Fog therefore contributed to its efficacy and facilitated its activities—both lawful and unlawful." ECF No. 116, at 15. The Court's analysis is consistent with the weight of authority construing the money laundering forfeiture statutes. It is well-established that that money laundering forfeiture pursuant to § 982(a)(1) includes "the money or other property being laundered (the corpus), any commissions or fees paid to the launderer, and any property used to facilitate the laundering offense." *United States v. Puche*, 350 F.3d 1137, 1153 (11th Cir. 2003) (internal citation omitted). As court after court has explained, commingling clean and dirty funds is the essence of money laundering, and thus it is appropriate to forfeit clean funds used as facilitating property:

> [L]imiting the forfeiture of funds under these circumstances to the proceeds of the initial fraudulent activity would effectively undermine the purpose of the forfeiture statute. Criminal activity such as money laundering largely depends upon the use of legitimate monies to advance or facilitate the scheme. It is precisely the

> commingling of tainted funds with legitimate money that facilitates the laundering and enables it to continue.

*United States v. Tencer*, 107 F.3d 1120, 1135 (5th Cir. 1997) (quoting *United States v. Contents of Account Numbers 208-06070 and 208-06068-1-2*, 857 F. Supp. 329, 334-35 (S.D.N.Y. 1994)).[2]

In essence, the defendant is asking this Court to declare that forfeiture of property used to facilitate a money laundering offense—one of the bedrock elements of the broad forfeiture authority under § 982(a)(1)—is per se unconstitutional. No legal authority supports this claim. Just the opposite: courts have recognized that the mixing of clean and dirty funds is central to the harm caused by money laundering. As the Eleventh Circuit explained in rejecting a constitutional challenge to a money laundering forfeiture in *Waked Hatum*:

> [F]or some crimes, including money laundering, the harm "does not generally fall upon an individual, but falls upon society in general." *United States v. Martin*, 320 F.3d 1223, 1227 (11th Cir. 2003) (per curiam) (quoting *United States v. Thompson*, 40 F.3d 48, 51 (3d Cir. 1994)). . . . [T]he greater harm from money laundering is usually obvious: criminals launder money to cover up their criminal conduct, and society suffers "when criminally derived funds are laundered to allow the criminal unfettered, unashamed and camouflaged access to the fruits of those ill-gotten gains." *United States v. O'Kane*, 155 F.3d 969, 972–73 (8th Cir. 1998). So, in *Martin*, this Court approved of the district court's calculation of the "harm" as equaling the amount the defendant laundered through the 97 different monetary transactions for which he was convicted. 320 F.3d at 1226–27. Our Court said that calculating the harm simply based on the value of the stolen check that gave rise to these transactions would not take full stock of the harm to society. *Id.* at 1227. In such a case, society has an interest in redressing "the injection of illegal proceeds into the stream of commerce." *Id.* (quotation marks omitted). Similarly, when a

---

[2] The defendant also relies on a multiple-hearsay article by an opinion writer at Bitcoin Magazine claiming to report on a 2019 Chainalysis webinar—without providing any of the underlying analysis or data from Chainalysis—purporting to show that the majority of funds sent to (not from) generic "Bitcoin mixers" (not further specified) did not originate from Darknet markets or stolen funds. *See* ECF No. 305-1. The Court should not accept this dubious article as "relevant and reliable," Fed. R. Crim. P. 32.2(b)(1)(B), and, as a factual matter, the government vehemently disputes the defendant's efforts to minimize the flow of illegal funds through Bitcoin Fog. But even taking the Bitcoin Magazine at face value, all it suggests is that Bitcoin Fog comingled legitimate and illegitimate funds. That was the very essence of Bitcoin Fog's money laundering methodology and in no way diminishes the volume of property "involved in" the money laundering conspiracy. *See* ECF No. 116.

laundering scheme covers up the movement of drug money, the conduct "is harmful in and of itself." *United States v. Chaplin's, Inc.*, 646 F.3d 846, 853 (11th Cir. 2011).

