**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **Criminal No. 21-cr-399 (RDM)** |
| | : | |
| **ROMAN STERLINGOV,** | : | |
| | : | |
| **Defendant.** | : | |

**GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING**

The United States of America, by and though the United States Attorney for the District of Columbia, respectfully submits its Memorandum in Aid of Sentencing. The government recommends that the defendant be sentenced to a term of imprisonment of 30 years and a fine of $100,000. The government respectfully submits that such a sentence would adequately serve the interests of justice as codified in 18 U.S.C. § 3553(a). In support of this motion, and to assist the Court in fashioning an appropriate sentence, the government submits the following:

**FACTUAL BACKGROUND**

**A. Introduction**

Following the defendant's arrest in April 2021 and subsequent indictment, the Court presided over an approximately one-month jury trial in February and March 2024. At the conclusion of the trial, on March 12, 2024, the jury returned a verdict of guilty on all four charged counts: Money Laundering Conspiracy, in violation of 18 U.S.C. § 1956(h); so-called "Sting" Money Laundering, in violation of 18 U.S.C. § 1956(a)(3)(A); Operating an Unlicensed Money Transmitting Business, in violation of 18 U.S.C. §§ 1960(a) & 2; and Operating an Unlicensed Money Transmitting Business, in violation of D.C. Code § 26-1023(c). The jury further reached a verdict on March 12, 2024, that several assets involved in the case, including assets within the

1

defendant's accounts and remaining cryptocurrency in Bitcoin Fog, constituted property, real or personal, involved in the federal offenses of which the defendant was convicted.

The trial, and the jury's verdict, established two essential facts that should guide the Court in determining a sentence. First, between 2011 and 2021 Bitcoin Fog laundered tens of millions of dollars for Darknet narcotics dealers, and facilitated illegal conduct by other individuals. Those other individuals even included those who participated in a Darknet site—Welcome to Video—for trafficking child sexual abuse material. Bitcoin Fog catered to criminals and that was its attraction; Bitcoin Fog did not discriminate so long as willing participants agreed that their cryptocurrency sent to Bitcoin Fog would be left untraceable in exchange for a one to three percent fee.

Second, Roman Sterlingov conceived of, set up, owned, operated, and profited from Bitcoin Fog. The defendant's Bitcoin Fog site and its operation at a high level of security ensured both that his customers would be satisfied with the anonymization of their illegally obtained cryptocurrency, and that law enforcement would never track down the defendant behind the site. The defendant collected a significant amount of service fees and by doing so left his fingerprints on Bitcoin Fog.

### B. The Success of Bitcoin Fog

The jury heard testimony that while the identity of a Bitcoin address owner is generally anonymous, law enforcement can on its own and/or in conjunction with commercial services analyze the address of the cryptocurrency that appears on the ledger-like blockchain. Bitcoin Fog mixed its deposits and returned other Bitcoin to its users. With sufficient funds in Bitcoin Fog, a user would walk away with Bitcoin completely unrelated to any prior transaction deposits, and then face less exposure in cashing the Bitcoin out. Legitimate virtual exchanges were obligated to

use Know Your Customer (KYC) rules as part of a regulatory scheme to deter money laundering; the defendant knew his customers were engaged in illicit activity and that they could not reveal their source of cryptocurrency funds to legitimate virtual currency exchanges.

The defendant's Bitcoin Fog mixer was highly successful. Between the defendant sending the very first cryptocurrency to the Bitcoin Fog wallet on November 10, 2011, before the site had even been publicly announced, and around the time of the defendant's arrest in April 2021, the Bitcoin Fog site took in cryptocurrency valued at the time of deposit at approximately $395,501,956. Bitcoin Fog at the beginning took in merely $13,797 in the last couple of months of 2011, ramped up to more than $4 million in 2012, and from then on never took in less in a full year than $35 million in deposits. Even in 2021, terminating with the defendant's arrest in April, Bitcoin Fog had already received deposits of more than $17 million in a few months. At the time of the defendant's arrest, Bitcoin Fog was a successful program with a proven track record of effective money laundering and was thriving.

The Bitcoin Fog site after receiving deposits then returned other cryptocurrency to the user, minus the 1-3 percent fee. Around the time of the defendant's arrest in April 2021, there was approximately 1354 Bitcoin remaining (as of February 21, 2024, about $70 million) in the Bitcoin Fog wallet. Those funds were left in the site untouched since April 29, 2021. In total, about $335 million had been processed through the site prior to the defendant's arrest. Again, the site was an overwhelming success.

### C. Bitcoin Fog Users

Who benefited from the operation of Bitcoin Fog? The Court heard extensive testimony about who deposited money into the Bitcoin Fog site, and none of the truthful testimony concerned depositing money for libertarian privacy principles. Instead, government investigators showed

that individuals operating as illegal narcotics vendor mixed their Bitcoin funds through Bitcoin Fog:

| Counterparty Name | | Directly Sent to BITCOIN FOG | Indirectly Sent to BITCOIN FOG | Directly Received from BITCOIN FOG | Indirectly Received from BITCOIN FOG |
|---|---|---|---|---|---|
| SILK ROAD | BTC | 377102.7388 | 101783.57 | 106522.7697 | 51273.39 |
| | USD | $9,724,911 | $10,340,446 | $2,321,637 | $1,471,025 |
| SILK ROAD 2.0 | BTC | 22863.74065 | 12438.155 | 11274.31369 | 4320.23 |
| | USD | $12,582,929 | $6,463,629 | $5,852,300 | $2,534,628 |
| ALPHABAY | BTC | 5700.845981 | 2826.69 | 3651.443827 | 2638.945 |
| | USD | $3,062,842 | $1,868,844 | $1,679,212 | $1,342,528 |
| AGORA | BTC | 41972.36366 | 25679.985 | 26398.44487 | 10027.08 |
| | USD | $14,231,729 | $8,624,142 | $8,588,675 | $3,389,947 |
| NUCLEUS | BTC | 5240.193979 | 2820.15 | 2829.752662 | 1463.475 |
| | USD | $1,438,077 | $886,452 | $802,798 | $400,639 |
| ABRAXAS | BTC | 4116.93734 | 1895.51 | 2066.420789 | 903.39 |
| | USD | $1,027,249 | $558,194 | $516,058 | $229,535 |
| PANDORA | BTC | 2032.569964 | 418.28 | 553.2503671 | 401.155 |
| | USD | $1,254,828 | $238,695 | $299,141 | $260,550 |
| SHEEP | BTC | 7646.828974 | 2747.84 | 1547.522515 | 1925.09 |
| | USD | $2,788,483 | $1,494,597 | $361,895 | $551,001 |
| BLACK BANK | BTC | 2918.068006 | 2146.795 | 1632.1633 | 947.065 |
| | USD | $912,669 | $1,043,156 | $427,255 | $280,495 |
| WELCOME TO VIDEO | BTC | 0 | 0 | 2.47269674 | 1.675 |
| | USD | $0 | $0 | $989 | $846 |

GOVERNMENT
EXHIBIT
601

As shown above in Government Exhibit ("GX") 601, vendors from established Darknet sites selling illegal narcotics and other illegal goods used Bitcoin Fog for its intended purpose to launder the Bitcoin received from buyers (and buyers used Bitcoin Fog to anonymize themselves as well). As discussed *infra*, the government recovered evidence showing Bitcoin Fog's laundering of tens of millions of dollars through thousands of deposits to Bitcoin Fog and presented that evidence to the jury. The vendors, in selling illegal narcotics to their customers, openly displayed their wares. Vendor Symbiosis on the site Silk Road, for example, openly advertised the sale of "uncut Cocaine flake." GX 608.a. Symbiosis was then able to take cryptocurrency from its narcotics purchasing customers and deposit more than $1.5 million of it into Bitcoin Fog so that the revenues could not be traced. GX 601.a.

Welcome to Video, a platform used to distribute child sexual abuse material (CSAM), did not operate on the same model as drug trafficking Darknet markets, with vendors selling drugs for profit. Instead, users of Welcome to Video could pay Bitcoin into the site to gain access to CSAM images. Many of these users also used Bitcoin Fog to anonymize payments made to the site. (As shown below, that this type of material would be for sale on the Darknet was a surprise to almost no one, much less the defendant). This of course had the effect of anonymizing the users who purchased the material. The jury further heard from Ilya Lichtenstein, who stole cryptocurrency and used Bitcoin Fog to launder a portion of it, and Larry Harmon, who earned cryptocurrency through his deployment of a Google-like search engine for the Darknet, designed to facilitate searching for and purchasing drugs from vendors across multiple Darknet markets. Mr. Harmon used Bitcoin Fog for the same reason. Bitcoin Fog took Bitcoin and laundered it for anyone and everyone.

### D.  The Pitch of Bitcoin Fog to Illegal Vendors

The defendant, who used the monikers Akemashite Omedetou and Killdozer and Meth!, among others, was fully aware that Bitcoin Fog would be used to launder Bitcoin from illegal vendors on the Darknet. As he noted succinctly about a month before creating Bitcoin Fog, Bitcoin and narcotics went hand in hand. "Also, like Silk Road, go ahead and accept payments in bitcoins; then, you will not be intimidated by even the U.S." GX 55.a at 34 (9/22/11 post).

The defendant had an understanding that legitimate exchanges of Bitcoin were "run as legitimate visible businesses, which will be forced to reveal information about your funds, should such a request be made by the authorities." GX 1 at 45. Likewise, law enforcement could make use of individual transactions to "track your money around the network." GX 13 at 4. The defendant was referring to exchanges that ran business in stated compliance with KYC and Anti-

Money Laundering (AML) laws.  For example, in responding to a customer query about "blockchains Shared Coin feature," the defendant responded "Blockchain is a public company and is required by law to comply with anti-money laundering laws, as well as revealing user information and logs, should the law require that."  GX 1 at 74.

The defendant advertised how his Darknet site worked on Bitcoin Talk.  Touting the value of the Tor network, the defendant bragged that his site "will never be found and dealt with by proper authorities . . . not only will we not cooperate with any authorities, the authorities will not actually be able to show up at our doorstep."  GX 1.  The defendant even advertised that the site would purge its logs each week.  "That way, if you have received a payment from us a month ago, not even the address will be left on our server."  GX 1 at 3.  Thus the defendant provided complete anonymity to Bitcoin Fog's users.  Use of the service would give the customer "plausible deniability" since no one could "actually prove that those bitcoins came from your account[]"  GX 13 at 5.

