# Exhibit C

THE HONORABLE RANDOLPH D. MOSS

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>ROMAN STERLINGOV,<br><br>Defendant. | CASE NO. 0090 1:21CR00399-001 (RDM)<br><br>DECLARATION OF<br>JOEL A. SICKLER IN SUPPORT OF<br>DEFENDANT ROMAN STERLINGOV'S<br>SENTENCING MEMORANDUM |

I, Joel A. Sickler, hereby declare under penalty of perjury the following:

**Introduction & Expertise**

1. I have worked in the field of sentencing and prisoner advocacy for over 40 years and currently head the Justice Advocacy Group, LLC, a criminal justice consulting firm based in Alexandria, Virginia. I have worked consistently since 1980 on federal sentencing and federal prison-related matters. I have worked as a correctional counselor in the District of Columbia's Department of Corrections (1978 to 1981) and previously served as the Director of Client Services at the National Center on Institutions & Alternatives in Washington, D.C. (1991 to 2003).

2. I have visited 52 federal prisons and have advised clients with inmate matters in 89 of the Bureau of Prisons' ("BOP") 122 institutions. Prior to the abolishment of parole, I

1

represented hundreds of federal inmates before the U.S. Parole Commission. Based on more than four decades of experience assisting thousands of clients who have been committed to the care and custody of the BOP, I have extensive knowledge of the BOP and its stated mission, services, policies, program statements, regulations, institutions, and standard practices.

3.  I have dealt with inmates and officials who have worked with or been confined in BOP facilities at every level of the federal prison system. I have worked with both staff and inmates at corrections facilities from the most severe (penitentiaries) to the least restrictive (minimum-security camps). I have worked with inmates and staff at detention facilities utilized by the BOP and the U.S. Immigration and Customs Enforcement ("ICE") facilities for deportable aliens who are either detained pre-trial or awaiting deportation back to their home country.

4.  I have reviewed and am thoroughly familiar with the following Program Statement of the BOP: *Inmate Security Designation & Custody Classification* (P.S. 5100.08, September 4, 2019). I have spoken on numerous occasions with personnel at the BOP's Designation and Sentence Computation Center ("DSCC")[1] and regional and central office officials in the correctional programs administration when seeking clarification about a specific policy/program statement.

5.  I have additionally conferred with defense counsel for the Defendant, Roman Sterlingov, in the above captioned matter. I have reviewed relevant case materials regarding the charges, the Presentence Investigation Report ("PSR"), and potential sentencing guidelines.

6.  I have prepared this declaration to provide the Court with information regarding the impact of Mr. Sterlingov's status as a noncitizen should he be sentenced to a term of imprisonment. First, due to Mr. Sterlingov's status as a sentenced alien, BOP will classify and assign him to a Federal Correctional Institution (a low-security, secure prison) and not to a minimum-security camp. Second, he will likely serve a period beyond his actual sentence in ICE custody as he awaits

---

[1] The DSCC is an office within the BOP's Office Complex located in Grand Prairie, Texas. All facility designations (the term used for selecting a location of placement) or assignments and inter-facility transfers are processed and made by the DSCC.

2

1  deportation. And third, he will be denied the opportunity to be pre-released to the community (to
2  a community-based option such as a residential reentry and home confinement, like most U.S.
3  citizen prisoners who pose no public safety risk) toward the end of his sentence.

4  **Ramifications of Mr. Sterlingov's Status as a Noncitizen**

5  7.  As a non-citizen of the United States, if Mr. Sterlingov is sentenced to a term of
6  imprisonment, he will be classified as a "Deportable Alien" which will have significant, and
7  unwarranted, ramifications for his time incarcerated.

8  8.  The BOP defines "Deportable Aliens" as follows: "Deportable Alien. A male or
9  female inmate who is not a citizen of the United States. . . . When applied, the inmate . . . shall be
10 housed in at least a Low security level institution."[2]

11 9.  Ordinarily, after the imposition of a sentence of imprisonment, a U.S. citizen
12 defendant with Mr. Sterlingov's (non-violent) offense, who has no history of violence, no prior
13 criminal record, and no outstanding detainers would be eligible to be designated by the BOP to a
14 minimum-security prison camp.