969 F.3d at 1169. This is consistent with the D.C. Circuit's analysis, in the sentencing context, that the harm to society inflicted by money laundering is properly measured by the *total* value of funds laundered, including both clean and dirty funds. As the Circuit explained in *United States v. Braxtonbrown-Smith*, 278 F.3d 1348 (D.C. Cir. 2002), it is the "total amount of money involved in the charged [money laundering] transactions . . . rather than only some portion of that amount based on the proportion of illegitimate funds" that "measures the harm to society that the money laundering causes to law enforcement's efforts to detect the use and production of ill-gotten gains." *Id.* at 1355 (internal quotations omitted). A forfeiture judgement targeting this harm—measured by the total value of funds used to facilitate the money laundering—is not grossly disproportional to the offense.

In a similar vein, the defendant argues (at 6-7) that the forfeiture money judgment exceeds the 1-3 percent service fee that he received for all the transactions laundered through Bitcoin Fog. As noted above, it is black-letter law that property "involved in" a money laundering offense and subject to forfeiture under § 982(a)(1) includes more than just the defendant's "commissions and fees," but also the "the money or other property being laundered (the corpus)" and "any property used to facilitate the laundering offense." *Puche*, 350 F.3d at 1153. Again, the defendant does not dispute that § 982(a)(1) mandates forfeiture of these categories of property—to hold otherwise would nullify Congress's careful distinction between forfeiture of property "involved in" money laundering and unlicensed money transmitting business offenses under § 982(a)(1), and forfeiture of the "proceeds" of other crimes under other provisions in § 982. Instead, the defendant seems to be arguing that forfeiting anything beyond a launderer's bare proceeds—his "commissions and

9

fees"—is per se unconstitutional.  As above, the defendant cannot cite a single legal authority to endorse this novel argument, and it cannot overcome the weight of the four *Bajakajian* factors that weigh heavily in favor of the government's requested forfeiture judgment.

### III. The Preliminary Order of Forfeiture Does Not Impose Joint and Several Liability, and *Honeycutt* Is Irrelevant to the Operator of a Custodial Mixer Who Obtained and Laundered $395,563,025.39 in Bitcoin Deposits

The defendant argues (at 13-14) that the proposed forfeiture order would impose joint and several liability contrary to the Supreme Court's holding in *Honeycutt v. United States*, 581 U.S. 443 (2017).  This objection is baffling, because the government's proposed Preliminary Order of Forfeiture contains no language making the defendant jointly and severally liable with any other person.  *See Bikundi*, 926 F.3d at 794 (rejecting challenge based on joint and several liability "because the forfeitures here do not impose joint and several liability").

The defendant nevertheless argues (at 14) that *Honeycutt* "limits forfeiture up to the amount acquired by a defendant to avoid the inequitable and unconstitutional situation" described by the facts of that case.  There are several problems with this argument.

First, *Honeycutt* was not decided on constitutional grounds.  The question presented was one of pure statutory interpretation; the Court did not declare anything "unconstitutional" or consider any constitutional principles in determining how to construe the relevant forfeiture statute.  *See* 581 U.S. at 445 (announcing ruling based on "the statute's text and structure").

Second, the forfeiture statute at issue in *Honeycutt* is materially different from the one here. In *Honeycutt*, the Court addressed 21 U.S.C. § 853(a)(1), which mandates forfeiture of "any property constituting, or derived from, any proceeds the person obtained, directly or indirectly, as the result of" drug trafficking offenses. The holding in *Honeycutt* flows directly from the statutory text: because the statute limits forfeiture to property "the person *obtained*" as a result of the

10

offense, the Court held that forfeiture "is limited to property the defendant himself actually *acquired* as the result of the crime."  581 U.S. at 454 (emphasis added).