The defendant advertised the site as "for people who have real problems for the law and we provide them the best possible service, and highest possible anonymity" GX53.  Those who had "real problems for the law" would mix "your bitcoins in our own pool with other users' bitcoins, and get paid back to other accounts from our mixed pool[]."  GX 53 at 230.  Thus, from the outset, the defendant established that the cryptocurrency deposited from vendors would contribute to the efficacy of and facilitated its activities, as this Court has already found in litigation over whether the defendant was entitled to use funds seized from various accounts that had originally been mixed with Bitcoin Fog.  ECF No. 116 at 14-15 ("By running funds through Bitcoin Fog, Sterlingov facilitated its operations, irrespective of how the funds were initially procured").  The pool of deposits was the essence of Bitcoin Fog.  GX 1 at 41-42 (responding to a customer

who asked about the money "laundered" on the site as to the size of the pool). Even if a person was to use Bitcoin Fog to anonymize hypothetically clean cryptocurrency, that had the effect of increasing the pool of funds and further anonymizing dirty cryptocurrency.[1]

Sterlingov was fully aware that narcotics dealers—and possessors of child sexual abuse material—on the Darknet would use his service. In his October 2011 announcements of the Bitcoin Fog site, the defendant mentioned Silk Road, about which the defendant was well aware, and which at the time had not yet been shut down. GX 13 at 5 (10/27/11 post); *id*. at 79 (2012 feed entry indicating "Silk Road mostly sells drugs"). On Exploit.in, a site used by cybercriminals to exchange information, the defendant, using his moniker Meth!, stated "for years, drugs are sold and (unfortunately) child pornography distributed through it . . . if you configure such a server correctly, then no matter how hard one tries, no one will fucking find where it is[.]" GX 55.a. The defendant noted Bitcoin Fog also had a customer service feature which allowed it to receive customer inquiries. GX 608.q (complaint by Symbiosis). When Agent Matthew Price deposited money in November 2019 to the site as an undercover, he made use of this communication service, stating, "I created my account to clean my coins from selling ecstasy. I sold molly on apollon and ive been selling on WSM and dream . . .I need help cleaning my bitcoin." GX 204.c.

---

[1]As it was the nature of Bitcoin Fog to obscure its users, it is not surprising that a significant amount of users were never identified. But no evidence was elicited at trial, other than in the untruthful testimony of the defendant, that any particular deposit into Bitcoin Fog over its ten years of operation came from licit activity, or that a user of Bitcoin Fog actually deposited licit activity derived funds into Bitcoin Fog at the cost of the one to three percent fee. *Cf.* ECF No. 312 ("Def. Obj. to Draft Presentence Investigation Report"), ¶ 1 (asserting without foundation that "many users of mixers mix their bitcoin for legitimate financial privacy reasons and not all bitcoin going through BTCF was illicit").

### E.  The Defendant's Profit

Bitcoin Fog laundered cryptocurrency related to illegality, and the defendant profited from it.  That the site took a percentage fee from each transaction demonstrates that every participant was willing to pay money to anonymize their currency, and that Bitcoin Fog would profit.  The Court heard testimony by Luke Scholl that the administrator of Bitcoin Fog would have earned commissions, before expenses and valued at the time of the transaction, of somewhere in the range of $3.95 million to $11.8 million over the almost ten years of the scheme, depending on the actual percentage taken of each deposit, which percentage was randomized.  GX 325, 2/21/24 PM Tr. at 91-92.

The government does not have a complete picture of the defendant's finances during this time period.[2]  Nevertheless, the government did recover significant data about the defendant's accounts with Binance, Bitfinex, BitPay, Bitstamp, BTCe, Kraken, Local Bitcoins, and others.  GX 305.  It also recovered more than $500,000 in Bitcoin on the defendant's person within a Mycelium wallet at the time of his arrest, and seized funds and various cryptocurrencies from the defendant's Kraken account valued, at the time of the seizure, at more than $848,000.  The accounts demonstrated that the defendant was an active trader in Bitcoin between 2011 and 2021, but there is no evidence that the defendant through trading savvy expanded his pool of Bitcoin or received his Bitcoin legitimately.  Rather, the defendant over the course of ten years appeared to be a young man earning somewhere between $11,000 and $44,000 a year, an income level inconsistent with

---

[2] The Draft PSR states that with respect to the defendant's financial information that probation was to have received information completed in January 2023 but defense counsel had not yet provided that information.  Draft PSR, ¶ 117.

the funds seized.[3]  Yet during the same time period, the defendant's various accounts were receiving significant funds from Bitcoin Fog, consistent with a person who was the administrator of the site and therefore receiving the cut of the deposits.  The defendant's LocalBitcoins Account contained deposits of $870,941 in Bitcoin, the vast majority of which came from Bitcoin Fog.  GX 356.  The defendant's Kraken account contained deposits of $418,394 in Bitcoin, the vast majority of which came from Bitcoin Fog.  GX 356.  The defendant's Mt. Gox account included deposits of which more than half came from Bitcoin Fog.  GX 356.  The defendant's Bitstamp account included deposits of $125,180 and it appears that the entirety came from the mixing site.  As Luke Scholl testified, the primary source of funds into the defendant's financial accounts at the various cryptocurrency exchanges was from Bitcoin Fog.  2/22/24 PM Tr. at 3.  Likewise, the defendant's phone contained a Mycelium wallet application containing more than 10 Bitcoin, then valued at over $500,000 at the time of his arrest, and that money also primarily came from Bitcoin Fog.  2/22/24 AM Tr. at 81 ("The funds came straight out of the Bitcoin Fog cluster").

The defendant's Bitstamp transactions and communications clearly demonstrate that the defendant could not articulate where he got his Bitcoin from without telling falsehoods about it.  In August 2016, Bitstamp asked if the defendant was using "cryptocurrency tumblers" (mixers).  GX 414C at 11-12.  The defendant responded "I don't know if I did with that—with those specific funds sent to your exchange . . . I haven't done this recently, but my account here is very old."  Neither of these statements was true.  The defendant was both using funds coming out of Bitcoin Fog to send to Bitstamp, and at the time of the inquiry in August 2016 the defendant was still receiving funds from Bitcoin Fog.  2/22/24 PM Tr. at 5 (Scholl).  It is clear that the defendant lied

---

[3] Yet the defendant was also able to expend more than $90,000 between 2014 and 2016 in Prepaid Financial Services funded by XML Gold, which came from various other sources—activity consistent with attempting to layer funds.

to an exchange seeking information consistent with its legal obligations because he did not want Bitstamp to know that his source of income was illegitimate.

Likewise, in March 2018, Bitstamp again inquired about a small Bitcoin deposit made on February 12, 2017, with the address beginning 1HEMZA. GX 414C at 16. In response, the defendant provided an invoice purported to be record of a payment made by a client for the defendant's fabricated business Code Reactor. The invoice contained several ways to pay, but the Bitcoin address provided to the "customer" and through the defendant as proof to Bitstamp was not actually a valid address. 2/22/24 PM Tr. at 9. When asked, the defendant complained that there was a typographical error. *Id.* at 10. When Bitstamp continued to press about the origin of the defendant's cryptocurrency, the defendant wrote a note to himself: "Bitstamp dollars, probably like 50K? Withdrawn everything when they started delaying withdrawals and asking for ten stupid questions. Do not use them. Tell everyone to stop using them." GX 711.a; 2/22/24 PM Tr. at 14-15. The defendant recognized that Bitstamp could see that the defendant's story was nonsensical. Indeed, the defendant created other fake invoices, which had Bitcoin addresses resolving to Bitcoin Fog, not to other clients paying him for services. GX 719A, 2/22/24 PM Tr. at 17 (Scholl). As the government showed the jury, these Code Reactor invoices claimed to offer customer payment to Bitcoin address 1EuDR, but the actual 1EuDR payments resolved back to Bitcoin Fog. GX 305.a. The Court should reasonably should infer the obvious: that the defendant created the Code Reactor invoices to create false sources of cryptocurrency income, when in fact the cryptocurrency came from Bitcoin Fog, and further infer that the defendant did so in order to disguise his Bitcoin Fog income from legitimate inquiries from such exchanges as Bitstamp. The source of income came from the administrative fees for withdrawing to Bitcoin Fog and collected by the defendant.

**F. The Defendant's Operational Security and the False Registration of a Domain Name**

The Court heard testimony concerning the various means by which the defendant attempted to place layers between his own true identity and Bitcoin Fog. In the incorporation of the clearnet domain, the defendant set up four Mt. Gox accounts and two Liberty Reserve accounts in September and October 2011, used them to disguise the payment for the domain, as well as for some testing transactions, but by November 2011 would never use several of those accounts again. The defendant created and ran Bitcoin Fog on Tor and boasted of its anonymity. "And all because if you configure such a server correctly, then no matter how hard one tries, no one will fucking find where it is…" GX 55.a at 34 (9/22/11 post). The record is replete with examples of the defendant's relentless focus on networking tools that would further insulate him from being identified. *See* GX 710.a (complaining that cybersecurity software SpiderOak had been "burned"); GX715.a (noting to self to eliminate any SpiderOak software); 714.a (noting other "burned" VPNs). The defendant ran servers for his scheme in other countries and then deleted their contents before they could be located by law enforcement. He ran virtual computers on his traveling computer that would link back to his computer in Sweden, all in pursuit of being able to operate Bitcoin Fog without attribution.

It is not surprising therefore that the defendant gave false information when registering the clearnet site. The defendant set up the Bitcoin Fog clearnet site www.bitcoinfog.com by transferring money through various accounts specifically set up for the establishment of the site, then to the Shormint Liberty Reserve Account, and then to High Hosting on October 25, 2011. GX 313.a. As part of the government investigation, the government obtained records establishing that bitcoinfog.com was registered at High Hosting in 2011 by the defendant using the moniker Akemashite Omedetou with shormint@hotmail.com as the email address. GX 504.a.. High

Hosting records from October 25, 2011 demonstrated that it had received payment of Liberty Reserve currency from the same moniker and email. GX 502.a. Later, in February 2012, the defendant transferred bitcoinfog.com to mainnameserver.com, using the same moniker. GX 504.b; 2/28/24 AM Tr. at 37. The defendant renewed the Bitcoin Fog domain registration, again using the same moniker. GX 811. The defendant continued to use the Akemashite Omedetou moniker to register the domain for the clearnet site because it was part of his scheme to avoid detection by law enforcement.