15 10. However, BOP designators also use Management Variables ("MGTV") and Public
16 Safety Factors ("PSF") to account for security considerations not included in their numeric security
17 point system. In Mr. Sterlingov's case, although he will have a total of only five (5) security level
18 points,[3] a PSF of "Deportable Alien" will be assigned to his security classification which will
19 necessarily result in a prison assignment above the "minimum" (or camp) range.

20 11. The application of the PSF of Deportable Alien is not discretionary – it will be

---

[2] *Inmate Security Designation & Custody Classification* (P.S. 5100.08, September 4, 2019), Ch. 5, p. 9 (CODE H).

[3] Mr. Sterlingov's BOP security level scoring utilizing the BP-A337.051 (Inmate Load and Security Designation Form) is estimated to be as follows: he will not be allowed to surrender voluntarily (0 pts.); his offense (property offense > $250,000) severity will be rated "Moderate" (3 pts.); he has no prior criminal history (0 pts.); no history of prior violence (0 pts.); no history of escape (0 pts.); no outstanding detainers (0 pts.); he will be 36-years old at sentencing (2 pts.); he has graduated high school (0 pts.); and he has no history of substance abuse within the last five years (0 pts.). Therefore, his total security designation points are *five* (5) yielding a security level of "**Minimum**." Per BOP P.S. 5100.08 (September 4, 2019) at Table 5-2, Security Point Totals of 0-11 equate to an Inmate Security Level of Minimum.

1  applied in Mr. Sterlingov's case. Mr. Sterlingov will be designated as a low-security inmate, rather than as a minimum-security one. Low-security prisons generally have security protocols and living conditions far different than what exists at the minimum-security, camp level.

12. There are four main differences between a minimum-security camp versus a low-security prison.

13. The first difference is the perimeter security and other forms of heightened security. Federal Prison Camps ("FPCs") are fenceless compounds that have the appearance and feel of an austere college campus. Camps do not have "controlled movements." A Federal Correctional Institution ("FCI"), on the other hand, is surrounded by barriers to prevent escape: walls, fencing with concertina wire, secured and defensible main gates, security lighting, motion sensors, and roving patrols. Remotely controlled doors, CCTV monitoring, alarms, and physical segregation of units are used within the facility. Inmate movement throughout the facility is highly controlled, with access from one location to another allowed only for ten minutes at the top of each hour. Mass body checks where groups of inmates are strip searched so officers can inspect their bodies for bruises or lacerations indicating violence, or fresh tattoos indicating gang involvement, are sometimes conducted for cause. Such assembly searches are not ordinarily done at the camp level. Housing units are searched far more frequently than at the camp level.

14. The second difference is the institution's size, mindset and crowding: FCIs are five to ten times larger than camps. As a rule, the bigger the institution, the more stressful it is on the general population in the prison. Large FCIs have cramped housing quarters where 90-100 inmates sleep in small cubicles with four or more bunk beds and compete for use of the dozen or so showers, sinks, and toilets. Most BOP facilities house more inmates than they are designed for; however, the camps are less crowded than the low-security FCIs.

15. For instance, the closest low-security FCI to New York City which is recommended for deportable aliens is FCI Allenwood (current population of 1,030 is 3.8 percent above the rated capacity of 992). FCI Danbury in nearby Connecticut has a current population of 1,067 which is

4

92.6 percent above the rated capacity of 554. In contrast, the three camps located in the Northeast Region close to New York City (Otisville, NY; Fairton, NJ; and Canaan, PA) currently house anywhere from 58 to 99 inmates – all three camps are operating under capacity..