The text of the forfeiture statute at issue here, by contrast, lacks the key references to property "obtained" by a specific "person."  Instead, it makes a defendant convicted of money laundering or unlicensed money transmitting business offenses liable for forfeiture of "any property . . . involved in *such offense*."  18 U.S.C. § 982(a)(1) (emphasis added).  Numerous courts have relied on these textual differences in refusing to extend *Honeycutt* to money laundering forfeitures under § 982(a)(1).  *See, e.g.*, *Waked Hatum*, 969 F.3d 1156, 1165 (4th Cir. 2020) ("[B]ecause § 982(a)(1) contains neither a 'proceeds' nor an 'obtained' limitation, *Honeycutt*'s 'tainted property' requirement does not apply to this case."); *United States v. Kenner*, 443 F. Supp. 3d 354, 369 (E.D.N.Y. 2020) ("[T]he contrasting plain language of § 982(a)(1) ('involved in' instead of § 853(a)(1's 'obtained') provides a compelling reason to conclude that *Honeycutt*'s holding does not apply to the money-laundering statute.").  The D.C. Circuit declined to reach the question in *Bikundi* but expressed doubt about applying *Honeycutt* to § 982(a)(1) because "[t]he forfeiture statutes at issue in this case"—including § 982(a)(1)—"arguably define forfeitable property more broadly than that in *Honeycutt*, so it is unclear whether *Honeycutt*'s logic extends to [the defendants'] forfeitures."  926 F.3d at 794.  Whatever the full impact of *Honeycutt* may be, it certainly did not announce a general rule—let alone a constitutional rule—that money laundering forfeitures under § 982(a)(1) are limited to the amount the defendant personally acquired.

Third, in any event, the defendant *did* obtain the entire $395,563,025.39 in Bitcoin deposited into Bitcoin Fog, because he ran a custodial mixer that took possession of users' funds in order to launder them.  The defendant's own pleading acknowledges this fact.  *See* ECF No. 305, at 5 ("Bitcoin Fog sent mixed funds back to it users after charging a variable service fee

11

between 1-3%."), 6 ("Bitcoin Fog users' money was sent back to them shortly after their funds were run through the service."), *id.* ("They ran their money through Bitcoin Fog and received all of it back minus the small service fee.").

It is irrelevant that the defendant passed along the corpus of the money laundering transactions to Bitcoin Fog users. Congress specifically mandated broad forfeiture under § 982(a)(1) of any property "involved in" money laundering and unlicensed money transmitting business offenses, including "the money or other property being laundered (the corpus)," *Puche*, 350 F.3d at 1153—which, as a matter of course, includes post-mix funds that are returned to customers of a money laundering service like Bitcoin Fog. It would defeat the purpose of this statute to exempt defendants from liability for laundered funds that they successfully dissipated. *See United States v. Young*, 330 F. Supp. 3d 424, 432 (D.D.C. 2018) (Jackson, J.) ("[A] convicted criminal defendant should not be able to evade the economic impact of criminal forfeiture by rendering the forfeitable property unavailable."); *United States v. Blackman*, 746 F.3d 137, 144 (4th Cir. 2014) ("The fact that a defendant is indigent or otherwise lacks adequate assets to satisfy a judgment does not operate to frustrate entry of a forfeiture order. . . . To conclude otherwise would enable wrongdoers to avoid forfeiture merely by spending their illegitimate gains prior to sentencing. . . . Imposing forfeiture on defendants who have divested themselves of their gains is therefore necessary to give full effect to the penal purposes of the forfeiture statute.").

Finally, comparing Roman Sterlingov (at 14) to the low-level college student in the *Honeycutt* hypothetical who earned $300 per month to deliver packages for a marijuana kingpin is risible. The defendant is a sophisticated cyber criminal who participated in creating, operating, and profiting from one of the Darknet's largest and longest-running Bitcoin laundering services. Bitcoin Fog operated for nearly 10 years, and it processed more than $400 million in transactions,

including tens of millions of dollars to or from Darknet markets selling illegal drugs and other contraband. He reaped millions of dollars in profits from his crimes.

In short, the government's proposed Preliminary Order of Forfeiture does not impose joint and several liability; *Honeycutt* is irrelevant to the forfeiture in this case; and, in any event, the defendant did personally obtain the entire $395,563,025.39 in Bitcoin, which forms the basis of the forfeiture money judgment here, through his operation of Bitcoin Fog.