### G. The Defendant's False Testimony

After the government's presentation of evidence, the defendant testified and denied setting up and running Bitcoin Fog. The jury, in finding the defendant guilty of all four charges, clearly rejected the defendant's testimony.

The defendant claimed he could not remember setting up the Clearnet domain BitcoinFog.com. 3/6/24 PM Tr. at 6 ("And I doubt that I would have done it and not remember it"); 9 (affirming that he answered "That's correct" in response to a question from Wired Magazine with respect to setting up the Bitcoin Fog domain that "You did not deny it to them and you're not denying it today?"). The defendant, in being asked about specific transactions, frequently stated he did not remember specific transactions. 3/6/24 PM Tr. at 17 ("I don't remember specific transactions like this from 13 years ago"). The defendant not only denied remembering specific transactions but the reasons for the transactions, which were to set up Bitcoin Fog. 3/6/24 PM Tr. at 20 (Q: "Even if you don't remember the exact details of this transaction, do you remember what it was for?" A: "No.") The defendant could not identify any peer-to-peer sale that would explain the layers of activity he made to pay for the registration of the Bitcoinfog.com Clearnet domain. GX 313.a; 3/6/24 PM Tr. at 22.

The defendant explicitly denied his connection to Shormint@hotmail.com, the Liberty Reserve account used to fund the clearnet address, stating it was not his account. 3/6/24 PM Tr. at 23-24 ("I have no recollection of sending any funds from this account or seeing this account before.); 3/7/24 Tr. at 39 (reviewing GX 313.a, "I don't know specifically what this transaction is or isn't"). He also explicitly denied that he set up Bitcoin Fog, claiming instead that he heard about Bitcoin Fog from another individual. 3/6/24 PM Tr. at 31. He also denied his first transaction on Bitcoin Fog. 3/6/24 PM Tr. at 33-34. While he admitted to using the moniker "Killdozer," which is the moniker used to communicate with the Blind Bitcoin creator Duncan Townsend just prior to the defendant setting up Bitcoin Fog, he equivocated whether he controlled that account and made that communication. 3/6/24 PM Tr. at 40 ("There's also another possibility that I was sharing my account with somebody who needed to just access the forum.").[4]

The defendant also testified that the source of the more than a million dollars in funds he obtained from Bitcoin Fog was the buying and selling of Bitcoin as an early investor. 3/7/24 AM Tr. at 37.

The defendant also testified about his company, Code Reactor, as well as an exchange involving the February 12, 2017 deposit into Bitstamp discussed above. The defendant claimed that these were "real freelance jobs," though he also acknowledged that he did not know "how much was each job and how much was each invoice for." 3/7/24 AM Tr. at 40. The defendant further claimed to have created invoices that were for work he did three or four or more years earlier. 3/7/24 AM Tr. at 45. He then denied that he used his Code Reactor invoices to money

---

[4] There was no evidence introduced at trial, other than self-serving claims by the defendant that he shared accounts, that "it is common in the technology industry for multiple individuals to use the same account." Def. PSR Obj. ¶ 4.

launder. 3/7/24 AM Tr. at 52. As previously noted, several of the invoices included Bitcoin addresses that were tied to Bitcoin Fog.

In summary, the defendant voluntarily testified under oath that he did not create Bitcoin Fog, denied involvement in key transactions involved in its creation, and claimed to have come lawfully by his Bitcoin that in fact originated from his own site. As the trial evidence overwhelmingly showed—and as the jury's verdict reflects—his testimony was false.

## SENTENCING GUIDELINES

### A. Statutory Maximums and Mandatory Minimums

#### *Count One: Conspiracy To Launder Monetary Instruments*

A violation of Conspiracy To Launder Monetary Instruments, in violation of 18 U.S.C. § 1956(h), carries a maximum sentence of 20 years of imprisonment; a fine of $500,000 or twice the value of the property involved in the transaction, pursuant to 18 U.S.C. § 1956(a)(1); a term of supervised release of not more than 3 years, pursuant to 18 U.S.C. § 3583(b)(2); mandatory restitution under 18 U.S.C. § 3663A; and an obligation to pay any applicable interest or penalties on fines and restitution not timely made.

#### *Count Two: Money Laundering (Sting)*

A violation of Monetary Laundering (sting), in violation of 18 U.S.C. § 1956(a)(3), carries a maximum sentence of 20 years of imprisonment; a fine of $250,000, pursuant to 18 U.S.C. § 3571(b)(3); a term of supervised release of not more than 3 years, pursuant to 18 U.S.C. § 3583(b)(2); mandatory restitution under 18 U.S.C. § 3663A; and an obligation to pay any applicable interest or penalties on fines and restitution not timely made.

### *Count Three: Operating an Unlicensed Money Transmitting Business*

A violation of Operating an Unlicensed Money Transmitting Business, in violation of 18 U.S.C. § 1960(a), carries a maximum sentence of 5 years of imprisonment; a fine of $250,000, pursuant to 18 U.S.C. § 3571(b)(3); a term of supervised release of not more than 3 years, pursuant to 18 U.S.C. § 3571(b)(2)-(3); mandatory restitution under 18 U.S.C. § 3663A; and an obligation to pay any applicable interest or penalties on fines and restitution not timely made.

### *Count Four: Money Transmission Without a License (D.C. Code)*

A violation of Money Transmission Without a License, in violation of 26 D.C. Code § 1023(c), carries a maximum sentence of 5 years of imprisonment and a fine of $25,000.

The Court must also impose a $100 special assessment under 18 U.S.C. § 3013. Additionally, U.S.S.G. § 5E1.2 indicates that the Court may impose a fine that is sufficient to pay the federal government the costs of any imprisonment, term of supervised release, and period of probation.

### B.  Sentencing Guidelines Calculation

The government agrees with Probation's calculation of the defendant's offense level under the United States Sentencing Guidelines ("U.S.S.G. or "Guidelines"), as set forth below.

### *Count One: Money Laundering Conspiracy (18 U.S.C. § 1956(h))*

| 18 U.S.C. § 1956(h)—Money Laundering Conspiracy | |
| --- | --- |
| | |
| Base Offense Level (§ 2S1.1(a)(2)) | 8 |
|   + Value of funds (§ 2B1.1(b)(1)(O)) | +28 |
| Knowledge of illicit proceeds—narcotics, child sexual abuse material (§ 2S1.1(b)(1) or § 2S1.3(b)(1) and (3))      +6 | +6 |
| Business of laundering funds (§ 2S1.1(b)(2)(C)) OR 1956 conviction (§ 2S1.1(b)(2)(B) plus sophisticated laundering (§ 2S1.1(a)(3) | +4 |
| Obstruction (§ 3C1.1) | +2 |
| False Registration of Domain Name (§ 3C1.4) | +2 |
| | |
| **Total Offense Level:** | **50** |

The statutory maximum term of imprisonment for a violation of § 1956 is 20 years.

### *Count Two: "Sting" Money Laundering (18 U.S.C. § 1956(a)(3)(A)-(B))*

| 18 U.S.C. § 1956(a)(3)(A)-(B)—Sting Money Laundering | |
| --- | --- |
| | |
| Base Offense Level (§ 2S1.1(a)(2)) | 8 |
| Knowledge of illicit proceeds—narcotics, child sexual abuse material (§ 2S1.1(b)(1) or § 2S1.3(b)(1) and (3))      +6 | +6 |
| Business of laundering funds (§ 2S1.1(b)(2)(C)) OR 1956 conviction (§ 2S1.1(b)(2)(B) plus sophisticated laundering (§ 2S1.1(a)(3) | +4 |
| Obstruction (§ 3C1.1) | +2 |
| False Registration of Domain Name (§ 3C1.4) | +2 |
| | |
| **Total Offense Level:** | **22** |

The statutory maximum term of imprisonment for a violation of § 1956 is 20 years.

### *Count Three: Operating an Unlicensed Money Transmitting Business (18 U.S.C. 1960(a))*

The defendant was convicted of 18 U.S.C. § 1960(a), which encompasses three sub-prongs under 18 U.S.C. § 1960(b)(1)(A)-(C). The first two prongs, namely (b)(1)(A) and (b)(1)(B), are indexed to U.S.S.G. § 2S1.3. The third prong, (b)(1)(C), is akin to a money laundering offense and is indexed to U.S.S.G. § 2S1.1. The jury returned a special verdict form unanimously finding

the defendant guilty under all three prongs.  The alternative calculations are set forth below.  The statutory maximum term of imprisonment for a violation of § 1960 is 5 years.

| 18 U.S.C. § 1960(b)(1)(C)—Operating an Unlicensed Money Transmitting Business Involving Transmission of Funds Derived from a Criminal Offense or Intended To Promote Unlawful Activity | |
|---|---|
| | |
| Base Offense Level (§ 2S1.1(a)(2)) | 8 |
|     + Value of funds (§ 2B1.1(b)(1)(O)) | +28 |
| Knowledge of illicit proceeds—narcotics, child sexual abuse material (§ 2S1.1(b)(1) or §2S1.3(b)(1) and (3))        +6 | +6 |
| Business of laundering funds (§ 2S1.1(b)(2)(C)) OR 1956 conviction (§ 2S1.1(b)(2)(B) plus sophisticated laundering (§ 2S1.1(a)(3) | +4 |
| Obstruction (§3C1.1) | +2 |
| False Registration of Domain Name (§3C1.4) | +2 |
| | |
| **Total Offense Level:** | **50** |

| 18 U.S.C. § 1960(b)(1)(A), (b)(1)(B)—Operating an Unlicensed Money Transmitting Business Without State License or Federal Registration | |
|---|---|
| | |
| Base Offense Level (§ 2S1.3(a)(2)) | 6 |
|     + Value of funds (§ 2B1.1(b)(1)(O)) | +28 |
| Knew funds were proceeds of unlawful activity/intended to promote unlawful activity (§ 2S1.3(b)(1)) | +2 |
| Obstruction (§3C1.1) | +2 |
| False Registration of Domain Name (§3C1.4) | +2 |
| | |
| **Total Offense Level:** | **40** |

### *Count Four: Money Transmission Without a License (D.C. Code § 26-1023(c))*

Under the District of Columbia Sentencing Commission, Voluntary Sentencing Guidelines Manual (DCVSG), Money Transmission Without a License is punishable as a Group 9 offense. DCVSG App. C-13.  For a defendant with no prior criminal history, the recommended sentencing range is 1-12 months of imprisonment.  *Id.* App. A.