16.     Overcrowding in FCIs results in cubicles that are quadruple bunked, and in some facilities, inmates are placed on mattresses on the floor in "overflow units." Sleep disturbances (resulting from sleeping on thin mattresses, snoring, constant light, and movement) are common. Noise is incessant in a secure correctional facility, and in some (those that have cubicles, for example), there is little to absorb or otherwise block nighttime noise. Inmates may be awakened repeatedly for late night head counts.

17.     Other problems exist in the more crowded FCIs. For instance, there are longer lines to use the telephone, to see a member of your unit team, for medications and checkups, or to use the library. During mealtime, the busy, noisy cafeteria serves institutional food, pre-packaged, pre-made, sometimes days before it is served. Inmates eat in shifts (each housing unit is called in an ever-changing rotation), and if your unit is called last, most of the edible food is gone. Naturally there are also long lines to use toilets, sinks, and showers.

18.     The third difference between an FPC and an FCI is the type of inmate. The camps house offenders convicted who are serving short sentences (less than 10 years) and have often cooperated with the government. These inmates generally are first-time offenders who have committed nonviolent crimes, have minor to no criminal history, and pose no public safety or flight risk. Camps also house low-level drug offenders. They tend to generally behave well out of fear they will end up in a higher security institution (infractions can penalize a camp inmate with a transfer to a low-security facility, although, Mr. Sterlingov will automatically end up in a facility above his security risk). Otherwise, camps house white-collar, property offenders. Inmates at low-security facilities (which also house drug offenders, but those of the more serious kind) are serving sentences greater than 10 years, likely have a prior record involving a gun or violent offenses, may be gang-affiliated, or are otherwise security or flight risks. FCIs also house all

5

deportable aliens, members of organized crime, drug cartel leaders, and all serious sexual offenders. Statistically, there is a 143 percent greater chance of being assaulted at an FCI as opposed to a camp.[4] Furthermore, the rate of "serious assault" is 553 percent higher in low-security institutions than minimum-security camps.[5] Safety may be of particular concern to Mr. Sterlingov, who is only 5'7" and a slight 130 pounds.[6]

19. The last difference is about visitation. At a camp, an inmate's family can drive up to the compound, park in a lot next to the visiting hall, walk in unescorted, show ID and then their incarcerated loved one appears. At an FCI, visitors must proceed to a guarded gate to access the facilities parking area. They are observed by officers on patrol in the parking lot. Once inside the prison, they pass through metal detectors, are subjected to random pat down searches (with vehicles on the property also subject to inspection), their hands are tested for drug use, they are escorted through several checkpoints, and they wait interminably for their friend or family member to be brought to the visiting room (a crowded indoor environment). Meanwhile, the average camp has an outdoor picnic area for visitation during warm months, which means a great deal to the family of someone inside.

20. The unfortunate result in Mr. Sterlingov's case is that rather than be designated to a minimum-security camp, he will instead, based solely on his citizenship status, now be housed in a significantly harsher institution, likely next door or in a bed adjacent to someone with a much more serious criminal background. Prison is hard enough for even the toughest of souls. Mr. Sterlingov is 36 years old, short and slight in stature, and has no prior criminal history or

---

[4] This percentage is based on the average rate per month (per 5,000 inmates) of "inmate on inmate" assault (serious and less serious) from 2008-2017. *See* Federal Bureau of Prisons, Office of Research and Evaluation (data files on assault from 2008-2017) (on file with the affiant).

[5] *Id.* Serious assault is defined in the *Inmate Discipline Program* (P.S. 5270.09, August 1, 2011), page 44, Table 1 (CODE 101 – "Assaulting any person, or an armed assault on the institution's secure perimeter (a charge for assaulting any person at this level is to be used only when serious physical injury has been attempted or accomplished).").

[6] Presentence Investigation Report prepared by U.S. Probation Officer Hana Field on July 17, 2024 in the U.S. District Court for the District of Columbia, ¶94 (ECF 311).

experience with criminal activity. And he will be imprisoned in a crowded, noisy prison, which employs security measures far beyond what is required for his care and custody.