### IV.     Defendant's Remaining Arguments Are Meritless

The defendant's remaining arguments are equally meritless. First, the defendant claims (at 11-12) that the government is "double counting" because it has seized or forfeited funds from other defendants who have been convicted of other crimes in unrelated cases, including the Silk Road case, Larry Harmon, and Ilya Lichtenstein, where individuals laundered a portion (not all) of their criminal proceeds through Bitcoin Fog. But the defendant cites no case in which any court has adopted this rationale to reduce one defendant's forfeiture based on a forfeiture judgment in another, unrelated case for different crimes.[3]

Just the opposite: courts have recognized that forfeiture is an element of punishment that is specific to each count of conviction. Even in cases where a single defendant is convicted of multiple counts involving forfeiture, courts often impose separate forfeiture judgments—reasoning that the different crimes cause discrete harm and should be punished individually. As the Second

---

[3] The defendant cites *Young*, but that case concerned a situation where the government was seeking two things for the same count—two kilograms of heroin seized from the defendant's house, and a $180,000 money judgment representing the funds used by the defendant to purchase the heroin. 330 F. Supp. 3d at 434-35 (describing situation as "tantamount to the recovery of *both* a forfeitable asset of the defendant (the drugs) *and* the money that the defendant spent to procure that asset"). The facts in *Young* are not remotely similar to those here, and then-Judge Jackson's concern about double-counting two recoveries for a *single count* are irrelevant to whether Roman Sterlingov should be fully liable for the money laundering and unlicensed money transmitting counts of conviction in his case.

Circuit explained in affirming separate forfeiture judgments for a defendant convicted of wire fraud and money laundering:

> Criminal forfeiture is a form of punishment. Schlesinger's fraud and money laundering are two offenses impacting two distinct sets of victims. The "victims" of fraud counts are those persons who have lost money or property as a direct result of the fraud. The "victim" of money laundering is, by contrast, ordinarily society at large. Schlesinger does not deny that he is subject to separate sentences for the fraud counts and the money laundering counts; consequently, the proceeds of those crimes are subject to separate orders of forfeiture.

*United States v. Schlesinger*, 261 F. App'x 355, 361 (2d Cir. Jan. 30, 2008) (internal citations and quotations omitted); *see also United States v. Beltramea*, 160 F. Supp. 3d 1119, (N.D. Iowa 2016) ("Here, however, the court does not double count because it does not order forfeiture of both cash and Castlerock based solely on Defendant's fraudulent scheme. Instead, the court orders forfeiture of $125,000 in tainted funds based on Defendant's fraudulent scheme and orders forfeiture of Castlerock based on Defendant's money laundering. . . . Because forfeiture is a form of punishment, and because each of Defendant's offenses caused a distinct harm to be accounted for, the court concludes that ordering forfeiture of both the defrauded funds and the real property paid for and improved upon by laundering those funds does not amount to impermissible double counting.").

The reasoning in *Schlesinger* applies with even more force here, where separate actors committed the underlying crimes (*e.g.*, wire fraud) while Roman Sterlingov laundered the funds on their behalf. Congress implicitly recognized this when it enacted § 982(a)(1), broadly mandating the forfeiture of property "involved in" money laundering offenses while knowing that money laundering almost always involves criminal proceeds from other crimes. At the same time, Congress deliberately declined to enact any sort of offsetting mechanism or statutory right of contribution for money laundering defendants, *see United States v. Guillen-Cervantes*, 748 F.3d

14

870 (9th Cir. 2014) (declining to find implied right to allow defendant, who was convicted of conspiracy to transport and harbor illegal aliens, "to seek contribution from other members of the conspiracy" to pay her forfeiture judgment), even though other parts of the forfeiture statutes contain offsetting language, *see, e.g.*, 18 U.S.C. § 981(a)(2)(B) (offsetting criminal proceeds in certain civil forfeiture cases involving "lawful goods or lawful services that are sold or provided in an illegal manner"). Accordingly, the defendant's request is not only unsupported by precedent, but contrary to the text and purpose of the money laundering forfeiture statute.

Next, the defendant seeks to relitigate (at 10-11) the forfeitability of the Bitcoin Fog wallet identified by root address 1YZJKaAx2HRWvcbCXDBtQbBZcRU46WJqw. But the jury has already rendered its forfeiture verdict—at the defendant's request—and found this specific property was "involved in" the defendant's crimes and is subject to forfeiture. The jury's verdict is final. *See United States v. Neal*, 2003 WL 24307070, at *2 & n.2 (E.D. Va. Sept. 29, 2003).