### C. Grouping and Guideline Range

Pursuant to U.S.S.G. § 3D1.2(a), all four Counts group together because they "involve the same victim and the same act or transaction." The counts also group under U.S.S.G. § 3D1.2(d),because the offense levels are determined largely on the basis of the total amount of harm or loss, and the relevant Guideline Sections, § 2S1.1 and § 2S1.3, are specifically listed under § 3D1.2(d). The highest level of the Counts in a Group is Count 1, which is 50. Thus, the adjusted offense level, assuming that the Court finds there is a preponderance of the evidence to support the enhancements discussed *infra*, is level 50. In those instances where the total offense level exceeds 43, the total offense level is treated as 43 by operation of Application Note 2 to Chapter Five, Part A. The sentencing range is therefore life.

It should be noted that pursuant to U.S.S.G § 5G1.2(d), "If the sentence imposed on the count carrying the highest statutory maximum is less than the total punishment, then the sentence imposed on one or more of the other counts shall run consecutively, but only to the extent necessary to produce a combined sentence equal to the total punishment. In all other respects, sentences on all counts shall run concurrently, except to the extent otherwise required by law." In this case, the counts would run consecutively to 50 years, which is less than life.

### D. Relevant Enhancements

#### 1. Value of Funds (§ 2S1.1(a)(2) and § 2B1.1(b)(1)(O))

The money laundering Guideline, § 2S1.1, directs the Court to determine "the value of the laundered funds." U.S.S.G. § 2S1.1(a)(2).[5] The term "laundered funds" to mean "the property,

---

[5] Subsection (a)(2) applies because the defendant was acting as a third-party launderer. *See United States v. Campbell*, 764 F.3d 874, 877 (8th Cir. 2014) ("[T]he Guidelines distinguish between direct money launderers in § 2S1.1(a)(1) and third-party launderers in § 2S1.1(a)(2). A direct launderer commits the crime that produces the illicit funds. A third-party launderer has no

funds, or monetary instrument *involved in* the transaction, financial transaction, monetary transaction, transportation, transfer, or transmission in violation of 18 U.S.C. § 1956 or § 1957." Application Note 1 to U.S.S.G. § 2S1.1 (emphasis added).  In *United States v. Braxtonbrown-Smith*, 278 F.3d 1348 (D.C. Cir. 2002) the D.C. Circuit held that this calculation necessarily includes the total volume of laundering transactions, not just the percentage that can be traced back to illegal activity.  *Id.* at 1355 (finding no error where district court "consider[ed] the total amount of money involved in the charged transactions—$487,290.78—rather than only some portion of that amount based on the proportion of illegitimate funds in the PDA account in calculating the value of the laundered funds for under § 2S1.1(b)(2) of the Guidelines.");  *see also United States v. Owens*, 159 F.3d 221, 229 (6th Cir. 1998) (holding that "the district court here could consider all the funds commingled with proceeds of the illicit enterprises" in calculating the amount of funds laundered).  That is consistent with this Court's prior construction of the appliable forfeiture statute, 18 U.S.C. § 982(a)(1), which uses the same "involved in" formulation.  *See* ECF No. 116, at 15 ("Each deposit of funds into Bitcoin Fog therefore contributed to its efficacy and facilitated its activities—both lawful and unlawful.");  *see also* ECF No. 310, at 7-9 (Gov't Reply in Support of Motion for Preliminary Order of Forfeiture) (collecting cases).  Accordingly, the volume of property involved in the money laundering conspiracy and unlicensed money transmitting business is equal to the total amount of funds transacted through Bitcoin Fog.

As established at trial, Bitcoin Fog received approximately 1,284,251 BTC (worth $395.5 million) and sent approximately 1,280,935 BTC (worth $402.8 million).  GX 308; 2/21/24 PM Tr.

---

involvement in the underlying offense but only launders money that the underlying offense generated.") (citations omitted).

at 75.  Referring to the loss table in U.S.S.G. § 2B1.1, a value of more than $250 million but less

than $550 million receives a 28-point enhancement.

### 2.  Knowledge of illicit proceeds (§ 2S1.1(b)(1))

The evidence presented at trial demonstrated that the defendant "knew or believed that any

of the laundered funds were the proceeds of, or were intended to promote  (i) an offense involving

the manufacture, importation, or distribution of a controlled substance or a listed chemical; … or

(iii) an offense involving … the sexual exploitation of a minor."  *See* § 2S1.1(b)(1).  As such, a 6-

point enhancement under 2S1.1(b)(1) is warranted.

Just prior to launching Bitcoin Fog as a Tor Hidden Service, the defendant posted on a

cyber criminal forum lauding the benefits of Tor Hidden Services.  GX 55.a, at 34.  In that post,

the defendant explained, "For years, drugs are sold and (unfortunately) child pornography

distributed through [Tor]."  Knowing this, the defendant launched a mixing service that was

specifically targeted to users on the Darknet.

The defendant had an account on Darknet market Silk Road which he used to purchase

drugs, GX 603.a-s, and to launder funds for Bitcoin Fog, Ex. 316, and he promoted Silk Road to

his friends, *see* GX 863.b.  The Bitcoin Fog promotional materials even commented favorably on

Silk Road.  *See, e.g.,* GX 1, at3 (Bitcoin Fog Announcement Post: "And once again, running

through Tor makes it not likely for us to be shut down under pressure from the authorities. When

in doubt about this, consider Silk Road."  (At the time the posting was made, Silk Road had not

been shut down by authorities.)).

As shown at trial, the most prolific users of Bitcoin Fog were individuals selling and buying

drugs on Darknet markets.  *See* GX 601 (summary charts of illicit proceeds), GX 354 (summary

charts of illicit proceeds), GX 601.a (sample Darknet market vendors).  The government also

presented evidence of specific examples of Darknet drug vendors who used Bitcoin Fog, GX 604-618 and subparts, GX 604-618 and subparts, see, e.g., 3/1/24 AM Tr. at 44-54 (Symbiosis), and specific examples of child sexual abuse material consumers who used Bitcoin Fog, GX 623-633; 3/1/24 AM Tr. at 114, 120-21; 3/4/24 AM Tr. at 5-11.

The overwhelming evidence of the defendant's knowledge of the nature of the funds moving through his site strongly support an enhancement under 2S1.1(b)(1).

### 3.  Obstruction (§ 3C1.1)

Under § 3C1.1, the offense level is increased by two levels if the defendant "willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction," and if the obstructive conduct related to "the defendant's offense of conviction and any relevant conduct; or . . . a closely related offense."  *See* U.S.S.G. § 3C1.1.  Committing perjury is an example of the type of conduct to which this adjustment applies, so long as such perjury "pertains to conduct that forms the basis of the offense of conviction."  U.S.S.G. § 3C1.1, App. Note 4(b).

This enhancement applies, *inter alia*, where a defendant commits perjury while testifying at trial.  *See, e.g.*, *United States v. Thompson*, 962 F.2d 1069, 1070 (D.C. Cir. 1992) (affirming application of a perjury enhancement notwithstanding defendant's argument that his trial testimony was "simply a denial of guilt").  To apply the perjury enhancement, "the sentencing court must determine whether the defendant testified (1) falsely (2) as to a material fact, and (3) willfully in order to obstruct justice."  *Id.* at 1071 (citing 18 U.S.C. § 1621 and collecting cases).  The Court need only find that obstruction occurred by a preponderance of the evidence.  *United States v. Makki*, 47 F. Supp. 2d 25, 29 & n.3 (D.D.C. 1999).

The application of this enhancement requires the trial court to make a finding at sentencing that the testimony was untruthful, material, and willfully obstructive. As the Supreme Court has explained:

> [I]f a defendant objects to a sentence enhancement resulting from her trial testimony, a district court must review the evidence and make independent findings necessary to establish a willful impediment to or obstruction of justice, or an attempt to do the same, under the perjury definition we have set out.

*United States v. Dunnigan*, 507 U.S. at 95. This requires a finding that the defendant gave "false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory." *Id.* at 94; *see also United States v. Smith*, 374 F.3d 1240, 1245 (D.C. Cir. 2004) (evaluating required findings of "falsity, materiality, and willfulness").

Here, the defendant's testimony readily passes that bar. First, the defendant firmly and unequivocally denied operating Bitcoin Fog:

```
16    Q.  Mr. Sterlingov, did you ever operate Bitcoin Fog?

17    A.  No.  I never operated or was administrator of Bitcoin

18    Fog.
```

3/5/24 PM Tr. at 30. This statement is wholly incompatible with the jury's verdict. The defendant made other statements that cannot be reconciled with the jury's verdict finding him guilty on all counts arising from his operation of Bitcoin Fog. The defendant testified that he *first learned* about Bitcoin Fog from another person, whom he met at a meet-up or through peer-to-peer trading:

> It was either on a meet-up or from a person that I was trading with. . . . I remember the person that got me into mixing, but I'm not sure if he gave me the actual address to Bitcoin Fog or if he told me the name and to look it up or if I found it somewhere after talking to him.

3/6/24 AM Tr. at 31; *see also* 3/5/24 PM Tr. at 80 ("But Bitcoin Fog was the one that I got introduced early on, and it just kept working").  That was another lie: if the defendant set up Bitcoin Fog, including by registering the BitcoinFog.com Clearnet domain, he could not possibly have learned about Bitcoin Fog from another person he met at a meet-up or through trading.