**Mr. Sterlingov's Ineligibility for Pre-Release and Re-Entry Transitioning**

21. Mr. Sterlingov's access to pre-release re-entry transitioning and a productively structured return to his community will also be compromised because of his immigration status as a non-U.S. citizen. Normally, an inmate would be accorded a portion of their sentence for community re-entry through one of the BOP's Residential Re-Entry Centers ("RRC"). But for Mr. Sterlingov's citizenship status, toward the end of his sentence he would be pre-released to an RRC for a period determined as required by his transitional needs—likely between six and twelve months before his release date.[7] Further, most minimum- and low-security inmates are also pre-released (in addition to their RRC or halfway house time) to home confinement for the last 10 percent of their sentence, up to a maximum of six months.[8] Instead of any normal transitional benefits afforded other inmates via pre-release, Mr. Sterlingov would be held beyond the length of his sentence when he would be transferred to the custody of ICE officials upon formal BOP release. In effect, this could add *over a year* to his sentence.

22. During any sentence of incarceration, Mr. Sterlingov – provided a Final Order of Removal (deportation) is not filed against him, will be able to participate in the rehabilitative programming and related incentives afforded to inmates via the First Step Act ("FSA"). This will slowly allow him to reduced his sentence by ten days a month for the first six months and 15 days a month thereafter until he reaches the maximum number of days available via the FSA of 365 days. Upon reaching that threshold most inmates continue to earn FSA credits toward their period of reentry in the community. However, these incentives which as said include the ability to earn "time credits" towards early pre-release to an RRC or home confinement – neither of which are available to non-U.S. citizens. While Mr. Sterlingov can conceivably "earn" these FSA time

---

[7] 18 U.S.C. § 3624.

[8] *Id.*

7

credits until such time as a Judicial or Final Removal Order is in place, they will not avail him of any pre-release relief.[9]

**Mr. Sterlingov Will Face an Extended Sentence During ICE Detention and Removal Proceedings**

23.     Mr. Sterlingov's post-incarceration release will be further complicated by the difficulty of an ICE detainer that will be placed on him (upon incarceration) to eventually accommodate the process of deporting a foreign national at the completion of their sentence.  ICE's Criminal Alien Program ("CAP") is responsible for identifying, processing, and removing criminal aliens incarcerated in federal, state, and local prisons and jails.  The enforcement of removal is overseen by ICE's Office of Detention and Removal Operations ("DRO"). When a prisoner's sentence is complete, they are placed in ICE custody and their status is changed from "prisoner" to "detainee."

24.     Armed ICE agents would transport Mr. Sterlingov (probably by bus) to a detention center once he is formally released from BOP custody to await the process of being physically removed from the U.S.  Unfortunately, this involves further incarceration at what are typically county jails (contracted by ICE) to wait on processing to finally be sent home. Moreover, Mr. Sterlingov's status as a deportable alien means that his confinement will likely extend long beyond whatever sentence the Court imposes for two separate, but related reasons.

25.     *First*, as noted, at the conclusion of his sentence, he will be turned over to U.S. Immigration and Customs Enforcement ("ICE") custody to face deportation proceedings.  The deportation process can take months or longer.  On top of the time spent being transferred to ICE custody, the Office of Inspector General ("OIG") recently found that "only 29 percent" of inmates who received a final order of removal after entering ICE detention were removed within a month, and that, on average, they spent an additional *three months* in ICE detention at the conclusion of

---

[9] If a final order of deportation is issued, then Mr. Sterlingov cannot earn any FSA credit, including the one year reduction.

8

their sentence.[10]

26.     *Second*, while Mr. Sterlingov could seek to have his removal order issued before the conclusion of his sentence, which might allow him to be deported more promptly following the end of his sentence, doing so would render him ineligible for First Step Act credits discussed above. 18 U.S.C. § 3632(d)(4)(E) (deportable noncitizens may receive First Step Act credits only if they have not received a final order of removal).