The defendant claims (at 14) the government has not satisfied the conditions for forfeiting substitute assets pursuant to 21 U.S.C. § 853(p)(1). The basis for this argument is the defendant's "double-counting" argument, which is meritless for the reasons stated above. Further, as the government explained in its opening forfeiture memorandum, trial testimony established that the majority of funds laundered through Bitcoin Fog were forwarded to Bitcoin Fog users following the mixing process, thus satisfying the statutory conditions that the original property subject to forfeiture "has been transferred or sold to, or deposited with, a third party" and "cannot be located in the exercise of due diligence." 21 U.S.C. § 853(p)(1)(A), (B); *see* ECF No. 297, at 9-10. The defendant repeatedly acknowledges this fact in his own opposition brief. *See* ECF No. 305, at 5-6 ("Bitcoin Fog sent mixed funds back to its users after charging a variable service fee between 1-3%.").

15

The defendant argues (at 15) that the government is barred from seeking forfeiture of funds "that were laundered outside the statute of limitations." As the Court instructed the jury, however, both the money laundering conspiracy charged in Count One and the unlicensed money transmitting business offense charged in Count Three are "continuing offenses," meaning that "the statute of limitations . . . only begins to run after the last day of the continuing offense." ECF No. 268, at 66. The Court is required to order the forfeiture all property "involved in such offense." 18 U.S.C. § 982(a)(1). Therefore, the Court must order the forfeiture of all Bitcoin deposits covering the entire course of the conspiracy and unlicensed money transmitting business offenses—that is, for the nearly ten years that Bitcoin Fog operated between 2011 and 2021.

Finally, the defendant argues (at 15) that the funds subject to forfeiture "are not an instrumentality of the crime of money laundering." The exact logic of the defendant's argument is difficult to follow, but it appears to arise out of a confused misreading of the Supreme Court's opinion in *Bajakajian*. In *Bajakajian*, the government argued that currency seized from a currency smuggler was an "instrumentality" of the crime, and as a consequence, the forfeiture fell within the tradition of *in rem* forfeitures that were considered nonpunitive and outside the scope of the Eighth Amendment. *See* 333 U.S. at 331-33. The Court disagreed, finding that the currency was not an "instrumentality" after all, but—more to the point—rejecting the idea that status as an "instrumentality" was the right test to determine whether the Eighth Amendment applies. *See id.* at 333 & n.9 ("It is therefore irrelevant whether respondent's currency is an instrumentality; the forfeiture is punitive, and the test for the excessiveness of a punitive forfeiture involves solely a proportionality determination."). In other words, whether property is an "instrumentality" or not is "irrelevant" to its forfeitability. *Id.*

16

In any event, as *Bajakajian* makes clear, whether the Eighth Amendment *applies* is only the first step in the Court's analysis. The second step requires the Court to determine, if the Eighth Amendment does apply, whether the forfeiture is grossly disproportional to the offense in light of the *Bajakajian* factors. *See Bikundi*, 926 F.3d at 794-96. And, as discussed above, the forfeiture here easily satisfies each of the *Bajakajian* factors. This Court should apply the § 982(a)(1) as written to punish the defendant's profoundly harmful crimes.

## CONCLUSION

For the foregoing reasons, and for good cause, the Court should enter the government's proposed Preliminary Order of Forfeiture.

        Respectfully submitted,

        MATTHEW M. GRAVES
        UNITED STATES ATTORNEY
        D.C. Bar No. 481052

BY:    */s/ C. Alden Pelker*
         */s/ Jeffrey Pearlman*
         C. Alden Pelker, Maryland Bar
         Jeff Pearlman, D.C. Bar No. 466901
         Trial Attorneys, U.S. Department of Justice
         Computer Crime & Intellectual Property Section
         1301 New York Ave., N.W., Suite 600
         Washington, D.C. 20005
         (202) 616-5007 (Pelker)
         (202) 579-6543 (Pearlman)
         Catherine.Pelker@usdoj.gov
         Jeffrey.Pearlman2@usdoj.gov