The defendant also lied about the source of his Bitcoin wealth, flatly stating: "I didn't have any funds that were sourced from Bitcoin Fog."  3/7/24 AM Tr. at 47.  Instead, the defendant falsely claimed that the Bitcoin he withdrew from Bitcoin Fog was generated from early investments he had made in Bitcoin (before quitting his job in 2014).  *See, e.g.*, *id.* at 37 (Q: "And when you were—when you testified, when you say that you were sending funds to Bitcoin Fog to mix them before sending them to Kraken or another account, where do these funds originate when they go to Bitcoin Fog in your testimony?" A: "That was the Bitcoin that I had bought and accumulated buying and selling it."); 3/5/24 PM Tr. at 58 (Q: "Were some of your funds on your Mycelium wallet, did they come from the purchases that you made of Bitcoin early on?" A: "Yes. That's where they all came from.  Most of them.  That's were most of them came from.").  Such testimony was also contrary to the jury's verdict and the weight of the government's evidence showing that the defendant's accounts were sourced overwhelmingly from Bitcoin Fog.

The defendant also testified that he only conducted "[m]aybe a few dozen" transactions on Bitcoin Fog during the nearly 10-year period from 2011 until 2021.  3/6/24 PM Tr. at 54.  That is impossible to reconcile with the jury's verdict finding him responsible for the Bitcoin Fog money laundering conspiracy and illegal money transmitting business.

The materiality of these statements is clear: if the jury had believed the defendant's testimony that he "never operated or was administrator of Bitcoin Fog," it would have been duty-bound to acquit.  *See* U.S.S.G. § 3C1.1. (defining "material" evidence as "evidence, fact,

statement, or information, as used in this section, means evidence, fact, statement, or information that, *if believed*, would tend to influence or affect the issue under determination.") (emphasis added). The same goes for the defendant's other statements falsely claiming that he learned about Bitcoin Fog from another person he met at a meet-up or trading, falsely claiming that none of his wealth was "sourced" from Bitcoin Fog, and falsely claiming that he made only a "few dozen" transactions on Bitcoin Fog over the course of almost 10 years.

The defendant's intent to mislead is manifest not only from the face of these statements themselves, but from the general evasiveness and feigned amnesia that permeated his entire testimony. When confronted with invoices that he purportedly prepared for "freelance" clients, but which were paid out of the Bitcoin Fog cluster, the defendant told contradictory and implausible stories, including testimony that one of the invoices "represents a real job," which occurred years *before* 2017, but which corresponded to a Bitcoin transaction (withdrawing funds from Bitcoin Fog) *in* 2017. *See* 3/7/24 AM Tr. at 39-51. And whenever the defendant was pressed to provide specific details about any of the key events, his memory suddenly became unreliable.[6]

---

[6] *See, e.g.*, 3/6/24 PM Tr. at 12:19-23 (claiming, "I don't remember if I had an AurumXChange account"); 13:3-19 (claiming, "I don't have a recollection of that. But it's possible," and "I don't remember this payment. But that's what the email says," when confronted with specific AurumXChange transaction confirmation emails from his email account); 15:9-15 (claiming, "I don't remember these transactions. I don't remember if I logged in or logged out. But that's what the records show," when confronted with transaction records from his Liberty Reserve account); 16:1-2 (claiming, "I think so. I'm not sure," when asked whether he used CryptoVPN); 16:8-12 (claiming, "I am simply saying that I don't remember individual transactions like these from 13 years ago," when asked whether he denied sending $100 to the Mt. Gox account opened with the email address volfprius@hotmail.com); 17:2-10 (claiming, "I don't remember specific transactions like this from 13 years ago. I just don't remember every time I sent money somewhere or not send money somewhere," when asked whether he sent 60 BTC to his Silk Road account); 18:7-14 (claiming, "I don't know one way or another," when asked to explain why he sent Bitcoin from his true-name Mt. Gox account to his Silk Road account through an intermediary Bitcoin address); 19:8-17 (claiming, "That's what it says," when asked to confirm that he withdrew the 60 BTC from his Silk Road account in a withdrawal that was not linked to any purchase); 20:13-25 (claiming, "I've got to say, I don't really remember any transaction from 13 years ago," when

Indeed, the defendant claimed he could not even remember whether he registered the BitcoinFog.com Clearnet domain, 3/6/24 PM Tr. at 4-10.

To be sure, the obstruction enhancement does not apply where inaccurate testimony is the result of sincere "confusion, mistake, or faulty memory," as such testimony may not "necessarily reflect a willful attempt to obstruct justice." § 3C1.1, App. Note 2. But the specificity of the defendant's false statements, combined with the blizzard of contradictory stories and strategic memory lapses, including his doubling down on the patently false cover story he attempted to provide Bitstamp, show that the defendant's false testimony was not inadvertent—it was deliberate perjury.

### 4. Business of Laundering Funds and/or Sophisticated Means

U.S.S.G. § 2S1.1(b)(2) sets out a series of enhancements that similarly apply to the defendant. First, because the defendant was in the business of laundering funds, he should receive a 4-point enhancement under § 2S1.1(b)(2)(C). Application Note 4 directs the court to consider

---

asked whether he deposited 89.87 euros into his true-name Mt. Gox account, and confirming that he could not explain what the transaction was for); 22:8-24 (claiming that he could not remember details of the transaction from his true-name Mt. Gox account to a Bitcoin address that subsequently transferred to the nfs9000@hotmail.com Mt. Gox account, and speculating that "it could be a peer-to-peer sale" and "it could be related to a freelance job" but "I don't remember specific details about that"); 24:25-25:3 (claiming, "I have no specific recollection of sending funds from this account," when asked about the Liberty Reserve account linked to shormint@hotmail.com, which was used to pay for the BitcoinFog.com Clearnet domain registration); 25:4-17 (claiming, "I'm not sure if I wrote it or if I wrote it from somebody's instructions or maybe if I copied it from somewhere," when questioned about a document found in the defendant's Google Drive that showed instructions for the same sequence of payments used to register the BitcoinFog.com Clearnet domain); 40:3 (claiming, "I'm not sure," and "it could have been me" or "[t]here's also another possibility that I was sharing my account with somebody" when asked if he was the one who reached out to Duncan Townsend about BlindBitcoin); 44:10-24 (claiming, "I don't understand" the word "importance," when asked whether he felt it was important to save log-in information for his accounts in his password file); 48:5-51:4 (claiming that it was his practice to add the word "white" to accounts in his password file to mark accounts that belonged solely to himself, but then admitting that numerous accounts of his were not marked "white" and "many times I wouldn't do that on some accounts").

the "totality of the circumstances" when applying this enhancement, and provides a non-exhaustive list of factors for the court to consider. U.S.S.G. § 2S1.1 App. n. 4. These factors include whether the defendant engaged in laundering funds "regularly," "during an extended period of time," or "from multiple sources," and whether the defendant "generated a substantial amount of revenue in return for laundering funds." *Id.* Here, this was not a one-off. The defendant ran Bitcoin Fog for nearly a decade, conducting thousands of transactions and laundering funds for thousands of customers. He earned millions of dollars' worth of commissions. GX 325, 2/21/24 PM Tr. at 91-92. Bitcoin Fog was in the business of laundering money.

Application of this Guideline reflects the Sentencing Commission's insight that "defendants who routinely engage in laundering funds on behalf of others, and who gain financially from engaging in such transactions, warrant substantial additional punishment because they encourage the commission of additional criminal conduct." Commentary n. 22 to Amendment of Guideline 2S1.1, at 156, available at https://www.ussc.gov/sites/default/files/pdf/amendment-process/reader-friendlyamendments/20010501_RF_Amendments_0.pdf.

Even if the defendant were not entitled to a 4-point enhancement for being in the business of laundering funds, he would receive an enhancement of equivalent value for the counts where he was convicted of 18 U.S.C. § 1956, because he employed "sophisticated means" § 2S1.1(a)(3). The Guidelines define "sophisticated means" as "complex or intricate offense conduct pertaining to the execution or concealment of the 18 U.S.C. § 1956 offense." U.S.S.G. § 2S1.1 App. n. 5. The Application Note provides a non-exhaustive list of features that may be involved in sophisticated means money laundering, including "fictitious entities," "shell corporations," "two or more levels (i.e., layering) of transactions ..." or "offshore financial accounts." *Id.* The

26

defendant's service was the ultimate layering machine, providing extensive obfuscation for the defendant's clients and the defendant himself.

### 5. False Registration of Domain Name (§3C1.4)

Section § 3C1.4 of the Guidelines provides a 2-level increase "[i]f a statutory enhancement under 18 U.S.C. § 3559(g)(1) applies." The referenced triggering statute sets forth criminal penalties for the use of a falsely registered domain name in the commission of a felony offense. *See* 18 U.S.C. § 3559(g)(1). The statute defines "falsely registers" as "registers in a manner that prevents the effective identification of or contact with the person who registers." *Id.* A defendant's offense level may be increased by 2 levels for false registration of a domain name without being charged and convicted of violating 18 U.S.C. § 3559(g)(1).[7]

The evidence presented at trial included significant evidence regarding the defendant's registration of BitcoinFog.com, the clearnet portal to the Bitcoin Fog money laundering site. As described in Section I.F, *supra*, the defendant registered the domain using a pseudonym, Akemashite Omedetou, and a multi-layer payment process designed to conceal the true owner of the domain. This meets the statutory definition of "falsely registered," under 18 U.S.C. § 3559(g)(2)(A), as the domain was "register[ed] in a manner that prevents the effective identification of or contact with the person who registers." *See* GX 2 (BitcoinFog.com screenshot);

---

[7] The Sentencing Commission made § 3C1.4 conditional on whether 18 U.S.C. § 3559(g)(1) "applies," meaning that the conditions set forth in § 3559(g)(1) are satisfied. The use of the word "applies" contrasts to the language in other Guidelines, such as § 2B1.1(a)(1), that are keyed to whether a defendant was "convicted" of certain offenses, *see, e.g.*, U.S.S.G. § 2B1.1(a)(1) (applying higher base offense level if defendant "was convicted" of certain offenses and "that offense of conviction" has at least 20-year statutory maximum). Application of the sentencing enhancement under § 3C1.4 is not barred by *Apprendi v. New Jersey*, 530 U.S. 466 (2000), because "*Apprendi* does not apply to sentencing findings that elevate a defendant's sentence *within* the applicable statutory limits." *United States v. Fields*, 251 F.3d 1041, 1043 (D.C. Cir. 2001).

GX 504.a (Bitcoin Fog Domain Registration), and GX 313.a (Chart showing payment for BitcoinFog.com).