27.     ICE detention centers, which are privately owned, house deportable aliens and offer few rehabilitative and release preparedness program. These detention facilities hold detainees of all security levels and offense types. Privately-run and operated prisons have consistently been under investigation over previous decades for poor management, lack of programming, lower-level of medical care and heightened rates of assaults. These deficiencies in privately-run correctional facilities caused President Biden to order the closing of all privately-owned BOP facilities in January 2021.[11] Unfortunately, this order did not affect ICE's use of them.

28.     In fact, as noted by the ACLU, "In the last two years, however, this number has markedly increased: as of July 2023, 90.8 percent of people detained in ICE custody each day are held in detention facilities owned or operated by private prison corporations . . . Contracts with ICE continue to make up a significant amount of revenue for private prison corporations like the GEO Group . . . In 2022, GEO Group made $1.05 billion in revenue from ICE contracts alone, 43.9 percent of its total revenue ($2.4 billion) . . .Despite calls from advocates to decrease funding for ICE detention, Congress appropriated $2.9 billion to hold 34,000 people in ICE detention each day for FY 2023."[12]

---

[10] *Review of the Institutional Hearing and Removal Program Expansion for Federal Inmates* at 20-21, DOJ, OIG (Sept. 2021), https://oig.justice.gov/sites/default/files/reports/21-123.pdf.

[11] Executive Order 14006, officially titled "Reforming Our Incarceration System to Eliminate the Use of Privately Operated Criminal Detention Facilities," is an executive order signed by U.S. President Joe Biden on January 26, 2021.

[12] https://www.aclu.org/news/immigrants-rights/unchecked-growth-private-prison-corporations-and-immigration-detention-three-years-into-the-biden-administration

29. As previously noted, the two closest low-security facilities to New York City for ease of deportation are FCI Allenwood, Pennsylvania and FCI Danbury in Connecticut, though in my experience it is most likely that Mr. Sterlingov will be assigned to FCI Allenwood. Regardless of the location, following the completion of his sentence, Mr. Sterlingov will be picked up by armed ICE agents and transported to a local detention center. The trip will be long and arduous, as Mr. Sterlingov will be placed in handcuffs, shackles and leg irons throughout the transfer process.

30. BOP inmates being deported from FCI Allenwood - Pennsylvania and its regional jurisdiction is primarily managed by the Philadelphia ICE ERO field office[13] as supervised by the Philadelphia ICE OCC.[14] Inmates are taken from Allenwood most often to the Clinton County Correctional Facility in McElhattan PA[15] which is about 35 miles or a 45-minute drive in ICE custody.

31. The Clinton County Correctional Facility is an arduous/difficult environment. In reviewing the last several years at this regional jail there are a litany of issues to be concerned with (and evident in public record). The 2017 death of inmate held on a parole violation brought 2019 lawsuits over tremendous medical negligence involved (an avoidable death). Treatable kidney infection was ignored, worsened and caused a death; detainee was restrained in a chair and placed in solitary confinement rather than medical staff intervening to save his life.[16] In June 2022 the lawsuit was settled with Clinton County settling monetary claims filed for having ignored the obvious distress regarding this individual.[17]

---

  https://www.aclumaine.org/en/news/unchecked-growth-private-prison-corporations-and-immigration-detention-three-years-biden

[13] https://www.ice.gov/field-office/philadelphia-field-office

[14] https://www.ice.gov/field-office/office-principal-legal-advisor-philadelphia

[15] https://www.ice.gov/detain/detention-facilities/clinton-county-correctional-facility
  https://www.clintoncountypa.gov/departments/correctional-facility

[16] https://www.lockhaven.com/news/local-news/2019/11/lawsuit-filed-against-clinton-county-in-inmates-death/
  https://www.witf.org/2019/11/12/lawsuit-clinton-county-jail-staff-ignored-ridiculed-sick-inmate-before-death/

[17] https://www.pennlive.com/news/2022/06/pa-county-offers-to-settle-its-part-of-inmates-wrongful-death-suit.html