## SENTENCING RECOMMENDATION

### A. Sentencing Factors

In *United States v. Booker*, 543 U.S. 220 (2005), the Supreme Court held that the Sentencing Guidelines are no longer mandatory. However, the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and "should be the starting point and the initial benchmark" in determining a defendant's sentence. *United States v. Gall*, 552 U.S. 38, 46, 49 (2007). Accordingly, this Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *Id.* at 49.

Next, the Court should consider all of the applicable factors set forth in 18 U.S.C. § 3553(a). *Id.* at 49-50. The Guidelines themselves are designed to calculate sentences in a way that implements the considerations relevant to sentencing as articulated in § 3553(a). *United States v. Rita*, 551 U.S. 338, 347-351 (2007). The § 3553(a) factors include, *inter alia*: (1) the nature and circumstances of the offense; (2) the history and characteristics of the defendant; (3) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment for the offense, and to afford adequate deterrence to criminal conduct and protect the public from further crimes of the defendant; (4) the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct; and (5) the need to provide restitution to any victims of the offense. *See* 18 U.S.C. § 3553(a)(1)-(7).

### B.  Sentencing Recommendation

The government recommends that the Court sentence the defendant to a sentence of imprisonment of 30 years.[8]  This represents a downward departure from the Guidelines-recommended sentence of life in prison (subject to the combined statutory maxima of up to 50 years in prison).  In addition, the government recommends that the Court impose a within-Guidelines fine of $100,000 and enter the government's Proposed Order of Forfeiture, ECF No. 297-1, at sentencing.  Such a sentence would reflect the extraordinary seriousness of the defendant's conduct, promote respect for the law, afford general and specific deterrence, avoid unwarranted sentencing disparities, and would be reasonable and appropriate in light of the factors set forth in 18 U.S.C. § 3553(a).

### 1.  The Nature and Circumstances of the Offense

The defendant's criminal conduct is extraordinary in its magnitude and gravity of harm. For nearly a decade, the defendant operated one of the Darknet's largest and longest-running money laundering services.  The defendant specifically catered to users engaged in illegal activities—including Darknet drug transactions and the trafficking of CSAM images. Through his online moniker Akemashite Omedetou, the defendant described Bitcoin Fog as a service "for people who have real problems with the law," who "might go to jail" if their transactions were discovered.  GX 53.  Bitcoin Fog, the defendant explained, was designed to prevent the "authorities" from being able to track users' transactions.  *Id.*  He operated Bitcoin Fog as a Tor hidden service "[f]or security purposes," and explained that "this also makes us feel more secure,

---

[8] The government does not oppose a within-Guidelines term of supervised release, *see* Draft PSR ¶¶ 130-137, but agrees with the Draft PSR that supervised release is not recommended under the Guidelines where, as here, the defendant is a deportable alien who will likely be removed following his sentence.  *See id.* ¶ 137 (citing U.S.S.G. § 5D1.1(c)).

knowing that we will never be found and dealt with by proper authorities."  *Id.*; *see also* GX 1 ("And once again, running through Tor makes it not likely for us to be shut down under pressure from the authorities.  When in doubt about this, consider Silk Road.").  Significantly, Bitcoin Fog was the result of extensive planning and elaborate steps taken by the defendant over the course almost *ten years*—a far cry from a momentary lapse of judgment.

The defendant knew that his service would be used for criminal purposes.  The defendant posted in the Russian cybercrime forum Exploit.in: "Folks, I will share with you an awesome idea, stop struggling and get a Tor Hidden Service."    GX 55.a The defendant explained his understanding of the illegal commerce on the Tor network: "For years, drugs are sold and (unfortunately) child pornography distributed through it."  *Id.*  And he recommended that sites accept Bitcoin to avoid law enforcement scrutiny: "Also, like Silk Road, go ahead and accept payments in bitcoins; then, you will not be intimidated by even the U.S. Government."  *Id.*



Ex. 55.a.  In another Exploit.in post, the defendant observed that "you can buy interesting things on Silk Road with bitcoins—well, LSD, cocaine or meth and other hard-to-find things, as an example."  Ex. 55.a.  Posting on BitcoinTalk under his moniker Killdozer, the defendant stated: "Silk Road mainly sells drugs, that is already illegal, and apparently already enough reason to try

to shutdown it and bitcoin . . . ." Ex. 13.  The defendant well knew the kinds of illegal goods and services for sale on Silk Road because he had a Silk Road account of his own, which he used to purchase psychedelic drugs.  Ex. 613.a; 3/5/24 PM Tr. at 74; 3/6/24 PM Tr. at 18.  In other words, the defendant knew exactly who the prospective users of his service would be: buyers and sellers of illegal drugs, CSAM, and other illegal goods and services.

Just as the defendant intended, criminal actors flocked to Bitcoin Fog.  Over the course of its nearly decade-long operation, Bitcoin Fog processed more than $400 million in untraceable transactions.  *See* GX 308; 2/21/24 PM Tr. at 74-76 (noting deposits totaling 1,284,251 BTC, valued at $395.5 million, and withdrawals totaling 1,280,935 BTC, valued at $402.8 million).  As the D.C. Circuit has recognized, the money laundering guideline, § 2S1.1, "measures the harm to society that the money laundering causes to law enforcement's efforts to detect the use and production of ill-gotten gains" based on "the total amount of money involved in the charged transactions . . . rather than only some portion of that amount based on the proportion of illegitimate funds."  *United States v. Braxtonbrown-Smith*, 278 F.3d 1348, 1355 (D.C. Cir. 2002) (internal quotations omitted); *see also United States v. Martin*, 320 F.3d 1223, 1227 (11th Cir. 2003) ("Unlike the 1998 Sentencing Guidelines for theft or fraud, which compute the offense level according to the 'loss' incurred by the victim, *see* U.S.S.G. §§ 2B1.1(b)(1), 2F1.1(b)(1), the 1998 Sentencing Guidelines for money laundering compute the base offense level according to the 'value of the funds,' U.S.S.G. § 2S1.1(b)(2).  This is so because the harm from such a transaction does not generally fall upon an individual, but falls upon society in general.  Each unlawful monetary transaction harms society by impeding law enforcement's efforts to track ill-gotten gains.") (cleaned up).

Even zeroing in on the proportion of transactions *directly* traceable to or from known Darknet markets, the figures are still staggering: Bitcoin Fog processed at least $67 million *directly* to or from infamous Darknet drug markets such as Silk Road, AlphaBay, and Agora, as well as the CSAM trafficking website Welcome to Video.  GX 601.

Trial evidence provided a snapshot of some of the criminal actors who took advantage of Bitcoin Fog's laundering capabilities.   Darknet drug traffickers such as the cocaine vendors Symbiosis and TrevorPhilipsEnterprises used Bitcoin Fog to launder hundreds of thousands of dollars in drug profits:

| DNM | Username | Fog Withdrawals (BTC) | USD Value | Fog Withdrawals Count |
|---|---|---:|---:|---:|
| Silk Road | Symbiosis | 29938.63 | $1,505,285 | 112 |
| Silk Road | Tyl3r Durden | 19515.6685 | $640,206 | 56 |
| Silk Road | Budworx UK | 12901.42865 | $408,378 | 1472 |
| Silk Road | MarijuanaIsMyMuse | 17370.93 | $278,299 | 230 |
| Silk Road | peels4u | 13970.19197 | $257,308 | 2466 |
| Silk Road | UK GROW TEK | 4056.7311 | $191,739 | 187 |
| Silk Road | RoxiPal | 1345.359 | $95,884 | 106 |
| Silk Road | WestCoastRX | 3574.72 | $42,389 | 94 |
| Silk Road 2 | chemicalbrothers | 976.3732113 | $470,610 | 250 |
| Silk Road 2 | MariosGramShoppe | 701.4681541 | $335,927 | 212 |
| Silk Road 2 | Budworx | 464.463247 | $248,435 | 208 |
| Silk Road 2 | CrystalBuddha | 427.0497105 | $215,395 | 67 |
| Silk Road 2 | Shine Cartel | 416.1425876 | $222,222 | 301 |
| Silk Road 2 | TrevorPhilipsEnterprises | 286.0135506 | $154,030 | 143 |

GX 601.a

Hi guys,

Earlier today I withdrew 630 coins to bitcoin fog but it has not shown up on their system. Could you confirm that it was sent to bitcoin address 1B7tRVgQfVqSPRZ1QvWp7DKYke8TZkjmMN  and if not could you tell me what address it was sent to please.

Symbiosis

GX 608.q.  The hacker Ilya Lichtenstein used Bitcoin Fog to launder a portion of the approximately 120,000 BTC that he stole from a major cryptocurrency exchange.  2/27/24 AM Tr. at 18-20. Welcome to Video users such as billybob1337 and user28387 used Bitcoin Fog to conceal their payments in order to gain access to vile images of child sexual abuse.

| Selected Welcome to Video Addresses Receiving Funds Directly from Bitcoin Fog | |
| --- | --- |
| Address | Corresponding User |
| 1PEWz5SBKNQNarHQcgsjAiYVrzcn9zKWDQ | ловушка9999 |
| 1AK19YKNymSnKS6pAUW7YEBVGjMTxW1Mu2 | billybob1337 |
| 17dQYVZnNTJtMBYyLYeL9Aid8khvYy2SR7 | user28387 |
| 12s7wsv8KcC8hvVxU1q6tLeQ3qUqpagtgr | tukogb1 |
| 12M2Vk7zq7eEgCGtF2AECSFENHkSwYpEqk | slammer88 |
| 12hWcUrkKMX9tYzjWfycVJy39HRCVebNC4 | geegeegee |
| 1Mb2m6vDAxfrWmQHAg4oLAPytUYvVpf1K5 | ilbe1 |
| 1H8xnAZNhDk66hNAMdc9XcaDeyub5Kdm7X | derrickk |
| 1FcVyZ6Z4EhyjXvWR4ocFnWWnkGQuuYZGC | rabdark |
| 1BMkmjC2To3FDieQQEpDGuJDwkh1FVTro9 | waltontarget |

GX 623.  All of these criminal actors were drawn to Bitcoin Fog—and went through the effort and expense of accessing Bitcoin Fog through Tor and paying an extra 1-3 percent premium on all transactions—because Bitcoin Fog held itself out as tool for criminals to make untraceable transactions and to conceal their identities.  The scale of harm facilitated by the defendant is simply staggering.