1    32.     In June 2020, 36 separate lawsuits seeking DHS inspection of the Clinton jail
2  facility were filed. They cited dozens of violations injuring inmates in ICE detention,
3  unclean/unsanitary conditions, vulnerability to infections, unclean water, pests/bugs in the walls -
4  further noting the Clinton facility as simply not equipped to (or properly adhering to) their
5  contractual obligations w/ICE.[18]

6    33.     The death of an inmate by suicide in October 2021 despite major warning flags led
7  to the family filing a wrongful death lawsuit accusing the staff of reckless indifference. The
8  subsequent federal lawsuit was filed in February 2023.[19] The November 2021 death of a female
9  inmate again raised questions at the Clinton County Correctional Facility, a medical emergency
10 negligently managed, answers regarding the causes remaining unanswered, the last record noting
11 a coroner's inconclusive status and further tests to be done, and categorized as pending.[20] And
12 continuing to February 2024 when a Clinton County Corrections Officer was arrested by PA State
13 Troopers and charged with three counts of sexual assault perpetrated upon an inmate.[21]

14   34.     While the Clinton County facility is the main conduit for Allenwood/ICE
15 deportations, the Moshannon Valley Processing Center (MVPC) in Philipsburg, PA also remains
16 a possibility dependent on ICE bed space and resources at the time of BOP release.[22] MVPC is 90

---

[18] https://www.pennlive.com/news/2020/06/36-ice-detainees-at-clinton-county-prison-sue-allege-constitutional-rights-violations.html

https://www.lockhaven.com/news/urgent-information/2020/06/36-ice-detainees-at-clinton-county-prison-sue-allege-constitutional-rights-violations/

[19] https://www.pennlive.com/news/2023/01/staffs-reckless-indifference-led-to-jailed-pa-mans-suicide-federal-suit-claims.html

[20] https://fox56.com/news/local/inmate-dies-following-medical-emergency-at-clinton-county-correctional-facility

https://therecord-online.com/site/archives/75616

[21] https://www.pahomepage.com/news/prison-guard-accused-of-sexually-assaulting-inmate-2/

https://www.lockhaven.com/news/local-news/2024/02/co-arrested-for-sexual-assault-in-county-prison/

https://www.northcentralpa.com/news/prison-guard-arrested-for-alleged-sexual-assault-on-inmate/article_e9e07864-e0a0-11ee-ac23-6feb9148bd8b.html

[22] https://www.ice.gov/detain/detention-facilities/moshannon-valley-processing-center

https://www.geogroup.com/FacilityDetail/FacilityID/67

11

miles and an hour and a half drive from FCI Allenwood. MVPC is a contract facility owned and operated by the GEO Group, Inc. The facility first opened in 2006 as the Moshannon Valley Correctional Center and housed federal criminal inmates for the DOJ's Bureau of Prisons. In March 2021 the BOP waived renewal of its contract with the facility and in September 2021 GEO entered into Intergovernmental Service Agreement with ICE converting the facility to immigration detention and contracting to house ICE detainees.[23] MVPC has the capacity for 1,875 detainees and provides detention for up to 800 ICE detainees (male and female).

35. As far back as late 2017 a Philadelphia Inquirer 'Private Prisons' review insightfully noted: "GEO and other leading for-profit prison corporations have been plagued by health and safety issues for years, with prisoner and staff complaints and wrongful-death lawsuits piling up like mounds of unopened jail mail."[24]

36. In February 2022, the Office of Immigration Ombudsman (OIDO) conducted an inspection of Moshannon Valley Processing Center (MVPC).[25] Violations and immediate areas of concern were medical staffing levels, timely referrals w/mental healthcare, and emergency preparedness. MVPC did not maintain adequate medical staffing levels or mental health referrals per basic protocol required.