The defendant also designed Bitcoin Fog quite deliberately to be a non-compliant money transmitting business.   On BitcoinTalk, he acknowledged that legitimate cryptocurrency exchanges provide the same anonymizing function as a mixer on the public blockchain by pooling customer funds.  The difference, the defendant explained, was that "legitimate" exchanges—unlike Bitcoin Fog—keep customer records, logs, and respond to legal process from law enforcement. GX 1.

> **Quote**
>
> Don't the exchanges run similiar to this service?  If I withdraw bitcoins from an exchange, wether from a purchase or transfered from another wallet, they come from a mixed pool of coins and not a specific address attached to my account.  Or do I have that wrong?

We have discussed this a little bit earlier. As I see it, you do get some anonymity by

mixing it like that (and that is the only other choice apart from mixing services I guess), but those companies do not try to make your payments anonymous deliberately, do not mix a lot just to hide all the traces. Most of them are also run as legitimate, visible businesses, which will be forced to reveal information about your funds, should such a request be made by the authorities. I would assume they are also keeping very long logs, since they don't have any reason not to. Us on the other hand, the authorities have to find first, which, as Silk Road have demonstrated, can prove problematic.

GX 1 at 44-45.  In a similar vein, the defendant explained the distinction between Bitcoin Fog and the cryptocurrency exchange Blockchain.info, which also offered transaction pooling services, because "Blockchain.info is a public company with easily identifiable members and staff," and

"[i]f any authority will ever want to find information about your money, they will simply go to the staff members who will have no choice but to reveal information about you . . . ."  GX 53 at 217. Bitcoin Fog, by contrast, "will . . . not cooperate with any authorities," and "the authorities will not actually be able to show up at our doorstep, because finding a tor doorstep has proven difficult." GX 1 at 3.  In other postings, the defendant wrote knowledgeably about Know Your Customer (KYC) and Anti-Money Laundering (AML) regulations, noting that "[t]he KYC/AML, of course, has been around, it exists now and will exist in the future," and "no one will allow the exchange to work normally without these things."  GX 55.a at 40; *see also* Ex. 13 at 145 (Killdozer posting June 27, 2013) ("FinCEN said they are now regulating bitcoins, so all companies need licenses.").

Money transmitting business regulations—including the Bank Secrecy Act and the D.C. Money Transmitters Act—are designed to combat real-world harms.  When Congress enacted the prohibition on unlicensed money transmitting businesses, 18 U.S.C. § 1960, it did so "in order to combat the growing use of money transmitting businesses to transfer large amounts of the monetary proceeds of unlawful enterprises."  *United States v. Velastegui*, 199 F.3d 590, 593 (2d Cir. 1999).  Specifically, Congress found that anti-money laundering regulation in the formal banking sector had the effect of driving drug traffickers and other criminals toward smaller, often poorly regulated nonbank financial institutions:

> In the past, drug money laundering deterrence legislation has focused on depository institutions. However, as deterrence and compliance programs by depository institutions have improved, money launderers with illicit profits have found new avenues of entry into the financial system. . . . Increasingly, money launderers are using money transmitters, check cashers, money exchanges and other nonbank financial companies for initial placement and the number of such businesses is growing rapidly in some States.

S. Rep. No. 101-460 (1990).  Section 1960 was enacted to strengthen federal and state regulation of money transmitters.  *See id.* ("The legislation . . . provides for an expanded federal role in a way that enhances and supplements State regulation.").

Under the Bank Secrecy Act and its implementing regulations, money transmitting businesses are required to register with FinCEN and comply with federal regulations designed to combat illicit money laundering.  31 C.F.R. § 1022.380(a)(1).  Money transmitting businesses are required to establish and maintain programs designed to detect and report suspicious activity, and to maintain certain records "where they have a high degree of usefulness in criminal, tax, or regulatory investigations or proceedings."  31 U.S.C. § 5311; *see, e.g.*, 31 U.S.C. § 5318(h)(1); 31 C.F.R. § 1022.210(a) (anti-money laundering programs); 31 U.S.C. § 5318(g)(1); 31 C.F.R. § 1022.320(a)(1) (suspicious activity reporting); 31 U.S.C. § 5313; 31 C.F.R. § 1010.311 (currency transaction reporting for transactions involving more than $10,000 in currency).  When money transmitting businesses do not register, it makes it more difficult for FinCEN to identify them and ensure they are in compliance with these obligations.  As Judge Collyer noted in *United States v. E-Gold, Ltd.*, No. 07-cr-109 (RMC), in sentencing one of the defendants involved in an unlicensed virtual currency operation: "[T]he failure to register is what leads to the ability of criminals to make use of the E-Gold system for nefarious purposes . . . Because once you register you have to report things and therefore it's not as anonymous or private . . . . So on one hand it's just a regulatory compliance issue.  On the other hand it's a very serious problem."  *In re Downey*, 162 A.3d 162, 170 (D.C. 2017) (opinion on attorney discipline for E-Gold defendant Robert Downey).

This case well illustrates the seriousness of the unlicensed money transmitting business offenses charged under Counts Three and Four.  Complying with applicable federal registration

and District of Columbia licensing requirements would have made it impossible for the defendant to continue operating Bitcoin Fog as a money laundering business: it would have forced him to verify customer identities, monitor for suspicious transactions, file Suspicious Activity Reports, and take steps to prevent his platform from being used for drug trafficking, dissemination of CSAM images, and other criminal offenses.  Doing so would have undermined Bitcoin Fog's reason for existence—because Bitcoin Fog served no other purpose than to enable criminality on a vast scale. The defendant's decision not to register or license Bitcoin Fog was an integral part of his money laundering conspiracy, and it should be treated as a comparably serious offense at sentencing.

### 2.  The History and Characteristics of the Defendant

The defendant has no prior criminal convictions.  He appears to have benefitted from family support, adequate education, and promising professional opportunities in Sweden.  There is no dispute that the defendant is a gifted computer programmer.  Yet he chose to turn his back on the opportunities he had to use his skills and live a productive life, instead creating Bitcoin Fog in 2011, quitting his job at Capo Marknadskommunication in or around 2014, leaving Sweden to reduce his tax liability in or around 2020, and drifting from one European country to another while living off the proceeds of Bitcoin Fog.  *See* 3/6/24 PM Tr. at 62; 3/7/24 AM Tr. at 34-36.  The government is aware of no mitigating circumstances for the defendant's crimes.  Just the opposite: the defendant made a calculated decision to pursue a criminal livelihood built on the profits of drug traffickers, CSAM peddlers, thieves, and other criminals—and maintained that path, year after year, supporting a succession of criminal users of his service.

The defendant perjured himself at trial by denying operation of Bitcoin Fog, 3/5/24 PM Tr. at 30; as well as—among other things—by feigning selective amnesia whenever pressed to provide specific details about his story, including whether he ever registered the BitcoinFog.com Clearnet

domain, 3/6/24 PM Tr. at 4-10.  The jury necessarily rejected the defendant's false and unreliable testimony when it returned a verdict of guilty on all counts.  And following the verdict, the defendant has shown no remorse for his role in operating Bitcoin Fog.  His failure to accept responsibility, combined with his cynical attempt to mislead the jury at trial, weigh in favor of a substantial sentence.

> **3. The Need for the Sentence Imposed To Reflect the Seriousness of the Offense, To Promote Respect for the Law, To Provide Just Punishment for the Offense, and To Afford Adequate Deterrence to Criminal Conduct and Protect the Public from Further Crimes of the Defendant**

The rise of the Darknet and cryptocurrency has fueled criminal activity on an enormous scale.  Law enforcement relies on its ability to track cryptocurrency transactions to investigate and prosecute cryptocurrency-enabled crimes ranging from drug transactions to cryptocurrency heists to CSAM offenses.  In one example involving the CSAM website Welcome to Video:

> Federal agents used an outside service to analyze the publicly viewable Bitcoin blockchain and identify a cluster of Bitcoin addresses controlled by the Website. Once they identified the Website's Bitcoin addresses, agents served a grand jury subpoena on Coinbase—rather than seeking and obtaining a warrant—for all information on the Coinbase customers whose accounts had sent Bitcoin to any of the addresses in the Website's cluster.  Coinbase identified Gratkowski as one of these customers.  With this information, agents obtained a search warrant for Gratkowski's house.  At his house, agents found a hard drive containing child pornography, and Gratkowski admitted to being a Website customer.

*United States v. Gratkowski*, 964 F.3d 307, 309 (5th Cir. 2020).

The defendant's service, Bitcoin Fog, was designed for the sole purpose of obstructing such legitimate law enforcement investigations.  As the defendant himself admitted, *supra*, Bitcoin users can obtain all the same privacy protections *on the public blockchain* by using any custodial exchange that pools customer funds, thus breaking the link between any individual deposit and outgoing transaction.  Bitcoin Fog was unique not because it obscured transactions on the public blockchain, but because it did so as a criminal service that advertised itself to "people who have

real problems with the law" and who "might go to jail" if their transactions were discovered, Ex. 53 at 106, deliberately avoided collecting customer records, purged all of its transaction logs, pledged not to cooperate with the authorities, and operated anonymously on the Darknet in order to ensure that it remained beyond the reach of the law. The sentence in this case should reflect the seriousness of the offense, and it should send a strong message to the defendant and to those who would follow in his footsteps that money laundering is a serious crime that will lead to significant consequences.

The sentence imposed in this case should be structured to discourage others from seeking to emulate the defendant's criminal scheme. General deterrence is a "crucial factor in sentencing decisions for economic" crimes. *United States v. Morgan*, No. 13-6025, 635 F. App'x 423, 450 (10th Cir. Nov. 6, 2015) (unpublished). The legislative history of Section 3553 documents Congress's emphasis on general deterrence in white-collar crime. *See* S. REP. 98-225, 76, 1984 U.S.C.C.A.N. 3182, 3259 (need to deter others is "particularly important in the area of white collar crime"). "Because economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence." *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) (internal quotations and citation omitted).

Specific deterrence is also a factor in this case. The defendant engaged in the Bitcoin Fog money laundering scheme for nearly a decade and was only stopped when he was arrested. He went to extraordinary lengths to cover his tracks and conceal his identity, perjured himself at trial, and to date has taken no responsibility for his actions. The defendant's counsel and defense team, for their part, have also attempted to frame the defendant's crimes in ideological terms, falsely portraying Bitcoin Fog as a misunderstood privacy service while ignoring mountains of evidence

showing it was designed, marketed, and operated to facilitate drug trafficking, crimes against children, and other criminal activity. The Court's sentence should take into account the risk that an unrepentant and ideologically-motivated defendant would attempt to reconstitute his money laundering service at his first opportunity.