37. In November 2022 report for DHS 'spot check (August 2022) at MVPC.[26] A number of reported use of force incidents and sexual assault allegations and corrective action regarding female detainees. "Moshannon does not have sufficient staff to provide proper

---

[23] https://wjactv.com/news/local/bureau-of-prisons-not-renewing-moshannon-valley-correctional-facility-contract-officials

https://www.youtube.com/watch?v=wiS52yV0b_Y

[24] https://www.inquirer.com/philly/news/crime/private-prisons-assaults-jeff-sessions-sally-yates-geo-20170817.html
https://www.prisonlegalnews.org/news/2017/aug/21/dead-bodies-and-billions-tax-dollars/

[25] https://www.dhs.gov/sites/default/files/2022-10/OIDO%20Final%20Inspection%20Report%20-%20Moshannon%20Valley%20Processing%20Center_2.pdf

[26] https://www.dhs.gov/sites/default/files/2024-03/22_1108_crcl-rec-memo-to-ice-moshannon-valley-processing-center-redacted-foia-508.pdf

https://www.dhs.gov/publication/recommendation-memo-ice-concerning-moshannon-valley-processing-center

supervision of detainees" - "Moshannon staff did not have the requisite training to ensure disturbances receive a rapid and effective response." Operational deficiencies in Moshannon's use of force practices [and] unsafe takedown techniques and prone restraint techniques. At least 16 PREA (Prison Rape Elimination Act) allegations have been filed since Moshannon began holding ICE detainees in November 2021.

38.     November 2023 saw a prisoner escape from MVPC (endangering other inmates as well as the community) until apprehended two miles from the facility 90 minutes later.[27] December 2023 saw Frankline Okpu, 37 years of age, a Cameroonian man, die in ICE custody at MVPC in Philipsburg PA (12/6/23) - according to toxicology reports he died from MDMA (ecstasy) toxicity, along with other conditions including atherosclerotic coronary artery disease, mild cardiomegaly, and diminutive right coronary artery. However neither ICE nor any of its oversight agencies has publicly released information revealing the cause and manner (or detail) of Okpu's death.[28]

39.     Another disturbing result of the formal ICE deportation process is the length of time one can be held after their sentence has been satisfied.  It can take up to six months for arrangements (internally within the U.S. and with officials of one's home country) to finalize the details necessary to complete this process.  All the while an individual who should have been released from custody continues to languish in a strange and dangerous place while bureaucratic paperwork is half-heartedly shuffled between U.S. government agencies.  Then there is the paperwork processed by the home country in coordination with the U.S.  All of this is very time-consuming and illustrates how an incarceratory sentence would impose a more substantial hardship on Mr. Sterlingov than it would upon a similarly situated U.S. individual.

---

[27] https://gantnews.com/2023/11/17/moshannon-valley-processing-center-detainee-apprehended-within-90-minutes-of-escape/

[28] https://www.ice.gov/news/releases/cameroonian-national-ice-custody-dies
https://www.aila.org/aila-files/1216283A-9412-45B2-AA55-EFAEF74F39E4/ddrFranklineOkpu.pdf
https://wjactv.com/news/local/troopers-investigation-ice-processing-immigration-moshannon-valley-pennsylvania-death-victim-police

**Summary**

40.     In summary, if Mr. Sterlingov is sentenced to a term of incarceration, he would be assigned to a prison facility beyond his security needs solely because of his immigration status. He will be placed at unnecessary risk. At a low-security assigned facility, he will be subjected to a more hostile environment and more unsanitary conditions than he would be subjected to in a minimum-security facility. The daily personal stress of incarceration in a higher than necessary security level will be palpable for Mr. Sterlingov, who is has never spent any time in prison. Because he is ineligible for full FSA credits, he will serve a significantly higher percentage of his sentence than a US citizen. Finally, he will also serve a period significantly beyond his actual sentence in ICE custody as he awaits deportation—and he will be denied an otherwise standard transfer to a community re-entry opportunity at the end of his sentence.

I declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct.

Executed this 12th of August 2024 at Alexandria, Virginia.

/s/ *Joel A. Sickler*

Joel A. Sickler, Founder
Justice Advocacy Group, LLC