### 4. The Need To Avoid Unwarranted Sentence Disparities Among Defendants with Similar Records Who Have Been Found Guilty of Similar Conduct

"The best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Otunyo*, 63 F.4th 948, 960 (D.C. Cir. 2023) (quoting *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009)); *see also Gall v. United States*, 552 U.S. 38, 52 (2007) ("As with the seriousness of the offense conduct, avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges. Since the District Judge correctly calculated and carefully reviewed the Guidelines range, he necessarily gave significant weight and consideration to the need to avoid unwarranted disparities."). A sentence within the Guidelines range is "presumptively reasonable," *United States v. Fry*, 851 F.3d 1329, 1333 (D.C. Cir. 2017), and this Court need not go any further in its analysis to confirm that its sentence will not result in any unwarranted sentencing disparities.

It is significant, however, that the Sentencing Commission statistics prepared for the Draft PSR show that defendants who were sentenced under the money laundering guideline (§ 2S1.1) at the same offense level (43) and criminal history category (I) as the defendant received, on average, sentences well in excess of 20 years in prison—282 months on average, with a median of 280. Draft PSR ¶ 164. In response to a government request, the Sentencing Commission declined to provide any identifying information about the individual cases included in the sample, so it is impossible to determine which comparators genuinely represent defendants "with similar records

who have been found guilty of similar conduct," 18 U.S.C. § 3553(a)(6).[9]  But the statistics generally confirm that the government's recommended sentence here—30 years in prison—is within the range of sentences that courts have imposed in (relatively) similar cases.  And the unique circumstances of this case—including the singular scale and sophistication of the defendant's crimes and the aggravating factor of his perjury at trial—justify a sentence above that bare average.

The government has been unable to locate any truly comparable cases reflecting the same staggering amount of money laundered in this case ($400 million), the harms facilitated by the defendant's laundering (drug trafficking, CSAM distribution, hacking and theft of cryptocurrencies, and other crimes), the prolonged duration of the offenses (nearly 10 years), or the technological sophistication and high degree of obfuscation involved in the defendant's scheme, not to mention the defendant's perjury and refusal to accept responsibility for his actions. Although not a precise comparator, the sentencing of Ross Ulbricht for operating Silk Road provides an instructive example.  Silk Road operated for less than three years, and it processed approximately $183 million in drug transactions and other illicit sales.  Mr. Ulbricht was convicted at trial on multiple counts, including drug trafficking offenses, aggravated identity theft, and money laundering conspiracy.  He was sentenced to the statutory maximum on each count, including two life sentences for the drug offenses and the statutory maximum sentence of 20 years

---

[9] Given the high Guidelines range of the defendants in this sample, it is possible that some of the defendants' sentences were artificially limited by statutory maxima.  It is also possible that some defendants entered into plea agreements while others went to trial.  *See United States v. Webster*, 102 F.4th 471, 490 (D.C. Cir. 2024) ("Defendants who go to trial are not 'similarly situated' to those who plead guilty, and therefore 'the disparity in their treatment' is generally permissible.") (quoting *Otunyo*, 63 F.4th at 960).  Further, the defendant's adjusted offense level in this case was actually 50, less two points under the zero-point offender adjustment, *see* Draft PSR ¶¶ 69, 71, but it was reduced to 43 by operation of Application Note 2 to Chapter Five, Part A of the U.S.S.G. Because of this automatic reduction in offense level, it is possible that the defendant's conduct in this case was more severe than the conduct of the other defendants included in the Sentencing Commission's sample.

for money laundering conspiracy. *See United States v. Ulbricht*, S.D.N.Y. No. 14-cr-68 (KBF), ECF No. 269 (Judgment).

In pronouncing her sentence, Judge Forrest noted the scale of Silk Road as a "worldwide criminal drug enterprise with a massive geographic scope," which "posed serious danger to public health and to our communities." *United States v. Ulbricht*, ECF No. 277 (5/29/14 Sentencing Hr'g Tr.), at 66.  She repeatedly emphasized the calculated and deliberate nature of Mr. Ulbricht's scheme to operate Silk Road. *Id.* at 65-66 ("The nature and circumstances of the crime can be summed up as a planned, comprehensive, and deliberate scheme to do that which was unlawful . . . ."); 69 ("You spent several years very carefully planning the site and designing carefully considered methods of avoiding legal detection both for yourself, for your vendors, and for your customers, and you sought in all of these ways to put yourself above the law."); 75 ("The crimes as to which you stand convicted, Mr. Ulbricht, are crimes which are intentional, they occurred over a lengthy period of time, you knew exactly what you were doing.").  She commented on Mr. Ulbricht's lack of remorse and failure to acknowledge the harm caused by his actions. *Id.* at 88 ("And except for your family and friends and the statement you made today, I don't know that you feel a lot of remorse for the people who were hurt.  I don't know that you believe you hurt a lot of people.  I don't think you know that you hurt many.").  And she underscored the importance of general deterrence in such a novel and high-profile case. *Id.* at 86-87 ("This is a case in which general deterrence plays a particularly important role. . . .  What you did was unprecedented and in breaking that ground as the first person you sit here as the defendant now today having to pay the consequences of that. . . .  For those of you considering stepping into your shoes, carrying some flag, some misguided flag, or doing something similar, they need to understand very clearly and without equivocation that if you break the law this way there will be very, very severe

consequences."). Likewise, the defendant's launched Bitcoin Fog near the beginning of cryptocurrency mixing, and was even the point of comparison for Larry Harmon as he developed his own mixer. Each of these considerations—the scale of the harm caused, the deliberation involved in carrying out the scheme, lack of remorse, and the need to deter others from similar unlawful conduct—applies with equal if not greater force here.

### 5. Other Sentencing Issues: Forfeiture, Restitution, and Fines

The government is not seeking restitution. While Bitcoin Fog caused enormous harm—in particular by facilitating drug transactions and trafficking of CSAM images—it is not the kind of harm that is readily quantifiable through restitution. The government requests that the Court enter the proposed Preliminary Order of Forfeiture, ECF No. 297-1, for the reasons outlined in the government's forfeiture briefing, *see* ECF Nos. 297, 310.

The government further recommends that the Court impose a within-Guidelines fine of at least $100,000. *See* Draft PSR ¶ 157 (calculating fine range for Counts One, Two and Three as $50,000 to $500,000). The burden rests on the defendant to show inability to pay a fine. *See* U.S.S.G. § 5E1.2(a) ("The court shall impose a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine."); *see, e.g.*, *United States v. Rafferty*, 911 F.2d 227, 232 (9th Cir. 1990) (holding that "[t]he guidelines establish that it is the defendant's burden to prove he is unable to pay a fine"); *United States v. Hernandez*, 160 F.3d 661, 665 (11th Cir. 1998) (same); *United States v. Fair*, 979 F.2d 1037, 1041 (5th Cir. 1992) (same). To date, the defendant has offered nothing to carry his burden and establish an inability to pay. *See* Draft PSR ¶¶ 117-121.

Indeed, throughout this litigation, the defendant has consistently misrepresented his access to financial resources—beginning with his initial false claim of indigency, made to secure

appointment of an Assistant Federal Public Defender, even as the defendant was secretly paying at least 1.65 BTC, worth approximately $54,550, to retain Mr. Nemtsev as an undeclared attorney in or about July 2021.  *See* ECF No. 53, at 6.  The pattern continued.  As the government summarized in January of 2023:

> In the defendant's opening motion [for the return of seized property], he flatly declared that he "has *nothing* to pay his legal fees except for the seized assets." ECF No. 48, at 25 (emphasis added).  Now he acknowledges spending *$184,000* in various assets, plus 1.9 bitcoin (BTC) and 33.4 Monero (XMR), to pay for his legal expenses to date.  In the defendant's detention briefing, he ridiculed the government for suggesting he had access to gold. . . .  Now he acknowledges owning at least $36,000 in gold, including gold bullion stored with one of his relatives.  And as this Court has previously noted, the defendant falsely claimed indigency in order to obtain appointed counsel from the Office of the Federal Public Defender, even as he was paying for Mr. Nemtsev's private representation out of his concealed assets.

ECF No. 106, at 13-14.  Since then, the defendant's trial team has continued to solicit donations from the public in the defendant's name, although there is no public accounting of any of the funds raised.  The Draft PSR indicates that the defense intends to provide "financial information that was apparently completed in January 2023."  Draft PSR ¶ 117.  The government has not received that accounting, and if it is the same document as the defendant's so-called Statement of Net Worth prepared by defense counsel in or about December 2022, *see* GX 51, it is not accurate and is not up-to-date.  The defendant has not come remotely close to carrying his burden of showing inability to pay.

## **CONCLUSION**

This is an extraordinary case that calls for significant punishment as supported by the § 3553(a) factors. For the foregoing reasons, the information reflected in the Draft PSR, and the record at trial and in pretrial proceedings, the United States respectfully asks that the Court sentence the defendant to a below-Guidelines period of imprisonment of 30 years on Counts One, Two, Three, and Four; impose a fine of $100,000; and enter the government's proposed Preliminary Order of Forfeiture at sentencing.

Respectfully submitted,
MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar No. 481052

BY:    */s/ Christopher B. Brown*
Christopher B. Brown, D.C. Bar No. 1008763
Special Assistant United States Attorney
U.S. Attorney's Office for the District of Columbia
601 D Street, N.W.
Washington, DC 20530
(202) 353-0018
Christopher.Brown8@usdoj.gov

*/s/ C. Alden Pelker*
*/s/ Jeffrey Pearlman*
C. Alden Pelker, Maryland Bar
Jeff Pearlman, D.C. Bar No. 466901
Trial Attorneys, U.S. Department of Justice
Computer Crime & Intellectual Property Section
1301 New York Ave., N.W., Suite 600
Washington, D.C. 20005
(202) 616-5007 (Pelker)
(202) 579-6543 (Pearlman)
Catherine.Pelker@usdoj.gov
Jeffrey.Pearlman2@usdoj.gov